their historical, near direct cost levels. For digoxin tablets, from 2012 through 2016 there were at least 4, and at times as many as 7, significant makers of the product in the market. For doxycycline hyclate tablets, in the same years there were at least 6, and at times as many as 7, significant makers of the product in the market. For generic doxycycline delayed release products, while Mylan was the first generic to enter, by 2013 at least three others had eventually joined it. With numbers of generic competitors such as this, historical fact and accepted economics teaches that – absent collusion – prices would remain at competitive levels.

205.  **Barriers to Entry.** Each of the markets presents significant barriers to entry. Significant investments of time and money are required to develop, test and manufacture these products. The time and money required preparing applications for, and gaining, FDA approval is significant; approval times in and of themselves impede the ability of any non-participant to the market to challenge short run increases in price. Barriers to entry increase the market's susceptibility to a coordinated effort among the dominant entities in the generic pharmaceutical industry to maintain supracompetitive prices.

206.  **Demand Inelasticity.** Generic digoxin and generic doxycycline are necessary treatment for millions of patients. Both generic digoxin and generic doxycycline are on the WHO's list of essential medicines.

207.  **Lack of Substitutes.** Some patients are unable to substitute other medications for generic digoxin and generic doxycycline. Generic digoxin is the only effective treatment for some heart patients, and generic doxycycline is widely prescribed for a variety of bacterial infections.

208.  **High Degree of Interchangeability.** Defendants' generic digoxin and generic doxycycline products are each interchangeable with their equivalent generic competitors as they

contain the same chemical compounds made from the same raw materials. Thus, generic digoxin and generic doxycycline are standardized across suppliers and are highly interchangeable from one defendant to the next. Lannett's Mr. Bedrosian has acknowledged the commodity nature of Lannett's generic business.[86]

209. **Absence of Departures from the Markets.** While there had been some departures from the markets years earlier, there were no departures from any of the markets that could explain the price increases. For digoxin tablets, from 2012 through 2013 there were no departures from the market; even the temporary hiatus of manufacture by West-Ward did not halt sales from inventory (and even its share accounted for single digit percentage of the market). For doxycycline hyclate tablets, from 2012 through 2013 only two makers arguably left the market, and their combined sales accounted for less than 2% of the market. For generic doxycycline delayed release products, no company departed the market – indeed as the defendants entered the market, the prices remained high. In short, departures from the market cannot explain the defendants' supra-competitive prices.

210. **Absence of Competitive Sellers.** The defendants have increased prices despite the entry of new suppliers to the market. Further, defendants have maintained supracompetitive pricing for generic digoxin and generic doxycycline throughout the Class Period. Thus, defendants have oligopolistic market power in the generic digoxin and generic doxycycline markets, which enables defendants to increase prices without losing market share.

211. **Size of the Price Increases.** The magnitude of the price increases involved in this case further differentiates them from parallel price increases. Oligopolists seeking to test market increases need to take measured approaches. But here the increases are not 5% or even

---

[86] *See, e.g.*, Lannett Q1 2014 Earnings Call Transcript (Nov. 7, 2013).

10% jumps – the increases are, in just one act, often double, triple or more the current price of the product. A rational oligopolist, when unaided with the certainty that its ostensible competitors would follow, would not do so.

212. **Reimbursement of Generic Drugs.** These markets, as with many generic drug markets, have institutional features that would inhibit non-collusive parallel price increases. The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions. As a result, the usual inhibitions of an oligopolist to unilaterally raise price are embedded in the generic reimbursement system. In the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales. However, when one observes significant generic price increases – particularly those of the kind alleged here – basic market economics dictates that the generic drug makers likely had an expectation that they would not lose volume (based on their expectations of what their ostensible competitors would do) – because they colluded.

213. **Opportunities for Contact and Communication among Competitors.** Certain defendants are members of trade association GPhA which provides and promotes opportunities to communicate. Lannett's CEO made statements that Lannett and its competitors would not compete on price. The issuance of grand jury subpoenas to defendants and the guilty pleas of two former executives of Heritage also supports the potential for communication among defendants on the pricing of generic digoxin and generic doxycycline.

214. In addition to these defendants' dominant market power has allowed them to substantially foreclose the market to rival competition, thereby impairing competition, maintaining and enhancing market power, and enabling defendants to charge plaintiffs and the class members inflated prices above competitive levels for generic digoxin and generic doxycycline.

## VIII. PLAINTIFFS' DISCOVERY OF DEFENDANTS' WRONGDOING

### A. Plaintiffs did not and could not have discovered their claims when they arose

215. Plaintiffs had no knowledge of the defendants' conspiracy, or of facts sufficient to place them on inquiry notice of their claims, until the reports of the DOJ and State Attorneys General investigations into anticompetitive conduct concerning generic drug pricing were first publicly disseminated. Even then, these reports lacked detail and were not widely disseminated.

216. Plaintiffs are purchasers of generic digoxin and generic doxycycline manufactured by defendants. Plaintiffs had no means to discover the conspiracy before reports of the investigations into anticompetitive conduct concerning generic drugs were first publicly disseminated.

217. No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

218. Defendants publicly stated to the market throughout the Class Period that they maintained antitrust/fair competition policies prohibiting anticompetitive conduct. For example:

- Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."

- Impax's Code of Business Conduct and Ethics provides: "Impax is committed to free and open competition in the marketplace, and requires

- 66 -

  employees to strictly adhere to the antitrust laws in the countries where we do business." It continues: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."

- Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."

- Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."

- Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."

- Par Pharmaceuticals Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."

- Sun's Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."

- Hikma's (parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."

219. It was reasonable for members of the class to believe that the defendants adhered to these policies.

## B. Defendants' Conspiracy was Fraudulently Concealed

220. Plaintiffs had no knowledge of defendants' conspiracy or of facts sufficient to place them on inquiry notice of their claims, until news sources first reported them. Prior to that

time, no information in the public domain or available to plaintiffs suggested that any defendant was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

221.   Defendants concealed, suppressed, and omitted to disclose material facts to plaintiffs and members of the class concerning defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. The concealed, suppressed, and omitted facts would have been important to plaintiffs and members of the class as they related to the cost of generic digoxin and generic doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions for digoxin and generic doxycycline by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic digoxin and generic doxycycline were deceptive as they had the tendency or capacity to mislead plaintiffs and members of the class to believe that they were purchasing generic digoxin and generic doxycycline at prices established by a free and fair market.

    1.    **Active Concealment of the Conspiracy**

222.   Defendants engaged in an illegal scheme to fix prices. Criminal penalties for engaging in such conduct are severe. Accordingly, defendants took measures to conceal their conspiratorial conduct. Plaintiffs did not know of, nor could they have known of, the involvement of any of the Defendants in the alleged conspiracy until the revelations made in SEC filings or press releases (by Actavis, Lannett, Impax, Par, Mylan, Mayne, Sun and West-Ward) or until the public filing of the Informations and AG Complaint (for Heritage). Prior to that, none of these defendants made any public statement about being investigated for antitrust violations and, as the AG Complaint indicates, the conspiracy was conducted in secret through e-mails, telephone calls and the like.

223. For example, the AG Complaint alleges that "[g]oing back to at least 2012, for example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing." This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

224. Defendants concealed their misconduct and falsely attributed price hikes to normal market forces. But these explanations did not provide the whole story and helped conceal the illegal conspiracy entered into by the defendants to fix, stabilize, maintain and raise the price of electrolytic and film capacitors to inflated, supra-competitive levels. There were no competitive justifications for the abrupt and dramatic increase in prices.

2. **Plaintiffs Exercised Reasonable Diligence**

225. Defendants' anticompetitive conspiracy was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, plaintiffs reasonably considered the markets for digoxin and doxycycline to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' prices before these disclosures.

226. Through their misleading, deceptive, false, and fraudulent statements, defendants effectively concealed their conspiracy to fix prices, thereby causing economic harm to plaintiffs and the class. The misrepresentations made by defendants regarding price changes were intended to cause plaintiffs and the class into accepting the price hikes as a result of normal competitive and economic market trends rather than the consequences of defendants' collusive acts. The public statements made by defendants were designed to mislead plaintiffs and the class into paying unjustifiably higher prices for digoxin and doxycycline.

227. Plaintiffs exercised reasonable diligence. Plaintiffs and the class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to conceal their illicit conduct.

228. Therefore, the running of any statute of limitations has been tolled for any claims alleged by plaintiffs and the class as a result of defendants' anticompetitive and unlawful conduct. Before that time, plaintiffs and members of the class were unaware of defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for digoxin and doxycycline throughout the United States during the Class Period.

## IX. CLASS ACTION ALLEGATIONS

229. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), plaintiffs brings this action on behalf of a class defined as follows:

> All persons or entities that directly purchased generic digoxin and/or generic doxycycline from defendants in the United States and its territories and possessions at any time during the period October 1, 2012 until the anticompetitive effects of defendants' conduct cease (the "Class Period").
>
> Excluded from the direct purchaser class are defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

230. Members of the class are so numerous that joinder is impracticable. Plaintiffs believe that there are hundreds of class members, geographically dispersed throughout the U.S., such that joinder of all class members is impracticable. Further, the class is readily identifiable from information and records maintained by defendants.

231. Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs' interests are not antagonistic to the claims of the other class members, and there are no material conflicts with any other member of the class that would make class certification inappropriate.

Plaintiffs and all members of the class were damaged by the same wrongful conduct of defendants.

232. Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of the plaintiffs are coincident with, and not antagonistic to, those of the class.

233. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

234. Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because defendants have acted on grounds generally applicable to the entire class, thereby determining damages with respect to the class as a whole is appropriate. Such generally applicable conduct is inherent in defendants' wrongful conduct.

235. The common legal and factual questions, which do not vary from class member to class member and which may be determined without reference to individual circumstances of any class member, include, but are not limited to, the following:

    (a)    Whether defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase the prices of generic digoxin and generic doxycycline in the U.S.;

    (b)    The duration and extent of the alleged contract, combination, or conspiracy;

    (c)    Whether defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

    (d)    The effect of the contract, combination, or conspiracy on the prices of generic digoxin and generic doxycycline in the U.S. during the Class Period;

    (e)    Whether defendants' conduct caused supracompetitive prices for generic digoxin and generic doxycycline;

    (f)    Whether, and to what extent, the conduct of defendants and their co-conspirators caused injury to plaintiffs and other members of the class; and

    (g)    Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

236. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

237. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## X. ANTITRUST INJURY

238. During the Class Period, plaintiffs and class members directly purchased generic digoxin and generic doxycycline from defendants. As a result of the defendants' anticompetitive conduct, plaintiffs and class members paid more for generic digoxin and generic doxycycline than they would have and thus suffered substantial damages. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

239. Because defendants' unlawful conduct has successfully eliminated competition in the market, and plaintiffs and class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

240. Defendants' misconduct reduced competition in the generic digoxin and generic doxycycline market, reduced choice for purchasers, and caused injury to purchasers.

241. Defendants' anticompetitive conduct is ongoing, and as a result plaintiffs and the class continue to pay supracompetitive prices for generic digoxin and generic doxycycline.

## XI. CLAIM FOR RELIEF - VIOLATION OF SECTION 1 OF THE SHERMAN ACT

242. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

243. Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

244. There is no legitimate, non-pretextual, procompetitive business justification for defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

245. As set forth above, in violation of Section 1 of the Sherman Antitrust Act, defendants entered into agreements with one another on the pricing and/or allocation of markets for generic digoxin and generic doxycycline in the U.S. This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

246. Each defendant has committed at least one overt act to further the conspiracy alleged in this complaint.

247. The conspiracy had its intended effect, as defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of generic digoxin and generic doxycycline, as described herein.

248. As a result of defendants' unlawful conduct, plaintiffs and class members have been injured in their business and property in that they have paid more for generic digoxin and

generic doxycycline than they otherwise would have paid in the absence of defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and class members pray for relief as set forth below:

A. Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of plaintiffs as class representatives and their counsel of record as class counsel;

B. That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C. A judgment against defendants, jointly and severally, for the damages sustained by plaintiffs and the class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D. By awarding plaintiffs and lass members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

E. The costs of this suit, including reasonable attorney fees; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

DATED: January 27, 2017

Respectfully submitted,

*[signature]*

Dianne M. Nast
Erin C. Burns
NastLaw LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300
215-923-9302 (facsimile)
dnast@nastlaw.com
eburns@nastlaw.com

*Lead Counsel for*
*Direct Purchaser Plaintiffs*

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
Nussbaum Law Group
1211 Avenue of the Americas, 40th Fl.
New York, New York 10036
917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
bdemuth@nussbaumpc.com

Michael L. Roberts
Debra G. Josephson
Stephanie E. Smith
Roberts Law Firm, P.A.
20 Rahling Circle
Mailing Address: P.O. Box 241790
Little Rock, Arkansas 72223
501-821-5575
501-821-4474 (facsimile)
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us
stephaniesmith@robertslawfirm.us

Thomas M. Sobol
David Nalven
Lauren G. Barnes
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway
Suite 301
Cambridge, Massachusetts 02142
617-482-3700
617-482-3003 (facsimile)
tom@hbsslaw.com
davidn@hbsslaw.com
lauren@hbsslaw.com

David F. Sorensen
Zachary D. Caplan
Berger & Montague P.C.
1622 Locust Street
Philadelphia, PA 19103
215-875-3000
215-875-4604 (facsimile)
dsorensen@bm.net
zcaplan@bm.net

*Direct Purchaser Plaintiffs' Steering Committee Members*

Daniel E. Gustafson
Daniel C. Hedlund
Joseph C. Bourne
Gustafson Gluek PLLC
Canadian Pacific Plaza
120 South 6th Street
Suite 2600
Minneapolis, Minnesota 55402
612-333-8844
612-339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jbourne@gustafsongluek.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
Saltz Mongeluzzi Barrett & Bendesky P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
215-496-8282
215-496-0999 (facsimile)
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Barry S. Taus
Kevin Landau
Archana Tamoshunas
Taus, Cebulash & Landau, LLP
80 Maiden Lane
Suite 1204
New York, New York 10038
212-931-0704
btaus@tcllaw.com
klandau@tcllaw.com
atamoshunas@tcllaw.com

Charles S. Zimmerman
David M. Cialkowski
Wm Dane DeKrey
Zimmerman Reed, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
612-341-0400
612-341-0844 (facsimile)
charles.zimmerman@zimmreed.com
david.cialkowski@zimmreed.com
dane.dekrey@zimmreed.com

Peter Kohn
Joseph T. Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue
Suite 600
Jenkintown, Pennsylvania 19046
215-277-5770
215-277-5771 (facsimile)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

John D. Radice
Radice Law Firm
34 Sunset Blvd
Long Beach, New Jersey 08008
646-386-7688
609-385-0745 (facsimile)
jradice@radicelawfirm.com

Kenneth A. Wexler
Bethany R. Turke
Justin N. Boley
Wexler Wallace LLP
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
312-346-2222
312-346-0022 (facsimile)
kaw@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com

*Counsel to Direct Purchaser Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2017, a copy of the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint was manually filed with the Clerk of the Court and served upon all counsel of record via electronic mail. Defendants that were newly added to the case through this complaint will be served upon issuance of the summonses.

Dianne M. Nast