# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC DIGOXIN AND DOXYCYCLINE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL END-PAYER ACTIONS<br>(Nos. 16-16-cv-990, 16-cv-1371, 16-cv-1388, 16-cv-1534, 16-cv-1954, 16-cv-2031, 16-cv-2077, 16-cv-2169, 16-cv-2191, 16-cv-2468, 16-cv-2810, 16-cv-3091, 16-cv-3576, 16-cv-3635, 16-cv-4308, 16-cv-4818, 16-cv-5016) | MDL No. 2724<br>No.  16-md-2724-CMR<br><br>HONORABLE CYNTHIA M. RUFE<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## END-PAYER PLAINTIFFS'
## CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**PAGE**

I.      NATURE OF THE ACTION ................................................................................. 1

II.     ON-GOING FEDERAL AND STATE INVESTIGATIONS ........................................... 2

III.    JURISDICTION AND VENUE ............................................................................. 7

IV.     PLAINTIFFS ................................................................................................... 8

V.      DEFENDANTS ................................................................................................ 19

VI.     CO-CONSPIRATORS ....................................................................................... 23

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............................... 23

VIII.   FACTUAL ALLEGATIONS ............................................................................... 23

        A.      The Generic Drug Industry ................................................................ 23

        B.      Current Pricing in the Generic Drug Industry.................................... 27

        C.      Generic Digoxin Market .................................................................... 29

        D.      Generic Doxycycline Market ............................................................. 30

        E.      Generic Digoxin Price Increases ....................................................... 31

        F.      Generic Doxycycline Price Increases ................................................ 37

        G.      Activities with Respect to the Generic Doxycycline Conspiracy ....... 41

        H.      Defendants' Opportunities to Conspire on Both Doxycycline and Digoxin ....... 43

        I.      Defendants' Own Acknowledgments of Lack of Generic Drug Competition..... 46

        J.      Defendants' Concerted Efforts to Increase Prices for Generic Digoxin and
                Doxycycline Yielded Supracompetitive Profits.................................. 49

        K.      Congress's and Regulators' Responses to Generic Drug Price Hikes ................ 50

        L.      Factors Increasing the Market's Susceptibility to Collusion .............. 58

                1.      Industry Concentration.......................................................... 59

                2.      Barriers to Entry.................................................................... 60

                3.      Demand Inelasticity .............................................................. 61

i

          4.      Lack of Substitutes...................................................................... 62

          5.      Standardized Product with High Degree of Interchangeability .............. 64

          6.      Inter-competitor Contacts and Communications ..................................... 65

IX.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 66

     A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs
            Did Not and Could Not Discover Defendants' Unlawful Conspiracy................ 66

     B.     Fraudulent Concealment Tolled the Statutes of Limitations ............................... 69

          1.      Active Concealment of the Conspiracy .................................................... 70

          2.      Plaintiffs Exercised Reasonable Diligence ............................................. 72

X.      CONTINUING VIOLATIONS ........................................................................ 73

XI.     DEFENDANTS' ANTITRUST VIOLATIONS............................................... 73

XII.    CLASS ACTION ALLEGATIONS ............................................................. 75

XIII.   CAUSES OF ACTION............................................................................... 79

XIV.   PRAYER FOR RELIEF ............................................................................ 121

XV.    JURY DEMAND ...................................................................................... 123

I.        **NATURE OF THE ACTION**

1.        For more than two years, federal and state enforcement agencies have been investigating price-fixing and bid-rigging by companies in the generic drug industry, including the manufacturers of generic digoxin and generic doxycycline.[1] Those investigations followed a Congressional inquiry and hearing concerning a significant spike in generic drug pricing.

2.        On January 9, 2017, two executives of a manufacturer of generic doxycycline pled guilty in federal court in the Eastern District of Pennsylvania to criminal price-fixing, thereby confirming the existence of a conspiracy among manufacturers to fix prices.  In addition, in December 2016, the Attorneys General of 20 states filed a civil complaint in the United States District Court for the District of Connecticut also alleging price fixing of generic doxycycline.

3.        This case is brought by indirect purchasers of generic digoxin and doxycycline ("End-Payers" or "Plaintiffs") to recoup overcharges that resulted from Defendants' price-fixing conspiracy.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin and doxycycline products manufactured by any Defendant from October 1, 2012 to the present, and (b) a damages class of persons or entities in the states identified herein, the District of Columbia and U.S. territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin and generic doxycycline products manufactured by any Defendant, other than for resale, from October 1, 2012 to the present.

---

[1] As used herein, the term "digoxin" is intended to refer to doses of generic digoxin taken orally in the form of a tablet.  As used herein, the term "doxycycline" will refer to generic doxycycline hyclate, including the delayed release ("DR") version of doxycycline hyclate taken in the form of a tablet or capsule, unless otherwise indicated.

4.      Defendants engaged in a conspiracy to allocate customers, rig bids and fix, maintain and/or stabilize the prices of generic digoxin and doxycycline. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the proposed Classes paid artificially inflated prices. All allegations herein are based on information and belief, except for those relating to Plaintiffs.

5.      Digoxin is used to treat mild to moderate heart failure in adults, increase the heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation. It is derived from the leaves of the digitalis (or foxglove) plant and was first described in medical literature around 1785. It is on the World Health Organization's ("WHO") list of essential medicines.[2] Digoxin must be taken daily and exactly as prescribed to be effective; failure to take digoxin as prescribed can have catastrophic consequences.

6.      Doxycycline is a broad spectrum antibiotic that entered the market in 1985 and is used in treating humans and animals. It is used to treat bacterial pneumonia, acne, chlamydia infections, *Clostridium difficile* colitis, early Lyme disease, cholera and syphilis, as well as malaria when used in conjunction with quinine.  Doxycycline is also on WHO's list of essential medicines.[3]

## II.      <u>ON-GOING FEDERAL AND STATE INVESTIGATIONS</u>

7.      In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of a broad conspiracy to fix the prices of generic drugs, including, but not limited to, generic digoxin and generic doxycycline, and has caused grand jury subpoenas to be issued to various of the defendants named here.

---

[2] *See* http://apps.who.int/medicinedocs/en/d/Js2253e/3.4.html#Js2253e.3.4.

[3] *See* http://apps.who.int/medicinedocs/en/d/Jh2922e/2.5.8.html#Jh2922e.2.5.8.

According to one report, prosecutors see the case much like DOJ's antitrust probe of the auto parts industry, which has gone on for years and morphed into the DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.). Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[4] According to a recent Bloomberg report, "[t]he antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter."[5]

8.      On December 12 and 13, 2016, DOJ filed criminal Informations against Jeffrey Glazer ("Glazer") and Jason Malek ("Malek") (both named as Defendants here), the respective former Chief Executive Officer and President of Heritage Pharmaceuticals, Inc. ("Heritage") (also named a Defendant here). The criminal Informations accuse both men of conspiring with unidentified co-conspirators to "knowingly enter[] into and engag[e] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States." Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

9.      A press release issued by DOJ in conjunction with these filings stated:

> Millions of Americans rely on prescription medications to treat acute and chronic health conditions. By entering into unlawful agreements to fix prices and allocate customers, these two

---

[4] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[5] http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines, said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion.

Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law, said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division. It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law.[6]

10.     On January 9, 2017, Glazer and Malek pled guilty to felony charges that they conspired with competitors to manipulate prices and allocate customers for doxycycline. Defendant Glazer admitted that:

[he] participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products including Doxycycline Hyclate, the primary purpose of which was to allocate customers, rig bids and fix and maintain prices of Doxycycline Hyclate sold in the United States in furtherance of the conspiracy.

Defendant and his co-conspirators, including individuals that the defendant supervised at his company and those he reported to at his company's parent, engaged in discussions and attended meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate. During such discussions and meetings, agreements were reached to allocate customers, rig bids and fix and maintain the prices of Doxycycline Hyclate sold in the United States.[7]

---

[6] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[7] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id*. at 22:4-11 (admitting facts).

11.     Defendant Malek admitted substantially the same facts.[8]

12.     In addition, a federal grand jury empaneled in the Eastern District of Pennsylvania has issued subpoenas to other generic manufacturers, including Defendant Lannett Co., Inc. ("Lannett") and Lannett's Vice-President of Sales and Marketing (believed to be Kevin Smith ("Smith"); Defendant Impax Laboratories, Inc. ("Impax") and an unidentified sales representative of Impax; Allergan, Inc. ("Allergan"), the predecessor to Defendant Actavis Holdco U.S. Inc. ("Actavis"); Defendant Par Pharmaceutical, Inc. ("Par"); Defendant Sun Pharmaceutical Industries, Inc. ("Sun"); Defendant Mayne Pharma USA, Inc. ("Mayne"), and Defendant Mylan Pharmaceuticals, Inc. ("Mylan").

13.     A report from the legal news service *mlex* indicated that DOJ had received assistance from a privately-held company that came forward as a leniency applicant in the summer of 2016:  "While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations."

14.     In addition to the federal criminal investigation, George Jepsen ("Jepsen"), the Connecticut Attorney General ("AG"), began an investigation in July of 2014 concerning the dramatic price increases in generic digoxin. That investigation expanded considerably over the next two years. On December 15, 2016, the AGs of 20 states, led by Connecticut, filed a Complaint against multiple corporate manufacturers and distributors of, *inter alia*, doxycycline, including many of the defendants named in this Complaint.  *See State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.) ("AG Complaint"). In a press release, Jepsen said that:

---

[8] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also id*. at 21:23-22:6 (admitting facts).

My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States.…

While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs.

\*\*\*

In July 2014, the state of Connecticut initiated an investigation of the reasons behind suspicious price increases of certain generic pharmaceuticals. The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a well-coordinated and long-running conspiracy to fix prices and allocate markets for doxycycline hyclate delayed release and glyburide. In today's lawsuit, the states allege that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives.

The complaint further alleges that the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone and text message communications. The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation. The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.[9]

---

[9] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

15.     The publicly available version of the AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications among competitors, which Jepsen recently described as "mind-boggling."[10]

16.     These criminal Informations, guilty pleas, and the AG Complaint are merely the tip of the iceberg. Indeed, the AG Complaint specifically refers to a "wide-ranging series of conspiracies implicating numerous different drugs and competitors," and a January 27, 2017 report stated that "new subpoenas are going out, and the [state AG] investigation is growing beyond the companies named in the suit."[11]

## III.  JURISDICTION AND VENUE

17.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

18.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

19.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

20.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade

---

[10] http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[11] *Id.*

and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here, where Lannett and Mylan are headquartered and where Impax's generics division, Global Pharmaceuticals ("Global"), is located.

21.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold digoxin or doxycycline throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

IV.     **PLAINTIFFS**

22.     Plaintiff International Union of Operating Engineers Local 30 Benefits Fund ("IUOE 30") is a local union that has served the interests of operating engineers and facilities maintenance workers for over a century. It is headquartered in Whitestone, New York. IUOE 30 provides health care, retirement and other benefits to both private sector and municipal employees through a series of not-for-profit trust funds. Retired private sector and municipal employees, who reside in numerous locations in the United States, can obtain benefits under either IUOE 30 Private Industry Retiree Benefit Plans or the IUOE 30 Municipal Retired Employees Welfare Trust Fund. IUOE 30 provides these benefits to over 4,700 people.  During the Class Period, IUOE 30 indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Illinois, Massachusetts,

New York, and Pennsylvania, thereby suffering injury to its business and property. During the Class Period, IUOE 30 indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Connecticut, Maryland, New Jersey, New York, North Dakota, Pennsylvania, and Virginia, thereby suffering injury to its business and property.  During the Class Period, IUOE 30 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Plaintiff IUOE 30 was injured in its business or property by reason of the violations of law alleged herein.  IUOE 30 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

23.     Plaintiff UFCW Local 1500 Welfare Fund ("Local 1500") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York, 11590. Local 1500 provides nearly 23,000 members with health and welfare benefits and is the largest grocery union in New York. During the Class Period, Local 1500 indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in New York. During the Class Period, Local 1500 indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in New York. During the Class Period, Local 1500 purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise,

maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff Local 1500 was injured in its business or property by reason of the violations of law alleged herein. Local 1500 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

24.     Plaintiff United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("UFCW") is an employee welfare benefits fund with its principal place of business at Maricopa County, Arizona. During the Class Period, UFCW indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by one of the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Colorado, Nevada, and New Mexico. During the Class Period, UFCW indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by one of the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Colorado, Indiana, Maine, Massachusetts, Missouri, Montana, Nevada, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. During the Class Period, UFCW purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UFCW was injured in its business or property by reason of the violations of law alleged herein.  UFCW intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

25.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high-quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Connecticut, Florida, Illinois, Indiana, Maryland, Massachusetts, Mississippi, Nevada, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Texas, Virginia, Washington, and West Virginia. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Delaware, Florida, Georgia, Hawaii, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming. During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for

these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

26.     Plaintiff Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178") is an employee welfare benefits fund with its principal place of business at 2501 W. Grand, Springfield, Missouri, 65802. Local 178 represents over 400 Union trained plumbers, pipefitters, steamfitters, refrigeration fitters, and service technicians in the state of Missouri. During the class period, Local 178 indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Missouri. During the Class Period, Local 178 indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Missouri. During the Class Period, Local 178 purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff Local 178 was injured in its business or property by reason of the violations of law alleged herein.  Local 178 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

27.     Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund ("FOP Miami") is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care or

benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW 2nd Avenue, Miami, Florida, and is a citizen of Florida. FOP Miami provides these benefits to over 4,168 people. During the Class Period, FOP Miami indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Florida, Georgia, North Carolina, and Texas, thereby suffering injury to its business and property. During the Class Period, FOP Miami indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia, thereby suffering injury to its business and property. During the Class Period, FOP Miami paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Plaintiff FOP Miami was injured in its business or property by reason of the violations of law alleged herein.  FOP Miami intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

28.     Plaintiff City of Providence, Rhode Island ("Providence") is a municipal corporation with a principal address of 444 Westminster Street, Suite 220, Providence, Rhode Island, 02903. Providence is a self-insured health and welfare plan. Providence provides health and prescription benefits to over 12,000 people. During the Class Period, Providence indirectly

purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Florida, Illinois, Massachusetts, New Hampshire, New York, North Carolina, Pennsylvania and Rhode Island, thereby suffering injury to its business and property. During the Class Period, Providence indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Connecticut, Florida, Georgia, Illinois, Maine, Maryland, Massachusetts, Mississippi, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, The U.S. Virgin Islands, Vermont, Virginia, and Wisconsin, thereby suffering injury to its business and property. During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Plaintiff Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

29.     Plaintiff NECA-IBEW Welfare Trust Fund ("NECA") is an employee health and welfare benefit plan that has served the interests of electrical contractors and workers for decades. NECA maintains its principal place of business at 2120 Hubbard Avenue, Decatur, Illinois. It provides health care, retirement and other benefits to approximately 24,000 people. During the Class Period, NECA indirectly purchased and paid for some or all of the purchase

price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Florida, Georgia, Illinois, Indiana, Kentucky, Missouri, New Jersey, Texas, and Wisconsin, thereby suffering injury to its business and property.  During the Class Period NECA indirectly purchased and paid for some or all of the purchase price for one or more doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arkansas, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Wisconsin and Wyoming, thereby suffering injury to its business and property. During the Class Period, NECA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Plaintiff NECA was injured in its business or property by reason of the violations of law alleged herein. NECA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

30.     Plaintiff Twin Cities Pipe Trades Welfare Fund ("Pipe Trades Fund") is an employee welfare benefits plan with its principal place of business in White Bear Lake, Minnesota. Pipe Trades Fund is the sponsor of a plan of benefits that is Pipe Trades Services MN Welfare Fund, which provides health benefits, including prescription drug benefits, to approximately 16,000 active participants and retirees, plus their spouses and dependents.  During the Class Period, Pipe Trades Fund indirectly purchased some or all of the purchase price for one

or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Minnesota and Wisconsin.  During the Class Period, Pipe Trades Fund also indirectly indirectly purchased and paid for some or all of the purchase price for one or more generic doxycyclene prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Minnesota.  Pipe Trades Fund paid or reimbursed some or all of the purchase price for each of these prescriptions during the Class Period. During the Class Period, Pipe Trades Fund purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Pipe Trades Fund was injured in its business or property by reasons of the violations of law alleged herein. Pipes Trades Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

31.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Philadelphia Teacher's Fund") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code to provide health benefits to its eligible participants and beneficiaries. Philadelphia Teacher's Fund maintains its principal place of business in Philadelphia, Pennsylvania. It provides health benefits, including prescription drug benefits, to approximately 34,000 beneficiaries and covered spouses and dependents. During the Class Period Philadelphia Teacher's Fund indirectly purchased and paid for some or all of the purchase price for one or more digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Delaware, Maryland, New Jersey and Pennsylvania.  During the Class Period Philadelphia Teacher's Fund also indirectly

purchased and paid for some or all of the purchase price for one or more doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, the District of Columbia, Delaware, Florida, Georgia, Illinois, Louisiana, Maine, Massachusetts, Michigan, Maryland, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, and Washington.  Philadelphia Teacher's Fund paid or reimbursed some or all of the purchase price for each of these prescriptions during the Class Period.  During the Class Period, Philadelphia Teacher's Fund purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Philadelphia Teacher's Fund was injured in its business or property by reasons of the violations of law alleged herein. Philadelphia Teacher's Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.     Plaintiff Plumbers and Steamfitters Local 33 Health and Welfare Fund ("Plumbers Local 33") is an employee welfare benefits fund administered in in Des Moines, Iowa. It provides health benefits to plan members. During the Class Period Plumbers Local 33 indirectly purchased indirectly purchased and paid for some or all of the purchase price for one or more generic digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Iowa. During the Class Period Plumbers Local 33 also indirectly purchased and paid for some or all of the purchase price for one or more generic doxycycline prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Iowa, Nebraska and South Dakota.

Plumbers Local 33 paid or reimbursed some or all of the purchase price for these prescriptions during the Class Period.  During the Class Period, Plumbers Local 33 purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plumbers Local 33 was injured in its business or property by reasons of the violations of law alleged herein. Plumbers Local 33 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.    Plaintiff Nina Diamond ("Diamond") is an individual and resident of Atlantic Beach, New York. During the Class Period, Diamond indirectly purchased generic digoxin manufactured by the Defendants. She purchased digoxin in New York for her personal use and was not reimbursed for her purchases, thereby suffering injury to her property. During the Class Period, Diamond paid more for generic digoxin than she would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for generic digoxin. As a result of the alleged conspiracy, Plaintiff Diamond was injured by reason of the violations of law alleged herein.  Diamond intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.    Plaintiff Valerie Velardi ("Velardi") is an individual and resident of San Francisco, California. During the Class Period, Velardi indirectly purchased generic doxycycline manufactured by the Defendants. She made her purchases of doxycycline in California for her personal use at its full retail price and was not reimbursed for her purchase, thereby suffering injury to her property. During the Class Period, Velardi paid more for generic doxycycline than

she would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for doxycycline. As a result of the alleged conspiracy, Plaintiff Velardi was injured by reason of the violations of law alleged herein. Velardi intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Ottis McCrary ("McCrary") is an individual and resident of Stevenson, Alabama. During the Class Period, McCrary indirectly purchased generic doxycycline manufactured by the Defendants. He made the purchase of doxycycline in Alabama for his personal use at its full retail price and was not reimbursed for his purchase, thereby suffering injury to his property. During the Class Period, McCrary paid more for generic doxycycline than he would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for doxycycline. As a result of the alleged conspiracy, Plaintiff McCrary was injured by reason of the violations of law alleged herein. McCrary intends to continue purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.     **DEFENDANTS**

36.     Defendant Actavis is a Delaware corporation that has its administrative headquarters in Parsippany-Troy Hills, New Jersey. In 2012, Watson Pharmaceuticals, Inc. acquired then-Switzerland-based Actavis Group to form Actavis plc, a major supplier of generic doxycycline.[12] On March 17, 2015, Actavis plc completed its acquisition of Allergan in a cash and equity transaction valued at approximately $70.5 billion. The merged Actavis-Allergan entity was renamed "Allergan," but its generic product lines were still marketed under the name

---

[12] http://allergan-web-cdn-prod.azureedge.net/actavis/actavis/media/pdfdocuments/2013_us_rx_product_catalog.pdf.

"Actavis." The following year, in August of 2016, Teva Pharmaceuticals USA, Inc. ("Teva") acquired the generic assets of Allergan, including doxycycline, for $40.5 billion. As part of this acquisition, Allergan's generic assets, including doxycycline, were assigned to Actavis, which Teva acquired in its deal with Allergan. In connection with the regulatory approval of that deal, the generic operations of Actavis plc (including its manufacture of generic doxycycline) were transferred to Teva Pharmaceuticals U.S., Inc. ("Teva") and are now being conducted by Teva's subsidiary, Defendant Actavis. Actavis Pharma, Inc. ("API") is a U.S. subsidiary of Actavis. During the Class Period, Actavis and API sold generic doxycycline products in this District and other locations in the United States.

37.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Private Ltd., an Indian company headquartered in Pune, India. During the Class Period, Heritage sold generic doxycycline to customers in this District and other locations in the United States.

38.     Defendant Impax is a Delaware corporation that has its principal place of business in Hayward, California. As noted above, Impax's generics division is called Global Pharmaceuticals ("Global") and is a manufacturer and distributor of generic digoxin. During the Class Period, Global sold generic digoxin to customers in this District and other locations in the United States.

39.     Defendant Lannett is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania. Lannett is the exclusive distributor of generic digoxin manufactured by Jerome Stevens Pharmaceuticals, Inc. ("JSP"), a New York corporation with its

principal place of business in Bohemia, New York. During the Class Period, Lannett sold generic digoxin to customers in this District and other locations in the United States.

40.     Defendant Mayne is a Delaware corporation that has its principal place of business in Raleigh, North Carolina. During the Class Period, Mayne sold generic doxycycline to customers in this District and other locations in the United States.

41.     Defendant Mylan is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc., a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. During the Class Period, Mylan sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

42.     Defendant Par is a New York corporation with its principal place of business in Chestnut Ridge, New York. In January 2014, Par announced that it had entered into an exclusive United States supply and distribution agreement with Covis Pharma S.à.r.l. ("Covis") to distribute the authorized generic version of Covis's Lanoxin® (digoxin) tablets. At that time, Par began selling and shipping digoxin in this country. Par also manufactures generic doxycycline. During the Class Period, Par sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

43.     Defendant Sun is a Michigan corporation with its principal place of business in Cranbury, New Jersey. In late 2012, Sun acquired URL Pharma, Inc. ("URL") with its principal place of business in Philadelphia, PA.  URL is a wholly-owned subsidiary of Sun.  URL as a group includes five wholly-owned subsidiaries, including Mutual Pharmaceutical Company, Inc. In late 2012, Sun and its wholly-owned subsidiaries held approximately 19.9% of the market

21

share of doxycycline in the United States.  During the Class Period, Sun sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.[13]

44.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company and is a manufacturer and distributor of generic digoxin. During the Class Period, West-Ward sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

45.     Defendant Glazer is a resident of Marlboro, New Jersey and served as CEO of Heritage from 2005 until August 2016.

46.     Defendant Malek is a resident of Ocean, New Jersey. He joined Heritage as Director of its Sales Operations in 2008, became Senior Director of Commercial Operations in 2010, became a Vice-President in May 2011 and a Senior Vice-President in April 2013, and from October 2015 until August 2016, served as its President.

47.     Whenever reference is made in this Complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

---

[13] Digoxin supplied by Sun Pharmaceutical Industries, Inc. ("SPII") was manufactured in the Detroit facility of Sun's subsidiary, Caraco Pharmaceutical Laboratories, Ltd. ("Caraco"), until approximately June of 2014 when Caraco shut down its Detroit facility. *See* http://www.crainsdetroit.com/article/20140502/NEWS/140509962/caraco-pharmaceutical-to-lay-off-178-close-its-detroit-plant-this. Upon information and belief, Sun resumed production and distribution of generic digoxin starting in the latter half of 2015. http://www.sunpharma.com/node/119521.

## VI.    <u>CO-CONSPIRATORS</u>

48.    Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

## VII.    <u>INTERSTATE AND INTRSTATE TRADE AND COMMERCE</u>

49.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

50.    During the Class Period, Defendants sold substantial quantities of generic digoxin and/or generic doxycycline in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

51.    Defendants' anticompetitive conduct occurred in part in trade and commerce within the states set forth herein, and also had substantial intrastate effects in, *inter alia*, retailers within each state were foreclosed from offering less expensive generic digoxin and doxycycline to Plaintiffs inside each respective state. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state, who were forced to pay supracompetitive prices.

## VIII.    <u>FACTUAL ALLEGATIONS</u>

A.    **The Generic Drug Industry**

52.    Defendants manufacture and sell generic versions of branded drugs. According to the United States Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[14] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the

---

[14] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[15]

53.     Since passage of the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

54.     According to a 2015 Generic Pharmaceutical Association ("GPhA") report, 88% of all prescriptions in the United States are filled with a generic drug.[16] Data from IMS Health depict the growing trend of filling prescriptions with generic drugs:



55.     In 2015, generic drug sales in the United States were estimated at $74.5 billion.[17]

56.     Generic drugs are supposed to be substantially less expensive than branded drugs. According to a PowerPoint presentation given by Lannett's CEO and CFO, the cost of generics

---

[15] *Id.*

[16] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[17] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

is "[o]ften 80-85% less than the brand."[18] Thus, generic competition for even a single brand drug can provide potentially billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs that reimburse the cost of drug purchases by covered individuals. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[19] In a January 2012 report, the GAO noted that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[20]

57.     As illustrated in the following chart, the price savings from generic drugs is even greater when more generic drug manufacturers compete:

### Generic Competition and Drug Prices

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

58.     These consumer welfare-enhancing attributes of generic drug competition were bolstered by enactment of the Hatch-Waxman Act. The Act creates a piggyback mechanism to

---

[18] https://www.sec.gov/Archives/edgar/data/57725/000110465915014242/a15-5445_1ex99d1.htm (slide 3).

[19] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[20] http://www.gao.gov/assets/590/588064.pdf.

simplify the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application ("NDA"), the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA").

59.     Through the ANDA process, the generic manufacturer attempts to show that its product is bioequivalent to its branded counterpart, which is referred to as the "reference listed drug" ("RLD"). As defined, an RLD is an "approved drug product to which new generic versions are compared to show that they are bioequivalent," that is, the generic version "performs in the same manner as the Reference Listed Drug."[21] A drug company seeking approval to market a generic equivalent must refer to the Reference Listed Drug in its Abbreviated New Drug Application (ANDA)." *Id.* Once the FDA approves an ANDA, the generic firm may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public. *Id.*

60.     In connection with the approval of a generic drug, the FDA will assign a "Therapeutic Equivalence Code" ("TE Code") which allows users to quickly determine important information about the drug product in question.[22] An "AB" rating signifies that the approved generic product is therapeutically equivalent to its branded counterpart.[23] An AB rating is significant because under state generic drug substitution laws, pharmacists are permitted—and in many cases, must—substitute the less expensive generic product for its branded counterpart. This inures to the financial benefit of consumers and third-party payers.

---

[21] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD.

[22] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

[23] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

B.     **Current Pricing in the Generic Drug Industry**

61.     Although generic drugs are widely understood to be substantially less expensive than their branded counterparts, for the drugs at issue here, that is no longer the case.

62.     Prices for certain generic drugs, including digoxin and doxycycline, increased dramatically from 2012.  These substantial and unjustified price hikes have engendered extensive scrutiny by the U.S. Congress. A chart compiled by Representative Elijah E. Cummings ("Cummings"), Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernie Sanders ("Sanders"), Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, reflects the skyrocketing price hikes for various generic drugs, including digoxin and doxycycline:[24]

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|---|---|---|---|---|
| Doxycycline Hyclate (bottle of 500, 100 mg tablets) | antibiotic used to treat a variety of infections | $20 | $1,849 | 8,281% |
| Albuterol Sulfate (bottle of 100, 2 mg tablets) | used to treat asthma and other lung conditions | $11 | $434 | 4,014% |
| Glycopyrrolate (box of 10 0.2 mg/mL, 20 mL vials) | used to prevent irregular heartbeats during surgery | $65 | $1,277 | 2,728% |
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | used to prevent migraines and treat certain types of seizures | $31 | $234 | 736% |
| Pravastatin Sodium (bottle of 500, 10 mg tablets) | used to treat high cholesterol and to prevent heart disease | $27 | $196 | 573% |
| Neostigmine Methylsulfate (box of 10 1:1000 vials) | used in anesthesia to reverse the effects of some muscle relaxants | $25 | $121 | 522% |
| Benazepril/Hydrochlorothiazide (bottle of 100, 20-25 mg tablets) | used to treat high blood pressure | $34 | $149 | 420% |
| **Drug** | **Use** | **Average Market Price Nov. 2012** | **Average Market Price Sept. 2014** | **Average Percentage Increase** |
| Isuprel (box of 25, 0.2 mg/mL vials) | used to treat heart attacks and irregular heartbeat | $916 | $4,489 | 390% |
| Nitropress (50 mg vial) | used to treat congestive heart failure and reduce blood pressure | $44 | $215 | 388% |
| **Drug** | **Use** | **Average Market Price Oct. 2012** | **Average Market Price June 2014** | **Average Percentage Increase** |
| Digoxin (single tablet, 250 mcg) | used to treat irregular heartbeats and heart failure | $0.11 | $1.10 | 884% |

---

[24] http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

63.     In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation of generic drug price increases.[25] On October 2, 2014, Sanders and Cummings sent letters to Actavis, Heritage (for whom Glazer and Malek worked—the letter was sent to Glazer),[26] Lannett, Par, Sun, Impax (via its generics division, Global), Mylan, and West-Ward ("October Letters") asking for detailed information on the generic digoxin and/or generic doxycycline price hikes, among others.[27]

64.     On November 20, 2014, Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs. Although Arthur Bedrosian ("Bedrosian"), the CEO of Lannett, was invited to testify, neither he nor any other chief executive of a generic drug manufacturer did so.[28]

65.     This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association ("NCPA"), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies [sic] ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability

---

[25] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[26] http://www.sanders.senate.gov/download/letter-to-mr-glazer-president-and-chief-executive-officer-heritage-pharmaceuticals-inc?inline=file.

[27] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[28] *See* http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

to purchase their needed medications. The NCPA survey found that "patients are declining their medication due to increased co-pays…."[29]

C.   **Generic Digoxin Market**

66.     The market for generic digoxin is mature, and Defendants that operate in that market can only gain market share by competing on price.

67.     On September 30, 1993, GlaxoSmithKline ("GSK") filed an NDA for the approval of digoxin tablets, under the brand name Lanoxin. According to FDA's Orange Book, Lannett, Global (a division of Impax), West-Ward, Par, Mylan, and Caraco (a subsidiary of Sun) have generic digoxin products that are AB-rated to the brand.

68.     However, despite the fact that six generic manufacturers have AB-rated digoxin products, mergers and withdrawals from the market caused the number of competitors to shrink. For instance, West-Ward had to suspend operations for eight months beginning in November 2012 in the wake of an FDA investigation into the fact that its production of generic digoxin was not in compliance with current Good Manufacturing Practices,[30] while Caraco had to halt production for nearly three years from June 2009[31] to August 2012.[32]

69.     According to data from IMS Health, annual sales of digoxin in the United States were approximately $44 million as of the beginning of 2014. Those sales numbers, however, increased dramatically in 2014 and 2015, as explained below.

---

[29] http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

[30] *See* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm291643.htm.

[31] *See* https://www.ihs.com/country-industry-forecasting.html?ID=106595376.

[32] *See* http://www.fiercepharma.com/pharma/sun-closing-caraco-plant-detroit-and-whacking-nearly-180-jobs.

D.      **Generic Doxycycline Market**

70.      The market for generic doxycycline is mature and Defendants that operate in that market can only gain market share by competing on price.

71.      Pfizer Inc. ("Pfizer") produces branded versions of doxycycline, including Vibramycin®, a capsule form of doxycycline. Pfizer received FDA approval for Vibramycin on December 5, 1967.

72.      At one point there were over 20 manufacturers of generic doxycycline.[33] However, over the past decade, the number of generic drug manufacturers producing doxycycline has declined. As Sun said in its 2015 and 2016 investor presentations, doxycycline is a "low competition product."[34]

73.      Defendants Heritage, Mayne, Mylan, Par, Sun, and West-Ward currently manufacture and/or distribute generic doxycycline. Actavis plc had been another major supplier of generic doxycycline.[35] Major Pharmaceuticals and Teva discontinued producing doxycycline in February 2013 and May 2013, respectively,[36] and West-Ward discontinued one line of doxycycline in or around July 2013.

74.      This reduction in the number of generic manufacturers increased concentration in the doxycycline market, facilitating price coordination and Defendants' conspiracy to fix, raise, maintain, and stabilize prices.

---

[33] https://vineyardgazette.com/news/2015/09/24/cost-doxycycline-skyrockets.

[34] Investor Presentation can be accessed at http://www.sunpharma.com/investors/annualreports.

[35] http://allergan-web-cdn-prod.azureedge.net/actavis/actavis/media/pdfdocuments/2013_us_rx_product_catalog.pdf. Actavis plc is a different entity from the Actavis entity named as a Defendant here.

[36] http://www.ashp.org/menu/DrugShortages/CurrentShortages/bulletin.aspx?id=977.

75.     Total U.S. retail sales of all forms of doxycycline (both monohydrate and hyclate) in 2013 were estimated to be over $973 million.[37]

E.      **Generic Digoxin Price Increases**

76.     Until the last few years, generic digoxin pricing was remarkably stable. That stability is reflected in the following chart submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing:[38]



Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:
(January 1, 2005 to December 31, 2013)

---

[37] http://www.drugs.com/stats/doxycycline.

[38] That testimony is available at http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.

The terms "AWP" and "WAC" in this chart refer, respectively, to "Average Wholesale Price" and "Wholesale Acquisition Price." Both prices are referred to by Dr. Schondelmeyer as benchmark prices.[39]

77.     While this chart shows the stability of the prices of generic digoxin over an eight year period, it reflects only a portion of the price hikes for generic digoxin that then occurred. The October Letters referenced above noted that prices for generic digoxin had increased dramatically between October 2012 and June 2014 for the market as a whole:

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Digoxin | 125mcg tablet | $.11 | $1.06 | $0.95 | 839% |
| Digoxin | 250mcg tablet | $.11 | $1.10 | $0.99 | 884% |

These astounding price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, Sun, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015, respectively. Pricing for .125 mg and .250 mg tablets of digoxin increased by roughly tenfold, from $0.11 per tablet in October 2012 to between $1.06 and $1.10 per tablet by June 2014.

78.     Data from the National Average Drug Acquisition Cost ("NADAC") on generic digoxin show average price increases that led to substantially higher prices for generic digoxin products for the .125 mg tablet dosage of generic digoxin (sold by Lannett, Impax, Par, West-Ward, Sun and Mylan) during the period from October 2012 to April 2015.

---

[39] *Id.* at 15.



79.     The following chart, based on NADAC data, shows the pricing of the .250 mg tablet dosage of generic digoxin (made by Lannett, West-Ward, Sun, Impax, and Mylan) during the period from October 2012 to mid-March 2015:



80.     By way of further example, the striking jump in prices for Impax's and Lannett's digoxin tablets can be seen in the following tables:

| WAC for Impax's Digoxin (.125 mg tablets, 1 bottle, 100 pills)[40] | |
|---|---|
| **Price** | **Effective** |
| $14.21 | 05/26/2010 |
| $118.50 | 10/22/2013 |

| WAC for Lannett's Digoxin (.125 mg tablets, 1 bottle, 100 pills)[41] | |
|---|---|
| **Price** | **Effective** |
| $14.21 | 08/19/2002 |
| $17.45 | 04/01/2009 |
| $118.50 | 10/16/2013 |

81.     As these tables show, WAC for Lannett's .125 mg digoxin tablets increased only 22% over a period of nearly seven years. By contrast, recently, in a little over four years, *prices increased 579%*.  Impax's digoxin tablets experienced a similarly large price increase, with prices going from $14.21 per bottle in May 2010 to $118.50 per bottle in October 2013—*an increase of around 734%* in a little over three years.

82.     There were no reasonable competitive justifications for these abrupt shifts in pricing conduct. To the contrary, anticompetitive activity explains these skyrocketing prices. Richard Evans at Sector & Sovereign Research recently wrote:  "[a] plausible explanation [for price increases of generic drugs, including generic digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of

---

[40] Oppenheimer Equity Research, Lannett Company, Inc., at 2 (Feb. 7, 2014).

[41] *Id.*

products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[42]

83.     These enormous price increases were not due to supply disruptions. As stated at the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the [digoxin] price increases, the U.S. Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and digoxin is not difficult to make. The companies have not yet provided an explanation for the price rise."[43] With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[44] but no supply disruption was reported by the relevant Defendants with respect to digoxin in the fall of 2013.

84.     The presence or absence of competitors in the marketplace also does not explain the substantial price increases of generic digoxin. From October 2012 to around November 21, 2013, the NADAC average price of generic digoxin was consistently around $0.11 for the .125 mg tablets and between $0.11 and $0.12 for the .250 mg tablets, despite the fact that for a portion of the period after West-Ward suspended production, Lannett and Impax were the only significant players in the market. West-Ward's return to the market in July 2013 also did not affect pricing. Indeed, throughout 2012 and through September 2013, as Dr. Schondelmeyer's chart shows, the price of generic digoxin remained steady. Following the astronomical price increases in the fall of 2013, Par entered the market in early 2015 and Mylan entered the market

---

[42] *See* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming.
[43] http://www.gabionline.net/Generics/General/Lawyers-look-at-new-price-hike-for-old-drug.
[44] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

in 2015, but prices did not fall even with the addition of new competitors. Pricing remains inflated to this day.

85. The steep digoxin price hikes have had a catastrophic effect on consumers. According to a December 2013 report:

> Bill Drilling, an owner of a pharmacy in Sioux City, Iowa, apologizes as he rings up a customer's three-month supply of the heart medicine digoxin. The total is $113.12—almost 10 times the cost for the same prescription in August. Digoxin isn't a new miracle drug. . . . "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down," Drilling says….
>
> \*       \*       \*
>
> "This is starting to create hardship," he says. Many of his customers fall into what is known as the Medicare "doughnut hole," a coverage gap in which patients pay 47.5 percent of branded-drug costs and 79 percent of a generic's price. Russ Clifford, a retired music teacher, learned digoxin's cost had jumped more than fourfold when he picked up his 30-day supply in mid-November. Clifford and his wife have had to dip into savings to pay their rising pharmaceutical bills.[45]

86. These massive price increases adversely affected patients' ability to purchase their digoxin medications. An independent pharmacist described the hardship caused by the digoxin price increases with this anecdote offered at the Senate Hearing:

> A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him.

---

[45] *See* http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

The patient called all around to try to get the medicine at the old, lower price, but to no avail.[46]

F. **Generic Doxycycline Price Increases**

87.     For generic doxycycline, the pattern of huge price increases started in the fall of 2012.

88.     Dr. Schondelmeyer, in his testimony at the Senate Hearing, presented the following chart showing the sudden increase in West-Ward's AWP for generic doxycycline from under $2.50 for a day of therapy to over $11 by January 2013:



89.     Similarly, Sanders and Cummings noted huge increases in the price of generic doxycycline in their October Letters:

| Drug | SKU | Average Market Price October 2013 | Average Market Price April 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Doxycycline Hyclate | bottle of 50, 100mg capsules | $4 | $191 | $187 | 5,025% |
| Doxycycline Hyclate | bottle of 50, 100mg tablets | $3 | $191 | $187 | 4,986% |
| Doxycycline Hyclate | bottle of 50, 50mg capsules | $3 | $70 | $67 | 2,191% |
| Doxycycline Hyclate | bottle of 500, 100mg capsules | $27 | $1,849 | $1,822 | 7,105% |
| Doxycycline Hyclate | bottle of 500, 100mg tablets | $20 | $1,849 | $1,829 | 8,281% |

90.    The NADAC data for 50 mg and 100 mg of generic doxycycline capsules manufactured and/or distributed by Defendants Actavis, West-Ward, Sun, and Mylan reveal a similar pattern:



91.    Set forth below are the NADAC data for 75 mg and 100 mg doxycycline Delayed Release DR tablets ("doxycycline DR"):





92.     These charts are offered as examples. As noted above, the price increases affected a variety of dosages of doxycycline in both capsule and tablet form

93.     There are no reasonable justifications for this abrupt and dramatic increase in prices.

94.     Input costs do not explain these price hikes. Sun reported in a May 28, 2012 earnings call that "[m]aterial cost, as a percentage of the net sales is 18.5% which is lower as compared to the previous year."[47] Likewise, in a November 14, 2013 earnings call, Sun reported that second quarter costs were "in-line with Q2 last year."[48] Hikma, the parent of West-Ward, reported in 2013 that doxycycline sales reflected "exceptional profitability" and "generated exceptionally strong cash flows."[49]

95.     These doxycycline price hikes caused extreme hardship to consumers. As reported on WSMV-TV of Nashville's website in March 2013:

> Many people may not recognize the name, but they have probably used it for a health problem at one point.
>
> Doctors use doxycycline to treat a wide range of issues, including everything from acne to Lyme disease, anthrax exposure and even heartworm in our pets.
>
> However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned.
>
> Hospitals like Vanderbilt University Medical Center keep doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.
>
> "It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil.
>
> Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50-count bottle of 100 mg doxycycline tablets for $10, but now the same bottle costs a staggering $250.
>
> "That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

---

[47] http://www.sunpharma.com/Media/Press-Releases/FY13%20Q4%20Earnings%20Call%20Transcript.pdf.

[48] http://www.sunpharma.com/Media/Press-Releases/FY14%20Q2%20Earnings%20Call%20Transcript(1).pdf.

[49]

http://www.hikma.com/content/dam/hikma/corporate/investors/Financial%20docs/2013%20Interim%20results.pdf.downloadasset.pdf.

Vanderbilt keeps thousands of doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive.

"This one is just hurting us when we need to replace the medication," he said.

But it's the most vulnerable who are in the most jeopardy. For a pet, a heartworm diagnosis can be a death sentence without doxycycline.

Veterinarian Dr. Joshua Vaughn of the Columbia Hospital for Animals is already seeing the tragic results.

"We had one patient who we diagnosed with heartworm. We recommended heartworm treatment, but when they saw the total dollar amount, they elected not to treat the dog at all," Vaughn said.

While manufacturers say they are having problems with raw supply, many in the medical community see greed as an overriding factor.

Vaughn said he wrote a recent prescription for doxycycline that cost $77. This week, the price increased to nearly $3,000.[50]

G.    **Activities with Respect to the Generic Doxycycline Conspiracy**

96.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

97.    Heritage began selling doxycycline DR on July 2, 2013. At the time, Mylan was the only competitor for doxycycline DR. Even before entering the market, Heritage contacted Mylan about refraining from price competition. Commencing on or about May 2, 2013, Malek of Heritage contacted one of the individuals in charge of National Accounts at Mylan and commenced a series of telephonic communications in which agreements on pricing of doxycycline were discussed. Beginning on May 8, 2013, Glazer of Heritage commenced similar

---

[50] http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concerns-many.

discussions with another Mylan executive. These Defendants reached an agreement to allocate market share and refrain from competing with one another for customers in the market for doxycycline. The objective was to avoid a price war which would reduce profitability for both companies. Mylan agreed to walk away from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share.

98.    In February 2014, Mayne entered the market for doxycycline. The month before it did so, on or about January 7, its representatives had telephonic discussions with representatives of Heritage on allocating customers and thereby dividing market share. After its entry, Mayne initially avoided competing for business with customers of Heritage and instead targeted customers of Mylan. In one instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid. Heritage declined, honoring its on-going agreement with Mylan, and provided a false, pretextual reason (inadequate supply) to the wholesaler.

99.    In March 2014, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. This led to telephonic, e-mail and texted discussions between representatives of Mayne and Heritage over the next several months. In November of 2014, Mayne made offers to the One Stop Program of McKesson Corporation ("McKesson") (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu). Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December 2014 by text

messaging and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

100.    The agreement resulted in elimination of price competition and higher prices for doxycycline. When Econdisc put its business out for bid again in January 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business. Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September 2015, it declined to do so after learning that Mayne was the incumbent supplier.

101.    Glazer, Malek, Heritage and Mayne knew they were acting unlawfully and endeavored to conceal their conduct. Glazer repeatedly advised Malek to destroy incriminating e-mails and not to put incriminating evidence in writing and gave similar admonitions to Heritage's sales team. Glazer, Malek and Heritage salespersons also deleted incriminating texts from their office iPhones, and a Mayne executive deleted incriminating texts from her cell phone before the data on it were imaged and produced to the Connecticut Attorney General.

H.    **Defendants' Opportunities to Conspire on Both Doxycycline and Digoxin**

102.    In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other.

103.    As alleged by the state AGs, "the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events . . . ."[51]

---

[51] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

104.    For instance, Defendants met at conferences held by their customers, such as wholesalers or distributors (McKesson, AmeriSource Bergen Corporation, Cardinal Health, Inc., H.D. Smith, LLC, and Morris & Dickson, LLC), GPOs (Econdisc, Vizient, Premier, Inc., Intalere, and Minnesota Multistate Contracting Alliance for Pharmacy), and retailers (such as Rite Aid Corporation, the Walgreen Company, Wal-Mart Stores, Inc., Target Corporation, and Publix Super Markets, Inc.).

105.    Defendants also met through trade associations, including the GPhA, which describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[52] Current "Regular Members" of the GPhA include Defendants Impax, Mylan, Par, Sun, and West-Ward. Regular Members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[53] Several of Defendants' high-ranking officers serve on GPhA's Board of Directors, including Mylan's Heather Bresch, Impax's Marcy MacDonald, Par's Tony Pera, and Sun's Jim Kedrowski. Ms. Bresch serves as the GPhA's current Chairperson.

106.    Representatives from Defendants attended periodic meetings held by GPhA.[54] The following table lists some of the GPhA meetings attended by Defendants' employees:

---

[52] http://www.gphaonline.org/about/the-gpha-association.

[53] http://www.gphaonline.org/about/membership.

[54] *See* http://www.gphaonline.org/index.php/events/2013-annual-meeting-past-attendees; http://www.gphaonline.org/index.php/events/2014-annual-meeting-past-meeting-attendees; http://www.gphaonline.org/events/past-events/2012-gpha-fda-fall-technical-conference; http://www.gphaonline.org/events/past-events/gpha-2013-fall-technical-conference.

| Meeting | Meeting Date & Location | Attendees |
|---|---|---|
| 2012 GPhA Annual Meeting Business Exposition | February 22-24, 2012 Orlando, Florida | Watson (Actavis), Mylan, Par |
| 2012 GPhA Fall Technical Conference | October 1-3, 2012 Bethesda, Maryland | Actavis, Impax, Lannett, Mylan, Par, Sun |
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Actavis, Impax, Mylan, Par |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Actavis, Impax, Lannett, Mylan, Par, Sun |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Actavis, Impax, Mylan, Par, Sun |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Actavis , Impax, Lannett, Mylan, Par, Sun, West-Ward |
| 2015 GPhA CMC Workshop | June 9-10, 2015 Bethesda, Maryland | Actavis , Impax, Lannett, Mylan, Par, Sun, West-Ward |

107.    They also met at industry trade shows such as those hosted by the GPhA, the National Association of Chain Drug Stores ("NACDS"), The Healthcare Distribution Alliance, the Efficient Collaborative Retail Marketing ("ECRM"), and the American Society of Health-System Pharmacists.

108.    In addition, there were numerous private industry dinners of high-level executives of generic pharmaceutical manufacturers. For instance, there was a January 2014 dinner attended by 13 high-ranking executives from a number of manufacturers, including Defendants.   And there were regular meetings and dinners attended by female generic pharmaceutical sales representatives that were known as "Girls Night Out" ("GNOs") or "Women In Industry" events. They were often held in connection with industry conferences. As described in paragraph 57 of

the AG Complaint, Defendants' representatives used these meetings to "meet with their competitors and discuss competitively sensitive information." In addition, there were events in connection with an ECRM conference in February 2015, a meeting in Baltimore in May 2015, and the NACDS conference held in August 2015.

109.    Thus, Defendants' representatives had numerous opportunities to meet and conspire at trade association meetings, as well as at industry healthcare meetings.

I.      **Defendants' Own Acknowledgments of Lack of Generic Drug Competition**

110.    The collusion relating to generic drugs (including digoxin and doxycycline) was also reflected in Lannett's, Impax's, Hikma's and Sun's own statements—in documents and in oral remarks at earnings calls.

111.    In a fourth quarter 2013 earnings call that occurred on September 10, 2013, Bedrosian announced Lannett's intention to increase prices and his expectations that his competitors would follow suit.  Discussing the role of Lannett's Vice-President of Sales, Kevin Smith (one of the persons apparently subpoenaed by DOJ), Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He [Smith] takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process….**I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.** (Emphasis added.)

112.    In a subsequent earnings call, Bedrosian reported that Lannett's chief competitor had indeed heeded his call for price increases. In an earnings call on November 7, 2013—after the initial generic digoxin price increases—Bedrosian noted, referring to Impax, that **"[w]e've had a recent price increase on the [generic digoxin] product as well because we are now**

**only 1 of 2 people in the market.** And as a result, I expect that product to do very well."
(Emphasis added).

113.    The very next quarter, Bedrosian expressed complacency about Par entering as a new competitor: "And we see Par as one of our rational competitors in the marketplace." As he went on to note, "we're not troubled by their pricing in the marketplace. Not at all."

114.    In a quarterly earnings call held on November 3, 2014, Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell." Bedrosian went on to discuss, *inter alia*, Par and Impax, saying: "**[T]he companies we're looking at here are not irrational players. I don't see them just going out and trying to grab market share**." (Emphasis added.) He also noted that Mylan was expected to enter the market, "but **Mylan is one of those rational competitors, so we're not really expecting anything crazy from them**." (Emphasis added.) He predicted that price increases would continue. But there is nothing "rational" in expecting new market entrants to eschew price competition and disavow market share.

115.    On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition. He stated: "**I think you're going to find more capital pricing [in the generic marketplace], more—I'll say less competition, in a sense. You won't have price wars**." (Emphasis added.) In his view, "I just don't see the prices eroding like they did in the past."

116.    In competitive markets, when new competitors enter the market, it tends to lead to increased competition and lower prices. This is the "rational" or expected result and is well

documented in the generic drug industry. Lannett's expectation that Impax, Par and Mylan, among others, would behave in exactly the opposite way suggests an agreement among them not to compete on price. Their subsequent conduct – raising prices, electing not to increase market share – further suggests the existence of such an agreement.

117.    Bedrosian has also been quoted as saying that "**[s]o whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices.**"[55] (Emphasis added.)  He referred to sending a "thank you note" to one of his "rational" competitors.[56]

118.    Frederick Wilkinson, the CEO of Impax, also spoke to this topic in a third quarter 2014 earnings call: "[W]e've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…." Likewise, during a November 4, 2013 earnings call, former Impax President Carole Ben-Maimon, when asked about her company's "huge price increase on digoxin following Lannett's pricing action," responded that "[t]he price increase for dig[oxin] speaks for itself…." In a February 20, 2014 earnings call, she stated that "the market has been pretty stable enough . . . . **We're pretty comfortable that what we've done is rational and will result in ongoing profitability for that product.**" (Emphasis added.)

119.    Likewise, Said Darwazah, CEO of Hikma (West-Ward's parent) told Bloomberg Business in December 2013 that West-Ward's huge increases in doxycycline prices were

---

[55] http://www.valuewalk.com/2017/01/lannett-lci-citron-research/.

[56] *Id.*

justified because it was "'forced' to raise prices because its competitors raised theirs."[57] This assertion only confirms Bedrosian's statement that his generic drug competitors were no longer interested in competing on price.

> **J.**      **Defendants' Concerted Efforts to Increase Prices for Generic Digoxin and Doxycycline Yielded Supracompetitive Profits**

120.    This meeting of the minds among the competing sellers of generic digoxin and generic doxycycline assured them handsome profits. Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history." Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic digoxin accounted for 23% of the company's revenues, and Lannett has acknowledged that it is highly dependent on price increases for revenue growth.

121.    Similarly, according to its 2015 SEC Form 10-K filed on February 26, 2015, Impax's 2014 revenues were $596 million, compared to $511 million in 2013—a 17% increase. One of the primary factors in this growth was "higher sales of our Digoxin."[58]

122.    Likewise, Hikma, West-Ward's parent, said in a March 2014 press release that its generic drug revenues increased by 158%, "reflecting very strong doxycycline sales."[59] And Sun reported in 2013 that price increases earlier in the year yielded "$60-80 million (of $128 million

---

[57] http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

[58] http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

[59] http://www.hikma.com/en/investors/results-reports-and-presentations.all.year2014.html.

in total revenue…) to come from [doxycycline], with operating margins in the range of 50-55%."[60]

123.    Defendants' agreement to inflate the prices of generic drugs led to increased revenue and higher profits – which was a motive for the conspiracy.  In addition, the burgeoning profits of the illegal scheme drove company share prices higher, which provided further motive to conspire. For example, Lannett's stock price in October 2012 was under $5.  But by April 2015, Lannett's share price had skyrocketed to more than $70, fueled by the inflated profits from generic drugs.  Bedrosian, the Lannett CEO, owned more than 600,000 shares of stock during this time frame, the value of which increased by tens of millions of dollars. Other Defendants' stock prices also exploded with the profits of their price-fixing scheme.  For example, the share prices of Mylan, Hikma and Sun approximately tripled between October 2012 and mid-2015.

K.      **Congress's and Regulators' Responses to Generic Drug Price Hikes**

124.    As noted above, the unprecedented price increases and exorbitant profits made by the generic drug manufacturers led to inquiries by Congress and to the Senate Hearing, where numerous witnesses referenced the pricing history summarized above.

125.    Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect that price increases of generic drugs, including generic digoxin and doxycycline, have had on generic drug spending within the Medicare and Medicaid programs.[61] The OIG responded in a letter dated April 13, 2015, saying

---

[60] http://www.business-standard.com/article/markets/sun-pharma-s-prospects-remain-bright-113091200894_1.html.

[61] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

it planned to engage in a review of quarterly average manufacturer prices for the 200 top generic drugs from 2005 through 2014.[62]

126.    In the summer of 2014, Connecticut AG Jepsen issued subpoenas to Defendants Lannett, Impax, Heritage and Par, specifically saying that there was "reason to believe" that a conspiracy took place "which is for the purpose, or has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories . . . ." And, in December 2016, the Connecticut AG and 19 other state AGs filed a complaint asserting price-fixing and customer allocation claims with respect to, *inter alia*, doxycycline, and named as defendants many of the entities named as Defendants in this Complaint.

127.    In addition, DOJ has filed criminal Informations against Glazer and Malek, two former officers of Defendant Heritage, for conspiring to allocate customers, rig bids, and fix prices for doxycycline. They pled guilty to those charges on January 9, 2017.

128.    Lannett, Impax, Par, Mayne, Sun, Actavis, and Mylan each have acknowledged in their SEC filings that they or their employees have received subpoenas from the federal grand jury empaneled in the Eastern District of Pennsylvania and/or from the Connecticut AG.  In an SEC Form 10-Q dated February 6, 2015, Lannett said that on November 3, 2014, "the Senior Vice-President of Sales and Marketing [Kevin Smith] was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[63] The responses to that subpoena led to the issuance of a second grand jury subpoena to Lannett itself. It noted in the same SEC filing that on December 5, 2014, "[t]he Company was served with a grand jury subpoena related to the federal investigation of the

---

[62] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[63] *See* http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=10044800&type=HTML&symbol=LCI&companyName=Lannett+Co.+Inc.&formType=10-Q&dateFiled=2015-02-06.

generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products." A report in *Pharmacy Times* described the subpoenas as follows:

> The Lannett Company, Inc. subpoena covers 2 specific areas related to antitrust laws and generic drug pricing. The first portion covers a Connecticut Attorney General investigation into whether the company or its employees engaged in price fixing, maintaining, or controlling for digoxin. The second portion serves the company's senior vice president of sales and marketing with a grand jury subpoena pertaining to Sherman antitrust act violations in the generic drug industry. That subpoena requests any documents exchanged with competitors related to the sale of any generic prescription medications during any time period.[64]

Similar statements are contained in Lannett's recent SEC Form 10-Qs.[65]

129.   On August 27, 2015, Lannett issued a new SEC Form 10-K. It contains this further explanation of the DOJ investigation:

> In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[66]

---

[64] http://www.pharmacytimes.com/publications/issue/2014/December2014/Senate-Hearing-Investigates-Generic-Drug-Prices.

[65] *E.g.*,http://www.sec.gov/Archives/edgar/data/57725/000110465916094983/a15-24119_110q.htm.

[66] http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

Similar statements are contained in Lannett's Form 10-Q, referenced above. Thus, Lannett has now indicated that the DOJ has caused subpoenas to be issued to a number of "affiliated individuals" and that the scope of the investigation extends back a decade.

130.    Similarly, in an SEC Form 10-K dated March 12, 2015, Par stated that "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin (digoxin) oral tablets and our generic doxycycline products."[67] Par repeated this disclosure in its Form 10-Q issued for the second quarter of 2015.[68] In a Form 10-Q for the third quarter of 2015, Endo International plc, the parent company of Par, stated that "[o]n December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is cooperating fully with the investigation."[69]

131.    Impax's 2015 Form 10-K states that "[o]n November 6, 2014, the company disclosed that one of its sales representatives received a grand jury subpoena from the Antitrust Division of the United States Justice Department. In connection with this same investigation, on

---

[67] https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[68] https://www.sec.gov/Archives/edgar/data/878088/000087808815000010/prx-20150630x10q.htm.

[69] http://phx.corporate-ir.net/phoenix.zhtml?c=123046&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwNTY2NjAwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

March 13, 2015, the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marking, and pricing of certain generic prescription medications. In particular, the Justice Department's investigation currently focuses on four generic mediations: digoxin tablets…." [70]This assertion was repeated in Impax's Form 10-Q filed in May 2015[71] and August 2015[72], and reconfirmed in its Form 10-K filed on February 22, 2016.[73]

132.    On August 6, 2015, Allergan (now part of Actavis) filed an SEC Form 10-Q, in which it disclosed that "[o]n June 25, 2015, [Actavis] received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[74]

133.    On December 4, 2015, Mylan N.V., the parent of Defendant Mylan, issued an SEC Form 8-K that stated, "On December 3, 2015, a subsidiary of Mylan N.V. … received a subpoena from the Antitrust Division of the U.S. Department of Justice … seeking information relating to the marketing, pricing and sale of our generic Doxycycline products and any communications with competitors about such products."[75] Regulatory investigations of Mylan are not limited to doxycycline, however. In its SEC Form 10-K filed on February 16, 2016,

---

[70] http://investors.impaxlabs.com/Investor-Relations/SEC-Filings/SEC-Filing-Details/default.aspx?FilingId=11200867.

[71] http://investors.impaxlabs.com/Investor-Relations/SEC-Filings/SEC-Filing-Details/default.aspx?FilingId=10690183.

[72] http://investors.impaxlabs.com/Investor-Relations/SEC-Filings/SEC-Filing-Details/default.aspx?FilingId=10854400.

[73] http://investors.impaxlabs.com/Investor-Relations/SEC-Filings/SEC-Filing-Details/default.aspx?FilingId=11200867.

[74] https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm.

[75] http://www.sec.gov/Archives/edgar/data/1623613/000119312515394875/d225442d8k.htm.

Mylan N.V. reported that "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[76] The activities of Mylan identified in the AG Complaint have been discussed above.

134.    On May 28, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Defendant Sun) stated in a filing with the National Stock Exchange of India that "one of the Company's U.S. subsidiaries, Sun Pharmaceutical Industries, Inc. ('SPII') has received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents from SPII and its affiliates relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters. SPII is currently responding to the subpoena."[77] As noted above. Sun is a manufacturer and/or distributor of both generic digoxin and generic doxycycline.

135.    On November 4, 2016, Mayne Pharma Group Limited (the parent of Defendant Mayne) issued a press release stating: "Previously on 28 June 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne

---

[76] http://files.shareholder.com/downloads/ABEA-2LQZGT/146191293x0xS1623613-16-46/1623613/filing.pdf.

[77] *See*
http://www.bseindia.com/corporates/ann.aspx?curpg=81&annflag=1&dt=&dur=A&dtto=&cat=&scrip=524715&anntype=C, at May 28, 2016.

Pharma is focused on doxycycline delayed-release tablets (generic) and potassium chloride powders."[78] The activities of Mayne identified in the AG Complaint have been discussed above.

136.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*, last updated in May 2016.[79] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

137.     Commentators have also taken note of the criminal subpoenas being issued. As noted on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.

---

[78] http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.
[79] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.
>
> The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[80]

138.   Or, as Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[81]

139.   And, as another legal commentator has recently noted,

> The recent disclosure widens the DOJ's criminal probe into whether or not leading generic drug providers are colluding to artificially raise generic drug prices. According to data from the Centers for Medicare and Medicaid Services (CMS), more than half of all generic drug prices rose between June 2013 and June 2014, including 10 percent of all generic drugs doubling in price during that time. As the fourth largest generics producer in the world, at least prior to the Teva deal, Allergan is largest company to be involved in the DOJ investigation so far. The probe became public last November when Impax was served with several criminal grand jury subpoenas. Lannett announced in a regulatory filing earlier in the year that the company, as well as its senior vice-president of sales and marketing, was being served with grand jury subpoenas as well. Like Lannett, Allergan wrote that it intends to fully cooperate with the investigation. Neither the DOJ, nor the company would comment further on the investigation beyond the filings. While Allergan made no mention of the medicines involved in the suspected collusion, filings from other companies

---

[80] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.
[81] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

indicate that the heart drug digoxin and the antibiotic doxycycline are among those under investigation.[82]

140.    Also of significance is the reported leniency applicant who has sought amnesty from the DOJ. As explained on one of the DOJ's webpages (https://www.justice.gov/atr/page/file/926521/download):

### 5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will not qualify for leniency through the Leniency Program.

As indicated on the webpage, the leniency applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

141.    In addition to the issuance of subpoenas by both the federal grand jury and the Connecticut AG, the acknowledgment of participation in unlawful conduct by the leniency applicant and the January 9, 2017 criminal guilty pleas by Defendants Glazer and Malek further confirm the existence of a conspiracy among Defendants to fix prices.

### L.    Factors Increasing the Market's Susceptibility to Collusion

142.    Publicly available data on the generic digoxin and doxycycline markets in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make

---

[82] http://www.legalreader.com/doj-subpoenas-allergan-as-generics-antitrust-probe-widens/.

a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) intercompetitor contacts and communication.

### 1.   **Industry Concentration**

143.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

144.    As described above, in the United States generic digoxin and generic doxycycline markets, the number of meaningful competitors has dwindled, creating conditions favorable to an effective cartel. The firms that currently control most of the market are Defendants. A graphic available at the website of one pharmacy benefits manager ("PBM")[83] reflects this development with respect to the market for generic digoxin:

145.    By the third quarter of 2013, the digoxin market was an effective duopoly and new entrants in 2014 were perceived as "rational" competitors who would not disrupt the existing price structure.

---

[83] http://campaign.optum.com/content/optum/en/thought-leadership/whatcanbedone.html.

146.    In fact, the combined market share of Defendants' generic digoxin was nearly 80% in 2012, 91% in 2013 and 97% in 2014.

147.    Doxycycline presents a similar scenario. At one point there were over 20 manufacturers of generic doxycycline.[84] However, over the past decade, the number of generic drug manufacturers producing doxycycline has steadily dropped. Major Pharmaceuticals, Teva, and West-Ward were among the generic manufacturers that discontinued certain doxycycline product lines. Major Pharmaceuticals' and Teva's discontinuations occurred in or around February 2013 and May 2013, respectively.[85] West-Ward discontinued one line of doxycycline in or around July 2013. Defendants' market share for generic doxycycline delayed release products was nearly 100%.

2.    **Barriers to Entry**

148.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

149.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic digoxin and doxycycline markets that make such entry time-consuming and expensive.

150.    Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

---

[84] https://vineyardgazette.com/news/2015/09/24/cost-doxycycline-skyrockets.
[85] http://www.ashp.org/menu/DrugShortages/CurrentShortages/bulletin.aspx?id=977.

151.    Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in both the generic digoxin and doxycycline markets. This is reflected in West-Ward's having to shut down temporarily its New Jersey production facility for digoxin and spend $39 million on remediation. Likewise, Impax's 2015 Form 10-K (cited above) referenced FDA warning letters it received with respect to its manufacturing facilities in Hayward, California and Taiwan. And the predecessor to Actavis plc's issues with the FDA over production of doxycycline at its New Jersey facilities provides another example.

152.    Intellectual property costs can also be substantial, as reflected in Par's digoxin licensing deal with Covis and Lannett's licensing arrangement with JSP.

153.    In addition to the substantial out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[86] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.    Demand Inelasticity

154.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic

---

[86] http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

155.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

156.    Demand for doxycycline and digoxin tablets are highly inelastic because both are unique products:  digoxin is a unique compound that is used for the treatment of atrial fibrillation and heart failure; doxycycline is similarly unique in that it is used to treat a broad spectrum of bacterial infections. Their common use has led to both drugs being designated as "essential medicines" by the World Health Organization.

157.    Thus, generic digoxin and generic doxycycline are excellent candidates for cartelization because price increases will result in more revenue, rather than less.

### 4.    **Lack of Substitutes**

158.    In the case of digoxin, while other medications exist for the treatment of atrial fibrillation, many doctors, particularly geriatricians and general practitioners, see digoxin as the primary medication for the treatment of this condition.

159.    Furthermore, other atrial fibrillation drugs have different mechanisms for treating atrial fibrillation that can be used as complements to, rather than substitutes for, digoxin. For example, sodium and potassium channel blockers like flecainide, propafenone, or sotalol, are used for controlling heart *rhythm* in patients with atrial fibrillation, while digoxin is used to control heart *rates* in patients with atrial fibrillation.

160.    Even other heart rate controlling medications, such as beta blockers, are not ready substitutes for digoxin tablets because they have different chemical and pharmacokinetic properties that may not make them suitable treatment options under many circumstances. One study published in the *Journal of the American College of Cardiology* found "that digoxin is still a first-line alternative to control ventricular rate in patients with atrial fibrillation, particularly in cases with congestive heart failure and left ventricular systolic dysfunction."[87]

161.    Other antibiotics—even other tetracycline antibiotics—are not substitutes for doxycycline. Medical professionals consider doxycycline a "workhorse" drug—the standard prescription for the treatment of a variety of bacterial infections, including bacterial pneumonia, acne, chlamydia, Lyme disease, cholera, and syphilis.[88]

162.    Other tetracyclines, such as chlortetracycline and oxytetracycline, are short acting antibiotics, with half-lives of between six and eight hours—meaning that half of these drugs' pharmacological benefits have been used within that period.  By contrast, doxycycline has a half-life of 16 hours, *i.e.*, double that of either chlortetracycline or oxytetracycline.  Further, even as compared to other longer-acting tetracyclines, such as minocycline, studies have found that doxycycline has resulted in fewer adverse events in patients, thereby making it the standard choice among physicians for the bacterial infections listed above.[89]

---

[87] Henrique H. Veloso & Angelo A.V. de Paola, *Beta-Blockers Versus Digoxin to Control Ventricular Rate During Atrial Fibrillation*, 45 J. Am. Coll. Cardiology 1905, 1906 (June 2005), http://content.onlinejacc.org/article.aspx?articleid=1136643.

[88] Dr. Jeremy A. Greene, *Drug Bust*, Slate (Nov. 20, 2014), http://www.slate.com/articles/business/moneybox/2014/11/generic_drug_prices_why_their_prices_are_suddenly_surging.html.

[89] *See* Kelly Smith & James J. Leyden, *Safety of doxycycline and minocycline: A systematic review*, 27 Clinical Therapeutics 1329 (Sept. 2005), http://www.ncbi.nlm.nih.gov/pubmed/16291409.

163.    In addition, branded versions of digoxin tablets or doxycycline do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  For example, WAC pricing for Lanoxin (the branded version of digoxin tablets) was $240.00 per 100 tablet bottle in August 2013, which was more than double both Impax's and Lannett's WAC prices for digoxin tablets around that time, which was $118.50 per 100 tablet bottle.[90]

164.    Thus, purchasers of doxycycline and digoxin tablets are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

165.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and it is easier to monitor these prices effectively.

166.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. Because the FDA, when approving an ANDA, is required to determine whether a generic drug product is bioequivalent to the brand's NDA, an AB-rating permits a pharmacist to substitute an AB-rated generic for its branded counterpart, as well as to substitute one AB-rated generic for another AB-rated generic for the same branded product.

_____

[90] Oppenheimer Equity Research, Lannett Company, Inc. (Feb. 7, 2014) at 2.

167.    The generic digoxin and/or generic doxycycline made by the defendant manufacturers are each chemical compounds composed of the same raw materials; indeed, Bedrosian has commented that Defendants use many of the same suppliers. He also acknowledged the commodity nature of Lannett's generics business during a November 7, 2013 earnings call.

168.    Because Defendants' digoxin tablets are AB-rated generics of Lanoxin, pharmacists are permitted to substitute them for Lanoxin. Similarly, Defendants' doxycycline tablets are AB-rated generics of their branded counterparts, enabling pharmacists to substitute them for branded products.

169.    Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's is through price reductions.[91] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor Contacts and Communications

170.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and GNOs. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. Indeed, the Connecticut AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. Defendants Glazer and Malek admitted at their guilty plea

---

[91] *See* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/12-02-drugpromo_brief.pdf at 1.

hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline.

171.    The grand jury subpoenas discussed above lend further support to the conclusion that inter-competitor communications occurred with respect to the pricing of generic drugs. Indeed, according to the previously-identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[92] The allegations in the AG Complaint confirm this.

172.    In addition, as noted above, Lannett's Bedrosian has made significant assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future. Such statements also indicate inter-competitor contacts and communications. For example, around seven months after the price of doxycycline skyrocketed in January 2013, Defendant West-Ward's parent company Hikma raised guidance for the drug doxycycline from $200 million to $230 million—a signal "that doxycycline prices will remain high."[93]

## IX.    <u>THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS</u>

### A.    **The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy**

173.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs

---

[92] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[93] *See* http://articles.economictimes.indiatimes.com/2013-08-23/news/41440919_1_sun-pharmaceuticals-doxycycline-sun-pharma-shares.

suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

174.    In the case of Heritage, Mayne, Glazer and Malek, specifically, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

175.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

176.    Plaintiffs are purchasers who indirectly purchased generic digoxin and generic doxycycline manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

177.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)    Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[94]

(b)    Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."[95]

(c)    Impax's Code of Business Conduct and Ethics provides: "Impax is committed to free and open competition in the marketplace, and requires

---

[94] http://www.allergan.com/investors/corporate-governance/code-of-conduct.
[95] http://www.lannett.com/docs/2013_Code_of_Business_Conduct_and_Ethics.pdf.

employees to strictly adhere to the antitrust laws in the countries where we do business." It continues: "No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."[96]

(d)   Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."[97]

(e)   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[98]

(f)   Par Pharmaceutical's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[99]

(g)   Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[100]

(h)   Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[101]

178.   It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

---

[96] http://investors.impaxlabs.com/Investor-Relations/Corporate-Governance/Policies/default.aspx.

[97] https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf.

[98] https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[99] http://corpdocs.msci.com/ethics/eth_19100.pdf.

[100] https://www.sunpharma.com/policies.

[101] http://www.hikma.com/en/sustainability/Code-of-conduct.html.

179.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

B.    **Fraudulent Concealment Tolled the Statutes of Limitations**

180.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted herein by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

181.    In the case of Heritage, Mayne, Glazer and Malek, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

182.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic digoxin and generic doxycycline.

183.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic digoxin and generic doxycycline. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic digoxin and generic

doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic digoxin and generic doxycycline. Defendants' false statements and conduct concerning the prices of generic digoxin and generic doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic digoxin and generic doxycycline at prices established by a free and fair market.

1.   <strong>Active Concealment of the Conspiracy</strong>

184.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

185.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic digoxin and doxycycline.

186.    For example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

187.    Paragraphs 119-27 of the AG Complaint provides specific examples of these acts of fraudulent concealment with respect to Defendants Heritage, Mayne, Malek, and Glazer, including: (a) Glazer reminding Malek on June 26, 2014 not to put evidence of his illegal

conduct in writing; (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone; (c) Malek sending a text message about how to avoid detection by regulators, which was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors; and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her cellular telephone before the data on that telephone were imaged and produced to the Connecticut AG's office.

188.    As Jepsen said in the press release referenced above that was issued at the time that the AG Complaint was filed:  "[t]he states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation."[102]

189.    The concealment was not limited to these Defendants. By way of further example, Defendants also falsely denied that their price increases were caused by agreements with one another. For example, in earnings calls held in 2015 and 2016, Bedrosian of Lannett repeatedly denied that his company engaged in any wrongdoing. Moreover, Bedrosian defended his company's price hikes on generic drugs like digoxin, calling them "[c]onsistent with industry norms."[103]

---

[102] http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[103] http://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#1c41cf0e77ef.

190.    In an August 2015 press release, Impax misleadingly characterized "significantly lower sales of generic digoxin as a result of additional competition."[104] In fact, the conspiracy among Defendants reduced competition in the market for generic digoxin, and prices remained at supracompetitive levels.

191.    Similarly, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products like … Doxycycline…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.[105]

192.    These false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic digoxin and generic doxycycline to inflated, supracompetitive levels.

### 2.    Plaintiffs Exercised Reasonable Diligence

193.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets for generic digoxin and doxycycline to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

194.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

---

[104] http://investors.impaxlabs.com/Media-Center/Press-Releases/Press-Release-Details/2015/Impax-Reports-Second-Quarter-2015-Financial-Results/default.aspx.

[105] http://www.sunpharma.com/Media/Press-Releases/FY16%20Q1%20Earnings%20Call%20Transcript.pdf.

195.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for generic digoxin and doxycycline throughout the United States during the Class Period.

196.    For these reasons, Plaintiffs' claims are timely under both the federal, state and common laws identified herein.

## X.    **CONTINUING VIOLATIONS**

197.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.    **DEFENDANTS' ANTITRUST VIOLATIONS**

198.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix prices for generic digoxin and/or doxycycline sold in the United States.

199.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic digoxin and/or generic doxycycline sold in the United States. These activities included the following:

(a)    Defendants participated in meetings and/or conversations regarding the price of generic digoxin and/or generic doxycycline in the United States;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic digoxin and/or generic doxycycline sold in the United States;

(c)    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic digoxin and/or generic doxycycline; and

(d)    Defendants issued price announcements and price quotations in accordance with their agreements.

200.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

201.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic digoxin and/or generic doxycycline at inflated and supracompetitive prices.

202.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3) and the laws of various Indirect Purchaser States enumerated below.

203.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic digoxin and/or generic doxycycline than they would have paid in a competitive market.

204.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges

at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices of digoxin and doxycycline to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of digoxin and doxycycline.

205.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic digoxin and/or generic doxycycline has been artificially restrained;

(b)    prices for generic digoxin and/or generic doxycycline sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    end-payer purchasers of generic digoxin and/or generic doxycycline sold by Defendants have been deprived of the benefit of free and open competition in the market for generic digoxin and generic doxycycline.

## XII.    **CLASS ACTION ALLEGATIONS**

206.    Plaintiffs brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin and/or generic doxycycline hyclate products, other than for resale, from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who

75

purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

207.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[106] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin and/or generic doxycycline hyclate products, other than for resale, from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

---

[106] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

208. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

209. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

210. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic digoxin and/or generic doxycycline and/or engaged in market allocation for generic digoxin and/or generic doxycycline sold by prescription in the United States;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e) Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

77

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic digoxin and generic doxycycline sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic digoxin and generic doxycycline, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

211.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic digoxin and generic doxycycline purchased indirectly from Defendants and/or their co-conspirators.

212.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

213. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

214. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

215. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIII. CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

216. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

217. Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

218.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic digoxin and/or doxycycline, thereby creating anticompetitive effects.

219.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic digoxin and generic doxycycline.

220.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased generic digoxin and generic doxycycline have been harmed by being forced to pay inflated, supracompetitive prices for generic digoxin and generic doxycycline.

221.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

222.     Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the United States

(b)      Prices for generic digoxin and generic doxycycline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)      Plaintiffs and members of the Nationwide Class who purchased generic digoxin and generic doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

80

223.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic digoxin and generic doxycycline purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

224.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

225.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

226.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

227.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic digoxin and generic doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

228.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic digoxin and generic doxycycline and to allocate customers for generic digoxin and generic doxycycline in the United States.

229.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and

81

elsewhere during which they agreed to price generic digoxin and generic doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic digoxin and generic doxycycline provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

230.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic digoxin and generic doxycycline.

231.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Alabama; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama

Code § 6-5-60, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic digoxin and generic doxycycline at

supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic digoxin and generic doxycycline. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic digoxin and generic doxycycline. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic digoxin and generic doxycycline provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic digoxin and generic doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct

had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further

injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic digoxin and generic doxycycline, increasing the prices of generic digoxin and generic doxycycline, preventing competition in the sale of generic digoxin and generic doxycycline, or binding themselves not to sell generic digoxin and generic doxycycline, in a manner that established the price of generic digoxin and generic doxycycline and precluded free and unrestricted competition among

themselves in the sale of generic digoxin and generic doxycycline, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As

a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or

89

conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open

90

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

244.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. In accordance with the requirements of § 598A.210(3), simultaneous notice of this action was mailed to the Nevada Attorney General by Plaintiffs. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

247.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

248.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Laws § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Laws § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

249.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

250. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*.

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

256.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators'

anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

258.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

259.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

260.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

261.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

262.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

263.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price

101

competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

264. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed generic digoxin and generic doxycycline in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common,

continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic digoxin and generic doxycycline in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic digoxin and generic doxycycline. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint,

103

Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic digoxin and generic doxycycline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic digoxin and generic doxycycline, including their illegal conspiracy to secretly fix the price of generic digoxin and generic doxycycline at supracompetitive levels and overcharge

consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic digoxin and generic doxycycline. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

106

268.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

269.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic digoxin and generic doxycycline for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic digoxin and generic doxycycline in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic digoxin and generic doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic digoxin and generic doxycycline by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic digoxin and generic doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic digoxin and generic doxycycline at prices established by a free and fair market.

Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic digoxin

and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic digoxin and generic doxycycline as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.

110

Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic digoxin and generic doxycycline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic digoxin and generic doxycycline, including their illegal conspiracy to secretly fix the price of generic digoxin and generic doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic digoxin and generic doxycycline. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or

unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic digoxin and generic doxycycline that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic digoxin and generic doxycycline ; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic digoxin and generic doxycycline were misled to believe that they were paying a fair price for generic digoxin and generic doxycycline or the price increases for generic digoxin and generic doxycycline were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic digoxin and generic doxycycline would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic digoxin and generic doxycycline would have a broad impact, causing consumer class members who indirectly purchased generic digoxin and generic

doxycycline to be injured by paying more for generic digoxin and generic doxycycline than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin and generic doxycycline in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin

and generic doxycycline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic digoxin and generic doxycycline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic

doxycycline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin and generic doxycycline in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

274.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, *et seq*.) Members of the Damages Class purchased generic digoxin and generic doxycycline for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1)

115

generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic digoxin and generic doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic digoxin and generic doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic digoxin and generic doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10, *et seq*.) Defendants' combination or conspiracy had the following effects: (1)

generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were

competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic digoxin and generic doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic digoxin and generic doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## **FOURTH COUNT**

### **Unjust Enrichment**
### **(on behalf of Plaintiffs and the Damages Class)**

### **(All States, District of Columbia and U.S. Territories, Except Ohio and Indiana)**

1.      Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

2.      To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

3.      Defendants have unlawfully benefited from their sales of digoxin and doxycycline because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for digoxin and doxycycline at prices that were more than they would have been but for Defendants' unlawful actions.

4.      Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

5.      Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

6.      Defendants have been enriched by revenue resulting from unlawful overcharges for digoxin and doxycycline while Plaintiffs have been impoverished by the overcharges they paid for digoxin and doxycycline imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

7.      There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

8.      Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

9.      The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of digoxin and doxycycline.

10.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of digoxin and doxycycline are ascertainable by review of sales records.

11.      It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of digoxin and doxycycline.

12.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased digoxin and doxycycline, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

13.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for digoxin and doxycycline is a direct and proximate result of Defendants' unlawful practices.

14.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

15.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for digoxin and doxycycline derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

16.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

17.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of digoxin and doxycycline.

18.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of digoxin and doxycycline by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state

antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.　　Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.　　Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.　　Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.　　Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.　　Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XV.   **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

January 27, 2017                                                    Respectfully submitted,


Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
215-567-6565
215-568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

**Lead Counsel for End-Payer Plaintiffs
and Counsel for Plaintiff UFCW Local
1500 Welfare Fund**


[additional counsel on following pages]

Gregory S. Asciolla
Jay L. Himes
Karin E. Garvey
Domenico Minerva
Robin A. van der Meulen
Matthew J. Perez
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
212-907-0700
212-818-0477  fax
gasciolla@labaton.com
jhimes@labaton.com
dminerva@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

Joseph Goldberg
Freedman Boyd Hollander Goldberg Urias
& Ward P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
505-842-9960
505-842-0761  fax
jg@fbdlaw.com

***Counsel for Plaintiff***
***UFCW Local 1500 Welfare Fund***

Michael D. Hausfeld
Jeannine M. Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
202-540-7200
202-540-7201  fax
mhausfeld@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Stephanie Y. Cho
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
415-633-1908
415-358-4980  fax
mlehmann@hausfeld.com
bsweeney@hausfeld.com
c1ebsock@hausfeld.com

Frank R. Schirripa
HACH ROSE SCHIRRIPA & CHEVERIE
LLP
185 Madison Ave.
New York, New York 10016
212- 213-8311
fschirripa@hrsclaw.com

***Counsel for Plaintiff International Union***
***of Operating Engineers Local 30 Benefits***
***Fund***

Alexandra S. Bernay
Carmen A. Medici
Arthur L. Shingler III
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego CA 92101-8498
619-231-1050
619-231-7423  fax
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
631-367-7100
631-367-1173  fax
srudman@rgrdlaw.com

*Counsel for Plaintiff*
*NECA-IBEW Welfare Trust Fund*


Jayne A. Goldstein
Natalie Finkelman Bennett
SHEPHERD FINKELMAN MILLER &
SHAH, LLP
35 East State Street
Media, PA 19063
610-891-980
jgoldstein@sfmslaw.com
nfinkelman@sfmslaw.com

*Counsel for Plaintiff*
*Fraternal Order of Police, Miami Lodge*
*20, Insurance Trust Fund*

Heidi M. Silton
Karen Hanson Riebel
W. Joseph Bruckner
Richard A. Lockridge
Kate M. Baxter-Kauf
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
612-339-6900
612-339-0981 fax
hmsilton@locklaw.com
khriebel@locklaw.com
wjbruckner@locklaw.com
ralockridge@locklaw.com
kmbaxter-kauf@locklaw.com

Gary F. Lynch
CARLSON LYNCH LTD
PNC Park
115 Federal Street, Suite 210
Pittsburgh, PA 15212
412-322-9243
412-231-0246 fax
glynch@carlsonlynch.com

Jeffrey L. Kodroff
John A. Macoretta
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF &
WILLIS P.C.
1818 Market Street, Suite 2500
Philadelphia, P A 19103
215-496-0300
215-496-6611 fax

*Counsel for Plaintiff*
*Pipe Trades Services MN*

Steven J. Greenfogel
Mindee J. Reuben
LITE DEPALMA GREENBERG, LLC
1835 Market Street, Suite 2700
Philadelphia, PA 19103
973-877-3819 (SJG)
267-314-7980 (MJR)
973-623-0858  fax
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

Joseph Gentile
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, New York 11021
516-699-8890
516-699-8968  fax
joseph@sarrafgentile.com

***Counsel for Plaintiff Nina Diamond***

Marc H. Edelson
Edelson & Associates, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
215-867-2200
267-685-0676  fax
medelson@edelson-law.com

***Counsel for Plaintiff***
***Philadelphia Federation of Teachers***
***Health and Welfare Fund***

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Joyce Chang
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
650-697-6000
650-697-0577  fax
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com

Steven L. Stemerman
Sarah Grossman-Swenson
DAVIS, COWELL & HOWE, LLP.
595 Market Street, Suite 800
San Francisco, CA 94015
415-597-7200
415-597-7201  fax
stem@dcbsf.com
sgs@dcbsf.com

***Counsel for Plaintiff United Food &***
***Commercial Workers and Employers***
***Arizona Health and Welfare Trust***
***        and***
***Plaintiff Unite Here Health***

R. Alexander Saveri
Lisa M. Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
415-217-6810
415-217-6813  fax
rick@saveri.com
lisa@saveri.com
cadio@saveri.com

Krishna B. Narine
Lauletta Birnbaum
100 S. Broad St., Suite 905
Philadelphia, PA  19110
215-644-3942
856-232-1601  fax
knarine@lauletta.com

Robert M. Foote
Kathleen C. Chavez
FOOTE, MIELKE, CHAVEZ
& O'NEIL LLC
10 West State Street, Suite 200
Geneva, IL 60134
630-232-7450
630-232-7452  fax
rmf@fmcolaw.com
kcc@fmcolaw.com

E. Kirk Wood
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
205-612-0243
866-747-3905  fax
ekirkwood1@bellsouth.net

Gerald J. Rodos
Jeffrey B. Gittleman
Chad A. Carder
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
215-963-0600
215-963-0838 fax
GRodos@barrack.com
JGittleman@barrack.com
Ccarder@barrack.com

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
415-421-3400
415-421-2234 fax
asteyer@steyerlaw.com
smacrae@steyerlaw.com

*Counsel for Plaintiff Ottis McCrary*

Lee Albert
Gregory B. Linkh
122 East 42nd Street, Suite 2920
New York, NY 10168
212-682-5340
212-884-0988 fax
lalbert@glancylaw.com
glinkh@glancylaw.com

*Counsel for Plaintiff Plumbers &*
*Pipefitters Local 78 Health and Welfare*
*Trust Fund*

127

Fred T. Isquith, Sr.
Thomas H. Burt
Anita Kartalopolous
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
212-545-4600
212-686-0144  fax
burt@whafh.com
kartalopolous@whafh.com

Theodore B. Bell
Carl V. Malmstrom
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
One South Dearborn St., Suite 2122
Chicago, Illinois 60603
312-984-0000
312-212-4496 fax
tbell@whafh.com
malmstrom@whafh.com

Michael McNally
FELHABER LARSON LLC
220 South 6th Street, Suite 2200
Minneapolis, MN 55402
612-339-6321
612-338-0535 fax
mcnally@felhaber.com

***Counsel for Plaintiff Plumbers &
Pipefitters Local 33 Health and Welfare
Fund***

Robert J. McConnell
Vincent L. Greene
MOTLEY RICE LLC
321 South Main Street, 2nd Floor
Providence, RI 02903
bmcconnell@motleyrice.com
vgreene@motleyrice.com
401-457-7730
401-457-7708  fax

Michael M. Buchman
MOTLEY RICE LLC
600 Third Avenue, Suite 2101
New York, NY 10016
212-577-0040
212-577-0054  fax

***Counsel for Plaintiff
The City of Providence, Rhode Island***

Terry Gross
Adam C. Belsky
GROSS & BELSKY, P.C.
201 Spear Street, Suite 1100
San Francisco, CA 94105
415-544-0200
415-544-0201  fax
terry@grossbelsky.com
adam@grossbelsky.com

R. Alexander Saveri
Lisa Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
415-217-6810
415-217-6813  fax
rick@saveri.com
cadio@saveri.com
lisa@saveri.com

***Counsel for Plaintiff
Valerie Velardi***

128

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of January, 2017, I filed the foregoing End-Payer Plaintiffs' Consolidated Class Action Complaint with the Clerk of Court who will electronically enter said filing on the docket.  Thereafter via ECF Notifications said filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.

 /s/  *Roberta D. Liebenberg*
Roberta D. Liebenberg