IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC DIGOXIN AND DOXYCYCLINE ANTITRUST LITIGATION | MDL NO. 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | HON. CYNTHIA M. RUFE |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT WEST-WARD PHARMACEUTICALS CORP.'S
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINTS

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................... 1

II. RELEVANT ALLEGATIONS ................................................................................. 3

    A. West-Ward's Manufacture of Digoxin and Doxycycline ................................. 3

    B. West-Ward's Digoxin and Doxycycline Prices ................................................ 5

    C. Plaintiffs' Purported Circumstantial Evidence ................................................. 6

III. ARGUMENT ............................................................................................................. 7

    A. Plaintiffs Do Not Plead Any Factual Allegations Demonstrating That West-Ward Joined or Participated in a Conspiracy .......................................... 8

    B. Plaintiffs Fail To Allege That West-Ward Engaged in Parallel Pricing .......... 9

    C. Plaintiffs' Allegations Provide an Obvious Alternative Explanation For Any Alleged Pricing Practices By West-Ward During the Relevant Period ............................................................................................... 10

    D. Plaintiffs' Other Allegations of Circumstantial Evidence Do Not Imply That West-Ward Participated In a Conspiracy .................................... 12

        1. Plaintiffs' Broad Allegations Regarding Government Action Do Not Implicate West-Ward ................................................................ 12

        2. Plaintiffs' Bare Allegations Regarding West-Ward's Membership in the GPhA Are Insufficient as a Matter of Law ......... 13

        3. Statements Made In Press Releases, Investor Reports, and Earnings Calls Do Not Imply West-Ward's Participation In Any Conspiracy ...................................................................................... 14

IV. CONCLUSION ....................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Amelio v. McCabe, Weisberg & Conway, P.C.*, No 14-1611, 2015 U.S. Dist. LEXIS 98378 (W.D. Pa. July 28, 2015) .................................................................................................. 4

*BanxCorp v. LendingTree LLC*, No. 10-2467, 2011 U.S. Dist. LEXIS 12258 (D.N.J. Feb. 7, 2011) ............................................................................................................................... 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 1, 7, 8, 9

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000) ........ 14

*Doe v. Aliquippa Hosp. Ass'n*, No. 93-570, 1994 U.S. Dist. LEXIS 21284 (W.D. Pa. Sep. 29, 1994) ............................................................................................................................... 3

*Erickson v. Neb. Mach. Co.*, No. 15-cv-01147-JD, 2015 U.S. Dist. LEXIS 87417 (N.D. Cal. July 6, 2015) .......................................................................................................................... 3

*Finkelman v. NFL*, 810 F.3d 187 (3d Cir. 2016) ........................................................................... 8

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) .................................................... 14

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) ............................. 12

*In re Frito-Lay N. Am., Inc.*, No. 12-MD-2413, 2013 U.S. Dist. LEXIS 123824 (E.D.N.Y. Aug. 29, 2013) ........................................................................................................................ 3

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) .............................................. 10

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) ....................... 8

*In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015) ........................................... 11

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................. 8

*InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003) ................................................. 10

*Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004) ................................. 8, 9

*Larry Pitt & Assocs. v. Lundy Law, LLP*, 57 F. Supp. 3d 445 (E.D. Pa. 2014) ............................. 7

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) ....................................................................... 11

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993) .............. 11

*Resco Prods., Inc. v. Bosai Minerals Gp. Co.*, 158 F. Supp. 3d 406 (W.D. Pa. 2016) ............ 9, 13

*Schuylkill Health Sys. v. Cardinal Health 200,* LLC, No. 12-cv-7065, 2014 U.S. Dist. LEXIS 103663 (E.D. Pa. July 30, 2014) .................................................................................... 13

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) .................................................................. 11

*Starks v. Coloplast Corp.*, No. 13-3872, 2014 U.S. Dist. LEXIS 19611 (E.D. Pa. Feb. 13, 2014) 3

*Superior Offshore Int'l, Inc. v. Bristow Gp.*, 490 F. App'x 492 (3d Cir. 2012) ........................... 10

*Superior Offshore Int'l, Inc. v. Bristow Gp.*, 738 F. Supp. 2d 505 (D. Del. 2010) ................. 12, 14

*U.S. Express Lines, LTD. v. Higgins*, 281 F.3d 383 (3d Cir. 2002) ............................................... 5

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 152 F. Supp. 3d 234 (D. Del. 2016) .............. 11

**Treatises**

5C Wright & Miller, Federal Practice & Procedure § 1363 (3d ed. 2004) ...................................... 4

I.      INTRODUCTION

Although DPPs and EPPs hypothesize that West-Ward participated in an overarching conspiracy to fix the price of two different drugs—digoxin and doxycycline—their Complaints are entirely bereft of the kind of predicate factual allegations required to support that theory as a matter of law.[1]  As the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-59 (2007), now is the time for the Court to "insist upon some specificity in pleading" before forcing West-Ward to be swept further into this complex antitrust action and subject to massive, burdensome discovery based on nothing more than Plaintiffs' bare assertions and speculation.

Each of the Plaintiffs' 250-plus paragraph Complaints mentions West-Ward only a handful of times and most of those allegations consist of background information.  The Complaints are totally silent as to crucial facts:

- They do not allege when or how West-Ward supposedly joined the alleged conspiracy or what role it played;

- They do not identify any West-Ward employee involved in the conspiracy or any illicit (or other) contact between West-Ward and any other Defendant;

- They do not plead West-Ward's actual prices and pricing moves or how they related to other Defendants' prices;

- They do not allege that West-Ward has been implicated in any way by any government investigation—Plaintiffs do not even allege (nor could they) that West-Ward received a subpoena from the Department of Justice ("DOJ") regarding its general investigation into the drug industry or that the company was named in the lawsuit filed by state Attorneys General in the District of Connecticut (the "State AG Suit"), which involves drugs that West-Ward does not make.  Indeed, West-Ward is not named in *any* of the myriad of generic drug price-fixing cases other than this one;

---

[1] West-Ward also joins Defendants' joint motions to dismiss Direct Purchaser Plaintiffs' ("DPPs") Consolidated Amended Class Action Complaint (Dkt # 125) and End-Payer Plaintiffs' ("EPPs") Corrected Consolidated Class Action Complaint (Dkt # 175) and the accompanying memoranda of law, and incorporates those filings herein by reference.

- Finally, they do not allege that West-Ward's participation in the Generic Pharmaceutical Association ("GPhA") encompassed more than its mere membership and its attendance at two conferences long after the supposed conspiracy started, where no inappropriate interactions are alleged to have occurred.

Thus, Plaintiffs do not and cannot allege even basic facts against West-Ward, dooming their claims against it from the outset. Plaintiffs cannot compensate for that deficiency—as they apparently seek to do—either by relying on undifferentiated group pleading regarding "Defendants" (which their own allegations reveal are far from monolithic but are rather distinct in important ways) or by their frequent invocations of government investigations, isolated guilty pleas from others (regarding drugs West-Ward has never made), and the State AG Suit. Rather, they must allege sufficient facts specific to West-Ward.

Instead of supporting a conspiracy theory, the Complaints' allegations regarding West-Ward reflect that it made independent, lawful business decisions that were economically rational. As Plaintiffs claim, West-Ward was forced to suspend operations in late 2012 in response to an FDA inspection. This resulted in doxycycline supply shortages and West-Ward's exit and extended absence from the digoxin market. When it resumed production of each drug, West-Ward allegedly followed price increases that its competitors made months earlier, which is exactly the kind of legitimate, rational price-following that economics and case law dictate would be expected in such circumstances. Accordingly, rather than plead facts that imply collusion, Plaintiffs instead allege an obvious alternative explanation for West-Ward's pricing conduct that belies the suggestion that the company colluded.

Plaintiffs simply do not and cannot meet their burden to sufficiently allege that West-Ward's conduct stemmed from an illegal agreement rather than independent decision, the issue the Supreme Court described in *Twombly* as the "crucial question" in a conspiracy case. 550

U.S. at 553. Their claims against West-Ward therefore fail as a matter of law, and should be dismissed now.

## II. RELEVANT ALLEGATIONS

### A. West-Ward's Manufacture of Digoxin and Doxycycline

West-Ward launched its generic version of immediate release doxycycline in 2003 and received approval to manufacture digoxin in 2007. (DPP CAC ¶¶ 71, 104; EPP CAC ¶ 67.) During the relevant period, West-Ward manufactured both drugs at its Eatontown, New Jersey facility. (DPP CAC ¶ 75; EPP CAC ¶¶ 44.) West-Ward has never manufactured a doxycycline delayed release ("Doxy DR") product—the only doxycycline product at issue in the State AG Suit and the guilty pleas of former Heritage executives Jeffrey Glazer and Jason Malek.

Plaintiffs plead that in November 2012, "West-Ward had to suspend operations . . . in the wake of an FDA investigation," ultimately shutting down its Eatontown facility for renovations. (EPP CAC ¶ 68; *see also* DPP CAC ¶ 75.) This led to a market shortage of doxycycline products as first reported in a December 10, 2012 drug shortage bulletin issued by the American Society of Health-System Pharmacists ("ASHP")[2], a professional association Plaintiffs cite and rely on as an accurate source for drug shortage information (*e.g.* DPP CAC ¶ 90; EPP ¶ 73 n.36). The FDA reported the shortage on January 18, 2013, stating that West-Ward's "manufacturing

---

[2] The Court may "take judicial notice of documents that are matters of public record" such as reports published by: the FDA, *Starks v. Coloplast Corp.*, No. 13-3872, 2014 U.S. Dist. LEXIS 19611, at *1-3 n.3 (E.D. Pa. Feb. 13, 2014), the Center for Disease Control ("CDC"), *Doe v. Aliquippa Hosp. Ass'n*, No. 93-570, 1994 U.S. Dist. LEXIS 21284, at *15 n.5 (W.D. Pa. Sep. 29, 1994), and professional or industry organizations like the ASHP, *In re Frito-Lay N. Am., Inc.*, No. 12-MD-2413, 2013 U.S. Dist. LEXIS 123824, at *14 (E.D.N.Y. Aug. 29, 2013).

A true and correct copy of the ASHP bulletin, which was originally available on the ASHP website, is attached as Exhibit 1. The bulletin is now available via the "Wayback Machine," an internet archive tool, at https://web.archive.org/web/20130106210923/http:/www.ashp.org/DrugShortages/Current/Bulletin.aspx?id=977 (last visited Mar. 28, 2017). "Courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Erickson v. Neb. Mach. Co.*, No. 15-cv-01147-JD, 2015 U.S. Dist. LEXIS 87417, at *4 n.1 (N.D. Cal. July 6, 2015).

delays" left it unable to supply 50mg capsules and 100mg tablets and capsules, and that it was estimated that West-Ward's products would not be available until the end of February or early March.[3] The CDC also later issued a Health Advisory regarding a shortage of doxycycline products caused by "increased demand and manufacturing issues."[4]

The plant issues also caused West-Ward's exit from the digoxin market, resulting in an absence extending well beyond the completion of facility renovations. Although Plaintiffs allege at one point that West-Ward returned to digoxin production in July 2013 (DPP CAC ¶ 91; EPP CAC ¶ 84), their other allegations correctly reflect that West-Ward did not return to the digoxin market until months into 2014.[5] For example, DPPs allege that although the initial alleged digoxin price increase occurred in "mid-October 2013," West-Ward did not raise its prices until it "re-entered" sometime after. (DPP CAC ¶ 81.) Similarly, both Complaints allege that "on November 7, 2013—after the initial generic digoxin price increases" Lannett's CEO stated that his company was "only 1 of 2 people in the market," the other being "chief competitor . . . Impax." (DPP CAC ¶ 126; EPP CAC ¶ 112; *see also* DPP ¶ 79 ("Lannett and Impax controlled

---

[3] A true and correct copy of the FDA bulletin is attached as Exhibit 2 (also available at https://web.archive.org/web/20130129145220/http:/www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm314739.htm (last visited Mar. 28, 2017)). The doxycycline information appears at page 9.

[4] A true and correct copy of the CDC Health Advisory is attached as Exhibit 3 (also available at https://stacks.cdc.gov/view/cdc/25258/Share (last visited Mar. 28, 2017)).

[5] "While the court accepts all well-pleaded factual allegations in the complaint as true, it need not accept allegations that are internally inconsistent or contradict matters of public record." *Amelio v. McCabe, Weisberg & Conway, P.C.*, No 14-1611, 2015 U.S. Dist. LEXIS 98378, at *12-13 (W.D. Pa. July 28, 2015); *see also* 5C Wright & Miller, Federal Practice & Procedure § 1363 (3d ed. 2004) ("The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits . . . incorporated in the pleading." (footnote omitted)).

the market for generic digoxin through 2013").) In that same call, Lannett's CEO speculated that "some of the other competitors *may* come back into the market."[6]

As Plaintiffs point out, West-Ward's renovation of its Eatontown facility cost $39 million and took eight months to complete. (DPP ¶ 75; EPP ¶ 151.) The FDA re-inspected the facility in February 2014, and West-Ward's digoxin production resumed sometime after.[7]

### B. West-Ward's Digoxin and Doxycycline Prices

Plaintiffs allege virtually nothing about West-Ward's prices or its pricing decisions. With respect to digoxin, Plaintiffs do not allege the prices West-Ward charged for any dosage at any time. Plaintiffs allege that the first (and largest) increase in the average market price of digoxin price occurred in November 2013, when West-Ward was not in the market. (DPP CAC ¶ 83; EPP CAC ¶ 112.)

With respect to doxycycline, Plaintiffs allege that the "pattern of huge price increases started in the fall of 2012," just after West-Ward suspended operations and experienced a supply shortage. (EPP CAC ¶ 87; *see also* DPP CAC ¶ 114.) The only allegations relating to West-Ward's individual doxycycline prices come in the form of a chart containing "benchmark" prices of one doxycycline product (a 100mg capsule). (DPP CAC ¶ 111; EPP CAC ¶¶ 76, 88.) Plaintiffs do not allege that West-Ward actually sold any doxycycline products at these "benchmark" levels, nor that they paralleled the prices of other manufacturers. Plaintiffs allege

---

[6] Transcript at 10 (emphasis added). A true and correct copy of the Lannett Earnings Call Transcript is attached as Exhibit 4. "[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *U.S. Express Lines, LTD. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

[7] This was reported in a March 12, 2014 press release from Hikma Pharmaceuticals Plc ("Hikma"), West-Ward's parent company, which both Complaints cite and rely on. (*See, e.g.*, DPP CAC ¶ 138; EPP CAC ¶ 122.) A true and correct copy of the press release is attached as Exhibit 5. The release also stated that West-Ward's 2013 revenue "include[d] only a limited contribution from the rest of our portfolio, which we began to slowly re-introduce over the course of the year." Ex. 5, at 5.

5

only that the chart reflects West-Ward's benchmark prices went up by January 2013—well after Plaintiffs allege doxycycline prices generally increased. (DPP CAC ¶ 111; EPP CAC ¶ 88.)

   C. **Plaintiffs' Purported Circumstantial Evidence**

Plaintiffs contend that Defendants' collusion can be inferred from government investigations, trade association membership, and public statements regarding sales results and market conditions. Although such allegations are themselves generally inadequate to support a conspiracy claim, they are particularly insufficient as to West-Ward.

Plaintiffs do not (nor can they) allege that West-Ward received a grand jury subpoena as part of the DOJ's general investigation into the generic drug industry. (*Cf.* DPP CAC ¶ 11; EPP CAC ¶ 12.) Nor do they allege that West-Ward is implicated by the guilty pleas of former Heritage executives Jeffrey Glazer and Jason Malek, which concern two products that West-Ward does not make: Doxy DR and glyburide. (*E.g.*, DPP CAC ¶ 13; *see also* EPP CAC ¶ 97-98 (alleging Heritage made Doxy DR and its only competitors were Mylan and Mayne.) West-Ward also is not a defendant in the State AG Suit (also concerning Doxy DR and glyburide). Indeed, West-Ward is not a defendant in *any* other civil action alleging generic drug price-fixing besides this MDL.

Regarding trade association activity, the lack of pleading is equally telling. Plaintiffs allege only that West-Ward is currently a member of the GPhA (now known as the Association for Accessible Medicines). (*See* DPP ¶ 152 (alleging that "Defendant West-Ward *is* a member of GPhA" (emphasis added)); EPP ¶ 105 (listing West-Ward as a "*Current* 'Regular Member'" (emphasis added)).) Further, although Plaintiffs reference seven GPhA meetings, they allege that West-Ward only participated in the last two: an October 2014 GPhA Fall Technical Conference and a June 2015 GPhA CMC Workshop, both occurring well after the alleged price increases for either digoxin or doxycycline. (DPP CAC ¶ 154; EPP CAC ¶ 106.) Plaintiffs do

not identify any West-Ward employee that attended these meetings, allege that the meetings in any way concerned digoxin or doxycycline prices, or claim that inappropriate interactions took place. And although Plaintiffs reference certain trade shows, "girls nights out," dinners, and other industry events, they do not allege that West-Ward employees attended any of them. (*See, e.g.*, DPP CAC ¶¶ 155-57; EPP CAC ¶¶ 107-08.)

Finally, Plaintiffs reference certain public statements made in press releases, investor reports, and earnings calls from West-Ward's parent company, Hikma. The majority of these statements simply report financial results and growth forecasts. (*See, e.g.*, DPP CAC ¶ 137-38; EPP CAC ¶ 122.) Plaintiffs also cite a Bloomberg Business article from December 2013—over a year after the initial alleged doxycycline price increases—reporting that Hikma CEO Said Darwazah stated that West-Ward was "forced" to raise its doxycycline prices "because its competitors raised theirs." (DPP CAC ¶ 140; EPP CAC ¶ 119.) In other words, Darwazah acknowledged the unexceptionable fact that West-Ward followed earlier price increases instituted by competitors when it resumed production, which hardly supports a plausible conspiracy inference. To the contrary, a Hikma press release just a few months later, cited by Plaintiffs, reported "Hikma anticipated potentially *reduced doxycycline revenue* in the U.S. market in 2014 due to *increased competition*." (DPP CAC ¶ 138 n.47 (emphasis added); *see also* EPP CAC ¶ 122.)

**III.   ARGUMENT**

Plaintiffs do not plead any facts "suggestive enough to render" West-Ward's participation in an antitrust conspiracy "plausible." *Twombly*, 550 U.S. at 556. As this Court has recognized, "[s]omething more than a mere possibility of a claim must be alleged; the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Larry Pitt & Assocs. v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 449 (E.D. Pa. 2014) (Rufe, J.) (quoting *Twombly*, 550 U.S.

7

at 555). Here, however, Plaintiffs' claims against West-Ward depend entirely on "unsupported conclusions and unwarranted inferences," which are insufficient "even at the pleading stage." *Finkelman v. NFL*, 810 F.3d 187, 202 (3d Cir. 2016).

### A. Plaintiffs Do Not Plead Any Factual Allegations Demonstrating That West-Ward Joined or Participated in a Conspiracy

The allegations regarding West-Ward in both Complaints are strikingly, and dispositively, sparse. "*Twombly* makes clear that at the pleading stage in [an] antitrust case . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383-84 (S.D.N.Y. 2016). Thus, Plaintiffs are required to "delineate[] to some sufficient specific degree" that West-Ward "purposefully joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011).

Nowhere in Plaintiffs' vast Complaints are there any allegations about when, how, or why West-Ward joined a conspiracy regarding digoxin or doxycycline. *See, e.g.*, *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004) ("plaintiffs are not relieved from alleging that each individual defendant joined the conspiracy and played some role in it"). There are no allegations that West-Ward communicated with other Defendants about anything, let alone digoxin or doxycycline pricing. There simply are no allegations about any specific conduct by West-Ward that plausibly suggests it purposefully joined any purported conspiracy.

Plaintiffs' reliance on repeated references to "Defendants" or "generic pharmaceutical manufacturers" (*e.g.*, DPP CAC ¶ 155) cannot support their claims against West-Ward. *See, e.g.*, *BanxCorp v. LendingTree LLC*, No. 10-2467, 2011 U.S. Dist. LEXIS 12258, at *21 (D.N.J. Feb. 7, 2011) ("Plaintiff's use of the 'global term' defendants [and cartel] to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy

is not sufficient under *Twombly* and its progeny." (internal quotations omitted)); *Jung*, 300 F. Supp. 2d at 163. Such generalized, undifferentiated group pleading simply highlights Plaintiffs' inability to proffer specific allegations regarding West-Ward, and fails as a matter of law.

### B. Plaintiffs Fail To Allege That West-Ward Engaged in Parallel Pricing

Lacking any direct evidence, plaintiffs must plead allegations regarding circumstantial evidence that are sufficient to support their conspiracy claims as a matter of law. Although Plaintiffs rely generally on what they contend are market-wide price increases with respect to each drug, allegations of parallel pricing among competitors are themselves insufficient. *Burtch*, 662 F.3d at 233 ("parallel conduct alone is not enough to satisfy the requirements of an agreement"). Plaintiffs must further plead facts that put West-Ward's alleged conduct into "a context that raises a suggestion of a preceding agreement"—often referred to as plus factors, which are required to differentiate normal, expected, and lawful follow-the-leader pricing from illegal collusion. *Twombly*, 550 U.S. at 557.

Plaintiffs here do not even adequately allege parallel pricing—they do not allege that West-Ward raised and maintained its prices for digoxin and doxycycline in lockstep with its competitors. With respect to digoxin, Plaintiffs do not plead the prices West-Ward charged for any dosage of digoxin at any time. Instead, they seek to implicate West-Ward solely through allegations of changes in the average market price of digoxin. (*See* DPP CAC ¶¶ 83-85; EPP CAC ¶¶ 77-79). Such allegations cannot substitute for allegations that West-Ward charged the same price, or implemented similar price increases, at the same time as its digoxin competitors. *See, e.g.*, *Resco Prods., Inc. v. Bosai Minerals Gp. Co.*, 158 F. Supp. 3d 406, 424 (W.D. Pa. 2016) (holding use of average price movements insufficient to demonstrate parallel conduct).

With respect to doxycycline, Plaintiffs again impermissibly rely on changes in the average market price to establish parallel pricing. (*See* DPP CAC ¶¶ 113-14; EPP CAC ¶¶ 89-

9

90.) Plaintiffs also borrow a chart that purports to "show[] the sudden increase in West-Ward's [Average Wholesale Price] for generic doxycycline . . . by January 2013." (EPP CAC ¶ 88; *see also* DPP CAC ¶ 111.) This chart only lists West-Ward's "benchmark prices" for one doxycycline product (a 100mg capsule) and does not reflect with any clarity *when* West-Ward increased its *actual* prices. There simply are no allegations that West-Ward adjusted its doxycycline prices in lockstep with its competitors. *See, e.g.*, *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation"). As a result, Plaintiffs do not even get out of the starting gate to state a viable claim based on allegations of circumstantial evidence.

      **C.**    **Plaintiffs' Allegations Provide an Obvious Alternative Explanation For Any Alleged Pricing Practices By West-Ward During the Relevant Period**

Moreover, even if Plaintiffs sufficiently alleged that West-Ward engaged in some level of parallel pricing (which they do not), Plaintiffs equally plead an "obvious alternative explanation" for any West-Ward price increases. As the Third Circuit has explained, "a claim of conspiracy predicated on parallel conduct" is insufficient when "'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation'" for a defendant's behavior. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (quoting *Twombly*); *see also Superior Offshore Int'l, Inc. v. Bristow Gp.*, 490 F. App'x 492, 499 (3d Cir. 2012) ("obvious business reasons for the defendants' actions casts serious doubt on whether wrongful concerted activity was the real cause of the price increases").

Here, Plaintiffs allege that West-Ward suspended operations at its manufacturing facility in November 2012 and ceased manufacturing all product lines in response to an FDA inspection. (*See* DPP CAC ¶ 75; EPP CAC ¶ 68.) As reported by the FDA and other sources, West-Ward experienced a supply shortage of doxycycline through at least mid-February 2013. And even

10

when West-Ward resumed operations at the Eatontown facility, it did not begin to manufacture digoxin for several months, ultimately not re-entering the market until well into 2014.[8] West-Ward, therefore, was not supplying the market with either digoxin or doxycycline when Plaintiffs allege those drugs first experienced significant price increases.

To the extent West-Ward allegedly increased its prices to levels near or at the prevailing market average upon resuming its manufacture of digoxin and doxycycline, the facility shutdown and resulting supply issues demonstrate the obvious alternative—and entirely legitimate—explanation for such conduct. Particularly, West-Ward's manufacturing issues would have made it difficult to immediately supply any new business gained by undercutting competitors' pricing. Thus, meeting the market price was perfectly reasonable and in West-Ward's independent self-interest; indeed, it would have been expected in concentrated markets like those alleged here.[9] And West-Ward's need to recoup the $39 million cost of the facility renovations (*e.g.*, EPP CAC ¶ 151) provided an additional disincentive to price below rivals. The alleged economic conditions, therefore, more plausibly suggest West-Ward's alleged behavior was the product of rational, independent choice rather than collusion. *Lum v. Bank of Am.*, 361 F.3d 217, 230 (3d Cir. 2004); *see also Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1236 (3d Cir. 1993) (dismissing defendant where capacity issues were obvious explanation for failure to seek new business); *Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (dismissing claim where alleged economic conditions explained defendant's behavior).

---

[8] *See supra* Section II.A, explaining West-Ward's departure from and return to the digoxin market.

[9] Courts have recognized that in a concentrated market with high barriers to entry, "a higher price generating higher profits will not be undone by the output of new entrants." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015). This is because the a firm's entire purpose for entering, or re-entering, a market may be to obtain the profits available from the prevailing market price. *Id.*, *see also Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 152 F. Supp. 3d 234, 248 (D. Del. 2016).

### D. Plaintiffs' Other Allegations of Circumstantial Evidence Do Not Imply That West-Ward Participated In a Conspiracy

#### 1. Plaintiffs' Broad Allegations Regarding Government Action Do Not Implicate West-Ward

Lacking any specific allegations of West-Ward's supposed participation in any asserted conspiracy, Plaintiffs rely heavily on the DOJ's general "investigation of the generic pharmaceutical industry." (DPP CAC ¶¶ 7-15; EPP CAC ¶¶ 7-12.) They place particular emphasis on the issuance of grand jury subpoenas to several Defendants, which they claim are "indicative that [those Defendants] have potentially violated antitrust law."[10] (DPP CAC ¶ 180; *see also* EPP CAC ¶ 171.) However, Plaintiffs do not, and cannot, allege that West-Ward received a grand jury subpoena, further undermining the utility of their focus on the investigation. (*See* DPP CAC ¶ 179; EPP CAC ¶ 12.)

Plaintiffs' attempts to piggyback on the State AG Suit similarly fail to support a claim against West-Ward. West-Ward is not a defendant in that complaint, which concerns products West-Ward does not manufacture. Any references in the State AG Suit to a "wide-ranging series of conspiracies" (*e.g.*, DPP CAC ¶ 198) are far too ambiguous to imply West-Ward's participation in any conspiracy, let alone the one alleged here. *Cf. In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) (holding that a court may not infer collusion from a separate conspiracy absent specific allegations of factual linkage).

And although West-Ward received a letter in 2014 from Senator Sanders and Senator Cummings relating to the "escalating prices of generic pharmaceuticals," there are no allegations that the letter stated or implied that West-Ward participated in a price-fixing conspiracy or even

---

[10] Plaintiffs' assertions are, of course, conclusory and legally incorrect. *See, e.g.*, *Superior Offshore Int'l v. Bristow Group*, 738 F. Supp. 2d 505, 508 (D. Del. 2010) (Davis, J., sitting by designation) ("[The subpoenas and investigation] do not permit a reasonable inference that any Defendant committed an antitrust violation because proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence.").

that its digoxin and doxycycline prices were similar to other manufacturers. (DPP CAC ¶ 173; *see also* EPP CAC ¶ 63.) At most, the letter requested information on West-Ward's unilateral business decisions, which in no way implicates the antitrust laws.

### 2. Plaintiffs' Bare Allegations Regarding West-Ward's Membership in the GPhA Are Insufficient as a Matter of Law

Plaintiffs also point to Defendants' alleged participation in the GPhA, which itself is insufficient. (*See, e.g.* DPP CAC ¶ 213; EPP CAC ¶170.) *See, e.g.*, *Superior Offshore*, 738 F. Supp. 2d at 516 (holding "Defendants' opportunities to conspire" at trade-association meetings "do not permit a reasonable inference of collusion"). Plaintiffs allege only (1) that West-Ward is a member of the GPhA, and (2) that West-Ward attended two GPhA meetings long after the initial (and most significant) digoxin and doxycycline price increases allegedly occurred.

Mere membership in the GPhA places West-Ward in no different position than the other "generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry" that are also members. (DPP CAC ¶ 149; EPP CAC ¶ 105.) West-Ward's membership in the GPhA thus provides no basis to label it a conspirator, a well-settled point under Third Circuit law. *See, e.g.*, *Resco*, 158 F. Supp. 3d at 425-26 (holding it "is not reasonable" to infer a conspiracy from trade association membership).

Further, Plaintiffs do not allege that West-Ward participated in GPhA functions at the time of any alleged price increases. West-Ward is only alleged to have attended two GPhA meetings, one in October 2014 and one in June 2015. As a matter of law, West-Ward's mere attendance at these meetings cannot imply its participation in a conspiracy. *See, e.g.*, *Schuylkill Health Sys. v. Cardinal Health 200*, LLC, No. 12-cv-7065, 2014 U.S. Dist. LEXIS 103663, at *32 (E.D. Pa. July 30, 2014) ("that Defendants are members of a trade association that hosts

13

annual conferences does not transform Defendants' parallel conduct into a conspiracy"). Regardless, given that the initial (and largest) price increases for doxycycline and digoxin are alleged to have occurred years earlier, West-Ward's alleged attendance at the two meetings is temporally disconnected from Plaintiffs' conspiracy claims. Inferring West-Ward's collusion from its attendance at these meetings contradicts Third Circuit law and defies common sense.

### 3. Statements Made In Press Releases, Investor Reports, and Earnings Calls Do Not Imply West-Ward's Participation In Any Conspiracy

Plaintiffs also cannot imply West-Ward's participation in any conspiracy through allegations of unremarkable public statements regarding the company's doxycycline sales[11] and general profitability. These innocuous statements do not, as Plaintiffs suggest, demonstrate West-Ward's "commitment to increasing generic pharmaceutical prices and maintaining them." (DPP CAC ¶ 121.) Inferring that these statements are confirmation of an illicit agreement requires the impermissible practice of "first assuming a conspiracy and then setting out to prove it." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999) ("courts generally reject conspiracy claims that 'seek to infer an agreement from . . . communications despite a lack of independent evidence tending to show an agreement'"); *Superior Offshore*, 738 F. Supp. 2d at 516 (granting dismissal where information sharing did not imply an agreement).

Moreover, the materials Plaintiffs cite more plausibly reflect that West-Ward's doxycycline pricing was based on independent decision-making. For example, the Complaints allege that Hikma's CEO told Bloomberg Business in December 2013 that West-Ward was "forced" to raise its doxycycline prices "because its competitors raised theirs." (DPP CAC ¶

---

[11] None of the statements Plaintiffs attribute to West-Ward or Hikma concern digoxin.

140; EPP CAC ¶ 119.)  Rather than suggest West-Ward was acting in concert with its competitors, this statement demonstrates that West-Ward determined whether or not to *follow* competitors' price increases on its independent analysis of market conditions.  Notably, the Bloomberg article quoted Hikma's CEO within the same paragraph that it reported that "the spike in price seems to have been triggered by a temporary [doxycycline] shortage" when West-Ward "stopped making the drug in November 2012."[12]

Similarly, although Plaintiffs attempt to rely on certain statements in a March 12, 2014 Hikma press release (DPP CAC ¶ 138; EPP CAC ¶ 138), DPPs concede that the release reported that "Hikma anticipated potentially *reduced doxycycline revenue* in the U.S. market in 2014 due to *increased competition*."  (DPP CAC ¶ 138 n.47 (emphasis added).)  Plaintiffs cannot square this prediction with an assertion that the release more broadly reflects West-Ward's role in a still *ongoing* doxycycline conspiracy.  Rather, Plaintiffs' struggle to twist these statements into evidence of collusion is indicative of their larger inability to allege any facts plausibly suggesting West-Ward acted in concert with any of the other Defendants.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs do not come close to plausibly alleging that West-Ward participated in an antitrust conspiracy even when they are considered in their entirety.  Simply put, Plaintiffs' limited, conclusory, and unremarkable allegations against West-Ward do not add up to anything more.  Accordingly, West-Ward respectfully requests that its motion is granted and all claims against it are dismissed with prejudice.

---

[12] A true and correct copy of the Bloomberg News Article is attached as Exhibit 6.

15

DATED: March 28, 2017

Respectfully submitted,

/s/ Jan P. Levine
Jan P. Levine
Robin P. Sumner
Michael J. Hartman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel. (215) 981-4000
Fax. (215) 981-4750

Jeffrey A. Carr
PEPPER HAMILTON LLP
301 Carnegie Center, Suite 400
Princeton, NJ 08543-5276
Tel. (609) 452-0808
Fax. (609) 452-1147

Keith J. Harrison
Shari Ross Lahlou
Astor H.L. Heaven
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
Tel. (202) 624-2500
Fax. (202) 624-5116

*Attorneys for Defendant West-Ward Pharmaceuticals Corp.*