# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC DIGOXIN AND DOXYCYCLINE ANTITRUST LITIGATION | MDL NO. 2724 16-MD-2724 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | HON. CYNTHIA M. RUFE |

**DEFENDANT IMPAX LABORATORIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND THE END-PAYER PLAINTIFFS' CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

RELEVANT ALLEGATIONS............................................................................. 2

LEGAL STANDARD.......................................................................................... 2

ARGUMENT ...................................................................................................... 3

I.      THE COMPLAINT FAILS TO STATE A CLAIM AGAINST IMPAX UNDER
        TWOMBLY AND IQBAL.................................................................................. 3

        A.      Plaintiffs Do Not Allege Direct Evidence of an Actual Agreement ..................... 5

        B.      Plaintiffs Do Not Allege Facts from Which This Court May Plausibly
                Infer the Existence of an Unlawful Agreement ................................... 6

                1.      Plaintiffs Fail to Allege Parallel Conduct ................................. 6

                2.      Plaintiffs Allegations of Parallel Conduct (or Lack Thereof) Do
                        Not Meet The Required Pleading Standard ............................. 7

                3.      Plaintiffs' Alleged Plus Factors are Insufficient....................... 9

                        a.      Market Structure ....................................... 10

                        b.      Trade Association Meetings ......................... 11

                        c.      Earnings Calls........................................... 12

                        d.      Government Investigations ......................... 14

CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
    37 F.3d 996 (3d Cir. 1994)....................................................................................................7

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of
    Podiatric Surgery, Inc.*,
    185 F.3d 606 (6th Cir. 1999) .............................................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................1, 2, 3, 4

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)............................................................................................6, 9

*Baraka v. McGreevey*,
    481 F.3d 187 (3d Cir. 2007).................................................................................................3

*In re Bath & Kitchen Fixtures Antitrust Litig.*,
    No. 05-CV-00510, 2006 U.S. Dist. LEXIS 49576 (E.D. Pa. July 19, 2006).........................15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................*passim*

*In re Blood Reagents Antitrust Litig.*,
    756 F. Supp. 2d 623 (E.D. Pa. 2010) .................................................................................8

*Brooke Group. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)............................................................................................................9

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)................................................................................................3

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).................................................................................................14

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)............................................................................................6, 9

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................................11, 12, 14

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
    647 F. Supp. 2d 1250 (W.D. Wash. 2009).........................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hinds Cnty. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)........................................................................15

*Holiday Wholesale v. Philip Morris*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002), *affd sub
  nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003)..................13

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010).................................................................................3, 4, 5

*In Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)..................................................................................4, 10

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..............................................................................3, 4, 5, 6

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003).......................................................................................6

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ..................................................................................8

*Kanter v. Barella*,
  489 F.3d 170 (3d Cir. 2007).......................................................................................3

*Monsanto Co. v. Spray-Rite Svc. Corp.*,
  465 U.S. 752 (1984)...................................................................................................6

*In re Musical Instrruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ....................................................................................8

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993)....................................................................................11

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015)..................................................................................6

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) .........................................................................3

*Resco Prods. v. Bosai Minerals Grp. Co.*,
  158 F. Supp. 3d 406 (W.D. Pa. 2016)..........................................................................7

*Schoenkopf v. Brown & Williamson Tobacco Corp.*,
  637 F.2d 205 (3d Cir. 1980).......................................................................................7

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*SigmaPharm, Inc. v. Mutual Pharm. Co., Inc.*,
   772 F. Supp. 2d 660 (E.D. Pa. 2011) ................................................................................8

*Superior Offshore Int'l, Inc. v. Bristow Group*,
   738 F. Supp. 2d 505 (E.D. Pa. 2010) ..............................................................10, 11, 14, 15

*In re Tableware Antitrust Litig.*,
   363 F. Supp. 2d 1203 (N.D. Cal. 2005) .........................................................................15

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ...........................................................................................9

*Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*,
   346 U.S. 537 (1954)..........................................................................................................3

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ...........................................................................................4

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
   844 F. Supp. 2d 571 (E.D. Pa. 2012) ...........................................................................5, 7

*U.S. v. General Motors Corp.*,
   No. 38219, 1974 U.S. Dist. LEXIS 6569 (E.D. Mich. Sept. 26, 1974) .................................13

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011) ...........................................................................................9

**Rules**

Fed. R. Civ. P. 8(a) ..............................................................................................................2

Fed. R. Civ. P. 12(b)(6)..........................................................................................................2

**Other Authorities**

Sherman Act § 1.................................................................................................. *passim*

## INTRODUCTION

Impax Laboratories, Inc. ("Impax") respectfully moves to dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (filed January 27, 2017) and End-Payer Plaintiffs' Corrected Consolidated Class Action Complaint (filed on March 28, 2017) (collectively, "Plaintiffs" and "Complaints").[1] With respect to Impax, the Complaints allege <u>only</u> a conspiracy to fix prices for <u>digoxin</u>. They do <u>not</u> allege Impax sold doxycycline or participated in that alleged conspiracy. Plaintiffs' allegations do not come remotely close to meeting the required pleading standards.

The deficiencies in Plaintiffs' Complaints against Impax are obvious from what they say and from what they do not say. They say that <u>average</u> digoxin prices increased at a time when the number of suppliers declined to two or three. This allegation is clearly insufficient to infer an agreement. It is just as consistent – if not more so – with a unilateral decision to raise price. But they do not say there was a direct agreement between Impax and any other competitor; they do not say that here has been any governmental proceeding against Impax involving digoxin or any other product; they do not say that Impax "signaled" any competitor or engaged in any other specific improper conduct.

In short, the Complaints are wholly lacking the allegations about Impax necessary to avoid dismissal because they do not satisfy the standard under *Twombly* and *Iqbal* or they fail under various state laws. Thus, this Court should dismiss Plaintiffs' Complaints as to Impax with prejudice.

---

[1] Impax's Motion joins and incorporates by reference Certain Defendants' Memorandum of Law in Support of Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint and Certain Defendants' Memorandum in Support of Joint Motion to Dismiss the End-Payer Plaintiffs' Corrected Consolidated Class Action Complaint.

## RELEVANT ALLEGATIONS

With respect to Impax, plaintiffs bring class actions on behalf of two groups of individuals and/or entities (direct purchasers ("DPPs") and end-payers ("EPPs")) who purchased digoxin from October 1, 2012 to present. (DPP Compl; ¶ 32; EPP Compl. ¶ 38).[2]

For digoxin, Plaintiffs rely only on: an October 2013 price increase (DPP Comp. ¶ 81; EPP Compl. ¶¶ 80-81) that occurred when "Lannett and Impax controlled the market for generic digoxin" (DPP Compl. ¶ 79), "as a result of the withdrawals from selling digoxin by other manufacturers (EPP Comp. ¶ 68);"[3] market characteristics for digoxin (DPP Comp. ¶¶202-208; EPP Compl. ¶¶ 142-169), Impax's participation in trade association and customer meetings (DPP Comp. ¶¶ 151-54; EPP Compl. ¶¶ 102-09), statements made during earnings calls (DPP Compl. 134-36; EPP Compl. ¶¶ 110, 118), and the existence of government investigations (DPP Comp. ¶¶ 172-73, 179, 185, 188; EPP Compl. ¶¶ 62, 128, 131).[4] These allegations as to Impax are insufficient to meet Plaintiffs' burden under *Twombly* and *Iqbal*.

## LEGAL STANDARD

A complaint must be dismissed if it fails to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under Rule 8(a) of the Federal Rules of Civil Procedure, a plaintiff

[2] Plaintiffs' Complaints allege various communications and government proceedings involving doxycycline, but not one of these allegations concerns Impax. Impax is not alleged to have participated in any alleged doxycycline conspiracy. DPP Compl. ¶ 32; EPP Compl. ¶ 38.
[3] Plaintiffs do not allege that Mylan, Par, or Sun manufactured digoxin at the time of the October 2013 price increase. Plaintiffs allege that West-Ward resumed manufacturing digoxin in July 2013, but their allegations regarding West-Ward's re-entry into the digoxin market are internally inconsistent. Plaintiffs' other allegations note West-Ward did not fully resolve manufacturing issues and return to the market until months into 2014. Plaintiffs also allege Par entered in 2014 and Mylan and Sun re-entered in 2015. DPP Compl. ¶¶ 73-79, 81; EPP Compl. ¶¶ 68, 77.
[4] Plaintiffs do not – and cannot – allege that Impax or any of its employees have been indicted or pleaded guilty to anticompetitive conduct concerning digoxin (or any other drug). No other digoxin supplier has been indicted or pleaded guilty to charges involving digoxin (or any other drug). Plaintiffs' Complaints are barren of facts alleging meetings, phone calls, documents, or any other communication between Impax and any competitor regarding digoxin or any other drug.

must give the defendant fair notice of the claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Id.* (quotation marks omitted). Although a court must "accept as true all allegations in the complaint," *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007), it is "not compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The allegations must "raise a right to relief above the speculative level," such that plaintiffs' claim is not only "conceivable" but "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility is evaluated with reference to well-settled antitrust jurisprudence that 'limits the range of permissible inferences from ambiguous evidence.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir. 2010) (quoting *Matsushita*, 475 U.S. at 588).

## ARGUMENT

## I.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST IMPAX UNDER *TWOMBLY* AND *IQBAL*

An agreement is an essential element of a Sherman Act § 1 Claim. *Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954). "To allege such an agreement . . . a plaintiff must allege facts plausibly suggesting a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010) (internal quotation marks and citations omitted); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395-96 (3d Cir. 2015). Thus, a complaint must "delineate[] to some sufficiently specific degree" that each defendant "purposefully joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011); *see also Total*

*Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (rejecting a pleading under *Twombly* that lacked "specifics as to the role each [defendant] played in the alleged conspiracy," including the "who, what, where, when, how or why").

Unilateral conduct by a defendant, "no matter how anticompetitive," cannot give rise to a § 1 violation. *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999). As a result, the U.S. Supreme Court has made clear that to avoid dismissal, a complaint alleging Sherman Act § 1 violations must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *see also Iqbal*, 556 U.S. at 684. As the Third Circuit has noted:

> *Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if "common economic experience" or the facts alleged in the complaint itself, show that independent self-interest is an "obvious alternative explanation' for defendants' common behavior."

*Ins. Brokerage*, 618 F.3d at 322-23. To survive dismissal, a complaint must allege "something more than merely parallel behavior . . . pointing toward a meeting of the minds. If, in the circumstances alleged, the asserted parallel conduct . . . could just as well be independent action, then the complaint has failed to plead a § 1 claim." *Id.* at 362 (citations omitted).

Accordingly, courts in this Circuit have routinely dismissed Sherman Act § 1 complaints that fail to allege sufficient facts supporting allegations of an "agreement."  For example:

- In *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010), the Third Circuit affirmed the dismissal of a complaint that failed to adequately allege an agreement among Dentsply dealers. The fact that each dealer might have been economically motivated to conspire was insufficient. Plaintiffs failed to allege any "coordination among the Dealers."  *Id.* at 256.

- *In Burch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011), the Third Circuit affirmed the dismissal of a complaint that failed to adequately allege an agreement to fix credit terms. Allegations of meetings among the alleged conspirators were held insufficient. *Id.* at 230.

- In *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571 (E.D. Pa. 2012), the court found insufficient allegations of a conspiracy to exclude plaintiffs' technology from an industry standard. There were no allegations defendants "got together and exchanged assurances of common action or otherwise adopted a common plan." *Id.* at 597.

These cases stand for a simple principle: to survive dismissal, a § 1 complaint must allege <u>facts</u> supporting a <u>reasonable</u> <u>inference</u> of an <u>agreement</u> – facts suggesting a "meeting of the minds," *Ins. Brokerage*, 618 F.3d at 362, "coordination" among the defendants, *Howard Hess Dental Labs.*, 602 F.3d at 256, 258, or that defendants "got together and exchanged assurances of common action or otherwise adopted a common plan," *TruePosition*, 844 F. Supp. 2d at 597. In this case, Plaintiffs have not alleged any such facts regarding Impax and digoxin, nor could they.

### A.    Plaintiffs Do Not Allege Direct Evidence of an Actual Agreement.

As an initial matter, the Complaints do not allege facts essential to their § 1 claim: the existence of a conspiracy or unlawful agreement concerning digoxin. Plaintiffs do <u>not</u> identify a single meeting, phone call, or document in which Impax hatched an unlawful agreement with its competitors regarding digoxin. They do <u>not</u> identify any Impax personnel involved in the formation of the alleged digoxin agreement. They do <u>not</u> say when the alleged digoxin agreement was formed, or what that agreement entailed. "Apart from identifying a [five]-year span in which the § 1 violations were supposed to have occurred . . . the pleadings mention[] no specific time, place, or person involved in the alleged [digoxin] conspiracy[y]," and "furnish[] no clue as to which of the [Defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." *Twombly*, 550 U.S. at 565 n.10.

Boilerplate recitations of legal elements and conclusory allegations of an agreement (DPP Compl. ¶¶ 151-55; EPP Compl. ¶¶ 105-07) are insufficient. As *Twombly* made clear "a formulaic recitation of the elements of a cause of action will not do," 550 U.S. at 555, and "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show

illegality." *Id*. at 557.

**B.** **Plaintiffs Do Not Allege Facts from Which This Court May Plausibly Infer the Existence of an Unlawful Agreement.**

Without direct evidence that Impax conspired to increase digoxin prices, Plaintiffs must present "circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme" to fix digoxin. *Monsanto Co. v. Spray-Rite Svc. Corp.*, 465 U.S. 752, 764 (1984). To meet that burden, they first must show "the defendants' behavior was parallel." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 165 (3d Cir. 2003); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 n.11 (3d Cir. 2004) (same). A plaintiff relying on parallel conduct must also allege circumstantial evidence ("plus-factors") from which a court may plausibly infer the existence of a conspiracy. *Ins. Brokerage*, 618 F.3d at 322-23.

**1.** **Plaintiffs Fail to Allege Parallel Conduct.**

Plaintiffs fail to show parallel conduct by Impax and other suppliers as to digoxin. Plaintiffs' meager attempt to show parallel pricing relies on changes in the "average wholesale price" and "average market price" for digoxin between October 2012 and June 2014. EPP Compl. ¶¶ 76-77; DPP Compl ¶¶ 82-85. Plaintiffs' charts depict "average price increases" as reported in National Average Drug Acquisition Cost data. DPP Compl ¶¶ 83-85; EPP Compl. ¶¶ 78-79. EPPs attempt to show Impax's and Lannett's parallel digoxin pricing through reports of changes in digoxin's "wholesale acquisition cost" ("WAC"). But like other average prices, WAC is a general market price that does not reflect Impax's actual prices to consumers.

The Third Circuit has found that reliance on average prices are insufficient proof of parallelism. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129 (3d Cir. 1999) ("[T]he pertinent inquiry is on the prices actually paid, the transaction prices."); *see also In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 152 (E.D. Pa. 2015) (analyses "based on averages"

allow "for large-scale comparisons but do not tell us anything affirmative about the individual purchasers" or their transactions). Similarly, Plaintiffs here rely on changes in unverified average prices or general market prices to assert conclusory assumptions of parallel conduct. This aggregate data, however, fails to suggest anything about the potential liability of individual market participants, including Impax. There are no details regarding the amount or timing of the transaction prices – the prices actually paid by consumers – implemented by Impax or any other digoxin supplier. *See Resco Prods. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 424 (W.D. Pa. 2016) (rejecting allegations of parallel pricing where the plaintiff's assertions of general price movements failed to provide evidence "of the amount or timing of any of the pricing increases"). Thus, Plaintiffs' reliance on general digoxin price movements fails to show parallel conduct.

2.     **Plaintiffs Allegations of Parallel Conduct (or Lack Thereof) Do Not Meet The Required Pleading Standard.**

Even if Plaintiffs sufficiently alleged parallel digoxin pricing, which they did not, those allegations are insufficient; independent business justifications (suppliers leaving the digoxin market, supply constraints, and unilateral conduct) are an obvious alternative explanation for any price increase. The Sherman Act does not prohibit "conscious parallelism." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 208 (3d Cir. 1980) (citations omitted); *accord Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1001 (3d Cir. 1994) ("[E]vidence of conduct which is as consistent with permissible competition as with illegal conspiracy, without more, does not support an inference of conspiracy . . . . [M]istaken inferences in such a context are especially costly[;] they chill the very conduct the antitrust laws are designed to protect.") (citations omitted). Parallel conduct is often "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly* at 554; *TruePosition*, 844 F. Supp. 2d at 579 ("We find that *Twombly* requires a level

7

of factual detail that makes it more likely that the Defendants' conduct was the result of an unlawful agreement rather than some other independent and lawful explanation and that such requirement is not a 'probability' requirement."); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation.") (citations omitted). It is Plaintiffs' burden to show why it is more plausible Impax entered into an illegal agreement to achieve the same result realized by purely rational profit-maximizing behavior with none of the costs or risks. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010). Plaintiffs have not and cannot meet their burden. [5]

In fact, Plaintiffs' own allegations support a finding that Impax, motivated by changing market forces, made a unilateral decision motivated to raise digoxin prices in October 2013. Plaintiffs assert that "as a result of the withdrawals from selling digoxin by other manufacturers, Lannett and Impax controlled the market for generic digoxin through 2013" (DPP Compl. ¶ 79) and that "mergers and withdrawals from the market caused the number of competitors to shrink" (EPP Compl. ¶ 68.). Two suppliers (West-Ward and Sun) shut down facilities or halted digoxin production due to regulatory compliance issues (DPP Compl. ¶¶ 74-75; EPP Compl. ¶ 68), constraining the digoxin supply available to the market. Thus, only two digoxin suppliers

---

[5] Plaintiffs' Complaints stand in stark contrast to Complaints that have been found sufficient. *Cf. SigmaPharm, Inc. v. Mutual Pharm. Co., Inc.*, 772 F. Supp. 2d. 660, 670-72 (E.D. Pa. 2011) (denying motion to dismiss in where Complaint detailed payments from King Pharmaceuticals to Mutual Pharmaceuticals and actions by Mutual, reversing its earlier positions, which delayed entry of generic product); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, (E.D. Pa. 2010) (denying motion to dismiss price-fixing Complaint where the only two competitors engaged in "unusual behavior" contrary to their individual economic self-interest, including raising prices significantly over an eight-year period while boasting that they "did not expect to lose any business"; cancelling contracts with each other's customers; allocating customers; acquiring all of their competitors and exchanging executives).

effectively served the market in October 2013.

Independent business justifications are just as likely – if not more so – to explain the alleged digoxin price increase than an unlawful agreement. With dwindling digoxin suppliers, it is logical that the two primary suppliers left – Impax and Lannett – would share "common perceptions" of the market that would prompt "a rational and competitive business strategy" to raise price. *Twombly*, 550 U.S. at 554; *see also Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("[R]ising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing."). EPPs also allege Impax followed Lannett's move to change digoxin pricing. EPP Compl. ¶ 80. Courts around the country, including the Third Circuit, recognize that following a competitor's price increase is commonplace and not indicative of conspiracy. *Flat Glass*, 385 F.3d at 359-60 (ruling that Sherman Act "does not proscribe" a firm from choosing to follow another firm's decision to raise its price); *White v. R.M. Packer Co.*, 635 F.3d 571, 585 (1st Cir. 2011) ("A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader."); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) ("[T]he fewer the firms, the easier it is for them to engage in 'follow the leader' pricing. . . .").

### 3.    Plaintiffs' Alleged Plus Factors are Insufficient.

A conspiracy claim based on consciously parallel behavior must allege facts showing sufficient "plus factors" to support a plausible claim that the alleged price increases were the result of an unlawful agreement to ensure the court does not punish unilateral, independent conduct of competitors.  *See Baby Food*, 166 F.3d at 122. Here, Plaintiffs' supposed plus factors come nowhere close to supporting a plausible claim of conspiracy as to Impax and digoxin.

### a. Market Structure.

The Complaints allege that the digoxin market is characterized by "high concentration," "barriers to entry,"  "demand inelasticity," "lack of substitutes," "high degree of interchangeability," and the "absence of competitive sellers."  DPP Compl. ¶¶ 202-214; EPP Compl. ¶¶ 142-169. But these allegations are insufficient to infer the existence of an agreement. *Burtch*, 662 F.3d at 229 ("Appellees' motivation of market behavior are precisely the legally insufficient facts we have cautioned against using as circumstantial evidence of an agreement."). Courts in this District and elsewhere have held similar market structure allegations insufficient to support a § 1 claim. For example, Judge Davis dismissed a complaint alleging price-fixing between two helicopter services firms holding 90% of the market despite allegations of "highly inelastic" demand, "lack of reasonable substitutes," a "high degree of concentration," and "high barriers" to entry because "[n]one of [those] allegations, taken singly or together, justifies an inference of conspiracy or states a plausible claim of price fixing."  *Superior Offshore Int'l., Inc. v. Bristow Group*, 738 F. Supp. 2d 505, 514 (E.D. Pa. 2010). Therefore, the allegations concerning the digoxin market do not "enhance" Plaintiffs' digoxin conspiracy claims.

In fact, the Complaints contradict themselves on a key issue: whether the digoxin market's characteristics increased the chance of collusion. On the one hand, Plaintiffs claim the digoxin market is one with high barriers to new entrants. But, Plaintiffs' own assertions state a host of new entrants came into the market after the October 2013 digoxin price increase. DPP Compl. ¶ 81; EPP Compl. ¶ 84. Plaintiffs allege West-Ward resumed participation in the digoxin market months into 2014 after resolving manufacturing issues, Par entered the market in January 2014 and Mylan and Sun re-entered in 2015. DPP Compl. ¶ 81; EPP Compl. ¶ 84. Thus, there are more digoxin suppliers today than at the time of the alleged price increase. DPP Compl. ¶ 81; EPP Compl. ¶ 84. This fact renders the digoxin market less susceptible to collusion, not more so.

### b.      Trade Association Meetings.

The Complaints also assert that generics companies "have opportunities to meet and conspire at industry meetings," (EPP Compl. ¶ 65; *see also* DPP Compl. ¶ 147), that "Defendants met at conferences held by their customers" (EPP Compl. ¶ 104), and "met through trade associations, including the GPhA" (EPP Compl. ¶ 105; *see also* DPP Compl. ¶¶ 147-155). But "proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 (3d Cir. 1993); *accord Twombly*, 550 U.S. at 567 n. 12; *Superior Offshore*, 738 F. Supp. 2d at 516. Membership in a trade association, attendance at trade association meetings, and participation in trade association activities are presumed legitimate and not a basis from which to infer a conspiracy. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (hereinafter, "*GPU*").

Plaintiffs' allegations as to Impax's role in these meetings are benign: Impax is a member of the GPhA; Impax's Marcy MacDonald (the Vice President of Regulatory Affairs and whom has no pricing authority) serves on GPhA's board of directors; and Impax attended several GPhA meetings over a three-year period. DPP Compl. ¶¶ 151-54; EPP Compl. ¶¶ 105-106. Plaintiffs do not identify any particular meeting or event in which <u>Impax</u> allegedly agreed to unlawful activity <u>regarding digoxin,</u> nor do they describe Impax's specific role in any such agreement. While Plaintiffs make conclusory assertions that "Defendants" conspired at specific executive dinners, "Girls Night Out" or "Women In Industry" events and other events at three conferences (DPP Compl. ¶¶ 156-57; EPP Compl. ¶¶ 108, 170), these allegations, copied from the AG complaint, relate to doxycycline and another drug, glyburide; they have nothing to do with digoxin or Impax. Plaintiffs improperly lump Impax and digoxin in with undifferentiated and conclusory statements about "Defendants" at these meetings. But, Plaintiffs' cite other court filings

indicating those events involve an entirely different alleged conspiracy. Plaintiffs should not be awarded for their attempt to subsume Impax into an alleged conspiracy they know it was not part of.

Further, Plaintiffs do not correlate any digoxin pricing activity to particular trade association meetings. According to Plaintiffs' own allegations, the fall 2013 GPhA Technical Conference occurred two weeks <u>after</u> the alleged October 2013 digoxin price increase. DPP Compl. ¶ 154; EPP Compl. ¶ 106. The Complaints thus contain fewer factual allegations than have been found deficient in other cases. *See, e.g.*, *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) (identifying trade association members); *GPU*, 527 F. Supp. 2d at 1021-23 (attempting to correlate trade association meetings with pricing activity).

### c.     Earnings Calls.

Plaintiffs also allege that statements made in public earnings calls are evidence of collusion, but nothing in these allegations provides any basis by which to infer an unlawful agreement as to Impax and digoxin.[6]  As to Impax, DPPs' Complaint contains just three paragraphs that quote parts of public earnings call remarks by two former Impax executives, Ms. Ben-Maimon and Mr. Wilkinson (DPP Compl. ¶¶ 134-136); and the EPPs' Complaint contains only one such paragraph (EPP Compl. ¶ 118). The quotation from Mr. Wilkinson in fact confirms Impax's unilateral, multi-factor pricing strategy.[7]  The quotation from Ms. Ben-Maimon says nothing to suggest collusive conduct, stating only her goal of "mak[ing] sure a high

---

[6] Many of the allegations involve only doxycycline. DPP Compl. ¶¶ 137-138, 140-141, 143.

[7] " . . . we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those and we'll continue to evaluate our line product-by-product probably on a week and monthly basis to see if there are opportunities to participate in that practice."  DPP Compl. ¶ 136; EPP Compl. ¶ 118.

quality product is available to the customer" (DPP Compl. ¶ 134). The third citation does not

even relate to digoxin (and neither digoxin nor Lannett are mentioned in Impax's February 20,

2014 earnings call at all).[8] The only other digoxin allegations relate to public comments by

Lannett executives, but contrary to Plaintiffs' claims, the quoted statements support the absence

of any unlawful agreement. The statements evidence intent to compete for market share[9] and

uncertainty in how competitors would react to price changes.[10]

Nothing in these calls remotely suggests Impax's commitment to fix prices with Lannett

or anyone else. Public discussions of a company's own pricing policies is certainly not evidence

of a conspiracy,[11] and Plaintiffs' Complaints are devoid of any allegations suggesting any

agreement was reached through these earnings calls. Plaintiffs do not allege that Impax

participated in, listened to, or even read a transcript of the Lannett calls. Even if (contrary to fact)

Lannett's earnings calls were an invitation to collude, according to Plaintiffs' own allegations,

Impax could not have accepted any proposed invitation because all of the Impax earnings calls

---

[8] The quote cited in DPP Complaint ¶ 135 and EPP Complaint ¶ 118 does not refer to Lannett or digoxin. The full quote reads as follows: "So I don't want to really specifically talk about pricing [indiscernible]. You know that the market has been pretty stable enough, as you suggested part of a launch in AJ. We're pretty comfortable that what we've done is rational and will result in ongoing profitability for that product. And we've continued, obviously, to do everything we can to maintain our own share."

[9] ". . . we're also looking to capture more market share on the Digoxin." "We don't want to sit by and just let our competition take away our market share."  (DPP Compl. ¶ 132).

[10] ". . . it's always hard to determine [at] what point you're going to get additional competition or when prices will erode as they generally do."  (DPP Compl. ¶ 128). "Sometimes it [a price increase] doesn't stick and we have to go back and reduce our price, and other times it does." DPP Compl. ¶ 123.

[11] *See U.S. v. General Motors Corp.*, No. 38219, 1974 U.S. Dist. LEXIS 6569, at *59 (E.D. Mich. Sept. 26, 1974) ("The public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire."); *see also Holiday Wholesale v. Philip Morris*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002), *affd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (noting that "cases which have found that an inference of traditional agreement from indirect communications took place show far more detailed communications [than public announcements] with no public purpose") (internal citations omitted).

occurred <u>after</u> the alleged October 2013 digoxin price increase that is the focus of the Complaints. Thus, it is wholly implausible that Impax and Lannett could have reached an agreement through these calls.

**d.     Government Investigations.**

Finally, the Complaint alleges that Impax is the subject of government investigations concerning digoxin. (DPP Compl. ¶¶ 172-73, 188; EPP Compl. ¶¶ 62, 128, 131). Significantly, no allegations are made concerning the filing of any indictments, plea agreements, or other government charges against Impax or against any other <u>digoxin</u> supplier. Neither Impax nor digoxin is the subject of the civil complaint filed by state AGs concerning doxycycline. Plaintiffs cannot create an inference of a digoxin conspiracy involving Impax by simply using government action as to an entirely different product and different alleged co-conspirators. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting allegations of wrongdoing in another market for merely suggesting that "if it happened there, it could have happened here").

The Complaints merely state that Impax received a subpoena for digoxin over two years ago. The fact that Impax received a subpoena does not permit a reasonable inference that Impax committed an antitrust violation – especially where the government has expressed a willingness to file criminal charges against <u>other</u> suppliers for <u>other</u> products. This District has dismissed complaints with similar allegations, finding that they add nothing to allegations of conspiracy. In dismissing the complaint in *Superior Offshore*, Judge Davis summarized the law on this point:

> Even assuming the veracity of the facts alleged in these [SEC] reports, they are not probative of the existence of an illegal agreement or concerted action by Defendants. They do not permit a reasonable inference that any Defendant committed an antitrust violation because proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal 2007) (holding that subpoenas served on the defendants and a grand jury investigation carry no weight in pleading an antitrust conspiracy where it is unknown whether the investigation will result in indictments or nothing at all); *In*

14

*re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) (rejecting the significance plaintiffs attached to an investigation because "[s]imply saying 'me too' after a governmental investigation does not state a claim"). Thus, the initiation of the DOJ's investigation and Defendants' receipt of document subpoenas, coupled with reports by some Defendants of their opinions and predictions about the financial impact of the investigation, do not enhance the plausibility of Plaintiff's claim and do not warrant subjecting Defendants to the burdens of antitrust discovery.

*Superior Offshore*, 738 F. Supp. 2d at 516; *accord*, *In re Bath & Kitchen Fixtures Antitrust Litig.*, No. 05-CV-00510, 2006 U.S. Dist. LEXIS 49576 (E.D. Pa. July 19, 2006) (dismissing § 1 complaint despite allegations of DOJ investigation); *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("The various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible, for the purpose of deciding a motion to dismiss . . . ."). Thus, Plaintiffs' allegations regarding government investigations are insufficient to enhance the plausibility of their claim as to Impax.

## CONCLUSION

For these reasons, this Court should dismiss the Complaints, with prejudice, as to Impax.

Dated:  March 28, 2017                    Respectfully Submitted,

                                          /s/ *Raymond A. Jacobsen, Jr.*
                                          Raymond A. Jacobsen, Jr.
                                          Paul M. Thompson (Pa. no. 82017)
                                          Lisa A. Peterson
                                          MCDERMOTT WILL & EMERY LLP
                                          500 N. Capitol St. NW
                                          Washington, D.C. 20001
                                          Tel. 202-756-8000
                                          rayjacobsen@mwe.com
                                          pthompson@mwe.com
                                          lpeterson@mwe.com

                                          David L. Hanselman Jr.
                                          MCDERMOTT WILL & EMERY LLP
                                          227 W. Monroe St.
                                          Chicago, IL 60605-5096
                                          Tel. 312-984-3610
                                          dhanselman@mwe.com

                                          Nicole L. Castle
                                          MCDERMOTT WILL & EMERY LLP
                                          340 Madison Ave.
                                          New York, NY 10173
                                          Tel. 212-547-5400
                                          ncastle@mwe.com

                                          *Counsel for Impax Laboratories, Inc.*

16