## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC DIGOXIN AND DOXYCYCLINE ANTITRUST LITIGATION | MDL No. 2724<br>No. 16-MD-2724<br><br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

---

**DEFENDANT MAYNE PHARMA INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION UNDER FRCP 12(B)(6) TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' AND THE END-PAYER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINTS**

---

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ iii

Introduction ..............................................................................................................1

Summary of Plaintiffs' Limited Allegations Against Mayne ...........................................2

Argument ..................................................................................................................5

    A.  Standard Of Review .........................................................................................5

    B.  The Law On Conspiracy ...................................................................................5

    C.  Claims Against Mayne Related to Digoxin Should Be Dismissed As
        Mayne Has No Connection to Digoxin...............................................................7

    D.  The Complaints Contain No Factual Allegations To Support A Claim That
        Mayne Participated In A Conspiracy Related To Doxy DR With Mylan ..................8

    E.  Allegations Regarding A Conspiracy Between Mayne And Heritage Are
        Insufficient As A Matter Of Law.....................................................................10

Conclusion ..............................................................................................................12

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................8

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) ..........................................................................7

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .....................................................................................6, 8

*In re K-Dur Antitrust Litig.*,
    No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ......................................6, 9

*Ingram v. United States*,
    360 U.S. 672 (1959) ......................................................................................................5

*Kotteakos, et al. v. United States*,
    328 U.S. 750 (1946) .....................................................................................................6, 9

*United States v. Baldridge*,
    559 F.3d 1126 (10th Cir. 2009) ................................................................................6, 9

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) .....................................................................................5

*United States v. Kelly*,
    892 F.2d 255 (3d Cir. 1989) .........................................................................................6

*United States v. Kemp*,
    500 F.3d 257 (3d Cir. 2007) .........................................................................................5

*United States v. Swafford*,
    512 F.3d 833 (6th Cir. 2008) .....................................................................................5, 7

*United States v. Yehling*,
    456 F.3d 1236 (10th Cir. 2006) ...................................................................................5

## INTRODUCTION

This Court should dismiss the claims against Mayne Pharma Inc. (hereinafter "Mayne") asserted in the Direct Purchaser Consolidated Amended Class Action Complaint (ECF 125) (hereinafter "DPP Complaint") and End-Payer Corrected Consolidated Class Action Complaint (ECF 175) (hereinafter "EPP Complaint") (jointly, "Complaints"). At the heart of their Complaints, the Direct Purchaser Plaintiffs and End-Payer Plaintiffs (collectively, "Plaintiffs") allege that the Defendants "engaged in a conspiracy to allocate customers, rig bids and fix, maintain and/or stabilize the prices of generic digoxin and doxycycline." DPP Compl. ¶ 3; EPP Compl. ¶ 4. Although the Complaints are insufficient as to all Defendants—as demonstrated in Defendants' Joint Motions to Dismiss—Plaintiffs' claims are particularly deficient as to Mayne.[1]

First, Plaintiffs fail to allege any facts to support a claim that Mayne was involved in an overarching conspiracy related to both generic digoxin and doxycycline. Digoxin and doxycycline are entirely distinct and unrelated products used for different purposes to treat different medical issues, and are sold in different markets by different companies at different prices. Additionally, the doxycycline referred to in the Complaints is actually two separate products: an immediate-release version of doxycycline hyclate and a delayed-release version known as "Doxy DR." Of these three products, Mayne has only ever sold one—Doxy DR; Mayne has absolutely no involvement in the digoxin market. DPP Compl. ¶ 39; EPP Compl. ¶ 40. It therefore defies logic that Mayne could be part of a conspiracy to fix prices or rig bids for customers on the sale of digoxin; indeed, the Complaints are devoid of any allegations that

---

[1] Mayne incorporates by reference the arguments of its Co-Defendants' in moving to dismiss the Complaints. *See* Certain Defendants' Memorandum of Law in Support of Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (ECF 185-1) ("Joint MTD DPP Complaint"); Certain Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the End-Payer Plaintiffs' Corrected Consolidated Class Action Complaint (ECF 188-1) ("Joint MTD EPP Complaint").

Mayne had any communications—much less conspired with—any of the non-Doxy DR manufacturers.[2]

Second, Plaintiffs fail to allege any facts to support a claim that Mayne participated in a broad conspiracy related to the sale of Doxy DR. Only three Defendants sell Doxy DR: Mayne, Heritage, and Mylan. DPP Compl. ¶ 98. While the Complaints contain conclusory allegations of agreements between Mayne and Heritage and between Heritage and Mylan, respectively, the only factual allegation in the Complaints regarding conduct between *Mayne and Mylan* is that Mayne vigorously competed *against* Mylan. EPP Compl. ¶ 98. There are no allegations that Mayne knew of, or depended upon, the alleged agreements between Heritage and Mylan. As a result, Plaintiffs' claim that Mayne participated in a broad conspiracy related to the sale of Doxy DR fails.

Third, the factual allegations that relate to a purported conspiracy between Mayne and Heritage are insufficient as a matter of law to comply with the Supreme Court's mandates for alleging an antitrust cause of action. For these reasons, Plaintiffs' claims against Mayne in both Complaints should be dismissed.

## PLAINTIFFS' LIMITED ALLEGATIONS AGAINST MAYNE

While Plaintiffs' Complaints confuse and conflate various generic pharmaceuticals and their forms and dosages, Mayne's involvement with the generic drugs identified in the Complaints is limited. Of the generic drugs at issue, Mayne's product offering has been limited to doxycycline hyclate delayed-release—informally known as "Doxy DR." DPP Compl. ¶¶ 39, 196. Only Mayne, Heritage, and Mylan manufactured Doxy DR, and Mayne was the last of the three to enter the Doxy DR market. DPP Compl. ¶ 39, 98, 105, 106. Mayne has no involvement

---

[2] Only Mayne, Heritage Pharmaceuticals, Inc. ("Heritage") and Mylan Pharmaceuticals, Inc. ("Mylan") manufactured Doxy DR. (DPP Compl. ¶ 98).

whatsoever with digoxin or other forms of doxycycline, such as doxycycline hyclate immediate-release ("Doxy IR").

In light of Mayne's limited involvement, Plaintiffs' allegations of conduct by Mayne are notably scarce. Of the DPP Complaint's two hundred and forty-eight allegations, only *six* specifically refer to Mayne. DPP Compl. ¶¶ 39, 98, 106, 161, 196, and 197. Three of these allegations consist of background information. DPP Compl. ¶¶ 39, 98, 106. One of the allegations cites Mayne's August and September 2015 financial presentations, only one of which generally reported on Mayne's sales of Doxy DR. DPP Compl. ¶ 161. The remaining two allegations include conduct between Mayne and Heritage, one of which consists wholly of conclusory allegations lifted from a redacted complaint filed by Attorneys General from various states in the District of Connecticut. DPP Compl. ¶¶ 196-197.

Of the EPP Complaint's two hundred and seventy-six allegations, again only *six* specifically refer to Mayne. EPP Compl. ¶¶ 40, 98, 99, 100, 101, 187. One of these allegations consists of background information. EPP Compl. ¶ 40. Two of the allegations refer to the same alleged instance of a Mayne executive deleting "incriminating texts" from her cellular telephone, but fail to provide any details on the who, what, where, when, or why to support the bald assertion that the texts were "incriminating." EPP Compl. ¶¶ 101, 187. One of the allegations refers to an alleged agreement between Mayne and Heritage to avoid competing with each other, as well as an agreement between Heritage and Mylan to avoid competing with each other. EPP Compl. ¶ 98. Incredibly, this same allegation states that Mayne "targeted customers of Mylan" and "made a bid to a large wholesaler where Mylan was the incumbent provider," which directly contradicts Plaintiffs' theory that Mayne was a member of a larger conspiracy with all defendants, including Mylan. *Id.* The remaining two allegations refer to communications

3

between Mayne and Heritage regarding a few bids and contend that the two companies reached an "agreement." EPP Compl. ¶¶ 99, 100. However, as alleged, the "agreement" consisted only of Heritage bidding high or declining to bid, an agreement that defies logic as Heritage received no benefit under this alleged "agreement." *Id.*

Mayne is noticeably absent from large sections of the Complaints. For instance, Plaintiffs contend that in furtherance of their alleged schemes, the Defendants "meet and conspire" or "communicate and collude" through trade organization meetings and events, including events and board activities of the Generic Pharmaceutical Association ("GPhA"). DPP Compl. ¶¶ 147-149; EPP Compl. ¶¶ 101-109. While the Complaints allege specific meetings of several defendants at these events, there is not a single mention of Mayne's attendance, and there is no allegation that Mayne has any officers that serve on the GPhA Board. *Id.* The only mention of Mayne's attendance at *any* trade organization event in either Complaint is a vague reference to Mayne employees meeting with Heritage employees at an unnamed trade association conference. DPP Compl. ¶ 197.

There is no allegation in the Complaints that Mayne met with, or conspired with, any Defendant other than Heritage. The Complaints do not include any other facts supporting Mayne's involvement in "an overarching scheme to eliminate competition for generic digoxin and doxycycline and to artificially inflate the prices of generic pharmaceuticals through unlawful agreements." DPP Compl. ¶ 4. Most significantly, the Complaints are devoid of *any* factual allegations even suggesting that Mayne had communications with—let alone coordinated bids with—Mylan. For the reasons set forth below, Plaintiffs' allegations are insufficient to support Mayne's participation in the massive conspiracy alleged in the Complaints.

**ARGUMENT**

4

While Plaintiffs seek to assert a vast conspiracy across sellers and manufacturers of both digoxin and doxycycline, Plaintiffs do not allege any facts which connect Mayne to such a broad conspiracy.

### A.  Standard of Review

In an effort to avoid redundancy, Mayne incorporates by reference, as if fully set forth herein, the standard of review case law in the Joint MTD DPP Complaint, at 13-14.

### B.  The Law On Conspiracy

To support a claim for conspiracy, Plaintiffs are required to establish: "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged conspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006); *see also*, *Ingram v. United State*s, 360 U.S. 672 (1959) (explaining that knowledge of the objective of the conspiracy is an essential element of conspiracy).

Courts have consistently affirmed the principle that, without demonstrating interdependence amongst alleged co-conspirators, plaintiffs cannot prove that a defendant engaged in a larger conspiratorial scheme. *See*, *e.g.*, *United States v. Swafford*, 512 F.3d 833, 841-842 (6th Cir. 2008) (holding that a single conspiracy did not exist because the government failed to prove that the defendants were acting in furtherance of a common goal or that there was substantial interdependence among the alleged coconspirators); *United States v. Kemp*, 500 F.3d 257, 288-291 (3d Cir. 2007) (holding that a single conspiracy did not exist because "no spoke depended upon, was aided by or had any interest in the success of the others"); *United States v. Chandler*, 388 F.3d 796, 811-812 (11th Cir. 2004) (holding that a single conspiracy did not exist because "each spoke acted independently and was an end unto itself"). To determine whether

allegations related to disparate facts and events can plausibly state a claim of a single, broad unified conspiracy, Plaintiffs must allege sufficient facts to support a showing that: (1) "there was a common goal among the [alleged] conspirators"; (2) the alleged conspirators depended on each other and the "continuous cooperation of the conspirators" to further their common goal; and (3) "the extent to which the participants overlap in the various dealings" that further their common goal. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989).

In *Kotteakos v. United States*, 328 U.S. 750 (1946), the Court considered whether a defendant engaged in a large, multi-party conspiracy solely by virtue of his connection with one of the common figures of the conspiracy. The Court sided with the defendant, emphasizing that allegations of a defendant conspiring with *one* player do not demonstrate that the defendant engaged in a larger conspiratorial agreement. *Id.*

Similarly, in *United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir. 2009), the court held that "a single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." *Id.* (internal quotations and citations omitted). *See also, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction"); *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016) ("For a single conspiracy to exist, the parties serving as spokes must have been aware of the existence of other spokes, and each spoke must have done something in furtherance of a single, illegal endeavor.").

Where conclusory allegations of anticompetitive conduct are "devoid of details" and "ha[ve] not provided a single detail as to when, why, or how the conspirators decided upon this alleged [scheme]," the complaint fails as a matter of law. *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002). Here, Plaintiffs allege that Mayne was part of "an overarching scheme to eliminate competition for generic digoxin and doxycycline and to artificially inflate the prices of generic pharmaceuticals through unlawful agreements" DPP Compl. ¶ 4; *see also*, EPP Compl. ¶ 198. The Complaints are barren, however, of any allegations that Mayne knew of, or much less bought into, this central objective. There are no allegations that Mayne sold digoxin, or that Mayne had any communications with any defendant other than Heritage. Further, there are no allegations that Mayne understood that its alleged communications with Heritage were part of a larger conspiratorial objective. Because Plaintiffs cannot allege a common, interdependent goal that connects Mayne to the vast conspiracy alleged, the claims against Mayne should be dismissed.

### C.  Claims Against Mayne Related To Digoxin Should Be Dismissed As Mayne Has No Connection To Digoxin

While addressed generally in the Joint MTD DPP Complaint (Joint MTD DPP Compl. at 9-13), Mayne specifically asserts that it cannot be held liable for any claims related to digoxin or any scheme to inflate prices related to digoxin. Mayne has never made, sold, distributed, or marketed digoxin and, as such, it is difficult to imagine how Mayne and the defendants who sold digoxin could have acted together towards a common objective related to digoxin, or been interdependent on each other to achieve a goal related to digoxin. *See*, *e.g.*, *Swafford*, 512 F.3d at 841-842 (6th Cir. 2008) (holding that for a conspiracy to exist, coconspirators must be interdependent upon each other and work towards a common goal). Additionally, the Complaints are devoid of any factual allegations that Mayne even knew of—much less had any involvement

7

in—a conspiracy related to digoxin. Because Plaintiffs fail to allege the basic elements of conspiracy between Mayne and the defendants who manufactured digoxin, and cannot offer support for any plausible conspiracy regarding this drug, any and all claims against Mayne related to digoxin should be dismissed. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

### D.  The Complaints Contain No Factual Allegations To Support A Claim That Mayne Participated In A Conspiracy Related To Doxy DR With Mylan

Plaintiffs do not allege any facts that suggest a conspiracy between Mayne and Mylan. To the contrary, the only allegation of any conduct between Mayne and Mylan in either Complaint is that Mayne "targeted customers of Mylan" and "made a bid to a large wholesaler where Mylan was the incumbent provider." EPP Compl. ¶ 98.

The Complaints do allege that Mayne had communications with Heritage about Doxy DR bids, and that Mayne and Heritage reached agreements related to those bids. DPP Compl. ¶¶ 196-97; EPP Compl. ¶¶ 98-100. The Complaints similarly allege that Heritage and Mylan had agreements related to Doxy DR. DPP Compl. ¶ 197; EPP Compl. ¶ 98. The Complaints fail to allege, however, that Mayne knew of the agreements between Heritage and Mylan, or that Mylan knew of the agreements between Heritage and Mayne. The Complaints also fail to allege that Mayne and Mylan depended on each other to achieve some common goal related to Doxy DR. In fact, the allegation that Mayne "targeted customers of Mylan" and "made a bid to a larger wholesaler where Mylan was the incumbent provider" shows that Mayne and Mylan were acting *independently* to achieve their own legitimate business goals. EPP Compl. ¶ 98.

This factual scenario has been deemed a "rimless wheel" conspiracy by courts, in which there is a common player at the center of the conspiracy but the separate spokes lack a significant interrelationship. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327 (where various

defendants enter into separate agreements with a common defendant, but have no connection with one another, it is considered a rimless wheel conspiracy); *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *18 ("For a single conspiracy to exist, the parties serving as spokes must have been aware of the existence of other spokes, and each spoke must have done something in furtherance of a single, illegal endeavor."). In such rimless wheel schemes, courts have repeatedly refused to find the existence of a single conspiracy as a result of a defendant's connection to a common conspiratorial player without evidence tying the defendant to the larger conspiracy. *Id.*

Plaintiffs fail to allege a common goal between Mayne, Heritage, and Mylan. At most, the Complaints allege unique common goals between Mayne and Heritage, and Heritage and Mylan, respectively, but there is no allegation that Mayne knew of, much less bought into, the latter. Similarly, Plaintiffs fail to allege that the success of Mayne's alleged agreements with Heritage in any way affected or depended upon the success of Heritage's alleged agreements with Mylan. This factual scenario is *precisely* the type of situation in which courts refuse to find that a party engaged in a single, overarching conspiracy. *See Kotteakos*, 328 U.S. 750 (allegations of a defendant conspiring with *one* player do not demonstrate that the defendant engaged in a larger conspiratorial agreement). At most, the Plaintiffs have alleged a conspiracy between Mayne and Heritage related to Doxy DR. This is insufficient, by itself, to link Mayne to a broader, single conspiracy with Mylan. *See Baldridge*, 559 F.3d at 1136 ("a single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people.")  For these reasons, Plaintiffs' allegations are insufficient to support Mayne's participation in a conspiracy with Mylan related to Doxy DR.

**E. Allegations Regarding A Conspiracy Between Mayne And Heritage Are Insufficient As A Matter Of Law**

Plaintiffs assert a limited number of interactions between Mayne and Heritage related to the sale of Doxy DR. DPP Compl. ¶¶ 196-97; EPP Compl. ¶¶ 98-100. A number of these allegations are conclusory in nature and fail to supply the level of specificity required under *Twombly*. DPP Compl. ¶ 197; EPP Compl. ¶¶ 101-102; *Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). Once these conclusory allegations are swept aside, the remaining substantive allegations show nothing more than independent business decisions.

DPPs allege that in February 2014, Mayne entered the market for Doxy DR and approached Heritage about obtaining market share. DPP Compl. ¶ 196. DPPs further allege that Heritage and Mayne "ultimately began coordinating bids," and offer the following two allegations in support of this asserted coordination: (1) "in January 2015, Econdisc Contracting Solutions, a large group purchasing organization, sought bids for Doxy DR, and Heritage made sure to bid a higher price than Mayne in accordance with the agreement not to compete;" and (2) "[i]n September 2015, Heritage also refused to provide a Doxy DR bid to a large pharmacy chain, because the incumbent supplier was Mayne." *Id.* What is notably absent from these allegations are specific facts about the alleged "coordination" and "agreement." For instance, there is no allegation of any counter promise or action on the part of Mayne that benefited Heritage or advanced the alleged conspiracy, nor any allegation of an exchange of price or bid information between Mayne and Heritage used to carry out their alleged "coordination." For the January 2015 allegation, DPPs do not assert that Mayne informed Heritage of the amount of Mayne's bid. Similarly, for the September 2015 allegation, DPPs do not assert that Mayne suggested that Heritage refrain from bidding. Stripped of the nefarious conclusory statements

that DPPs inject into the allegations, all that is alleged is that Heritage's bid to Econdisc Contracting Solutions was higher than Mayne's and that Heritage declined to submit a bid to a large pharmacy chain. *Id.* As alleged, Plaintiffs' theory of the conspiracy—that Heritage, an established seller of Doxy DR, simply walked away from business because Mayne, a new market participant, asked it to—is simply implausible and insufficient to support a claim of conspiracy against Mayne. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (explaining plaintiffs in *Twombly* "looked around and saw conduct *consistent* with conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original).  Without any specific allegations that would lead to another conclusion, DPPs' allegations should be presumed to be nothing other than Heritage's independent business decisions. *See* Joint MTD DPP Complaint, Section III.B.2.

EPPs' Complaint contains the same deficiencies. EPPs allege that in the month preceding Mayne's entry into the market, Mayne and Heritage representatives had telephonic discussions on "allocating customers." EPP Compl. ¶ 98. EPPs further allege that once Mayne entered the market in February 2014, Mayne "avoided competing for business with customers of Heritage and instead targeted customers of Mylan." *Id.* However, EPPs' very next allegation is that in March 2014, just one month after entering the market, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. EPP Compl. ¶ 99. EPPs allege that this "led to" discussions between representatives from Mayne and Heritage "over the next several months," but the EPP Complaint is silent on any details related to those discussions and does not even allege that they were in any way improper. *Id.*

EPPs also allege that in November 2014, Mayne "made offers to the One Stop Program of McKesson Corporation ("McKesson") [] and Econdisc Contracting Solutions (Econdisc)." *Id.*

11

EPPs allege that a Heritage representative contacted Mayne personnel "to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson." *Id.* EPPs allege that the Heritage representative "worked out an agreement with Mayne by November 25, 2014" and that the parties engaged in "follow-up communications in December 2014," but there is no allegation that Mayne actually withdrew its bid to McKesson. *Id.* There is no factual allegation that the "idea" was effectuated by Heritage. As a result, EPPs fail to allege with any level of specificity that Mayne and Heritage actually reached an agreement, much less acted upon that agreement.

EPPs also repeat the allegations made in the DPP Complaint regarding Heritage's higher bid to Econdisc in January 2015, and Heritage's decision to decline to submit a bid to a large nationwide pharmacy in September 2015. EPP Compl. ¶ 100. As was true of these same allegations in the DPP Complaint, discussed above, EPPs offer no factual allegations that would contradict the presumption that these were the result of anything other than Heritage's independent business decisions. *See* Joint MTD DPP Complaint, Section III.B.2.

Having failed to allege facts sufficient to support a claim of conspiracy between Mayne and Heritage, the claims against Mayne should be dismissed.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss the Direct Purchaser and End-Payer Plaintiffs' claims against Mayne.

Respectfully Submitted,

Dated:  March 28, 2017                    */s/ Michael E. Martinez*

Michael Martinez
Steven Kowal
Lauren Norris Donahue
Brian J. Smith

12

**K&L GATES LLP**
70 W. Madison St.
Suite 3100
Chicago, IL 60602
Tel. 312-372-1121
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*

13