**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC DIGOXIN AND DOXYCYCLINE ANTITRUST LITIGATION** | **MDL NO. 2724** <br> **16-MD-2724** <br><br> **HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** <br><br> **DIRECT PURCHASER ACTIONS** <br> **END-PAYER ACTIONS** | |

---

**DEFENDANT MYLAN PHARMACEUTICALS INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT
AND END-PAYER PLAINTIFFS' CORRECTED CONSOLIDATED
CLASS ACTION COMPLAINT**

---

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

    I        Plaintiffs Fail to Plead Pricing Evidence that Mylan Participated in Any Conspiracy ................................................................................................ 2

    II       Plaintiffs Fail to Plead Any Other Evidence of Mylan Participating in Any Conspiracy ................................................................................................ 4

CONCLUSION ....................................................................................................................... 7

# **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ..................................................................................................... 1, 6

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
　509 U.S. 209 (1993) ......................................................................................................... 1

*Coon v. Froehlich*,
　573 F. Supp. 918 (S.D. Ohio 1983) ................................................................................. 3

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
　231 F. Supp. 2d 1253 (N.D. Ga. 2002),
　*aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*,
　346 F.3d 1287 (11th Cir. 2003) ....................................................................................... 6

*In re Baby Food Antitrust Litig.*,
　166 F.3d 112 (3d Cir. 1999) ............................................................................................ 4

*In re Chocolate Confectionary Antitrust Litig.*,
　999 F. Supp. 2d 777 (M.D. Pa. 2014),
　*aff'd*, 801 F.3d 383 (3d Cir. 2015) ................................................................................... 3

*In re Domestic Drywall Antitrust Litig.*,
　163 F. Supp. 3d 175 (E.D. Pa. 2016) ............................................................................... 6

*In re Elevator Antitrust Litig.*,
　502 F.3d 47 (2d Cir. 2007) .............................................................................................. 4

*In re Graphics Processing Units Antitrust Litig.*,
　527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................................... 3, 5

*In re Late Fee and Over-Limit Fee Litig.*,
　528 F. Supp. 2d 953 (N.D. Cal. 2007),
　*aff'd*, 741 F.3d 1022 (9th Cir. 2014) ............................................................................... 3

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
　764 F. Supp. 2d 991 (N.D. Ill. 2011) ............................................................................... 6

*In re Polyurethane Foam Antitrust Litig.*,
　799 F. Supp. 2d 777 (N.D. Ohio 2011) ........................................................................... 3

*In re Processed Egg Prods. Antitrust Litig.*,
　821 F. Supp. 2d 709 (E.D. Pa. 2011) ............................................................................... 3

*InterVest, Inc. v. Bloomberg, L.P.*,
　340 F.3d 144 (3d Cir. 2003) ............................................................................................ 4

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010) ........................................................................5, 7

*Valspar Corp. v. E.I. du Pont de Nemours*,
    152 F. Supp. 3d 234 (D. Del. 2016) ...........................................................................6

## RULES

Fed. R. Civ. P. 11 ...............................................................................................................5

## OTHER AUTHORITIES

6 P. Areeda & H. Hovenkamp,
    Antitrust Law ¶ 1433a (2d ed. 2003) ..........................................................................1

**INTRODUCTION**

There are no allegations, sufficient to survive a motion to dismiss, demonstrating direct evidence or circumstantial evidence (parallel conduct combined with "plus factors") that Mylan Pharmaceuticals Inc. ("Mylan") entered into any unlawful agreement to fix the price of digoxin or doxycycline. To the contrary, the pricing patterns that form the core of Plaintiffs' conspiracy theory actually show that Mylan, independently and rationally, took pricing actions after observing that a rival had profitably raised its own price first. This follow-the-lead pricing strategy is perfectly legal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) (Conscious parallelism, "a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)); *see also* 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed. 2003) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1."). All the other noise Plaintiffs make about government investigations, statements during earnings calls with investors, and attendance at trade shows fail to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. Mylan should be dismissed from these cases.[1]

---

[1] Mylan joins and incorporates the arguments Defendants raise in support of their Joint Motion to Dismiss Direct Purchaser Plaintiffs' ("DPPs") Consolidated Amended Complaint, D.I. 125, and Joint Motion to Dismiss the End-Payer Plaintiffs' ("EPPs") Corrected Consolidated Class Action Complaint, D.I. 175. For purposes of this Memorandum, Mylan refers to the DPPs' and EPPs' respective Complaints as "DPP CAC" and "EPP CAC".

**ARGUMENT**

I    **Plaintiffs Fail to Plead Pricing Evidence that Mylan Participated in Any Conspiracy**

DPPs and EPPs claim that price-fixing impacted three products: (1) digoxin, a heart drug, (2) doxycycline hyclate, an antibiotic, and (3) the delayed release version of doxycycline hyclate ("Doxy DR"). Digoxin and doxycycline are separate products, made from different active ingredients, used to treat unrelated medical conditions. *See, e.g.*, DPP CAC ¶¶ 66, 96. Plaintiffs also separate doxycycline hydrate from Doxy DR, noting that different Defendants "operate in the market for generic doxycycline" while other Defendants "operate in the market for Doxy DR." *Id*. ¶ 98. Most importantly, each manufacturer's participation and pricing in each market varies by drug.

As Plaintiffs acknowledge, Mylan stopped selling digoxin in 2008 (five years before the alleged conspiracy), and did not return to the market until early 2015, more than a year after Plaintiffs allege the price of digoxin began rising around October 2013. DPP CAC ¶¶ 73, 81, 87; EPP CAC ¶¶ 77-81, 84. Mylan could see that re-entry would be profitable because prices were higher than when it had exited the digoxin market. DPP CAC ¶ 85; EPP CAC ¶¶ 78-79. Consistent with a competitive market, digoxin prices declined upon Mylan's re-entry. *Id.*[2]

Similarly, Plaintiffs do not allege that Mylan made or sold doxycycline hyclate when other firms allegedly raised prices in the fall of 2012. DPP CAC ¶ 114; EPP CAC ¶ 87. Because Plaintiffs do not provide any facts about any manufacturer's individual prices, the complaints do not specify when Mylan re-entered or at what price. DPP CAC ¶¶ 110-14; EPP CAC ¶¶ 87-91. However, as with digoxin, Mylan could plainly see a profitable opportunity to re-enter the

---

[2] Other than misleading charts about Lannett's and Impax's prices, Plaintiffs do not provide specifics about the actual prices charged by any other digoxin manufacturer during the class period.

2

doxycycline hyclate market because prices were higher than when it had exited. *Id.*

These facts undermine the core of Plaintiffs' conspiracy theory against Mylan. Mylan simply could not have reached an agreement to fix prices of digoxin or doxycycline hyclate when it did not make or sell the drugs at the time of the purportedly unlawful price increases. Mylan should be dismissed because there is no evidence – direct or circumstantial – to connect Mylan to any unlawful agreement. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (Plaintiffs must "plausibly suggest that the *individual defendant* actually joined and participated in the conspiracy") (emphasis added); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("[E]ven where some competitors have admitted to meeting to fix prices at or near trade shows and conferences, it is *not* reasonable to infer that another competitor in attendance at the same meeting had done likewise.") (emphasis added); *Coon v. Froehlich*, 573 F. Supp. 918, 922 (S.D. Ohio 1983) (to hold a defendant liable for all of the conspiracy's acts prior to joining the conspiracy it must be shown that he knew about "what has gone on before" and "participated in the conspiracy after entering it"); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011) (applying the holding from *Coon* in the antitrust conspiracy context).

To the contrary, Mylan followed the lead of others to later re-enter the market when it was profitable to do so. That is not unlawful conduct. Rather, by adopting a follow-the-lead pricing strategy, Mylan acted independently, competitively, and lawfully. *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) (granting motion to dismiss because a "[Sherman Act § 1] violation cannot . . . be inferred from . . . an industry's follow-the-leader pricing strategy") (citation omitted); *see also In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 796-97 (M.D. Pa. 2014), *aff'd*,

3

801 F.3d 383 (3d Cir. 2015) (concluding that defendant's price-follower strategy was not unlawful because "'market players will often raise prices along with the market leader in order to increase their profit'") (citation omitted); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 135 (3d Cir. 1999) ("[I]f a firm's motivation is merely to meet rival prices, it would constitute only interdependence" rather than an unlawful agreement).

With respect to Doxy DR, Plaintiffs provide no facts about the actual prices charged by Mylan or any Doxy DR manufacturer during the class period – no "who," "how much" or "when" facts. DPP CAC ¶¶ 110-14; EPP CAC ¶¶ 87-91. It is impossible to infer a conspiracy, let alone parallel conduct, when, for example, DPPs only state that "prices for 75 mg and 100 mg Doxy DR tablets were maintained at supracompetitive levels." DPP CAC ¶ 114. All Plaintiffs can say is the wholly insufficient allegation that Doxy DR is the subject of government investigations. Plaintiffs' complaints should be dismissed with respect to Doxy DR as well.

## II  Plaintiffs Fail to Plead Any Other Evidence of Mylan Participating in Any Conspiracy

The hodgepodge of other circumstances Plaintiffs present against Mylan fare no better in demonstrating a plausible conspiracy.

Plaintiffs do not identify: any meeting or communication between Mylan and other Defendants in which a price-fixing agreement was reached, what specifically Mylan agreed to do (or refrain from doing) as part of any such agreement, which Mylan employee(s) entered into any such agreement, or when and where any such agreement occurred. *See, e.g.*, *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 163 (3d Cir. 2003) (providing examples of direct evidence such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators") (citation omitted); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (allegations of agreements made at unidentified place and time

4

are insufficient to establish direct evidence supporting a plausible inference of agreement necessary for surviving motion to dismiss).

For the reasons set forth in Defendants' Joint Motions to Dismiss against DPPs and EPPs, Plaintiffs cannot rely on allegations brought by others – namely the State Attorneys General – to satisfy their pleading obligations under Federal Rule of Civil Procedure 11.  *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) ("[M]ere occurrence of [an] investigation is equally consistent with Defendants' innocence."); *In re Graphics*, 527 F. Supp. 2d at 1024 (existence of investigations "is a non-factor" and "carries no weight in pleading an antitrust conspiracy claim").  Even so, Plaintiffs' barebones summary of those allegations contain only conclusory statements that are not entitled to a presumption of truth, but no actual *facts* showing any conspiracy involving Mylan related to any of the three drugs at issue.  DPP CAC ¶ 197.[3]

Plaintiffs cite various statements made during public earnings calls with market analysts and public investor reports, none of which contain a modicum of evidence suggesting communication or agreement between Mylan and other Defendants.  *See, e.g.*, DPP CAC ¶¶ 122-46.  It is telling that the best Mylan-specific support in this category Plaintiffs can glean consists of nothing beyond broad commentary in two of Mylan's quarterly earnings calls about the "positive pricing environment" and "generic pricing" – discussed (i) in the context of other drugs in which neither digoxin nor doxycycline are ever mentioned, and (ii) well *after* the allegedly unlawful digoxin and doxycycline price increases occurred.  DPP CAC ¶ 144 (quoting Q3 2015

---

[3] While claiming factual support for the existence of a single conspiracy across three drugs, Plaintiffs conveniently ignore that the complaint of the State Attorneys General does not involve digoxin or doxycycline hyclate.

5

and Q4 2014 Mylan earnings calls).[4]  *See, e.g.*, *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) ("It is difficult to imagine how these generic statements [regarding industry trajectory] render the conspiracy allegation more plausible."); *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1276-77 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ("[T]he cases which have found that an inference of traditional agreement from indirect communications took place show far more *detailed communications with no public purpose*. … Here, Plaintiffs have documented nothing reaching the level of prohibited exchanges, but rather have described the type of information *companies legitimately convey to their shareholders*.") (emphasis added); *Valspar Corp. v. E.I. du Pont de Nemours*, 152 F. Supp. 3d 234, 247-48 (D. Del. 2016) (even pricing changes *following* publicly issued advance price announcements for which "there are lawful non-collusive reasons", without more, were not suggestive of conspiracy in oligopolistic market).

Plaintiffs' allegations concerning Mylan's membership in trade associations like the Generic Pharmaceutical Association ("GPhA"), officer position on GPhA's Board of Directors, and attendance at trade conferences or events are equally deficient.  *See, e.g.*, DPP CAC ¶¶ 151-57.  Well-established case law confirms such allegations are not valid "plus factors."  *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016); *see also Twombly*,

---

[4] Digoxin prices allegedly spiked around October 2013 (DPP CAC ¶¶ 81-82; EPP CAC ¶¶ 79-81) and doxycycline hyclate prices allegedly spiked around "fall of 2012" (DPP CAC ¶ 114; EPP CAC ¶ 87), both **well before** when Mylan's Q3 2015 and Q4 2014 earnings calls took place in October 2015 and March 2015 respectively.  The full transcript of Mylan's Q3 2015 earnings call is publicly available at: http://seekingalpha.com/article/3628326-mylan-nv-myl-heather-m-bresch-q3-2015-results-earnings-call-transcript?part=single (last accessed March 26, 2017).  Transcript of Mylan's Q4 2014 earnings call is publicly available at: http://seekingalpha.com/article/2966726-mylan-myl-heather-m-bresch-on-q4-2014-results-earnings-call-transcript?part=single (last accessed March 26, 2017).

550 U.S. at 567 n.12 (defendant should not be forced to "devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy[,] all this just because he belonged to the same trade guild as one of his competitors"); *Superior Offshore*, 738 F. Supp. 2d at 516.  GPhA's membership includes not just manufacturers, but also distributors, chemical manufacturers, and suppliers of other goods and services to the generic industry.  DPP CAC ¶ 149.  Similarly, EPPs allege that Mylan met with other Defendants "at *conferences held by their customers*[.]"  EPP CAC ¶ 104 (emphasis added).  Yet both Complaints contain zero specific allegations as to (1) how such environments, particularly conferences hosted by *customers*, can be conducive to Defendants' building of a conspiracy; and (2) Mylan's communications regarding any particular drug at any trade conference or event.

Allegations concerning seven GPhA meetings, during which Mylan supposedly had opportunities to collude, are equally deficient.  Six of these seven GPhA meetings took place during 2012-2014, when Mylan was out (and had been out) of the digoxin market for years. *Compare* DPP CAC ¶ 154 (chart of seven GPhA meetings during 2012-2015) *and* EPP CAC ¶ 106 (same), *with* DPP CAC ¶¶ 73, 81, 87 (Mylan "temporarily stopped selling digoxin" in or around April 2008 and did not re-enter digoxin market until 2015).

## CONCLUSION

For all of the foregoing reasons, in addition to those set forth in Defendants' Joint Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (D.I. 185) and Joint Motion to Dismiss the End-Payer Plaintiffs' Corrected Consolidated Class Action Complaint (D.I. 188),  Mylan respectfully requests that the Court dismiss both Complaints against Mylan with prejudice.

Dated:  March 28, 2017                          /s/ *Chul Pak*

                                            Chul Pak (cpak@wsgr.com)
                                            Jeffrey C. Bank (jbank@wsgr.com)
                                            **WILSON SONSINI GOODRICH & ROSATI**
                                            1301 Avenue of the Americas, 40th Floor
                                            New York, New York 10019
                                            Telephone:  (212) 497-7700
                                            Facsimile:  (212) 999-5899

                                            Seth C. Silber (ssilber@wsgr.com)
                                            **WILSON SONSINI GOODRICH & ROSATI**
                                            1700 K Street, N.W., 5th Floor
                                            Washington, D.C. 20006
                                            Telephone:  (202) 973-8800
                                            Facsimile:  (202) 973-8899

                                            *Attorneys for Defendant*
                                            *Mylan Pharmaceuticals Inc.*