# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724 <br> 16-MD-2724 <br> HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY THE PLAINTIFF STATES FOR A SEPARATE GOVERNMENT TRACK

Forty-five States, the District of Columbia and the Commonwealth of Puerto Rico (the "Plaintiff States"[1]), by and through their respective State Attorneys General, submit this memorandum of law in support of their motion for a separate government track for the enforcement actions brought by the State Attorneys General bearing the captions, *Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, Civ. A. No. 2:17-cv-03768-CMR and *Arkansas v. Aurobindo Pharma USA, Inc.*, Civ. A. No. 17-3769-CMR (collectively, the "State Enforcement Action"), in which the Plaintiff States' proposed Consolidated Amended Complaint would be the operative complaint.[2]

---

[1] The Plaintiff States involved in this law enforcement action are the States of Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, Tennessee, Utah, Vermont, Washington, West Virginia and Wisconsin, the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, the District of Columbia and the Commonwealth of Puerto Rico.

[2] The Plaintiff States filed their Motion for Leave to File a Consolidated Amended Complaint on October 31, 2017 (Docket No. 3) in *Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.* Civ. A. No. 2:17-cv-03768-CMR. The proposed Consolidated Amended Complaint consolidates the two actions filed by the Plaintiff States and transferred to this Court, as well as adding Alaska and Puerto Rico as plaintiffs.

Based on a multi-year investigation led by the Connecticut Attorney General's Office, the Plaintiff States have uncovered evidence of an overarching conspiracy among the defendants to engage in illegal anticompetitive conduct in the generic pharmaceutical industry and allege interrelated agreements to fix prices and allocate markets for fifteen generic drugs among twenty defendants. Because of the nature of the Plaintiff States' claims, the evidence uncovered, and the sovereign and quasi-sovereign interests unique to the Plaintiff States, the Plaintiff States' allegations cannot be litigated on a drug-by-drug basis. Therefore, the Plaintiff States' action does not fit within the case management protocol adopted by the Court prior to the Plaintiff States' transfer to this multidistrict litigation ("MDL").

Specifically, the Plaintiff States request that the Court designate 2:17-cv-03768 as a separate "lead case" (as that term is used in Pretrial Order No. 24), entitled "State Attorneys General," and exempt the Plaintiff States from any pretrial orders that require private plaintiffs to file their multiple complaints on a drug-by-drug basis. If the Plaintiff States are required to divide up their action drug-by-drug, it would significantly undermine the unique sovereign interests of the States and their ability to prosecute this enforcement action in the manner the Plaintiffs States have determined (1) best fits the evidence uncovered and alleged in their enforcement action and (2) best advances the public interest in the prompt and efficient enforcement of the antitrust laws.

As part of this MDL, the Plaintiff States recognize that the Court is tasked with eliminating the potential for duplicative discovery, inconsistent pretrial rulings and conflicting discovery obligations. Thus, as part of the proposed order accompanying their motion (attached at Exhibit A), the Plaintiff States agree to enter into a coordination order with the private plaintiffs and defendants.

I. BACKGROUND

   A. The State Enforcement Action

The State Enforcement Action arises out of a multi-year investigation begun by the Connecticut Attorney General's Office in July 2014 into the pricing of generic pharmaceuticals.[3] In 2016, Connecticut was joined in its efforts by attorneys general from across the United States, and litigation commenced in the United States District Court for the District of Connecticut on December 15, 2016. The initial Complaint, which alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, was amended on March 1, 2017, adding additional States and state-law claims. Although the ongoing parallel investigation is broader in scope, the initial complaints alleged price fixing and market allocation in the markets for Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide, against six defendants. At the time the initial Complaint was filed, there were no pending class actions relating to either Doxy DR or Glyburide.

Since filing their initial complaint, the Plaintiff States have continued to investigate the widespread anticompetitive activity in the generic drug industry under their broad statutory investigatory powers. The Plaintiff States have gathered extensive investigatory materials, including millions of pages of documents and emails, as well as voluminous records of phone calls and text messages. In addition, many of the Plaintiff States entered into settlement and cooperation agreements with two former executives of defendant Heritage Pharmaceuticals, Inc. ("Heritage"): (1) Jason Malek, Heritage's former president, and (2) Jeffrey Glazer, Heritage's former chairman and chief executive officer.[4]

---

[3] Connecticut's investigation was followed shortly thereafter by a Congressional inquiry and a criminal grand jury investigation by the United States Department of Justice Antitrust Division, which is investigating similar conduct.

[4] The Connecticut Attorney General's May 24, 2107 announcement of the settlement and cooperation agreements is at http://www.ct.gov/ag/cwp/view.asp?A=2341&Q=593238. In December

As a result of this investigation, the Plaintiff States filed the proposed Consolidated Amended Complaint, which alleges an overarching conspiracy to engage in illegal anticompetitive conduct in the generic pharmaceutical industry and interrelated agreements to fix prices and/or allocate markets involving fifteen drugs and twenty defendants.[5,6] The Plaintiff States seek injunctive relief, disgorgement, civil penalties and damages.

### B. Transfer to the MDL

On August 3, 2017, at the request of several defendants, and over the Plaintiff States' objection, the State Enforcement Action was transferred to this MDL. The Plaintiff States raised concerns about consolidation in the MDL, including that the State Enforcement Action is broader in scope than the cases pending in the MDL and that consolidation in the MDL could undermine the unique interests of the Plaintiff States and the State Attorneys General. Aware that their investigation would expand beyond the allegations of their initial complaint, the Plaintiff States also noted that the State Enforcement Action would not fit within the existing MDL drug-by-drug structure for grouping claims. *See* Brief in Support of Plaintiff States' Motion to Vacate Conditional Transfer Order (CTO-3), MDL No. 2724, Dkt. No. 321-1 at 6, n.7 (JPML).

In its Transfer Order, the Judicial Panel on Multidistrict Litigation (the "Panel") acknowledged these concerns and noted that the MDL Court had the ability to address them by

---

2016, Glazer and Malek each entered into plea agreements with the U.S. Department of Justice after being charged with two counts of criminal violations of the Sherman Act.

[5] Not every Plaintiff State joins in every count in the proposed Consolidated Amended Complaint.

[6] As noted in paragraph 3 of the proposed Consolidated Amended Complaint, the Plaintiff States continue to investigate additional conspiracies, involving these defendants and other generic manufacturers, regarding the sale of other drugs not identified in this Complaint, and will likely bring additional actions based on those conspiracies at the appropriate time. The Plaintiff States do not presently expect to further amend the proposed Consolidated Amended Complaint to include other drugs or conspiracies, in part because the Plaintiff States anticipate that such future actions will be based on evidence that does not focus as centrally on Heritage as this complaint does.

establishing a separate government track. The Panel stated, "[t]o the extent the State Action presents unique factual and legal issues, the transferee judge has the discretion to address those issues through the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice." Transfer Order, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, 2017 WL 4582710, *2 (JPML Aug. 3, 2017).

## II. ARGUMENT

### A. The Plaintiff States' Unique Interests Are Best Advanced through a Separate Government Track.

Because of the unique interests of the Plaintiff States, and the significant differences from private plaintiffs, the Court should establish a separate government track for the Plaintiffs States within the MDL framework. The State Enforcement Action is brought by forty-seven State Attorneys General in their capacity as the chief legal officers of the Plaintiff States, and all of the attorneys general represent their respective jurisdictions in their sovereign and quasi-sovereign capacities to enforce both state and federal antitrust law. The Plaintiff States seek to remedy past wrongdoing and to deter future illegal conduct, not on behalf of any one person but for the public interest at large.

Unlike in a class action, State Attorneys General (often constitutional officers) act for their respective state and its interests, pursuant to state law. As representatives of sovereign entities, State Attorneys General cannot cede their authority to another entity (although they can appoint special counsel to act under their supervision). Thus, the specific claims alleged by the Plaintiff States cannot be consolidated with the claims of private plaintiffs, nor can the State Attorneys General cede decision-making authority to entities such as the Plaintiffs' Steering Committee or a designated Lead Counsel. Any order to the contrary could improperly and illegally infringe on the statutory, constitutional and other legal authority vested in the Plaintiff

5

States' Attorneys General, who, as the chief legal officers in their states, are vested with certain powers and charged with certain duties and responsibilities in connection with litigation by or against the state. As a result, if private counsel—who are neither appointed nor controlled by the state—purport to exercise control over the States' litigation, they impermissibly encroach upon the obligations, duties and powers of the attorneys general, which is unacceptable from both a legal and practical perspective.[7]

After several meet and confers with the Defendants' Liaison Counsel, the Plaintiff States understand that the Defendants do not object to a separate government track, but do object to the filing of a single consolidated amended complaint that includes allegations regarding multiple drugs.

---

[7] There are also fundamental differences between the class action plaintiffs and Plaintiff States' law enforcement action. In a typical class action, one private litigant seeks to recover economic damages for herself and those similarly situated (and attorneys' fees for class counsel). By contrast, when a state pursues its own sovereign and quasi-sovereign interest, it is acting on behalf of its own separate interest in the economic health and well-being of the state, not on behalf of the individual interests of its citizens. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600-07 (1982). The state may, among other things, seek civil penalties to punish those who have violated the law and to deter those who might violate the law in the future. And, unlike private plaintiffs, the Plaintiff States may seek injunctive relief to prevent injury to their economies. *See, e.g., Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257-60 (1972); *see generally* ABA Section of Antitrust Law, State Antitrust Enforcement Handbook (2003). For these law enforcement purposes, the Plaintiff States are not acting as a purchaser, although the Plaintiff States may also seek damages as purchasers. Thus, the Plaintiff States, unlike the private plaintiffs here, are not easily divided into categories such as direct purchasers, indirect purchasers and indirect resellers.

The attorneys general of some Plaintiff States also represent consumers as *parens patriae* or similar authority under state law. The distinction between a class action and a *parens patriae* action by the attorney general is a crucial one. As the court explained in *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 217 (2d Cir. 2013), in a *parens patriae* action the representation is effective upon filing and, "[u]nlike private class representatives, the Attorney General is not designated as a member of the class whose claim would be typical of the claims of class members. Instead, the Attorney General is granted statutory authority to sue in *parens patriae* and need not demonstrate standing through a representative injury or obtain class certification in order to recover on behalf of the citizens of the state. *Id.* (internal quotations and citations omitted). Therefore, there is no need to certify a class.

### B. A Separate Government Track Should Exist Apart from the MDL's Current Drug-By-Drug Framework.

A separate government track should not be organized on a drug-by drug basis, as the Court has organized the private plaintiffs' cases. As explained below, the existing case management framework was entered into without the Plaintiff States' consent or input, does not fit the Plaintiff States' structure of their enforcement action, the evidence uncovered to date or the allegations pled, and would unduly prejudice the Plaintiff States' ability to prosecute their civil enforcement claims in the manner the State Attorneys General have determined best fits the evidence gathered and best serves the public interest.

#### 1. The Plaintiff States' Allegations of Overarching Conspiracy and Multiple Interrelated Conspiracies Preclude Organizing the Government Track on a Drug-By-Drug Basis.

Although a potential way to organize the private class actions, drug-by-drug case management is in direct conflict with the factual allegations contained in the Plaintiff States' proposed Consolidated Amended Complaint and the manner in which the Plaintiff States seek to prosecute their action and advance the public interest.

The basis for these allegations derives from the Plaintiff States' extensive multi-year investigation, including information obtained through Civil Investigative Demands—information that was unavailable to the private plaintiffs when pleading their separate complaints. The Plaintiff States developed their proposed complaint after reviewing a legion of documents, emails, phone records and text messages, and with the cooperation of two former executives. Based on this evidence, the Plaintiff States allege conspiracies involving fifteen (15) specific drugs, eighteen (18) different generic drug manufacturers and two high-ranking executives.

The proposed Consolidated Amended Complaint alleges an overarching conspiracy among multiple generic drug manufacturer defendants that manifested itself in both market

7

allocation schemes and agreements to raise or stabilize prices. Although defendant Heritage Pharmaceuticals, Inc. is a consistent participant in each of those conspiracies, the Plaintiff States also allege that the conduct is pervasive and industry-wide and the schemes identified are part of a larger, overarching understanding about how generic manufacturers price and allocate markets to suppress competition. These allegations cannot be divided up on a drug-by-drug basis.

Defendants' alleged anticompetitive conduct falls principally into two categories, the overarching goal being to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted products without triggering a "fight to the bottom" among existing competitors. (*See* proposed Consolidated Amended Complaint ("CAC") ¶¶ 12-13.) First, to avoid competing with one another and thus eroding the prices for a myriad of generic drugs, defendants—either upon their entry into a given generic market or upon the entry of a new competitor into that market—communicated with each other to determine and agree on how much market share and which customers each competitor was entitled to. (*See* CAC ¶¶ 12, 113-242.) They then implemented the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful. (*See, e.g.,* CAC ¶¶ 12, 123-24, 139, 172-75, 190-95, 196-206, 209-10, 213-14, 215, 234-35, 238, 239-40.) Defendants agreed to allocate markets for Nimodipine, Meprobamate, Zoledronic Acid and Doxycycline Hyclate Delayed Release ("Doxy DR"), among others. (*See* CAC ¶¶ 113-242.) These schemes reduced or eliminated competition for particular drugs and have allowed the defendants to maintain artificially supra-competitive prices in these markets throughout the United States. (*See* CAC ¶¶ 470-518.)

Second, and often in conjunction with the market allocation schemes, the proposed Consolidated Amended Complaint alleges that competitors in a particular market

communicated—either in person, by telephone, or by text message—and agreed to collectively raise and/or maintain prices for a particular generic drug. (*See* CAC ¶¶ 243-453.) The defendants collectively agreed to raise and/or maintain prices for Acetazolamide, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nimodipine, Meprobamate, Nystatin, Paromomycin, Theophylline and Verapamil, among others. (*See id.*)

Undergirding these agreements, the Plaintiff States allege, defendants understood and acted upon an underlying code of conduct for the generics industry: an expectation that any time a company is entering a market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of fair share; the purpose of which was to avoid competition and maintain high prices. (*See* CAC ¶¶ 89-109.) While different drugs may involve different sets of companies, this background understanding remains constant and is an important component of the defendants' ability to reach their individual agreements. (*See* CAC ¶ 14.) The larger understanding applies equally to market allocation and price fixing agreements. (*See* CAC ¶¶ 98-106.) This overarching conspiracy is illustrated again and again by the defendants' actions with regard to the individual drugs identified throughout the Consolidated Amended Complaint. (*See, e.g.*, CAC ¶¶ 119-21, 131 (Nimodipine), 135-38, 274 (Nimodipine), 150-53 (Zoledronic Acid), 167-77 (Meprobamate), 183-88, 190-95, 196-206, 209-10, 213-14, 215 (Doxy DR), 234-35, 238, 239-40 (Doxy DR), 262 (Doxy Mono), 271-72 (Heritage-Teva communications about multiple drugs), 276 (Heritage-Mylan communications about multiple drugs), 348, 353-54, 356-59, 361 (Glyburide), 384-85 (Leflunomide), 400 (Nystatin) 441 (Theophylline).) As alleged in the proposed Consolidated Amended Complaint, this industry-wide understanding dates back many years. (*See* CAC ¶¶ 91.)

Thus, the Plaintiff States allege that within the generic drug industry there is a larger understanding among generic manufacturers which ties together all of the agreements on individual drugs identified in the Consolidated Amended Complaint. This understanding, the Plaintiff States allege, permeates all of defendants' actions including any agreement on a specific drug and is part of a *quid pro quo* prevalent in the industry. For example, the Plaintiff States allege, companies willingly allow a new entrant to obtain market share for one drug without competition because that competitor had cooperated regarding a different drug in the past. (*See* CAC ¶¶ 103, 188.) The Plaintiff States also allege that companies allow their competitors to raise prices on one or more drugs without fear of losing market share because they expect reciprocal treatment when they increase price on different drugs. (*See* CAC ¶¶ 106, 276.)

Within this context, the proposed Consolidated Amended Complaint alleges specific conspiracies among the multiple defendants. Even apart from the detailed allegations of overarching conspiracy, rampant anticompetitive conduct throughout the industry and extensive and regular communications among the defendants, the allegations in the proposed Consolidated Amended Complaint support pleading them together in one complaint. At the center of the proposed Consolidated Amended Complaint is Heritage, which is alleged to have engaged in conspiracies with each of the other defendant drug manufacturers concerning at least fifteen drugs. (*See* CAC ¶¶ 113-453.) For example, Heritage is alleged to have engaged in the following illegal agreements, by drug,

    a.     Glyburide: with 3 co-conspirators (CAC ¶¶ 339-64);

    b.     Doxy DR: with 3 corporate, 2 individual co-conspirators (CAC ¶¶ 180-242);

    c.     Acetazolamide: with 2 co-conspirators (CAC ¶¶ 295-305);

    d.     Doxy Mono: with 3 co-conspirators (CAC ¶¶ 246-67);

e. Fosi-HCTZ: with 4 co-conspirators (CAC ¶¶ 306-28);

f. Glipizide/Metformin: with 2 co-conspirators (CAC ¶¶ 329-38);

g. Glyburide/Metformin: with 3 co-conspirators (CAC ¶¶ 365-79);

h. Leflunomide: with 2 co-conspirators (CAC ¶¶ 380-90);

i. Meprobamate: with 1 co-conspirator (CAC ¶¶ 165-79);

j. Nimodipine: with 2 co-conspirators (CAC ¶¶ 115-48);

k. Nystatin: with 2 co-conspirators (CAC ¶¶ 391-414);

l. Paromomycin: with 1 co-conspirator (CAC ¶¶ 415-26);

m. Theophylline: with 1 co-conspirator (CAC ¶¶ 427-42);

n. Verapamil: with 2 co-conspirators (CAC ¶¶ 443-53); and

o. Zoledronic Acid: with 1 co-conspirator (CAC ¶¶ 149-64).

Heritage is not alone in its overlapping involvement: Teva is alleged to be involved in illegal agreements surrounding seven specific drugs (CAC ¶ 271; Counts 9, 11-15, 17, 19); Mylan is alleged to be involved in illegal agreements surrounding four specific drugs (CAC ¶¶ 180-242, 246-67, 276, 329-38, 443-53; Counts 5, 8, 11, 19); Aurobindo is alleged to be involved in illegal agreements surrounding three specific drugs (CAC ¶¶ 277, 306-28, 339-64, 365-79; Counts 10, 12, 13, 19); Sun is alleged to be involved in illegal agreements surrounding three specific drugs (CAC ¶¶ 115-48, 391-414, 415-26; Counts 1, 15, 16, 19); and Dr. Reddy's is alleged to be involved in illegal agreements surrounding two specific drugs (CAC ¶¶ 149-64, 165-79; Counts 3, 4, 19).

Moreover, many of the allegations focus on the recurring conduct and communications of a few individuals concerning multiple drugs, and many of the documents referenced in the proposed Consolidated Amended Complaint evince communications on multiple drugs at once

11

and interrelated agreements involving more than one drug. (*See, e.g.,* CAC ¶¶ 276, 287, 332, 347, 354, 369, 378, 452.) This is another way that the State Enforcement Action differs from the private plaintiffs' actions—their separate drug-by-drug complaints do not involve a central defendant like Heritage nor recurring communications among the same individuals.

Thus, the State Attorneys General, as law enforcers, are not bringing a series of individual drug-specific cases (unlike the complaints brought by the private plaintiffs), and the State Enforcement Action cannot be divvied up on a drug-by-drug basis. Therefore, the case management protocols adopted by the Court for the rest of MDL No. 2724 simply are not workable for the State Enforcement Action. The State Enforcement Action should proceed on its own separate track not subject to the existing case management structure.

There is significant precedent for treating state enforcement actions differently than class actions. In *In re Merrill Lynch Auction Rate Securities Litigation*, 2010 WL 532855 (S.D.N.Y 2010), for example, while declining to sever and remand the State of Louisiana's unique claims against one defendant, the court established a separate track for that State that "will ensure that [Louisiana]'s claims are heard in an expedient and efficient manner." *Id.* at *5.

Finally, requiring the Plaintiff States to structure their complaint in a certain way (*i.e.*, file a separate complaint for each drug) would unduly prejudice the Plaintiff States and their ability to enforce the antitrust laws. The MDL is for pretrial proceedings. If the Plaintiff States' action is divided up for pretrial organizational purposes, putting it back together for trial would be difficult. Moreover, price-fixing and market allocation in the generic drug industry are matters of grave public concern. Each day that the State Enforcement Action suffers delays, patients who rely on generic medications continue to suffer harm. For some patients, the harm is economic; for others who cannot afford the high price of generic drugs, the harm can be life-

threatening. To aid this enforcement, the Plaintiff States seek prospective injunctive relief and penalties, in addition to other remedies, to promote the public interest at large. A critical component of any prospective relief will necessarily need to address the systemic anticompetitive conduct that the Plaintiff States allege permeates the generic drug industry. Such relief simply cannot be obtained if the Plaintiff States are forced to artificially carve up their action piecemeal.

### 2. The Plaintiff States Did Not Agree to File Complaints or Prosecute their Enforcement Action on a Drug-By-Drug Basis.

The Plaintiff States should also not be required to file their Complaints on a drug-by-drug basis for the additional reason that the State Attorneys General had no role in structuring the existing case management protocols. Months before the State Enforcement Action was transferred to this MDL, the private plaintiffs proposed, and defendants agreed to, organizing their cases on a drug-by-drug basis. This framework was discussed and agreed to by the Court (after soliciting comments from the private parties, *see* Pretrial Order Nos. 13 and 20) and, as a result, on May 26, 2017, the Court created a Lead Case for each drug at issue, with a corresponding Class Case for each type of private plaintiff, also organized by drug. *See, e.g.,* Pretrial Orders Nos. 18, 23, 24. Further, the private plaintiffs agreed to file new and separate complaints for each drug in each of the Lead Cases by August 15, 2017. *See* Pretrial Order No. 23, 24.

Because the Plaintiff States were not part of the MDL at the time this drug-by-drug framework was adopted by the Court, the Plaintiff States were not involved in any discussions about this case management framework, could not (and did not) agree to this framework, and were not afforded an opportunity to comment on or object to its application to the State Enforcement Action.

Having never agreed to file multiple complaints on a drug-by-drug basis (unlike the private plaintiffs) or to structure their enforcement action in such a manner, the Plaintiff States object to application of any case management orders to the Plaintiff States in a manner that requires that the Plaintiff States divide up their enforcement action, file complaints and prosecute their claims on drug-by-drug basis.

### C. The Plaintiff States Can Coordinate Discovery and Pretrial Issues with the Private Plaintiffs and Defendants across the MDL.

Although the Plaintiff States' claims differ from the class actions, these differences do not preclude coordination on many discovery issues. The Plaintiff States recognize that they are part of an MDL and the purpose of the MDL is to streamline discovery and pretrial proceedings. For these reasons, the Plaintiff States have included in their proposed form of order (attached as Exhibit A), the requirement that parties enter into a coordination agreement and proposed coordination order that will address the coordination of discovery and pretrial scheduling matters among the State Enforcement Action and the other lead cases in the MDL. The proposed order attached to this motion states that the parties shall make a good faith effort to identify areas of coordination that will promote the convenience of the parties and witnesses, eliminate duplicative discovery and conserve the resources of the parties, their counsel and the judiciary.[8] *See* Proposed Order, ¶¶ 6-7.

The Plaintiff States are already participating in meet and confers on discovery orders that will apply across the MDL, including a protective order, an ESI Order and a document preservation order.

---

[8] Such a coordination order among states, private plaintiffs and defendants was entered by Judge Goldberg in *In Re Suboxone Antitrust Litigation*, MDL No. 2445 (E.D. Pa.), coordinating discovery between a state enforcement action and related MDL cases.

**Conclusion**

For the foregoing reasons, this Court should grant the Plaintiff States' motion for a separate government track, designate 2:17-cv-03768 as a separate "lead case" (as that term is used in Pretrial Order No. 24) entitled "State Attorneys General," and exempt the Plaintiff States from pretrial orders that require private plaintiffs to file complaints drug-by-drug.

Dated: November 14, 2017

                          PLAINTIFF
                          STATE OF CONNECTICUT
                          GEORGE JEPSEN
                          ATTORNEY GENERAL

BY:   /s/ W. Joseph Nielsen
        W. Joseph Nielsen
        Federal Bar No. ct20415
        Assistant Attorney General
        55 Elm Street
        P.O. Box 120
        Hartford, CT  06141-0120
        Tel: (860) 808-5040
        Fax: (860) 808-5391
        Joseph.Nielsen@ct.gov

*Liaison Counsel for the Plaintiff States*

/s/ Laura J. Martella
Laura J. Martella
Assistant Attorney General
Federal Bar No. ct27380
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5224
Fax:  (860) 808-5391
laura.martella@ct.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2017, I caused the foregoing document to be filed electronically with the Clerk of Court by using the CM/ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

/s/ Laura J. Martella
Laura J. Martella
Assistant Attorney General