# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS* | HON. CYNTHIA M. RUFE |

## MEMORANDUM OPINION

Rufe, J.                                                                                                           June 5, 2018

The State Attorneys General for 44 states, the District of Columbia, and the Commonwealth of Puerto Rico (collectively, the "State Plaintiffs") have moved for leave to file a Consolidated Amended Complaint ("CAC") and for a separate government track in this multidistrict litigation ("MDL").[1] For the following reasons, the motions will be granted.

## I.  BACKGROUND

### A.  Formation of the MDL

To place the motions into context, some background on the development of the MDL may be useful. On August 5, 2016, the Judicial Panel on Multidistrict Litigation ("JPML") granted a motion under 28 U.S.C. § 1407, transferring a civil action to this Court for coordinated

---

[1] The proposed CAC, filed in *Connecticut v. Aurobindo Pharma USA, Inc.*, Civil Action No. 17-3768 (E.D. Pa.), names as Plaintiffs Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. Arkansas, Missouri, New Mexico, West Virginia, and the District of Columbia are the named Plaintiffs in *Arkansas v. Aurobindo Pharma USA, Inc.*, Civil Action No. 17-3769 (E.D. Pa.), to which no responsive pleading has yet been filed. State Plaintiffs note, however, that Rhode Island has decided to join the proposed CAC, that Wyoming anticipates it will join, but that California has not joined the motion for leave to file a consolidated CAC. State Plffs.' Reply at 1 n.1 [Doc. No. 4 in Civil Action No. 17-3768]. The proposed CAC consolidates Civil Action Nos. 17-3768 and 17-3769, although Plaintiffs in Civil Action No. 17-3769 (and new Plaintiffs Alaska and Puerto Rico) could have raised the allegations by complaint or amendment without leave of court.

or consolidated pretrial proceedings with nine other cases then pending in this District, designating the MDL as "*In re: Generic Digoxin and Doxycycline Antitrust Litigation.*" The MDL encompassed actions by direct and indirect purchasers alleging that "defendants, all of which are manufacturers of generic pharmaceuticals, conspired to fix the prices of" the two named products.[2] After additional actions were filed or transferred into the MDL, the JPML on April 6, 2017, renamed the MDL as "*In re: Generic Pharmaceuticals Pricing Antitrust Litigation*" and expanded it to encompass actions in which:

> (a) plaintiffs assert claims for price fixing of generic drugs in violation of the Sherman Act and/or state antitrust laws on behalf of overlapping putative nationwide classes of direct or indirect purchasers of generic pharmaceuticals; (b) the average market price of the subject generic pharmaceutical is alleged to have increased between 2012 and the present; (c) defendants are alleged to have effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations, in particular meetings of the Generic Pharmaceutical Association; and (d) the allegations stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.[3]

The JPML noted that "[a]lthough separate conspiracies are alleged, they may overlap significantly," and that the allegations in all the cases "stem from the same government investigation into price fixing, market allocation, and other anticompetitive conduct in the generic pharmaceuticals industry."[4] These cases included proposed class actions filed by numerous Plaintiffs sorted into three groups (Direct Purchaser Plaintiffs, End-Payer Plaintiffs,

---

[2] MDL Doc. No. 1.

[3] MDL Doc. No. 194.

[4] *Id.*

2

and Indirect Reseller Plaintiffs); each group thereafter has filed 18 consolidated class action complaints, one complaint for each generic pharmaceutical at issue.[5]

The JPML expanded the MDL again to include State Plaintiffs' litigation in the MDL, holding that State Plaintiffs "assert claims for price fixing of generic drugs . . . in violation of the Sherman Act and state antitrust laws; allege that the average market price of these pharmaceutical products increased between 2012 and the present; and allege that defendants effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations."[6] The JPML noted that State Plaintiffs' claims "stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry."[7] At that time, State Plaintiffs asserted claims as to glyburide and doxycycline hyclate delayed release. More recently, an action was filed in this Court on behalf of private plaintiffs who do not wish to be part of the class-action complaints ("Direct Action Plaintiffs"). Direct Action Plaintiffs have filed a complaint alleging an overarching conspiracy and naming 30 drugs (those named by Class Plaintiffs and those in State Plaintiffs' proposed CAC).[8]

**B.     Factual Allegations**

The proposed CAC asserts claims for violation of federal antitrust laws and supplemental claims based upon state law. State Plaintiffs allege that Defendants, drug manufacturers and

---

[5] Class Plaintiffs have filed complaints concerning albuterol, amitriptyline, baclofen, benazepril HCTZ, clobetasol, clomipramine, desonide, digoxin, divalproex ER, doxycycline, econazole nitrate, fluocinonide, glyburide, levothyroxine, lidocaine/prilocaine, pravastatin, propranolol, and ursodiol.

[6] MDL Doc. No. 417. *See also* MDL Doc. No. 425 (transferring additional state actions).

[7] MDL Doc. No. 417.

[8] *Kroger Co. v. Actavis Holdco U.S., Inc.*, Civil Action No. 18-284 (E.D. Pa. filed Jan. 22, 2018). Direct Action Plaintiffs support the formation of an overarching conspiracy track within the MDL.

suppliers, have conspired to artificially inflate and maintain prices and reduce competition for 15 generic drugs: acetazolamide, doxycycline hyclate delayed release, doxycycline monohydrate, fosinopril-hydrochlorothiazide, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.[9] The CAC additionally alleges that Defendants participated in an overarching conspiracy to "minimize if not thwart competition across the generic drug industry" through a series of specific conspiracies.[10] State Plaintiffs allege that competition is a key factor in the cost of generic drugs:

> [W]hen the first generic manufacturer enters a market for a given drug, the manufacturer prices its product slightly lower than the brand-name manufacturer. A second generic manufacturer's entry reduces the average generic price to nearly half the brand-name price. As additional generic manufacturers market the product, the prices continue to fall slowly. For drugs that attract a large number of generic manufacturers, the average generic price falls to 20% or less of the price of the branded drug.[11]

According to the CAC, Defendant Heritage Pharmaceuticals, Inc. is a key player in the conspiracies, but all Defendants have communicated with others in various configurations to determine how to divide market share and allocate customers for the drugs in question.[12] The "cozy nature" of the industry allegedly provides extensive opportunities for collusion through conferences and trade shows, industry dinners, private meetings, as well as telephone calls and texts.[13]

---

[9] State Plffs.' Proposed CAC at ¶ 1 [Doc. No. 3 in Civil Action No. 17-3768].

[10] *Id.* at ¶ 2.

[11] *Id.* at ¶ 5.

[12] *Id.* at ¶¶ 11-13. Heritage is a wholly-owned subsidiary of Defendant Emcure Pharmaceuticals, Ltd., an Indian corporation. *Id*. at ¶¶ 30, 32. Among the named Defendants is Satish Mehta, the CEO and Managing Director of Emcure and member of the Heritage's Board of Directors. *Id.* at ¶ 36.

[13] *Id.* at ¶¶ 76-88, 94-95.

State Plaintiffs allege illegal schemes as to each of the 15 drugs consisting of market allocation agreements to maintain market share and avoid price erosion and agreements to fix prices. These activities allegedly had the purpose or effect of unreasonably restraining and injuring competition, directly relating in an increase in consumer prices for generic pharmaceuticals.[14]

## II. LEGAL STANDARD

Typically, a court's decision to grant leave to amend begins and ends with Federal Rule of Civil Procedure 15, which provides that leave to amend should be "freely give[n] when justice so requires," and therefore "counsels in favor of liberally permitting amendments to a complaint."[15] "Denial of leave to amend can be based on undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility."[16] "Amendment would be futile if the amended complaint would not survive a motion to dismiss for failure to state a claim."[17] The court, acting within its discretion, also may "ground its decision, within reason, on consideration of additional equities such as judicial economy/burden on the court and the prejudice denying leave to amend would cause to the plaintiff."[18] However, "prejudice to the non-moving party is the touchstone for the denial of an amendment."[19]

---

[14] *Id.* at ¶ 464.

[15] *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 629 (3d Cir. 2013) (citation omitted)

[16] *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).

[17] *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (internal citation omitted).

[18] *Mullin*, 875 F.3d at 149-50 (footnotes and citations omitted).

[19] *Id.* at 150 (internal quotation marks, footnote, and citation omitted).

## III. DISCUSSION

### A. Motion to Amend

In seeking leave to amend, there is no dispute that State Plaintiffs have not acted with undue delay, bad faith, or dilatory motives. In opposing the motion to amend, Defendants argue amendment would be futile, because the CAC fails to allege an overarching conspiracy, and would prejudice Defendants, because of the burden of discovery and potential scope of liability such an overarching claim could portend.

#### 1. Futility

Defendants argue that the proposed CAC fails to allege an overarching conspiracy, and thus amendment would be futile. Defendants argue that the State Plaintiffs fail to address "the critical question of why a price increase on a particular drug would benefit the Defendants that do not manufacture that drug, or why they would even care about the price of drugs that they do not sell."[20] An antitrust complaint is sufficient if it contains "enough factual matter (taken as true) to suggest that an agreement was made."[21] As long as the facts pleaded provide "plausible grounds to infer an agreement," a well-pleaded complaint may proceed even if it seems that "actual proof of those facts is improbable. . . ."[22] State Plaintiffs allege that the typical pattern has been that as more manufacturers market a particular generic pharmaceutical, the more the average price falls in relation to the price of the branded drug, making generic drugs a relative health care bargain, but that "[a]t some point, the price dynamic changed for many generic drugs," and the prices of dozens of generic drugs have risen, some dramatically.[23] The proposed

---

[20] Defs.' Opp'n at 15-16 [MDL Doc. No. 542].

[21] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[22] CAC at ¶¶ 5-7.

[23] *Id.* at ¶¶ 5-7.

6

CAC alleges that Defendants reached agreements as to specific drugs and that groups of Defendants entered into agreements to allocate market share as competitors entered the market for a particular drug.[24] From the facts alleged in the CAC – which resulted in part from an investigation commenced in 2014 by the State of Connecticut – it is plausible to infer that there was a broader conspiracy.[25]

Defendants rely heavily upon a decision denying a motion to amend in the *Automotive Parts* antitrust MDL.[26] However, there are significant differences between that decision and the present motion. The motion to amend in *Automotive Parts* came six years into the litigation, and represented a claimed "evolution of the facts as they unfolded during discovery," an evolution that the court found unsupported and contradicted by the investigation of the Department of Justice, which concluded that the conspiracies were separate, not overarching.[27] The posture of this case is markedly different: the litigation is in a significantly earlier stage, there are continuing state and federal investigations, and the Court is not prepared to rule at this time that it is implausible that pharmaceutical manufacturers agreed for anticompetitive reasons how the broader market for generic pharmaceuticals will be divided. Although, as Defendants point out, the proposed CAC is structured in part to detail the allegations as to each of the 15 drugs named,[28] State Plaintiffs also allege that Defendants were coordinating more than one drug at a

---

[24] CAC at ¶ 102.

[25] *See In re: Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 340-41 (3d Cir. 2010) (rejecting the defendants' argument on a motion to dismiss that bid-rigging allegations did not adequately support the more general allegation of an agreement among the defendants to allocate customers in an alleged conspiracy dominated by one entity because of a plausible inference that the bid-rigging was part of a larger agreement not to compete).

[26] *In re: Auto. Parts Antitrust Litig.*, No. 12-md-2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016).

[27] *Id.* at * 3, 4.

[28] The pharmaceuticals cited in the CAC overlap only in part as to those cited by the Class and Direct Action Plaintiffs.

time and thereby influencing the broader generic drug market.[29] Therefore, amendment would not be futile.

### 2. Prejudice

Defendants "must do more than merely claim prejudice; [they] must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the. . . amendments been timely."[30] Defendants argue that it would be prejudicial to allow discovery to proceed when some Defendants manufactured only one of the drugs in question. It is certainly true that "antitrust discovery can be expensive."[31] But this is not a case where there is "no reasonably founded hope that the discovery process will reveal relevant evidence to support" the antitrust and other claims.[32] State Plaintiffs are not required to litigate on a pharmaceutical-by-pharmaceutical basis because the Class Plaintiffs opted to proceed in that way. Moreover, there are State Attorneys General who could file the proposed CAC without seeking leave to amend (including Alaska and Puerto Rico, who were not part of any previous complaint), and the prejudice argument does not apply to them at all.

The arguments of all Defendants as to potential liability, including joint and several liability, will be carefully assessed, whether in the context of a consolidated complaint or a single-pharmaceutical complaint. The Court recognizes the concern of the majority in *Twombly* with regard to the limits of judicial efforts to control discovery, but nevertheless is prepared, with special master assistance, to make all necessary efforts in this regard, and to require that discovery be conducted in a proportionate fashion.

---

[29] *See, e.g.*, CAC at ¶¶ 270-276, 293, 318.

[30] *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (internal quotation marks and citations omitted).

[31] *Twombly*, 550 U.S. at 558.

[32] *Twombly*, 550 U.S. at 559 (internal quotation marks, citations, and brackets omitted).

8

### B. Motion for a Separate Track

In Pretrial Orders 24 and 33, the Court set forth in the First and Second Electronic Case Management Orders a structure for the docketing and filing of documents in the MDL, establishing Lead Cases and Class Cases for each pharmaceutical, as that corresponded with the structure of the Complaints at that time. The purpose of the Electronic Case Management Orders is to facilitate the efficient management of the MDL, not to dictate the course of the litigation. The Court does not accept Defendants' arguments that the creation of a track for State Plaintiffs will result in chaos to the MDL proceedings, or that it will result in unfair prejudice to Defendants. The Court has no hesitation in making structural adjustments as the needs of the MDL evolve. A Third Electronic Case Management Order will be entered.

### IV. CONCLUSION

The Court is persuaded that amendment should be allowed and the docketing structure modified to accommodate the amendment. Appropriate orders will be entered.