# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | **MDL 2724**<br>**16-MD-2724** |
| THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS* | |

**PLAINTIFFS UNITED HEALTHCARE SERVICES, INC. AND HUMANA INC.'S OPPOSITION TO END-PAYER PLAINTIFFS' AND DIRECT PURCHASER PLAINTIFFS' MOTION FOR ENTRY OF SET-ASIDE ORDERS**

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   UNITED AND HUMANA ............................................................................................4

III.  THIS MDL AROSE OUT OF GOVERNMENT INVESTIGATIONS .....................................6

IV.   THE PROPOSED SET-ASIDE ORDERS SHOULD BE REJECTED ....................................8

    A.   Set-Aside Orders Are Almost Never Entered in Antitrust MDLs .......................................8

        1.   Set-aside orders are typically reserved for mass tort cases where the court appoints a leadership counsel for individual (non-class) cases ....................................................8

        2.   The authorities on which EPP/DPP Counsel rely are inapposite................................10

    B.   The Proposed Set-Aside Orders Would Undermine the Objectives of the MDL Procedure and Create Unnecessary Work for the Court and Parties ................................12

        1.   The proposed set-aside orders would create an administrative mess .........................12

        2.   The proposed set-aside orders would create the wrong structural incentives for successful collaboration and efficient case management.............................................13

    C.   The True Motivation for the Set-Aside Orders is to Punish and Deter Putative Class Members from Pursuing Their Own Claims....................................................................16

    D.   The Exorbitant Set-Aside Sought by EPP/DPP Counsel Further Exposes Their Unjust Motives ..........................................................................................................................18

V.    CONCLUSION...........................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*In re Actiq Sales and Marketing Practices Litigation,*
    307 F.R.D. 150 (E.D. Pa. 2015)......................................................................................17

*In re Avandia Marketing, Sales Practices, and Products Liability Litigation,*
    58 F. App'x 29 (3d Cir. 2016) ......................................................................................2, 9

*In re Chicago Flood Litigation,*
    289 Ill. App. 3d 937 (1997) ...........................................................................................16

*In re Fasteners Antitrust Litigation,*
    No. 08-md-1912, 2014 WL 296954 (E.D. Pa. Jan. 27, 2014) .....................................19

*Galt v. Eagleville Hospital,*
    310 F. Supp. 3d 483 (E.D. Pa. 2018) ............................................................................18

*Gelboim v. Bank of America Corp.,*
    135 S. Ct. 897 (2015).......................................................................................................9

*In re Lidoderm Antitrust Litigation,*
    No. 14-md-02521-WHO, 2017 WL 3478810 (N.D. Cal. Aug. 14, 2017)..................11

*In re Linerboard Antitrust Litigation,*
    292 F. Supp. 2d 644 (E.D. Pa. 2003) ..................................................................... passim

*In re Thalomid and Revlimid Antitrust Litigation,*
    No. 14-cv-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) ......................................17

*In re Wellbutrin XL Antitrust Litigation,*
    308 F.R.D. 134 (E.D. Pa. 2015)....................................................................................17

*U.S. v. Tobias,*
    935 F.2d 666 (4th Cir. 1991) ...........................................................................................3

*Vista HealthPlan, Inc. v. Cephalon, Inc.,*
    No. 2:06-cv-01833, 2015 WL 3623005 (E.D. Pa. June 10, 2015)...............................17

<u>Statutes</u>

28 U.S.C. § 1407...................................................................................................................18

<u>Other Authorities</u>

Manual for Complex Litigation at § 10 ...............................................................................14

5 Newberg on Class Actions § 15:53 (5th ed.) .....................................................................9

## I.   INTRODUCTION

This sprawling antitrust MDL was triggered by government investigations and is still in its very early stages, despite this Court's efforts to push it forward aggressively.  Documents obtained by State Attorneys General (the "States") have only now started to become available to the private plaintiffs.  Many motions to dismiss must still be decided.  Full merits discovery is months away.  And the States have promised additional complaints alleging additional conduct involving additional drugs—the second of which was filed on May 10, 2019, involving more than 100 new drugs.  Plaintiffs have yet to perform the vast majority of work left to be done in this MDL.  And there are only a limited number of plaintiffs available to perform that work: the States; three putative classes, each representing purchasers at different levels in the chain of distribution; and three sets of Direct Action Plaintiffs ("DAPs").  In these circumstances, the plaintiffs should band together to cooperatively prosecute their respective cases.  The proposed set-aside orders, however, would create contrary incentives.

Counsel for the putative classes of End-Payer Plaintiffs and Direct Purchaser Plaintiffs ("EPP/DPP Counsel") seek to impose an unprecedented, unnecessary (and grossly excessive) set-aside order of 10 percent of settlement proceeds to *each* group of EPP and DPP counsel, thus seeking to impound 20 percent of settlement proceeds for those DAPs who are both end payors and direct purchasers like United HealthCare Services, Inc. ("United") and Humana  Inc. ("Humana").  Such orders would be inefficient and unfair.  Indeed, by allowing EPP/DPP Counsel to seek a share of United's and Humana's future recoveries, the proposed set-aside orders would lay the foundation for literally dozens of collateral fee disputes that would strain this Court's limited resources.

Courts typically reserve set-aside orders for mass tort cases where the MDL court is faced with thousands of individual plaintiffs and lawyers.  In such cases, the only efficient way to

manage the MDL is to appoint a lead counsel structure to pursue the litigation on behalf of all plaintiffs.  For example, in *In re Avandia Marketing, Sales Practices, and Products Liability Litigation*, this Court created a Plaintiffs' Steering Committee to litigate on behalf of more than 5,000 individual actions.[1]  658 F. App'x 29, 31 (3d Cir. 2016).  A set-aside order in that context is justified to compensate counsel who the Court specifically appointed to bear a disproportionate burden in the litigation on behalf of all plaintiffs.  In the context of MDLs like this one, however, there is no need for such a structure.

The proposed set-aside orders would discourage teamwork by creating financial incentives for EPP/DPP Counsel to make litigation decisions based on attorneys' fees rather than what is best for the MDL.  Indeed, EPP/DPP Counsel have already refused to work with United and Humana because United and Humana declined to agree to the proposed set-aside order.  Conversely, United and Humana would naturally be reluctant to cede work to EPP/DPP Counsel for fear that it would be used against United and Humana in subsequent fee disputes.  Such rivalry would do a disservice to this MDL.  This is not the "rare antitrust case in which major entities and their counsel awaited the development of the case by designated counsel and only filed suit on the eve of the conclusion of discovery."  *In re Linerboard Antitrust Litigation*, 292 F. Supp. 2d 644, 661 (E.D. Pa. 2003).  In a comparable situation, the Hon. Susan Illston declined to enter a similar set-aside order because "it makes a lot more sense" in the context of mass tort cases.  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, No. 3:07-md-01827 (N.D. Cal.), Transcript of Hearing (Mar. 11, 2011) (attached to Declaration of James R. Martin in Support of Plaintiffs United Healthcare Services, Inc. and Humana Inc.'s Opposition to

---

[1]  https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-March-15-2019.pdf.

Motion for Entry of Set-Aside Orders ("Martin Decl.") at Ex. A).  In denying the request, Judge Illston professed concern about the willingness of plaintiffs to work together cooperatively.  *Id.*

United and Humana submit that the better structure for this MDL is the standard one in which each party pays its own lawyers and plaintiffs' counsel support each other to achieve a common goal.  United and Humana have retained experienced lawyers with long track records of success in complex antitrust cases like these.[2]  Were they sincere about ensuring the efficient and equitable litigation of this action, EPP/DPP Counsel would embrace—not reject—the significant resources that United and Humana will bring to bear in this MDL.  But ensuring efficiency and equity is not the impetus for EPP/DPP Counsel's proposed set-aside orders, which do not seek contribution from each other or from the Indirect-Reseller Plaintiff (IRP) class.  United and Humana respectfully suggest that EPP/DPP Counsel are upset that United and Humana—two of the largest victims of Defendants' alleged scheme—hired their own lawyers to make their own strategic decisions on how best to litigate their own cases to recover their own significant damages.  EPP/DPP Counsel filed for the proposed set-aside orders to impermissibly punish United and Humana for choosing to exercise their Due Process rights to proceed independent of the class actions, and to deter any other putative class members from doing the same.  In fact, in dismissing United's offer to perform common benefit work in this MDL, EPP/DPP Counsel candidly explained, "If United wanted to work for the benefit of the class, it could have joined the class group, but it chose a different path."  Martin Decl. Ex. B (Letter from Roberta Liebenberg and Jeffrey Istvan to Judith Zahid and Hamish Hume (Apr. 2, 2019)) at 3.  While

---

[2] *See, e.g., U.S. v. Tobias*, 935 F.2d 666, 668 (4th Cir. 1991) ("[G]enerally, a fund claimant who is represented by counsel . . . is deemed not to have taken a 'free-ride' on the efforts of another's counsel.").

honest, that is simply not a legitimate justification for EPP/DPP Counsel's proposed set-aside orders.

Finally, as Professor William B. Rubenstein at Harvard Law School opines in his expert declaration, direct-action plaintiffs in antitrust class action MDLs, like United and Humana, are not taxed class counsel fees except in the rare case when the litigation is significantly advanced, *i.e.*, a class has been certified, discovery is completed or substantially completed, and a settlement has been achieved. Expert Declaration of Professor William B. Rubenstein in Support of Plaintiffs United Healthcare Services, Inc. and Humana Inc.'s Opposition to End-Payer Plaintiffs' and Direct Purchaser Plaintiffs' Motion for Entry of Set-Aside Orders ("Rubenstein Decl."), filed concurrently, at ¶¶ 15-16. Professor Rubenstein concluded that EPP/DPP Counsel have not met this threshold to entitlement. *Id.* at ¶¶ 17-18. He further opines that the 10% set-aside requested by each counsel is "extraordinarily high" in relation to set asides ordered in other cases—normally, mass tort MDLs—and that should the Court conclude that a set-aside order is appropriate for United and Humana, a "small flat payment in acknowledgment of work undertaken prior to the direct filings may be a more appropriate approach" than granting a percentage of United and Humana's recoveries. *Id.* at ¶ 25.

## II. UNITED AND HUMANA

United (including its subsidiaries and affiliates) is the largest health insurance carrier and services provider in the country. OptumRx (an affiliate that has assigned its direct-purchaser claims to United) operates a mail-order and specialty pharmacy business and also operates one of the largest pharmacy benefit managers in the country. In 2018, United and OptumRx processed more than three-quarters of a trillion dollars in gross billed charges and managed more than $250 billion in aggregate health care spending on behalf of more than 65 million members. United filed suit on January 16, 2019, which the Judicial Panel on Multidistrict Litigation conditionally

transferred to this MDL on February 11, 2019.  United is represented by Boies Schiller Flexner LLP and Zelle LLP, which have substantial experience in complex antitrust litigation representing direct-action and class plaintiffs.  Appendix A summarizes some of the antitrust cases that United's lawyers have handled over the past two decades.[3]

Humana is one of the nation's largest health insurers with over 22 million members. Through its subsidiaries and affiliates, it provides the following benefits in all 50 states, the District of Columbia, and Puerto Rico: (1) Medicare benefits through a variety of Medicare Advantage plans, including prescription drug benefits under Part D of Medicare, and (2) private commercial health insurance plan benefits for individuals and groups.  Humana is the second largest Medicare Advantage Organization in the United States.  Humana is also the parent and assignee of claims of its subsidiary Humana Pharmacy, Inc. f/k/a Rightsource, which buys prescription drugs directly from manufacturers and wholesalers and dispenses them to Humana's benefit plan members through mail order and retail pharmacies.  Humana is also the parent and assignee of claims of Humana Pharmacy Solutions, Inc., a pharmacy benefits manager.

Humana filed its initial complaint on August 3, 2018, which was incorporated into this MDL on November 20, 2018.  MDL Doc. No. 773.  During the relevant times, Humana purchased either directly or indirectly over $2.6 billion of the drugs at issue in its lawsuit. Humana is represented by Lowey Dannenberg, P.C. and Schneider Wallace Cottrell Konecky Wotkyns LLP, both of which have substantial experience in antitrust and other complex federal litigation.  *See* Appendix B.  Lowey Dannenberg is known in the healthcare industry for

---

[3] In many of those cases, including the *DRAM*, *LCDs*, and *CRTs* antitrust matters, United's counsel worked closely and collaboratively with several States Attorneys General to jointly prosecute large price-fixing cartel claims.

representing some of the largest health benefits companies in the United States to recover overcharges for prescription drugs.[4]

United and Humana bring federal claims for overcharges paid directly to Defendants for price-fixed drugs and state law claims under state antitrust and consumer protection laws for overcharges paid as third-party payors.  At least six of the drugs included in Humana's complaint, and fourteen drugs included in United's complaint, stem directly from the States' investigation and subsequent litigation.[5]  Prior to filing their respective complaints, United and Humana each engaged in substantial due diligence to verify their understanding of the facts and allegations drawn from the government agencies' filings, confirm that the alleged conduct proximately caused them economic harm, and form a view (supported by retained consulting economists) on estimated damages.  Humana has actively participated in this case since August 2018, drafting and editing briefs, submitting oppositions to motions to dismiss, and attending conferences before the Court and Special Masters. United has likewise participated in this litigation since January 2019, drafting and editing briefs, and attending conferences before the Court and Special Masters.

## III.     THIS MDL AROSE OUT OF GOVERNMENT INVESTIGATIONS

This MDL arose from Congressional hearings and ongoing investigations of the State Attorneys General and United States Department of Justice ("DOJ") that all commenced in 2014—well before the EPPs and DPPs filed their first complaints in 2016.  *See, e.g.,*

---

[4] Lowey's expertise was highlighted in the 2013 and 2014 editions of Corporate Counsel magazine's "In House Law Departments at the Top 500 Companies," where Aetna and Humana identified Lowey as a "Go-to Law Firm" for litigation services.

[5] And even more drugs currently at issue in Humana's and United's complaints have been included among the 112 drugs at issue in the State AGs' most recent complaint filed on May 10, 2019.

*International Union of Operating Engineers Local 30 Benefits Fund v. Lannett Company, Inc., et al.*, No. 2:16-cv-00990 (E.D. Pa.), March 2, 2016 Complaint (Doc. No. 1) at ¶¶ 2, 4, 10-11 (alleging that the DOJ "commenced in 2014 a wide-ranging criminal investigation of this broad conspiracy" and that "Defendants' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators."); *In Re: Generic Digoxin and Doxycycline Antitrust Litigation*, No. 16-md-2724 (E.D. Pa.), End-Payer Plaintiffs' Jan. 27, 2017 Consolidated Class Action Complaint (MDL Doc. No. 126) at ¶¶ 1-2, 4-16 ("For more than two years, federal and state enforcement agencies have been investigating price-fixing and bid-rigging by companies in the generic drug industry, including the manufacturers of generic digoxin and generic doxycycline."); *1199 SEIU Nat'l Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.*, No. 18-cv-02401 (E.D. Pa.), EPPs' April 1, 2019 Amended Class Action Complaint (Doc. No. 165) at ¶¶ 15-20, 23-31 (alleging ongoing state and federal investigations that began in 2014.  In fact, the Connecticut AG's independent investigation has been the most comprehensive of the plaintiff groups, serving more than 300 subpoenas on generic pharmaceutical manufacturers, employees, and telephone carriers, reviewing and analyzing 19 million internal documents, obtaining information from several confidential informants, and using law enforcement software to analyze 12 million phone logs.[6] The Kroger Plaintiffs were the first to allege an overarching conspiracy involving more than two dozen generic drugs.  *See The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.*, No. 2:18-cv-00284 (E.D. Pa.), January 22, 2018 Complaint (Doc. No. 1).

---

[6] https://www.cbsnews.com/video/the-price-of-generics-the-most-unlikely-meeting-mark-bradford/.

Moreover, EPP/DPP Counsel have not acted alone.  The various discovery requests served on Defendants and third-parties and the related protocols and disputes, among other accomplishments, were the collective efforts of the States, the Kroger Plaintiffs, and counsel for the three putative classes.  Thus, as EPP/DPP Counsel acknowledge, they have not exclusively driven this MDL.  *See* EPP/DPP Counsel Br. at 1 ("EPP and DPP Class Counsel have, ***along with the States***, driven this MDL forward and managed its complicated moving parts.").[7]  The contributions of the States played the predominant and commanding role in getting this MDL to where it is today.  Indeed, as evidenced by their most recent complaint, the States—not DPP/EPP Counsel—continue to push this MDL forward, along with the Court and the Special Masters.

## IV.     THE PROPOSED SET-ASIDE ORDERS SHOULD BE REJECTED

### A.    Set-Aside Orders Are Almost Never Entered in Antitrust MDLs

#### 1.  *Set-aside orders are typically reserved for mass tort cases where the court appoints a leadership counsel for individual (non-class) cases*

Set-aside orders arose in the context of "common fund" cases, typically mass torts, where there are so many plaintiffs and attorneys that the only way to manage the MDL is to appoint a group of attorneys to act on behalf of all claimants.  In that context, courts enter set-aside orders to ensure that the attorneys appointed to serve as lead counsel for the plaintiffs are fairly

---

[7] EPP/DPP Counsel overinflate their role under the guise of PTO No. 37.  *See* EPP/DPP Br. at 4 ("Pursuant to this Court's Pretrial Order No. 37 . . . Class Counsel have taken the lead in organizing and driving this massive MDL.").  That order, however, was entered before any DAP entered the case and defines EPP/DPP Counsel's leadership duties and responsibilities with respect to ***only*** the groups of DPPs, EPPs, and IRPs.  It does not designate EPP/DPP Counsel to assume any leadership role with respect to the States or any DAP.  In fact, it requires them to "***negotiate and coordinate with any other plaintiffs or groups that may be transferred into or made a part of this MDL***."  PTO No. 37, ¶ 3 (emphasis added).

compensated.[8]  For example, in the *Avandia* case, this Court created a Plaintiffs' Steering Committee ("PSC") to litigate on behalf of more than 5,000 individual actions, which required PSC attorneys to conduct and coordinate all discovery.  *In re Avandia Mkt'g, Sales Pracs. & Prods. Liability Litig.*, MDL No. 1871, Case Management Order No. 1.[9]  It later entered a set-aside order to fairly compensate the members of the PSC, who bore a disproportionate burden in the litigation on behalf of all plaintiffs.  All the mass tort cases cited by EPP/DPP Counsel fit this same pattern.  This case does not.  *See* Rubenstein Decl. ¶ 13 ("This is a distinct and far rarer form of common benefit fee than that at issue in mass tort MDLs like *Avandia*, and it triggers a distinct set of concerns.").

Here, as is routine in antitrust MDLs, the Court has appointed a leadership group and structure for each of the three class actions.  Each leadership group acts only for its respective putative class.  Thus, for example, lead counsel for the IRP putative class make decisions for its putative class only.  No lead counsel for any putative class speaks for DAPs, nor should they.  Each DAP has chosen to proceed independent of the putative class (or classes) of which it might otherwise ultimately be a member.  Although consolidated for pretrial proceedings, each individual case remains separate and distinct.  *See, e.g., Gelboim v. Bank of America Corp.*, 135 S. Ct. 897, 899 (2015) (recognizing that "cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities").

---

[8] Another typical scenario is a class action, where courts appoint lead counsel, and class counsel are compensated from the common fund created for the class.  5 Newberg on Class Actions § 15:53 (5th ed.).

[9] http://www.paed.uscourts.gov/documents/MDL/MDL1871/CMO1.pdf.

In the typical antitrust MDL, class counsel litigate alongside DAPs who choose to proceed independently.  In those circumstances, set-aside orders are not justified.  *See* Rubenstein Decl. ¶¶ 15-16 (opining that class counsel are not entitled to a set-aside from direct-action plaintiffs who choose to actively participate in the MDL before class certification, the completion of discovery and the negotiation of a settlement).  Indeed, in a comparable situation, the Hon. Susan Illston professed concern about the willingness of plaintiffs to work together cooperatively and ultimately declined to enter a similar set-aside order, noting that "[a set-aside order] makes a lot more sense" in the context of mass tort cases.  Martin Decl. Ex. A (Hr'g Tr.) at 13.

### 2. *The authorities on which EPP/DPP Counsel rely are inapposite*

Of the hundreds of antitrust MDLs over the past two decades, EPP/DPP Counsel cite to just ***two*** in which a set-aside order was entered allowing class counsel to seek fees from absent class members who chose to opt out of the class.  Neither supports EPP/DPP Counsel's position here.  In each case, the DAPs joined the MDL at the tail end of the litigation ***when classes were certified after the discovery record was already or nearly complete***.

In *Linerboard*, the class plaintiffs litigated an antitrust case for more than five years accusing linerboard manufacturers of conspiring to take coordinated downtime, which had the effect of increasing prices in the downstream market for corrugated sheets.  292 F. Supp. 2d at 648-52.  Class counsel developed the case almost from scratch with no assistance from government enforcers or any other classes.  It pursued a somewhat novel theory (conduct affecting products in an upstream market raising prices in a downstream market) and won an appeal in the Third Circuit on class certification that established an "***imprimatur*** of theory of liability."  *Id*. at 659-60.  The court certified two litigation classes after extensive merits discovery when, six years after the suit was filed, more than 100 class members opted out to

pursue their own cases. *Id.* at 650-52, 659. Judge DuBois held that in those extraordinary circumstances, the DAPs should pay the class counsel for the benefit that the class conferred on those opt-outs. Even so, Judge DuBois did not impose a set-aside percentage. *Id.* at 667. The DAPs resolved the issue by making a one-time payment to class counsel. Martin Decl. at ¶¶ 5-6.[10]

In *In re Lidoderm Antitrust Litigation*, a putative class of end-payor plaintiffs prosecuted a pay-for-delay case alongside a single end-payor DAP for approximately three years. No. 14-md-02521-WHO, 2017 WL 3478810, at *2 (N.D. Cal. Aug. 14, 2017). ***After certifying the end-payor class***, but prior to the opt-out deadline, counsel for the end-payors sought a set-aside order that would apply to any ***new opt-out entrants to the MDL*** given the "significantly advanced" stage of the litigation. *Id.* The order expressly excluded the one DAP who had already filed suit. *Id.* at n.1.

In each case, the set-aside order was sought at a time where none of the structural concerns identified above were in play. There was no concern about cooperation among plaintiffs in *Linerboard* because merits discovery was at its end. In *Lidoderm* the order did not apply to the lone existing DAP, thus raising no cooperation issues.

By contrast, in the *LCD* case, class plaintiffs made the same arguments advanced by EPP/DPP Counsel. They argued that class counsel conferred a "substantial benefit" on DAPs. Martin Decl. Ex. A (Hr'g Tr.) at 12:5-13:4. Class counsel acknowledged that common-benefit

---

[10] United already proposed this exact approach, which EPP Counsel summarily declined. United had offered to negotiate a one-time payment that would effectively compensate EPP counsel for a fair share of their work and investment made to date. *See* Martin Decl. Ex. C (Letter from Judith Zahid and Hamish Hume to Roberta Liebenberg (Mar. 14, 2019)) at 1. Instead of exploring this approach, EPP counsel rejected it outright and refused to consider anything other than an exorbitant set-aside percentage of United's future recoveries. *See* Martin Decl. Ex. B (Liebenberg letter) at 3.

fees were usually awarded in mass tort cases, at which point Judge Illston interjected "where it makes a lot more sense." *Id.* at 13:5. Later, Judge Illston expressed concern that "if it were true that there were not cooperation among the various different kinds and sorts of plaintiffs in this case, that would redound, as you no doubt know, only to the benefit of the defendants. And it sure wouldn't help the process at all." *Id.* at 26:2-5. Judge Illston then denied the motion on the record. *Id.* at 28:13-14. She did not issue a written opinion.

There is zero precedent for entry of a set-aside order in circumstances comparable to those presented here. Nor is there any reason for this Court to create that precedent. This litigation is not at an advanced stage; full non-stayed merits discovery has not begun; and EPP/DPP Counsel have not had to single-handedly carry the burden of what little has transpired to date. To the contrary, and ironically, any burden EPP/DPP Counsel would have ordinarily endured has been minimized (if not eliminated altogether) by (a) the common benefit conferred by the significant pre-suit work the States performed, and (b) the fact that EPP/DPP Counsel have been members of a joint-prosecution group that includes the States, the IRPs, and the Kroger Plaintiffs. United and Humana have been, and remain, willing and eager to join that effort. United and Humana have already agreed to contribute to cost-sharing arrangements and will prove an enormous asset in helping to perform the tremendous amount of work yet to be done in this case to move it along as efficiently and effectively as possible.

B. <u>The Proposed Set-Aside Orders Would Undermine the Objectives of the MDL Procedure and Create Unnecessary Work for the Court and Parties</u>

*1. **The proposed set-aside orders would create an administrative mess***

The proposed set-aside orders would set the stage for dozens of collateral fee-disputes. With more than 30 defendants (as of now), the Court could be burdened with up to 60 fee disputes for United and Humana alone. Each dispute would require briefing. The parties would

submit self-serving declarations recounting their work and the results generated, and they would attempt to attribute a particular value to that work while simultaneously asking the Court to determine the reasonableness of any "common benefit" value incurred from the top of any recovery.  The Court would need to hold hearings and issue a series of orders.  The losing party could appeal, and more hearings would ensue.  None of that work is necessary, and it would strain the resources of the Court and parties to this MDL.

The proposed set aside-orders would also undoubtedly complicate settlement negotiations between DAPs and Defendants, thereby running the risk of needlessly prolonging litigation of these issues.

### 2. *The proposed set-aside orders would create the wrong structural incentives for successful collaboration and efficient case management*

The proposed set-aside orders would create serious adverse consequences for this MDL. In an antitrust case with a relatively small group of plaintiffs[11] and a significant amount of work to do, plaintiffs should work together closely on all common pretrial tasks.  To take one example, the MDL in *In re Urethane* contained a class of direct purchasers (led by, among others, Fine Kaplan & Black, Lead Counsel for EPPs) and, later, 11 DAPs.  Martin Decl. at ¶¶ 7-9.  Counsel coordinated on all aspects of the litigation to develop the factual record and prepare their respective cases for trial.  *Id.*  Among other things, counsel strategized on legal and factual issues, vetted and agreed upon written discovery, shared work product, and agreed in advance upon lead and backup questioners for depositions.  *Id.*  That teamwork led to successes for both the class and DAPs.  *Id.*  The class went to trial against the lone remaining defendant and

---

[11] Unlike a mass torts MDL which typically involves thousands of plaintiffs, this MDL involves only eight Plaintiffs/Plaintiff groups (States, the Kroger Plaintiffs, the Marion Plaintiffs, Humana, United, DPPs, IRPs and EPPs).

obtained a verdict in excess of $1 billion.  *Id.*  The DAPs were remanded to New Jersey for trial where they ultimately settled their claims for $400 million.  *Id.*  In the experience of counsel for United and Humana, that is the type of cooperation that typically prevails in antitrust MDLs (where, customarily, no set-aside order exists).  Indeed, one of the guiding principles for any MDL is that "counsel act cooperatively and professionally."  Manual for Complex Litigation at § 10.  Here, United and Humana hope to apply that principle to achieve the same level of cooperation and generate the same *esprit de corps* that proved so successful in *Urethane*.

The existence of the proposed set-aside orders would undermine the likelihood of that level of cooperation by injecting adverse financial interests into the equation.  Litigation decisions would be made under the long shadow of future fee disputes years down the road in which EPP/DPP Counsel and counsel for United and Humana each would have to claim credit for work that they performed.  Indeed, as Professor Rubenstein opines, "Setting aside a lot of money up front incentivizes counsel to perpetuate the litigation so as to generate a lodestar, for cross-check purposes, supporting award of the full set-aside at the back end."  *See* Rubenstein Decl. n. 41.  Even if it made perfect sense for one group of lawyers to delegate a particular task, those lawyers would have to wonder if that would be used against them in later fee disputes.  Those are perverse incentives for effective cooperation.  Litigation decisions should be made based on merit.  For example, if one group of lawyers has pre-existing expertise in an area of law or specialized knowledge of a particular Defendant, Plaintiff counsel should allow them to take the lead on those issues without having to worry about the financial consequences.

In fact, the proposed set-aside orders have already undermined the efficient management of this case.  EPPs have specifically refused to work with United and Humana inside the "joint prosecution group" unless and until United and Humana agree to their proposed set-aside order.

14

*See, e.g.,* Martin Decl. Ex. B (Liebenberg letter) at 2.  As a result, United and Humana have not been (a) privy to strategy discussions among counsel for the three putative classes, the States, and the Kroger Plaintiffs, (b) coordinated with on discovery to Defendants and third parties, (c) consulted on discovery positions, (d) coordinated with on motions that affect the interests of *all* Plaintiffs, or (e) otherwise allowed to meaningfully integrate into the collective pursuit of claims in this MDL.  The mere existence of the proposed set-aside orders is toxic to meaningful collaboration.

Sadly, EPP/DPP Counsel recently made clear that their idea of efficient coordination is to simply exclude anyone other than the pre-existing "Lead or Liaison Counsel" group—which, in their view, includes every plaintiff group and DAP in this case *but* United and Humana— because they somehow ***disagree*** that all plaintiffs should work collaboratively on pretrial issues, including discovery.  *See* MDL Docket ECF No. 982 at 3.[12]  The only rational basis for this objection is that EPP/DPP Counsel intend to charge United and Humana for performing this supposed common-benefit work, including work performed after United's and Humana's entry into this MDL.  *See* EPP/DPP Br. at 14 ("Class Counsel undoubtedly will continue to lead the litigation and do the lion's share of the work, and Direct Action Plaintiffs will continue to enjoy the benefits.").  This is just one concrete example of how divisive the proposed set-aside orders would be by creating an incentive for counsel to "compete" for fees.  It also underscores how EPP/DPP Counsel are trying to pirate United's and Humana's abilities and prerogatives to strategically litigate their own claims with counsel of their choosing.  Having "lost" United and Humana as potential members of their respective putative classes, EPP/DPP Counsel are trying

---

[12] As the Court is aware, EPP/DPP Counsel have expressed support for the Kroger Plaintiffs' counsel to serve as DAP liaison.  *Id.*

to use the proposed set-aside orders as an unjustified and ill-conceived grab at a share of the damages that may ultimately be recouped by United and Humana.  Contrary to their presumptuous view of the world, there is no reason that EPP/DPP Counsel should lead the litigation for United and Humana.  To the contrary, United and Humana have chosen other counsel for that specific purpose.

C. <u>The True Motivation for the Set-Aside Orders is to Punish and Deter Putative Class Members from Pursuing Their Own Claims</u>

The EPP/DPP Counsel's request for set-aside orders appears to be motivated more by a desire to penalize United and Humana and deter putative class members from similarly pursuing their own claims than by a credible need to account for any supposed "free-rider" problem. Counsel for EPPs essentially admitted as much in their response to United's assertion that its lawyers were prepared to work collaboratively with the joint prosecution group, including the putative EPP class: "If United wanted to work for the benefit of the class, it could have joined the class group, but it chose a different path."  Martin Decl.  Ex. B (Liebenberg letter) at 3.

In *In re Chicago Flood Litigation*, an Illinois appellate court held that imposing a set-aside order early in the litigation would impermissibly burden the right of absent class members to opt out of a certified class to pursue their own claims.  289 Ill. App. 3d 937, 941-47 (1997). That court astutely observed: "To restrict the right to opt out would result in individual class members losing control over their claims and being forced to accept court-appointed counsel without regard to their independent choice of counsel."  *Id.*  While Judge DuBois distinguished that case in *Linerboard*, he did so on the basis that the DAPs in *Linerboard* opted out of the certified litigation classes in the "final days" before the discovery deadline.  292 F. Supp. 2d at 662-63.  Judge DuBois noted that, in *Chicago Flood*, the DAPs were "actively engaged in the cases from the outset."  *Id.*

16

Here, merits discovery is months away and United and Humana have every financial incentive to fully participate in the prosecution of these coordinated cases. The putative EPP class consists of thousands of purchasers, big and small, including both insurers and their insureds. Indeed, Defendants will aggressively challenge any class certification motion and United and Humana have reasonably chosen to file suit long before certification proceedings to anticipate and eliminate the risk to them of an adverse certification ruling.[13] By contrast, United and Humana have chosen to tailor their litigation strategy to maximize the value of their respective claims and have chosen counsel who are well-acquainted with how they do business and the facts surrounding their purchasing practices.

Notably, EPP Counsel seek only to tax the recoveries of entities that fall within the proposed EPP class definition, and DPP Counsel seek only to tax the recoveries of entities that fall within the proposed DPP class definition.[14] This is so, even though the work of either EPP

---

[13] Indeed, recent trends in the Third Circuit indicate that putative class members cannot count on their claims being successfully pursued through certified classes. *See, e.g., In re Thalomid and Revlimid Antitrust Litig.,* No. 14-cv-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) (denying class certification for failure to meet the predominance and ascertainability requirements of Rule 23); *Vista HealthPlan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01833, 2015 WL 3623005, at *1 (E.D. Pa. June 10, 2015) (denying class certification as to consumers and third-party payors "because Plaintiffs have failed to satisfy the Rule 23 requirements of ascertainability, predominance and superiority"); *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134 (E.D. Pa. 2015) (decertifying certification of a class of indirect purchasers because they failed to demonstrate that the class is ascertainable); *In re Actiq Sales and Marketing Practices Litig.*, 307 F.R.D. 150 (E.D. Pa. 2015) (denying certification of an end-payor class because plaintiffs failed to show that a class action was the best way to resolve their claims; "the largest impediment to a finding of superiority is the difficulty of managing a class action in which the laws of TPPs' various home states apply and individual questions of fact predominate").

[14] Logically, application of the common-benefit doctrine in this MDL should allow any plaintiff to seek a share of any other plaintiff's recovery. For example, EPP Counsel should be able to seek a share of DPP recoveries, and *vice versa*. Similarly, the Kroger Plaintiffs, United and Humana should be permitted to seek a share of any class recoveries. United and Humana raise this issue solely to demonstrate the dangers of EPP/DPP Counsel's argument.

or DPP Counsel would logically inure to the benefit of all plaintiffs, regardless of the putative class definitions. That singular focus reveals that EPP/DPP Counsel's real concern is that when members of their respective putative classes choose to exercise their Due Process rights to litigate their own cases, the total value of the EPP and DPP claims diminish and, along with it, EPP/DPP Counsel's potential attorneys' fees because they will be determined as a percentage of each class's recovery. *See Galt v. Eagleville Hospital*, 310 F. Supp. 3d 483, 497 (E.D. Pa. 2018, Rufe, J.) (applying percentage method for calculating attorneys' fees). United and Humana respectfully suggest that EPP/DPP Counsel gain more for their class members by coordinating with United and Humana than they do by driving a wedge between the groups' efforts to work together. United's and Humana's cost-sharing abilities and resources can only help defray costs and attorneys' fees that would otherwise be charged to the EPP and DPP classes. Further, absent members of the putative EPP and DPP classes, like all plaintiffs, will benefit from the work performed by counsel for United and Humana. Respectfully, the fairest and most efficient way to promote cooperation among plaintiffs is to adhere to the normal structure in which each plaintiff pays its own lawyers and no others.

D.  The Exorbitant Set-Aside Sought by EPP/DPP Counsel Further Exposes Their Unjust Motives

As shown above, United and Humana strongly believe that any proposed set-aside order would undermine the "just and effective" litigation of this MDL. 28 USC § 1407. The excessive amounts sought by EPP/DPP Counsel further demonstrate that they seek the proposed set-aside order, not to remedy any supposed "free-rider" problem or address any other legitimate issue in this MDL, but to castigate putative class members that choose to file their own lawsuits.

Even if one assumed *arguendo* that this were a mass tort MDL or United and Humana stood on the sidelines for years before opting out of a certified class, as explained by Professor

Rubenstein, the 10% set aside sought by *each* of the EPPs and DPPs would still be far beyond

the pale.  Rubenstein Decl. ¶¶ 19-22.  Because United and Humana fall within the definition of

each putative class, Defendants would have to set aside 20% of any payments made to United

and Humana.  Even in legitimate common-benefit situations (unlike here), the median set-aside

was approximately 2%.  *Id.*

      None of the cases cited by EPP/DPP Counsel approved a 20% set-aside.  In *Linerboard*,

approximately 140 plaintiffs paid a total of $3 million to counsel for two certified classes for fees

and costs incurred over many years of litigation.  Even if one (incorrectly) disregarded the

obvious differences between the *Linerboard* MDL and this one, by extrapolation the common

benefit conferred on United and Humana would translate into a very small payment, expressed in

dollars (*e.g.*, $100,000), to be paid from United and Humana's first recoveries.

      Furthermore, the outlier cases cited by EPP/DPP Counsel ordering double-digit set-asides

involved free riders who had not litigated their own claims, as explained above, or are mass tort

cases that are not applicable here.  *See* Rubenstein Decl.

      EPP/DPP Counsel's assertion that *In re Fasteners Antitrust Litigation*, No. 08-md-1912,

2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014), stands for the proposition that "the requested

10% set-aside amount is less than half the amount that courts in this District commonly award

class counsel in attorneys' fees" actually undermines EPP/DPP Counsel's position.  EPP/DPP

Counsel Memo at 18.  *Fasteners* stands for the proposition that class counsel who perform work

that demonstrably benefits their own certified class will be fully and fairly compensated for their

efforts from their own class' recoveries.  EPP/DPP Counsel have not even attempted to show that

they would suffer some injustice if they are limited to recovering fees that benefit their own

clients.  Ultimately, EPP/DPP Counsel's request for a total 20% set-aside is such an obvious

overreach that it only confirms the improper motives behind the set-aside request.  *See* Rubenstein Decl. ¶ 22 ("it appears that these particular DAPs are being asked to pay a 10% assessment to both EPP and DPP counsel, or 20%, an assessment level that is, according to my data, literally unprecedented").

**V.    CONCLUSION**

For the foregoing reasons, EPP/DPP Counsel's Motion for Entry of Set-Aside Orders should be denied in its entirety.  If, however, the Court is inclined to enter set-aside orders that would in any respect apply to existing DAPs, United and Humana would ask for the following modifications.  First, make it backward-looking only so that EPP/DPP Counsel may seek fees for work that they performed ***before*** United and Humana entered the MDL.  That would at least address the structural incentive problem that would otherwise infect this litigation.  Second, set a briefing schedule now so the Court can determine a specific dollar value (not based on an arbitrary percentage) to the work that EPP/DPP Counsel performed to date for which they can seek contribution from United and Humana (in the event of a recovery).

Dated: May 15, 2019                                      Respectfully submitted,

  */s/ Peter D. St. Phillip*
Peter D. St. Phillip, PA ID # 70027
Jennifer Risener (admitted pro hac vice)
Lee Yun Kim (admitted pro hac vice)
LOWEY DANNENBERG, P.C
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
JRisener@lowey.com
LKim@lowey.com

  */s/ Judith A. Zahid*
Judith A. Zahid
Eric W. Buetzow
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
jzahid@zelle.com
ebuetzow@zelle.com

Laura K. Mummert, PA ID # 85964
LOWEY DANNEBERG, P.C.
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Telephone: (215) 399-4770
LMummert@lowey.com


Todd Schneider (admitted pro hac vice)
Jason Kim (admitted pro hac vice)
Kyle Bates (admitted pro hac vice)
SCHNEIDER WALLACE COTTRELL
  KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com


Garrett W. Wotkyns (admitted pro hac vice)
SCHNEIDER WALLACE COTTRELL
  KONECKY WOTKYNS LLP
8501 North Scottsdale Road
Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0144
GWotkyns@schneiderwallace.com

*Counsel for Plaintiff Humana Inc.*

James R. Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Avenue, NW,
Suite 375
Washington, D.C. 20006
Telephone: (202) 899-4100
jmartin@zelle.com
jhackett@zelle.com


Hamish P.M. Hume
Abby L. Dennis
Kyle Smith
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, D.C. 20005
Telephone: (202) 895-7580
hhume@bsfllp.com
adennis@bsfllp.com
ksmith@bsfllp.com


Duane L. Loft
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
20th Floor
New York, NY 10001
Telephone: (212) 446-2300
dloft@bsfllp.com

*Counsel for Plaintiff United Healthcare
Services, Inc.*

## APPENDIX A

*In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill.).  Boies Schiller serves as liaison counsel for dozens of direct-action plaintiffs and the case is being prosecuted—currently in the discovery phase—with great cooperation amongst all classes and private plaintiffs.

*In re Capacitors Antitrust Litigation*, No. 3:14-cv-03264 (N.D. Cal.).  Boies Schiller represents a private opt-out plaintiff and has worked *productively* and collaboratively with counsel for both direct and indirect classes as well as two other groups of counsel representing other DAPs.

*In re LIBOR-Based Financial Instruments Antitrust Litigation*, MDL No. 2262, No. 1:11-md-02262 (S.D.N.Y.).  Zelle serves as liaison counsel for more than two dozen DAPs (while representing Freddie Mac and the FDIC as Receiver for 39 Closed Banks).  Freddie Mac and the FDIC allege, among other things, that defendants engaged in a horizontal price-fixing conspiracy.

*United HealthCare Services, Inc. v. Cephalon, Inc., et al.*, No. 2:17-cv-00555 (E.D. Pa.).  Boies Schiller and Zelle represent United HealthCare Services, Inc. in an individual antitrust matter against the makers of the branded pharmaceutical drug Provigil and its generic equivalents. The suit alleges a successful pay-for-delay scheme that kept lower-priced generics off the market for several years, allowing the brand manufacturer to continue charging inflated monopoly prices that caused United HealthCare Services, Inc. substantial damages.

*In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917, No. 3:07-cv-05944 (N.D. Cal.).  This is a great example of collaborative and joint working efforts, as one of United's co-counsel (Boies Schiller) represented a group of nine opt-out direct-action plaintiffs (DAPs) and served as liaison counsel for the overall direct-action plaintiff group, which consisted of many dozens of private plaintiffs represented by numerous other law firms.  In addition, United's other co-counsel (Zelle) served as one of the lead law firms for the indirect purchaser class.  The DAPs and indirect class—and all classes—had collaborative and productive working relationships that culminated in settlements of over $500 million for the indirect class and private confidential settlements of all direct-action plaintiff cases, without any trials and without any "set aside" motions.

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, No. 3:07-md-01827 (N.D. Cal.) (set aside decision is cited in the brief).  This is also an example of plaintiffs working together.  Boies Schiller represented twelve DAPs and worked collaboratively and productively with the classes and all other DAPs, resulting in private settlements of Boies Schiller's clients' claims.  Zelle served as court-appointed co-lead counsel for end-user consumers and businesses that purchased TVs, computer monitors, and laptop computers containing LCD screens alleged to have been the subject of one of the largest antitrust cartels in history. All-cash settlements totaling nearly $1.1 billion were reached with the defendants just before trial, leading to one of the largest consumer antitrust recoveries ever obtained.

*In re Urethane Antitrust Litigation*, **MDL No. 1616, No. 2:08-cv-05169 (D.N.J).**  Zelle lawyers represented 11 plaintiff families in an international price-fixing case involving three chemicals.  Despite a lack of direct evidence, Zelle lawyers successfully defeated summary judgment motions challenging the existence of a conspiracy and its duration.

*In re Vitamins Antitrust Litigation*, **MDL No. 1285, Misc. No. 99-197 (D.D.C.).**  Zelle lawyers represented more than 150 direct-action plaintiffs, including Kraft Foods and GNC, alleging a 15-year international cartel covering more than a dozen vitamins.  Recoveries exceeded $2 billion.

*ZF Meritor LLC v. Eaton Corp.*, **No. 06-623-SLR (D. Del.).**  Zelle lawyers represented a manufacturer of heavy-duty transmissions in a case alleging the dominant producer excluded it from the relevant market.  The case went to trial and resulted in a liability verdict for violations of Sections 1, 2, and 3 of the Sherman Act.  The Third Circuit upheld the verdict and the case settled for $500 million prior to the damages trial.

*In re Methionine Antitrust Litigation*, **MDL No. 1311, No. 3:00-md-01311 (N.D. Cal.).**  Represented more than three dozen DAPs, including Tyson Foods, alleging an international price-fixing cartel.  Recoveries exceed $400 million.

*In re Linerboard Antitrust Litigation*, **MDL No. 1261, No. CIV.A. 98-5055 (E.D. Pa.).**  Zelle represented more than 50 Fortune 500 companies, including names such as PepsiCo and Coca-Cola, in a conspiracy among containerboard producers to take "market downtime" to restrict output and cause price increases. Successfully defeated summary judgment motions despite the lack of direct evidence.  Served as liaison counsel for direct-action plaintiffs. Recoveries exceeded $200 million.

*In re German Automotive Manufacturers Antitrust Litigation*, **MDL No. 2796, No. 3:17-md-02796 (N.D. Cal.).**  Zelle was appointed by the Court to the Plaintiffs' Steering Committee and represents a putative class of direct purchaser plaintiffs (dealers) of luxury German automobiles.

*In re Lithium Ion Batteries Antitrust Litigation*, **MDL No. 2420, No. 4:13-md-02420 (N.D. Cal.).**  Zelle was appointed liaison counsel for a proposed class of direct purchasers of lithium-ion batteries, the dominant form of rechargeable battery found in a variety of consumer electronics. The defendant manufacturers were alleged to have formed a cartel to fix the prices of certain lithium-ion battery cells, in violation of federal antitrust law. The case settled for nearly $140 million in cash to the direct purchaser class.

*In re Automotive Parts Antitrust Litigation*, **MDL No. 2311, No. 12-md-02311 (E.D. Mich.).**  Zelle serves on the Plaintiffs' Executive Committee for the End-Payor Plaintiffs in this antitrust class action on behalf of consumers and businesses that bought vehicles containing auto parts systems made by defendant auto parts manufacturers. These cases involve alleged price fixing and bid rigging conspiracies pertaining to 28 different part systems and over 30 defendant company groups; it is one of the largest criminal antitrust investigations in the history of the U.S. Department of Justice. Zelle attorneys were tasked to handle the economic experts for the plaintiffs. Settlements to date are currently over $1 billion.

## APPENDIX B

*In re Aggrenox Antitrust Litig.*, **MDL No. 2516 (D. Conn. 2014).** Lowey Dannenberg P.C. (Lowey) represented Humana in a generic delay case against Boehringer Ingelheim Pharmaceuticals, Inc., the brand-Aggrenox manufacturer, and the generic manufacturer Barr Pharmaceuticals, Inc. (later acquired by Teva Pharmaceuticals), before Chief Judge Underhill in the District of Connecticut. The litigation asserted claims under state antitrust law, claiming a $100 million co-promotion agreement was a disguised pay-for-delay, and as a result, Humana overpaid for Aggrenox.  Lowey achieved a confidential settlement on behalf of Humana.

*In re Lidoderm Antitrust Litig.,* **MDL No. 2521 (N.D. Cal. 2014).** Lowey represented Government Employees Health Association (GEHA) in a generic delay case concerning Lidoderm, the brand name for a prescription pain patch sold by Endo Pharmaceuticals, Inc. Teikoku Pharma USA, and Teikoku Seiyaku Co., Ltd. Lowey negotiated a settlements with each of the defendants together with the End-Payor class on behalf of GEHA and several other third party payer clients.

*FTC v. Actavis, Inc.* No. 12-416 (S. Ct. 2013). In 2013, America's Health Insurance Plans, a national association representing the health insurance industry, hired Lowey to represent it before the United States Supreme Court as *amicus curiae* in *FTC v. Actavis*, the Supreme Court's seminal decision on how "pay-for-delay" agreements between brand name drug companies and generic companies should be adjudicated under federal antitrust law.

*Blue Cross Blue Shield Association et al. v. GlaxoSmithKline LLC, No.* **2:13-cv-4663-JS (E.D. Pa. 2013).** Lowey represents 39 health plans that collectively comprise 60% of the private health insurance market in the United States, including nearly two dozen Blue Cross Blue Shield licensees, Aetna, and Cigna, in an action currently pending in the Eastern District of Pennsylvania alleging that GlaxoSmithKline improperly manufactured, marketed, and sold to plaintiffs 17 prescription drugs.

*In re Neurontin Marketing and Sales Practices Litig.,* **No. 1:04-cv-10981 (D. Mass. 2004).** Lowey represented Aetna and was appointed by the U.S. District Court in Boston to represent third-party payer interests on the Plaintiffs Steering Committee in an action alleging Warner-Lambert and Pfizer engaged in off-label marketing of Neurontin.  Lowey assisted Kaiser's trial team in securing the first ever verdict against a pharmaceutical manufacturer finding that it engaged in a RICO enterprise by fraudulently marketing its drug.  Representing Aetna on appeal, Lowey won a landmark RICO decision in the First Circuit holding drug manufacturers accountable to health insurers for damages attributable to marketing fraud.  The firm obtained a confidential settlement for Aetna and later negotiated a resolution for other third-party payer clients as part of the class' $325 million settlement.

*In re Rezulin Products Liability Litig., MDL No. 1348* **(S.D.N.Y. 2000)**. Lowey represented a class of third-party payers alleging Warner-Lambert and Pfizer misrepresented the qualities of the medication, Rezulin.  Before the Second Circuit, Lowey successfully argued to reverse the dismissal of the class action. establishing precedent-setting law that has influenced every third-party payer prescription drug case since.  Specifically, the Second Circuit held that

24

health insurers have viable claims against pharmaceutical manufacturers for drug overcharges for defective drugs.  Lowey successfully negotiated a $22 million class settlement.

*In re Cardizem CD Antitrust Litigation,* **MDL No. 1278 (E.D. Mich. 1999).** Lowey filed the first ever "pay-for-delay" case on behalf of a class of third-party payers and, before the Sixth Circuit Court of Appeals, successfully argued that a reverse settlement agreement can be a *per se* illegal restraint of trade. Lowey successfully negotiated an $80 million class settlement.

*In re Terazosin Hydrochloride Antitrust Litig.* **MDL No. 1317 (S.D. Fla. 1999).** Lowey was appointed class counsel and secured a $28.7 million, 17-state class settlement against Abbott Laboratories for allegedly filing sham patent infringement lawsuits to delay generic entry, and fraudulently procuring patents for its brand-drug Hytrin.

*In re Warfarin Sodium Antitrust Litig., No. 98-md-1232 (***D. Del.** *1998).* The Third Circuit Court of Appeals affirmed the United States District Court for the District of Delaware's approval of a $44.5 million class action settlement to consumers and third-party payers to settle claims of unfair marketing practices in connection with the prescription blood thinner, Coumadin.  Lowey, appointed by the District Court to the Plaintiffs' Executive Committee as the third-party payer representative, successfully argued the appeal.

*Laydon v. Mizuho Bank, Ltd. et al.,* **No. 12-cv-3419 (S.D.N.Y. 2012)***; Sonterra Capital Master Fund Ltd., et al. v. UBS AG, et al.,* **No***.* **15-cv-5844 (S.D.N.Y. 2015).** Lowey is leading the prosecution of international financial institutions responsible for intentional and systematic manipulation of the London Interbank Offered Rate ("LIBOR") for the Japanese Yen and Euroyen TIBOR (the Tokyo Interbank Offered Rate).

*Sullivan, et al. v. Barclays plc, et al.,* **No. 13-cv-2811 (S.D.N.Y. 2013).**  Lowey is leading the prosecution of international financial institutions responsible for setting the Euro Interbank Offered Rate ("Euribor"), a global reference rate used to benchmark, price and settle over $200 trillion of financial products. Lowey has recovered a total of $491.5 million for Euribor-based derivative investors.

*In re JP Morgan Stable Value Fund ERISA Litigation***, No. 12-cv-02548-VSB (S.D.N.Y.).** Schneider Wallace Cottrell Konecky Wotkyns ("Schneider Wallace") obtained a $75 million settlement (final approval pending) on behalf of a class of retirement investors alleging that JP Morgan imprudently managed its stable value funds, an investment option offered in hundreds of retirement plans for major corporations.

*Northern Trust Co.***, Nos. 09-Civ-1934 and 09-7203A (N.D. Ill.)** Schneider Wallace obtained a $60 million settlement in two related class actions against Northern Trust Corp. arising from its securities-lending activities for retirement plans.

*Willitts v. City of Los Angeles***, No. 10-05782-CBM (C.D. Ca.).** Schneider Wallace obtained a settlement with relief valued at $1.367 billion against the City of Los Angeles on behalf of a class of disabled Los Angeles residents.

25

***Conant v. Bank of America Corp.***. **No. 17 Civ. 3139-LGS (S.D.N.Y.).** Schneider Wallace presents a putative class of indirect purchasers in a case alleging price fixing by major financial institutions in the foreign exchange market and has preliminarily obtained settlements from two defendants.

***In re Andarko Basin Oil and Gas Lease Antitrust Litigation***, **No. CIV-16-0209-HE (W.D. Ok.).** Schneider Wallace was appointed Co-Lead Counsel in this class action on behalf of mineral leaseholders alleging price fixing by major energy companies in one of the nation's largest natural gas producing regions and obtained a $6.95 million settlement.