IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |

### STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT HERITAGE PHARMACEUTICALS INC.S' ("HERITAGE") MOTION TO ENFORCE PROTECTIVE ORDER

**I.      PRELIMINARY STATEMENT**

Heritage's Motion to Enforce Protective Order is baseless, and must be summarily denied for a number of reasons.  First, the Protective Order – by its own very clear terms – does not apply to the document in question, which was lawfully obtained by the States during the course of their ongoing antitrust investigation (not in discovery in this MDL), and was referenced in a Complaint filed in another jurisdiction.  The Protective Order does not provide this Court with the authority to dictate the terms upon which sovereign states acquire and use evidence to carry out their antitrust enforcement responsibilities under their respective state laws.

Second, the document in question is not privileged, and no reasonable person (including Heritage's former counsel, counsel for any of the private plaintiffs or likely even the Department of Justice) has apparently ever believed that it was during the two years since it was produced.  A summary of an attorney's discussions with third parties – who have no common interest in the subject matter of those communications – to coordinate an inappropriate response to a Congressional inquiry (which is what was referred to by the States in their Complaint) simply

1

does not fall within any conceivable definition of the attorney-client privilege, despite the protestations of Heritage's newly-appointed counsel.

Last, the Motion includes certain frivolous and inflammatory misstatements – made for the obvious and improper purpose of tainting the credibility of the States, and harassing Connecticut in particular – that likely violate Rule 11, and should not be condoned by this Court. Heritage wrongly (and repeatedly) asserts, with no reference to any evidence, that the States leaked the unredacted Complaint to a news outlet called the Business Insider. In support of this claim, Heritage's new counsel seems to be parroting equally baseless statements made by other defense counsel in the past – in court hearings, status conferences and in motions that have previously been denied by this Court. Pursuant to its power under Rule 11 of the Federal Rules of Civil Procedure, the States respectfully request that this Court Order counsel for Heritage to Show Cause why his conduct has not violated Rule 11(b).[1]

## II.  BACKGROUND

On May 10, 2019, as a result of an ongoing investigation into anticompetitive conduct in the generic drug industry, a group of 44 States and U.S. Territories filed a Complaint in the United States District Court for the District of Connecticut, alleging a broad conspiracy to artificially inflate and manipulate prices, reduce competition and unreasonably restrain trade for more than 100 different generic drugs. Heritage – although not named as a Defendant in that Complaint – was prominently identified as a coconspirator and as one of Teva Pharmaceutical, Inc.'s ("Teva") "Highest Quality" competitors.

---

[1] Because of the expedited briefing schedule imposed by this Court with regard to Heritage's Motion to Enforce Protective Order (2:16-md-2724, Doc. #1043, 7/12/19), the States were not able to comply with the prerequisites for filing a separate Motion for Sanctions under Rule 11, which would require notice and permit Heritage a period of twenty-one days to withdraw or otherwise correct the frivolous statements in its Motion. This Court can, however, on its own initiative under Rule 11(c)(3), order counsel for Heritage to show cause why his conduct in filing the Motion to Enforce Protective Order as described herein has not violated Rule 11(b).

In a section of the Complaint titled "Obstruction of Justice," the Complaint describes the conduct of certain generic manufacturers "to obstruct the ongoing government investigations and to limit any potential response." Complaint, May 10, 2019, at ¶ 1130. In one example of obstruction related specifically to Heritage, the Complaint states (including the originally redacted, now-unsealed portion highlighted in grey):

> For example, in early October 2014, Heritage received a letter from Representative Cummings and Senator Sanders as part of their inquiry into generic drug pricing. Heritage's outside counsel immediately set out to coordinate a response with counsel for Defendants Teva and Mylan, to provide what he referred to as 'polite f-u' letters to Congress.

*Id.* ¶ 1131. The Complaint then embedded a picture of the actual email communication from counsel to client (which was fully redacted in the original, public filing), in which Heritage's outside counsel recounted to his client his specific communications with third parties, including counsel for Teva and Mylan Inc. ("Mylan"). *Id.*

The email referred to by the States in ¶ 1131 of their Complaint was produced by Heritage, through its prior counsel – Gibson, Dunn & Crutcher LLP ("Gibson Dunn") – more than two years ago, as part of the States' ongoing antitrust investigation of the generic pharmaceutical industry. It was not produced to the States in discovery in this MDL.

Shortly after filing the Complaint, on May 21, 2019, the States notified Defendants' Liaison counsel that they intended to file a Motion to Unseal the Complaint, and requested MDL Defendants' position on such a motion.[2] None of the Defendants in the MDL – including Heritage – objected to the Motion. Hearing no objection, the States filed a Motion to Unseal the Complaint on June 6, 2019. (2:19-cv-2407-CMR, Doc. #12.) In a Leadership Status Conference

---

[2] Along with that request, the States provided the MDL Defendants with a draft Motion to Unseal and Memorandum of Law in Support of their Motion to Unseal.

the next day – June 7, 2019 – the Motion was discussed briefly and the Court provided its opinion on how the Motion should be handled.

That same day, unbeknownst to the States, a media outlet called the Business Insider reported a story about a leaked copy of the Complaint. In the instant Motion, Heritage alleges that the Connecticut Attorney General's Office violated the Protective Order by, among other things, "leaking an un-redacted version of the Complaint before this Court gave Connecticut the right to unseal the document." (Heritage Memorandum in Support of its Motion to Enforce Protective Order ("Heritage Mem.") at 1, 12 ("Connecticut ran for daylight with the Privileged Document by using it in the Complaint, apparently leaking the sealed contents to a reporter . . . .") Doubling down, Heritage further alleges that "[t]hese are not isolated incidents," and argues that Connecticut leaked a prior version of the States' Consolidated Amended Complaint before it was unsealed by this Court. (Heritage Mem. at 2, 4 ("for the second time"), 6 ("prior breaches"), 14 ("In light of the egregiousness of the repeated breaches by the Attorney General of Connecticut that are the subject of this Motion").)

These statements are not only false and prejudicial, but they make no sense. By the time the Complaint was apparently leaked, the States had already filed their Motion to Unseal and were comfortable, based on prior statements and rulings of this Court, that the Motion would be granted in short order.[3] There would be absolutely no reason for the States to leak the Complaint, and they have not done so.

III. **ARGUMENT**

    A. **The Court Cannot Enforce The Protective Order Against The States With Regard To The Document In Question Because, By Its Own Terms, The Protective Order Does Not Apply To Investigatory Documents Obtained Independently By The States During An Ongoing Investigation.**

---

[3] The Motion to Unseal was in fact granted by this Court on June 21, 2019. (2:16-md-2724-CMR, Doc. #1024.)

4

PTO 53 – the Protective Order issued by this Court on September 4, 2018 (Doc. #697), and the Order that Heritage seeks to enforce through its Motion – does not apply to documents that were lawfully obtained independent of discovery in this MDL (i.e., investigatory documents obtained through lawfully issued investigatory subpoenas as part of an ongoing antitrust investigation). Paragraph 5.8 of PTO 53 expressly states:

> 5.8. This Order shall not apply to and, thus, does not restrict any Party's use, for any purpose, of: (a) its own Protected Material; or (b) any documents, things, information, or other material that: (i) at the time of disclosure in this MDL is publicly known through no unauthorized act of such Party; (ii) was lawfully developed or obtained independent of discovery in this MDL; or (iii) was obtained or purchased by a Party from a non-party under a confidentiality or other non-disclosure agreement. The Party shall have the burden of proving that the use or disclosure satisfies one or more of these criteria. Any Party with material

It cannot be disputed that the document at issue was produced to Connecticut as part of its ongoing investigation, and not as part of discovery in this MDL. The fact that it was later made available to the other parties in the MDL pursuant to PTO 70 (the AG Access Protocol) does not alter that fact, at least with respect to the States. Paragraph 5.8 of PTO 53 was specifically negotiated by the parties so that the Protective Order would not limit how the States might be able to use investigatory documents in the course of their ongoing antitrust investigation, or control how those documents were characterized in a Complaint filed by the States as a result of such investigation (even if those documents were subsequently produced to other parties in this MDL). Thus, Heritage's Motion has no legal basis, and must be denied on that ground alone.

### B.     The Document In Question Is Not Privileged.

Even if this Court could conclude that the Protective Order applied to the State's use of the document in question, no additional action would have been required by the States because the document in question is not privileged.

The attorney-client privilege is narrowly construed because it "obstructs the truth-finding process." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 84 (3d Cir. 1992) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)). "Courts should be cautious in their application of the privilege mindful that 'it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" *Louisiana Mun. Police Employees Retirement Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 305 (D.N.J. 2008) (quoting *Fisher*, 425 U.S. at 403).

"The party asserting the privilege bears the burden of demonstrating that 'the communication was given in confidence and that the client *reasonably understood it to be so given*.'" *U.S. v. LeCroy*, 348 F. Supp. 2d 375, 382 (E.D. Pa. 2004) (emphasis in original) (quoting *U.S. v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989)). However, under no circumstances will the privilege "protect disclosure of the underlying facts." *In re Processed Egg Products Antitrust Litig.*, 278 F.R.D. 112, 117 (E.D. Pa. 2011) (Rice, Mag.) (quoting *Fisher*, 425 U.S. at 385).

### 1.  Communications Between An Attorney And Third Parties Are Not Confidential or Privileged.

"A communication is only privileged if it is made 'in confidence.'" *In re Teleglobe Communications Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) (quoting RESTATEMENT (THIRD)

OF THE LAW GOVERNING LAWYERS § 68); *see also LeCroy*, 348 F. Supp. 2d at 381 ("It is axiomatic that in order for a communication to be privileged that communication must be made in confidence") (citing *Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979)). "A communication is not made in confidence, and in turn is not privileged, if persons other than the client, its attorney, or their agents are present." *WebXchange, Inc. v. Dell Inc.*, 264 F.R.D. 123, 126 (D. Del. 2010) (citing *Teleglobe*, 493 F.3d at 361). "Disclosing a communication to a third party unquestionably waives the privilege." *Id.*

"Thus, 'a communication between the attorney and any third party not the client is not privileged *even if the information contained therein is then conveyed by the attorney to the client*.'" *Cottillion v. United Refining Co.*, 279 F.R.D. 290, 298 (W.D. Pa. 2011) (quoting *Barr Marine Products, Co. v. Borg-Warner Corp.*, 84 F.R.D. 631, 634 (E.D. Pa. 1979)) (emphasis added). That is precisely what happened here. As Heritage describes in its Motion – and as is clear from the document itself – after Heritage asked outside counsel to handle a Congressional inquiry sent to Heritage, outside counsel immediately proceeded to communicate with third parties, including competitors Teva and Mylan, about coordinating a response. Counsel reported that those companies had also been in contact with the industry trade association, GPhA, to coordinate the response and described the understanding about what that response should be. The companies even planned to schedule a conference call to discuss it further and make sure everyone was on the same page. Counsel for Mylan told Heritage's outside counsel that a response letter could either be ghost-written on company letterhead, or sent directly by outside counsel. In reporting the content of those communications back to the client, outside counsel indicated that he would keep the client updated.

Once Heritage's outside counsel began discussing Heritage's response to the Congressional inquiry with Heritage's competitors and potentially other members of the industry trade association, the privilege was waived not just with regard to those communications, but also as to any other communications about the same subject matter. *Westinghouse*, 951 F.2d at 1427 ("under traditional waiver doctrine a voluntary disclosure . . . to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else") (citing *United States v. Rockwell International*, 897 F.2d 1255, 1265 (3d Cir. 1990)) ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed"); *Katz v. AT&T Corp.*, 191 F.R.D. 433, 439 ("The general rule regarding the voluntary disclosure of privileged attorney-client communications is that the disclosure waives the privilege as to all other communications on the same subject") (citing *Helman v. Murry's Steaks, Inc.*, 728 F. Supp. 1099, 1103 (D. Del. 1990)).

As Heritage notes, the only part of the email that was referred to by the States in their Complaint filed on May 10, 2019 was the final email, where Heritage's outside counsel summarized his communications with third parties about how to respond to Congress. Further, and importantly, the fact that outside counsel shared those third-party communications with his client does not shield the communications from disclosure. *Cottillion*, 279 F.R.D. at 298.[4]

>  2. **There Was No Common Interest In October 2014 Between Heritage and Its Competitors Or the Industry Trade Association.**

Heritage contends that its outside counsel's communications with several different third parties did not waive the attorney-client privilege relating to those communications because they were subject to the "common-interest privilege." This argument fails for several reasons.

---

[4] Although the other communications between outside counsel and client referenced by Heritage were not disclosed or publicized, it would not matter because Heritage waived the privilege as to those communications by sharing the subject matter with third parties. *Katz*, 191 F.R.D. at 439.

8

"The common interest doctrine is an exception to the general rule that the attorney client privilege is waived upon disclosure of privileged information with a third party." *Katz v. AT&T Corp.*, 191 F.R.D. 433, 436 (E.D. Pa. 2000) (citations omitted). "Pursuant to the common interest doctrine (or community of interest doctrine), 'parties with shared interest in actual or potential litigation against a common adversary may share privileged information without waiving their right to assert the privilege.'" *Id.* (quoting *Thompson v. Glenmeade Trust Co.*, 1995 WL 752443, at *4 (E.D. Pa. Dec. 19, 1995)). The nature of the common interest, however, "must be 'identical, not similar, and be legal, not solely commercial.'" *Id.* (quoting *In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (other citations omitted); *see also Teleglobe*, 493 F.3d at 365 ("the congruence-of-legal-interests requirement ensures that the privilege is not misused to permit unnecessary information sharing"); *In re Processed Egg Products Antitrust Litig*, 278 F.R.D. at 118 ("the requirement that the parties to the communication share 'at least a substantially similar legal interest' prevents abuse of the privilege and 'unnecessary information sharing.'").

Here, Heritage did not have *any* common interest with Teva or Mylan in responding to the congressional inquiry, let alone an *identical* or *substantially similar* legal interest. Heritage makes clear in its Motion that it did not even sell the one product that was the subject of its congressional inquiry. (Heritage Mem. at 10 ("Heritage *had never sold, or even had the right to sell, the one product that was the subject of that letter.*") This fact alone destroys Heritage's claim that there was a common legal interest with any of these third parties. Third Circuit law is clear that "disclosure to a third party waives the attorney client privilege *unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance*." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (quoting *Westinghouse Elec. Corp.*, 951 F.3d

9

at 1428) (emphasis added).  Here, if Heritage did not even sell the one drug that was the subject of the inquiry, it would have no need to communicate with those third parties in order to adequately respond to that inquiry.  This fact further supports the allegations in the States' May 10, 2019 Complaint that these competitors and industry participants were coordinating their responses to avoid exposing any evidence of their ongoing agreement to allocate their fair share of the generic drug market and fix and raise prices on a number of different generic drugs.

It is also important to note that neither Teva nor Mylan – the two companies with whom Heritage's counsel communicated, and with whom there was supposedly a common interest – have (1) objected to the unsealing of the Complaint, (2) claimed that the document in question was subject to a common interest privilege, or (3) joined in Heritage's Motion to have the document in question treated as privileged.

Further, as the attachments to Heritage's own Motion demonstrate, the inquiries from Congress to each of the respective companies (largely requests for sales and pricing information, not evidence of conspiracy) related to almost entirely different sets of drugs.  For example:

| Company Receiving Congressional Inquiry Letter | Drugs Subject to Inquiry |
| --- | --- |
| Heritage Pharmaceuticals, Inc. (*See* Heritage Mem., Ex. J) | Doxycycline Hyclate |
| Mylan Inc. (*See* Heritage Mem., Ex. K) | Albuterol Sulfate<br>Benazepril/Hydrochlorothiazide<br>Divalproex Sodium ER<br>Doxycycline Hyclate<br>Pravastatin Sodium |
| Teva Pharmaceutical Industries, Ltd. (*See* Heritage Mem., Ex. K) | Divalproex Sodium ER<br>Pravastatin Sodium |

Other than baldly reciting that a common interest existed, Heritage does not once articulate why various generic manufacturers (or the industry trade association) might have "common legal interests in responding to a Congressional inquiry" about different drugs.

(Heritage Mem. at 8.)  Simply saying that companies "often coordinate their responses to Congressional inquiries, and it is quite common for trade associations to get involved in those efforts" (Heritage Mem. at 9) is not enough.  Heritage has the burden of proving it.  "To take advantage of the common interest doctrine the [party asserting the privilege] must still satisfy their burden of proving . . . that the parties had an identical legal, and not solely commercial, interest."  *Katz*, 191 F.R.D. at 437.

Going beyond the Congressional inquiry – as of October 2014 Connecticut had not yet started investigating Heritage, Teva or Mylan in the context of its antitrust investigation of the generic pharmaceutical industry.  No subpoenas had been sent; and no documents had been received from any of those companies.  Similarly, the Department of Justice (based on publicly available reports) had not yet convened a grand jury to investigate the matter.  Consequently, any notion that Heritage shared a common legal interest with any of those competitors at that time is meritless.

### 3. **Crime Fraud Exception**

The purpose of the attorney-client privilege "would be frustrated if the client used the lawyer's services to further a continuing or future crime or tort."  *In re Chevron*, 633 F.3d 153, 166 (3d Cir. 2011) (citing *In re Impounded*, 241 F.3d 308, 316 (3d Cir. 2001).   "Therefore, in situations where the client consults the attorney for the purpose of committing a future crime or fraud, the crime-fraud exception to the attorney-client privilege applies and communications made in furtherance of the anticipated crime or fraud are not protected from disclosure as recognition of 'the privilege is no longer defensible.'"  *Id.* (citations omitted).

"[T]he purpose of the crime-fraud exception is to assure that the 'seal of secrecy' between lawyer and client does not extend to communications from the *lawyer* to the client made by the

*lawyer* for the purpose of giving advice for the commission of a fraud or crime.  The seal is broken when the lawyer's communication is meant to facilitate future wrongdoing by the client." *Haines*, 975 F.2d at 90 (emphasis in original).  "The communication condemned and unprotected by the attorney-client privilege is advice that is illicit because it gives direction for the commission of a future fraud or crime." *Id.*

Here, the communications from Heritage's outside counsel to the client fall squarely within the crime-fraud exception.  The States have made a prima facie showing, through the detailed allegations in both of their Complaints filed to date, that Heritage, Teva, Mylan and other generic manufacturers were engaging in an ongoing conspiracy to allocate markets and fix prices in the generic drug industry.  Indeed, two former Heritage executives have pled guilty to such conduct and Heritage itself has admitted guilt in the context of a Deferred Prosecution Agreement and in obtaining Conditional Leniency from the Department of Justice.  Although no one else knew about that conspiracy in October 2014, the participants did.  Their efforts to coordinate with each other to evade scrutiny relating to their continuing unlawful conduct, and obstruct a Congressional inquiry, cannot be protected by the attorney-client privilege.

**C.     The Document In Question Was Not Inadvertently Produced.**

Newly appointed counsel for Heritage claims now – two years after the document in question was first produced, and two months after the States' Complaint was filed – that the document was inadvertently produced to Connecticut.  It was not.  For all the reasons discussed above, Heritage's prior counsel, Gibson, Dunn, produced the document in question to the States on June 26, 2017 without claiming it was privileged.  (*See* Heritage Mem. at 3; Ex. B.)

During the intervening two years since the document was produced, it is inconceivable that Gibson Dunn (sophisticated counsel from one of the top litigation firms in the country), in

its representation of Heritage in this lawsuit or with respect to the DOJ investigation, would not have reviewed the document in question. The document relates to a drug that has been under investigation and is the subject of several lawsuits (Doxycycline) and involves two generic manufacturers – Teva and Mylan – whose relationships with Heritage are also under investigation and are the subject of several lawsuits. During this time, Heritage has not been sitting idly by. The company has been actively defending the lawsuits, and has also been providing substantial cooperation to the DOJ.[5] Based on the States' own interactions with Gibson Dunn, it is clear that the firm exhaustively reviewed the relationship between Heritage and Mylan in the context of several drugs, including Doxycycline.

In order to believe that the document in question was inadvertently produced by Heritage, this Court would have to assume the following: (1) that Gibson Dunn never did a privilege review of the documents produced to Connecticut; (2) that beyond a full privilege review, Gibson Dunn never even conducted a cursory search for documents in the production that included the name of Heritage's outside counsel; (3) that Gibson Dunn never searched for or reviewed documents in the production relating to the relationship between Heritage and Teva during the time period in question;[6] (4) that Gibson Dunn never searched for or reviewed documents in the production relating to the relationship between Heritage and Mylan during the time period in question;[7] and (5) that Gibson Dunn never did even a basic search for documents

---

[5] According to a recent DOJ press release, Heritage's "substantial and ongoing cooperation with the investigation to date" was identified as a primary reason that Heritage was able to obtain a deferred prosecution agreement from DOJ. *See* https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.

[6] As part of its Deferred Prosecution Agreement with the DOJ, Heritage admitted that it engaged in a conspiracy to fix prices and allocate markets for Glyburide from April 2014 through at least December 2015. As detailed in the States' Consolidated Amended Complaint, Teva was a primary competitor on that drug.

[7] In December 2016, two former Heritage executives (Jeffrey Glazer and Jason Malek) pleaded guilty to participating in a conspiracy to fix prices and allocate markets relating to the drugs Doxycycline and Glyburide. As

that included the terms "Mylan" AND "doxy*." Any one of these basic searches would have quickly uncovered the document in question.

That simply cannot be the case.

### D. Several Statements In Heritage's Motion Violate Rule 11 of the Federal Rules of Civil Procedure.

"The signer's signature on a pleading, motion, or other paper certifies the signer has done three things: (1) read the pleading, motion, or paper; (2) made a reasonable inquiry into the contents of the pleading, motion, or other paper and concluded that it is well grounded in fact and warranted in law; and (3) has not acted in bad faith in signing the document." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278 (3d Cir. 1994) (citing *CTC Imports and Exports v. Nigerian Petroleum Corp.,* 951 F.2d 573, 578 (3d Cir.1991)). The reasonableness of an inquiry is determined using an objective standard. *Id.* (citations omitted). "It is clear that the signer has a 'personal, nondelegable responsibility' to comply with the requirements of Rule 11 before signing the document." *Id.* (citing *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. at 127; *In re Mitchell,* 901 F.2d 1179, 1188 & n. 23 (3d Cir.1990)).

"Rule 11 therefore is intended to discourage pleadings that are 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'" *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986) (citations omitted). "Counsel's certification also warrants that the pleading is not being used for an improper purpose, such as to cause harassment, undue delay, or needless increase in litigation expense." *Id.*

Putting aside the fact that Heritage's counsel has filed a motion to enforce an Order that by its own terms does not apply here, and therefore is not well grounded in law – the Motion also

---

detailed in the States' Consolidated Amended Complaint, Mylan was a primary competitor in the market for Doxycycline Delayed Release ("Doxy DR").

includes a number of factual statements that are false, baseless, appear to be made in bad faith, and are possibly defamatory, including:

- That the Connecticut Attorney General's office leaked an unredacted version of the Complaint before this Court gave Connecticut the right to unseal the document. (Heritage Mem. at 1);
- That Connecticut has engaged in a "pattern of conduct reflecting a disregard for the rules and orders of this Court, and, very likely, of the Connecticut Rules of Professional Responsibility, arising from its ongoing campaign to use these cases for extrajudicial, political purposes" (Heritage Mem. at 2);
- That prior to June 21, 2019, "[n]o one had previously asserted that Heritage attempted to obstruct the Congressional investigation" (Heritage Mem. at 4-5.)[8]
- "[I]n defiance of an Order of this Court, Connecticut ran for daylight with the Privileged Document by using it in the Complaint, apparently leaking the sealed contents to a reporter, and by re-publishing the contents of the plainly privileged communication in a press release and in social media."  (Heritage Mem. at 12-13.)
- "Connecticut has repeatedly trampled upon both Heritage's rights and the authority of this Court and, in all likelihood, violated the Connecticut Rules of Professional Responsibility."  (Heritage Mem. at 13.)
- Stressing "the egregiousness of the repeated breaches by the Attorney General of Connecticut that are the subject of this motion" and asking the Court to "deter Connecticut from continuing to engage in a pattern of extrajudicial conduct that reflects a prioritization of the Attorney General's political goals over the authority of this Court and the rights of the Defendants."  (Heritage Mem. at 14.)

Accordingly, the States respectfully request that this Court, under its authority in Fed. R. Civ. P. Rule 11(c), require that Mr. Schwartz – the signer of Heritage's Motion – be required to show cause why his conduct in filing the Motion to Enforce Protective Order as described herein has not violated Rule 11(b).  In particular, Mr. Schwartz should be required to articulate (1) the basis for the statements identified above, (2) what inquiry he made to determine that they were well grounded, and (3) how he acted in good faith, and not for an improper purpose, in signing the document.

---

[8] As stated above, the States' Complaint, even in its redacted form, describes Heritage's conduct in detail in a section titled "Obstruction of Justice." Complaint at ¶¶ 1130-31.  The States filed the redacted Complaint on the public docket on May 10, 2019.  Despite that, Heritage waited two months before filing the instant Motion.

15

## IV.  CONCLUSION

For all the foregoing reasons, the States respectfully request that this Court deny Heritage's Motion to Enforce Protective Order.

> Respectfully submitted,
>
> PLAINTIFF
> STATE OF CONNECTICUT
> WILLIAM TONG
> ATTORNEY GENERAL
>
> BY:   /s/ W. Joseph Nielsen
> W. Joseph Nielsen
> Federal Bar No. ct20415
> Laura J. Martella
> Federal Bar No. ct27380
> Assistant Attorneys General
> 55 Elm Street
> P.O. Box 120
> Hartford, CT  06141-0120
> Tel: (860) 808-5040
> Fax: (860) 808-5391
> Joseph.Nielsen@ct.gov
>
> *Liaison Counsel for the Plaintiff States*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2019, I caused the foregoing document to be filed electronically with the Clerk of Court by using the CM/ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

/s/ W. Joseph Nielsen
W. Joseph Nielsen
Assistant Attorney General
