# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE KROGER CO., ALBERTSONS
COMPANIES, LLC, H.E. BUTT GROCERY
COMPANY L.P., AND SMITH DRUG
COMPANY,

           Plaintiffs,

vs.

ACTAVIS HOLDCO U.S., INC., ACTAVIS
PHARMA, INC., AKORN, INC., ALVOGEN INC.,
AMNEAL PHARMACEUTICALS, INC., APOTEX
CORP., AUROBINDO PHARMA USA, INC.,
BRECKENRIDGE PHARMACEUTICAL, INC.,
CAMBER PHARMACEUTICALS, INC., CITRON
PHARMA, LLC, DR. REDDY'S
LABORATORIES, INC., EMCURE
PHARMACEUTICALS, LTD., ENDO
INTERNATIONAL PLC, EPIC PHARMA, LLC,
FOUGERA PHARMACEUTICALS, INC., G&W
LABORATORIES, INC., GLENMARK
PHARMACEUTICALS INC., USA,
GREENSTONE LLC, HERITAGE
PHARMACEUTICALS, INC., HI-TECH
PHARMACAL CO., INC., IMPAX
LABORATORIES, INC., LANNETT COMPANY,
INC., LUPIN PHARMACEUTICALS, INC.,
MAYNE PHARMA USA INC., MALLINCKRODT
INC., MORTON GROVE PHARMACEUTICALS,
INC., MYLAN PHARMACEUTICALS, INC.,
MYLAN, INC., MYLAN N.V., PAR
PHARMACEUTICAL, INC., PERRIGO NEW
YORK, INC., PFIZER INC., PLIVA, INC.,
SANDOZ, INC., STRIDES PHARMA, INC., SUN
PHARMACEUTICAL INDUSTRIES, INC., TARO
PHARMACEUTICALS USA, INC., TELIGENT,
INC., TEVA PHARMACEUTICALS USA, INC.,
UDL LABORATORIES, INC., UPSHER-SMITH
LABORATORIES, LLC, WEST-WARD
PHARMACEUTICALS CORP., WOCKHARDT
USA LLC, VALEANT PHARMACEUTICALS

Civil Action No: 18-cv-284-CMR

JURY TRIAL DEMANDED

**REDACTED PUBLIC VERSION**

NORTH AMERICA, LLC, VALEANT
PHARMACEUTICALS INTERNATIONAL,
VERSAPHARM, INC., AND ZYDUS
PHARMACEUTICALS (USA) INC.

　　　　　Defendants.

## [PROPOSED] SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs The Kroger Co., Albertsons Companies, LLC, H.E. Butt Grocery Company L.P., and Smith Drug Company ("Plaintiffs"), file this Second Amended Complaint ("Complaint") under the antitrust laws of the United States against Defendants Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Akorn, Inc., Alvogen Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Aurobindo Pharma USA, Inc., Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories, Inc., Emcure Pharmaceuticals, Ltd., Endo International plc, Epic Pharma, LLC, Fougera Pharmaceuticals, Inc., G&W Laboratories, Inc., Glenmark Pharmaceuticals Inc., USA, Greenstone LLC, Heritage Pharmaceuticals, Inc., Hi-Tech Pharmacal Co., Inc., Impax Laboratories, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma USA Inc., Mallinckrodt Inc., Morton Grove Pharmaceuticals, Inc., Mylan Pharmaceuticals, Inc., Mylan, Inc., Mylan N.V., Par Pharmaceutical, Inc., Perrigo New York, Inc., Pfizer Inc., Pliva, Inc., Sandoz, Inc., Strides Pharma, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories, Inc., Upsher-Smith Laboratories, LLC, West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, Valeant Pharmaceuticals North America, LLC, Valeant Pharmaceuticals International, Versapharm, Inc., and Zydus Pharmaceuticals (USA) Inc., (collectively "Defendants"), and allege as follows:

I.    **INTRODUCTION**

1.      This is a civil antitrust action against Defendants and their co-conspirators for violating Section One of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix, increase, stabilize, or maintain prices of the specified generic pharmaceutical drugs.  As a result of this unlawful conspiracy, Plaintiffs seek damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, injunctive relief, and such other relief as provided by law.

2.      The existence of the conspiracy is supported by a number of facts alleged below, which should be read collectively.  Plaintiffs' allegations are based upon personal knowledge as well as upon information and belief as to all other matters.  Some of the information on which Plaintiffs rely is based upon information made public during ongoing government investigations of Defendants' cartel.

3.      The existence of the conspiracy alleged in this Complaint is supported by, among other facts, the fact that Heritage executives Jeffrey Glazer and Jason Malek have pled guilty to participating in a conspiracy to fix prices of Glyburide and Doxycycline between at least 2013 and 2015.   Additionally, Heritage and Co-conspirator Rising Pharma have entered into deferred prosecution agreements that involved admissions that they conspired to fix the prices of Glyburide and Benazepril HCTZ, respectively.  Heritage also resolved False Claims Act claims brought by the United States related to its price fixing of Hydralazine and Thephylline ER.  By operation of law, these guilty pleas and judicial admissions merely define the minimum parameters of the generic drug price fixing conspiracy.  Thus, the scope of the conspiracy actionable in this civil antitrust action may be (and as alleged in this Complaint is) broader than the judicial admissions

to date.  While these admissions establish that a conspiracy did exist, discovery is necessary to determine the full scope of the conspiracy in terms of products, time period, and participants.

4.     In a competitive marketplace, each generic drug manufacturer should price its drug competitively relative to other manufacturers.  Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.  But the market for generic drugs has not been characterized by such competition for many years.

5.     The Attorney General of Connecticut and the Attorneys' General of 48 additional jurisdictions (the "States") have exposed a marketplace in which generic drug manufacturers communicated with each other to determine and agree on the amount of market share each "competitor" would be allocated.  These shares were determined by the timing of each manufacturer's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

6.     The purpose of the unlawful "fair share" allocation was to fix, maintain and stabilize prices – either for a particular generic drug or any number of generic drugs.  In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug.  Manufacturers implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful.  This prevented prices from declining even when a new "competitor" joined the market.

7.     Additionally, in conjunction with their market allocation agreement, manufacturers also agreed to raise prices above competitive levels for certain drugs, and were able to maintain or

slow the decline of prices for other drugs that would have been lower absent their conspiratorial agreements.

8.      Currently, the States are pursing claims against 23 Defendants alleging collusion that distorted the prices of more than one hundred generic drugs.  The States' investigation is ongoing, and they have indicated that many other manufacturers and up to three hundred additional drugs are implicated in widespread anticompetitive conduct.

9.      Through this industry-wide market allocation agreement, Defendants were also able to implement substantial price increases on a number of additional generic drugs.  As detailed below, during the conspiracy, Defendants' price increases were almost always more than 100% and in some instances approached 5000%.  All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that are the subject of the pending state and federal enforcement actions.

10.      Indeed, the United States Department of Justice ("DOJ") has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the drugs that are not yet the subject of government enforcement actions were nonetheless subject to collusion.  Specifically, the DOJ informed the Court that "[e]vidence uncovered during the criminal investigation implicates other companies (including a significant number of the Defendants here) and individual employees in collusion with respect to ... a significant number of the [additional drugs]."  The DOJ further noted that the lack of complete overlap between its criminal investigation and the drugs that are not yet subject to enforcement actions should not be read as an indication that any of these drugs was not the subject of collusion by Defendants, explaining that: "[s]till more companies and individuals, and additional drugs, may be implicated as the investigation continues to develop."  Based on the substantial overlap between the

allegations in this Complaint and the DOJ's pending investigation, the DOJ has repeatedly sought to stay discovery by private litigants in MDL 2724.

11.     Moreover, for the drugs that are not yet the subject of pending enforcement actions, the collusive nature of Defendants' price increases on these drugs is supported by the facts from those enforcement actions that have been made publicly available.  Take Digoxin, for example. Digoxin is an essential heart medication that was widely used in the U.S. prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act.  Between 2010 and 2013, the price for Digoxin was remarkably stable, with one tablet costing as little as 12 cents.  Beginning in October 2013, however, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward successfully raised prices from 12 cents per tablet to more than a dollar per tablet, an increase of 750%.  We know for certain (from Glazer's and Malek's guilty pleas) that Heritage conspired to fix prices of Doxycycline, and the States' investigation confirms that Mylan and Mayne were the unidentified co-conspirators with which Malek and Glazer pled guilty to conspiring.  Additionally, the States' investigation further reflects that Mylan, Lannett, Par and Sun adhered to the generic drug industry's overarching market allocation agreement.  Accordingly, under the circumstances alleged here, the unprecedented 750% price increase on Digoxin is also shown to be the result of collusion.  (Or put differently, this enormous price increase was <u>not</u> the result of competitive and independent decision-making by documented conspirators participating in an industry rife with collusion).

12.     Further, each of the price increases that are the subject of this Complaint was against each Defendant's self-interest at the time in the absence of collusion.  This is because, among other reasons, based on fundamental economic theory and the nature of price competition in the generic drug industry, in the absence of collusion, each Defendant that raised prices would lose substantial market share to rivals that continued to price competitively.  This is particularly

so where, as here, the price increases were so stunningly large.  Thousands of generic drugs have been sold in the United States since the passage of the Hatch-Waxman Act in 1984.  Prior to approximately 2007, nearly all of the pricing behavior of generic drugs was consistent with economic theory, *i.e.*, when generic entry occurred, generic drug prices declined.  Not so for the 134 generic drugs that are the subject of this Complaint; their pricing pattern – considered alone or in comparison with Benazepil HCTZ, Doxycycline, and Glyburide – is so unusual and extraordinary as to demonstrate the existence of a conspiracy.  (Plaintiffs reserve the right to amend this Complaint to add allegations about other generic drugs subject to discovery or further proceedings in this case.)

13.    Still other economic evidence confirms the broader scope of the conspiracy alleged in this Complaint.  As alleged below, each of the generic drug price increases covered by this Complaint is not explained by changes in supply, the costs of production, or demand.  Indeed, there are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion.  Moreover, as alleged below, each Price-Fixed Generic Drug has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated.  These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization.

14.    The existence of a broader generic drug price fixing conspiracy is further revealed or supported by other activities of U.S. law enforcement.  The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint.  To empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.  Upon information and belief, nearly all of the Defendants

identified in this Complaint were served with grand jury subpoenas. (The following companies (some of whom are not yet Defendants in this MDL) have publicly acknowledged receiving the grand jury subpoenas: Aceto (which purchased Citron), Actavis, Aurobindo, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus. Privately-held companies are under no obligation to make this disclosure.) The DOJ also executed search warrants at the corporate offices of Perrigo, Mylan, and Aceto (which purchased Citron in 2016). For this to occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and ACETO. Finally, upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in this case. (This company has not yet publicly acknowledged its amnesty status.) Under the DOJ Guidelines, for DOJ to grant a company conditional amnesty, the amnesty applicant had to confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant.

15.    As noted above, the States' and DOJ's investigations are ongoing and likely involve additional conspirators and additional drugs beyond those named in this Complaint. For example, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U. S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone.

16.    In addition to the information made public from these government investigations, the allegations in this Complaint are further supported by the fact that Defendants engaged in an extremely high level of interfirm communications. These communications included a large number of in-person meetings facilitated by an almost constant stream of industry trade events,

8

such as the trade association meetings sponsored by the Generic Pharmaceutical Association.  In addition to these in-person meetings, Defendants frequently communicated by telephone, e-mail, and text message.  As demonstrated in this Complaint, these interfirm communications involved high-level executives with pricing authority and directly affected Defendants' pricing decisions on the generic drugs identified in this Complaint.

17.     Considered collectively – (1) the guilty pleas and judicial admissions; (2) the States' civil enforcement action and allegations; (3) the unprecedented price increases with respect to the generic drugs covered in this Complaint (particularly given the economic and market conditions in the generic drug industry); (4) the absence of any reasonable economic or market explanation for these price increases other than collusion; (5) the correlation between the unprecedented and indisputably collusive pricing on Glyburide, Doxycycline, Hydralazine, Benazepril HCTZ, and Theophylline ER and the other generic drugs covered in this Complaint; (6) the economic and structural factors rendering the market for the manufacture and sale of generic drugs conducive to cartelization; (7) the extremely high level of interfirm communications by senior executives with pricing authority that occurred in-person through trade association meetings as well as by telephone, e-mail, and text message; and (8) the other U.S. law enforcement activities, including the search warrants and criminal subpoenas – all support the existence of the conspiracy alleged in this Complaint.

18.     Defendants and their co-conspirators carried out their continuing conspiracy regarding generic drugs through in-person meetings and communications, including e-mails, text messages, and telephone calls.  During these meetings and communications, they conspired  on the terms alleged in this Complaint, and coordinated price increase announcements or pricing terms, allocated markets and customers, rigged bids, secretly and collusively exchanged pricing

information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of generic drugs sold to Plaintiffs and others in the United States.

19.     Upon information and belief, a single group of core conspirators consisting of Actavis, Heritage, Mylan, Par, Sun/Taro, Teva, and the Sandoz Defendants (collectively the "Core Conspirators") engaged in the conduct alleged in this Complaint and directed the implementation of an overarching conspiracy.  Each of the Price-Fixed Generics alleged in this Complaint were manufactured by at least one of the Core Conspirators.   All other Defendants named in this Complaint joined the Core Conspirators and were active participants in the overarching conspiracy.  In some cases, some Defendants only manufactured one or two of the Price-Fixed Generics, but their participation in the overarching conspiracy was necessary to raise the price of the Price Fixed Generic Drugs that they manufactured because it would have been in their independent interests not to follow the price increases of the other conspirators and thereby increase their market share.  The existence of the overarching conspiracy permitted the Core Conspirators to induce all other Defendants to participate as necessary to increase prices on each of the Price Fixed Generic Drugs to fully implement and maintain the overarching conspiracy.

20.     The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.  Count I alleges an overarching conspiracy among all Defendants regarding all of the Price-Fixed Generic Drugs in violation of Section 1 of the Sherman Act and Count II, which is pled in the alternative to Count I, alleges an overarching conspiracy involving only those drugs identified in the States' Complaint in Case No. 19-cv-2407-CMR (E.D. Pa.).  Counts III through CXXXVI allege individual-drug conspiracies among the specified Defendants regarding each individual Price-Fixed Generic Drug in violation of Section 1 of the Sherman Act.

## II.   DRUGS INVOLVED IN THE CONSPIRACY

21.     As it is used in this Complaint, the term "Price-Fixed Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations (if none are specified) of the following generic drugs.

| | | |
|---|---|---|
| Acetazolamide | Drospirenone and ethinyl estradiol (Ocella) | Methylphenidate |
| Adapalene Gel | Econazole | Methylprednisolone |
| Albuterol | Enalapril Maleate Tablets | Moexipril HCL Tablets |
| Amiloride HCL/HCTZ Tablets | Entecavir | Moexipril HCL/HCTZ Tablets |
| Amitriptyline | Epitol Tablets | Nabumetone Tablets |
| Amoxicillin/Clavulanate Chewable Tablets | Estazolam Tablets | Nadolol Tablets |
| Amphetamine/Dextroamphetamine (aka Mixed Amphetamine Salts) | Estradiol Tablets | Niacin ER Tablets |
| Azithromycin | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) | Nimodipine |
| Baclofen | Ethosuximide | Nitrofurantoin MAC Capsules |
| Benazepril HCTZ | Etodolac | Norethindrone Acetate |
| Bethanechol Chloride Tablets | Fenofibrate | Norethindrone/ethinyl estradiol (Balziva) |
| Budesonide DR Capsules | Fluconazole Tablets | Nortriptyline HCL Capsules |
| Budesonide Inhalation | Fluocinonide | Nystatin |
| Bumetanide Tablets | Fluoxetine HCL Tablets | Omega-3-Acid Ethyl Esters |
| Buspirone Hydrochloride Tablets | Flurbiprofen Tablets | Ondansetron |
| Cabergoline | Flutamide Capsules | Oxaprozin Tablets |
| Capecitabine | Fluvastatin Sodium Capsules | Oxybutynin Chloride Tablets |
| Carbamazepine | Fosinopril HCTZ | Oxycodone/Acetaminophen |
| Cefdinir | Gabapentin Tablets | Paricalcitol |
| Cefprozil Tablets | Glimepiride Tablets | Paromomycin |
| Celecoxib | Glipizide | Penicillin VK Tablets |
| Cephalexin Suspension | Glyburide | Pentoxifylline Tablets |
| Cimetidine Tablets | Glyburide-Metformin | Piroxicam |
| Ciprofloxacin HCL Tablets | Griseofulvin Suspension | Potassium Chloride |
| Clarithromycin ER Tablets | Haloperidol | Pravastatin |
| Clemastine Fumarate Tablets | Hydralazine | Prazosin HCL Capsules |
| Clobetasol | Hydroxyurea Capsules | Prochlorperazine Tablets |

| Clomipramine | Hydroxyzine Pamoate Capsules | Propranolol |
|---|---|---|
| Clonidine TTS Patch | Irbesartan | Raloxifene HCL Tablets |
| Clotrimazole Topical Solution | Isoniazid | Ranitidine HCL Tablets |
| Cyproheptadine HCL Tablets | Ketoconazole | Tamoxifen Citrate Tablets |
| Desmopressin Acetate Tablets | Ketoprofen Capsules | Temozolomide |
| Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Ketorolac Tromethamine Tablets | Theophylline ER |
| Desonide | Labetalol HCL Tablets | Tizanidine |
| Dexmethylphenidate HCL ER Capsules | Lamivudine/Zidovudine (generic Combivir) | Tobramycin |
| Dextroamphetamine Sulfate ER | Leflunomide | Tolmetin Sodium Capsules |
| Diclofenac Potassium Tablets | Levothyroxine | Tolterodine |
| Dicloxacillin Sodium Capsules | Lidocaine-Prilocaine | Topiramate Sprinkle Capsules |
| Diflunisal Tablets | Loperamide HCL Capsules | Trifluoperazine HCL |
| Digoxin | Medroxyprogesterone Tablets | Ursodiol |
| Diltiazem HCL Tablets | Meprobamate | Valsartan HCTZ |
| Disopyramide Phosphate Capsules | Methotrexate Tablets | Verapamil |
| Divalproex ER | Metronidazole | Warfarin Sodium Tablets |
| Doxazosin Mesylate Tablets | Mimvey (Estradiol/Norethindrone Acetate) Tablets | Zoledronic Acid |
| Doxycycline | Metformin ER | |

## III.   **VENUE AND JURISDICTION**

22.    This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

23.    This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 & 1337.

24.    Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below:

(a)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of generic drugs to one or more Plaintiffs and others at supracompetitive prices;

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

25.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District.  Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this

District including, without limitation, selling one or more generic drugs to one or more Plaintiffs and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the Commonwealth in which this Federal Court sits because, as alleged in this Complaint, each Defendant has transacted business in the Commonwealth, each Defendant has contracted to supply services or things in this Commonwealth, each Defendant has caused harm by acts taken within this Commonwealth, each Defendant has caused harm in this Commonwealth by acts or omissions outside this Commonwealth, each Defendant has committed violations of 15 U.S.C. § 1 within this Commonwealth, and because the Commonwealth's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the Commonwealth to satisfy due process; and/or

(e)     This Court has personal jurisdiction over Defendants because, as alleged in this Complaint, they and one or more of their co-conspirators contracted to supply services or goods, including generic drugs, in the Commonwealth where this Federal Court sits; money flowed from Plaintiffs or other purchasers in the Commonwealth to pay Defendants and their co-conspirators for generic drugs; Defendants and one or more of their co-conspirators transact business in the Commonwealth in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Complaint to be done, or consequences to occur, in the Commonwealth; Defendants and their co-conspirators engaged in unlawful conduct described in this Complaint outside of the Commonwealth causing injury to one or more Plaintiffs in the Commonwealth, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this Commonwealth or the Constitution of the United States.

(f)     Based on the allegations in this Complaint, Defendants are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum Commonwealth) and have purposefully availed themselves of the laws of the United States.  As alleged in this Complaint, each Defendant, either directly, or indirectly through their subsidiaries, engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum Commonwealth and the United States.

## IV.   PARTIES

### A.   Plaintiffs

26.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and as the assignee of Cardinal Health, Inc. ("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Kroger and has assigned or agreed to assign its claims arising out of those purchases to Kroger.  Kroger owns and operates retail stores and pharmacies that sell generic drugs.  During the time period relevant to Plaintiffs' claims, Kroger and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

27.     Plaintiff Albertsons Companies, LLC, is a Delaware limited liability company with its principal place of business in Boise, Idaho.  Albertsons Companies, LLC is wholly owned by AB Acquisition LLC (a Delaware limited liability company) and is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. (collectively "Albertsons").  Albertsons Companies, LLC, brings this action on its own behalf and as the assignee of Cardinal Health, Inc.

("Cardinal"), a pharmaceutical wholesaler that, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants for resale to Albertsons and has assigned or agreed to assign its claims arising out of those purchases to Albertsons.  Albertsons also brings this action based on an internal assignment from Safeway Inc.  Albertsons owns and operates retail stores and pharmacies that sell generic drugs.  During the relevant period, Albertsons and/or its assignor directly purchased each of the Price-Fixed Generic Drugs in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

28.     Plaintiff H.E. Butt Grocery Company ("HEB") is a Texas limited partnership with its principal place of business in San Antonio, Texas.  HEB brings this action on its own behalf and, during the relevant period, purchased Price-Fixed Generic Drugs directly from Defendants and/or their co-conspirators and sustained injury and damage to its business or property as a proximate result of the antitrust violations alleged in this Complaint.  HEB owns and operates retail stores and pharmacies that sell generic drugs.

29.     Plaintiff Smith Drug Company ("Smith"), is a South Carolina company with its principal place of business in Spartanburg, South Carolina.  Smith is a drug wholesaler with distribution centers in Spartanburg, South Carolina, Paragould, Arkansas, Valdosta, Georgia, Milton, Vermont, and Carey, Ohio.  During the relevant period, Smith purchased Price-Fixed Generic Drugs directly from Defendants and/or their co-conspirators and sustained injury and damage to its business or property as a proximate result of the antitrust violations alleged in this Complaint.

B. **Defendants**

30.     Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Watson Pharmaceuticals, Inc., ("Watson") acquired Actavis in or about October 2012.  The two companies operated as a single entity, albeit under separate names, until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name.  March 2015, Actavis, plc, the parent company of Defendant Actavis, merged with Allergan, plc ("Allergan") and adopted Allergan's name.  In August 2016, Defendant Teva USA purchased Actavis' generics business, which included Actavis Inc., Actavis Elizabeth Inc. and Defendant Actavis Pharma Inc., from Allergan, plc.  All the assets of the entities were then transferred to the newly formed Actavis Holdco.  The acquisition cost Teva USA $33.43 billion in cash and approximately 100 million shares of Teva securities.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

31.     Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  During the time period relevant to Plaintiffs' claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Actavis Holdco (and its

predecessors, including Watson) and Actavis Pharma are collectively defined as "Actavis." Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

32.     Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business located in Lake Forest, Illinois.  Akorn is the parent company of Defendant Hi-Tech (defined below).  Akorn is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Akorn directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

33.     Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business in Pine Brook, New Jersey.  Robert Wessman, the former CEO of Actavis, stepped down from that position in order to found Alvogen in 2009.  Alvogen is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Alvogen directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

34.     Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Apotex directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or

through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

35.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with its principal place of business located in Bridgewater, New Jersey.  Amneal is defined to include its managers, officers, employees, and agents acting on its behalf.  At all times relevant to the Complaint, Amneal produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

36.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business located in Dayton, New Jersey.  Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Aurobindo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

37.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business located in Fairfield, New Jersey.  Breckenridge is wholly-owned by Pensa Pharma S.A.  Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Breckenridge directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

38.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey.  Camber is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Camber directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

39.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business located in East Brunswick, New Jersey.  Citron is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Citron directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

40.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business located in Princeton, New Jersey.  Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company. Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

41.     Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is an Indian company with its principal place of business located in Pune, India.  In April 2011, Emcure acquired Defendant Heritage (defined below).   Heritage, as a subsidiary of Emcure, conducts Emcure's U.S. commercial operations.  Emcure is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Emcure directly participated in the conspiracy alleged in this Complaint; produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories both directly and through its wholly owned subsidiaries, directly and/or through its subsidiaries sold Price-Fixed generic drugs to Plaintiffs and others in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  In addition, during the time period relevant to this Complaint, Defendant Emcure purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

42.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York.  Epic is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Epic directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

43.     Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  In 2012, Novartis International AG acquired Fougera.  Fougera is defined to include its managers, officers, employees, and agents

21

acting on its behalf.  During the time period relevant to Plaintiffs' claims, Fougera directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  The term "Sandoz Defendants" refers to Fougera and Sandoz, collectively.

44.     Defendant G&W Laboratories, Inc. is a New Jersey Corporation with its principal place of business in South Plainfield, New Jersey.  G&W is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, G&W directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

45.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey.  Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

46.     Defendant Greenstone LLC ("Greenstone") is a Delaware limited liability company with its principal place of business in North Peapack, New Jersey.  Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer.

Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President.  Greenstone employees also use Pftzer for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable.  At all times relevant to the Complaint, Greenstone has – under the direction and control of Pfizer – marketed and sold generic pharmaceuticals in this District and throughout the United States.  Greenstone and Pfizer are defined to include their managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Greenstone and Pfizer directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, received the proceeds of their unlawful in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

47.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey.  In April 2011, Emcure acquired Heritage.  Heritage is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Heritage directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

48.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business located in Amityville, New York.  Hi-Tech is a wholly-owned subsidiary of Defendant Akorn, which purchased Hi-Tech in April 2014, for $640 million.  Hi-Tech is defined to include its managers, officers, employees, and agents acting on its behalf.

During the time period relevant to Plaintiffs' claims, Hi-Tech directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

49.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania. Defendant Impax is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Impax directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

50.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  Defendant Lannett is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lannett directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

51.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business located in Baltimore, Maryland.  Lupin is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Lupin directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories,

and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

52.     Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business located in Paramus, New Jersey.  Mayne is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Mayne directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

53.     Defendant Mallinckrodt Inc. ("Mallinckrodt") is a Delaware corporation with its principal place of business in Webster Groves, Missouri. Mallinckrodt is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Mallinckrodt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

54.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois.  Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove.  Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Morton Grove directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout

the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

55.     Defendant Mylan N.V. is Dutch corporation with its principal place of business and global headquarters in Canonsburg, Pennsylvania.  Mylan N.V. is the direct parent corporation of Defendant Mylan Inc. and the ultimate parent and owner of Defendants Mylan Pharma and UDL (both defined below).  During the time period relevant to Plaintiffs' claims, Mylan N.V. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

56.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. is the parent company of Defendant UDL (defined below) and Defendant Mylan Pharma (defined below).  Mylan Inc. is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

57.     Defendant Mylan Pharmaceuticals, Inc., ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  Mylan Pharma is a subsidiary of Defendant Mylan Inc.  Mylan Pharma is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Mylan Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold

one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. Mylan N.V., Mylan Inc., Mylan Pharma, and UDL (defined below) are collectively defined as "Mylan."

58.     Defendant Par Pharmaceutical, Inc. ("Par Pharma") is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Defendant Par Pharma is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Par Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

59.     Defendant Endo International plc ("Endo") is an Irish company with its principal place of business in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania. Endo is the ultimate parent and owner of Par. Unless addressed individually, Par and Endo are collectively referred to herein as "Par." At all times relevant to the Complaint, Endo has marketed and sold generic pharmaceuticals in this District and throughout the United States participated in the conspiracy alleged in this Complaint, either on its own or through its owned and controlled subsidiaries/affiliates, and knowingly received proceeds of the unlawful conduct. In addition, during the time period relevant to this Complaint, Defendant Endo purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

60.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Allegan, Michigan. Perrigo is a subsidiary of Perrigo Company, plc,

an Irish company. Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

61. Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. Pliva is a wholly-owned subsidiary of Defendant Teva (defined below). Pliva is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims Pliva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

62. Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Co-conspirator Sun Pharmaceutical Industries Ltd., ("Sun Ltd."), based in Mumbai, India, along with certain of its wholly-owned subsidiaries, owns 100% of Sun. Sun Ltd. also owns approximately 70% of Defendant Taro (defined below) and Taro's parent, Taro Pharmaceutical Industries, Ltd. In late 2012, Sun acquired URL Pharma, Inc., which is a wholly-owned subsidiary of co-conspirator Mutual Pharmaceutical Company, Inc. ("Mutual"). Mutual is a wholly-owned subsidiary of Sun. Sun is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiffs' claims Sun directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-

Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

63.     Defendant Sandoz, Inc. ("Sandoz USA") is a Colorado corporation with its principal place of business located in Princeton, New Jersey.  Sandoz USA distributes the drugs that its parent, Sandoz Germany, develops and manufacturers.  Sandoz USA and Sandoz Germany are both owned by Novartis International AG. Defendant Sandoz USA is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Sandoz USA directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.  Sandoz USA is hereinafter referred to as "Sandoz."

64.     Defendant Strides Pharma, Inc. ("Strides") is a New Jersey corporation withs its principule place of business in East Brunswick, New Jersey.  Strides is the U.S. subsidiary and sales agent of Strides Pharma Science Limited, an Indian pharmaceutical conglomerate.  Strides is defeined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Strides directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

65.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli corporation.  Taro is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs'

claims, Taro directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

66.     Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business located in Buena, New Jersey.  Teligent is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims Teligent directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

67.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation.  Teva is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims: Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

68.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois.  UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc.  UDL is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, UDL directly

participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

69.     Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business located in Maple Grove, Minnesota.  During the time period relevant to Plaintiffs' claims, Upsher-Smith manufactured generic Baclofen and Propranolol.  Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Upsher-Smith directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

70.     Defendant Valeant Pharmacueticals International ("Valeant International") is a Canadian company with its principal place of business in Bridgewater, New Jersey.  Valeant International was a California company until September 2010, when it merged with Biovail Corporation, a Canadian company.  Defendant Valeant Pharmaceuticals North America, LLC ("Valeant North America") is a Delaware corportation with its principal place of business in Bridgewater, New Jersey.  It is a wholly-owned subsidiary of Valeant International.  Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California.  Oceanside is a wholly-owned subsidiary of Valeant.  In this Complaint, Valeant International, Valeant North America, and Oceanside are referred together as "Valeant."  Valeant is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Valeant directly participated in

the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

71.     Defendant Versapharm, Inc. ("Versapharm") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Marietta, Georgia.  Versapharm is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Versapharm directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

72.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey.  West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

73.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wockhardt is a wholly-owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc.  Wockhardt is defined to include its managers, officers, and employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Wockhardt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either

on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

74.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business located in Pennington, New Jersey.  Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiffs' claims, Zydus directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

### C.     Co-Conspirators and Agents

75.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

76.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs reserve the right to amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

77.     At all relevant times, other persons, firms, and corporations, referred to in this Complaint as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

78.     The acts alleged in this Complaint that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly

authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

79.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.     **TRADE AND COMMERCE**

80.     During the time period relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic drugs;

(b)     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)     Defendants and their co-conspirators imported substantial quantities of raw materials for generic drugs from outside the United States.

81.     The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VI.    **GENERIC DRUGS, THE FDCA AND THE HATCH-WAXMAN AMENDMENTS**

82.     The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can (and do) exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person both pays for and chooses the product, the price of the product plays an appropriate role in the person's choice and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

83.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including each of the Price-Fixed Generics Drugs, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

84.     Brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturers' products.  These sales representatives do not advise doctors of the cost of the branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive

to price differences because they do not have to pay for the products. The result is a marketplace in which the price plays a comparatively unimportant role in product selection.

85.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.

86.     Due to this disconnect, retailers like Plaintiffs play an important role in driving down prescription drug costs in the United States. The most important tool that retailers like Plaintiffs have at their disposal is the availability of generic drug manufacturers operating in a competitive marketplace. As explained below, when drug manufacturers begin selling generic bio-equivalent alternatives to branded prescription drugs that have previously been subject to a patent, retailers are able to drive the prices paid for those drugs down substantially.

87.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain Food and Drug Administration ("FDA") approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b). The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the

brand manufacturer's original NDA by showing that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug – that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

88.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

89.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

90.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

91.     Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiator and the basis for competition among manufacturers. Over time, generics' pricing nears the generic manufacturers' marginal costs.

92.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug.  Generic competition to a single blockbuster brand drug (*i.e.*, a drug that generates annual sales of $1 billion or more) can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.  Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[1]

93.     Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name

---

[1]     GPhA, Generic Drug Savings in the U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

counterpart.  Since passage of the Hatch-Waxman Amendments, every State has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing  "dispense as written" or similar language on the prescription).

94.     There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain.  Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and patients also benefit from the lower prices that result from generic competition.

95.     Further, the more generic manufacturers that enter a market, the more the price for the drug decreases.  As an FDA study reflects, "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction," as average prices fall to roughly half the price of the branded drug.  Further, with the entry of each additional generic manufacturer up to the ninth manufacturer, the price continues to fall.  In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version.  This phenomenon is demonstrated in the following chart prepared by the FDA:



**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

96.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.[2]

## VII.    THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS

97.     As noted above, Defendants' conduct regarding generic drugs is under investigation by the DOJ, State Attorneys General, the United States Congress and others.

### A.    The DOJ is Leading a Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers

98.     No later than November 3, 2014, as noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas to several generic drug manufacturers, including nearly all Defendants and/or their affiliates.

99.     A source at the Policy and Regulatory Report says "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever.  Like in that case, prosecutors expect to move from one drug to another in a similar cascading fashion."[3]

---

[2]     At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.

[3]     *See* Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FIERCE PHARMA (July 10, 2015), http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations.

100.     According to BLOOMBERG NEWS, the investigation encompasses more than a dozen companies and at least two dozen generic drugs.  The source quoted by the BLOOMBERG article correctly predicted in November 2016 that the DOJ would file criminal charges against at least one member of the generic drug price-fixing conspiracy by the end of 2016.[4]

101.     Sure enough, on December 12, 2016, DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage).  Both Glazer and Malek have since pled guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for Glyburide and Doxycycline.  The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act.  Sentencing for both Glazer and Malek was originally set for April 2017, but both sentencings have been repeatedly rescheduled as Glazer and Malek continue to cooperate with the DOJ.  As alleged above, by operation of law, these guilty pleas merely define the minimum parameters of the conspiracy alleged in this Complaint.

102.     Following the plea agreements of Malek and Glazer, the DOJ has obtained and executed search warrants against at least Aceto Corporation (which purchased Citron's generic drugs business in December 2016), Perrigo, and Mylan in connection with the generic drug price fixing probe.  Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was probable that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

---

[4]     *See* D. McLaughlin & C. Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG NEWS (Nov. 3, 2016,), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

103.    In addition to the raid of Perrigo's, Mylan's, and Aceto's corporate offices, the grand jury empaneled by DOJ as part of its investigation has issued subpoenas to numerous Defendants and/or their employees.   The following companies have publicly acknowledged receiving grand jury subpoenas:  Aceto,  Actavis,  Aurobindo,  Citron,  Dr.  Reddy's, Greenstone/Pfizer, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, co-conspirator Rising, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus.  Upon information and belief, additional companies have also received subpoenas but have not publicly acknowledged this fact.

104.    The fact that most Defendants and/or their employees received criminal subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, *available at* https://www.justice.gov/atr/division-manual.  Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82.  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.  *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."  *Id*. at III-83.  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which Price-Fixed sales were made or where conspiratorial communications occurred." *Id*.  Thus, the fact that one or more of the Defendants and certain of their employees received

federal grand jury subpoenas is an indication that antitrust offenses have occurred involving these companies.

105.     Additionally, public sources have reported that at least one Defendant or co-conspirator has applied for conditional amnesty under ACPERA.  That a target has applied for leniency is significant.  As the DOJ notes on its web site (https://www.justice.gov/atr/page/file/926521/download):

> 5.     Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?
>
> Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.
>
> The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.[5]

*Id.*

106.     The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical Propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's

---

[5]          https://www.justice.gov/atr/page/file/926521/download.

ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed.'' The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that: "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug - overlap significantly with aspects of the ongoing criminal investigation.'' As noted above, the DOJ also filed a motion to stay discovery in MDL 2724, stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxy Hyclate, Glyburide, and other drugs (including a significant number of the drugs at issue here)."[6] DOJ has continued to maintain that a Stay of certain discovery is necessary to protect its investigation even after the judicial admissions by Heritage and Rising.

107. Some of the companies that have received subpoenas have confirmed that the inquiry extends to other drugs. For example, Mayne disclosed that the criminal investigation into its conduct "is focused on [Doxy DR] and potassium chloride powders," and Impax disclosed that the DOJ subpoena sought focused on specific drugs including digoxin and lidocaine/prilocaine.

108. The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[7]

---

[6]    *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.,* MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[7]    DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

B.     **At Least 49 State Attorneys General are Also Investigating the Anticompetitive Conduct in the Generic Drug Industry**

109.     In addition to the DOJ's criminal enforcement action, at least 49 States' Attorneys General, led by the State of Connecticut, have also filed several civil enforcement actions based on their investigation to date into generic drug pricing.  To date, the States have identified as co-conspirators 25 corporate generic drug manufacturers that conspired to fix prices of more than 130 different generic drugs.[8]

110.     In essence, the States allege that market for more than 130 generic drugs (along with many other drugs not included in their Complaints) was cartelized based on an agreement or understanding between or among Defendants and their co-conspirators to refrain from competing with each other on the pricing and sale of the generic drugs in the United States.  This agreement or understanding that the Defendants and their co-conspirators adhered to provides that each generic manufacturer "is entitled to its [predetermined share] of the market, whether the market is a particular drug, or a number of generic drugs.  [The predetermined share] is an approximation of how much market share each competitor is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry....  The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price."  In other words, generic drug manufacturers followed an express agreement to apply a negotiated formula that allocated the market share for the manufacturers of numerous generic drugs.

---

[8]     Those companies are Actavis, Ascend, Apotex, Amneal, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Emcure, Glenmark, Greenstone, Heritage, Lannett, Lupin, Mayne, Mylan, Par, Pfizer, Sandoz, Sun, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

111.    The States establish that this formula was developed and agreed to as the result of "an almost constant ability for Defendants to meet in person and discuss their business plans."  For example, anticompetitive agreements are reached at:

> [o]rganized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.   Of particular importance here, generic drug manufacturer representatives who attend these functions ... use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively sensitive information.

> These trade shows and customer conferences provide generic drug manufacturers, including but not limited to [the identified Defendants], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

112.    In furtherance of the conspiracy, the States allege that Defendants would frequently rig bids by increasing pricing to existing customers in order to allow another conspirator to win the business of that customer and obtain the market share to which it was entitled by the conspiracy's formula.  This process of purposefully abandoning existing customers would occur most frequently when a new conspirator enters the market for a generic drug.   Whereas fundamental economic principles dictate that the price of the drug should decrease as the number of suppliers of that drug increases, the opposite typically occurred as a direct result of the conspiracy, because the existing competitors would walk away from their customers in order to allow the new entrant a portion of the market.

113.    These market allocation and price-fixing agreements were often negotiated across more than one generic drug.  In order to maintain supracompetitive prices, "customers in one drug market might be traded for customers in another drug market....  Alternatively, competitors might

allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs."

114.    For example, Rajiv Malik of Mylan, N.V., spoke with Jeffrey Glazer of Heritage, and Malik agreed that Mylan would walk away from two large accounts for Doxycycline DR so that Heritage could win this business.  Malik noted that Mylan's consideration for abandoning this business had been provided previously, when Heritage intentionally forfeited accounts to Mylan on a different drug.  During this exchange, as with all collusive communications involving Mylan alleged in this Complaint, the senior executive from Mylan (in this case Mr. Malik) acted on behalf of and reached an agreement that bound all of the Mylan entities identified in this Complaint.

115.    By adhering to the common understanding regarding the market share that each conspirator was entitled to, the Defendants also facilitated substantial price increases.  "As long as everyone in the 'sandbox' is playing fair, and the manufacturers believe that they have their [predetermined market share], the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as 'punishing' a competitor for raising prices – which is against the rules."

116.    These allegations – and numerous others – from the States' investigation are supported by direct evidence from at least six cooperating witnesses.  The expected testimony from these cooperating witnesses will directly support and corroborate the allegations throughout this Complaint. Some of those cooperating witnesses include:

117.    A former pricing executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

118.    A former sales and marketing executive at Rising Pharmaceuticals, Inc. ("Rising") and Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

119.    A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

120.    A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

121.    A former senior executive at Defendant Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

122.    Jason Malek ("Malek"), the former Vice President of Commercial Operations at Defendant Heritage who pled guilty to his role in the price-fixing Glyburide and Doxycycline.

## VIII.    CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES

123.    In addition to the investigations by the DOJ and the States, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.

124.    In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs that had experienced extraordinary price increases.[9]   In November 2014, Senator Sanders conducted a hearing entitled "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").   Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[10]

---

[9]     Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[10]     Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

125.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[11]

126.     In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[12]   The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[13]   And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[14]

## IX.     THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS

127.     The collusion alleged in this Complaint infected the generic drug industry, and at a minimum it contaminated the pricing and sale of the Price-Fixed Generic Drugs in this case.

---

[11]     HHS OIG, Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[12]     GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/products/GAO-16-706.

[13]     GAO Report, at 23-25.

[14]     *Id.* at 1 & Appendix III.

128.    As Connecticut's Attorney General George C. Jepsen commented, there is "a culture of cronyism [in the generic drugs industry] where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation."[15]

129.    As alleged in this Complaint, these numerous competitor contacts resulted in express agreements between Defendants and their co-conspirators to fix prices, allocate markets, and rig bids on the pricing and sale of generic drugs sold in the United States to Plaintiffs and others, including the Price-Fixed Generics.  In other words, the Defendants got together and exchanged assurances of common action and also adopted a common plan to cartelize the pricing and sale of the Price-Fixed Generic Drugs.

### A.    Defendants Used Trade Association Meetings to Facilitate Their Collusion

130.    As the civil and criminal enforcement actions indicate, Defendants were members of numerous trade associations and used the meetings of those associations to facilitate their collusion.  The frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States.

131.    Upon information and belief, Defendants' anticompetitive conduct was a result of an agreement (or series of agreements) to fix, maintain, and stabilize prices, rig bids, and allocate customers for the sale of the Price-Fixed Generic Drugs.  The agreement (or series of agreements) was furthered by discussions held at industry meetings and events hosted by various trade associations, including GPhA, HDMA, ECRM, and MMCAP (all defined below) as well as other meetings and communications.

---

[15]     K. Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, NY TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?mcubz=3.

132.     In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other acts:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with coconspirators to discuss the sale and pricing of Price-Fixed Generic Drugs in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Price-Fixed Generic Drugs sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling Price-Fixed Generic Drugs in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Price-Fixed Generic Drugs sold in the United States at collusive and noncompetitive prices.

133.     To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through: (1)

trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

134.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

135.    The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.  The States have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."[16]

136.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation

---

[16]    http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

concerning Price-Fixed Generic Drugs, including but not limited to GPhA and HDMA.   In addition, Defendants regularly attended industry events hosted by the MMCAP.[17]

137.    The GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The trade association was the result of a 2000 merger between the GPhA and two rival trade associations (the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance). According to GPhA's website, its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."  The GPhA's website touts the "business networking opportunities" and the "peer-to-peer connections" as the primary reasons to join the trade association.  *See* http://www.gphaonline.org/about/ membership.  GPhA members during the relevant time period have included Defendants Actavis, Amneal, Apotex, Aurobindo, Cadista, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus.

138.    Throughout the period relevant to Plaintiffs' claims, the GPhA held three conferences each year.  The GPhA's Fall Technical Conference was held each year in late October in Bethesda, Maryland.  The GPhA's Annual Meeting was held each year in mid-February in Orlando, Florida.  The GPhA's CMC Workshop was held each year in early June in Bethesda, Maryland.  Exhibit 1 lists GPhA meetings attended by Defendants.

139.    Upon information and belief, each of the conspiratorial price increases alleged in this Complaint was discussed, at least in part, at the GPhA's three annual meetings (including the

---

[17]       Exhibit 1 to the Complaint contains a chart which details all known trade association meetings, conferences, and/or events attended by Defendants from 2010-2016.  The latter half of Exhibit 1 lists the names of individual attendees at each meeting.

numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners).  In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the Price-Fixed Generic Drugs.  Indeed, the States allege that the GPhA meetings and other events "provide generic drug manufacturers ... with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

140.    Moreover, several of Defendants' high-ranking corporate officers served on GPhA's Board of Directors, which gave Defendants an opportunity to communicate with each other.  Listed below are the individuals and their companies.

| Defendants' Membership in GPhA Board of Directors 2012-2016 | |
| --- | --- |
| Actavis | 2012-2013 (Charles Mayr) <br> 2015 (Bob Stewart) |
| Apotex | 2012-2016 (Jeff Watson) |
| Amneal | 2012-2013 (Chriag Patel) |
| Aurobindo | 2016 (Robert Cunard) |
| Dr. Reddy's | 2016 (Alok Sonig) |
| Heritage | 2012-2015 (Jeffrey Glazer) |
| Impax | 2012-2014 (Carole Ben-Maimon) <br> 2015-2016 (Marcy Macdonald) |
| Lupin | 2014-2016 (Paul McGarty) |
| Mylan | 2012-2014 (Tony Mauro) <br> 2015 (Marcie McClintic Coates) <br> 2016 (Heather Bresch) |
| Par | 2015-2016 (Tony Pera) |
| Perrigo | 2013-2015 (Doug Boothe) <br> 2016 (Richard Stec) |
| Sandoz | 2012-2013 (Don DeGolyer) <br> 2014-2016 (Peter Goldschmidt) |
| Sun | 2015-2016 (Jim Kedrowski) |
| Teva | 2012-2013 (Debra Barrett) <br> 2014 (Allan Oberman) <br> 2015-2016 (Debra Barrett) |
| West-Ward | 2016 (Michael Raya) |
| Zydus | 2012-2016 (Joseph Renner) |

141.    In addition to the GPhA meetings, other industry events provided Defendants with opportunities to collude, and Defendants did in fact use these opportunities to discuss their unlawful agreements.

142.    The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.   HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.   HDMA members, during the relevant time period, have included Defendants Apotex, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, Zydus.  Exhibit 1 lists HDMA meetings attended by Defendants.

143.    Other events at which Defendants may have conspired included meetings held by the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) and the Efficient Collaborative Retail Marketing (ECRM).

144.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.   MMCAP has been delivering pharmacy and healthcare value to members since 1985.   MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

145.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture

program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program....  In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy ... and currently provide healthcare-related contracting to state and local government members located across the United States of America.  Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually.

146.    MMCAP held its National Member Conference in Bloomington, Minnesota on May 12-15, 2014.  At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."  At the MMCAP conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of one or more Price-Fixed Generic Drugs.  Exhibit 1 lists MMCAP meetings attended by Defendants.

147.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up one on-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.  Exhibit 1 lists ECRM meetings attended by Defendants.

148.    At these various conferences and trade shows, representatives from at least some Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

149.    In conjunction with meetings at these conferences and trade shows, representatives of generic drug manufacturers got together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers got together periodically for what at least some of them referred to as industry dinners.

150.    A large number of generic drug manufacturers, including many Defendants here, are headquartered in close proximity to one another in New York, New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

151.    Through these various interactions, Defendants' employees were often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often led to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

152.    Defendants also routinely communicated and shared information with each other about bids and pricing strategy.  This included forwarding bid packages received from a customer (*e.g.,* a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.  Upon information and belief, these information exchanges were made by individuals with pricing and bidding authority and impacted the prices charges by Defendants for the Price-Fixed Generic Drugs.

153.    Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate higher prices or superior terms with their customers, which was to the ultimate detriment of consumers.  Again, this information sharing was undertaken for the purpose of impacting (and increasing) Defendants and their conspirators' prices for the Priced Fixed Generic Drugs.

154.    In sum, during meetings of the GPhA, HDMA, ECRM, and MMCAP, and the other meetings described in Exhibit 1, Defendants and co-conspirators exchanged confidential, commercially sensitive information in furtherance of the conspiracy, or agreed to fix prices, or both of Price-Fixed Generic Drugs.

**B.    Defendants Communicated in Secret Through E-Mail, Telephone, and Text Messages**

155.    In addition to the in-person meetings, Defendants also communicated regularly in furtherance of the conspiracy via e-mail, telephone, and text.

156.    Telephone records produced to the States establish that senior sales executives and other individuals with responsibility for pricing at Heritage had at least 513 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.

157.    Similarly, senior sales executives and other individuals responsible for pricing at Teva had at least 1,501 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

158.    Collusion is the only plausible inference to draw from the extremely high number of competitors' contacts revealed by Defendants' phone records.  Upon information and belief, Defendants used these contacts to discuss the unlawful agreements alleged in this Complaint.

C.      **The Overarching Conspiracy Between Generic Drug Manufacturers –**
        **Playing Nice in the Sandbox**

159.    As a result of these communications, sales and marketing executives in the generic

pharmaceutical industry are well aware of their competitors' current and future business plans.

This reciprocal sharing of inside information greatly facilitates agreements among competitors to

allocate markets to avoid price competition.

160.    The overarching conspiracy among generic manufacturers, however – which ties

together all of the agreements on individual drugs identified in this Complaint – is an agreed- upon

code that each competitor is entitled to its "fair share" of the market, whether that market is a

particular generic drug, or a number of generic drugs.  Coined "fair share," the term is generally

understood as an approximation of how much market share each competitor is entitled to, based

on the number of competitors in the market, with a potential adjustment based on the timing of

entry.  Once a manufacturer has achieved its "fair share," it is generally understood that the

competitor will no longer compete for additional business.  The common goal or purpose of this

overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further

supra-competitive price increases.

161.    This overarching agreement is widespread across the generic drug industry and is

broader than the Defendant manufacturers named in this Complaint.  This Complaint focuses on

the role of these named Defendants and their participation in, and agreement with, this overarching

conspiracy.  This Complaint describes conspiracies regarding the sale of specific drugs, and how

these specific conspiracies are also part of the larger overarching conspiracy.

162.    The exact contours of this "fair share" understanding, which has been in place for

many years (and pre-dates any of the specific conduct detailed herein), has evolved over time

during the numerous in-person meetings, telephonic communications, and other interactions

between generic manufacturers about specific drugs.  These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans.  For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

163.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

164.    For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions.  Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below.  The following Table (Table 1), which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds some light on the frequency with which Defendants communicated with each other throughout 2013.

**Teva Phone/Text Communications With Other Defendants (By Month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

165.     Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel and Rekenthaler of Teva speaking with competitors.   Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

166.     Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions.   Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below.   The following Table (Table 2), which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Teva Phone/Text Communications With Other Defendants (By Month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

167.     Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva). Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

168.     It was not just Teva personnel speaking to their competitors, however.  All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy.  Because it would be too voluminous to list the total number of calls among all of the Defendants, the following graphic shows the interlocking web of communications and relationships between just some of the individuals employed by Teva and its key competitors.  Each line in the graphic below demonstrates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were competitors.  For many of these individuals, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



169.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationship between Defendant Teva and another conspirator.   However, this convenience should not imply that the Complaint is solely concerned with bilateral relationships involving Teva.

170.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct.  For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules.  These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

171.    Referred to sometimes as the ▮▮▮▮▮▮▮▮▮" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

172.    When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  For example, when Defendant Dr. Reddy's was about to enter

the market for a drug in January 2013, the Vice President of Sales and Marketing explained during

negotiations with his competitor that ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████

173.    Conversely, those generic manufacturers that enter later are typically entitled to a

little less than their proportional share. One of the many examples of this occurred in March 2014,

when – as discussed more fully below – Defendant Lupin entered the Niacin ER market after

Defendant Teva had previously been exclusive.  Patel of Teva and Berthold of Lupin spoke directly

by phone a number of times during this period, including three (3) calls on March 24, 2014.  That

same day, Rekenthaler of Teva sent an internal e-mail to Patel stating ███████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████   Here, Teva's expectation to maintain 60% share in a two-player market,

after being the first in that market, was consistent with the overarching conspiracy.

174.    Defendant Taro went so far as to create a graphic representation of that

understanding, taking into account both the number of competitors and order of entry to estimate

what its "fair share" should be in any given market:



175.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year.  The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

176.    This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that ████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████    As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

177.    This scheme to minimize competition and allocate "fair share" is typically implemented as follows.  First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market.  Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price.  This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

178.    This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  In today's generic drug markets, a new competitor will either approach or be approached by the existing competitors.  Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a

cover bid.  The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price.  The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

179.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues.  If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance.  By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.  For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business.  Aprahamian sent an internal e-mail stating: ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

180.    These rules about "fair share" apply equally to price increases.  As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business.  Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules."  Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

181.    For example, in May 2013 after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a

bid for several drugs. Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:



182. Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

183. When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014 Defendant Teva was approached by a large retail customer on behalf of Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant, and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

184. Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, Richard Tremonte, a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to Jeff George, another Sandoz senior executive, stating: "



185.    Defendant Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles.  For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a ███████████████ and Defendant Taro as a ██████████████████████.

186.    Defendant Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors.  As explored more fully below, Teva had long-standing relationships with these competitors, including several of the corporate Defendants, which affected nearly every overlapping drug they sold.  As just one example, Patel of Teva exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian of Taro on June 3 and 4, 2014.  After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to ████████████, a Teva senior marketing executive, stating: ████████████████████████████████
██████████████████████████████████████████████
██████████████

187.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement.  If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.  In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors.  For example, in March 2015, Defendant Upsher-Smith learned that Defendant Sandoz had submitted a bid for Chlorpromazine at one of Upsher-Smith's GPO customers.  ████████████, a senior account manager at Upsher-

Smith, forwarded that information internally stating: █████████████████████████

a█████████████████████████████████████████████████████████████████████████

188.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.  For example, in July 2013, Luis Jorge, a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market.  After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:



189.    Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Defendant Teva, asking them to submit a █████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████

190.    Further, in January 2015, Defendant Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL HCTZ Tablets.  The customer stated: ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

191.    The "fair share" agreement is not limited to any one drug; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across individual-drug markets.  For example, in November 2013, Defendant Dr. Reddy's won the "B" slot[18] business at a large wholesale customer on Divalproex ER.  Dr. Reddy's had previously won the "A" slot business at that customer because Defendant Mylan had ████████████" from the business.███████████, a senior account executive at Dr. Reddy's, sent an internal e-mail stating: "██████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████

192.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on Haloperidol and Trifluoperazine at a large retail customer.  CW-1 explained his reasoning as follows ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[18]     Sometimes customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

███████████████████████████████████████████████████████

████████████   These decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Defendants Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol and Benazepril HCTZ.

193.    A similar scenario occurred in August 2015, when Defendant Taro declined to bid on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus was the incumbent.  Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium Tablets.  ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████   As discussed more fully below, both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014.  Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

194.    As these examples make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

195.    In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped.  For instance, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases.  Patel explained that she had been

hired by Teva to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price. CW-1 reiterated his conversation to Kellum, who understood and approved.

196.    Indeed, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time. As just one example, in July 2013, Defendant Teva increased pricing on a list of 21 different products. There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal e-mail address before then forwarding it to CW-2's personal e-mail address. Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a number of products that Defendant Sandoz did not even sell.

197.    It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell. In another example, Defendants Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril in July 2013 (discussed more fully below). After a lengthy conversation with Patel in the midst of the price increases, Aprahamian of Taro (not in the market for Enalapril at that time) sent an internal e-mail, including to ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████. Taro then re-entered the Enalapril market and matched competitor pricing.

198.    In another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items –Green of Teva spoke five (5) times with Nesta of Mylan.  The next day, Green spoke with Kellum of Sandoz. Kellum then sent an internal e-mail to the Sandoz team

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████    Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

199.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets.  Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies.  As one example, in July 2013, Defendant Sandoz was looking to implement a ████████████ that involved temporarily delisting ten products that they overlapped on with Defendant Taro.  This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

200.    This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course.  The States have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy.  This includes forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

201.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price

protection and rebates.  Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of purchasers and payors.  For instance, in December 2013, Defendant Teva was negotiating new price increase language in its customer contracts, and wanted some comfort that its competitors had similar language.  On December 23, 2013, Rekenthaler spoke with Nesta of Mylan three times, including a thirteen (13) minute call. Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

From:   Dave Rekenthaler
Sent:   Mon 12/23/2013 10:41 AM (GMT-05:00)
To:     ████████; Maureen Cavanaugh
Cc:     Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

202.   Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy.  For example, in May 2014, a large customer of Taro's received a bid on augmented Betamethasone Dipropionate and gave Taro an opportunity to bid to retain the business ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

203.   Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

204.    To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

205.    It bears noting that the examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.  Indeed, to date, many of the Defendants have made no document productions in connection with the States' investigation or MDL 2724, including Defendants Amneal, Apotex, Breckenridge, Glenmark, Lupin, and Zydus, and several other Defendants have made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt. Even Teva, the central figure in this Complaint, has to date only produced documents from two custodians to the States.

## XI.    INDUSTRY COMMENTARY FURTHER SUGGESTS THAT DEFENDANTS' COLLUSIVE CONDUCT IS A PLAUSIBLE EXPLANATION FOR THE INCREASED PRICES OF THE PRICE-FIXED GENERIC DRUGS

224.    Comments from industry analysts suggest manufacturers alternative explanations for the price hikes (*e.g.*, supply disruptions) are mere pretext, intended to shroud the Defendants' and co-conspirators' conspiratorial conduct and ends.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes - accommodate price inflation.[19]

_____

[19]    *See* Ed Silverman, Generic Drug Prices Keep Rising, but is a Slowdown Coming?, WALL ST. J. (Apr. 22, 2015), *available at*  http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

225.    One study of the generic drug industry concluded that in 2014: "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[20]   The GAO Report also noted similar "extraordinary price increases" across many generic drugs, including Doxycycline, in recent years that could not be linked to any particular cause.

## XII.   CORPORATE AND INDIVIDUAL RELATIONSHIPS THAT ALLOWED THE CONSPIRACY TO EVOLVE

226.    An important event in the evolution of the conspiracy occurred in April 2013, when Teva took a major step toward implementing more significant price increases by hiring Nisha Patel as its Director of Strategic Customer Marketing.  In hiring Patel, Teva threw gasoline on an already smoldering conspiracy.

227.    In this position, Patel's job responsibilities included, among other things: (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

228.    Most importantly, she was responsible for – in her own words – █████████████ ███████████████████████████████████████████████████████████████████ ████████████   In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases.  This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

---

[20]    David   Belk,   MD,   Generic   Medication   Prices,   *available   at* http://truecostofhealthcare.net/generic_medication_prices/.

229.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

230.    Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases. Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013 – nearly three weeks before Patel started at Teva – Ara Aprahamian, the Vice President of Sales and Marketing at Defendant Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva - Hush Hush for now...."  The COO responded by saying ███████████████████████████ ████████████  Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva.  Patel had also worked with Aprahamian several years earlier at ABC.

231.    Patel's last day at ABC was April 11, 2013, and she started at Teva on April 22, 2013. Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva.

232.    Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent – and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

A. __Ranking "Quality of Competition" to Identify Price Increase Candidates__

233.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition.  As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors.  In a separate tab of the same

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████

234.    Patel understood – and stressed internally at Teva – that ████████████████████ ████████████████████████████████████████████████████ Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly.  Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

235.    As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale.  For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices.  She asked CW-1 how Sandoz handled price increases.  CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased.  Not surprisingly, Sandoz was one of Teva's highest "quality" competitors.  Patel and Teva based many

price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

236.    It is important to note that Patel had several different ways of communicating with competitors.  Throughout this Complaint, you will see references to various phone calls and text messages that she was exchanging with competitors.  But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications.  Although the States have been able to obtain some of these communications, many of them have been destroyed by Patel.

237.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality."  Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases.  Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor.  The top ranked competitors at that time included the following companies:



238.    The lowest ranked competitors were:



239.    Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase.  According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality."  Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

240.    Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

1.    The "High Quality" Competitor Relationships

241.    The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases.  The agreements and understandings regarding price increases were what made each of those competitors a high quality competitor.  As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

(a)    *Mylan (+3)*

242.    Mylan was Teva's highest-ranked competitor by "quality."  The relationship between these two competitors was longstanding, and deeply engrained.  It survived changes in personnel over time, and pre-dated Patel's creation of the quality competitor rankings.

243.    Kevin Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Jim Nesta of Mylan by telephone on February 21, 2012. From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company.  This amounts to an average of nearly one call or text message every business day during this period.

244.    Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes.  Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often.  Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel.  Several examples of these communications are outlined more fully in various sections below.

245.    When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong.  Rekenthaler promptly took over the role of communicating with Nesta.  Starting in December 2013, through the time that Rekenthaler left Teva in April, 2015, Rekenthaler spoke to Nesta 100 times.  Prior to Green leaving Teva in late- October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

246.    The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta.  For example, between January 1, 2010 and October 26, 2011, Robert Cunard, a senior executive at Teva, communicated ███████████, a senior executive counterpart at Mylan, by phone or text at least 135 times.  The pace of communications between the two companies

slowed dramatically in November 2011 after Cunard left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and Potter at Mylan.

        (b)    *Watson/Actavis (+3)*

247.    Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and Andy Boyer, a senior sales executive at Actavis. Rekenthaler also communicated frequently with Allan Slavsky, a senior sales executive at Actavis – a relationship that pre-dated Patel joining Teva.

248.    Patel contacted Boyer shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013.  But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis.  From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

249.    In August 2013, Defendant Marc Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler.  From August 7, 2013 through the date that Rekenthaler left Teva in April, 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

250.    Maureen Cavanaugh also had a very strong relationship with Falkin.  The two communicated with great frequency.  From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

(c)     *Sandoz (+3)*

251.     Sandoz was also considered a top-quality competitor by Teva.  Patel had a very strong relationship with CW-1 at Sandoz.

252.     Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.  As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases.  Patel explained that she had been hired at Teva to identify products where Teva could increase prices.  CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

253.     Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive.  These relationships pre-dated Patel joining Teva.

(d)     *Glenmark (+3)*

254.     Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and Jessica Cangemi, a sales and marketing executive at Glenmark.

255.     As stated above, Patel began communicating with CW-5 even before she began her employment at Teva.  Patel was also communicating frequently with both CW-5 and Cangemi during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

256.     Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months.

After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

(e)     *Taro (+3)*

257.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Defendant Ara Aprahamian.  Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

258.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva.  From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

(f)     *Lupin (+2)*

259.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with David Berthold, the Vice President of Sales at Lupin.  The relationship between Teva and Lupin, however, pre-dated Patel.  Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold.  Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

260.    From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

261.    Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Defendants Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave.  For example, in October 2013, Lupin was preparing to increase its pricing on the drug Cephalexin Oral Suspension.  Without Green or Patel

to communicate with, Berthold instead communicated with Rekenthaler and Sherman-Mouro of Teva in order to coordinate the price increase.

### B.   Individual Relationships

262.   In addition to the corporate relationships discussed above, individual relationships were also important to the conspiracy's evolution.   The following sections discuss certain individuals who held senior positions at certain Defendants and who played key roles in the conspiracy's operation.

#### 1.   Ara Aprahamian

263.   Aprahamian is the Vice President of Sales at Defendant Taro and has held that position since he moved to Taro from Actavis in March 2013.   Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the corporate Defendants.  For example, between March 2013 and October 2018, Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Aurobindo, and Greenstone.

#### 2.   David Berthold

264.   Berthold is the Vice President of Sales at Defendant Lupin and has held that position since June 2006.  During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors. Indeed, Berthold has relationships with individuals at many of the corporate Defendants and is one of the most prolific communicators of all the individual participants.  For example, between March 2011 and October 2018, Berthold exchanged at least 4,185 phone calls and text messages with his contacts at Defendants Aurobindo, Glenmark, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, Lannett, and Greenstone.

### 3.  Jim Brown

265.    Brown is the Vice President of Sales at Defendant Glenmark and has held that position since November 2012.  Brown was one of several Glenmark executives that conspired with competitors.  Although not as prolific in his communications with competitors as some of the other individuals, he did communicate when necessa1y to further the agreements.  For example, between June 2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Defendants Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro.

### 4.  Maureen Cavanaugh

266.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Defendant Teva until April 2018.  She is currently the Senior Vice President and Chief Commercial Officer at Defendant Lannett. During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation.  In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the agreements.  For example, between January 2011 and August 2017, Cavanaugh exchanged at least 612 phone calls and text messages with her contacts at Defendants Actavis, Amneal, Zydus, Sandoz, Glenmark, and Greenstone.

### 5.  Marc Falkin

267.    Falkin was the Vice President of Marketing, Pricing and Contracts at Defendant Actavis until Actavis was acquired by Teva in August 2016.  For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva.  During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the corporate Defendants.  For example, between August 2013 and July 2016, Falkin exchanged at least 2,562 phone calls and text messages with his

contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Apotex, Taro, Amneal, Sandoz, Wockhardt, and Greenstone.

6.    Jim Grauso

268.    Grauso was employed as a Senior Vice President of Commercial Operations at Defendant Aurobindo until January 2014.  In February 2014, Grauso moved to Defendant Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations.  Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark.  For example, between December 2011 and January 2014, Grauso exchanged at least 1,763 phone calls and text messages with his contacts at Defendants Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Wockhardt, Breckenridge, and Greenstone.

269.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo.  For example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Defendants Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Dr. Reddy's, Amneal, Rising, Par, Breckenridge, Upsher-Smith, Mylan, and Greenstone.

7.    Kevin Green

270.    Green worked at Defendant Teva as a Director of National Accounts until November 2013 when he took a position with Defendant Zydus.  Green is currently the Vice President of Sales at Zydus.  Green developed a number of relationships with individuals at many of the corporate Defendants.  He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus.  For example, between January 2010 and October 2013, Green exchanged at least 1,410 phone calls and text messages with his contacts at

Defendants Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Breckenridge, Wockhardt, Lannett, and Greenstone.

271.    Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Green exchanged at least 969 phone calls and text messages with his contacts at Defendants Teva, Glenmark, Mylan, Lupin, Aurobindo, Rising, Amneal, Sandoz, Lannett, Dr. Reddy's, and Greenstone.

### 8.    Armando Kellum

272.    Kellum was the Director of Pricing and Contracts at Defendant Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors. In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the agreements. For example, between May 2011 and April 2015, Kellum exchanged at least 182 phone calls and text messages with his contacts at Defendants Lupin, Teva, Upsher-Smith, Zydus, Actavis, Amneal, Dr. Reddy's, and Greenstone.

### 9.    Jill Nailor

273.    Nailor has worked at Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts. Nailor directed her subordinate ████████, a national account executive, and others at Greenstone to fix prices and allocate customers with competitors on overlap drugs, including with several of the Defendants. She also instructed them to avoid putting any evidence of such communications into writing.

274.    In addition, Nailor regularly communicated directly with competitors herself. For example, between August 2010 and May 2017, Nailor exchanged at least 4,439 phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan,

Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro.

### 10.   James Nesta

275.   Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Defendant Mylan.  Nesta communicates regularly with his counterparts at many of the corporate Defendants.  For example, between January 2011 and February 2016, Nesta exchanged at least 5,293 phone calls and text messages with his contacts at Defendants Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, Par, and Greenstone.

### 11.   Konstantin Ostaficiuk

276.   Ostaficiuk is the President of Defendant Camber and has held that position since 2009.  During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors.  Indeed, Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants.  For example, between March 2011 and August 2017, Ostaficiuk exchanged at least 464 phone calls with his contacts at Defendants Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis.

### 12.   Nisha Patel

277.   Patel worked at Defendant Teva from April 2013 to December 2016, first as a Director of Strategic Customer Marketing and then as a Director of National Accounts.  As discussed in great detail above, Patel was in frequent communication with her counterparts at the corporate Defendants to fix prices and allocate markets. For example, during her time at Teva, Patel exchanged at least 1,240 phone calls and text messages with her contacts at Defendants

Zydus, Sandoz, Actavis, Glenmark, Taro, Lupin, Dr. Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, Breckenridge, and Greenstone.  As discussed in various sections of this Complaint, Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp.

13.    David Rekenthaler

278.    Rekenthaler was the Vice President of Sales, US Generics at Defendant Teva until April 2015. Rekenthaler is now the Vice President of Sales at Defendant Apotex.  During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the corporate Defendants.  For example, between January 2011 and March 2015, Rekenthaler exchanged at least 1,044 phone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Taro, Lannett, Wockhardt, and Greenstone.

14.    Rick Rogerson

279.    Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis until Actavis was acquired by Teva in August 2016.  Rogerson now works at Defendant Amneal as a Senior Director of Marketing and Business Analytics.  During his time at Actavis, Rogerson communicated with his contacts at several corporate Defendants.  For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls and text messages with his contacts at Defendants Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus.

15.   Tracy Sullivan

280.   Defendant Tracy Sullivan has been employed at Defendant Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants.  For example, between March 2011 and August 2016, Sullivan exchanged at least 495 phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, Breckenridge, and Greenstone.

## XIII.   THE CONSPIRATORIAL PRICE-FIXING, BID-RIGGING, & MARKET ALLOCATION AGREEMENTS

281.   As a result of their frequent in-person meetings and the collusive communications that ensued as a result of these meetings via e-mail, telephone, and text messages, Defendants and their co-conspirators were able to implement, and did implement, radical, extraordinary, and abrupt price increases on many of the Price-Fixed Generic Drugs identified in this Complaint.

282.   There were no market-based justifications for any of the abrupt price increases described below.  The increases in price were not necessitated by increased manufacturing costs, or research and development costs.  Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption was reported during the duration of the alleged conspiracy as to any of the Price-Fixed Generic Drugs (except where expressly alleged below).  Similarly, during the time frame relevant to these allegations, there were no known raw material shortages affecting the manufacture of any of the Price-Fixed Generic Drugs in the United States, nor did demand for any of these drugs suddenly increase.

283.   Each of the conspiratorial price increases would have been against each Defendant's self-interest if taken unilaterally and without advance agreement.  As the last 30 years of generic drug pricing has demonstrated, in a competitive industry, a firm would cut its price with

the expectation of increasing its market share if its competitors were setting prices above marginal costs.

284.    This economic reality is further compelled by the existence of MAC prices.  As noted above, a MAC price represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.  Payors set the MAC price of a drug based on a variety of factors including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.  MAC pricing effectively requires pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price.

285.    MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

286.    Given the existence of MAC pricing and the fact that AB-rated generic drugs are bioequivalent to both the branded version and also to other AB-rated generic versions of the same drug, Plaintiffs base their purchasing decisions almost exclusively on price.  Due to this homogeneity, there is a very high cross-elasticity of demand for generic drugs from different manufacturers.

287.    Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales, and the price increases of the Price-Fixed Generic Drugs described in this Complaint were against each Defendant's individual self-interest.

288.     While drug-specific agreements involve those Defendants that marketed and sold the particular drug, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was also a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the drugs that are the subject of this Complaint.  From this broad agreement among all Defendants sprang additional agreements among the manufacturers relating to each of the individual drugs.  The purpose and effect of all of these agreements was to lessen competition in the markets for each drug and throughout the industry.

289.     When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed. Some illustrative examples of these agreements are set forth below, describing specific examples relating to specific drugs over time.

290.     As evident from the many examples below, the overarching "fair share" conspiracy was well established in the industry by 2012, including among each of the Defendants.  Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion.  The structure and inner workings of the agreement were well understood and adopted throughout the industry.

291.     As further detailed below, manufacturers eventually began to focus more on price increases than they had in the past.  They were no longer satisfied to simply maintain prices at already supracompetitive levels – there was a concerted effort by many in the industry to

significantly raise prices.  Manufacturers started communicating with each other about those increases with greater and greater frequency.

292.    A troubling pattern began to emerge.  Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase.  The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – *i.e.*, that they would not punish a competitor for leading a price increase, or steal a competitor's market share on an increase.  There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

293.    It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

294.    The following examples of drug-specific collusion, set forth alphabetically by drug, demonstrate how the conspiracy pervaded the entire industry.

A.       **Acetazolamide**

295.     Acetazolamide is sold in at least two formulations – tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus, and Teva).

1.       Acetazolamide Tablets

296.     The market for Acetazolamide tablets is dominated by Taro and Lannett.  Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share on Acetazolamide tablets.

297.     These tablets come in two dosages: 125 mg and 250 mg.  Both Taro and Lannett make the 250 mg dosage, which is the predominant form.  While only Taro makes the 125 mg dosage, this formulation appears to be included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

298.     In mid-2012, Taro and Lannett imposed list price increases of 40% to 50%, and brought list prices for Acetazolamide 250 mg tablets to identical levels.

299.     By mid-2013, Taro and Lannett appeared to have worked out a remarkably stable split of the market, taking into account both 125 mg tablets and 250 mg tablets.

300.     In late 2013, within weeks of each other, Taro and Lannett imposed identical list prices for Acetazolamide 250 mg tablets.  The increases were well over 200%.  Taro imposed a similarly large list price increase on 125 mg tablets around this time.  Average wholesale prices for both products increased dramatically.

301.     Throughout these coordinated increases, Lannett and Taro captured stable shares of the 250 mg table market.  Lannett claimed approximately 56% and Taro claimed 44%.  Taro was the lone manufacturer of 125 mg tablets and had 100% of sales of that dosage.  Interestingly,

the total dollar sales across both products was virtually identical.  Lannett's larger share of the 250 mg tablet market was offset by Taro's sales of 125 mg tablets.

302.     Taro and Lannett's ability to reach market share and price increase agreements was aided by the prevalence of trade association events and conferences where the parties were able to meet in person.  For example, in August 2013, not long before the large price increases imposed by Taro and Lannett, both Defendants attended the NACDS Total Store Expo in Las Vegas.

2.     Acetazolamide Capsules

303.     During the relevant time period, Heritage, Teva, and Zydus sold generic Acetazolamide capsules to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

304.     In April 2014, Malek of Heritage discussed the possibility of a collusive price increase on Acetazolamide with a senior sales executive at Teva, Nisha Patel ("Patel").  (Heritage and Teva controlled almost 80% of the market for Acetazolamide.)  During an April 15, 2014 phone call, Malek and the Teva sales executive, Patel, agreed that Heritage would lead the price increase (which would be approximately 75%) and Patel would communicate the details of the price increase to the sales executive at Zydus ███████████████ who was responsible for Acetazolamide.

305.     On April 16, 2014, the sales executives responsible for Acetazolamide at Teva and Zydus (Patel and █████) discussed the collusive price increase by phone for approximately 20 minutes (on April 16) and for 12 minutes (on April 17).

306.     On April 24, 2014, Malek reached out to ████o, the Zydus sales executive, via LinkedIn, and the two communicated the next day about the Acetazolamide price increase as well.

307.   In order to ensure that the price increase was successful, Heritage, Zydus, and Teva agreed that they would not underbid each other's Acetazolamide business while they implemented the price increase.   Malek and ███ confirmed this agreement with each other by telephone on May 7, 2014.

308.   On June 26, 2014, as agreed with Zydus and Teva, Heritage began notifying its customers that it was increasing prices of Acetazolamide by approximately 75%.   Heritage fully implemented this price increase on all its major accounts (at least 17 customers) by July 9, 2014.

309.   Following Heritage's lead, Zydus and Teva increased prices of Acetazolamide by approximately 75% as well.

### B.   Albuterol

310.   The market for Albuterol is mature, as Albuterol has been available in the United States for over twenty-five years.   The World Health Organization ("WHO") includes Albuterol on its list of essential medicines.   During the relevant time period, Mylan sold Albuterol pursuant to an ANDA approved by the FDA in or around January 1991.   Sun (either directly or through its subsidiary Mutual) sold Albuterol to purchasers pursuant to ANDAs that were approved by the FDA in or around December 1989.   Both Mylan and Sun sold Albuterol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint

311.   At all times relevant to this lawsuit there has been more than one manufacturer of Albuterol on the market.   Defendants Mylan and Sun dominate the market for Albuterol.

312.   For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Albuterol was remarkably stable.   Beginning in March 2013, the prices rose abruptly and, for the most part, in unison.

313.    By way of example, available WAC data demonstrates that beginning in March 2013, Defendants selling generic Albuterol took substantial price increases on the 2 mg strength that exceeded 3400%:[21]

| Product MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3674% |

314.    There are no legitimate reasons or explanations for the unprecendented and dramatic price increases of Albuterol.  Demand for Albuterol has not materially changed between 2010 and the present, nor does any change in input costs explain these price increases. Furthermore, at the time Albuterol prices were increased in March 2013, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

315.    Upon information and belief, the price increases on Albuterol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Albuterol in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

316.    For example, on on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan and Sun.  *See* Ex. 1.

---

[21]    WAC prices referenced throughout this Complaint are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

317.     On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Mylan and Sun. *See* Ex. 1.

318.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Mylan and Sun.  *See* Ex. 1.

319.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This conference was attended by representatives from both Mylan and Sun.  *See* Ex. 1.

320.     In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iii) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (iv) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (v) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vi) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (vii) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (viii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (ix) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (x) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xiii) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xiv) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xv) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (xvi) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

C.     **Amiloride HCL/HCTZ**

321.    The market for Amiloride HCL/HCTZ is mature, as the drug has been available in generic form for more than thirty years to treat edema and hypertension.  Moduretic 5-50, the branded version of Amiloride HCL/HCTZ was patented by Merck prior to 1982.

322.    At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market.  Defendants Mylan and Teva dominate the market for Amiloride HCL/HCTZ.

323.    Prior to June 2011, Amiloride HCL/HCTZ were stable at just a few cents per dose. However, in Summer 2011, Mylan and Teva – applying their common understanding of the Fair Share overarching agreement – conspired to implement an abrupt and substantial price increase of more than 300%.

324.    Mylan and Teva continued to conspire to stabilize and maintain this supracompetitive price increase.  Indeed, after Nisha Patel arrived at Teva, the Defendants targeted Amiloride HCL/HCTZ for additional price increases in 2013 and 2014.  As a result of this collusion, by 2014, Teva and Mylan were able to charge prices for Amiloride that were up to 700% higher than they were prior to June 2011.

325.    These price increase were coordinated by telephone and in-person communications by high-level sales executives at Teva and Mylan, including Patel, Rekentheler, and Green of Teva, and James Nesta and Robert Potter of Mylan.

326.    As a result of these collusive communications, Defendants continue to charge supracompetitive prices for Amiloride HCL/HCTZ as of the filing of this Complaint.

D.    **Amitriptyline**

327.    The market for Amitriptyline is mature, as Amitriptyline has been available in the United States for over sixty years.  Amitriptyline is on the WHO's List of Essential Medicines. During the relevant time period, Defendants Mylan, Par, and Sandoz sold Amitriptyline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

328.    At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market.  Defendants Mylan, Par, and Sandoz dominate the market for Amitriptyline.

329.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Amitriptyline were remarkably stable.  Beginning in May 2014, Defendants increased their prices abruptly and, for the most part, in unison.  Average prices for Amitriptyline increased 300% to nearly 2,000% across dosage strengths.  The Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[22]  The Boston Globe similarly reported: "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 10-milligram pill in 2014 to $1.03 in 2015."[23]

---

[22]    David Crow, Teva bids for Mylan amid pressure on copycat drugmakers, The Financial Times (May 12, 2015), *available at* https://wvv\:v.ft.com/content/8ff2fc5a-f5 l 3-l l e4-8a42-00l44feab7de.

[23]    Priyanka Dayal McCluskey, As competition wanes, prices.for generics skyrocket, The Boston Globe (Nov. 6, 2015), *available at* https://www.bostonglobe.com/business /2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/l-13 iA9CSxA UylnCdGjLNKVN/story.html.

330.    Defendants' WAC prices further illustrate these substantial price increases.  By way of example, beginning in May 2014, Defendants Sandoz, Mylan, and Par set their WACs for their 50 mg product in lockstep, increasing from previous WACs that exceeded 900%:

| Product 50 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1157% |
| 100 ct | Par | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Par | 00603221432 | * | $0.48 | 26-Sep-14 | * |

331.    There are no legitimate reasons or explanations for the unprecendented and dramatic price increases of Amitriptyline.  Changes in demand for Amitriptyline do not justify the price increases.  If anything, the price should have gone down because demand was likely lower after 2012.  In 2012, Amittriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high risk of adverse effects in seniors.  When drugs are classified as high risk, doctors tend to prescribe them to seniors less causing total demand to decline.  Lower total demand generally causes prices to drop.  Here, the drop in demand does not explain the price increase.

332.    Furthermore, at the time Amitryptiline prices were increased in May 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.  The huge increases on Amitryptiline were not due to supply disruptions.

333.    Upon information and belief, the price increases on Amitryptiline were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Amitryptiline in the United States.  These collusive agreements were

furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

334.    For example, on February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Sandoz, Mylan, and Par, including key executives such as Mylan's President, Tony Mauro and Sandoz's President, Don DeGolyer.  *See* Ex. 1.

335.    On June 2-5, 2013, the HDMA held a Business Leadership Conference ("BLC") in Orlando, Florida that was attended by representatives from Sandoz, Mylan, and Par, including key executives for generics prices and sales.  For example, all three Defendants sent their National Account Directors.  *See* Ex. 1.

336.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan, Par, and Sandoz.  *See* Ex. 1.

337.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

338.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

339.    On December 3, 2013, NACDS held its 2013 Foundation Reception & Dinner that was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

340.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Defendants Mylan, Sandoz, and Par.  *See* Ex. 1.

341.    On April 1, 2014, the HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York City that was attended by representatives of Mylan and Sandoz.  *See* Ex. 1.

342.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Mylan, Sandoz, and Par. *See* Ex. 1.

343.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by representatives from Mylan, Sandoz, and Par.  *See* Ex. 1.

344.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

345.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Mylan, Sandoz, and Par.  *See* Ex. 1.

346.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz.  *See* Ex. 1.

347.    On December 3, 2014, NACDS held its 2014 Foundation Reception & Dinner that was attended by Mylan and Sandoz employees.  *See* Ex. 1.

348.    The price increases on Amitriptyline closely followed Mylan, Sandoz, and Par's, participation in the February 2014 GPhA Annual Meeting and their participation in the April 2014 Annual Meeting of the NACDS in Scottsdale, Arizona.

349.    In 2015 and 2016, representatives of Mylan, Sandoz, and Par continued to regularly attend trade association meetings and events.

### E.    **Amphetamine/Dextroamphetamine**

350.    Amphetamine/Dextroamphetamine Immediate and Extended Release, also known by the brand name Adderall, is a medication used in the treatment of attention deficit hyperactivity

disorder (ADHD). The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS."

351.    During the time period relevant to this Complaint, Actavis, Impax, and Teva dominated the marker for MAS Extended Release ("MAS-XR"), and Actavis, Aurobindo, Mallinckrodt, Sandoz, and Teva dominated the market for MAS Immeidate Release ("MAS-IR").

352.    On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in ▇▇▇▇▇ of its MAS-XR business. A senior Teva sales director ▇▇▇▇, insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

353.    Teva deferred its decision on pricing until Actavis was in a position to ship the product.

354.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012. At 9:58 pm that same evening, Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32 am the next morning, Teva employee ▇▇▇▇▇ responded that she had spoken to ▇▇▇▇▇, a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:



355.    The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

356.    Upon learning which customers Actavis wanted, ███ warned colleagues that this allocation of market share could be tricky.  She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be ████ that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

357.    One year later, Teva's customer renewed its request for a price reduction on MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug.  On May 7, 2013, ████ informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business.  She made it clear that Teva had already conceded an appropriate amount of business to its competitor.  She stated████████████████

358.    Also in 2012, Mallinckrodt entered the market for MAS-IR and sought to add share. In internal documents, Teva acknowledged that it had willinglyly conceded a number of accounts to Mallinckrodt, the new competitor, which was wholly consistent with the Fair Share agreement.

359.    In March 2014, Aurobindo was making plans to enter the market with its MAS-IR product.  On March 18, 2014, Teva's ████ shared with her colleagues that Aurobindo's market share target for the impending launch was 10%.  Teva's senior marketing operations executive, ████ indicated that Teva was aware that both Aurobindo and Actavis were launching.

360.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail.  The day before, on March 17, 2014, Patel had spoken to Actavis's Director of Pricing, Rick Rogerson, three (3) times. Rekenthaler and

Falkin of Actavis also spoke once on that day.  On March 18, 2014, the day of the e-mail, Rekenthaler and ███████, a senior-most executive at Aurobindo, had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

361.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for MAS-IR.  Patel informed ███████ that the challenge was coming from Actavis and recommended that Teva concede that customer's account.  At 1:43 pm, she communicated to another colleague that the decision had been made to concede.  Apparently closing the loop, she called Rogerson at Actavis at 1:55 pm. They spoke for just over four (4) minutes.

362.    As a result of these collusive communications, Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva were able to charge fix prices for both MAS-XR and MAS-IR, and those supracompetitive prices persist as of the filing of this Complaint.

**F.    Baclofen**

363.    The market for Baclofen is mature, as Baclofen has been available in the United States for nearly 50 years.  During the relevant time period and continuing today, Defendant Lannett sells Baclofen pursuant to an ANDA that was approved by the FDA in or around July 2007 and Defendant Par sells Baclofen pursuant to ANDAs approved by the FDA in or around August 2005.  Teva sells Baclofen pursuant to ANDAs approved in February 1992, and Upsher-Smith sells Baclofen pursuant to ANDAs approved in May 1988 and August 1996.  Lannett, Par, Teva, and Upsher-Smith each sold Baclofen to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

364.    At all times relevant to this lawsuit, there has been more than one manufacturer of Baclofen on the market.  Defendants Lannett, Par, Teva, and Upsher-Smith dominate the market for Baclofen.  In the years prior to the conspiracy period, Defendants' average price in the U.S. for Baclofen was remarkably stable.  Beginning in February 2014, Defendants increased their prices abruptly and in unison.

365.    Baclofen is among the drugs identified by the GAO, which concluded that Baclofen, in both the 10 mg and 20 mg tablet form "[e]xperienced and extraordinary price increase" in 2014-2015.  Similarly, American Pharmacies, a group of independent pharmacists that monitors the pricing of generic drugs and issues notices to customers, warned in February 2014 of the recently announced "[m]arketwide price increases of more than 500% … occurring on Baclofen tablets."

366.    Effective February 21, 2014, Defendant Upsher-Smith took a significant price increase on Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation. Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering whether to exit the market or significantly raise price.  It chose the latter.

367.    The primary competitors in the market for Baclofen at this time were Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

368.    Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases – but decided against it.  The primary reason was that Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor. In other words, Qualitest would likely compete for market share if Teva increased its price.

369.    Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems, and could exit the market for at least 3-4 months, if not permanently.

370.    Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase.  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

371.    Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with ████████, a national account executive at Upsher-Smith.  In the week before she started her employment at Teva (after leaving her previous employment), Patel and █████ exchanged several text messages.  During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to █████ on April 29, 2013 for nearly twenty (20) minutes.  During these initial communications, Patel and Leonard reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase.  Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

372.    There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price increase based on Patel's prior conversations with █████ and based on the history of collusion between the two competitors.

373.    Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly.  Teva increased its WAC pricing from 350% – 447%, depending on the dosage strength.  Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

374.    The chart below shows the increases by Teva and Upsher-Smith on 20 mg strength

doses of baclofen:

| Product 20 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 1000 ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 100 ct | Teva | 00172409760 | $0.10 | $0.49 | 15-Apr-14 | 420% |
| 1000 ct | Teva | 00172409780 | $0.09 | $0.49 | 15-Apr-14 | 447% |

375.    Pursuant to the agreement between the companies, Teva did not seek to take any

customers from Upsher-Smith during the time period after Upsher-Smith's increase and before

Teva could follow.  Even after Teva's increase, when Qualitest customers approached Teva for a

bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith.  As Patel told ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

376.    Upsher-Smith, on the other hand, was able to secure several new customers as a

result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-

Smith. On April 18, 2014 – only three days after the Teva price increase – ████████, a Senior

Director of Sales and Marketing at Upsher-Smith, made the following pronouncement:



377.   Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith.  Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

378.   These dramatic price increases were not the result of supply shortages or demand spikes.  There were no relevant labeling changes or reported drug shortages that might have led to price increases.  Nor was there a spike in demand that could explain these large price increases.  Instead, the increase was the product of the overarching fair-share agreement and also the following collusive communications between Defendants.

379.   In June 2014, Defendant Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply. In an internal e-mail sent to his sales staff, ████████, a senior sales executive at Lannett, stated: ████████████████████████████████████ ████████████████████   At that time, Teva had a large market share in relation to the existing competitors in the market.

380.   Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger.  On June 12, 2014, Sullivan messaged Patel, stating:



381.   The message was sent at 11:16 am.  At 11:30 am, Patel called Sullivan and they spoke for seven (7) minutes.  This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013.  During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly.  In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



382.   True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail.  Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

383.   On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague:

That same day, Patel sent a text message to Sullivan asking                    Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three (3) minutes.  After speaking, Patel sent another text message to Sullivan, stating

384.   Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating:

The customer asked whether Teva wanted to exercise its right of first refusal (*i.e.*, offer a lower price to maintain the account).  Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Patel specifically agreed with the decision to concede, stating:

███████████████████████████████████████████

████████████████████████

G.     **Benazepril HCTZ**

385.     Benazepril HCTZ, also known by the brand name Lotensin, is an angiotensin converting enzyme (ACE) inhibitor that is used to treat high blood pressure.

386.     The market for Benazepril HCTZ is mature, as Benazepril HCTZ has been available in the United States for over 25 years.  At all times relevant to this lawsuit there has been more than one manufacturer of Benazepril HCTZ on the market.  Defendants Mylan and Sandoz dominate the market for Benazepril HCTZ, and co-conspirator Rising entered the Benazepril HCTZ market following collusive discussions with Mylan and Sandoz during which Rising agreed to follow the conspiracy pricing.

387.     At issue here are three dosage strengths of Benazerpil HCTZ: 10 mg/12.5 mg, 20 mg/12.5 mg, and 20 mg/25 mg.

388.     In the years prior to the conspiracy period, Defendants' average price in the U.S. for Benazepril HCTZ was remarkably stable.  Beginning in August 2013, Defendants increased their prices abruptly and in unison.  This price increase was the result of an agreement reached during discussions between Mylan and Sandoz.

389.     In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ.  However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

390.     On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding

█████████████████████████████████████████

███████   Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

391.   The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 E-mail outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above).  That list did not include Benazepril HCTZ. CW-1 forwarded the July 2013 E-mail to Kellum stating: ███████████████████████████████████████

███████████████████████████████████████████████

███████████████

392.   Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

393.   On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled ████████████

███████████████████████████████████████████████

█████████████████

394.   One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ.  The increase was large – nearly 334% on all dosage strengths.

395.   On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

396.    By way of example, in August 2013, Mylan and Sandoz set nearly identical WAC prices on their 25 mg product for Benazepril HCTZ, reflecting increases of more than 300%:

| Product 25 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 00378477501 | $0.38 | $1.65 | 9-Aug-13 | 334% |
| 20 ct | Sandoz | 00185027701 | $0.32 | $1.62 | 20-Aug-13 | 407% |

397.    A third competitor – Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic.  When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.  Both before and after entering the market, CW-2 – then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and ▮▮▮▮▮▮) about obtaining market share on Benazepril HCTZ.  Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

398.    In December 2019, Co-conspirator Rising reached a deferred prosecution agreement in which it admitted to price-fixing Benazepril HCTZ between at least April 2014 and September 2015.

399.    As a result of the overaching "fair share" understanding and these collusive communications, Mylan, Sandoz, and Rising sold Benazepril HCTZ to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

**H.    Budesonide DR Capsules**

400.    Budesonide DR Capsules, also known by the brand name Entocort EC, is a steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

401.     Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

402.     Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug.  On April 1, 2014, ▌▌▌▌▌▌▌▌, a senior national account executive at Par, called Rekenthaler at Teva.  The two executives spoke for twenty-six (26) minutes.  The next day, April 2, 2014 – which happened to be the same day that Teva received FDA approval to market Budesonide DR – Par increased its price for Budesonide DR by over 15%.

403.     That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

404.     Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase ▌▌▌▌▌▌▌▌▌▌, a senior account executive at Par, spoke to ▌▌▌▌▌▌ ▌▌▌ a senior account manager at Mylan, for fifteen (15) minutes.

405.     On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and ▌▌▌▌ a similarly high-level executive at Par, that same day.

406.     Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

## I.     **Budesonide Inhalation**

407.    Budesonide Inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent asthma attacks.  It belongs to a class of drugs called corticosteroids, and works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways.

408.    Teva obtained approval to market Budesonide Inhalation in November 2008.  As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension.  Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly.  So before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9%.  Although a very modest increase in percentage terms, the 9% price increase added ██████ to Teva's annual revenues.

409.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid.  Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, David Rekenthaler of Teva called his counterpart at Actavis ██████ – a senior sales and marketing executive – and they spoke for two (2) minutes.  This was the first-ever phone call between them based on the phone records produced.

410.    The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes.  Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market

with the exact same WAC price as Teva.  Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was ███ ████████████████████████

411.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to continue to charge the agreed-upon prices.  In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

412.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying: ████████████████████████ Budesonide Inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

413.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes.   The following morning, Teva's ████ confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis.  She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer.   Thus, she explained, she was working with the customers on an████ ████   to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

**J.      Buspirone Hydrochloride Tablets**

414.    Buspirone HCL is an antianxiety drug thay was first approved for medical use in the United States in 1986.

415.    During the time period relevant to this Complaint, Actavis, Mylan, and Teva dominated the market for Buspirone HCL.

416.    Buspirone HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ████ ██l of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called ███  Also, Rekentheler spoke with ███████ of Actavis and ███ ██████ of Breckenridge.  These communications solified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

417.    As a result of these collusive communications, Defendants have been able to maintain Buspirone HCL at anticompetitive prices since July 2012.

**K.    Cabergoline**

418.    Cabergoline, also known by the brand name Dostinex, is used to treat medical problems that occur when too much of the hormone prolactin is produced.  It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

419.    During the time period relevant to this Complaint, the market for Cabergoline is dominated by Greenstone, Par, and Teva.

420.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, a senior Greeenstone sales executive approached ████ of Teva on Greenstone's behalf to discuss obtaining market share for Greenstone. The Greenstone executive made clear to

Teva that, in exchange for market share, Greenstone would adhere to the overarching Fair Share agreement.

421.    The same day that ██████ e-mailed Greenstone, she also spoke with a senior sales executive at Par.  Upon information and belief, the purpose of this call was so that Coward could inform Par that Teva was prepared to concede a large customer to Greenstone, consistent with the overarching Fair Share agreement.

422.    The next day, after some internal conversation at Teva, ████████████

████████████████████████████████████████████

████████

423.    Pursuant to this agreement, Greenstone was able to acquire ABC as a customer for Cabergoline without any fear that Teva (or Par) would compete to retain the business. In exchange, Greenstone agreed to ██████████████ – *i.e.*, not compete with Teva for other customers and drive prices down in the market.

424.    As a result of these collusive communications, Teva, Par, and Greenstone have been able to charge supracompetitive prices to Plaintiffs and others for Cabergoline since December 2014.

**L.    Capecitabine**

425.    Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

426.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers – including Teva and Mylan – that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

427.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e- a national accounts executive at Teva, informed ▮▮▮ Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that ▮▮▮ ▮▮▮ Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

428.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

429.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

430.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

431.    For example, at 12:46 pm that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:



432.    Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

433.    Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will ███████████████████████████████████ ██████████████████████████████████████████  Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

434.    On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business.  Patel then sent an e-mail to ██████ Rekenthaler, and ███████████, a senior operations executiv at Teva, to ask if they had ████████████████████████████ ██████ replied that Teva did ████████ ████ but ██████ did not want to put the plan in writing. Instead she told Patel she ██████████ to discuss it. ██████████ separately questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information.  Rekenthaler also did not want to put that ████████████████████████████████████████████████████"

435.    The "████ was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva.  The same day that Mylan put a bid in to McKesson – August 7, 2014 – Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes.  On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

436.    This market allocation ████████████████████████████████





████   Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

437.   The next morning, at 8:30 am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was ████████ ██████████████████   Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler e-mailed ██████ Patel and others at Teva to confirm that ████████████████████████████████ He added that Teva ████████████████████████████████████████ ██████

438.   In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

439.   Teva also conceded some of the ██████████ as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine.   On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, ██████ circulated an internal e-mail confirming that Teva ████████████████████ at Cigna.

**M.    Carbamazepine**

440.   Carbamazepine tablets, including regular tablets, chewable tablets, and extended release tablets, are anticonvulsants used to prevent seizures and treat bipolar disorder.

441.    During the period relevant to this Complaint, Apotex, Taro and Teva dominated the market for Carbemazepine tablets ("Tablets"); Taro and Teva dominated the market for Carbemazepine chewable tablets ("Chewable Tablets"); and Sandoz and Taro dominated the market for Carbamazepine Extended Release tablets ("Carbamazepine ER").

442.    ██████ – a senior sales executive at Taro – and CW-4 – a senior sales executive at Sandoz – spoke by phone on May 16, 2013, and again on May 17, 2013.

443.    Upon information and belief, the purpose of these calls was to coordinate a price increase on Carbamazepine ER.

444.    Following these calls between ████ and CW-4, both Taro and Sandoz implemented substantial and abrupt price increases on Carbamazepine ER of more than 50%.

445.    One year later, in May 2014, Ara Aprahamian of Taro led price increases on all three formulations of Carbamazepine.

446.    Between May and July of 2014, Aprahamian texted or spoke with Nisha Patel of Teva a number of times.  Following their first series of communications in May 2014, Patel added Carbamazepine to the list of drugs she was then targeting for price increases.

447.    In early June 2014, Taro increased prices on all forumalations of Carbamazepine tablets, including price increases on the Carbamazepine Tablets and Chewable Tablets of between 200% and 1000%.

448.    As a result of the overarching Fair Share agreement, Aprahamian knew that his competitors would follow these massive price increases – which they did.  Teva followed the Taro price increases on Carbamazepine Tablets and Chewable Tablets in July 2014, and Apotex increased prices on Carbamazepine Tablets simulataneously with Teva.  Sandoz also followed the Taro price increase on Carbamazapine ER.

449.    Aprhamian continued to speak with Patel by phone in June and July 2014. Additionally, David Rekenthaler of Teva and ███████████ (a senior vice president at Apotex) texted and spoke by phone a number of times between June and September 2014.

450.    Due to these collusive communications and each Defendant's commitment to the overarching Fair Share agreement, prices on Carbamazepine have remained elevated since May 2013.  For example, Defendants continue to sell Carbamazepine Tablets at prices more than 700% higher than in early 2014.  Additionally, Defendants' prices for Carbamazepine ER are more than 100% higher today than in early 2013, and their prices for Carbamazepine Chewable Tablets are more than 300% higher than before the collusive price increase.

### N.    Celecoxib

451.    Celecoxib, also known by the brand name Celebrex®, is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

452.    Teva received approval to market generic Celecoxib in May 2014.

453.    On November 20, 2014, as Teva was preparing to launch its generic Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business.  The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to ███████████ in light of the fact that Teva had already secured over 30% of the market.

454.    Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: █████████████████████████████

455.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided.  Another customer, a large retail pharmacy chain ("The

Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

456.    Rekenthaler's response was consistent with ████████████████████

████████████████████████████████████

457.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis.  Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute.  Patel spoke to ██████████, a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8.  Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call.  On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

458.    As a result of these collusive communications, Defendants have been able to sell Celecoxib at supracompetitive prices since December 2014.

**O.    Clobetasol**

459.    The market for Clobetasol is mature, as Clobetasol has been available in the United States for decades.  During the relevant time period, Defendants Actavis, Akorn, Hi-Tech, Sandoz, Fougera, Perrigo, Taro, Wockhardt, and Morton Grove sold Clobetasol to Plaintiffs and others in

the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

460.    For more than two years prior to June 2014, Defendants' average price in the U.S. for Clobetasol was remarkably stable.

461.    Beginning in approximately June 2014, Defendants abruptly increased their prices for Clobetasol on multiple formulations and sizes.  By way of example, Taro, Sandoz, Hi-Tech, Actavis, and Wockhardt all took price increases on their 0.05% cream product in near lockstep reflecting increases of more than 800%:

| Product crm .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672125801 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | 00168016315 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | 50383026715 | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | 00472040015 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672125802 | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | 00168016330 | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | 50383026730 | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | 00472040030 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672125806 | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | 00168016346 | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | 50383026745 | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | 00472040045 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672125803 | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | 00168016360 | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | 50383026760 | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | 00472040060 | * | $6.12 | 10-Mar-15 | * |

462.    Upon information and belief, between June and August 2014, Akorn, Morton Grove, Fougera, and Perrigo all increased their list prices for Clobetasol by similar amounts, even though these prices were not publicly reported.

463.    Clobetasol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase" in 2014-15.

464.    Defendants' dramatic price increases were not due to supply disruptions because there is no indication that there was a drug shortage.  These dramatic increases cannot be explained by any other market feature or shock.

465.    Upon information and belief, the price increases on Clobetasol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

466.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

467.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland, which was attended by representatives from Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

468.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended the Expo.  *See* Ex. 1.

469.     On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Actavis, Sandoz, Hi-Tech, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

470.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

471.     On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Arizona.  The June 1-4, 2014 BLC was attended by represnetatives from Actavis, Hi-Tech, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

472.     On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Perrigo, Sandoz, Hi-Tech, and Taro.  *See* Ex. 1.

473.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Actavis, Hi-Tech, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

474.     On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Sandoz, Fougera, Perrigo, Taro, and Wockhardt.  *See* Ex. 1.

475.     On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

476.     On February 9-11, 2015, GPhA held its Annual Meeting in Miami Beach, Florida. Representatives from Actavis, Sandoz, Akorn, Perrigo, Taro, and Wockhardt attended.  *See* Ex. 1.

477.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers in Palm Beach, Florida.  NACDS's 2015 annual meeting was attended by representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt.  *See* Ex. 1.

478.    The June 7-10, 2015 HDMA BLC was held in San Antonio, Texas.  The June 2015 BLC was attended by representatives from Actavis, Sandoz, and Wockhardt.  *See* Ex. 1.

479.    On June 9-10, 2015, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Sandoz, Perrigo, Taro and Wockhardt.  *See* Ex. 1.

480.    On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended.  *See* Ex. 1.

481.    In 2016, Actavis, Akorn, Fougera, Perrigo, Sandoz, Taro, and Wockhardt continued to attend trade association meetings and events.  *See* Ex. 1.

**P.    Clomipramine**

482.    Clomipramine HCL, also known by the brand name Anafranil, is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.  The market for Clomipramine is mature, as Clomipramine has been available in the United States for over 20 years.  The World Health Organization ("WHO") includes Clomipramine on its list of essential medicines.  During the relevant time period, Mylan sold Clomipramine pursuant to ANDAs approved by the FDA in or around January 1998.  Sandoz sells Clomipramine to purchasers pursuant to ANDAs that were approved by the FDA in or around June 1997 and March 1998.  Taro sells Clomipramine to purchasers pursuant to ANDAs approved by the FDA in December 1996.

483.    At all times relevant to this lawsuit there has been more than one manufacturer of Clomipramine on the market.   Defendants Mylan, Sandoz, and Taro sold Clomipramine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

484.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Clomipramine was remarkably stable.   Beginning in approximately May 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

485.    In addition to Defendants Sandoz and Mylan, Defendant Taro also manufactured Clomipramine HCL.   Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

486.    In the weeks leading up to the Taro price increase on Clomipramine, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and Michael Aigner, a national account manager at Mylan.   In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next.   At the same time, CW-4 of Sandoz was also speaking with Doug Statler, a senior sales and national account executive at Taro.   During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL.

487.    CW-3 of Sandoz also took contemporaneous notes of some of his conversations with competitors.   For example, after speaking with Aprahamian of Taro twice on April 30, 2013, CW-3 made the notes identifying Clomipramine HCL as one of the products that Taro planned to increase on May 1st.

488.    Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

489.    As part of the agreement to raise prices and not poach each other's customers on Clomipramine, Defendant Sandoz consistently refused to bid for Taro's customers after Taro raised its price.  For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine, and asked whether Sandoz wanted to bid for the business.  Kellum e-mailed CW-4 stating: █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████

490.    Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market.  On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine. Kellum responded: █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████

491.    The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes.  CW-3 hung up the phone and then immediately called Kellum. The two spoke for eight (8) minutes. First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five (5) minutes.  Within a half hour, CW-3 again contacted Kellum and spoke for two (2) minutes. Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating ████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████

492.     Ultimately, Sandoz was awarded the Clomipramine business at Rite Aid.  When Rite Aid notified Taro, Aprahamian forwarded the e-mail to ███████████████████████ ████████████████████████████████████████████

493.     Mylan was the next to increase price on Clomipramine HCL.  On May 16, 2013,Mylan increased to the same WAC per unit cost as Taro.  In the days leading up to the Mylan price increase, all three competitors were in contact with each other by telephone to coordinate efforts.

494.     On July 3, 2013, Plaintiff HEB informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business.  Aprahamian responded that he was ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████

495.     On July 16, 2013, CW-4 of Sandoz sent the July 2013 E-mail identifying Clomipramine HCL as a Mylan price increase product.  By this time, Sandoz knew that Mylan had increased its price on this product.

496.     On July 20, 2013, Taro received a ███████████" notification that Sandoz was increasing price on Clomipramine HCL.  Aprahamian forwarded the notice ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████

497.     Two days later – on July 22, 2013 – Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

498.    On August 5, 2013, Walgreens – a Mylan customer – e-mailed Sandoz and requested a bid on Clomipramine HCL. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████

499.    In October 2013, CW-4 and Nesta spoke by phone several times, including multiple calls on October 3rd and 4th.

500.    After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum. The call lasted one minute.  Approximately one half hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

501.    On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating: ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

502.    In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL.  Kellum prepared a response claiming that Sandoz had simply followed the market price increase after learning of it through public sources.

503.    As is clear from the above allegations, Kellum's statement was a lie.  In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance, and stayed true to its commitments to keep those prices high.

504.    By way of example, beginning in May 2013, Mylan, Sandoz, and Taro set their WACs in lockstep on their 25 mg product, reflecting increases from previous WACs of, more than 2,700%:

| Product 25 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 30 ct | Taro | 51672401106 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 90 ct | Taro | 51672401105 | $0.25 | $8.99 | 1-May-13 | 3441% |
| 100 ct | Mylan | 378302501 | $0.30 | $8.99 | 16-May-13 | 2853% |
| 100 ct | Sandoz | 781202701 | $0.31 | $8.99 | 22-Jul-13 | 2778% |

505.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Clomipramine, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Clomipramine was identified as experienced an "extraordinary price increase."

506.    There are no legitimate justifications for these price hikes.  There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that explain these abrupt increases.

507.    The price increases on Clomipramine were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clomipramine in the United States.

508.    These collusive agreements were also furthered at least in part, through in-person meetings at industry events hosted by GPhA and HDMA.

509.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

510.    On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida.  GPhA's 2013 Annual Meeting was attended by representatives of Taro, Sandoz, and Mylan.  *See* Ex. 1.

511.    On April 20-23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's Annual Meeting was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

512.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.   HDMA's June 2013 BLC was attended by representatives from Sandoz and Mylan.  *See* Ex. 1.

513.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1

514.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

515.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Taro, Sandoz, and Mylan.  *See* Ex. 1.

516.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Defendants Mylan and Sandoz.  *See* Ex. 1.

### Q.    **Clonidine-TTS Patch**

517.    Clonidine-TTS Patch – also known by the brand name Catapres-TTS – is a medication in the form of a transdermal patch that is used to treat high blood pressure.

518.     As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having ███████████% market share and Teva having ████████████ market share.  At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

519.     In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid.  Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term █████ █████ that Mylan was experiencing.  A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine-TTS.  Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

520.     On February 10, 2012, the move of Cardinal's business to Teva prompted ███████ of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called ████████ a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes.  Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, ████████████████ ████████████████████████ Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan.  With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine-TTS.

521.     To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson.  To de-escalate the situation, Teva ████████████████████████████████ Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at CVS to

gain back market share and further signal its displeasure with Teva for taking the Cardinal business.  Internally, Teva lamented that Mylan was ███████████████████████████████ ████████████████████████████████████████████

522.    Teva heard Mylan's retaliatory message loud and clear.  On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin.  At the time, Mylan was the primary supplier for Doxazosin at Cardinal.  Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.  Rather than take this business, ████████ cautioned his colleagues that Teva██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

523.    On July 18, 2012,████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012.  Those calls lasted three (3) minutes and five (5) minutes, respectively.

524.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes.  On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.  As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

525.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market.  For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was ███████████████████, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below ██████████████████ for those dosages, respectively.  Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of ██████████████████, respectively.

526.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS.  For example, Teva submitted bids to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4, 2012 and October 5, 2012, respectively.   In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
| --- | --- | --- | --- | --- | --- |
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

527.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding.  For example, on October 10, 2012, Green and Nesta spoke for ten (10) minutes.  That same day, ██████████ of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should ███████ █████████████████

528.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share.  In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc.  Rather than competitively bid for the business, Teva's internal documents state that they chose to " ███████ Econdisc back to Mylan.  By April 2013 Teva also ████████████ ███████████████████████

529.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Rekenthaler acknowledged in an internal e-mail dated February 28, 2013 that Teva was ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████  For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention.  CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so.  Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing.  Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain artificially higher prices at CVS.

530.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact.  In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

531.    By April 2013, Teva had ██████████████████████████████ ████████████████████████████████████████████████

prices on Clonidine-TTS.  On April 8, 2013, ██████████ , a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



533.    Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes.  In a follow up call the following day between Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

533.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS.  Teva and Actavis immediately commenced an extensive negotiation over price and market share.  Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

534.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. ███████ of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis.  At the same time, Teva employees bemoaned Actavis's "████████ low pricing for a new entrant, saying that price "is already eroded here."

535.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls.  On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54 am.  At 10:02 am, she informed her colleagues of the results of the negotiations, instructing them:████████████████████████

536.    The following day, May 9, 2014, Patel learned from yet another customer of a ████████████████████ on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times.  Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market.  She also stated that Actavis would likely want 10%-15% of that share from Teva.  During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her ████████████████████████████████ ████████████████████████████████ ████████████████████

537.    Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: ████████████████████████ ████████████████████████████████

senior sales executive, ███ cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying: ████████████████████████████████ ████████████████████████████████████

538.    The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine-TTS.  On May 14, 2014, for example, Patel told colleagues that Teva must be ████████████████████████████████ ████ On May 17, 2014, Teva conceded a large retailer account to Actavis.  On May 20, 2014, Patel again declined to bid at another customer du████████████████████████ ██████████████████████████

539.    ████████████ Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, ████████████████████████████████ ████████████████████████████

### R.    Desogestrel/Ethinyl Estradiol Tablets (Kariva)

540.    Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two hormones: progestin and estrogen.  This medication is an oral contraceptive.  Defendant Glenmark markets this drug under the name Viorele, while Defendant Teva markets the drug under the name Kariva.  These drugs are also known by the brand name, Mircette.  Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

541.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser.████████ ████ an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for

various drugs, including Kariva. ████████████████████████████████

████████████████████████████████████████████████████████

542.     This sparked a flurry of communications that same day between Patel and three different Glenmark representatives – ██████████████████████████████ a sales and marketing executive at Glenmark – as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

543.     After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price ████████████████████████████████ ███████████████████████ virtually guaranteeing that the business would be awarded to Glenmark.

**S.     Desonide**

544.     The market for Desonide is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

545.     During the relevant time period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro sold Desonide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

546.     At all times relevant to this lawsuit there has been more than one manufacturer of Desonide on the market.  Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominate the market for Desonide.

547.    For at least five years prior to May 2013, Defendants' prices for Desonide in the United States remained stable.  In May 2013, however, Defendants abruptly began implementing substantial price increases.

548.    By way of example, Defendants all set the same WACs for their ointment products beginning in May 2013, reflecting increases from previous WACs of more than 140%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15 GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60 GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15 GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60 GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15 GM | Sandoz | 00168030915 | * | $3.21 | 17-Jan-14 | * |
| 60 GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

549.    In August 2013, Actavis entered the market for Desonide and implemented the supracompetitive prices as well.  Upon information and belief, just as the Defendants did with Glyburide and Doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entry, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers.  This agreement on Desonide was facilitated by the overarching market allocation (or "fair share") agreement that was followed by all Defendants and conspirators and it prevented Actavis' entry into the market from eroding the conspiratorial pricing on Desonide.

550.    Desonide was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

551.    No competitive justifications explain the abrupt increase in price.  Changes in ingredient costs do not explain Defendants' price increases.  The gel and lotion formulations of

desonide did not experience the same coordinated and extraordinary price increases in May 2013 that the cream and ointment formulations experienced, even though all formulations have the same active ingredient.

552.     The abrupt price increases were not due to supply disruptions.

553.     Upon information and belief, the price increases on Desonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Desonide in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

554.     For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

555.     On February 20-22, 2013, GPhA held its Annual Meeting at the JW Marriott Orlando Grand Lake in Orlando, Florida that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

556.     On April 20-23, 2013, shortly before the drastic May 2013 price increases, NACDS held its annual meeting at The Breakers, Palm Beach, Florida.  This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

557.     On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  HDMA's June 2013 BLC was attended by representatives from Actavis and Sandoz.  *See* Ex. 1.

558.     On June 4-5, 2013, GPhA held a CMC Workshop meeting at Bethesda North Marriott Hotel, Bethesda, Maryland, that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

559.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center.  NACDS's August 2013 event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

560.    On October 28-30, 2013, GPhA held its 2013 Fall Technical Conference in Bethesda, Maryland that was attended by representatives from all Defendants.  *See* Ex. 1.

561.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo.  *See* Ex. 1.

562.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro.  *See* Ex. 1.

563.    These Defendants continued to attend trade associaition meetings and events between 2014 and 2016.  *See* Ex. 1.

**T.    Dexmethylphenidate HCL Extended Release**

564.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

565.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price.  On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg.  Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. On February 18, Patel left a voicemail for CW-1.  That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

566.     Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER.  After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business.  In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:



567.     One of the Teva national account managers on the e-mail responded by confirming that the approach

568.     On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

569.     Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (*i.e.*, a lower purchase price for the drug).  Patel spoke to CW-1 the same day for almost twenty-one (21) minutes.  The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating:

570.     Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was

███████████████████████████████████████████████████████ ██

surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

571.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.  In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.  Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER.  The agreement was also carried out by other manufacturers allowing Sandoz to take share from them.  In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par███████

█████████████████████████████████████████████████████████

████████████████████████, a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

572.    The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015.  On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER 5mg on the basis ██████████████████████████████████████

██████████ Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.  When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

U.      **Dextroamphetamine Sulfate Extended Release**

573.    Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine® and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

574.    During the relevant time period, Actavis, Teva, and Mallinckrodt dominated the market for Dex Sulfate XR, with Teva having by far the largest share as the first generic entrant.

575.    In 2012, as Mallinckrodt entered the market for Dex Sulfate XR, internal Teva documents acknowledged that Teva had "███████████ (*i.e.*, willingly) conceded a large number of accounts for the drug to Mallinckrodt solely because it was entering the market and sought to add share.  This was wholly consistent with the Fair Share agreement.

576.    On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting. Rekenthaler ██████████████     Rekenthaler knew Actavis's market share goals because he and Falkin of Actavis had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

577.    Five days later on June 24, 2014, Teva ███████████████ confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR.  She remarked that Teva had a 72.2% share of this ████████████████████████████████ ████████████████████████████████ – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis.  Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because ████████ ████████████████████████

V.   **Digoxin**

578.   The market for Digoxin is mature, as Digoxin has been available in the United States for more than a decade.  Generic Digoxin is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization. Variants of the drug have been in existence since the 18th century.  Because Digoxin was in existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process.

579.   In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of Digoxin.  Because Digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

580.   During the relevant time period, Defendants Impax, Lannett, Mylan, Par, and West-Ward sold Digoxin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

581.   At all times relevant to this lawsuit there has been more than one manufacturer of Digoxin on the market.  Defendants Impax, Lannett, Mylan, Par, and West-Ward dominate the market for Digoxin.

582.   Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic Digoxin.  Despite the existence of a duopoly, until October 2013, the price of Digoxin charged by Lannett and Impax remained stable.

583.    Beginning in October 2013, however, Defendants issued abrupt and substantial price increases.

584.    Defendants continued to increase the prices they charged to Plaintiffs and others for Digoxin during the first six months of 2014, despite Par's entry into the Digoxin market in early 2014 and West-Ward's re-entry soon after.  Mylan also re-entered in early 2015 and followed the pricing agreed to by the conspirators.  Upon information and belief, Par, West-Ward, and Mylan each communicated their entry into the generic Digoxin market to their co-conspirators well in advance of the date each entrant began marketing the drug, so that agreements could be reached on price without any disruption to the prevailing supracompetitive prices.

585.    By way of example, with respect to WAC pricing, in October 2013, Lannett and Impax implemented lockstep WAC prices on their 0.125 mg products, reflecting increases of more than 630%.  Instead of competing on price, Par, West-Ward, and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

586.    In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Digoxin, which had experienced extraordinary price increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Digoxin was identified as experiencing an "extraordinary price increase."

587.    There were no legitimate justifications for these abrupt shifts in pricing conduct. There were no drug shortages or supply disruptons which would cause large price spikes.

588.    Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down.  Instead, as a result of their collusion, Defendants' pricing for Digoxin in the United States increased as the number of "competitors" in the market grew.  Thus, the pricing of Digoxin mirrors Defendants' collusion on Glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on the diabetes drug in advance of the entry into the market by Heritage and Mayne.

589.    In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing.

590.    Upon information and belief, the price increases on Digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Digoxin in the United States.  As a result, Defendants have sold Digoxin at supracompetitive levels since October 2013.

591.    These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

592.   For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida.   This meeting was attended by representatives from Defendants Mylan and Par. *See* Ex. 1.

593.   On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida.  This meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

594.   On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

595.   On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.  Representatives from Mylan and Par attended this meeting.  *See* Ex. 1.

596.   On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

597.   On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts.  This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward.  *See* Ex. 1.

598.   On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida.  The speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends."   The NPF was attended by representatives of Defendants Mylan and Westward.  *See* Ex. 1.

599. On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. This meeting was attended by representatives from Defendants Mylan, Par, and West-Ward. *See* Ex. 1.

600. Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (g) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (h) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

## W. Divalproex ER

601. The market for Divalproex ER is mature, as generic versions of the drug have been available in the United States for almost a decade. Valproate, the base compound in Divalproex ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

602. In 1999, Abbot Laboratories received FDA approval to market Depakote ER, a branded version of the drug. Depakote ER was a blockbuster drug that achieved nearly $1,000,000,000 in sales for Abbot.

603. Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs authorizing them to market

Divalproex ER as generic versions of Depakote ER.  Defendant Dr. Reddy's sells Divalproex ER pursuant to ANDAs approved by the FDA in March 2012.

604.    During the relevant time period, Defendants Mylan, Zydus, Dr. Reddy's and Par sold Divalproex ER to Plaintiffs and others in the United States  at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

605.    At all times relevant to this lawsuit there has been more than one manufacturer of Divalproex ER on the market.  Defendants Mylan, Zydus, Dr. Reddy's and Par dominate the market for Divalproex ER.

606.    Between 2009 and June 2013, Defendants' prices for Divalproex ER remained relatively stable.  However, in early July 2013, Defendants implemented in unison abrupt and substantial price increases on Divalproex ER.  For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle.  Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1600 per bottle, an increase of more than 1100%.

607.    By way of example, with respect to WAC pricing, Mylan and Par set identical WAC prices within a couple weeks of each other in June 2013; and Dr. Reddy's and Zydus matched those WACs in August 2013, around the time they each entered the market.  As noted below, the new WACs for 100 and 500 count bottles of 500 mg pills reflected increases of more than 300%:

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

608.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Divalproex ER, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Divalproex ER was identified as experiencing an "extraordinary price increase."

609.    There are no legitimate justifications for the abrupt increases in 2013. Divalproex ER was not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to the FDA. Furthermore, the large price spike cannot be attributed to an increase in demand. If anything, in defiance of rational economic behavior, demand for Divalproex ER was actually decreasing when prices were increasing.

610.    Upon information and belief, the price increases on Divalproex ER were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

611.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives from Dr. Reddy's and Mylan. *See* Ex. 1.

612.     On February 20-22, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

613.     On April 20-23, 2013, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Annual Meeting in Palm Beach, Florida.  *See* Ex. 1.

614.     Shortly before Mylan's and Par's Divalproex ER prices increased, Dr. Reddy's, Mylan, Par, and Zydus, attended the HDMA 2013 BLC in Orlando, Florida on June 2-5, 2013. *See* Ex. 1.

615.     On June 4-5, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

616.     On August 10-13, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada.  *See* Ex. 1.

617.     On October 28-30, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Fall Technical Conference in Bethesda, Maryland.  *See* Ex. 1.

618.     On February 19-21, 2014 representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2014 GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

619.     On April 26-29, 2014, NACDS held its 2014 Annual Meeting in Scottsdale, Arizona.  NACDS's 2014 Annual Meeting was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

620.     On June 1-4, 2014, the HDMA held a BLC in Arizona.  This event was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

621.     On June 3-4, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland.  *See* Ex. 1.

622.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center.  This Expo was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus.  *See* Ex. 1.

623.    On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

624.    On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference.  *See* Ex. 1.

625.    On February 9-11, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Annual Meeting in Miami, Beach, Florida.  *See* Ex. 1.

626.    On June 9-10, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the GPhA CMC Workshop.  *See* Ex. 1.

627.    On November 2-4, 2015, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the 2015 GPhA Fall Technical Conference in North Bethesda, Maryland.  *See* Ex. 1.

### X.    **Doxycycline**

628.    The Doxycycline market is mature, as generic Doxycycline – which includes generic versions of branded Doxycycline such as Vibramycin, Vibra-Tabs, and Monodox – has been available in the United States since the mid-1980s in tablet and capsule form.  Doxycycline has been designated by the WHO as an essential medicine.  Doxy DR is the generic version of the branded acne medication, Doryx, for which Warner Chilcott received an NDA in May 2005.  Although Doxy Hyclate and Doxy Mono are not bioequivalent drugs, doctors will often simply write a prescription for Doxycycline, which allows pharmacists to supply consumers with either Doxy Hyclate or Doxy Mono.

629.    Although there were, at one point, approximately 20 manufacturers of Doxycycline, by early 2012, the primary manufacturers were Actavis, Par, Sun (including its subsidiaries Mutual and Caraco), and West-Ward (for Doxy Hyclate) and Heritage, Lannett, Mylan, and Par (for Doxy Mono).  In 2012, Mylan received authorization to market both Doxy Hyclate and Doxy DR.  Because Mylan was the first generic manufacturer to receive an ANDA for Doxy DR, it received 180 days of exclusivity as the sole authorized generic manufacturer, which expired in early 2013.  Mylan remained the only generic manufacturer of Doxy DR until Heritage and Mayne entered the market in 2013.  Historically, Doxy Mono cost more than Doxy Hyclate, and for that reason, Doxy Hyclate was the most commonly used version of Doxycycline.

630.    Defendants Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun (including Mutual and Caraco), and West-Ward each sold at least one variation of Doxycycline to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1.    The Doxy Hyclate Collusive Price Increase

631.    Although prices of Doxycycline had remained stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price increase across all doses of Doxy Hyclate.  By May 2013, Defendants' prices for Doxy Hyclate increased on certain strengths by as much as 8,000%.  For example, in mid-January 2013, West-Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength Doxy Hyclate pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

632.    Upon information and belief, the agreement to increase prices on Doxy Hyclate was discussed at the GPhA meetings in October 2012 in Bethesda and February 2013 in Orlando.  The October 2012 meeting was attended by Actavis, Teva, Sun, and Mylan, in addition to the other

conspiring Defendants identified in Exhibit 1. The February 2013 meeting was attended by Actavis, Mylan, and Teva, in addition to the other conspiring Defendants identified in Exhibit 1.

633.   By way of example, Defendants raised Doxycycline WACs on the 100 mg capsules to identical benchmark prices over a two-week period reflecting increases of more than 2,500%:

| Product 100 mg cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7844% |

634.   In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500%:

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5631% |
| 500 ct | Sun | 53489012005 | $0.08 | $4.92 | 5-Feb-13 | 6268% |

635.   In May 2013, after the price increases had been implemented, Teva discontinued production of Doxy Hyclate – a product that it had manufactured for three decades. This act was against Teva's individual self-interest (given that pricing for Doxy Hyclate had been raised by orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

636.    By April 2014, DAVA launched Doxy Hyclate pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell").  Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

637.    Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement for Doxycycline.[24]  Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take delivery of Doxycycline shipments from Chartwell despite the fact that there was demand for Doxycycline in the market.  Because Endo (through its generics subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

638.    Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits."  But Endo (and, subsequently, Par) withheld Doxycycline supply from the U.S. market and priced its Doxycycline at the supracompetitive price of its co-conspirators.  Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market.  It accused Endo and its generic subsidiaries of engaging in an illegal price-fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold-and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' Doxycycline, and, in collusion with its alleged 'competitors,' set Doxycycline's price at the *exact same* level its

---

[24]    *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

competitors were charging for the drug." (Emphasis in original). Chartwell further alleged that "DAVA and Moezinia dedicated efforts to *withhold* [Doxycycline] from the marketplace..., to keep the overall price of Doxy high." (Emphasis in original). For example, Chartwell cites to an e-mail dated on or about July 11, 2014 where Moezinia e-mailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

639.   Chartwell sought discovery of the materials that Par and Endo have produced to the DOJ and the States. Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: Doxy Hyclate, doxazosin mesylate, and methotrexate sodium. Chartwell and Endo settled their claims in November 2016.

2.   The Doxy Mono Collusive Price Increase

640.   In February 2013, because the abrupt and substantial price increase on Doxy Hyclate led it to cost more than Doxy Mono, large purchasers of Doxycycline (such as Plaintiffs) began to increase their purchases of Doxy Mono, so that they could supply their customers with the cheaper drug. In February and March of 2013, Heritage and Lannett recognized this opportunity to implement a substantial collusive price increase on Doxy Mono as well.

641.   In February 2013, Heritage believed that demand for some Doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of Doxy Mono. Accordingly, Heirtage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy Mono. These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

642.   Starting in March 2013, Heritage's ███████, began communicating with Lannett about pricing for Doxy Mono.

643.   On March 7, 2013, ████ spoke with a senior sales executive from Lannett, ████ ████ by telephone for approximately 14 minutes, and executives from both companies followed up on March 13, 2013, through e-mail and a five-minute phone call.

644.   Throughout the next several months, ████ and ████ communicated about Doxy Mono by phone, text message an in person.

645.   On April 25, █████████████ spoke on the phone for more than eight minutes.

646.   Heritage's ███████████ attended a conference together on May 14, 2013.  At the conference, they discussed a possible increase on Doxy Mono.

647.   On June 4, 2013, ████ called and texted with another Lannett employee, ████ ███ a Director of National Accounts at Lannett.

648.   Upon information and belief, these communications resulted in an agreement between Heritage and Lannett to increase prices on Doxy Mono by approximately 400%.

649.   However, before they could implement the price increase, Lannett and Heritage had to confirm that Mylan and Par were on board as well.  During a series of industry events in May and June, executives from all four companies met in person to discuss the Doxy Mono price increase.  Lannett agreed to lead the price increase on June 12, 2013, and communicated this intention to Mylan, Par, and Heritage.  For example, a Lannett executive, ████ met with a Heritage executive, Sather, to discuss the price increase during a trade association event on June 4.  Sales executives from █████████, and Par ████████, spoke several times about the price increase by telephone on June 7, and on June 11, a Heritage executive, ████ and

a Mylan executive, ███████ spoke by phone, while Lannett's ████████████████

communicated through at least nine text messages.  The following day, when Lannett announced

the price increase, Lannett's ████████████████ texted at least another nine times.

650.   Upon information and belief, these communications by Mylan, Par, Lannett, and

Heritage resulted in an agreement that each would follow Lannett's price increase of

approximately 400% on Doxy Mono, which each Defendant did.  For example, Par provided

instructions to its sales employees to begin implementing the price increase of August 13, 2013.

And upon information and belief, Mylan began announcing price increases on Doxy Mono to

customers during Summer 2013 as well.

651.   Although Heritage had supply chain issues for Doxy Mono for a brief period in

2013 (and had to delay the implementation of the price increase), these issues arose after

Defendants had reached the agreement to increase prices.  By October 2013, Heritage began

announcing the price increase on Doxy Mono and fully implemented the price increase by March

2014.

652.   Additionally, during the period that it delayed announcing the price increase,

Heritage continued to speak with Lannett, Mylan, and Par to ensure that it remained committed to

the price increase, notwithstanding its delay in implementation.  For example, Hertiage's █████

met with ████████████████ at a conference in August 2013, and Par, Mylan, Lannett,

and Heritage continued to communicate about the pricing of Doxy Mono throughout the Summer

of 2013.  Additionally, consistent with the overarching agreement that governed each Defendant's

market share of each drug in the industry, Mylan, Heritage, and Par agreed to refrain from

competing for any of Lannett's Doxy Mono business after Lannett led the price increase.

### 3.   Collusion on Doxy DR

653.   With respect to Doxy DR, as the sole generic manufacturer of the drug for a period of time in 2012, Mylan was able to charge a supracompetitive price during the period of generic exclusivity.   (As explained in ¶ 95, the FDA estimates that, in a market with one generic manufacturer, the generic drug will typically sell at 94% of the branded drug.)

654.   In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Defendant Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them.   It was decided that Satish Mehta, the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Rajiv Malik, in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

655.   Beginning in May 2013, Heritage reached out to Mylan for the purpose of colluding to allocate the Doxy DR market without disturbing the supracompetitive price.   On May 2, 2013, Malek of Heritage contacted a senior executive at Mylan through the social networking website LinkedIn, and on May 7 and 8, 2013, Glazer of Heritage spoke with Rajiv Malik senior executive by e-mail and then by telephone, first writing: "Rajiv: Would like to schedule a time for a call to catch up and discuss some recent Heritage news.   Please let me know when you are available and we'll pencil it in."   Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

656.   Upon information and belief, these discussions between Glazer and Malik – which were facilitated by Satish Mehta of Emcure – resulted in an agreement that Mylan would concede significant business in the Doxy DR market that accounted for approximately 30% of that market.

Malik noted that Mylan was agreeing to concede this business to Heritage because Heritage had previously agreed to concede market share to Mylan for another generic drug.

657.    In July 2013, Heritage began to sell Doxy DR to Plaintiffs and others in the United States subject to the terms of its unlawful agreement with Mylan.  Again, Satish Mehta of Emcure spoke with Rajiv Malik of Mylan on July 18, 2013, to coordinate Heritage's entry into the market. Following Mehta's entreaty, Glazer spoke with Malik againt to finalize the details.  Following these calls between Mehta, Glazer, and Malik, Mylan arranged to put in a bid at Walgreens that it knew would be above Heritage's bid, so that Heritage could take this business and get its "fair share" of the market.

658.    In January 2014, Mayne informed Heritage and Mylan that it planned to enter the Doxy DR market as well.  For example, a senior executive with Mayne spoke with a senior executive with Heritage on January 7, 2014, about making room for Mayne in the market allocation agreement between Heritage and Mylan.

659.    Senior executives from Heritage, Mylan, and Mayne communicated frequently via e-mail, text, and phone about their collusive market allocation agreement throughout 2014. Executives from Heritage and Mayne also met in person at the American Society of Health System Pharmacist's conference in Anaheim, California in December 2014.

660.    Mayne, Emcure, Heritage, and Mylan continued to adhere to their collusive agreements.  For example, in May 2014, Heritage walked away from a large account so that Mayne could win the bid.  Similarly, in January 2015, Heritage submitted a bid to Econdisc, a group purchasing organization, that it knew would be above Mayne's bid, so that Mayne could win the Econdisc business.

661.    As a result of their collusion, the price in the United States for Doxy DR has remained at elevated and supracompetitive levels since 2013, despite the entry of two additional generic manufacturers.  Indeed, whereas the FDA study mentioned in ¶ 95 would predict a market price of 44% of the branded price, Mylan, Emcure, Heritage, and Mayne, charged – and continue to charge – Plaintiffs the same or similar price that Mylan charged during its period of generic exclusivity.  Accordingly, Plaintiffs have paid, and continue to pay, substantial overcharges to Defendants on Doxy DR.

662.    The market allocation agreement on Doxy DR and the price-fixing agreements on Doxy Hyclate and Doxy Mono still remain in force or effect (or both).

### Y.    Drospirenone and ethinyl estradiol (Ocella)

663.    Drospirenone and ethinyl estradiol, commonly known by the brand name Ocella®, is a pair of drugs used in combination as an oral contraceptive.  This drug is also marketed under the brand names Yaz, Yasmin and Gianvi.

664.    Barr Pharmaceuticals received approval to market generic Ocella in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi.

665.    In late 2012, Lupin received approval to market a generic Ocella product.

666.    By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves.  On April 24, 2013, Berthold of Lupin called ███ at Teva.  The two spoke for over three (3) minutes. Berthold called ███ two more times the following day.

667.    The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis.  In preparation, on April 29, 2013, ███ of Teva asked a colleague for

current market share figures along with a list of Teva's generic Ocella customers.  The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

668.    The next day, April 30, █████████, a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone.  That same day, Patel of Teva also called Boyer.  On May 1, Patel sent █████ four (4) text messages.

669.    The competitors' communications continued into early May.  On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes.  █████ and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes.  Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

670.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share.  Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes.  On May 9, █████ spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

671.    The following day, Teva's Liz Ricketts complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin.  Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes.  Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

672.    On May 14, 2013, █████████ of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "█████████

673.    On July 10, 2013, ███ spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes).  After the first of those calls, ███ requested specific information from a colleague to help him continue to negotiate with Lupin:

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:** ████████
> **Cc:** ████████; Nisha Patel02
> **Subject:** Ocella
>
>
> Tom,
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

674.    Later that day, ███ called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold.  During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin.  Patel called Berthold shortly after and the two spoke for more than four (4) minutes.  They spoke again first thing the next morning, for nearly one (1) minute.

675.    The next day, Patel e-mailed ████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

676.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between ███ and Berthold that lasted twenty (20) minutes.

677.    On July 29, 2013, ████████████████████████████████ ██████████████

678.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take

which generic Ocella accounts.  On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of ██████ discussions with Berthold about Lupin's desired market share.  ██████ spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

679.    On September 9, 2013, ██████ of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business.  He informed them that because Teva had secured two other significant customer ██████ ████████████████████████████████████████████████████████████████

680.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, ██████ sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement.  He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

**Z.    Econazole**

681.    The market for Econazole is mature, as Econazole has been available in the United States for almost 20 years.  Defendants Taro and Fougera sell generic Econazole pursuant to ANDAs approved by the FDA in November 2002.  Defendant Perrigo sells Econazole pursuant to an ANDA approved in 2004.  Teligent sells Econazole pursuant to an ANDA it acquired in February 2013.

682.    During the relevant time period, Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to purchasers throughout the United States.

683.    At all times relevant to this lawsuit there has been more than one manufacturer of Econazole on the market.  Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

684.    Between 2009 and September 2013, Defendants' prices for Econazole remained relatively stable.  However, beginning in September 2013 and continuing thereafter, Defendants began implementing abrupt and substantial price increases on Econazole.

685.    Between September 2013 and the Summer of 2014, Econazole, which had cost roughly 12 cents/unit shot up to more than four dollars/unit.

686.    This skyrocketing price cannot be explained by supply shortages or other market events.  The only material change in the months preceding the price increases was Teligent's entry into the market.

687.    On Feburary 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC. During that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three Defendants had an opportunity to discuss Teligent's entry into the market.

688.    During this same time period, Teligent also became interested in entering the market for other generic pharmaceuticals.  Teligent launched its first topical generic drug in late 2012, followed by its acquisition of the Econazole ANDA in February 2013.  By September 2013, Teligent had 12 ANDAs pending for FDA approval.  By June 20, 2014, that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.

689.    When Teligent acquired the right to sell Econazole from Prasco LLC, it was the beginning of a publicly announced plan that would place Teligent in direct competition with Taro

and Perrigo across numerous drugs.  Teligent now makes 20 topical drugs.  Seventeen of these drugs are also made by Taro; fifteen are made by Perrigo.

690.    Teligent's entry into the Econazole market demonstrates a "fair share" agreement. Where a drug manufacturer, like Teligent, plans to enter a market with established manufacturers, and where the established manufacturers are competitors across multiple drugs, such a situation sets the groundwork for a "fair share" agreement.  Rather than allow the new entrant to drive the price of drugs lower, the incumbent manufacturers and the new entrant can "play nice in the sandbox" and keep prices high.  The conduct of Teligent, Perrigo, Fougera and Taro after Teligent entered the Econazole market is the result of a market allocation or "fair share" agreement among these Defendants.

691.    Teligent launched Econazole under its own label in September 2013.  In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.  Teligent, however, announced a list price (WAC) increase in July 2013, even before its first sale of Econazole under its own label.  Rather than competing for market share by lowering prices, Teligent made the economically irrational decision to raise prices.  Upon information and belief, Teligent's conduct reflected an agreement with Perrigo, Fougera, and Taro that Teligent would enter with higher – rather than lower – prices in exchange for the incumbents' promise to cede market share to Teligent.

692.    On October 28-30, 2013, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro, Fougera and Teligent, met at a GPhA conference where they had an opportunity to discuss Econazole market shares and pricing.  *See* Ex. 1.

693.    By January 2014, Teligent's effective pricing for Econazole was more than double that of Perrigo and Taro.  Pursuant to their agreement, the incumbents also matched Teligent's high prices.

694.    In February 2014, Perrigo began to increase its effective prices, and by March, Perrigo's effective prices had risen to the level of Teligent's prices.  Taro's prices remained relatively stable, but that changed after representatives from Perrigo, Teligent, and Taro, met at the June 3-4, 2014 GPhA meeting in Bethesda, Maryland.

695.    Consistent with their price-fixing agreement, in mid to late 2014, Teligent, Perrigo, Taro, and Fougera each implemented abrupt and substantial price increases on the Econazole products they sold to Plaintiffs and others in the United States in lockstep.

696.    With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WACs to identical prices, reflecting increases of more than 600%:

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30 gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30 gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30 gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |
| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |

697.    Upon information and belief, by November 2014, Fougera increased its WAC prices to the same levels as Perrigo, Teligent, and Taro.

698.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Econazole, which had experienced extraordinary prices increases.  In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Econazole was identified as experiencing an "extraordinary price increase."

699.    Although the conspirators have not been able to maintain their full conspiracy price increase, Defendants continue to charge an average of more than $2.00 per dose for Econazole, which is roughly four times the prevailing market price before the conspiratorial price increases in late 2014.

700.    Upon information and belief, the price increases on Econazole were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Econazole in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those identified below.

701.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Perrigo, Fougera, and Taro.  *See* Ex. 1.

702.    On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida that was attended by representatives from Perrigo, Taro, and Teligent.  *See* Ex. 1.

703.    On February 24-27, 2013, representatives from Perrigo, Fougera, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficent Program Planning Session.  *See* Ex. 1.

704.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.  NACDS's 2013 Annual Meeting was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

705.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, and Taro.  *See* Ex. 1.

706.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from Defendants Perrigo, Fougera, and Taro.  *See* Ex. 1.

707.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, Taro, and Teligent.  *See* Ex. 1.

708.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants Perrigo, Taro, and Teligent.  *See* Ex. 1.

709.    On February 23-26, 2014, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.  *See* Ex. 1.

710.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives  from Defendants Perrigo and Taro.  *See* Ex. 1.

711.    On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, and Taro.  *See* Ex. 1.

712.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts.  NACDS's August 2014 Total Store Expo was attended by representatives from Defendants Perrigo and Taro.  *See* Ex. 1.

713.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, Taro, and Teligent.  *See* Ex. 1.

714.    The GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015 was attended by representatives of Perrigo, Taro, and Teligent.  *See* Ex. 1.

715.    On February 22-25, 2015, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.  *See* Ex. 1.

716.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida.  NACDS's 2015 annual meeting was attended by representatives from Defendants Perrigo and Taro, who were key executives for generic drug sales and pricing.  *See* Ex. 1.

717.    On June 9-10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

718.    On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado.  NACDS's August 2015 Total Store Expo was attended by representatives from Perrigo and Taro.  *See* Ex. 1.

719.    On November 2-4, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro.  *See* Ex. 1.

720.    Defendants continued to attend trade association meetings and conference throughout 2016, including: (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16-19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19-22, 2016.  *See* Ex. 1.

721.    A number of individuals with leadership roles at Teligent have ties to other Defendants that are implicated in the conspiracy.

722.    For example, Jason Grenfell-Gardner ("Grenfell-Gardner") joined Teligent as CEO in July 2012.  Prior to that time, he had served in a number of roles at West-Ward.

723.    Damian Finio, who worked with Grenfell-Gardner at West-Ward, served briefly on Teligent's Board in 2014 before leaving that job to become the CFO of Heritage.  In 2018, he returned to Teligent and is now Teligent's CEO.

724.    Carole Ben-Maimon joined the Teligent Board in 2016.  She has held leadership positions at Impax, Par, and Teva.

725.    Narendra Borkar served on the Board of Teligent and is the former CEO of Aurobindo and Caraco (now part of Sun).

726.    Bhaskar Chaudhuri served on the Teligent Board and previously worked for Valeant and Mylan.

### AA.    **Enalapril Maleate**

727.    Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec®, is a drug used in the treatment of high blood pressure and congestive heart failure.

728.    In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market.  It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

729.    By mid-2013, the Enalapril market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%.  Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

730.    Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

731.   In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva as well as ███████, a senior sales and marketing



executive at Wockhardt, about Enalapril.  As a result of those conversations, Taro's plans changed.

732.   On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Patel called Aprahamian and left a message.  He returned the call and the two spoke for almost fourteen (14) minutes.  Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective –Aprahamian called ████ at Wockhardt on his office phone and left a message.  He then immediately called ████ cell phone, which ████ answered.  They spoke for nearly eleven (11) minutes.

733.   On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:

734.   Aprahamian followed up with another e-mail shortly after, adding that Taro

███████████████████████████████

██████████████████████

735.    In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

736.    On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets.  Enalapril was one of the drugs where, according to Patel, Teva was █████████████ so she authorized the submission of a bid.  Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11 minute call) and July 31, 2013 (4 minute call). Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

737.    Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on ████████ ██████████████████████████ "

738.    In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, ████████████ , during conversations of two (2) and eleven (11) minutes.

739.    On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths.  At 4:30 pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

740.    Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva.  On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

741.    Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a ███████████████████████████████████████████ nearly identical to Wockhardt's and Mylan's.

742.    Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's ██████ during a brief phone conversation that afternoon.  This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

743.    Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market.  Aprahamian and ██████ talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

744.    Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

745.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both.  For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer.  This caused ████████████ of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation.  During the call, ██████ agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to

Taro. In an e-mail on January 2, 2014, █████████ of Wockhardt conveyed the details to his colleagues:



746. By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril: █████████████████████████████████████ " The same day she sent that e-mail – May 14, 2014 – Patel spoke to Aprahamian for more than four (4) minutes, and exchanged eight (8) text messages with him.

747. By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player market. Mylan and Teva each had approximately 28% market share.

**BB.** **Entecavir**

748. Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

749. As Teva was preparing to enter the market for Entecavir in August 2014, █████ a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir " █████ depending on when the FDA approved the drug.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

750.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: ████████████████████████████████████████████████

████████████████████    Rekenthaler also noted that Teva would be pricing as if they were "████████████████████████████████████████████████████████

████████████████████████████████████████████

751.    The same day, August 28, 2014, Rekenthaler had three phone calls with ████, a senior national account executive at Par.  The two spoke two (2) more times the next day, August 29, 2014.

752.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva.  The employee inquired whether Teva might consider reducing its price as well.  Rekenthaler, after speaking with ████ at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was ████████████████████████████    Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

753.    Also on August 29, Rekenthaler e-mailed ████ asking if she had received any feedback from CVS on Entecavir.  ████ replied that she had not, and followed up later saying that ABC had indicated that it would sign Teva's offer letter.  Rekenthaler replied: ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

754.    Teva and Par both launched their respective Entecavir products on September 4, 2014.   Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

755.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

756.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to ███████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

757.    The two-player market for Entecavir remained stable over time.   By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

## CC.   **Estradiol Tablets**

758.    Estradiol is a form of estrogen that used to treat symptoms of menopause.   During the time period relevant to this Complaint, Actavis, Mylan, and Teva dominate the market for Estradiol tablets.

759.    Estradiol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.   Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.   For example, in July 2012, ████ spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill of Alvogen. On July 31, ████ and Nesta spoke five times, and immediately following some of these calls,

██ called Hill.  Also, Rekentheler spoke with ████████ of Actavis and ████████ of Breckenridge.  These communications solified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

**DD.**   **Estradiol/Norethindrone Acetate Tablets (Mimvey)**

760.   Estradiol/Norethindrone Acetate Tablets ("Mimvey") contains estrogen and progestin and is used to reduce the symptoms of menopause.  During the time period relevant to this Complaint, Breckenridge and Teva dominate the market for Estradiol/Norethindron Acetate tablets.

761.   Estradiol/Norethindrone Acetate was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ████████ of Alvogen.  On July 31, ████ and Nesta spoke five times, and immediately following some of these calls, ████████.  Also, Rekentheler spoke with ████ ████████████████████████████████  These communications solified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

762.   On November 14, 2013, Breckenridge increased its pricing on both Mimvey and Cyproheptadine HCL Tablets.  For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

763.    In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with ▮▮▮ at Breckenridge to coordinate the price increases.  The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013.  After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

764.    Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter and refused to increase market share while it had a lower price than its competitors.

765.    On April 4, 2014, Teva followed the Breckenridge price increases with a substantial increase of Mimvey (contract increases of as much as 393%.  In addition, Teva increased the WAC price on Mimvey (Estradiol/Norethindrone Acetate Tablets) by 26% to exactly match Breckenridge's WAC price.

### EE.    Ethinyl Estradiol and Levonorgestrel

766.    Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy.  During the relevant time period, both Teva and Sandoz marketed ethinyl estradiol and levonorgestrel under multiple names – including both Portia and Jolessa.

767.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

768.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa, ▮▮▮▮▮▮▮▮▮, a senior sales executive at Teva, responded: ▮▮▮▮▮▮▮▮▮

[REDACTED]

769.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, [REDACTED] of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa.  Teva discussed the decision internally and explained that the reason for the [REDACTED]

770.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa.  On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its [REDACTED]  On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call.  On July 10, Teva learned that the challenger was Sandoz.  At 12:16 pm, Rekenthaler forwarded an e-mail to Patel and posed the question: [REDACTED]  Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

771.    Rekenthaler then called CW-2 at Sandoz at 1:26 pm that same day and they spoke for two (2) minutes.  CW-2 called Rekenthaler back a few minutes later and they spoke for nine

(9) minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48 pm, for seven (7) minutes.  Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as ███████████ for their primary supply.  Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

     **FF.**   **Etodolac**

772.    Etodolac, also known by the brand name Lodine, is a medication known as a non-steroidal anti-inflammatory drug (NSAID).  It is used to reduce pain, swelling and joint stiffness from arthritis.  It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

773.    Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for Etodolac capsules.

774.    In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.  Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching Fair Share Agreement.

775.    As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the market at the higher price and gain its "Fair Share."  As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

776.    This coordination paved the way for a subsequent price increase on the tablet formulations of the drug.  One year later, when Patel first began planning for ███████ Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential ███████ increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

777.    Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

778.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen (16) minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes.  After hanging up the phone with CW-3, Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes.  On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

779.    During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac tablets and Etodolac ER.

780.    On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac tablets and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

781.    Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac tablets, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

782.    That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac tablets.  Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac tablets. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

783.    The Sandoz price increase for Etodolac tablets became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets.  After learning of the request, Aprahamian responded swiftly internally: █████████████ ████████████████████████████████████ t.”

784.    When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:



785.    Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor ████████ Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR

(immediate release). She instructed them to ███████████████████████████

████████████████████████████████████████████████████████████

██ ████████████████████████████████████

tablet and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013,

for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian

at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

787.    Aprahamian was also speaking to his contact at Sandoz – CW-3 – during this time,

including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

788.    On August 1, 2013 - shortly after speaking with Patel – Aprahamian instructed a

colleague at Taro to begin implementing a price increase on Etodolac tablets and Etodolac ER.

Aprahamian stated:████████████████████████████████████████████

████████████████████████████████████████████

789.    By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac tablets and Etodolac ER.  The minutes from a Teva ███████ ███████████████████████ – which Patel attended – reflect the following:



790.    When Patel sent the ███████████████████████████████████████ ████████ on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac tablets and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs████ ███████████ quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

791.    Teva and Taro raised prices for Etodolac tablets and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were increased to the exact same price points.  The increases were substantial.  For Etodolac tablets, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

792.    This substantial price increase resulted in Zydus entering the market for Etodolac ER, which should have led to price competition.  Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "Fair Share" of the market.  For example, Nisha Patel, Ara Aprahamian, and █████████ discussed a plan to cede a large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later.  Some of these conversations are reflected in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

793.    Defendants continued to allocate the market.  On May 14, 2014, Anda, a wholesaler customer of Teva, notified Teva that Zydus had submitted a bid for its Etodolac ER business.  That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian. The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

794.    On May 20, 2014, Green called Patel and they spoke for four (4) minutes.  That same day, ████████, a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Maureen Cavanaugh of Teva.  The next day – May 21, 2014 – Green called Patel again and they spoke for twenty- eight (28) minutes. That same day, ████ of Zydus and Cavanaugh of Teva exchanged four (4) text messages.

795.    The next day, on May 22, 2014, ████otts, Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some

share with a new market entrant. Anda is looking for a response today."  Patel responded: "agree with concede."

796.    Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business.  Later that day, Patel spoke with Aprahamian at Taro for fourteen (14) minutes.

797.    On July 2, 2014, Patel called Green and left a four-second voicemail.  The next day, on July 3, 2014, Patel sent an internal e-mail advising that: ████████████    Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

798.    When  Patel's  supervisor, ████████████████████████
████████████████████████████████████████
████████████████████████████

### GG.    **Fenofibrate**

799.    Fenofibrate – also known by brand names such as Tricor – is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

800.    By the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

801.    Based on the Fair Share agreement, between late 2012 and March 2014, three new competitors entered the Fenofibrate market – Mylan, Perrigo, and Zydus.  Consistent with the conspiracy, when each competitor entered, the existing manufacturers coordinated to cede market share to the new entrant.

802.     On February 27, 2013, ███████████, a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide ████████████████████ ███████████████████████████████████   █████████ ████████████████████ on Mylan's potential entry to the market.  In order to get this information, ████ called Mylan's Vice President of National Accounts, Jim Nesta.  Over the course of that day, ████ and Nesta spoke at least four (4) different times. That same day, ████ reported back to ██████ and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

803.     A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate.  In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate.  On May 8, 2013, ████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████

804.     Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone. These calls include at least those listed below.  On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

805.    In one striking example of the coordination between the three companies, Nesta called Green at 2:42 pm on May 7 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 pm – Nesta called Berthold and spoke for nearly three (3) minutes.

806.    On May 10, 2013, ███████ received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, ███████ concluded that ███████ ███████████████████████████████████████████████████████████████ By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she ███████████████████████████████████████████████████ The logic, of

course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

807.    Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls.  These calls include at least those listed below.  On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

808.    Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on ████████████████████████████████

████████████████████████

809.    Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times.  These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

810.    In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, Berthold, and Perrigo's ████ ████ to share pricing information and allocate market share to his new employer, Zydus.

811.    On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, ████ Senior Director, Marketing Operations, for a meeting to discuss ████ ████████████████████ n February 24, 2014.  One discussion item was Zydus's anticipated entry into the Fenofibrate market.  Notably, Defendant Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

812.    In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

813.    On or about March 7, 2014, Defendant Zydus entered the Fenofibrate market at WAC pricing that matched Defendants Teva, Mylan, and Lupin.  In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other.  These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

814.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.  A half an hour after the second call, Patel e-mailed her supervisor, ████████ identifying ████

██████████████ for several products on which Teva overlapped with Defendant Zydus - including Fenofibrate.  With respect to Fenofibrate, Patel recommended ████████████████████ Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

815.    In the months that followed, Teva ████████████████" several customers to Zydus in accordance with the agreement they had reached.

816.    For example, on Friday March 21, 2014, ██████████, a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource.  Patel responded that Teva was "███████████████████████

817.    That morning, Patel sent a calendar invite to Rekenthaler and to ██████████ scheduling a meeting to discuss ████████████████████████████████████████ ████████████████████████████████

818.    The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "██████ OptiSource and Humana to Zydus.  Patel further stated that Teva provided a ██████████████████ to a third customer, NC Mutual, but stated that Teva should████████ ████████████████ That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

819.    In the meantime, Zydus bid at another Teva customer, Ahold.  On March 25, 2014, Patel e-mailed Rekenthaler stating: ██████████████ NC pending, and new request for Ahold. We may not be aligned."  Patel then sent an internal e-mail directing that Teva "██████ the Ahold business.  Later that day, Patel called Green.  He returned the call and they spoke for nearly eight (8) minutes.  Patel also called Berthold of Lupin and they spoke for five (5) minutes.

820. 



### HH.   <u>Fluocinonide</u>

825.    The market for Fluocinonide is mature, as the drug has been available in the United States for more than 40 years.  Fluocinonide, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

826.    There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and Fluocinonide 0.05% ointment.

827.    As an established generic drug that had been on the market for a long period of time, in early 2014, the price of generic Fluocinonide was fairly stable.  As of June 2014, Teva, Taro and Sandoz were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned above.  On June 11, 2014, Teva identified the market-share breakdown for each of the different formulations of those drugs as follows:

| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

828.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four of those formulations of Fluocinonide in July 2013, based in part on discussions that started between Patel and Aprahamian even before Patel started her employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

829.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to Taro's WAC prices are set forth below:



Taro notified its customers of the increases the day before they became effective – June 2, 2014.

830.   Patel knew of these (and other) Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

831.    On May 14, 2014, Patel and Aprahamian exchanged eight (8) text messages, and had one phone conversation lasting more than four (4) minutes.

832.    Subsequent to the May 14 communications Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.*  The relevant portions of that spreadsheet are set forth below:



833.    On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to ████████████████████████████████████████████████ ████████████████████ ” on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva.  The CVS representative

offered to move a significant amount of business from Taro to Teva, stating: ████████████

████████████ e-mail was forwarded to Patel, who responded:

████████████████████████████████████████████████████████████

834.   Of course Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to ████████████████ But she still needed to determine the specific price points so that Teva could follow quickly.

835.   ████████ stated that she had not heard about a price increase from anyone else, but indicated that she would ████████████████████████████

836.   Patel immediately began snooping around by exchanging five (5) text messages with Aprahamian at Taro.  Later that afternoon, she reported that she had ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████

837.     Shortly after sending that e-mail Patel called Aprahamian and they spoke for nearly seven (7) minutes.  As discussed more fully below, Taro had also increased its prices for Warfarin and Carbamazepine on June 3.  Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

838.     First thing the next morning – June 4, 2014 – Patel exchanged two (2) more text messages with Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes.  Within minutes after hanging up the phone with Aprahamian, Patel sent the following e-mail to ▮▮▮▮▮ making it clear that she had obtained additional "▮▮▮ that she did not want to put in writing:



839.     That same day, Teva received a bid request from another large customer, Walmart. Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro:



After further deliberation, Teva decided not to bid on any of the Walmart business at all.

840.    On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with ███████ she had obtained directly from Aprahamian.  That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (*i.e.*, wholesalers, chain drug stores, mail order and GPO).  Prior to sending that "███████ Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes.  The contract price points obtained by Patel were not otherwise publicly available.

841.    Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel.  Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period.  At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

842.    During one of the calls on June 20 referenced above, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz.  CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available.  Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

843.    On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees- including Patel and Rekenthaler – for a 3:00 pm conference call that day.  The notice stated: ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████  The next morning, at 9:57 am, Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

844.    Taro and Teva set identical WAC prices within a month of each other in the Summer of 2014, reflecting increases of more than 200%:

| Product CRM .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Taro | 51672125301 | $0.79 | $2.43 | 3-Jun-14 | 206% |
| 30 gm | Taro | 51672125302 | $0.56 | $2.43 | 3-Jun-14 | 337% |
| 60 gm | Taro | 51672125303 | $0.39 | $2.43 | 3-Jun-14 | 524% |
| 15 gm | Teva | 00093026215 | $0.79 | $2.43 | 1-Jul-14 | 206% |
| 30 gm | Teva | 00093026230 | $0.56 | $2.43 | 1-Jul-14 | 337% |
| 60 gm | Teva | 00093026292 | $0.39 | $2.43 | 1-Jul-14 | 524% |

845.    The Teva price increases on Fluocinonide became effective on July 1, 2014.  Teva increased its WAC pricing to match Taro's pricing almost exactly.  That same day, Patel spoke to her contact at Sandoz – CW-1 – several times, including at least those calls set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

846.    During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

847.    Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014, but followed the increase on the gel three months later, on October 10, 2014).  Sandoz increased its WAC pricing on the gel by 491%.  That same day, Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

848.    During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream, but had not yet gained any significant market share due to supply problems.  Nonetheless, Actavis still followed the Taro and Teva price increases in December

2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently. At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

849.     As a result of thise communications, Defendants Sandoz, Taro, Teva, and Actavis sold Fluocinonide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

## II.     Fosinopril HCTZ

850.     Fosinopril HCTZ is the generic version of Monopril HCT, a drug developed by Bristol Meyers Squibb in 1994 to treat hypertension. The market for Fosinopril HCTZ is mature. The primary marketers of Fosinopril HCTZ are Aurobindo, Citron, Glenmark, Heritage, and Sandoz, and each sold Fosinopril HCTZ to Plaintiffs and others in the United States at

supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

851.     During an April 22, 2014 internal call at Heritage, Malek informed the sales team that he wanted Heritage to take a price increase on Fosinopril HCTZ.  Both Malek and Glazer pushed the Heritage sales team members to communicate with their competitors to obtain agreements to raise prices.

852.     In early May 2014, sales executives with pricing authority for Fosinopril HCTZ from Heritage, Glenmark, and Aurobindo began to discuss a collusive price increase for the drug. For example, on May 2, 2014, the Heritage executive, ███████████████████ reached out to his counterpart at Glenmark, the Executive Vice President of Generics.  On May 8, 2014, the Fosinopril HCTZ sales executives from each of the three companies spoke several times by telephone in order to discuss and coordinate the price increase.

853.     On May 14, 2014, at the MMCAP conference, executives from Sandoz, Aurobindo, and Heritage met in person to discuss raising prices on Fosinopril HCTZ.  Heritage's ███████ ████████████████████████████████████████).  ██████ also spoke with CW-3, a National Accounts Executive at Sandoz.  The next day, Aurobindo's ████████ and Sandoz's CW-3 communicated by text messages about the price increase.

854.     Also on May 15, 2014, Heritage agreed to walk away from a large pharmacy account, so that it could concede this business to Aurobindo.  This act against Heritage's self-interest was done to ensure that Aurobindo participated in the price increase.

855.     On May 21, 2014, Heritage's ██████ exchanged texts with Sandoz's CW-3 to confirm that each had the other's mobile phone numbers.

856.    On June 3, 2014, following an HDMA conference held that day, Heritage's ███ met for drinks with her counterpart at either Sandoz or Aurobindo (or both).  During the week that followed this conference, the sales executives from Aurobindo, Sandoz, and Glenmark spoke by phone at least nine times and also exchanged numerous text messages about the Fosinopril HCTZ price increase.

857.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes.  Again, these discussions were presumably about the pricing of various Drugs at Issue, including Fosinopril HCTZ.

858.    On June 25, 2014, ████████████████████████████ ███████████ spoke by phone for approximately 18 minutes.  Upon information and belief, during that call, Heritage informed the Aurobindo executive that Heritage would increase Fosinopril HCTZ prices by approximately 200% beginning the next day, and the Aurobindo executive ensured Heritage that each of Aurobindo, Glenmark, and Sandoz would follow Heritage's price increase.

859.    That same day, Glenmark's sales executive spoke with the sales executive at Citron with responsibility for both Glyburide and Fosinopril HCTZ.████████████.  Upon information and belief, during the discussion, Citron informed Glenmark that Citron would be entering the Fosinopril HCTZ market, and Glenmark informed Citron about the agreement between Glenmark, Heritage, Aurobindo, and Sandoz to follow Heritage's forthcoming price increase.

860.    Beginning on June 26, 2014, Heritage began to implement the 200% price increase on Fosinopril HCTZ with its customers.

861.    On June 27, 2014, executives from Aurobindo and Glenmark discussed the price increase on Fosinopril HCTZ.  Upon information and belief, each confirmed to the other that the two companies would follow Heritage's price increase.

862.    On July 1, 2014, Citron's ████ the Citron employee that had discussed the price increase with Glenmark reached out to Heritage's ██████ to discuss the price increases of both Glyburide and Fosinopril HCTZ.  ██████████ that communications should not be done through e-mail (this would leave evidence of the conspiracy), and instead, Heritage should communicate only by phone with a specific Citron executive.████████████

863.    On July 2, 2014, Heritage's ████ spoke with the specified Citron representative, ████ for approximately 22 minutes.  Upon information and belief, during that call, Citron agreed to follow Heritage's price increases on both Fosinopril HCTZ and Glyburide.  The two executives continued to speak frequently about both drugs for the rest of July 2014.

864.    By July 9, 2014, Heritage had fully implemented the price increase of 200% on Fosinopril HCTZ.  That same day, Citron executives spoke internally about their intention to follow through on their agreement to increase prices of Fosinopril HCTZ, as well as other drugs (including Glyburide).

865.    A few days later, on July 14, 2014, Citron's ████ spoke with a Glenmark employee on the phone for about 20 minutes.

866.    The next day, July 15, 2014, Citron began announcing to customers its pricing of Fosinopril HCTZ (which was in line with the increased prices announced by Heritage).

867.    The Defendants continued to communicate in mid- and late-July 2014 regarding the Fosinopril HCTZ price increase.  For example, Heritage's ████ spoke with her Glenmark counterpart for about 23 minutes on July 18 and for approximately 5 minutes on July 30, and

Aurobindo's ███████ and Citron's █████ spoke for about 24 minutes on July 28.   Upon information and belief, Defendants communicated to each other during these calls their commitment to the agreement to follow Heritage's increased prices.

868.    By January 2015, each of the Defendants fully implemented the increased pricing on Fosinopril HCTZ.

869.    As alleged above, the price increases regarding Fosinopril-HTCZ were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Fosinopril HCTZ to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### JJ.    Gabapentin Tablets

870.    Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants.  The medication is used to treat epilepsy and neuropathic pain.

871.    During the time period relevant to this Complaint, Aurobindo, Glenmark, and Teva dominate the market for Gabapentin 600mg and 800mg tablets.

872.    On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors, including executives at Glenmark and Aurobindo. The PCMA described its Annual Meeting as ████████████████████

████████████████████████████████

████████████████████

873.    Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin,

and suggested that this would be a great opportunity to pick up some market share.  The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.  At around the time she sent the e-mail, Patel exchanged two (2) text messages with Brown of Glenmark.

874.    Also in October 2014, Jim Grauso of Glenmark was speaking frequently with ████████████, the CEO of Aurobindo, and █████ was speaking frequently with Teva's Rekenthaler.

875.    Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share.  Over the next several weeks, Teva did pick up ██████████████████████████████ ████████████████████████████████████

876.    These communications reflect that, even in instances when competitors took share from each other, it was fully in line with the conspiracy's Fair Share principles.  Indeed, the fact that these high-level conspirators were actively communicating about confidential pricing information while also taking market share from each other demonstrates that Teva's act of taking market share from Glenmark was the conspiracy functioning on a business as usual basis.

**KK.    Glipizide-Metformin**

877.    The market for Glipizide is mature, as the drug has been available in generic form since 2005.  During the relevant time period, Heritage, Teva, and Mylan sold Glipizide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

878.    During the same April 15, 2014 phone call between Malek and the Teva's Patel alleged above that resulted in an agreement between the two companies to increase prices on Doxy Mono, Malek informed Teva's Patel that Heritage wanted to raise prices on Glipizide.  Teva agreed that it would either match Heritage's price increase or commit to not bidding against Heritage's business.

879.    Around the same time, a second Heritage employee, ███████████████ who was tasked with coordinating price increases with Mylan discussed the Glipizide price increase with his Mylan contact, ██████  On April 23, 2014, ████████████ e-mailed Malek to confirm to him that Mylan agreed to the Glipizide price increase as well.  (They also agreed to raise prices on Doxy Mono and Verapamil in the same communication.)

880.    Pursuant to the agreement with Teva and Mylan, Heritage began informing customers of the price increase in late June, and had fully implemented the price increase by July 9, 2014.

881.    In furtherance of the agreement, Teva and Mylan did not bid for any of Heritage's Glipizide business.  Additionally, in those instances where Heritage's customers sought out bids from Teva, Teva responded with pricing that it knew was higher than Heritage's pricing.

882.    As alleged above, the price increases regarding Glipizide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glipizide to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

LL.   **Glyburide**

883.    The market for Glyburide is mature, as Glyburide has been available in the United States for decades and has been available in generic form in the United States for more than 20 years.  Prior to September 2015, the primary manufacturers were Heritage, Teva, Citron, and Aurobindo (Citron entered the market in 2014 through a manufacturing partnership with Aurobindo), and each sold Glyburide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

884.    Glazer's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Glazer] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

885.    Similarly, Malek's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Malek] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide.  During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

886.    On or about April 22, 2014, Heritage held an internal teleconference during which Malek identified drugs that could be targeted for price increases.  Glyburide was one of the drugs on Malek's list.  During the call or shortly thereafter, Malek instructed Heritage sales executives

to contact their counterparts at Teva and Aurobindo and to reach an agreement to raise prices on Glyburide.

887.    Malek himself spoke to a senior executive at Teva, Patel, about Glyburide and several other drugs on his list, including an 18 minute call on April 15, 2014 (one week before and after the April 22 conference call).  During Malek's communications with the Teva's Patel, an agreement was reached that both companies would raise their prices on Glyburide sold to Plaintiffs and others in the United States.

888.    After successfully reaching an agreement with Teva in late April, Malek and Glazer pressured their sales executives to reach agreement with Aurobindo as well in order to allow the collusive Glyburide price increase to succeed.

889.    While Malek was responsible for communicating with Teva (among other Defendants), Heritage's ████████ was assigned to communicate with Aurobindo.  Malek and Glazer asked ████████ for updates about his communications with Aurobindo on April 28, 29, and 30. ████████ eventually connected with his contact at Aurobindo on May 8, 2014, when the two spoke for sixteen minutes.  During this call, they agreed to rise the price of a number of drugs, including Glyburide.

890.    On May 9, 2014, Heritage's sales team had another internal call to share the results of their conversations with competitors and further discuss the contemplated prices increases for other generic drugs, including Glyburide.

891.    At the MMCAP conference in Bloomington, Minnesota, between May 12-15, 2014, Heritage's ████ met with a number of competitors and held collusive discussions on a number of generic drugs.  Among her conspiratorial meetings, Sather met with an executive from Aurobindo, ████████ who also attended the conference and confirmed that each of the three

218

generic manufacturers of Glyburide (Aurobindo, Heritage and Teva) would increase prices on Glyburide sold in the United States.  Sather confirmed that Aurobindo was committed to the agreement in an e-mail to Malek on May 15, 2014.

892.     But the Defendants were not done.  On June 23, 2014, Heritage held another teleconference during which the company determined that the price of Glyburide could be raised by 200%, notwithstanding the fact that Citron was planning to enter the market through its partnership with Aurobindo.  (As noted earlier, the FDA has documented that, with each new competitor that enters a market for a generic drug, the price of the drug typically declines substantially.)

893.     In June and July 2014, executives from Heritage communicated with executives from Citron via text message, phone, and e-mail in order to ensure that Citron would abide by the collusive agreement already in place between the three existing manufacturers of generic Glyburide.  Citron agreed to increase prices on Glyburide, but Citron's ███ requested that there be no communication to Citron via e-mail in order to prevent the unlawful agreement from being exposed.  Citron requested that the collusive communications be conveyed by telephone and directed to a specific individual within the company, ███

894.     By early July 2014, with Citron, Heritage, Aurobindo, and Teva all committed to the collusive price increase, these four Defendants had successfully implemented the collusive price increase and were able to raise their prices for Glyburide to Plaintiffs and others in the United States to supracompetitive levels.

895.     Thereafter, Citron, Heritage, Aurobindo, and Teva adhered to the collusive agreement.  In July 2014, a purchaser of Glyburide sought a request for proposal from Teva on Glyburide, in response to Heritage's price increase.  Teva sales executives declined to bid based

on their agreement with Defendants, and referenced the agreements on both Glyburide and another drug as the basis for refusing to issue a competitive bid to the potential customer. Defendants also engaged in discussions about how Citron could acquire market share without disrupting the collusive conspiracy agreement.

896. Through their continued collusion, Citron, Heritage, Aurobindo, and Teva were able to maintain their collusive pricing on Glyburide until at least December 2015. This conspiratorial agreement continues to impact prices that Plaintiffs and others in the United States pay for Glyburide.

897. As alleged above, the price increases regarding Glyburide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above, and at trade association events and conferences.

**MM.   Glyburide-Metformin**

898. The market for Glyburide-Metformin is mature, as the drug has been available in generic form since 2004. During the relevant time period, Heritage, Teva, Aurobindo, Actavis, and Citron sold Glyburide-Metformin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

899. During the same April 15, 2014 phone call alleged above when they discussed a number of other collusive price increases, Malek and the senior Teva sales executive, Patel, agreed to increase prices on Glyburide-Metformin.

900.    On April 22, 2014, Heritage held an internal call during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned ███████ to contact Aurobindo about Glyburide-Metformin, and ███████ was assigned to Actavis to discuss Glyburide-Metformin.

901.    After the internal conference call, Heritage's Sather spoke with a senior executive at Actavis, ███████████ on April 22, 2014 about the Glyburide-Metformin price increase. Upon information and belief, during this call, the executives from Heritage and Actavis agreed to increase prices on both Glyburide-Metformin and another drug (Verapamil). As with all collusive communications identified in this Complaint involving Actavis, the Actavis representative acted on behalf of and reached an agreement that was followed by all Actavis entities identified in this Complaint.

902.    On May 8, 2014, Heritage's ███████ spoke with Aurobindo's ██████ about the Glyburide-Metformin price increase. Heritage and Aurobindo executives followed up this phone call with an in-person meeting, during which – upon information and belief – the Glyburide-Metformin price increase was discussed (along with price increases on other drugs).

903.    Executives from the four companies continued to communicate regarding the price increase for the next month. For example, the Actavis executive spoke with Teva by phone on May 1 and May 6, and the two exchanged at least 30 text messages about pricing agreements on Glyburide-Metformin and other drugs. The same Actavis executive also spoke with Aurobindo's CEO regarding the pricing agreement.

904.    Heritage also communicated the terms of the agreement to Citron and Sun. Because Citron had agreed to increase prices of Glyburide, Heritage sought to ensure that Citron (which had authority to market Glyburide-Metformin, but did not actively manufacture the drug at that

time) did not take any steps that would undermine or reveal the collusion on Glyburide-Metformin. Accordingly, a Heritage sales executive discussed the Glyburide-Metformin price agreement by text. Additionally, to facilitate collusion on other drugs, Heritage informed Sun through a chain of text messages sent in August 2014 about the successful price increases on Glyburide-Metformin and Verapamil.

905.    In Summer 2014, Aurobindo, Actavis, Heritage, and Teva increased their WAC pricing on Glyburide-Metformin.

906.    In August 2014, Heritage's ▇▇▇ texted a Sun employee regarding agreements Heritage had reached with Actavis to increase the prices of both Glyburide-Metformin and Verpamil. Such a communication highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to drugs that it did not market or sell.

907.    By September 2014, Citron had mobilizied to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

908.    As alleged above, the price increases regarding Glyburide-Metformin were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide-Metformin to Plaintiffs and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### NN.    Hydralazine

909.    Hydralazine HCL is a drug used to treat high blood pressure. It is also known by the brand names Apresoline and Dralzine.

910.    During the relevant time period, Teva, Par, Heritage, Strides, Camber, and Glenmark dominated the market for Hydralazine tablets.

911.    In approximately August 2014, Defendants applied the "fair share" understanding to the market for Hydralazine in order to prevent any price erosion for the drug.

912.    As of August 2014, Defendant Strides was in the process of ramping back up its domestic operations, following its 2013 sale of its specialty injectables business to Defendant Mylan.  As a result of this ramp up, Strides sought to obtain its "fair share" of the Hydralazine market, consistent with the principles of Defendants' fair share agreement.  As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

913. ███████████ joined Defendant Heritage as VP of Marketing on August 1, 2014.  One of his first acts of business for Heritage was to facilitate an agreement to allow Defendant Strides to obtain market share for Hydralazine.

914.    In early August 2014, ███████████████████, an executive working with co-conspirator TruPharma, who relayed the message that Strides would submit an unsolicited bid to Morris & Dickson, a wholesaler, for its Hydralazine business.  Through ██████ Strides requested that Heritage concede the business.

915.    On August 20, 2014, ████ informed Malek that Strides wanted Morris & Dickson's Hydralazine business.  ████ advised Malek that Heritage should concede this business to Strides.  Malek also looped in ███████, who was responsible for the Morris & Dickson account.

916.    On September 5, Morris & Dickson informed ▇▇▇▇ that it had received a competing bid for its Hydralazine business and asked for Heritage to provide a better price for Hydralazine.

917.    Consistent with the fair share understanding, Heritage declined to match Strides' bid and instead conceded the Morris & Dickson business to Strides.

918.    Upon information and belief, Heritage's decision to concede this business to Strides was communicated to Teva, Par, Camber, and Glenmark, so that each of these Defendants would know that Heritage was complying with the fair share agreement for the benefit of each Defendant.

919.    As a result of the overarching fair share agreement, Defendants have been able to maintain the market allocation agreement for Hydralazine tablets since at least August 2014, which has allowed them to sell Hydralazine at supracompetitive prices to Plaintiffs and other.

**OO.    Irbesartan**

920.    Irbesartan is a drug used in the treatment of hypertension.  It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure.  Irbesartan is also known by the brand name Avapro®.

921.    Teva received approval to manufacture generic Irbesartan in March 2012.

922.    On March 6, 2012, Teva's ▇▇▇▇▇▇ polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

923.    At 11:27 am, ▇▇▇▇▇▇▇▇, an account manager at Teva responded: ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



924.    That same day, Rekenthaler informed the group that he still had not received ██████

████████████████████████████████ He received an immediate response from a senior

commercial operations executive at Teva, expressing his displeasure:



925.    At 10:54 am the next day, Green called Berthold again.  They spoke for nearly

seven (7) minutes.  At 12:20 pm, ████████ of Teva shared with the sales team the competitively

sensitive information Green had obtained.  Included were the details Berthold had shared with

Green about which competitors were launching/not launching the drug, and the identity of the

customers that received offers.  ████████ stated that Teva was in a position to take up to a 40%

market share when it launched Irbesartan on March 30, 2012.

PP.    **Labetalol**

926.    Labetalol, also known by brand names such as Normodyne and Trandate, is a

medication used to treat high blood pressure.  Labetalol, like Nadolol, is in a class of drugs called

beta blockers, and it works by relaxing blood vessels and slowing heart rate to improve blood flow

and decrease blood pressure.

927.    Labetolol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ████████ Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called Hill.  Also, Rekentheler spoke with ████████ of Actavis and ████████ of Breckenridge.  These communications solified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

928.    After Teva increased its pricing on Labetalol on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug.  For example, in October 2012, Teva learned that Sandoz was ████████████████



929.    That same day, Green spoke to CW-2 of Sandoz two (2) times. After those calls with CW-2, Green responded to the analyst's question:



930.    ████████████████████████

931.    Rekenthaler was not satisfied, however.  In order to confirm that Actavis was also still committed to maintain high pricing on Labetalol, Rekenthaler called and spoke ███████, a senior sales executive at Actavis, four (4) times on October 18, 2012.

### QQ.    **Lamivudine/Zidovudine (generic Combivir)**

932.    Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of medications used in the treatment of human immunodeficiency virus (HIV) infection.  This combination of drugs is often prescribed to decrease the chances that an HIV-positive patient will develop acquired immunodeficiency syndrome (AIDS) or other related illnesses.

933.    Teva launched its generic Combivir product in December 2011.

934.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

935.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants.  Rekenthaler was speaking to ███████, a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

936.    For example, on April 24, 2012, ███████ of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir.  Rekenthaler responded immediately that Aurobindo was entering.  When ███████ questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:



937.    That "good friend" was Aurobindo's ▮▮▮▮ who had previously worked with both

▮▮▮▮ and Rekenthaler while at Teva.  Rekenthaler was reluctant to identify ▮▮▮▮ in writing

as it would evidence conspiratorial communications between the two competitors.  To confirm this

information, Green also called and spoke to Grauso of Aurobindo that same day for twelve (12)

minutes and Berthold of Lupin for four (4) minutes.

938.    After speaking with Berthold, Green responded separately to ▮▮▮▮ providing

specific information regarding Lupin's entry plans, including commercially sensitive intelligence

about Lupin's anticipated bid at a large wholesaler.  Green and Berthold then spoke again the next

day, April 25, 2012, for seven (7) minutes.

939.    In early May, with the Lupin and Aurobindo launches just days away,

communications among all three competitors accelerated noticeably.  Over the four-day period

from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in

the table below:



| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

940.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible.  The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

941.   On May 10, 2012, at the conclusion of this four-day period of intensive communications, ███████ of Teva informed his colleagues of the results.  He confirmed that ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████  ███████████████████████████████████████████████████ ████████████████████████

942.   Even before the negotiations with Aurobindo and Lupin were finalized, ██████████ made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market.  On May 9, 2012, when a major customer was pressing Teva for a bid, ███████ instructed ██████ that Teva did not plan to keep that customer.  When ███████ asked if she should provide any bid at all, ██████ directed her to provide a sham bid, saying:

███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

943.   Three days later, when preparing the bid for that customer, ██████ pushed back on ██████████ directive on price, asking: ██████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████ "

944.    In a separate e-mail exchange with ▇▇▇▇ on that same day, May 11, 2012,



945.    Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

**RR.    <u>Leflunomide</u>**

946.    The market for Leflunomide is mature, as the drug has been available in generic form since 2005.  During the relevant time period, Defendants Apotex, Heritage, and Teva sold Leflunomide to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

947.    During their April 15, 2014 phone call alleged above, Malek and the Teva's Patel also discussed Leflunomide and targeted it for a price increase.

948.    During the first week of May 2014, executives from Teva, Heritage and Apotex spoke several times by telephone.  During these phone calls, all three companies agreed to increase prices on Leflunomide and to refrain from submitting competitive bids to each other's customers. These conversations also resulted in an agreement that Apotex would lead the price increase, which it did on May 9, 2014.

949.    Pursuant to the agreement between the three companies, Heritage began to announce the price increase in June, and had fully implemented the price increase on all its major Leflunomide accounts by early July.

950.    In early July, after the price increase on Leflunomide was implemented, Teva exited the market for the drug.  Because the price increase was successful, this action was against Teva's self interest.  Upon information and belief, Heritage induced Teva's exit by agreeing to concede market share to Teva on other drugs.

951.    As alleged above, the price increases regarding Leflunomide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Leflunomide to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

**SS.    Levothyroxine**

952.    Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.  The market for Levothyroxine is mature, as Levothyroxine has been available in the United States for over 50 years.  Levothyroxine is on the WHO's list of essential medicines.  Levothyroxine is often featured on lists of the top ten most prescribed generic drugs and, as of June 2015, it was the most prescribed generic drug in the United States and constituted 2.7% of the entire generic drug market by number of prescriptions.  Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

953.    Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

954.    In 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine.  Nesta of Mylan spearheaded the discussions by speaking ███████████, a senior sales executive at Lannett, and with CW-4 of Sandoz.  In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Green of Teva.  Notably, Levothyroxine was not a drug that Teva sold.

955.    As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone.  The next morning – the day of the Mylan price increases – Green spoke twice with Kellum, including a six (6) minute call at 9:34 am.

956.    Shortly after hanging up the phone with Green, Kellum sent an internal e-mail stating, among other things, that he █████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████

957.    That same morning, Smith of Lannett called Nesta of Mylan. The phone call lasted 44 seconds.  Then, on January 10, 2013, Nesta called Smith back and they spoke for more than six (6) minutes.  That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally: ██████████████████████████████ ████████████████████

958.    The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan.  Notably, after these phone calls, Nesta would not speak again with Smith of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

959.    On July 16, 2013 – as detailed above – CW-4 spoke with Nesta and sent the July 2013 E-mail identifying the Mylan price increases.   The price list included Levothyroxine and noted that Lannett had followed.

960.    On August 6, 2013, Nesta called CW-4 two times. Both calls lasted less than a minute.  A few minutes after the second call, Nesta called ██████ at Lannett.  The call lasted 24 seconds (likely a voicemail).  Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

961.    On August 10, 2013.████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

962.    Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

963.    On August 14, 2013, ██████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

964.    On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████m

965.     During a September 10, 2013 earnings call, Lannett's CEO, Arthur Bedrosian, was asked for his reaction to Mylan's Levothyroxine price increase.  Bedrosia responded: "You mean after I sent them a thank you note?  I'm just kidding....  I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well....  So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

966.     On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

967.     By way of example, Defendants set matching WAC prices on their 0.05 mg tablet in quick succession in August and September 2013:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct | Lannett | 00527134201 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1000 ct | Lannett | 00527134210 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 90 ct | Sandoz | 00781518192 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Sandoz | 00781518110 | $0.12 | $0.27 | 13-Sep-13 | 120% |

968.     The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there.  They coordinated again to raise price on Levothyroxine in April/May 2014.

969.     Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Nesta and K S. of

Lannett spoke by phone several times. These calls are listed below. Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

970.    On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine –

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

971.    Lannett quickly followed with a price increase of its own - raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors. The following chart reflects Defendants' price increases on .05 mg tablets:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------------------|-----------|-----|---------|---------|------------------|---------------------|
| 1000 ct | Mylan | 00378180310 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct | Lannett | 00527134201 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1000 ct | Lannett | 00527134210 | $0.27 | $0.41 | 28-Apr-14 | 54% |
| 90 ct | Sandoz | 00781518192 | $0.27 | $0.41 | 23-May-14 | 54% |
| 1000 ct | Sandoz | 00781518110 | $0.27 | $0.41 | 23-May-14 | 54% |

972.     As a result of the overarching "fair share" understanding and these collusive communications, Defendants Lannett, Mylan, and Sandoz all sold Levothyroxine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

973.     Mylan, Sandoz, and Lannett have maintained their prices at these supracompetitive levels and, as a result, Plaintiffs have been forced to pay supracompetitive prices for generic Levothyroxine since January 2013.

**TT.     Lidocaine-Prilocaine**

974.     The market for Lidocaine-Prilocaine is mature, as Lidocaine-prilocaine has been available in the United States for decades.  It is marketed in the United States under the brand name EMLA.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera have all sold Lidocaine-prilocaine throughout the United States.

975.     At all times relevant to this lawsuit there has been more than one manufacturer of Lidocaine-prilocaine on the market.  Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera sold Lidocaine-prilocaine to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

976.     For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Lidocaine-prilocaine was remarkably stable.  Beginning in mid-2014, Defendants increased their prices abruptly and, for the most part, in unison.

977.     Upon information and belief, Akorn, Hi-Tech, Impax, Sandoz, and Fougera reached an agreement to increase prices for Lidocaine-Prilocaine in the United States from an average of 47 cents per dose in April 2014 to an average price of $1.20 by January 2015.

978.    These extraordinary price increases were not the result of supply shortages, demand spikes, or other competitive market conditions.  There were no relevant labelling changes or reported drug shortages that might have led to price increases.  Nor was there a spike in demand that could explain the price hikes.

979.    Upon information and belief, this agreement to increase prices on Lidocaine-Prilocaine was the result of collusive communications between and among Defendants that were initiated by Sandoz and Fougera to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry.  The collusive agreement to increase prices on Lidocaine-Prilocaine was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

980.    For example, on October 1-3, 2012, representatvies from Fougera, Impax, and Sandoz attended the GPhA Annual Meeting in Orlando, Florida.  *See* Ex. 1.

981.    On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by Akorn, Impax, and Sandoz.  *See* Ex. 1.

982.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida, which was attended by Akorn, Impax, and Sandoz.  *See* Ex. 1.

983.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by Fougera, Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

984.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas.  This event was attended by representatives from Akorn, Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

985.    On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by Akorn, Fougera, Hi-Tech, Impax, and Sandoz representatives.  *See* Ex. 1.

986.    On February 28-30, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Hi-Tech, Impax, and Sandoz.  *See* Ex. 1.

987.    On June 1-4, 2014, HDMA held a BLC in the Marriott in Phoenix, Arizona. Representatives from Akorn, Sandoz, and Impax attended.  *See* Ex. 1.

988.    On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Hi-Tech, Fougera, Impax, and Sandoz.  *See* Ex. 1.

989.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo in Boston. Representatives from Akorn, Impax, and Sandoz attended.  *See* Ex. 1.

990.    On October 27-29, 2014, GPhA held its Fall Conference in Bethesda, Maryland. Representatives from Impax, Fougera, and Sandoz attended.  *See* Ex. 1.

991.    Akorn, Hi-Tech, Impax, Sandoz, and Fougera continued to attend trade association events in 2015 and 2016.

**UU.    Loperamide HCL Capsules**

992.    Mylan and Teva dominate the market for Loperamide HCL capsules.

993.    Loperamide HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.   For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, ██████ ██ of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called ███  Also, Rekentheler spoke with ██████████ of Actavis and ███

███████ of Breckenridge.  These communications solified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

994.    As a result of these collusive communications, Mylan and Teva were able to increase prices on Loperamide HCL.  By adhering to the Fair Share agreement and through the numerous other examples of collusion between Teva and Mylan, Defendants have been able to maintain prices for Loperamide HCL at supracompetitive levels since July 2012.

**VV.    Meprobamate**

995.    The market for Meprobamate is mature, as the drug has been available in the United States since 1955.  Heritage and Dr. Reddy's sold Meprobamate to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

996.    On March 21, 2013, Heritage's Malek e-mailed ███████ and instructed him to contact Dr. Reddy's about a possible increase in Meprobamate prices.

997.    On March 22, 2013, ██████████████████████████████████ ██████████████████████) to propose that both companies increase their prices for Meprobamate in the United States.

998.    On March 22, 2013, Heritage's ████████████████████████ by phone for about nine minutes.  Upon information and belief, during the phone call, the two companies agreed to increase prices on Meprobamate in the United States.  The terms of the agreement were further confirmed in e-mails exchanged between ████████████████████ between March 22 and March 25, 2013.

999.    On March 27, 2013, Malek forwarded an RFP to ███████ that Heritage had received from a prospective purchaser of Meprobamate.  Through e-mails that followed and through about

a four minute phone call on March 29, 2013 between ███████████, Heritage and Dr. Reddy's took steps to ensure that neither submitted bids that undercut the other's pricing for Meprobamate.

1000.   In April 2013, Dr. Reddy's requested that Heritage allow Dr. Reddy's to increase its market share for Meprobamate.  Dr. Reddy's wanted to achieve this by reaching an agreement that Heritage would walk away from its existing Meprobamate business with a national pharmacy chain.  Heritage quickly agreed to give this business to Dr. Reddy's, and by April 2013, Heritage took steps to give up this business so that Dr. Reddy's could take it.

1001.   Malek and other employees continued to e-mail and speak by phone throughout May 2013 to ensure that the market for Meprobamate in the United States was allocated to the liking of both Dr. Reddy's and Heritage.

1002.   As a result of this anticompetitive conduct, Heritage and Dr. Reddy's increased the prices for Meprobamate sold to Plaintiffs and others in the United States to supracompetitive levels.  This market allocation and price-fixing agreement and the ensuing supracompetitive pricing continued in either force or effect (or both) until at least the end of 2016.

**WW.   <u>Metronidazole</u>**

1003.   The market for Metronidazole is mature, as the drug has been available in the United States since the 1970s.  Defendants G&W, Impax, Sandoz, Teva, and Valeant sold Metronidazole to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  There are several formulations of Metronidazole including cream, jelly, lotion, and vaginal formulations.

1.      <u>Metronidazole Cream</u>

1004.   Defendants G&W, Sandoz, and Teva were the primary manufacturers of the cream formulation in 2011.  Beginning around June 2011, G&W, Sandoz, and Teva engaged in price

increases on Metronidazole Cream of more than 400%.  Prices have remained at artificially high levels since 2011.

1005.  The GAO Report listed Metronidazole Cream as having experienced an "extraordinary price increase."

1006.  These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

2.  Metronidazole Jelly

1007.  Defendants G&W, Sandoz, Taro, and Teva were the primary manufacturers of the jelly formulation in 2011.  Impax entered the market in 2012.

1008.  Beginning around June 2011, G&W, Sandoz, Taro, and Teva engaged in price increases of Metronidazole Jelly of more than 400%.  When Impax entered the market in 2012, it did not disturb the artificially inflated pricing.

1009.  The GAO Report listed Metronidazole Jelly as having experienced an "extraordinary price increase."

1010.   These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

3.  Metronidazole Lotion

1011.  Defendants Sandoz and Teva were the primary generic manufacturers of Metronidazole Lotion in 2011.

1012.  Beginning in June 2011, Defendants Sandoz and Teva engaged in a multifold coordinated price increase of Metronidazole Lotion of more than 400%.

1013.   The GAO Report listed Metronidazole Lotion as having experienced an "extraordinary price increase."

1014.   These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

4.      Metronidazole Vaginal

1015.   Defendants Sandoz and Valeant were the primary generic manufacturers of generic Metronidazole Vaginal in 2015.

1016.   Prior to January 2015, prices for Metronidazole Vaginal remained stable for years.

1017.   Beginning in around February 2015, Defendants Sandoz and Valeant engaged in price increases of more than 300%.

1018.   Notably, the price increase on Metronidazole Vaginal occurred around the same time that news sources reported that Valeant was dramatically increasing prices on other drugs.

1019.   These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.  There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

1020.   Upon information and belief, the agreement to increase prices on all formulations of Metronidazole was the result of collusive communications between and among Defendants, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry.  The collusive agreement to increase prices on Metronidazole was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

1021.   For example, on August 30-31, 2010, representatives from G&W, Sandoz, and Teva attended the NACDS Pharmacy and Technology Conference in San Diego, California.  *See* Ex. 1.

1022.   On August 27-30, 2011, NACDS held a Pharmacy and Technology Conference in Boston.  Representatives from G&W, Sandoz, and Teva attended.  *See* Ex. 1.

1023.   On April 24-27, 2012, NACDS held its Annual Meeting.  Representatives from G&W, Impax, Sandoz, and Teva attended.  *See* Ex. 1.

1024.   On February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida. Representatives from G&W, Impax, Sandoz, and Teva attended.  *See* Ex. 1.

1025.   On December 3, 2014, NACDS held its Foundation and Reception Dinner in New York City.  Representatives from Sandoz, Valeant, and Teva attended.  *See* Ex. 1.

1026.   On April 25-28, 2015, NACDS held its annual meeting in Florida.  Representatives from G&W, Impax, Sandoz, Teva, and Valeant attended.  *See* Ex. 1.

## XX.   **Metformin ER**

1027.   Metformin ER, the generic version of Fortamet, is prescribed to treat adult-onset diabetes.

1028.   During the time period relevant to this Complaint, Actavis, Amneal, Lupin, Sun, and Teva dominated the market for Metformin ER tablets.

1029.   Lupin led the price increase in August 2015, by raising prices by approximately 200%.  Between August 2015 and January 2016, Actavis, Amneal, Sun, and Teva all supported Lupin's price increase by following it themselves and by refraining from adding market share beyond each Defendant's "fair share" of the market.

1030.    Senior sales executives from each Defendant were in active contact with each other during the period in which they implemented the price increase, both by telephone and at trade shows and industry events.

1031.    For example, and as detailed in the phone records tables depicted throughout this Complaint, between July 2015 and February 2016, David Berthold of Lupin was in frequent contact with ████████████████████████████ and with Mark Falkin and ████████████ of Actavis.  Similarly, during this same time period, Ara Aprahamian (on behalf of Taro's corporate parent, Sun) was in frequent contact with was in frequent contact with ████████ ████████; Rick Rogerson, Mark Falkin, and ████████████ of Actavis; and Nisha Patel of Teva.

1032.    As a result of these collusive communications, Defendants have been able to maintain prices at supracompetitive levels on Metformin ER tablets since July 2015.

**YY.    <u>Methylphenidate</u>**

1033.    Methylphenidate – the generic version of the branded drug Ritalin – is a central nervous system stimulant prescrived to treat attention deficit disorder.

1034.    During the time period relevant to this Complaint, Actavis, Impax, Mallinckrodt, Par, Sandox, and Sun dominated the market for Methylphenidate.

1035.    In early March 2013, Mallinckrodt announced that it would have a temporary supply disruption.  Whether Mallincrkodt truly had a supply disruption or not remains unclear; what is clear though, is that immediately after this announcement, Sandoz and Mallincrkodt began coordinating to exploit this purported supply disruption to raise prices.

1036.    Between March 1, 2013, and March 8, 2013, CW-3 (a senior sales executive at Sandoz) and ████████████ (a Vice President of Mallinckrodt) spoke by phone four times.

Following their fourth call of the week on March 8, 2013, Sandoz announced that it was raising its prices on Methylphenidate by 400%.

1037.   Following Sandoz's announcement, ███████ one, a Director of National Accounts at Watson (a predeccor to Actavis) spoke with ███████, the VP of Generic Sales of Sandoz for more than 20 minutes on April 21, 2013.   Upon information and belief, ███████ confirmed to ████ that Actavis would follow Sandoz's price increase.

1038.   Two days after the call between ██████████████████████ of Sun reported to her superior that Actavis/Watson would raise price effective May 25 (even though Actavis had not yet announced a price increase) and that Mallinckrodt would follow this price increase when it resolved its supply issue.

1039.   Sure enough, on April 25, 2013, Actavis/Watson announced that it was matching Sandoz's 400% price increase.

1040.   Less than a week later, Mallinckrodt sought to re-enter the market and regain the share that it had forfeited during the period of its claimed supply disruption – which lasted just two months.   Despite selling the product at competitive levels in February 2013, Mallinckrodt reentered the market at the elevated price set by Sandoz and Actavis.

1041.   The day after Mallinckrodt announced that its supply disruption had been resolved, ██████████ – a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former colleague from Sandoz.   Upon information and belief, the purpose of this call was to determine which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

1042.   And that is just what happened.  In August 2013, CW-2 and Armando Kellum – both of Sandoz – acknowledged conceding a large customer ████████████████████████ ████████████████████████████████████████

1043.   In late 2014, Sun's market share was well below what it determined would be its fair share of 17% in what was then a five-manufacturer market. ███████████████████gh of Sun then coordinated with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

1044.   In 2014 and 2015, Impax and Par entered the Methylphenidate market at the elevated prices set by Sandoz, Actavis, and Mallinckrodt.  Consistent with the overarching Fair Share agreement, Impax and Par communicated with the existing manufacturers to arrange for the seamless transfer of a "fair share" of the market without disrupting the price.  For example, ████ ████████████████████████████████████████████████████████████ ███████ – both senior sales executives at Par – to coordinate Par's entry into the market and arrange for Par to receive Fair Share in mid-2015.

1045.   As a result of these collusive communications, Defendants have been able to maintain prices for Methylphenidate at supracompetitive levels since March 2013.

### ZZ.   Methylprednisolone

1046.   Methylprednisolone, the generic version of the branded drug Medrol manufactured by Defendant Pfizer, is a corticosteroid that is prescribed to reduce inflammation and treat a wide range of conditions including arthritis, ulcerative colitis, psoriasis, and endocrine disorders. Methylprednisolone is most typically sold in 4 mg tablets, but is also occasionally sold in higher-dose tablets ranging from 8 mg to 32 mg.

1047.   The market for Methylprednisolone is mature, as the drug has been available in the United States for more than 60 years.

1048.   During the time period relevant to this Complaint, Breckenridge, Cadista, Greenstone, Par, and Sandoz dominated the market for Methylprednisolone.

1049.   In early 2011, Methylprednisolone cost just a few cents per tablet.  For example, Cadista sold packages of 21 4 mg tablets for 85 cents each.  Between March and June 2011, however, Defendants colluded to implement a massive price increase.

1050.   Cadista and Sandoz both raised their prices by more than 2000%.  For example, the same 21 tablet package that Cadista sold for 85 cents in March cost more than $19.00 by June.  Sandoz concurrently imposed the same price increase as Cadista.

1051.   Par – which was obligated by contractual price protections to maintain its current prices for large customers – complied with the fair share agreement by declining to supply Cadista's and Sandoz's customers.  As Par's contractual price obligations for Methylprednisolone phased out, Par also raised its prices in accordance with Sandoz and Cadista.

1052.   Between October 2011 and October 2012, Greenstone and Breckenridge entered the market for Methylprednisolone.  Consistent with the Fair Share agreement, Greenstone and Breckenridge communicated with the other Defendants and confirmed their intentions to enter the market at the elevated price.  For example, ████████████ of Breckenridge communicated with ████████████, Par's Vice President for Generic Sales prior to Breckenridge's entry into the market.  In return, and Cadista, Par, and Sandoz conceded market share to the new entrants so that they could receive their "fair share."

1053.   In response to this price increase, customers pushed back on the Defendants to lower their pricing on Methylprednisolone.  For example, Walgreens – who was supplied to

Cadista – solicited Sandoz to submit a bid in December 2012. Upon learning that Walgreens was soliciting ████████████e, the Vice President of Sales & Marketing at Sandoz, instructed his sales associate that ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ confirmed this instruction with Armando Kellum of Sandoz.

1054.   Walgreens continued to seek a lower price on Methylprednisolone in 2013.   In September 2013, Kellum of Sandoz intervened again to prevent a sales associate from bidding on the large account, which still belonged to Cadista.   Upon learning that a sales executive was working on a bid for Walgreens for Methylprednisolone, Kellum instructed ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

1055.   Par also openly acknowledged in a 2013 internal quarterly business review prepared in July 2013, that it had ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

1056.   As a result of these collusive communications and each Defendants' adherence to the fair share agreement, the price increase on Methylprednisolone stuck, and Defendants have been able to sell the drug at supracompetitive levels ever since.   Indeed, in August 2012, roughly a year after the initial Methylprednisolone price increase, Kellum of Sandoz conducted an analysis to determine how likely its price increases were to "████ He determined that, of the ████████

███████████████████████████████████████████

████████████████████████████

### AAA.  **Moexipril Hydrochloride Tablets**

1057.    Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors.  It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently. Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

1058.    As discussed more fully below, Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril between May and July, 2013.  When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

1059.    On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC.  Upon hearing this news, Rekenthaler, the Vice President of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business:



1060.   Rekenthaler forwarded the e-mail only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

1061.   Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:



1062.   The call that Patel had made earlier that day was to Defendant CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

1063.   Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Jim Brown, the Vice President of Sales at Glenmark, called Patel at 9:45 am but did not reach her. Patel returned Brown's call at 10:08 am and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11 pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

1064.   As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril. Later that same day – August 6, 2013 – a Teva executive informed colleagues that "█████████████

████████████████████████████████████████████████████████

███████

BBB.  **Nadolol**

1065.  As early as 2012, Teva was speaking to competitors about the drug Nadolol. Nadolol, also known by the brand name Corgard, is a "beta blocker" which is used to treat high blood pressure, reducing the risk of stroke and heart attack.  It is also used to treat chest pain (angina).

1066.  In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability.  Nadolol was a high volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

1067.  Teva's relationships with Mylan and Sandoz are discussed more fully below, but by 2012 an anticompetitive understanding among those companies was firmly entrenched.

1068.  Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase – following a pattern that would become routine and systematic over the following years Kevin Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan.  Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

1069.  Sandoz followed with its own increase on August 27, 2012.  The increases were staggering – varying from 746% to 2,762% depending on the formulation.  The day before the Sandoz increase, Defendant Armando Kellum, then the Senior Director of Pricing and Contracts

at Sandoz, called Green.  They had also spoken once earlier in the month, shortly after the Teva increase.  CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price.  The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

1070.  Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013.  In what had become a routine component of the scheme, the day before the Mylan increase Nesta spoke to Green four (4) times.  The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase Green called Kellum twice in the morning, including a six (6) minute call at 9:43 am.  Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:



1071.  Being '         on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1072.   Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50 am the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

1073.   Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

1074.   In 2014, Greenstone entered the market for Nadolol and abided by the overarching Fair Share agreement in the process.  ██████████ of Greenstone was in frequent contact with Kellum of Sandoz, Nesta of Mylan, and Patel of Teva around the time that Greenstone entered the market. Through these conversations, the competitors arranged for Greenstone to obtain its "Fair Share" of the Nadolol market, and Greenstone agreed to enter the market at the existing supracompetitive price.

1075.   To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years.  In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol.  Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

1076.   As discussed more fully below, Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

CCC.   **Niacin ER**

1077.   Niacin Extended Release ("ER"), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

1078.   Defendant Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.  Teva's exclusivity was set to expire on March 20, 2014.

1079.   Teva had advance knowledge that Defendant Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter.  Teva also knew that Defendant Zydus planned to enter on June 28, 2014.

1080.   Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the competitors' entry.  In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.  The communications between Green and Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

1081.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.  The communications between Green and Rekenthaler and Patel of Teva, and Berthold of Lupin, are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

1082.   In May 2014, Zydus began readying to enter the Niacin ER market.  On May 5, 2014, Zydus bid on the Niacin ER business at ABC – a Teva customer.  The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes.  Less than an hour later, Green called Patel and they spoke for eight (8) minutes.  A few minutes later, Green called Patel again and left a twelve-second voicemail.  Later that evening, Patel e-mailed K G. reporting what Teva had learned on those calls:



1083.   ██████ responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER, and include Rekenthaler.

1084.   Over the next several days, Patel and Rekenthaler exchanged several calls with Green.  Green also exchanged several calls with Berthold of Lupin.

1085.   Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

1086.   On May 29, 2014, ██████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████ After receiving the e-mail, Rekenthaler called Green.  The call lasted two (2) minutes.  Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes.  Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

1087.   On June 2, 2014,██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████ Later that morning, Green called Rekenthaler.  The call lasted two (2) minutes.  Green then called Patel and they spoke for nearly six (6) minutes.

1088.   On June 5, 2014, ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

1089.   On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

**DDD.   Nimodipine**

1090.   The market for Nimodipine is mature, as the drug has been available in the United States in generic form for more than 10 years.  Heritage, Sun (through Caraco), and Teva sold Nimodipine in the United States to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1091.   In June 2012, Malek instructed a Heritage employee, Sather, to reach out to a sales executive at Caraco to discuss an agreement to raise prices and confirm the market allocation that the two companies would abide by in the U.S. market for Nimodipine.   The ensuing communications between Heritage's ▮▮▮▮ and Caraco's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮") resulted in an agreement to increase prices on Nimodipine.

1092.   In furtherance of this agreement to increase prices, Heritage agreed to submit a sham bid to an RFP from Cardinal, with Heritage intentionally quoting a price to Cardinal that Heritage knew was higher than the price that Caraco was quoting.

1093.   In late 2012, the FDA issued a recall on the Nimodipine that Caraco was selling in the United States, which required Caraco to briefly exit the market.

1094.   In late April or early May 2013, Malek learned that Caraco would seek to re-enter the Nimodipine market by July 2013.  Malek initiated discussions with Caraco that resulted in an agreement that both companies would continue charging elevated prices on Nimodipine, and Heritage would allow Caraco to retake a certain percentage of the market.

1095.  Caraco ultimately reentered the Nimodipine market in November 2013 and implemented the agreement with Heritage by charging the agreed-upon prices.  Upon information

and belief, Heritage reciprocated by allowing Sun and Caraco to retake the agreed-upon percentage of the Nimodipine market.

1096.   These anticompetitive agreements by Heritage and Sun (through Caraco) resulted in supracompetitive prices for Nimodipine in the United States that have persisted since June 2012.

1097.   As alleged above, the price increases regarding Nimodipine were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Nimodipine to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### EEE.   Nitrofurantoin Macrocrystal Capsules

1098.   Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat certain urinary tract infections.

1099.   In 2012, Mylan and Teva dominated the market for Nitrofurantoin Macrocrystal capsules, and Alvogen also maintained approximately 10% market share.

1100.   Nitrofurantoin Macrocrystal was one of eight drugs that Teva targeted for a price increase effective July 31, 2012.  Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen.  For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and ▮▮▮▮ l of Alvogen.  On July 31, Green and Nesta spoke five times, and immediately following some of these calls, Green called ▮▮▮  Also, Rekentheler spoke with ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of Breckenridge.  These communications solified the

agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

1101.   Teva's July 31, 2012 price increase on Nitrofurantoin Macrocrystal was between 90-95% depending on the dosage and formulation.   After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

1102.   For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (*i.e.*, other distributors).   At 9:49 am on October 10, 2012, ▇▇▇▇ of Teva sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:



1103.   Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and William Hill, his counterpart at Alvogen.   At 10:01 am, Green called Nesta and the two spoke for ten (10) minutes.   After hanging up – at 10:11 am – Green called ▇▇ at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes.   To close the loop, Nesta also separately spoke to ▇▇ two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

### FFF.   Norethindrone Acetate

1104.   Norethindrone Acetate, also known by the brand name Primolut-Nor among others, is a female hormone used to treat endometriosis, uterine bleeding caused by abnormal hormone levels, and secondary amenorrhea.

1105.   On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate.   One of Teva's competitors for Norethindrone Acetate was Defendant Amneal.  The same day, Patel received phone calls from two different Amneal employees – ███████████ a senior sales executive (call lasting more than three (3) minutes), and ████████, a senior sales and finance executive (almost twenty-five (25) minutes).  These were the first calls Patel had with ██████████████ since she joined Teva in April 2013.  That same day, █████ also spoke several times with Jim Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

1106.   After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market.  At that time, market share was almost evenly split between the three competitors. When discussing it later, Patel acknowledged internally that Teva had ███████████████████ ██████████████████████████████████████████████████████████████ █████████████  By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

**GGG.   Norethindrone/ethinyl estradiol (Balziva®)**

1107.   Norethindrone/ethinyl estradiol, also known by the brand name Ovcon®35, is a combination of medications used as an oral contraceptive.  Teva markets its generic version of this combination medication under the name Balziva®.

1108.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business.  Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its generic of Ovcon®35.

1109.   Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that ████████████████████████████████████████ ██████████████████████

1110.   The discussions about how to share the market with the recent entrant were not limited to internal communications, however.  On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

1111.   Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: ████████████████████████████████████████ ████████████████

1112.   On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin.  That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### HHH.  Nortriptyline Hydrochloride

1113.   Nortriptyline Hydrochloride ("Nortriptyline"), also known by the brand name Pamelor, is a drug used to treat depression.

1114.   While Taro was approved in May 2000 to market generic Nortriptyline, it subsequently withdrew from the market.  As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

1115.   By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that ████████████████████████████████ ████████████████████████

1116. 

1118.   Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

1119.   Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market.  For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

1120.   Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva.  Their conversation lasted almost eleven (11) minutes.  That same day, Aprahamian announced to his

1121.   The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however.  Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18.  Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

1122.   Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis.  On November 19, 2013 when a colleague presented an opportunity

to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying:

████████████████████████████████████████████████████

1123.   The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue.  Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to ██████████████, a senior national account executive at Actavis, less than four hours later.  They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

1124.████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████.

1127.   Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up.  The dialogue continued on February 4, 2014 when Patel called Aprahamian back.  The two talked for nearly twenty-four (24) minutes.

1128.   Two days later, on February 6, a potential customer solicited Taro to bid on its business.  When a colleague informed Aprahamian of that fact and asked if he wanted to pursue

the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1129.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1130.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline.  Prior to this time, particularly in early 2014, Nortriptyline had been listed by Teva as a potential candidate for a price increase.  On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more

than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry. ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

1131.   Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts.  Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

1132.   In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva.  During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus.  Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

### III.   Nystatin

1133.   The market for Nystatin is mature, as the drug has been available in the United States since 1950.  The drug is considered an essential medicine by the World Health Organization. Actavis, Par, Perrigo, Sandoz, Taro, Teva, Heritage, and Sun (through Mutual) sold Nystatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1134.   During the relevant period, Defendants Actavis, Par, Perrigo, Sandoz, and Taro were the primary manufacturers of Nystatin external cream.

1135.   During the relevant period, Defendants Actavis, Perrigo, and Sandoz were the primary manufacturers of Nystatin ointment.

1136.   During the relevant period, Defendants Teva, Heritage, and Sun (through Mutual) were the primary manufacturers of Nystatin tablets.

       1.   <u>Nystatin Cream</u>

1137.   In late 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin cream.  Taro and Perrigo increased their prices in very close succession in late 2011.  Par followed the price increase in August and Actavis joined in November 2011.  Sandoz joined the price increase when it re-entered the market in 2013.

1138.   In June 2011, Taro announced a dramatic price increase of more than 600%.  Rather than compete on price in order to gain market share, Perrigo followed Taro's increase and raised its own prices to almost identical levels.  Perrigo increased production and managed to gain some market share from 2011-2013, but, consistent with the overarching market allocation (or "fair share") agreement, market prices remained relatively stable.

1139.   In August 2011, Par, which only had about 1% of the market, followed the Taro and Perrigo price increase.  Rather than competing on price in order to gain market share, Par followed this price increase.  Over the next few years Par grew its market share, but it did so without competing on price, just as the fair share agreement intended.

1140.   In November, Actavis ramped up production of Nystatin cream and re-joined the market.  It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.  Even a fourth entrant into the Nystatin cream market did not cause prices to erode.  Defendants' agreement was working.

1141.   Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market.  Like Perrigo, Par and Actavis before it, rather than compete on price in order to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators.  Prices remained stable and elevated even with a fifth seller in the market.

1142.   Upon information and belief, the price increases on Nystatin cream were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States.   These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

           2.     Nystatin Ointment

1143.   In June 2011, after Sandoz and Actavis had ceded the Nystatin ointment market, Perrigo implemented a more than 300% increase.

1144.   In early 2012, Actavis increased production of Nystatin ointment.  Rather than compete on price and try to steal market share from Perrigo, Actavis increased its list prices to high levels to match Perrigo.

1145.   This pattern repeated in the Summer of 2012.  Sandoz increased its production.  Rather than compete on price to gain market share, Sandoz raised its list price to identical levels as Perrigo and Actavis.

1146.   These actions by Actavis and Sandoz reflected the "fair share" agreement understanding.

1147.   Upon information and belief, the price increases on Nystatin ointment were the result of collusive agreements between and among Defendants to increase pricing and restrain

competition for the sale of Nystatin in the United States.  These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

       3.   <u>Nystatin Tablets</u>

1148.  Beginning in approximately April 2013, Sun (along with its subsidiary, Mutual) sought to increase the prices of Nystatin.  A senior executive from Sun, ███████ discussed the price increase with █████ of Heritage on April 16, 2013, during a phone call that lasted approximately 40 minutes.  However, the newly hired senior executive at Teva responsible for pricing of Nystatin (Nisha Patel) was initially leery about joining Sun's price increase.

1149.  Malek sought to get Teva on board with the price increase.  Malek spoke with Teva's Patel by telephone regarding a possible price increase on Nystatin several times in July 2013, including for about 21 minutes on July 9, 10 minutes on July 23 and for more than approximately 20 minutes on July 30.  Heritage's █████ also discussed with Sun's ███████ the conversations Heritage was having with Teva.

1150.  The discussions between the three companies were put on hold for a period of time in late 2013, while Teva's Patel went on maternity leave.  Shortly after her return to work, she spoke with Malek about finally implementing the Nystatin price increase during a February 4, 2014 telephone conversation.  Malek and Teva's Patel spoke several additional times about the Nystatin price increase in February and March in order to confirm the agreement.

1151.  On April 4, 2014, Teva announced an increase of approximately 100% on its Nystatin pricing.  Around the same time, Malek renewed discussions with Sun to confirm the timing of Sun's and Heritage's price increases.  As it was Sun that began the collusive discussions on Nystatin roughly one year prior, Sun quickly agreed to implement the price increase.

1152.   Beginning in late June 2014, Heritage began announcing to its customers an increase on its Nystatin prices of almost 100%.  Heritage confirmed to Sun the details of its pricing announcements in a detailed text message sent on June 25, 2014.  By July 9, 2014, Heritage had fully implemented the Nystatin price increase.

1153.   After Heritage implemented its price increase on Nystatin, a large pharmacy sent an RFP to Teva seeking a competitive bid on Nystatin pricing.  Teva forwarded the RFP to Heritage, confirming that Teva was following the conspiracy pricing.

1154.   In August 2014, as it had discussed with Teva and Heritage, Sun (and Mutual) announced and implemented the increased pricing on Nystatin.

1155.   As a result of this collusive agreement on Nystatin pricing, Teva, Heritage, and Sun (including Mutual) were able to roughly double the prices for generic Nystatin tablets that they sold to Plaintiffs and others in the United States.  This collusive agreement remained in force or effect (or both) from April 2014 until the present.

**JJJ.   Omega-3-Acid Ethyl Esters**

1156.   Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides.

1157.   ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████
████████████████████████████████████████
████████████████████████████████████████



1159.   Pera did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening.  Patel then followed up with ▇▇▇▇ informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was ▇▇▇▇▇▇▇▇▇...."

1160.   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████
████████████

1161.   Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

1162.   After the discussions between Patel and Pera at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.  As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped ████████████████████████

████████████████████████████████

1163.   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████   Rekenthaler had obtained this information through phone calls with ████████████, a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

1164.   Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014.   █████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████

1165.   By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing.  During this time, Rekenthaler was speaking frequently with ████████████, a senior national account executive at Par, to coordinate.

1166.   By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop.  By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to █████

████████████████████████████████████████████████████████████████████████████

Rekenthaler was speaking frequently with ████████ at Apotex to coordinate during the time period of Apotex's entry in the market.

**KKK.  Oxaprozin Tablets**

1167.   Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID).  It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1168.   Prior to July 2012, Teva and Dr. Reddy's dominated the Oxaprozin market. However, between July 2012 and March 2013, two additional competitors entered the market, yet the price of the drug went up more than 500% in the process.

1169.   First, Sandoz entered the market in July 2012.  Prior to Sandoz's entry into the market, Teva raised its prices by approximately 500%.

1170.   This price increase was made possible by the Fair Share agreement, as Teva knew that it would not lose market share by raising prices, even with Sandoz's pending entry into the market.  Indeed, when Sandoz did enter the market in July 2012, it matched Teva's higher prices and was still able to gain its "Fair Share" of the market.

1171.   Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva.  In the days and weeks leading up to Greenstone's entry into the market, Green of Teva and ████████████, an account executive at

Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

1172.   During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

1173.   Part of the understanding between the companies was that Teva would concede at least two large customers – CVS and Cardinal – to Greenstone, and that Teva would retain Walmart as a customer.  On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

1174.   On March 27, 2013, ███████ of Teva forwarded an e-mail that ███████ had received from Walmart to Green and Rekenthaler.  The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (Greenstone).

1175.   ████████████████████████████

████████████████████████████████████

████████████████████████████████████



1176.   Teva took immediate steps to address the situation.  That same day – March 27, 2013 –Green called ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████

1177.   After Green spoke to ███████ he immediately called ███████ at Greenstone.  She relayed the information from Green to her boss, Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

1178.   During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

1179. 

1181.   In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year.  In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share.  Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1182.   On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to ███████████████████████████████████████████████ ████████████

1183.   Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva.  At the time, Teva had 60% market share.  Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier.  Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

1184.   ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████

1186.   While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – Jake Austin of Dr. Reddy's called Green.  That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

1187.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

1191.   By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.  At that time, its customers included Econdisc, Keysource, and Premier.

1192.   As a result of this collusion, Defendants have been able to maintain pricing for Oxaprozin at supracompetitive levels since July 2012.

**LLL.   Oxycodone/Acetaminophen**

1193.   Oxycodone/Acetaminophen, which is the generic version of Percocet and is sometimes abbreviated as "Oxy/Apap" is prescribed to treat chronic or severe pain.

1194.   During the time period relevant to this Complaint, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, and Teva dominated the market for Oxy/Apap.  Given the large number of competitors that entered the market for the drug between 2011 and 2015, pricing for Oxy/Apap should have fallen substantially over time.  Instead, the opposite occurred.  For example, by December 2013, Mallinckrodt, Actavis, Alvogen, Amneal and Par all sold 100-tablet bottles of 10/325 mg pills that had cost roughly $18 per bottle throughout 2011 and 2012 for more than $80.

1195.   Although the Defendants did not increase prices on the drug until late 2013, Defendants ensured that the fair share agreement applied as new competitors entered the market. For example, Alvogen received approval to launch Oxy/Apap in July 2012.  Upon learning that Alvogen was entering the market for Oxy/Apap, ███████ of Dr. Reddy's – which did not manufacture the drug – reached out to ████████, Alvoegn's EVP of US Commercial Sales, to congratulate him on the approval.   ███ responded that Alvogen's entry "should be a fun ride. We're just trying to find the right spots to fill some holes in the market."  In other words, ███

confirmed to a Defendant that did not manufacture the drugf that Alvogen was complying with the overarching agreement by not seeking any more than its "fair share" of the market.

1196.   Between July and December 2013, Defendants coordinated to more than quadruple their prices on Oxy/Apap.  Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Par quickly followed.  Upon information and belief, the campaign to increase prices on the drug was spearheaded by Actavis and Mallinckrodt.  Between July 2013 and December 2013, Marc Falkin of Actavis spoke with ▮▮▮▮▮▮▮▮, Alvoegn's EVP of US Commercial Sales; ▮▮▮▮▮▮▮▮▮, VP of Sales at Amneal; ▮▮▮▮▮▮▮▮, the CEO of Aurobindo ▮▮▮▮▮▮▮▮, Vice President and General Manager at Mallinckrodt; ▮▮▮▮▮▮▮▮, Par's VP of Sales. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Amneal) also coordinated with Aurobindo and Actavis, respectively, during this timeframe.

1197.   On November 19, 2013, Par received an inquiry from Econdisc to bid for Oxy/Apap.  Upon learning that the RFP was requested due to a price increase from the incumbent supplier.  Upon information and belief, Par declined to bid for this business after ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

1198.   As a Teva sales executive reported internally in a November 26, 2013 e-mail to Kevin ▮▮▮▮▮ David Rekenthaler, Nisha Patel, and others, ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" This information proved accurate, as Actavis followed Mallinckrodt's price increase just a few days later.

1199.   Mayne entered the market for Oxy/Apap in late 2014.  In planning for the launch, ▮▮▮▮▮, Mayne's President, encouraged his sales team to engage in ▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████████████

████████████    Indeed, upon entry, Mayne received its "fair share" as the eighth entrant into the market without any disruption to price, in accordance with the overarching conspiracy.

1200.  As a result of these collusive communications, Defendants have been able to maintain Oxy/Apap at supracompetitive levels since July 2012.

**MMM.  Paricalcitol**

1201.  Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

1202.  Defendant Teva entered the market on Paricalcitol on September 30, 2013.  As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1203.  In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede.  Teva had advance knowledge that Defendant Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

1204.  ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

1205.  In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

1206.  On February 28, 2014, ██████████████████, a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER.  After

receiving that e-mail, Rekenthaler called Green.  The call lasted less than one (1) minute (likely a voicemail).  The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes.  On March 4, Patel called Green again and left a voicemail.

1207.   On March 12, 2014, ██████████ o e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC.  That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented.  This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

1208.   On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing.  The next day, on March 14, 2014, Patel called Green.  A few minutes later, Green returned the call and they spoke for nineteen (19) minutes.  Rekenthaler then called Patel and they spoke for eleven (11) minutes.

1209.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes.  During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market.



Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1210.   Over the next several weeks, Defendant Teva would "███████ concede several customers to the new entrant Zydus.

1211.   For example, on March 27, 2014, Green called Patel. Patel returned the call and they spoke for nearly nine (9) minutes.  The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

1212.   That same day, Defendant Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business.  On April 1, 2014, Defendant Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was

████████████████████████

1213.   Also on April 1, 2014, Defendant Zydus bid for the Parcalcitol business at NC Mutual, another Teva customer.  That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

1214.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain.  Two days later, on April 17, 2014, ███████████ responded that he thought it might be Zydus.  Patel replied: ███████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████

1215.   By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.  On May 1, 2014, ████████████ of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

1216.   At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices.  Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

1217.   On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("The Pharmacy") – Patel spoke with ████████████, the Vice President of Sales for North American Generics at Dr. Reddy's, several times.  At 8:50am, Patel called Borelli and left a voicemail.  Borelli returned the call at 9:18 am, and the two spoke for more than ten (10) minutes ████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████

1218.   By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The Pharmacy.  The internal plan was that if Walgreens declined, then Dr. Reddy's would make

an offer to CVS.  That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

1219.  Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the four mcg portion of the business. Patel recommended to her boss.

1220.  Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity.  ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014.  In internal e-mails discussing this price challenge, Teva employees noted that Dr. Reddy's was                               and potentially eroding the price of the drug. When asked for his thoughts on this, Rekenthaler remarked:

1221.   █████████████████████████████████████████

███████████████████████████████████████████████████

██████

    ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

1223.   Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's.  Patel recommended that Teva concede the business.  Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

1224.   Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014.  That same day, Borelli of Dr. Reddy's called Patel and the two spoke for more than twelve (12) minutes.  Shortly after getting off the phone with Borelli, Patel responded to a question from a colleague regarding an RFP to another supermarket chain.█████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████.

1225.   The next day, Teva conceded the Giant Eagle business to Dr. Reddy's.██████████

█████████████████████████████████████████████████

███████████████████████████████  Giant Eagle accepted Dr. Reddy's proposal the next day.

1226.   After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business.  Teva decided internally to concede Paricalcitol at Schnucks

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

1227.   Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

1228.   On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the RiteAid portion. Patel wrote internally to her team that ███████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

1229.   On July 18, 2014 – a Friday – Patel called ██████ at Dr. Reddy's at 4:20 pm and left a message. ██████ returned the call on Monday morning, and the two spoke for more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six minutes. During these calls, Patel and ██████ agreed that Dr. Reddy's would stop competing for additional

market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's.  Indeed, Dr. Reddy's confirmed to McKesson (that same day)

### NNN.  Paromomycin

1232.   The market for Paromomycin is mature, as the drug has been available in the United States since 1960.  The drug is considered an essential medicine by the World Health Organization. Heritage and Sun sold Paromomycin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1233.   Until April 2014, pursuant to the conspiracy's overarching agreement on market allocation, Heritage maintained approximately a 65% market share for Paromomycin and Sun maintained approximately a 35% market share.

1234.   During a lengthy phone call on April 22, 2014, discussed an agreement to raise prices on Paromomycin.  Ultimately, it was agreed between the two companies that Sun would exit the market for Paromomycin.  Upon information and belief,

Heritage agreed to concede market share to Sun on another generic drug in exchange for Sun's agreement to stop manufacturing Paromomycin.

1235.  In May 2014, Sun stopped its production of Paromomycin (although it continued to sell its surplus inventory of the drug until approximately January 2015).

1236.  Knowing that it would have a complete monopoly for the manufacture of generic Paromomycin in the United States, Heritage decided to raise prices, and on June 26, 2014, Heritage notified its customers that its prices for Paromomycin would double going forward.  Upon information and belief, Heritage raised its prices by approximately 100%.

1237.  As a result of this unlawful agreement between Heritage and Sun, Defendants have charged supracompetitive prices on generic Paromomycin sold to Plaintiffs and others in the United States since at least April 2014.

**OOO.  Piroxicam**

1238.  Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1239.  On March 3, 2014, Greenstone received FDA approval to market Piroxicam Capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

1240.  Greenstone immediately began seeking potential customers. At 10:07am on March 5, 2014, ▮ of Teva sent an e-mail to Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. ▮ asked Patel: ▮

▮

1241.  Before responding to that e-mail, Patel sought to negotiate strategy with Greenstone.  Patel called ▮ at Greenstone at 10:55 am and they spoke briefly.  Shortly after that call, Patel also called ▮ boss, Nailor.  At 2:14 pm that afternoon, Patel and Nailor spoke briefly. Immediately after hanging up with Nailor, Patel responded to ▮ e-mail:



1242.  Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market.  On March 6, 2014, Patel requested a customer profitability and share analysis.  During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a ▮ could easily determine which customers to concede when talking to competitors about dividing the market.

1243.  That same day, Patel had multiple calls with Nailor and ▮ at Greenstone to discuss their plans for dividing the Piroxicam market.  At least some of those calls are set forth in the table below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

1244.    The next day – March 7, 2014 – after the flurry of phone calls detailed above, Patel sent an e-mail to ▮▮▮▮▮, a customer marketing manager at Teva, identifying specific customers to concede to Greenstone.  Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

1245.    Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam.  ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1246.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks.  On March 17, 2014, Patel called ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Teva retained the

CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

1247.   For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor.  Following an analysis of its market share, Teva determined that it still had more than its fair share of the market.  Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it was obligated under the unwritten rules of the Fair Share agreement to concede the Anda business to Greenstone on Piroxicam.  Patel agreed with the decision to concede on April 1, 2014.

PPP.   **Potassium Chloride**

1248.   Potassium Chloride is prescribed to treat hypokalemia, a condition occurring when a patient's blood levels have insufficient potassium.

1249.   During the time period relevant to this Complaint, Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus dominated the market for Potassium Chloride tablets and capsules.

1250.   In August 2010, Actavis, Sandoz, and Upsher-Smith each implemented abrupt and substantial parallel price increases on Potassium Chloride.  For example, bottles of 100 tablets of 8 MEQ dosage strength that sold for less than $7.00 at the end of July 2010 increased to more than $42.00 by mid-August.

1251.   Upon information and belief, this price increase was agreed upon during telephone calls between ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████.  Additionally, representatives of each of the three companies met at trade shows and other industry events throughout Summer 2010.

1252.   In mid-2011, Zydus entered the market at the elevated prices established by Actavis, Sandoz, and Upsher-Smith.   Prior to Zydus' entry, ███████████ – the company's Associate Vice President of National Accounts – communicated frequently with CW-4 of Sandoz. The purpose of these communications was to determine which accounts Zydus would add in order for the company to receive its "fair share" of the market.   In exchange for Zydus' support of the supracompetitive conspiracy pricing for Potassium Chloride, Actavis, Sandoz, and Upsher-Smith each conceded market share to Zydus.

1253.   In late 2014, Mylan also entered the market for Potassium Chloride.   Consistent with the Fair Share agreement, Jim Nesta of Mylan reached out to Marc Falkin of Actavis in September 2014 to coordinate Mylan's receipt of its "fair share" of the market.   Like Zydus, Mylan agreed to support the pricing as already fixed by Actavis, Sandoz, and Upsher-Smith, and in return, the existing manufacturers of Potassium Chloride conceded market share to Mylan.

1254.   Internal Upsher-Smith documents prepared in late 2014 confirmed that the Fair Share agreement was followed by all competitors, noting tha ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

█████████████████

1255.   As a result of these collusive communications, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride tablets and capsules since August 2010.

QQQ. **Pravastatin**

1256.   Pravastatin, also known by the brand name Pravachol, is a medication belonging to a class of drugs called "statins," and is used to treat high cholesterol and triglyceride levels.  The market for Pravastatin is mature, as generic Pravastatin has been available in the United States for over 10 years.  In October 1991, Bristol Meyers Squibb received FDA approval to market Pravachol, which is prescribed to control high cholesterol and triglycerides.  Pravastatin is the generic version of Pravachol.

1257.   Upon the expiration of Bristol Meyers Squibb's patent in 2006, a number of generic manufacturers applied for ANDAs to market Pravastatin in the United States.  By 2010, Apotex, Glenmark, Teva, Dr. Reddy's, Lupin, Zydus, and Mylan had all received ANDAs to manufacture and sell generic Pravastatin and each sold Pravastatin to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.  As a result, the average cost of a dose of generic Pravastatin sold at a competitive price of less than 10 cents between January 2010 and June 2013.

1258.   Beginning in May 2013, Defendants conspired to implement a series of collusive price increases on Pravastatin.  Although the price increases were taken in stair-step fashion, they could not have been implemented without collusion between and among each of the eight generic manufacturers of Pravastatin.

1259.   As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark.  Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly."  Within minutes, she received a call from CW-5 and they discussed

price increases for a number of different drugs, including Pravastatin.  Shortly after that call, Patel

sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark

drugs, to the price increase list.  In all, Patel spoke to CW-5 four (4) times throughout the day on

May 2, 2013, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

1260.   As of May 2013, the market for Pravastatin included five competitors: Glenmark,

Teva, Lupin, Zydus and Apotex.  The number of competitors made it more difficult to coordinate

a price increase.  This difficulty stemmed in part because two of those competitors – Zydus and

Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings,

and any price increase for that drug would require significant coordination and communication

before Teva could feel comfortable raising its own price.

1261.   Teva was able to achieve a sufficient level of comfort and substantially raise prices

for Pravastatin by systematically communicating and reaching agreement with each and every

competitor on that drug over the next several months.

1262.   On May 3, 2013, Green called ███████████, a senior executive at Zydus, twice

with one call lasting four (4) minutes.  Over the next several weeks, Green communicated

numerous times with both ████████████████, a senior sales executive at Zydus, to

coordinate a Zydus price increase on Pravastatin.

1263.   On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold)

and Glenmark ████████████ a national account executive) multiple times.  Those calls are

detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

1264.   During one or more of her calls with ████ and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the Glenmark increases became public – and documented those price points in her price increase spreadsheet.

1265.   By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase, and were comfortable enough with the situation that one marketing executive at Teva indicated in an e-mail to Patel that he was hoping to raise price on Pravastatin ████████████████████

1266.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On May 15, 2013 – the day before Glenmark's increase would become effective – a Teva executive sent an e-mail out to the pricing team stating that: ██████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████

1267.   That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

1268.   As was now the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva executives.  At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

1269.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase.  At that time, Patel did not view Zydus as a quality competitor.  Patel stated: ████████████████████████████████████

████████████████████████████████████████

████████████████████████

1270.   Green was responsible for coordinating with Zydus.  As seen in the table above, on May 15, 2013, Green spoke with three Zydus employees, including a call with ████ of Zydus lasting sixteen (16) minutes.  The next day, on May 16, Green spoke with ██████ for 4 minutes. Later that day, ████████████ and the two Zydus executives spoke for more than seventeen (17) minutes.  Green also spoke to Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1271.   Also on May 16, Patel's ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████



1272.   The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin.  For example, at 12:08 pm, Patel called Berthold at Lupin for an eleven (11) minute call.  While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 pm) and left a 23-second voice mail.  Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1273.   As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex.  From May 20-24, Patel had the following series of phone calls with ███████████, a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

1274.   These were the first documented phone calls between Patel and ███████ since Patel had joined Teva.

1275.   But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price.  For example, when she sent the ███████████ spreadsheet to her supervisor ████████ on May 24, 2013, Pravastatin was still not on the list.

1276.   That would change shorlty. On May 28, 2013, Apotex raised its price for Pravastatin.  That same day, Green also exchanged six (6) text messages with ██████ at Zydus.  The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1277.   The day after the Apotex increase, Green spoke to ██████ at Zydus two more times, and exchanged four (4) more text messages.  Zydus then quickly followed with a price increase of its own on June 14, 2013.

1278.   Following the normal pattern, Green spoke to ██████ and others at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:



| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

1279.   Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013.  As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1280.   When Patel sent the ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

1281.   A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases.  In her response, Patel confirmed that it was Kevin Green (or ███████) who had indeed coordinated the Pravastatin price increase with Zydus:

████████████████████████████████████████████████████████████

1282.  Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

1283.  The extra work required to implement the Pravastatin price increase was well worth it to Teva.  On August 8, 2013 – the day before the Teva increase – Patel sent her supervisor,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

1284.  Between July 2013 and October 2013, Apotex, Glenmark, Teva, Lupin, Zydus, and Mylan each increased their prices for generic Pravastatin sold to Plaintiffs and others in the United States.  The Defendants continued to further raise prices throughout the remainder of 2013.

1285.  By way of example, with respect to WAC pricing, Defendants reported nearly identical WACs for their 10 mg products, reflecting increases of more than 100%:

| Product 10 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Apotex | 60505016809 | $0.26 | $0.56 | 28-May-13 | 119% |
| 500 ct | Apotex | 60505016805 | $0.26 | $0.56 | 28-May-13 | 119% |
| 90 ct | Zydus | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 500 ct | Zydus | 68382007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 90 ct | Teva | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |
| 1000 ct | Teva | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 90 ct | Lupin | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 500 ct | Lupin | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

1286.   These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions.   There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

1287.   Although prices for Pravastatin have receded somewhat from the peak in early 2014, Defendants continue to charge supracompetitive prices for Pravastatin to Plaintiffs and others in the United States.   The conspiracy overcharge remains embedded in the price of Pravastatin that Defendants charge Plaintiffs and others.

**RRR.   Propranolol**

1288.   The market for Propranolol is mature, as Propranolol has been available in the United States for decades.   Propranolol, also known by various brand names including Inderal LA, Inderal XL, Hemangeol and InnoPran XL, is a beta-blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.   The drug is considered an essential medicine by the World Health Organization, and is used by millions of patients in the United States.   The price for Propranolol had fallen steadily since its introduction in the 1960s, and as recently as early 2013, a monthly prescription for Propranolol cost as little as $8.00.

1289.   Actavis, Breckenridge, and Upsher-Smith each manufacture Propranolol in capsule form, while Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage manufacture Propranolol in tablet form.   Each sold either Propranolol capsules or tablets (or both) to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1.   Propranolol Capsules

1290.   Actavis, Breckenridge, and Upsher-Smith implemented a collusive price increase beginning in November 2013 on Propranolol capsules.   Breckenridge, which had previously had

lower prices for Propranolol capsules, increased its prices for all dosages by 88% to 140%. Upsher-Smith followed in December with a corresponding price increase on all dosages of Propranolol capsules that ranged from 49% to 79%, depending on the dosage strength.  In February 2014, Actavis increased prices for all dosages of Propranolol capsules by 64% to 81%, depending on the dosage strength.   Although prices fell slightly from their peak in 2014, Actavis, Breckenridge, and Upsher-Smith still continue to price Propranolol capsules at supracompetitive levels.

1291.   Upon information and belief, the price increases on Propranolol capsules were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Propranolol capsules to Plaintiffs and others in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications as described in Ex. 1.

2.    Propranolol Tablets

1292.   Although the conspiring Defendants increased prices on Propranolol capsules by early 2014, Defendants' prices for Propranolol tablets remained stable throughout 2014.

1293.   Beginning in January 2015, however, Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage colluded to increase prices on Propranolol tablets as well.

1294.   On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol.  The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1295.   In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently.  For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1296.   Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan – the other quality competitor in the market for Propranolol.  The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1297.   On January 16, 2015 – more than a month before the Actavis price increase for Propranolol was disclosed to the public – Rekenthaler forwarded Teva's price increase list to Patel. Propranolol was on the list, with the following explanations about pricing strategy and reasons for the price increase:



1298.   Teva raised its pricing for Propranolol on January 28, 2015 – before the Actavis price increase even became effective.   As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1299.   When the Actavis price increase on Propranolol did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing.  For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three (23) minutes.  Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1300.   Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, Teva, Pliva, and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively.  Mylan and Par began increasing their prices soon after, by amounts ranging from 55%-607% and 52%-216%, respectively.  Actavis, Mylan, Teva, Pliva, Par, and Heritage continued to increase prices throughout 2015, and by January 2016, Defendants had increased their prices for some strengths of Propranolol tablets by more than 1700%.  For example, Actavis raised its prices of 80 mg Propranolol tablets from an average of $0.30 to $0.46 per tablet between December 2014 and November 2015.

1301.   With respect to both the capsule and the tablet price increases, even in those instances in which the Defendants did not increase prices in perfect unison, they still managed to align their pricing on a bi-monthly or quarterly basis, which is consistent with an illegal agreement.

1302.   Defendants continue to charge supracompetitive prices for Propranolol tablets as of the filing of this Complaint.

SSS.   **Temozolomide**

1303.   Temozolomide, also known by the brand name Temodar, is used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

1304.   The patent on Temodar was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration.  Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

1305.   On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid.  That same day, CW-1 received a telephone call from Patel.  Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.  Nothing was agreed to on that call.

1306.   

1307.   At the same time, CW-1 was reaching out to Teva directly to get more information.  CW-1 called Patel at approximately 1:45 pm on July 23, 2013.  After exchanging voicemails, they spoke for over fourteen (14) minutes that same afternoon.

1308. ████████████████████████████████████

████████████████████████████████████



1309.   Thus, Teva was able to communicate to Sandoz: (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide.  Sandoz understood the implications of the communication, and understood ████████████████████████████

████████████████████████████████████

1310.   On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ Rekenthaler most likely got his information from Patel.  Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

1311.   Teva and Sandoz were also coordinating through other channels. After receiving the RFP from Walgreens, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

1312.   Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two (2) times.  The two spoke again on July 31, 2013 for six (6) minutes.  During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted Walgreens' business.  The next day, August 1, 2013, ████████████, another Sandoz executive, e-mailed Kellum, conveying the message from Green:

███████████████████████████████████████████████████

1313.   Teva and Sandoz communicated their future plans with each other for other accounts in addition to Walgreens and CVS. █████████████████████████

███████████████████████████████████████████████████

████████████████████████████

1314.  Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide.  On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.  There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

1315.  Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength.  In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan: ██████████████

████████████████████████████████████████████

1316.  CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### TTT.  Theophylline ER

1317.  The market for Theophylline ER is mature, as Theophylline has been used to treat various conditions since approximately 1900.  Heritage and Teva sold Theophylline ER to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1318.  In February 2014, Teva's Patel spoke with Heritage's Malek for more than an hour regarding a number of potential drugs on which prices could be increased.  Upon information and belief, during that conversation, Heritage and Teva agreed that they would increase prices for Theophylline ER.

1319.   Teva agreed that it would lead the price increase for Theophylline ER.  By late April 2014, Teva fully implemented a price increase on the drug of approximately 150%.

1320.   During an internal company meeting on April 22, 2014, Malek informed sales employees at Heritage that Heritage would follow Teva's price increase and raise prices for Theophylline ER by approximately 150%.

1321.   Heritage began announcing the price increase to customers in late June 2014, and by July 9, 2014, it had fully implemented the collusive 150% price increase of Theophylline ER.

1322.   As a result of the unlawful agreement on Theophylline ER between Teva and Heritage, prices for the drug still remain at supracompetitive levels.

**UUU.  <u>Tobramycin</u>**

1323.   Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

1324.   Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period █████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

1325.   As expected, Teva was "█████████ when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.  Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how

to divide up the market for Tobramycin.  Patel conveyed some of this information in an internal
Teva e-mail the same day, writing: ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

    1326.   On July 7, 2014, Patel and CW-1 spoke fiver more times, including one call lasting
eleven (11) minutes.  On these calls, CW-1 and Patel discussed how to divide up the market for
Tobramycin, including specific accounts that that each would maintain or concede to the other.
Patel then memorialized the agreement in an e-mail two days later.  The result: Teva would take
Walgreens, McKesson, Econdisc, ABC, and Omnicare.  Teva also planned to concede the Cardinal
business to Sandoz.

    1327.   Patel told CW-1 specifically that Teva would not even submit a bid to CVS.  This
was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire
the CVS business by offering only a nominal reduction to the extremely high Teva price.

    1328.   According to plan, Teva conceded the CVS business to Sandoz after CVS contacted
Teva and requested that Teva submit a lower price to retain the business.  Rekenthaler wrote in an
internal e-mail: ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

    1329.   CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and
Walgreens.  CW-1 spoke with Kellum about his conversations with Patel and the agreement to
stay away from Walgreens and ABC, and Kellum agreed with the plan.  Pursuant to that agreement,
Sandoz made no effort to contact those two large customers when it entered the market.

1330.   CW-1 and Patel also discussed Sandoz's target market share.  CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

1331.   On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin.  A Teva analyst stated in an internal e-mail, ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████  Patel's

direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail.  CW-1 then returned her call the same day and the two spoke for four (4) minutes.

**VVV.  Tolterodine**

1332.   Tolterodine Tartrate, also known by the brand name Detrol, is in the antispasmodics class of medications and is prescribed to treat an overactive bladder.  Tolterodine Extended Release ("Tolterodine ER") – also known by the brand name Detrol LA – is an extended release version of the drug used for the same purpose.

(a)   Tolterodine ER

1333.   Teva planned to launch the first generic version on January 2, 2014.  During the first half of December 2013, Teva was under the impression – based on conversations with potential customers – that Mylan was not in a position to launch until 30 to 60 days after Teva

launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did

eventually launch ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ .

1334.   Through the first half of December 2013, as Teva was soliciting usage amounts

from potential customers, customers were asking Teva to send in pricing offers before the launch.

Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014

launch date.  Teva's delay in putting together pricing for potential customers was part of a plan to

drive up the amount it could charge for Tolterodine ER.  Specifically, Teva expected that on

January 1, 2014, the price of branded Detrol LA was going to increase.  This would allow Teva to

peg its price to the now inflated price of the branded drug and thereby command a higher price for

Tolterodine ER on the January 2, 2014 generic launch date.

1335.   At the end of the day on Friday December 20, 2013, ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

1336.   Figure it out they did.  ████████ informed her Teva colleagues of Mylan's plans.

████████ of Teva then worked over the weekend to turn this information into initial pricing for all

of Teva's potential customers and then shared it internally.  In a telling admission that Teva had

no intention to bid competitively for all accounts, ██████████ noted that the next step was ██████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

1337.   On Monday, December 23, 2013, Rekenthaler, Patel, ████████████, and several others at Teva had a telephone conference scheduled from 8:00 am to 9:00 am to discuss the Tolterodine ER launch strategy.  Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan.  Nesta returned Rekenthaler's call at 8:15 am, which was during Teva's scheduled Tolterodine ER phone conference.  Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds.  Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times.  At 10:22 am, Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds.  During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

1338.   For example, at 10:33 am – while Rekenthaler was still on the phone with Nesta, ████████ sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases.  Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:



1339.   Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

1340.  At 12:12 pm on December 23, 2013, ███████ circulated a revised version of Teva's pricing plan for the Tolterodine ER launch.  This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding.  Notably, the revised pricing plan identified the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share.

1341.  In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted.  This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers located to Mylan; Walgreens, Cigna, Humana, Prime Therapeutics, Optum, and Kaiser.

1342.  In addition to submitting inflated bids for the accounts listed above, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

1343.  The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement.  Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

(b)   Tolterodine Tartrate

1344.  Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, ███████ and Nailor of Greenstone were speaking frequently to Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

1345. During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

1346. The day after Greenstone's entry – January 24, 2014 – in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not) Patel stated: ███████████████████████████

███████████████████████████████████████

1347. On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. ████████ of Teva immediately asked: ████████████████████

████████ Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:



1348.   The next day, Patel and ▮▮▮ of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

1349.   On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. ▮▮▮ of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded – again not wanting to put the details into writing:



1350.   The next day, Patel called ▮▮▮ at Greenstone and the two spoke for nearly sixteen (16) minutes.

1351.   After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to Greenstone.  CVS represented more than 20% of Teva's business on Tolterodine Tartrate.

**WWW.** **Ursodiol**

1352.  The market for Ursodiol is mature, as generic versions of Ursodiol have been available in the United States since 2000.  Defendants Actavis, Lannett, and Epic sold Ursodiol to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1353.  At all times relevant to this lawsuit there has been more than one manufacturer of Ursodiol on the market.  Defendants Actavis, Lannett, and Epic dominate the market for Ursodiol.

1354.  In the years prior to the conspiracy period, Defendants' average price in the U.S. for Ursodiol were remarkably stable.  Beginning in or around May 2014, Defendants increased their prices for Ursodiol abruptly and, for the most part, in unison.

1355.  By way of example, beginning in May 2014, Defendants selling generic Ursodiol set their WACs in near lockstep, reflecting increases from previous WACs on the 300 mg capsule of more than 560%:

| Product Cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

1356.  Ursodiol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

1357.  Furthermore, there are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Ursodiol.  Demand for Ursodiol has not materially changed in the last few years, nor does any change in input costs explain these price increases.  Furthermore, at the time Ursodiol prices were increased in Summer 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

1358.   Upon information and belief, the price increases on Ursodiol were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Ursodiol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are highlighted below.

1359.   For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1360.   On June 4-5, 2013, the GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1361.   On June 2-5, 2013, HDMA held its 2013 BLC in Florida.  Representatives from Actavis and Lannett attended the event.  *See* Ex. 1.

1362.   On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. Representatives from Actavis and Lannett attended.  *See* Ex. 1.

1363.   On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1364.   On May 12-15, 2014, MMCAP held its National Member Conference which was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1365.   On June 1-4, 2014, HDMA held its BLC at the JW Marriott in Arizona.  This event was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1366.   On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett.  *See* Ex. 1.

1367.   On August 23-26, 2014, NACDS held its 2014 TSE in Boston.  Representatives from Actavis, Epic, and Lannett attended.  *See* Ex. 1.

1368.   On October 27-29, 2014, GPhA held a meeting in Maryland that attended by Actavis and Lannett.  *See* Ex. 1.

### XXX.   Valsartan HCTZ

1369.   Valsartan HCTZ works to lower blood pressure and relax blood vessels so that blood can flow more easily, in order to prevent strokes, heart attacks, and kidney problems.  Mylan and Sandoz dominate the market for Valsartan HCTZ.

1370.   In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment.  CW-4 contacted Nesta because she was interested in potentially working at Mylan.  CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself.  During that phone call, Nesta immediately started talking about competitively-sensitive information.  Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

1371.   In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases.  Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone.  Examples of their coordination with respect to specific drugs are discussed in more detail below.

1372.   The first drug that CW-4 and Nesta coordinated about was Valsartan HCTZ.  Valsartan HCTZ, also known by the brand name Diovan HCT, is used to treat high blood pressure.

1373.   Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

1374.   Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

1375.   Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012.  In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product.  These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

1376.   During these phone calls, Sandoz and Mylan- through CW-4 and Nesta – agreed to divvy up the market so that each competitor obtained roughly a 50% market share.

1377.   Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

1378.   On September 21, 2012 – the date of the Valsartan HCTZ launch –



1379.   That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked:

1380.

1381.   On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ.

1382.   On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

### YYY.  <u>Verapamil</u>

1383.   The market for Verapamil is mature, as the drug has been available in the United States since 1981.  The drug is considered an essential medicine by the World Health Organization. Actavis, Heritage, and Mylan sold Verapamil to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1384.   During phone calls with senior sales executives from Mylan and Actavis on April 22 and April 23, 2014, Heritage, Mylan, and Actavis agreed to raise prices on Verapamil in the United States.

1385.   Heritage began announcing the price increase to its customers in late June 2014, and had fully implemented the Verapamil price increase by July 9, 2014.

1386.   During the Summer of 2014, Mylan and Actavis also implemented the collusive price increase on Verapamil, as agreed by the three Defendants.  As a result of this agreement, prices for Verapamil sold to Plaintiffs and others in the United States still remain at supracompetitive levels.

**ZZZ.** **Zoledronic Acid**

1387. The market for Zoledronic Acid is mature, as the drug has been available in generic form since 2013. The drug is considered an essential medicine by the World Health Organization. Heritage and Dr. Reddy's sold Zoledronic Acid to Plaintiffs and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1388. In early 2013, Heritage received approval to market Zoledronic Acid in the United States. On January 21, 2013, Malek instructed members of his sales team to reach out to Dr. Reddy's – which at the time was the exclusive manufacturer of generic Zoledronic Acid in the United States – to reach an agreement on the price that the two companies would charge and a "fair share" market allocation that each would follow once Heritage entered the market.

1389. Through a number of phone calls in late January 2013 between Heritage's ███ and Dr. Reddy's ███ an agreement was reached that Heritage would be entitled to a 40% market share and Dr. Reddy's could keep the remaining 60% of the market. The two Defendants also agreed not to compete on pricing for Zoledronic Acid.

1390. Conversations between the two companies in furtherance of the agreement continued in early March 2013, in preparation for Heritage's entry into the market on March 13, 2013. For example, Heritage employees, at Malek's direction, e-mailed and spoke by telephone with Dr. Reddy's employees on March 1, March 4, March 6, and March 12, 2013. Heritage employees also exchanged a number of texts with their contacts at Dr. Reddy's on March 12, 2013.

1391. When Heritage began shipping Zoledronic Acid on March 13, 2013, Malek confirmed this to Dr. Reddy's, and he also confirmed the exact prices that Heritage was charging.

1392.   On April 19, 2013, in order to conceal the conspiracy, Malek instructed his sales team not to reduce to writing any collusive discussions or agreements relating to Zoledronic Acid or other drugs.

1393.   In order to ensure that the market allocation agreement (and the resulting supracompetitive pricing) remained in place, Malek and his counterparts at Dr. Reddy's discussed their bids to potential customers.  For example, in November 2013, Malek e-mailed Dr. Reddy's to discuss an instance in which Dr. Reddy's responded to an RFP with quoted prices below what Heritage was charging.

1394.   As a result of these anticompetitive agreements and collusive communications, prices for Zoledronic Acid sold to Plaintiffs and others in the United States remain at supracompetitive levels as of the filing of this Complaint.

## XIV.   THE CONSPIRATORS INCREASE PRICES IN BUNCHES

1395.   As discussed in detail in Section XIII, the overarching "fair share" agreement allowed the conspirators to maintain supracompetitive prices on numerous drugs, and implement massive price increases on many others.  In this Section, Plaintiffs explain how the overarching "fair share" agreement allowed competitors to begin increasing prices on drugs in bunches.  As detailed below – including by tying in examples of price-fixing agreement discussed above in Section XIII – as the rules of the conspiracy became more established and the relationships within the industry developed, Defendants ramped up their price increase activity substantially.

### A.   Nisha Patel's First List of Increase Candidates: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron

1396.   As noted above, Patel's first task at Teva was to identify drugs for which Teva could increase prices by colluding with its competitors.  Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements

for Teva to follow them.  On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and

Sandoz several times:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

1397.



1399.   For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013.  (The increases on Fluocinonide and Pravastatin have been discussed in more detail above.)  During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs.  For some of these drugs including the multiple formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1400.   The following graphic summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013:



1. Glenmark

1403. A number of the drugs identified in the ████████████████ targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began

to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

- **CW-5:** 4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (7:59 and 1:03). For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:



1404.   Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓

1405.   As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs:



1406.   In accordance with the fair share understanding outlined above, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1407.   Following the normal pattern, Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases.  Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron.  Patel also spoke to CW-5 and Cangemi at Glenmark multiple times on May 17, 2013.

1408.   After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order to maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler

approached Teva about bidding on several Glenmark increase drugs: ███████████████

███████████████████

1409.   Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved competitors that were not of the highest "quality."  For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

1410.   For example, the market for Fluconazole Tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark.  As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor.  In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, ███████ – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps.  The following Monday, May 20, Patel called ███████████, a national account manager at Greenstone but was unable to connect.  Patel was ultimately not able to communicate with ████ by phone until May 28, 2013 when the two had a twenty-one (21) minute call.  The next day after speaking to Hatosy – May 29, 2013 – Patel promptly added Fluconazole to the Teva price increase list.

1411.   As discussed more fully below, Teva followed the Glenmark price increase for Fluconazole Tablets on July 3, 2013.  That same day, Patel spoke to █████ for nearly sixteen (16) minutes; she also spoke to CW-5 at Glenmark for almost five (5) minutes.  ███████████

██████████████████████████████████

██████████████████████████████████

███████████████████

1412.   The price increase on Fluconazole Tablets is also reflective of how the overarching conspiracy operating.   The massive price increase on Fluconazole Tablets led to two additional market entrants:  Citron and Dr. Reddy's.  When both of these competitors entered the market for Fluconazole Tablets, they spoke with the existing entrants to arrange for their "Fair Share" and to prevent competition for the drug. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

2.   Sandoz

1413.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████



1415.

1417. ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████

1418.   The next day – June 12, 2013 – Patel exchanged at least five (5) calls with CW-1 at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

1419.   At 8:27 am, after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information ████████ had provided, reflecting some of the conversations about market share she was having with CW-1:



1420.   Later that day, at 3:21 pm, Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:



1421.   As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz.  Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

3.      Taro

1422.   Patel noted in her May 24, 2013



1423.   Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene Gel in order to evaluate a potential Taro increase on the drug, including volume and pricing.  Aprahamian indicated that the reason for his request was that the ████████████████████████████████

1424.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene Gel:



1425.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene Gel.  As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

**B.**    **Nisha Patel's July 3, 2013 Price Increases: Adapalene Gel, Cefaclor ER Tablets, Cefadroxil Tablets, Cefdinir Capsules and Oral Suspension, Cefprozil Tablets, Cimedine Tablets, Fluconazole Tablets, Fluocinonide Cream, Gel, and Ointment, Methotrexate Tablets, Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Nadolol Tablets, Oxybutynin Chloride Tablets, Prazosin HCL Capsules, and Ranitidine HCL Tablets**

1426.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 ▮▮▮▮▮▮▮▮▮ but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:



1427.   Following the now-established pattern, Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

1428.   The following graphic details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase; color coded to show the calls with specific competitors relating to each drug:



1429.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the graphic above) were drugs where Teva was exclusive – *i.e.*, had no competitors.

1430.   Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013.  Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

1.    Upsher-Smith

1431.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Defendant Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride Tablets.

1432.   Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions.   Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease problems of urgency and frequent urination.

1433.   Apotex, Par, Teva, and Upsher-Smith dominated the market for Oxybutynin Chloride during the time period relevant to this Complaint.

1434.   ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████

1436.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████.

1437.   ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

1438.   On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% increase on Oxybutynin Chloride, depending on the dosage strength.  Like the other drugs on the list, Teva would not have increased its price without the existence of the Fair Share agreement, which provided the rules for the industry and generally prevented competitors from stealing market share from each other.

2.     Mylan

1439.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

1440.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes.  Green also called Patel twice that day to repo1i on what he had learned.  Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

1441.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

1442.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin and Methotrexate.

1443.   For Methotrexate, Par had already increased its prices in February 2013 and West-Ward followed this price increase on May 15, 2013.  Consistent with the "Fair Share" agreement,

Par knew it could lead this price increase without losing market share, and West-Ward knew that it could follow Par's increase without losing share to Mylan or Teva as well.

1444.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs.  From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

1445.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:



1446.



1447.   At that time, Nystatin was not considered a strong candidate for a price increase because of the quality of the competitors in the market.  As discussed more fully below, those dynamics would later change after Patel struck up a collusive relationship with a high-level executive at Heritage.

1448.   Not surprisingly given the ▮▮▮▮ Mylan raised its price for both Ketorolac and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013.  Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.  As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1449.   At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four (4) minute call starting at 10:59 am.  Within minutes after that call, Patel sent the following e-mail internally at Teva:



1450.   Patel obtained this information directly from Green, but got one significant point

wrong (which confirms that she had advance notice of the Mylan increase).  In actuality, Mylan

did not announce the price increases until the following Monday, July 1, 2013 – with an effective

date of July 2, 2013.

1451.   ▓▓▓▓▓ was a term consistently used by Patel in e-mails to camouflage the fact

that she and her co-conspirators within Teva were communicating with competitors about future

price increases.  She used the term when discussing Taro in the May 24, 2013 ▓▓▓▓▓▓

spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene Gel.

She used it again on June 26, 2013 – after Green and Nesta spoke several times in advance of

Mylan's price increase on Ketoprofen.

1452.   Similarly, on July 2, 2013 – the day before Teva's price increases (including for the

drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing

compared with regard to Methotrexate.  Patel responded that Mylan's pricing was a little low on

that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" so Teva felt comfortable

increasing the price of that drug on July 3, 2013. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

      3.     Sandoz

1453.  After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz

sought to obtain a ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that

Sandoz would follow their price increases and not steal their customers after an increase.

Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was

aware of every increase taken by both competitors so it could live up to its end of the bargain.

1454.  On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would ████

████████████████████████████████████████████████████████

████████

1455.  Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at

Teva and left a message.  Rekenthaler called CW-2 back immediately and the two had a three (3)

minute conversation during which CW-2 asked Rekenthaler to provide him with a full,

comprehensive list of all the Teva price increase drugs – not just those drugs where Teva

overlapped with Sandoz.  Rekenthaler complied. Understanding that it was improper to share

competitively sensitive pricing information with a competitor, and in an effort to conceal such

conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a

personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's

personal e-mail account:



1456.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1457.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol.  Sandoz was the only other competitor in that market.  Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

    C.    **Summer 2013: Sandoz and Mylan Coordinate to Orchestrate Price Increases on Diltiazen HCL, Haloperidol, Clomipramine, Tizanidine, Levothyroxine, and Nadolol**

1458.   Patel's efforts to coordinate the July 2013 Price increases also helped facilitate additional collusion between Mylan and Sandoz.  After Mylan and Teva implemented significant

price increases in early July 2013, Sandoz executives sought to obtain a ███████████ of those Teva and Mylan price increases.  Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1459.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, █ ████████████████████████████████

1460.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each.  Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta.  The call lasted two-and-a-half (2.5) minutes.  A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

1461.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase.  Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large.  Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high.  After the phone call ended, CW-4 sent the following e-mail to her superiors (the "July 2013 E-mail"):



1462.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 e-mail.  Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

1463.   Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products.  Some examples of this conduct are detailed below.

1464.   Additionally, consistent with the overarching conspiracy's Fair Share principles, the price increases attracted new market entrants without any resulting price competition.  For example, Zydus entered the market for Haloperidol in late 2014, and Kevin Green communicated frequently with Nesta to ensure that Zydus obtained market share without eroding market pricing.

1.     Haloperidol and Trifluoperazine HCL

1465.   Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

1466.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice.  Both calls were less than a minute long.  Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL.  For Haloperidol, Mylan increased the WAC price by 250% on several formulations.  For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

1467.   On August 19, 2013, Steven Greenstein, a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to ███████████████████

1468.   On August 22, 2013, CW-2 e-mailed Kellum stating that CVS ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

1469.   On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL.  ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

1470.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL.  CW-1 sent an internal e-mail explaining that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1471.   On  October  2,  2013,  CW-1  e-mailed ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇ , but also lie about the reason for doing so:



1472.   Over the next several days, CW-4 and Nesta spoke by phone several times.  These communications are detailed in the table below.  Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1473.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL.   After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

1474.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but waited to follow on Trifluoperazine HCL until January 31, 2014.

2.    Tizanidine

1475.   Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

1476.   Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug.  As of May 2013, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz, and Sun were in the market for Tizanidine.  Dr. Reddy's led the increase on this product in early May 2013, increasing its WAC price and raising contract pricing tenfold, and by July 2013, Apotex, Mylan, Sandoz, and Sun each followed the price increase.

1477.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine.  For example, on May 10, 2013, ██████████████, a national account executive at

Sandoz, sent an internal e-mail stating that: ███████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████

1478.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes.  Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding ████████████████
████████

1479.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation.  Sandoz's WAC increases were significant – ranging from 248% to 344%, depending on the formulation.  In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and ████████████, a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine.  At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

1480.   Notably, after this, Nesta would not speak with Austin again until three months later in August 2013.

1481.   On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine.  CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking: ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

1482.   On June 11, 2013, ████████████████████████████████████

████████████████████████████████████   Upon information and belief, the purpose of this call was to confirm that Apotex would support the "Fair Share" agreement and follow Dr. Reddy's price increase (which Apotex subsequently did).

1483.   On June 14, 2013, Anda, a wholesale customer, ████████████████████

████████████████████████████████████████████████████████

████ had learned of Mylan's intent to follow the price increase through his prior communications with Nesta.  However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2, 2013.

1484.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine.  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████

### D.   **Enalapril Maleate**

1485.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called ████████ – another large set of Teva price increases.  In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate Tablets.

1486.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug belonging to the class called ACE inhibitors, and is used to treat high blood pressure.

1487.   Mylan previously increased its price for Enalapril effective July 2, 2013.  At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect.

1488.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril.  Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase.

██████████████████████████████

████████████████████

1489.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify.  That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes.  The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow

the Mylan price increase on Enalapril. This information sparked the following e-mail exchange between Green and Patel (starting from the bottom):



1490. As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact *plan* to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1491.

1492.   That same day, Patel and Green each started ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

1493.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes.   During these calls, Green conveyed to Patel what he had learned from ████████ that Wockhardt planned to follow the Mylan price increase.

1494.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

1495.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. █



That same day, Nesta called Patel and left a voice mail.

1496.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase.  That same day, July 16, 2013, Patel then scheduled a █



1497.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Patel nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same day:



1498.  Within a few days after the increases, a customer complained to ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**E.**   **August 9, 2013 Price Increases ("Patel's Round 2"): Amiloride HCL/HCTZ Tablets, Clemastine Fumarate Oral Liquid and Tablets, Diclofenac Tablets, Diltizaem HCL Tablets, Etodolac ER Tablets, Ketroprofen Capsules, Ketrolac Tablets, Pravastatin Tablets, Tometin Sodium Capsules**

1499.  On August 9, 2013, Teva raised prices on twelve (12) different drugs.  These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

1500.  Patel began planning for the increase shortly after the July 3 increases were implemented.  On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1501.   The list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz.  In the days leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

1502.   Patel was also communicating indirectly with Mylan through Kevin Green. For example, on July 10, 2013 – the day before Patel sent the preliminary "Round 2" increase list – Green and Nesta spoke twice.  Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes.  The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

1503.   Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva increase.

1504.   By August 7, 2013, Patel had finalized the list  As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors.

1505.   ▮▮▮▮ immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva.  In response to the e-mail, he politely asked Patel to remove some of the incriminating information.





In accordance with the executive's request, Patel deleted the information.

1506.  Following the now common and systematic pattern, Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The following graphic details some of the calls with competitors in the days and weeks leading up to the increases:



1507.   The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive and thus had no competitors.  Interestingly, that drug was slated for the lowest increase of all drugs on the list (7%).

1508.   The day before the price increase went into effect – August 8, 2013 – Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

1509.   As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

      1.     Mylan

1510.   Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases.  During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions.  The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs.  But at times, Patel communicated directly with Nesta.

1511.  For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████████████

A large majority were Mylan drugs.

1512.  The next day – July 23, 2013 – at 4:30 pm, Green and Nesta spoke for more than six (6) minutes.  Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.  The call lasted more than three (3) minutes.

1513.  On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July.  Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:



1514.   The next day, July 30, 2013, Patel sent Green the ███████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████ for a group of seven Mylan drugs, some of which

varied slightly from the prior spreadsheet.

1515.   Following the same consistent pattern, Green and Nesta spoke six (6) times over

the next two days.  After hanging up from the last call between the two on August 1, 2013, Green

called Patel and conveyed the results of his conversations.  This series of phone calls is detailed

below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

1516.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel

sent the following e-mail with "█████████ about the customer request, with a particular focus

on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:



1517.   Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013, as set forth above.

2.   Etodolac

1518.   Etodolac, also known by the brand name Lodine, is a medication known as a non-steroidal anti-inflammatory drug (NSAID).  It is used to reduce pain, swelling and joint stiffness from arthritis.  It works by blocking the body's production of certain natural substances that cause inflammation.  An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

1519.   Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for Etodolac capsules.

1520.   In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.  Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching Fair Share Agreement.

1521.   As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the market at the higher price and gain its "Fair Share."  As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

1522.   This coordination paved the way for a subsequent price increase on the tablet formulations of the drug.  One year later, when Patel first began planning for "████ 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases.  For example, when she circulated a long list of potential "████ 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

1523.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July.  Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1524.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen (16) minutes.  Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes.  After hanging up the phone with CW-3,

Aprahamian immediately called Patel.  They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes.  On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

1525.   During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac tablets and Etodolac ER.

1526.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac tablets and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

███████████████████████████████████████████████████████

1527.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac tablets, and that Taro would follow suit and raise its price for Etodolac ER.  During those conversations, Teva agreed to follow both price increases.

1528.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac tablets.  Prior to the conference call on July 23, CW-1 called Patel at Teva.  After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day.  During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac tablets.  Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

1529.   The Sandoz price increase for Etodolac tablets became effective on July 26, 2013.  That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets.  After learning of the request, Aprahamian responded swiftly internally:  ████████████

████████████████████████████████

1530.  When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:



1531.  Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor ████████ Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release).  She instructed them to ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

1532.  Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac tablet and Etodolac ER price increases (among other things).  Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

1533.   Aprahamian was also speaking to his contact at Sandoz- CW-3 - during this time, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

1534.   On August 1, 2013 – shortly after speaking with Patel – Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac tablets and Etodolac ER. Aprahamian stated: ███████████████████████████████████████████

███████████████████████████████████████████████████

1535.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac tablets and Etodolac ER.  The minutes from a Teva ██████

███ meeting on August 5, 2013 – which Patel attended – reflect the following:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

1536.   When  Patel  sent  the ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████   quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1537.   Teva and Taro raised prices for Etodolac tablets and Etodolac ER simultaneously, with the price increases effective on August 9, 2013.  Both their AWP and their WAC prices were

increased to the exact same price points. The increases were substantial. For Etodolac tablets, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

1538. Once again, this substantial price increase resulted in Zydus entering the market for Etodolac ER in early, which should have led to price competition. Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "Fair Share" of the market. For example, Nisha Patel, Ara Aprahamian, and Kevin Green discussed a plan to cede a large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later.

3. Impact of Price Increases

1539. As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent Pravastatin increase. The results were staggering.

1540. According to her analysis, the ▇▇▇▇▇▇▇▇▇▇▇▇▇" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering ▇▇▇▇▇ (nearly $1 billion) *per quarter* to Teva, as shown below:



1541. Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a ▇▇▇▇ cash bonus, as well as an allocation ▇▇▇▇ Teva stock options.

4.    Price Increase Hiatus

1542.   Shortly after the August 9, 2013 price increase went into effect, Patel left the office for several months while on maternity leave.

1543.   This slowed down Teva's plans for its next round of price increases.  During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work.  Patel began to return to the office on a part-time basis beginning in November 2013.

1544.   During this time period, Kevin Green left Teva to join Defendant Zydus as the Associate Vice President of National Accounts.  His last day of employment at Teva was October 23, 2013.  This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan.  Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

1545.   As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they simply communicated through different channels.  These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

1546.   As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

F.      **March 7, 2014: (Niacin ER)**

1547.   Niacin Extended Release (ER), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

1548.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer.  As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1549.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014.  As that date approached, Teva began to plan for loss of its exclusivity.  By at least as early as February, Teva learned that Defendant Lupin would be the only competitor entering the market on March 20.

1550.   The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price.  On February 28, 2014, Maureen Cavanaugh instructed ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████    Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

1551.   Within a week, Teva was ready to implement the price increase.  On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating: ███████████████████████████████

█████████████████████████████████████████████████████████████   The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014.   The increase was for 10% across the board, on all formulations.

1552.   Once Teva coordinated the price increase, it next began taking the necessary steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

1553.   This situation was no different.  During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes.  During this and several subsequent calls, discussed in more detail below, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

1554.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation.  In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

1555.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing – so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels.  In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

1556.   Over the next several days, Patel and Berthold continued to coordinate to make sure

Lupin obtained the agreed-upon customers ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████



1557.   That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

Patel responded:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1558.  The next day – March 25, 2014 – ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

G.    **April 4, 2014 Price Increases: Azithromycin Suspension and Oral Suspension, Bumetanide Tablets, Cephalexin Suspension, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Dicloxacillin Sodium Capsules, Diflunsial Tablets, Estazolam Tablets, Ethosuximide Capsules and Oral Suspension, Hyrodxyzine Pamoate Capsules, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tablets, Estradiol/Norethindrone Acetate Tablets, Nystatin Oral Tablets, Pentoxifylline Tablets, Tamoxifen Citrate Tablets, Theophylline ER Tablets**

1559.  On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Again, nearly all of these increases were coordinated with a number of Teva's high-quality competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone.  But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Defendants Breckenridge and Versapharm, as well as Heritage and Rising – as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

1560.  Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors.  This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor ████████  For example, on January 16, 2014, Patel sent a document to ████████ titled ████ ████████████████████ where she outlined her plan for implementing price increases:



1561.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave.  On January 14, 2014, Patel sent ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

1562.   The initial list contained drugs sold by Actavis, Lupin and Greenstone, among others.  Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

1563.   On February 7, 2014, Patel created a formal list of ███████████" in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

1564.   Those efforts were successful.  By February 26, 2014, Patel had a more refined list

of ▓▓▓▓▓▓▓ which she forwarded to another colleague for his review.  That list included

the following drugs and notes about each drug:



Patel continued to refine the list over the next several weeks.

1565.   On March 17, 2014, Patel sent a near final version of the ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████   At least some of those communications are reflected in the table

below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

1566.  Rekenthaler had also previously spoken with his contact at Versapharm ████, a senior national accounts executive – on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure Versapharm's agreement to follow the Teva

increase on two drugs.  Those were the only two identified telephone calls between Rekenthaler and Josway since 2012.  As discussed more fully below, Versapharm followed with its own price increase shortly after the Teva increase.

1567.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone.  On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – *i.e.*, the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1568.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:



1569.  These price increases were all coordinated and agreed to between Teva and its competitors.  As was now their standard procedure, Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase.  Many of those communications are set forth in the graphic below:



1570.  Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave.  Some illustrative examples of those efforts are set forth below.

1.    Lupin (Cephalexin Oral Suspension)

1571.   Throughout 2013, David Berthold of Lupin colluded with two different individuals at Teva: Patel and Green.  As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

1572.   As of late October, 2013, however, neither of those options was available to Berthold.  Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1573.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with.  The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals.  So in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension – a drug where Teva was the only other competitor in the market – Berthold already knew that Teva would follow the increase.

1574.   On October 14, 2013, Berthold called Rekenthaler at Teva.  They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives.  Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

1575.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension – Berthold also called ███████████, a national account executive at Teva, to notify Teva of the price increase.  He called ███████████ at 9:18 am that morning and left a message.  ███████████ o returned the call at 9:57 am, and the two spoke for nearly five (5) minutes.

1576.   Within minutes after hanging up the phone with Berthold, Sherman-Mouro notified others internally at Teva about the substantial increase Lupin was about to take:



1577.   The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013 – demonstrating that ▮▮▮▮▮▮ had advance knowledge of the increase.   Shortly thereafter, ▮▮▮▮▮▮ followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

1578.   ▮▮▮▮ of Teva responded later that day, asking: ▮▮▮▮▮▮▮▮



1579.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.   ▮▮▮▮▮▮ forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.   ▮▮▮▮ agreed, and simultaneously forwarded the e-mail to Patel stating: ▮▮▮▮▮▮▮▮ Patel called Berthold the same day and left a message.

1580.   And discuss they did.  When Patel drafted her initial list of possible price increase candidates and forwarded it to ████████ in January 2014, Cephalexin Oral Suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

1581.   On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly.   The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

2.   <u>Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets)</u>

1582.   In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets.   Patel and ████████, a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013.   Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

1583.   On December 2, 2013 - the same day that Greenstone was slated to send out notices of the price increases to its customers – Patel spoke to Hatosy at Greenstone three times within a span of twenty (20) minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

385

1584.   After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase – one that would not be effective for another month:



1585.   On December 5, 2013, Patel continued to communicate with ▇ about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails.   The next day, Patel sent another e-mail to ▇ about Azithromycin Suspension:



1586. ███████ agreed with Patel's recommendation.  Later that day, ███████ of Teva
sent the following notice to several Teva colleagues:



That same day, Teva declined to bid on Azithromycin at multiple customers.

1587.  Over the next several months – during the period of time before Teva followed
Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's
market share) when requested by customers, for both Azithromycin formulations and
Medroxyprogesterone Tablets ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

1588.  Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly
final price increase list to ███████ – Teva was approached by another wholesaler requesting a
lower price for Azithromycin Oral Suspension. A national account executive at Teva asked Patel:
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████

1589.   Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets on April 4, 2014.  Patel spoke twice with ██████ from Greenstone that same day.

### 3.   Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam)

1590.   Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014.  One of them was Clarithromycin ER Tablets.  As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

1591.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market.  Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

1592.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At 9:37 am that morning, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

1593.   Immediately after receiving that e-mail, at 9:40am, Patel called Rogerson at Actavis and the two spoke for more than seventeen (17) minutes.  Shortly after hanging up the phone with Rogerson, at 10:12 am, Patel responded to the e-mail, saying ███████████████████████

███████████████████████████████████████████████████

1594.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price.  At 9:19 am that morning, Patel called Rogerson at Actavis and they spoke for more than six (6) minutes.  Shortly after that call, at 9:45 am, Patel sent an e- mail internally at Teva stating: ███████████████████████████████████████████████████

███████████████████████

1595.   When Patel sent her supervisor the initial list of ███████████████████ on January 14, 2014, Clarithromycin ER was on the list.

1596.   Similarly, in March, 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva.  Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

1597.   Following a now very familiar pattern, at 9:54 am on March 14, 2014, Rogerson called Patel and left a message.  Patel called Rogerson back at 10:31 am, and the two spoke for more than twelve (12) minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:



1598.   In actuality, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

1599.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added: ███████████████████████

1600.   Less than two hours later, at 12:37 pm, Patel called Rogerson again.  They spoke for more than five (5) minutes.  Shortly after hanging up the phone, at 12:51 pm, Patel wrote another e-mail to certain colleagues at Teva, stating: ████████████████████████████████████████████████████████████████████████

1601.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the ███████████ list to ████████ at Teva.  The list included both Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes.  Rekenthaler of Teva and Falkin of Actavis also exchanged four (4) text messages that day, and had one call lasting more than six (6) minutes.

1602.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014.  Patel and Rogerson spoke twice by phone that day.  Rekenthaler and Falkin also spoke by phone that day.  Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1603.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating ██████████████████████

█████████   When Patel and her other conspirators at Teva used the term "█████ in this context, it was code for the fact that there was an understanding in place with a competitor.

1604.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had ████ of the market, and Actavis had ████ A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid ██████████████████████████████ ████████   Patel responded: ██████████████████████

4.   <u>Multiple Manufacturers (Ketoconazole Cream and Tablets)</u>

1605.   Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in February 2014. They were not listed on her original ████████████ list that she sent to ██████ on January 14, 2014, but they were on the list of ██████████ that she sent to a colleague on February 26, 2014, with the following notes about each:



1606.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's competitors were Taro and Sandoz. For Ketoconazole Tablets, Teva's competitors were Taro, Mylan and Apotex.

1607.   Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz. During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with ██████████, a senior sales executive at Apotex, on March 20 and 25, 2014.

1608.  On Ketoconazole Cream, co-conspirators at Taro and Sandoz were also communicating directly with each other.  On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes.  They discussed the Teva increase and the fact that Taro would follow.  CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:



1609.  CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on ████████████ " until Sandoz determined how to proceed.

1610.  That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

1611.  The following Monday, April 7, 2014, Taro received a request from a customer – the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), seeking a competitive bid on Ketoconazole Tablets due to the Teva price increase.  After reviewing the request, a Taro sales executive sent an internal e-mail stating: ████████████████████

████████████████████████

████████████████████████

████████████████████████

████

1612.  Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes.  Later that same day, he initiated a price

increase for all of Taro's customers on both the Ketoconazole Cream and the Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1613.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1614.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Patel, who responded immediately:



1615.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian at Taro.  She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1616.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: ██████████████████████████████████

1617.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014.  That same day, Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

1618.   The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%.  For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

1619.   Following this first successful price increase, Defendants were able to increase prices again on Ketoconazole Cream when G&W entered the market. Consistent with the overarching Fair Share agreement, G&W entered the market at prices that were substantially higher than those charged by the existing manufacturers.  Notwithstanding the fact that it was a new market entrant with a higher price, G&W was able to gain market share as Taro, Sandoz, and Teva ceded market share to G&W.  Further, Taro quickly matched G&W's price increase.  Upon information and belief, this collusion was facilitated by communications between Aprahamian of Taro and high level executives at G&W.

     5.   <u>New Relationships Emerge</u>

1620.   By early 2014, the generic drug industry was in the midst of a price increase explosion.  In an internal Teva presentation given shortly after the April 2014 price increases –

titled 

Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases.  Some illustrative examples are set forth below.

(a)   *Breckenridge*

1621.   One of those new co-conspirators was Defendant Breckenridge.  Patel already had a relationship with ████████, a senior sales executive at Breckenridge, and Rekenthaler had a relationship with ████████, another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1622.  On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.[25]  For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%.  The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1623.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with ████ at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on

---

[25]      Breckenridge had acquired the ANDA for Cyproheptadine HCL Tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.

October 24, 2013.  After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

1624.  Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1625.  With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market.  For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase.  For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine.  When she learned the news, Patel called ▮▮▮ at Breckenridge.  They ended up speaking twice that day – the first and only phone calls ever between them.  After speaking to ▮▮▮ Patel sent the following e-mail regarding the customer's request:



1626.  With regard to Mimvey, however, Teva only had 19% market share in a two-player market.  For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1627.  On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL Tablets (contract increases of as much as 526%).  In addition, Teva increased the WAC price on Mimvey

(Estradiol/Norethindrone Acetate Tablets) by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% – to exactly match Breckenridge's WAC price on both products.

> (b)   *Rising*

1628.   Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013.  Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1629.   Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal.  For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1630.   Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes.  When Patel sent her initial list of ████████████ to ██████ on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1631.   Teva and Rising continued to coordinate the increase over the next several months.  For example, when Patel sent a nearly final list of ████████" to her supervisor ██████ on March 17, 2014, she included the following notation about Diflunisal:

████████████████████████████████████████████████████████████

1632.   That same day, Rekenthaler spoke with CW-2 twice.  During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future.  C W-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1633.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal.  On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1634.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014.  When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.  Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014.  On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing exactly matched Teva's WAC price increase from April 2014.

(c)   *Versapharm*

1635.   On the April 4, 2014 Teva price increase list, Defendant Versapharm was a competitor on Ethosuximide Capsules and Oral Solution.

1636.   When Patel began creating the price increase list, Ethosuxamide was not considered a candidate for an increase.  For example, when Patel sent her initial ▌▌▌▌▌▌▌▌▌ list to ▌▌▌▌▌▌ in mid-January 2014, neither drug was on the list.

1637.   Versapharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, Versapharm was given a -2 score in the rankings.  That did not stop Rekenthaler, however, from calling ▌▌▌▌▌▌, a senior national account executive at Versapharm, and speaking for five (5) minutes on January 22, 2014.  When Patel sent the next ▌▌▌▌▌▌▌ list to a colleague on February 26, 2014 – Ethosuximide Capsules and Oral Solution were both on the list, with the following notation:

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

1638.   Rekenthaler called again and spoke with Josway at Versapharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014.  For Ethosuximide Capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%.  For Ethosuximide Oral Solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

1639.   If Versapharm was being tested by Patel and Teva, it passed with flying colors.  On April 9, 2014 – only five days after the Teva increase – Versapharm increased its pricing on both Ethosuximide Capsules and Oral Solution to a nearly identical price to Teva.

1640.   Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and ▮▮▮▮ of Versapharm never spoke by phone again.

6.   Impact

1641.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase.  Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of ▮▮▮▮ per year.

**H.   August 28, 2014 Price Increases: Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate Chewable Tablets, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clemastine Fumarate Tablets, Clotrimazole Topical Solution, Desmopressin Acetate Tablets, Diclofenac Potassium Tablets, Disopyramide Phosphate Capsules, Enalapril Maleate Tablets, Epitol Tablets, Flurbiprofen Tablets, Flutamide Capsules, Fluvastatin Sodium Capsules, Hydroxyurea Capsules, Loperamide HCL Capsules, Penicillin VK Tablets, Prazosin HCL Capsules, Prochlorperazine Tablets, Topiramate Sprinkle Capsules, Warfarin Sodium Tablets**

1642.   On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:



1643.   Following the normal pattern of the conspiracy, in the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance.   At least some of those communications are set forth in the graphic below:



1644.  The day before the increase became effective – August 27, 2014 – Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

1645.   In addition to those phone communications noted above, representatives from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year.  Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

1646.   For those few drugs where the phone records do not identify direct communications between Teva executives and their competitors, these executives, at a minimum, communicated through other competitors.

1647.   For example, with regard to Enalapril, Patel was speaking to Aprahamian at Taro as shown above.  Aprahamian, in turn, spoke to ███████, the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

1648.   Similarly, with regard to the drug Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above.  Nesta, in turn, communicated with ███████, a senior sales executive at co-conspirator Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

402

1649.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor.  The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

      1.    <u>Mylan</u>

1650.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva.  Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1651.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases.  On April 21, ███████████, a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan.  The spreadsheets were created by Mylan personnel.

1652.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated: ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets.

1653.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases.  On April 24, 2014, Patel began to formulate a ███████████████ in order to respond to those requests, but noted that Teva was ████████████ about the Mylan customer contract price points, which were not publicly available.  Previously, Patel had relied on

Kevin Green to obtain specific Mylan customer price points (referred to as " ███ through his communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this situation, and concluded that ███████ ███████████ about the Mylan contract price points.

1654.   Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating ██████████████████ ████████████████████████████████████████████████████████ ████████████████

1655.   On May 9, 2014, Patel sent another e-mail:



1656.   Shortly after receiving that e-mail – at 11:15 am that morning – Rekenthaler called Nesta at Mylan and left a message.  Nesta returned the call at 11:23 am, and the two spoke for nearly eight (8) minutes.

1657.   Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to ███████████ at Teva, lamenting the absence of Green to obtain the Mylan intel:



1658.   The next day, ██████████ o sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:



1659.   The e-mail was unclear on where ████████ o had obtained this "███" but the spreadsheet attached to her e-mail was created by a Mylan employee.

1660.   Rekenthaler and Nesta spoke again on May 20, 2014.  Armed with this new source of "███" Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market.  That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "████ Her colleague provided the list, as requested, on May 21.

1661.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes.  By May 28, Teva had a much more comprehensive list of price increase

items.  On that list, seven of the Mylan items were prominently listed with a 

notation listed next to each:

1662.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium Tablets; Flurbiprofen Tablets; and Prochlorperazine Tablets.

1663.   With the list firmly squared away at the end of May, Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increases.  In the weeks leading up to the August 28, 2014 Teva price increases, Rekenthaler and Nesta spoke several times to coordinate, including at least the calls set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
| --- | --- | --- | --- | --- | --- |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06:00 |

2.   Taro

1664.   As discussed above, Taro implemented a substantial price increase on various formulations of Fluocinonide on June 3, 2014.  In addition to Fluocinonide, Taro also significantly raised its prices on the following additional drugs, which overlapped with Teva: Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets.

1665.   Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian.  It was understood that Teva would follow the Taro price increases based on these and prior conversations.  In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1666. Specifically, on May 28, 2014, ███████████ of Teva sent Patel the then-current version of her ████████████████████ spreadsheet. That list included the following Taro drugs, which had not yet been increased by Taro:

███████████████████████████████████

1667. Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

1668. On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs – Patel and Aprahamian exchanged five (5) text messages. After exchanging those text messages, Patel confirmed to her supervisor ████████ and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: ████████████████████████████████ ███████████████████████████████████ ████████████████████████████ At 5:08 pm that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

1669. First thing the next morning, Patel and Aprahamian exchanged two (2) text messages. Then, at 9:56 am, the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to ████████ making it clear that she had obtained additional "███ regarding the Taro price increases that she did not want to put into writing, stating: ████████████████████████

1670. On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.

One of the options discussed was a price increase. ███████ – aware that Patel had been in discussions with Aprahamian and had "███ regarding the Taro price increase on Carbamazepine (and other drugs) – stated: ████████████████████████████████ ████████████████████████████████ In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

1671.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium Tablets ("Warfarin").  Also known by the brand name Coumadin, Warfarin is a blood thinner medication used to treat and prevent blood clots.

1672.   As of June 2014, there were three competitors in the market for Warfarin: Teva, Taro and Zydus.  Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014.  In the days between the Taro and Zydus price increases for Warfarin, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1673.   On June 13, 2014 – the date of the Zydus increase on Warfarin – Teva was presented with an offer from a customer for a one-time buy on that drug.  Patel responded that ████████████████████████████████ Later that same day, Patel sent an internal e-mail ale1iing her group, including her supervisor ██████ about a list of drugs on which Teva planned to raise prices.  A number of them – including

Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin Sodium Tablets – included the notation █████████████ as the reason for the increase. For that list of drugs, Patel directed that █████████████████████████████████████████ Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

1674. On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase. She noted that Teva had already been ████████████████████████████████████████████████████ Patel continued: █████████████████████████████████

███████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████

1675. Some of the "█████████ referred to by Patel was gathered during a phone conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen (15) minutes.

1676. The next day, Patel continued to gather "█████████ and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus. The timing and duration of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

1677.   On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

3.     Zydus

1678.   In addition to their agreement on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

1679.   Topiramate Sprinkle Capsules, also known by the brand name Topamax, is a medication used to treat seizures caused by epilepsy, and also to treat migraine headaches.  As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3% of the market.

1680.   In April 2014, Zydus raised its price for Topiramate Sprinkle Capsules.  Patel was in frequent communication with Green at the time of the Zydus price increase.

1681.   In the days leading up to the June 13 Zydus price increase on Warfarin, which is discussed more fully above, Kevin Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

411



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1682.   Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle Capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above – Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: ███████████

███████   Two days before that – the same day that Green had extensive phone calls with both Rekenthaler and Patel – Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle Capsules.

1683.   Teva followed the Zydus price increase for Topiramate Sprinkle Capsules on August 28, 2014.  As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

4.   Competitors Follow Teva

1684.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in sho1iorder and those price increases were also coordinated.

1685.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/Potassium Clavulanate Chewable Tablets; (2) Diclofenac Potassium Tablets; and (3) Penicillin V Potassium Tablets.  Following the normal pattern, Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

1686.   Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate Tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21 and November 25, 2014.

1687.   Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase.  For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices.  Patel's initial response to the customer was: ████████████████████████████████████████ ████████████████████████████████████████████ In a subsequent internal discussion, Patel expressed how difficult it was to actually keep track of all of Teva's different collusive agreements, saying: ██████████████████████████████████ ████████████████████████████

1688.   Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets.  Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

**I.      January 28, 2015 Price Increases: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, Propranolol**

1689.   Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva.  She left her position in the pricing department to take on the role of Director of National Accounts at Teva.  Her new position meant new responsibilities, necessitating more

frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1690.   When Patel left the pricing department at Teva her position was not re-filled. ▇▇▇▇▇ Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1691.   On January 28, 2015, Teva raised prices on a number of different drugs.  Teva's price increase spreadsheet – now maintained by ▇▇▇▇ at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:



1692.   Consistent with their normal pattern, Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015.   The relevant phone communications between Teva and several of its competitors related to these drugs are set forth below:



1693. Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

1694. Some specific examples of Teva's coordination with competitors about its January 28, 2015 price increases are set forth below.

1.    Ciprofloxacin HCL and Glimepiride

1695.   Ciprofloxacin HCL Tablets, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is an antibiotic that fights bacteria in the body.  It is used to treat different types of bacterial infections, including skin infections, bone and joint infections, respiratory or sinus infections, urinary tract infections, and certain types of diarrhea.

1696.   Glimepiride Tablets, also known by the brand name Amaryl, is a medication used to control high blood sugar in people with type 2 diabetes.

1697.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014.  The increases to the Ciprofloxacin HCL WAC were 201% – 533% depending on the dosage strength.    The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

1698.   In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, ▮▮▮▮▮, a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases, including calls on July 10, 18, 21, 22, and 24.

1699.   ▮▮▮▮ continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases.  The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

1700.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase.  On the same day that Teva sent its price increase notices out to its customers, ▮▮▮▮▮, a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's).

Although unclear how ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████



1701 ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between ██████ and Patel during their various conversations.

1702.  In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015.  In the interim, ██████ and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

1703.  Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

1704.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly.  That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list.  That list included many drugs that Dr. Reddy's did not market.

    2. <u>Griseofulvin</u>

1705.   Griseofulvin Microsize Oral Suspension, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to creams or lotions.  The medication works by stopping the growth of fungi.

1706.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Microsize Oral Suspension.  In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase. Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

1707.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

1708.   Teva promptly added Griseofulvin to its own price increase list, with the notation ████████████████████████ as the reason for the price increase.

1709.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.  As discussed above, in the days leading up to that price increase

Rekenthaler of Teva and Falkin of Actavis coordinated frequently.  Teva's price increase for Griseofulvin Microsize Oral Suspension matched Actavis's WAC pricing exactly.

## XV.   AFTER SUCCESSFULLY COLLUDING, DEFENDANTS' QUALITY RANKINGS IMPROVE

1710.   A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014.  This updated list reflected changes in Teva's conspiratorial relationships.

1711.   Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Defendants Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period.  These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

### A.   Apotex

1712.   Apotex, for instance, was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

1713.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with ▮▮▮▮▮▮▮, a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate.

1714.   As noted above, Patel revised her May 2013 price increase list on May 29, 2013 to add, *inter alia*, Pravastatin.  The day before – May 28 – Apotex increased its price on Pravastatin by over 100%.  Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

1715.   In the days leading up to Patel's decision to add Pravastatin to her list of price increase candidates – and Apotex actually increasing its prices – Patel communicated frequently with ███████ at Apotex.  Between May 20 and May 24, 2013, the two spoke five (5) times.

1716.   Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex and Zydus – on August 9, 2013.  In the days leading up to the Teva price increase, Patel spoke to ███████ at Apotex three (3) times to coordinate.

1717.   At the same time that Teva raised its prices on Pravastatin in August 2013, it also increased its pricing on Doxazosin Mesylate.  Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases.  Apotex itself had increased the price of this drug on July 23, 2013.  ███████ of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1718.   Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired ███████ as a senior executive.  Rekenthaler of Teva and ███████ began communicating regularly after ███████ was hired by Apotex.  There is no record that they had ever communicated by phone before that.

1719.   That relationship continued through 2014.  On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%.  Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with Hampton at Apotex.  The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively.  They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes.

A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1720.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

**B.**    **Zydus**

1721.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3.  But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period.  While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel- oriented: Kevin Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013.  With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

1722.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin (May – June 2014), and Etodolac ER (May – July 2014).

1723.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014.  Teva followed with an increase on both drugs on August 28, 2014.  With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to ███ ███████ namely Zydus.

1724.   In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases.  On June 19, 2014 – four days before Zydus increased its prices – Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

1725.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes.  On August 20, the two exchanged an additional pair of phone calls.

1726.   Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green.  In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office.  After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1727.   Even before Green joined Zydus in November 2013, Teva had some success in coordinating price increases with Zydus.  As discussed above, Patel decided to add Pravastatin to her price increase list only after determining that Zydus agreed to the increase.  In the week leading up to Patel's decision to revise her price increase list to include Pravastatin, Green (still at Teva) spoke to Kristy Ronco and Michael Keenley, both senior executives at Zydus.

1728.   Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastin by over 150%.  Green similarly had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

1729.   As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013. At that time, Patel recommended that Teva follow the competitors that had already raised their prices - including Zydus.  Prior to Teva raising its prices on August 9, 2013, Green spoke to ▮▮▮ ▮▮▮ at Zydus three times- twice on August 4, 2013 and once on August 5.

**C.     Heritage**

1730.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013.  Initially, Patel gave Heritage a ranking of "0."  However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1731.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Jason Malek.  After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013.  From that date until July 25, 2014, the two spoke by phone at least 37 times.

**D.     Lupin**

1732.   In Patel's initial May 2013 quality competitor ranking list, Defendant Lupin was given a ranking of +2.  When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1733.   Defendant Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans.  From May 2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone.  Green, while still at Teva, also had a very strong relationship with Berthold.  As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1734.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following drugs: Cefdinir Oral Suspension and Capsules, Cefprozil Tablets, and Pravastatin.  Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

1735.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension. As discussed above, in October 2013 Berthold called Rekenthaler and ███████████, a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension.  When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1736.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014.  Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

**E.**     **Par**

1737.   In Patel's initial May 2013 quality competitor ranking list, Defendant Par was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1738.   Defendant Par rose in the rankings largely because of several strong relationships between executives at the two companies.   For example, ████████████, a national sales executive at Teva, had a strong relationship with ████████, a senior sales executive at Par. The two began communicating by telephone in September 2013.  Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1739.   Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, ████████, Rekenthaler spoke with █████ frequently throughout 2013 and 2014.  From the beginning of 2013 through May 2014, Rekenthaler spoke to █████ at Par at least thirty-two (32) times by phone.

1740.   Patel was well aware of these strong relationships, and relied on the information that ████████ and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs.  One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets.  Patel forwarded the e-mail to ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████

1741.   The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol) to Rekenthaler, saying: ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

1742.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

1743.   As discussed more fully above, Teva continued to conspire with Defendant Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

**F.    Greenstone**

1744.   Greenstone was not a highly-ranked competitor when Patel first created the quality competitor ranking list in May 2013.  Patel had, at that time, given Greenstone a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

1745.   One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with ████████████████, a national account executive at Greenstone. Patel and Hatosy were former co-workers at ABC, and had a longstanding relationship.  From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and █████ communicated by phone or text at least

66 times.  Patel also spoke to Hatosy's supervisor, Jill Nailor of Greenstone, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

1746.   Patel and █████ of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 the day that Greenstone sent notices to customers of its price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

1747.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

**G.**   **Amneal**

1748.   In Patel's initial May 2013 quality of competitor ranking list, Defendant Amneal was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1749.   One of the reasons why Defendant Amneal rose in the rankings was because of several strong relationships between executives at the two companies.  For example, Rekenthaler of Teva had a strong relationship with █████████, a senior sales executive at Amneal.  From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well.  Rekenthaler and █████ were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and

gathered socially by night, referring to each other as ███████ and ███████████." (Green and Ostaficiuk were also participants.)

1750.   Similarly, Patel also developed strong relationships with two Amneal executives: ███████████, a senior sales and finance executive at Amneal, and Rutledge.  As discussed above, Patel and ██████ coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1751.   Patel also spoke to ████████ regarding Norethindrone Acetate in September 2014, and continued to communicate with ████████ into at least 2015 – sometimes using alternative forms of communication.  In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.  In the message exchange below (relating to a drug not identified in this Complaint), ██████ informed Patel that Amneal would concede one customer – Econdisc ("E") – so long as Amneal could retain another large customer, Red Oak Sourcing ("RO"):



1752.   On the day of this message exchange, Patel and Rutledge also spoke by phone for nearly five (5) minutes.

**H.   Rising**

1753.   In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1.  When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1754.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising.  At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate.  Teva was one of the competitors already in that market.   During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1755.   Later, in March 2014, CW-2 sought to return the favor.   At that time, Rising experienced supply problems for the drug Diflunisal Tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1756.   On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%).  In the weeks leading up to those

price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

1757.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing matched Teva's WAC price increase from April 2014.

1758.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

## I.   **Breckenridge**

1759.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1760.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1761.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Mimvey and Cyproheptadine HCL Tablets. In the weeks leading up to those Breckenridge

price increases, Rekenthaler communicated by phone several times with Dave Nelson, a sales executive at Breckenridge.  The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

1762.   On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL Tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products.  Teva raised prices even higher on its customer contracts.  Teva increased the contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine HCL Tablets by as much as 526%, depending on the dosage strength.

1763.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge.  Rekenthaler spoke to █████n at Breckenridge on January 15, 2014 – the day after Patel sent her first list of ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████.

1764.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

**J.**     **Glenmark**

1765.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Defendant Glenmark, for example, declined slightly in the rankings.  In Patel's

initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3.  When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1766.   The reason that Defendant Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5.  CW-5 left Glenmark in April 2014.  In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times.  They also communicated frequently using an encrypted messaging application, WhatsApp.  As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexpiril HCTZ and Pravastatin.

1767.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company.  For instance, Patel exchanged 44 phone calls or text messages with ████████████, a sales and marketing executive at Glenmark, between May 2013 and July 2015.  Similarly, Patel exchanged 36 calls with Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014.  As discussed more fully above, Patel continued to coordinate with ███████ and Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

**K.      A Commitment to the Overarching Conspiracy Was Instrumental to the Success of the Price-Fixing Agreements**

1768.   As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market.  When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose.  These "fair share" principles were the foundation upon which the price increases

were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with a comparable price increase of its own.

1769.   There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Defendant Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating: ██████████████████████ Teva later declined to bid on the business.

1770.   The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Defendants Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed above, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – *i.e.*, Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like ████████████████ ████████████████████

1771.  Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway.  So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business.  Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

**L.** **"Quality Competitor" Rankings Relate to Price Increases, But Even "Low Quality" Competitors Comply With the Overarching Conspiracy**

1772.  As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox."

1.   Camber and Teva fix prices on Ranitidine HCL

1773.  When Patel first created the quality of competitor rankings in early May 2013, she gave Defendant Camber a ranking of -2.  When Patel revised those rankings one year later in May 2014, Camber's ranking did not change.  It remained one of the lowest ranked of all of Teva's competitors.

1774.  Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1775.  This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1776.   One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista – a drug used in the treatment of osteoporosis in postmenopausal women.

1777.   Teva had begun marketing Raloxifene in March of that year. Actavis had received approval to begin marketing Raloxifene in 2014 as well, but had not yet entered by September 2014.

1778.   The other drug was a generic form of Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Generic Combivir is used in the treatment of human immunodeficiency virus (HIV).  Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin.  As discussed more fully above, Defendants Teva, Lupin and Aurobindo agreed to divvy up the generic Combivir market in 2012 when Teva was losing exclusivity on that drug.

1779.   As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market.  On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with ███ ███r, a senior sales and marketing executive at Actavis.  A short time later, a Teva executive told colleagues that she had ████████████████████████████████

1780.   Teva's discussions with Actavis escalated over the coming week.  On September 10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen (15) minutes and one (1) minute, respectively.  On September 11, the men talked for ten (10) more minutes.  On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with Andy Boyer lasting thirty-four (34) minutes.

1781.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene business. ███████████ of Teva replied in the affirmative.  Rekenthaler then shared the information he had gathered through his communications with competitors: ████████████████████████████████████████████████ ████████████████████████████████████ That same day, on September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer, Econdisc.

1782.   Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1783.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes.  The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day.  Notably, these are the first identified phone calls ever between the two competitors.  As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

1784.   On September 24, Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc.  She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating: "████████████████████████████████████████████████████ ███████████████

1785.   As a part of this discussion, ██████ considered whether Teva should just concede Econdisc to Camber, and seek to recover that market share with another customer.  At 9:07 am

that morning, Patel informed her supervisor ███████ and numerous others at Teva, that Rekenthaler planned to discuss the matter with Camber:



1786.   Indeed, at 9:28 am that morning, Rekenthaler called Ostaficiuk and the two spoke for two (2) minutes.  They spoke two more times that day, including one call that lasted eight (8) minutes.

1787.   Some of these calls also related to Camber's entry into the market for generic Combivir.  Teva and Lupin were already in the market for generic Combivir, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market.  At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

1788.   On that same day, Berthold also spoke with Paul McMahon, a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the generic Combivir communications.

1789.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market, and aimed with the information Rekenthaler had gathered from Camber's President, ████ concluded: ████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████ Rekenthaler and Ostaficiuk spoke again twice that day.

1790.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product, but stressed that the company would not bid on any additional Teva accounts ████████████████████ ██████████

1791.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista. Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1792.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or generic Combivir.  As a result of this communication, on Monday September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:



1793.   ██████████, a senior sales executive at Camber, replied: ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

1794.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. ████ ████, a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

1795. ██████████████████████████████████████████████

██████████████ and Teva would be surprised if Camber had intended to make an offer to the customer.   After further discussion with the customer, Teva staff learned that it was a misunderstanding.   Camber never actually made the offer, but had instead complied with its agreement with Teva.

1796.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene.  A Camber employee described the prospect of Teva being on backorder for this drug as a ████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

## XVI.   CONSCIOUSNESS OF GUILT

1797.   The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by these individuals, as well as individuals at other corporate Defendants, to avoid putting incriminating information in writing, in order to evade detection.

1798.   Teva was aware of the antitrust laws, and paid them lip service in its Corporate Code of Conduct.  For example, Teva's Code of Conduct from the summer of 2013 states specifically:



440

1799.   But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

1800.   For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Defendant Ara Aprahamian at Taro.

1801.   As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, Kevin ███████ – a senior marketing executive at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

1802.   With ████████ approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided ████████ with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal ██████████ spreadsheet to ████████ on May 24, 2013, she identified, for example, that the drug Nabumetone was a price

increase candidate because, among other things, ███████████████████████

███████████████████████████████████ " – even though Taro had

not yet increased its prices for Adapalene Gel.  Patel had obtained this competitively sensitive

information directly from her communications with competitors.

1803.  ████████ immediately forwarded that information to Maureen Cavanaugh, the

Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning

that Patel provided for each drug.  As discussed more fully above, Teva raised prices on those

drugs (and others) on July 3, 2013.

1804.  Cavanaugh was well aware that Patel was communicating with competitors about

price increases, and making recommendations based on those communications, because Patel told

her so directly.  For example, during a 2013 meeting of Teva sales and pricing personnel where

Cavanaugh was present, Patel was discussing her communications with certain competitors about

price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could

not hear what was being said.  Not once, however, did Cavanaugh ever tell Patel or anyone else at

Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

1805.  Patel continued to send intelligence that she had obtained from competitors to her

supervisor, ████████  On August 7, 2013, Patel sent him a summary list of drugs slated for a price

increase on August 9, 2013.  In the █████████████ column, Patel again included specific

information that could only have come from her communications with competitors, including:

1806.  This time, ████ – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:



1807.  As discussed more fully above, Teva increased prices on those three drugs two days later.  Not once did ████ ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

1808.  Patel also spoke regularly to both Rekenthaler and Green about each other's communications with competitors.  Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction.  Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

1809.  Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing.  For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.  Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz.  Rekenthaler complied.  Understanding, however, that it was improper to share competitively sensitive pricing information

with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

1810.   As another example, when Kevin Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only █████████ Again, this was done to avoid putting any potentially incriminating communications in writing. Patel learned this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

1811.   Armando Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal. Kellum had received antitrust training, and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws.   Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

1812.   Similarly, Jill Nailor of Greenstone instructed her subordinates to avoid putting any sensitive market intelligence in writing.

## XVII.  THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION

1813.   Defendants' anticompetitive conduct alleged in the Complaint constitutes a conspiracy to fix prices and engage in market customer allocation, which is a per se violation of Section 1 of the Sherman Act.  Therefore, Plaintiffs need not define a relevant market.  There are,

however, features of the industry relevant to this case that show both (i) that the industry is susceptible to collusion, and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

1814.   Indeed, the U.S. market for each of the Price-Fixed Generic Drugs has been characterized by numerous factors that facilitated Defendants' conspiracy, including: (i) industry concentration; (ii) sufficient numbers to drive competition; (iii) substantial barriers to entry; (iv) demand inelasticity; (v) lack of substitutes; (vi) interchangeability; (vii) absence of non-conspiring competitors; (viii) opportunities for contact and an extremely high level of inter-firm communications; (ix) the magnitude of the price increases; and (x) the reimbursement of generic drugs purchases by third parties.

1815.   Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered the market ripe for collusion.  For example: Teva acquired Ivax Corporation in 2006, Barr Laboratories in 2008 (including Defendant Pliva), Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016; Watson Pharmaceuticals acquired Andrx Corporation in 2006; Endo acquired Qualitest in 2010; Perrigo acquired Paddock Laboratories, Inc. in 2011; and Sandoz acquired Fougera in 2012.  As a result of the industry-wide consolidation, for each of the Price-Fixed Generic Drugs, there were between two and ten manufacturers of the generic drugs for sale in the United States during the time period relevant to Plaintiffs' claims, thus rendering the market for each drug concentrated.

1816.   Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices.  Costs of manufacture, intellectual property, and

expenses related to regulatory oversight create substantial barriers to entry in the generic pharmaceutical industry.

1817.   Each of the Price-Fixed Generic Drugs is medically necessary to the health and well-being of the patient for whom it is prescribed.  For that reason, each demonstrates substantial demand inelasticity.   Indeed, notwithstanding the substantial price increases alleged in this Complaint, demand for each of the Price-Fixed Generic Drugs dropped very little following the increase in price.

1818.   There are a lack of available substitute products for each of the Price-Fixed Generic Drugs, because patients face substantial barriers to switching to other drugs, and because patients often face little incentive to switch as a result of the disconnect described in ¶ 86.

1819.   Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same dosage strength.  For example, a 40 mg tablet of Pravastatin manufactured by Glenmark is interchangeable with a 40 mg tablet of Pravastatin manufactured by Teva.   Accordingly, each of the Price-Fixed Generic Drugs is highly interchangeable from Defendant to Defendant, and the only way that a Defendant can gain market share is by competing on price.

1820.   The Defendants control the markets for each of the Price-Fixed Generic Drugs, which enables them to increase prices without losing market share to non-conspirators.

1821.   As alleged throughout this Complaint, there was a high level of interfirm communications within the generic pharmaceutical industry, and numerous opportunities for such communications through various trade association and similar meetings.

1822.  The magnitude of the price increases involved in this case further differentiates them from parallel price increases.

1823.  As noted above, there are unique features of the generic drug industry, including the fact that reimbursement for generic drugs to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of the a pharmaceutical's generic equivalent versions.  There is therefore, in the absence of collusion, an enhanced incentive to compete on price within this reimbursement system.

## XVIII.  DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING

1824.  As a proximate result of this conspiracy, and during the time period relevant to Plaintiffs' claims, Defendants and co-conspirators charged Plaintiffs and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for each of the Price-Fixed Generic Drugs.

1825.  Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiffs on the Price-Fixed Generic Drugs that Plaintiffs directly purchased from one or more Defendants and co-conspirators.  Even in those instances in which Plaintiffs were able to negotiate Defendants down from the full overcharge agreed to by conspirators, Defendants' agreements still impacted and artificially elevated the prices paid by Plaintiffs, because each Defendant knew that Plaintiffs would not be able to obtain a competitive price from the Defendant's competitors for each Price-Fixed Generic Drug.  Defendants also knew that any new entrants to the market would also follow the conspiracy pricing (or even seek to increase it further) based on the conspiracy's overarching market allocation agreement.

1826.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014 (but prices remained steadily and artificially high).  This was not a coincidence.  Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

1827.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz found that



1828.   The report went on to state that "[t]he number and level of price increases declined noticeably in 4Q 2014."  The following graphic, which was included in the Sandoz report, actually demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the States commenced their non-public investigation:



1829.   The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down.  To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

1830.  As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators applied the "fair share" overarching agreement to each of the Price-Fixed Generic Drugs.  They were successful in achieving price increases on numerous drugs and on allocating markets for all Price-Fixed Generic Drugs, which enabled them to impose supracompetitive prices on Plaintiffs and others.   Defendants' coordinated price increases and market allocation agreements provided them with a higher, unified starting point negotiating prices with Plaintiffs and others for each Price-Fixed Generic Drug than would have resulted if each Defendant had independently and unilaterally set its own price increases for each Price-Fixed Generic Drug.

1831.   The conspiracy alleged in this Complaint remains in either force of effect (or both) as of the date Plaintiffs filed this Complaint and Defendants continue to charge Plaintiffs supracompetitive prices for each Price-Fixed Generic Drug as a result of the conspiracy alleged in this Complaint.

## XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

1832.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products, and participants.  Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants, claims, time period, products, or other allegations based upon discovery and further investigation.  Plaintiffs also reserve the right to amend this Complaint in accordance with Orders from the Court, including – but in no way limited to – any Order setting cases or claims for trial in MDL 2724.  This includes any amendment that may be needed to narrow

any claim or count in this Complaint to further align, if necessary, with bellwether claim(s) set for trial by this Court.

## XX.   TOLLING OF THE STATUTE OF LIMITATIONS

1833.   The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

(a)      The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Price-Fixed Generic Drugs tolled the running of the statute of limitations on Plaintiffs' claims;

(b)      On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of generic Doxycycline and Glyburide sold in the United States.  The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation on Plaintiffs' claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i); and/or

(c)      Defendants' affirmative and fraudulent concealment of the conspiracy prevented Plaintiffs from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiffs' claims.

1834.   Each of the overt acts in furtherance of the conspiracy alleged in this Complaint was done for the purpose of concealing the conspiracy and preventing Plaintiffs and other purchasers of generic drugs from learning about the conspiracy's existence.   Accordingly, Plaintiffs did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing

this Complaint that would have put them on reasonable notice of their claims.  More than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators fraudulently concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

1835.   During the time period relevant to Plaintiffs' claims, including the time period more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators concealed the existence of Plaintiffs' antitrust claims from Plaintiffs as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below.  As a result, Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing this Complaint.

1836.   During the time period relevant to Plaintiffs' claims, Plaintiffs exercised diligence in an effort to ensure that the prices that they were paying Defendants for each generic drug that is the subject of claims in this Complaint were competitive.  For example, Plaintiffs frequently submitted requests for competitive bids on each of the Price-Fixed Generic Drugs to Defendants. Unbeknownst to Plaintiffs, Defendants shared these requests for quotations and took steps to coordinate with their conspirators to ensure that the bids they provided in response to these requests were rigged and were not competitive.

1837.   Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiffs' claims, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators affirmatively misled Plaintiffs by wrongfully and affirmatively concealing the existence of Plaintiffs' antitrust claims from Plaintiffs.  In addition to the many overt acts alleged above that were undertaken for the purpose of concealing the

conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiffs and others.  For example:

(a)     During the conspiracy alleged in this Complaint, and as alleged above, Defendants and co-conspirators spoke and met in secret to affirmatively conceal the existence of the conspiracy from Plaintiffs and others.  For each of the numerous meetings between Defendants alleged in this Complaint, Defendants took steps to either conceal the existence of the meeting from Plaintiffs or others, or to create a pretextual explanation for why the meeting occurred.

(b)     During the conspiracy alleged in this Complaint, Defendants made false and pretextual statements about the bids they provided to Plaintiffs and others in response to requests from Plaintiffs and others for competitive bids.  For example, upon information and belief, when Cardinal requested that Heritage provide a competitive bid for Nimodipine in June 2012, Heritage made representations to Cardinal that the sham bid that Heritage submitted in response (and that Heritage had coordinated with Sun and Caraco in advance) was the lowest price that Heritage could provide.  In reality, Heritage could have manufactured and sold the drug for substantially less than it quoted to Cardinal, but Heritage had agreed in advance with Sun and Caraco that Heritage would not submit a competitive price in response to Cardinal's request.  Accordingly, Heritage's false statements to Cardinal were intended to conceal from all purchasers of Nimodipine (and all other generic drugs) the existence of the conspiracy.

(c)     During the conspiracy alleged in this Complaint, Defendants took steps to ensure that their communications in furtherance of the conspiracy were not recorded in writing. For example, on April 19, 2013, Malek instructed his employees at Heritage not to keep in writing any evidence of the agreements that Heritage was negotiating (and that it would soon reach) with other Defendants relating to the Zoledronic Acid (and other drugs).  Similarly, during the July 1,

2014 telephone conversation in which a senior sales executive at Heritage discussed the collusive price increases of Glyburide and Fosinopril HCTZ with a senior sales executive at Citron, the Citron representative told the Heritage representative not to communicate with Citron through e-mail.

(d)     During the conspiracy alleged in this Complaint, Defendants took steps to confine knowledge of the conspiracy to a small group of senior executives for the purpose (and with the effect) of concealing the conspiracy's existence.  For example, during the same July 1, 2014 telephone conversation between Heritage and Citron, the Citron representative told the Heritage representative to communicate with a specifically designated employee of Citron that was fully briefed on the conspiracy.

(e)     During the conspiracy alleged in this Complaint, Defendants discussed and coordinated the timing of their price increase announcements for the purpose of making each price increase seem like it was each Defendant's independent decision to raise prices even though, in reality, it was not.   For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine.   For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz issued its matching price increase on May 23, 2014.  Also on May 23, 2014, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering the announcement of these price increases, Sandoz and Mylan intended to convince generic drug purchasers such as Plaintiffs and others that the latter price increase was the independent response to the initial price increase.  As the allegations in this Complaint make clear though, Defendants actively discussed, coordinated, and agreed to these price increases in secret, in order to conceal the existence of the conspiracy.

1838.   During the conspiracy, including more than four years before Plaintiffs filed this Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiffs; and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

1839.   As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint, more than four years before Plaintiffs filed this Complaint.  Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in this Complaint.

A.      **Spoliation of Evidence**

1840.   Many of the individual participants, and other employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

1841.   For example, Nisha Patel produced text messages – in response to the States' subpoena – going back as far as early 2014.  Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan; and many other text messages with employees of Dr. Reddy's,

Glenmark (including CW-5), Greenstone (including ██████████), Par, Sandoz, Upsher-Smith and Zydus.

1842.   Patel deleted these text messages after a conversation with Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was aware of the government investigations that had been commenced, and told Patel that the government was showing up on people's doorsteps.  Sometime after that, Patel deleted her text messages with competitors.

1843.   Defendant Apotex also destroyed an entire custodial file for one of its key employees ██████████, a senior sales executive), after the States requested it through an investigatory subpoena in July 2017.  As discussed above, ████████ was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings.  After the States' subpoena was issued, Defendant Apotex destroyed ████████ custodial file – and did not inform the States that it had done so for over a year.

**B.    <u>Obstruction of Justice</u>**

1844.   Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response.

1845.   For example, when the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Defendant Apotex.  Rekenthaler then immediately called Cavanaugh and ██████████, another senior Teva executive.  Rekenthaler spoke several times to Cavanaugh before then calling his own attorney and speaking twice.  Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

1846.   Other Defendants took similar action in response to events in the States' investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel.  As just one example, on July 17, 2018 the States sent a subpoena to Grauso, through his counsel.  That same day, Grauso spoke to Aprahamian for more than twelve (12) minutes.  The States then set up a conference call with Grauso's counsel for July 25, 2018.  The day before that call – July 24, 2018 – Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso.  The next day, shortly after a conversation between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

1847.   Accordingly, Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each of Plaintiffs' claims.

1848.   Plaintiffs' claims have been brought within the applicable statute of limitations period.

## XXI.   <u>ANTITRUST VIOLATIONS</u>

### A.   <u>Count One – Overarching Conspiracy on all Price-Fixed Generic Drugs Against all Defendants</u>

1849.   Plaintiffs incorporate by reference ¶¶ 1 through 1848 above.

1850.   By 2010, as alleged above, the market for manufacture, pricing and sale of Price-Fixed Generic Drugs had become conducive to cartelization.   The Defendants' efforts to manipulate the pricing and sale of some Price-Fixed Generic Drugs as alleged above infected and over time spread to the pricing and sale of all Price-Fixed Generic Drugs as alleged above.  Beginning at a time yet to be determined, but no later than June 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Price-Fixed Generic

Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1851. Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

1852. Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

1853. Every Defendant intended to join the all-Price-Fixed Generic Drugs conspiracy.

1854. The Core Conspirators, consisting of Actavis, Heritage, Mylan/UDL, Par, Sun, Taro, Teva/Pliva, and the Sandoz Defendants, engaged in the conduct alleged in this Complaint and directed the implementation of the all Price-Fixed Generic Drugs conspiracy. Each of these Core Conspirators played a prominent role in the overarching all-Price-Fixed Generic Drugs conspiracy. However, all Defendants named in this Complaint engaged in the conduct alleged in

this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than the Core Conspirators, and some only sold one Price-Fixed Generic Drug. However, the participation of all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured. Absent the participation of all other Defendants, the Core Conspirators' efforts to increase the prices would have been thwarted because it would have been in the independent interests of their competitors to increase their market share by refusing to follow the price increases of the Core Conspirators. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint, and this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained below in ¶¶ 1856 to 1863, there was substantial overlap between all Defendants in the overarching conspiracy.

1855. By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the all-Price-Fixed Generic Drugs Conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint were interdependent for at least six reasons.

1856. First, every agreement on each of the Price-Fixed Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price-Fixed Generics Conspiracy. For example, Defendants with a proportionately smaller market shares of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they

enjoyed a proportionately larger market share.  Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that could be traded.  For example, as alleged in ¶ 656, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

1857.   The overarching all-Price-Fixed Generics conspiracy also benefitted Defendants that manufactured just a few, or even just one of the Price-Fixed Generics.  For example, as alleged in ¶¶ 912-917, when Strides sought to reenter the market for Hydralazine in 2014, it knew to approach Heritage and arrange to receive market share.  Because Strides knew that Heritage – a Core Conspirator – would concede a customer to Strides, Strides was able to put in a bid to that customers at a supracompetitive price, comfortable in the knowledge that Heritage would concede the account and the inflated bid would be accepted.  Similarly, when Mayne entered the Doxy DR market that had been cartelized by Core Conspirators Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supracompetitive prices on Doxy DR.  The portion of Doxy DR sales allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supracompetitive price level.

1858.   In this manner, the existence of the overarching conspiracy permitted the Core Conspirators to induce the collusive agreements of all Defendants as needed to raise prices on each of the Price Fixed Generic Drugs.  In other words, the Core Conspirators allocated sufficient sales to all other Defendants to incentivize and compensate them for adhering to the collusive scheme.  Absent such compensation, non-conspiring manufacturers would have acted in their unilateral self

interests by lowering their prices to gain profitable sales. For example, the existence of the overarching conspiracy allowed Core Conspirator Actavis to persuade Defendant Breckenridge to lead a series of collusive price increases on Propranolol capsules and to persuade Defendant Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion. Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants, including Core Conspirators Actavis, Mylan, and Teva, to reach an agreement with Defendant Lupin to triple its prices on Pravastatin. And, the overarching conspiracy facilitated the collusive agreement of Defendants Morton Grove and Wockhardt to raise prices on Clobetasol, and Defendant Teligent's collusive agreement to raise prices on Econazole. And although the Core Conspirators were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the other Defendants would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending the many industry events alleged in Section VIII, *supra* – that each of the Defendants would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

1859. Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged in ¶ 895, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on other drugs discussed in this Complaint. In other

words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because most Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that the cheater manufactured. Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one. For example, Mayne (which manufactured only Doxycycline) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also committed to the conspiracy. Indeed, Mylan and Heritage shared a strong incentive to reward Mayne for its adherence to the overarching conspiracy.

1860.   Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Plaintiffs and others. For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine. For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014. That same day, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014. By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time. And for the same reasons explained in ¶¶ 1856-1859, the ability of Core Conspirators such as Sandoz and Mylan to compel

each other's compliance with the unlawful agreement helped to ensure that other Defendants, some of whom manufactured just one of the drugs subject to staggered price increases – such as Lannett (Levothyroxine) or Par (Amitriptyline) – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

1861.   Fourth, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug.   Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only Propranolol, but also each of the other Price-Fixed Generic Drug that also used the same binding agents.

1862.   Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost.   However, successful price increases also incentivized other manufacturers to substitute capacity towards the high margin drugs.   Accordingly, it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits.   Further, in the instances, if any, that Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug.   For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug.   Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

1863.   Sixth, certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution.  For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes.  The same is true of the oral diabetes drugs (Glipizide, Glyburide, Glyburide-Metformin, and Metformin ER).  Accordingly, the success of certain of the conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases.

1864.   The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1865.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(b)     To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(c)     To control the production and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and others in the United States; and/or

(d)     To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States that resulted from the collusion alleged in this Complaint.

1866.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the Price-Fixed Generic Drugs;

(b)   They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold in the United States;

(c)   They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

(d)   They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1867.   Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs to Plaintiffs and/or others in the United States.

1868.   As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of the Price-Fixed Generic Drugs among Defendants to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)     Prices for the Price-Fixed Generic Drugs sold by Defendants to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of the Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

1869.   Each Plaintiff and/or its assignor has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**B.      Count Two (Pled in the Alternative to Count One) Against Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, and Zydus**

1870.   Plaintiffs incorporate by reference ¶¶ 1 through 1848 above.

1871.   For the pirposes of this Count, the term "Specified Price-Fixed Generic Drugs" means:

| | | |
|---|---|---|
| Adapalene Gel | Benazepril HCTZ | Cefdinir Capsules |
| Amiloride HCL/HCTZ Tablets | Bethanechol Chloride Tablets | Cefdinir Oral Suspension |
| Amoxicillin/Clavulanate Chewable Tablets | Budesonide DR Capsules | Cefprozil Tablets |
| Amphetamine/ | Budesonide Inhalation | Celecoxib |
| Dextroamphetamine ER (aka | Bumetanide Tablets | Cephalexin Suspension |
| Mixed Amphetamine Salts) | Buspirone Hydrochloride | Cimetidine Tablets |
| Amphetamine/ | Tablets | Ciprofloxacin HCL Tablets |
| Dextroamphetamine IR | Cabergoline | Clarithromycin ER Tablets |
| Azithromycin Oral Suspension | Capecitabine | Clemastine Fumarate Tablets |
| Azithromycin Suspension | Carbamazepine Chewable | Clomipramine |
| Baclofen Tablets | Tablets | Clonidine TTS Patch |
| | Carbamazepine Tablets | Clotrimazole Topical Solution |

Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream

Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Haloperidol
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Levothyroxine
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets

Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tizanidine
Trifluoperazine HCL
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Valsartan HCTZ
Warfarin Sodium Tablets

1872.   For the purposes of this Cout, the term "Defendants" means Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, and Zydus.

1873.   The market for manufacture, pricing and sale of the Specified Price-Fixed Generic Drugs was conducive to cartelization.  Beginning in 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Specified Price-Fixed

Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1874.   Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Specified Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits.  This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Specified Price-Fixed Generic Drugs.

1875.   Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Specified Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Specified Price-Fixed Generic Drugs in order to achieve supracompetitive profits.   Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1.  Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

1876.   Every Defendant intended to join the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs.

1877.   Teva engaged in the conduct alleged in this Complaint and was a central catalyst for the implementation of the conspiracy.  However, all Defendants engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than Teva.  However, the participation of

all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.

1878.   By joining the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of overarching conspiracy.  Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint with respect to the Specified Price-Fixed Generic Drugs were interdependent for the reasons explained above in Count One.

1879.   The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1880.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain, and/or raise prices of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(b)    To allocate customers, the volume of sales, and/or market shares of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States;

(c)    To control the production and/or sale of the Specified Price-Fixed Generic Drugs to Plaintiffs and others in the United States; and/or

(d)    To earn supra-competitive profits on the price of the Specified Price-Fixed Generic Drugs sold to Plaintiffs and others in the United States that resulted from the collusion alleged in this Complaint.

1881.  In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

       (a)    They agreed to exchange, and did exchange, current and future price information about the Specified Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the Specified Price-Fixed Generic Drugs;

       (b)    They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Specified Price-Fixed Generic Drugs sold in the United States;

       (c)    They agreed on prices, price levels, and/or production levels of the Specified Price-Fixed Generic Drugs in the United States; and/or

       (d)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1882.  Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Specified Price-Fixed Generic Drugs to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Specified Price-Fixed Generic Drugs to Plaintiffs and/or others in the United States.

1883.  As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

     (a)    Price competition in the sale of the Specified Price-Fixed Generic Drugs among Defendants to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

     (b)    Prices for the Specified Price-Fixed Generic Drugs sold by Defendants to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

     (c)    Plaintiffs and other direct purchasers of the Specified Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

1884.  Each Plaintiff and/or its assignor has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the Specified Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

    **C.**    **Counts Three Through One Hundred Thirty-Six (Individual Conspiracies)**

1885.  Plaintiffs incorporate by reference ¶¶ 1 through 1848 above.

1886.  The individual product conspiracies alleged in Counts Two through One Hundred Thirty-Five involve only the specified individual generic drug and the specified Defendants, as indicated on the table below.  For the purposes of Counts Three through One Hundred Thirty-Six, the term "Defendants" refers to only those companies identified in each individual Count.

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 3. | Acetazolamide | Heritage, Lannett, Taro, Teva, Zydus | Spring 2012 to the present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 4. | Adapalene Gel | Glenmark, Taro, Teva | May 2013 to present |
| 5. | Albuterol | Mylan, Sun | March 2013 to the present |
| 6. | Amiloride HCL/HCTZ Tablets | Mylan, Teva | May 2013 to present |
| 7. | Amitriptyline | Mylan, Par, Sandoz | May 2014 to present |
| 8. | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva | August 2014 to present |
| 9. | Amphetamine/Dextroamphetamine (aka Mixed Amphetamine Salts) | Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, Teva | June 2012 to present |
| 10. | Azithromycin | Greenstone, Teva | November 2013 to present |
| 11. | Baclofen | Lannett, Par, Teva, Upsher-Smith | February 2014 to present |
| 12. | Benazepril HCTZ | Mylan, Sandoz | August 2013 to present |
| 13. | Bethanechol Chloride Tablets | Amneal, Teva | January 2015 to present |
| 14. | Budesonide DR Capsules | Mylan, Par, Teva | April 2014 to present |
| 15. | Budesonide Inhalation | Actavis, Teva | February 2015 to present |
| 16. | Bumetanide Tablets | Sandoz, Teva | April 2014 to the present |
| 17. | Buspirone Hydrochloride Tablets | Actavis, Mylan, Teva | July 2012 to the present |
| 18. | Cabergoline | Greenstone, Teva | December 2014 to present |
| 19. | Capecitabine | Mylan, Teva | January 2014 to the Present |
| 20. | Carbamazepine | Apotex, Sandoz, Taro, Teva | May 2013 to present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 21. | Cefdinir | Lupin, Sandoz, Teva | May 2013 to present |
| 22. | Cefprozil Tablets | Lupin, Sandoz, Teva | May 2013 to present |
| 23. | Celecoxib | Actavis, Teva | November 2014 to present |
| 24. | Cephalexin Suspension | Lupin, Teva | October 2013 to the present |
| 25. | Cimetidine Tablets | Mylan, Teva | May 2013 to present |
| 26. | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva | August 2014 to present |
| 27. | Clarithromycin ER Tablets | Actavis, Teva, Zydus | April 2014 to present |
| 28. | Clemastine Fumarate Tablets | Sandoz, Teva | August 2013 to the present |
| 29. | Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt | June 2014 to the present |
| 30. | Clomipramine | Mylan, Sandoz, Taro | May 2013 to the present |
| 31. | Clonidine TTS Patch | Actavis, Mylan, Teva | October 2012 to the present |
| 32. | Clotrimazole Topical Solution | Taro, Teva | May 2014 to present |
| 33. | Cyproheptadine HCL Tablets | Breckenridge, Teva | November 2013 to present |
| 34. | Desmopressin Acetate Tablets | Actavis, Teva | August 2014 to present |
| 35. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Glenmark, Teva | May 2014 to present |
| 36. | Desonide | Actavis, Fougera, Perrigo, Sandoz, Taro | May 2013 to the present |
| 37. | Dexmethylphenidate HCL ER Capsules | Sandoz, Teva | February 2014 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|-----------|-------------|
| 38. | Dextroamphetamine Sulfate ER | Actavis, Teva | June 2014 to present |
| 39. | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva | August 2013 to present |
| 40. | Dicloxacillin Sodium Capsules | Sandoz, Teva | April 2014 to the present |
| 41. | Diflunisal Tablets | Teva, Rising | April 2014 to present |
| 42. | Digoxin | Impax, Lannett, Mylan, Par, West-Ward | October 2013 to the present |
| 43. | Diltiazem HCL Tablets | Mylan, Teva | May 2013 to present |
| 44. | Disopyramide Phosphate Capsules | Actavis, Teva | July 2013 to the present |
| 45. | Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to the present |
| 46. | Doxazosin Mesylate Tablets | Apotex, Mylan, Teva | May 2013 to present |
| 47. | Doxycycline | Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun, West-Ward | October 2012 to the present |
| 48. | Drospirenone and ethinyl estradiol (Ocella) | Actavis, Lupin, Teva | May 2013 to present |
| 49. | Econazole | Fougera, Perrigo, Taro, Teligent | June 2014 to the present |
| 50. | Enalapril Maleate Tablets | Mylan, Taro, Teva, Wockhardt | July 2013 to present |
| 51. | Entecavir | Par, Teva | September 2014 to present |
| 52. | Epitol Tablets | Apotex, Taro, Teva | August 2014 to the present |
| 53. | Estazolam Tablets | Actavis, Teva | April 2014 to present |
| 54. | Estradiol Tablets | Actavis, Mylan, Teva | May 2013 to present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 55. | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) | Sandoz, Teva | May 2012 to the Present |
| 56. | Ethosuximide | Teva, Versapharm | April 2014 to present |
| 57. | Etodolac | Apotex, Taro, Teva, Sandoz, Zydus | July 2013 to present |
| 58. | Fenofibrate | Lupin, Mylan, Perrigo, Teva, Zydus | February 2013 to the Present |
| 59. | Fluconazole Tablets | Citron, Dr. Reddy's, Glenmark, Greenstone, Teva | May 2013 to present |
| 60. | Fluocinonide | Actavis, Sandoz, Taro, Teva | June 2014 to the present |
| 61. | Fluoxetine HCL Tablets | Mylan, Par, Teva | January 2015 to the present |
| 62. | Flurbiprofen Tablets | Mylan, Teva | May 2013 to present |
| 63. | Flutamide Capsules | Actavis, Par, Teva | August 2014 to the present |
| 64. | Fluvastatin Sodium Capsules | Mylan, Teva | April 2014 to present |
| 65. | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz | April 2014 to the present |
| 66. | Gabapentin Tablets | Aurobindo, Glenmark, Teva | October 2014 to present |
| 67. | Glimepiride Tablets | Dr. Reddy's, Teva | August 2014 to present |
| 68. | Glipizide | Heritage, Mylan, Teva | April 2014 to the present |
| 69. | Glyburide | Aurobindo, Citron, Heritage, Teva | April 2014 to the present |
| 70. | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva | April 2014 to the present |
| 71. | Griseofulvin Suspension | Actavis, Teva | September 2014 to the present |

| Count | Drugs | Defendants | Time Period |
|-------|-------|------------|-------------|
| 72. | Haloperidol | Mylan, Sandoz, Zydus | August 2013 to the present |
| 73. | Hydralazine | Camber, Glenmark, Heritage, Par, Strides, Teva | August 2014 to the present |
| 74. | Hydroxyurea Capsules | Par, Teva | August 2014 to the present |
| 75. | Hydroxyzine Pamoate Capsules | Actavis, Rising, Sandoz, Teva | October 2013 to the present |
| 76. | Irbesartan | Lupin, Teva | March 2012 to the present |
| 77. | Isoniazid | Sandoz, Teva | June 2013 to the present |
| 78. | Ketoconazole | G&W, Mylan, Sandoz, Taro, Teva | February 2014 to the present |
| 79. | Ketoprofen Capsules | Mylan, Teva | July 2013 to the present |
| 80. | Ketorolac Tromethamine Tablets | Mylan, Teva | July 2013 to the present |
| 81. | Labetalol HCL Tablets | Actavis, Alvogen, Par, Sandoz, Teva | July 2012 to the present |
| 82. | Lamivudine/Zidovudine (generic Combivir) | Aurobindo, Camber, Lupin, Teva | May 2012 to the present |
| 83. | Leflunomide | Apotex, Heritage, Teva | April 2014 to the present |
| 84. | Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to the present |
| 85. | Lidocaine-Prilocaine | Akorn, Fougera, Hi-Tech, Impax, Sandoz | March 2014 to present |
| 86. | Loperamide HCL Capsules | Mylan, Teva | April 2014 to the present |
| 87. | Medroxyprogesterone Tablets | Greenstone, Teva | November 2013 to the present |
| 88. | Meprobamate | Dr. Reddy's, Heritage | March 2013 to the present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 89. | Methotrexate Tablets | Mylan, Par, Teva, West-Ward | February 2013 to present |
| 90. | Metronidazole | G&W, Impax, Sandoz, Taro, Teva, and Valeant | Summer 2011 to the present |
| 91. | Mimvey (Estradiol/Norethindrone Acetate) Tablets | Actavis, Breckenridge, Mylan, Teva | July 2012 to the present |
| 92. | Metformin ER | Actavis, Amneal, Lupin, Sun, Teva | July 2015 to the present |
| 93. | Methylphenidate | Actavis, Impax, Mallinckrodt, Par, Sandoz, Sun | February 2013 to the present |
| 94. | Methylprednisolone | Breckenridge, Cadista, Greenstone, Par, Sandoz | February 2011 to the present |
| 95. | Moexipril HCL Tablets | Glenmark, Teva | May 2013 to present |
| 96. | Moexipril HCL/HCTZ Tablets | Glenmark, Teva | May 2013 to present |
| 97. | Nabumetone Tablets | Actavis, Glenmark, Sandoz, Teva | May 2013 to present |
| 98. | Nadolol Tablets | Greenstone, Mylan, Sandoz, Teva | May 2013 to present |
| 99. | Niacin ER Tablets | Lupin, Teva, Zydus | March 2014 to the present |
| 100. | Nimodipine | Heritage, Sun | June 2012 to the present |
| 101. | Nitrofurantoin MAC Capsules | Alvogen, Mylan, Teva | July 2012 to the present |
| 102. | Norethindrone Acetate | Amneal, Glenmark, Teva | September 2014 to the present |
| 103. | Norethindrone/ethinyl estradiol (Balziva) | Lupin, Teva | January 2014 to the present |
| 104. | Nortriptyline HCL Capsules | Actavis, Taro, Teva | November 2013 to the present |
| 105. | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva | Summer 2011 to the present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 106. | Omega-3-Acid Ethyl Esters | Apotex, Par, Teva | June 2014 to the present |
| 107. | Ondansetron | Glenmark, Teva | May 2013 to present |
| 108. | Oxaprozin Tablets | Dr. Reddy's, Greenstone, Sandoz, Teva | July 2012 to the present |
| 109. | Oxybutynin Chloride Tablets | Apotex, Par, Teva, Upsher-Smith | April 2013 to the present |
| 110. | Oxycodone/Acetaminophen | Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, Teva | June 2012 to the present |
| 111. | Paricalcitol | Dr. Reddy's, Teva, Zydus | March 2014 to the present |
| 112. | Paromomycin | Heritage, Sun | April 2014 to the present |
| 113. | Penicillin VK Tablets | Aurobindo, Greenstone, Sandoz, Teva | August 2014 to the present |
| 114. | Pentoxifylline Tablets | Apotex, Mylan, Teva | April 2014 to the present |
| 115. | Piroxicam | Greenstone, Teva | March 2014 to the present |
| 116. | Potassium Chloride | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus | July 2010 to the present |
| 117. | Pravastatin | Apotex, Glenmark, Lupin, Mylan, Teva, Zydus | May 2013 to the present |
| 118. | Prazosin HCL Capsules | Mylan, Teva | May 2013 to the present |
| 119. | Prochlorperazine Tablets | Mylan, Sandoz, Teva | May 2014 to the present |
| 120. | Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, Teva, Upsher-Smith | November 2013 to the present |
| 121. | Raloxifene HCL Tablets | Teva, Camber | September 2014 to the present |

| Count | Drugs | Defendants | Time Period |
|---|---|---|---|
| 122. | Ranitidine HCL Tablets | Amneal, Glenmark, Sandoz, Teva | May 2013 to the present |
| 123. | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva | March 2014 to the present |
| 124. | Temozolomide | Sandoz, Teva | July 2013 to the Present |
| 125. | Theophylline ER | Heritage, Teva | February 2014 to the present |
| 126. | Tizanidine | Apotex, Dr. Reddy's, Mylan, Sandoz, Sun | May 2013 to the present |
| 127. | Tobramycin | Sandoz, Teva | October 2013 to the Present |
| 128. | Tolmetin Sodium Capsules | Mylan, Teva | May 2013 to present |
| 129. | Tolterodine | Greenstone, Mylan, Teva | December 2013 to the Present |
| 130. | Topiramate Sprinkle Capsules | Actavis, Teva, Zydus | April 2014 to the present |
| 131. | Trifluoperazine HCL | Mylan, Sandoz | January 2013 to the present |
| 132. | Ursodiol | Actavis, Epic, Lannett | May 2014 to the present |
| 133. | Valsartan HCTZ | Mylan, Sandoz | September 2012 to the present |
| 134. | Verapamil | Actavis, Heritage, Mylan | April 2014 to the present |
| 135. | Warfarin Sodium Tablets | Taro, Teva, Zydus | June 2014 to the present |
| 136. | Zoledronic Acid | Dr. Reddy's, Heritage | January 2013 to the present |

1887.   Beginning on or about the time referenced in the table below, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on

the sale of the generic drug referenced on the table above in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1888.   The contract, combination, and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of the specified generic drug in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

1889.   The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)   To fix, stabilize, maintain, and/or raise prices of the specified generic drug sold to Plaintiffs and others in the United States;

(b)   To allocate customers, the volume of sales, and/or market shares of the specified generic drug sold to Plaintiffs and others in the United States;

(c)   To control the production and/or sale of the specified generic drug and others in the United States; and/or

(d)   To earn supracompetitive profits on the price of the specified generic drug sold to Plaintiffs and others in the United States that resulted from Defendants' collusion.

1890.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)   They agreed to exchange, and did exchange, current and future price information about the specified generic drug sold in the United States, including the prices quoted or charged to Plaintiffs for the sale of the specified generic drug;

(b)      They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the specified generic drug sold in the United States;

(c)      They agreed on prices, price levels, and/or production levels of the specified generic drug sold in the United States; and/or

(d)      They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

1891.   Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of each the specified generic drug to be sold to Plaintiffs and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the specified generic drug to Plaintiffs and/or others in the United States.

1892.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)      Price competition in the sale of the specified generic drug among Defendants and their co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)      Prices for the specified generic drug sold by Defendants and their co-conspirators to Plaintiffs and others have been raised, fixed, maintained, and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)      Plaintiffs and other direct purchasers of the specified generic drug produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

1893.   Each Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of the specified generic drug is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## XXII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.      A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

B.      A judgment against Defendants, jointly and severally, by the Court, in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs, and interest as allowable by law.

C.      A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  January 28, 2020

Respectfully submitted,

By: _____

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Scott E. Perwin, Esquire
Anna T. Neill, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
Joshua B. Gray, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:    (305) 373-1000
Fax:    (305) 372-1861
E-mail:  rarnold@knpa.com
        wblechman@knpa.com
        sperwin@knpa.com
        aneill@knpa.com
        srandall@knpa.com
        bfloch@knpa.com
        jgray@knpa.com

*Counsel for Plaintiffs*

610858.2