**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL NO. 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br>*ALL ACTIONS* | HON. CYNTHIA M. RUFE |

**PLAINTIFFS' RESPONSE IN SUPPORT OF SPECIAL MASTER REGARD'S AMENDED REPORT AND RECOMMENDATION RELATING TO GLOBAL SEARCH TERM MODIFICATIONS REQUESTED BY SANDOZ**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Sandoz Agreed in August 2018 that Its Former Chief Executives—DeGolyer and Goldschmidt—Possess Responsive Information ..... 2

B. Following Entry of PTO 105 in October 2019, Sandoz Sought to Withdraw Its Agreement Regarding DeGolyer and Goldschmidt. ..... 3

C. Plaintiffs Have Amassed Substantial Evidence Tying Both DeGolyer and Goldschmidt to the Conspiracy Alleged in This Case. ..... 4

D. Sandoz's March 2020 Deferred Prosecution Agreement with the DOJ Underscores the Need to Prioritize Discovery of Sandoz's Executives. ..... 8

III. LEGAL STANDARDS ..... 9

IV. ARGUMENT ..... 9

A. DeGolyer and Goldschmidt Were Intimately Involved in the Conspiracy and Possess Highly Responsive Information. ..... 9

B. The "Tier 1" Search Terms Are Designed to—and Do—Target Responsive Information from DeGolyer and Goldschmidt. ..... 11

C. Sandoz's Arguments Regarding "Sensitive" Information Have Been Considered and Rejected Six Times. ..... 13

D. Sandoz's Proposed "Tier 3" Terms Do Not Address Its Purported Concern Regarding "Sensitive" Information ..... 14

E. Permitting Sandoz to Create a "Tier 3" for its CEOs Would Invite Other Defendants to Splinter the Global Negotiations. ..... 15

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Actavis Holdco U.S., Inc. v. Connecticut*,
140 S. Ct. 1290 (2020) .......... 14

*BlackBerry Ltd. v. Facebook, Inc.*,
No. CV 18-1844-GW (KSx), 2019 WL 4544425 (C.D. Cal. Aug. 19, 2019) .......... 10

*Digital Ally, Inc. v. TASER Int'l, Inc.*,
No. 16-cv-2032-CM-TJJ, 2018 WL 4334297 (D. Kan. Sept. 11, 2018) .......... 11

*First Niagara Risk Mgmt., Inc. v. Folino*,
317 F.R.D. 23 (E.D. Pa. 2016) .......... 9

*Green v. Cosby*,
314 F.R.D. 164 (E.D. Pa. 2016) .......... 9

*Harris v. Union Pac. R.R. Co.*,
No. 8:16CV381, 2018 WL 2729131 (D. Neb. June 6, 2018) .......... 10

*In re Actavis Holdco U.S., Inc.*,
No. 19-3549, 2019 WL 8437021 (3d Cir. Dec. 6, 2019) .......... 13

*Lux Glob. Label Co., LLC v. Shacklett*,
No. 18-cv-5061, 2020 WL 1700572 (E.D. Pa. Apr. 8, 2020) .......... 9

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .......... 9

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
322 F.R.D. 1 (D.D.C. 2017) .......... 11, 12

**Rules**

Federal Rule of Civil Procedure 26(b)(1) .......... 9



PUBLIC VERSION – FILED WITH REDACTIONS

## I. INTRODUCTION

This Objection is Defendant Sandoz's third attempt to convince the Special Masters or this Court to limit discovery of its former Chief Executive Officers, Don DeGolyer and Peter Goldschmidt. Sandoz's prior attempts have failed, and they should again here.

Sandoz agreed in August 2018 to include DeGolyer and Goldschmidt as custodians, without limitation. At the time, Sandoz explicitly acknowledged the obvious: that the CEOs of Sandoz during the bulk of this conspiracy "may have responsive documents." Fifteen months later—within days of the Court issuing Pretrial Order ("PTO") 105 and denying Defendants' request to subjectively withhold their custodians' documents for "relevance"—Sandoz "withdrew" the CEOs as agreed custodians. Tellingly, Sandoz did not suggest, as it does now, that narrower search terms were appropriate; rather, Sandoz refused to produce *any documents at all* from these previously agreed custodians. Plaintiffs brought this issue to the Special Masters, who agreed that both CEOs are proper custodians.

Within a week, Sandoz changed tack and attempted to negotiate a new, narrower set of search terms (as compared to the Global Search Terms by then negotiated by all parties to the MDL) that would apply *only* for DeGolyer and Goldschmidt. Again, Plaintiffs brought the issue to the Special Masters. Following eight written submissions and two conferences with the parties, Special Master Regard recommended that DeGolyer and Goldschmidt be included among the custodians whose files will be searched using "Tier 1" of the two-tiered Global Search Terms. ECF No. 1416 ("R&R") at 4.

The R&R should be upheld because it is supported by both individualized allegations and substantial preliminary record evidence tying the CEOs to the price-fixing conspiracy at the heart of this case. Sandoz's repeated claims that Plaintiffs lack evidence tying DeGolyer and Goldschmidt to the conspiracy is directly contradicted by this evidence: there are dozens of communications already produced in this case (many of which were presented to the Special Masters in prior briefing), through which the CEOs actively engaged in discussions regarding

[redacted] among other topics. As set forth below, Special Master Regard accurately determined that even this *preliminary* evidence is sufficient to warrant their inclusion in Tier 1. The fact that Sandoz continues to deny even the *relevance* of these documents underscores the wisdom of the Court's refusal in PTO 105 to grant Defendants carte blanche to withhold documents they subjectively believe to be "non-responsive."

Sandoz also fails to carry its burden of establishing that either CEO requires an ESI search term process that is different from *every other custodian in this MDL*, including 33 additional President and CEO custodians. Sandoz's assertion that the Tier 1 terms are overbroad is contradicted by Sandoz's own analyses. Indeed, Sandoz's analyses demonstrate that *one out of every four documents it seeks to exclude is relevant and responsive*. Sandoz's concern that the Tier 1 terms will capture "sensitive" information is likewise unsubstantiated, and has also been rejected on *six* prior occasions. Moreover, permitting Sandoz to invent its own "Tier 3" of search terms solely for its CEOs—without any justification—would invite other Defendants to make similar attempts to splinter and upend discovery negotiations, which are about to begin for the next round of discovery. Plaintiffs therefore respectfully submit that Sandoz's Objections to the R&R should be overruled.

## II. BACKGROUND

### A. Sandoz Agreed in August 2018 that Its Former Chief Executives—DeGolyer and Goldschmidt—Possess Responsive Information.

Plaintiffs and Sandoz began negotiating custodians in June 2018. Those negotiations completed on August 3, 2018, when the parties agreed to a list of 36 custodians that included both DeGolyer and Goldschmidt. Ex. 1 (Aug. 3, 2018 Ltr. from A. Croushore). At the time, Sandoz acknowledged that DeGolyer and Goldschmidt "were the successive heads of Sandoz Inc. during the relevant period and may have responsive documents." *Id.* at 2. The parties' agreement did not place any limits or special conditions upon their inclusion as custodians. *Id.*

**B. Following Entry of PTO 105 in October 2019, Sandoz Sought to Withdraw Its Agreement Regarding DeGolyer and Goldschmidt.**

Fifteen months after the parties' agreement and shortly after the Court's entry of PTO 105, Sandoz informed Plaintiffs that it was "withdrawing consent to include Don DeGoyler and Peter Goldschmidt as 'Agreed Custodians' under the ESI Protocol." Ex. 2 (Oct. 28, 2019 Email from M. Rogers). Sandoz's only justification for its reversal was that, in light of the Court's ruling in PTO 105 that a Defendant could not withhold documents prior to production based on a subjective relevance review, Sandoz no longer wanted its former CEOs' documents subject to discovery because their files *might* include "sensitive company information." Ex. 3 (Oct. 30, 2019 Email from M. Rogers).

Plaintiffs moved to compel the inclusion of DeGolyer and Goldschmidt as custodians, and Sandoz cross-moved for a protective order designating them as "limited custodians" subject to a special relevance review. After considering the parties' arguments, Special Master Merenstein agreed with Plaintiffs that DeGolyer and Goldschmidt should be custodians, without limitation. Ex. 4 (Dec. 18, 2019 Recommendation). Sandoz then informed Plaintiffs that while it accepted Special Master Merenstein's recommendation, it would not agree to include DeGolyer and Goldschmidt in either the "Tier 1" or "Tier 2" search term categories that the parties had for months been negotiating on a global level—*i.e.*, for *all custodians* and *every party* in this MDL. Ex. 5 (Dec. 23, 2019 Email from A. Añon).[1] Instead, Sandoz for the first time proposed a "Tier 3" of narrower search terms that would apply *only* to DeGolyer and Goldschmidt. Ex. 6 (Jan. 2, 2020 Email from M. Rogers). Here, again, Sandoz's only justification for treating DeGolyer and Goldschmidt differently than every other custodian in this MDL was its assertion that there is a "wide range of non-responsive commercially sensitive and strategic information in their files." *Id*. Notably, Sandoz did not, *and still has not*, identified or even described a *single document* that would be produced under the agreed two-tier system that allegedly contains such "non-responsive commercially sensitive and strategic information." On

[1] The Global Search Terms—comprised only of "Tier 1" and "Tier 2" groupings—were finalized by stipulation in March 2020. R&R at 2.

January 7, 2020, Sandoz produced this new "Tier 3" set of search terms and limiters, despite the fact that Special Master Regard had the day before "strongly encourage[d] the parties to work within the current two-tiered system." Ex. 7 (Jan. 6, 2020 Email from D. Regard).

Plaintiffs moved again, this time to compel application of the "Tier 1" search terms to DeGolyer and Goldschmidt. After considering the parties' arguments, Special Master Regard agreed with Plaintiffs and recommended that DeGolyer and Goldschmidt be designated at "Tier 1" custodians, given that both CEOs "were in possession of communications that they received or sent regarding pricing and market share – issues Plaintiffs' deem as core to their conspiracy allegations." R&R at 4. Special Master Regard also concluded, as had Special Master Merenstein, that Sandoz's unspecified concern regarding the allegedly sensitive nature of the CEOs' files is sufficiently addressed by PTO 105's confidentiality and clawback provisions. *Id*. Sandoz now formally objects to this R&R. ECF No. 1430 ("Sandoz Br.").

All told, the parties have collectively submitted eight briefs—dated November 27, 2019 (Plaintiffs), December 9, 2019 (Sandoz), December 13, 2019 (Plaintiffs), December 16, 2019 (Sandoz), January 21, 2020 (Sandoz), January 21, 2020 (Plaintiffs), April 6, 2020 (Sandoz), and April 7, 2020 (Plaintiffs)—held two conferences—dated January 22, 2020 and March 31, 2020—and engaged in multiple *ex parte* communications with the Special Masters on this topic. This briefing represents the *fifth time* that Sandoz has written to either a Special Master or the Court specifically regarding DeGolyer and Goldschmidt since the entry of PTO 105.

### C. Plaintiffs Have Amassed Substantial Evidence Tying Both DeGolyer and Goldschmidt to the Conspiracy Alleged in This Case.

What Sandoz has produced in the MDL to date—*i.e.*, even before DeGolyer's and Goldschmidt's custodial files have been searched—confirms that both individuals are properly included as Tier 1 custodians. Indeed, both Special Masters reviewed a subset of this preliminary evidence, and both agreed that it was sufficient to warrant their inclusion as custodians in this matter (Merenstein) at the Tier 1 level (Regard). *See* Ex. 4 (Special Master Merenstein stating that Plaintiffs "identified a number of documents that are likely to be found in

these executives' files that relate to the core issues in this case, including pricing and market allocation, confirming Sandoz's prior representation that these individuals may possess responsive documents"); R&R at 4 (Special Master Regard stating that these documents "indicate that these Sandoz CEOs were in possession of communications that they received or sent regarding pricing and market share – issues Plaintiffs' deem as core to their conspiracy allegations"). Moreover, as set forth below, Plaintiffs have identified numerous additional communications tying DeGolyer and Goldschmidt to the conspiracy in the months since Special Masters Merenstein and Regard reviewed this evidence.

**DeGolyer.** DeGolyer was Sandoz's President and CEO from April 2010 through August 2013. Plaintiffs detailed DeGolyer's involvement in the conspiracy in their amended complaints, highlighting [REDACTED] States' Am. Compl., ECF No. 106, No. 19-cv-2407 (E.D. Pa. Nov. 1, 2019), ¶ 983. Plaintiffs also allege DeGolyer attended trade association events and was a board member of the Generic Pharmaceutical Association (GPhA) on Sandoz's behalf during the Relevant Time Period. *See, e.g.*, Consol. End-Payer Compl. re: Benazepril HCTZ (Aug. 15, 2017), ¶¶ 111-12 (DeGolyer attended the GPhA Annual Meeting in Orlando, Florida on Feb. 20-22, 2013 and the NACDS 2013 Annual Meeting in Palm Beach, Florida on Apr. 20-23, 2013); *id.*, ¶ 105 (DeGolyer served on GPhA's Board of Directors in 2012 and 2013).

At the time Plaintiffs first briefed DeGolyer's custodial status in November 2019, Plaintiffs had uncovered additional communications placing DeGolyer squarely within the conspiracy. For example, DeGolyer repeatedly [REDACTED] *See, e.g.*, Ex. 8 at SDZCTAG-02448670 [REDACTED]); SDZCTAG-02557981 [REDACTED] DeGolyer also [REDACTED] *Id.* at SDZCTAG-02171851 [REDACTED]).



In the intervening eight months, Plaintiffs uncovered even further communications implicating DeGolyer in the conspiracy. For example, [redacted] Ex. 9 at SDZMDL-003659761. DeGolyer [redacted]. *Id.* DeGolyer also [redacted],[2] [redacted],[3] and [redacted].[4] These communications are consistent with general statements from DeGolyer—in addition to those outlined above—[redacted] *Id.* at SDZMDL-004446780.

**<u>Goldschmidt.</u>** Goldschmidt was Sandoz's President and CEO from August 2013 through March 2018. As with his predecessor, Plaintiffs allege that Goldschmidt attended trade association events and was a GPhA board member during the Relevant Time Period. *See, e.g.*, Consol. End-Payer Compl. re: Amitriptyline (Aug. 15, 2017) ("Amitriptyline Compl."), ¶¶ 117, 119, 123 (alleging Goldschmidt attended the NACDS 2013 Total Store Expo in Las Vegas,

---

[2] *See, e.g.*, Ex. 9 at SDZCTAG-03215032 ([redacted] SDZCTAG-03213410 [redacted] SDZMDL-004432509 ([redacted]

[3] *See, e.g.*, Ex. 9 at SDZMDL-002327936 at -8004 [redacted]

4 *See, e.g.*, Ex. 9 at SDZCTAG-02986814 [redacted]

Nevada on August 10-13, 2013, the NACDS 2013 Foundation and Reception Dinner in New York, New York on December 3, 2013, and the NACDS 2014 Annual Meeting in Scottsdale, Arizona on April 26-29, 2014); Consol. End-Payer Compl. re: Clobetasol (Aug. 15, 2017), ¶ 148 (alleging Goldschmidt attended the NACDS 2015 Annual Meeting in Palm Beach, Florida on April 25-28, 2015); Amitriptyline Compl., ¶ 105 (alleging Goldschmidt served on GPhA's Board of Directors in 2014, 2015, and 2016).

As with his predecessor, Plaintiffs had uncovered numerous communications connecting Goldschmidt to Plaintiffs' allegations of a conspiracy by the time Plaintiffs first briefed Goldschmidt's custodial status to Special Master Merenstein, including [REDACTED]. *See, e.g.*, Ex. 10 at SDZCTAG-01809262 at -263-265 [REDACTED] SDZCTAG-01524338 [REDACTED] SDZCTAG-01526411 [REDACTED] SDZCTAG-01584626-27 [REDACTED] Goldschmidt also repeatedly [REDACTED] *See, e.g.*, *id*. at SDZCTAG-01542849 [REDACTED] SDZCTAG-01794207 ([REDACTED]

And, as with his predecessor, in the intervening eight months Plaintiffs have uncovered even further communications implicating Goldschmidt. For example, [REDACTED]

[redacted] Ex. 11 at SDZMDL-004476148. Similarly, [redacted] *Id*. at SDZCTAG-01788392. [redacted] *Id*. at SDZMDL-003224735. And, as with DeGolyer, Goldschmidt [redacted].[5]

**D. Sandoz's March 2020 Deferred Prosecution Agreement with the DOJ Underscores the Need to Prioritize Discovery of Sandoz's Executives.**

On March 2, 2020, Sandoz publicly accepted responsibility for its role in the criminal price-fixing conspiracy at the heart of this case. *See* Sandoz Br., Ex. C (Deferred Prosecution Agreement, No. 2:20-cr-00111-RBS, ECF No. 2) at ¶ 2 ("Sandoz acknowledges that, under United States law, it is responsible for the acts of its officers, directors, employees, and agents that give rise to the charges in the Information. Sandoz admits, accepts, and acknowledges that the facts set forth in the Statement of Facts are true and accurate."); *see also* Ex. 12 (DOJ Press Release, *Major Generic Pharmaceutical Company Admits to Antitrust Crimes*, Mar. 2, 2020). This Agreement followed a guilty plea by a "high-ranking executive" of Sandoz—Armando Kellum—who likewise admitted to the facts at the center of this case. Ex. 13 (DOJ Press

---

[5] *See, e.g.*, Ex. 11 at SDZMDL-004477416 [redacted]

Release, *Former Generic Pharmaceutical Executive Pleads Guilty*, Feb. 14, 2020).

Sandoz cannot and does not credibly dispute the import of these admissions of culpability in this MDL. With respect to this discovery dispute, it has become even clearer since these issues were first briefed to the Special Masters that Sandoz's high-ranking executives are perhaps even more likely than other Defendants' CEOs to possess relevant information, and Sandoz should not be permitted to shield them from discovery.[6]

## III. LEGAL STANDARDS

Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." As courts within this District repeatedly recognize, relevance under Rule 26 is "construed broadly." *See, e.g.*, *Green v. Cosby*, 314 F.R.D. 164, 171 (E.D. Pa. 2016) ("Relevance is 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)); *Lux Glob. Label Co., LLC v. Shacklett*, No. 18-cv-5061, 2020 WL 1700572, at *2 (E.D. Pa. Apr. 8, 2020) (same). Once the party seeking discovery demonstrates the relevance of the information sought, the burden is on the withholding party to justify its refusal with arguments and information *specific to the material requested*. *First Niagara Risk Mgmt., Inc. v. Folino*, 317 F.R.D. 23, 25 (E.D. Pa. 2016). Sandoz cannot and has not met this burden.

## IV. ARGUMENT

### A. DeGolyer and Goldschmidt Were Intimately Involved in the Conspiracy and Possess Highly Responsive Information.

Sandoz's assertion that Plaintiffs lack any "factual allegations that Sandoz' CEOs were involved in or knew about alleged anticompetitive conduct" is directly contradicted by the

[6] Sandoz has admitted its role in the unlawful conspiracy involving Clobetasol (*see* Sandoz Br., Ex. C (DPA) at Attachment A), and is a Defendant in all four MDL bellwether cases: Clobetasol, Clomipramine, Pravastatin, and the States' "Teva" overarching conspiracy complaint. *See* ECF Nos. 1442, 1443 (July 14, 2020 Bellwether Opinion and Order).

evidence described in detail above. Sandoz Br. at 10; *see supra* Section II.C (summarizing early discovery, in which the CEOs discussed ████████████████████████████████████████████████████████████████████████████████████████████████████████████, among other topics).[7] As set forth above, two Special Masters have determined that even this *preliminary* evidence of the CEOs' knowledge and involvement is sufficient to warrant their inclusion as Tier 1 custodians. *Id.* In light of these documents, Sandoz's assertion that there is no evidence the CEOs "were involved in or knew about alleged anticompetitive conduct" is belied by the record.

Sandoz's authorities regarding purported limitations on "executive discovery" do not counsel otherwise, as they involved situations where this nexus had not been alleged (to say nothing of substantiated), as it has here. In *BlackBerry Ltd. v. Facebook, Inc.*, No. CV 18-1844-GW (KSx), 2019 WL 4544425, at *7 (C.D. Cal. Aug. 19, 2019), for example, the moving party had conceded that the executive at issue—Mark Zuckerberg—was "probably far afield of" the issue central to that case. Not so here. *See supra* Section II.C. Similarly, in *Harris v. Union Pacific Railroad Co.*, No. 8:16CV381, 2018 WL 2729131, at *4 (D. Neb. June 6, 2018), the withholding party demonstrated that the executives at issue had no relationship to the program being challenged as discriminatory. Moreover, the court expressly left open the possibility that it would revisit its ruling, if and when the plaintiff ascertained evidence to the contrary. *Id*. Here, as acknowledged by the Special Masters, Plaintiffs have already amassed substantial evidence tying both DeGolyer and Goldschmidt to the conspiracy at the heart of this case. *See supra*

[7] Plaintiffs' allegations and evidence regarding DeGolyer and Goldschmidt are consistent with their overarching allegation that Defendants' high-level executives were intimately involved in this price-fixing conspiracy, often through interactions at trade association events and similar meetings. *See, e.g.*, States' Am. Compl., ¶ 13 ("Generic drug manufacturers, *through their senior leadership* . . . have routine and direct interaction. The Defendants exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.") (emphasis supplied). The Court specifically highlighted such conduct as among the "facts implying the existence of a traditional conspiracy." ECF No. 1070 (Aug. 15, 2019 Mem. Op.) at 21.

Section II.C.[8]

CEOs are subject to the same Rule 26 relevance standard as any other custodian. *See generally, e.g.*, *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1 (D.D.C. 2017) (granting motion to compel *all documents* belonging to plaintiff's CEO in large-scale antitrust action, applying the same Rule 26 factors that would apply to any other custodian). As set forth above, there can be no dispute that the CEOs here possess relevant information. And as set forth below, Sandoz has failed to meet its burden of demonstrating that the requested production does not otherwise meet the requirements of Rule 26.

### B. The "Tier 1" Search Terms Are Designed to—and Do—Target Responsive Information from DeGolyer and Goldschmidt.

The crux of Sandoz's argument is that the Global Search Terms are intended to be "the first line of defense against violating the Rule 26 mandate that only relevant information be produced." Sandoz Br. at 3. Here, Sandoz's own analyses demonstrate that they are.

Sandoz fails to articulate any reason or cite any evidence to suggest that the Tier 1 search terms do not, in fact, operate as the "initial screen for relevance" that this Court envisioned. ECF No. 1155 (Nov. 14, 2019 Mem. Op.) at 4. For example, Sandoz asserts without any basis that terms seeking documents discussing "market share" within close proximity to terms like "adjustment" or "change" are "more likely [to] capture documents that simply mention an adjustment or change having nothing to do with market share at all." Sandoz Br. at 14. But Sandoz does not cite any instance where this was actually the case, to say nothing of an instance where this search term captured the "commercially sensitive" information that Sandoz fears (again without any basis) will be swept into this collection.

The limited search term analyses Sandoz has offered actually *strengthen* the case for

---

[8] Sandoz's final authority, *Digital Ally, Inc. v. TASER International, Inc.*, No. 16-cv-2032-CM-TJJ, 2018 WL 4334297 (D. Kan. Sept. 11, 2018) is equally unavailing. There, unlike here, the withholding party made overbreadth objections to specific, individual search terms, and the court addressed them on a term-by-term basis. Here, Sandoz makes categorical objections to four groups of terms, without substantiating these objections with any term-by-term analysis. Sandoz Br. at 14-15.

including DeGolyer and Goldschmidt as Tier 1 custodians. In both its January 21, 2020 and April 6, 2020 submissions to Special Master Regard, Sandoz presented the results of a "self-study," whereby Sandoz "reviewed every document in the CEOs' files for several of Plaintiffs' proposed general business terms" and then reported on what percentage of the documents appearing only within the CEOs' files were (in Sandoz's view) responsive to this case. Ex. 14 (Sandoz Jan. 21, 2020 Ltr.) at 3-4; Ex. 15 (Sandoz Apr. 6, 2020 Ltr.) at 3. Back in January, Sandoz reported that between 0% and 8% of the CEO-only documents that hit upon three specific (and presumably cherry-picked) search terms were responsive. Ex. 14 at 4. By April, those numbers had gone up (again only for the three standalone search terms hand-picked by Sandoz) to between 8% and 12%. Ex. 15 at 3.[9] And Sandoz now asserts that up to 25% of the standalone search terms are responsive (however Sandoz is defining and applying that term). ECF No. 1435 (Declaration of Margaret A. Rogers, June 26, 2020) ¶ 8. This, alone, would be sufficient to support the CEOs' inclusion as Tier 1 custodians. In *Oxbow*, for example, the court held that it "strains reason to suggest" that a CEO "would have no unique information" relevant to an antitrust litigation, and compelled production of *all of the CEOs documents* despite the fact that a sample showed less than 12 percent were responsive. 322 F.R.D. at 8-10.[10]

Sandoz's analysis of its own search proposal raises additional, troubling questions. First, and most importantly, Sandoz appears to suggest that it knows, based on its own "sampling," that *one out of every four documents* it seeks to exclude through its proposal *is relevant and responsive* and exists only in the CEOs' files. Rogers Decl. ¶¶ 6-8. For that reason alone, Sandoz's proposal must be rejected. Second, Sandoz provides no description of or methodology for its "relevance" review. Specifically, it does not describe what criteria of relevance it is

---

[9] It bears emphasis that Sandoz did not provide information about the responsiveness rates of the other 147 agreed standalone terms, or any one of the many dozen Defendant-name terms, presumably because all of them showed an even *higher* responsiveness rate.

[10] To be clear, Plaintiffs do not agree with either the methodology or conclusions of Sandoz's analyses. But a comparison of Sandoz's January, April, and June results underscores the reality that the case for including Sandoz's CEOs as Tier 1 custodians has only improved since the parties first began briefing this issue.

applying, which is particularly troubling given that Sandoz apparently fails to understand that the many documents cited above demonstrate the CEOs had knowledge of and were involved in the conspiracy. That Sandoz on the one hand, and Plaintiffs and the Special Masters on the other, could take such different views of the import of these documents suggests Sandoz is applying a relevance standard that is at best idiosyncratic and more likely unduly cramped.

Sandoz has therefore failed to meet its burden of establishing that the terms will not isolate responsive communications. This is unsurprising, given than the terms were crafted and agreed upon by *all parties to the MDL*—including both Plaintiffs and Defendants—with the goal of isolating responsive documents from key custodians such as DeGolyer and Goldschmidt.

### C. Sandoz's Arguments Regarding "Sensitive" Information Have Been Considered and Rejected Six Times.

Sandoz sole basis to treat Goldschmidt and DeGolyer differently than every other custodian is an unsupported assertion that their files contain more "sensitive" or "trade secret" information than other custodians. This exact same argument has been considered and rejected on *six occasions*: first, when the Court entered PTO 105 and declined to include the Defendants' requested pre-production responsiveness review;[11] second, when a Third Circuit panel and the *en banc* Court declined to overturn PTO 105;[12] third, when Special Master Merenstein recommended including DeGolyer and Goldschmidt as custodians, without limitation;[13] fourth,

---

[11] *See* ECF No. 1091 (Defs.' Obj. to Special Master Marion's R&R) at 4, 8-9 (arguing that "sensitive" information in CEO files necessitated responsiveness review); Nov. 14, 2019 Mem. Op. at 3 (noting "sensitive information" is protected by PTO 53); PTO 53 at 1 (adopting provisions that the Court determined would "adequately protect confidential material").

[12] *See* Ex. 16 (Defs.' Pet. for Writ of Mandamus) at 1, 19-22 (arguing "sensitive" information in CEO files necessitated responsiveness review); Ex. 17 (Defs.' Pet. for Rehearing En Banc), at 9-10 (same); *In re Actavis Holdco U.S., Inc.*, 2019 WL 8437021 (3d Cir. Dec. 6, 2019).

[13] *See* Ex. 4 (Dec. 18, 2019 Recommendation) ("I appreciate that Sandoz, along with the other defendants, is concerned that the procedures in PTO No. 105 will lead to the production of non-responsive, non-relevant documents, including highly sensitive business information having no connection to the MDL. I do not intend to minimize those concerns, but there are a number of protections in place to address them, including the detailed protective order entered by the Court, the automatic designation of all documents with the highest confidentiality protection for 120 days, and the right to claw back documents that include trade secrets, competitively sensitive information, or business information unrelated to the MDL.").

when the Supreme Court declined to stay entry of PTO 105;[14] fifth, when it denied Defendants' Petition for a Writ of Certiorari; and sixth, when Special Master Regard recommended applying the Tier 1 search terms to DeGolyer and Goldschmidt.[15]

It would be improper to permit Sandoz a *seventh* attempt at this argument. As the Special Masters, Court, and Third Circuit have all agreed, any concerns Sandoz may have regarding confidentiality are sufficiently protected against disclosure by the governing Protective Order and clawback provision. Moreover, despite the fact that this is Sandoz's *seventh* attempt at this argument, and despite the fact that Plaintiffs have repeatedly encouraged Sandoz to do so, if it can, *not once* has Sandoz identified any specific non-responsive "sensitive" document (either in general terms or for potential *in camera* review by the Special Masters or the Court) that is actually captured by the Tier 1 search terms. Sandoz's alleged concerns are argument alone; Sandoz has not provided any *actual evidence*. Sandoz submitted a declaration from counsel regarding search term issues, in which it could have submitted, under oath, a statement that specific pieces of non-responsive sensitive data would be captured by Plaintiffs' search terms. That it chose not to do so (and has not done so at any point during the extensive briefing on these issues) demonstrates that this concern is unfounded.

### D. Sandoz's Proposed "Tier 3" Terms Do Not Address Its Purported Concern Regarding "Sensitive" Information.

Even if Sandoz's concern about "sensitive" information had not been rejected on six prior occasions, and even if Sandoz had substantiated this concern with sufficient particularity, nothing in Sandoz's proposed search terms addresses this purported issue. Sandoz's Tier 3 proposal represents a small subset of the Tier 2 terms, with the addition of certain terms culled from relevant communications Plaintiffs identified in prior correspondence and Complaints (such

---

[14] *Actavis Holdco U.S., Inc. v. Connecticut*, 140 S. Ct. 1290 (2020).

[15] *See* R&R at 4 ("Although sensitive to Sandoz's concern that the Tier 1 Global Search Terms may capture a large volume of non-relevant business sensitive documents, the established procedures in this case that have been held to be sufficient to address such a production of sensitive and non-relevant documents.").

as "play nice," "fair share," "co-opetition"). Sandoz has never explained how this proposal addresses its concern regarding "non-responsive strategic information," and none is apparent.

Sandoz's Tier 3 proposal is simply an attempt to limit production of its CEOs' documents, and is not tailored to address its concerns regarding sensitive information, which are already addressed by the existing Protective Order and clawback provisions.

### E. Permitting Sandoz to Create a "Tier 3" for its CEOs Would Invite Other Defendants to Splinter the Global Negotiations.

Permitting Sandoz to create a "Tier 3" set of search terms containing only DeGolyer and Goldschmidt would invite other Defendants to revisit their prior agreements regarding the tiering of "executive custodians." There are currently at least 12 other custodians who also held the title of CEO or President included in Tier 1, and the remaining 21 executive custodians are included in Tier 2.[16] Sandoz has articulated no reason why its former CEOs should be treated differently than these other custodians at this late date. But if Sandoz succeeds, then other Defendants may feel entitled to request the same special treatment for their executive custodians, essentially dismantling the existing framework recently agreed upon by the parties and approved by the Special Masters. This would severely impair the orderly progress of discovery, which is about to enter a new phase to address additional document requests served in March and July 2020.

No party to this MDL should be permitted to undercut global discovery agreements through a showing as meager as the one Sandoz offers now. To hold otherwise would be to prevent the efficient (and final) resolution of discovery matters for the remainder of this already complex litigation, in contravention of the Court's repeated directives to move discovery forward. *Cf.* Nov. 14, 2019 Mem. Op. at 7 (criticizing Defendants' attempts to "halt the progress" of discovery and "disrupt the pace and the content of the administration of the MDL").

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court overrule Sandoz's Objections and approve the R&R.

---

[16] *See* Ex. 18 at 2-3 (identifying other executive custodians).

Dated: July 17, 2020

Respectfully submitted,

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
215-567-6565
rliebenberg@finekaplan.com

*Lead and Liaison Counsel for the End-Payer Plaintiffs*

*/s/ Dianne M. Nast*
Dianne M. Nast
NASTLAW LLC
1100 Market Street, Suite 2801
Philadelphia, PA 19107
215-923-9300
dnast@nastlaw.com

*Lead and Liaison Counsel for the Direct Purchaser Plaintiffs*

*/s/ Jonathan W. Cuneo*
Jonathan W. Cuneo
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
202-789-3960
jonc@cuneolaw.com

*Lead Counsel for the Indirect Reseller Plaintiffs*

*/s/ W. Joseph Nielsen*
W. Joseph Nielsen
Assistant Attorney General, State of Connecticut
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5040
Joseph.Nielsen@ct.gov

*Liaison Counsel for the Plaintiff States*

*/s/ William J. Blechman*
William J. Blechman
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
(305) 373-1000
wblechman@knpa.com

*Counsel for the Kroger Plaintiffs and Liaison Counsel for the Direct Action Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2020, a copy of the foregoing Response in Support of Special Master Regard's Amended Report and Recommendation Regarding Global Search Term Modifications Requested by Sandoz Inc. was served on all counsel of record via the Court's electronic filing system.

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg