```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          -  -  -

 3                                   :  MDL 2724
        IN RE:                       :
 4                                   :  CIVIL ACTION NO.
        GENERIC PHARMACEUTICALS      :  16-MD-2724
 5      PRICING ANTITRUST            :
        LITIGATION                   :  STATUS CONFERENCE
 6      _____

 7
                                     James A. Byrne U.S. Courthouse
 8                                   Via videoconference
                                     July 9, 2020
 9                                   Commencing at 1:40 p.m.
10      _____

             BEFORE THE HONORABLE CYNTHIA M. RUFE
11      _____

12
        APPEARANCES:
13
        FOR DIRECT          FINE, KAPLAN AND BLACK
14      PURCHASER           BY:  ROBERTA D. LIEBENBERG, ESQUIRE
        PLAINTIFFS PSC,     BY:  PAUL COSTA, ESQUIRE
15      END-PAYER           BY:  JEFFREY S. ISTVAN
        PLAINTIFFS PSC,     One South Broad Street
16      INDIRECT RESELLERS  Suite 2300
        PSC, STATE          Philadelphia, Pennsylvania 19107
17      ATTORNEYS GENERAL   (215) 567-6565
        PLAINTIFFS          rliebenberg@finekaplan.com
18                          pcosta@finekaplan.com
                            jistvan@finekaplan.com
19

20
        FOR STATE           ATTORNEY GENERAL'S OFFICE - ELM
21      ATTORNEYS GENERAL   BY:  W. JOSEPH NIELSEN, ESQUIRE
        PLAINTIFFS          55 Elm Street
22                          Hartford, Connecticut 06106
                            (860) 808-5396
23                          joseph.nielsen@ct.gov

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DIRECT        NASTLAW LLC
     PURCHASER             BY:  DIANNE M. NAST, ESQUIRE
 4   PLAINTIFFS PSC,       BY:  JOSEPH N. RODA, ESQUIRE
     END-PAYER             1101 Market Street
 5   PLAINTIFFS PSC:       Suite 2801
                           Philadelphia, Pennsylvania 19107
 6                         (215) 923-9300
                           dnast@nastlaw.com
 7                         jnroda@nastlaw.com

 8

 9   DIRECT ACTION         KENNY NACHWALTER, PA
     PLAINTIFFS LIAISON    BY:  WILLIAM J. BLECHMAN, ESQUIRE
10   COUNSEL:              1441 Brickell Avenue
                           Suite 1100
11                         Miami, Florida 33131
                           (305) 373-1000
12                         wblechman@knpa.com

13

14   DEFENSE LIAISON       WILSON SONSINI GOODRICH & ROSATI PC
     COUNSEL:              BY:  CHUL PAK, ESQUIRE
15                         1301 Avenue of the Americas
                           40th Floor
16                         New York, New York 10019
                           (212) 999-5800
17                         cpak@wsgr.com

18

19   DEFENSE LIAISON       WILLIAMS & CONNOLLY LLP
     COUNSEL:              BY:  SARAH F. KIRKPATRICK, ESQUIRE
20                         725 Twelfth Street, N.W.
                           Washington, DC 20005
21                         (202) 434-5000
                           skirkpatrick@wc.com
22

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   DEFENSE LIAISON        TROUTMAN PEPPER HAMILTON SANDERS
     COUNSEL:               LLP
 4                          BY:  JAN P. LEVINE, ESQUIRE
                            3000 Two Logan Square
 5                          Eighteenth and Arch Streets
                            Philadelphia, Pennsylvania 19103
 6                          (215) 981-4000
                            jan.levine@troutman.com
 7

 8
     DEFENSE LIAISON        KASOWITZ BENSON TORRES LLP
 9   COUNSEL:               BY:  SHERON KORPUS, ESQUIRE
                            1633 Broadway
10                          New York, New York 10019
                            (212) 506-1700
11                          skorpus@kasowitz.com

12

13   DEFENSE LIAISON        KIRKLAND & ELLIS LLP
     COUNSEL:               BY:  DEVORA W. ALLON, ESQUIRE
14                          601 Lexington Avenue
                            New York, New York 10022
15                          (212) 446-4800
                            devora.allon@kirkland.com
16

17
     FOR THE DEFENDANT      TARTER KRINSKY & DROGIN, LLP
18   EPIC PHARMA, LLC:      BY:  JING XIA, ESQUIRE
                            1350 Broadway
19                          New York, New York 10018
                            (221) 216-8000
20                          jxia@tarterkrinsky.com

21

22   FOR THE DEFENDANT      BY:  JAMES A. BACKSTROM, ESQUIRE
     MARC FALKIN:           1515 Market Street
23                          Suite 1200
                            Philadelphia, Pennsylvania 19102
24                          (215) 864-7797
                            jabber@backstromlaw.com
25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR THE DEFENDANT      MORGAN, LEWIS & BOCKIUS LLP
     GLENMARK               BY:  STEVEN A. REED, ESQUIRE
 4   PHARMACEUTICALS        1701 Market Street
     INC., USA:             Philadelphia, Pennsylvania 19103
 5                          (215) 963-5000
                            steven.reed@morganlewis.com
 6                          (via telephone)

 7

 8   FOR THE INTERVENOR     UNITED STATES DEPARTMENT OF JUSTICE
     UNITED STATES OF       BY:  THOMAS P. DEMATTEO, ESQUIRE
 9   AMERICA:               450 5th Street, NW
                            Suite 8700
10                          Washington, DC 20530
                            (202) 598-2942
11                          thomas.dematteo@usdoj.gov
                            (via telephone)
12

13
     SPECIAL MASTER:        WHITE AND WILLIAMS, LLP
14                          BY:  DAVID H. MARION, ESQUIRE
                            1800 One Liberty Place
15                          1650 Market Street
                            Philadelphia, Pennsylvania 19103
16                          (215) 864-7000
                            mariond@whiteandwilliams.com
17

18
     SPECIAL MASTER:        SCHNADER HARRISON SEGAL & LEWIS
19                          BY:  BRUCE P. MERENSTEIN, ESQUIRE
                            1600 Market Street
20                          Suite 3600
                            Philadelphia, Pennsylvania 19103
21                          (215) 751-2000
                            bmerenstein@schnader.com
22

23

24

25
```

```
 1
     APPEARANCES CONTINUED:
 2

 3
     SPECIAL MASTER:        IDISCOVERY SOLUTIONS
 4                          BY:  DANIEL L. REGARD, ESQUIRE
                            3000 K Street, NW
 5                          Suite 330
                            Washington, DC 20007
 6                          (202) 249-7877
                            dan@idsinc.com
 7

 8

 9

10

11

12

13

14

15

16                              -   -   -

17

18                  Ann Marie Mitchell, CRR, RDR, RMR
                          Official Court Reporter
19                          (267) 299-7250

20

21   Proceedings taken stenographically and prepared utilizing

22   computer-aided transcription

23

24

25
```

1          (Court called to order at 1:40 p.m.)

2          THE COURT:  We will start this proceeding.  For the

3   stenographer's benefit, it's nice to know when we're actually

4   starting something, so we'll call the status conference for the

5   MDL Generic Pharmaceuticals Pricing Antitrust Litigation to

6   convene.

7          And we would like to address the joint proposed agenda

8   for the July hearing or meeting.  I don't think it's an actual

9   hearing until we get to some oral argument later on.

10          So I would like to hear about the status of the

11   revised case management order negotiations.

12          MR. COSTA:  Thank you, Your Honor.  This is Paul Costa

13   speaking for the plaintiffs.

14          Since our last general status conference in March, the

15   parties have been working very diligently to revise the

16   deadlines in the case management order.

17          As the Court well knows, we are in very uncertain

18   times with COVID-19.  And this MDL is fairly complex, and many

19   of the deadlines and issues in the case management order are

20   interrelated.  And so what the parties have done is to try to

21   take this one step at a time in stages.  And I think thus far

22   that -- I think that has been fairly successful in that we have

23   reached agreement on many issues and are making some good

24   progress.

25          As the Court will recall, we first addressed the

1  deadline for the production of custodial documents.  We were

2  able to reach an agreement, and we submitted that as a

3  stipulation to the Court, which was approved in Pretrial Order

4  123.  It's my understanding that the Court did receive a full

5  briefing on that at the June leadership conference, so I won't

6  review that in any detail, but we'll only note that it did

7  vacate a number of the deadlines in the case management order

8  that we are now working hard to fill in.

9       We are currently discussing deadlines for the

10  production of privilege logs, for making confidentiality

11  designations and for making clawback requests.

12       Regarding the privilege logs, the parties have reached

13  agreement for service of a series of rolling or incremental

14  privilege logs for the custodial documents that are being

15  withheld or redacted on the basis of attorney-client privilege

16  or as work product.

17       Regarding the confidentiality designations, the

18  parties have also agreed on some revised procedures and

19  deadlines.

20       As the Court may recall, under the initial case

21  management order, PTO 105, the process was that defendants

22  would produce all of their documents under the highest level of

23  protection, outside counsel eyes only, and then had 120 days

24  afterwards to then redesignate them with the appropriate level

25  of protection as called for by the protective order.  This was

1   the same process that was found in the AG Access Protocol, PTO

2   70, and that process was incorporated into PTO 105.

3           The parties discussed looking at different approaches

4   to that.  Rather than having the defendants make these blanket

5   designations of all their documents and then redesignating

6   them, we talked about three different approaches.

7           And the first approach, which we have agreed on, would

8   have a defendant elect to continue with the procedure in PTO

9   105 but would be given more time in which to redesignate its

10  documents.  We agreed on two firm deadlines by which to make

11  those redesignations keyed off of the custodial document

12  production deadline instead of having rolling deadlines that

13  were keyed to each individual production which are going on on

14  a rolling basis.

15          The second approach was that a defendant could elect

16  to make individualized confidentiality designations prior to

17  producing them, prior to producing their documents.  So that

18  would mean that a defendant following this approach would have

19  its designations deemed permanent with whatever level of

20  protection was applied at the time of production and then

21  wouldn't have any further obligations during the subsequent

22  120-day period.  They would just -- those documents would

23  maintain that level of protection.  And this is -- we also have

24  agreed on this approach.

25          We are also currently discussing a third proposed

1  approached for roughly ten defendants who have been applying

2  the confidentiality designations to their documents pursuant to

3  PTO 105 but feel that it's -- it's unduly burdensome for them

4  to perform the individualized review and redesignation process

5  that's currently in place.  And the plaintiffs have agreed to

6  discuss those defendants' concerns and explore whether an

7  alternative procedure is workable or acceptable.

8        Turning to the clawbacks, the parties have also

9  negotiated --

10       THE COURT:  Before you do --

11       MR. COSTA:  Sure.

12       THE COURT:  Before you do, Mr. Costa, the initial

13  deadline to try to work out all of these newer updated

14  procedures is September, September 1st, I think.

15       MR. COSTA:  Correct.

16       THE COURT:  Does it appear to you that the

17  confidential designation in the old way that is perceived to be

18  burdensome pursuant to 105, is that doable?  We have six weeks

19  left.  Is it likely?

20       MR. COSTA:  Well, Your Honor, the parties are

21  continuing to discuss this issue, so I'm not -- I'm a little

22  bit hesitant to comment.  And to be frank, I think this is more

23  a question for the defendants in that that's their -- you know,

24  their processes would probably dictate whether that's doable or

25  not.

1          THE COURT:  I get that.  Yeah, I get that.

2          But I wanted the plaintiffs' perspective on whether or

3    not you thought it could be achieved within that time period.

4          The renovation of these deadlines and these procedures

5    is supposed to come to an end, and I'm just wondering how it's

6    going given anything, pandemic or otherwise.

7          MR. COSTA:  Well, I will say that in general, you

8    know, when we presented PTO -- the stipulation that turned into

9    PTO 123, it was our -- it was plaintiffs' sincere hope that the

10   deadlines that were presented to the Court would be firmly met

11   and that we wouldn't have additional delays in moving the case

12   forward.

13         I don't know that the confidentiality designations is

14   necessarily something that is holding up the pace of discovery.

15   It is a complicating issue.  I think as the Court well knows,

16   the confidentiality designations limit the parties' abilities

17   to use documents in certain ways and who they can be shared

18   with and so forth.  So that I think is an issue that, you know,

19   we are going to continue to discuss with the defendants.

20         If you're asking in the broader sense whether there

21   are concerns about timing, I think there are, from plaintiffs'

22   perspective.  But again, that's something that we are engaged

23   in discussions with defendants about.  And, you know, as

24   always, we hope to avoid disputes and try to reach

25   accommodations.  And, you know, at this time, that's our

1   intention.

2          THE COURT:  All right.  I think you were going to

3   proceed to the clawback request.

4          Did you have anything that you wanted to add on that?

5          MR. COSTA:  Yes.  I was just going to summarize what

6   we have agreed on so far.

7          We have agreed on some new procedures and deadlines

8   for defendants to request the clawbacks that they produced from

9   their custodial files under Section 3 of the case management

10  order.

11         We have agreed to eliminate the rolling deadlines that

12  are found in PTO 105 and instead allow defendants to issue

13  clawback requests within 120 days after each of the two

14  document production deadlines that are in PTO 123.  This

15  provides the defendants with some additional time in which to

16  seek a clawback.  And from an administrative standpoint, it

17  really does reduce confusion and administrative burdens by

18  setting only two deadlines instead of dozens of rolling

19  deadlines.

20         We have also discussed a deadline for plaintiffs'

21  response to those clawback requests, though we have not yet

22  reached agreement.  And we have been engaged in discussions

23  with the special masters to resolve this issue.  And those

24  discussions are still ongoing under Mr. Marion's supervision.

25         So for these three topics, the privilege logs, the

1  confidentiality designations and the clawbacks, the parties are

2  working on a stipulation to memorialize our agreements.  And

3  once we have agreed on appropriate language, we intend to

4  submit that to the Court for your consideration.

5            I do have --

6            SPECIAL MASTER MARION:  Your Honor, may I interrupt on

7  the clawbacks, please?

8            THE COURT:  Sure.

9            SPECIAL MASTER MARION:  I just want to note that this

10  morning I issued an informal recommendation on the dispute that

11  was before me as to when the plaintiffs had to object to

12  clawback requests.  And my informal recommendation may be

13  superseded by things that the parties have already agreed to.

14  But basically, in -- one thing that is missing from the -- from

15  the 105, the CMO, was the deadline for when the plaintiffs had

16  to object to clawback requests.

17            And I proposed a -- recommended a proposal that

18  would -- from the date of September 1, the documents produced

19  prior to September 1, the defendants would have 60 days from

20  September 1 to ask for clawbacks as to those documents.  And

21  the plaintiffs would have 60 days from those -- these are

22  primarily the first tier custodial documents.  They would have

23  60 days from September 1 to object to them.  But after that,

24  the clawback request would be on a rolling basis of 45 days

25  from production, and the objections to the clawbacks would be

1  on a rolling basis of 45 dates from receipt of the clawback

2  request.

3           The parties disagreed on that, and I don't know

4  whether they are reaching agreement that will be different from

5  my recommendation, but I was alarmed that under the plaintiffs'

6  proposal, the dates for -- they would have had until April 29,

7  2021, to object to the tier 1 custodial productions and until

8  July 14, 2021 to object to the remaining clawback requests.

9           Without repeating the arguments back and forth, I was

10  kind of alarmed by the distance from today of those two dates.

11  And I thought if we went on a rolling basis, both for

12  presentation of clawback requests and objections thereto, it

13  could be speeded up considerably.  And also it would provide a

14  device whereby there would be early decisions on clawback

15  requests and the objections that would guide the parties and

16  reduce the number of objections thereafter as the later

17  documents are produced.

18           So that may or may not be acceptable to the parties,

19  it may or may not be acceptable to the Court, but I thought

20  that was a reasonable compromise.  And I also allowed for any

21  party on the defense or plaintiffs' side to show good cause as

22  to why they couldn't meet those deadlines, and we would

23  consider them and be reasonable in granting extensions.

24           And I should also say, and Mr. Regard may elaborate on

25  this, that at present, there are somewhere over 11 million

1  documents already produced and a $28 million target of

2  documents to be produced by the end of this process under

3  paragraph 3 of PT 105.  And I was looking for a way to expedite

4  the closure of the production process so that we can get on to

5  other things.

6         THE COURT:  Thank you, Mr. Marion.

7         SPECIAL MASTER MARION:  The parties have not had a

8  chance to respond to that at all, but I did want to get it in

9  before this conference.

10        THE COURT:  Obviously specifics I'm not going to

11  discuss because you're working on them, but if Master Regard

12  wanted to say anything as Mr. Marion has indicated you may have

13  something else to say about it?

14        SPECIAL MASTER REGARD:  No, ma'am, nothing in detail,

15  only that we are ready to work with the plaintiffs and the

16  defendants with any ideas to keep things on track.

17        THE COURT:  Thank you.  Thank you very much.

18        I'm going to go back to you, Mr. Costa, because I'm

19  not sure you were completely finished.

20        MR. COSTA:  I'm almost finished, Your Honor.  I just

21  wanted to touch on a handful of additional discussions that are

22  ongoing.

23        We are in the midst of discussing the scope and timing

24  of the production of defendants' sales transaction data and

25  cost information.  We recently did seek the assistance of

1  Special Discovery Master Merenstein to address the scope of

2  those productions, and there is a call scheduled for tomorrow.

3       The parties are also discussing the next round of

4  document discovery.  As Your Honor knows, the private

5  plaintiffs and the States in the past six months or so did file

6  additional Complaints that added additional drugs and

7  defendants to the MDL.  And so the parties have been discussing

8  how to proceed with the next round of discovery to cover those

9  Complaints or those additional drugs and defendants in a fair

10  and efficient way.

11       I will note that the private plaintiffs and the

12  defendants who were added to the MDL since last winter, we have

13  reached an agreement on the timing for defendants -- for those

14  defendants' responses to our document requests and

15  interrogatories and to begin our meet and confer profess.  And

16  we are -- as far as the discovery relating to the rest of the

17  defendants, we are still discussing those next steps.

18       So that is the update I have for the Court so far on

19  our case management negotiations, and I am happy to address any

20  questions that the Court may have.

21       THE COURT:  Thank you.  I did pose the question that I

22  had.  And maybe there would be another.

23       But I'd like to hear from the defense on this same

24  report.  Thank you.

25       MR. COSTA:  Thank you, Your Honor.

1          MS. KIRKPATRICK:  Good afternoon, Your Honor.

2          THE COURT:  Who would like to address this?

3          MS. KIRKPATRICK:  I'm sorry, Your Honor.  This is

4   Sarah Kirkpatrick for the defendants.

5          THE COURT:  Hello.

6          MS. KIRKPATRICK:  In addition to all of what Mr. Costa

7   has described, the parties of course have been discussing the

8   discovery to be provided by plaintiffs.

9          In particular, as I think Your Honor knows, the State

10  Attorneys General, their discovery is particularly complicated,

11  and the parties have been engaged in almost weekly discussions

12  about the scope of that discovery.  Those discussions are

13  making progress.  We're also discussing the timing and the

14  deadlines that will apply to the States' document productions

15  pursuant to PTO 123.

16         The private plaintiffs have been producing documents

17  on a rolling basis and have been making progress.

18         The one note there is that Your Honor has pending

19  before you a dispute about the direct purchaser plaintiffs, the

20  scope of discovery and the search terms that those plaintiffs

21  will have to apply.  So the parties are awaiting your ruling on

22  that in order to finalize the scope of private plaintiffs'

23  discovery.

24         THE COURT:  Okay.  What's the status of the briefing

25  in that?

1          MS. KIRKPATRICK:  I believe the briefing was completed
2   I want to say maybe several weeks ago.  I'm happy to look up
3   the date for you, but it was a little while ago it was
4   completed.
5          THE COURT:  I haven't reviewed that as the package yet
6   with complete briefing, having reviewed it before and it was a
7   topic at at least one other conference.  So we will look at
8   that to see if we can assist this in moving along because we
9   know that it's necessary to clarify.
10         MS. KIRKPATRICK:  That would be great.  Thank you,
11  Your Honor.
12         THE COURT:  Thank you.  Anyone else on this area?
13         MR. BLECHMAN:  Your Honor?
14         THE COURT:  Yes.
15         MR. BLECHMAN:  Can I just give a reminder to everybody
16  that if you're not speaking to please be on mute.  It will cut
17  down the feedback.  Thank you.
18         THE COURT:  I'm hearing feedback on the telephone
19  connection that I have next to my ear, and I don't know if
20  that's being pick up by the microphone on the video system.
21         MR. BLECHMAN:  It's easy to see who's on mute and
22  who's not by looking at the participant list.  Everyone should
23  be on mute.
24         THE COURT:  Nicole just thinks she muted everybody.
25  Maybe she cut them off.  I don't know.  But I'm not hearing the

1    clicks anymore in my ear, so maybe that's where it was coming

2    from.   Thank you.

3         So no one else on the status of revised case

4    management order negotiations?  And if not, we will address the

5    schedules of future meetings, conferences and hearings.

6         And we don't think that this is the summer to take off

7    August, because who is going to the south of France anyway?

8         I'm thinking that we work through.  We did miss May.

9    I do think that we need to continue to have meetings to

10   complement the work that you're doing between yourselves and

11   with the masters, and I would prefer to continue and have a

12   status conference in August, which would be August 10th.  And

13   that would be leadership.  And then in September, I think what

14   is that date?  Is that the 8th?

15        I can't seem to find it.  Just a moment.

16        September 10th.  August 13th perhaps, September 10th,

17   October 8th.  At least we could go up two or three more months

18   and then regroup before we schedule definitively for November

19   and December because we may be scheduling oral argument in some

20   of these meetings, and that requires us to give more attention

21   and time to those.

22        So I would ask if there's any strenuous objections to

23   continuing our current format and scheduling.  And our next

24   conference, which would be leadership, would be August 13th.

25        Any objections to that?

1          MS. NAST:  Your Honor, we've checked the calendar, and

2    there aren't any holidays or anything of concern on the August

3    date.

4          And did you say September 10?

5          THE COURT:  Yes.

6          MS. NAST:  There is also nothing to conflict with

7    that.

8          We were going to suggest October 8th, but I don't know

9    if you want to go into October yet or not.

10          THE COURT:  I don't know why -- yes, I do.  I do want

11    to go into October.

12          MS. NAST:  That would be a leadership conference?  The

13    one in September is all hands on?

14          THE COURT:  Yes, yes.  And it's my suggestion that we

15    go into October and then hold up perhaps for next time November

16    and December.

17          I don't know what we need to face in the very near

18    future.  The pandemic has created many foils for people to

19    follow through in the earnest negotiations and meetings and

20    document discovery, review, et cetera.  I know that is a fact.

21    All of us have felt the change in productivity, I think.  And

22    while some of us have used this time to learn how to use

23    electronics, some of us have also felt the devastating loss of

24    the personal contact with colleagues and Court.  And it was

25    only this week I returned to real live court on Monday.  It was

1  joyous and sad at the same time because we all had masks on.

2  And it's difficult to perceive that this must continue into the

3  next coming six months, possibly a year, maybe we're waiting

4  for a vaccine.

5         We're all doing the best we can.  And I appreciate all

6  the hard work that everyone does.  But there is no case on my

7  docket that is more expansive, comprehensive and needs me than

8  this MDL with all the multitude of cases within it.

9         So I'm looking, as I always do, to you good counsel

10 and our special masters to help me do that, because it is easy

11 to put aside something this complex and say, I'll do it

12 tomorrow.  I'm not doing that, even though it's difficult to

13 get things out as quickly as I'd like.  But we're working on

14 that.

15        If anything working from home does for you, it

16 eliminates transportation time and gives me a chance to knock

17 off at least ten extra motions a week.  And they're big

18 motions, not little ones.

19        I don't know about you, but I found that when we

20 retired to working in our homes, that I ended up working from

21 6:30 or 7:00 in the morning till maybe 10:00, 11:00 at night

22 because it never stops and the emails are always coming.  And I

23 began to feel like I was in private practice and there was no

24 turnoff time.  So I'm afraid I revolted after a while and said,

25 no new emails after 5:30, but I still take them.

1          And there you go.  So we're all trying.  And I'm

2    probably trying harder, because I need to try harder.  But it's

3    very difficult, I have to tell you.  And I'm sorry that I can't

4    figure out a way to make things happen faster.  So I'm relying

5    on you to give me the heads up when you see I really am needed

6    to help you do that.

7          We have to discuss soon the bellwether trial system

8    here.  And I have questions about not everything in the R&R,

9    which I told you last time we met I was inclined to accept and

10   adopt, but I do want to address that, because it seems to me in

11   MDL court -- and I may be a little philosophical for some of

12   you, but an MDL court has to be the one to try the cases first,

13   whether they be tried in the Eastern District of PA or tried in

14   the home jurisdiction, because that can be arranged.  But it's

15   not going to be arranged in the time of a pandemic.  One,

16   there's not going to be any jury trials; and two, we're so far

17   from that with all the class certification needs that I don't

18   think we even have to worry about it.

19          But if we are going to spend and target attention,

20   time and resources to developing the discovery in order to

21   develop the motions and the necessary pretrial work in cases,

22   it behooves us to use cases that the Court can try herself.

23   And there comes Lexecon.

24          And I know it wasn't a consideration.  Some of these

25   cases you don't have to consider it; they were filed directly

1   in the Eastern District of PA.  I'm not talking about those.

2   But I'm talking about major cases to consider for bellwether

3   trials that may very well not be tried here or by me.

4          So that's really what I wanted to address.  That's why

5   we entered that provisional order recommendation that you be

6   prepared to talk about that today, because what I see for our

7   future may be different than what you are all looking at, legal

8   strategies aside, legal advocacy for your clients aside.  It

9   has to do with creating bellwether case lists that include

10  those cases that best represent the issues raised in this MDL.

11  That doesn't mean a party as much as it means the issues,

12  because that is where it becomes instructive and helpful for

13  the rest of the trials, the rest of the motions and of course

14  possible settlement.  And that's what I want to hear about.

15         So I would like to address that now, unless there's

16  something else, because we can end on the Lexecon issues.  But

17  if somebody has something else they would like to ask me or

18  perhaps something to present that's not on this joint proposed

19  agenda, I'll hear you now, before we get into the legal

20  argument.

21         I hear nothing.  Maybe you're all on mute.  I hear

22  nothing.

23         MS. KIRKPATRICK:  We are, Your Honor.  We're ready to

24  go on to Lexecon.  Thank you.

25         MR. PAK:  I --

1          THE COURT:  Mr. Pak, did you wish to say something?

2          MR. PAK:  Yes, Your Honor.  I was going to save this

3     one for the end because it's so anticlimactic compared to

4     Lexecon.  It's truly a housekeeping matter.

5          THE COURT:  Go ahead.

6          MR. PAK:  It was just -- my understanding is that the

7     parties are working on dates for new Complaints, but the most

8     critical issue for us was just to confirm with Mr. Nielsen the

9     last Complaint that was filed and now transferred, I think it

10    was the Third Complaint, was the last Complaint that we'll see

11    in this MDL.

12         THE COURT:  He said that.  He did say that more than

13    once.

14         Mr. Nielsen?  Are you being questioned or --

15         MR. NIELSEN:  I'm not sure, but I'll stand by what I

16    said previously, which is that as of now, that -- that our plan

17    was that that was the last Complaint that we filed.  And we

18    would expect that that's the last Complaint that would

19    certainly be part of this MDL anyway.  You know, I can't really

20    bind my boss to never filing another Complaint related to price

21    fixing in the industry, but that's our intention, you know,

22    absent something unforeseen.

23         THE COURT:  Thank you.

24         MR. PAK:  Thank you.

25         THE COURT:  Was that all you needed to hear, Mr. Pak,

1  or was there some other part to your question?

2         MR. PAK:  There was no more, Your Honor.  Sorry for

3  the interruption.

4         THE COURT:  No, you're not interrupting.  I like

5  clarification as well.  But I was resting on what I thought we

6  had been informed about earlier, thus, the June deadline was

7  met.

8         And as far as new Complaints that may be filed around

9  the country that are sent through the MDL panel to us to join

10 in this MDL, we can't control that.  But as for Amended

11 Complaints, those last asserting overarching conspiracy, I

12 don't think we're going to see another one, not for some time.

13 So I'm hoping that we can deal with what we have, because those

14 are expansive and momentous enough in what they raise and how

15 to handle them.

16        So that being said, I would like to hear from the

17 plaintiffs first on the Lexecon issues.  And please tell me the

18 considerations that go into whether or not the cases that you

19 promote to be the bellwethers have any extenuating issues

20 relative to Lexecon.

21        I'm not sure that I see that, but I'd like the

22 plaintiffs also to represent their observations about the

23 Lexecon issues as to the defendants, because I'd like to hear

24 from them -- from you on that as well.

25        And who will argue for the plaintiffs?

1          MR. NIELSEN:  Your Honor, Joe Nielsen from Connecticut

2    will be speaking.  And then I think if I have missed anything,

3    possibly Jeff Istvan on behalf of the EPPs may want to add some

4    things.

5          But I can go ahead and address our view on Lexecon.

6    And, you know, I just want to make sure the Court understands

7    that we did consider Lexecon extensively as we went through the

8    process of selecting bellwether trials and as we met with

9    Special Master Marion and the defendants to talk through what

10   the criteria would be to select bellwether trials.  And, you

11   know, as we're making proposals and modifying our proposals as

12   we went through the process, Lexecon was always there and it

13   was always an issue that we considered.

14         But it became clear that, you know, by some point

15   through the process that every party to the MDL believed that

16   there should be a large overarching conspiracy case as a

17   bellwether and that the State plaintiffs should be a part of

18   such a bellwether trial.  And so the Lexecon issues gave -- you

19   know, since they would apply equally to whatever State

20   overarching conspiracy case was part of the bellwether, the

21   Lexecon issues gave way to the priority of determining what

22   actually would be the most appropriate overarching conspiracy,

23   multidrug case to be the bellwether.

24         Now, that said, I understand your concerns about

25   wanting to preside over the bellwether, in particular, you

1    know, the overarching conspiracy component of the bellwether.

2         And let me just say, you know, our proposal, which was

3    ultimately adopted by Special Master Marion, really sought to

4    put forward representative cases for the two different types of

5    cases that are pending in the MDL, the individual drug cases

6    which were filed in Philadelphia, and therefore, there are

7    really no Lexecon-related issues, and then an overarching

8    conspiracy bellwether, which based on all of our conversations

9    leading up to this process, we understood everyone believed

10   there should be an overarching conspiracy bellwether.

11        So, you know, we focused on which case we thought

12   would be the most appropriate for that category of cases, but I

13   do recognize your desire to preside over the bellwether.  And

14   I'll just say, from that perspective, we want that as well.

15   From the States' perspective, if our Teva case is selected as a

16   bellwether, we would want you to preside over that.  And I

17   think there are -- as you mentioned, there are different ways

18   to accomplish that.

19        The States would consent to waive our Lexecon rights

20   to stay in Philadelphia for a trial of our Teva case.  I don't

21   know whether the defendants would as well.  You know, I expect

22   you'll hear from them on that.  But they have proposed that our

23   Heritage overarching conspiracy case be a part of their

24   proposed bellwether, and I presume that they were proposing

25   that would happen in Philadelphia.  So it is possible that all

 1  parties would consent and waive their Lexecon rights and we

 2  could have a trial and Lexecon would be a nonissue.

 3          Even if the defendants do not consent to waive their

 4  Lexecon rights, the States would be prepared, you know, once we

 5  got through discovery and through summary judgment and we're

 6  being sent for remand back to Connecticut, we would be willing

 7  to apply a 1404 motion to transfer back to Philadelphia for

 8  trial if necessary.

 9          I know that, you know, the defendants have argued

10  strenuously already that these cases should be pending in

11  Philadelphia, so the standard would be, you know, the

12  convenience of the parties and the witnesses and whether it

13  would be in the interests of justice.  I think we feel pretty

14  confident that we would be able to convince the District of

15  Connecticut the case should come back if necessary.

16          And again, absent that, like you mentioned, there is a

17  possibility that, you know, even if we weren't successful in

18  those other two efforts, we'd love to have you come to

19  Connecticut and preside over a trial in Connecticut if you had

20  to and if you are willing to.  You know, Connecticut is

21  beautiful most of the year, and we're currently I think the

22  lowest transmission rate of any state for COVID-19, so it would

23  be a very -- potentially very safe place to come and try a case

24  if we had to.

25          THE COURT:  You must be a good lawyer because that's a

1   great argument.

2          MR. NIELSEN:  I try.  I do feel safe here.  And I will

3   say, I was apprehensive about coming down to Philadelphia if we

4   had to do that in person today, so I'm very happy that we were

5   able to figure out this technology to do it this way.  But, you

6   know, someday we will have to see each other again in person.

7          So, you know, from our perspective, you know, we

8   really looked at it as everyone in the case was proposing an

9   overarching conspiracy bellwether that involved the State

10  plaintiffs.  The State plaintiffs do want to participate in a

11  bellwether trial.  We think that of all the groups, we're

12  obviously much more advanced in -- from a factual development

13  perspective.  We've had our investigation.  We've developed

14  cooperating witnesses.  We would have the ability to move a

15  bellwether forward much more quickly and efficiently than

16  potentially other groups.  So we think it is appropriate to be

17  in the bellwether.

18         We think there are a number of ways that we could have

19  you preside over a bellwether.  And so we don't -- I don't,

20  frankly, believe Lexecon is an impediment to you adopting

21  Special Master Marion's recommended ruling and adopting our

22  Teva overarching conspiracy case as a bellwether.

23         I would say regardless, at the end of the day, we as a

24  group of plaintiffs decided that regardless of where the case

25  is tried or who ultimately tries the case, that if you are

1   going to choose an overarching conspiracy case as a bellwether,

2   that the Teva case would be the best choice regardless,

3   because, you know, for all the reasons -- we don't need to

4   reargue all of those reasons why it is a better choice, but,

5   you know, we still thought regardless of where it's tried and

6   who it's tried in front of, it was the best choice, although we

7   would much prefer to be in front of you if at all possible.

8           THE COURT:  Thank you, Mr. Nielsen.

9           Anyone else on behalf of plaintiffs?

10          MR. ISTVAN:  Good afternoon, Your Honor.  Jeff Istvan

11  for the private plaintiffs.

12          THE COURT:  Good afternoon.

13          MR. ISTVAN:  I have very little to add, just to

14  confirm that what you said in your order is correct, that

15  clobetasol, clomipramine and pravastatin cases are all original

16  cases to this district and they're here to stay.  I didn't

17  understand you to want specific argument about those single

18  drug cases.  Those seem to be noncontroversial.

19          And I would add that Joe is right, that we on the

20  plaintiffs' side have all thought all along that it's essential

21  for the States to be involved in the bellwether process.  We

22  think that the largest plaintiff groups should be the

23  bellwether plaintiffs, and that would be the direct purchaser

24  plaintiffs, the end-payer plaintiffs and the States at a

25  minimum.  And so our thinking is that Lexecon doesn't really

 1   have anything to say about what would be an appropriate

 2   bellwether.

 3          And also regardless of where any case is tried, you

 4   will issue all the decisions leading up to trial.  And so, you

 5   know, wherever the trial is and wherever the jury sits, we will

 6   learn a lot about these cases from you before trial.  And we'll

 7   learn a lot about them from whichever the jury turns out to be.

 8          THE COURT:  Thank you very much.

 9          All right.  Then I will switch to the defense side.

10   And why do I think that Mr. Korpus wants to speak?

11          MR. KORPUS:  Thank you, Your Honor.  Sharon Korpus.

12   Thank you for this very special edition of Hollywood Squares.

13   Very nice to see you.

14          THE COURT:  Nice to see you too.

15          MR. KORPUS:  Let me start with the following.  We

16   disagree that Lexecon was at all considered or even mentioned

17   in the many meetings, briefings, both before Special Master

18   Marion and before you.  It was certainly not the focus of the

19   discussion that I can recall, and I attended every single

20   meeting.  I did hear Mr. Nielsen say that he would be willing

21   to try the case in Philadelphia, but certainly it was not

22   something that defendants focused on.  We really focused on the

23   pretrial process leading up to summary judgment.  And that's

24   our mistake.  We should have considered it earlier.  And I

25   thank the Court for flagging it, but it is not something that

1  we considered.

2          Now that you have raised it, we have spoken.  We are
3  not in a position to waive our Lexecon rights for cases that
4  were not filed directly into this district.  There are many
5  defendants.  All of them would need to agree, and at this point
6  I'm not aware that anybody has come out and said we're willing
7  to waive our Lexecon right.

8          And I think where that leaves the Court is that in
9  order to select a bellwether that the Court can preside over --
10  and we understand why the Court would want to preside over at
11  least the first bellwether, if not a series of bellwethers --
12  then we have to look at cases that were filed in this district.

13          And when we consider the cases that were filed in this
14  district, the one thing that I do agree with Mr. Nielsen on is
15  that we should choose an overarching conspiracy case since that
16  is the heart of this MDL these days.  This is where all the
17  disputes have been, where all the issues have been, where the
18  discovery has been.

19          And in order for the Court to be able to preside over
20  an overarching conspiracy case filed in this district, we
21  submit that the most viable candidates are the private
22  plaintiffs class actions raising overarching conspiracies which
23  are the DPPs, IRPs, and EPPs.  And we believe all three of them
24  should be the ones selected.

25          Now, for all the reasons we briefed before, it is our

1   position that the Heritage-based overarching conspiracy cases

2   are a much more manageable set of cases to take on as a

3   bellwether.  Like Mr. Nielsen didn't go into the reasons why he

4   believes it should be the Teva-centric ones, I'm not going to

5   go into all the reasons that we briefed before about the

6   Heritage ones, but we do believe that it should be the

7   overarching conspiracy cases, preferably the Heritage ones.  If

8   not, then I guess the Teva-centric ones.

9        We do not believe that having the individual

10  conspiracy cases as bellwethers really advances the ball much

11  because then there won't be any overarching conspiracy trial

12  before the Court, and we would have to wait for all that to be

13  done before we consider.

14       I have not thought about the issues of either transfer

15  from Connecticut and what we would do about it or any of the

16  circuit appointment by -- which I think has to be done by Chief

17  Justice Roberts, if I'm not mistaken.

18       THE COURT:  Yes.

19       MR. KORPUS:  I don't have views on that.  But we

20  believe it should be the private plaintiff.

21       Now, this is not an unusual dynamic.  I want to leave

22  you with some case law.  Because when you look at how other

23  courts have addressed that issue -- for example, in the

24  Southern District of New York, there's a current MDL pending

25  called Zimmer M/L Taper Hip.  And let me give you the cite

1   since we didn't get a chance to brief this.  2019 US District

2   Lexus 202294 SDNY 2019.

3            In that case Judge Crotty provided the parties with a

4   mechanism where the only cases that would be in the bellwether

5   pool and then chosen randomly were cases that would be

6   selected -- would be cases that were filed directly into that

7   district.  And he overruled objections from defendants in that

8   case that the plaintiffs were biasing the pool by only taking

9   the cases directly filed.  And he cited Lexecon saying that is

10  the reason why, to avoid a Lexecon problem.

11           Similarly, in a case called Re:  Fosamax Product

12  Liability Litigation, 815 F.Supp. 2d 649, Judge Keenan directed

13  the parties to select cases for expedited treatment that were

14  eligible for inclusion in the bellwether trial pool only if

15  there was a Lexecon waiver or they were filed into the

16  district.

17           So this is a dynamic that judges are faced with.  And

18  we would suggest that it's met by dealing with the cases filed

19  in this district.

20           Where does that leave the AGs?  We're going to be

21  engaged in discovery for many months to come.  The AGs' cases

22  can go through discovery in parallel with the private

23  plaintiffs' cases on which -- prioritizing whichever discovery

24  Your Honor chooses as a bellwether, be it Heritage or Teva.

25  They'll participate fully in discovery.  At that point I

1   assume -- and there will be class certification motions a

2   little before the end of discovery per the schedule.  And then

3   all cases will go before you for summary judgment.

4        And at that point, the bellwether trials would proceed

5   of the three classes.  And it's important to know that I'm

6   saying the three classes, because the R&R only has two, but you

7   really need to try the three together because there could be

8   overlapping damages and we don't want to be in a position where

9   there is double counting of damages against us.  So we think it

10  is important that all three class proceed together.

11       So at that point we would have a trial of the three

12  class actions.  And once that's done, at that point it would be

13  a proper time for Mr. Nielsen to try his case in Connecticut.

14  That would be our proposal.

15       THE COURT:  Thank you.

16       Anyone else on the defense side that would like to

17  speak up?

18       MR. PAK:  Your Honor, Chul Pak, if I could just add

19  one added point to what Mr. Korpus has said.

20       One of the benefits management-wise of the proposal

21  that he outlined is if you proceed with the private plaintiffs

22  cases that were filed in the Eastern District of Pennsylvania

23  on the overarching conspiracy cases, overarching conspiracy for

24  class certification is also a significant issue.

25       So under the proposal that he outlined, we would be

1   addressing class certification on an overarching conspiracy

2   case, whereas the current recommendation does not address class

3   certification on an overarching conspiracy case.

4           But we think that's a significant issue in this

5   litigation that Your Honor should entertain.

6           THE COURT:  Thank you.

7           MR. KORPUS:  And I did neglect to say -- I'm sorry.

8           THE COURT:  Go ahead.

9           MR. KORPUS:  I did neglect to mention on the

10  individual conspiracy cases that were proposed by the private

11  plaintiffs, it is our view that in trying an overarching

12  conspiracy case, by definition, you also need to try the

13  individual conspiracies as part of that conspiracy.

14          So we think you would be informing the parties of the

15  risk and rewards of those alleged conspiracies by trying the

16  overarching cases.

17          And you did receive a letter concerning pravastatin in

18  particular from Glenmark, I believe.  I don't know if you saw

19  that.

20          THE COURT:  I did.  I did.

21          One second.

22          You mentioned Glenmark.  I was going to bring that up.

23          Glenmark had a letter submitted that I already knew

24  the situation because DOJ did inform the Court, I guess it was

25  yesterday, might have been the day before, concerning a new

1  indictment here in the EDPA concerning Glenmark, also filed and

2  assigned to Judge Barclay Surrick, a colleague on this court

3  who is handling the other indictments in this area and nature.

4        And I don't have any other information.  That is

5  public.  It's been filed.  It's a grand jury indictment, so it

6  is not private or confidential information any longer.

7        And of course I understand that in any case where

8  indictment might be pending or investigation is pending,

9  there's always Fifth Amendment considerations.  But for

10  example, we know that we can work through some of those.

11  Whether you agree with a special master or whether I have to

12  rule on it, there's a way to do that ad hoc, case by case.  I

13  see no reason that is a blanket stay on any discovery and even

14  motions practice if that's the case.

15        I want you to know that at this point, in all the

16  years of investigation, there can't possibly be a stay of all

17  civil litigation, unless it's really so permeated that nothing

18  can happen.  And I don't know that yet.  So I wouldn't be

19  granting a stay on any particular cases right now just because

20  there are indictments and convictions in some of those cases.

21        MR. KORPUS:  We understand, Your Honor.  We are

22  talking about a selection of bellwether and not a stay, which I

23  think raises different considerations.

24        THE COURT:  Yes, it does.  But I thought I should

25  bring that up so everyone could know what I was thinking.

1          And someone on the telephone does want to speak.

2          Who is it?

3          MR. REED:  Your Honor, forgive me for interrupting.

4    It's Steve Reed on behalf of Glenmark.

5          THE COURT:  You are not interrupting.  I'm welcoming

6    your interruption.

7          Yes?

8          MR. REED:  I did speak over people and I apologize.

9          So Your Honor, I appreciate the opportunity to address

10   the issue.

11         First, one point of clarification, there is no grand

12   jury indictment.  DOJ chose to proceed by way of information.

13   That's an issue that was raised with Judge Surrick and --

14         (Court reporter clarification.)

15         THE COURT:  We're going to move up the volume and ask

16   you to repeat that because I do think it's important.

17         You didn't have much after that, did you?

18         If that's an information, my understanding of the

19   filing of informations is that's by consent.  Otherwise, you

20   have to get a grand jury.

21         MR. REED:  Your Honor, that's Glenmark's understanding

22   to be well.  But to be clear, Glenmark did not consent to

23   proceed by way of information.  So that is an issue that we

24   have raised and intend to address with Judge Surrick.

25         It's not, Your Honor, I think germane to the issue

1  that we're discussing here, but I did want to be clear on the

2  record.

3          THE COURT:  You're right.  It's not germane to

4  Lexecon.  And thank you, Mr. Reed.

5          I do think it's an anomaly, and Judge Surrick is going

6  to figure that one out.

7          MR. REED:  Your Honor, if I may continue, just for a

8  moment.

9          THE COURT:  Yes, Mr. Reed.

10          MR. REED:  It's Steve Reed.

11          On the other point, we appreciate and obviously we'll

12  respect your guidance on a stay.

13          Just to be clear, Glenmark is not at this time seeking

14  a stay.  We thought it was important to call this issue here to

15  your attention promptly as you're considering the selection of

16  bellwethers for the reasons set forth in my letter, and I'm

17  happy to elaborate.  We think the fact that there is a criminal

18  proceeding, given the Fifth Amendment concerns that you

19  recognize, concerns about expanding the scope of criminal

20  discovery and the limits of Rule 16(b) of the Rules of Criminal

21  Procedure but with parallel civil issues, for a host of

22  reasons, we think pravastatin is an unsuitable and equally

23  wrong choice as a bellwether.

24          Although that's the point we wanted to raise this

25  development with you as you consider choosing among the various

1  options for bellwethers, we respectfully submit that

2  pravastatin should not be a bellwether for the reasons we've

3  stated.

4         THE COURT:  Thank you, Mr. Reed.  You did state very

5  clearly in your letter that you were not seeking a stay on

6  behalf of Glenmark to stay all proceedings.  And you copied

7  this to many other counsel, plaintiffs, defense, special

8  masters, so I wasn't worried about bringing this up.

9         But it brings to mind the number of opportunities

10 there are to -- roadblocks in terms of depositions primarily

11 and other types of discovery.

12        And I know that Special Master Merenstein has dealt

13 with a few of these.

14        I do think that we can do with a few less of those

15 roadblocks by carefully choosing bellwethers.  But in no way,

16 shape or form does the selection of bellwether trials create a

17 pass or an unofficial stay for any other case.  Discovery is to

18 not just commence but to be vigorously sought in as many cases

19 as possible, in as comprehensive and consolidated a way as

20 possible.

21        So we are happy that -- to receive the information

22 that you imparted, Mr. Reed.  And we will certainly consider

23 your request not to include Glenmark in a bellwether, not at

24 this moment, anyway.

25        Thank you.

1            And was there another person on the telephone --

2            Was there another person on the telephone?

3            MR. DeMATTEO:  Yes, Your Honor.  This is Tom DeMatteo

4    from DOJ.

5            THE COURT:  Oh, I didn't know you were on the phone.

6    I would have called on you earlier.

7            MR. DeMATTEO:  No problem.  I just wanted to confirm

8    that it was an information and also just to reiterate DOJ's

9    position as we filed our statement of interest back in March.

10   We don't take a position on what the best case for the

11   bellwether is.  And the parties can keep with discovery to

12   prioritize depositions unaffected by the stay.  You know, any

13   bellwether selected should be able to progress efficiently.

14           THE COURT:  Thank you.  I think that's clear.  Thank

15   you very much.

16           MR. DeMATTEO:  You're welcome, Your Honor.

17           THE COURT:  Now we'll go back to you, Mr. Istvan.

18           MR. ISTVAN:  I just wanted to respond briefly about

19   Glenmark.

20           We don't think that the information against Glenmark

21   changes the suitability of pravastatin as a bellwether at all.

22           As you know, the DOJ investigation is ongoing.  The

23   next DOJ information or indictment could easily involve one of

24   the other single drug cases that are pending here.  So the fact

25   that pravastatin has now been selected and identified as one in

1  which there was criminal wrongdoing doesn't seem to me to

2  change anything.

3         We briefed fairly extensive the individual defendants'

4  arguments because of the potential of criminal indictment they

5  should not have to participate in a bellwether.

6         The same arguments apply to Glenmark.  They don't get

7  a pass on civil litigation or a delay on civil litigation

8  simply because they might get indicted or that there's an

9  information.  Right?  All of the defendants are in that same

10  situation.  They all might get indicted.  There might be an

11  information against any of them.

12         And then with respect to Glenmark's witnesses, there

13  are some Glenmark witnesses.  There are some witnesses from

14  every defendant that are on the DOJ's list that they want

15  deferred.

16         The pravastatin information didn't change anything on

17  that list.  They're all the same witnesses.  No one has been

18  added or subtracted.  If anything, it's possible that the

19  pravastatin -- the DOJ's pravastatin piece may go faster than

20  the others.

21         And also there's another defendant, Apotex, which has

22  been the subject of DOJ investigation and action.  And Apotex

23  has a deferred prosecution agreement on pravastatin and has

24  admitted liability.

25         And therefore, it's possible -- it's possible, right,

1   that more witnesses might actually testify on pravastatin than

2   on some of the other drugs, because certain defendants'

3   liability with respect to the criminal investigation has

4   already been determined on pravastatin.  So we think if

5   anything, the argument in favor of pravastatin is stronger now

6   that the case is more developed with the DOJ and there's less

7   uncertainty.

8            THE COURT:  Thank you.  I appreciate your comments.

9            MR. REED:  Your Honor, may I address -- Steve Reed

10  again.  May I address that briefly?

11           THE COURT:  Yes.  Mr. Reed and then to you, Mr.

12  Blechman.

13           MR. REED:  I shouldn't have to say this, but it sounds

14  like I need to.

15           The fact that there is an information filed means

16  there are allegations of wrongdoing.  There's no evidence of

17  criminal conduct with respect to pravastatin or otherwise.

18  These are allegations.  They overlap with the allegations in

19  the civil claims, and that's precisely why we believe that

20  pravastatin is a poor choice as a bellwether.

21           Glenmark is not looking for any kind of pass in this

22  MDL.  We expect to participate in discovery as we have been.

23  We're talking rather specifically about a product that is

24  directly at issue in a criminal proceeding.  It's customary, as

25  I'm sure Your Honor knows.  You have discretion when -- it is

1   not unusual for a judge who is presiding over a civil matter to

2   allow the criminal matter to proceed first for pretty obvious

3   concerns.  But again, what we're -- we're not asking for a

4   stay.  We're suggesting that there are a number of choices the

5   Court has as bellwethers.  I'm not going to reargue this point,

6   which have been briefed extensively and argued extensively.

7   But as you consider which would be the most productive,

8   informative bellwethers to move this MDL along, I would

9   respectively submit that pravastatin shouldn't be among them,

10  because it presents unique challenges.  Right now the fact that

11  other criminal informations or indictments might be filed in

12  the future is a fact that we all have to deal with.  But why

13  would the Court want to buy into a known problem now because of

14  the concerns about the potential but unknown problems in the

15  future.

16          THE COURT:  Thank you, Mr. Reed.

17          Mr. Blechman?

18          MR. BLECHMAN:  Yes, Your Honor.  Thank you, very much.

19  I had my phone on mute before when plaintiffs were speaking.  I

20  didn't figure out how to unmute it in time, so thank you for

21  the opportunity.

22          I wanted to note in connection with the bellwethers

23  the special master's report and recommendation notes on page 4,

24  Footnote 4, that the Kroger Direct Action Plaintiffs, which

25  include Kroger, Albertsons and HEB, all of whom have a

1  significant number of retail pharmacies and significant direct

2  purchase claims, that we desire to participate in the

3  bellwether proceedings as well, unless it becomes infeasible or

4  causes delay.

5          We have pending before the Court a motion to amend to

6  add a Second Amended Complaint which contains among the counts

7  a mirror image Teva-centric overarching conspiracy claim.

8  That's at Docket Entry Number 196 in the individual case that

9  we have filed.

10         And our inclusion in bellwether to the extent that

11  that occurs we think makes it more inclusive.  We think the

12  States are actually okay with this.  And we'll make -- provide

13  for more guidance in terms of what the bellwether results

14  provide.

15         So we want to be involved in the discussion, the

16  planning, the scheduling and the implementation of the

17  bellwethers, unless, as the special master notes, it creates

18  unreasonable complications or delay.

19         It does not implicate Lexecon issues, Your Honor,

20  because we filed the Kroger Direct Action Plaintiffs Complaint

21  in the Eastern District of Pennsylvania.  However, if the case

22  ends up as the bellwether going to the District of Connecticut,

23  then we would have to address 1404 motions or other potential

24  procedural devices.

25         Thank you.

1          THE COURT:  All right.  Thank you.

2          Mr. Nielsen, did you wish to say anything?

3          MR. NIELSEN:  So am I -- I'm not on mute.  Okay.

4          Yeah.  No.  I think we have evolved well away from the

5     Lexecon issues into the merits of bellwether briefing.  But I

6     just -- I want to address at least these Fifth Amendment issues

7     to just point out, you know, these have been extensively

8     briefed.  And the Fifth Amendment implications apply equally to

9     any other bellwether in this MDL, in particular the Heritage

10    case.  A number of the most important witnesses in that case

11    are either on the DOJ list or they are -- have indicated they

12    will plead the Fifth in deposition.  So those issues I don't

13    think have a real significant, you know, impact on which case

14    is selected as a bellwether.

15         And then just one other point I wanted to make with

16    regard to Special Master Marion's recommendation.  You know,

17    all of these issues about the timing of the cases and

18    everything that was proposed by Mr. Korpus were extensively

19    considered by the special master.  And I think his proposal is

20    ingenious in some respects in that, you know, it will move

21    different cases forward much more quickly than the defendants'

22    proposal.

23         The proposal that Mr. Korpus made during his oral

24    argument was that, you know, we proceed with a class action

25    overarching conspiracy bellwether.  And that -- you know, the

1  effect of that would be that the States' case and any direct

2  action cases that aren't affected by class action would in

3  essence be stayed during the pendency of class action

4  proceedings, and we wouldn't even be allowed to proceed to

5  summary judgment until after those class action issues were

6  resolved on appeal and otherwise all the way up, which could be

7  years of delay, whereas Special Master Marion proposed that the

8  States' Teva case would be able to go forward unaffected by the

9  class action issues, which would move that case forward much

10  more quickly, which is really one of the fundamental goals I

11  think of a bellwether and one of the considerations the Court

12  should have, how do we move this MDL forward in the most

13  representative way and in the most efficient and quick way.

14        So I just wanted to make those points relating to --

15  those are non-Lexecon issues, but it seems that we've gone that

16  way in the oral argument.

17        THE COURT:  Well, sometimes you can't separate

18  everything without more difficulty.

19        And quite frankly, the Court's role is to combine all

20  of these considerations, Lexecon included.

21        And yes, it's not that I will make this decision based

22  on only whether I can try the case or not.  They have to be the

23  right issues in the most comprehensive cases to give us enough

24  information to help guide the rest of the litigation.  So that

25  means they have to have those commonalities and connections.

1   And I never took issue with the R&R on that.

2        It's really -- I wanted to know what counsel and their

3   clients were willing to do, because that is a basic

4   consideration of an MDL judge.  And if I'm going to go through

5   the administrative hoops of proving to the USSC Chief Justice

6   that he should approve me to go try a case in Connecticut,

7   California, or dare I say it again, the south of France, I

8   really want to know why I should ask that question.  Do I have

9   to ask that question?  Isn't there something else I could have

10  done to avoid that kind of mechanism?

11       And you know, there are good judges all over our

12  federal judicial system, and I never doubt the capability of a

13  judge in any other federal district court being able to try one

14  of these cases.  But they have busy dockets too.  They may even

15  have their own MDLs.  But it has been done before.  It has

16  never been a preclusion to me considering the recommendations

17  in the R&R or any of your arguments.  It is simply is it the

18  best case plus is it Lexecon friendly.

19       And I know the answers to those questions, and I have

20  heard very clearly that some plaintiffs will probably waive

21  Lexecon and right now no defendants are waiving Lexecon.  So

22  maybe defendants get to try their cases all over the country.

23  I don't know.  But that is their right, their position.  And

24  then there are other mechanisms, but I don't even want to

25  consult them now.  I want to get the best cases moving forward.

1    That's where I am with this.

2            And so you've satisfied my questions.  And I will take

3    this matter briefly under advisement, and you will get a swift

4    response from me, because we pretty much had devoured all of

5    the briefing on the R&R and the other considerations.  So it's

6    time to move this on.  And we will all together move on.

7            So with that being said, is there anything else to

8    address today, Counsel?

9            MR. COSTA:  Your Honor, Paul Costa for the plaintiffs.

10           I apologize, I did just want to circle back to an

11   issue relating to the case management and specifically with

12   respect to the discussion of the States' final Complaint and

13   Mr. Pak's question.

14           I wanted to ensure that you were clear on the

15   landscape when it comes to the private plaintiffs as well.

16           This is part of the discussions that we're having with

17   the defendants regarding the discovery going forward.  And I

18   wanted to let you know that the end-payer plaintiffs do intend

19   to file an Amended Complaint that will bring it in line with

20   the current scope of drugs and defendants that are in the MDL

21   in our next Complaint.  We do not intend to add any additional

22   drugs or defendants, and so we don't think it will be -- it

23   will prevent any progress being made from discovery.  And

24   that's been -- as I said, that's been part of our ongoing

25   discussions with defendants which are not yet final.  But in

1   light of your comments earlier, I wanted to make sure that you

2   understood where we are on that issue.

3           THE COURT:  So Mr. Pak was talking about something

4   that was out there and hasn't been done yet?  Because I thought

5   that the Amended Complaints were pretty much done.  I thought.

6           So --

7           MR. BLECHMAN:  Your Honor -- go ahead, Paul.

8           THE COURT:  Mr. Costa, you get to respond to that, if

9   you want.

10          MR. COSTA:  Yes.  I understood Mr. Pak's question to

11  be directed to the States and asked whether they were finished

12  filing additional Complaints.  And I understood Mr. Nielsen to

13  say yes.

14          The States' most recent Complaint added approximately

15  15 additional drugs to the MDL.  That's on top of the several

16  dozen that were added by the EPPs, the DPPs and some other

17  private plaintiffs in the last six months or so.  What we're

18  talking about for the EPPs is amending the existing Complaints

19  in order to bring them in line with the universe of drugs that

20  are in the MDL.  So it's not to expand the MDL in any way or to

21  broach new ground in discovery but rather to bring our

22  Complaints in line with all of the current allegations and

23  claims in the MDL.

24          So to the extent that -- I think from our perspective,

25  progress and the, you know, efficient conduct of discovery, it

1    requires that we have a defined universe of drugs and

2    defendants.  That's something that we've talked about with

3    defendants.  And that is -- consistent with that, that's our

4    plan, to amend the Complaint to keep the -- confine our claims

5    to what's currently in the MDL and not expand them.

6              THE COURT:  And do I dare ask this next question, does

7    that mean that you would not be duplicating cases and claims?

8              But would that not -- if you were consolidating all of

9    these, would that not eliminate some of the prior cases?

10             MR. COSTA:  No, Your Honor.  It would -- for the EPPs,

11   our last -- our last Complaint was filed in December of 2019.

12   That case would not be eliminated.  We would just be amending

13   the claims in that Complaint.  That's our intent in terms of

14   our next move with respect to Complaints.

15             THE COURT:  Okay.  Thank you.

16             And then Mr. Blechman?

17             MR. BLECHMAN:  Thank you very much, Your Honor.

18             A couple points of clarification.

19             I agree with Mr. Costa.  I heard Mr. Pak -- I

20   interpreted his remarks as referring to the States and whether

21   they were filing any Complaints after the third that they have

22   filed.

23             But in the interest of clarity and to make sure that

24   the Court is fully informed, the Kroger Direct Action

25   Plaintiffs, we intend to amend to bring into the case the

1  additional drugs that also are reflected in the States' Third

2  Complaint.

3          Because I told you earlier, Your Honor, that we have a

4  motion for leave to amend that had been filed on January 30th.

5  And I don't want the Court to do work it doesn't need to do.

6  Our expectation is that we will be filing a motion for leave to

7  amend to -- and essentially substitute but to file a proposed

8  Amended Complaint that builds out the additional drugs in much

9  the same way that Mr. Costa was referring to.

10          In the pleading that we had filed earlier that's the

11  subject of the motion for leave to amend, we added a plaintiff,

12  Smith Drug Company.  That has created some procedural issues

13  and some discovery issues I won't burden the Court with, but in

14  the interest of just making -- simplifying this, what we'll do

15  at that time is we'll also file a Complaint on behalf of Smith

16  Drug Company.  But the legacy direct action plaintiffs, Kroger,

17  Albertsons, HEB, will be the subject of a motion for leave to

18  amend to conform with those other drugs and align with what's

19  been done in the MDL and as filed by the States most recently.

20          Finally, Your Honor, it's my belief that other direct

21  action plaintiffs will on a timetable consistent with what is

22  the proposed case management order that the parties are

23  negotiating will themselves be filing either an amendment or an

24  additional Complaint to likewise align with the additional

25  drugs and allegations that are now part of the MDL as reflected

1   in the States' Third Complaint.

2           Thank you for the opportunity, Your Honor, to clarify

3   that.

4           MR. KORPUS:  Your Honor, if may I respond.

5           THE COURT:  Yes, you may.

6           MR. KORPUS:  So yet again you see why we have such

7   difficulties in this MDL.

8           And Mr. Blechman started this call by asking you to

9   rule on the motion to amend, which now I guess he's telling you

10  he doesn't want you to rule on because he's filing yet a new

11  Complaint.  We opposed his last motion to amend, and I am sure

12  we will be opposing this one.

13          That's all I had to say.

14          THE COURT:  Understood.

15          I find it -- the prayer that I had at least two years

16  ago was can we get all of this in line.  And it is an expansive

17  area of investigation and activity that's been alleged here.

18          I was hoping that June was the cutoff, but I am too

19  long in the tooth to believe that it would ever be the end.

20          I am surprised to hear this, but if it's to clean

21  up -- let me just use that phrase, not like it's a mess right

22  now, but because it's so confused, one would have a very

23  difficult time choosing the perfect vehicle to be a bellwether.

24  If it were to permit these amendments so that we could get the

25  most updated allegations and the most updated defense, we might

1    all be able to end this in ten years.

2         I'm sad to say that, because I don't know how long

3    I'll stick around here.  However, I have taken this on, and

4    maybe -- maybe this is what I take with me to the other world.

5    I don't know.  And I don't want it to be.

6         MR. KORPUS:  I hope not.

7         THE COURT:  We can't do justice that way.  We can't do

8    justice that way.  We have to figure out a way to cut through

9    this.

10        And I know the special masters have been focused on

11   that, to target discovery to get best type of response and the

12   best way possible so that the case can move on and to select

13   bellwethers that truly represent what there is.

14        I don't hear in any of the amendments that may be

15   pending that there is a change in the primary allegation of

16   overarching conspiracy.  I am hearing you want to add or drop

17   claims or parties specifically.

18        And the sooner you do that, the better.  And I may

19   just have to put a date on this that is realistic.  And I don't

20   know what that is yet, but I'm going to have to, because I want

21   it to stop.  It's going to have to stop.

22        And I may just be too tired after a long day of video

23   hearings to actually think through what that date is right now,

24   but it might very well be October 1st.  I won't be cruel enough

25   to do September 1st.  I don't think that's realistic anyway.

 1          But there's always exceptions to every rule and every

 2    order.  And if there were good cause, I could reconsider that

 3    if it were presented to me.  But I think I'm going to have to

 4    drop that line and figure out when that date is, or we will

 5    never get past where we have to get past.

 6          And this is for all parties' sake.  I mean, defendants

 7    want clarity too.  If they want to get anybody out of this and

 8    cleared, it's not going to happen while they're still being

 9    added by yet another group.

10          So I'm willing to consider a deadline now.  I thought

11    June was a pretty good aim, but that did not include the

12    additional problematic addition of Smith in your case, Mr.

13    Blechman.  That's a different issue.

14          So all right.

15          MR. KORPUS:  So Your Honor, we would just request that

16    when you do come up with a date, that it's clear that it

17    includes both type of animals.  We have Mr. Blechman who is

18    filing Amended Complaints and we have the other private

19    plaintiffs who are filing new Complaints.  And we would like

20    the date to apply to all of them so that we know finally what

21    is the scope of this MDL.

22          THE COURT:  Yes.  We will probably have to pick up on

23    this discussion if not before at our next monthly leadership

24    conference.

25          So let's dig in and find out what we can find out and

1    then see if there's some closure we can bring to some of this,

2    I never suspect all of this.  But I know that cases can be

3    filed still for a very long time.  I'm dealing with statutes of

4    limitations, which would prevent some of this.  But we really

5    do have to move on it.

6           MR. ISTVAN:  Your Honor, may I offer one

7    clarification?

8           THE COURT:  Yes.

9           MR. ISTVAN:  With respect to the bellwethers, these

10   proposed upcoming Amended Complaints don't have anything to do

11   with any of the cases that Special Master Marion has selected

12   bellwether.  The States' Teva Complaint is going to remain as

13   is, as are the EPP and DPP clomipramine, clobetasol and

14   pravastatin Complaints.  They will remain unchanged.

15          THE COURT:  Thank you for the clarification.

16          Before I --

17          MS. LEVINE:  Your Honor, I also -- it's Jan Levine --

18   had one clarification that I heard in the bellwether

19   discussion.

20          So while Your Honor is considering these issues, I

21   just want to make sure that the issue that Mr. Blechman raised

22   in terms of the bellwether, can he confirm that he would be

23   only seeking to move forward as part of the bellwether his

24   claims to the extent whatever operative Complaint he's talking

25   about is co-terminus with the States' Teva AG Complaint, not

1   broadening it?

2         MR. BLECHMAN:  Your Honor, I only heard part of that.

3   I'm going to repeat what I heard, and you can tell me.

4         I think what I heard is you were asking if I can

5   confirm that the Teva -- that the bellwether we would go

6   forward with if we did would be the Teva-centric overarching

7   conspiracy count.

8         And if that's the question, the answer would be yes,

9   that's what we would be going forward with in the bellwether.

10        MS. LEVINE:  Just wanted to clarify, because your Teva

11   overarching is not a cookie cutter of the States.  And you did

12   not intend to broaden the bellwether?

13        I just want to make sure that you're talking about

14   just any claims that are co-terminus with the States' AG Teva

15   Complaint.

16        MR. BLECHMAN:  Your Honor, I don't know if I should

17   have a lawyer sitting next to me to answer the questions,

18   forgive me.  I don't need to be answering questions from

19   counsel without going through the Court.  So I want to be

20   respectful, Your Honor.  I know Ms. Levine does too.  I'll

21   answer the questions, Your Honor, but I want to stay within the

22   procedures the Court prefers.

23        THE COURT:  I'm going to let you two continue that

24   discussion offline --

25        MR. BLECHMAN:  Very well, Your Honor.

1          THE COURT:  -- because that needs to be clarified.

2          It does impact on what happens here.

3          MR. BLECHMAN:  Thank you, Your Honor.

4          THE COURT:  But I think -- I understand exactly what's

5    happening here.  Where are the lines?  Can we draw any?  Can we

6    draw some?  And I hope we can.  All right.

7          I'd like to ask the Masters if any of you would like

8    to add anything.  I'm going to start with Special Master Dan

9    Regard.

10          Where are you, Dan?

11          SPECIAL MASTER REGARD:  Here, Your Honor.

12          I only want to let Your Honor know that there is an

13    objection to my R&R that was filed.  And that's before the

14    Court filed by Sandoz.  And it's just a reminder.

15          I have nothing else to add.

16          THE COURT:  Thank you.

17          Yes, I saw the objection.  I don't know if all the

18    briefing is done yet.

19          Okay.  And Master Merenstein, is there anything you

20    could tell us?

21          SPECIAL MASTER MERENSTEIN:  Good afternoon, Your

22    Honor.

23          THE COURT:  Good afternoon.

24          SPECIAL MASTER MERENSTEIN:  Nothing much to add.  Mr.

25    Costa had referred to one discrete dispute involving

1  defendants' sales and transactional data.  We have a call about

2  that tomorrow that I will hopefully be able to resolve.

3         And the only other thing that I would report is that

4  you may recall at the last status conference you referred to me

5  the dispute over the DOJ's list.  The defendants would like to

6  expand the scope of those who can put eyes on that list.  I've

7  received letters from the parties.  We have a call scheduled

8  about that dispute next Wednesday.  Again, hopefully, we can

9  work that out.

10        That's it, Your Honor.

11        THE COURT:  Thank you very much.

12        And Special Master Marion, do you have anything else

13 to add?

14        SPECIAL MASTER MARION:  Just to say that there are two

15 other issues that I have.  One is resolved, one on the way to

16 resolution I hope, involving production of documents by the

17 States of Connecticut and Pennsylvania.

18        I issued an informal recommendation for the

19 Connecticut dispute, and the parties reached agreement on all

20 the issues there.

21        And I have still outstanding an informal report on the

22 defendants' motion to compel Pennsylvania to produce certain

23 documents.  And without getting into the issues, that is still

24 pending, but I hope it will be resolved.

25        I mentioned the matter I am handling with the

1   clawbacks and trying to do something creative that will shorten

2   some of these dates rather than lengthen them.

3          And finally, I think my conscience requires me to say

4   that Mr. Nielsen gave me a compliment about being ingenious.

5   And the compliment really should be to the Court because it was

6   your suggestion that we consider separate tracks.  And we did

7   do that in the R&R on the bellwether.

8          That's all I have to say I think that's pertinent.

9          THE COURT:  I don't know that that's ingenious either

10  even if I did suggest it, but it's something that I thought

11  would help alleviate some of the confusion.

12         SPECIAL MASTER MERENSTEIN:  It would help.

13         THE COURT:  If any of you know me, I like to eliminate

14  confusion.

15         I thank you very much.  And I thank all of you for

16  continuing to work sometimes with some difficulty through these

17  very thorny issues.

18         Anything else from anyone who has joined us by audio

19  only?

20         I'll give you a moment to unmute.

21         I don't hear anything.

22         Mr. Blechman, do you need something else?

23         MR. BLECHMAN:  No, Your Honor.  I was just checking --

24         THE COURT:  Because you're front and center in my

25  screen, and that usually means you're making noise.

```
 1              MR. BLECHMAN:  Sorry about that.  I was just checking
 2   my microphone.
 3              THE COURT:  No problem.
 4              Then if there's no objection, I'll thank you and see
 5   you in one month.
 6              RESPONSE:  Thank you, Your Honor.
 7              (Proceedings concluded at 3:07 p.m.)
 8
 9
10              I certify that the foregoing is a correct transcript
11   from the record of proceedings in the above-entitled matter.
12
13   _____
14   Ann Marie Mitchell, CRR, RDR, RMR
     Official Court Reporter
15
     Date:  July 13, 2020
16
17
18
19
20
21
22
23
24
25
```

**$28** [1] - 14:1
**06106** [1] - 1:22
**1** [5] - 12:18, 12:19, 12:20, 12:23, 13:7
**10** [1] - 19:4
**10018** [1] - 3:19
**10019** [2] - 2:16, 3:10
**10022** [1] - 3:14
**105** [8] - 7:21, 8:2, 8:9, 9:3, 9:18, 11:12, 12:15, 14:3
**10:00** [1] - 20:21
**10th** [3] - 18:12, 18:16
**11** [1] - 13:25
**1100** [1] - 2:10
**1101** [1] - 2:4
**11:00** [1] - 20:21
**120** [2] - 7:23, 11:13
**120-day** [1] - 8:22
**1200** [1] - 3:23
**123** [4] - 7:4, 10:9, 11:14, 16:15
**13** [1] - 60:15
**1301** [1] - 2:15
**1350** [1] - 3:18
**13th** [2] - 18:16, 18:24
**14** [1] - 13:8
**1404** [2] - 27:7, 44:23
**1441** [1] - 2:10
**15** [1] - 49:15
**1515** [1] - 3:22
**16(b** [1] - 38:20
**16-MD-2724** [1] - 1:4
**1600** [1] - 4:19
**1633** [1] - 3:9
**1650** [1] - 4:15
**1701** [1] - 4:4
**1800** [1] - 4:14
**19102** [1] - 3:23
**19103** [4] - 3:5, 4:4, 4:15, 4:20
**19107** [2] - 1:16, 2:5
**196** [1] - 44:8
**1:40** [2] - 1:9, 6:1
**1st** [3] - 9:14, 53:24, 53:25
**20005** [1] - 2:20
**20007** [1] - 5:5
**2019** [3] - 33:1, 33:2, 50:11
**202** [3] - 2:21, 4:10, 5:6
**2020** [2] - 1:8, 60:15
**2021** [2] - 13:7, 13:8
**202294** [1] - 33:2
**20530** [1] - 4:10
**212** [3] - 2:16, 3:10, 3:15
**215** [7] - 1:17, 2:6, 3:6, 3:24, 4:5, 4:16, 4:21
**216-8000** [1] - 3:19
**221** [1] - 3:19
**2300** [1] - 1:16
**249-7877** [1] - 5:6

**267** [1] - 5:19
**2724** [1] - 1:3
**2801** [1] - 2:5
**29** [1] - 13:6
**299-7250** [1] - 5:19
**2d** [1] - 33:12
**3** [2] - 11:9, 14:3
**3000** [2] - 3:4, 5:4
**305** [1] - 2:11
**30th** [1] - 51:4
**330** [1] - 5:5
**33131** [1] - 2:11
**3600** [1] - 4:20
**373-1000** [1] - 2:11
**3:07** [1] - 60:7
**4** [2] - 43:23, 43:24
**40th** [1] - 2:15
**434-5000** [1] - 2:21
**446-4800** [1] - 3:15
**45** [2] - 12:24, 13:1
**450** [1] - 4:9
**506-1700** [1] - 3:10
**55** [1] - 1:21
**567-6565** [1] - 1:17
**598-2942** [1] - 4:10
**5:30** [1] - 20:25
**5th** [1] - 4:9
**60** [3] - 12:19, 12:21, 12:23
**601** [1] - 3:14
**649** [1] - 33:12
**6:30** [1] - 20:21
**70** [1] - 8:2
**725** [1] - 2:20
**751-2000** [1] - 4:21
**7:00** [1] - 20:21
**808-5396** [1] - 1:22
**815** [1] - 33:12
**860** [1] - 1:22
**864-7000** [1] - 4:16
**864-7797** [1] - 3:24
**8700** [1] - 4:9
**8th** [3] - 18:14, 18:17, 19:8
**9** [1] - 1:8
**923-9300** [1] - 2:6
**963-5000** [1] - 4:5
**981-4000** [1] - 3:6
**999-5800** [1] - 2:16
**abilities** [1] - 10:16
**ability** [1] - 28:14
**able** [9] - 7:2, 27:14, 28:5, 31:19, 40:13, 46:8, 47:13, 53:1, 58:2
**above-entitled** [1] - 60:11
**absent** [2] - 23:22, 27:16
**accept** [1] - 21:9
**acceptable** [3] - 9:7, 13:18, 13:19
**Access** [1] - 8:1
**accommodations** [1] - 10:25

**accomplish** [1] - 26:18
**achieved** [1] - 10:3
**ACTION** [2] - 1:4, 2:9
**action** [9] - 41:22, 45:24, 46:2, 46:3, 46:5, 46:9, 51:16, 51:21
**Action** [3] - 43:24, 44:20, 50:24
**actions** [2] - 31:22, 34:12
**activity** [1] - 52:17
**actual** [1] - 6:8
**ad** [1] - 36:12
**add** [12] - 11:4, 25:3, 29:13, 29:19, 34:18, 44:6, 48:21, 53:16, 57:8, 57:15, 57:24, 58:13
**added** [8] - 15:6, 15:12, 34:19, 41:18, 49:14, 49:16, 51:11, 54:9
**addition** [2] - 16:6, 54:12
**additional** [14] - 10:11, 11:15, 14:21, 15:6, 15:9, 48:21, 49:12, 49:15, 51:1, 51:8, 51:24, 54:12
**address** [17] - 6:7, 15:1, 15:19, 16:2, 18:4, 21:10, 22:4, 22:15, 25:5, 35:2, 37:9, 37:24, 42:9, 42:10, 44:23, 45:6, 48:8
**addressed** [2] - 6:25, 32:23
**addressing** [1] - 35:1
**administrative** [3] - 11:16, 11:17, 47:5
**admitted** [1] - 41:24
**adopt** [1] - 21:10
**adopted** [1] - 26:3
**adopting** [2] - 28:20, 28:21
**advanced** [1] - 28:12
**advances** [1] - 32:10
**advisement** [1] - 48:3
**advocacy** [1] - 22:8
**affected** [1] - 46:2
**afraid** [1] - 20:24
**afternoon** [5] - 16:1, 29:10, 29:12, 57:21, 57:23
**afterwards** [1] - 7:24
**AG** [3] - 8:1, 55:25, 56:14
**agenda** [2] - 6:7, 22:19
**ago** [3] - 17:2, 17:3, 52:16
**agree** [4] - 31:5, 31:14, 36:11, 50:19
**agreed** [10] - 7:18, 8:7, 8:10, 8:24, 9:5, 11:6, 11:7, 11:11, 12:3, 12:13
**agreement** [8] - 6:23, 7:2, 7:13, 11:22, 13:4, 15:13, 41:23, 58:19
**agreements** [1] - 12:2
**AGs** [1] - 33:20
**AGs'** [1] - 33:21

**ahead** [4] - 23:5, 25:5, 35:8, 49:7
**aided** [1] - 5:22
**aim** [1] - 54:11
**alarmed** [2] - 13:5, 13:10
**Albertsons** [2] - 43:25, 51:17
**align** [2] - 51:18, 51:24
**allegation** [1] - 53:15
**allegations** [6] - 42:16, 42:18, 49:22, 51:25, 52:25
**alleged** [2] - 35:15, 52:17
**alleviate** [1] - 59:11
**ALLON** [1] - 3:13
**allow** [2] - 11:12, 43:2
**allowed** [2] - 13:20, 46:4
**almost** [2] - 14:20, 16:11
**alternative** [1] - 9:7
**amend** [9] - 44:5, 50:4, 50:25, 51:4, 51:7, 51:11, 51:18, 52:9, 52:11
**Amended** [7] - 24:10, 44:6, 48:19, 49:5, 51:8, 54:18, 55:10
**amending** [2] - 49:18, 50:12
**amendment** [1] - 51:23
**Amendment** [4] - 36:9, 38:18, 45:6, 45:8
**amendments** [2] - 52:24, 53:14
**AMERICA** [1] - 4:9
**Americas** [1] - 2:15
**animals** [1] - 54:17
**Ann** [2] - 5:18, 60:14
**anomaly** [1] - 38:5
**answer** [3] - 56:8, 56:17, 56:21
**answering** [1] - 56:18
**answers** [1] - 47:19
**anticlimactic** [1] - 23:3
**Antitrust** [1] - 6:5
**ANTITRUST** [1] - 1:5
**anyway** [4] - 18:7, 23:19, 39:24, 53:25
**apologize** [2] - 37:8, 48:10
**Apotex** [2] - 41:21, 41:22
**appeal** [1] - 46:6
**appear** [1] - 9:16
**APPEARANCES** [5] - 1:12, 2:1, 3:1, 4:1, 5:1
**applied** [1] - 8:20
**apply** [7] - 16:14, 16:21, 25:19, 27:7, 41:6, 45:8, 54:20
**applying** [1] - 9:1
**appointment** [1] - 32:16
**appreciate** [4] - 20:5, 37:9, 38:11, 42:8
**apprehensive** [1] - 28:3
**approach** [4] - 8:7, 8:15,

8:18, 8:24
**approached** [1] - 9:1
**approaches** [2] - 8:3, 8:6
**appropriate** [6] - 7:24, 12:3, 25:22, 26:12, 28:16, 30:1
**approve** [1] - 47:6
**approved** [1] - 7:3
**April** [1] - 13:6
**Arch** [1] - 3:5
**area** [3] - 17:12, 36:3, 52:17
**argue** [1] - 24:25
**argued** [2] - 27:9, 43:6
**argument** [8] - 6:9, 18:19, 22:20, 28:1, 29:17, 42:5, 45:24, 46:16
**arguments** [4] - 13:9, 41:4, 41:6, 47:17
**arranged** [2] - 21:14, 21:15
**aside** [3] - 20:11, 22:8
**asserting** [1] - 24:11
**assigned** [1] - 36:2
**assist** [1] - 17:8
**assistance** [1] - 14:25
**assume** [1] - 34:1
**attended** [1] - 30:19
**attention** [3] - 18:20, 21:19, 38:15
**attorney** [1] - 7:15
**ATTORNEY** [1] - 1:20
**attorney-client** [1] - 7:15
**Attorneys** [1] - 16:10
**ATTORNEYS** [2] - 1:17, 1:21
**audio** [1] - 59:18
**August** [6] - 18:7, 18:12, 18:16, 18:24, 19:2
**Avenue** [3] - 2:10, 2:15, 3:14
**avoid** [3] - 10:24, 33:10, 47:10
**awaiting** [1] - 16:21
**aware** [1] - 31:6
**BACKSTROM** [1] - 3:22
**ball** [1] - 32:10
**Barclay** [1] - 36:2
**based** [3] - 26:8, 32:1, 46:21
**basic** [1] - 47:3
**basis** [6] - 7:15, 8:14, 12:24, 13:1, 13:11, 16:17
**beautiful** [1] - 27:21
**became** [1] - 25:14
**becomes** [2] - 22:12, 44:3
**BEFORE** [1] - 1:10
**began** [1] - 20:23
**begin** [1] - 15:15
**behalf** [5] - 25:3, 29:9, 37:4, 39:6, 51:15
**behooves** [1] - 21:22
**belief** [1] - 51:20
**believes** [1] - 32:4
**bellwether** [61] - 21:7, 22:2,

22:9, 25:8, 25:10, 25:17, 25:18, 25:20, 25:23, 25:25, 26:1, 26:8, 26:10, 26:13, 26:16, 26:24, 28:9, 28:11, 28:15, 28:17, 28:19, 28:22, 29:1, 29:21, 29:23, 30:2, 31:9, 31:11, 32:3, 33:4, 33:14, 33:24, 34:4, 36:22, 38:23, 39:2, 39:16, 39:23, 40:11, 40:13, 40:21, 41:5, 42:20, 44:3, 44:10, 44:13, 44:22, 45:5, 45:9, 45:14, 45:25, 46:11, 52:23, 55:12, 55:18, 55:22, 55:23, 56:5, 56:9, 56:12, 59:7
**bellwethers** [12] - 24:19, 31:11, 32:10, 38:16, 39:1, 39:15, 43:5, 43:8, 43:22, 44:17, 53:13, 55:9
**benefit** [1] - 6:3
**benefits** [1] - 34:20
**BENSON** [1] - 3:8
**best** [9] - 20:5, 22:10, 29:2, 29:6, 40:10, 47:18, 47:25, 53:11, 53:12
**better** [2] - 29:4, 53:18
**between** [1] - 18:10
**biasing** [1] - 33:8
**big** [1] - 20:17
**bind** [1] - 23:20
**bit** [1] - 9:22
**BLACK** [1] - 1:13
**blanket** [2] - 8:4, 36:13
**Blechman** [8] - 42:12, 43:17, 50:16, 52:8, 54:13, 54:17, 55:21, 59:22
**BLECHMAN** [13] - 2:9, 17:13, 17:15, 17:21, 43:18, 49:7, 50:17, 56:2, 56:16, 56:25, 57:3, 59:23, 60:1
bmerenstein@schnader. com [1] - 4:21
**BOCKIUS** [1] - 4:3
**boss** [1] - 23:20
**Brickell** [1] - 2:10
**brief** [1] - 33:1
**briefed** [5] - 31:25, 32:5, 41:3, 43:6, 45:8
**briefing** [7] - 7:5, 16:24, 17:1, 17:6, 45:5, 48:5, 57:18
**briefings** [1] - 30:17
**briefly** [3] - 40:18, 42:10, 48:3
**bring** [7] - 35:22, 36:25, 48:19, 49:19, 49:21, 50:25, 55:1
**bringing** [1] - 39:8
**brings** [1] - 39:9
**broach** [1] - 49:21
**Broad** [1] - 1:15

**broaden** [1] - 56:12
**broadening** [1] - 56:1
**broader** [1] - 10:20
**Broadway** [2] - 3:9, 3:18
**BRUCE** [1] - 4:19
**builds** [1] - 51:8
**burden** [1] - 51:13
**burdens** [1] - 11:17
**burdensome** [2] - 9:3, 9:18
**busy** [1] - 47:14
**buy** [1] - 43:13
**Byrne** [1] - 1:7
**calendar** [1] - 19:1
**California** [1] - 47:7
**candidates** [1] - 31:21
**capability** [1] - 47:12
**carefully** [1] - 39:15
**case** [62] - 6:11, 6:16, 6:19, 7:7, 7:20, 10:11, 11:9, 15:19, 18:3, 20:6, 22:9, 25:16, 25:20, 25:23, 26:11, 26:15, 26:20, 26:23, 27:15, 27:23, 28:8, 28:22, 28:24, 28:25, 29:1, 29:2, 30:3, 30:21, 31:15, 31:20, 32:22, 33:3, 33:8, 33:11, 34:13, 35:2, 35:3, 35:12, 36:7, 36:12, 36:14, 39:17, 40:10, 42:6, 44:8, 44:21, 45:10, 45:13, 46:1, 46:8, 46:9, 46:22, 47:6, 47:18, 48:11, 50:12, 50:25, 51:22, 53:12, 54:12
**cases** [52] - 20:8, 21:12, 21:21, 21:22, 21:25, 22:2, 22:10, 24:18, 26:4, 26:5, 26:12, 27:10, 29:15, 29:16, 29:18, 30:6, 31:3, 31:12, 31:13, 32:1, 32:2, 32:7, 32:10, 33:4, 33:5, 33:6, 33:9, 33:13, 33:18, 33:21, 33:23, 34:3, 34:22, 34:23, 35:10, 35:16, 36:19, 36:20, 39:18, 40:24, 45:17, 45:21, 46:2, 46:23, 47:14, 47:22, 47:25, 50:7, 50:9, 55:2, 55:11
**category** [1] - 26:12
**causes** [1] - 44:4
**center** [1] - 59:24
**centric** [4] - 32:4, 32:8, 44:7, 56:6
**certain** [3] - 10:17, 42:2, 58:22
**certainly** [4] - 23:19, 30:18, 30:21, 39:22
**certification** [5] - 21:17, 34:1, 34:24, 35:1, 35:3
**certify** [1] - 60:10
**cetera** [1] - 19:20
**challenges** [1] - 43:10
**chance** [3] - 14:8, 20:16,

33:1
**change** [4] - 19:21, 41:2, 41:16, 53:15
**changes** [1] - 40:21
**checked** [1] - 19:1
**checking** [2] - 59:23, 60:1
**Chief** [2] - 32:16, 47:5
**choice** [5] - 29:2, 29:4, 29:6, 38:23, 42:20
**choices** [1] - 43:4
**choose** [2] - 29:1, 31:15
**chooses** [1] - 33:24
**choosing** [3] - 38:25, 39:15, 52:23
**chose** [1] - 37:12
**chosen** [1] - 33:5
**CHUL** [1] - 2:14
**Chul** [1] - 34:18
**circle** [1] - 48:10
**circuit** [1] - 32:16
**cite** [1] - 32:25
**cited** [1] - 33:9
**civil** [6] - 36:17, 38:21, 41:7, 42:19, 43:1
**CIVIL** [1] - 1:4
**claim** [1] - 44:7
**claims** [9] - 42:19, 44:2, 49:23, 50:4, 50:7, 50:13, 53:17, 55:24, 56:14
**clarification** [7] - 24:5, 37:11, 37:14, 50:18, 55:7, 55:15, 55:18
**clarified** [1] - 57:1
**clarify** [3] - 17:9, 52:2, 56:10
**clarity** [2] - 50:23, 54:7
**class** [13] - 21:17, 31:22, 34:1, 34:10, 34:12, 34:24, 35:1, 35:2, 45:24, 46:2, 46:3, 46:5, 46:9
**classes** [2] - 34:5, 34:6
**clawback** [12] - 7:11, 11:3, 11:13, 11:16, 11:21, 12:12, 12:16, 12:24, 13:1, 13:8, 13:12, 13:14
**clawbacks** [7] - 9:8, 11:8, 12:1, 12:7, 12:20, 12:25, 59:1
**clean** [1] - 52:20
**clear** [7] - 25:14, 37:22, 38:1, 38:13, 40:14, 48:14, 54:16
**cleared** [1] - 54:8
**clearly** [2] - 39:5, 47:20
**clicks** [1] - 18:1
**client** [1] - 7:15
**clients** [2] - 22:8, 47:3
**clobetasol** [2] - 29:15, 55:13
**clomipramine** [2] - 29:15, 55:13
**closure** [2] - 14:4, 55:1

**CMO** [1] - 12:15
**co** [2] - 55:25, 56:14
**co-terminus** [2] - 55:25, 56:14
**colleague** [1] - 36:2
**colleagues** [1] - 19:24
**combine** [1] - 46:19
**coming** [4] - 18:1, 20:3, 20:22, 28:3
**commence** [1] - 39:18
**Commencing** [1] - 1:9
**comment** [1] - 9:22
**comments** [2] - 42:8, 49:1
**commonalities** [1] - 46:25
**Company** [2] - 51:12, 51:16
**compared** [1] - 23:3
**compel** [1] - 58:22
**Complaint** [25] - 23:9, 23:10, 23:17, 23:18, 23:20, 44:6, 44:20, 48:12, 48:19, 48:21, 49:14, 50:4, 50:11, 50:13, 51:2, 51:8, 51:15, 51:24, 52:1, 52:11, 55:12, 55:24, 55:25, 56:15
**Complaints** [15] - 15:6, 15:9, 23:7, 24:8, 24:11, 49:5, 49:12, 49:18, 49:22, 50:14, 50:21, 54:18, 54:19, 55:10, 55:14
**complement** [1] - 18:10
**complete** [1] - 17:6
**completed** [2] - 17:1, 17:4
**completely** [1] - 14:19
**complex** [2] - 6:18, 20:11
**complicated** [1] - 16:10
**complicating** [1] - 10:15
**complications** [1] - 44:18
**compliment** [2] - 59:4, 59:5
**component** [1] - 26:1
**comprehensive** [3] - 20:7, 39:19, 46:23
**compromise** [1] - 13:20
**computer** [1] - 5:22
**computer-aided** [1] - 5:22
**concern** [1] - 19:2
**concerning** [3] - 35:17, 35:25, 36:1
**concerns** [7] - 9:6, 10:21, 25:24, 38:18, 38:19, 43:3, 43:14
**concluded** [1] - 60:7
**conduct** [2] - 42:17, 49:25
**confer** [1] - 15:15
**CONFERENCE** [1] - 1:5
**conference** [10] - 6:4, 6:14, 7:5, 14:9, 17:7, 18:12, 18:24, 19:12, 54:24, 58:4
**conferences** [1] - 18:5
**confident** [1] - 27:14

**confidential** [2] - 9:17, 36:6
**confidentiality** [7] - 7:10, 7:17, 8:16, 9:2, 10:13, 10:16, 12:1
**confine** [1] - 50:4
**confirm** [5] - 23:8, 29:14, 40:7, 55:22, 56:5
**conflict** [1] - 19:6
**conform** [1] - 51:18
**confused** [1] - 52:22
**confusion** [3] - 11:17, 59:11, 59:14
**Connecticut** [13] - 1:22, 25:1, 27:6, 27:15, 27:19, 27:20, 32:15, 34:13, 44:22, 47:6, 58:17, 58:19
**connection** [2] - 17:19, 43:22
**connections** [1] - 46:25
**CONNOLLY** [1] - 2:19
**conscience** [1] - 59:3
**consent** [5] - 26:19, 27:1, 27:3, 37:19, 37:22
**consider** [11] - 13:23, 21:25, 22:2, 25:7, 31:13, 32:13, 38:25, 39:22, 43:7, 54:10, 59:6
**considerably** [1] - 13:13
**consideration** [2] - 12:4, 21:24, 47:4
**considerations** [6] - 24:18, 36:9, 36:23, 46:11, 46:20, 48:5
**considered** [5] - 25:13, 30:16, 30:24, 31:1, 45:19
**considering** [3] - 38:15, 47:16, 55:20
**consistent** [2] - 50:3, 51:21
**consolidated** [1] - 39:19
**consolidating** [1] - 50:8
**conspiracies** [3] - 31:22, 35:13, 35:15
**conspiracy** [28] - 24:11, 25:16, 25:20, 25:22, 26:1, 26:8, 26:10, 26:23, 28:9, 28:22, 29:1, 31:15, 31:20, 32:1, 32:7, 32:10, 32:11, 34:23, 35:1, 35:3, 35:10, 35:12, 35:13, 44:7, 45:25, 53:16, 56:7
**consult** [1] - 47:25
**contact** [1] - 19:24
**contains** [1] - 44:6
**continue** [7] - 8:8, 10:19, 18:9, 18:11, 20:2, 38:7, 56:23
**CONTINUED** [4] - 2:1, 3:1, 4:1, 5:1
**continuing** [3] - 9:21, 18:23, 59:16

**control** [1] - 24:10
**convene** [1] - 6:6
**convenience** [1] - 27:12
**conversations** [1] - 26:8
**convictions** [1] - 36:20
**convince** [1] - 27:14
**cookie** [1] - 56:11
**cooperating** [1] - 28:14
**copied** [1] - 39:6
**correct** [3] - 9:15, 29:14, 60:10
**cost** [1] - 14:25
**Costa** [9] - 6:12, 9:12, 14:18, 16:6, 48:9, 49:8, 50:19, 51:9, 57:25
**COSTA** [12] - 1:14, 6:12, 9:11, 9:15, 9:20, 10:7, 11:5, 14:20, 15:25, 48:9, 49:10, 50:10
**Counsel** [1] - 48:8
**COUNSEL** [6] - 2:10, 2:14, 2:19, 3:3, 3:9, 3:13
**counsel** [5] - 7:23, 20:9, 39:7, 47:2, 56:19
**count** [1] - 56:7
**counting** [1] - 34:9
**country** [2] - 24:9, 47:22
**counts** [1] - 44:6
**couple** [1] - 50:18
**course** [3] - 16:7, 22:13, 36:7
**COURT** [1] - 1:1
**court** [5] - 19:25, 21:11, 21:12, 36:2, 47:13
**Court** [5] - 5:18, 6:1, 19:24, 37:14, 60:14
**Court's** [1] - 46:19
**Courthouse** [1] - 1:7
**courts** [1] - 32:23
**cover** [1] - 15:8
**COVID-19** [2] - 6:18, 27:22
**cpak@wsgr.com** [1] - 2:17
**create** [1] - 39:16
**created** [2] - 19:18, 51:12
**creates** [1] - 44:17
**creating** [1] - 22:9
**creative** [1] - 59:1
**criminal** [9] - 38:17, 38:19, 41:1, 41:4, 42:3, 42:17, 42:24, 43:2, 43:11
**Criminal** [1] - 38:20
**criteria** [1] - 25:10
**critical** [1] - 23:8
**Crotty** [1] - 33:3
**CRR** [2] - 5:18, 60:14
**cruel** [1] - 53:24
**current** [5] - 18:23, 32:24, 35:2, 48:20, 49:22
**custodial** [6] - 7:1, 7:14, 8:11, 11:9, 12:22, 13:7

**customary** [1] - 42:24
**cut** [3] - 17:16, 17:25, 53:8
**cutoff** [1] - 52:18
**cutter** [1] - 56:11
**CYNTHIA** [1] - 1:10
**damages** [2] - 34:8, 34:9
**Dan** [2] - 57:8, 57:10
**dan@idsinc.com** [1] - 5:6
**DANIEL** [1] - 5:4
**dare** [2] - 47:7, 50:6
**data** [2] - 14:24, 58:1
**Date** [1] - 60:15
**date** [9] - 12:18, 17:3, 18:14, 19:3, 53:19, 53:23, 54:4, 54:16, 54:20
**dates** [5] - 13:1, 13:6, 13:10, 23:7, 59:2
**DAVID** [1] - 4:14
**days** [7] - 7:23, 11:13, 12:19, 12:21, 12:23, 12:24, 31:16
**DC** [3] - 2:20, 4:10, 5:5
**deadline** [7] - 7:1, 8:12, 9:13, 11:20, 12:15, 24:6, 54:10
**deadlines** [16] - 6:16, 6:19, 7:7, 7:9, 7:19, 8:10, 8:12, 10:4, 10:10, 11:7, 11:11, 11:14, 11:18, 11:19, 13:22, 16:14
**deal** [2] - 24:13, 43:12
**dealing** [2] - 33:18, 55:3
**dealt** [1] - 39:12
**December** [3] - 18:19, 19:16, 50:11
**decided** [1] - 28:24
**decision** [1] - 46:21
**decisions** [2] - 13:14, 30:4
**deemed** [1] - 8:19
**DEFENDANT** [3] - 3:17, 3:22, 4:3
**defendant** [5] - 8:8, 8:15, 8:18, 41:14, 41:21
**defendants** [36] - 7:21, 8:4, 9:1, 9:23, 10:19, 10:23, 11:8, 11:12, 11:15, 12:19, 14:16, 15:7, 15:9, 15:12, 15:13, 15:17, 16:4, 24:23, 25:9, 26:21, 27:3, 27:9, 30:22, 31:5, 33:7, 41:9, 47:21, 47:22, 48:17, 48:20, 48:22, 48:25, 50:2, 50:3, 54:6, 58:5
**defendants'** [9] - 9:6, 14:24, 15:14, 41:3, 42:2, 45:21, 58:1, 58:22
**DEFENSE** [5] - 2:14, 2:19, 3:3, 3:8, 3:13
**defense** [6] - 13:21, 15:23, 30:9, 34:16, 39:7, 52:25
**deferred** [2] - 41:15, 41:23
**defined** [1] - 50:1
**definition** [1] - 35:12

**definitively** [1] - 18:18
**delay** [4] - 41:7, 44:4, 44:18, 46:7
**delays** [1] - 10:11
**DeMatteo** [4] - 40:3, 40:7, 40:16
**DEMATTEO** [1] - 4:8
**DEPARTMENT** [1] - 4:8
**deposition** [1] - 45:12
**depositions** [2] - 39:10, 40:12
**described** [1] - 16:7
**designation** [1] - 9:17
**designations** [9] - 7:11, 7:17, 8:5, 8:16, 8:19, 9:2, 10:13, 10:16, 12:1
**desire** [2] - 26:13, 44:2
**detail** [2] - 7:6, 14:14
**determined** [1] - 42:4
**determining** [1] - 25:21
**devastating** [1] - 19:23
**develop** [1] - 21:21
**developed** [2] - 28:13, 42:6
**developing** [1] - 21:20
**development** [2] - 28:12, 38:25
**device** [1] - 13:14
**devices** [1] - 44:24
**DEVORA** [1] - 3:13
**devora.allon@kirkland. com** [1] - 3:15
**devoured** [1] - 48:4
**DIANNE** [1] - 2:3
**dictate** [1] - 9:24
**different** [9] - 8:3, 8:6, 13:4, 22:7, 26:4, 26:17, 36:23, 45:21, 54:13
**difficult** [4] - 20:2, 20:12, 21:3, 52:23
**difficulties** [1] - 52:7
**difficulty** [2] - 46:18, 59:16
**dig** [1] - 54:25
**diligently** [1] - 6:15
**direct** [6] - 16:19, 29:23, 44:1, 46:1, 51:16, 51:20
**Direct** [3] - 43:24, 44:20, 50:24
**DIRECT** [3] - 1:13, 2:3, 2:9
**directed** [2] - 33:12, 49:11
**directly** [5] - 21:25, 31:4, 33:6, 33:9, 42:24
**disagree** [1] - 30:16
**disagreed** [1] - 13:3
**Discovery** [1] - 15:1
**discovery** [30] - 10:14, 15:4, 15:8, 15:16, 16:8, 16:10, 16:12, 16:20, 16:23, 19:20, 21:20, 27:5, 31:18, 33:21, 33:22, 33:23, 33:25, 34:2,

36:13, 38:20, 39:11, 39:17, 40:11, 42:22, 48:17, 48:23, 49:21, 49:25, 51:13, 53:11
**discrete** [1] - 57:25
**discretion** [1] - 42:25
**discuss** [5] - 9:6, 9:21, 10:19, 14:11, 21:7
**discussed** [2] - 8:3, 11:20
**discussing** [9] - 7:9, 8:25, 14:23, 15:3, 15:7, 15:17, 16:7, 16:13, 38:1
**discussion** [2] - 30:19, 44:15, 48:12, 54:23, 55:19, 56:24
**discussions** [8] - 10:23, 11:22, 11:24, 14:21, 16:11, 16:12, 48:16, 48:25
**dispute** [6] - 12:10, 16:19, 57:25, 58:5, 58:8, 58:19
**disputes** [2] - 10:24, 31:17
**distance** [1] - 13:10
**DISTRICT** [2] - 1:1, 1:1
**district** [9] - 29:16, 31:4, 31:12, 31:14, 31:20, 33:7, 33:16, 33:19, 47:13
**District** [8] - 21:13, 22:1, 27:14, 32:24, 33:1, 34:22, 44:21, 44:22
**dnast@nastlaw.com** [1] - 2:6
**doable** [2] - 9:18, 9:24
**Docket** [1] - 44:8
**docket** [1] - 20:7
**dockets** [1] - 47:14
**document** [6] - 8:11, 11:14, 15:4, 15:14, 16:14, 19:20
**documents** [18] - 7:1, 7:14, 7:22, 8:5, 8:10, 8:17, 8:22, 9:2, 10:17, 12:18, 12:20, 12:22, 13:17, 14:1, 14:2, 16:16, 58:16, 58:23
**DOJ** [8] - 35:24, 37:12, 40:4, 40:22, 40:23, 41:22, 42:6, 45:11
**DOJ's** [4] - 40:8, 41:14, 41:19, 58:5
**done** [10] - 6:20, 32:13, 32:16, 34:12, 47:10, 47:15, 49:4, 49:5, 51:19, 57:18
**double** [1] - 34:9
**doubt** [1] - 47:12
**down** [2] - 17:17, 28:3
**dozen** [1] - 49:16
**dozens** [1] - 11:18
**DPP** [1] - 55:13
**DPPs** [2] - 31:23, 49:16
**draw** [2] - 57:5, 57:6
**DROGIN** [1] - 3:17
**drop** [2] - 53:16, 54:4
**drug** [3] - 26:5, 29:18, 40:24

**Drug** [2] - 51:12, 51:16
**drugs** [12] - 15:6, 15:9, 42:2, 48:20, 48:22, 49:15, 49:19, 50:1, 51:1, 51:8, 51:18, 51:25
**duplicating** [1] - 50:7
**during** [3] - 8:21, 45:23, 46:3
**dynamic** [2] - 32:21, 33:17
**ear** [2] - 17:19, 18:1
**early** [1] - 13:14
**earnest** [1] - 19:19
**easily** [1] - 40:23
**EASTERN** [1] - 1:1
**Eastern** [4] - 21:13, 22:1, 34:22, 44:21
**easy** [2] - 17:21, 20:10
**edition** [1] - 30:12
**EDPA** [1] - 36:1
**effect** [1] - 46:1
**efficient** [3] - 15:10, 46:13, 49:25
**efficiently** [2] - 28:15, 40:13
**efforts** [1] - 27:18
**Eighteenth** [1] - 3:5
**either** [4] - 32:14, 45:11, 51:23, 59:9
**elaborate** [2] - 13:24, 38:17
**elect** [2] - 8:8, 8:15
**electronics** [1] - 19:23
**eligible** [1] - 33:14
**eliminate** [3] - 11:11, 50:9, 59:13
**eliminated** [1] - 50:12
**eliminates** [1] - 20:16
**ELLIS** [1] - 3:13
**ELM** [1] - 1:20
**Elm** [1] - 1:21
**emails** [2] - 20:22, 20:25
**END** [2] - 1:15, 2:4
**end** [10] - 10:5, 14:2, 22:16, 23:3, 28:23, 29:24, 34:2, 48:18, 52:19, 53:1
**end-payer** [2] - 29:24, 48:18
**END-PAYER** [2] - 1:15, 2:4
**ended** [1] - 20:20
**ends** [1] - 44:22
**engaged** [4] - 10:22, 11:22, 16:11, 33:21
**ensure** [1] - 48:14
**entered** [1] - 22:5
**entertain** [1] - 35:5
**entitled** [1] - 60:11
**Entry** [1] - 44:8
**EPIC** [1] - 3:18
**EPP** [1] - 55:13
**EPPs** [5] - 25:3, 31:23, 49:16, 49:18, 50:10
**equally** [3] - 25:19, 38:22, 45:8

**ESQUIRE** [18] - 1:14, 1:14, 1:21, 2:3, 2:4, 2:9, 2:14, 2:19, 3:4, 3:9, 3:13, 3:18, 3:22, 4:3, 4:8, 4:14, 4:19, 5:4
**essence** [1] - 46:3
**essential** [1] - 29:20
**essentially** [1] - 51:7
**et** [1] - 19:20
**evidence** [1] - 42:16
**evolved** [1] - 45:4
**exactly** [1] - 57:4
**example** [2] - 32:23, 36:10
**exceptions** [1] - 54:1
**existing** [1] - 49:18
**expand** [3] - 49:20, 50:5, 58:6
**expanding** [1] - 38:19
**expansive** [3] - 20:7, 24:14, 52:16
**expect** [3] - 23:18, 26:21, 42:22
**expectation** [1] - 51:6
**expedite** [1] - 14:3
**expedited** [1] - 33:13
**explore** [1] - 9:6
**extensions** [1] - 13:23
**extensive** [1] - 41:3
**extensively** [5] - 25:7, 43:6, 45:7, 45:18
**extent** [4] - 44:10, 49:24, 55:24
**extenuating** [1] - 24:19
**extra** [1] - 20:17
**eyes** [2] - 7:23, 58:6
**F.Supp** [1] - 33:12
**face** [1] - 19:17
**faced** [1] - 33:17
**factual** [1] - 28:12
**fair** [1] - 15:9
**fairly** [3] - 6:18, 6:22, 41:3
**FALKIN** [1] - 3:22
**far** [6] - 6:21, 11:6, 15:16, 15:18, 21:16, 24:8
**faster** [2] - 21:4, 41:19
**favor** [1] - 42:5
**federal** [2] - 47:12, 47:13
**feedback** [2] - 17:17, 17:18
**felt** [2] - 19:21, 19:23
**few** [2] - 39:13, 39:14
**Fifth** [5] - 36:9, 38:18, 45:6, 45:8, 45:12
**figure** [6] - 21:4, 28:5, 38:6, 43:20, 53:8, 54:4
**file** [4] - 15:5, 48:19, 51:7, 51:15
**filed** [29] - 21:25, 23:9, 23:17,

24:8, 26:6, 31:4, 31:12, 31:13, 31:20, 33:6, 33:9, 33:15, 33:18, 34:22, 36:1, 36:5, 40:9, 42:15, 43:11, 44:9, 44:20, 50:11, 50:22, 51:4, 51:10, 51:19, 55:3, 57:13, 57:14
**files** [1] - 11:9
**filing** [9] - 23:20, 37:19, 49:12, 50:21, 51:6, 51:23, 52:10, 54:18, 54:19
**fill** [1] - 7:8
**final** [2] - 48:12, 48:25
**finalize** [1] - 16:22
**finally** [3] - 51:20, 54:20, 59:3
**FINE** [1] - 1:13
**finished** [3] - 14:19, 14:20, 49:11
**firm** [1] - 8:10
**firmly** [1] - 10:10
**first** [8] - 6:25, 8:7, 12:22, 21:12, 24:17, 31:11, 37:11, 43:2
**fixing** [1] - 23:21
**flagging** [1] - 30:25
**Floor** [1] - 2:15
**Florida** [1] - 2:11
**focus** [1] - 30:18
**focused** [4] - 26:11, 30:22, 53:10
**foils** [1] - 19:18
**follow** [1] - 19:19
**following** [2] - 8:18, 30:15
**Footnote** [1] - 43:24
**foregoing** [1] - 60:10
**forgive** [1] - 37:3, 56:18
**form** [1] - 39:16
**format** [1] - 18:23
**forth** [3] - 10:18, 13:9, 38:16
**forward** [12] - 10:12, 26:4, 28:15, 45:21, 46:8, 46:9, 46:12, 47:25, 48:17, 55:23, 56:6, 56:9
**Fosamax** [1] - 33:11
**France** [2] - 18:7, 47:7
**frank** [1] - 9:22
**frankly** [2] - 28:20, 46:19
**friendly** [1] - 47:18
**front** [3] - 29:6, 29:7, 59:24
**full** [1] - 7:4
**fully** [2] - 33:25, 50:24
**fundamental** [1] - 46:10
**future** [5] - 18:5, 19:18, 22:7, 43:12, 43:15
**GENERAL** [2] - 1:17, 1:21
**general** [2] - 6:14, 10:7
**General** [1] - 16:10
**GENERAL'S** [1] - 1:20

**GENERIC** [1] - 1:4
**Generic** [1] - 6:5
**germane** [2] - 37:25, 38:3
**given** [3] - 8:9, 10:6, 38:18
**GLENMARK** [1] - 4:3
**Glenmark** [14] - 35:18, 35:22, 35:23, 36:1, 37:4, 37:22, 38:13, 39:6, 39:23, 40:19, 40:20, 41:6, 41:13, 42:21
**Glenmark's** [2] - 37:21, 41:12
**goals** [1] - 46:10
**GOODRICH** [1] - 2:14
**grand** [3] - 36:5, 37:11, 37:20
**granting** [2] - 13:23, 36:19
**great** [2] - 17:10, 28:1
**ground** [1] - 49:21
**group** [2] - 28:24, 54:9
**groups** [3] - 28:11, 28:16, 29:22
**guess** [3] - 32:8, 35:24, 52:9
**guidance** [2] - 38:12, 44:13
**guide** [2] - 13:15, 46:24
**HAMILTON** [1] - 3:3
**handful** [1] - 14:21
**handle** [1] - 14:21
**handling** [2] - 36:3, 58:25
**hands** [1] - 19:13
**happy** [5] - 15:19, 17:2, 28:4, 38:17, 39:21
**hard** [2] - 7:8, 20:6
**harder** [1] - 21:2
**HARRISON** [1] - 4:18
**Hartford** [1] - 1:22
**heads** [1] - 21:5
**hear** [14] - 6:10, 15:23, 22:14, 22:19, 22:21, 23:25, 24:16, 24:23, 26:22, 30:20, 52:20, 53:14, 59:21
**heard** [6] - 47:20, 50:19, 55:18, 56:2, 56:3, 56:4
**hearing** [5] - 6:8, 6:9, 17:18, 17:25, 53:16
**hearings** [2] - 18:5, 53:23
**heart** [1] - 31:16
**HEB** [2] - 43:25, 51:17
**hello** [1] - 16:5
**help** [5] - 20:10, 21:6, 46:24, 59:11, 59:12
**helpful** [1] - 22:12
**Heritage** [6] - 26:23, 32:1, 32:6, 32:7, 33:24, 45:9
**Heritage-based** [1] - 32:1
**herself** [1] - 21:22
**hesitant** [1] - 9:22
**highest** [1] - 7:22
**Hip** [1] - 32:25
**hoc** [1] - 36:12
**hold** [1] - 19:15

**holding** [1] - 10:14
**holidays** [1] - 19:2
**Hollywood** [1] - 30:12
**home** [2] - 20:15, 21:14
**homes** [1] - 20:20
**Honor** [58] - 6:12, 9:20, 12:6, 14:20, 15:4, 15:25, 16:1, 16:3, 16:9, 16:18, 17:11, 17:13, 19:1, 22:23, 23:2, 24:2, 25:1, 29:10, 30:11, 33:24, 34:18, 35:5, 36:21, 37:3, 37:9, 37:21, 37:25, 38:7, 40:3, 40:16, 42:9, 42:25, 43:18, 44:19, 48:9, 49:7, 50:10, 50:17, 51:3, 51:20, 52:2, 52:4, 54:15, 55:6, 55:17, 55:20, 56:2, 56:16, 56:20, 56:21, 56:25, 57:3, 57:11, 57:12, 57:22, 58:10, 59:23, 60:6
**HONORABLE** [1] - 1:10
**hoops** [1] - 47:5
**hope** [6] - 10:9, 10:24, 53:6, 57:6, 58:16, 58:24
**hopefully** [2] - 58:2, 58:8
**hoping** [2] - 24:13, 52:18
**host** [1] - 38:21
**housekeeping** [1] - 23:4
**ideas** [1] - 14:16
**identified** [1] - 40:25
**IDISCOVERY** [1] - 5:3
**image** [1] - 44:7
**impact** [2] - 45:13, 57:2
**imparted** [1] - 39:22
**impediment** [1] - 28:20
**implementation** [1] - 44:16
**implicate** [1] - 44:19
**implications** [1] - 45:8
**important** [5] - 34:5, 34:10, 37:16, 38:14, 45:10
**INC** [1] - 4:4
**inclined** [1] - 21:9
**include** [4] - 22:9, 39:23, 43:25, 54:11
**included** [1] - 46:20
**includes** [1] - 54:17
**inclusion** [2] - 33:14, 44:10
**inclusive** [1] - 44:11
**incorporated** [1] - 8:2
**incremental** [1] - 7:13
**indicated** [2] - 14:12, 45:11
**indicted** [2] - 41:8, 41:10
**indictment** [6] - 36:1, 36:5, 36:8, 37:12, 40:23, 41:4
**indictments** [2] - 36:3, 36:20, 43:11
**INDIRECT** [1] - 1:16
**individual** [7] - 8:13, 26:5, 32:9, 35:10, 35:13, 41:3, 44:8

**individualized** [2] - 8:16, 9:4
**industry** [1] - 23:21
**infeasible** [1] - 44:3
**inform** [1] - 35:24
**informal** [4] - 12:10, 12:12, 58:18, 58:21
**information** [15] - 14:25, 36:4, 36:6, 37:12, 37:18, 37:23, 39:21, 40:8, 40:20, 40:23, 41:9, 41:11, 41:16, 42:15, 46:24
**informations** [2] - 37:19, 43:11
**informative** [1] - 43:8
**informed** [2] - 24:6, 50:24
**informing** [1] - 35:14
**ingenious** [3] - 45:20, 59:4, 59:9
**initial** [2] - 7:20, 9:12
**instead** [3] - 8:12, 11:12, 11:18
**instructive** [1] - 22:12
**intend** [6] - 12:3, 37:24, 48:18, 48:21, 50:25, 56:12
**intent** [1] - 50:13
**intention** [2] - 11:1, 23:21
**interest** [3] - 40:9, 50:23, 51:14
**interests** [1] - 27:13
**interpreted** [1] - 50:20
**interrelated** [1] - 6:20
**interrogatories** [1] - 15:15
**interrupt** [1] - 12:6
**interrupting** [3] - 24:4, 37:3, 37:5
**interruption** [2] - 24:3, 37:6
**INTERVENOR** [1] - 4:8
**investigation** [7] - 28:13, 36:8, 36:16, 40:22, 41:22, 42:3, 52:17
**involve** [1] - 40:23
**involved** [3] - 28:9, 29:21, 44:15
**involving** [2] - 57:25, 58:16
**IRPs** [1] - 31:23
**issue** [22] - 9:21, 10:15, 10:18, 11:12, 11:23, 23:8, 25:13, 30:4, 32:23, 34:24, 35:4, 37:10, 37:13, 37:23, 37:25, 38:14, 42:24, 47:1, 48:11, 49:2, 54:13, 55:21
**issued** [2] - 12:10, 58:18
**issues** [30] - 6:19, 6:23, 22:10, 22:11, 22:16, 24:17, 24:19, 24:23, 25:18, 25:21, 26:7, 31:17, 32:14, 38:21, 44:19, 45:5, 45:6, 45:12, 45:17, 46:5, 46:9, 46:15, 46:23, 51:12, 51:13, 55:20, 58:15, 58:20, 58:23, 59:17

**ISTVAN** [6] - 1:15, 29:10, 29:13, 40:18, 55:6, 55:9
**Istvan** [3] - 25:3, 29:10, 40:17
**jabber@backstromlaw. com** [1] - 3:24
**James** [1] - 1:7
**JAMES** [1] - 3:22
**Jan** [1] - 55:17
**JAN** [1] - 3:4
**jan.levine@troutman.com** [1] - 3:6
**January** [1] - 51:4
**Jeff** [2] - 25:3, 29:10
**JEFFREY** [1] - 1:15
**JING** [1] - 3:18
**jistvan@finekaplan.com** [1] - 1:18
**jnroda@nastlaw.com** [1] - 2:7
**Joe** [2] - 25:1, 29:19
**join** [1] - 24:9
**joined** [1] - 59:18
**joint** [2] - 6:7, 22:18
**JOSEPH** [2] - 1:21, 2:4
**joseph.nielsen@ct.gov** [1] - 1:23
**joyous** [1] - 20:1
**judge** [3] - 43:1, 47:4, 47:13
**Judge** [6] - 33:3, 33:12, 36:2, 37:13, 37:24, 38:5
**judges** [1] - 33:17, 47:11
**judgment** [4] - 27:5, 30:23, 34:3, 46:5
**judicial** [1] - 47:12
**July** [4] - 1:8, 6:8, 13:8, 60:15
**June** [4] - 7:5, 24:6, 52:18, 54:11
**jurisdiction** [1] - 21:14
**jury** [6] - 21:16, 30:5, 30:7, 36:5, 37:12, 37:20
**JUSTICE** [1] - 4:8
**justice** [3] - 27:13, 53:7, 53:8
**Justice** [2] - 32:17, 47:5
**jxia@tarterkrinsky.com** [1] - 3:20

**KAPLAN** [1] - 1:13
**KASOWITZ** [1] - 3:8
**Keenan** [1] - 33:12
**keep** [3] - 14:16, 40:11, 50:4
**KENNY** [1] - 2:9
**keyed** [2] - 8:11, 8:13
**kind** [3] - 13:10, 42:21, 47:10
**KIRKLAND** [1] - 3:13
**Kirkpatrick** [1] - 16:4
**KIRKPATRICK** [7] - 2:19, 16:1, 16:3, 16:6, 17:1, 17:10, 22:23

**knock** [1] - 20:16
**known** [1] - 43:13
**knows** [5] - 6:17, 10:15, 15:4, 16:9, 42:25
**KORPUS** [11] - 3:9, 30:11, 30:15, 32:19, 35:7, 35:9, 36:21, 52:4, 52:6, 53:6, 54:15
**Korpus** [5] - 30:10, 30:11, 34:19, 45:18, 45:23
**KRINSKY** [1] - 3:17
**Kroger** [5] - 43:24, 43:25, 44:20, 50:24, 51:16
**landscape** [1] - 48:15
**language** [1] - 12:3
**large** [1] - 25:16
**largest** [1] - 29:22
**last** [13] - 6:14, 15:12, 21:9, 23:9, 23:10, 23:17, 23:18, 24:11, 49:17, 50:11, 52:11, 58:4
**law** [1] - 32:22
**lawyer** [2] - 27:25, 56:17
**leadership** [5] - 7:5, 18:13, 18:24, 19:12, 54:23
**leading** [3] - 26:9, 30:4, 30:23
**learn** [3] - 19:22, 30:6, 30:7
**least** [6] - 17:7, 18:17, 20:17, 31:11, 45:6, 52:15
**leave** [6] - 32:21, 33:20, 51:4, 51:6, 51:11, 51:17
**leaves** [1] - 31:8
**left** [1] - 9:19
**legacy** [1] - 51:16
**legal** [3] - 22:7, 22:8, 22:19
**lengthen** [1] - 59:2
**less** [3] - 39:14, 42:6
**letter** [4] - 35:17, 35:23, 38:16, 39:5
**letters** [1] - 58:7
**level** [4] - 7:22, 7:24, 8:19, 8:23
**LEVINE** [2] - 3:4, 55:17, 56:10
**Levine** [2] - 55:17, 56:20
**LEWIS** [2] - 4:3, 4:18
**Lexecon** [33] - 21:23, 22:16, 22:24, 23:4, 24:17, 24:20, 24:23, 25:5, 25:7, 25:12, 25:18, 25:21, 26:7, 26:19, 27:1, 27:2, 27:4, 28:20, 29:25, 30:16, 31:3, 31:7, 33:9, 33:10, 33:15, 38:4, 44:19, 45:5, 46:15, 46:20, 47:18, 47:21
**Lexecon-related** [1] - 26:7
**Lexington** [1] - 3:14
**Lexus** [1] - 33:2
**liability** [2] - 41:24, 42:3

**Liability** [1] - 33:12
**LIAISON** [6] - 2:9, 2:14, 2:19, 3:3, 3:8, 3:13
**Liberty** [1] - 4:14
**LIEBENBERG** [1] - 1:14
**light** [1] - 49:1
**likely** [1] - 9:19
**likewise** [1] - 51:24
**limit** [1] - 10:16
**limitations** [1] - 55:4
**limits** [1] - 38:20
**line** [5] - 48:19, 49:19, 49:22, 52:16, 54:4
**lines** [1] - 57:5
**list** [6] - 17:22, 41:14, 41:17, 45:11, 58:5, 58:6
**lists** [1] - 22:9
**LITIGATION** [1] - 1:5
**Litigation** [2] - 6:5, 33:12
**litigation** [1] - 35:5, 36:17, 41:7, 46:24
**live** [1] - 19:25
**LLC** [2] - 2:3, 3:18
**LLP** [7] - 2:19, 3:3, 3:8, 3:13, 3:17, 4:3, 4:13
**Logan** [1] - 3:4
**logs** [4] - 7:10, 7:12, 7:14, 11:25
**look** [4] - 17:2, 17:7, 31:12, 32:22
**looked** [1] - 28:8
**looking** [6] - 8:3, 14:3, 17:22, 20:9, 22:7, 42:21
**loss** [1] - 19:23
**love** [1] - 27:18
**lowest** [1] - 27:22
**M/L** [1] - 32:25
**ma'am** [1] - 14:14
**maintain** [1] - 8:23
**major** [1] - 22:2
**manageable** [1] - 32:2
**management** [11] - 6:11, 6:16, 6:19, 7:7, 7:21, 11:9, 15:19, 18:4, 34:20, 48:11, 51:22
**management-wise** [1] - 34:20
**MARC** [1] - 3:22
**March** [2] - 6:14, 40:9
**Marie** [2] - 5:18, 60:14
**Marion** [8] - 14:6, 14:12, 25:9, 26:3, 30:18, 46:7, 55:11, 58:12
**MARION** [5] - 4:14, 12:6, 12:9, 14:7, 58:14
**Marion's** [3] - 11:24, 28:21, 45:16
**mariond@ whiteandwilliams.com** [1] -

**4:16
**Market** [5] - 2:4, 3:22, 4:4, 4:15, 4:19
**masks** [1] - 20:1
**Master** [13] - 14:11, 15:1, 25:9, 26:3, 28:21, 30:17, 39:12, 45:16, 46:7, 55:11, 57:8, 57:19, 58:12
**master** [3] - 36:11, 44:17, 45:19
**MASTER** [12] - 4:13, 4:18, 5:3, 12:6, 12:9, 14:7, 14:14, 57:11, 57:21, 57:24, 58:14, 59:12
**master's** [1] - 43:23
**Masters** [1] - 57:7
**masters** [5] - 11:23, 18:11, 20:10, 39:8, 53:10
**matter** [6] - 23:4, 43:1, 43:2, 48:3, 58:25, 60:11
**MDL** [32] - 1:3, 6:5, 6:18, 15:7, 15:12, 20:8, 21:11, 21:12, 22:10, 23:11, 23:19, 24:9, 24:10, 25:15, 26:5, 31:16, 32:24, 42:22, 43:8, 45:9, 46:12, 47:4, 48:20, 49:15, 49:20, 49:23, 50:5, 51:19, 51:25, 52:7, 54:21
**MDLs** [1] - 47:15
**mean** [4] - 8:18, 22:11, 50:7, 54:6
**means** [4] - 22:11, 42:15, 46:25, 59:25
**mechanism** [2] - 33:4, 47:10
**mechanisms** [1] - 47:24
**meet** [2] - 13:22, 15:15
**meeting** [2] - 6:8, 30:20
**meetings** [5] - 18:5, 18:9, 18:20, 19:19, 30:17
**memorialize** [1] - 12:2
**mention** [1] - 35:9
**mentioned** [5] - 26:17, 27:16, 30:16, 35:22, 58:25
**MERENSTEIN** [4] - 4:19, 57:21, 57:24, 59:12
**Merenstein** [3] - 15:1, 39:12, 57:19
**merits** [1] - 45:5
**mess** [1] - 52:21
**met** [5] - 10:10, 21:9, 24:7, 25:8, 33:18
**Miami** [1] - 2:11
**microphone** [2] - 17:20, 60:2
**midst** [1] - 14:23
**might** [9] - 35:25, 36:8, 41:8, 41:10, 42:1, 43:11, 52:25, 53:24
**million** [2] - 13:25, 14:1
**mind** [1] - 39:9
**minimum** [1] - 29:25

**mirror** [1] - 44:7
**miss** [1] - 18:8
**missed** [1] - 25:2
**missing** [1] - 12:14
**mistake** [1] - 30:24
**mistaken** [1] - 32:17
**Mitchell** [2] - 5:18, 60:14
**modifying** [1] - 25:11
**moment** [4] - 18:15, 38:8, 39:24, 59:20
**momentous** [1] - 24:14
**Monday** [1] - 19:25
**month** [1] - 60:5
**monthly** [1] - 54:23
**months** [5] - 15:5, 18:17, 20:3, 33:21, 49:17
**MORGAN** [1] - 4:3
**morning** [2] - 12:10, 20:21
**most** [14] - 23:7, 25:22, 26:12, 27:21, 31:21, 43:7, 45:10, 46:12, 46:13, 46:23, 49:14, 51:19, 52:25
**motion** [9] - 27:7, 44:5, 51:4, 51:6, 51:11, 51:17, 52:9, 52:11, 58:22
**motions** [7] - 20:17, 20:18, 21:21, 22:13, 34:1, 36:14, 44:23
**move** [12] - 28:14, 37:15, 43:8, 45:20, 46:9, 46:12, 48:6, 50:14, 53:12, 55:5, 55:23
**moving** [3] - 10:11, 17:8, 47:25
**MR** [58] - 6:12, 9:11, 9:15, 9:20, 10:7, 11:5, 14:20, 15:25, 17:13, 17:15, 17:21, 22:25, 23:2, 23:6, 23:15, 23:24, 24:2, 25:1, 28:2, 29:10, 29:13, 30:11, 30:15, 32:19, 34:18, 35:7, 35:9, 36:21, 37:3, 37:8, 37:21, 38:7, 38:10, 40:3, 40:7, 40:16, 40:18, 42:9, 42:13, 43:18, 45:3, 48:9, 49:7, 49:10, 50:10, 50:17, 52:4, 52:6, 53:6, 54:15, 55:6, 55:9, 56:2, 56:16, 56:25, 57:3, 59:23, 60:1
**MS** [11] - 16:1, 16:3, 16:6, 17:1, 17:10, 19:1, 19:6, 19:12, 22:23, 55:17, 56:10
**multidrug** [1] - 25:23
**multitude** [1] - 20:8
**must** [2] - 20:2, 27:25
**mute** [6] - 17:16, 17:21, 17:23, 22:21, 43:19, 45:3
**muted** [1] - 17:24
**N.W** [1] - 2:20
**NACHWALTER** [1] - 2:9

**NAST** [4] - 2:3, 19:1, 19:6, 19:12
**NASTLAW** [1] - 2:3
**nature** [1] - 36:3
**near** [1] - 19:17
**necessarily** [1] - 10:14
**necessary** [4] - 17:9, 21:21, 27:8, 27:15
**need** [11] - 18:9, 19:17, 21:2, 29:3, 31:5, 34:7, 35:12, 42:14, 51:5, 56:18, 59:22
**needed** [2] - 21:5, 23:25
**needs** [3] - 20:7, 21:17, 57:1
**neglect** [2] - 35:7, 35:9
**negotiated** [1] - 9:9
**negotiating** [1] - 51:23
**negotiations** [4] - 6:11, 15:19, 18:4, 19:19
**never** [7] - 20:22, 23:20, 47:1, 47:12, 47:16, 54:5, 55:2
**new** [8] - 11:7, 20:25, 23:7, 24:8, 35:25, 49:21, 52:10, 54:19
**New** [9] - 2:16, 3:10, 3:14, 3:19, 32:24
**newer** [1] - 9:13
**next** [14] - 15:3, 15:8, 15:17, 17:19, 18:23, 19:15, 20:3, 40:23, 48:21, 50:6, 50:14, 54:23, 56:17, 58:8
**nice** [3] - 6:3, 30:13, 30:14
**Nicole** [1] - 17:24
**Nielsen** [11] - 23:8, 23:14, 25:1, 29:8, 30:20, 31:14, 32:3, 34:13, 45:2, 49:12, 59:4
**NIELSEN** [5] - 1:21, 23:15, 25:1, 28:2, 45:3
**night** [1] - 20:21
**NO** [1] - 1:4
**noise** [1] - 59:25
**non** [1] - 46:15
**non-Lexecon** [1] - 46:15
**noncontroversial** [1] - 29:18
**nonissue** [1] - 27:2
**note** [5] - 7:6, 12:9, 15:11, 16:18, 43:22
**notes** [2] - 43:23, 44:17
**nothing** [7] - 14:14, 19:6, 22:21, 22:22, 36:17, 57:15, 57:24
**November** [2] - 18:18, 19:15
**Number** [1] - 44:8
**number** [7] - 7:7, 13:16, 28:18, 39:9, 43:4, 44:1, 45:10
**NW** [2] - 4:9, 5:4
**object** [5] - 12:11, 12:16, 12:23, 13:7, 13:8

**objection** [3] - 57:13, 57:17, 60:4
**objections** [7] - 12:25, 13:12, 13:15, 13:16, 18:22, 18:25, 33:7
**obligations** [1] - 8:21
**observations** [1] - 24:22
**obvious** [1] - 43:2
**obviously** [3] - 14:10, 28:12, 38:11
**occurs** [1] - 44:11
**October** [6] - 18:17, 19:8, 19:9, 19:11, 19:15, 53:24
**offer** [1] - 55:6
**OFFICE** [1] - 1:20
**Official** [2] - 5:18, 60:14
**offline** [1] - 56:24
**old** [1] - 9:17
**once** [4] - 12:3, 23:13, 27:4, 34:12
**one** [31] - 6:21, 12:14, 16:18, 17:7, 18:3, 19:13, 21:12, 21:15, 23:3, 24:12, 31:14, 34:19, 34:20, 35:21, 37:11, 38:6, 40:23, 40:25, 41:17, 45:15, 46:10, 46:11, 47:13, 52:12, 52:22, 55:6, 55:18, 57:25, 58:15, 60:5
**One** [2] - 1:15, 4:14
**ones** [6] - 20:18, 31:24, 32:4, 32:6, 32:7, 32:8
**ongoing** [4] - 11:24, 14:22, 40:22, 48:24
**operative** [1] - 55:24
**opportunities** [1] - 39:9
**opportunity** [3] - 37:9, 43:21, 52:2
**opposed** [1] - 52:11
**opposing** [1] - 52:12
**options** [1] - 39:1
**oral** [4] - 6:9, 18:19, 45:23, 46:16
**Order** [1] - 7:3
**order** [18] - 6:1, 6:11, 6:16, 6:19, 7:7, 7:21, 7:25, 11:10, 16:22, 18:4, 21:20, 22:5, 29:14, 31:9, 31:19, 49:19, 51:22, 54:2
**original** [1] - 29:15
**otherwise** [4] - 10:6, 37:19, 42:17, 46:6
**outlined** [2] - 34:21, 34:25
**outside** [1] - 7:23
**outstanding** [1] - 58:21
**overarching** [28] - 24:11, 25:16, 25:20, 25:22, 26:1, 26:7, 26:10, 26:23, 28:9, 28:22, 29:1, 31:15, 31:20, 31:22, 32:1, 32:7, 32:11, 34:23, 35:1, 35:3, 35:11,

35:16, 44:7, 45:25, 53:16, 56:6, 56:11
**overlap** [1] - 42:18
**overlapping** [1] - 34:8
**overruled** [1] - 33:7
**own** [1] - 47:15
**p.m** [3] - 1:9, 6:1, 60:7
**PA** [3] - 2:9, 21:13, 22:1
**pace** [1] - 10:14
**package** [1] - 17:5
**page** [1] - 43:23
**Pak** [5] - 23:1, 23:25, 34:18, 49:3, 50:19
**PAK** [7] - 2:14, 22:25, 23:2, 23:6, 23:24, 24:2, 34:18
**Pak's** [2] - 48:13, 49:10
**pandemic** [3] - 10:6, 19:18, 21:15
**panel** [1] - 24:9
**paragraph** [1] - 14:3
**parallel** [2] - 33:22, 38:21
**part** [11] - 23:19, 24:1, 25:17, 25:20, 26:23, 35:13, 48:16, 48:24, 51:25, 55:23, 56:2
**participant** [1] - 17:22
**participate** [5] - 28:10, 33:25, 41:5, 42:22, 44:2
**particular** [5] - 16:9, 25:25, 35:18, 36:19, 45:9
**particularly** [1] - 16:10
**parties** [29] - 6:15, 6:20, 7:12, 7:18, 8:3, 9:8, 9:20, 12:1, 12:13, 13:3, 13:15, 13:18, 14:7, 15:3, 15:7, 16:7, 16:11, 16:21, 23:7, 27:1, 27:12, 33:3, 33:13, 35:14, 40:11, 51:22, 53:17, 58:7, 58:19
**parties'** [2] - 10:16, 54:6
**party** [3] - 13:21, 22:11, 25:15
**pass** [3] - 39:17, 41:7, 42:21
**past** [3] - 15:5, 54:5
**Paul** [3] - 6:12, 48:9, 49:7
**PAUL** [1] - 1:14
**payer** [2] - 29:24, 48:18
**PAYER** [2] - 1:15, 2:4
**PC** [1] - 2:14
**pcosta@finekaplan.com** [1] - 1:18
**pendency** [1] - 46:3
**pending** [10] - 16:18, 26:5, 27:10, 32:24, 36:8, 40:24, 44:5, 53:15, 58:24
**Pennsylvania** [11] - 1:16, 2:5, 3:5, 3:23, 4:4, 4:15, 4:20, 34:22, 44:21, 58:17, 58:22
**PENNSYLVANIA** [1] - 1:1
**people** [2] - 19:18, 37:8

**PEPPER** [1] - 3:3
**per** [1] - 34:2
**perceive** [1] - 20:2
**perceived** [1] - 9:17
**perfect** [1] - 52:23
**perform** [1] - 9:4
**perhaps** [3] - 18:16, 19:15, 22:18
**period** [2] - 8:22, 10:3
**permanent** [1] - 8:19
**permeated** [1] - 36:17
**permit** [1] - 52:24
**person** [4] - 28:4, 28:6, 40:1, 40:2
**personal** [1] - 19:24
**perspective** [7] - 10:2, 10:22, 26:14, 26:15, 28:7, 28:13, 49:24
**pertinent** [1] - 59:8
**PHARMA** [1] - 3:18
**PHARMACEUTICALS** [2] - 1:4, 4:4
**Pharmaceuticals** [1] - 6:5
**pharmacies** [1] - 44:1
**Philadelphia** [14] - 1:16, 2:5, 3:5, 3:23, 4:4, 4:15, 4:20, 26:6, 26:20, 26:25, 27:7, 27:11, 28:3, 30:21
**philosophical** [1] - 21:11
**phone** [2] - 40:5, 43:19
**phrase** [1] - 52:21
**pick** [2] - 17:20, 54:22
**piece** [1] - 41:19
**place** [2] - 9:5, 27:23
**Place** [1] - 4:14
**plaintiff** [3] - 29:22, 32:20, 51:11
**plaintiffs** [38] - 6:13, 9:5, 12:11, 12:15, 12:21, 14:15, 15:5, 15:11, 16:8, 16:16, 16:19, 16:20, 24:17, 24:22, 24:25, 25:17, 28:10, 28:24, 29:9, 29:11, 29:23, 29:24, 31:22, 33:8, 34:21, 35:11, 39:7, 43:19, 47:20, 48:9, 48:15, 48:18, 49:17, 51:16, 51:21, 54:19
**PLAINTIFFS** [7] - 1:14, 1:15, 1:17, 1:21, 2:4, 2:5, 2:9
**Plaintiffs** [3] - 43:24, 44:20, 50:25
**plaintiffs'** [9] - 10:2, 10:9, 10:21, 11:20, 13:5, 13:21, 16:22, 29:20, 33:23
**plan** [2] - 23:16, 50:4
**planning** [1] - 44:16
**plead** [1] - 45:12
**pleading** [1] - 51:10
**plus** [1] - 47:18
**point** [14] - 25:14, 31:5,

33:25, 34:4, 34:11, 34:12, 34:19, 36:15, 37:11, 38:11, 38:24, 43:5, 45:7, 45:15
**points** [2] - 46:14, 50:18
**pool** [3] - 33:5, 33:8, 33:14
**poor** [1] - 42:20
**pose** [1] - 15:21
**position** [6] - 31:3, 32:1, 34:8, 40:9, 40:10, 47:23
**possibility** [1] - 27:17
**possible** [9] - 22:14, 26:25, 29:7, 39:19, 39:20, 41:18, 41:25, 53:12
**possibly** [3] - 20:3, 25:3, 36:16
**potential** [3] - 41:4, 43:14, 44:23
**potentially** [2] - 27:23, 28:16
**practice** [2] - 20:23, 36:14
**pravastatin** [17] - 29:15, 35:17, 38:22, 39:2, 40:21, 40:25, 41:16, 41:19, 41:23, 42:1, 42:4, 42:5, 42:17, 42:20, 43:9, 55:14
**prayer** [1] - 52:15
**precisely** [1] - 42:19
**preclusion** [1] - 47:16
**prefer** [2] - 18:11, 29:7
**preferably** [1] - 32:7
**prefers** [1] - 56:22
**prepared** [3] - 5:21, 22:6, 27:4
**present** [2] - 13:25, 22:18
**presentation** [1] - 13:12
**presented** [3] - 10:8, 10:10, 54:3
**presents** [1] - 43:10
**preside** [8] - 25:25, 26:13, 26:16, 27:19, 28:19, 31:9, 31:10, 31:19
**presiding** [1] - 43:1
**presume** [1] - 26:24
**pretrial** [2] - 21:21, 30:23
**Pretrial** [1] - 7:3
**pretty** [5] - 27:13, 43:2, 48:4, 49:5, 54:11
**prevent** [2] - 48:23, 55:4
**previously** [1] - 23:16
**price** [1] - 23:20
**PRICING** [1] - 1:5
**Pricing** [1] - 6:5
**primarily** [2] - 12:22, 39:10
**primary** [1] - 53:15
**prioritize** [1] - 40:12
**prioritizing** [1] - 33:23
**priority** [1] - 25:21
**private** [15] - 15:4, 15:11, 16:16, 16:22, 20:23, 29:11, 31:21, 32:20, 33:22, 34:21, 35:10, 36:6, 48:15, 49:17,

54:18
**privilege** [5] - 7:10, 7:12, 7:14, 7:15, 11:25
**problem** [4] - 33:10, 40:7, 43:13, 60:3
**problematic** [1] - 54:12
**problems** [1] - 43:14
**procedural** [2] - 44:24, 51:12
**procedure** [2] - 8:8, 9:7
**Procedure** [1] - 38:21
**procedures** [5] - 7:18, 9:14, 10:4, 11:7, 56:22
**proceed** [10] - 11:3, 15:8, 34:4, 34:10, 34:21, 37:12, 37:23, 43:2, 45:24, 46:4
**proceeding** [3] - 6:2, 38:18, 42:24
**proceedings** [4] - 39:6, 44:3, 46:4, 60:11
**Proceedings** [2] - 5:21, 60:7
**process** [12] - 7:21, 8:1, 8:2, 9:4, 14:2, 14:4, 25:8, 25:12, 25:15, 26:9, 29:21, 30:23
**processes** [1] - 9:24
**produce** [2] - 7:22, 58:22
**produced** [5] - 11:8, 12:18, 13:17, 14:1, 14:2
**producing** [3] - 8:17, 16:16
**Product** [1] - 33:11
**product** [2] - 7:16, 42:23
**production** [10] - 7:1, 7:10, 8:12, 8:13, 8:20, 11:14, 12:25, 14:4, 14:24, 58:16
**productions** [3] - 13:7, 15:2, 16:14
**productive** [1] - 43:7
**productivity** [1] - 19:21
**profess** [1] - 15:15
**progress** [6] - 6:24, 16:13, 16:17, 40:13, 48:23, 49:25
**promote** [1] - 24:19
**promptly** [1] - 38:15
**proper** [1] - 34:13
**proposal** [9] - 12:17, 13:6, 26:2, 34:14, 34:20, 34:25, 45:19, 45:22, 45:23
**proposals** [2] - 25:11
**proposed** [12] - 6:7, 8:25, 12:17, 22:18, 26:22, 26:24, 35:10, 45:18, 46:7, 51:7, 51:22, 55:10
**proposing** [2] - 26:24, 28:8
**prosecution** [1] - 41:23
**protection** [4] - 7:23, 7:25, 8:20, 8:23
**protective** [1] - 7:25
**Protocol** [1] - 8:1
**provide** [3] - 13:13, 44:12, 44:14
**provided** [2] - 16:8, 33:3

**provides** [1] - 11:15
**proving** [1] - 47:5
**provisional** [1] - 22:5
**PSC** [5] - 1:14, 1:15, 1:16, 2:4, 2:5
**PT** [1] - 14:3
**PTO** [10] - 7:21, 8:1, 8:2, 8:8, 9:3, 10:8, 10:9, 11:12, 11:14, 16:15
**public** [1] - 36:5
**purchase** [1] - 44:2
**PURCHASER** [2] - 1:14, 2:3
**purchaser** [2] - 16:19, 29:23
**pursuant** [3] - 9:2, 9:18, 16:15
**put** [4] - 20:11, 26:4, 53:19, 58:6

**questioned** [1] - 23:14
**questions** [7] - 15:20, 21:8, 47:19, 48:2, 56:17, 56:18, 56:21

**quick** [1] - 46:13
**quickly** [4] - 20:13, 28:15, 45:21, 46:10
**quite** [1] - 46:19

**R&R** [7] - 21:8, 34:6, 47:1, 47:17, 48:5, 57:13, 59:7
**raise** [2] - 24:14, 38:24
**raised** [5] - 22:10, 31:2, 37:13, 37:24, 55:21
**raises** [1] - 36:23
**raising** [1] - 31:22
**randomly** [1] - 33:5
**rate** [1] - 27:22
**rather** [4] - 8:4, 42:23, 49:21, 59:2
**RDR** [2] - 5:18, 60:14
**Re** [1] - 33:11
**RE** [1] - 1:3
**reach** [2] - 7:2, 10:24
**reached** [5] - 6:23, 7:12, 11:22, 15:13, 58:19
**reaching** [1] - 13:4
**ready** [2] - 14:15, 22:23
**real** [2] - 19:25, 45:13
**realistic** [2] - 53:19, 53:25
**really** [17] - 11:17, 21:5, 22:4, 23:19, 26:3, 26:7, 28:8, 29:25, 30:22, 32:10, 34:7, 36:17, 46:10, 47:2, 47:8, 55:4, 59:5
**reargue** [2] - 29:4, 43:5
**reason** [2] - 33:10, 36:13
**reasonable** [2] - 13:20, 13:23
**reasons** [8] - 29:3, 29:4, 31:25, 32:3, 32:5, 38:16, 38:22, 39:2
**receipt** [1] - 13:1
**receive** [3] - 7:4, 35:17,

39:21
**received** [1] - 58:7
**recent** [1] - 49:14
**recently** [2] - 14:25, 51:19
**recognize** [2] - 26:13, 38:19
**recommendation** [8] - 12:10, 12:12, 13:5, 22:5, 35:2, 43:23, 45:16, 58:18
**recommendations** [1] - 47:16
**recommended** [2] - 12:17, 28:21
**reconsider** [1] - 54:2
**record** [2] - 38:2, 60:11
**redacted** [1] - 7:15
**redesignate** [2] - 7:24, 8:9
**redesignating** [1] - 8:5
**redesignation** [1] - 9:4
**redesignations** [1] - 8:11
**reduce** [2] - 11:17, 13:16
**REED** [6] - 4:3, 37:3, 37:8, 37:21, 38:7, 38:10, 42:9, 42:13
**Reed** [9] - 37:4, 38:4, 38:9, 38:10, 39:4, 39:22, 42:9, 42:11, 43:16
**referred** [2] - 57:25, 58:4
**referring** [2] - 50:20, 51:9
**reflected** [2] - 51:1, 51:25
**Regard** [3] - 13:24, 14:11, 57:9
**REGARD** [3] - 5:4, 14:14, 57:11
**regard** [1] - 45:16
**regarding** [3] - 7:12, 7:17, 48:17
**regardless** [5] - 28:23, 28:24, 29:2, 29:5, 30:3
**regroup** [1] - 18:18
**reiterate** [1] - 40:8
**related** [2] - 23:20, 26:7
**relating** [3] - 15:16, 46:14, 48:11
**relative** [1] - 24:20
**relying** [1] - 21:4
**remain** [2] - 55:12, 55:14
**remaining** [1] - 13:8
**remand** [1] - 27:6
**remarks** [1] - 50:20
**reminder** [2] - 17:15, 57:14
**renovation** [1] - 10:4
**repeat** [2] - 37:16, 56:3
**repeating** [1] - 13:9
**report** [4] - 15:24, 43:23, 58:3, 58:21
**Reporter** [2] - 5:18, 60:14
**reporter** [1] - 37:14
**represent** [3] - 22:10, 24:22, 53:13

**representative** [2] - 26:4, 46:13
**request** [6] - 11:3, 11:8, 12:24, 13:2, 39:23, 54:15
**requests** [9] - 7:11, 11:13, 11:21, 12:12, 12:16, 13:8, 13:12, 13:15, 15:14
**requires** [3] - 18:20, 50:1, 59:3
**RESELLERS** [1] - 1:16
**resolution** [1] - 58:16
**resolve** [2] - 11:23, 58:2
**resolved** [3] - 46:6, 58:15, 58:24
**resources** [1] - 21:20
**respect** [7] - 38:12, 41:12, 42:3, 42:17, 48:12, 50:14, 55:9
**respectful** [1] - 56:20
**respectfully** [1] - 39:1
**respectively** [1] - 43:9
**respects** [1] - 45:20
**respond** [4] - 14:8, 40:18, 49:8, 52:4
**response** [3] - 11:21, 48:4, 53:11
**RESPONSE** [1] - 60:6
**responses** [1] - 15:14
**rest** [4] - 15:16, 22:13, 46:24
**resting** [1] - 24:5
**results** [1] - 44:13
**retail** [1] - 44:1
**retired** [1] - 20:20
**returned** [1] - 19:25
**review** [3] - 7:6, 9:4, 19:20
**reviewed** [2] - 17:5, 17:6
**revise** [1] - 6:15
**revised** [3] - 6:11, 7:18, 18:3
**revolted** [1] - 20:24
**rewards** [1] - 35:15
**rights** [4] - 26:19, 27:1, 27:4, 31:3
**risk** [1] - 35:15
**rliebenberg@finekaplan. com** [1] - 1:17
**RMR** [2] - 5:18, 60:14
**roadblocks** [2] - 39:10, 39:15
**ROBERTA** [1] - 1:14
**Roberts** [1] - 32:17
**RODA** [1] - 2:4
**role** [1] - 46:19
**rolling** [9] - 7:13, 8:12, 8:14, 11:11, 11:18, 12:24, 13:1, 13:11, 16:17
**ROSATI** [1] - 2:14
**roughly** [1] - 9:1
**round** [2] - 15:3, 15:8
**RUFE** [1] - 1:10

**rule** [4] - 36:12, 52:9, 52:10, 54:1
**Rule** [1] - 38:20
**Rules** [1] - 38:20
**ruling** [2] - 16:21, 28:21
**sad** [2] - 20:1, 53:2
**safe** [2] - 27:23, 28:2
**sake** [1] - 54:6
**sales** [2] - 14:24, 58:1
**SANDERS** [1] - 3:3
**Sandoz** [1] - 57:14
**Sarah** [1] - 16:4
**SARAH** [1] - 2:19
**satisfied** [1] - 48:2
**save** [1] - 23:2
**saw** [2] - 35:18, 57:17
**schedule** [2] - 18:18, 34:2
**scheduled** [2] - 15:2, 58:7
**schedules** [1] - 18:5
**scheduling** [3] - 18:19, 18:23, 44:16
**SCHNADER** [1] - 4:18
**scope** [9] - 14:23, 15:1, 16:12, 16:20, 16:22, 38:19, 48:20, 54:21, 58:6
**screen** [1] - 59:25
**SDNY** [1] - 33:2
**search** [1] - 16:20
**second** [2] - 8:15, 35:21
**Second** [1] - 44:6
**Section** [1] - 11:9
**see** [14] - 17:8, 17:21, 21:5, 22:6, 23:10, 24:12, 24:21, 28:6, 30:13, 30:14, 36:13, 52:6, 55:1, 60:4
**seek** [2] - 11:16, 14:25
**seeking** [3] - 38:13, 39:5, 55:23
**seem** [3] - 18:15, 29:18, 41:1
**SEGAL** [1] - 4:18
**select** [4] - 25:10, 31:9, 33:13, 53:12
**selected** [7] - 26:15, 31:24, 33:6, 40:13, 40:25, 45:14, 55:11
**selecting** [1] - 25:8
**selection** [3] - 36:22, 38:15, 39:16
**sense** [1] - 10:20
**sent** [2] - 24:9, 27:6
**separate** [2] - 46:17, 59:6
**September** [12] - 9:14, 12:18, 12:19, 12:20, 12:23, 18:13, 18:16, 19:4, 19:13, 53:25
**series** [2] - 7:13, 31:11
**service** [1] - 7:3
**set** [2] - 32:2, 38:16
**setting** [1] - 11:18
**settlement** [1] - 22:14

**several** [2] - 17:2, 49:15
**shape** [1] - 39:16
**shared** [1] - 10:17
**Sharon** [1] - 30:11
**SHERON** [1] - 3:9
**shorten** [1] - 59:1
**show** [1] - 13:21
**side** [4] - 13:21, 29:20, 30:9, 34:16
**significant** [5] - 34:24, 35:4, 44:1, 45:13
**similarly** [1] - 33:11
**simplifying** [1] - 51:14
**simply** [2] - 41:8, 47:17
**sincere** [1] - 10:9
**single** [3] - 29:17, 30:19, 40:24
**sits** [1] - 30:5
**sitting** [1] - 56:17
**situation** [2] - 35:24, 41:10
**six** [4] - 9:18, 15:5, 20:3, 49:17
**skirkpatrick@wc.com** [1] - 2:21
**skorpus@kasowitz.com** [1] - 3:11
**Smith** [3] - 51:12, 51:15, 54:12
**SOLUTIONS** [1] - 5:3
**someday** [1] - 28:6
**someone** [1] - 37:1
**sometimes** [2] - 46:17, 59:16
**somewhere** [1] - 13:25
**SONSINI** [1] - 2:14
**soon** [1] - 21:7
**sooner** [1] - 53:18
**sorry** [5] - 16:3, 21:3, 24:2, 35:7, 60:1
**sought** [2] - 26:3, 39:18
**sounds** [1] - 42:13
**South** [1] - 1:15
**south** [2] - 18:7, 47:7
**Southern** [1] - 32:24
**speaking** [6] - 6:13, 17:16, 25:2, 43:19
**special** [9] - 11:23, 20:10, 30:12, 36:11, 39:7, 43:23, 44:17, 45:19, 53:10
**SPECIAL** [12] - 4:13, 4:18, 5:3, 12:6, 12:9, 14:7, 14:14, 57:11, 57:21, 57:24, 58:14, 59:12
**Special** [11] - 15:1, 25:9, 26:3, 28:21, 30:17, 39:12, 45:16, 46:7, 55:11, 57:8, 58:12
**specific** [1] - 29:17
**specifically** [3] - 42:23, 48:11, 53:17

**specifics** [1] - 14:10
**speeded** [1] - 13:13
**spend** [1] - 21:19
**spoken** [1] - 31:2
**Square** [1] - 3:4
**Squares** [1] - 30:12
**stages** [1] - 6:21
**stand** [1] - 23:15
**standard** [1] - 27:11
**standpoint** [1] - 11:16
**start** [3] - 6:2, 30:15, 57:8
**started** [1] - 52:8
**starting** [1] - 6:4
**State** [5] - 16:9, 25:17, 25:19, 28:9, 28:10
**state** [2] - 27:22, 39:4
**STATE** [2] - 1:16, 1:20
**statement** [1] - 40:9
**States** [11] - 15:5, 26:19, 27:4, 29:21, 29:24, 44:12, 49:11, 50:20, 51:19, 56:11, 58:17
**STATES** [3] - 1:1, 4:8, 4:8
**States'** [11] - 16:14, 26:15, 46:1, 46:8, 48:12, 49:14, 51:1, 52:1, 55:12, 55:25, 56:14
**status** [7] - 6:4, 6:10, 6:14, 16:24, 18:3, 18:12, 58:4
**STATUS** [1] - 1:5
**statutes** [1] - 55:3
**stay** [14] - 26:20, 29:16, 36:13, 36:16, 36:19, 36:22, 38:12, 38:14, 39:5, 39:6, 39:17, 40:12, 43:4, 56:21
**stayed** [1] - 46:3
**stenographer's** [1] - 6:3
**stenographically** [1] - 5:21
**step** [1] - 6:21
**steps** [1] - 15:17
**Steve** [3] - 37:4, 38:10, 42:9
**STEVEN** [1] - 4:3
**steven.reed@morganlewis .com** [1] - 4:5
**stick** [1] - 53:3
**still** [8] - 11:24, 15:17, 20:25, 29:5, 54:8, 55:3, 58:21, 58:23
**stipulation** [3] - 7:3, 10:8, 12:2
**stop** [2] - 53:21
**stops** [1] - 20:22
**strategies** [1] - 22:8
**Street** [10] - 1:15, 1:21, 2:4, 2:20, 3:22, 4:4, 4:9, 4:15, 4:19, 5:4
**Streets** [1] - 3:5
**strenuous** [1] - 18:22
**strenuously** [1] - 27:10

**stronger** [1] - 42:5
**subject** [3] - 41:22, 51:11, 51:17
**submit** [4] - 12:4, 31:21, 39:1, 43:9
**submitted** [2] - 7:2, 35:23
**subsequent** [1] - 8:21
**substitute** [1] - 51:7
**subtracted** [1] - 41:18
**successful** [2] - 6:22, 27:17
**suggest** [3] - 19:8, 33:18, 59:10
**suggesting** [1] - 43:4
**suggestion** [2] - 19:14, 59:6
**suitability** [1] - 40:21
**Suite** [7] - 1:16, 2:5, 2:10, 3:23, 4:9, 4:20, 5:5
**summarize** [1] - 11:5
**summary** [4] - 27:5, 30:23, 34:3, 46:5
**summer** [1] - 18:6
**superseded** [1] - 12:13
**supervision** [1] - 11:24
**supposed** [1] - 10:5
**surprised** [1] - 52:20
**Surrick** [4] - 36:2, 37:13, 37:24, 38:5
**suspect** [1] - 55:2
**swift** [1] - 48:3
**switch** [1] - 30:9
**system** [3] - 17:20, 21:7, 47:12
**Taper** [1] - 32:25
**target** [3] - 14:1, 21:19, 53:11
**TARTER** [1] - 3:17
**technology** [1] - 28:5
**telephone** [6] - 4:6, 4:11, 17:18, 37:1, 40:1, 40:2
**ten** [3] - 9:1, 20:17, 53:1
**terminus** [2] - 55:25, 56:14
**terms** [5] - 16:20, 39:10, 44:13, 50:13, 55:22
**testify** [1] - 42:1
**Teva** [15] - 26:15, 26:20, 28:22, 29:2, 32:4, 32:8, 33:24, 44:7, 46:8, 55:12, 55:25, 56:5, 56:6, 56:10, 56:14
**Teva-centric** [4] - 32:4, 32:8, 44:7, 56:6
**The Court** [103] - 6:2, 6:17, 6:25, 7:3, 7:4, 7:20, 9:10, 9:12, 9:16, 10:1, 10:10, 10:15, 11:2, 12:4, 12:8, 13:19, 14:6, 14:10, 14:17, 15:18, 15:20, 15:21, 16:2, 16:5, 16:24, 17:5, 17:12, 17:14, 17:18, 17:24, 19:5, 19:10, 19:14, 21:22, 23:1, 23:5, 23:12, 23:23, 23:25,

24:4, 25:6, 27:25, 29:8, 29:12, 30:8, 30:14, 30:25, 31:8, 31:9, 31:10, 31:19, 32:12, 32:18, 34:15, 35:6, 35:8, 35:20, 35:24, 36:24, 37:5, 37:15, 38:3, 38:9, 39:4, 40:5, 40:14, 40:17, 42:8, 42:11, 43:4, 43:13, 43:16, 44:5, 45:1, 46:11, 46:17, 49:3, 49:8, 50:6, 50:15, 50:24, 51:5, 51:13, 52:5, 52:14, 53:7, 54:22, 55:8, 55:15, 56:19, 56:22, 56:23, 57:1, 57:4, 57:13, 57:16, 57:23, 58:11, 59:5, 59:9, 59:13, 59:24, 60:3
**themselves** [1] - 51:23
**thereafter** [1] - 13:16
**therefore** [2] - 26:6, 41:25
**thereto** [1] - 13:12
**thinking** [3] - 18:8, 29:25, 36:25
**thinks** [1] - 17:24
**Third** [3] - 23:10, 51:1, 52:1
**third** [2] - 8:25, 50:21
**THOMAS** [1] - 4:8
**thomas.dematteo@usdoj. gov** [1] - 4:11
**thorny** [1] - 59:17
**three** [9] - 8:6, 11:25, 18:17, 31:23, 34:5, 34:6, 34:7, 34:10, 34:11
**tier** [2] - 12:22, 13:7
**timetable** [1] - 51:21
**timing** [5] - 10:21, 14:23, 15:13, 16:13, 45:17
**tired** [1] - 53:22
**today** [4] - 13:10, 22:6, 28:4, 48:8
**together** [3] - 34:7, 34:10, 48:6
**Tom** [1] - 40:3
**tomorrow** [3] - 15:2, 20:12, 58:2
**took** [1] - 47:1
**tooth** [1] - 52:19
**top** [1] - 49:15
**topic** [1] - 17:7
**topics** [1] - 11:25
**TORRES** [1] - 3:8
**touch** [1] - 14:21
**track** [1] - 14:16
**tracks** [1] - 59:6
**transaction** [1] - 14:24
**transactional** [1] - 58:1
**transcript** [1] - 60:10
**transcription** [1] - 5:22
**transfer** [2] - 27:7, 32:14
**transferred** [1] - 23:9
**transmission** [1] - 27:22

**transportation** [1] - 20:16
**treatment** [1] - 33:13
**trial** [13] - 21:7, 25:18, 26:20, 27:2, 27:8, 27:19, 28:11, 30:4, 30:5, 30:6, 32:11, 33:14, 34:11
**trials** [7] - 21:16, 22:3, 22:13, 25:8, 25:10, 34:4, 39:16
**tried** [7] - 21:13, 22:3, 28:25, 29:5, 29:6, 30:3
**tries** [1] - 28:25
**TROUTMAN** [1] - 3:3
**truly** [2] - 23:4, 53:13
**try** [16] - 6:20, 9:13, 10:24, 21:2, 21:12, 21:22, 27:23, 28:2, 30:21, 34:7, 34:13, 35:12, 46:22, 47:6, 47:13, 47:22
**trying** [5] - 21:1, 21:2, 35:11, 35:15, 59:1
**turned** [1] - 10:8
**turning** [1] - 9:8
**turnoff** [1] - 20:24
**turns** [1] - 30:7
**Twelfth** [1] - 2:20
**two** [12] - 8:10, 11:13, 11:18, 13:10, 18:17, 21:16, 26:4, 27:18, 34:6, 52:15, 56:23, 58:14
**Two** [1] - 3:4
**type** [2] - 53:11, 54:17
**types** [2] - 26:4, 39:11
**U.S** [1] - 1:7
**ultimately** [2] - 26:3, 28:25
**unaffected** [2] - 40:12, 46:8
**uncertain** [1] - 6:17
**uncertainty** [1] - 42:7
**unchanged** [1] - 55:14
**under** [8] - 7:20, 7:22, 11:9, 11:24, 13:5, 14:2, 34:25, 48:3
**understood** [5] - 26:9, 49:2, 49:10, 49:12, 52:14
**unduly** [1] - 9:3
**unforeseen** [1] - 23:22
**unique** [1] - 43:10
**UNITED** [3] - 1:1, 4:8, 4:8
**universe** [2] - 49:19, 50:1
**unknown** [1] - 43:14
**unless** [4] - 22:15, 36:17, 44:3, 44:17
**unmute** [2] - 43:20, 59:20
**unofficial** [1] - 39:17
**unreasonable** [1] - 44:18
**unsuitable** [1] - 38:22
**unusual** [2] - 32:21, 43:1
**up** [21] - 10:14, 13:13, 17:2, 17:20, 18:17, 19:15, 20:20, 21:5, 26:9, 30:4, 30:23, 34:17, 35:22, 36:25, 37:15,

39:8, 44:22, 46:6, 52:21,
54:16, 54:22
**upcoming** [1] - 55:10
**update** [1] - 15:18
**updated** [3] - 9:13, 52:25
**US** [1] - 33:1
**USA** [1] - 4:4
**USSC** [1] - 47:5
**utilizing** [1] - 5:21
**vacate** [1] - 7:7
**vaccine** [1] - 20:4
**various** [1] - 38:25
**vehicle** [1] - 52:23
**Via** [1] - 1:8
**via** [2] - 4:6, 4:11
**viable** [1] - 31:21
**video** [2] - 17:20, 53:22
**videoconference** [1] - 1:8
**view** [2] - 25:5, 35:11
**views** [1] - 32:19
**vigorously** [1] - 39:18
**volume** [1] - 37:15
**wait** [1] - 32:12
**waiting** [1] - 20:3
**waive** [6] - 26:19, 27:1, 27:3,
31:3, 31:7, 47:20
**waiver** [1] - 33:15
**waiving** [1] - 47:21
**wants** [1] - 30:10
**Washington** [3] - 2:20, 4:10,
5:5
**ways** [3] - 10:17, 26:17,
28:18
**wblechman@knpa.com** [1] -
2:12
**Wednesday** [1] - 58:8
**week** [2] - 19:25, 20:17
**weekly** [1] - 16:11
**weeks** [2] - 9:18, 17:2
**welcome** [1] - 40:16
**welcoming** [1] - 37:5
**whereas** [2] - 35:2, 46:7
**whereby** [1] - 13:14
**whichever** [2] - 30:7, 33:23
**WHITE** [1] - 4:13
**WILLIAM** [1] - 2:9
**WILLIAMS** [2] - 2:19, 4:13
**willing** [6] - 27:6, 27:20,
30:20, 31:6, 47:3, 54:10
**WILSON** [1] - 2:14
**winter** [1] - 15:12
**wise** [1] - 34:20
**wish** [2] - 23:1, 45:2
**withheld** [1] - 7:15
**witnesses** [8] - 27:12, 28:14,
41:12, 41:13, 41:17, 42:1,
45:10
**wondering** [1] - 10:5
**workable** [1] - 9:7

**world** [1] - 53:4
**worried** [1] - 39:8
**worry** [1] - 21:18
**wrongdoing** [2] - 41:1, 42:16
**XIA** [1] - 3:18
**year** [2] - 20:3, 27:21
**years** [4] - 36:16, 46:7,
52:15, 53:1
**yesterday** [1] - 35:25
**York** [9] - 2:16, 3:10, 3:14,
3:19, 32:24
**yourselves** [1] - 18:10
**Zimmer** [1] - 32:25