**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** ) ) ) ) ) ) ) | |
| | **MDL 2724** |
| | **16-MD-2724** |
| | |
| | **HON. CYNTHIA RUFE** |
| **THIS DOCUMENT RELATES TO:** ) ) | |
| *ALL ACTIONS* ) ) ) ) | |


<u>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO THE SECOND REPORT AND RECOMMENDATION OF THE SPECIAL DISCOVERY MASTER AS TO PLAINTIFFS' MOTION TO COMPEL SUPPLEMENTAL PRODUCTIONS OF TRANSACTIONAL DATA**</u>

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION AND BACKGROUND ........................................................ 1

II.  LEGAL STANDARD ............................................................................... 4

III. ARGUMENT .......................................................................................... 4

     A.   Special Discovery Master Merenstein Correctly Found that There Are No Changed Circumstances Warranting Departure from the April 2019 Agreement ............................................................................................. 4

          1.   The Parties' April 2019 Agreement Set a Cutoff Date for Transactional Data of December 31, 2018 and Did Not Provide for Supplementation ..................................................................... 4

          2.   Neither Post-2018 Prices Nor this Court's Bellwether Ruling Supports Supplementation Under the Terms of the April 2019 Agreement ............................................................................... 6

     B.   Plaintiffs Have Not Demonstrated that the Agreed-Upon Data Will Provide an Insufficient Benchmark for Assessing Impact and Damages ............... 8

     C.   The Case Law Supports Adopting Special Discovery Master Merenstein's Report and Recommendation Denying Supplementation of Post-2018 Data ....... 10

     D.   Adopting the Report and Recommendation Will Not Prejudice Plaintiffs .......... 12

     E.   Ongoing Data Supplementation Will Impose Significant Burdens on Defendants ......................................................................................... 14

IV.  CONCLUSION ...................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adidas Am., Inc. v. TRB Acquisitions LLC*,
    2018 WL 4849312 (D. Or. Oct. 5, 2018) ........................................................................10

*Am. Express Travel Related Servs. Co. v. Visa U.S.A. Inc.*,
    No. 1:04-cv-08967 (S.D.N.Y. May 15, 2007) ...............................................................11

*Ashton Woods Holdings LLC v. USG Corp.*,
    2016 U.S. Dist. LEXIS 166424 (E.D. Pa. Dec. 2, 2016) ...............................................8

*Bayer AG v. Betachem, Inc.*,
    173 F.3d 188 (3d Cir. 1999) .............................................................................................4

*Bro-Tech Corp. v. Thermax, Inc.*,
    651 F. Supp. 2d 378 (E.D. Pa. 2009) .............................................................................11

*Diaz-Padilla v. BMS Holding Co.*,
    2005 U.S. Dist. LEXIS 5879 (D.P.R. Apr. 4, 2005) .....................................................10

*Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*,
    2007 U.S. Dist. LEXIS 98353 (D. Kan. Dec. 19, 2007) ...............................................13

*In re Broiler Chicken Antitrust Litigation*,
    No. 1:16-cv-08637 (N.D. Ill. May 19, 2020) ................................................................11

*In re EpiPen (Epinephrine Injection, USP) Marketing,*
*Sales Practices and Antitrust Litig.*,
    No. 2:17-md-02785-DDC-TJJ (D. Kan. July 17, 2020) .................................................10

*In re Microcrystalline Cellulose*,
    221 F.R.D. 428 (E.D. Pa. 2004) .......................................................................................8

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    319 F.R.D. 158 (E.D. Pa. 2016) .......................................................................................9

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
    2016 WL 2756437 (E.D. La. May 12, 2016) ...................................................................9

*In re Processed Egg Prods. Antitrust Litig.*,
    No. 08-md-2002 (E.D. Pa. June 27, 2013) ...............................................................10, 11

*In re Restasis Antitrust Litig.*,
    No. 18-md-02819-NG (E.D.N.Y. June 5, 2019) ............................................................11

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
No. 13-md-2445 (E.D. Pa. Nov. 10, 2017), ECF No. 413-1 ............................................13

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
No. 13-md-2445 (E.D. Pa. Nov. 30, 2017), ECF No. 419 ........................................ *passim*

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010) .......................................................................................9

*In re Uranium Antitrust Litig.*,
552 F. Supp. 518 (N.D. Ill. 1982) ....................................................................................13

*In re Urethane Antitrust Litig.*,
2012 WL 6681783 (D. Kan. Dec. 21, 2012),
*aff'd*, 768 F.3d 1245 (10th Cir. 2014) ..............................................................................10

*Insight Equity v. Transitions Optical, Inc.*,
252 F. Supp. 3d 382 (D. Del. 2017) .................................................................................13

*Isola U.S. Corp. v. Taiwan Union Tech. Corp.*,
2015 WL 12555875 (D. Ariz. Aug. 20, 2015) ..................................................................11

*Kleen Prods. LLC v. Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015),
*aff'd*, 831 F.3d 919 (7th Cir. 2016) ....................................................................................9

*Kuhns v. City of Allentown*,
2010 WL 4236873 (E.D. Pa. Oct. 26, 2010) ................................................................4, 10

*MSC Software Corp. v. Altair Eng'g, Inc.*,
2012 WL 1340445 (E.D. Mich. Apr. 18, 2012) ................................................................10

**RULE**

Fed. R. Civ. P. 26 .....................................................................................................................10

I.      INTRODUCTION AND BACKGROUND

The parties' long-standing agreement regarding the scope of data productions governs and disposes of Plaintiffs' Objections. Special Discovery Master Merenstein's recommendation to deny Plaintiffs' motion to compel data supplementation is consistent with that agreement, his prior recommendations, and relevant case law. Plaintiffs' Motion to Compel ("Plaintiffs' Motion"), on the other hand, seeks to walk back their previous agreement to forgo data supplementation in exchange for up to nine years of Defendants' transactional data. Plaintiffs' Objections fail to identify any material changes that justify altering the parties' agreement or overturning Special Discovery Master Merenstein's Recommendation. Moreover, if Plaintiffs' Motion is granted, the scope of transactional data discovery becomes virtually boundless, with Defendants potentially needing to produce data on hundreds of products at intervals yet to be determined for years to come. In addition to providing the parties with certainty, setting fixed time periods for data production guides negotiations with the dozens of third parties throughout the pharmaceutical distribution chain that have been subpoenaed by both Plaintiffs and Defendants. In short, Plaintiffs' repetitive request for data supplementation is unjustified, and holding them to their own agreement is critical to ensuring that the MDL proceeds efficiently.

In September 2018, Plaintiffs requested that Defendants produce annual data supplementation in their motion to compel submitted to this Court, when the time periods for documents and transactional data were in dispute. The Court referred Plaintiffs' motion to Special Discovery Master Merenstein, who heard argument from the parties, issued an informal recommendation, and facilitated an agreement between the parties in April 2019 that resolved all issues in Plaintiffs' motion (the "April 2019 Agreement"), including this same issue of data supplementation. Although Plaintiffs had originally moved to compel a transactional data end date of "December 31, 2017, subject to annual supplements," Mot. to Compel on Global Issues 5, Sept.

25, 2018, ECF No. 714-1, the parties negotiated an agreement—guided by Special Discovery Master Merenstein's informal recommendation—by which (1) Defendants would produce transactional data through December 31, 2018, providing Plaintiffs an additional year of data beyond what they requested and setting a firm end-date for purposes of collection and production, and (2) Plaintiffs could seek supplementation of those productions only if warranted by additional information or developments in the MDL.

In reliance on the April 2019 Agreement, Defendants have collected transactional data, provided samples, and participated in meet and confers with Plaintiffs to discuss the data and individual burden issues. Defendants in bellwether cases have substantially completed production of data relating to bellwether products, and productions relating to non-bellwether products will be completed in the coming weeks.[1] At no point during the meet and confers did Plaintiffs indicate that they intended to renege on the April 2019 agreement to again seek supplementation.

Once the parties reached an impasse this summer on another issue, Plaintiffs piggybacked another request for supplementation onto the dispute. Specifically, Plaintiffs sought both an extension of the cutoff date from December 31, 2018 to December 31, 2019 and future supplemental productions. After briefing and a hearing, Special Discovery Master Merenstein informally recommended that the parties be held to the April 2019 Agreement, including for products added to the MDL since April 2019. Plaintiffs objected to the denial of data supplementation, but Special Discovery Master Merenstein again agreed with Defendants and issued his Report and Recommendation denying Plaintiffs' request for supplementation. *See* Second Report and Recommendation of the Special Discovery Master as to Pls.' Mot. to Compel Supp. Productions of Transactional Data, ECF No. 1503 (hereinafter "R&R").

---

[1] Some Defendants have already substantially completed their entire data productions.

As the R&R concluded, the April 2019 Agreement terms regarding transactional data reflected a principled compromise between the parties: Plaintiffs received an additional year of transactional data, and Defendants received assurance that they would not have indefinite data production obligations. This agreement enabled negotiations regarding potentially relevant data fields, collections, and productions to proceed.

While the parties "retain[ed] the right to seek or object to additional discovery beyond the parameters outlined above if warranted by additional information or developments in the MDL," Apr. 2019 Agmt. (Ex. 1 at ¶ 7), no such changed circumstances exist here. Neither of Plaintiffs' claimed sources of "additional information or developments"—*i.e.*, the 2019 and 2020 prices for certain pharmaceutical products and this Court's bellwether ruling—justifies supplementation. As described herein, the fact that ███████████████████████████████████████████ ████ was known to Plaintiffs at the time of the April 2019 agreement, and regardless, Plaintiffs rely on an incorrect analysis to assert that this pricing is germane at all. Additionally, nothing about the selection of particular cases as bellwethers justifies supplementation given that, among other reasons, Plaintiffs' requests for supplementation have spanned all products.

Plaintiffs decry the R&R as imposing a "heightened" requirement that offers "no guidance" as to the conditions under which they can seek data supplementation in the future. Pls.' Obj. to Second Report and Recommendation as to Mot. to Compel Supplemental Productions of Transactional Data, Oct. 2, 2020, at 11-12 (hereinafter "Obj."). But applying the plain terms of the parties' own agreement cannot be an improper heightened standard. Parties are free to enter into discovery agreements, and the case law supports holding Plaintiffs to the deal they struck. *See, e.g.*, Order at 1 n.1, *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, No. 13-md-2445 (E.D. Pa. Nov. 30, 2017), ECF No. 419 (Ex. 2) (hereinafter "*Suboxone*") (holding

plaintiffs to agreement on data productions and rejecting demands for supplementation). Altering the parties' expectations as to data supplementation now would frustrate the purpose of the April 2019 Agreement and inject unnecessary delays and uncertainty into the discovery process. Defendants, therefore, respectfully request that this Court adopt the R&R in full.

## II.     LEGAL STANDARD

"Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999). Moreover, courts do not require "rolling, open-ended discovery simply because the moving party alleges ongoing misconduct. . . [A] party is *not* under a continuing burden except as expressly provided'—that is, except when a party learns that in some material respect its prior discovery is incomplete or incorrect." *Kuhns v. City of Allentown*, 2010 WL 4236873, at *2 (E.D. Pa. Oct. 26, 2010). Parties may also enter into agreements concerning their discovery obligations, which courts will uphold. *See Suboxone.*

## III.    ARGUMENT

### A.     Special Discovery Master Merenstein Correctly Found that There Are No Changed Circumstances Warranting Departure from the April 2019 Agreement

#### 1.     The Parties' April 2019 Agreement Set a Cutoff Date for Transactional Data of December 31, 2018 and Did Not Provide for Supplementation

Plaintiffs attempt to frame the April 2019 Agreement as merely contemplating "the production of data through the then-present" and that the cutoff date of December 2018 was chosen as "the end of the then-most recent year." Obj. at 13-14. But Plaintiffs expressly agreed to a fixed cutoff date of December 2018, despite demanding supplementation in their original motion to compel. The cutoff date was to guide data productions going *forward*—not to apply only to the single moment in time when the parties reached the Agreement. The cutoff date was in no way

tied to the length of discovery or the date of productions, and the Agreement did not provide for supplementation.

Judge Goldberg's denial of Direct Purchaser Plaintiffs' motion to compel supplemental sales data in *Suboxone* presents an apt analogy. The court rejected DPPs' arguments that "(a) th[e] data [was] highly relevant to assess injury and damages to the class, and (b) [defendant had] a duty to supplement its discovery responses under Federal Rule of Civil Procedure 26(e)(1)(A)" in light of a negotiated agreement between the parties on appropriate discovery limits, as is the situation here. *Suboxone* at 1 n.1. The agreement in *Suboxone* was explicit that defendants "will not produce documents or information in response to these RFPs other than the financial data already produced." *Id*. Likewise here, the April 2019 Agreement was explicit that there was a cutoff date, clearly resolved all issues raised in the motion to compel (one of which was supplementation), and did not provide for supplementation. As in *Suboxone*, Plaintiffs here "agreed to precise limitations on the financial documentation to which they are entitled." *Id*. Particularly in light of the magnitude of the case, Defendants need to be able to rely on the parties' negotiated discovery boundaries that do not expand at Plaintiffs' whim.

Moreover, the time required for data discovery and the overall case schedule were not unforeseeable. As Special Discovery Master Merenstein recognized, "plaintiffs knew in April 2019 that many months and even years would pass between the transactional data cutoff date of December 31, 2018 and other key events in the litigation." R&R at 8. *See also Suboxone* at 2 n.1 ("[D]elays in a case of this magnitude were not unexpected or unforeseeable. Plaintiffs could have easily negotiated an appropriate provision into the Discovery Agreement requiring supplementation of specific information in the event of such delays. Their failure to do so precludes

them from attempts to amend the agreement through a motion to this Court."). Plaintiffs cannot now recast their agreement as somehow being limited in duration or scope.

> ### 2.    Neither Post-2018 Prices Nor this Court's Bellwether Ruling Supports Supplementation Under the Terms of the April 2019 Agreement

No additional information or developments have come to light that justify unwinding the parties' April 2019 Agreement. Plaintiffs cite to two supposedly pertinent developments: ████████████████████████████████████████████████████████████ ██████████████████████ and this Court's July 13, 2020 bellwether ruling. Obj. at 2, 14. Neither supports requiring data supplementation either now or in the future.

Plaintiffs principally rely on the 2019-2020 prices as the key "additional information" justifying data beyond the cutoff date set forth in the April 2019 Agreement. But Plaintiffs also argue that the post-2018 data would be relevant from their perspective ████████████████ Obj. at 7. Thus, if the post-2018 data would have been relevant from Plaintiffs' perspective ███████ ██████████████████████ Plaintiffs cannot argue that the prices in 2019 and 2020 constitute new information that supports revising the cutoff date under the terms of the April 2019 Agreement. Moreover, Plaintiffs had IMS data for 2016-2018 when they agreed to the April 2019 Agreement.[2] At that time, █████████████████████████████████████████████ ████████████████████████████ but Plaintiffs nonetheless agreed to an end date of December 31, 2018 and never stated that future prices would be cause for supplementation.

The fact that prices for certain products are █████████████████████████████████ █████████████████████████ also provides no basis for requiring supplementation. According to Plaintiffs' expert, Dr. Leitzinger, "[t]he end date of such lasting effects of a cartel would be

---

[2] In fact, Plaintiffs had access to the majority of the data for this period when they filed their September 2018 motion to compel arguing for a cutoff date of December 31, 2017.

when the but-for prices and the actual prices have fully converged." Ex. A to Obj., Leitzinger Decl.

¶ 8. He then concludes that ███████████████████████████████ itself "suggest[s]

that the alleged conspiracy as it related to Clomipramine continued in 2019 or, if not, there were

still continuing overcharges from that prior conspiracy in 2019." *Id.* ¶ 9. But that conclusion

incorrectly conflates the 2013 price with the but-for price in 2019 and fails to account for external

factors impacting price, as Dr. Leitzinger acknowledges it must. *Id.* ¶ 8 (citing literature stating

that the correct benchmark is not pre-conduct pricing). Indeed, pricing levels can be due to any

number of market factors, including issues related to the cost and supply of active pharmaceutical

ingredients (API) and other raw materials, market consolidation, heightened demand for certain

products following expanded coverage programs, increased prices by other intermediaries

(including pharmacy benefit managers)[3] in the distribution chain, inflation, and myriad other

factors.[4] In any event, this Court does not need to reach the merits of this argument at this juncture

because, as Special Discovery Master Merenstein correctly found, the 2019-2020 prices of certain

products do not constitute new information under the terms of the April 2019 Agreement.

Plaintiffs then argue that Special Discovery Master Merenstein's issuance of his informal

recommendation denying data supplementation on the same day as the bellwether order justifies

undoing the terms of the April 2019 Agreement. Obj. at 14. But Plaintiffs cannot seriously contend

---

[3] *See* Auditor of State, *Ohio's Medicaid Managed Care Pharmacy Services* 1 (Aug. 16, 2018) *(*Ex. 3) (report by Ohio regarding impact of PBM practices on generic product pricing); Massachusetts Health Policy Commission, *HPC DataPoints, Issue 12: Cracking Open the Black Box of Pharmacy Benefit Managers* (June 5, 2019) (Ex. 4) (report by Massachusetts regarding impact of PBM practices on generic pharmaceutical pricing, including numerous products at issue in the MDL). It is disingenuous for Plaintiffs to argue they are hearing about PBMs' impact on prices "for the first time in this litigation," Obj. at 13 n.8, when they have already issued numerous subpoenas to PBMs seeking, among other things, extensive transactional data.

[4] *See* Defendants' Opposition to Plaintiffs' Motion to Compel Data Supplementation, Aug. 18, 2020, at 15, 11 n.7. (Ex. 5).

that the bellwether decision prompted their claimed need for supplementation when they submitted their letter brief to the Special Masters requesting supplementation *three weeks prior* to the bellwether order. *Compare* Pls.' Ltr. Br. to Special Masters, dated June 23, 2020 (Ex. 6) *with* ECF No. 1442, dated July 13, 2020. And, as the R&R highlighted, Plaintiffs sought supplementation back in September 2018 for all products, including the three bellwether products. R&R at 8. As such, this Court's bellwether ruling also does not constitute a new development warranting supplementation.

### B. Plaintiffs Have Not Demonstrated that the Agreed-Upon Data Will Provide an Insufficient Benchmark for Assessing Impact and Damages

Plaintiffs have not demonstrated that data supplementation is necessary to provide a benchmark for assessing impact and damages, especially in light of the voluminous data productions already being made that provide Plaintiffs with years of data both before and after the alleged conduct. The dozens of complaints filed in this case between March 2016 and the present do not allege unlawful price increases, communications, or agreements occurring after 2016. Discovery must be grounded in the factual allegations in Plaintiffs' complaints, and a 2018 cutoff date means Plaintiffs are getting three years (or more for some products) of data following the last-in-time allegations of unlawful price increases.

Courts generally limit benchmark "after-period" data to two to three years beyond the end date of the alleged conduct—precisely what the parties previously agreed to here. For example, in *Ashton Woods Holdings LLC v. USG Corp.*, the court held that two years of data following the alleged conspiracy was sufficient for plaintiffs' analysis. 2016 U.S. Dist. LEXIS 166424, at *4 (E.D. Pa. Dec. 2, 2016); *see also In re Microcrystalline Cellulose*, 221 F.R.D. 428, 430 (E.D. Pa. 2004) (court rejected argument that more than three years of data following the alleged conspiracy

was needed to "prove liability and calculate damages" using a "before and after analysis"); *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583, 597 (N.D. Cal. 2010) (same).[5]

Plaintiffs respond that "[n]othing—not the filing of the first generic price-fixing complaint in March 2016, nor defendants' receipt of subpoenas from the Department of Justice in 2016, nor anything else— ███████████████████████ " Obj. at 4. However, some government subpoenas in fact issued as early as 2014, and the alleged lack of price impact suggests that prices were never at "conspiracy levels" but rather at levels reflecting non-conspiratorial industry realities. Additionally, the start date of a government investigation is a presumptive dividing line for before-and-after analyses in antitrust cases, based on the logic that any allegedly anticompetitive conduct would cease at the initiation of the investigation. *See, e.g.*, *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 2016 WL 2756437, at *4 (E.D. La. May 12, 2016) (plaintiffs' expert used ten-month period after initiation of Federal Trade Commission investigation as benchmark).

As Special Discovery Master Merenstein recognized, Defendants are producing data for "almost three years after the first complaint was filed in this matter and more than four years after the first investigations into the conduct at issue in the MDL," and "[P]laintiffs will have access to many years of such data for the period following the heart (if not the entirety) of the alleged antitrust conspiracies." R&R at 7. Contrary to Plaintiffs' assertions, this is not an inappropriate merits determination; rather, Special Discovery Master Merenstein's R&R is explicitly tailored to the "alleg[ations]" in Plaintiffs' complaints. *Id.*

---

[5] In fact, antitrust plaintiffs in other cases have relied on much shorter benchmark periods. *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 602 (N.D. Ill. 2015) (plaintiffs used "a benchmark period of *months* before and after the class period") (emphasis added), *aff'd*, 831 F.3d 919 (7th Cir. 2016); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 193 (E.D. Pa. 2016) (using a "before-and-after period of thirty days").

C.     **The Case Law Supports Adopting Special Discovery Master Merenstein's Report and Recommendation Denying Supplementation of Post-2018 Data**

Plaintiffs' cited cases stand for the unremarkable proposition that data is often produced for a limited "after period" beyond the alleged end date of the unlawful conduct—which Defendants do not contest (*see supra*, Section III.B.). What Plaintiffs ignore is that no case supports an open-ended demand for supplementation for an indefinite number of products over multiple intervals and at undetermined points in the future. Rule 26 does not require "rolling, open-ended discovery." *Kuhns*, 2010 WL 4236873, at *2.[6] Instead, courts often refuse requests for supplementation—particularly in light of a prior agreement between the parties; where, as here, the supplementation would be burdensome; or where the moving party has not demonstrated that seeking additional discovery would be anything more than a fishing expedition.[7]

Plaintiffs claim support from *EpiPen*, but there the parties agreed to limited supplementation on one product, and only after a class was certified. Pretrial Order at 54, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, No. 2:17-md-02785-DDC-TJJ (D. Kan. July 17, 2020), ECF No. 2169 (Ex. 7). Here, Plaintiffs are seeking a broad license for supplementation of an unknown amount of years' worth of data for potentially hundreds of products from dozens of Defendants. *In re Processed Egg Prods. Antitrust Litig.* is

---

[6] *See also, e.g.*, *MSC Software Corp. v. Altair Eng'g, Inc.*, 2012 WL 1340445, at *2 (E.D. Mich. Apr. 18, 2012) ("Rule 26(e) does not place a continuing burden [] to supplement with new information . . . [T]here are serious objections to the burden continuous supplementation imposes, especially in protracted cases.").

[7] *See, e.g.*, *Suboxone*; *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *5 (D. Kan. Dec. 21, 2012), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) (denying motion to compel supplementation of discovery responses); *Adidas Am., Inc. v. TRB Acquisitions LLC*, 2018 WL 4849312, at *4 (D. Or. Oct. 5, 2018) (refusing to alter parties' agreement for a single supplementation closer to trial when such supplementation would be burdensome); *Diaz-Padilla v. BMS Holding Co.*, 2005 U.S. Dist. LEXIS 5879, at *7–8 (D.P.R. Apr. 4, 2005) (refusing to compel additional data production because "courts should not grant discovery requests based on pure speculations that amount to nothing more than a fishing expedition").

similarly unpersuasive, as the stipulated agreement there provided for annual supplementation, whereas the April 2019 Agreement did not provide for supplementation at all. *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa. June 27, 2013), ECF No. 829 at 2 (Ex. 8).

*In re Broiler Chicken Antitrust Litigation* is also inapposite. Order at 3, No. 1:16-cv-08637 (N.D. Ill. May 19, 2020), ECF No. 3622 (Ex. 9). First, the plaintiffs there alleged specific examples of allegedly anticompetitive conduct, such as "ongoing unlawful exchanges of [statistical] reports" and the continued use of a policy by one defendant to coordinate production with others. Pls.' Reply in Supp. of Mot. to Compel at 3, No. 16-cv-08637 (N.D. Ill. May 4, 2020), ECF No. 3593 (Ex. 10). Second, plaintiffs requested "somewhat narrower" supplementation only after scheduling issues that unexpectedly and "significantly" delayed the case, and the parties had not agreed upon a firm end date for production. Order at 3-4 (Ex. 9). Plaintiffs here, in contrast, do not allege specific price increases or communications after 2016, have cited no unforeseeable changes to the case schedule compared to the one that existed at the time of the April 2019 Agreement, and request supplementation of the same broad data they are currently receiving.[8]

Based on Plaintiffs' logic, so long as prices are higher than alleged pre-conspiracy prices in *any* year in which a case in this MDL gets to class certification, summary judgment, or trial, then Plaintiffs are entitled to supplemental data. ██████████████████████

---

[8] *In re Restasis Antitrust Litig.* is not analogous because it was a generic exclusion case in which the alleged conduct was ongoing. *See* Mot. at 3, No. 18-md-02819-NG (E.D.N.Y. June 5, 2019), ECF No. 298 (Ex. 11). *Isola U.S. Corp. v. Taiwan Union Tech. Corp.* was a patent case where plaintiff requested the "updating of a single-page spreadsheet" just to calculate damages due to ongoing infringement. 2015 WL 12555875, at *1 (D. Ariz. Aug. 20, 2015). In *Bro-Tech Corp. v. Thermax, Inc.*, plaintiffs alleged an ongoing misappropriation of trade secrets. 651 F. Supp. 2d 378, 385 (E.D. Pa. 2009). Finally, *Am. Express Travel Related Servs. Co. v. Visa U.S.A. Inc.*, was a competitor exclusion case and the requested data supplementation was "mutually-agreed information" mostly to track new agreements among the member banks and credit card companies. Stipulated Order, No. 1:04-cv-08967 (S.D.N.Y. May 15, 2007), ECF No. 267 (Ex. 12).

████████████████████████████████████████

██████████████████████████████ There is no basis for the Court to disregard the parties'

previously negotiated agreement on appropriate cutoff dates.

Plaintiffs also argue that disgorgement and the need to identify class members justify

supplemental data, but these arguments also fail. Plaintiffs simply assume that Defendants' post-

2016 profits are the result of illegality, and the further out from the factual allegations (i.e., 2019

and beyond), the less persuasive Plaintiffs' argument. Additionally, ordering future

supplementation now to identify hypothetical direct purchasers that purchased a product at issue

for the first time after 2018 is pure speculation, and further undercut by the fact that three direct

purchaser wholesalers (Cardinal Health, McKesson Corp. and AmerisourceBergen Corp.) are

responsible for the overwhelming majority of wholesaler purchases.

Moreover, even if Plaintiffs obtain Defendants' post-2018 data, they will need "alternative"

third party data to determine damages (and possibly liability), as Defendants' data alone is

insufficient for the many plaintiffs that do not purchase directly from Defendants—a point that

Plaintiffs acknowledge. Obj. at 6. Because pharmaceutical distribution channels are incredibly

complex, particularly for indirect purchasers, and depend largely on third-party intermediaries,

third-party data will be required to assess pass-through. Thus, in addition to setting the parties'

discovery obligations, a firm end date also guides negotiations with the dozens of third parties

subpoenaed by both Plaintiffs and Defendants.

**D.      Adopting the Report and Recommendation Will Not Prejudice Plaintiffs**

To the extent that Plaintiffs seek ongoing damages beyond 2018 in light of allegedly

lingering price effects, Special Discovery Master Merenstein's R&R does not prevent them from

doing so. As explained therein, "whether [Plaintiffs] are entitled to such damages is not an issue

before the Special Discovery Master and the adoption of this Report and Recommendation would

not foreclose plaintiffs from seeking such damages." R&R at 9.[9] Moreover, claiming that damages continue to accrue (especially before any merits issue has been decided) does not justify departure from the parties' April 2019 Agreement. This issue was squarely before the court in *Suboxone*, where plaintiffs argued that "the requested supplemental updated data production will allow Plaintiffs to calculate Class damages through the present, consistent with Plaintiffs' claims." Pls.' Reply in Supp. of Mot. to Compel at 4, *Suboxone* (E.D. Pa. Nov. 10, 2017), ECF No. 413-1 (Ex. 13). Nonetheless, the court denied plaintiffs' request, finding that plaintiffs' argument "disregards the formal, written agreement concerning [defendants'] discovery obligations entered into by the parties" nearly two years earlier. Order at 1 n.1, *Suboxone* (Ex. 2).

Plaintiffs also claim that absent guarantees of access to Defendants' data, they "will need to begin the expensive and time-consuming task of obtaining alternative data from third parties now." Obj. at 12. It is not clear what burden Plaintiffs are hoping to avoid, as they have *already* begun collecting data from third parties. In fact, Plaintiffs have issued dozens of subpoenas to date. It is simply too speculative to claim that lack of data supplementation at this point would be prejudicial to Plaintiffs, especially when Plaintiffs have made no showing as to the vast majority

---

[9] Contrary to Plaintiffs' assertions, the R&R does not bar Plaintiffs from attempting to prove harm from alleged "lingering effects" based on reasonable estimates and an appropriate methodology, but nothing about this instant dispute changes the standard to be applied to Plaintiffs' claims at later stages in the litigation. *See In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 525 n.13 (N.D. Ill. 1982) ("future damages may be recovered if they can be reasonably estimated"); *Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, 2007 U.S. Dist. LEXIS 98353, at *30-31 (D. Kan. Dec. 19, 2007) (expert's testimony was found speculative when it contained "no analysis of future market conditions, future population trends, future reimbursement trends, future competition, etc."). In *Insight Equity v. Transitions Optical, Inc.*, the plaintiff's estimated damages were acceptable only when based on a "estimates that were actually used in the course of business." 252 F. Supp. 3d 382, 396 (D. Del. 2017).

of products at issue in this case.[10] Furthermore, Plaintiffs' broad and vague request that they not be held to the changed-circumstances standard they themselves negotiated is unavailing, and granting such a request would render the earlier agreement between the parties meaningless.

### E.   Ongoing Data Supplementation Will Impose Significant Burdens on Defendants

Plaintiffs argue that the burden is on Defendants to demonstrate why post-2018 data is not relevant and why productions of such data would impose an undue burden in order to *uphold* the terms of the April 2019 Agreement. This would be turning the agreement on its head. Instead, Plaintiffs bear the burden of demonstrating "additional information or developments" warranting departure from the agreement. Thus, criticizing Special Discovery Master Merenstein for not addressing "the relevance of post-2018 transaction data, or whether defendants would incur any substantial burden in producing it" is baseless. Obj. at 2. He did not need to reach either of those conclusions in order to deny supplementation. What Plaintiffs wanted him to do was ignore the requirements of the parties' agreement, and consider only the relevance and proportionality of post-2018 data. But Special Discovery Master Merenstein, correctly, considered the agreement's threshold question of whether the moving party identified "additional information or developments in the MDL." Finding that Plaintiffs had failed to do so, he correctly denied Plaintiffs' Motion.

Regardless, as described above, *supra* Sections III.A.2, III.B, Plaintiffs fail to show that the data supplementations would be relevant, thus ending the inquiry. Nonetheless, requiring Defendants to supplement their transactional data at numerous to-be-determined points would impose an enormous burden—and even the request for a single "refresh" of the bellwether data

---

[10] Defendants reject Plaintiffs' attempt to shield their expert reports from any critiques. Obj. at 6 n.5. Because expert reports have not yet been served and evaluated, Plaintiffs' request is premature and unfounded, and no precedent supports granting such an extraordinary demand.

would impose a significant burden. Plaintiffs bury their heads in the sand as to burden, claiming that Defendants "have never demonstrated" why data supplementation would be burdensome. Obj. at 10. After numerous meet and confers with Defendants spanning over a year in which the parties discussed the collection, review, and production of millions of rows of transactional data, Plaintiffs cannot now feign ignorance as to the burdens the process imposes on Defendants.

Plaintiffs attempt to minimize their requests by stating they are only seeking supplementation "prior to class certification" and "at a small number of other key events" including class certification for other products, summary judgment, and trial. Obj. at 11. This could mean collecting years of data across dozens of fields for sales and costs for hundreds of products on multiple occasions. Each time data is collected and produced, Defendants need to confer with their employees, grapple with changes in complex data systems over time, organize data for processing and production, answer questions from Plaintiffs regarding the data and the fields, and engage experts to analyze even more data. Granting an unbounded request for future supplementation will create an undue burden on Defendants and frustrate the April 2019 Agreement's purpose of setting reasonable limits on discovery.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court overrule Plaintiffs' objections and enter an order upholding the R&R.

Dated: October 26, 2020

Respectfully submitted,

*/s/ Sheron Korpus*
Sheron Korpus
Seth A. Moskowitz
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
skorpus@kasowitz.com
smoskowitz@kasowitz.com

*Counsel for Defendants Actavis*
*Elizabeth, LLC, Actavis Holdco U.S.,*
*Inc., and Actavis Pharma, Inc.*

*/s/ R. Brendan Fee*
R. Brendan Fee
Steven A. Reed
Melina R. DiMattio
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
brendan.fee@morganlewis.com
steve.reed@morganlewis.com
melina.dimattio@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219
Telephone: (412) 560-7455
wendy.feinstein@morganlewis.com

*Counsel for Defendant Glenmark*
*Pharmaceuticals, Inc., USA*

*/s/ Jeffrey C. Bank*
Jeffrey C. Bank
Seth C. Silber
**WILSON SONSINI GOODRICH &**
**ROSATI, PC**
1700 K Street, NW Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8824
jbank@wsgr.com
ssilber@wsgr.com

Chul Pak
**WILSON SONSINI GOODRICH &**
**ROSATI, PC**
1301 Avenue of the Americas 40th Floor
New York, New York 10019
Telephone: (212) 497-7726
cpak@wsgr.com

Adam K. Levin
Benjamin F. Holt
Justin W. Bernick
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
adam.levin@hoganlovells.com
benjamin.holt@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendants Mylan Inc., Mylan*
*Pharmaceuticals, Inc., UDL Laboratories,*
*Inc., and Mylan N.V.*

/s/ Mark A. Robertson
Robin D. Adelstein
Mark A. Robertson
Gerald A. Stein
**NORTON ROSE FULBRIGHT US LLP**
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3000
mark.roberston@nortonrosefulbright.com
robin.adelstein@nortonrosefulbright.com
gerald.stein@nortonrosefulbright.com

*Counsel for Defendants Valeant
Pharmaceuticals North America LLC
n/k/a Bausch Health US, LLC, Valeant
Pharmaceuticals International n/k/a
Bausch Health Americas, Inc., and
Oceanside Pharmaceuticals, Inc.*

/s/ Margaret A. Rogers
Margaret A. Rogers
Saul P. Morgenstern
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 W. 55th Street
New York, NY 10019
Telephone: (212) 836-8000
margaret.rogers@arnoldporter.com
saul.morgenstern@arnoldporter.com

Laura S. Shores
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Avenue
Washington, DC 20001
Telephone: (202) 942-5000
laura.shores@arnoldporter.com

*Counsel for Defendants Sandoz Inc. and
Fougera Pharmaceuticals Inc.*

/s/ Sarah F. Kirkpatrick
Sarah F. Kirkpatrick
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
skirkpatrick@wc.com

*Counsel for Defendant Par Pharmaceutical
Inc.*

/s/ Christopher P. Wilson
Christopher P. Wilson
John M. Taladay
Erik T. Koons
Stacy L. Turner
**BAKER BOTTS LLP**
1299 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 639-7700
christopher.wilson@bakerbotts.com

john.taladay@bakerbotts.com
erik.koons@bakerbotts.com
stacy.turner@bakerbotts.com

Lauri A. Kavulich
Ann E. Lemmo
**CLARK HILL PLC**
2001 Market St, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
lkavulich@clarkhill.com
alemmo@clarkhill.com

Lindsay S. Fouse
**CLARK HILL PLC**
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
lfouse@clarkhill.com

*Counsel for Defendants Sun Pharmaceutical
Industries, Inc. and Taro Pharmaceuticals
USA, Inc.*

/s/ Raymond A. Jacobsen, Jr.
Raymond A. Jacobsen, Jr.
Paul M. Thompson (Pa. Bar No. 82017)
Lisa (Peterson) Rumin
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, NW
Washington, D.C. 20001
Telephone: (202) 756-8000
rayjacobsen@mwe.com
pthompson@mwe.com
lrumin@mwe.com

Nicole L. Castle
**MCDERMOTT WILL & EMERY LLP**
340 Madison Avenue
New York, NY 10173
Telephone: (212) 547-5400
ncastle@mwe.com

*Counsel for Defendants Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals LLC, and Impax Laboratories, Inc.*

/s/ Jan P. Levine
Jan P. Levine
Robin P. Sumner
Michael J. Hartman
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
Telephone: (215) 981-4000
jan.levine@troutman.com
robin.sumner@troutman.com
michael.hartman@troutman.com

*Counsel for Defendant West-Ward Pharmaceuticals Corp. (n/k/a Hikma Pharmaceuticals USA, Inc.)*

/s/ Edward B. Schwartz
Edward B. Schwartz
Nicholas V. Albu
Andrew C. Bernasconi
**REED SMITH LLP**
1301 K Street NW
Suite 1000
Washington, DC 20005
Telephone: (202) 414-9200
eschwartz@reedsmith.com
nalbu@reedsmith.com
abernasconi@reedsmith.com

*Counsel for Defendant Heritage Pharmaceuticals, Inc.*

/s/ Brian J. Smith
Michael Martinez
Steven Kowal
Lauren Norris Donahue
Brian J. Smith
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372-1121
michael.martinez@klgates.com
steven.kowal@klgates.com
lauren.donahue@klgates.com
brian.j.smith@klgates.com

*Counsel for Defendant Mayne Pharma Inc.*

/s/ Jay P. Lefkowitz, P.C.
Jay P. Lefkowitz, P.C.
Devora W. Allon
Alexia R. Brancato
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jay.lefkowitz@kirkland.com
devora.allon@kirkland.com
alexia.brancato@kirkland.com

*Counsel for Defendant Upsher-Smith Laboratories, LLC*

18

*/s/ J. Gordon Cooney, Jr.*
J. Gordon Cooney, Jr.
John J. Pease, III
Alison Tanchyk
William T. McEnroe
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
jgcooney@morganlewis.com
john.pease@morganlewis.com
alison.tanchyk@morganlewis.com
william.mcenroe@morganlewis.com

Amanda B. Robinson
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: (202) 739-3000
amanda.robinson@morganlewis.com

*Counsel for Defendant Teva*
*Pharmaceuticals USA, Inc.*

*/s/ J. Clayton Everett, Jr.*
Scott A. Stempel
J. Clayton Everett, Jr.
Tracey F. Milich
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: (202) 739-3000
scott.stempel@morganlewis.com
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

Harvey Bartle IV
Francis A. DeSimone
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
harvey.bartle@morganlewis.com
frank.desimone@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

*/s/ Wayne A. Mack*
Wayne A. Mack
Sean P. McConnell
Sarah O'Laughlin Kulik
**DUANE MORRIS LLP**
30 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1152
wamack@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com

*Counsel for Defendant Aurobindo Pharma*
*USA, Inc.*

*/s/ Ryan T. Becker*
Gerald E. Arth
Ryan T. Becker
Nathan M. Buchter
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2000
garth@foxrothschild.com
rbecker@foxrothschild.com
nbuchter@foxrothschild.com

George G. Gordon
Julia Chapman
**DECHERT LLP**
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2382
george.gordon@dechert.com
julia.chapman@dechert.com

*Counsel for Defendant Lannett Company, Inc.*

*/s/ Jason R. Parish*
Jason R. Parish
Martin J. Amundson
**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 452-7900
jason.parish@bipc.com
martin.amundson@bipc.com

Bradley J. Kitlowski
**BUCHANAN INGERSOLL & ROONEY PC**
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Telephone: (412) 562-8800
bradley.kitlowski@bipc.com

*Counsel for Defendant Zydus Pharmaceuticals (USA) Inc.*

*/s/ James W. Matthews*
James W. Matthews
Katy E. Koski
John F. Nagle
**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, Massachusetts 02199
Telephone: (617) 342-4000
jmatthews@foley.com
kkoski@foley.com
jnagle@foley.com

James T. McKeown
Elizabeth A. N. Haas
Kate E. Gehl
**FOLEY & LARDNER LLP**
777 E. Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 271-2400
jmckeown@foley.com
ehaas@foley.com
kgehl@foley.com

Steven F. Cherry
April N. Williams
Claire Bergeron
**WILMER CUTLER PICKERING HALE AND DORR LLP**
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
steven.cherry@wilmerhale.com
april.williams@wilmerhale.com
claire.bergeron@wilmerhale.com

Terry M. Henry
Melanie S. Carter
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA  19103
Telephone: (215) 569-5644
THenry@blankrome.com
MCarter@blankrome.com

*Counsel for Defendant Apotex Corp.*