**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724 Case No. 2:16-MD-2724 |
| THIS DOCUMENT RELATES TO: *Direct Purchaser Class Plaintiffs' Actions* | HON. CYNTHIA M. RUFE |

**MEMORANDUM IN SUPPORT OF DIRECT PURCHASER
CLASS PLAINTIFFS' MOTION FOR AN ORDER:
(1) CERTIFYING A SETTLEMENT CLASS;
(2) GRANTING PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENTS;
(3) APPOINTING SETTLEMENT CLASS COUNSEL;
(4) APPOINTING A CLAIMS ADMINISTRATOR AND ESCROW AGENT;
(5) APPROVING THE FORM AND MANNER OF NOTICE TO THE
SETTLEMENT CLASS;
(6) PRELIMINARILY APPROVING THE PLAN OF ALLOCATION; AND
(7) SCHEDULING A FAIRNESS HEARING**

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 3

III.    MATERIAL TERMS OF THE SETTLEMENTS.................................................. 4

      A.      Monetary Relief ........................................................................................5

      B.      Joint and Several Liability of Non-Settling Defendants ............................6

      C.      MFN Clauses ............................................................................................6

      D.      Cooperation by Sun and Taro ...................................................................7

      E.      Settlement Class Releases.........................................................................7

      F.      Expenses, Attorneys' Fees, and Service Awards.......................................8

IV.     THE REQUIREMENTS FOR CERTIFICATION OF A SETTLEMENT
      CLASS HAVE BEEN MET ............................................................................... 10

      A.      The Requirements of Rule 23(a) Are Satisfied.........................................12

            i.      Numerosity.................................................................................... 12

            ii.     Commonality................................................................................. 13

            iii.    Typicality ...................................................................................... 14

            iv.     Adequacy of Representation .......................................................... 16

      B.      The Requirements of Rule 23(b)(3) Are Satisfied ....................................16

            i.      Predominance................................................................................. 17

                 1.      Common Issues Predominate as to Violation of
                 the Antitrust Laws........................................................ 20

                 2.      Common Issues Predominate as to Proof of
                 Impact ......................................................................... 21

                 3.      The Court Need Not Evaluate Damages To Certify
                 the Settlement Class......................**Error! Bookmark not defined.**

|  |  | ii. | A Class Action Is Superior to Other Methods of Adjudication | 26 |

|  | C. | Settlement Class Counsel Meet the Requirements for Appointment | 27 |

| V. | THE PROPOSED SETTLEMENTS MEET THE STANDARD FOR PRELIMINARY APPROVAL | 29 |

|  | A. | The Court is Likely to Determine the Proposed Settlements are Fair, Reasonable, and Adequate Pursuant to Rule 23(e)(2) | 30 |

|  |  | i. | The Class Representatives and Settlement Class Counsel Have Adequately Represented the Settlement Class | 31 |

|  |  | ii. | The Proposed Settlements Were Reached After Arm's Length Negotiations | 32 |

|  |  | iii. | The Relief Provided for the Settlement Class is Adequate | 32 |

|  |  |  | 1. | The Settlements Account for the Costs, Risks, and Delays of Trial and Appeal | 34 |

|  |  |  | 2. | The Settlements Provide an Effective Method to Distribute the Relief to the Settlement Class | 36 |

|  |  |  | 3. | The Proposed Terms for Attorneys' Fees are Reasonable | 38 |

|  |  | iv. | The Proposal Treats Settlement Class Members Equitably | 40 |

| VI. | A.B. DATA SHOULD BE APPOINTED AS THE CLAIMS ADMINISTRATOR AND THE HUNTINGTON NATIONAL BANK SHOULD BE APPOINTED AS THE ESCROW AGENT | 40 |

| VII. | THE FORM AND MANNER OF NOTICE SHOULD BE APPROVED | 41 |

| VIII. | THE PLAN OF ALLOCATION SHOULD BE PRELIMINARILY APPROVED | 44 |

| IX. | THE PROPOSED SCHEDULE IS FAIR AND SHOULD BE APPROVED | 49 |

| X. | CONCLUSION | 50 |

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Actavis Holdco U.S., Inc. v. Connecticut*, 141 S. Ct. 124 (2020) .....................................28

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................10, 16,18, 19, 26

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455 (2013) ..............................17

*Am. Sales Co., LLC v. Pfizer, Inc.*, 2017 WL 3669604 (E.D. Va. July 28, 2017) .............10

*Am. Sales Co., LLC v. Pfizer, Inc.*, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017)............10

*Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127 (E.D. Pa. 2010)...............10

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ................................................................13

*Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89 (D.N.J. 2018)..........................................45

*Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322 (E.D. Pa. 2007)..........45

*Byrd v. Aaron's, Inc.*, 784 F.3d 154 (3d Cir. 2015) ....................................................42, 43

*Caddick v. Tasty Baking Co.*, 2021 WL 1374607 (E.D. Pa. Apr. 12, 2021) .........24, 30, 31

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d. Cir. 2013) .....................................................42

*Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820 (D.N.J. 2015)......................14, 16, 21

*Castro v. Sanofi Pasteur, Inc.*, 2015 WL 5770381 (D.N.J. Sept. 30, 2015).....................18

*Chimenti v. Wetzel*, 2018 WL 2388665 (E.D. Pa. May 24, 2018)....................................14

*Dewey v. Volkswagen Aktiengesellschaft¸ 681 F.3d 170 (3d Cir. 2012) ..........................15

*Ebner v. Merchants & Med. Credit Corp.*,
2017 WL 1079966 (E.D. Pa. Mar. 22, 2017).....................................................................34

*First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*,
No. 3:13-cv-00454, ECF No. 301 (S.D. Ill. Dec. 8, 2017) ................................................28

iv

*Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446 (E.D. Pa. 1985)..................34

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
No. 09-cv-852, ECF No. 1088 (E.D. Wis. Aug. 8, 2017)....................................................28

*Gates v. Rohm & Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) .....................................11, 30

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)......................................................................31

*Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005)....................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)......................................17

*Hall v. Accolade, Inc.*, 2019 WL 3996621 (E.D. Pa. Aug. 23, 2019)...........................30, 31

*Hall v. Best Buy Co., Inc.*, 274 F.R.D. 154 (E.D. Pa. 2011) ................................................43

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) ......................................................... 11-12

*Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912 (3d Cir. 1992)........................14

*In re Actavis Holdco U.S., Inc.*, 2019 WL 8437021 (3d Cir. Dec. 6, 2019).....................28

*In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171 (S.D.N.Y. 2014*)* ..........49

*In re Aggrenox Antitrust Litig.*,
No. 14-md-2516, ECF Nos. 733, 739 (D. Conn. Dec. 18, 2017)  ....................................45

*In re Amtrak Train Derailment*, 2016 WL 1359725 (E.D. Pa. Apr. 6, 2016)....................11

*In re Auto. Parts Antitrust Litig.*, 2017 WL 3499291 (E.D. Mich. July 10, 2017)..............6

*In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812 (E.D. Mich. Dec. 20, 2019)..........49

*In re Automotive Refinishing Paint Antitrust Litig.*,
2003 WL 23316645 (E.D. Pa. Sept. 5, 2003) ....................................................................32

*In re Automotive Refinishing Paint Antitrust Litig.*,
2004 WL 1068807 (E.D. Pa. May 11, 2004).......................................................................33

*In re Auto. Refinishing Paint Antitrust Litig.*,
No. 2:10-md-1426, ECF No. 136 (E.D. Pa. Oct. 13, 2004)...............................................39

*In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336 (E.D. Pa. 2007) ........44

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013)..................................32, 41

*In re Blood Reagents Antitrust Litig.*,
2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)...............................................13, 14, 16, 18, 19

*In re Capacitors Antitrust Litig. (No. III)*,
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ................................................................18

*In re Cathode Ray Tube (CRT) Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015)....................12, 19

*In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000)................................45

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)............................................30, 45

*In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199 (E.D. Pa. 2014) ..............36

*In re Chocolate Confectionary Antitrust Litig.*,
No. 1:08-md-01935, ECF No. 1106 (M.D. Pa. Dec. 12, 2011) .........................................10

*In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) ......10, 18

*In re Comcast Corp. Set-Top Cable*, 656 Fed. App'x 8 (3d Cir. 2016)............................42

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*,
333 F.R.D. 364 (E.D. Pa. 2019).................................................................24, 26, 32

*In re Corel Corp. Inc., Sec. Litig.*, 293 F.Supp.2d 484 (E.D.Pa.2003).............................44

*In re DDAVP Direct Purchaser Antitrust Litig.*,
2011 WL 13318188 (S.D.N.Y. Aug. 16, 2011) ........................................................28, 43

*In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*,
582 F.3d 524 (3d Cir. 2009)....................................................................................40

*In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10 (D.D.C. 2019) ..........33

*In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188 (E.D. Pa. 2017) .................10, 18

*In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437,
ECF No. 185 (E.D. Pa. Mar. 16, 2015).................................................................10, 21, 24

*In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437,
ECF No. 276 (E.D. Pa. Aug. 20, 2015) ........................................................................24

*In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437,
ECF No. 427 (E.D. Pa. July 18, 2016).........................................................................10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2013 WL 12333442 (N.D. Cal. Jan. 8, 2013) ..............................................................20

*In re Dynamic Random Access Memory Antitrust Litig.*,
2014 WL 12879520 (N.D. Cal. June 27, 2014) ............................................................20

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) ...................................................49

*In re Fasteners Antitrust Litig.*, 2014 WL 285076 (E.D. Pa. Jan. 24, 2014) ...................13

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ..................................18

*In re Flonase Antitrust Litig.*, 2013 WL 12148283 (E.D. Pa. Jan. 14, 2013)...................43

*In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) ........................45

*In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018). ..3, 20

*In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019). ........3

*In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995 ........................................................................................30, 35

*In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004) ..................49

*In re Glumetza Antitrust Litig.*, 336 F.R.D. 468 (N.D. Cal. 2020) .............................10, 22

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008).....................19, 21

*In re Ikon Office Solutions Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ........34, 41, 44

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)...........19, 21, 22, 24, 25

*In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92 (D.N.J. 2012)...................................16

*In re Intuniv Antitrust Litig.*,

No. 1:16-cv-12653, ECF Nos. 393-400 (D. Mass. Jan. 10, 2020).....................................50

*In re K-Dur Antitrust Litig.*, 2008 WL 2699390 (D.N.J. Apr. 14, 2008) ...................10, 13

*In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012).......................10, 16, 21, 22, 25

*In re K-Dur Antitrust Litig.*, 2013 WL 5180857 (3d Cir. Sept. 9, 2013)...........................10

*In re Lidoderm Antitrust Litig.*, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017).......10, 22, 25

*In re Lidoderm Antitrust Litig.*,
No. 14-md-2521, ECF Nos. 1004, 1054 (N.D. Cal. Sept. 20, 2018) ................................45

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ...................................15

*In re Linerboard Antitrust Litig.*, 305 F.3d 145, 151 (3d Cir. 2002) ................................21

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)...............32, 33, 34

*In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619 (E.D. Pa. 2004)...........................33

*In re Loestrin 24 Fe Antitrust Litig.*,
2019 WL 3214257 (D.R.I. July 2, 2019) .......................................................10, 15, 22, 28

*In re: Loestrin 24 FE Antitrust Litig.*,
No. 1:13-md-02472, ECF No. 1200 (D.R.I. Aug. 14, 2019) ...........................................42

*In re Loestrin 24 FE Antitrust Litig.*,
No. 1:13-md-2472, ECF No. 1426 (D.R.I. Mar. 23, 2020) ..............................................50

*In re Loestrin 24 FE Antitrust Litig.*,
No. 1:13-md-02472, ECF No. 1462 (D.R.I. Sept. 1, 2020)..............................................45

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003).............18

*In re Modafinil Antitrust Litig.,* 837 F.3d 238 (3d Cir. 2016).........................12, 13, 21, 22

*In re Mushroom Direct Purchaser Antitrust Litig.*,
319 F.R.D. 158 (E.D. Pa. 2016)................................................................................18, 25

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2017 WL 696983 (E.D. Pa. Feb. 22, 2017) ....................................................................25

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)................................................................22

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020)................................................................45

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996).....19, 20

*In re Nat'l Football League Players Concussion Injury Litig.*,
775 F.3d 570 (3d Cir. 2014)....................................................................... 10-11

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016)................................................................14, 24, 39,

*In re Neurontin Antitrust Litig.*, 2011 WL 286118 (D.N.J. Jan. 25, 2011)............10, 15, 25

*In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47 (D. Mass. 2013)................10

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ...................................................17

*In re Niaspan Antitrust Litig.*,
397 F. Supp. 3d 668 (E.D. Pa. 2019) .............................................10, 12, 13, 14, 22, 25, 28

*In re: Niaspan Antitrust Litig.*,
No. 2:13-md-02460, ECF No. 697 (E.D. Pa. Dec. 13, 2019) .............................................42

*In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365 (D.D.C. 2007)................................22, 28

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D. Pa. 1997) ........32

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
2000 WL 1622741 (E.D. Pa. Oct. 23, 2000)....................................................................40

*In re Packaged Ice Antitrust Litig.*, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011)...........6

*In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011)........45

*In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276 (E.D. Mich. 2017) .........................33

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010).......................................11

*In re Philips/Magnavox TV Litig.*, 2012 WL 1677244 (D.N.J. May 14, 2012)................32

*In re Pool Prod. Distr. Mkt. Antitrust Litig.*,
2016 WL 235781 (E.D. La. Jan. 20, 2016)......................................................................39

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
584 F. Supp. 2d 697 (M.D. Pa. 2008) .............................................................................33

*In re Processed Egg Prods. Antitrust Litig.*,
284 F.R.D. 278 (E.D. Pa. 2012)..........................................14, 18, 21, 22, 24, 26, 33, 39

*In re Prograf Antitrust Litig.*, 2015 WL 13908415 (D. Mass. May 20, 2015) .................43

*In re Ranbaxy Generic Application Antitrust Litig.*, 338 F.R.D. 294 (D. Mass. 2021).....10

*In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) ........................................26

*In re Remeron Direct Purchaser Antitrust Litig.*,
2005 WL 3008808 (D.N.J. Nov. 9, 2005) ........................................................................45

*In re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
1:18-md-02819, ECF No. 507 (E.D.N.Y. May 15, 2020) ................................................41

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)......................................18

*In re Shop-Vac Mktg. & Sales Practices Litig.*,
2016 WL 3015219 (M.D. Pa. May 26, 2016) ...................................................................11

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
2017 WL 4621777(D. Mass. Oct. 16, 2017).............................................................10, 22

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-md-2503, ECF No. 1179 (D. Mass. July 18, 2018)..............................................45

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009)......................................................................................19

*In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*,
421 F. Supp. 3d 12 (E.D. Pa. 2019) ....................................................................10, 15, 28

*In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*,
967 F.3d 264 (3d Cir.  2020).............................................................10, 15, 24, 25, 28, 37

*In re: Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*,
No. 2:13-md-02445, ECF Nos. 641-2, 683 (E.D. Pa. Jan. 21, 2021) ..............................42

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
2021 WL 3929698 (E.D. Pa. Sept. 2, 2021) ....................................................................43

*In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) .............18

*In re Tricor Direct Purchaser Antitrust Litig.*,
No. 05-cv-340, ECF Nos. 536-1, 543 (D. Del. Apr. 23, 2009)........................................45

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ......................................18

*In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012) ............................... 16-17

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004).........................18, 35

*In re Wawa, Inc. Data Sec. Litig.*,
2021 WL 3276148 (E.D. Pa. July 30, 2021)...............................................24, 29, 30, 39, 40

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
2008 WL 1946848 (E.D. Pa. May 2, 2008).........................................................10, 22, 28

*In re Wellbutrin SR Antitrust Litig.*, 2011 WL 13392296 (E.D. Pa. Nov. 21, 2011).........43

*In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) .........................49

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
No. 2:06-cv-01797, ECF No. 831 (E.D. Pa. July 27, 2015) .......................................42, 50

*Kleen Prods. LLC v. Int'l Paper*, 831 F.3d 919 (7th Cir. 2016) .......................................18

*Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585 (N.D. Ill. 2015) ..................................18

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y.2002) .......................49

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) .........................................13

*Meijer, Inc. v. 3M*, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006)...............................33, 44

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, (D.D.C. 2007) ..22

*Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015) ............................35

*Myers v. Jani-King of Phila., Inc.*, 2019 WL 4034736 (E.D. Pa. Aug. 26, 2019).............30

*Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd. Co.*,
2014 WL 631031 (E.D. Pa. Feb. 18, 2014) ......................................................................10

*Mylan Pharms., Inc. v. Warner Chilcott Public Ltd.*,
No. 12-cv-3824, ECF Nos. 452, 665 (E.D. Pa. Sept. 15, 2014) ........................................45

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001).....14

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .................................................................12

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) .....................................................17

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir. 2013) ..............................................26

*Schuylkill Health Sys. v. Cardinal Health, Inc.*,
No. 2:12-cv-07065, ECF No. 175 (E.D. Pa. Feb. 12, 2016).........................................21, 24

*Sheinberg v. Sorensen*, 606 F.3d 130 (3d Cir 2010).........................................................27

*Silvis v. Ambit Energy L.P.*,326 F.R.D. 419 (E.D. Pa. 2018) ...........................................10

*Smith v. Prof'l Billing & Mgmt. Servs., Inc.*,
2007 WL 4191749 (D.N.J. Nov. 21, 2007) ......................................................................43

*Sullivan v. D.B. Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011)....................11, 13, 19, 40, 44, 45

*Teva Pharmaceuticals USA Inc. v. Abbott Labs.*,
252 F.R.D. 213 (D. Del. 2008) ...........................................................................17, 22, 25

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................17, 25

*Vista Healthplan, Inc. v. Cephalon, Inc.*, 2020 WL 1922902 (E.D. Pa. Apr. 21, 2020) ...44

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................13

*Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956 (3d Cir. 1983)...........................44

*Whiteley v. Zynerba Pharms., Inc.*, 2021 WL 4206696 (E.D. Pa. Sept. 16, 2021)......12, 32

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).............................21

**Statutes**

28 U.S.C. § 1715 ..................................................................................................50

**Rules**

Fed. R. Civ. P. 23 ........................................................................... *passim*

**Other Authorities**

3 Newberg on Class Actions, § 8:45 (4th ed. 2011) ...........................................45

4 Alba Conte & Herbert Newberg, Newberg on Class Actions, § 12.35 (4th ed. 2002)...44

4 Newberg on Class Actions § 13:14 (5th ed.) ....................................................29, 30, 31

4 Newberg on Class Actions § 14:5 (5th ed.) ...................................................39

7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d ed. 2014).....................19

7AA Charles Alan Wright et al., Federal Practice and Procedure § 1781 (3d ed. 2005) ..25

I.     **INTRODUCTION**

Direct Purchaser Class Plaintiffs ("DPPs" or "Settling Plaintiffs")[1] respectfully submit this memorandum in support of preliminary approval of two Settlements[2] reached between DPPs, on behalf of themselves and the Settlement Class[3] and Settling Defendants Sun and Taro. The Settlements were reached after extended, arm's length negotiations between experienced counsel for DPPs and for Sun and Taro. These "ice breaker" settlements are the first on behalf of any private plaintiff in this complex MDL that has been litigated for nearly six years, and the first settlements reached by DPPs. The Settlements consist of: (1) a combined $85,000,000 monetary payment, which could be reduced to $75,000,000 to account for opt-outs or be increased to as much as $105,000,000 under the most favored nation ("MFN") clauses, (2) an agreement that Sun's and Taro's sales remain in the MDL for purposes of joint and several liability as to non-settling Defendants to the extent permitted or authorized by law,[4] and (3)

---

[1] DPPs are César Castillo, LLC, FWK Holdings, LLC, Rochester Drug Co-Operative, Inc., and KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc.

[2] DPPs have reached a proposed settlement with Defendant Sun Pharmaceutical Industries, Inc. and its affiliates (Caraco Pharmaceutical Laboratories, Ltd., Mutual Pharmaceutical Company, Inc., and URL Pharma, Inc. (collectively, "Sun") and a proposed settlement with Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") (collectively, "Settling Defendants"). The Settlement Agreements are Exs. 1 and 2 to the accompanying Declaration of Dianne M. Nast ("Nast Declaration"), the "Taro Settlement Agreement," and the "Sun Settlement Agreement," respectively (collectively, the "Settlement Agreements"). Sun and Taro are related entities because Sun owns a controlling stake in Taro. *See, e.g.*, DPP Amended Complaint, No. 20-cv-721, ECF No. 62 ¶¶ 84-85.

[3] The Settlement Class is defined as: "All persons or entities, and their successors and assigns, that directly purchased one or more of the Named Generic Drugs from one or more Defendants in the United States and its territories and possessions, at any time during the period from May 1, 2009 until December 31, 2019. Excluded from the Settlement Class are Defendants and their present and former officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities." Settlement Agreements ¶ 1.

[4] A list of the Defendants is attached to the Settlement Agreements as Exhibit C.

cooperation from Sun and Taro, both in terms of effectuating the Settlements and providing information which will help in the continued prosecution of the litigation against the non-settling Defendants.[5]

Experienced Class Counsel believe that the Settlements are fair, reasonable, and adequate. The Settlements ensure that the Settlement Class will receive substantial benefits, while avoiding the risks and delays of continued litigation against Sun and Taro. Class Counsel also believe the proposed Plan of Allocation, submitted herewith, is fair, reasonable, and efficient.

Accordingly, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e), DPPs respectfully request an Order in the form submitted herewith ("Proposed Order"): (1) certifying the Settlement Class; (2) granting preliminary approval of the Settlements (described herein and in the Declaration of Dianne M. Nast, attached hereto as Ex. A); (3) appointing Settlement Class Counsel; (4) appointing A.B. Data, Ltd. as the Claims Administrator and The Huntington National Bank as the Escrow Agent; (5) approving the form and manner of notice to the Settlement Class (described herein and in the Declaration of Eric Miller of A.B. Data, Ltd. Regarding Proposed Notice Plan ("A.B. Data Decl.") (attached hereto as Ex. B) (proposed forms of Notice attached hereto as Exs. C & D)); (6) preliminarily approving the proposed Plan of Allocation (submitted herewith as Ex. E); and (7) scheduling a Fairness Hearing. Settling Defendants assent to this Motion (but take no position on any request for fees, expenses or service awards).

---

[5] The Cooperation Agreements are attached as the first exhibit to each of the Settlement Agreements.

2

## II.   **BACKGROUND**

Since 2016, DPPs—direct purchasers of generic drugs from Defendants—have litigated claims alleging that Sun and Taro (manufacturers of generic drugs) conspired with the non-settling Defendants (other manufacturers of generic drugs) in violation of the Sherman Act to artificially inflate and maintain the prices that DPPs paid for the Named Generic Drugs ("NGDs").[6] DPPs contend that the alleged anticompetitive conduct of Sun and Taro and other generic drug manufacturers resulted in supracompetitive prices causing DPPs and the Settlement Class they seek to represent to pay overcharges. Defendants have denied liability as to DPPs' claims and have mounted a tenacious defense in all phases of the MDL.

DPPs have filed 18 individual drug complaints and 2 multi-drug complaints.[7] In October 2018, the Court denied Defendants' motions to dismiss six of the DPPs' individual drug complaints.[8] In August 2019, the Court denied Defendants' motions to dismiss the DPPs' first multi-drug complaint that alleged an "overarching" conspiracy among Defendants.[9] Following the Court's decisions on the motions to dismiss, the parties have engaged in substantial discovery including propounding hundreds of document requests, interrogatories, and requests for

---

[6] A list of the NGDs for which DPPs have brought claims is attached to the Settlement Agreements as Exhibit B. Exhibits B and C to the Settlement Agreements were modified by agreement subsequent to initial signing of the agreements.

[7] No. 20-cv-721 (ECF No. 62), No. 18-cv-2641 (ECF No. 12), No. 16-AL-27241 (ECF No. 46), No. 16-AM-27241 (ECF No. 54), No. 16-BC-27241 (ECF No. 59), No. 16-BZ-27241 (ECF No. 53), No. 16-CB-27241 (ECF No. 74), No. 16-CM-27241 (ECF No. 61), No. 16-DS-27241 (ECF No. 71), No. 16-DG-27241 (ECF No. 74), No. 16-DV-27241 (ECF No. 71), No. 16-DX-27241 (ECF No. 83), No. 16-EC-27241 (ECF No. 66), No. 16-FL-27241 (ECF No. 66), No. 16-GL-27241 (ECF No. 50), No. 16-LV-27241 (ECF No. 62), No. 16-LD-27241 (ECF No. 56), No. 16-PV-27241 (ECF No. 68), No. 16-PP-27241 (ECF Nos. 62, 65),  No. 16-UR-27241 (ECF No. 54).

[8] *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018).

[9] *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019).

admissions; producing and reviewing millions of documents, taking numerous depositions, and engaging in briefing and numerous hearings before the Court and the three Special Masters.

On July 13, 2020, following substantial briefing and conferences with Special Master David H. Marion, the Court entered its Opinion and PTO 132 selecting bellwether cases. ECF Nos. 1442, 1443. On May 7, 2021, following additional briefing and conferences with Special Master Marion, the Court entered PTO 171 revising the selection of bellwether cases, retaining clobetasol and clomipramine as the Class Bellwethers for the DPPs and end-payor class plaintiffs ("EPPs"). ECF No. 1769. The Court also selected the States' dermatology complaint as the States' Bellwether. On December 9, 2021, after additional briefing and conferences with Special Master Marion, the Court entered PTO 188 setting a schedule for further proceedings in the bellwether cases. ECF No. 1901. Under that schedule, bellwether fact discovery is set to close on January 17, 2023.

Settlement negotiations between Class Counsel and attorneys for Sun and Taro were hard fought, at arm's length, and spanned many months, as described in more detail in the accompanying Nast Declaration. The parties executed the Settlements on November 4, 2021. As the first DPP class settlements and the first settlements on behalf of any proposed class in this very large and complex litigation, DPP counsel believes that the monetary relief and cooperation provided by the Settlements will serve as an important "ice breaker" to further develop DPPs' cases and potentially prompt settlement discussions with other Defendants.

## III.   <u>MATERIAL TERMS OF THE SETTLEMENTS</u>

The Settlements provide for substantial monetary relief, as well as other valuable terms, which will assist DPPs in the continued prosecution of the litigation against the non-settling Defendants. In exchange for this monetary relief and cooperation, DPPs and members of the

proposed Settlement Class that do not exclude themselves will give up their rights to sue Settling Defendants and Released Parties for Released Claims.

### A.    Monetary Relief

The monetary component of the Settlements is a combined $85 million.[10] Settling Defendants will pay this amount within 20 days following the entry of the Proposed Order (without material change). Settlement Agreements ¶ 7. The Settlement Fund may be reduced by up to $10 million if Settlement Class members with a sufficiently large share of Sun's and Taro's purchases opt-out of the Settlement Class.[11] The Settlement Fund also may be increased to a maximum of $105 million under the MFN clauses described in further detail below. The monetary component of the Settlements, net of Court-approved attorneys' fees, service awards for the DPP class representatives, and expenses and costs of litigation and notice and administration of the Settlements ("Net Settlement Fund"), will be distributed to the Settlement Class pursuant to the Plan of Allocation (upon Court approval after the filing of a motion for distribution).

---

[10] Sun shall pay $17,357,000 into the Settlement Fund, and Taro shall pay $67,643,000 into the Settlement Fund. Settlement Agreements ¶ 7. As noted above, the $85 million payment could be reduced at most to $75 million to account for opt-outs or be increased to as much as $105 million under the MFN clauses.

[11] Sun shall be entitled to a reduction of up to $2,042,000 based on the aggregate dollar amount of purchases from Sun by DPPs who opt-out of the settlement. Sun Settlement Agreement ¶ 9. Taro shall be entitled to a reduction of up to $7,958,000 based on the aggregate dollar amount of purchases from Taro by direct purchasers who opt-out of the settlement. Taro Settlement Agreement ¶ 9. Pursuant to separate letter agreements, Sun and Taro shall have the right to rescind the Settlement Agreements if the aggregate amount of purchases represented by opt-outs reaches or exceeds a certain level. *Id.* DPPs will file the letter agreements with the Court if the Court desires, and in that event, would request that they be filed *in camera*.

### B.      Joint and Several Liability of Non-Settling Defendants

The Settlements provide that the non-settling Defendants remain jointly and severally liable for Sun's and Taro's sales to the extent permitted or authorized by law. Paragraph 14 of each Settlement reserves, for the purposes of joint and several liability against non-Settling Defendants, DPPs' ability to rely on Settling Defendants' sales of NGDs to the Settlement Class in order to seek the full amount of damages to which they may be entitled from any other Defendant in the MDL. This is a term that is valuable to DPPs and is a win-win for the Settlement Class, as it maintains DPPs' right to seek alleged damages associated with Sun and Taro sales from Sun's and Taro's alleged co-conspirators, and the non-settling Defendants will be only entitled to a credit for any judgment against them for the value of the settlement proceeds paid by Sun and Taro[12] but only after trebling. This means that these settlements will not reduce in any way the single damages to which the Settlement Class is entitled.

### C.      MFN Clauses

The Settlements also contain MFN clauses in Paragraph 11 of each Settlement. Those clauses provide that, in the event Settling Defendants enter a separate, more favorable settlement or binding term sheet within twenty-one months of the execution of the Settlements (i.e., at any time before August 4, 2023) with any direct purchaser that opts-out of these Settlements, the Settlement Class may be entitled to additional financial compensation. Specifically, if the financial payment made by Settling Defendants to such opt-out in any other direct purchaser settlement is more favorable on a proportionate basis than the terms of these Settlements, these

---

[12] *See*, *e.g.*, *In re Packaged Ice Antitrust Litig.*, 2011 WL 717519, at *17 (E.D. Mich. Feb. 22, 2011) (granting final approval of a settlement where the settlement agreement provides that settling defendants' sales "remain in th[e] action and shall be part of any joint and several liability against any non-settling Defendant"); *In re Auto. Parts Antitrust Litig.*, 2017 WL 3499291, at *2 (E.D. Mich. July 10, 2017) (similar).

two Settlements shall be automatically amended so that DPPs shall receive the benefit of the more favorable financial terms of the other direct purchaser settlement. If the terms of Paragraph 11 are triggered, Sun and Taro could pay up to an additional $20 million collectively into the Settlement Fund to the benefit of the Settlement Class.

> **D.**     **Cooperation by Sun and Taro**

In addition to the monetary relief and other valuable terms highlighted above, the Settlement Agreements also deliver benefits to the Settlement Class through the cooperation Sun and Taro have agreed to provide to DPPs. *See* Settlement Agreements ¶ 10; Cooperation Agreements attached as Exhibit A to each Settlement Agreement. Settling Defendants' cooperation will include: (1) the identification of "known persons who are likely to have relevant information;" Cooperation Agreements ¶ 4; (2) attorney proffers and summaries, *id.* ¶¶ 5-6; (3) access to witnesses for interview, *id.* ¶ 7; (4) responses to data inquires, *id.* ¶ 8; (5) authentication and admission of documents, *id.* ¶ 9; and (6) access to witnesses for trial, *id.* ¶ 10. Such cooperation benefits the Settlement Class because it will facilitate the administration of the Settlements as well as DPPs' continued litigation against the non-settling Defendants.

> **E.**     **Settlement Class Releases**

In exchange for the benefits provided under the Settlement Agreements, DPPs have agreed to releases as set forth in Paragraphs 12, 13, and 14 of each Settlement Agreement. The Settlements release Settling Defendants and Releasees for claims DPPs or the Settlement Class asserted or could have asserted, based upon the allegations in the MDL, relating to the NGDs or other generic drugs that could have been named based on the facts alleged in the MDL including, but not limited to, those arising under any federal or state antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, or trade practice law up to the date of execution of the Settlement Agreements. Settlement Agreements ¶ 12. The Settlements release any and all

provisions, rights, and benefits conferred by § 1542 of the California Civil Code or any similar, comparable, or equivalent law. Settlement Agreements, ¶ 13.

The Settlements do not resolve, compromise, discharge, or settle any of the claims of DPPs or the Settlement Class against any other Defendant in this MDL. Settlement Agreements, ¶ 12. Additionally, the Settlements do not release any claims arising under Article 2 of the Uniform Commercial Code in the ordinary course of business between Settling Defendants and the Settlement Class, except those claims based in whole or in part on the released claims. *Id.* Likewise, the Settlements do not release any claims for indirect purchases of any generic drugs, any claims for negligence, breach of contract, bailment, failure to deliver, lost goods, damaged or delayed goods, breach of warranty or product liability claims except those claims based in whole or in part on any of the released claims, or any claims which are currently the subject of any unrelated pending litigation against Settling Defendants that is not part of this MDL. *Id.* Furthermore, the Settlements do not release any claims as to any generic drug that, after November 4, 2021, are the subject of any unrelated litigation brought against Settling Defendants under federal or state antitrust laws or under RICO, where the allegation is that generic competition was delayed (*e.g.*, reverse payment, sham litigation, sham citizen petition, or "*Walker Process*" fraud cases) or otherwise reduced or impaired by alleged conduct other than that pled or based on the facts alleged in the DPPs' complaints in the action. *Id.* Finally, the Settlements do not release any claims of any type relating to any drugs other than the NGDs, other than those pled or based on the facts alleged in the DPPs' complaints in the MDL. *Id.*

### F.      Expenses, Attorneys' Fees, and Service Awards

The Settlement Agreements each provide that up to $250,000 may be used to pay for reasonable expenses in connection with administering the Settlements, such as those expenses associated with providing notice of the Settlements to the Settlement Class, expenses associated

with administering and distributing the Settlements, expenses associated with developing a plan of allocation, and any expenses incurred in connection with taxation matters relating to the Settlements. Settlement Agreements, ¶ 8.a. Thus, up to $500,000 may be withdrawn after the Court grants preliminary approval, and such withdrawal will not require additional Court approval. *Id.* Administration expenses incurred above this amount shall be borne, in the first instance, by Settlement Class Counsel, who may be repaid from the Settlement Fund (or have outstanding invoices paid from the Settlement Fund) after the "Effective Date" with Court approval. The "Effective Date" is the date of final approval, and the expiration of any time to appeal or if appealed, the date the appeal has been resolved. Settlement Agreements, ¶ 6. In addition, the Settlement Agreements provide that Settlement Class Counsel may request attorneys' fees up to one-third of the settlement amount, reimbursement of expenses or charges in connection with prosecuting the MDL, and class representative service awards. Settlement Agreements, ¶ 16.

DPPs intend to file a motion seeking (1) reimbursement out of the Settlement Fund for out-of-pocket expenses expended or incurred to date (the bulk of which relates to out-of-pocket expert fees); and (2) approval for certain expenses incurred to date, and future expenses to be incurred, in connection with the claims administration or litigation in a total amount up to $6.8 million (inclusive of the $500,000 for Administration Expenses); (3) service awards for the DPPs of $20,000 each (a total of $80,000); and (4) approval to put one-third of the remaining Settlement Fund (net of the above and net of Administrative Expenses and including interest) into escrow to pay attorneys' fees as may be awarded by the Court in the future. DPPs intend to seek an award of attorneys' fees at a later time. In the interim, one-third of the Net Settlement Fund would remain in escrow.

IV.    **THE REQUIREMENTS FOR CERTIFICATION OF A SETTLEMENT CLASS HAVE BEEN MET**

DPPs, Sun and Taro have agreed, subject to the Court's review and approval, to a

Settlement Class for purposes of settlement defined as follows:

> All persons or entities, and their successors and assigns, that directly purchased one or more of the Named Generic Drugs from one or more Defendants in the United States and its territories and possessions, at any time during the period from May 1, 2009 until December 31, 2019.

> Excluded from the Settlement Class are Defendants and their present and former officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.

Settlement Agreements, ¶ 1.[13] Courts have repeatedly certified classes of direct purchasers

alleging antitrust overcharge claims both for purposes of litigation and settlement.[14]

---

[13] The generic drugs sued on by DPPs are set forth in Exhibit B to each Settlement Agreement, and the Defendants are set forth in Exhibit C to each Settlement Agreement. The Settlement Class definition is similar to the definition in DPPs' most recent complaint. *See* DPP Amended Complaint, No. 20-cv-721 (ECF No. 62) ¶ 1808.

[14] *See*, *e.g.*, *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 78 (E.D. Pa. 2019) (certifying class for litigation), *aff'd* 967 F.3d 264 (3d Cir. 2020); *In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 691 (E.D. Pa. 2019) (certifying for litigation); *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188 (E.D. Pa. 2017) (certifying for litigation); *In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437, ECF No. 427 (E.D. Pa. July 18, 2016) (certifying class for settlement); *Id.*, ECF No. 185 (E.D. Pa. Mar. 16, 2015) (same); *Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd. Co.*, 2014 WL 631031, at *1 (E.D. Pa. Feb. 18, 2014) (certifying for settlement); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012) (certifying for litigation); *In re Chocolate Confectionary Antitrust Litig.*, No. 1:08-md-01935, ECF No. 1106 (M.D. Pa. Dec. 12, 2011) (certifying class for settlement); *Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 137 (E.D. Pa. 2010) (certifying for litigation); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *11 (E.D. Pa. May 2, 2008) (certifying for litigation); *In re K-Dur Antitrust Litig.*, 2008 WL 2699390, at *1 (D.N.J. Apr. 14, 2008) (certifying for litigation), *aff'd*, 686 F.3d 197, 224 (3d Cir. 2012), *reinstated*, 2013 WL 5180857, at *1 (3d Cir. Sept. 9, 2013); *In re Neurontin Antitrust Litig.*, 2011 WL 286118, at *1 (D.N.J. Jan. 25, 2011) (certifying for litigation). *See also In re Ranbaxy Generic Application Antitrust Litig.*, 338 F.R.D. 294, 309 (D. Mass. 2021) (certifying for litigation); *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 484 (N.D. Cal. 2020) (certifying for litigation); *In re Loestrin 24 Fe Antitrust Litig.*, 2019 WL 3214257, at *17 (D.R.I. July 2, 2019) (certifying for litigation); *In re Solodyn (Minocycline Hydrochloride) Antitrust*

"Where, as here, the court has not already certified the class prior to evaluating the settlement, it must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b)[.]" *Silvis v. Ambit Energy L.P.*, 326 F.R.D. 419, 427 (E.D. Pa. 2018) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997); *In re Nat'l Football League Players Concussion Injury Litig.*, 775 F.3d 570, 581 (3d Cir. 2014); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010)). *See also Sullivan v. D.B. Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (*en banc*) ("[B]efore approving a class settlement agreement, a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.") (citation and internal quotation marks omitted). "At the preliminary approval stage, the Court may conditionally certify the class for purposes of providing notice" by making a "'preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)).'" *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439 (E.D. Pa. 2008) (quoting Manual Complex Lit. § 21.632 (4th ed.)). In determining whether to grant preliminary class certification, a Court "employs a 'less rigorous analysis than that necessary for final certification' because courts conduct a 'fairness hearing in order to issue a final class certification and approve the settlement.'" *In re Shop-Vac Mktg. & Sales Practices Litig.*, 2016 WL 3015219, at *3 (M.D. Pa. May 26, 2016) (quoting *In re Amtrak Train Derailment*, 2016 WL 1359725, at *2, *4 (E.D. Pa. Apr. 6, 2016)).

Class certification is particularly appropriate with respect to claims asserting nationwide, horizontal price-fixing like those alleged here. In *Hawaii v. Standard Oil Co.*, the Supreme Court

---

*Litig.*, 2017 WL 4621777, at *22 (D. Mass. Oct. 16, 2017) (certifying for litigation); *Am. Sales Co., LLC v. Pfizer, Inc.*, 2017 WL 3669604, at *17 (E.D. Va. July 28, 2017), *adopted*, 2017 WL 3669097, at *1 (E.D. Va. Aug. 24, 2017) (certifying for litigation); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *15 (N.D. Cal. Feb. 21, 2017) (certifying for litigation); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 60 (D. Mass. 2013) (certifying for litigation).

explained:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. . . . Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery of three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'. . . *Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture*.

405 U.S. 251, 262, 266 (1972) (emphasis added) (citation omitted).[15]

Here, the Settlement Class satisfies these elements of Rule 23 meriting certification, and Settlement Class Counsel should be appointed.

### A.    The Requirements of Rule 23(a) Are Satisfied

#### i.    Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). Although courts in the Third Circuit consider a "non-exhaustive list" of factors to determine whether numerosity is met, such as "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages,"[16] the Third

---

[15] *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("Congress created the treble-damages remedy . . . precisely for the purpose of encouraging *private* challenges to antitrust violations. These private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations.") (emphasis in original); *In re Cathode Ray Tube (CRT) Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (observing that "[c]lass actions play an important role in the private enforcement of antitrust actions").

[16] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir. 2016).

Circuit has recognized that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[17]

Here, there are more than 500 Settlement Class members geographically dispersed around the United States, readily satisfying Rule 23(a)(1). *See* Declaration of Jeffrey J. Leitzinger, Ph.D. Regarding Certification of the Sun Taro Settlement Class ("Leitzinger Class Decl.") ¶ 5 n.3 (attached hereto as Ex. F). Judicial economy also weighs in favor of certification given the practicalities of litigating this complex, large, multi-party antitrust MDL and the very large volume of discovery and motion practice associated with it.[18]

### ii. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).[19] To satisfy commonality under Rule 23(a)(2), the common issue "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[20]

---

[17] *Id.* at 249-50 (internal quotation marks omitted). *See also Whiteley v. Zynerba Pharms., Inc.*, 2021 WL 4206696, at *7 (E.D. Pa. Sept. 16, 2021) (same); *Niaspan*, 397 F. Supp. 3d at 676-77 (numerosity satisfied where putative class contained forty-eight members with "widespread geographic dispersion").

[18] *See Modafinil*, 837 F.3d at 253; *Niaspan*; 397 F. Supp. 3d at 679.

[19] *See also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) ("For purposes of Rule 23(a)(2), even a single common question will do") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

[20] *Sullivan*, 667 F.3d at 335 (Scirica, C.J., concurring) (quoting *Dukes*, 564 U.S. at 350). *See also Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) ("Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.").

This requirement is "easily met," *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994), and especially so in an antitrust case such as this. *See*, *e.g.*, DPP Amended Complaint, No. 20-cv-721, ECF No. 62 ¶ 1814 (listing legal and factual questions common to the class).[21]

The central issue in this antitrust case is whether the Settling Defendants conspired with other defendants to raise or maintain the price of generic drugs sold to the Settlement Class. Plaintiffs allege that this wrongful conduct caused the Settlement Class to incur antitrust injury by paying overcharges. *See*, *e.g.*, *Niaspan*, 397 F. Supp. 3d at 679 (finding commonality satisfied where a common question includes, *inter alia*, "whether defendants conspired to suppress generic competition to Niaspan"). Commonality is met here.

### iii.    Typicality

Rule 23(a)(3) requires the named plaintiffs' claims to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The Third Circuit has a 'low threshold' for satisfying typicality."[22] In assessing typicality, "the court must examine 'whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.'"[23] "If the claims of the named plaintiffs and putative class

---

[21] *See also In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *26 (E.D. Pa. Oct. 19, 2015) ("Courts interpreting the commonality requirement in the antitrust area have held that allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement.") (internal quotation marks omitted); *In re Fasteners Antitrust Litig.*, 2014 WL 285076, at *5 (E.D. Pa. Jan. 24, 2014) ("Cases involving the existence, scope, and efficacy of an alleged conspiracy generally meet the commonality requirement because the allegations present questions adequately common to class members.") (internal quotation marks omitted); *K-Dur*, 2008 WL 2699390, at *4 ("Courts routinely find commonality among antitrust class members alleging conspiracy to fix prices, as well as monopolization.").

[22] *Niaspan*, 397 F. Supp. 3d at 680 (quoting *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016)); *Chimenti v. Wetzel*, 2018 WL 2388665, at *6 (E.D. Pa. May 24, 2018).

[23] *Niaspan*, 397 F. Supp. 3d at 680 (quoting *Blood Reagents*, 2015 WL 6123211, at *26).

14

members involve the same conduct by the defendant, typicality is established regardless of factual differences."[24] "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."[25]

Here, the claims of the DPPs and the Settlement Class are based on the same allegations. Settling Defendants' alleged liability for the alleged damage to each Settlement Class Member does not depend on the individual circumstances of the Settlement Class Members. The DPPs and each Settlement Class Member will be required to make the same factual presentation and legal argument with respect to the common questions of liability. In other Section 1 antitrust cases, courts have found the typicality prong met because the named plaintiffs asserted that defendants' anticompetitive conduct caused overcharges for themselves and the class.[26] For the same reasons, typicality is met here.

---

[24] *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 290 (E.D. Pa. 2012) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)). *See also Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members and if based on the same legal theory.").

[25] *Chimenti*, 2018 WL 2388665, at *6 (citation omitted). *See also Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 844 (D.N.J. 2015) (claims are typical if they "'arise from the same alleged wrongful conduct' and are based upon 'the same general legal theories'") (citation omitted).

[26] *See Suboxone*, 421 F. Supp. 3d at 49 (typicality is generally satisfied in instances where it is alleged that the defendants engaged in a common scheme relative to all members of the class) (citing *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001)); *Loestrin*, 2019 WL 3214257, at *11 (class satisfies typicality because "members' claims plainly stem from a unitary course of conduct" in delayed generic entry); *Neurontin*, 2011 WL 286118, at *4 (finding typicality satisfied where the defendant's "alleged misuse of the patent process and filing of frivolous lawsuits in order to delay generic entry and maintain its monopoly of the gabapentin market . . . affected Named Plaintiffs and Class Members in the same way, as all direct purchasers paid higher prices for gabapentin").

####          iv.          **Adequacy of Representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement has two components: (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel."[27]

Here, there are no indications that DPPs have interests antagonistic to those of the Settlement Class.[28] DPPs, on their own behalf and on behalf of all Settlement Class Members, seek to recover overcharges caused by Settling Defendants' alleged unlawful conduct. Their interests are congruent with the interests of other Settlement Class Members. As the Third Circuit held in *K-Dur* (and as true here), "all of the class members have the same financial incentive for purposes of the litigation - *i.e.*, proving that they were overcharged and recovering damages based on that overcharge."[29]

The experience and performance of Settlement Class Counsel are discussed *infra,* Section IV.C. Class Counsel are more than adequate. Rule 23(a)(4) is met.

#### B.          **The Requirements of Rule 23(b)(3) Are Satisfied**

If a proposed class satisfies Rule 23(a), a class should be certified under Rule 23(b)(3) if the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here,

---

[27] *Suboxone*, 421 F. Supp. 3d at 50 (citing *Dewey v. Volkswagen Aktiengesellschaft¸* 681 F.3d 170, 181 (3d Cir. 2012)).

[28] *See Suboxone*, 967 F.3d at 272 (The adequacy analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent.") (rejecting defendant's adequacy argument).

[29] *K-Dur*, 686 F.3d at 223.

questions of law and fact common to the Settlement Class predominate over any individualized

questions, and a class action is the superior method of adjudicating the controversy.

### i.   Predominance

Predominance is "readily met" in cases alleging violations of antitrust law.[30] Rule

23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of

[her] claim [is] susceptible to classwide proof.' What the rule does require is that common

questions '*predominate* over any questions affecting only individual [class] members.'"[31] Thus,

Rule 23(b)(3) is satisfied when common issues predominate, even if there are some

individualized questions.[32]

---

[30] *Amchem*, 521 U.S. at 625. *See also Castro*, 134 F. Supp. 3d at 845 ("Common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members.") (citation omitted); *Blood Reagents*, 2015 WL 6123211, at *28 ("In horizontal price-fixing cases, courts routinely hold that common proof predominates in determining whether an unlawful conspiracy existed."); *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 108 (D.N.J. 2012) ("Given that antitrust class action suits are particularly likely to contain common questions of fact and law, it is not surprising that these types of class actions are also generally found to meet the predominance requirement"); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012) (stating that in horizontal price-fixing cases, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class").

[31] *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 469 (2013) (citing Fed. R. Civ. P. 23(b)(3)) (emphasis and alterations in original).

[32] *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) (even if there are "individualized questions of reliance in the case, there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)") (internal citation and quotation marks omitted); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'") (citation omitted); *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015) ("Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("[T]he question is whether there is 'reason to think that [individualized] questions will *overwhelm* common ones and render class certification inappropriate[.]'") (alteration in original) (citation omitted); *Teva*

Predominance requires only that "*questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."[33] "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'"[34]

Consistent with this precedent, courts in this district have repeatedly certified direct purchaser classes in analogous cases alleging horizontal conspiracies to artificially inflate prices.[35] One key reason is that trials in cartel cases *necessarily* focus on a core set of common questions, including: Did the defendants conspire?; and Did their conspiracy cause higher prices? These types of class-wide questions have repeatedly been found to satisfy Rule 23(b)(3) in antitrust cases like this one.[36]

---

*Pharmaceuticals USA Inc. v. Abbott Labs.*, 252 F.R.D. 213, 227 (D. Del. 2008) ("[T]he existence of an individual inquiry does not preclude class certification, especially where all members face the necessity of proving the same fraudulent scheme.") (hereafter, "*Tricor*").

[33] *Amgen*, 568 U.S. at 459.

[34] *Id.* (quoting Fed. R. Civ. P. 23(b)) (alteration in original).

[35] *See, e.g., In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. at 204; *Blood Reagents*, 2015 WL 6123211; *Castro v. Sanofi Pasteur, Inc.*, 2015 WL 5770381 (D.N.J. Sept. 30, 2015); *Drywall*, 322 F.R.D. at 235; *Chocolate*, 289 F.R.D. at 226; *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 208 (E.D. Pa. 2016); *In re OSB Antitrust Litig.*, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003).

[36] *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) ("[T]he predominance test is met in an antitrust case because 'consideration of the conspiracy issue would, of necessity, focus on defendants' conduct, not the individual conduct of the putative class members[.]'") (quoting *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 483-84 (W.D. Pa. 1999)); *Processed Egg Prods.*, 312 F.R.D. at 203; Mushroom, 319 F.R.D. at 188 (finding predominance and explaining that "Evidence that [defendants] entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy.") (citation and internal quotation marks omitted) (alteration in original); *Chocolate*, 289 F.R.D. at 225 (Finding predominance and concluding that "Direct Purchasers will present common evidence of all major issues regarding Defendants' alleged conspiracy at trial."); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 593–94, 600 (N.D. Ill. 2015) (finding predominance established because each class member "would be relying on the same evidence"

The trial in this case will undoubtedly focus overwhelmingly on proving (and for

Defendants, attempting to refute) the existence of a conspiracy or conspiracies, and Defendants'

roles in such conspiracy or conspiracies. Such evidence will include, *inter alia*, witness

testimony (live or by deposition), documents, economic evidence of conspiracy, expert

testimony, and other evidence relating to Defendants' pricing and conduct—all of it exclusively

common to the Settlement Class as a whole. And that is precisely why "courts routinely hold that

common proof predominates in determining whether an unlawful conspiracy existed." *Blood*

*Reagents*, 2015 WL 6123211, at *28. In a price-fixing class action like the one alleged here, in

which proving a conspiracy will be the central issue at trial, common issues are almost certain to

predominate over any individualized issues.[37]

---

to prove the existence of a conspiracy and antitrust impact, and it would be "much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence"), *aff'd* 831 F.3d 919 (7th Cir. 2016); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *6 (N.D. Ill. Mar. 21, 2007) ("The extent to which any awarded damages must be adjusted to each individual is not fatal to certification, first because it has traditionally been seen as an inappropriate barrier to applying the efficiencies of Rule 23, and second because there are adequate judicial processes for addressing the problem."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("'predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws,' because proof of the conspiracy is a common question that is thought to predominate over the other issues of the case" (quoting *Amchem*, 521 U.S. at 625; ellipsis in original)); *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("[A]s many courts have noted, the claim of a conspiracy to fix prices inherently lends itself to a finding of commonality and predominance, even when the market involves different products and prices.").

[37] *See* 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d ed. 2014) ("[W]hether a[n antitrust] conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)."); *Cathode Ray Tube*, 308 F.R.D. at 620 ("In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.") (quotation omitted); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Plaintiffs need not

Predominance is more readily satisfied in the settlement context, where there are no concerns about how each element will play out at trial.[38] Thus, courts commonly certify classes for settlement purposes even when certification has been denied for litigation.[39]

Here, the evidence that would be presented at trial will consist mostly or exclusively of evidence common to the Settlement Class as a whole, including testimony, documents and data from Defendants' employees, files and expert testimony based on that common evidence concerning Defendants' alleged unlawful conduct, and if necessary, calculation of aggregate Class damages.

---

show that there will be common proof on each element of the claim" especially where proof of the violation is "the predominant issue[.]") (quotation omitted); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present.") (citations omitted).

[38] *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) ("[H]ere we are not as concerned with 'formulat[ing] some prediction' as to how this element of a Sherman Act violation would 'play out' at trial, 'for the proposal is that there be no trial,' and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones.") (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) and *Amchem*, 521 U.S. at 620); *Sullivan*, 667 F.3d at 304 ("The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws" when evaluating predominance).

[39] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2013 WL 12333442, at *56 (N.D. Cal. Jan. 8, 2013), *report and recommendation adopted sub nom. In re Dynamic Random Access Memory Antitrust Litig.*, 2014 WL 12879520 (N.D. Cal. June 27, 2014) (Certifying a settlement class despite prior denial of certification for a litigation class. "This Court's concerns related to litigation issues, that is the likelihood that at trial, individualized proof would overwhelm common proof on the disputed elements of impact and pass-on of damages. Here, neither a prediction of the common evidence needed to establish the defendants' liability to class members nor any other aspect of trial manageability is a concern for the point of these proposed settlements is to eliminate a trial.") (collecting cases).

1.   **Common Issues Predominate as to Violation of the Antitrust Laws**

The elements of a Section 1 claim are "(1) concerted actions; '(2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that [plaintiffs were] injured as a proximate result of the concerted action.'"[40]

Proof of the Defendants' alleged misconduct "will not vary among class members." *In re NASDAQ Market Makers Antitrust Litig.*, 169 F.R.D. at 518. The anticompetitive conduct alleged involves evidence common to the Settlement Class, including whether the Defendants engaged in an illegal conspiracy or conspiracies. Such classwide evidence of defendants' antitrust violation is routinely found to predominate by courts addressing certification of settlement classes.[41]

2.   **Common Issues Predominate as to Proof of Impact**

Antitrust injury, or impact, requires showing "some injury" due to an antitrust violation.[42] "[F]or certification plaintiff need not prove antitrust injury actually occurred."[43] DPPs must

---

[40] *Generic*, 338 F. Supp. 3d at 438 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)).

[41] *See*, *e.g.*, *Processed Egg Prods.*, 284 F.R.D. at 263 ("we find that common questions abound with respect to whether the defendants engaged in illegal, concerted action.'"); *In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-02437, ECF No. 185 at 3-4 (granting certification of a settlement class "because common issues, including whether USG and other Defendants entered into any conspiracy, predominate over any questions affecting only individual members of the USG Settlement Class"); *Schuylkill Health Sys. v. Cardinal Health, Inc.*, No. 2:12-cv-07065, ECF No. 175 (E.D. Pa. Feb. 12, 2016) (Sanchez, J.) (granting preliminary approval of a settlement and certifying a settlement class, finding that common issues predominated over any individual issues in a case alleging violations of Section 1 and Section 2 of the Sherman Act).

[42] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969). *See also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325; *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 151 (3d Cir. 2002).

[43] *K-Dur*, 686 F.3d at 222.

provide a plausible theory of injury that can be proven through predominantly common evidence.[44] Class certification is proper even if the class includes some uninjured members.[45]

Common issues predominate as to antitrust impact as well, just as courts have repeatedly found in certifying, for litigation and settlement, classes of direct purchasers in other antitrust cases.[46] Likewise, courts routinely certify classes and find predominance as to impact in horizontal price-fixing cases like this one.[47]

---

[44] *See Modafinil*, 837 F.3d at 262-63 (a class should be certified "if such impact is plausible in theory [and] . . . susceptible to proof at trial through available evidence common to the class") (citation omitted) (alteration in original).

[45] *K-Dur*, 686 F.3d at 221-22 (certification appropriate even if some class members might have "zero or negative damages"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269 ("we are satisfied that the element of antitrust injury—that is, the fact of damages—is susceptible to common proof, even if the amount of damage that each plaintiff suffered could not be established by common proof."); *Linerboard*, 305 F.3d at 158 (uninjured class members were merely "limited exceptions relating to purchasers whose contracts were tied to a factor independent of the price of linerboard") (affirming class certification); *Castro*, 134 F. Supp. 3d at 847 (the possibility or inevitability of uninjured members does not preclude certification).

[46] *See, e.g.*, *K-Dur*, 686 F.3d at 221; *In re Modafinil*, 837 F.3d at 66; *Niaspan*, 397 F. Supp. 3d at 685-88 (common issues predominate with respect to classwide antitrust injury for direct purchasers of brand and/or generic Niaspan); *Glumetza*, 336 F.R.D. at 476-79 (similar); *Opana ER*, 2021 WL 3627733, at *5 (similar); *Solodyn*, 2017 WL 4621777, at *7-8 (similar); *Loestrin*, 2019 WL 3214257, at *13-14 (similar); *Lidoderm*, 2017 WL 679367, at *9-10 (similar). *See also In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 215-17 (S.D.N.Y. 2018) (studies, defendant's analyses, and sales data are sufficient proof of antitrust injury for brand and/or generic direct purchasers); *Wellbutrin SR*, 2008 WL 1946848, at *8-10 (literature and data satisfy predominance despite disagreement between experts about whether all brand purchasers would have converted to generic); *TriCor*, 252 F.R.D. at 229-30 (literature and empirical evidence of prices and market shares "can demonstrate impact on a class-wide basis" where "all or nearly all class members would have either bought the generic at lower prices, or paid lower prices on branded [product], or both."); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 308-10 (D.D.C. 2007) (common impact issues predominate based on literature, generic projections and sales data, despite several class members never purchasing generic); *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 370 & n.10 (D.D.C. 2007) (studies and defendant projections are classwide proof of impact to generic only purchasers).

[47] *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 268-269 ("whether the named plaintiffs and absent class members were proximately injured by the conduct of the [] Defendants is a question that is capable of proof on a class-wide basis" where Defendants conspired to raise prices on the product purchased by plaintiffs and thus "common questions exist even with

DPPs' expert Dr. Leitzinger opines that DPPs will be able to prove impact to the Class using predominantly common evidence. *See* Leitzinger Class Decl. ¶¶ 14-27. Dr. Leitzinger's opinion is based on several forms of common proof. *Id.* First, Dr. Leitzinger considers extensive economic research regarding generic competition, which finds that (absent the conspiracies alleged in this case) competition among and between generic pharmaceutical manufacturers drives down generic prices market-wide, and therefore the conspiracies alleged, if proven, would result in overcharges that are substantial and widespread. *Id.* ¶¶ 18-22. Second, Dr. Leitzinger considers his work in more than two dozen cases brought by direct purchasers challenging allegedly impaired generic competition in the pharmaceutical industry and the court rulings certifying these classes. *Id.* ¶ 23. Third, Dr. Leitzinger considers the size of the price increases being challenged in this case and finds that the vast majority of NGD formulations experienced substantial price hikes (based on IQVIA (formerly IMS) data). *Id*. ¶ 24. Such large price increases and overcharges make it even more likely that direct purchasers of these drugs suffered antitrust impact. *Id.* In addition, Dr. Leitzinger explains that the fact that many Settlement Class members purchased more than one NGD makes it even more likely that these Settlement Class members were impacted by Defendants' alleged conduct given that Settlement Class members need only have suffered overcharges on a single NGD to be impacted. *Id.* ¶ 25.[48] Finally, Dr.

---

respect to the element of antitrust injury and therefore any individual issues do not overwhelm the common ones."); *Processed Egg Prods.*, 284 F.R.D. at 263-64 (finding predominance as to impact: "The issue here is, whether the Class Members were proximately injured by the conduct of [the settling defendants] and other Defendants, which is a question that is capable of proof common to the class members" because class members will be relying on "the same alleged conduct [by Defendants], common proof of such conduct, and economic harm of overpayment for the respective products resulting from such conduct.")

[48] Based on Dr. Leitzinger's work to date, approximately 55% of Settlement Class members purchased more than one NGD, and this percentage will likely increase as additional Defendant data is processed. Leitzinger Class Decl. ¶ 25.

Leitzinger considered the experience of the Settlement Class members that purchased the class bellwether NGDs (clobetasol and clomipramine), and found that, following the price spikes for these drugs, nearly all of the clobetasol and clomipramine buyers paid an amount that was at least double the price prevailing prior to the spike. *Id.* ¶¶ 26-27. Dr. Leitzinger explained: "As this experience reflects, and the generic literature and prior case experience would lead one to expect, the presumptive impact of the alleged conspiracies on these NGDs was associated with a substantial increase in prices paid for at least one of the affected NGD formulations by nearly all of the Settlement Class buyers." *Id.* ¶ 27

### 3. The Court Need Not Evaluate Damages To Certify the Settlement Class

Damages need not have been calculated prior to certification of a settlement class.[49] An action can properly be certified under Rule 23(b)(3) if "one or more of the central issues in the action are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such as damages or some other affirmative defenses peculiar to some individual class members."[50]

---

[49] *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 268-69 (affirming certification of a settlement class and finding predominance satisfied without the evaluation of a damages model); *Processed Egg Prods.*., 284 F.R.D. at 263–64 (certifying a settlement early in the litigation proceeding and finding predominance without the evaluation of a damages model); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 377 (E.D. Pa. 2019) (certifying a settlement class without the benefit of expert discovery or damages modelling); *Domestic Drywall*, No. 2:13-md-2437, ECF No. 185 (E.D. Pa. Mar. 16, 2015) (preliminarily certifying a settlement class and finding predominance without evaluating a damages model.); *id.*, ECF No. 276 (E.D. Pa. Aug. 20, 2015) (final approval of the settlement and certification of the settlement class); *Schuylkill Health Sys.*, No 2:12-cv-07065, ECF No. 175 (E.D. Pa. Feb. 12, 2016) (Sanchez, J.) (certifying a settlement class and finding predominance without the evaluation of a damages model).

[50] *In re Wawa, Inc. Data Sec. Litig.*, 2021 WL 3276148, at *4  (E.D. Pa. July 30, 2021) (quoting *NFL Players*, 821 F.3d at 427) (certifying class for settlement and finding common issues predominate where class members "would rely on common documentary, testimonial, and

In addition, in *Suboxone*, the Third Circuit reaffirmed that predominance is readily satisfied as to damages where, as here, aggregate damages to the Class can and will be reliably measured using classwide evidence.[51] Even before *Suboxone*, courts in this circuit and around the country in direct purchaser actions similar to this one uniformly found that common issues predominate with respect to damages and rejected arguments that individual damage questions and variations in prices, rebates, and damage amounts preclude certification.[52] Whether members suffered different amounts of overcharge damages is no obstacle to certification.[53] Once a jury determines the aggregate damages suffered by the class, allocation of the award is of no concern

---

expert evidence to show both Wawa's action and inaction and to establish liability") (internal citation and quotation marks omitted); *Caddick v. Tasty Baking Co.*, 2021 WL 1374607, at *5 (E.D. Pa. Apr. 12, 2021) (similar).

[51] *Suboxone*, 967 F.3d at 272.

[52] *See supra* fn. 45 (citing cases). This is true in pharmaceutical antitrust cases like this one, alleging suppressed generic competition. *See e.g.*, *Suboxone*, 967 F.3d at 272 ("Individualized determinations, however, are of no consequence in determining whether there are common questions concerning liability."); *K-Dur*, 686 F.3d at 221-22 (certification affirmed despite pricing variation among class members); *Niaspan*, 397 F. Supp. 3d at 688 ("[I]ndividualized rebuttal does not cause individual questions to predominate.") (citation omitted); *Neurontin*, 2011 WL 286118, at *9 n.24 ("Any arguments regarding the variable rates at which Class Members substituted generic . . . for [brand] relate to the quantum of injury, rather than the fact of injury, and therefore do not defeat predominance with respect to the impact element."); *Lidoderm*, 2017 WL 679367, at *11 (variation in direct purchasers' prices paid and damages amounts no bar to certification); *Tricor*, 252 F.R.D. at 231 (approving aggregate damages analysis). This also holds true in horizontal price fixing cases like this one. *See e.g. In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. at 206 (rejecting arguments in a horizontal price-fixing case "premised on the notion that variation of damages between and among class members defeats predominance. . . . The determination of the aggregate classwide damages is something that can be handled most efficiently as a class action, and the allocation of that total sum among the class members can be managed individually") (citations omitted), *recon. denied*, 2017 WL 696983 (E.D. Pa. Feb. 22, 2017).

[53] 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1781, at 235 (3d ed. 2005) ("[I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate."); *In Re Insurance Brokerage Antitrust Litig.*, 579 F.3d at 268-69; *supra* fn. 45 (citing cases).

to the defendant and may be done through various means, including a special master.[54]

Individualized damages determinations and allocation issues do not preclude certification.[55]

### ii.    A Class Action Is Superior to Other Methods of Adjudication

Rule 23(b)(3) also requires that a class action would be a superior method of adjudicating

DPPs' and Settlement Class Members' claims. For certification of a Settlement Class, the Court

is not required to analyze the superiority factors in great detail.[56]

Here, class treatment is superior to other means of resolving these claims. *See*, *e.g.*,

*Processed Egg Prods.*, 284 F.R.D. at 294 ("[A] class action device enables individual direct

purchasers to pursue their claims in an economically feasible manner, with greater efficacy in

achieving enforcement and deterrence goals, and with greater bargaining power for settlement

purposes."). This is especially true given that this case has progressed over nearly a six-year

period with substantial motion practice and fact discovery completed. Having this matter remain

in this Court as a certified class action is far superior and more manageable than having it start

all over again on behalf of every single class member. Class certification also limits the

likelihood of inconsistent rulings. *See In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 347 (D.

Mass. 2003) ("Resolution by class action would instead promote uniform treatment of class

members-similarly situated direct purchasers who allege similar injuries resulting from the same

---

[54] *See*, *e.g.*, *Tyson Foods*, 577 U.S. at 461 (allocation issues are a premature and insufficient basis to challenge predominance at class certification because "a challenge to the proposed method of allocation" is properly raised when the case is ready "for disbursal of the award").

[55] *Suboxone*, 967 F.3d at 271-72 & n.12.

[56] *See*, *e.g.*, *Amchem*, 521 U.S. at 620 (holding that a court does not need to consider whether there would be manageability issues at trial since a proposed settlement would avoid the need for trial); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 378 (3d Cir. 2013) (recognizing that "certain Rule 23 considerations, such as whether the case, if tried, would present intractable management problems, are not applicable in the settlement class context") (internal quotation marks omitted); *Comcast Corp. Set Top*, 333 F.R.D. at 374 ("because a settlement obviates the need for trial, concerns regarding the manageability of a Rule 23(b)(3) class disappear.").

conduct."). Certification of the Settlement Class is plainly the superior method by which

Settlement Class members can obtain compensation for their injuries.

### C.      Settlement Class Counsel Meet the Requirements for Appointment

Under Rule 23(g), if the Court certifies the Settlement Class for purposes of the

Settlements with Sun and Taro, it must appoint Settlement Class Counsel. Settlement Class

Counsel is charged with fairly and adequately representing the interests of the Settlement Class.

In appointing Settlement Class Counsel, the Court must consider:

> (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class.

*Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir 2010).

The Court previously appointed Dianne M. Nast as Plaintiffs' Lead and Liaison Counsel

for DPPs, and appointed Ms. Nast, Robert N. Kaplan, Linda P. Nussbaum, Michael L. Roberts,

Thomas M. Sobol, David F. Sorensen, and their respective firms to serve as members of the

Plaintiffs' Steering Committee ("PSC") for the class of direct purchasers (collectively,

"Settlement Class Counsel").[57] DPPs respectfully request that the Court reaffirm these

appointments.

Harnessing the experience garnered by litigating antitrust cases for decades,[58] Settlement

Class Counsel investigated and filed the first direct purchaser antitrust action challenging

Defendants' conduct at issue here and have vigorously pursued the litigation on behalf of the

proposed Settlement Class for nearly six years. Settlement Class Counsel engaged in extensive

---

[57] MDL 2724, Pretrial Order No. 21 (Plaintiffs' Steering Committees) (superseding Pretrial Order Nos. 6 and 9) (ECF No. 342); Pretrial Order No. 37 (ECF No. 507).

[58] *See, e.g.*, MDL 2724, ECF Nos. 49, 312, & 11-1 (Class Counsel firm resumes).

fact discovery, including propounding hundreds of document requests, interrogatories, and requests for admissions; producing and reviewing millions of documents; taking or participating in numerous depositions; and engaging in numerous informal and formal hearings before the Court and the three Special Masters. The parties have also engaged in extensive discovery motion practice, including an appeal of a discovery ruling that was briefed before the Third Circuit and the United States Supreme Court.[59] Settlement Class Counsel has already expended millions of dollars litigating this case, and will commit the resources necessary—both time and funding—to vigorously represent the Settlement Class in this litigation. Courts have recognized Settlement Class Counsel's expertise in this field and have repeatedly adjudged Settlement Class Counsel adequate under Rule 23(a)(4) and 23(g).[60] Settlement Class Counsel has capably represented the Settlement Class throughout the litigation and thus should be appointed as Settlement Class Counsel.

---

[59] *In re Actavis Holdco U.S., Inc.*, 2019 WL 8437021 (3d Cir. Dec. 6, 2019) (denying petition for writ of mandamus), *cert. denied*, 141 S. Ct. 124 (2020).

[60] *See, e.g.*, *Niaspan*, 397 F. Supp. 3d at 681 (finding adequacy under Rule 23(a)(4) where Hagens Berman and Berger Montague served as Co-Lead Counsel); *Suboxone*, 421 F. Supp. 3d at 67-68, *aff'd* 967 F.3d 264 (finding adequacy under Rule 23(a)(4) where Hagens Berman served as Co-Lead Counsel and Berger Montague served as counsel for a class representative); *Loestrin*, 2019 WL 3214257, at *17 (finding adequacy under Rule 23(a)(4) where Hagens Berman and Berger Montague served as Co-Lead Counsel); *Nifedipine*, 246 F.R.D. at 369 (finding adequacy under Rule 23(a)(4) where Kaplan Fox and Dianne Nast served as Co-Lead Counsel and Berger Montague served on the Executive Committee); *In re DDAVP Direct Purchaser Antitrust Litig.*, 2011 WL 13318188, at *1 (S.D.N.Y. Aug. 16, 2011) (finding adequacy under Rule 23(g) where Linda Nussbaum and Berger Montague served as Co-Lead counsel); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.,* 2008 WL 1946848, at *3-4 (finding adequacy under 23(a)(4) where Dianne Nast served as lead counsel and Roberts Law Firm, Kaplan Fox, and Berger Montague served as co-counsel); *First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, No. 3:13-cv-00454, ECF No. 301 (S.D. Ill. Dec. 8, 2017) (finding adequacy under Rule 23(a)(4) where Dianne Nast and Michael L. Roberts served as co-lead counsel); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co*., No. 09-cv-852, ECF No. 1088 (E.D. Wis. Aug. 8, 2017) (finding adequacy under 23(a)(4) where Roberts Law Firm served as co-lead counsel).

## V.   THE PROPOSED SETTLEMENTS MEET THE STANDARD FOR PRELIMINARY APPROVAL

"In determining whether to grant preliminary approval, a court should consider whether the proposed settlement has any 'obvious deficiencies' as to its fairness and where [sic] it 'appears to fall within the range of possible approval.'"[61] Federal Rule of Civil Procedure 23(e) governs class action settlements and sets forth the procedures for reviewing settlements. Rule 23(e)(1) authorizes a court to grant preliminary approval of a proposed class action settlement so long as the moving parties demonstrate that the court will "'*likely be able to*' grant final approval to the settlement." 4 Newberg on Class Actions § 13:14 (5th ed.) (citing Fed. R. Civ. P. 23(e)(1)(B)) (emphasis added). First, the parties "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). The court then decides whether "giving notice is justified by the parties' showing that the court will *likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added).

Preliminary approval does not require a hearing (though DPPs will make themselves available should the Court desire one). As explained in the *Manual for Complex Litigation (Fourth)*, "this initial evaluation can be made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties." *Id.* § 21.632 at 382. Given the Court's knowledge of counsel and the MDL, supplemented by the documents and exhibits submitted herewith, this Court can and should grant DPPs' motion and preliminarily approve the settlement.

---

[61] *Wawa*, 2021 WL 3276148, at *8 (quoting *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007)).

### A.      The Court is Likely to Determine the Proposed Settlements are Fair, Reasonable, and Adequate Pursuant to Rule 23(e)(2)

Rule 23(e)(2), amended in 2018, codified the factors a court must consider when

determining the fairness of a class action settlement at final approval.[62] Fed. R. Civ. P. 23(e)(2)

directs courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the
> class; (B) the proposal was negotiated at arm's length; (C) the relief provided for
> the class is adequate, taking into account: (i) the costs, risks, and delay of trial and
> appeal; (ii) the effectiveness of any proposed method of distributing relief to the
> class, including the method of processing class-member claims; (iii) the terms of
> any proposed award of attorney's fees, including timing of payment; and (iv) any
> agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats
> class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). At preliminary approval, courts need only consider these factors for

purposes of finding that they would "likely" approve the proposed settlement.[63]

---

[62] 4 Newberg on Class Actions § 13:14 (5th ed.) ("Rule 23(e)(2) in turn authorizes final approval only upon a showing that the settlement is 'fair, reasonable, and adequate,' made after a consideration of four factors."); *id.* at § 13:15 ("Congress adopted this standard for the first time at the end of 2018. Prior to that, Rule 23 did not embody a specific preliminary settlement approval process or standard"); *Myers v. Jani-King of Phila., Inc*., 2019 WL 4034736, at *7 n.4 (E.D. Pa. Aug. 26, 2019) ("Effective December 1, 2018, Rule 23(e) was amended to list factors to guide a district court's determination of whether a proposed settlement is 'fair, reasonable, and adequate.'").

[63] *See Wawa*, 2021 WL 3276148, at *8 (evaluating the new Rule 23(e) requirements when considering preliminary approval of a class action settlement); *Caddick*, 2021 WL 1374607, at *6 (same); *Hall v. Accolade, Inc*., 2019 WL 3996621, at *2 (E.D. Pa. Aug. 23, 2019) (same).

Prior to the Rule 23(e) Amendment, courts in the Third Circuit preliminarily approved settlements as long as "there [were] no obvious deficiencies and the settlement [fell] within the range of reason." *Gates*, 248 F.R.D. at 438 (internal quotation marks and citation omitted). In *GM Trucks,* the Third Circuit established four factors that, if satisfied, entitled a proposed settlement to a "presumption of fairness." *In re Cendant Corp. Litig*., 264 F.3d 201, 233 n.18 (3d Cir. 2001) ("*GM Trucks* held that a district court reviewing a proposed class action settlement should make a preliminary determination, under which a presumption of fairness for the settlement is established if the court finds that: (1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.") (citing *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 785 (3d Cir. 1995)).

      **i.**      **The Class Representatives and Settlement Class Counsel Have Adequately Represented the Settlement Class**

In evaluating a proposed settlement, this factor focuses on "the actual performance of counsel acting on behalf of the class." Fed. R. Civ. P. 23(e)(2) Advisory Committee Note on 2018 Amendments.[64] As addressed above, Settlement Class Counsel engaged in extensive discovery and discovery-related motions practice prior to entering these Settlements. *See supra,* Section IV.C. In reaching these Settlements, Settlement Class Counsel engaged in lengthy, hard-fought, arm's length negotiations on behalf of the class. *See supra,* Section II. *See also* Nast Decl. ¶¶ 8-12. This factor will likely be satisfied for final approval and thus weighs in favor of preliminarily approving of the Settlements.

---

While the Rule 23(e) factors were not intended to replace the factors previously developed by the Third Circuit in evaluating the fairness of a class settlement, they were intended to codify prior practice. Fed. R. Civ. P. 23(e)(2) Advisory Committee Note on 2018 Amendments ("The goal of [the Rule 23(e)(2)] amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."); 4 Newberg on Class Actions § 13:14 (5th ed.) (similar). Indeed, the 23(e) factors largely overlap with the *GM Trucks* factors, the factors set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), and other factors courts in the Third Circuit previously relied on to evaluate the fairness of a settlement at the preliminary and final approval stages. *See Hall*, 2019 WL 3996621, at *2 ("The Girsh factors predate the recent revisions to Rule 23, which now explicitly identifies the factors that courts should apply in scrutinizing proposed class settlements, and the discussion in Girsh substantially overlaps with the factors identified in Rule 23.").

[64] *See also Caddick*, 2021 WL 1374607, at *6 (finding adequate representation under Rule 23(e)(2)(a) where "class counsel expanded considerable time and effort on this case, engaged in extensive discovery, including reviewing and analyzing a substantial volume of documents."); *Hall*, 2019 WL 3996621, at *4 (finding adequate representation under Rule 23(e)(2)(a) where class counsel logged hundreds of attorney hours on the litigation, took depositions, requested and reviewed written and electronic discovery, constructed a damages model, and interviewed class members).

### ii.     The Proposed Settlements Were Reached After Arm's Length Negotiations

As a general matter, settlements that result from arm's length negotiations between experienced counsel are given deference by courts.[65]

As shown in the Nast Declaration, these Settlements are the result of lengthy, hard-fought, arm's length negotiations between Settlement Class Counsel and Settling Defendants' counsel, all of whom are capable attorneys with decades of experience in complex class actions and antitrust matters. *See supra,* Section II; Nast Decl. ¶¶ 14-22. Settlement Class Counsel and Settling Defendants' counsel vigorously advocated for their respective clients and were prepared to continue with the litigation if no settlement had been reached.

### iii.    The Relief Provided for the Settlement Class is Adequate

These "ice breaker" Settlements represent a substantial recovery to the Settlement Class – in both dollar value and cooperation. The $85 million in monetary relief (which, as noted above, may be adjusted up via the MFN clauses, or down due to opt-outs) and other terms provided by

---

[65] *See Whiteley*, 2021 WL 4206696, at *4 ("[C]ourts generally recognize that a proposed class settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery") (internal quotation marks omitted); *In re Automotive Refinishing Paint Antitrust Litig.*, 2003 WL 23316645, at *2 (E.D. Pa. Sept. 5, 2003) ("Though the ultimate determination of the fairness of a partial settlement is left to the court, it is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations, in making this determination."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) (holding that "[a] presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D. Pa. 1997) (concluding that the settlement was the product of "good faith, arms' length negotiations[,]" which eliminated "the risk that a collusive settlement agreement may [have been] reached"). Further, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation.'" *Comcast Corp. Set Top*, 333 F.R.D. at 378 (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013)). And "[w]here this negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." *In re Philips/Magnavox TV Litig.*, 2012 WL 1677244, at *11 (D.N.J. May 14, 2012).

these Settlements are substantial and (according to Sun and Taro's records) constitute nearly 3%

of Sun and Taro's applicable sales, a percentage greater than many ice-breaker settlements.[66] As

a threshold measure, in a multi-defendant case like this one, the existence of an ice breaker

settlement is itself valuable to the Settlement Class because such settlements may bring other

defendants to settlement negotiations.[67] The Settlement Agreements also include provisions to

protect the Settlement Class's rights to seek the full value of their damages from other, non-

settling Defendants in the MDL to the extent permitted or authorized by law. *See* Settlement

Agreements, ¶ 14 (Non-settling Defendants remain joint and severally liable for Sun's and

Taro's sales, and DPPs' rights to rely on Settling Defendants' sales of NGDs to the Settlement

Class for this purpose are preserved).

Further, the cooperation required by the Settlement Agreements will assist DPPs in the

continued prosecution of this MDL on behalf of the Settlement Class.[68]

---

[66] Recoveries between 1.5% and 2.0% "ha[ve] been recognized as fair and reasonable in many antitrust class action lawsuits." *In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 294 (E.D. Mich. 2017) (citing *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)) (approving a cash settlement that represented 1.5% of defendants' sales during the class period and finding this percentage "within the range of settlements approved in other class actions" in that district); *Meijer, Inc. v. 3M*, 2006 WL 2382718, at *16 (E.D. Pa. Aug. 14, 2006) (approving a $28.9 million settlement that represented 2% of the settling defendant's sales to class members); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving a settlement that represented 1.62% of settling defendants' sales); *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (preliminarily approving a settlement that represented 2% of the settling defendants' sales).

[67] *See*, *e.g., Linerboard*, 292 F. Supp. 2d at 643 ("An early settlement with one of many defendants can 'break the ice' and bring other defendants to the point of serious negotiations."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 19 (D.D.C. 2019) (explaining that "icebreaker settlements" typically result in a discount as a result of the significant value of the settlement itself and cooperation provisions).

[68] *See Processed Egg Prods.*, 284 F.R.D. at 255 (approving settlement where one defendant agreed to cooperate in prosecution of case against other defendants by providing documents and expert witnesses); *Linerboard*, 292 F. Supp. 2d at 643 (noting settlement provision of

In approving class action settlements, courts in the Third Circuit have long deferred to the judgment of experienced counsel who have conducted arm's length settlement negotiations.[69] Here, Settlement Class Counsel have extensive experience litigating antitrust claims; they have demonstrated throughout this litigation that they are well-versed in this area of law and committed to vigorously prosecuting this case to achieve the best result for the class.[70] Settlement Class Counsel endorse these Settlements and believe that the combination of monetary recovery and cooperation provided for in the Settlement Agreements is a fair and reasonable result for the Settlement Class. Their experienced opinion should be given great weight.

### 1. The Settlements Account for the Costs, Risks, and Delays of Trial and Appeal

As a result of the substantial discovery and motion practice that has occurred to date, Settlement Class Counsel possess the information necessary to evaluate the settlement in light of the costs, risks, and delays associated with litigating the case through trial. Settlement Class Counsel continue to believe that claims against Settling Defendants have merit and will continue to vigorously prosecute their claims against the non-settling defendants. Nevertheless, the Settlement Class would face a number of risks, expenses, and difficult challenges if the litigation were to continue.

---

cooperation provided substantial benefit to the classes and supported settlement approval); *In re Ikon Office Solutions Inc. Sec. Litig.*, 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable in settling a complex case).

[69] *See*, *e.g.*, *Ebner v. Merchants & Med. Credit Corp.*, 2017 WL 1079966, at *5 (E.D. Pa. Mar. 22, 2017) (approving class settlement and noting that, "*experienced* class counsel endorses this settlement," and "[s]uch an opinion is entitled to 'significant weight.'") (emphasis in original) (internal citation omitted); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("[T]he professional judgment of counsel involved in the litigation is entitled to significant weight.").

[70] *See* Section IV.A.iv, *supra.*

The complex nature of this case, requiring discovery of approximately three dozen Defendant families and economic evaluations for 159 drugs, unavoidably involves significant expenditures on discovery and expert fees. Settlement Class Counsel has already expended more than $5 million in out-of-pocket expenses, and the first phase of discovery, on the bellwether drugs, does not close until mid-2023.[71] Expenses will continue to grow as the case proceeds through discovery.

The Settlement Class would also face a number of legal challenges and delays if the case continued through trial, including discovery disputes; preparation for the bellwether trials; preparing and defending fact and expert depositions; preparing and defending expert reports; and preparing and defending *Daubert* motions, class certification (and potential Rule 23(f) petition), summary judgment, and motions *in limine*. Antitrust class actions "are notoriously complex, protracted, and bitterly fought."[72] This case is no different. The initial complaints in this litigation were filed nearly six years ago. Defendants' motions to dismiss have been the subject of extensive briefing and argument. Each stage of this litigation is likely to be just as vigorously fought as the motions to dismiss. There can be no doubt that this case would be expensive to continue, complex to try, and uncertain in result.

For these reasons, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."[73] The settlements will ensure an immediate monetary distribution to the Settlement

---

[71] *See* PTO 188 (setting the deadline for the last expert depositions for Bellwether drugs on July 31, 2023).

[72] *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

[73] *Gen. Motors*, 55 F.3d at 784 (internal citations omitted). *See also Warfarin*, 391 F.3d at 535 ("there is an overriding public interest in settling class action litigation, and it should

Class and the accompanying cooperation will likely strengthen DPPs' claims and expedite the discovery process with other Defendants. That the Court will likely find this factor satisfied for final approval weighs in favor of preliminarily approving the Settlements.

### 2.    The Settlements Provide an Effective Method to Distribute the Relief to the Settlement Class

Under Rule 23(e)(2)(C)(ii), the Court "scrutinize[s] the method of claims processing to ensure that it facilitates filing legitimate claims" and "should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes on 2018 Amendments. The Settlements provide a straightforward process for Settlement Class Members to submit claims and receive their *pro rata* share of the settlement distribution. *See* proposed Plan of Allocation (submitted herewith as Ex. E). The *pro rata* shares will be calculated by Dr. Leitzinger using Defendants' transaction data. Declaration of Jeffrey J. Leitzinger, Ph.D. Related to Proposed Allocation Plan ("Leitzinger Allocation Decl.") ¶ 14 (submitted herewith as Ex. G).

Defendants' data must be processed and analyzed to make it useful for calculating *pro rata* shares. That work is continuing, but given the number of Defendants and volume of data, it will take roughly eight months to complete, assuming Defendants cooperate with answering technical questions about their data, plugging gaps in the data, and the like. Leitzinger Allocation Decl. ¶ 8. That timetable should still allow claim forms to be distributed not unduly long after final approval of the Settlements, given that the proposed schedule would set the hearing on final approval no earlier than 210 days after the Court order preliminarily approving the Settlements.

---

therefore be encouraged"); *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 216 (E.D. Pa. 2014) ("[I]f the parties were to continue to litigate this case, further proceedings would be complex, expensive and lengthy, with contested issues of law and fact . . . . That a settlement would eliminate delay and expenses and provide immediate benefit to the class militates in favor of approval.").

As discussed further below, because Dr. Leitzinger will use Defendants' sales data to calculate claims, individual claimants will not have to submit their own purchase data on the 159 NGDs at issue. In fact, for the most part, they would not be permitted to submit such data since claimants' shares will be calculated based on Defendants' sales data. As Dr. Leitzinger explains, if in addition to the work done in analyzing Defendants' transaction sales data, a claimant could then submit their own data, processing and analyzing individual purchase data from claimants for 159 NGDs over the 10-year Settlement Class period would be very time consuming and expensive (expenses that would further reduce the Settlement Fund available to all claimants). *Id.* ¶¶ 10-13. Also, the various data sets that might be submitted would require further efforts and time to evaluate any differences between them and data produced by Defendants, potentially requiring rounds of inquiry to both claimants and Defendants. *Id.* Defendants' own sales data, by contrast, is generally considered reliable and will be the basis of damage calculations going forward.[74]

There may be some claimants, however, whose claims cannot be calculated from Defendants' sales data because the data produced is not completely co-extensive with the Settlement Class period. Defendants produced data through the end of 2018 (or 2017), and some Defendants' data begins later than May 2009. If there are claimants who are not in Defendants' sales data, they will be given the opportunity to participate in the settlement if they can demonstrate that they purchased NGDs directly from Defendants at some point during the period from May 1, 2009 through December 31, 2019, and if they submit their own purchase data

---

[74] Courts have repeatedly certified classes of direct purchasers of pharmaceuticals, finding predominance met where direct purchasers' damages were calculated utilizing the defendants' data. *See*, *e.g.*, *Suboxone*, 967 F.3d at 272 n.13; *Wellbutrin XL*, 2011 WL 3563385, at *13-14.

showing the amount(s) of NGDs they purchased directly from Defendants during this period.[75]

### 3. The Proposed Terms for Attorneys' Fees are Reasonable

The terms of the Settlement Agreements allow Settlement Class Counsel to request attorneys' fees up to one-third of the net settlement amount, reimbursement of expenses or charges in connection with prosecuting the MDL, and class representative service awards. Settlement Agreements ¶ 16. DPPs intend to file a motion for fees at a later time. DPPs will file a motion seeking reimbursement for out-of-pocket expenses to date, approval to pay future expenses, service awards for class representatives, and the establishment of an escrow fund for future attorneys' fees before the time for Settlement Class members to object or opt out. *See* Section III.F, *supra*.

The Settlement Agreements provide that Settlement Class Counsel may use up to $500,000 to administer the settlements upon receiving preliminary approval in order to effectuate notice and claims administration. In conformity with the schedule outlined below, *see* Section IX, *infra*, Class Counsel intend to submit a request for expenses, service awards, and a set-aside for attorneys' fees within 45 days of the date on which notice is provided to the Class, and at least 45 days prior to the deadline for members of the Settlement Class to object to the Settlement. In accordance with the Settlement Agreements, this request may include (1) up to $6.8 million for out-of-pocket expenses incurred to date and future expenses (inclusive of the $500,000 discussed above), (2) service awards totaling $80,000 for the Class Representatives, and (3) permission to put one third of the remaining Settlement Fund (net of the above and net of Administrative Expenses, plus accrued interest) into escrow to pay future attorneys' fees

---

[75] Claimants who are not identified as direct purchasers in the data produced by Defendants will have to provide documentation sufficient to show that they purchased at least one NGD directly from at least one Defendant, as explained in Section VIII, *infra*.

awarded by the Court. This structure, providing for attorneys' fees based on the current

settlement, payment of current expenses, service awards, and establishment of an escrow fund

for future fees and expenses is not uncommon in complex, multi-defendant cases where litigation

remains ongoing against non-settling defendants.[76]

The notice contains sufficient information on the maximum amount Class Counsel may

request in attorneys' fees and expenses to allow class members to make an informed decision

about whether to opt out or object to the settlement. This satisfies due process.[77]

At this time, it is not necessary for the Court to make a determination on the

appropriateness of attorneys' fees since it will be addressed in a future motion before the Court.[78]

---

[76] *See*, *e.g.*, *In re Auto. Refinishing Paint Antitrust Litig*., No. 2:10-md-1426, ECF No. 136 (E.D. Pa. Oct. 13, 2004) (approving a request for attorneys' fees of approximately 32% of the current settlement, reimbursement of current costs, incentive awards for class representatives, and establishment of a fund to pay future expenses); *In re Pool Prod. Distr. Mkt. Antitrust Litig*., 2016 WL 235781, at *12 (E.D. La. Jan. 20, 2016) (approving a request by class counsel for expenses incurred to date and the establishment of an escrow fund for future expenses) ("Courts routinely approve setting aside a portion of a partial settlement for counsel's future litigation expenses to be incurred as they prosecute non-settling defendants.") (collecting cases).

[77] *NFL Players*, 821 F.3d at 444–47 (Affirming final approval of a settlement where the District Court intended to consider attorneys' fees after final approval and settlement class members were informed that attorneys may seek fees of up to $112.5 million. "Even if the class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with particular retired players—they still had enough information to make an informed decision about whether to object to or opt out from the settlement.").

[78] *See Wawa*, 2021 WL 3276148, at *13 (Preliminarily approving a settlement and explaining, "[a]t this time, the Court need not analyze or make a determination about the propriety of attorneys' fees because there will be an opportunity to do so once a formal motion is filed."); *NFL Players*, 821 F.3d at 444 ("The petition for a fee award will be submitted to the Court at a later date. Objectors will then be able to present arguments as to why the requested award is improper, and the Court will have discretion to modify the award in whatever way it sees fit."); *Processed Egg Prods.*, 284 F.R.D. at 277 ("Because, here, the [] Settlement Agreement provides that the attorneys' fees and expenses ultimately will be determined upon approval of the Court, which will require the assessment of the reasonableness of any such fees and expenses sought pursuant to Fed.R.Civ.P. 23(h) (and Fed.R.Civ.P. 54(d)(2)), the [] Settlement's provisions concerning attorneys' fees and expenses do not raise issues at this time

### iv.   The Proposal Treats Settlement Class Members Equitably

"A district court's principal obligation in approving a plan of allocation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Wawa*, 2021 WL 3276148, at *13 (quoting *Sullivan*, 667 F.3d at 326) (internal quotation marks and citations omitted). As discussed further in Section VIII below, the Settlements treat all Settlement Class Members equitably. In accordance with the Plan of Allocation, Settlement Class Members will receive compensation in an equitable manner based on their *pro rata* share of overall NGDs purchased directly from Defendants. *See* Section VIII, *infra*. The Court will likely find this factor weighs in favor of final approval, and so this factor also weighs in favor of preliminary approval.

In sum, the court should preliminarily approve the Settlements and direct notice of them to Settlement Class members because the factors provided by Rule 23(e)(2) for final approval all weigh in favor of finding that the Settlements are fair, reasonable, and adequate. Thus, the court will "*likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal," and "notice is justified." Fed. R. Civ. P. 23(e)(1)(B).[79]

### VI.   A.B. DATA SHOULD BE APPOINTED AS THE CLAIMS ADMINISTRATOR AND THE HUNTINGTON NATIONAL BANK SHOULD BE APPOINTED AS THE ESCROW AGENT

DPPs propose A.B. Data, Ltd. ("A.B. Data"), whom Settlement Class Counsel has

---

that would weigh against approving the settlement.); Newberg on Class Actions § 14:5 (5th ed.) ("In some situations, the court will give final approval to a class action settlement and leave fees and costs for a later determination."); *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 582 F.3d 524, 534–35 (3d Cir. 2009) (upholding award of attorneys' fees made six years after final approval of settlement); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 2000 WL 1622741, at *1 (E.D. Pa. Oct. 23, 2000) (approving fee award three years after final approval).

[79] *See* Section V, *supra*.

worked with in prior cases, be appointed as the Claims Administrator. A.B. Data will oversee administration of the Settlements, including disseminating notice to the Settlement Class and distributing settlement proceeds to members of the Settlement Class. A.B. data is well-regarded within the legal, accounting, and financial service fields and frequently handles claims administration for settlements in large, complex antitrust cases. *See* A.B. Data Decl. ¶¶ 3-4.

DPPs propose The Huntington National Bank, whom Class Counsel has used in prior, similar cases, as escrow agent. Huntington Bank is well-reputed and frequently handles escrow accounts in settlements for large, complex antitrust cases.

## VII. THE FORM AND MANNER OF NOTICE SHOULD BE APPROVED

Under Rule 23(e), class members are entitled to reasonable notice of a proposed settlement and the final Fairness Hearing before a class settlement is finally approved by the Court.[80] To satisfy due process, "notice to class members must be reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[81] There are two components of notice: (1) the form of the notice; and (2) the manner in which notice is sent to Settlement Class members.

The proposed form of mailed notice (Ex. C hereto), which has been used by Settlement Class Counsel in virtually the same form in prior antitrust cases, is appropriate.[82] The proposed

---

[80] Fed. R. Civ. P. 23(e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by the proposal."). *See also* Manual §§ 21.312, 21.633.

[81] *Mehling*, 246 F.R.D. at 477. *See also Baby Prod.*, 708 F.3d at 180 ("Generally speaking," notice is sufficient if it "enable[s] class members to make informed decision on whether they should take steps to protect their rights, including objecting to the settlement."); *Ikon*, 194 F.R.D. at 174 (same).

[82] *See, e.g.*, *In re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 1:18-md-02819, ECF No. 507 (approving form notice), 507-1 (approved notice) (E.D.N.Y. May 15, 2020); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01797, ECF No. 795-5 (E.D. Pa. Apr. 17, 2015) (proposed notice), ECF No. 831 (E.D. Pa. July 27, 2015) (approving

notice is designed to alert Settlement Class members to the proposed Settlement by using a bold headline, and the plain language text provides important information regarding the terms of the proposed Settlement. A.B. Data Decl. ¶ 8. In addition, the proposed notice prominently features Settlement Class Counsel's contact information and directions to the settlement website where the Settlement documents and supplemental information will be provided, as well as contact information for the Claims Administrator.

As to the manner of notice, DPPs propose to send notice by first-class United States mail to the more than 500 Settlement Class members who have been identified by DPPs' expert, Dr. Leitzinger. "Rule 23(c)(2)(B) requires that individual notice in 23(b)(3) actions be given to class members who can be identified through reasonable effort." Manual, § 21.311 at 488. Dr. Leitzinger has identified more than 500 Settlement Class members and will identify others by reviewing data and other available sources (such as class lists) produced by Defendants. *See* Leitzinger Class Decl., ¶ 5 n.3; Leitzinger Allocation Decl. ¶ 21 n.13.[83] The claims administrator,

---

form of notice); *In re: Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 2:13-md-02445, ECF No. 641-2 (E.D. Pa. Aug. 24, 2020) (Proposed Notice), ECF No. 683 (E.D. Pa. Jan. 21, 2021) (Approving form of Notice); *In re: Niaspan Antitrust Litig.*, No. 2:13-md-02460, ECF No. 690-3 (E.D. Pa. Sept. 13, 2019) (Proposed Notice), ECF No. 697 (E.D. Pa. Dec. 13, 2019) (Approving form of notice); *In re: Loestrin 24 FE Antitrust Litig.*, No. 1:13-md-02472, ECF No. 1200 (D.R.I. Aug. 14, 2019) (Approving form of notice), ECF No. 1178-1 (D.R.I. July 26, 2019) (Proposed Notice).

[83] It is not necessary for courts to evaluate ascertainability when certifying a settlement class. *In re Comcast Corp. Set-Top Cable*, 656 Fed. App'x 8 (3d Cir. 2016) ("The concern that a defendant be 'able to test the reliability of the evidence submitted to prove class membership' is not implicated [when there is a settlement] . . . Similarly, the concern that '[t]he method of determining whether someone is in the class ... be administratively feasible,' is not implicated by this case, because the settlement agreement removes the need for a trial.") (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d. Cir. 2013)). Nevertheless, the Class members are ascertainable—they purchased NGDs directly from Defendants from 2009-2019—and most have already been identified. This is sufficient. *See Byrd v. Aaron's, Inc*., 784 F.3d 154, 165 (3d Cir. 2015) ("The [Third Circuit's] ascertainability requirement ensures that class members can be identified after certification and therefore better prepares a district court to 'direct to class

A.B. Data, will use the USPS National Change of Address database to verify and update addresses. *See* A.B. Data Decl. ¶ 7.  First-class mail is a reliable method of notice.[84]

The mailed notice will also be supplemented by publication notice (Ex. D). In addition to directly mailing notice to all of the Settlement Class members who can be readily identified, the claims administrator A.B. Data shall establish a settlement website and shall also undertake a digital ad program on the Pink Sheet in order to reach Settlement Class members. *See* A.B. Data Decl. ¶ 11. (describing the digital ad program). It shall also have the published notice appear in *The Wall Street Journal* and disseminated as a news release to over 10,000 media outlets over *Business Wire. Id.* at ¶¶ 10, 12. Publication notice in this manner is a reliable method for reaching class members that are not identifiable through reasonable effort.[85] The proposed form

---

members the best notice that is practicable under the circumstances'") (citing Fed.R.Civ.P. 23(c)(2)(B)) (citation omitted). As explained by Dr. Leitzinger, the data and other documents that Defendants produced that are being used to identify Settlement Class Members for notice will likely capture most direct purchasers encompassed by the Settlement Class definition. Leitzinger Allocation Decl. ¶ 21 n.13.Any Settlement Class Members not captured by the data set will be identifiable through objective criteria submitted through the claims process, proving they made a purchase of a NGD directly from a Defendant during the Settlement Class Period. *See Byrd*, 784 F.3d at 164-65 ("A trial court . . . needs a class to be 'defined with reference to objective criteria' and some assurance that there can be 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition'") (citation omitted).

[84] *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, 2007 WL 4191749, at *5 (D.N.J. Nov. 21, 2007) ("first-class mail . . . is unquestionably the best notice practicable under the circumstances").

[85] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2021 WL 3929698, at *3 (E.D. Pa. Sept. 2, 2021) ("[p]ublication notice alone is considered a sufficient means to reach class members) (citing *Hall v. Best Buy Co., Inc*., 274 F.R.D. 154, 168 (E.D. Pa. 2011)). The combination of notice via direct mail and digital ad program is routinely approved by courts in pharmaceutical litigation. *See e.g. In re Flonase Antitrust Litig*., 2013 WL 12148283, at *1 (E.D. Pa. Jan. 14, 2013); *In re Wellbutrin SR Antitrust Litig*., 2011 WL 13392296, at *1 (E.D. Pa. Nov. 21, 2011); *In re Prograf Antitrust Litig*., 2015 WL 13908415, at *1 (D. Mass. May 20, 2015); *DDAVP*, 2011 WL 13318188, at *3.

and manner of notice more than satisfies due process and the requirements of Rule 23 and should be approved by the Court.

## VIII.   THE PLAN OF ALLOCATION SHOULD BE PRELIMINARILY APPROVED

DPPs' proposed Plan of Allocation, filed herewith (Ex. E), would allocate settlement funds on a *pro rata* basis based on Settlement Class members' unit direct purchases of the NGDs from Defendants during the Settlement Class period. The proposed Plan of Allocation is fair, reasonable, and efficient. Similar plans of allocation have been repeatedly approved, and the proposed Plan of Allocation here should be approved as well.

"Approval of a plan of allocation for a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole [, *i.e.*,] the distribution plan must be fair, reasonable and adequate."[86] "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable."[87]

Plans of allocation that distribute settlement funds based on a *pro rata* share of purchases

---

[86] *Ikon*, 194 F.R.D. at 184 (internal quotation marks omitted). *See also Sullivan*, 667 F.3d at 326 ("A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'") (quoting *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983)).

[87] *Sullivan*, 667 F.3d at 328 (quoting *In re Corel Corp. Inc., Sec. Litig.*, 293 F.Supp.2d 484, 493 (E.D.Pa.2003) (internal quotation marks omitted)). *See also Ikon*, 194 F.R.D. at 184 (same, approving a plan of allocation that reimbursed stock-holders at progressive percentages for their defined losses based on the timing of their stock purchases and defendant's disclosures) (citation omitted); *Meijer*, 2006 WL 2382718, at *17 (same, approving a plan of allocation distributing funds to direct purchasers proportionate to the volume and amount of their purchases); *Vista Healthplan, Inc. v. Cephalon, Inc*., 2020 WL 1922902, at *25 (E.D. Pa. Apr. 21, 2020) (same, approving a plan of allocation distributing funds to indirect purchaser claimants proportionately based on the amounts they paid for the affected drugs); *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 345 (E.D. Pa. 2007) (same, approving a plan of allocation distributing funds on a *pro rata* basis based upon the amount of each claimant's eligible purchases).

are routinely approved.[88] Settlements in antitrust cases are commonly distributed to direct

purchaser classes based on a purchaser's *pro rata* share as well.[89]

The proposed Plan of Allocation meets this standard. As set forth in the proposed Plan of

Allocation and in the Declaration of Dr. Leitzinger, the Net Settlement Fund will be distributed

---

[88] 4 Alba Conte & Herbert Newberg, Newberg on Class Actions, § 12.35, at 350 (4th ed. 2002) (noting that *pro-rata* allocation of a settlement fund "is the most common type of apportionment of lump sum settlement proceeds for a class of purchasers" and "has been accepted and used in allocating and distributing settlement proceeds in many antitrust class actions"); *Beneli v. BCA Fin. Servs., Inc*., 324 F.R.D. 89, 105–06 (D.N.J. 2018) ("In particular, *pro rata* distributions are consistently upheld, and there is no requirement that a plan of allocation differentiat[e] within a class based on the strength or weakness of the theories of recovery.") (citation and internal quotation marks omitted); *In re Packaged Ice Antitrust Litig*., 2011 WL 6209188, at *15 (E.D. Mich. Dec. 13, 2011) ("Typically, a class recovery in antitrust or securities suits will divide the common fund on a *pro rata* basis among all who timely file eligible claims, thus leaving no unclaimed funds.") (quoting 3 Newberg on Class Actions, § 8:45 (4th ed. 2011)); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); *Sullivan*, 667 F.3d at 328 (upholding a district court's approval of a plan of allocation based on a *pro rata* share of diamond purchases). A plan of allocation "need not be, and cannot be, perfect." *In re Cendant Corp. Sec. Litig*., 109 F. Supp. 2d 235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir. 2001), *cert. denied*, 535 U.S. 929 (2002).

[89] *See, e.g.*, *In re Remeron Direct Purchaser Antitrust Litig*., 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ... in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable."); *In re Flonase Antitrust Litig*., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where each class member receives their *pro rata* share of the net settlement fund based on their share of qualifying purchases of the at issue drug); *In re Namenda Direct Purchaser Antitrust Litig*., 462 F. Supp. 3d 307, 309 (S.D.N.Y. 2020) (same); Order Granting Final Approval of Pls.' Proposed Plan of Allocation, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-md-2503, ECF No. 1179 (D. Mass. July 18, 2018) (same); Order Granting Direct Purchaser Plaintiffs' Unopposed Motion for Final Approval of Settlement, *In re Loestrin 24 FE Antitrust Litig.*, No. 1:13-md-02472, ECF No. 1462 (D.R.I. Sept. 1, 2020) (same); *In re Lidoderm Antitrust Litig*., No. 14-md-2521, ECF Nos. 1004-5, 1004-6, 1054 (N.D. Cal. Sept. 20, 2018) (same); *In re Aggrenox Antitrust Litig*., No. 14-md-2516, ECF Nos. 733-1, 739 (D. Conn. Dec. 18, 2017) (same); *Mylan Pharms., Inc. v. Warner Chilcott Public Ltd*., No. 12-cv-3824, ECF Nos. 452-3, 665 (E.D. Pa. Sept. 15, 2014) (same); *In re Tricor Direct Purchaser Antitrust Litig*., No. 05-cv-340, ECF Nos. 536-1, 543 (D. Del. Apr. 23, 2009) (same).

to Settlement Class members based on each claimant's volume of purchases across all NGDs from all Defendants during the period from May 1, 2009 through December 31, 2019. *See* Plan of Allocation § 2.1; Leitzinger Allocation Decl. ¶ 14.[90] Claimants' purchase volumes will be calculated using data produced by Defendants. Claimants will not be allowed to submit their own data, except in limited circumstances, because, as Dr. Leitzinger explains: (a) generic manufacturer data, like Defendants' data that will be used here, is "highly reliable;" (b) in Dr. Leitzinger's experience "where there has been data submissions from Class members in connection with settlement distribution, those submissions have not materially affected the outcomes;" and (c) review of Class member data submissions could be expensive and time-consuming, causing the Settlement Class to incur additional expense and delay distribution. Leitzinger Allocation Decl. ¶¶ 10-13.

Purchases of NGDs will be weighted so that purchases of NGDs with higher price points will be given greater weight in the allocation process (consistent with Dr. Leitzinger's expectation that those NGD formulations likely carried bigger overcharges). *Id*. ¶¶ 15-16. Specifically, Claimant purchase volumes of each NGD formulation will be multiplied by the average price reported for it by IQVIA (formerly IMS) over the period from May 2009 to December 2019. *Id*. ¶ 15.

The data set that will be used for these calculations is enormous. Unlike most pharmaceutical or antitrust cases that involve a few defendants and a single product, this case covers approximately three dozen Defendant families and 159 drugs (with various formulations

---

[90] Depending on drug formulation of each NGD, a unit may be pill (tablet or capsule); milligram or milliliter as appropriate for drugs sold in a cream, solution, jelly/gel, ointment, pastes, inhalation, infusion, etc.; a suppository for drugs sold in that form; a patch for drugs sold in that form; and a syringe for those drugs sold in syringes. Plan of Allocation at 3.

and strengths). The Plan of Allocation will utilize all of the sales data Defendants produce for all

159 drugs that is useable, meaning that Dr. Leitzinger can use it to calculate Class members' unit

purchases. *Id.* ¶ 11. Nevertheless, while this data captures the vast majority of sales and thus the

vast majority of direct purchasers of NGDs in the Settlement Class, there may be some

Settlement Class Members whose purchases are not contained within this data set, such as

purchasers that bought NGDs in 2009 (since not all Defendants produced data back to 2009), or

past 2017 or 2018, the end dates of Defendants' data. *See id.* ¶ 21 n.13. Claimants who do not

appear in Defendants' produced sales data will need to show they purchased NGD(s) directly

from Defendants during the period from May 1, 2009 through December 31, 2019 and will need

to submit their purchase data showing these direct purchases. Plan of Allocation at § 2.2. In

addition, the Plan of Allocation provides that claimants who file based on an assignment of rights

from a Class member shall have to reach agreement about the volume of unit purchases covered

by any such assignments.[91]

---

[91] Specifically, Section 2.3 of the Plan of Allocation provides:

> *Claimants that file on the basis of an assignment from a Settlement Class member.* Allocations to Claimants who file a claim based on an assignment from a Settlement Class member would be determined either (a) by agreement between the assignor Settlement Class member and its respective assignee claimant, or (b) if the assignor Settlement Class member and its assignee claimant cannot reach an agreement, then the assignee claimant shall receive no allocation based on its assignment from the assignor Settlement Class member and the assignor Settlement Class member's allocation shall not be reduced to account for the assignment to the assignee claimant. There are only two types of agreements between an assignor Settlement Class member and its respective assignee claimant that shall be acceptable for purposes of an assignee claimant receiving an allocation based on an assignment from a Settlement Class member: (i) the assignor Settlement Class member and its respective assignee claimant can agree that the assignee claimant shall be allocated a share that is a fixed percentage of the assignor Settlement Class member's share (say 5% of the Settlement Class member's share) and that the assignor Settlement Class member's allocation shall be reduced by the same amount; or (ii) the assignor Settlement Class member and

It will take time for DPPs' experts to work with the data and incorporate it into the Plan of Allocation calculations, but given the schedule proposed herein for notice and final approval, DPPs do not believe that this data process will unduly delay distribution.

In Dr. Leitzinger's opinion, the proposed plan of allocation is fair, reasonable, and reflects the type and approximate extent of the alleged injury incurred by Settlement Class members. Leitzinger Allocation Decl. ¶¶ 7, 22. "By relying upon Defendants' data, the basis for the allocation is reliable and the process is efficient, thereby preserving net settlement amounts by avoiding undue costs. In addition, as noted above, this allocation method employs allocation approaches similar to those approved by courts in other cases involving overcharges on generic drugs." *Id.* ¶ 22.[92]

---

its respective assignee claimant can submit agreed upon figures for the purchase volumes covered by the assignment for each NGD sold by Defendants, and then this information can be used by Econ One to calculate the assignee's allocation in accordance with this Plan of Allocation (and the assignor Settlement Class member's share shall be reduced by the same amount). Neither an assignee (nor any other Claimant) other than as stated herein shall be allowed to submit its own purchase data. Reviewing assignee claimants' purchase data would likely be expensive and time consuming, and will delay disbursement. If the assignor Settlement Class member and assignee claimant cannot reach agreement, they can attempt to resolve any dispute outside of this allocation process. The assignor and assignee shall be given no more than 90 days from the deadline for claims submission to reach agreement, and, if they cannot reach agreement by that time, the assignor's and assignee's share shall not be distributed, and shall remain in the escrow account until such time as they either reach agreement or obtain a court order providing for the amounts to be distributed to the assignor and assignee.  As the Claim Form will make clear, any claim (including all related documentation or materials submitted therewith) submitted by a Claimant who files a Claim Form based on an assignment may be shared with the Claimant's assignor Settlement Class member during the claims administration process.

[92] The Plan of Allocation also provides that claimants who have given partial assignments to entities that opt out of the Class (such as Direct Action Plaintiffs ("DAPs")) shall have their combined net totals reduced to account for those assignments. Plan of Allocation § 2.1.d. This shall be done using the chargeback data produced by the Defendants that Dr. Leitzinger can use to estimate the percentage of units purchased by the Settlement Class members which were then

48

In addition, "[w]hen evaluating the fairness of a Plan of Allocation, courts give weight to the opinion of qualified counsel."[93] This Plan of Allocation was developed in conjunction with Settlement Class Counsel and is highly recommended by Settlement Class Counsel, which further supports approval.

## IX.  THE PROPOSED SCHEDULE IS FAIR AND SHOULD BE APPROVED

As set forth in the proposed order, DPPs propose the following schedule for completing the Settlement approval process:

- Within 10 days from the date of filing for preliminary approval, the Settling Defendants shall serve notices pursuant to the Class Action Fairness Act of 2005;

- Within 45 days from the date the preliminary approval order is entered, notice is mailed to each identified member of the Settlement Class;

- Within 45 days from the date the preliminary approval order is entered, the Notice Administrator shall complete publication notice, as set forth in the A.B. Data Declaration;

- Within 45 days of the date on which notice is mailed to each identified member of the Settlement Class, Settlement Class Counsel will file a motion for reimbursement of expenses, payment for future expenses, service awards, and set aside of up to one-third of the remaining Settlement Fund for attorneys' fees;

- Within 90 days from the date that the Notice is mailed, Settlement Class members may request exclusion from the Class or object to the Settlement or attorneys' fees, expenses and service awards;

- Within 21 days following the deadline for members of the Settlement Class to request exclusion from the Settlement Class or object to the Settlement and/or attorneys' fees,

---

resold to the DAPs or other assignees. *Id.* This calculation is described in detail in paragraph 20 of Dr. Leitzinger's Allocation Declaration.

[93] *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014*); In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). *See also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.") (quoting *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y.2002) (citation omitted)); *In re Auto. Parts Antitrust Litig.*, 2019 WL 7877812, at *1 (E.D. Mich. Dec. 20, 2019) (same); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (same).

expenses and service awards, Settlement Class Counsel will file a report to the Court with any and all opt-out requests that are received;

- Within 45 days following the deadline for members of the Settlement Class to request exclusion from the Settlement Class or object to the Settlement and/or attorneys' fees, expenses and service awards, Settlement Class Counsel will file a motion seeking final approval of the Settlements with Sun and Taro;

- On a date to be set by the Court no less than 210 days following entry of the preliminary approval order, the Court will hold a final Fairness Hearing.

This schedule is fair to Settlement Class members. It gives Settlement Class members ample time for consideration of the Settlements before the deadline for opting-out or submitting objections. Courts routinely approve periods shorter than 90 days for Class members to opt out or object. *See*, *e.g.*, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01797, ECF No. 831 (E.D. Pa. July 27, 2015) (66 days); *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12653, ECF Nos. 400, 393 (D. Mass. Jan. 10, 2020) (35 days); *In re Loestrin 24 FE Antitrust Litig.*, 1:13-md-2472, ECF No. 1426 (D.R.I. Mar. 23, 2020) (35 days). And as noted herein, the notice will, *inter alia*, explain the Settlements, inform Settlement Class members of Settlement Class Counsel's intent to reserve up to a third of the Settlement for attorneys' fees, and seek payment of expenses and service awards, and direct Settlement Class members as to how they can get more information or answers to any questions they may have. In addition, the schedule allows the full statutory period for the Settling Defendants to serve their Class Action Fairness Act notice pursuant to 28 U.S.C. § 1715, and for regulators to review the proposed settlement and, if they choose, advise the Court of their view.

## X.   **CONCLUSION**

For the reasons set forth above, the Court should grant DPPs' Motion and schedule a Fairness Hearing.

Dated: March 16, 2022

Respectfully submitted,

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
dnast@nastlaw.com

*Lead and Liaison Counsel*
*for Direct Purchaser Plaintiffs*

David F. Sorensen
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net

Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com

Michael L. Roberts
ROBERTS LAW FIRM P.A.
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
(617) 482-3700
tom@hbsslaw.com

Linda P. Nussbaum
NUSSBAUM LAW GROUP, PC
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9189
lnussbaum@nussbaumpc.com

*Direct Purchaser Plaintiffs' Steering Committee*