EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION**<br><br>**This Document Relates to:**<br><br>***Direct Purchaser Class Plaintiffs' Actions*** | **MDL 2724**<br><br>**16-MD-2724**<br><br>**HON. CYNTHIA M. RUFE** |

**DECLARATION OF JEFFREY J. LEITZINGER, PH.D.
Related to Proposed Allocation Plan**

**Econ ONE Research, Inc.**

**March 16, 2022**

550 South Hope St., Suite 800
Los Angeles, CA 90071

## TABLE OF CONTENTS

**I.     Introduction** ..................................................................................**1**

**II.    Allocation Plan** ...........................................................................**3**

    A.  General Approach............................................................... 3

    B.  Data Sources ..................................................................... 4

    C.  Calculating Purchase Shares ............................................. 6

    D.  Contingencies ................................................................... 7

        1.  Non-Participating Settlement Class Members ................... 7

        2.  Opt-Outs ..................................................................... 7

        3.  Additional Settlement Class Members ............................ 8

Declaration of Jeffrey J. Leitzinger, Ph.D.

## I.      Introduction

1.      I am an economist and Managing Director at Econ One Research, Inc., an economic research and consulting firm with offices in half a dozen cities around the country.  I have master's and doctoral degrees in economics from UCLA and a bachelor's degree in economics from Santa Clara University.  My doctoral work concentrated on the field within economics known as industrial organization, which involves among other things the study of markets, competition, antitrust, and other forms of regulation.

2.      During the past nearly 40 years of my professional career, industrial organization has remained the principal focus of much of my work.  I have worked on numerous projects relating to antitrust economics, including analyzing issues involving market power, market definition, and the competitive effects of firm behavior.  I also have frequently assessed damages resulting from alleged anticompetitive conduct and have substantial experience in the calculation of damages in class action litigation. Additionally, I have significant experience with economic issues related to class certification in antitrust contexts.

3.      I have testified as an expert economist in state and federal courts, before a number of regulatory commissions and in international treaty arbitrations.  I have been involved continuously in research regarding the pharmaceutical industry for over twenty years now.  I am familiar with the economic and academic literature on the subject of generic drug competition, both as it operates normally and regarding strategies brand companies may employ to limit it.  I previously have conducted economic analysis of impact and damages for purposes of class certification in a number of cases involving alleged anticompetitive conduct directed against AB-rated generic competition.[1]  With

---

[1] *In re Glumetza Antitrust Litigation*, No. 3:19-cv-05822 (N.D. Cal); *In re Zetia (Ezetimibe) Antitrust Litigation*, MDL No. 2836 (E.D. Va.); *In re Intuniv Antitrust Litigation*, No. 16-cv-12653 (D. Mass.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In re Niaspan Antitrust Litigation*, MDL No. 2460 (E.D. Pa.); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.); *In re Celebrex (Celecoxib) Antitrust Litigation*, No. 2:14-cv-00361 (E.D. Va.); *In re Lidoderm Antitrust Litigation*, No. 14-md-2521 (N.D. Cal.); *In re Prograf Antitrust Litigation*, No. 1:11-cv-10344-RWZ (D. Mass.); *In re Wellbutrin XL Antitrust Litigation*, No. 08-2431 (E.D. Pa.); *In re Relafen Antitrust Litigation*, Master File No. 01-12239-WGY (D. Mass.); *In re Tricor Direct Purchaser Antitrust Litigation*, C.A. No. 05-340 KAJ (D. Del.); *Meijer, Inc. et al. v. Warner Chilcott Holdings III, Ltd., et al.*, No. 05 Civ. 2195 CKK (D.D.C.) (involving the drug Ovcon 35); *In re Nifedipine Antitrust Litigation*, No. 03-MS-223 (D.D.C.); *In re K-Dur Antitrust Litigation*, No. 2:01-cv-01652 (D.N.J.);



few exceptions, the direct purchaser classes proposed in these cases were certified.[2]  I also have provided expert opinions regarding market power, anticompetitive effects, procompetitive justifications, overcharges, and/or class-member settlement allocations in connection with the merits phase of many of these same cases.  A detailed summary of my training, past experience, and prior testimony is shown in Exhibit 1.

4.      I have been asked by counsel for plaintiffs César Castillo, LLC, FWK Holdings, LLC, Rochester Drug Cooperative, Inc., and KPH Healthcare Services, Inc. (the "Settling Plaintiffs") to develop a fair and reasonable method for allocating the Net Settlement

---

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis, et al.* No. 1:07-cv-07343-HB (S.D.N.Y.) (involving the drug Arava); and *In re Flonase Direct Purchaser Antitrust Litigation*, Master File No. 2:08-cv-03149 (E.D. Pa.).  I also have offered testimony (either by deposition or declaration or both) regarding aggregate overcharge damages suffered by classes of direct purchasers in numerous cases including those listed above as well as:  *In re Cardizem CD Antitrust Litigation,* MDL No. 1278 (E.D. Mich.); *In re Buspirone Patent & Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.); *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-CV-0085 (D.N.J.); *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.,* (D.D.C.) (involving the drug Platinol); *In re Terazosin Hydrochloride Antitrust Litigation,* MDL No. 1317 (S.D. Fla.); and *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, MDL No. 1383 (E.D.N.Y.).

[2] I understand that in *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01797 (E.D. Pa.) (involving the drug Provigil) the district court certified a class of 22 direct purchasers, but the Third Circuit vacated and remanded, finding the court had not adequately explained why joinder was impractical.  *In re Modafinil Antitrust Litigation*, 837 F.3d 238 (3d Cir. 2016).  On remand, the district court denied certification to a proposed class of 24-25 members, and some of the former class members proceeded individually. 2:06-cv-01797 (E.D. Pa.), Dkt. No. 1081 (Jan. 21, 2018) (stating 16 former class members were proceeding against the remaining defendant); the case was settled in November 2018 (Stock Exchange Letter Intimation of Settlement in re Modafinil Antitrust Litigation in US with Certain Plaintiffs, available at https://www.sunpharma.com/node/236140).  In addition, I understand that the Court denied class certification on "numerosity" grounds in *In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084, 2018 WL 3424612 (N.D. Ga. Jul. 16, 2018), and there too, some former class members are proceeding individually.  See *King Drug Co. of Florence, Inc. v. Abbott Labs*, No. 2:19-cv-03565 (E.D. Pa.).



Fund[3] among Settlement Class members ("Settlement Class members") eligible to participate in the settlements.[4]

5.      Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $895 per hour.  Econ One also is being compensated for time spent by my research staff on this matter at their normal and customary hourly rates.

## II.     Allocation Plan

### A. General Approach

6.      In my opinion, a fair and reasonable approach to the allocation of net settlement proceeds would be to give each Settlement Class member a share of those proceeds reflecting its *pro rata* share of the total purchases across the drugs allegedly impacted by the alleged illegal behavior--referred to below as the Named Generic Drugs or NGDs.[5]  I note allocation procedures based upon settlement class member purchase volumes have been approved by numerous Courts in other cases involving overcharges on generic drugs.  These cases include *In re Intuniv Antitrust Litigation*, No. 16-cv-12653 (D. Mass.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-2503-DJC (D. Mass.); *In re Celebrex (Celecoxib) Antitrust Litigation*, No. 2:14-cv-00361 (E.D. Va.); *In re Lidoderm Antitrust Litigation*, No. 14-md-2521(N.D. Cal.); *In re K-Dur Antitrust Litigation*, No. 01-cv-1652 (SRC)(CLW) (D.N.J.); *King Drug Company of*

---

[3] The Net Settlement Fund refers to the amount payable to the Settlement Class pursuant to the settlements with Defendant Taro Pharmaceuticals U.S.A., Inc. and with Defendant Sun Pharmaceutical Industries, Inc. and its affiliates (Caraco Pharmaceutical Laboratories, Ltd., Mutual Pharmaceutical Company, Inc., and URL Pharma, Inc.--collectively, "Sun"), plus interest, net of Court-approved attorneys' fees and any other Court-approved expenses or payments from the Settlement Fund.

[4] The Settlement Class is defined as:  "All persons or entities, and their successors and assigns, that directly purchased one or more of the Named Generic Drugs from one or more Defendants in the United States and its territories and possessions, at any time during the period from May 1, 2009 until December 31, 2019." "Excluded from the Settlement Class are Defendants and their present and former officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities."  Taro Settlement Agreement dated Nov. 4, 2021, ¶ 1; and Sun Settlement Agreement dated Nov. 4, 2021, ¶ 1.

[5] A list of the Named Generic Drugs is attached as Exhibit B to the Settlement Agreements.  A list of Defendants is attached as Exhibit C to the Settlement Agreements.



*Florence, Inc., et al. v. Cephalon, Inc. et al.*, No. 06-CV-1797-MSG (E.D. Pa.); *In re Doryx Antitrust Litig. (Mylan Pharmaceuticals, Inc., v. Warner Chilcott Public Ltd.)*, No. 12-cv-3824 (E.D. Pa.); *In re Miralax Antitrust Litig.*, No. 07-cv-142 (D. Del.); *In re Prograf Antitrust Litig.*, No. 11-md-2242 (D. Mass.); *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No. 06-cv-52 (D. Del.); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del.); *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa.); and *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn.).

7.    The settlement allocation here pertains to 159 NGDs, and different Settlement Class members will have purchased different mixes of those 159 NGDs.[6]   Nonetheless, I find that a *pro rata* settlement allocation based upon Settlement Class member shares of purchase activity across all of the NGDs would be fair and reasonable.

### B.  Data Sources

8.    Plaintiffs' experts have thus far processed and prepared for analysis the transaction data of the following Defendants:  Actavis, Akorn, Dr. Reddy's, Mylan, Perrigo, Sandoz, Teva, Upsher-Smith, and Wockhardt for computer-based analysis, meaning that this data can be used to calculate each Settlement Class member's direct purchases of the NGDs.  Work is ongoing to prepare data produced by the additional Defendants for analysis.  That process will take roughly 8 months to complete, depending on the information that can be obtained from Defendants to help us understand and process their data.

9.    I propose to use these data for purposes of determining Settlement Class member purchases and thereby allocate the Net Settlement Fund (as described below).  I have worked extensively with these same kind of generic manufacturer transaction records for over 20 years (including in the cases listed above in paragraph 6).  I find them highly reliable and seldom, if ever, to be inaccurate based on records maintained by other parties (i.e., customers or industry data collection firms).

10.    In that regard, it is my understanding that Settlement Class members with purchase activity covered by the Defendants' data generally will not be given the option to

---

[6] The settlements referenced above in paragraph 6 typically involved overcharges on brand and generic versions of a particular drug molecule.



submit their own data (provided this meets with Court approval).  I find this limitation reasonable.  Given my experience with the reliability of the manufacturer data, I would not expect review and comparison with Settlement Class member records or data to result in any material changes to the purchase histories recorded by the Defendants.  Indeed, in my past experience where there has been data submissions from class members in connection with settlement distribution, those submissions have not materially affected the outcomes.

11.     Beyond likely having little impact on the end-results, the review of, and comparison of Defendant data to Settlement Class member records and data could be a very substantial undertaking.  In that regard, it is worth noting that purchase activity on the part of the Settlement Class will involve 159 different generic drugs with multiple formulations and strengths; approximately 30 different manufacturers and 500 or more Settlement Class members.  Incorporating Settlement Class member data submissions would necessitate interpretation and analysis of (potentially, hundreds of) different data sources, along with potentially multiple rounds of follow-up questions with the submitting Settlement Class members to understand those sources.

12.     Even if Settlement Class member submissions, once interpreted and analyzed, did show different results, that would only be the start of the process.  Additional back and forth both with the Defendant in question and the Settlement Class member likely would be needed to resolve the differing outcomes.  In the past, we have on some occasions gone through this process only to find that no easy resolution was apparent.

13.     The effort needed to a) interpret and incorporate purchase data submitted by Settlement Class members, b) process that data and compare it with the Defendants' data, and then c) try to resolve any data differences that emerge from that process, could readily add hundreds of thousands of dollars to the costs borne by the Settlement Class.  In that regard, I would expect that the added costs would in total greatly outweigh the amount of any additional settlement allocation it might yield across all of the Settlement Class members submitting data.  Moreover, it would likely delay settlement distributions by many months.  It certainly has done so in my past experience with settlement allocations and class member data submissions.  And, that

experience has involved settlements pertaining just to a single drug, typically a handful of manufacturers and, in most cases, less than 80 class members.

### C. Calculating Purchase Shares

14.   I propose the following process for calculating *pro rata* purchase shares using the data provided by Defendants.  I would use Defendants' data, where available[7], to determine unit[8] volume purchases by each Settlement Class member for each NGD formulation for the period May 2009 – December 2019.[9]

15.   I recognize that the per-unit amount of overcharges associated with each NGD formulation likely would be positively correlated with their prices.[10]  In that regard, I have data from a third-party pharmaceutical data collection and reporting company, IQVIA (formerly known as IMS), which provides data regarding prices paid for each NGD formulation.  IQVIA prices are generally regarded as reliable and are widely used both by industry participants and researchers.  I propose using these prices to give greater weight in the allocation process to purchase volumes of NGD formulations with higher price points (consistent with the expectation that those NGD formulations likely carried bigger per-unit overcharges).  I would do this by

---

[7] All but five Defendants agreed to produce data through December 2018, and it is my understanding that the other five stipulated to producing data through at least December 2017.  Data start dates vary by NGD as stated in PTO 139 (ECF No. 1514) and I understand it, amended by agreement of the parties on March 12, 2021.  It is my opinion that these data are sufficient for allocation purposes.

[8] The unit of purchase is an "extended unit" which is generally equal to a tablet, capsule, gram, milliliter, suppository, patch, etc.  "Purchases" throughout refers to net unit purchases, i.e., gross purchases net of any returns.

[9] It is my understanding that allocations to Claimants who file a claim based on an assignment from a Settlement Class member would be determined either (a) by agreement between the assignor Settlement Class member and its respective assignee claimant, or (b) if the assignor Settlement Class member and its assignee claimant cannot reach an agreement, then the assignee claimant shall receive no allocation based on its assignment from the assignor Settlement Class member.  I understand that an assignee who submits a claim generally will not be allowed to submit its own purchase data.  I understand that, if the assignor Settlement Class member and assignee claimant cannot reach agreement, they can attempt to resolve any dispute outside of this allocation process.

[10] Economic models of pricing under conditions of limited competition typically draw a correspondence between the extent of such limitation and the percentage overcharge that will occur as a result.  Those models therefore imply that holding everything else (in particular, demand conditions and the extent of competitive limitations) the same, higher priced products will have higher per-unit overcharges.



multiplying Settlement Class member purchase volumes of each NGD formulation by the average price for that NGD formulation from IQVIA for May 2009 – December 2019.

16.     I propose to then sum those price-weighted purchase volumes across all Settlement Class members and calculate the share of those weighted units corresponding to each Settlement Class member.  Subject to certain minor adjustments based upon the contingencies described below, I propose using those shares to allocate the Net Settlement Fund across Settlement Class members.

17.     In addition, there are contingencies related to the notice and claims process which--as I understand it--may affect these allocations.  I discuss them below.

### D. Contingencies

#### 1. Non-Participating Settlement Class Members

18.     I understand that the claims administrator will provide direct notice to known Settlement Class members, but if these Settlement Class members (or any claimants) do not respond by certain deadlines regarding claim submission, they will be removed from the allocation and shares for the remaining Settlement Class members will be recalculated.

#### 2. Opt-Outs

19.     I also understand that potential Settlement Class members will have the ability to opt out of the Settlement Class.  Based upon separate case filings, there is a recognized list of likely entities that may opt out of this settlement, and it's possible that other entities could opt out as well.  If there are some opt-outs (which either purchased directly, have assignments from direct purchasers, or both), I will then recalculate the Settlement Class member purchase shares (under the process described above) excluding purchases attributable to the opt-outs.

20.     It is straightforward to remove the opt-outs' direct purchases from the *pro rata* share calculation using the Defendants' data.  Claims filed by assignors who have assigned part of their claims to entities that opt out of the Settlement Class will be handled differently than what is described above in footnote 9 because the assignees are not



intending (as opt-outs) to have their assignments used as a basis for a share of this settlement.  As to those assignee opt-outs, where the assignment is not in dispute, I have been asked to estimate their likely assignment volumes and remove those estimated volumes from the volumes used to determine the allocations for their assignors (typically the large wholesalers).  For that purpose, I would use chargeback data produced by the Defendants or other available data showing volumes covered by assignments, to estimate the percentage of the units purchased by the assignor direct purchasers that were resold to the assignee opt-outs.[11]  I would then use those percentages to reduce the purchase volumes utilized for those assignor direct purchasers in the allocation process.[12]

### 3. Additional Settlement Class Members

21.     I understand that, in addition to providing mailed notice to identified Settlement Class members, the claims administrator also will provide publication notice.  To the extent additional claimants file claims based on purchases that are not present in Defendants' transaction data (as processed at the time of distribution, some months from now), I understand that Settlement Class Counsel are proposing that such claimants submit their own purchase data.[13]  My final calculations will assign *pro rata* shares to these claimants using the same methodology discussed above.

22.     In my opinion, the allocation procedure described above is fair and reasonable and reflects the type and approximate extent of the alleged injury incurred by Settlement Class members.  By relying upon Defendants' data, the basis for the allocation is reliable and the process is efficient, thereby preserving net settlement amounts by

---

[11] Usable chargeback data was not produced by all Defendants.

[12] For example, if the analysis of the chargeback data shows that, as to certain Defendants and the NGDs they sold, wholesaler "A" sold 20 percent of its purchase volume to opt-outs, likely both to have assignments regarding those claims and to opt out, I would then reduce wholesaler A's purchase volumes for all NGDs purchased from all Defendants by that same 20 percent.

[13] I believe I will be able to identify most Settlement Class members from the Defendants' data.  However, there may be some Settlement Class members whose purchases are not contained within this data set, for example, purchasers that bought NGDs in 2009 (since not all Defendants produced data back to 2009), or after 2017, when some Defendants' data end.



avoiding undue costs.[14]  In addition, as noted above, this allocation method employs allocation approaches similar to those approved by courts in other cases involving overcharges on generic drugs.

23.     The foregoing is true and correct to the best of my knowledge and belief.

_____
Jeffrey J. Leitzinger, Ph.D.
March 16, 2022

---

[14] To the extent necessary, I will work with Class Counsel and the claims administrator to evaluate challenges raised by claimants.



Exhibit 1
Page 1 of 9

econ ONE

**Dr. JEFFREY J. LEITZINGER**
*Managing Director*
**Los Angeles, California**
**Tel: 213 624 9600**

## EDUCATION

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

## WORK EXPERIENCE

*Econ One Research, Inc.*, 1997 to date
Board Chairman and Managing Director, 2018 to date
Management Committee Chair, 2012-2018
President and CEO, 1997-2011
Founder, 1997

*Micronomics, Inc.,* 1988-1997
President and CEO, 1994-1997
Executive Vice President, 1988-1994
Cofounder, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

*California State University, Northridge*, Lecturer, 1979-1980

## BOARD EXPERIENCE

Board of Visitors, UCLA Department of Economics, 2018-present
California United Bank, 2015-2017
Advisory Board Member, American Antitrust Institute, 2013-present
Bolton & Company, 2006-present
First Enterprise Bank, 2006-2015
Blind Children's Center, 2005-present

## AREAS OF EXPERTISE

Has offered expert testimony regarding:

- Competition economics

- Commercial damages

- Econometrics and statistics

- Intellectual property

- Valuation

## INVITED PRESENTATIONS

Some Implications of Tyson for Econometric Models in Class Action Antitrust Cases, *American Bar Association,* 65th Antitrust Law Spring Meeting, March 2017.

Where Are We on Class Certification? Examples from Health Care and Pharmaceutical Cases, *ABA Section of Antitrust Law, Health Care and Pharmaceuticals and Civil Practice and Procedure and Trial Practice Committees*, March 2016.

Corporations & Cartels: Should You Be a Plaintiff?, *American Bar Association,* 62nd Antitrust Law Spring Meeting, March 2014.

Developments in Antitrust Cases Alleging Delayed Generic Competition in the Pharmaceutical Industry, *American Antitrust Institute,* 5th Annual Future of Private Antitrust Enforcement Conference, December 2011.

Class Certification and Calculation of Damages, *American Bar Association*, Section of Antitrust Law and *International Bar Association*, 8th International Cartel Workshop, February 2010.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2007.

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions, *American Bar Association*, Houston Chapter, April 2007.

Class Certification Discussion and Demonstration, *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2005.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 3 of 9**


**INVITED PRESENTATIONS** (cont'd.)

What Can an Economist Say About the Presence of Conspiracy?, *American Bar Association,* Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons from Gas Deregulation, *International Association for Energy Economics,* Houston Chapter*, December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* 6th National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea:  Does the Defendant Pay the Price in the Civil Damage Action, *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does the Future Hold?, *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?,  *National Association of Regulatory Utility Commissioners*, July 1995.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 4 of 9**

**INVITED PRESENTATIONS** (cont'd.)

<u>Natural Gas Restructuring: Lessons for Electric Utilities and Regulators</u>, *International Association for Energy Economics*, May 1995.

<u>Techniques in the Direct and Cross-Examination of Economic, Financial, and Damage Experts</u>, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2nd Annual Golden State Antitrust and Trade Regulation Institute, October 1994.

<u>Demonstration: Deposition of Expert Witnesses and Using Legal Technology</u>, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, September 1994.

<u>Direct and Cross Examination of Financial, Economic, and Damage Experts</u>, *The State Bar of California, Antitrust and Trade Regulation Law Section,* May 1994.

<u>Price Premiums in Gas Purchase Contracts</u>, *International Association for Energy Economics,* October 1992.

<u>Valuing Water Supply Reliability</u>, *Western Economic Association,* Natural Resources Section, July 1992.

<u>Transportation Services After Order 636: "Back to the Future" for Natural Gas</u>, Seminar sponsored by Jones, Day, Reavis & Pogue, May 1992.

<u>The Cost of an Unreliable Water Supply for Southern California</u>, Forum presented by Micronomics, Inc., May 1991.

<u>Market Definition: It's Time for Some "New Learning"</u>, *Los Angeles County Bar Association,* Antitrust and Corporate Law Section, December 1989.

<u>Market Definition in Antitrust Cases: Some New Thinking</u>, *Oregon State Bar,* Antitrust Law Section, March 1987.

<u>Future Directions for Antitrust Activity in the Natural Gas Industry</u>, *International Association of Energy Economists*, February 1987.

<u>Information Externalities in Oil and Gas Leasing</u>, *Western Economic Association Meetings*, Natural Resources Section, July 1983.

<u>Economic Analysis of Offshore Oil and Gas Leasing</u>, *Western States Land Commissioners Association*, December 1982.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 5 of 9**


## PUBLISHED ARTICLES

"Statistical Significance and Statistical Error in Antitrust Analysis," *Antitrust Law Journal*, Volume 81, Issue 2, July 2017.

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases:  Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.


## REGULATORY SUBMISSIONS

<u>In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023</u>, Public Utilities Commission of the State of California, November 2001.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                                    **Page 6 of 9**


**REGULATORY SUBMISSIONS** (cont'd.)

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development, and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

**Dr. Jeffrey J. Leitzinger**
*Managing Director*                                      **Page 7 of 9**

## REGULATORY SUBMISSIONS (cont'd.)

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104, Public Service Commission, State of Wisconsin, August 1987.

Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016 (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

Econ One Research, Inc.
Los Angeles, California
Page 8 of 9

Dr. Jeffrey Leitzinger
March 2018 – February 2022

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 1. | In Re: AndroGel Antitrust Litigation | U.S. District Court, Northern District of Georgia | Case No. 1:09-MD-2084-TWT |
| 2. | In Re: Rail Freight Surcharge Antitrust Litigation | U.S. District Court, District of Columbia | Case No. 1:07-MC-00489 |
| 3. | UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al. | Superior Court of California, County of San Francisco | No. CGC 14-538451 No. CGC-18-565398 |
| 4. | Sourceone Dental Inc. v. Patterson Companies, et al. | U.S. District Court, Eastern District of New York | Case No. 15-cv-05440 |
| 5. | In re: Thalomid and Revlimid Antitrust Litigation | U.S. District Court, District of Connecticut | C.A. No. 3:14-MD-2516 (SRU) |
| 6. | In re Loestrin 24 FE Antitrust Litigation | U.S. District Court, District of Rhode Island | MDL No. 2472, Master File No. 1:13-md-2472-S-PAS |
| 7. | CVS Health Corporation, Caremark, LLC, and Caremark, PCS, LLC v. Vividus LLC f/k/a HM Compounding Services, LLC, and HMX Services, LLC d/b/a HM Compounding | American Arbitration Association | Case No. 01-14-0002-0801 |
| 8. | In Re: Qualcomm Litigation | U.S. District Court, Southern District of California | Case No. 3:17-cv-00108-GPC-MDD |
| 9. | In re: Niaspan Antitrust Litigation | U.S. District Court, Eastern District of Pennsylvania | MDL 2460, Master Case No. 2:13-md-2460 |
| 10. | Littop Enterprises Limited, et al. v. Ukraine | The Stockholm Chamber of Commerce | SCC Case No 2015/092 |
| 11. | In re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation | U.S. District Court, Eastern District of New York | Case No. 18-MD-2819 (NG) (LB) |

**Dr. Jeffrey Leitzinger**
**March 2018 – February 2022**

| | Proceeding | Court/Commission/ Agency | Docket or File |
|---|---|---|---|
| 12. | In re: Opana ER Antitrust Litigation | U.S. District Court, Northern District of Illinois | Civil Action No. 14-cv-10150 |
| 13. | In re: Intuniv Antitrust Litigation | U.S. District Court, District of Massachusetts | Civil Action No. 16-cv-12653-ADB (Direct) |
| 14. | SS&C Technologies, Inc. v. Clearwater Analytics, LLC | Superior Court for the State of Connecticut, Judicial District of Hartford | No. X07-HHD-CV-16-6070719-S |
| 15. | In re: Zetia (Ezetimibe) Antitrust Litigation | U.S. District Court, Eastern District of Virginia Norfolk Division | MDL No. 2836 Civil Action No. 18-md-2836-RBS-DEM |
| 16. | In re: Glumetza Antitrust Litigation | U.S. District Court, Northern District of California | Case No. 3:19-cv-05822-WHA |
| 17. | In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | U.S. District Court, Southern District of New York | No. 1:14-md-02542 (VSB) (SLC) No. 1:19-cv-00325 (VSB) |
| 18. | In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | U.S. District Court, Eastern District of New York | No. 05-md-1720 |
| 19. | International Construction Products, LLC v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC doing business as Cat Auction Services. | U.S. District Court, District of Delaware | C.A. No. 15-108-RGA |
| 20. | In re: Novartis and Par Antitrust Litigation | U.S. District Court, Southern District of New York | Case No. 1:18-cv-04361-AKH |