IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*Reliable Pharmacy v. Actavis Holdco U.S., Inc.* | Individual Action No. 19-6044 |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                      **May 25, 2022**

      This case is part of a large and complex multidistrict litigation ("MDL") concerning allegations that manufacturers engaged in an antitrust conspiracy by allocating the market for and fixing the prices of numerous generic pharmaceutical products. Within the MDL are individual cases and proposed class actions brought by different groups of plaintiffs, such as entities that purchased pharmaceuticals directly from the manufacturers (including drug purchasing cooperatives and retail pharmacy operators), third-party payors (including employee welfare benefits funds, labor unions, private individuals, and private insurers) that indirectly purchased the drugs or provided reimbursements, and states and other jurisdictions asserting claims on their own behalf or on behalf of their citizens. Plaintiffs here, independent pharmacies and a hospital that did not purchase directly from the manufacturers (the "Indirect Reseller Plaintiffs" or "IRPs"),[1] have filed a proposed class-action Amended Complaint alleging an

---

[1] Plaintiffs in this case are Reliable Pharmacy, Halliday's & Koivisto's Pharmacy, Russell's Mr. Discount Drugs, Falconer Pharmacy, Chet Johnson Drug, and North Sunflower Medical Center. Am. Compl. [Doc. No. 61] ¶¶ 9–14.

overarching conspiracy by both the manufacturers of generic pharmaceuticals and by the distributors of the products. The Distributor Defendants[2] have moved to dismiss the claims brought against them. For the reasons that follow, the motion will be granted.

## I. BACKGROUND

IRPs allege that Distributer Defendants actively participated in a "fair share" conspiracy among generic drug manufacturers to allocate market share to ensure generic pharmaceuticals could be sold for supracompetitive prices, in violation of the Sherman Act and the antitrust statutes of every state and territory.[3] Distributor Defendants, which represent "over 81% of the total purchasing volume of generic drugs in the United States," allegedly "understood, agreed with, and did their part to achieve the common goals of the fair share conspiracy: to prevent price erosion by 'stabilizing' and 'settling' the market, and to encourage coordinated price increases."[4] IRPs further allege that Distributor Defendants participated in the conspiracy

> by orchestrating coordinated price increases, by passing anticompetitive messages at the behest of their manufacturer co-conspirators, and by brokering the allocation of customers in order to establish fair share. They arranged the manufacturers' collusive price increases by confirming that the manufacturers would not undercut one another's price increases and would work in concert to drive prices up. Additionally, the distributors served a crucial policing function in the tight-knit industry by criticizing employees at manufacturers who sought to lower prices to compete legitimately, because actual competition on the basis of price is seen as "irresponsible" "irrational," "aggressive," and "not playing fair."[5]

---

[2] Distributor Defendants are AmerisourceBergen Drug Corp. ("ABDC"), H.D. Smith, LLC, Cardinal Health, Inc., The Harvard Drug Group, LLC, McKesson Corp., Morris & Dickson Co., LLC, Red Oak Sourcing, LLC, Walgreens Boots Alliance, Inc., and Walgreens Boots Alliance Development GmbH ("WBAD"). Distributor Defs.' Mem. L. Supp. Mot. Dismiss [Doc. No. 72-1] at 1 n.1. WBAD asserts it has not been served in this action.

[3] *Id.* ¶¶ 120–22.

[4] *Id.* ¶ 162.

[5] *Id.* ¶ 163.

2

Additionally, IRPs allege that Distributor Defendants went beyond merely discussing their own purchases with the manufacturers, an otherwise standard business practice, and instead "arranged anticompetitive communications that affected the market as a whole."[6]

IRPs bring five counts against Distributor Defendants: (1) "Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief;"[7] (2) "Violation of Sections 1 and 3 of the Sherman Act—Damages;"[8] (3) "Violation of State Antitrust Statutes;"[9] (4) "Violation of State Consumer Protection Statutes;"[10] and (5) "Unjust Enrichment."[11]

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim when a plaintiff's "plain statement" lacks sufficient substance to show that they are entitled to relief.[12] On a motion to dismiss, the Court considers whether a claim is plausible, not whether it is probable.[13] A claim is plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[14] A plaintiff is not required "to plead facts that, if true, definitely rule out all possible innocent explanations."[15]

---

[6] *Id.* ¶ 172.

[7] *Id.* ¶¶ 748–57.

[8] *Id.* ¶¶ 758–66.

[9] *Id.* ¶¶ 767–79.

[10] *Id.* ¶¶ 780–89.

[11] *Id.* ¶¶ 790–804.

[12] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[14] *Id.* (citing *Twombly*, 550 U.S. at 556).

[15] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014).

"But there is a difference between allegations that stand on well-pleaded facts and allegations that stand on nothing more than supposition."[16] "[J]udging the sufficiency of a pleading is a context-dependent exercise."[17]

### III. DISCUSSION

#### A. Failure to State a Sherman Act Claim

IRPs allege that Distributor Defendants engaged in a "contract, combination, or conspiracy," which "is a per se violation of the federal antitrust laws."[18] To state a claim for a Sherman Act conspiracy, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made."[19] "[T]he conspiracy must not be compartmentalized. The character and effect of the conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[20]

A conspiracy based on direct evidence requires allegations of "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."[21] Here, IRPs have not alleged the existence of an explicit agreement between any of the Distributor Defendants and the manufacturers. Instead, the allegations require an inferential step to conclude that an agreement was reached. Plaintiffs therefore must allege evidence of parallel conduct plus "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that

---

[16] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016).

[17] *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[18] Am. Compl. [Doc. No. 61] ¶ 756.

[19] *Twombly*, 550 U.S. at 556.

[20] *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011) (internal quotation marks and citations omitted).

[21] *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).

4

could just as well be independent action."[22] "Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct."[23] The necessary context may be shown through allegations of ''plus factors'' that ''serve as proxies for direct evidence of an agreement.''[24]

    The Third Circuit has established a minimum of three ''plus factors'' which may support a finding of a conspiracy based on circumstantial evidence: ''(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.''[25] Distributor Defendants argue that none of these plus factors are plausibly alleged here, that IRPS allege, at most, an awareness of the purported conspiracy, and that IRPs have failed to plead circumstantial evidence indicating that any parallel conduct was the result of an agreement between distributors and manufacturers.[26]

    IRPs point to "Distributors' consistent facility with the terms of the fair share conspiracy and their willingness to coordinate the allocation of market share alongside their manufacturer co-conspirators."[27] IRPs also allege that Distributor Defendants have a motive to participate in the conspiracy because they benefit from higher drug prices.[28] The complaint references two

---

[22] *Twombly*, 550 U.S. at 557.

[23] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (citing *Baby Food*, 166 F.3d at 132).

[24] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (internal quotation marks and citation omitted).

[25] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (internal quotation marks and citations omitted).

[26] Distributor Defs.' Reply Mem. Supp. Mot. Dismiss [Doc. No. 89] at 8–13.

[27] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 15.

[28] Am. Compl. [Doc. No. 61] ¶¶ 173–81; IRPs' Opp'n to Distributor Defs.' Mot. To Dismiss at 16-19.

SEC 10-K filings from Distributor Defendants McKesson and ABDC, explaining that frequent increases in drug prices by manufacturers benefit distributors because they are able to sell their existing inventory at the new, higher prices.[29] In addition, these filings indicate that "a significant proportion" of the distribution contracts between Distributor Defendant McKesson and manufacturers provide for "compensation based on a percentage of [McKesson's] purchases," creating a direct benefit to McKesson from high prices.[30] However, a desire for profit does not itself constitute a conspiratorial motive.[31] Something more must be alleged.

Similarly, IRPs have not alleged facts that would give rise to the inference that Distributor Defendants acted contrary to their own interests. IRPs argue that Distributor Defendants acted contrary to their interests in spending more to purchase generic pharmaceuticals from Manufacturer Defendants and conceded as much.[32] But there are no allegations that Distributor Defendants, as middlemen, cannot pass on price increases to their customers.[33]

Nor do the allegations suggest a traditional conspiracy. IRPs alleged that Distributor Defendants and Manufacturer Defendants communicated about pricing and marketing strategies.[34] However, "the fact that a manufacturer and its distributors are in constant

---

[29] Am. Compl.[Doc. No. 61] ¶¶ 174–75.

[30] Am. Compl.[Doc. No. 61] ¶ 174.

[31] *See Marion Diagnostic Ctr., LLC, v. McKesson Corp.*, 386 F. Supp. 3d 477, 485 (E.D. Pa. 2019).

[32] "As Distributor Defendants say themselves, signing on 'to spend more' on generic drugs 'make[s] no economic sense' unless there is a conspiratorial agreement underway that will raise prices across the board. Yet, agreeing to pay more for generic drugs is exactly what Distributor Defendants are alleged to have done." IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 18 (quoting Distributor Defs.' Mem. L. Supp. Mot. Dismiss [Doc. No. 72-1] at 15).

[33] *See Marion*, 386 F. Supp. 3d at 485.

[34] *See, e.g.*, Am. Compl. [Doc. No. 61] ¶¶ 267 ("Due to patent appeals, about five competitors were poised to launch generic Celecoxib in December 2014. By October 24, 2014, ABC was already asking the various manufacturers

communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions."[35] As the Supreme Court has held, "distributors are an important source of information for manufacturers" and "to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently."[36] In addition, the Third Circuit has held that the mere exchange of information, in the absence of an agreement, does not violate the Sherman Act.[37] IRPs have not plausibly alleged circumstantial evidence of a conspiracy between Distributor Defendants and Manufacturer Defendants.

Even if IRPs had sufficiently alleged a conspiracy between Distributor Defendants and Manufacturer Defendants, the alleged conspiracy would not constitute a per se violation of Section 1 of the Sherman Act. "Horizontal restraints are agreements between competitors at the same level of market structure, whereas vertical restraints are combinations of persons at different levels of market structure such as manufacturers and distributors."[38] "An arrangement is said to be horizontal when its participants are (1) either actual or potential rivals at the time the

---

about their share targets so that it could coordinate 'pre-commitments' across the market and ensure price stability at launch."); 332 (showing that WBAD communicated about market share information with Dr. Reddy's Laboratories, Inc., a seller of generic pharmaceuticals, as it prepared to enter the Paricalcitol market); 369 ("Cardinal [provided to Teva] Mylan's future pricing for Tolterodine ER, and conveyed that Mylan was 'looking for a 40% market share.'").

[35] *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984).

[36] *Id.* at 763–64.

[37] *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011) ("[T]he mere exchange of credit information, without an agreement, does not violate Section 1 of the Sherman Act."); *Ins. Brokerage*, 618 F.3d at 330 (outside of a horizontal conspiracy, the disclosure of information "is at least equally consistent with unconcerted action").

[38] *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 419 F. Supp. 3d 791, 805 (D. Del. 2019) (quoting *Am. Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 62 (1st Cir. 2016)).

agreement is made; and (2) the agreement eliminates some avenue of rivalry among them."[39] "Vertical conspiracies, on the other hand, involve agreements among actors at different levels of market structure to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market."[40]

The Supreme Court has held that the differing economic effects of horizontal and vertical restraints justify differential treatment under the Sherman Act.[41] Horizontal conspiracies are deemed per se unlawful, while the rule of reason analysis applies to vertical agreements.[42] Unlike horizontal price fixing agreements, vertical price fixing agreements may not decrease competition.[43] Vertical restraints of trade are rarely deemed to be per se violations of the Sherman Act.[44]

IRPs argue that what is alleged here is not a vertical conspiracy, but that Distributor Defendants are aiding and abetting the horizontal fair share conspiracy among Manufacturer

---

[39] *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-620, 2015 WL 6322383, at *9 (E.D. Pa. May 26, 2015) (internal quotations and citation omitted).

[40] *Id.* (internal quotations and citation omitted).

[41] *Leegin Creative Leather Prods., Inc v. PSKS, Inc.*, 551 U.S. 877, 888 (2007) (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 734 (1988)); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348, n.18 (1982)); *see also AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level.").

[42] When weighing whether a restraint on trade violates the Sherman Act under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) (quoting *JMC Telecom, LLC*, 470 F.3d at 531 n. 7).

[43] In *Leegin*, the Supreme Court addressed a number of pro-competitive rationales that suggest treating vertical price restraints differently than horizontal price restraints, noting for example that "[m]inimum resale price maintenance can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand." 551 U.S. at 890 (internal citation omitted). The Court also noted that, "Resale price maintenance can . . . increase interbrand competition by facilitating market entry for new firms and brands." *Id.* at 891.

[44] *See Ins. Brokerage,* 618 F.3d at 318 n.15.

Defendants.[45] There is no case law supporting aiding and abetting as a valid theory of liability under Section 1 of the Sherman Act.[46] The Supreme Court has held in a different context that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."[47] Because Distributor and Manufacturer Defendants are vertically related, their conduct will be analyzed accordingly.

Per se liability may attach to a vertical conspiracy that is part of a hub-and-spoke conspiracy. "Such a conspiracy 'involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes.'"[48] "'[T]he critical issue for establishing a per se violation with the hub and spoke system is [determining] how the spokes are connected to each other.'"[49] "In all hub-and-spoke conspiracies, the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa."[50]

---

[45] "IRPs do not allege that there was an agreement between one distributor and another to allocate share of the drug-distribution market between distributors. IRPs continue to allege the same basic manufacturer fair share conspiracy as alleged in earlier complaints, with the addition of the Distributor Defendants as knowing aiders and abetters of that same illegal agreement." IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 8.

[46] *See, e.g.*, *In re Railway. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 495 (W.D. Pa. 2019) (quoting *Top Rank, Inc. v. Haymon*, No. 15-4961, 2015 WL 9948936, at *16 (C.D. Cal. Oct. 16, 2015)) ("'[A]iding and abetting is not an independent theory of civil liability under the Sherman Act.'").

[47] *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). *See MCI Telecomms. Corp. v. Graphnet, Inc.*, 881 F. Supp. 126, 129–31 (D.N.J. 1995) (applying the Supreme Court's decision to the antitrust context).

[48] *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (hereinafter *Hess II*) (quoting *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008)).

[49] *Ins. Brokerage*, 618 F.3d at 327 (quoting *Total Benefits Plan. Agency*, 552 F.3d at 436).

[50] *Id.* at 347.

All hub-and-spoke conspiracies subject to per se treatment require a horizontal agreement relationship among the spokes; otherwise there is only a series of individual vertical conspiracies which happen to share a common hub.[51] "There is no special exception for applying per se status just because there is a hub and spoke conspiracy; the complaint still must show **some** horizontal relationship."[52]

To allege a horizontal conspiracy connecting the spokes, IRPs cannot rely on mere knowledge of the conspiracy.[53] Instead, IRPs must "'allege facts plausibly suggesting a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"[54] Specifically, there must be plausible allegations that Distributor Defendants participated in this scheme in concert with one another, to fall under Section 1 of the Sherman Act.[55] Because IRPs have not alleged that "the distributors ('the rim') coordinated with each other at the direction of the [manufacturers] (the 'hub'),"the claims must be dismissed as to the Distributor Defendants.[56]

IRPs argue that "a consulting firm could have just as easily served the role of go-between, and become a conspirator."[57] IRPs argue that the Supreme Court, in *Interstate Circuit*

---

[51] *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 755, 768–69, 772 (1946); Joseph F. McSorley, *A Portable Guide to Federal Conspiracy Law* 145 (1996)).

[52] *Total Benefits Plan. Agency*, 552 F.3d at 435 (emphasis original).

[53] *Hess II*, 602 F.3d at 255.

[54] *Ins. Brokerage*, 618 F.3d at 331 (quoting *Hess II*, 602 F.3d at 254).

[55] *See Leegin*, 551 U.S. at 893 ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful.").

[56] *Marion Diagnostic Center, LLC v. Becton Dinkinson & Co.*, 29 F. 4th 337, 343 (7th Cir. 2022). *See also United States v. Fattah*, 914 F.3d 112, 165 (3d Cir. 2019) (citing *Ins. Brokerage*, 618 F.3d at 374) (holding that in a hub-and-spoke conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, as in a conspiracy under Section 1 of the Sherman Act, the spokes of the conspiracy must be connected).

[57] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 9.

*v. United States*,[58] held a theater "liable for having facilitated a horizontal agreement between the competitor film companies, even without any evidence of horizontal communication between those competitors."[59] However, for purposes of Sherman Act liability, courts always look to the characteristics of the relevant market to see how the parties relate to one another in light of the market's competitive structure.[60] Importantly, in *Interstate Circuit*, the Supreme Court specifically held that the evidence of a horizontal agreement among distributors of films was sufficient when each distributor knew the identities of the others involved in a multi-level conspiracy to fix prices for film screenings and recognized that "without substantially unanimous action with respect to the restrictions for any given territory there was risk of a substantial loss of the business and good will of the subsequent-run and independent exhibitors [of distributed films]."[61] The evidence in *Interstate Circuit* for concerted action among the distributors may have been circumstantial, but it nevertheless supported a finding of horizontal agreement among the distributors. There are no similar allegations supporting concerted action among the Distributor Defendants.

      IRPs cite to an earlier decision in this MDL for the proposition that "'a single conspiracy may attract different members at different times or involve different sub-groups committing acts

---

[58] 306 U.S. 208 (1939).

[59] IRPs' Opp'n to Distributor Defs.' Mot. To Dismiss at 9.

[60] *See Int'l Constr. Prod. LLC*, 419 F. Supp. 3d at 805–06.

[61] *Interstate Cir.*, 306 U.S. at 222.

in furtherance of the overall plan.'"[62] But that decision concerned only IRP claims against manufacturers—a horizontal conspiracy.[63]

IRPs further analogize their case to the decision in *Hinds County, Mississippi v. Wachovia Bank N.A.*,[64] claiming that Distributor Defendants engaged in similar conduct as the brokers in *Hinds County*.[65] As IRPs frame it, a District Court in the Southern District of New York "upheld allegations against numerous brokers who facilitated bid-rigging and price-fixing [of municipal derivatives] among banks—similarly to the way the distributors facilitated price-fixing and market allocation [of generic pharmaceuticals] by the manufacturers here."[66] However, in *Hinds County*, the market was structured such that the plaintiffs purchased municipal derivatives directly from defendant banks, with defendant brokers solely facilitating transactions.[67] Here, IRPs purchased the pharmaceuticals at issue from Distributor Defendants, who purchased the pharmaceuticals from Manufacturer Defendants. The presence of a middleman fundamentally changes the nature of the supply chain, as it creates a vertical relationship among the Defendants, as well as between the Defendants and IRPs. Brokers that merely facilitate transactions among vertically situated parties are not themselves engaged in a vertical relationship with the entity they represent.[68]

---

[62] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 10 (quoting *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 529 (E.D. Pa. 2019)).

[63] *See Generic Pharm. Pricing*, 394 F. Supp. 3d at 514–15. IRPs also cite to *In re Railway Industry Employee No-Poach Antitrust Litigation.* IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 11. This case also concerned a typical horizontal conspiracy. *See Railway. Indus. Emp. No-Poach*, 395 F. Supp. 3d at 490.

[64] 700 F. Supp. 2d 378 (S.D.N.Y. 2010).

[65] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 12 (citing *Hinds Cnty.*, 700 F. Supp. 2d at 396–97).

[66] *Id.* (citing *Hinds Cnty.*, 700 F. Supp. 2d at 396-97).

[67] 700 F. Supp. 2d at 387–88.

IRPs also argue that Distributor Defendants raise inquiries which are inappropriate during the motion-to-dismiss stage.[69] However, to survive a motion to dismiss, IRPs must plead sufficient factual detail to show that the conduct alleged plausibly suggests an illegal conspiracy subject to per se condemnation under Section 1 of the Sherman Act, meaning the allegations must not have an "obvious alternative explanation."[70] IRPs' pleadings do not meet this standard. The Court will dismiss IRPs' Section 1 claims against Distributor Defendants.

### B.     Antitrust Standing for Damages Claim

Even if Distributor Defendants could be held liable under the Sherman Act for the conduct alleged, IRPs nevertheless would be ineligible to recover damages from them because they are indirect purchasers of the pharmaceuticals at issue. Under the *Illinois Brick* doctrine, an antitrust plaintiff generally may only recover damages when they purchase the product directly from the antitrust violator.[71] A plaintiff is an "indirect purchaser" if the product they purchased "'passe[d] through two separate levels in the chain of distribution before reaching' them."[72] However, the Third Circuit has adopted a limited co-conspirator exception to *Illinois Brick* in non-resale price maintenance cases, applicable if "the middlemen would be barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the

---

[68] This fundamental distinction between IRPs' complaint and *Hinds County* also has significant implications for IRPs' standing to recover damages from the Defendants. This implication will be explained in Section B *infra*.

[69] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 13 ("[T]hroughout their Joint Brief, the Distributor Defendants argue that 'these types of communications' are proper and could even be 'procompetitive.' . . . These are interesting disputes of fact but not suited to a motion to dismiss where the legal standard is whether it is plausible that they were improper.").

[70] *Twombly*, 550 U.S. at 567.

[71] *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005) (hereinafter *Hess I*) (citing *Ill. Brick v. Illinois*, 431 U.S. 720, 729, 735 (1977)).

[72] *Id.* (quoting *Ill. Brick*, 431 U.S. at 726) (alteration original).

conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense' of a manufacturer)."[73]

Here, with the exception of Plaintiff Falconer Pharmacy, which allegedly bought pharmaceuticals directly from a subsidiary of Manufacturer Defendant Teva, it is undisputed that IRPs purchased from Distributor Defendants, not Manufacturer Defendants.[74] It is also undisputed that Distributor Defendants purchased the pharmaceuticals from Manufacturer Defendants. IRPs (excluding Plaintiff Falconer Pharmacy) are therefore indirect purchasers under *Illinois Brick*.

However, to the extent that any of the IRPs could invoke the limited co-conspirator exception, they have not alleged "complete, voluntary and substantially equal participation in an illegal practice" by Distributor Defendants.[75] The communication of market share and pricing information alleged is not substantially equal to the allegations that Manufacturer Defendants allocated the markets through a "fair share" scheme. Therefore, IRPs are still barred from recovering damages from Distributer Defendants under *Illinois Brick*.

### C. State Law Claims

Distributor Defendants also move to dismiss IRPs' state antitrust, consumer protection, and unjust enrichment claims against them, arguing that they are all derivative of IRPs' federal claims.[76] IRPs argue that the "Court has already upheld IRPs' state law claims in earlier

---

[73] *Hess I*, 424 F.3d at 379.

[74] Am. Compl. [Doc. No. 61] ¶¶ 9–14.

[75] *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 437 (D. Del. 2011) (citing *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994)) (internal quotation omitted).

[76] Distributor Defs.' Mem. L. Supp. Mot. Dismiss [Doc. No. 72-1] at 27 (citing first *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009), then *Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008)); Distributor Defs.' Reply Mem. Supp. Mot. Dismiss [Doc. No. 89] at 17 (citing *St. Clair*, 340 F. App'x at 65 n.2).

complaints, and the claims in this Complaint were drafted in accordance with those earlier decisions."[77] However, in the earlier decisions, the federal antitrust claims moved forward, and state law claims generally are derivative of the federal antitrust claims.[78] IRPs have not alleged that their claims under state law are subject to a qualitatively different standard than their Sherman Act claims. Nor have IRPs otherwise explained why their claims that Distributor Defendants violated 25 state antitrust statutes, 16 state consumer protection statutes, and the unjust enrichment laws of every state and territory aside from Ohio and Indiana should proceed in the absence of an overarching federal claim against Distributor Defendants.

      D.     **Leave to Amend**

Distributor Defendants seek dismissal of IRPs' claims with prejudice "because granting leave to file a fourth version of IRPs' Complaint would be inequitable and futile," given that IRPs have twice amended their complaint on this docket and have "countless iterations of their complaint in other dockets."[79] Distributor Defendants further assert that "[a]mendment would be futile because IRPs simply cannot plead around *Illinois Brick*."[80] Lastly, Distributor Defendants argue that given IRPs' access to voluminous amounts of discovery, they would have been able to properly plead a Sherman Act violation by now if they could.[81] IRPs respond that they continue

---

[77] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 23 (citing *In re Generic Pharms. Pricing Antitrust Litigation*, 368 F. Supp. 3d 814, 852 (E.D. Pa. 2019)).

[78] *See, e.g., Rick-Mik Enters. Inc.*, 532 F.3d at 832 n.5 (In California, "[t]he state law antitrust claims are derivative of the federal law claims. Because the federal claims fail, the state law claims fail."); *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x at 65 n.2 (stating that the New Jersey Antitrust Act must be "construed in harmony with" the Sherman Act); *cf. Generic Pharms. Pricing*, 368 F. Supp. 3d at 832 n.70 (noting that "Defendants concede that federal antitrust law is either determinative or highly persuasive with respect to [its] state law analogues.") (internal citation and quotation omitted).

[79] Distributor Defs.' Mem. L. Supp. Mot. Dismiss [Doc. No. 72-1] at 27–28.

[80] *Id.* at 28.

[81] *Id.*

15

to receive additional evidence of the Distributor Defendants' conduct in furtherance of the overarching conspiracy, and thus the Court should grant them leave to amend.[82]

IRPs have already amended their complaint, meaning they may further amend it "only with the opposing party's written consent or the court's leave."[83] Nevertheless, "[t]he court should freely give leave [to amend] when justice so requires."[84] "Denial is justified on the grounds of undue delay, bad faith, prejudice to the opposing party, or futility."[85] In light of this standard, the Court grants leave for IRPs to file a further amended complaint, provided that they are able to do so in conformity with this Memorandum Opinion.

## IV.　CONCLUSION

For the reasons set forth above, Distributor Defendants' Motion to Dismiss will be granted without prejudice, and IRPS will be given leave to amend their complaint. An appropriate order follows.

---

[82] IRP Resp. Opp'n Mot. Dismiss [Doc. No. 85] at 24.

[83] Fed. R. Civ. P. 15(a)(2).

[84] *Id.*

[85] *Marion*, 386 F. Supp. 3d at 489 (quoting *Jang v. Boston Sci. Scimed, Inc.*, 729 F.3d 357, 367 (3d Cir. 2013)) (internal quotation omitted).