# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*In re State Attorneys General Litigation* | HON. CYNTHIA M. RUFE<br><br>Case No. 17-3768 |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                                                                                 **June 7, 2022**

      Plaintiffs, forty-nine polities in the United States,[1] allege that Defendants, twenty pharmaceutical companies, "participated in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry."[2] This suit is part of a broader multidistrict antitrust litigation, centered on allegations that Defendants and others violated antitrust laws by engaging in a "scheme or schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocations [of certain] generic pharmaceutical products."[3] As the parties are well acquainted with the broader multidistrict litigation and the

---

[1] Plaintiffs in this case include the states of Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin and Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania, Puerto Rico and Virginia, and the District of Columbia (the "Plaintiff States").

[2] CAC [Doc. No. 15] ¶ 2.

[3] *In re Generic Pharmas. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 513 (E.D. Pa. 2019).

specific facts of the above-captioned case, the Court sets forth only the facts and procedural history essential to this decision.[4]

Defendants have moved to dismiss Plaintiff States' federal claim for disgorgement of Defendants' purportedly ill-gotten gains and moved to dismiss all federal law claims in the Consolidated Amended Complaint ("CAC") for lack of standing. For the reasons explained below, the motion will be granted as to the disgorgement issue and denied as to the standing issue.

I.   **LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff's complaint must set forth "[f]actual allegations . . . enough to raise a right to relief above the speculative level."[5] In analyzing whether the complaint sets forth sufficient factual allegations, the court must "accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[6] The court must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[7]

---

[4] For greater detail on the background facts and procedural history, see *In re Generic Pharmas. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848 (E.D. Pa. 2018).

[5] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

[6] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

[7] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).

## II.  DISCUSSION

Defendants seek dismissal of the States' claim for disgorgement under federal law[8]; and the States' claim for "damages," "injunctive," and "other relief" as *parens patriae* under federal law.[9] Defendants essentially advance two arguments in favor of dismissal: (1) as to disgorgement, § 16 of the Clayton Act empowers courts to order "injunctive relief," but not disgorgement, and the disgorgement remedy is otherwise at odds with *Illinois Brick*; and (2) the States do not have *parens patriae* standing.[10]

  A. *Disgorgement is not authorized under the terms of § 16 of the Clayton Act*

    1. <u>Monetary disgorgement is not available under § 16</u>

Defendants first urge the Court to dismiss the States' claims to the extent that the States seek monetary relief in the form of "disgorgement."[11] They argue that Section 16 of the Clayton Act, on which "[t]he States' federal disgorgement claim" is based,[12] does not authorize such monetary disgorgement.[13] The Court agrees.

Section 16 of the Clayton Act provides that:

> Any person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, . . . under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that

---

[8] Defs.' Mot. to Dismiss [Doc. No. 74] at 2 (citing CAC 190 at ¶ D (Prayer for Relief))

[9] Mot. to Dismiss [Doc. No. 74] at 2 (citing CAC ¶¶ 17, 22, 467).

[10] *See* Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 2-3, 4; Defs.' Reply Mem. Supp. Mot. to Dismiss [Doc. No. 164] at 1.

[11] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 5-7.

[12] States' Mem. Opp. Mot. to Dismiss [Doc. No. 121] at 1.

[13] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 5; Defs.' Reply Mem. Supp. Mot. to Dismiss [Doc. No. 164] at 1-4.

the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . .[14]

To determine whether § 16 permits an award of monetary disgorgement or restitution as a form of "injunctive relief," the Court applies the analytical framework established by the Third Circuit in *United States v. Lane Labs-USA, Inc.*[15] As the Third Circuit explained in *FTC v. AbbVie Inc.*, the decision in *Lane Labs* established a "fairly easy to follow" two-part analysis to determine the limits of a court's equitable powers under a statute: "(1) a district court sitting in equity may order restitution unless there is a clear statutory limitation on the district court's equitable jurisdiction and powers; and (2) restitution is permitted only where it furthers the purpose of the statute."[16]

In *AbbVie*, the Third Circuit applied the *Lane Labs* "analytical course" to determine whether § 13(b) of the Federal Trade Commission Act ("FTC Act") authorized courts to order "disgorgement" as a form of "injunctive relief."[17] The Third Circuit concluded that disgorgement, a form of restitution, was unavailable under the statute and that "[i]njunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement."[18]

The Supreme Court, in *AMG Capital Management, LLC v. FTC*, recently reached the same conclusion regarding § 13(b).[19] In holding that section § 13(b) did not provide for disgorgement, the Court observed that "[t]he language and structure of § 13(b), taken as a whole,

---

[14] 15 U.S.C. § 26.

[15] 427 F.3d 219 (3d Cir. 2005).

[16] 976 F.3d 327, 378 (3d Cir. 2020) (quoting *Lane Labs*, 427 F.3d at 225).

[17] *Id*. at 375-76, 379.

[18] *Id*. at 376 (quoting *Owner-Operator Indep. Drivers Ass'n v. Landstar Sys.*, 622 F.3d 1307, 1324 (11th Cir. 2010)).

[19] *AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347 (2021).

indicate that the words 'permanent injunction' have a limited purpose—a purpose that does not extend to the grant of monetary relief."[20] The Court contrasted injunctive relief, which typically offers prospective relief against ongoing or future harm, with restitution, which typically offers retrospective relief to redress past harm.[21]

The Supreme Court also considered the purpose of the FTC Act and the enforcement scheme that it established.[22] Given the "elaborate enforcement provisions . . . that explicitly provide for [monetary] relief" in other parts of the FTC Act, the Supreme Court drew the intuitive "inference against § 13(b)'s authorization of monetary relief" under the injunctive relief provisions of § 13(b).[23] Thus, the Supreme Court's analysis in *AMG* tracks the Third Circuit's *Lane Labs* "analytical course."

Applying the *Lane Labs* framework here, the "injunctive relief" provided by § 16 of the Clayton Act does not authorize disgorgement, just as the term did not authorize disgorgement under § 13(b) of the FTC Act. First, the text of § 16 does not support the conclusion that disgorgement is an authorized form of "injunctive relief." Nowhere in § 16 do the words "disgorgement," "restitution," or "monetary damages" appear.[24] Instead, monetary damages are explicitly provided for under a different section of the statute—§ 4. The term that is used under § 16, however, is "injunctive relief." As the Third Circuit noted in *AbbVie*, the term "injunctive relief" is "not an umbrella term that encompasses . . . disgorgement."[25] Thus, both the plain

---

[20] *Id.* at 1348.

[21] *Id.* (citations and quotations omitted).

[22] *Id.* at 1350 (explaining that courts are to consider "the text and structure of the statutory scheme at issue" when delineating the bounds of the courts' equitable powers).

[23] *Id.* at 1350 (quotation and citation omitted).

[24] 15 U.S.C. § 26.

[25] 976 F.3d at 376 (citation omitted).

language of the text and the fact that "injunctive relief" appears in the context of forward-looking harms such as "threatened loss or damage" and "the danger of . . . loss"[26] supports the conclusion that disgorgement, a backward-looking form of relief, does not fall under the term "injunctive relief" as it is used in § 16 of the Clayton Act.

Second, permitting the States to pursue and obtain disgorgement under § 16's provision for "injunctive relief" would undercut, rather than further, the federal antitrust enforcement scheme. That § 4 and § 4c of the Clayton Act already provide direct purchasers, and the States representing such direct purchasers as *parens patriae*, an avenue to pursue monetary damages militates against recognizing disgorgement as a remedy under § 16's injunctive relief provision.[27] Thus, applying the analytical course charted in *Lane Labs* to this case, the Court concludes that disgorgement is not available as a form of "injunctive relief" under § 16 of the Clayton Act.

        2.    <u>Allowing monetary disgorgement under § 16 would be inconsistent with the policy of *Illinois Brick*</u>

To permit plaintiffs to obtain monetary relief under § 16 in the form of "monetary disgorgement or restitution," and under § 4 or § 4c in the form of monetary damages, would also undermine the policy against duplicative recoveries set forth by the Supreme Court in *Illinois Brick Co. v. Illinois*.[28]

---

[26] 15 U.S.C. § 26.

[27] *See AMG*, 141 S. Ct. at 1350 (reasoning that the availability of monetary relief under other sections of the FTCA supports an "inference against § 13(b)'s authorization of monetary relief."); *see also FTC v. Mylan Labs.*, 62 F. Supp. 2d 25, 41 (D.D.C. 1999) (observing that because state governments already "have a cause of action for treble damages under § 4c of the Clayton Act as *parens patriae* on behalf of natural persons," permitting "disgorgement under § 16 would provide yet another route to defendants' allegedly ill-gotten gains, and would therefore heighten the possibility that defendants in antitrust actions could be exposed to multiple liability.").

[28] 431 U.S. 720 (1977).

In *Illinois Brick*, the State of Illinois and a group of local government agencies sought damages from several manufacturers of concrete blocks for alleged price fixing.[29] The plaintiffs, however, did not purchase the blocks directly from these manufacturers.[30] Instead, the plaintiffs alleged that masonry contractors purchased the blocks and used them to build structures that were incorporated by general contractors into buildings that were sold to the plaintiffs.[31]

The Supreme Court held that indirect purchasers had no standing to pursue damages under § 4 of the Clayton Act. To have held otherwise, the Supreme Court reasoned, would have "open[ed] the door to duplicative recoveries," against antitrust defendants—once by direct purchasers, and again by indirect purchasers.[32] Thus, just as "residents purchasing at inflated retail prices from innocent dealers would be denied standing under the *Illinois Brick* indirect-purchaser rule to obtain damages from manufacturers, so also is the state denied standing to obtain damages in a *parens patriae* suit."[33]

In view of the Supreme Court's admonishment against duplicative recoveries in *Illinois Brick*, courts have recognized that permitting private, indirect purchasers to pursue and obtain disgorgement under § 16 contemporaneously with monetary damages under § 4 would sanction an "impermissible attempt to circumvent Supreme Court precedent [in *Illinois Brick*]."[34] As *Illinois Brick*'s indirect-purchaser rule applies equally to private and public litigants, the

---

[29] *Id.* at 726.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 731 (quoting *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972)).

[33] PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 355 (5th ed. 2021).

[34] *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1059 (8th Cir. 2018); *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) (Brody, J.) ("The policy of *Illinois Brick* prohibits indirect purchasers from suing the manufacturer to recover any ill-gotten gains the manufacturer has obtained by violating antitrust laws.").

structure of the overall enforcement scheme supports the conclusion that disgorgement should not be permitted under § 16. Otherwise, § 16 might simply devolve into an end run around the indirect-purchaser rule. State governments may not obtain disgorgement as an "injunctive" remedy under § 16, because

> [w]hile disgorgement would have the additional benefit of permitting the States to compensate indirect purchasers who are excluded from recovery under current law, the Supreme Court weighed this interest against the threat of duplicative recovery and determined that only direct purchasers have standing under the Clayton Act . . . . The States should not be allowed to circumvent *Illinois Brick* through a novel interpretation of § 16.[35]

The case law therefore draws the distinction between forward-looking equitable remedies (such as divestiture), which are permitted under § 16,[36] and backward-looking remedies (such as restitution or disgorgement), which are not.[37] The motion to dismiss will be granted to the extent that the States claim monetary disgorgement or restitution under § 16 of the Clayton Act.

### B. The States have parens patriae *standing to pursue injunctive relief other than backward-looking monetary restitution or disgorgement on behalf of their citizens*

Defendants argue that the States' claims must otherwise be dismissed because the States have not "alleged sufficient facts to seek relief under federal antitrust law as *parens patriae* . . . much less for supposed harms to their 'general econom[ies].'"[38] The States purportedly failed to allege facts of three kinds: (1) facts to show that the States, as sovereigns, have some "interest

---

[35] *FTC v. Mylan*, 62 F. Supp. 2d at 41-42 (concluding that to read monetary disgorgement into the term "injunctive relief" would be a "novel interpretation" of the law and "circumvent *Illinois Brick*.").

[36] *California v. Am. Stores*, 495 U.S. 271 (1990).

[37] *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 233-34 (9th Cir. 1976) (holding that "[w]hile restitution is indeed an equitable remedy, § 16 limits the equitable remedies available under its terms to those against 'threatened loss or damage.' Here, the 'reimbursement' would be awarded for the loss which has already occurred . . . it would not be relief 'against threatened loss or damage.' Recovery for past losses is properly covered under § 4; it comes under the head of 'damages.'" *Id.* at 234. In other words, "whether payments which [the states] seek for some of their citizens is 'equitable' . . . is of no consequence because § 16 does not allow the claimed relief for past loss." *Id.* at 234.

[38] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 3 (brackets in original; citation omitted).

apart from that of particular [citizens] who may be affected"[39] by the alleged antitrust misconduct; (2) facts to show that Defendants affected a sufficiently substantial segment of States' residents;[40] and (3) facts to show that individual citizens are incapable of obtaining their own private relief.[41] The Court disagrees.

"*Parens patriae* means literally 'parent of the country.'"[42] To maintain an action as *parens patriae*, a state "must express a 'quasi-sovereign' interest."[43] Although what constitutes a quasi-sovereign interest defies generalization, the Supreme Court has explained that states have a quasi-sovereign "interest in the health and well-being—both physical and economic—of its residents," so long as the well-being of a "sufficiently substantial segment of its population" is at stake.[44] Thus, in *Georgia v. Pennsylvania Railroad Co.*, for example, the Supreme Court acknowledged Georgia's standing as *parens patriae* in an alleged price-fixing scheme by twenty railroad companies.[45] Preventing antitrust harms to a state's citizenry is a recognized quasi-sovereign interest.[46] However, a state may not maintain *parens* standing under the Clayton Act in a suit for damages based solely on injury to its general economy.[47] A state that is not a direct

---

[39] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 8.

[40] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 10.

[41] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 9-10.

[42] *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982) (citation omitted).

[43] *Id.* at 607.

[44] *Id.* (emphasis added); *Broselow v. Fisher*, 319 F.3d 605, 609 (3d Cir. 2003) (same).

[45] 324 U.S. 439, 450-51 (1945).

[46] *See, e.g.*, *In re Insur. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991) ("The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining damages and/or an injunction.") (citation omitted), *rev'd in part on other grounds sub nom. Hartford Fire Ins. Co. v. Calif.*, 509 U.S. 764 (1993).

[47] *Standard Oil*, 405 U.S. at 263.

purchaser may seek only injunctive relief as *parens patriae* under § 16.[48] Accordingly, States may pursue injunctive relief but not damages as *parens patriae* for generalized injury to their economies.[49]

### 1. The States have alleged a recognized quasi-sovereign interest apart from their individual citizens

The States articulate their quasi-sovereign interest as "securing an honest marketplace."[50] This interest fits neatly within the Supreme Court's articulation of the state's interest in "securing observance of the terms under which it participates in the federal system . . . . [and] ensuring that the State and its residents are not excluded from the benefits that are to flow from [such] participation."[51] A state has an interest "in the removal of barriers to the participation by its residents in the free flow of interstate commerce . . . . [and] alleviating hardships" for its residents.[52]

Here, the States have a quasi-sovereign interest in ensuring that their citizens are not denied the benefit of lower-priced drugs that would result from market participants' adherence to a fair marketplace regulations and an interest in ensuring that those who sell medication to their citizens abide by the federal antitrust system.[53]

---

[48] *Id.*; *cf.* 15 U.S.C. § 15c (providing *parens patriae* standing for states to pursue monetary relief on behalf of citizens directly injured by any alleged antitrust violation).

[49] *Compare, e.g.*, *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633 (4th Cir. 1977) (recognizing *parens patriae* standing for state suit to enjoin merger) *with Standard Oil*, 405 U.S. at 251 (disallowing *parens patriae* standing for suit for damages to general economy).

[50] States' Mem. Opp. Mot. to Dismiss [Doc. No. 121] at 9.

[51] *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607-08.

[52] *Id.* at 608.

[53] *See* CAC [Doc. No. 15] ¶¶ 1-17 (outlining the contours of Defendants' alleged conspiracy and the ways in which Defendants purportedly manipulated the market).

2. <u>The States have alleged facts to support an inference that a sufficiently substantial segment of their citizens have been affected</u>

Defendants argue that the States' complaint fails to allege any facts to support that a "sufficiently substantial segment" of their citizenry has been affected by the alleged anticompetitive practices. However, the CAC contains manifold allegations that Defendants' conspiracy was far-reaching and affected a substantial portion of all persons who consume the more than a dozen medications at issue. Among other allegations, the States aver:

> ¶ 1    Defendants . . . [are] unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the generic pharmaceutical industry . . . including . . . the markets for [] fifteen (15) generic drugs . . . .
>
> ¶ 4    Defendants' illegal agreements have raised prices . . . [in an industry that otherwise] can save (and have saved) consumers and other purchasers of drugs tens of billions of dollars annually.
>
> ¶ 11    Defendant Heritage participated in a wide-ranging series of restraints with more than a dozen generic drug manufacturers . . .
>
> ¶ 22    To the extent specified in the state claims . . . certain Attorneys General . . . [seek] relief . . . for governmental entities and consumers in their states who paid or reimbursed for the generic pharmaceutical drugs.
>
> ¶ 47    Generics constitute "over 80% of prescriptions filled" nationally.
>
> ¶ 64    Defendants' customers supply generic pharmaceuticals to a wide swath of consumer populations, including . . . Medicaid recipients; private and public sector employees . . . employer-funded, or self-funded health plans; patients in non-profit, or public hospitals or long-term care facilities; and prisons.
>
> ¶ 66    Taken together, customers purchase a wide range of generic pharmaceutical products, in enormous volumes, in every state. Defendants' business plans and strategies for their

>broad portfolios . . . reach consumer populations in every state.[54]

These allegations, among others throughout the CAC, are sufficient at the pleading stage to support a reasonable inference that a substantial segment of the States' citizenry has been affected by Defendants' alleged anticompetitive conduct.

### 3. The States need not allege that their suit does not overlap with individual citizen suits

Finally, Defendants contend that the States' claims impermissibly overlap with or duplicate claims brought by individual citizens. Defendants boldly state that "*parens patriae* standing exists only when 'individual consumers cannot be expected to litigate' the claims a state purports to assert on their behalf."[55] But the States correctly respond that Defendants have miscited *Maryland v. Louisiana* for that proposition.[56] The decision in *Maryland* does not create such a bright line rule. Instead, although a "[s]tate must be more than a nominal party . . . . a [s]tate does have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population."[57] A state's *parens* standing to pursue injunctive relief does not depend on whether individual citizens might succeed in independent litigation. The States' quasi-sovereign interest (ensuring a fair marketplace) diverges from any private litigant's interest (obtaining treble damages under federal law).

Finally, Defendants urge that even if there is no explicit rule prohibiting overlap between state government suits and individual citizen suits, there is a risk of "duplicative recovery" in

---

[54] CAC [Doc. No. 15].

[55] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 9 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 739 (1981)).

[56] States' Mem. Opp. Mot. to Dismiss [Doc. No. 121] at 11.

[57] *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 608.

violation of *Illinois Brick*.[58] This final argument carries no weight as the Court has concluded that the states cannot obtain monetary disgorgement or restitution. As the States can obtain only injunctive relief, there is little risk of duplicative monetary recovery. Thus, to the extent that the States are pursuing injunctive relief in their *parens* capacity, they have standing to proceed.

## IV.   CONCLUSION

For these reasons, Defendants' joint motion to dismiss plaintiffs' federal law claims for lack of standing will be granted in part and denied in part. An appropriate order will be entered.

---

[58] Defs.' Mem. Supp. Mot. to Dismiss [Doc. No. 74-1] at 10.