**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*In re State Attorneys General Litigation* | HON. CYNTHIA M. RUFE<br><br>Individual Case No. 20-3539 |

**MEMORANDUM OPINION**

Rufe, J.                                                                February 27, 2023

Plaintiffs, most of the states and territories of the United States and the District of

Columbia (collectively, "Plaintiff States"), have filed the Consolidated Amended Complaint

("CAC") against Defendants, pharmaceutical companies and current or former executives

thereof, alleging that "collusion has been rampant among manufacturers of generic topical

products" for years.[1] This suit is part of a broader multidistrict antitrust litigation ("MDL"),

centered on allegations that Defendants and others violated antitrust laws by engaging in a

"scheme or schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and

customer allocations [of certain] generic pharmaceutical products."[2]

Defendants have filed both individual and joint motions to dismiss. This memorandum

will discuss the motions as they relate to the federal claims.[3] As the parties are well acquainted

---

[1] Am. Compl. [Doc. No. 62] ¶ 1. Topical products are pharmaceuticals that are usually administered externally and include "creams, lotions, gels, ointments, and solutions." *Id.*

[2] *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 513 (E.D. Pa. 2019).

[3] A separate ruling will be issued as to the substance of the state-law claims.

with the broader MDL and the specific facts of the above-captioned case, the Court sets forth only the facts and procedural history necessary to resolve the motions.[4]

The Amended Complaint alleges that the prices of approximately 80 drugs used to treat dermatological conditions have been artificially inflated due to collusion among Defendants. Plaintiff States allege that "[t]he generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis,"[5] through trade Association and customer conferences, "various industry trade shows throughout the year,"[6] industry dinners,[7] golf outings,[8] and "Women in the Industry" or "Girls Night Out" get togethers.[9] Plaintiff States allege that Defendants take these opportunities to collude to allocate each manufacturer its "fair share" of the market for a drug or drugs.[10] The general understandings are reinforced through hundreds or thousands of telephone calls and emails among competitors.[11] Plaintiff States detail allegations of anticompetitive actions over hundreds of pages in the Amended Complaint.

## I.   LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff's complaint must set forth "[f]actual allegations . . . enough to raise a right to relief above the speculative

---

[4] For greater detail on the background facts and procedural history, see *In re Generic Pharms. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848 (E.D. Pa. 2018).

[5] Am. Compl. [Doc. No. 62] ¶ 110.

[6] *Id.* ¶ 112.

[7] *Id.* ¶ 117-18.

[8] *Id.* ¶ 119

[9] *Id.* ¶ 120-23.

[10] *Id.* ¶ 124.

[11] *Id.* ¶¶ 128-29.

level."[12] In analyzing whether the complaint sets forth sufficient factual allegations, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[13] The court must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[14]

## II.   DISCUSSION

### A.  Common Arguments for Dismissal

Defendants in both joint and individual motions to dismiss have raised certain common arguments. The Court herein discusses those arguments *ensemble*.

#### 1.   *Standing as to Federal-Law Claims*

Among the categories of relief sought are monetary relief in the form of disgorgement and other relief in the States' capacities as *parens patrie.* Defendants argue that the Clayton Act limits the available remedy to injunctive relief, and that the Plaintiff States, who did not purchase any drugs directly from any Defendant, cannot obtain monetary relief under federal antitrust law based on the Supreme Court's decision in *Illinois Brick Co. v. Illinois*.[15]

In ruling on a similar motion filed in another case brought by Plaintiff States, the Court held that Plaintiff States were precluded from seeking disgorgement or restitution under federal law but had *parens patriae* standing to the extent that the States are pursuing injunctive relief in

---

[12] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

[13] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[14] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

[15] 431 U.S. 720 (1977).

3

their *parens* capacity.[16] The Court relied on the decisions of the Court of Appeals for the Third Circuit in *FTC v. AbbVie Inc.*, which held that "(1) a district court sitting in equity may order restitution unless there is a clear statutory limitation on the district court's equitable jurisdiction and powers; and (2) restitution is permitted only where it furthers the purpose of the statute."[17] In *AbbVie*, the Third Circuit concluded that disgorgement, a form of restitution, was unavailable under the Federal Trade Commission Act and that "[i]njunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement."[18]

In the earlier ruling, the Court also concluded that the text of § 16 of the Clayton Act does not authorize disgorgement, because the text of § 16 does not support the conclusion that disgorgement is an authorized form of "injunctive relief."[19] Permitting the States to pursue and obtain disgorgement under § 16's provision for "injunctive relief" would undercut, rather than further, the federal antitrust enforcement scheme, as § 4 and § 4c of the Clayton Act already provide direct purchasers, and the States representing such direct purchasers as *parens patriae* (if any), an avenue to pursue monetary damages.[20] In addition, the Court held that permitting Plaintiff States to obtain monetary relief under § 16 in the form of "monetary disgorgement or restitution," and under § 4 or § 4c in the form of monetary damages, would undermine the policy against duplicative recoveries set forth by the Supreme Court in *Illinois Brick Co. v. Illinois*.[21] Therefore, Plaintiff States may pursue injunctive relief in their *parens* capacity.

---

[16] *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 680 (E.D. Pa. 2022).

[17] 976 F.3d 327, 378 (3d Cir. 2020) (quoting *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005)).

[18] *Id*. at 376 (quoting *Owner-Operator Indep. Drivers Ass'n v. Landstar Sys., Inc.*, 622 F.3d 1307, 1324 (11th Cir. 2010)).

[19] *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d at 677 (E.D. Pa. 2022).

[20] *Id.* at 677-78.

[21] *Id.* at 678 (citing 431 U.S. 720 (1977)).

       2.     *Statute of Limitations*

In the Third Circuit, a limitations defense may "be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."[22] Dismissal is only appropriate if it is "apparent on the face of the complaint" that the claim lies outside of the limitations period.[23]

Defendants contend that Plaintiff States' claims are facially untimely, citing the publicly available information of Connecticut's initiation of an investigation into generic drug price increases in July 2014.[24] Therefore, argue Defendants, the limitations period began to run at that time, and since this action was filed in June 2020, any claim with a limitations period of five years or less is untimely.[25] Defendants further argue that Plaintiff States have failed to plead any overt acts in the conspiracies occurring after June 10, 2016, which means that all claims subject to a limitations period of four years or less are untimely.[26]

Although Defendants have raised serious questions concerning the timeliness of at least some of the claims, the Court cannot hold that the action is untimely as to some or all of the Plaintiff States based on the face of the Amended Complaint. Defendants offer an array of trigger dates: that the earliest alleged conspiracies began more than 10 years before the action was filed; that allegations of collusion were "wide[ly] publ[ished]" in 2014; that the earliest complaints brought by Plaintiff States were filed in 2016; and that the last allegations of conspiratorial

---

[22] *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted) (citing *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir. 2002)).

[23] *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017).

[24] Defs.' Reply [Doc. No. 165] at 4.

[25] *Id.* at 5.

[26] *Id.* at 12; *see* Am. Compl. ¶ 1574 ("[B]etween 2009 and early 2016, the Defendants colluded to allocate markets and raise prices on at least 80 different generic drugs.").

actions also occurred in 2016.[27] However, none of these triggers establishes as a matter of law, from the face of the Amended Complaint, that the action is untimely. The Amended Complaint alleges that Defendants actively concealed their conduct, and to establish what a particular polity knew or should have known at a particular time cannot be determined from the face of the Amended Complaint.[28] Nor does the fact of publicly available price lists establish as a matter of law that Plaintiff States should have known the *reason* that the prices were set as they were. Therefore, "[t]he question of whether any of Plaintiffs' claims are barred by the asserted statute of limitations defenses is more appropriate for resolution at a later stage of the proceedings following more particularized discovery."[29] The Court will deny both the Joint Motion to Dismiss and the individual Motions on the basis of the statute of limitations.

### 3. Claims of Overarching Conspiracy

Defendants seek to dismiss the overarching conspiracy claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), which provides for dismissal of a complaint for failure to state a claim when a plaintiff's "plain statement" lacks enough substance to show that it is entitled to relief.[30] "[J]udging the sufficiency of a pleading is a context-dependent exercise."[31]

On a motion to dismiss, the Court "consider[s] plausibility, not probability."[32] Plaintiffs must allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence

---

[27] Defs.' Mem. Supp. Mot. Dismiss [Doc. No. 121] at 1-2.

[28] *See Schmidt*, 770 F.3d at 251.

[29] *In re Generic Pharms. Pricing Antitrust Litig.,* 368 F. Supp. 3d 814, 852 (E.D. Pa. 2019).

[30] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[31] *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[32] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260 (3d Cir. 2017); *see also Twombly*, 550 U.S. at 570 (holding that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

of illegal agreement."[33] "Speculative or conjectural assertions are not sufficient."[34] However, Plaintiffs are not required "to plead facts that, if true, definitively rule out all possible innocent explanations."[35] "[I]t is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible."[36] "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[37]

To state a claim of an antitrust conspiracy, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made."[38] In the absence of allegations of direct evidence of such an agreement, Plaintiffs may allege parallel conduct plus "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[39] The necessary context may be shown through allegations of "plus factors" that "serve as proxies for direct evidence of an agreement."[40] "Plaintiffs are not required to plead simultaneous price increases–or that the price increases were identical–in order to demonstrate parallel conduct."[41] At least three "plus factors" support a finding that there is a suggestion of a

---

[33] *Twombly*, 550 U.S. at 556.

[34] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

[35] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014).

[36] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017).

[37] *Twombly*, 550 U.S. at 556 (internal quotation marks and citation omitted); *see also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ("[T]he task of the district court is not to sustain or dismiss a complaint based on whether the Court feels it is a winner or has curb appeal. The Court's task is to determine whether the facts alleged in the complaint rise above mere speculation, even if the Court has doubts about them and whether they plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.") (citations and internal quotation marks omitted).

[38] *Twombly*, 550 U.S. at 556.

[39] *Id.* at 557.

[40] *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 360 (3d Cir. 2004).

[41] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)).

preceding agreement: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[42] "[T]he conspiracy must not be compartmentalized. The character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[43]

Plaintiff States argue that the basis for the overarching conspiracy is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. Plaintiff States have alleged parallel conduct in the form of price increases across the market for generic drugs that are "reasonably proximate in time and value."[44] Plaintiff States also have alleged that the structure of the market for generic drugs motivated Defendants to enter into an antitrust conspiracy and undertake actions against self interest in the form of pricing and bidding decisions that would be irrational in a competitive market for generic drugs. [45] Further, the Amended Complaint alleges facts implying the existence of a traditional conspiracy: inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing. These allegations are not mere "labels and conclusions," "allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy."[46] Plaintiff States

---

[42] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (internal quotation marks and citations omitted).

[43] *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011) (second alteration in original) (internal quotation marks and citations omitted).

[44] *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015).

[45] Defendants also argue that these overarching claims have been brought in other cases, and constitute improper claim-splitting. Given the nature of the MDL and the focus of the Amended Complaint on different drugs than alleged in other overarching complaints, the argument as to the risks of duplicative recovery is premature.

[46] *Twombly*, 550 U.S. at 556.

allege that a competitor that does not maintain the "fair share" agreement is viewed as irresponsible, and as this Court previously held, allegations that Defendants "risked retribution not just for the individual drugs implicated, but also for other generic drugs in their portfolios … create a plausible inference that Defendants knew that they would need to enter into future agreements with other combinations of would-be competitors . . . and therefore had a vested interest in playing fair according to their shared code of conduct."[47] Therefore, the Court will deny the Joint Motion to Dismiss and the individual Motions as to the allegations of an overarching conspiracy.

### B. Defendant-specific arguments for dismissal

#### 1. Actavis

Actavis Holdco U.S. Inc., Actavis Elizabeth LLC and Actavis Pharma, Inc. (collectively, "Actavis"), Actavis argues, and Plaintiffs agree, that there are no allegations that Actavis manufactured or sold Methylphenidate HCL Extended Release ("ER") tablets, and Count 5 will be dismissed as to this drug.[48] With regard to other drugs, the motion is denied for the reasons stated above.

#### 2. Lannett

Defendant Lannett Company, Inc., argues primarily that the overarching allegations against it concern only a single drug, Acetazolamide, out of the 80 dermatological products, which is not enough to show that it engaged in a wide-ranging conspiracy. For the reasons

---

[47] *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 530–31 (internal quotation marks and citation omitted).

[48] Plaintiffs agree to dismiss these claims and contend that the Amended Complaint should have referenced Methylphenidate HCL IR (immediate release), not ER. Pls.' Opp. [Doc. No. 138] at 3 n.1.

explained above, viewing the Amended Complaint as a whole, the allegations support a claim

against Lannett.

### 3. Bausch

Bausch Health Americas, Inc. and Bausch Health US, LLC (collectively, "Bausch" and

formerly known as Valeant Pharmaceuticals North America),[49] contends that it is never

mentioned in 50 paragraphs describing the alleged overarching conspiracy. Plaintiff States argue

that Bausch seeks to compartmentalize the Amended Complaint rather than looking at the

allegations as a whole. For example, Plaintiff States allege elsewhere in the Amended Complaint

that Valeant ceded the Publix Supermarket account for Fluocinonide Cream 0.1% to Taro in

2014, with an executive stating in an email that "Yes, we are all in agreement. We'll give up

Publix to Taro."[50] As previously discussed, it is improper to "segregate Plaintiffs' alleged

overarching scheme of anticompetitive conduct into multiple discrete acts."[51] Therefore, for the

reasons stated above, the allegations support a claim against Bausch.

### 4. Sun

Plaintiff States have withdrawn the claim as to Methylphenidate HCL ER asserted against

Sun Pharmaceuticals Industries, Inc. and the motion to dismiss will be granted as to this drug.

The Court otherwise rejects the arguments that Sun merely matched pricing, and that it and Taro

are a single entity that cannot conspire for antitrust purposes. Plaintiff States sufficiently allege

Sun's participation in raising the price of Methylphenidate HCL IR and that Sun used its "cozy

---

[49] Am. Compl. [Doc. No. 62] ¶ 42.

[50] Id. ¶ 932.

[51] In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., Nos. 13-MD-2445, 16-5073, 2021 WL 662292, at *18 (E.D. Pa. Feb. 19, 2021) (citing In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 967 F.3d 264, 270-71 (3d Cir. 2020)).

relationship" with Taro to facilitate collusion with other competitors. The allegations sufficiently support the claims asserted against Sun.

### 5. *John Wesolowski*

Defendant John Wesolowski, a Perrigo executive, argues that Counts 27 and 28 are time barred; or in the alternative that Count 27 should be dismissed as to 12 drugs with no factual allegations, and the Court should decline jurisdiction over supplemental state claims in Count 28, in which he is not named.[52] As discussed above, Plaintiff States have alleged an overarching conspiracy in which Defendant participated, and dismissal will not be granted at this time.

### 6. *Michael Perfetto*

Michael Perfetto, an executive with Actavis and Taro, generally asserts arguments for dismissal substantially similar to those that have been rejected above, including that the allegations against him are insufficient. As Plaintiff States have alleged that this Defendant participated in an overarching conspiracy, dismissal is not warranted at this time.

### 7. *Mylan*

Mylan Inc. and Mylan Pharmaceuticals Inc. (collectively, "Mylan") move to dismiss any conspiracy beyond the product-specific Bromocriptine Mesylate Tablets and Phenytoin Sodium ER Capsules alleged in Count Nine. Mylan also argues that the alleged conspiracy as to Pioglitazone HCL Meformin HCL Tablets ("Pio-Met") ended in 2013 and that there are no allegations of parallel conduct as to Pio-Met.[53] Plaintiff States argue that they have alleged that there is a record of calls between Mylan and Teva and Teva and Aurobindo, a new entry to the Pio-Met market, just before Aurobindo entered the market in 2013 and that the parties discussed

---

[52] Def.'s Mot. Dismiss Am. Compl. [Doc. No. 117] at 1.

[53] Am. Compl. [Doc. No. 62] ¶¶ 1206-14, 1218-24.

pricing and allocation of market share, including the allocation of the Cardinal account. The allegations against Mylan are sufficient to survive a motion to dismiss.

### 8. Amneal

Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals LLC (collectively "Amneal"), argue that they are not alleged to be part of an overarching conspiracy but only named to a single, non-topical drug, phenytoin sodium ER capsules.[54] Amneal argues that it increased prices three months after Taro and one and a half months after Sun and Mylan,[55] and that it attended only one trade meeting and a golf outing after the price increase.[56] However, Plaintiff States have alleged some communications in surrounding months[57] and are not required to allege that Amneal "engaged in *all* activities alleged to have advanced the conspiracy."[58] For the reasons stated above, Plaintiff States have alleged more than "generic reference[s] to 'Defendants' tacked on to a conclusory verb form to connect [Amneal] to an actual agreement in an antitrust conspiracy."[59]

### 9. Pfizer

Plaintiff States maintain that "Greenstone [e]quals Pfizer."[60] Pfizer argues that this is bad arithmetic and that the allegations are insufficient as a matter of law to show that Greenstone and Pfizer operate as a single entity or fraudulent or inequitable misuse of Greenstone's corporate

---

[54] Amneal states that it is not moving at this time for dismissal as to phenytoin sodium ER capsules. Defs.' Mot. Dismiss Am. Compl. [Doc. No. 124] at 1 n.1. Phenytoin is an anticonvulsant that has been used to treat ulcers, epidermolysis bullosa, and inflammatory conditions.

[55] Am. Compl. [Doc. No. 62] ¶¶ 902, 906, 908

[56] *Id.* ¶¶ 897, 119.

[57] *Id.* ¶¶ 606-07, 898, 900, 902, 904, 1385-86.

[58] *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 450 (E.D. Pa. 2018) (emphasis added) (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 742 (E.D. Pa. 2011)).

[59] *Id.* at 438 (internal citations omitted).

[60] Am. Compl. [Doc. No. 62] at 335.

form. Instead, Pfizer argues, Greenstone was at the relevant time a wholly-owned subsidiary,[61] and Plaintiff States' allegations do not show that Pfizer and Greenstone operate "as a single functioning entity, without regard to corporate formalities."[62]

> The Court of Appeals for the Third Circuit has
>
> identified several factors helpful in determining whether, as a matter of federal common law, a subsidiary is merely an alter ego of its parent. Those factors include "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [subsidiary] corporation, siphoning of funds from the [subsidiary] corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a façade for the operations of the dominant stockholder."[63]

The Court must look to the totality of the circumstances, and "in order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually function[] as a single entity and should be treated as such."[64] Plaintiff States allege that Greenstone "does not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department," that it does not have senior executives higher than the level of General Manager, and that most of Greenstone's employees are actually employed by Pfizer and use Pfizer email addresses.[65] Plaintiff States further allege that "Pfizer directly controls the decision-making of Greenstone," including price increases.[66]

---

[61] Pfizer states that in November of 2020 Greenstone was spun off and joined Mylan N.V. to create Viatris. Def.'s Mot. Dismiss Am. Compl. [Doc. No. 125] at 2 n.1.

[62] Am. Compl. [Doc. No. 62] ¶ 1281.

[63] *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365–66 (3d Cir. 2018) (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001)).

[64] *Pearson*, 247 F.3d at 485.

[65] Am. Compl. [Doc. No. 62] ¶¶ 1282-1288.

[66] *Id.* ¶ 1296.

Allegations of a close relationship or shared goals between the entities is not enough to pierce the corporate veil. "[L]iability will not be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary,"[67] the entities file consolidated financial statements, or they are jointly described as engaging in the "single business activity of the manufacture and sale of" a product.[68] Plaintiff States do not allege that Greenstone was "grossly undercapitalized, failed to observe corporate formalities, had its funds siphoned or used indiscriminately by [Pfizer], [or] failed to maintain corporate records," which would indicate that Greenstone was a sham corporation or that Pfizer used the form to perpetrate an injustice.[69] Therefore, Plaintiff States have not alleged a basis for piercing the corporate veil.

However, Plaintiff States also allege that Pfizer is directly liable because it engaged in conspiratorial conduct. "A parent corporation may be liable under the agency theory for the acts of its subsidiary depending on the amount of control the parent corporation exercises over the actions of the subsidiary."[70] Under this theory, the "parent corporation will be liable for the activities of the subsidiary only if the parent dominates those activities."[71] "[O]nly the conduct shown to be instigated by the parent may be attributed to the parent."[72] Plaintiff States allege that "[n]ot only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of

---

[67] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* No. 13-MD-2445, 2017 WL 4810801, at *11 (E.D. Pa. Oct. 25, 2017) (citing *Pearson,* 247 F.3d at 484).

[68] *Id.*

[69] *Id.*

[70] *Id.* at *12.

[71] *Id.* (internal quotation marks and citations omitted).

[72] *Id.* (internal citations omitted).

Pfizer."[73] Based upon these allegations, Plaintiffs have alleged that Pfizer dominated the actions of Greenstone. Pfizer's motion to dismiss will be denied on this basis.

## IV.    CONCLUSION

Having fully considered the issues raised by the parties, the motions to dismiss will be granted in part and denied in part as set forth above. An appropriate order will be entered.

---

[73] Am. Compl. [Doc. No. 62] ¶ 1296.

15