**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL No. 2724 Case No. 2:16-MD-2724** |
| **THIS DOCUMENT RELATES TO:** *Direct Purchaser Plaintiffs' Actions* | **HON. CYNTHIA M. RUFE** |

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF
DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
(1) DIRECT PURCHASER PLAINTIFFS' APOTEX SETTLEMENT AND
(2) THE PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................. 1

II.  BACKGROUND ................................................................. 3

III.  MATERIAL TERMS OF THE SETTLEMENT ................................................................. 4

  A.  Monetary Relief .................................................................5

  B.  Joint and Several Liability of Non-Settling Defendants .............................5

  C.  MFN Clause .................................................................6

  D.  Cooperation by Settling Defendant.............................................7

  E.  Settlement Class Releases..........................................................7

  F.  Expenses, Attorneys' Fees, and Service Awards.........................................8

IV.  THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL ................................................................. 10

  A.  Settlement Class Counsel and the Class Representatives Have Adequately Represented the Settlement Class ...............................11

  B.  The Proposed Settlement Was Reached After Arm's Length Negotiations..........................................................11

  C.  The Relief Provided for the Settlement Class is Fair, Reasonable and Adequate ..........................................................12

  D.  The Proposal Treats Settlement Class Members Equitably......................18

V.  THE PLAN OF ALLOCATION WARRANTS FINAL APPROVAL ................ 19

VI.  CONCLUSION................................................................. 24

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Beneli v. BCA Fin. Servs., Inc.*,
324 F.R.D. 89 (D.N.J. 2018) ........................................................................................ 20

*Bradburn Parent Teacher Store, Inc. v. 3M*,
513 F. Supp. 2d 322 (E.D. Pa. 2007) .......................................................................... 20

*Caddick v. Tasty Baking Co.*,
2021 WL 1374607 (E.D. Pa. Apr. 12, 2021) ............................................................... 11

*Ebner v. Merchants & Med. Credit Corp.*,
2017 WL 1079966 (E.D. Pa. Mar. 22, 2017) ............................................................... 13

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
604 F. Supp. 446 (E.D. Pa. 1985) ................................................................................ 13

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975) ......................................................................................... 10

*Hall v. Accolade, Inc.*,
2019 WL 3996621 (E.D. Pa. Aug. 23, 2019) ............................................................... 11

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) .................................................................................. 24

*In re Aggrenox Antitrust Litig.*,
No. 14-md-2516, ECF Nos. 733-1, 739 (D. Conn.) ..................................................... 20

*In re Auto. Parts Antitrust Litig.*,
2017 WL 3499291 (E.D. Mich. July 10, 2017) ............................................................. 6

*In re Auto. Parts Antitrust Litig.*,
2019 WL 7877812 (E.D. Mich. Dec. 20, 2019) ........................................................... 24

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007) .......................................................................... 19

*In re Automotive Refinishing Paint Antitrust Litig.*,
2003 WL 23316645 (E.D. Pa. Sept. 5, 2003) ............................................................. 11

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ......................................................................................... 12

*In re Cendant Corp. Sec. Litig.*,
   109 F. Supp. 2d 235 (D.N.J. 2000) ......................................................................... 20

*In re Cendant Corp. Sec. Litig.,,*
   264 F.3d 201 (3d Cir. 2001).................................................................................... 20

*In re Cendant Corp. Sec. Litig.*,
   535 U.S. 929 (2002)................................................................................................ 20

*In re CertainTeed Fiber Cement Siding Litig.*,
   303 F.R.D. 199 (E.D. Pa. 2014)............................................................................. 15

*In re Comcast Corp. Set Top Cable Television Box Antitrust Litig.*,
   333 F.R.D. 364 (E.D. Pa. 2019)............................................................................. 12

*In re Corel Corp. Inc., Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D.Pa.2003) ....................................................................... 19

*In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*,
   582 F.3d 524 (3d Cir. 2009).................................................................................... 18

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................................ 24

*In re Flonase Antitrust Litig.*,
   951 F. Supp. 2d 739 (E.D. Pa. 2013) ..................................................................... 20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)............................................................................... 10, 15

*In re Generic Pharm. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ....................................................................... 3

*In re Generic Pharm. Pricing Antitrust Litig.*,
   394 F. Supp. 3d 509 (E.D. Pa. 2019) ....................................................................... 3

*In re Glob. Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................... 24

*In re Ikon Office Solutions Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000).......................................................................  13, 19

*In re Lidoderm Antitrust Litig.*,
   No. 14-md-2521, ECF Nos. 1004-5, 1004-6, 1054 (N.D. Cal.) .............................. 20

iv

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................. 11, 13

*In re Loestrin 24 FE Antitrust Litig.*,
    No. 1:13-md-02472, ECF No. 1462 (D.R.I. Sept. 1, 2020) ...................................... 20

*In re Namenda Direct Purchaser Antitrust Litig.*,
    462 F. Supp. 3d 307 (S.D.N.Y. 2020)....................................................................... 20

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)............................................................................... 17, 18

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    176 F.R.D. 158 (E.D. Pa. 1997).............................................................................. 12

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    2000 WL 1622741 (E.D. Pa. Oct. 23, 2000)............................................................ 18

*In re Packaged Ice Antitrust Litig.*,
    2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ...................................................... 20

*In re Packaged Ice Antitrust Litig.*,
    2011 WL 717519 (E.D. Mich. Feb. 22, 2011) ........................................................... 6

*In re Philips/Magnavox TV Litig.*,
    2012 WL 1677244 (D.N.J. May 14, 2012) .............................................................. 12

*In re Processed Egg Prods. Antitrust Litig.*,
    284 F.R.D. 278 (E.D. Pa. 2012)......................................................................... 13, 18

*In re Remeron Direct Purchaser Antitrust Litig.*,
    2005 WL 3008808 (D.N.J. Nov. 9, 2005) ............................................................... 20

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    No. 14-md-2503, ECF No. 1179 (D. Mass. July 18, 2018)...................................... 20

*In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*,
    967 F.3d 264 (3d Cir. 2020)................................................................................... 16

*In re Tricor Direct Purchaser Antitrust Litig.*,
    No. 05-cv-340, ECF Nos. 536-1, 543 (D. Del.)...................................................... 20

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004).................................................................................... 15

*In re Wawa, Inc. Data Sec. Litig.*,
  2021 WL 3276148 (E.D. Pa. July 30, 2021) .......................................................... 18

*In re Wellbutrin XL Antitrust Litig.*,
  2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ......................................................... 16

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................... 24

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y.2002) ..................................................................... 24

*Meijer, Inc. v. 3M*,
  2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ......................................................... 19

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) ...................................................................... 14

*Myers v. Jani-King of Phila., Inc.*,
  2019 WL 4034736 (E.D. Pa. Aug. 26, 2019) ......................................................... 10

*Mylan Pharms., Inc. v. Warner Chilcott Public Ltd.*,
  No. 12-cv-3824, ECF Nos. 452-3, 665 (E.D. Pa.) .................................................. 20

*Sullivan v. D.B. Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) ........................................................................ 18, 19, 20

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  2020 WL 1922902 (E.D. Pa. Apr. 21, 2020) ......................................................... 19

*Walsh v. Great Atl. & Pac. Tea Co., Inc.*,
  726 F.2d 956 (3d Cir. 1983) ................................................................................... 19

*Whiteley v. Zynerba Pharms., Inc.*,
  2021 WL 4206696 (E.D. Pa. Sept. 16, 2021) ......................................................... 11

## Rules

Fed. R. Civ. P. 23 .................................................................................... *passim*

## Other Authorities

3 Newberg on Class Actions (4th ed. 2011) ............................................................... 20

4 Newberg on Class Actions (4th ed. 2002) ............................................................... 20

4 Newberg on Class Actions (5th ed.) ...................................................................... 10, 18

I.      **INTRODUCTION**

On February 13, 2024, the Court granted preliminary approval of the Direct Purchaser Plaintiffs' ("DPPs") settlement with Settling Defendant Apotex Corp. ("Apotex" or "Settling Defendant"). MDL Doc. No. 2841. That Order (the "Apotex Preliminary Approval Order") certified a Settlement Class, appointed Settlement Class Counsel, appointed a Claims Administrator, preliminarily approved the Plan of Allocation, and approved the form and manner of Notice to the Settlement Class.[1] In its Order of March 20, 2024 [MDL Doc. No. 2891], the Court approved DPPs' request to modify the form and manner of Notice and set a Final Fairness Hearing for September 23, 2024.

Pursuant to the above, Settlement Class Counsel have carried out the extensive Notice program authorized by the Court including a mailing to Settlement Class members and publication of the Notice for 30 days in The Pink Sheet, PR Newswire, and in The Wall Street Journal. *See* July 18, 2024 Declaration of Eric J. Miller [MDL Doc. No. 3053-1]. The Notice was also posted on a dedicated website.[2] *See id.*

As set forth above, the deadline to object or opt out of this settlement was June 27, 2024. Settlement Class Counsel are unaware of any objections to this settlement. Settlement Class Counsel have received six timely letters requesting exclusion (*i.e.,* letters post-marked on or before June 27, 2024) and two untimely letters requesting exclusion (*i.e.,* letters post-marked after June 27, 2024). *See id.*; *see also* August 12, 2024 Supplemental Declaration of Eric J. Miller, attached hereto as Exhibit 1. Each of the letters requesting exclusion pertains to entities

---

[1] Unless otherwise noted, the capitalized terms used in this Memorandum of Law have the same meanings as defined in the Settlement Agreement. *See* MDL Doc. No. 2781-3, Ex. A thereto.

[2] GenericDrugsDirectPurchaserSettlement.com.

or the affiliates of entities that have previously filed their own complaints and have been litigating as Direct Action Plaintiffs ("DAPs").[3]

The Settlement was reached after extended, arm's length negotiations between experienced counsel for DPPs and for Settling Defendant. The Settlement consists of: (1) a $30,000,000 monetary payment, which may be reduced to $26,400,000 to account for timely opt-outs, but could have been increased by an additional $7,058,823.50 under the most favored nation ("MFN") clause, (2) an agreement that Apotex's sales remain in the MDL for purposes of joint and several liability as to non-settling Defendants to the extent permitted or authorized by law, and (3) cooperation from Apotex, both in terms of effectuating the Settlement and providing information to help in the continued litigation against the non-settling Defendants. *See* MDL Doc. No. 2781-3 at Ex. A.

Experienced Settlement Class Counsel submit that the Settlement is fair, reasonable, and adequate. The Settlement ensures that the Settlement Class will receive substantial benefits, while avoiding the risks and delays of continued litigation against Apotex. Settlement Class Counsel also submit that the proposed Plan of Allocation (MDL Doc. No. 2781-7), is fair, reasonable, and efficient.

Accordingly, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), 23(e), and 54(b), DPPs respectfully request granting final approval to this settlement, entry of Judgment in the form submitted herewith and granting of final approval to the Plan of Allocation. Settling Defendant assents to this Motion.

---

[3] The entities requesting exclusion, including all known affiliated entities, are listed in Exhibits E (timely requests) and F (untimely requests) to the August 12, 2024 Supplemental Declaration of Eric J. Miller, attached hereto as Exhibit 1.

## II.    <u>BACKGROUND</u>

Since 2016, DPPs have litigated claims along with other private plaintiffs and the States, alleging that Apotex (a manufacturer of generic drugs) conspired with the non-settling Defendants (other manufacturers of generic drugs) in violation of the Sherman Act to artificially inflate and maintain the prices that DPPs paid for certain of the Named Generic Drugs ("NGDs"). *See* ECF No. 2781-3 (list of NGDs attached as Exhibit B to the Settlement Agreement). DPPs contend that the alleged anticompetitive conduct of Settling Defendant and other generic drug manufacturers resulted in supracompetitive prices causing DPPs and the Settlement Class to pay illegal overcharges. Settling Defendant has denied liability as to DPPs' claims and has mounted a tenacious defense in all phases of the MDL.

DPPs have filed 18 individual drug complaints and two multi-drug complaints.[4] In October 2018, the Court denied Defendants' motions to dismiss six of the DPPs' individual drug complaints.[5] In August 2019, the Court denied Defendants' motions to dismiss the DPPs' first multi-drug complaint that alleged an "overarching" conspiracy.[6] Following the Court's decisions on the motions to dismiss, the parties have engaged in substantial discovery including propounding hundreds of document requests, interrogatories, and requests for admissions;

---

[4] No. 20-cv-721 (ECF No. 62), No. 18-cv-2641 (ECF No. 12), No. 16-AL-27241 (ECF No. 46), No. 16-AM-27241 (ECF No. 54), No. 16-BC-27241 (ECF No. 59), No. 16-BZ-27241 (ECF No. 53), No. 16-CB-27241 (ECF No. 74), No. 16-CM-27241 (ECF No. 61), No. 16-DS-27241 (ECF No. 71), No. 16-DG-27241 (ECF No. 74), No. 16-DV-27241 (ECF No. 71), No. 16-DX-27241 (ECF No. 83), No. 16-EC-27241 (ECF No. 66), No. 16-FL-27241 (ECF No. 66), No. 16-GL-27241 (ECF No. 50), No. 16-LV-27241 (ECF No. 62), No. 16-LD-27241 (ECF No. 56), No. 16-PV-27241 (ECF No. 68), No. 16-PP-27241 (ECF Nos. 62, 65),  No. 16-UR-27241 (ECF No. 54).

[5] *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018).

[6] *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019).

producing and reviewing millions of documents, taking numerous depositions, and engaging in

briefing and numerous hearings before the Court and the multiple Special Masters.

On July 13, 2020, following substantial briefing and conferences with Special Master

David H. Marion, the Court entered its Opinion and Pretrial Order ("PTO") No. 132 selecting

bellwether cases. MDL Doc. Nos. 1442 & 1443. On May 7, 2021, following additional briefing

and conferences with Special Master Marion, the Court entered PTO No. 171 revising the

selection of bellwether cases, retaining clobetasol and clomipramine as the Class Bellwethers for

the DPPs and End-Payor Class Plaintiffs ("EPPs"). MDL Doc. No. 1769. On December 9, 2021,

after additional briefing and conferences with Special Master Marion, the Court entered PTO No.

188 setting a schedule for further proceedings in the bellwether cases. MDL Doc. No. 1901. On

October 13, 2022, by stipulation of the parties, the Court entered PTO No. 217 extending the

proceedings for the bellwether cases. On May 9, 2023, by stipulation of the parties, the Court

entered PTO No. 234 extending the proceedings for the bellwether cases. Under that schedule,

bellwether fact discovery closed on October 2, 2023. MDL Doc No. 2243. Motions for class

certification and *Daubert* motions are fully briefed, and summary judgment briefing is ongoing.

Settlement negotiations between Class Counsel and attorneys for Settling Defendant were

hard fought, at arm's length, and spanned many months, as described in more detail in the

Declaration of Dianne Nast (MDL Doc. No. 2781-3). The parties executed the Settlement on

December 23, 2023.

III.     **MATERIAL TERMS OF THE SETTLEMENT**

The Settlement provides for substantial monetary relief, and other valuable terms, which

will assist DPPs in the continued prosecution of the litigation against the non-settling

Defendants. In exchange for this monetary relief and cooperation, DPPs and members of the

4

Settlement Class that have not excluded themselves will be precluded from suing Settling
Defendant and Released Parties for the Released Claims.

### A.    Monetary Relief

The monetary component of the Settlement is $30,000,000.[7] Settling Defendant has paid
this amount and it has been accruing interest. Settlement Agreement ¶ 7. The Settlement Fund
may be reduced by up to $3,600,000 based upon provisions in the Settlement Agreement
concerning the opt outs.[8] The Settlement Fund also could have been increased by an additional
$7,058,823.50 under the MFN clause described in further detail below. The monetary component
of the Settlement, net of Court-approved attorneys' fees, service awards for the DPP class
representatives, expenses and costs of litigation, Notice and administration of the Settlement
("Net Settlement Fund"), will be distributed to the Settlement Class pursuant to the Plan of
Allocation (upon Court approval after the filing of a motion for distribution).

### B.    Joint and Several Liability of Non-Settling Defendants

The Settlement provides that the non-settling Defendants remain jointly and severally
liable for Settling Defendant's sales to the extent permitted or authorized by law. Paragraph 14 of
the Settlement Agreement reserves, for the purposes of joint and several liability against non-
settling Defendants, DPPs' ability to rely on Settling Defendant's sales of NGDs to the

---

[7] Apotex has paid $30,000,000 into the Settlement Fund. Settlement Agreement ¶ 7. As noted
above, the $30,000,000 payment could have been increased by as much as $7,058,823.50 under
the MFN clause. Based upon the timely opt-out notices received, the settlement amount will be
reduced.

[8] Pursuant to separate letter agreement, Settling Defendant had the right to rescind the
Settlement Agreement if the aggregate amount of purchases represented by opt-outs reached or
exceeded a certain percentage of total purchases by Direct Purchasers. *Id.* That percentage was
not reached, and the Settlement Agreement remains in force. DPPs will file these letter
agreements with the Court if the Court desires, and in that event, would request that they be filed
*in camera*.

Settlement Class to seek the full amount of damages to which they may be entitled from any other Defendant in the MDL. This term is valuable to DPPs and the DPP Settlement Class, as it maintains DPPs' right to seek alleged damages associated with Settling Defendant's sales from Settling Defendant's alleged co-conspirators. The non-settling Defendants will only be entitled to a credit for any judgment against them for the value of the settlement proceeds paid by Settling Defendant[9] after the judgment is trebled. This settlement will not reduce in any way the single damages to which the Settlement Class is entitled.

### C.    MFN Clause

The Settlement also contains a Most Favored Nation ("MFN") clause in Paragraph 11 of the Settlement. The clause provided that, in the event Settling Defendant entered a separate, more favorable settlement or binding term sheet prior to April 11, 2024 with any Opt-outs (as defined in Paragraph 9 of the Settlement Agreement), Settling Defendant would have been obligated to inform DPPs and the Settlement Class may have been entitled to additional financial compensation. Specifically, if the financial payment made by Settling Defendant to such Opt-out in any Other Direct Purchaser Settlement had been more favorable on a proportionate basis than the terms of this settlement, this Settlement would have been automatically amended so that DPPs shall receive the benefit of the more favorable financial terms of the Other Direct Purchaser Settlement. If the terms of Paragraph 11 were triggered, Settling Defendant could have paid up to an additional $7,058,823.50 into the Settlement Fund for the benefit of the Settlement Class.

---

[9] *See*, *e.g.*, *In re Packaged Ice Antitrust Litig*., 2011 WL 717519, at *17 (E.D. Mich. Feb. 22, 2011) (granting final approval of a settlement where the settlement agreement provides that settling defendants' sales "remain in th[e] action and shall be part of any joint and several liability against any non-settling Defendant"); *In re Auto. Parts Antitrust Litig*., 2017 WL 3499291, at *2 (E.D. Mich. July 10, 2017) (similar).

**D.      Cooperation by Settling Defendant**

In addition to the monetary relief and other valuable terms highlighted above, the

Settlement Agreement (MDL Doc. No. 2781-3), as modified pursuant to Paragraph 12 of the

separate Cooperation Agreement reached between Parties (attached hereto as Exhibit 1), also

delivers benefits to the Settlement Class through the cooperation that Settling Defendant has

agreed to provide to DPPs. *See* Settlement Agreement ¶ 10; Cooperation Agreements attached as

Exhibit A to the Settlement Agreement. Settling Defendant's cooperation will include: (1) the

identification of "known persons who are likely to have relevant information;" Cooperation

Agreement ¶ 4; (2) attorney proffers and summaries, *id.* ¶¶ 5-6; (3) access to witnesses for

interviews, *id.* ¶ 7; (4) responses to data inquires, *id.* ¶ 8; and (5) authentication and admission of

documents, *id.* ¶ 9. Such cooperation benefits the Settlement Class. Such cooperation will

facilitate the administration of the Settlement and aid DPPs' continued litigation against the non-

settling Defendants.

**E.      Settlement Class Releases**

In exchange for the benefits provided under the Settlement Agreement, DPPs have agreed

to releases as set forth in Paragraphs 12 and 13 of the Settlement Agreement. The Settlement

releases Settling Defendant and Releasees for claims DPPs or the Settlement Class asserted or

could have asserted, based upon the allegations in the MDL, relating to the NGDs or other

generic drugs that could have been named based on the facts alleged in the MDL including, but

not limited to, those arising under any federal or state antitrust, unfair competition, unfair

practices, price discrimination, unitary pricing, or trade practice law. Settlement Agreement ¶ 12.

The Settlement releases all rights, and benefits conferred by § 1542 of the California Civil Code

or any similar, comparable, or equivalent law. Settlement Agreement, ¶ 13.

The Settlement, however, does not resolve, compromise, discharge, or settle any of the claims of DPPs or the Settlement Class against any other Defendant in this MDL. Settlement Agreement, ¶ 12. Additionally, the Settlement does not release any claims arising under Article 2 of the Uniform Commercial Code in the ordinary course of business between Settling Defendant and the Settlement Class, except those claims based in whole or in part on the released claims. *Id.* Likewise, the Settlement does not release any claims for indirect purchases of any generic drugs, any claims for negligence, breach of contract, bailment, failure to deliver, lost goods, damaged or delayed goods, breach of warranty or product liability claims except those claims based in whole or in part on any of the released claims, or any claims which are currently the subject of any unrelated pending litigation against Settling Defendant that is not part of this MDL. *Id.* The Settlement does not release any claims as to any generic drug that, after December 22, 2023, is the subject of any unrelated litigation brought against Settling Defendant under federal or state antitrust laws or under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), where the allegation is that generic competition was delayed (*e.g.*, reverse payment, sham litigation, sham citizen petition, or "*Walker Process*" fraud cases) or otherwise reduced or impaired by alleged conduct other than that pled or based on the facts alleged in the DPPs' complaints in the action. *Id.* Finally, the Settlement does not release any claims of any type relating to any drugs other than the NGDs, other than those pled or based on the facts alleged in the DPPs' complaints in the MDL. *Id.*

### F.     Expenses, Attorneys' Fees, and Service Awards

The Settlement Agreement provides that up to $150,000 may be used to pay for reasonable expenses in connection with administering the Settlement, such as those expenses associated with providing Notice of the Settlement to the Settlement Class, expenses associated

with administering and distributing the Settlement, expenses associated with developing a Plan of Allocation, and any expenses incurred in connection with taxation matters relating to the Settlement. Settlement Agreement, ¶ 8.a. Thus, up to $150,000 may be withdrawn after the Court grants Preliminary Approval. Administration expenses incurred above this amount shall be borne, in the first instance, by Settlement Class Counsel, who may be repaid from the Settlement Fund (or have outstanding invoices paid from the Settlement Fund) after the "Effective Date" with Court approval. The "Effective Date" is the date of final approval, and the expiration of any time to appeal or if appealed, the date the appeal has been resolved. Settlement Agreement, ¶ 6. In addition, the Settlement Agreement provides that Settlement Class Counsel may request attorneys' fees up to one-third of the settlement amount, reimbursement of expenses or charges in connection with prosecuting the MDL, and class representative service awards. Settlement Agreement, ¶ 16. These provisions were included in the Class Notice so that class members would be informed about them.

On May 13, 2024, DPPs filed a motion (MDL Doc Nos. 2957 & 2965) seeking from this Settlement Fund and the Settlement Funds created in connection with the Breckenridge and Heritage settlements: (1) reimbursement for $4,500,000 in out-of-pocket expenses incurred through April 2024 less the prior reimbursement of $6,800,000 from the Sun/Taro settlement; and (2) service awards for the class representatives of $20,000 each (a total of $80,000); and (3) approval to put one-third of the remaining Settlement Funds (net of the above and including interest) into escrow to pay attorneys' fees as may be awarded by the Court in the future, as was done for the Sun/Taro settlements. MDL Doc. No. 2965. DPPs intend to seek an award of attorneys' fees at a later time. In the interim, if this Motion is approved by the Court, one-third of the Net Settlement Fund would remain in escrow to allow funds to pay future Court awarded

counsel fees.  No objections have been received to these requests (nor to any aspect of the

Settlement or Plan of Allocation).

## IV.    THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL

The Proposed Settlement is Fair, Reasonable, and Adequate pursuant to Rule 32(e)(2).

Rule 23(e)(2), amended in 2018, codified the factors a court must consider when determining the

fairness of a class action settlement at final approval.[10] Fed. R. Civ. P. 23(e)(2) directs courts to

consider whether:

> (A) the class representatives and class counsel have adequately represented the
> class; (B) the proposal was negotiated at arm's length; (C) the relief provided for
> the class is adequate, taking into account: (i) the costs, risks, and delay of trial and
> appeal; (ii) the effectiveness of any proposed method of distributing relief to the
> class, including the method of processing class-member claims; (iii) the terms of
> any proposed award of attorney's fees, including timing of payment; and (iv) any
> agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats
> class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[11]

---

[10] 4 Newberg on Class Actions § 13:14 (5th ed.) ("Rule 23(e)(2) in turn authorizes final
approval only upon a showing that the settlement is 'fair, reasonable, and adequate,' made after a
consideration of four factors."); *id.* at § 13:15 ("Congress adopted this standard for the first time
at the end of 2018. Prior to that, Rule 23 did not embody a specific preliminary settlement
approval process or standard"); *Myers v. Jani-King of Phila., Inc.*, 2019 WL 4034736, at *7 n.4
(E.D. Pa. Aug. 26, 2019) ("Effective December 1, 2018, Rule 23(e) was amended to list factors
to guide a district court's determination of whether a proposed settlement is 'fair, reasonable, and
adequate.'").

[11] While the Rule 23(e) factors were not intended to replace the factors previously developed
by the Third Circuit in evaluating the fairness of a class settlement, they were intended to codify
prior practice. Fed. R. Civ. P. 23(e)(2) Advisory Committee Note on 2018 Amendments ("The
goal of [the Rule 23(e)(2)] amendment is not to displace any factor, but rather to focus the court
and the lawyers on the core concerns of procedure and substance that should guide the decision
whether to approve the proposal."); 4 Newberg on Class Actions § 13:14 (5th ed.) (similar).
Indeed, the 23(e) factors largely overlap with the factors set forth in *In re Gen. Motors Corp.
Pick-Up Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995), the factors set forth in
*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), and other factors courts in the Third Circuit
previously relied on to evaluate the fairness of a settlement at the preliminary and final approval

**A.     Settlement Class Counsel and the Class Representatives Have Adequately Represented the Settlement Class**

In evaluating a proposed settlement, this factor focuses on "the actual performance of counsel acting on behalf of the class." Fed. R. Civ. P. 23(e)(2) Advisory Committee Note on 2018 Amendments.[12] As addressed above, Settlement Class Counsel engaged in extensive discovery and discovery-related motion practice prior to entering this settlement and were fully aware of the strengths and weakness of the case. *See supra,* Section II. In reaching this settlement, Settlement Class Counsel engaged in lengthy, hard-fought, arm's length negotiations on behalf of the class. *See supra, id*. *See also* Nast Declaration, MDL Doc No. 2781-3, ¶¶ 13-15. This factor has been satisfied and thus weighs in favor of approving the Settlement.

**B.     The Proposed Settlement Was Reached After Arm's Length Negotiations**

As a general matter, settlements that result from arm's length negotiations between experienced counsel are given deference by courts.[13] As shown in the Nast Declaration, this

---

stages. *See Hall v. Accolade, Inc.*, 2019 WL 3996621, at *2 (E.D. Pa. Aug. 23, 2019) ("The Girsh factors predate the recent revisions to Rule 23, which now explicitly identifies the factors that courts should apply in scrutinizing proposed class settlements, and the discussion in Girsh substantially overlaps with the factors identified in Rule 23.").

[12] *See also Caddick v. Tasty Baking Co.*, 2021 WL 1374607, at *6 (E.D. Pa. Apr. 12, 2021) (finding adequate representation under Rule 23(e)(2)(a) where "class counsel expanded considerable time and effort on this case, engaged in extensive discovery, including reviewing and analyzing a substantial volume of documents."); *Hall*, 2019 WL 3996621, at *4 (finding adequate representation under Rule 23(e)(2)(a) where class counsel logged hundreds of attorney hours on the litigation, took depositions, requested and reviewed written and electronic discovery, constructed a damages model, and interviewed class members).

[13] *See Whiteley v. Zynerba Pharms. Inc.*, 2021 WL 4206696, at *4 (E.D. Pa. Sept. 16, 2021) ("[C]ourts generally recognize that a proposed class settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery") (internal quotation marks omitted); *In re Automotive Refinishing Paint Antitrust Litig.*, 2003 WL 23316645, at *2 (E.D. Pa. Sept. 5, 2003) ("Though the ultimate determination of the fairness of a partial settlement is left to the court, it is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations, in making this determination."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)

settlement is the result of lengthy, hard-fought, arm's length negotiations between Settlement

Class Counsel and Settling Defendant's counsel, all of whom are capable attorneys with decades

of experience in complex class actions and antitrust matters. *See supra,* Section II; Nast

Declaration, MDL Doc. No. 2781-3, ¶¶ 13-15. Settlement Class Counsel have vigorously

advocated for the Settlement Class. Settlement Class Counsel were prepared to continue with

litigation if no settlement had been reached, along with the ongoing litigation that continues

against the other non-settling Defendants.

## C. The Relief Provided for the Settlement Class is Fair, Reasonable and Adequate

This Settlement represents a substantial recovery to the Settlement Class – in both dollar

value and cooperation, and after an extensive notice program, no Settlement Class Member has

objected to the settlement. The thirty million dollars ($30,000,000) in monetary relief, which, as

noted above, may be adjusted down to $26,400,000 based on timely opt-outs, but could have

been adjusted up via the MFN clause. The Settlement Agreement protects the Settlement Class's

rights to seek the full value of their damages from other, non-settling Defendants to the extent

permitted or authorized by law. *See* Settlement Agreement, ¶ 14 (Non-settling Defendants

remain jointly and severally liable for Settling Defendant's sales and DPPs' rights to rely on

---

(holding that "[a] presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D. Pa. 1997) (concluding that the settlement was the product of "good faith, arms' length negotiations[,]" which eliminated "the risk that a collusive settlement agreement may [have been] reached"). Further, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation.'" *In re Comcast Corp. Set Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 378 (E.D. Pa. 2019) (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013)). And "[w]here this negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." *In re Philips/Magnavox TV Litig.*, 2012 WL 1677244, at *11 (D.N.J. May 14, 2012).

Settling Defendant's sales of NGDs to the Settlement Class for this purpose are preserved).

Further, the cooperation required by the Settlement Agreement will assist DPPs in the continued

prosecution of this MDL on behalf of the Settlement Class.[14]

In approving class action settlements, Courts in the Third Circuit have long deferred to

the judgment of experienced counsel who have conducted arm's length settlement negotiations.[15]

Here, Settlement Class Counsel have extensive experience litigating antitrust claims; they have

demonstrated throughout this litigation that they are well-versed in this area of law and

committed to vigorously prosecuting this case to achieve the best result for the class.[16]

Settlement Class Counsel endorse this settlement and submit that the combination of monetary

recovery and cooperation provided for in the Settlement Agreement is a fair, reasonable and

adequate result for the Settlement Class. Their experienced opinion should be given great weight.

1. **The Settlement Accounts for the Costs, Risks, and Delays of Trial and Appeal**

As a result of the substantial discovery and motion practice that has occurred to date,

Settlement Class Counsel possess the information necessary to evaluate the settlement,

considering the costs, risks, and delays associated with litigating the case through trial. The

---

[14] *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 255 (E.D. Pa. 2012) (approving settlement where one defendant agreed to cooperate in prosecution of case against other defendants by providing documents and expert witnesses); *Linerboard*, 292 F. Supp. 2d at 643 (noting settlement provision of cooperation provided substantial benefit to the classes and supported settlement approval); *In re Ikon Office Solutions Inc. Sec. Litig.*, 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable in settling a complex case).

[15] *See, e.g., Ebner v. Merchants & Med. Credit Corp.*, 2017 WL 1079966, at *5 (E.D. Pa. Mar. 22, 2017) (approving class settlement and noting that, "*experienced* class counsel endorses this settlement," and "[s]uch an opinion is entitled to 'significant weight.'") (emphasis in original) (internal citation omitted); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("[T]he professional judgment of counsel involved in the litigation is entitled to significant weight.").

[16] *See supra,* Section II.

Settlement Class Counsel submit that claims against Settling Defendant have significant merit and will continue to vigorously prosecute their claims against the non-settling Defendants. Nevertheless, the Settlement Class would face a number of risks, expenses, and difficult challenges, were the litigation to continue against Settling Defendant.

The complex nature of this case, requiring discovery of approximately three dozen Defendant families and analysis of one hundred fifty-nine (159) drugs, unavoidably involves significant expenditures on e-discovery and expert fees. Settlement Class Counsel has already expended more than $11,500,000 in out-of-pocket expenses. MDL Doc. No. 2957-2.  Expenses will continue to grow as DPPs' cases proceed.

The Settlement Class would also face a number of legal challenges and delays if the case against Settling Defendant continued through trial, including discovery disputes; preparation for trials; preparing and defending fact and expert depositions; preparing and defending expert reports; and preparing and defending *Daubert* motions, class certification (and a potential Rule 23(f) petition), summary judgment, and motions *in limine*. Antitrust class actions "are notoriously complex, protracted, and bitterly fought."[17] This case is no different. The initial complaints in this litigation were filed over eight years ago. Defendants' motions to dismiss have been the subject of extensive briefing and argument. Each stage of this litigation is likely to be just as vigorously fought as the motions to dismiss. There can be no doubt that this case would be expensive to continue and complex to try.

For these reasons, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal

---

[17] *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

litigation."[18] The settlement will ensure an immediate monetary distribution to the Settlement

Class and the accompanying cooperation will strengthen DPPs' claims and expedite discovery of

litigating Defendants. This factor weighs in favor of approving the Settlement.

> **2.    The Settlement Provides an Effective Method to Distribute Relief to the Settlement Class**

Under Rule 23(e)(2)(C)(ii), the Court "scrutinize[s] the method of claims processing to

ensure that it facilitates filing legitimate claims" and "should be alert to whether the claims

process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes on 2018

Amendments. This settlement provides a straightforward process for Settlement Class Members

to submit claims and receive their *pro rata* share of the settlement distribution. *See* proposed

Plan of Allocation, MDL Doc. No. 2781-7. The *pro rata* shares will be calculated by Dr.

Leitzinger using Defendants' transaction data. Declaration of Jeffrey J. Leitzinger, Ph.D. Related

to Proposed Allocation Plan (MDL Doc. No. 2010-9, "Leitzinger Allocation Decl.") ¶ 14. The

Plan of Allocation was described in the Notice disseminated to the Settlement Class and there

have been no objections. It is also materially identical to the Plan of Allocation that the Court

previously adopted for the Sun/Taro settlements.

Defendants' data has been analyzed to make it useful for calculating *pro rata* shares,

allowing claim forms to be distributed after final approval of the Settlement. Dr. Leitzinger will

rely on Defendants' sales data to calculate claims, individual claimants will not have to submit

---

[18] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 784 (internal citations omitted). *See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 216 (E.D. Pa. 2014) ("[I]f the parties were to continue to litigate this case, further proceedings would be complex, expensive and lengthy, with contested issues of law and fact . . . . That a settlement would eliminate delay and expenses and provide immediate benefit to the class militates in favor of approval.").

purchase data on the 159 NGDs at issue (and for the most part, will not be permitted to). As Dr. Leitzinger has explained, in addition to the work required to analyze Defendants' transaction sales data, if a claimant could submit its own data, processing and analyzing individual purchase data from claimants for 159 NGDs over the 10-year Settlement Class period would be time consuming and expensive (costs that would reduce the Settlement Fund available to all claimants). *Id.* ¶¶ 10-13. Also, the various data sets submitted would require further efforts and time to evaluate differences between their data and data produced by Defendants, potentially requiring rounds of inquiry to both claimants and Defendants. *Id*. Defendants' sales data, by contrast, are considered reliable and will be the basis of damage calculations going forward.[19]

There may be some claimants whose claims cannot be calculated from Defendants' sales data because the data produced is not completely co-extensive with the Settlement Class period. Some Defendants produced data through the end of 2018, some produced through the end of 2017, and some Defendants' data begins later than May 2009. If there are claimants who are not in Defendants' sales data, they will be given the opportunity to participate in the settlement if they can demonstrate that they purchased NGDs directly from Defendants at some point during the period from May 1, 2009, through December 31, 2019, and if they submit their own purchase data showing the amount(s) of NGDs they purchased directly from Defendants during this period.[20]

---

[19] Courts have repeatedly certified classes of Direct Purchasers of pharmaceuticals, finding predominance met where Direct Purchasers' damages were calculated utilizing the defendants' data. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, 967 F.3d 264, 272 n.13 (3d Cir. 2020); *In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *13-14 (E.D. Pa. Aug. 11. 2011).

[20] Claimants who are not identified as Direct Purchasers in the data produced by Defendants will have to provide documentation sufficient to show that they purchased at least one NGD directly from at least one Defendant, as explained in Section V, *infra*.

### 3.    The Proposed Terms for Attorneys' Fees are Reasonable

The terms of the Settlement Agreement allow Settlement Class Counsel to request attorneys' fees up to one-third of the net settlement amount, including reimbursement of expenses incurred in prosecuting this litigation, and class representative service awards. Settlement Agreement ¶16.

DPPs intend to file a motion for fees later. DPPs have already filed a motion and supporting Memoranda, seeking reimbursement for out-of-pocket expenses through April 2024, service awards for class representatives, and establishing an escrow fund for future attorneys' fees awarded. MDL Doc. Nos. 2957 & 2965. That motion and its Second Corrected Memorandum of Law were filed well before the opt-out/objection deadline of June 27, 2024. Settlement Class members will be permitted to review and object to a motion for fees after it is filed. No objections, however, have been lodged to the requests for payment of expenses or service awards at this time, nor to the request to set aside one-third of the net Settlement Fund (plus interest) to provide funds for the payment of any attorneys' fees the Court may award.

The Notice, which was mailed on March 29, 2024, also informed Settlement Class members about the maximum amount Class Counsel may request in attorneys' fees and expenses. The Notice allowed Settlement Class Members to decide whether to opt out or object to the settlement. This type of Notice has been repeatedly found to satisfy due process.[21] After an

---

[21] *In re Nat'l Football Players Concussion Injury Litig.*, 821 F.3d 410, 444–47 (3d Cir. 2016) (Affirming final approval of a settlement where the District Court intended to consider attorneys' fees after final approval and settlement class members were informed that attorneys may seek fees of up to $112.5 million. "Even if the class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with particular retired players—they still had enough information to make an informed decision about whether to object to or opt out from the settlement.").

extensive notice program, no Settlement Class Member has objected to the reimbursement of expenses, the incentive payments or the attorney fee holdback.

DPP Class Counsel intend to file a Motion for an award of Counsel Fees at a later date, to which Settlement Class Members will have the right to review and object. Accordingly, the Court need not decide on the appropriateness of attorneys' fees now since it will be addressed in a future motion.[22]

### D. The Proposal Treats Settlement Class Members Equitably

"A district court's principal obligation in approving a plan of allocation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Wawa*, 2021 WL 3276148, at *13 (quoting *Sullivan v. D.B. Invs., Inc.*, 667 F.3d 274, 326 (3d Cir.2011)) (internal quotation marks and citations omitted). As discussed further in Section V below, the Settlement treats all Settlement Class Members equitably. In accordance with the Plan of Allocation, Settlement Class Members will receive equitable compensation based on their *pro*

---

[22] *See In re Wawa, Inc. Data Sec. Litig.*, 2021 WL 3276148, at *13 (E.D. Pa. July 30, 2021) (Preliminarily approving a settlement and explaining, "[a]t this time, the Court need not analyze or make a determination about the propriety of attorneys' fees because there will be an opportunity to do so once a formal motion is filed."); *Nat'l Football League Players*, 821 F.3d at 444 ("The petition for a fee award will be submitted to the Court at a later date. Objectors will then be able to present arguments as to why the requested award is improper, and the Court will have discretion to modify the award in whatever way it sees fit."); *Processed Egg Prods.*, 284 F.R.D. at 277 ("Because, here, the [] Settlement Agreement provides that the attorneys' fees and expenses ultimately will be determined upon approval of the Court, which will require the assessment of the reasonableness of any such fees and expenses sought pursuant to Fed.R.Civ.P. 23(h) (and Fed.R.Civ.P. 54(d)(2)), the [] Settlement's provisions concerning attorneys' fees and expenses do not raise issues at this time that would weigh against approving the settlement.); Newberg on Class Actions § 14:5 (5th ed.) ("In some situations, the court will give final approval to a class action settlement and leave fees and costs for a later determination."); *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 582 F.3d 524, 534–35 (3d Cir. 2009) (upholding award of attorneys' fees made six years after final approval of settlement); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 2000 WL 1622741, at *1 (E.D. Pa. Oct. 23, 2000) (approving fee award three years after final approval).

18

*rata* share of overall NGDs purchased directly from Defendants. *See* Section V, *infra*. This factor weighs in favor of final approval.

## V.      THE PLAN OF ALLOCATION WARRANTS FINAL APPROVAL

DPPs' proposed Plan of Allocation would allocate settlement funds on a *pro rata* basis based on Settlement Class members' unit direct purchases of the NGDs from Defendants during the Settlement Class period. MDL Doc. No. 2781-7. The proposed Plan of Allocation is fair, reasonable, and efficient and materially identical to the plan of allocation that this Court adopted for the Sun/Taro settlements. "Approval of a plan of allocation for a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole [, *i.e.*,] the distribution plan must be fair, reasonable and adequate."[23] "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable."[24]

Plans of allocation that distribute settlement funds based on a *pro rata* share of purchases

---

[23] *Ikon*, 194 F.R.D. at 184 (internal quotation marks omitted). *See also Sullivan*, 667 F.3d at 326 ("A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'") (quoting *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983)).

[24] *Sullivan*, 667 F.3d at 328 (quoting *In re Corel Corp. Inc., Sec. Litig.*, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003) (internal quotation marks omitted)). *See also Ikon*, 194 F.R.D. at 184 (same, approving a plan of allocation that reimbursed stock-holders at progressive percentages for their defined losses based on the timing of their stock purchases and defendant's disclosures) (citation omitted); *Meijer*, 2006 WL 2382718, at *17 (same, approving a plan of allocation distributing funds to Direct Purchasers proportionate to the volume and amount of their purchases); *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2020 WL 1922902, at *25 (E.D. Pa. Apr. 21, 2020) (same, approving a plan of allocation distributing funds to indirect purchaser claimants proportionately based on the amounts they paid for the affected drugs); *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 345 (E.D. Pa. 2007) (same, approving a plan of allocation distributing funds on a *pro rata* basis based upon the amount of each claimant's eligible purchases).

are routinely approved.[25] Settlements in antitrust cases are commonly distributed to direct

purchaser classes based on a purchaser's *pro rata* share as well.[26]

The proposed Plan of Allocation meets this standard. As set forth in the proposed Plan of

Allocation and in the Declaration of Dr. Leitzinger, the Net Settlement Fund will be distributed

---

[25] 4 Alba Conte & Herbert Newberg, Newberg on Class Actions, § 12.35, at 350 (4th ed. 2002) (noting that *pro-rata* allocation of a settlement fund "is the most common type of apportionment of lump sum settlement proceeds for a class of purchasers" and "has been accepted and used in allocating and distributing settlement proceeds in many antitrust class actions"); *Beneli v. BCA Fin. Servs., Inc*., 324 F.R.D. 89, 105–06 (D.N.J. 2018) ("In particular, *pro rata* distributions are consistently upheld, and there is no requirement that a plan of allocation differentiat[e] within a class based on the strength or weakness of the theories of recovery.") (citation and internal quotation marks omitted); *In re Packaged Ice Antitrust Litig*., 2011 WL 6209188, at *15 (E.D. Mich. Dec. 13, 2011) ("Typically, a class recovery in antitrust or securities suits will divide the common fund on a *pro rata* basis among all who timely file eligible claims, thus leaving no unclaimed funds.") (quoting 3 Newberg on Class Actions, § 8:45 (4th ed. 2011)); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); *Sullivan*, 667 F.3d at 328 (upholding a district court's approval of a plan of allocation based on a *pro rata* share of diamond purchases). A plan of allocation "need not be, and cannot be, perfect." *In re Cendant Corp. Sec. Litig*., 109 F. Supp. 2d 235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir. 2001), *cert. denied*, 535 U.S. 929 (2002).

[26] *See, e.g.*, *In re Remeron Direct Purchaser Antitrust Litig*., 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses ... in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade. Such a method of allocating the Net Settlement Fund is inherently reasonable."); *In re Flonase Antitrust Litig*., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where each class member receives their *pro rata* share of the net settlement fund based on their share of qualifying purchases of the at issue drug); *In re Namenda Direct Purchaser Antitrust Litig*., 462 F. Supp. 3d 307, 309 (S.D.N.Y. 2020) (same); Order Granting Final Approval of Pls.' Proposed Plan of Allocation, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-md-2503, ECF No. 1179 (D. Mass. July 18, 2018) (same); Order Granting Direct Purchaser Plaintiffs' Unopposed Motion for Final Approval of Settlement, *In re Loestrin 24 FE Antitrust Litig.*, No. 1:13-md-02472, ECF No. 1462 (D.R.I. Sept. 1, 2020) (same); *In re Lidoderm Antitrust Litig*., No. 14-md-2521, ECF Nos. 1004-5, 1004-6, 1054 (N.D. Cal.) (same); *In re Aggrenox Antitrust Litig*., No. 14-md-2516, ECF Nos. 733-1, 739 (D. Conn.) (same); *Mylan Pharms., Inc. v. Warner Chilcott Public Ltd*., No. 12-cv-3824, ECF Nos. 452-3, 665 (E.D. Pa.) (same); *In re Tricor Direct Purchaser Antitrust Litig*., No. 05-cv-340, ECF Nos. 536-1, 543 (D. Del.) (same).

to Settlement Class members based on each claimant's volume of purchases across all NGDs from all Defendants during the period from May 1, 2009 through December 31, 2019. *See* Plan of Allocation § 2.1; Leitzinger Allocation Decl. ¶ 14.[27] Claimants' purchase volumes will be calculated using data produced by Defendants. Claimants will only need to submit their own data, in limited circumstances. As Dr. Leitzinger explains: (a) generic manufacturer data, like Defendants' data that will be used here, is "highly reliable;" (b) in Dr. Leitzinger's experience "where there has been data submissions from Class members in connection with settlement distribution, those submissions have not materially affected the outcomes;" and (c) review of Class member data submissions could be expensive and time-consuming, causing the Settlement Class to incur additional expense and delay distribution. Leitzinger Allocation Decl. ¶¶ 10-13. (MDL Doc. No. 2010-9).

Purchases of NGDs will be weighted so that purchases of NGDs with higher price points will be given greater weight in the allocation process (consistent with Dr. Leitzinger's expectation that those NGD formulations likely carried bigger overcharges). *Id.* ¶¶ 15-16. Specifically, Claimant purchase volumes of each NGD formulation will be multiplied by the average price reported for it by IQVIA (formerly, IMS Health) over the period from May 2009 to December 2019. *Id.* ¶ 15.

The data set that will be used for these calculations is enormous. Unlike most pharmaceutical or antitrust cases that involve a few defendants and a sole product, this case covers approximately three dozen Defendant families and 159 drugs (with various formulations

---

[27] Depending on drug formulation of each NGD, a unit may be pill (tablet or capsule); milligram or milliliter as appropriate for drugs sold in a cream, solution, jelly/gel, ointment, pastes, inhalation, infusion, etc.; a suppository for drugs sold in that form; a patch for drugs sold in that form; and a syringe for those drugs sold in syringes. Plan of Allocation at 3.

and strengths). The Plan of Allocation will utilize all of the sales data Defendants produced for all 159 drugs that Dr. Leitzinger can use to calculate Class members' unit purchases. *Id.* ¶ 11. Nevertheless, while this data captures the vast majority of sales, there may be some Settlement Class Members whose purchases are not contained within this data set, such as purchasers that bought NGDs in 2009 (since not all Defendants produced data back to 2009), or past 2017 or 2018, the end dates of Defendants' data. *See id.* ¶ 21 n.13. Claimants who do not appear in Defendants' sales data will need to show they purchased NGDs directly from Defendants during the period from May 1, 2009, through December 31, 2019, and will need to submit their purchase data showing these direct purchases. Plan of Allocation at § 2.2.

In addition, the Plan of Allocation provides that claimants who file based on an assignment of rights from a Class member shall have to reach agreement about the volume of unit purchases covered by any such assignments.[28] Finally, consistent with the Sun/Taro

---

[28] Specifically, Section 2.3 of the Plan of Allocation provides:

> *Claimants that file on the basis of an assignment from a Class member.*
> Allocations to Claimants who file a claim based on an assignment from a Class member would be determined either (a) by agreement between the assignor Class member and its respective assignee claimant, or (b) if the assignor Class member and its assignee claimant cannot reach an agreement, then the assignee claimant shall receive no allocation based on its assignment from the assignor Class member and the assignor Class member's allocation shall not be reduced to account for the assignment to the assignee claimant. There are only two types of agreements between an assignor Class member and its respective assignee claimant that shall be acceptable for purposes of an assignee claimant receiving an allocation based on an assignment from a Class member: (i) the assignor Class member and its respective assignee claimant can agree that the assignee claimant shall be allocated a share that is a fixed percentage of the assignor Class member's share (say 5% of the Class member's share) and that the assignor Class member's allocation shall be reduced by the same amount; or (ii) the assignor Class member and its respective assignee claimant can submit agreed upon figures for the purchase volumes covered by the assignment for each NGD sold by Defendants, and then this information can be used by Econ One to calculate the assignee's allocation in accordance with this Plan of Allocation (and the

settlement, the Plan of Allocation also provides for each Settlement Class Member to receive reasonable compensation such that any class member who would have been eligible to receive less than $25 under a *pro rata* distribution will instead receive a distribution of $25. Leitzinger Allocation Decl. ¶¶ 3.3.

In Dr. Leitzinger's opinion, the proposed plan of allocation is fair, reasonable, and reflects the type and approximate extent of the injury incurred by Settlement Class members. Leitzinger Allocation Decl. ¶¶ 7, 22. "By relying upon Defendants' data, the basis for the allocation is reliable and the process is efficient, thereby preserving net settlement amounts by avoiding undue costs. In addition, as noted above, this allocation method employs allocation approaches similar to those approved by courts in other cases involving generic drug overcharges." *Id.* ¶ 22.[29]

---

assignor Class member's share shall be reduced by the same amount). Neither an assignee (nor any other Claimant) other than as stated herein shall be allowed to submit its own purchase data. Reviewing assignee claimants' purchase data would likely be expensive and time consuming, and will delay disbursement. If the assignor Class member and assignee claimant cannot reach agreement, they can attempt to resolve any dispute outside of this allocation process. The assignor and assignee shall be given no more than 90 days from the deadline for claims submission to reach agreement, and, if they cannot reach agreement by that time, the assignor's and assignee's share shall not be distributed, and shall remain in the escrow account until such time as they either reach agreement or obtain a court order providing for the amounts to be distributed to the assignor and assignee. As the Claim Form will make clear, any claim (including all related documentation or materials submitted therewith) submitted by a Claimant who files a Claim Form based on an assignment may be shared with the Claimant's assignor Class member during the claims administration process.

[29] The Plan of Allocation also provides that claimants who have given partial assignments to entities that opt out of the Class (such as Direct Action Plaintiffs ("DAPs")) shall have their combined net totals reduced to account for those assignments. Plan of Allocation § 2.1.d. This shall be done using the chargeback data produced by the Defendants that Dr. Leitzinger can use to estimate the percentage of units purchased by the Class members which were then resold to the DAPs or other assignees. *Id.* This calculation is described in detail in paragraph 20 of Dr. Leitzinger's Allocation Declaration.

In addition, "[w]hen evaluating the fairness of a Plan of Allocation, courts give weight to the opinion of qualified counsel."[30] This Plan of Allocation was developed in conjunction with Settlement Class Counsel and is recommended by Settlement Class Counsel, which further supports approval.

## VI.    CONCLUSION

For the reasons set forth above, it is respectfully requested that the Court grant final approval to the Apotex settlement and to the Plan of Allocation.

Dated: August 21, 2024

Respectfully submitted,

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
dnast@nastlaw.com

*Lead and Liaison Counsel*
*for Direct Purchaser Plaintiffs*

David F. Sorensen
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, Massachusetts 02109
(617) 482-3700
tom@hbsslaw.com

Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP

Linda P. Nussbaum
NUSSBAUM LAW GROUP, PC

---

[30] *In re Advanced Battery Techs., Inc. Sec. Litig*., 298 F.R.D. 171, 180 (S.D.N.Y. 2014*); In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004). *See also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.") (quoting *Maley v. Del Global Techs. Corp*., 186 F. Supp. 2d 358, 367 (S.D.N.Y.2002) (citation omitted)); *In re Auto. Parts Antitrust Litig*., 2019 WL 7877812, at *1 (E.D. Mich. Dec. 20, 2019) (same); *In re EVCI Career Colleges Holding Corp. Sec. Litig*., 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (same).

800 Third Avenue, 38th Floor
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com

Michael L. Roberts
ROBERTS LAW FIRM P.A.
1920 McKinney Ave., Suite 700
Dallas, Texas 75201
(501) 821-5575
mikeroberts@robertslawfirm.us

1133 Avenue of the Americas, 31st Floor
New York, New York 10036
(917) 438-9189
lnussbaum@nussbaumpc.com

*Direct Purchaser Plaintiffs' Steering Committee*