**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL No. 2724**<br>**Case No. 2:16-MD-2724** |
| **THIS DOCUMENT RELATES TO:**<br><br>***Direct Purchaser Plaintiffs' Actions*** | **HON. CYNTHIA M. RUFE** |

**MEMORANDUM OF LAW IN SUPPORT OF
DIRECT PURCHASER PLAINTIFFS' MOTION FOR AN ORDER GRANTING:
(1) AN AWARD OF ATTORNEYS' FEES;
(2) REIMBURSEMENT OF EXPENSES; AND
(3) PAYMENT OF SERVICE AWARDS**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 2

      A.  Investigation and Litigation of DPPs' Claims................................2

      B.  Settlements Reached to Date .........................................................4

III.  ARGUMENT ...................................................................................... 6

      A.  Class Counsel is Entitled to a Fair Fee Award................................6

              1.  The Percentage Award Requested by Class Counsel is
                  Reasonable ............................................................................ 7

              2... The Lodestar Cross-Check Confirms that the Percentage Award
                  Requested by Class Counsel is Reasonable ................................. 19

      B.  The Expenses Requested by Class Counsel are Reasonable ...........................21

      C.  The Service Awards Requested Are Reasonable .............................................23

IV.   CONCLUSION.................................................................................. 25

## <u>**TABLE OF AUTHORITIES**</u>

Page

<u>**Cases**</u>

*Bradburn Parent Teacher Store, Inc. v. 3M,*
   513 F. Supp. 2d 322 (E.D. Pa. 2007) ...................................................................... 7, 13, 24

*Boeing Co. v. VanGemert*,
   444 U.S. 472 (1980).......................................................................................................... 7

*Cullen v. Whitman Med. Corp.,*
   197 F.R.D. 136 (E.D. Pa. 2000)...................................................................................... 11

*Glaberson v. Comcast Corp.,*
   2015 WL 5582251 (E.D. Pa. Sept. 22, 2015) ........................................................... 21, 23

*Gunter v. Ridgewood Energy Corp.,*
   223 F.3d 190 (3d Cir. 2000)................................................................................... 8, 11, 20

*Fleisher v. Fiber Composites, LLC,*
   2014 WL 866441 (E.D. Pa. Mar. 5, 2014)...................................................................... 21

*Harshbarger v. Penn Mutual Life Ins. Co.,*
   2017 WL 6525783 (E.D. Pa. Dec. 20, 2017)............................................. 9, 16, 18, 19, 23

*In re Ikon Office Solutions, Inc. Sec. Litig.,*
   194 F.R.D. 166 (E.D. Pa. 2000)............................................................. 8, 11, 12, 17, 18, 21

*In re AT&T Corp.*,
   455 F.3d 160 (3d Cir. 2006).................................................................................... *passim*

*In re Cendant Corp. Sec. Litig.*,
   404 F.3d 173 (3d Cir. 2005)............................................................................................. 6

*In re Cendant Corp. PRIDES Litig.,*
   243 F.3d 722 (3d Cir. 2001).................................................................................. 7, 13, 19

*In re CertainTeed Fiber Cement Siding Litig.*,
   303 F.R.D. 199 (E.D. Pa. 2014)...................................................................................... 22

*In re Cigna-American Specialty Health Administrative Fee Litig.,*
   2019 WL 4082946 (E.D. Pa. Aug. 29, 2019) ...................................... 10, 12, 14, 16-20, 23

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
   582 F.3d 524 (3d Cir. 2009)........................................................................ 6, 8, 15, 17, 18

*In re Domestic Drywall Antitrust Litig.,*
  2018 WL 3439454 (E.D. Pa. July 17, 2018) ............................................................ 7, 12

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................................... 12, 16, 17

In re: Generic Pharm. Pricing Antitrust Litig.,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ...................................................................... 3

*In re: Generic Pharm. Pricing Antitrust Litig.*,
  394 F. Supp. 3d 509 (E.D. Pa. 2019) ...................................................................... 4

*In re Flonase Antitrust Litig.,*
  291 F.R.D. 93 (E.D. Pa. 2013) ....................................... 10-11, 16-17, 19, 21, 23

*In re Flonase Antitrust Litig.*,
  951 F. Supp. 2d 739 (E.D. Pa. 2013) ................................................................. 24

*In re Linerboard Antitrust Litig.*,
  2004 WL 1221350 (E.D. Pa. June 2, 2004) ...................................................... 24

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002) ............................................................................ 24

*In re Namenda Direct Purchaser Antitrust Litig.*,
  2020 WL 3170586 (S.D.N.Y. June 15, 2020) ................................................... 25

*In re Processed Egg Prods. Antitrust Litig.,*
  2012 WL 5467530 (E.D. Pa. Nov. 9, 2012) ...................................... 13, 15, 19

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) .......................................................... 8, 15, 19, 20

*In re Remeron Direct Purchaser Antitrust Litig.,*
  2005 WL 3008808 (D. N.J. Nov. 9, 2005) ............................................. 16, 25

In re Rite Aid Corp. Sec. Litig.,
  396 F.3d 294 (3d Cir. 2005) .................................... 8, 10, 13, 15, 16, 17, 19, 20

*In re Solodyn Antitrust Litig.*,
  2018 WL 7075881 (D. Mass. July 18, 2018) ................................................... 25

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
  No. 13-md-02445-MSG, ECF No. 1000, (E.D. Pa. Feb. 27, 2024) ................................ 25

*In re Viropharma Inc. Sec. Litig.*,
　　2016 WL 312108 (E.D. Pa. Jan. 25, 2016) .......................................................... 9

*McDonough v. Toys "R" Us, Inc.*,
　　80 F. Supp. 3d 626 (E.D. Pa. 2015) .................................... 13, 16, 18, 19, 21, 23

*McGee v. Ann's Choice, Inc.*,
　　2014 WL 2514582 (E.D. Pa. June 4, 2014) ...................................................... 24

*Mehling v. New York Life Ins. Co.*,
　　248 F.R.D. 455 (E.D. Pa. 2008) ......................................................................... 22

*Serrano v. Sterling Testing Sys., Inc.*,
　　711 F. Supp. 2d 402 (E.D. Pa. 2010) ................................................................. 11

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
　　2020 WL 1922902 (E.D. Pa. Apr. 21, 2020) ............................... 10, 13, 14, 16, 18, 19, 24

## **Statutes**

　　28 U.S.C. § 1407 .................................................................................................. 2

## **Secondary Sources**

　　MANUAL FOR COMPLEX LITIGATION § 14.231 (4th ed. 2011) ........................................ 7

## I.   INTRODUCTION

For more than eight years in this expansive multidistrict litigation ("MDL"), Direct Purchaser Plaintiffs ("DPPs") have been litigating claims on behalf of putative classes of direct purchasers of various generic drugs. In twenty different complaints, DPPs have alleged that approximately forty different Defendant Corporate Families unlawfully inflated the prices of hundreds of different pharmaceutical products. As Defendants themselves have stated, this case is "one of the most procedurally complex MDLs in history." Petition for a Writ of Mandamus at 1, No. 24-1295, Doc. No. 1-1 (3d Cir. Feb. 22, 2024).

DPPs have spent the better part of a decade investigating and litigating their extensive antitrust claims on a wholly contingent basis without any guarantee of success. As explained in the accompanying Declaration of Dianne M. Nast, DPPs have expended more than 270,000 hours of uncompensated professional time on these matters, as well as millions of dollars in unreimbursed out-of-pocket expenses, and the Named Plaintiffs have been subject to extensive discovery obligations. *See* Declaration of Dianne M. Nast in Support of Direct Purchaser Plaintiffs' Motion for an Order Granting: (1) An Award of Attorneys' Fees; (2) Reimbursement of Expenses; and (3) Payment of Service Awards ("Nast Declaration"), attached as Exhibit 1 hereto.

To date, DPPs have reached six settlements on behalf of direct purchasers with: (1) Apotex Corp. ("Apotex"); (2) Breckenridge Pharmaceutical, Inc. ("Breckenridge"); (3) Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals Ltd., and Satish Mehta ("Heritage"); (4) Sandoz Inc. and Fougera Pharmaceuticals Inc. ("Sandoz"); (5) Sun Pharmaceutical Industries and its affiliates Caraco Pharmaceutical Laboratories, Ltd., Mutual Pharmaceutical Company, Inc., and URL Pharma, Inc. ("Sun"); and (6) Taro Pharmaceuticals U.S.A., Inc. ("Taro"). Collectively,

these settlements are the product of complicated and prolonged litigation and negotiations and will deliver hundreds of millions of dollars to members of the settlement classes.

For the reasons articulated herein, DPPs respectfully seek an award of attorneys' fees equivalent to 29% of the combined total of the six settlement funds, inclusive of accrued interest but net of any reimbursed expenses or service awards. This requested award is fair and reasonable based on the factors that courts in this Circuit routinely employ and is within the range of fees ordinarily awarded in this District and throughout the Third Circuit. Indeed, Courts often award fees on gross settlement amounts before deduction of expenses and service awards. From the Sandoz Settlement only, DPPs also seek reimbursement of $2,000,000 in unreimbursed out-of-pocket expenses and $80,000 to pay four equal service awards of $20,000 to each Named Plaintiff.

In sum, from the net of the six settlements totaling $335,415,000 (net of expenses and service awards sought, assuming certain agreed provisions of the settlements are met, and before inclusion of accrued interest), DPPs seek an award of 29%, or $97,270,350 (before the inclusion of accrued interest). This presently represents a *negative* multiple (below 1) on counsel's lodestar of $107,590,356.30.

## II.   BACKGROUND

### A.   Investigation and Litigation of DPPs' Claims

The Judicial Panel on Multidistrict Litigation ("JPML") created the *In re: Generic Pharmaceuticals Pricing Antitrust Litigation* MDL on August 5, 2016 via its initial Transfer Order. MDL Doc. No. 1. At that time, pursuant to 28 U.S.C. § 1407, the JMPL centralized a collection of factually similar cases in the Eastern District of Pennsylvania before the Honorable Cynthia M. Rufe. The cases consolidated at that time included DPPs' initial complaints, each of which required extensive investigations of generic drug markets, including reviewing public data

and statements and working with experts to analyze the market and potential overcharges. *See e.g., KPH Healthcare Servs., Inc. v. Lannett Co., Inc.,* 16-cv-02432-CMR, ECF No. 1 (E.D. Pa. May 18, 2016) (alleging doxycycline and digoxin price-fixing conspiracies).

The Court thereafter appointed Dianne M. Nast as Lead and Liaison Counsel for DPPs and appointed certain DPP counsel to a Plaintiffs' Steering Committee ("PSC"). *See* Pretrial Order Nos. 2 & 6, MDL Doc Nos. 36 & 84. Both before and after these appointments, counsel for DPPs litigated aggressively on behalf of the direct purchasers, continuing to investigate and file additional complaints, alleging additional conspiracies that broadened the scope of the MDL. *See, e.g., Rochester Drug Co-Operative, Inc. v. Fougera Pharm., Inc.,* 16-cv-06644-CMR, ECF No. 1 (E.D. Pa. Dec. 27. 2016) (alleging pravastatin price-fixing conspiracy). Each complaint required extensive investigation and the commitment of resources by counsel.

Within a year of the creation of the MDL, when its scope had expanded to include more than a dozen drugs, DPPs drafted and filed consolidated amended class action complaints on behalf of the various proposed direct purchaser classes. *See* PTO No. 23, MDL Doc. No. 347 (requiring amended pleadings by August 15, 2017). DPPs and co-counsel also negotiated, among other things, an orderly proposal for the Court to consider motions to dismiss. *See e.g.,* PTO No. 28 (Briefing on Motions to Dismiss), MDL Doc. No. 388.

Between October 2017 and January 2018, DPPs engaged in extensive and successful motion practice regarding Defendants' motions to dismiss DPPs' Clobetasol, Digoxin, Divalproex ER, Doxycycline, Econazole, and Pravastatin cases, resulting in the Court largely denying Defendants' motions to dismiss. *In re: Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 458 (E.D. Pa. 2018) (Rufe, J.) (denying Group 1 motions to dismiss except Defendant Teligent's motion as to Econazole cases).

By 2018, the MDL had expanded to include complaints brought by DPPs and other plaintiffs alleging multi-drug, overarching conspiracies. DPPs once again aggressively opposed Defendants' motions to dismiss, successfully defeating a joint defense motion to dismiss those overarching allegations with the assistance of co-plaintiffs. *See In re: Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 533 (E.D. Pa. 2019) (Rufe, J.).

Since the Court's decisions on motions to dismiss, DPPs and other parties have engaged in substantial fact discovery. DPPs and co-plaintiffs litigated a dispute over a scheduling order all the way to the United States Supreme Court. DPPs have actively participated in all phases of discovery in this MDL, including: hundreds of document requests, interrogatories, and requests for admission; the production and review of tens of millions of documents; dozens of depositions of Defendants' witnesses, as well as depositions of DPPs' named Plaintiffs; and significant motion practice before the Court and Special Masters on numerous discovery and case management disputes.

DPPs have also expended significant resources on expert issues, both to understand and analyze the voluminous data produced by Defendants concerning the many drugs at issue, and to prepare certain cases to serve as bellwethers. In November 2023, DPPs served two complex expert reports by economic experts and filed lengthy motions for class certification in two bellwether cases. The time and resources dedicated to these efforts were significant.

### B.  Settlements Reached to Date

In tandem with steadfastly pursuing their claims, DPPs also have aggressively pursued and achieved six settlements so far. DPPs reached their first two settlements on November 4, 2021, with Defendants Sun and Taro. These two initial settlements provided settlement funds totaling $75,000,000 after agreed reductions for opt-outs but before accrued interest. After deducting $80,000 for service awards to Named Plaintiffs and reimbursement of $6,800,000 for

certain case expenses as authorized by the Court, *see* MDL Doc. No. 2093 at ¶ 13, MDL Doc.
No. 2387 at ¶¶ 1-2, the Sun/Taro settlement fund had a value of $68,120,000. By its March 9,
2023 Order, the Court permitted DPPs to set aside one third of this latter amount for a future fee
petition. MDL Doc. No. 2387 at ¶ 3.

DPPs entered their third settlement on October 31, 2023 with Heritage, their fourth
settlement on December 22, 2023 with Apotex, and their fifth settlement on January 2, 2024 with
Breckenridge. These three settlement funds totaled $45,000,000 before accrued interest, with
reductions of up to $4,245,000 for opt-outs, or increases due to Most Favored Nation clauses. By
separate, pending motion, DPPs have asked to set aside one-third of each of these settlement
funds, inclusive of any accrued interest but net of the $4,500,000 they requested for expense
reimbursement and the $80,000 they requested for service awards to the Named Plaintiffs. *See*
Direct Purchaser Plaintiffs' Motion for an Order Granting: (1) Reimbursement of Expenses; (2)
Payment of Service Awards, and (3) A One-Third Set Aside of Each of the Apotex,
Breckenridge, and Heritage Settlement Funds, MDL Doc. No. 2957. These three settlements
therefore will have a net value of between $36,175,000 to $45,000,000, subject to increases for
any Most Favored Nation adjustments and interest, and depending on the extent of opt-out
reductions and whether the Court approves the requested reimbursement of expenses and grant
of service awards.

On February 28, 2024, DPPs entered their sixth settlement with Sandoz, for
$265,000,000 before accrued interest, with reductions of up to $31,800,000 for opt-outs, any
increases due to the Most Favored Nation clause, or reimbursement of up to the $2,000,000 for

expenses[1] and the $80,000 for service awards for which they are currently requesting approval by this Court. This settlement will therefore have a net value of between $231,120,000 to $265,000,000, subject to increases for any Most Favored Nation adjustments and interest, and depending on the extent of opt-out reductions and whether the Court approves the requested expense and service awards.

Assuming that all opt-out reductions are triggered, expenses are reimbursed as requested, and service awards are granted as requested, and that a Most Favored Nation clause is not triggered, DPPs' six settlement funds, before inclusion of interest, are valued collectively at $335,415,000. Before the addition of interest, 29% of these aggregated settlement funds would be $97,270,350. With or without accrued interest, the requested fee is substantially less than the $107,590,356.30 that counsel have expended in lodestar at historical hourly rates as reported in the Declaration of Dianne Nast, resulting in a multiplier currently below 1.

## III.   ARGUMENT

### A.  Class Counsel is Entitled to a Fair Fee Award

The common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.,* 582 F.3d 524, 540 (3d Cir. 2009) (quoting *In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 187 (3d Cir. 2005)). This is consistent with United States Supreme Court precedent recognizing that "persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful

---

[1] After deducting the expenses reimbursed as part of the Sun/Taro settlements, and those for which DPPs have previously sought reimbursement as part of the Apotex, Breckenridge, and Heritage settlements, DPPs have an additional $2,732,844.48 in unreimbursed expenses, and are seeking reimbursement of $2,000,000 of that amount at this time.

litigant's expense." *Boeing Co. v. VanGemert,* 444 U.S. 472, 478 (1980)). A court may "prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionally among those benefitted by the suit." *Id.*

"[T]he amount of a fee award … is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *In re AT&T Corp.,* 455 F.3d 160, 163-64 (3d Cir. 2006) (quoting *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 299 (3d Cir. 2005)). "Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method." *Id.* at 164 (citing *Rite Aid,* 396 F.3d at 300).

### 1. The Percentage Award Requested by Class Counsel is Reasonable

"In common fund cases such as this one, the percentage-of-recovery method is generally favored because 'it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure.'" *AT&T*, 455 F.3d at 164 (quoting *Rite Aid*, 396 F.3d at 300). "Therefore, counsel's compensation depends directly on the value created for the class." *In re Domestic Drywall Antitrust Litig.,* 2018 WL 3439454, at *2 (E.D. Pa. July 17, 2018). "The vast majority of courts of appeal now permit or direct district courts to use the percentage method in common-fund cases." MANUAL FOR COMPLEX LITIGATION § 14.231 (4th ed. 2011).

"The percentage-of-recovery method applies a certain percentage to the settlement fund." *AT&T,* 455 F.3d at 164 (citing *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 732 n.10 (3d Cir. 2001)). The percentage is "based on the net settlement fund after deducting the costs of litigation." *Bradburn Parent Teacher Store, Inc. v. 3M,* 513 F. Supp. 2d 322, 337 (E.D. Pa. 2007) (citation omitted). "[T]his approach increases the incentives for cautious expenditure and …

7

helps align the interests of the class more closely with those of counsel." *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 193 (E.D. Pa. 2000) (citations omitted).

"In determining what constitutes a reasonable percentage fee award, a district court must consider the ten factors … identified in *Gunter*, 223 F.3d 190,[2] and *Prudential*, 148 F.3d 283.[3]" *Diet Drugs,* 582 F.3d at 541. "They are: (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement." *Id.* (citing *Gunter,* 223 F.3d at 195 n.1; *Prudential*, 148 F.3d at 336-40).

"The fee award reasonableness factors 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *AT&T*, 455 F.3d at 166 (quoting *Rite Aid,* 396 F.3d at 301). Additionally, "[t]he *Gunter/Prudential* factors are not exhaustive." *Diet Drugs,* 582 F.3d at 541 n.34. "In reviewing an attorneys' fee award in a class action settlement, a district court should consider [those] factors …, and any other factors that are useful and relevant with respect to the particular facts of the case." *Id.* (quoting *AT&T,* 455 F.3d at 166). Here, all pertinent factors support the requested fee award.

---

[2] *Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000).*
[3] *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998).

a. *The size of the fund created, and the number of beneficiaries, support the requested percentage award.*

The six settlements reached by DPPs have created a common fund of more than $325 million for the benefit of a settlement class of more than 700 direct purchasers, thereby avoiding the uncertainty of continuing litigation against certain Defendants. Similar to counsel in *AT&T,* "[w]ith regard to the size and nature of the common fund, and the number of persons benefitted by the settlement … Lead Counsel [in this litigation] were able to obtain an excellent, sizeable result on behalf of the Class despite the substantial risks they faced in establishing liability." *See AT&T*, 455 F.3d at 169. Courts look favorably upon a fee award in cases such as this, where the "Settlement Agreement secures a recovery for the Settlement Class now, rather than the 'speculative promise of a larger payment years from now.'" *See Harshbarger v. Penn Mutual Life Ins. Co.,* 2017 WL 6525783, at *4 (E.D. Pa. Dec. 20, 2017) (quoting *In re Viropharma Inc. Sec. Litig.,* 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016)). Thus, the first factor weighs in favor of approving DPPs' requested fee.

b. *The absence of substantial objections to the requested settlement terms and/or fees supports the requested percentage award.*

DPPs have received, to date, no objections to any of the proposed settlements, which include the Apotex, Breckenridge, Heritage, Sun, and Taro settlements for which the objection deadline has long passed. The Notices informed class members to assume DPPs would be seeking up to a one-third fee, larger than the 29% fee sought now.

In affirming approval of the requested fee award in *AT&T,* the Third Circuit noted that out of more than one million class members notified of the proposed settlement, only eight submitted objections, with only four opposing the requested fee. *AT&T*, 455 F.3d at 166. The court further noted that no objections were filed by those with the greatest financial stake in the

settlement. *Id.* Thus, the Third Circuit agreed with the district court's conclusion that "the absence of substantial objections by class members to the fees requested by counsel strongly supports approval." *Id.* at 170.

In *Rite Aid,* 396 F.3d at 305, the court favorably referred to the fact that there were only two objections to the fee petition following the mailing of 300,000 notices, calling this "low level of objection" a "rare phenomenon." In *Vista Healthplan, Inc. v. Cephalon, Inc.,* 2020 WL 1922902, at * 28 (E.D. Pa. Apr. 21, 2020), the court approved the requested fee award in part because only one class member had objected, and 40,000 class members had submitted claims, "thus tacitly indicating their approval for the Settlement and requested attorneys' fees."

In *In re Cigna-American Specialty Health Administrative Fee Litig.,* 2019 WL 4082946, at *11 (E.D. Pa. Aug. 29, 2019), the court said that the lack of objections "evidences both a satisfactory result and a reasonable fee."

With a lack of objections here thus far, this second factor weighs in favor of approval of DPPs' requested fee. While the deadline for objections to the terms of the Sandoz settlement will remain pending until October 8, 2024, DPPs will promptly inform the Court before the final fairness hearing if any objections are received.

> c. *The skill and efficiency of the attorneys involved supports the requested percentage award.*

Counsel for DPPs collectively have decades of experience representing antitrust plaintiffs like the members of DPPs' classes here. Relying on that experience over the past eight years, DPPs have been able to successfully recover hundreds of millions of dollars for direct purchasers of generic drugs.

"The Third Circuit has explained that the goal of the percentage fee-award device is to ensure 'that competent counsel continue to undertake risky, complex, and novel litigation.'" *In re*

10

*Flonase Antitrust Litig.,* 291 F.R.D. 93, 104 (E.D. Pa. 2013) (quoting *Gunter,* 223 F.3d at 198).

Class counsel's skill and efficiency is measured by "the quality of the result achieved, the

difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise

of the counsel, the skill and professionalism with which counsel prosecuted the case[,] and the

performance and quality of opposing counsel." *Serrano v. Sterling Testing Sys., Inc.,* 711 F.

Supp. 2d 402, 420 (E.D. Pa. 2010) (quoting *Ikon*, 194 F.R.D. at 194). "[T]he single clearest

factor reflecting the quality of class counsels' services to the class are the results obtained."

*Flonase,* 291 F.R.D. at 104 (quoting *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 149 (E.D.

Pa. 2000)).

In affirming approval of the requested fee award in *AT&T,* the Third Circuit observed

that "because the case had been vigorously litigated for over four years, … class counsel had a

thorough and exhaustive appreciation for the merits of the case prior to settlement." *AT&T*, 455

F.3d at 167 (internal quotations and citations omitted). The court cited counsel's review and

analysis of over 4.5 million pages of documents produced by defendants and over 380,000

additional pages produced by non-party witnesses, their informal interviews of numerous

witnesses, their taking of more than 80 fact witness depositions, and their preparation of

numerous filings related to motions to dismiss, complex discovery motions, a class certification

motion, and a summary judgment motion. *Id.*[4] The Third Circuit further approvingly cited the

district court's conclusion that "Lead Counsel displayed excellent lawyering skills through their

consistent preparedness during court proceedings, arguments and the trial, and their well-written

and thoroughly researched submissions to the Court." *Id.* at 170.

---

[4] That case, unlike this one, proceeded through the first two weeks of trial before settlement. *Id.*

Similarly, in *Domestic Drywall,* this Court pointed to the fact that "Plaintiffs' counsel are experienced antitrust lawyers who have been working in this field of law for many years and have brought with them a sophisticated and highly professional approach to gathering persuasive evidence on the topic of price-fixing." *Domestic Drywall,* 2018 WL 3439454, at *18. The court noted that the "briefs filed by Plaintiffs' counsel were consistently of high quality," and added that "Plaintiffs' counsel were up against highly skilled defense counsel, who represented the Defendants in this case with vigor and substantive briefing to try to persuade this Court that Plaintiffs did not have a case, and should not be allowed to represent a class of direct purchasers. The Court considered the defense arguments carefully and considerably, but generally sided with the Plaintiffs because of the outstanding work of Plaintiffs' counsel as presented in this petition for approval of fees." *Id.*

Likewise, in *Ikon,* this Court cited not only the extensive experience and national reputation of Plaintiffs' counsel, but also the expertise of their counterparts. *Ikon,* 194 F.R.D. at 195. This Court noted that "defense counsel has a fine reputation and has displayed great skill in defending this complex class action. Their opposition to plaintiffs has been anything but token, and many of the battles on crucial issues were hard fought." *Id.*

Here, as in *AT&T*, *Domestic Drywall*, and *Ikon*, DPPs have extensive experience and have dedicated significant time to litigating and resolving claims on behalf of members of the settlement classes. Accordingly, the third factor weighs in favor of approval of the requested fee.

> **d. *The complexity and duration of the litigation supports the requested percentage award.***

The fourth factor "is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *Cigna,* 2019 WL 4082946, at *13 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 812 (3d Cir. 1995). "'[C]omplex and/or

novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours

spent on the case by class counsel' are factors which 'increase the complexity of class

litigation.'" *Vista Healthplan,* 2020 WL 1922902, at *29 (quoting *Cendant PRIDES,* 243 F.3d at

741).

      Few cases are as complex as this one, involving antitrust claims relating to 159 drugs

produced by 58 manufacturers spread across 40 defendant families. "Antitrust class actions are

particularly complex to litigate and therefore quite expensive." *McDonough v. Toys "R" Us,*

*Inc.,* 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015) (citations omitted). *See also Bradburn Parent*

*Teacher Store,* 513 F. Supp. 2d at 338-39 ("[C]ourts have stated that antitrust class actions are

perhaps the most complex cases to litigate.") (citations omitted); *In re Processed Egg Prods.*

*Antitrust Litig.,* 2012 WL 5467530, at *4 (E.D. Pa. Nov. 9, 2012) ("[A]ntitrust class action

litigation is complex, and, especially at its early stages, inherently rife with risk and

unpredictability in terms of ultimately prevailing to establish liability and damages and achieve

class certification.") (citations omitted).

      Similar to *AT&T,* this case from inception "involved complex legal and factual issues"

that have not been "straightforward or simple." *See AT&T,* 455 F.3d at 166 (citation omitted).

Again, similar to *AT&T,* plaintiffs here "had the burden of proving loss causation and damages,

which would likely involve conceptually difficult economic theories and complex calculations

based on experts with diametrically opposed opinions." *See id.* (internal quotations and citation

omitted). And, similar to *Rite Aid,* the "litigation presented layers of factual and legal complexity

which assured that, absent a global settlement, these disputes would take on Dickensian

dimensions." *See Rite Aid,* 396 F.3d at 305. Therefore, the fourth factor weighs in favor of

approval of the requested fee.

*e.   The risk of nonpayment supports the requested percentage award.*

"Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *Cigna,* 2019 WL 4082946, at \*13 (citations omitted). *See also Vista Healthplan,* 2020 WL 1922902, at \*29 (citing the receipt of no payment during years of lengthy litigation and the risk of nonpayment as factors supporting the requested fee). The substantial likelihood of challenge on appeal in the event of a recovery at trial further illustrates the risk of nonpayment. *Id.*

DPPs have spent the better part of a decade and hundreds of thousands of hours litigating this case with no guarantee of recovery. As in *AT&T,* "[h]aving accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award, Lead Counsel nonetheless maintained vigor and dedication throughout." *See AT&T,* 455 F.3d at 171.

This case is similar in additional ways to *AT&T,* where, in assessing risks, the Third Circuit pointed to the fact that the defendants had "vehemently denied any wrongdoing," had "asserted a reasonable basis existed" for its actions, and had "intended to call key witnesses … who would support this assertion." *Id.* at 167 (citations omitted). The Third Circuit approvingly cited the district court's conclusion that the settlement "represents an excellent result for the Class considering the substantial risks Plaintiffs faced, and the absence of any guarantee of a favorable verdict." *Id.* (citations omitted). Here, Defendants have likewise mounted a tenacious defense at all phases of the litigation. The fifth factor therefore weighs in favor of approval of DPPs' requested fee.

          *f.*   *The amount of time devoted to the case by Plaintiffs' counsel supports the requested percentage award.*

As detailed in the attached Nast Declaration, DPPs have expended hundreds of thousands of hours investigating, litigating, and resolving cases in this MDL. Unlike many other pharmaceutical antitrust cases, DPPs' cases here involve not one product but more than a hundred. Unlike many other antitrust cases in general, this case involves not just a handful of defendants but many dozens. The size and scope of this case have necessitated a significant dedication of attorney resources.

As in *Processed Egg Products*, "Plaintiffs have taken several steps to make their work on this litigation as efficient as possible. The amount of time spent on this case prior to final approval of the settlement most likely reflects the complexity of the Plaintiffs' claims, not the inefficiency of their counsel. Presumably, the thousands of hours counsel spent working on this matter prevented those individuals from litigating other cases. This factor thus strongly favors granting the motion for attorneys' fees." *Processed Egg Products,* 2012 WL 5467530, at *4.

The Nast Declaration summarizes the quantity and kind of work performed by DPP attorneys, and while DPPs can furnish detailed, daily time records at the Court's request, "[i]n large cases, especially one of prodigious proportions like this, reliance on summaries is certainly within the discretion of the district court." *Diet Drugs,* 582 F.3d at 539. *See also Rite Aid,* 396 F.3d at 306-07 ("[C]ourts may rely on summaries submitted by the attorneys and need not review actual billing records.") (citing *Prudential,* 148 F.3d at 342, which found "no abuse of discretion where the district court 'reli[ed] on time summaries, rather than detailed time records.'"). Accordingly, this sixth factor weighs in favor of approval of DPPs' requested fee.

15

*g.   The awards in similar cases support the requested percentage award.*

"While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund." *Vista Healthcare,* 2020 WL 1922902, at *30 (citation omitted) (collecting cases); *Cigna,* 2019 WL 4082946, at *13 (citing *Gen. Motors,* 55 F.3d at 822). *See also Harshbarger,* 2017 WL 6525783, at *4 (referencing range of nineteen to forty-five percent of the common fund) (citing *Gen. Motors,* 55 F.3d at 822); *McDonough,* 80 F. Supp. 3d at 653 (same) (citations omitted).

"A one-third fee award is standard in complex antitrust cases of this kind." *Flonase,* 291 F.R.D. at 104. "Indeed, a one-third award 'is consistent with awards in other complex antitrust actions involving the pharmaceutical industry.'" *Id.* (quoting *In re Remeron Direct Purchaser Antitrust Litig.,* 2005 WL 3008808, at *16 (D. N.J. Nov. 9, 2005) (collecting cases).

Here, DPPs are seeking a 29% fee award, which is less than the one-third that is standard in many complex antitrust cases, and reasonable given the size of the recovery and extraordinary effort DPPs have expended in these matters. While "it may be appropriate in some circumstances for fee percentages in large recovery cases to be smaller than those with smaller recovery cases, 'there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund'." *AT&T,* 455 F.3d at 174 (quoting *Rite Aid,* 396 F.3d at 303). To the contrary, the Third Circuit has "recognized the declining percentage principle is 'criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.'" *Id.* at 174 n.10 (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 284 n.55 (3d Cir. 2001)). This Court has been one such critic, stating:

> This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements. More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizable. It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage…. Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give sufficient weight to the fact that "large attorneys' fees serve to motivate capable counsel to undertake these actions."

*Ikon,* 194 F.R.D. at 197 (quoting *In re Gen. Motors,* 55 F.3d at 801).

Applying the above reasoning, this Court noted that "[t]here are … courts that have simply declined to adjust the 'standard' percentage, even in the fact of a huge recovery," and followed suit, stating that it "will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent." *Id.* at 196. This is consistent with Third Circuit jurisprudence directing that "the declining percentage concept does not trump the fact-intensive *Prudential/Gunter* analysis." *AT&T,* 455 F.3d at 174 (quoting *Rite Aid,* 396 F.3d at 303). The seventh factor therefore weighs in favor of approval of the requested fee.

> h.  *The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups supports the requested percentage award.*

In *AT&T,* the Third Circuit noted that counsel had not been aided by a government investigation. *Id.* at 173. The Eastern District of Pennsylvania has similarly favorably cited the lack of other investigations when considering fee awards in other cases. *See, e.g., Cigna,* 2019 WL 4082946, at *14; *Domestic Drywall,* 2019 WL 3439454, at *18; *Flonase,* 291 F.R.D. at 104-

05. However, the existence of a government investigation is not determinative. *See Diet Drugs,* 582 F.3d at 544 (not reducing a fee award based on work done in other cases, noting that despite what those cases may have added to the MDL litigation, "the recoveries arising from the MDL were due to the 'herculean efforts' of the PMC—in developing the case against [the defendant], in negotiating an agreement that allowed [the defendant] to resolve the claims against it, and in amending the Settlement Agreement when it appeared to be in jeopardy.").

Here, DPPs have reached resolution with more Defendants before most co-counsel in the MDL and before the States litigating in the District of Connecticut. However, the Department of Justice has conducted investigations of many of the same manufacturers and resolved claims with some of them prior to DPPs' settlements. On the whole, therefore, this eighth factor is neutral to approval of the requested fee.

> i.   *The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained supports the requested percentage award.*

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained." *Vista Healthcare,* 2020 WL 1922902, at *31 (quoting *In re Diet Drugs Prods. Liab. Litig.,* 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008)). This is because "the goal of the fee setting process [is] to determine what the lawyer would receive if he were selling his services on the market rather than being paid by Court Order." *Id.* (quoting *In re Linerboard Antitrust Litig.,* 333 F. Supp. 2d 243, 351 (E.D. Pa. 2004)).

"[I]n private contingency fee cases … plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." *Id.* (quoting *Ikon,* 194 F.R.D. at

194. *See also Cigna,* 2019 WL 4082946, at \*14 (citing customary contingent fee of thirty to forty

percent); *Harshbarger,* 2017 WL 6525783, at \*5 (same); *McDonough,* 80 F. Supp. 3d at 655

(same). In this case, DPPs are seeking 29% of the common benefit fund, after expenses and

service awards are deducted, which falls below this routinely negotiated range. Thus, this ninth

factor also weighs in favor of approval of the requested fee.

> j.  *Any innovative terms of settlement are neutral to the requested percentage award.*

"In certain cases, a district court may find that 'class counsels' representation and the

results achieved [by the settlement agreement] were 'nothing short of remarkable.'" *Vista*

*Healthcare,* 2020 WL 1922902, at \*31 (quoting *Prudential,* 148 F.3d at 339). "Such a finding

may be warranted where a settlement involved 'innovative' or unique terms." *Id.* (quoting

*Prudential,* 148 F.3d at 339). If there are no such remarkable or innovative terms, this is a neutral

factor that does not bear on the fee award. *See id.*; *Cigna,* 2019 WL 4082946, at \*14;

*Harshbarger,* 2017 WL 6525783, at \*5; *McDonough,* 80 F. Supp. 3d at 655; *Flonase,* 291

F.R.D. at 105; *Processed Egg Products,* 2012 WL 5467530, at \*6.

Here, each of DPPs' six settlements has followed a similar framework, influenced by the

years of experience DPPs' counsel have in resolving complex antirust cases. While these

settlements do not feature any innovative terms, this factor is neutral to approval of the requested

fee.

> 2.  The Lodestar Cross-Check Confirms that the Percentage Award Requested by Class Counsel is Reasonable

The Third Circuit has "recommended that district courts use the lodestar method to cross-

check the reasonableness of a percentage-of-recovery fee award." *AT&T*, 455 F.3d at 164 (citing

*Rite Aid,* 396 F.3d at 305, and *Prudential,* 148 F.3d at 333). "The lodestar method multiplies the

number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Id.* (quoting *Cendant PRIDES*, 243 F.3d at 732 n.11). "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *Id.* This "need not entail 'mathematical precision' or 'bean counting.'" *Id.* at 169 n.6 (quoting *Rite Aid*, 396 F.3d at 306). Cross-checking involves only an "abridged lodestar analysis," *Cigna,* 2019 WL 4082946, at *14, and "not a full-blown lodestar inquiry." *AT&T*, 455 F.3d at 169 n.6 (quoting *Rite Aid,* 396 F.3d at 307 n.16).

"The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id.* at 164 n.4 (quoting *Rite Aid*, 396 F.3d at 305-06); *Diet Drugs,* 582 F.3d at 540 n.33 (quoting *Rite Aid*, 396 F.3d at 305-06). "Accordingly, when used as a cross-check in a common fund case, the lodestar calculation can be adjusted to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved." *AT&T*, 455 F.3d at 164 n.4 (citing *Gunter,* 223 F.3d at 195 n.1).

"[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Prudential,* 148 F.3d at 341 (citing 3 *Newberg on Class Actions* § 14.03 at 14-15 (3d ed. 1992)). However, the "lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *AT&T*, 455 F.3d at 164 (citing *Rite Aid,* 396 F.3d at 307). Indeed, the lodestar multiplier "need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *Id.* at 172-73 (quoting *Rite Aid,* 396 F.3d at 307).

Here, DPPs' lodestar at historical billing rates is $107,590,356.30 and represents nearly 275,000 hours of professional work over the course of the better part of decade. In this unique

case, where there are over a hundred different drugs at issue, dozens of Defendants that have produced tens of millions of documents and dozens of witnesses for deposition, four class representatives that have been required to respond to extensive discovery themselves, and countless hard-fought disputes, the significant amount of time and effort DPPs have expended is reasonable.

Moreover, DPPs' lodestar is ultimately larger than the requested fee of 29%. "Where the lodestar is greater than the requested fee award, however, the court may dispense with a cross-check." *Glaberson v. Comcast Corp.,* 2015 WL 5582251, at *14 (E.D. Pa. Sept. 22, 2015) (citing *Fleisher v. Fiber Composites, LLC,* 2014 WL 866441, at *15 (E.D. Pa. Mar. 5, 2014) ("Where, as here, counsel requests a fee that represents less than their lodestar, there is no need to discuss multipliers and the appropriateness of an increase to the lodestar."). *See also Flonase,* 291 F.R.D. at 106 ("A negative multiplier strongly underscores the risk counsel accepted to prosecute this case to trial" and "[t]he lodestar crosscheck therefore provides additional support for approving the attorneys' fees request."). A lodestar cross-check, therefore, supports the reasonableness of DPPs' requested fee of 29%.

### B.  The Expenses Requested by Class Counsel are Reasonable

"In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to granting fee awards." *McDonough,* 80 F. Supp. 3d at 658 (citing *AT&T,* 455 F.3d at 169). *See also Ikon,* 194 F.R.D. at 192 ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of … *reasonable* litigation expenses from that fund.") (emphasis in original) (citation omitted).

As provided in Exhibit B to the attached Nast Declaration, DPPs have incurred more than $14,000,000 in expenses in this litigation. The Court has previously granted DPPs reimbursement of $6,800,000 in expenses, but even assuming that DPPs' separate request for

21

reimbursement of $4,500,000 in expenses from the Apotex, Breckenridge, and Heritage settlements for $4,500,000 is granted, DPPs will have at least $2,700,000 in unreimbursed expenses remaining, with more to be incurred while they continue litigating against the remaining Defendants. The Notice DPPs disseminated to members of the Sandoz Settlement Class informed them that DPPs would seek reimbursement of up to $2,000,000 in expenses, which is less than the outstanding expenses DPPs have incurred to date.

Early in this MDL, this Court entered Pretrial Order No. 8, specifying appropriate categories of common benefit expenses. *See* Pretrial Order No. 8 ("PTO 8") at p. 3-6. As explained in the attached Nast Declaration, DPPs have incurred and continue to incur reasonably appropriate expenses that are consistent with the framework outlined in PTO 8. Consistent with Third Circuit precedent, reasonable expenses under PTO 8 include: assessments; deposition and court reporter costs; costs for the electronic storage, retrieval, and searches of ESI; Court, filing, and service costs; expert witness and consultant fees and expenses; data and materials provided by outside third-party vendors, consultants, and attorneys; and bank and financial charges. *Cf.* PTO 8; *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 226 (E.D. Pa. 2014) (finding reasonable expenses to include "mediation costs, court filing fees, hearing transcripts, expert fees, [and] online research"); *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 467 n.21 (E.D. Pa. 2008) (finding the following types of out-of-pocket expenses compensable: "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (1) postage, [and] (11) the cost of hiring a mediator").

As set forth above and in the accompanying Nast Declaration, DPPs have incurred $14,032,844.48 in expenses: $12,536,122.83 in expenses incurred by the litigation fund through August 31, 2024, and $1,492,953.07 in expenses incurred by the various DPP law firms and reported as part of their obligations under PTO No. 8 through February 29, 2024. These expenses exceed those reimbursed in connection to the Sun/Taro settlements and those for which DPPs have requested reimbursement in connection with the Apotex, Breckenridge, and Heritage settlements. These expenditures have been reasonably necessary to litigate DPPs' claims in this MDL, obtain settlements, and issue notice of those settlements. Because these expenses have been for the common benefit of the settlement class, are reasonable in amount, and are adequately supported by documentation in DPPs' possession, DPPs respectfully request reimbursement of $2,000,000 for expenses from the Sandoz settlement fund.

### C.  The Service Awards Requested Are Reasonable

"Courts recognize the purpose and appropriateness of service awards to class representatives." *Glaberson,* 2015 WL 5582251, at *16 (citations omitted). "Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *Flonase,* 291 F.R.D. at 106 (internal quotations and citation omitted); *McDonough,* 80 F. Supp. 3d at 664 (internal quotations and citation omitted).

"As a matter of practice, courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *Flonase,* 291 F.R.D. at 106 (internal quotations and citation omitted). This is because courts recognize "that there would be no benefit to the Settlement Class Members if

23

Plaintiffs had not stepped forward and prosecuted this matter to the current resolution." *Cigna,* 2019 WL 4082946, at *16; *Harshbarger,* 2017 WL 6525783, at *7.

"Factors to be considered when deciding to give incentive awards include 'the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class.'" *Vista Healthcare,* 2020 WL 1922902, at * 33 (quoting *McGee v. Ann's Choice, Inc.*, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014)).

Here, Class Counsel requests incentive awards in the amount of $20,000 each for four class representatives from the Sandoz Settlement. As in *Vista Healthcare,* "Class Counsel note that each of the … named Plaintiffs provided significant assistance to the case, including responding to written discovery, producing documents, and sitting for a deposition by Defendants. In addition, each named Plaintiff actively monitored the litigation and reviewed the Complaint and other substantive pleadings. Finally, the named Plaintiffs participated in mediation talks and were responsible for reviewing and approving the Settlement." *See id.*

The awards requested here are also consistent with awards this Court previously awarded. MDL Doc. No. 2387 at ¶ 2 (awarding DPPs' class representatives $20,000 service awards for the Sun and Taro settlements). Moreover, Courts in this Circuit and elsewhere often compensate class representatives for their services in amounts comparable to or exceeding the $20,000 that DPPs request here for each Class Representative. *See e.g., In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004) (approving service awards of $25,000 to each of five class representatives); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 752 (E.D. Pa.

2013) (finding "an incentive award of $50,000 and $40,000 is within the range of payments awarded by courts within the Third Circuit in other direct purchaser antitrust litigation"); *Bradburn Parent Teacher Store,* 513 F. Supp. 2d at 342 (approving service award of $75,000 to class representative); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (approving service awards representing an aggregate of "approximately 0.3% of each class's recovery"); *In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 3170586, at *2 (S.D.N.Y. June 15, 2020) (approving service awards of $75,000 to each class representative); *In re Solodyn Antitrust Litig.*, 2018 WL 7075881, at *2 (D. Mass. July 18, 2018) (approving service awards of $90,000 to each class representative); *Remeron,* 2005 WL 3008808, at *3, 18 (approving service awards totaling $60,000 for two class representatives from a $75,000,000 settlement fund); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-md-02445-MSG, Order Granting Final Judgment and Order of Dismissal Approving Direct Purchaser Class Settlement and Dismissing Direct Purchaser Claims, ECF No. 1000, ¶ 13 (E.D. Pa. Feb. 27, 2024) (awarding service awards of $100,000 each for three DPP class representatives).

Accordingly, because the Class Representatives' contributions have benefited the entire class, DPPs respectfully submit this request for service awards of $20,000 for each Class Representative to be paid from the Sandoz Settlement Fund.

## IV.   CONCLUSION

For the reasons set forth above, DPPs respectfully request that the Court enter the attached proposed Order Granting Direct Purchaser Plaintiffs' Motion for: (1) An Award of Attorneys' Fees; (2) Reimbursement of Expenses; and (3) Payment of Service Awards.

Dated: September 23, 2024

Respectfully submitted,

_Dianne M. Nast_

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
dnast@nastlaw.com

*Lead and Liaison Counsel*
*for Direct Purchaser Plaintiffs*

David F. Sorensen
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net

Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
800 Third Avenue, 38th Floor
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com

Michael L. Roberts
ROBERTS LAW FIRM P.A.
1920 McKinney Ave., Suite 700
Dallas, Texas 75201
(501) 821-5575
mikeroberts@robertslawfirm.us

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, Massachusetts 02109
(617) 482-3700
tom@hbsslaw.com

Linda P. Nussbaum
NUSSBAUM LAW GROUP, PC
1133 Avenue of the Americas, 31st Floor
New York, New York 10036
(917) 438-9189
lnussbaum@nussbaumpc.com

*Direct Purchaser Plaintiffs' Steering Committee*