**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL NO. 2724<br><br> 16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*All End-Payer Plaintiffs' Actions* | HON. CYNTHIA M. RUFE |

**<u>MEMORANDUM OF LAW IN SUPPORT OF END-PAYER CLASS COUNSEL'S
MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS</u>**

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................... 3

   A.  EPP Class Counsel's Fact Investigation and Initial Complaints .............................. 3

   B.  EPP Class Counsel's Successful Opposition of Defendants' Motions to Dismiss............... 4

   C.  EPP Class Counsel's Extensive Work  in Discovery ................................................ 4

   D.  EPP Class Counsel's Successful Opposition to Additional Motions to Dismiss ............... 13

   E.  EPP Class Counsel's Leading Role in Case Management Issues......................................... 14

   F.  EPP Class Counsel's Continued and Vigorous Prosecution of the Bellwether Cases ........ 15

   G.  EPP Class Counsel's Successful Motion for Certification of the Bellwether Classes ........ 16

   H.  EPP Class Counsel Have Obtained Settlements that Confer Significant Benefits Upon the EPP Settlement Classes ........................................................................................... 18

III.  ARGUMENT .......................................................................................................... 20

   A.  Class Counsel Are Entitled to a Fair Fee Award........................................................ 20

      1.  The Percentage Award Requested by Class Counsel is Reasonable................................ 20

      2.  The Lodestar Cross-Check Confirms that the Percentage Award Requested by Class Counsel is Reasonable ................................................................................ 32

   A.  The Expenses Requested by Class Counsel are Reasonable................................................. 34

   B.  The Service Awards Requested Are Reasonable................................................................. 36

IV.  CONCLUSION .................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

*Cases*

*Alin v. Honda Motor Co.*,
    2012 WL 8751045 (D.N.J. Apr. 13, 2012) ............................................................................ 38

*Boeing Co. v. VanGemert*,
    444 U.S. 472 (1980) .............................................................................................................. 20

*Bradburn Parent Teacher Store, Inc. v. 3M*,
    513 F. Supp. 2d 322 (E.D. Pa. 2007) ............................................................................ 21, 25

*Fleisher v. Fiber Composites, LLC*,
    No. 12-cv-1326, 2014 WL 866441 (E.D. Pa. Mar. 5, 2014)................................................ 34

*Glaberson v. Comcast Corp.*,
    No. 03-cv-6604, 2015 WL 5582251 (E.D. Pa. Sept. 22, 2015) ..................................... 34, 36

*Gunter v. Ridgewood Energy Corp.*,
    223 F.3d 190 (3d Cir. 2000).................................................................................... 21, 23, 33

*Harshbarger v. Penn Mutual Life Ins. Co.*,
    No. 12-cv-6172, 2017 WL 6525783 (E.D. Pa. Dec. 20, 2017).............................. 22, 28, 31, 36

*In re AT&T Corp.*,
    455 F.3d 160 (3d Cir. 2006) ...................................................................................... passim

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)................................................................................................ 29

*In re Cendant Corp. PRIDES Litig.*,
    243 F.3d 722 (2001) ...................................................................................................... 25, 32

*In re CertainTeed Fiber Cement Siding Litig.*,
    303 F.R.D. 199 (E.D. Pa. 2014) ......................................................................................... 35

*In re Cigna-American Specialty Health Admin. Fee Litig.*,
    No. 16-cv-03967, 2019 WL 4082946 (E.D. Pa. Aug. 29, 2019) ................................. passim

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
    582 F.3d 524 (3d Cir. 2009) ....................................................................................... passim

*In re Diet Drugs Prods. Liab. Litig.*,
    553 F. Supp. 2d 442 (E.D. Pa. 2008) ................................................................................. 31

*In re Domestic Drywall Antitrust Litig.*,
No. 13-MD-2437, 2018 WL 3439454 (E.D. Pa. July 17, 2018) .................................. 20, 24, 37

In re Flonase Antitrust Litig., 291 F.R.D. 93 (E.D. Pa. 2013) .................................... 23, 28, 34, 36

*In re Gen. Motors Corp. Pick- Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .................................................................... 25, 28, 30

*In re Generic Digoxin & Doxycycline Antitrust Litig.*,
222 F. Supp. 3d 1341 (J.P.M.L. 2017) ........................................................................ 3

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) .......................................................................... 4

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019) .......................................................................... 4

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 16-CB-27242, 2022 WL 1470272 (E.D. Pa. May 10, 2022) ............................... 4

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 16-CB-27242, 2024 WL 4980784 (E.D. Pa. Dec. 3, 2024) ........................................ 10, 16

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 16-CB-27242, 2025 WL 478178 (E.D. Pa. Feb. 12, 2025) ............................... 10

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 16-CB-27242, 2025 WL 754567 (E.D. Pa. Mar. 7, 2025) ............................... 17

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000) ................................................................... passim

*In re Linerboard Antitrust Litig.*,
333 F. Supp. 2d 343 (E.D. Pa. 2004) .......................................................................... 31

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) .................................................................... 19, 31

*In re Processed Egg Prods. Antitrust Litig.*,
No. 08-md-2002, 2012 WL 5467530 (E.D. Pa. Nov. 9, 2012) .......................................... 25, 27

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) ................................................................... 21, 28, 32, 33

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005) ................................................................................ 29

*In re Remeron Direct Purchaser Antitrust Litig.*,
No. 03-cv-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ................................... 29

*In re Rite Aid Corp. Secs. Litig.*,
  396 F.3d 294 .................................................................................................... passim

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  No. 13-MD-2445, 2023 WL 8437034 (E.D. Pa. Dec. 4, 2023) ......................... 19, 31

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  No. 13-MD-2445, 2024 WL 815503 (E.D. Pa. Feb. 27, 2024) ......................... 19, 31

*In re Viropharma Inc. Sec. Litig.*,
  No. 12-cv-2714, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) .................................... 22

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  No. 06-1797, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) .................................... 37

*McDonough v. Toys "R" Us, Inc.*,
  80 F. Supp. 3d 626 (2015) ............................................................................... passim

*McGee v. Ann's Choice, Inc.*,
  No. 12-cv-2664, 2014 WL 2514582 (E.D. Pa. June 4, 2014) ........................... 36, 37

*Mehling v. New York Life Ins. Co.*,
  248 F.R.D. 455 (E.D. Pa. 2008) ............................................................................. 35

*Serrano v. Sterling Testing Sys., Inc.*,
  711 F. Supp. 2d 402 (E.D. Pa. 2010) .................................................................... 23

*Shore Hematology-Oncology Assocs. v. Bristol-Myers Squibb Co.*,
  No. 04-cv-248, 2004 WL 7348048 (D.D.C. Nov. 30, 2004) .................................... 29

*United States. See In re Actavis Holdco U.S., Inc.*,
  No. 19-3549, 2019 WL 8437021 (3d Cir. Dec. 6, 2019) ......................................... 14

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  No. 06-cv-1833, 2020 WL 1922902 (E.D. Pa. Apr. 21, 2020) ......................... passim

**Rules**

Federal Rule of Evidence 1006 .................................................................................... 12

**Other Authorities**

3 *Newberg on Class Actions* § 14.03 at 14-15 (3d ed. 1992) ..................................... 33

## I.    <u>INTRODUCTION</u>

Over the course of more than eight years in this expansive multidistrict litigation, Lead Counsel, the Plaintiffs' Steering Committee, and other firms working for the benefit of the End-Payer Plaintiffs and the putative classes that they represent (together "Class Counsel"), have actively prosecuted this action on behalf of indirect purchasers of various generic drugs. In eighteen individual drug complaints and two multi-drug complaints, EPPs have alleged that more than thirty manufacturers of generic pharmaceuticals unlawfully inflated the prices of hundreds of different products. This Court has presided over each step of the litigation thus far, including denying Defendants' motions to dismiss six of the EPPs' individual drug complaints; denying Defendants' motions to dismiss the EPPs' first multi-drug complaint that alleged an "overarching conspiracy" among Defendants; ruling on numerous discovery motions; including one motion that was briefed before the Third Circuit and the United States Supreme Court; and granting the motions to certify the End-Payer Classes in the bellwether cases.

As explained in the accompanying Declaration of Roberta D. Liebenberg, EPPs have expended more than 670,900 hours of uncompensated professional time on these matters, as well as millions of dollars in unreimbursed out-of-pocket expenses, and the Named Plaintiffs have been subject to extensive discovery obligations. *See* Declaration of Roberta D. Liebenberg in Support of End Payer Class Counsel's Motion for Attorneys' Fees, Expenses, and Service Awards ("Liebenberg Decl."). The Court is thoroughly familiar with the efforts expended on both sides of the litigation, the novelty and complexity of the issues, and the substantial risk that EPPs and their counsel could come away from this litigation empty-handed.

As this Court is aware, EPPs recently reached a $275,000,000 settlement with Sandoz Inc. and Fougera Pharmaceuticals ("Sandoz"), which the Court has preliminarily approved. The settlement confers a significant benefit upon the class, and it is the largest settlement, to date,

that has been achieved by any plaintiffs' group  in the MDL.

For the risks undertaken, the resources invested, and the results achieved to date, Class Counsel respectfully seek an award of attorneys' fees equivalent to one-third of the Sandoz settlement fund, inclusive of accrued interest but net of the costs of notice and administration of the fund, any reimbursed expenses, and any service awards. This requested award is fair and reasonable based on the factors that courts in this Circuit routinely employ and is within the range of fees ordinarily awarded in this District and throughout the Third Circuit.

Class Counsel also respectfully request that the Court approve the payment of $25,700,911.41 in unreimbursed expenses incurred by Class Counsel from the inception of this litigation through the end of 2024. While Class Counsel sought to keep expenses low by splitting certain expenses with other plaintiff groups, the necessities of this complex litigation required significant expert work and other costs. Class Counsel also request service awards of $30,000 to each of the Third-Party Payer Class Representatives and $5,000 to each of the Consumer Class Representatives in recognition of the time and effort they have expended during the course of this litigation.

Depending on the extent to which the opt-out reduction is triggered, Class Counsel's request falls within the range of $67,713,029.53 to $82,713,029.53 (before the inclusion of accrued interest). In the unlikely event that the upper number in that range is reached (*i.e.*, in the event that there is no opt-out reduction), the request would represent only 24.91% of the total lodestar Class Counsel have expended in this litigation. In other words, Class Counsel's ask is that they receive compensation for, at most, only 24.91% of their work at this time.[1]

---

[1] Class Counsel intend to ask for additional fees out of later settlements and judgments.

## II.  BACKGROUND

Since this MDL began in March 2016, Counsel for EPPs have taken the laboring oar in pursuing this litigation and implementing an effective litigation strategy against dozens of major drug manufacturers who are represented by some of the country's largest and most experienced law firms. Uniquely among the three class plaintiff groups (EPPs, DPPs, and IRPs, collectively "Class Plaintiffs"), EPPs took the lead or played a principal role in *every* significant aspect of this MDL.

### A.  EPP Class Counsel's Fact Investigation and Initial Complaints

This MDL began in March 2016, when EPPs filed **antitrust complaints** concerning digoxin and doxycycline, and the Judicial Panel for Multidistrict Litigation ("JPML") created MDL 2724. Thereafter, EPPs filed 16 cases concerning 16 additional drugs, and the JPML transferred those cases to this Court and expanded the scope of MDL 2724. *See In re Generic Digoxin & Doxycycline Antitrust Litig*., 222 F. Supp. 3d 1341, 1344 (J.P.M.L. 2017). Much of the work that was done in investigating and drafting those initial complaints was done without the benefit of a prior  complaint, governmental or otherwise. Specifically, of the 18 single-drug cases, 17 were originated by EPPs and/or DPPs, while only one (glyburide) was a follow-on to a case filed by the State Attorneys General ("States"). Notably, EPPs' complaints named all of the largest and most central Defendants, including Mylan, Sandoz, Taro, and Teva, before the States' complaints did.[2] Later, in June 2018 and December 2019, EPPs filed two complaints alleging an

---

[2] All told, EPPs named 29 defendants in an MDL complaint before the States did:  Actavis, Akorn, Alvogen, Apotex, Breckenridge, Camber, Dr. Reddy's, Epic, G&W, Glenmark, Impax, Jubilant Cadista, Lannett, Lupin, Mallinckrodt, Mylan, Oceanside/Bausch, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, and Zydus. The States first named nine MDL defendants: Amneal, Ascend, Aurobindo, Citron, Emcure (not sued by EPPs), Greenstone/Pfizer, Heritage, Mayne, and Strides (not sued by EPPs).

overarching conspiracy in the generic pharmaceutical industry, and those complaints identified additional drugs and additional Defendants – some of which were (again) not identified in any of the States' (or anyone else's) complaints.

**B.  EPP Class Counsel's Successful Opposition of Defendants' Motions to Dismiss**

From the start, EPPs took a leading role in organizing and driving this massive MDL, including taking the lead for plaintiffs on common issues at virtually every general and leadership status conference with the Court. One of the first such issues confronting the Court was how to manage **motions to dismiss** when dozens of complaints had been filed in the MDL. EPPs negotiated and litigated a sequenced schedule under which Defendants would first move to dismiss certain class action complaints with respect to six drugs, and thereafter could move to dismiss additional complaints at later dates. MDL Doc. 388. Defendants filed their motions to dismiss EPPs' complaints with respect to those six drugs, which EPPs opposed. The Court denied, almost in their entirety, both of Defendants' motions. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 458 (E.D. Pa. 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 852 (E.D. Pa. 2019). Later, EPPs defeated a second round of motions to dismiss and to strike certain allegations, filed by several Defendants regarding EPPs' state law claims. *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CB-27242, 2022 WL 1470272, at *11 (E.D. Pa. May 10, 2022).

**C.  EPP Class Counsel's Extensive Work  in Discovery**

While Defendants' motions to dismiss were pending in 2017, Defendants and DOJ both sought to stay discovery until after resolution of all pending and forthcoming motions to dismiss. MDL Docs. 426, 492, 516. EPPs took the lead on behalf of all Plaintiffs in opposing the **motions to stay** and cross-moving for **permission to conduct certain discovery**. MDL Docs. 523, 524. On February 9, 2018, the Court denied the motions to stay, granted Plaintiffs' cross-motion for

targeted discovery, and authorized certain discovery to proceed immediately. *See* PTO 44, MDL Doc. 560. Later, as DOJ asked for extensions of the partial discovery stay, EPPs continued to take the lead in negotiating with DOJ to craft proposed pretrial orders that lifted the partial stay of discovery as it applied to employee documents. *See* PTO 60, MDL Doc. 774; PTO 73, MDL Doc. 853. Those negotiations allowed EPPs to continue developing the case even while DOJ's investigation was proceeding. In the years thereafter, EPPs negotiated with DOJ regarding serial renewals (and the narrowing) of the limited stay of discovery (*see* PTO 47, MDL No. 582; PTO 60, MDL No.774; PTO 73, MDL No. 853; PTO 96, MDL No. 1046; PTO 117, MDL No. 1325; PTO 126, MDL No. 1409; PTO 136, MDL No. 1494; PTO 147, MDL No. 1613; PTO 156, MDL No.1686; PTO 166, MDL No. 1739; PTO 173, MDL No. 1781; PTO 174, MDL No. 1787; PTO 181, MDL No. 1820; PTO 200, MDL No. 2045); took a leading role in briefing to the Court concerning disputes related to that stay; and in June 2024 negotiated the final termination of the stay for Class Plaintiffs and Direct Action Plaintiffs (*i.e.*, opt-outs) (together "Private Plaintiffs") (*see* PTO 276, MDL No. 3002).

EPPs expended considerable time and effort in negotiating and litigating <u>all</u> of the primary **discovery-related protocols and stipulations** in the MDL. Some of the most important, early-contested discovery issues were related to Defendants' arguments that discovery should proceed on a drug-specific basis, and to Defendants' attempts to silo discovery by limiting the use of documents to the individual drug-specific cases in which they were produced. EPPs spearheaded the oppositions to Defendants' efforts (MDL Doc. 517 at 8-10; MDL Doc. 518), and in an important victory for all plaintiff groups, the Court rejected Defendants' arguments, allowing material produced during discovery to be used in "any part of this MDL," PTO 45, MDL Doc. 561 at 11.

EPPs also negotiated the protocol that enabled <u>all</u> Private Plaintiffs to **gain access to documents that the States had gathered** during their non-public investigation of the generic pharmaceuticals industry. After the Court ordered that Plaintiffs should have access to those materials (*see* MDL Doc. 758), EPPs took the lead in extensive negotiations with Defendants and the States, with the assistance of the Special Master, to develop a plan for obtaining those important documents pursuant to the Court's Order. On January 31, 2019, the Court adopted the plan as PTO No. 70, known as the "AG Access Protocol." MDL Doc. 841. Later, EPPs negotiated modifications to the Protocol to account for the States' subsequent "Teva-centric" complaint, thus ensuring that all Private Plaintiffs had access to the broader universe of documents collected in the States' investigation. *See* PTO 106.

EPPs engaged in lengthy and extensive negotiations to develop other protocols in the case, as well. They were the lead negotiators on the initial **Protective Order**, PTO 53, and the detailed protocol for the production of electronically stored information, the **"ESI Protocol,"** PTO 95, MDL Doc. 583. Although agreement was reached on many issues, there were several discrete but significant disputes that EPPs briefed, including whether Defendants could redact documents for relevance, rather than only for privilege; technical issues relating to "email thread suppression"; and other metadata production issues. *See* MDL Docs. 584, 585, 587, 588, 602. EPPs presented argument on those issues at a July 11, 2018, hearing, MDL Doc. 649, submitted supplemental briefing, MDL Doc. 879, and presented extensive oral argument in front of the ESI Special Master. On April 10, 2019, the Court ruled in Plaintiffs' favor on the redaction dispute, prohibiting Defendants from redacting documents on grounds of relevance. *See* MDL Doc. 938. This important victory permitted all plaintiff groups to review and use full, rather than sanitized, versions of Defendants' documents.

As the case developed, EPPs led a successful effort to **modify the protective order** in order to allow for greater flexibility during depositions of Defendants' witnesses by allowing Defendants' employees to be examined with documents produced by other Defendants with whom the witness is alleged to have conspired. Defendants opposed those efforts, but after extensive negotiations and litigation before Special Master Marion, the Court implemented the relief EPPs sought on behalf of all plaintiffs when it entered PTO 195 (*see* PTO 195, MDL Doc. 1976 ¶¶ 5.3j, 5.3.l).

EPPs also took the lead in drafting and negotiating a protocol for proceedings among the parties and the Special Masters to address **discovery disputes**, which this Court entered as PTO 68, MDL Doc. 823. Later, EPPs led an effort to modify the Special Master Protocol to allow the expedited mediation of disputes (*see* PTO 163, MDL Doc. 1707 ¶ 6), thus making dispute resolution more efficient and flexible.

In 2018, after obtaining the Court's permission to proceed with certain discovery under PTO 44, EPPs promptly **served nearly 100 requests for production** of documents and interrogatories on each of the 30-plus Defendants. Thereafter, EPPs engaged in dozens of time-consuming negotiations with Defendants, on both individual and global issues. While plaintiffs were able to resolve many issues through extensive meet-and-confers, the parties reached impasse with respect to certain global issues, primarily the definitions of "Relevant Time Period," "Drugs at Issue," "Defendants," and "Competitors," which were critical to defining the scope of discovery and required comprehensive briefing. MDL Docs. 714, 756, 761, 762, 764-771. EPPs argued those issues before the Special Discovery Master during a lengthy in-person session on December 18, 2018. On January 8, 2019, the Special Discovery Master issued a recommended resolution of the disputed definitions, which all parties except two Defendants

accepted. EPPs engaged in further meetings and negotiations with those two Defendants and the Special Discovery Master, ultimately achieving a favorable resolution. *See* PTO 82, MDL No. 930. With assistance from the States, EPPs negotiated the search terms to be applied to Defendants' custodial documents and litigated the related disputes before Special Master for ESI Dan Regard.

On a separate track from the negotiations over global discovery issues, EPPs spent many months negotiating with individual Defendants concerning all manner of **document production issues**: selection of custodians and search terms, search methodologies, how to manage collection and production of documents without individual attorney relevance review under PTO 105, MDL Doc. 1135 (subject to a clawback right), production of "go-get" documents, and production deadlines. EPPs again took the lead on behalf of all plaintiffs' groups in engaging all Defendants in hundreds of meet-and-confers. Those discussions often required the input of technical experts. To that end, EPPs hired a vendor on behalf of all plaintiff groups to provide e-discovery expertise and assistance in meet and confers with Defendants on issues such as how to search Defendants' collection of text messages using mobile phone numbers as search terms. EPPs also conducted related legal research on a range of issues such as privacy law, e-discovery, and preservation obligations.

After the scope of the MDL expanded in 2019 with the filing of additional complaints, EPPs drafted, served, and led negotiations concerning all plaintiffs' **second set of document requests and second set of interrogatories**. Those discovery requests sought documents and information from Defendants who had been added to the MDL in 2019, and they expanded the relevant time period for previously sued Defendants as part of "Phase 2" discovery. *See* PTO 153, MDL Doc. 1648.

When the parties' discussions reached impasse, EPPs frequently took the lead in drafting letter-briefs and arguing **issues before the Special Masters** on a range of issues, including:

- The adequacy of Mylan's interrogatory responses regarding employees' personal cell phones;

- Mylan's production of calendars and contact files;

- Disputed Impax document custodians;

- Whether Sandoz's former Presidents and CEOs should be document custodians;

- Whether Lupin and Lannett executive assistants should be document custodians;

- Assertions of Fifth Amendment privileges by certain former employees in response to document subpoenas;

- Defendant-specific search term disputes involving Defendants Mylan and Sandoz;

- The temporal scope of Defendants' transaction data productions;

- Former Actavis employee Michael Perfetto's motion for a protective order seeking to stay his deposition pending the outcome of the criminal trial of Ara Aprahamian;

- Mylan's objections to Plaintiffs' 30(b)(6) notice;

- Reopening the Taro 30(b)(6) deposition due to improper assertions of privilege;

- Securing transaction data from Caremark, one of the nation's largest pharmacy benefit managers;

- Whether Defendants may obtain discovery about how third-party payers fund their health plans; and

- Whether Taro may withdraw its answers to requests for admissions, in which it admitted to participating in the conspiracies described in its deferred prosecution

agreement with the U.S. Department of Justice.

Many of these disputes established favorable precedents that governed related disputes with other Defendants and thus avoided duplicative litigation. For example, the resolution of the Caremark dispute cleared a significant hurdle relating to EPPs' collection of unprecedented amounts of transaction data from eight pharmacy benefit managers detailing end-payer transactions. Similarly, after Defendants recently moved to compel DAP insurers Humana, HCSC and Molina to produce documents relating to their premium-setting processes and the "spread pricing" practices of pharmacy benefit managers, in opposing that motion the DAP insurers opposed the motion, relying on two victories previously secured by EPPs regarding those same issues. *See* MDL Doc. 3226 (Order overruling defense objections to the Special Master's Sixteenth R&R); *In re Generic Pharms. Pricing Antitrust Litig*., No. 16-CB-27242, 2024 WL 4980784, at *17 (E.D. Pa. Dec. 3, 2024); *In re Generic Pharms. Pricing Antitrust Litig*., No. 16-CB-27242, 2025 WL 478178, at *3 (E.D. Pa. Feb. 12, 2025) (addressing spread pricing issues).

On yet another track, EPPs served several hundred subpoenas on non-parties. On behalf of all Private Plaintiffs, EPPs led the effort to secure phone records of Defendants' employees via subpoena to telephone carriers. In April 2018, Defendants moved to quash one of those subpoenas. MDL Doc. 601. EPPs opposed the motion and following oral argument at a July 11, 2018 hearing, the Court denied Defendants' motion. MDL Docs. 634, 758. In January 2019, more than a dozen Defendants launched another round of motions seeking to quash more of EPPs telephone carrier subpoenas. EPPs took the lead in briefing the opposition to each motion and presenting oral argument before the Special Discovery Master. EPPs' efforts resulted in the production of several million phone records, which are central evidence of Defendants'

conspiracy. EPPs also negotiated with phone carriers to obtain declarations to authenticate the phone records.

Relatedly, EPPs negotiated the protective order governing production and use of phone records in the MDL (PTO 94, MDL No. 1044), as well as a supplemental protective order allowing disclosure of Defendants' employees' phone numbers to subpoena recipients (PTO 182, MDL No. 1838). Those protective orders facilitated all plaintiff groups' ability to utilize phone records to conduct further discovery and prove the existence of inter-defendant communications. On all aspects of phone record evidence – litigating, securing, and authenticating – EPPs led the way for all Private Plaintiffs.

With many Defendants claiming a lack of possession, custody or control over key discovery materials, including employees' cell phones, EPPs sought those materials directly from Defendants' current and former employees. EPPs drafted and served dozens of subpoenas on those individuals, and along with the other plaintiff groups, conducted extensive meet-and-confers. That, too, resulted in the production of evidence that advanced the case.

These discovery-related efforts ultimately led to the production of tens of millions of documents and a massive amount of transaction data that all plaintiff groups are using to prove their claims. EPPs devoted dozens of attorneys to reviewing the document discovery record, a crucial undertaking that unearthed emails and other documents that are the centerpiece of plaintiffs' deposition program and serve as crucial pieces of the conspiracy puzzle. In addition, EPPs led negotiations with certain Defendants to secure stipulations, on behalf of all plaintiff groups, that certify the authenticity of Defendants' documents. For recalcitrant Defendants who refused to stipulate on this straightforward issue, EPPs issued hundreds of requests for admission in order to authenticate the documents.

EPPs also led efforts to facilitate the timely production of documents. On behalf of all plaintiffs, EPPs raised concerns with the Special Masters about the lack of progress in Defendants' document productions, which led to a regular reporting process and accountability. Similarly, with respect to third-party discovery, EPPs led the effort to develop a reporting regime to track production of transaction data and documents by third parties, resulting in the regular submission of a tracking report to the Special Masters, providing greater transparency and accountability.

EPPs played a leading role in all aspects of deposition planning and strategy. First, EPPs led the negotiations with Defendants over the protocol for conducting fact depositions, and they briefed and argued related disputes before the Special Discovery Master. EPPs' efforts led to entry of the Fact Deposition Protocol (PTO 158, MDL No. 1688). For deposition preparation, EPPs established a protocol and oversaw the creation of Federal Rule of Evidence 1006 summary exhibits that would be used by all plaintiff groups during deposition. The summary exhibits were a resource-intensive but extremely important project that charted communications among Defendants' employees as reflected in phone records. Following their creation, EPPs trained all counsel for all plaintiff groups on how to use the exhibits in depositions. The exhibits featured heavily in the dozens of depositions where inter-defendant conspiratorial communications were examined. During bellwether discovery, EPPs planned and organized calls among all plaintiff groups to ensure dozens of depositions of Defendants' current and former employes proceeded effectively, efficiently, and according to plan. EPPs also drafted plaintiffs' Rule 30(b)(6) notices for the bellwether defendants, organized a team of plaintiffs' counsel to take those depositions, oversaw planning and strategy for those depositions, and took the 30(b)(6) depositions of key Defendants Actavis, Mylan, Perrigo, Sandoz, Taro, and Wockhardt.

In course of this MDL, some defendants have declared bankruptcy. EPPs participated in the bankruptcy proceedings of Defendants Mallinckrodt, Teligent, Akorn, and Par, and negotiated a discovery stipulation that preserved the ability of all plaintiff groups to obtain discovery (including depositions) from the bankrupt entities, and to efficiently manage their confidentiality obligations. EPPs implemented those agreements by obtaining limited relief from the bankruptcy stay. See, e.g., MDL Docs. 1748, 1749, 1850, 2132, 2296, 2370 n.1, 2454, 2752.

Cooperating witnesses have played a central role in this MDL, providing direct evidence and detailed testimony regarding the formation and existence of the conspiracies at issue. EPPs led negotiations and finalized the cooperation agreements with three cooperating witnesses on behalf of Private Plaintiffs. When Defendants issued document requests to all Private Plaintiffs regarding those negotiations, EPPs led Private Plaintiffs' response and produced responsive, non-privileged documents relating to the cooperating witness agreements. EPPs' leadership was typical of how common issues were managed among Private Plaintiffs, with EPPs leading the way, including on practical aspects of the litigation. For example, EPPs organized the cost-sharing arrangements among all plaintiff groups, and EPPs negotiated and finalized the deposition vendor contract and the contract for Private Plaintiffs' shared document review platform.

### D.  EPP Class Counsel's Successful Opposition to Additional Motions to Dismiss

When briefing common issues, as well, EPPs typically have taken the lead. EPPs led negotiations with the so-called "Newly Added Defendants" regarding their efforts to file additional motions to dismiss, and led Private Plaintiffs' efforts, through filings and discussions with the Court, to develop a briefing schedule to minimize disruption to the MDL (see Order of 3/18/2022, MDL Doc. 2014). Likewise, EPPs led strategy, planning and drafting of the pleadings to add Novartis AG and Sandoz AG as MDL defendants following a reorganization that

threatened to leave defendant Sandoz Inc. unable to satisfy its MDL liabilities. EPPs filed the first such motion to amend (MDL Doc. 2787), which other Private Plaintiffs later incorporated by reference (see, e.g., MDL Doc. 2809-1 at 3), and negotiated the briefing schedule on behalf of all Plaintiffs so that the overlapping issues could be presented to the Court in an orderly way. See MDL Doc. 2935. EPPs also led objections to Novartis AG's efforts to prematurely insert itself into those proceedings. See MDL Docs. 2818 & 2954 at 25-30.

**E.  EPP Class Counsel's Leading Role in Case Management Issues**

In addition to all of these important litigation activities, over these many years, EPPs have taken a leading role on all case management issues. EPPs initiated and led discussions with Defendants to develop the first case management order in the MDL, and EPPs briefed and argued the disputes that ultimately were resolved by the Court in PTO 105 (Case Management and Discovery Schedule). Entry of that Order generated one of the most heated disputes in the MDL, precipitated by Defendants' Petition for a Writ of Mandamus to the Third Circuit, which concerned the document production protocol of PTO 105. Along with the States, EPPs successfully opposed Defendants' Petition (and related motions to stay), which was litigated in the Third Circuit and the Supreme Court of the United States. *See In re Actavis Holdco U.S., Inc.*, No. 19-3549, 2019 WL 8437021 (3d Cir. Dec. 6, 2019), *cert denied*, 141 S. Ct. 124 (2020). EPPs led the negotiations of all modifications of successor Case Management Orders (*see* PTO 110, MDL No. 1179; PTO 123, MDL No. 1363; PTO 137, MDL No. 1512; PTO 138, MDL No. 1513; PTO 139, MDL No. 1514; PTO 141, MDL No. 1550; PTO 153, MDL No. 1648; PTO 165, MDL No. 1736; PTO 172, MDL No. 1780), including the complicated negotiations over procedures for privilege logs, confidentiality designations and clawbacks (*see* PTO 137, MDL No. 1512); and EPPs successfully navigated a dispute involving some Defendants who sought to blanket-designate every document as "outside counsel eyes only" (*see* PTO 141, MDL No.

1550).

Later, EPPs led coordination among all plaintiff groups to address the selection of criteria for bellwether cases (*see* PTO 105, MDL 1135 ¶ 9(a)), and EPPs led subsequent discussions with Special Master Marion (*see id*. ¶ 9(b)). Along with the States, EPPs led the effort to select appropriate bellwether cases to provide guidance for all MDL parties, and EPPs played a principal role in all related litigation (*see, e.g*., PTO 132, MDL No. 1443; PTO 171, MDL No. 1769). Once bellwethers were selected, EPPs led negotiations and litigation before the Special Master, as well discussions before the Court, concerning entry of the first bellwether schedule, PTO 188, MDL No. 1901. EPPs also managed all subsequent discussions that led to modifications of that schedule. *See* PTOs 217, MDL No. 2244; PTO 234, MDL No. 2443.

Following the resignation of Special Discovery Master Bruce Merenstein, EPPs led discussions among all plaintiff groups, and with Defendants and the Court, concerning potential replacement candidates. And at the Court's request, EPPs led discussions among all plaintiff groups and with Defendants concerning candidates to be appointed as a settlement master (*see* PTO 255, MDL No. 2746).

**F.**  **EPP Class Counsel's Continued and Vigorous Prosecution of the Bellwether Cases**

EPPs have vigorously litigated their bellwether cases, Clobetasol and Clomipramine, on behalf of the classes. Pursuant to the Court's scheduling Order, PTO 234 (MDL No. 2443), EPPs worked nearly nonstop to bring two separate, complex cases – at the same time – through expert discovery, class certification proceedings, Daubert motions, and summary judgment.

Beyond the extensive written and deposition discovery conducted of the Bellwether Defendants, EPPs retained and worked with seven different experts to address diverse topics relevant to class certification and the merits of the cases. EPPs defended each of their experts at deposition, with depositions lasting two days each for Drs. McClave and Lamb. Defendants filed

Daubert motions against all seven of EPPs' experts, which EPPs opposed in seven separate briefs. In further opposing those motions, EPPs presented live testimony from certain of their experts during a 3-day hearing on September 24-26, 2024 (MDL Docs. 3110-3112) and presented oral argument thereafter on October 8, 2024 (MDL Doc. 3123). To date, EPPs have defeated four of Defendants' seven motions; the other three have been deferred. See *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CB-27242, 2024 WL 4980784 (E.D. Pa. Dec. 3, 2024).

Notably, EPPs also vigorously litigated the reliability of the five experts proffered by Defendants. Each was deposed, with two-day depositions for both Drs. Gilbert and Hughes. Thereafter, EPPs filed Daubert motions against four of Defendants' experts (Drs. Gilbert, Happe, Hughes and Trish), which required yet additional extensive briefing.[3]

### G. EPP Class Counsel's Successful Motion for Certification of the Bellwether Classes

In class certification proceedings, EPPs filed three briefs in each of the two bellwether cases, totaling hundreds of pages and attaching more than 300 exhibits.[4] EPPs presented oral argument on December 17, 2024 (MDL Doc. 3188), after which the Court granted the motions in large part, certifying the two proposed EPP Classes' claims under state antitrust and consumer protection laws, declining only to certify the Classes' claims for unjust enrichment. *In re Generic*

---

[3] Because Defendants filed supplemental expert reports and *Daubert* sur-reply briefs that were not authorized by any Pretrial Order, and did so without first seeking leave of Court, EPPs filed a motion for sanctions seeking to strike those materials from the record, and the dispute was referred to the Special Discovery Master. MDL Doc. 3046. After further briefing and oral argument, the Special Discovery Master issued an informal recommendation that largely granted EPPs' motion for sanctions, the parties agreed to accept that recommendation, and it was memorialized in an October 29, 2024 Order approving a Joint Stipulation. *See* 16-CB-27242, ECF 416.

[4] See In re Generic Pharms. Pricing Antitrust Litig., No. 16-CB-27242, ECFs 240, 280, 341; In re Generic Pharms. Pricing Antitrust Litig., No. 16-CM-27242, ECFs 184, 221, 275.

*Pharms. Pricing Antitrust Litig.*, No. 16-CB-27242, 2025 WL 754567 (E.D. Pa. Mar. 7, 2025).
Defendants filed two Rule 23(f) petitions for review in the Third Circuit, both of which EPPs
opposed on a condensed schedule. Those petitions remain pending.

All Defendants in the EPP Clobetasol and Clomipramine cases filed individual motions
for summary judgment, plus a joint motion for summary judgment. EPPs filed a motion for
summary judgment on discrete but important state-law issues that, if granted, would bring
significant efficiencies to the trials of EPPs' claims. All told, EPPs drafted more than 200 pages
of briefing opposing Defendants' motions and in support of EPPs' motions. EPPs will present
oral argument on those motions on May 13-14, 2025. PTO 294, MDL No. 3282 at 2.

Having brought the EPP Clobetasol and Clomipramine cases through all of these
important pretrial steps, EPPs have continued to devote significant time and resources to
preparing both cases for trial. On behalf of both EPPs and DPPs, EPPs led negotiations with the
Bellwether Defendants to craft a pretrial schedule that includes all of the necessary steps to make
four separate cases trial-ready by August 4, 2025 – the date established by the Court for the first
bellwether trial to proceed. *See* PTO 281, MDL No. 3809 ¶ 2; PTO 289, MDL No. 3185 ¶ 1.
Pursuant to that agreed schedule, which the Court entered as PTO 294 (MDL No. 3282), EPPs
have marshalled the skills and resources of counsel and support staff to compile EPPs' trial
exhibit lists, designate deposition testimony, and to work toward accomplishing all of the many
necessary pretrial preparations in both EPP bellwether cases. Those preparations are occurring
even as important issues relating to trial structure and duration remain outstanding – issues on
which EPPs are taking the lead (on behalf of both EPPs and DPPs) in further litigation before the
Court, including in briefing (*see* No. 16-CM-27242, ECF 377; No. 16-CB-27242, ECF 459) and
during the upcoming April 10, 2025 general status conference (*see* MDL Doc. 3316).

**H. EPP Class Counsel Have Obtained Settlements that Confer Significant Benefits Upon the EPP Settlement Classes**

In tandem with steadfastly pursuing their claims, EPPs have also determinedly pursued settlements. EPPs reached their first settlement with Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals Ltd., and Satish Mehta ("Heritage Defendants"). The Heritage Settlement, which resulted in a cash payment of $10,000,000 and an agreement that the Heritage Defendants would provide significant cooperation, received this Court's preliminary approval on June 26, 2024. MDL Doc. 3020. Notice of the Settlement was deferred at Class Counsel's request so that it could be disseminated efficiently and economically in conjunction with a future settlement. *Id.*

EPPs second settlement was with Apotex Corp. in the amount of $48,000,000, which may be reduced, depending on the number of opt-outs. MDL Doc. 3313-1 ¶¶ I.N, V. In addition to providing a monetary recovery, the Apotex settlement provides for significant cooperation from Apotex. *Id.* ¶ VIII & Appx. C. EPPs' motion for preliminary approval of the Apotex settlement and EPPs' motion for approval of the notice plan and proposed allocation of the Heritage and Apotex settlements are currently pending before the Court. MDL Docs. 3312, 3313, 3314.

EPPs' third settlement was with Sandoz Inc. and Fougera Pharmaceuticals Inc. ("Sandoz") It provides for a $275,000,000 settlement fund, which may be reduced by up to $45,000,000, depending on the number of opt-outs. MDL Doc. 3253-2, ¶ I.I. In addition, Sandoz has agreed to provide cooperation. *Id.* ¶VI. This Court preliminarily approved the EPP/Sandoz settlement on February 19, 2025 and scheduled a Fairness Hearing for July 23, 2025. MDL Doc. 3257. The notice program commenced on March 10, 2025, and EPP Counsel continue to work with the Notice Administrator to assure that adequate notice is provided to the Settlement Class.

In sum, EPP Counsel have negotiated $333 million in settlements so far. It is exceedingly

rare for end payers to achieve larger settlements than direct purchasers, especially in pharmaceutical antitrust cases. Typically, in antitrust class actions involving pharmaceutical products, EPPs receive much less than DPPs. *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2024 WL 815503, at *7 (E.D. Pa. Feb. 27, 2024) ($385 million DPP settlement); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2023 WL 8437034, at *2 (E.D. Pa. Dec. 4, 2023) ($30 million EPP settlement); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 309 (S.D.N.Y. 2020) ($750 million DPP settlement); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-06549-CM-RWL, ECF No. 975 at 1 (S.D.N.Y. Sept. 16, 2024) ($56,438,000 EPP settlement). EPPs were able to achieve these results because, as described above, EPP Counsel have led this case, and they have made EPPs a real threat to Defendants.

At this time, Class Counsel respectfully request one-third of the Sandoz Settlement, inclusive of accrued interest, and net of costs, expenses, and service awards. Because the opt-out period has not yet expired, EPPs cannot state with certainty the extent of the opt-out reduction. Assuming that the $750,000 allowance for the cost of notice and allocation is exhausted; Class Counsel's request for reimbursement of expenses in the amount of $25,700,911.41 is granted; and Class Counsel's request for service awards in the amount of $410,000 is granted; then, before the addition of interest, the requested fee award falls within the range of $82,713,029.53 (based on a zero dollar opt-out reduction) and $67,713,029.53 (based on the maximum $45,000,000 opt-out reduction). The requested fee amounts to 20.4% to 24.9% of the $332,011,584.21 that counsel have expended in lodestar at historical hourly rates, *i.e.*, at this juncture Class Counsel are seeking a multiplier that is substantially below 1. *See* Liebenberg Decl. ¶ 18 & Ex. A.

## III.  ARGUMENT

### A.  Class Counsel Are Entitled to a Fair Fee Award

The common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.,* 582 F.3d 524, 540 (3d Cir. 2009) (internal quotation marks and citation omitted). This is consistent with United States Supreme Court precedent recognizing that "persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co. v. VanGemert,* 444 U.S. 472, 478 (1980)). A court may "prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit." *Id.*

"[T]he amount of a fee award … is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *In re AT&T Corp.,* 455 F.3d 160, 163-64 (3d Cir. 2006) (internal quotation marks and citation omitted). "Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method." *Id.* at 164.

#### 1.  The Percentage Award Requested by Class Counsel is Reasonable

"In common fund cases such as this one, the percentage-of-recovery method is generally favored because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *AT&T,* 455 F.3d at 164 (internal quotation marks and citation omitted). "Therefore, counsel's compensation depends directly on the value created for the class." *In re Domestic Drywall Antitrust Litig.,* No. 13-MD-2437, 2018 WL 3439454, at *2 (E.D. Pa. July 17, 2018). "The vast majority of courts of appeal now permit or direct district

courts to use the percentage method in common-fund cases." MANUAL FOR COMPLEX LITIG. §

14.121 (4th ed.). "The percentage-of-recovery method applies a certain percentage to the

settlement fund." *AT&T,* 455 F.3d at 164. The percentage is "based on the net settlement fund

after deducting the costs of litigation." *Bradburn Parent Teacher Store, Inc. v. 3M,* 513 F. Supp.

2d 322, 337 (E.D. Pa. 2007) (citation omitted). "[T]his approach increases the incentives for

cautious expenditure and … helps align the interests of the class more closely with those of

counsel." *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 193 (E.D. Pa. 2000)

(citations omitted).

 "In determining what constitutes a reasonable percentage fee award, a district court must

consider the ten factors … identified in *Gunter* and *Prudential*." *Diet Drugs,* 582 F.3d at 541

(citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000); *In re*

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 336-40 (3d Cir.

1998). "They are: (1) the size of the fund created and the number of beneficiaries, (2) the

presence or absence of substantial objections by members of the class to the settlement terms

and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the

complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time

devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of

benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as

government agencies conducting investigations, (9) the percentage fee that would have been

negotiated had the case been subject to a private contingent fee arrangement at the time counsel

was retained, and (10) any innovative terms of settlement." *Id.*

 "The fee award reasonableness factors 'need not be applied in a formulaic way' because

each case is different, 'and in certain cases, one factor may outweigh the rest.'" *AT&T*, 455 F.3d

at 166 (quoting *In re Rite Aid Corp. Secs. Litig.,* 396 F.3d 294, 301). Additionally, "[t]he

*Gunter/Prudential* factors are not exhaustive." *Diet Drugs,* 582 F.3d at 541 n.34. "In reviewing

an attorneys' fee award in a class action settlement, a district court should consider [those]

factors …, and any other factors that are useful and relevant with respect to the particular facts of

the case." *Id.* (quoting *AT&T,* 455 F.3d at 166). Here, all pertinent factors support the requested

fee award.

> a. *The size of the fund created, and the number of beneficiaries,*
> *support the requested percentage award.*

The Sandoz settlement reached by EPPs has resulted in a settlement fund of $275 million

that will benefit a settlement class consisting of many thousands of TPPs and Consumers,

thereby avoiding the uncertainty of continuing litigation against Sandoz. Similar to counsel in

*AT&T,* "[w]ith regard to the size and nature of the common fund and the number of persons

benefitted by the settlement … Lead Counsel [in this litigation] were able to obtain an excellent,

sizeable result on behalf of the Class despite the substantial risks they faced in establishing

liability." *See AT&T*, 455 F.3d at 169. Courts look favorably upon a fee award in cases such as

this, where the "Settlement Agreement secures a recovery for the Settlement Class now, rather

than the 'speculative promise of a larger payment years from now.'" *See Harshbarger v. Penn*

*Mutual Life Ins. Co.,* No. 12-cv-6172, 2017 WL 6525783, at *4 (E.D. Pa. Dec. 20, 2017)

(quoting *In re Viropharma Inc. Sec. Litig.,* No. 12-cv-2714, 2016 WL 312108, at *16 (E.D. Pa.

Jan. 25, 2016)). Thus, the first factor weighs in favor of approving EPPs' requested fee.

> b. *The absence of substantial objections to the requested settlement*
> *terms and/or fees supports the requested percentage award.*

On March 10, 2025, A.B. Data, Ltd., the Court-appointed Notice Administrator for the

Sandoz Settlement disseminated direct notice to TPPs and publication notice to Consumers and

TPPs per the Court-approved Notice Plan. MDL Doc. No. 3257 ¶ VI. The Notices disclosed that

EPPs would be seeking up to one-third of the Sandoz Settlement for attorneys' fees and promised that this fee petition would be posted to the Settlement Website, which it has been. The deadline for objections to the Sandoz settlement, and this fee petition, is May 9, 2025. EPPs will inform the Court before the final fairness hearing if any objections are received and, if necessary, Class Counsel will respond to any objections.

> ### c. The skill and efficiency of the attorneys involved supports the requested percentage award.

Counsel for EPPs have many decades of experience representing antitrust plaintiffs like the EPP classes here. Relying on that experience over the past eight years, EPPs have been able to successfully recover hundreds of millions of dollars for indirect purchasers of generic drugs.

"The Third Circuit has explained that the goal of the percentage fee-award device is to ensure 'that competent counsel continue to undertake risky, complex, and novel litigation.'" *In re Flonase Antitrust Litig.,* 291 F.R.D. 93, 104 (E.D. Pa. 2013) (quoting *Gunter,* 223 F.3d at 198). Class counsel's skill and efficiency is measured by "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case[,] and the performance and quality of opposing counsel." *Serrano v. Sterling Testing Sys., Inc.,* 711 F. Supp. 2d 402, 420 (E.D. Pa. 2010) (quoting *Ikon,* 194 F.R.D. at 194). "[T]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *Flonase,* 291 F.R.D. at 104 (internal quotation marks and citation omitted).

In affirming approval of the requested fee award in *AT&T,* the Third Circuit observed that "because the case had been vigorously litigated for over four years, … class counsel had a thorough and exhaustive appreciation for the merits of the case prior to settlement." *AT&T,* 455 F.3d at 167 (internal quotation marks and citations omitted). The court cited counsel's review

and analysis of over 4.5 million pages of documents produced by defendants and over 380,000 additional pages produced by non-party witnesses, their informal interviews of numerous witnesses, their taking of more than 80 fact witness depositions, and their preparation of numerous filings related to motions to dismiss, complex discovery motions, a class certification motion, and a summary judgment motion. *Id.* The Third Circuit further approvingly cited the district court's conclusion that "Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court." *Id.* at 170.

Similarly, in *Domestic Drywall,* this Court pointed to the fact that "Plaintiffs' counsel are experienced antitrust lawyers who have been working in this field of law for many years and have brought with them a sophisticated and highly professional approach to gathering persuasive evidence on the topic of price-fixing." *Domestic Drywall,* 2018 WL 3439454, at *18. The court noted that the "briefs filed by Plaintiffs' counsel were consistently of high quality," and added that "Plaintiffs' counsel were up against highly skilled defense counsel, who represented the Defendants in this case with vigor and substantive briefing to try to persuade this Court that Plaintiffs did not have a case, and should not be allowed to represent a class of direct purchasers. The Court considered the defense arguments carefully and considerably, but generally sided with the Plaintiffs because of the outstanding work of Plaintiffs' counsel as presented in this petition for approval of fees." *Id.*

Likewise, in *Ikon,* this Court cited not only the extensive experience and national reputation of Plaintiffs' counsel, but also the expertise of their counterparts. *Ikon,* 194 F.R.D. at 195. This Court noted that "defense counsel has a fine reputation and has displayed great skill in defending this complex class action. Their opposition to plaintiffs has been anything but token,

and many of the battles on crucial issues were hard fought." *Id.*

Here, as in *AT&T*, *Domestic Drywall*, and *Ikon*, EPPs have extensive experience and have dedicated significant time to litigating and resolving claims on behalf of members of the settlement class. Indeed, as the above discussion makes clear, this case is more complex, and involves more parties, more depositions, more documents and more motion practice, and therefore requires more skill and efficiency, than any of those cases. Accordingly, the third factor weighs in favor of approval of the requested fee.

>    d.  *The complexity and duration of the litigation supports the requested percentage award.*

The fourth factor "is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Cigna American Specialty Health Admin. Fee Litig.,* No. 16-cv-03967, 2019 WL 4082946, at *13 (quoting *In re Gen. Motors Corp. Pick- Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 812 (3d Cir. 1995). "'[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the [case] by class counsel' are factors which 'increase the complexity of class litigation.'" *Vista Healthplan,* 2020 WL 1922902, at *29 (quoting *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 741).

As the Court well knows, this case has been pending for nine years. And few cases are as complex as this one, involving antitrust claims relating to 197 drugs and dozens of defendant families. "Antitrust class actions are particularly complex to litigate and therefore quite expensive." *McDonough v. Toys "R" Us, Inc.,* 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015) (citations omitted). *See also Bradburn Parent Teacher Store,* 513 F. Supp. 2d at 338-39 ("[C]ourts have stated that antitrust class actions are perhaps the most complex cases to litigate.") (citations omitted); *In re Processed Egg Prods. Antitrust Litig.,* No. 08-md-2002, 2012 WL 5467530, at *4 (E.D. Pa. Nov. 9, 2012) ("[A]ntitrust class action litigation is complex, and, especially at its early

stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability and damages and achieve class certification.") (citations omitted).

Similar to *AT&T,* this case from inception "involved complex legal and factual issues" that have not been "straightforward or simple." *See AT&T,* 455 F.3d at 166 (citation omitted). Plaintiffs here "had the burden of proving loss causation and damages, which would likely involve conceptually difficult economic theories and complex calculations based on experts with diametrically opposed opinions." *See id.* (internal quotation marks and citation omitted). And, similar to *Rite Aid,* the "litigation presented layers of factual and legal complexity which assured that, absent a global settlement, these disputes would take on Dickensian dimensions." *See Rite Aid,* 396 F.3d at 305. Therefore, the fourth factor weighs in favor of approval of the requested fee.

>    *e. The risk of nonpayment supports the requested percentage award.*

"Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval." *Cigna,* 2019 WL 4082946, at *13 (citations omitted). *See also Vista Healthplan,* 2020 WL 1922902, at *29 (citing the receipt of no payment during years of lengthy litigation and the risk of nonpayment as factors supporting the requested fee). The substantial likelihood of challenge on appeal in the event of a recovery at trial further illustrates the risk of nonpayment. *Id.*

EPPs have spent the better part of a decade and hundreds of thousands of hours litigating this case with no guarantee of recovery. As in *AT&T,* "[h]aving accepted the responsibility of prosecuting this class action on a contingency fee basis and without any guarantee of success or award, Lead Counsel nonetheless maintained vigor and dedication throughout." *See AT&T,* 455 F.3d at 171.

This case is similar in additional ways to *AT&T,* where, in assessing risks, the Third

Circuit pointed to the fact that the defendants had "vehemently denied any wrongdoing," had "asserted a reasonable basis existed" for its actions, and had "intended to call key witnesses … who would support this assertion." *Id.* at 167 (citations omitted). The Third Circuit approvingly cited the district court's conclusion that the settlement "represents an excellent result for the Class considering the substantial risks Plaintiffs faced, and the absence of any guarantee of a favorable verdict." *Id.* (citations omitted). Here, Defendants have likewise mounted a tenacious defense at all phases of the litigation. The fifth factor therefore weighs in favor of approval of EPPs' requested fee.

<blockquote>f. <em>The amount of time devoted to the case by Plaintiffs' counsel supports the requested percentage award.</em></blockquote>

As detailed in the attached Liebenberg Declaration, EPPs have expended hundreds of thousands of hours investigating, litigating, and resolving cases in this MDL. Unlike many other pharmaceutical antitrust cases that involve only one drug, EPPs' cases here include nearly 200 drugs. Unlike many other antitrust cases in general, this case involves not just a handful of defendants but dozens of defendant families. The size and scope of this case have necessitated a significant dedication of attorney resources.

As in *Processed Egg Products*, "Plaintiffs have taken several steps to make their work on this litigation as efficient as possible. The amount of time spent on this case prior to final approval of the settlement most likely reflects the complexity of the Plaintiffs' claims, not the inefficiency of their counsel. Presumably, the thousands of hours counsel spent working on this matter prevented those individuals from litigating other cases. This factor thus strongly favors granting the motion for attorneys' fees." *Processed Egg Products,* 2012 WL 5467530, at *4.

The Liebenberg Declaration summarizes the quantity and kind of work performed by EPP attorneys. If the Court requests them, EPPs can furnish detailed, daily time records, but "[i]n

large cases, especially one of prodigious proportions like this, reliance on summaries is certainly

within the discretion of the district court." *Diet Drugs,* 582 F.3d at 539. *See also Rite Aid,* 396

F.3d at 306-07 ("[C]ourts may rely on summaries submitted by the attorneys and need not review

actual billing records.") (citing *Prudential,* 148 F.3d at 342, which found "no abuse of discretion

where the district court 'reli[ed] on time summaries, rather than detailed time records.'"). This is

especially true where the principal basis for the request for fees is a percentage of the common

fund, and where the requested fee is substantially below counsel's lodestar.[5]

     Accordingly, this sixth factor weighs in favor of approval of EPPs' requested fee.

        g.   *The awards in similar cases support the requested percentage award.*

     "While there is no benchmark for the percentage of fees to be awarded in common fund

cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases

generally range from nineteen to forty-five percent of the common fund." *Vista Healthcare,* 2020

WL 1922902, at *30 (citation omitted) (collecting cases); *Cigna,* 2019 WL 4082946, at *13

(citing *Gen. Motors,* 55 F.3d at 822). *See also Harshbarger,* 2017 WL 6525783, at *4

(referencing range of nineteen to forty-five percent of the common fund) (citing *Gen. Motors,* 55

F.3d at 822); *McDonough,* 80 F. Supp. 3d at 653 (same) (citations omitted).

     Here, EPPs are seeking a one-third fee award, which is standard in complex antitrust

cases, and reasonable given the size of the recovery and extraordinary effort EPPs have expended

in these matters. *See Flonase,* 291 F.R.D. at 104 ("A one-third fee award is standard in complex

antitrust cases of this kind. Indeed, a one-third award is consistent with awards in other complex

---

[5] If the Court wishes to see the detailed time records, Class Counsel would request to submit them *in camera* so that the Defendants are not given an unfair look into Class Counsel's work product and strategies.

antitrust actions involving the pharmaceutical industry.") (internal quotation marks and citation

omitted; collecting cases); *In re Remeron Direct Purchaser Antitrust Litig.,* No. 03-cv-0085,

2005 WL 3008808, at *15 (D. N.J. Nov. 9, 2005) (awarding 33 1/3% of $75 million settlement

fund; "A one third fee from a common fund has been found to be typical by several courts within

this Circuit which have undertaken surveys of awards within the Third Circuit and others."); *In

re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) (awarding 33.33% fee of a $175

million settlement); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-cv-06549-CM-

RWL, ECF No. 967 at 16 (S.D.N.Y. Mar. 23, 2023) (awarding 33 1/3% of $56,438,000

settlement); *N. Shore Hematology-Oncology Assocs. v. Bristol-Myers Squibb Co*., No. 04-cv-

248, 2004 WL 7348048, at *3 (D.D.C. Nov. 30, 2004) (awarding 33 1/3% of $50 million

settlement fund). While "it may be appropriate in some circumstances for fee percentages in

large recovery cases to be smaller than those in smaller recovery cases, 'there is no rule that a

district court must apply a declining percentage reduction in every settlement involving a sizable

fund.'" *AT&T*, 455 F.3d at 174 (quoting *Rite Aid,* 396 F.3d at 303). To the contrary, the Third

Circuit has "recognized the declining percentage principle is 'criticized by respected courts and

commentators, who contend that such a fee scale often gives counsel an incentive to settle cases

too early and too cheaply.'" *Id.* at 174 n.10 (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201,

284 n.55 (3d Cir. 2001)). This Court has been one such critic, stating:

> This court respectfully concludes that such an approach tends to penalize
> attorneys who recover large settlements. More importantly, it casts doubt on the
> whole process by which courts award fees by creating a separate, largely
> unarticulated set of rules for cases in which the recovery is particularly sizable. It
> is difficult to discern any consistent principle in reducing large awards other than
> an inchoate feeling that it is simply inappropriate to award attorneys' fees above
> some unspecified dollar amount, even if all of the other factors ordinarily
> considered relevant in determining the percentage would support a higher
> percentage…. Such an approach also fails to appreciate the immense risks
> undertaken by attorneys in prosecuting complex cases in which there is a great

> risk of no recovery. Nor does it give sufficient weight to the fact that "large
> attorneys' fees serve to motivate capable counsel to undertake these actions."

*Ikon*, 194 F.R.D. at 197 (quoting *In re Gen. Motors*, 55 F.3d at 801).

Applying the above reasoning, this Court noted that "[t]here are … courts that have
simply declined to adjust the 'standard' percentage, even in the face of a huge recovery," and
followed suit, stating that it "will not reduce the requested award simply for the sake of doing so
when every other factor ordinarily considered weighs in favor of approving class counsel's
request of thirty percent." *Id.* at 196. This is consistent with Third Circuit jurisprudence directing
that "the declining percentage concept does not trump the fact-intensive *Prudential/Gunter*
analysis." *AT&T*, 455 F.3d at 174 (quoting *Rite Aid,* 396 F.3d at 303). The seventh factor
therefore weighs in favor of approval of the requested fee.

> h. *The value of benefits attributable to the efforts of class counsel*
> *relative to the efforts of other groups supports the requested*
> *percentage award.*

As described in great detail in Section II, *supra*, EPPs have taken the lead or played a
principal role in *every* significant aspect of this MDL, often to the benefit of all plaintiff groups.
While it is true that the Department of Justice and the States have conducted investigations into
the generic pharmaceutical industry, the existence of government investigations is not
determinative. *See Diet Drugs,* 582 F.3d at 544. Moreover, as discussed in Section II.A, *supra*, of
the 18 single-drug cases in this MDL, 17 were originated by EPPs and/or DPPs, while only one
(glyburide) was a follow-on to a case filed by the States. In addition, EPPs' complaints named all
of the largest and most central Defendants, including Mylan, **Sandoz**, Taro, and Teva, before the
States did. As in *Diet Drugs*, EPP Class Members' recoveries "[are] due to the 'herculean efforts'
of [Class Counsel]—in developing the case against [the defendant]" and "in negotiating an
agreement that allowed [the defendant] to resolve the claims against it." *Id.*

Here, as a result of Class Counsels' efforts, EPPs have a settlement that is larger than any plaintiff group's settlement with any Defendant to date. This is a remarkable result for EPPs and the Sandoz Settlement Class given that the typical antitrust case results in EPP settlements that are smaller, and often much smaller, than DPP settlements. *See, e.g., In re Suboxone*, 2024 WL 815503, at \*7 ($385 million DPP settlement); *In re Suboxone*, No. 13-MD-2445, 2023 WL 8437034, at \*2 ($30 million EPP settlement); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d at 309 ($750 million DPP settlement); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-06549-CM-RWL, ECF No. 975 at 1 ($56,438,000 EPP settlement). The eighth factor weighs heavily in favor of the requested fee.

> i.   *The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained supports the requested percentage award.*

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts. That is, we must consider the 'percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.'" *Vista Healthcare,* 2020 WL 1922902, at \*31 (quoting *In re Diet Drugs Prods. Liab. Litig.,* 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008)). This is because "the goal of the fee setting process [is] to determine what the lawyer would receive if he were selling his services on the market rather than being paid by Court Order." *Id.* (quoting *In re Linerboard Antitrust Litig.,* 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004)).

"[I]n private contingency fee cases … plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." *Id.* (quoting *Ikon,* 194 F.R.D. at 194. *See also Cigna,* 2019 WL 4082946, at \*14 (citing customary contingent fee of thirty to forty percent); *Harshbarger,* 2017 WL 6525783, at \*5 (same); *McDonough,* 80 F. Supp. 3d at 655 (same). In this case, EPPs are seeking one-third of the net settlement fund, which is well within

this routinely negotiated range. Thus, this ninth factor also weighs in favor of approval of the requested fee.

>    *j.   Any innovative terms of settlement are neutral to the requested percentage award.*

"In certain cases, a district court may find that 'class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'" *Vista Healthcare,* 2020 WL 1922902, at *31 (quoting *Prudential,* 148 F.3d at 339). "Such a finding may be warranted where a settlement involved 'innovative' or unique terms." *Id.*

Here, EPPs' Sandoz settlement has several features that are innovative in a settlement of these types of claims. First, there is an absence of a blow provision. This means that regardless of the number of class members who opt out of the settlement, *ceteris paribus*, the settlement will not be terminated. Second, the opt-out reduction calculation is such that the more opt outs there are, the more each remaining class member gets (*i.e.*, the reduction is less than proportional). Third, those requesting to opt-out are not being required to submit transactional data regarding the drugs at issue because Sandoz and EPPs have devised a more efficient method for determining the opt-out reduction. This factor, therefore, weighs in favor of the requested fee.

>    2.   The Lodestar Cross-Check Confirms that the Percentage Award Requested by Class Counsel is Reasonable

The Third Circuit has "recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award." *AT&T,* 455 F.3d at 164 (citing *Rite Aid,* 396 F.3d at 305, and *Prudential,* 148 F.3d at 333). "The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Id.* (quoting *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 732 n.11). "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *Id.* This "need not entail 'mathematical precision' or 'bean counting.'"

*Id.* at 169 n.6 (quoting *Rite Aid*, 396 F.3d at 306). Cross-checking involves only an "abridged lodestar analysis," *Cigna,* 2019 WL 4082946, at *14, and "not a full-blown lodestar inquiry." *AT&T*, 455 F.3d at 169 n.6 (quoting *Rite Aid,* 396 F.3d at 307 n.16).

"The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id.* at 164 n.4 (quoting *Rite Aid*, 396 F.3d at 305-06); *Diet Drugs,* 582 F.3d at 540 n.33 (quoting *Rite Aid*, 396 F.3d at 305-06). "Accordingly, when used as a cross-check in a common fund case, the lodestar calculation can be adjusted to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved." *AT&T*, 455 F.3d at 164 n.4 (citing *Gunter,* 223 F.3d at 195 n.1).

"[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Prudential,* 148 F.3d at 341 (citing 3 *Newberg on Class Actions* § 14.03 at 14-15 (3d ed. 1992)). However, the "lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *AT&T*, 455 F.3d at 164 (citing *Rite Aid,* 396 F.3d at 307). Indeed, the lodestar multiplier "need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *Id.* at 172-73 (quoting *Rite Aid,* 396 F.3d at 307).

Here, EPPs' lodestar at historical billing rates is $332,011,584.21 and represents over 670,900 hours of professional work over the course of almost a decade. In this unique case, where there are nearly two hundred drugs at issue, dozens of Defendants that have produced tens of millions of documents and more than 100 witnesses for deposition, class representatives that have been required to respond to extensive discovery themselves, and countless hard-fought disputes, the significant amount of time and effort EPPs have expended is reasonable.

Moreover, EPPs' lodestar is much larger than the requested fee of one-third of the net settlement fund. "Where the lodestar is greater than the requested fee award . . . the court may dispense with a cross-check." *Glaberson v. Comcast Corp.,* No. 03-cv-6604, 2015 WL 5582251, at *14 (E.D. Pa. Sept. 22, 2015) (citing *Fleisher v. Fiber Composites, LLC,* No. 12-cv-1326, 2014 WL 866441, at *15 (E.D. Pa. Mar. 5, 2014) ("Where, as here, counsel requests a fee that represents less than their lodestar, 'there is no need to discuss multipliers and the appropriateness of an increase to the lodestar.'"). *See also Flonase,* 291 F.R.D. at 106 ("A negative multiplier strongly underscores the risk counsel accepted to prosecute this case to trial. . . . The lodestar crosscheck therefore provides additional support for approving the attorneys' fees request."). A lodestar cross-check, therefore, supports the reasonableness of EPPs' requested fee of one-third of the net settlement fund.

### A.  <u>The Expenses Requested by Class Counsel are Reasonable</u>

"In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to granting fee awards." *McDonough,* 80 F. Supp. 3d at 658 (citing *AT&T,* 455 F.3d at 169). *See also Ikon,* 194 F.R.D. at 192 ("There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of … *reasonable* litigation expenses from that fund.") (emphasis in original) (citation omitted).

Early in this MDL, this Court entered Pretrial Order No. 8, specifying appropriate categories of common benefit expenses. *See* Pretrial Order No. 8 ("PTO 8") at p. 3-6. As explained in the attached Liebenberg Declaration, EPPs have incurred and continue to incur reasonably appropriate expenses that are consistent with the framework outlined in PTO 8. Consistent with Third Circuit precedent, reasonable expenses under PTO 8 include: assessments; deposition and court reporter costs; costs for the electronic storage, retrieval, and searches of ESI; Court, filing, and service costs; expert witness and consultant fees and expenses; data and

materials provided by outside third-party vendors, consultants, and attorneys; and bank and financial charges. *Cf. In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 226 (E.D. Pa. 2014) (finding reasonable expenses to include "mediation costs, court filing fees, hearing transcripts, expert fees, [and] online research"); *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 467 n.21 (E.D. Pa. 2008) (finding the following types of out-of-pocket expenses compensable: "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, [and] (11) the cost of hiring a mediator").

As provided in Exhibit B to the attached Liebenberg Declaration, from the inception of this litigation through the end of 2024, EPPs incurred $25,700,911.41 in expenses. The Notice EPPs disseminated to members of the Sandoz Settlement Class informed them that EPPs would seek reimbursement of up to $26,000,000 in expenses. These expenditures have been reasonably necessary to litigate EPPs' claims in this MDL and to obtain settlements. The vast majority of the expenses have been for expert witness fees and records management. As the Court saw at the Daubert hearings and in the class certification papers, the expert fees have been money well spent. And in a case of this size, involving so many documents, phone records and data, the need for quality recordkeeping and searching is paramount. Because these expenses have been for the common benefit of the settlement class, are reasonable in amount, and are adequately supported by documentation in EPPs' possession,[6] EPPs respectfully request reimbursement of $25,700,911.41 for expenses from the Sandoz settlement fund.

---

[6] Class Counsel would be happy to provide backup documentation if the Court so requests, but would request to do so *in camera* so that the Defendants are not given an unfair look into Class Counsel's work product and strategies.

35

**B.  <u>The Service Awards Requested Are Reasonable</u>**

"Courts recognize the purpose and appropriateness of service awards to class representatives." *Glaberson,* 2015 WL 5582251, at *16 (citations omitted). "Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *Flonase,* 291 F.R.D. at 106 (internal quotation marks and citation omitted); *McDonough,* 80 F. Supp. 3d at 664 (internal quotation marks and citation omitted).

"As a matter of practice, courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *Flonase,* 291 F.R.D. at 106 (internal quotation marks and citation omitted). This is because courts recognize "that there would be no benefit to the Settlement Class Members if Plaintiffs had not stepped forward and prosecuted this matter to the current resolution." *Cigna,* 2019 WL 4082946, at *16; *Harshbarger,* 2017 WL 6525783, at *7.

"Factors to be considered when deciding to give incentive awards include 'the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class.'" *Vista Healthcare,* 2020 WL 1922902, at * 33 (quoting *McGee v. Ann's Choice, Inc.*, No. 12-cv-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014)).

Here, Class Counsel requests incentive awards in the amount of $30,000 for each of the

36

TPP Class Representatives[7] and $5,000 for each of the Consumer Class Representatives.[8] As in *Vista Healthcare,* the Class Representatives "provided significant assistance to the case." *Id.* Namely, all of the Sandoz Settlement Class Representatives responded to written discovery, produced documents, actively monitored the litigation, reviewed the Complaint and other substantive pleadings, and reviewed and approved the Sandoz Settlement; and over half of all Sandoz Settlement Class Representatives have prepared for and sat for deposition. *See* Liebenberg Decl. ¶¶ 31-33.

The awards requested here are consistent with awards that Courts in this Circuit and elsewhere have awarded to class representatives for their services, Indeed, TPP Class Representatives often receive larger awards. *See e.g., Vista Healthplan, Inc. v. Cephalon, Inc*., No. 06-cv-1833, 2020 WL 1922902, at *33 (E.D. Pa. Apr. 21, 2020) (granting $50,000 service awards to each of four TPP plaintiffs) (collecting cases); *In re Domestic Drywall Antitrust Litig*., No. 13-MD-2437, 2018 WL 3439454, at *17, 20 (E.D. Pa. July 17, 2018) (awarding $50,000 and $40,000 service awards to each of two named plaintiffs); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving

---

[7] The TPP Sandoz Settlement Class Representatives are 1199SEIU Greater New York Benefit Fund; 1199SEIU Licensed Practical Nurses Welfare Fund; 1199SEIU National Benefit Fund; 1199SEIU National Benefit Fund for Home Care Workers; American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan; American Federation of State, County and Municipal Employees District Council 47 Health & Welfare Fund; City of Providence, Rhode Island; Detectives Endowment Association of the City of New York; Hennepin County; Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana; Philadelphia Federation of Teachers Health and Welfare Fund; Self-Insured Schools of California; Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund; UFCW Local 1500 Welfare Fund; Uniformed Fire Officers Association Family Production Plan Local 854; and United Food & Commercial Workers and Employers Arizona Health & Welfare Trust.

[8] The Consumer Sandoz Settlement Class Representatives are Nina Diamond; Ottis McCrary; Valerie Velardi; and Robby Johnson.

$100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives).[9]

Likewise, the awards requested for Consumer Class Representatives are consistent with what courts within the Third Circuit have awarded to individual persons in antitrust class actions. *See*, *e.g.*, *In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Prods. Litig.*, Apr. 25, 2024 Order (ECF 2737) (approving $5,000 service awards); *In re Railway Industry Employee No-Poach Antitrust Litig.*, No. 18-798 (W.D. Pa.) ECF 313 ¶4 ($15,000 service award to each plaintiff); *Vista Healthplan*, 2020 WL 1922902, at *33 ($15,000 service award to consumer class representative). Though the size of the Consumer representatives' service awards is less than that of the TPP representatives, it is justified, given that they were not subject to extensive ESI searches, and they produced a much smaller volume of documents and transactional data than the TPP representatives. *See* Liebenberg Decl. ¶ 33; *Vista Healthplan*, 2020 WL 1922902, at *33 (noting that "the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities" is a factor to consider when deciding whether to approve service awards") (internal quotation marks and citation omitted); *Alin v. Honda Motor Co.*, 2012 WL 8751045, at *16 (D.N.J. Apr. 13, 2012) ("It is not unusual for representative plaintiffs to receive different incentive awards when their degree of participation is different.").

Accordingly, because the Class Representatives' contributions have benefited the entire EPP Class EPPs respectfully submit this request for service awards of $30,000 for each TPP Class Representative and $5,000 for each Consumer Sandoz Class Representative to be paid from the Sandoz Settlement Fund.

---

[9] Class Counsel intend to request additional service awards for the Class Representatives out of future settlements or judgments, in recognition of the extraordinary efforts these Class Representatives have expended over so many years.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, EPPs respectfully request that the Court enter the

attached proposed Order Granting Direct Purchaser Plaintiffs' Motion for: (1) An Award of

Attorneys' Fees; (2) Reimbursement of Expenses; and (3) Payment of Service Awards.


Dated: April 9, 2025                              Respectfully submitted,

                                                  /s/ Roberta D. Liebenberg
                                                  Roberta D. Liebenberg
                                                  FINE, KAPLAN AND BLACK, R.P.C.
                                                  One South Broad Street, 23rd Floor
                                                  Philadelphia, PA 19107
                                                  Telephone: (215) 567-6565
                                                  rliebenberg@finekaplan.com

                                                  *Lead and Liaison Counsel for End-Payer
                                                  Plaintiffs*