**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: GENERIC** | : | **MDL NO. 2724** |
| **PHARMACEUTICALS** | : | **16-MD-2724** |
| **PRICING ANTITRUST LITIGATION** | : | |
| | : | **HON. CYNTHIA M. RUFE** |
| | : | |
| | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| *Molina Healthcare, Inc. v. Actavis* | : | **No. 20-695** |
| *Elizabeth, LLC* | : | |
| | : | **No. 18-3299** |
| *Humana Inc. v. Actavis Elizabeth, LLC* | : | **No. 19-4862** |
| *Humana Inc. v. Actavis Elizabeth LLC* | : | **No. 20-6303** |
| *Humana Inc. v. Actavis Elizabeth LLC* | : | |

**SPECIAL MASTER LAWRENCE F. STENGEL'S
REPORT AND RECOMMENDATION TO THE COURT RESOLVING DEFENDANTS'
MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL AND LAW FIRM**

This Report and Recommendation affects the above-referenced cases.  Before me are

Defendants Motion to Disqualify Plaintiffs' Counsel (W. Joseph Nielsen) and the Law Firm of

Lowey Dannenberg, P.C. from Representing Plaintiffs Molina Healthcare, Inc. and Humana Inc.,

as well as the related opposition and reply briefing.  The motion and related materials were filed

in MDL Sub-Dockets Nos. 20-CV-695; 18-CV-3299; 19-CV-4862; and 20-CV-6303.[1]  These

filings were referred to me by Pretrial Order No. 309 in the MDL (ECF 3658).  Argument was

held on October 28, 2025.

---

[1] Because the filings appear in multiple dockets, they have various ECF filing references.  In
Sub-Docket No. 20-CV-695, Defendants' motion is ECF 288, 290 (supporting brief); Plaintiffs'
opposition is ECF 293; and the Defendants' reply is ECF 300.  In Sub-Docket No. 18-3299,
Defendant's motion is ECF 346, 357 (supporting brief); Plaintiff's opposition is ECF 379; and
the Defendants' reply is ECF 386.  In Sub-Docket No. 19-4862, the Defendants' motion is ECF
255, 257 (supporting brief); Plaintiffs' opposition is ECF 261; and Defendants' reply is ECF 269.
In Sub-Docket 20-6303, Defendants' motion is ECF 169, 172 (supporting brief); Plaintiffs'
opposition is ECF 177; and the Defendants' reply is ECF 185.

## I.  INTRODUCTION

W. Joseph Nielsen, Esq. ("Nielsen") worked as an Assistant Attorney General for the State of Connecticut for many years.  During his time there, he was the lead attorney for the multi-state investigation of the defendant pharmaceutical companies' alleged antitrust violations.  Recently, he left the Connecticut Attorney General's Office and started a career in private practice at the law firm of Lowey Dannenberg.  There, he now represents private plaintiffs Molina Healthcare, Inc. ("Molina") and Humana Inc. ("Humana").  The Defendants[2] seek the disqualification of Nielsen and Lowey Dannenberg (by imputation), based on claimed violations of Pennsylvania Rule of Professional Responsibility 1.11 ("PRC 1.11" or "Rule 1.11").

The Defendants argue that Nielsen's representation of Molina and Humana – even though it did not involve "switching sides" (since he went from State plaintiff to private plaintiff) – violates PRC 1.11, because 1) Nielsen has confidential government information that could be used to the Defendants' material disadvantage, and 2) the State of Connecticut did not consent to Nielsen's representation of the two private plaintiffs.

Plaintiffs' opposition to the motion to disqualify rests on two key points.  First, Connecticut did in fact consent (albeit in writing after the Defendants raised the disqualification issue).  Second, the discovery from the State Actions in the District of Connecticut was produced in the MDL and/or is otherwise available through routine discovery tools, and the States and private plaintiffs cooperated on litigation strategy, so Nielsen has no confidential government information that other parties do not also have.

---

[2] The Plaintiffs note that, of the defendants that have not filed for bankruptcy, Glenmark Pharmaceuticals, Inc., Impax Pharmaceuticals, LLC (f/k/a Impax Pharmaceuticals, Inc.), Lupin Pharmaceuticals, Inc., Upsher-Smith Laboratories, LLC, and West-Ward Pharmaceuticals, Corp. have not joined the motion.  Pltfs. Opp. at 2 note 4.

## II.    LEGAL STANDARD RELATED TO DISQUALIFICATION

### A.  Case Law Related to Disqualification

The Court's "power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).  The decision of whether to disqualify an attorney is generally "committed to the sound discretion of the district court." *Id.* at 1201. *Miller* also holds that "disqualification never is automatic" upon a finding that a disciplinary rule "prohibits an attorney's appearance in a case." *Id.* (citations omitted). The district court must "consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.* (citations omitted).  The Third Circuit has observed that district courts have "a wide discretion in framing [their] sanctions to be just and fair to all parties involved." *Id.* "Even when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy." *In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022) ("*Boy Scouts*").  Relevant factors to evaluate in considering attorney disqualification include: "the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the integrity of legal proceedings, and preventing unfair prejudice." *Boy Scouts*, 35 F.4th at 160.

The Third Circuit considers disqualification of counsel a "drastic remedy." *Boy Scouts*, 35 F.4th at 161; *see also Jackson v. Rehm & Hoss Co.*, 366 F. App'x 342, 347 (3d Cir. 2010) ("extreme remedy of attorney disqualification."). A party seeking to disqualify counsel bears a heavy burden and a high standard of proof. *See Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D.

Pa. 1994) ("The party seeking to disqualify opposing counsel bears the burden of clearly showing that continued representation would be impermissible. Vague and unsupported allegations are not sufficient to meet this standard. Generally, motions to disqualify opposing counsel are not favored.") (internal citations omitted); *see also Reg'l Employers' Assur. Leagues Voluntary Employees' Beneficiary Ass'n Tr. v. Castellano*, No. CIV A 03-6903, 2009 WL 1911671 at *2 (E.D. Pa. July 1, 2009) ("In this district, motions to disqualify are an 'extreme sanction' that should not be imposed lightly.").

Rule 1.11 links to the disqualification analysis through courts' interest in protecting the integrity of the proceedings before them. The Rules of Professional Conduct adopted by the United States District Court for the Eastern District of Pennsylvania are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time.  *See* Local Rules of Civil Procedure, Rule 83.6, Rule IV -- Standards for Professional Conduct. "[C]ourts have vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar, eliminating conflicts of interest, and protecting confidential communications between attorneys and their clients." *Inorganic Coatings, Inc. v. Falberg*, 926 F. Supp. 517, 519 (E.D. Pa. 1995) (citation omitted). Indeed, "[t]he Rules of Professional Conduct are designed to 'safeguard the integrity of the profession and preserve public confidence in our system of justice.'" *United States v. Nedrow*, 1991 U.S. Dist. LEXIS 19427, at *12-13 (W.D. Pa. Nov. 27, 1991) (quoting *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1990)). When counsel violates a disciplinary rule, a court may order disqualification if it determines that "disqualification is an appropriate means of enforcing the applicable disciplinary rule, given the ends that the disciplinary rule is designed to serve." *Henry v. Delaware River Joint Toll Bridge Comm'n*, 2001 WL 1003224, at *1 (E.D. Pa. Aug. 24, 2001) (citing *Miller*, 624 F.2d at 1201). A

court may also "use its inherent authority to disqualify counsel or a firm for reasons beyond those in the incorporated rules." *In re Maxus Energy Corp.*, 49 F.4th 223, 227 n.1 (3d Cir. 2022).

With that said, the Third Circuit has nonetheless observed that "Sometimes disqualification is more disruptive than helpful even though an attorney may not have satisfied his or her professional obligations.  And, indeed, courts in our Circuit often deny disqualification even when finding or assuming conflicts under the professional conduct rules." *Boy Scouts*, 35 F.4th at 160 (collecting cases).

### B.  Pennsylvania Rule of Professional Conduct 1.11

Pennsylvania Rule of Professional Conduct 1.11 governs "Special Conflicts of Interest for Former and Current Government Officers and Employees."  Relevant here, PRC 1.11(a) prohibits a former government employee from "represent[ing] a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, *unless the appropriate government agency gives its informed consent* to the representation." PRC 1.11(a)(2) (emphasis added).

PRC 1.11(c) restricts former government attorneys from working on matters in which the attorney possesses confidential government information. No consent or waiver can cure this conflict.  Rule 1.11(c) provides:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information *could* be used to the material disadvantage of that person.

PRC 1.11(c) (emphasis added).  Rule 1.11(c) defines "confidential government information" as "information that has been obtained under governmental authority and which, at the time this

Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." PRC 1.11(c).

"Courts and the bar have called it fundamentally unfair for a former government attorney, newly in private practice, to use specific information obtained by the exercise of government power—information that otherwise would not be available to their client—to the prejudice of opposing private party litigants. This unfairness exists even if the former client, the government, is not prejudiced by the lawyer's subsequent use of the information." *Brown v. Dist. of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 45 (D.C. 1984) (en banc) (citations omitted).

## III.    THE PARTIES' POSITIONS AND ARGUMENTS

### A.  The Defendants' Opening Arguments

#### 1.    Rule 1.11(a)'s Informed Consent Requirement

While discussed second in the motion, Defendants' argument based on Rule 1.11(a) is more straightforward and discussed first here. Defendants argue that Connecticut did not give informed consent to Nielsen's representation of the private plaintiffs, as required by Rule 1.11(a).  The Defendants say that they repeatedly asked Lowey Dannenberg to provide proof that consent had been given, and the firm equivocated, ultimately providing no documentation before the motion was filed.[3]

Thus, the Defendants argue that PRC 1.11(a) has been violated, because Molina and Humana failed to provide any evidence showing that Connecticut gave its informed consent to

---

[3] The Defendants' briefing on the Rule 1.11 informed-consent issue contains a detailed analysis of whether the Connecticut and MDL matters are related and whether Nielsen's involvement in the Connecticut investigation was personal and substantial.  The answer is straightforward: Yes to both.  The State AG actions started in the MDL, before being transferred to Connecticut, and Nielsen's leading of the Connecticut investigation is well-known.  There is no need to belabor these points.

Nielsen's representation of the private plaintiffs.  However, the Defendants then offer a loose,

nebulous argument to the effect that – even if Connecticut did consent – Nielsen's involvement

in the Connecticut investigation was so substantial that having him involved in representing the

private plaintiffs would simply "taint" the proceedings.  Defs. Br. at 27.  Defendants posit that

jurors might be swayed by Nielsen's impressive pedigree and investigatory role, thus

undermining the value of *Humana I* as a bellwether.  *See* Defs. Br. 26-27.

### 2.    Rule 1.11(c) and the Use of Confidential Government Information

Defendants also argue that Nielsen has confidential government information and that he

"could" use it against them.  The information includes:

a.  "unique insights" that Nielsen gained from confidential settlement discussions that he

had in Connecticut;[4]

b.  "confidential information and strategy" that he gained by interviewing, proffering,

and entering settlement agreements with cooperating witnesses;

c.  Nielsen "coordinat[ing] with other state and federal enforcers, who provided him with

additional confidential information" some of which he has refused to produce as

privileged;

---

[4] The Defendants' briefing does not detail the nature of the confidential information that may
have been shared during settlement negotiations, and which would not have also been captured
by shared discovery or coordinated efforts among the private plaintiffs and the States.  During
argument, the Defendants offered to supplement the settlement-discussion issue with additional
submissions to me.  Approximately one month after the oral argument, a Defendant offered to
submit additional information *ex parte* and *in camera*.  I asked the parties to submit additional
letters on the propriety of any such *ex parte/in camera* request.  Based on due process concerns, I
informed the parties that I would be willing to accept additional submission(s), but the
submission would not be *ex parte/in camera*, and the parties would be given an opportunity to
review any new information and respond.  No Defendant decided to submit additional
information to me given these requirements.

d.  Nielsen obtaining millions of documents through civil investigative demands, and some of the materials have not been produced in the MDL; and

e.  Nielsen developing "strategic insights" and "roadmaps" of evidence through his time as the lead attorney for the Connecticut investigation.

*See* Defs. Br. at 19-20.

Simply put, the Defendants argue that there is information inside Mr. Nielsen's head that could never be produced, as well as some documentary information that has been withheld as privileged in the MDL.  Nielsen cannot unlearn all of this confidential information, and he could use it against the Defendants.  As examples of how confidential government information "*could*" be used here, Defendants say that Nielsen could push Lowey to litigate claims against certain Defendants more aggressively than against others based on what he learned in confidential settlement discussions. He could push Lowey for settlement with certain Defendants with stronger defenses based on what he learned during attorney proffers. He could strategically tailor questions to witnesses in depositions and at trial based on what he learned interviewing confidential government witnesses. Nielsen could also push for discovery from the DOJ and other government agencies based on the information he learned working with these agencies, which Defendants claim that Nielsen has already done on behalf of private Plaintiffs. *See generally* Defs. Br. 23.

Accordingly, if he continues to represent Molina and Humana, PRC 1.11(c) will be violated.

### 3.    Disqualification of Lowey Dannenberg

Defendants argue that Lowey Dannenberg should be disqualified by imputation, because the firm failed to implement a timely and effective ethical screen when it hired Nielsen. PRC

1.11(c) provides that "A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom."  Implementing a screen now would be "closing the barn door long after the horses left." Defs. Br. at 29.

### B.  The Plaintiffs' Opposition

#### 1.    Rule 1.11(a)'s Informed Consent Requirement

The Plaintiffs say that the PRC 1.11 issue is moot, because Connecticut has provided written, informed consent to Nielsen's representation of Molina and Humana.  *See* Exh. B to Nielsen Decl., submitted in support of Pltfs. Br.

#### 2.    Rule 1.11(c) and the Use of Confidential Government Information

Plaintiffs argue that Nielsen has no confidential government information that could be used to the material disadvantage of the Defendants, because of the shared discovery in the MDL.  The States entered into broad Common Interest Agreements ("CIAs") with all the private plaintiffs' groups' counsel in the MDL (including Lowey Dannenberg) to "make sure all plaintiffs were on a level playing field and could coordinate, freely share information and attorney work product, and strategize to efficiently develop their cases." Pltfs. Br. at 1.  Because the MDL Court required all information acquired by the States to be produced to the private parties starting in 2018 (PTO 70),[5] and because the plaintiffs have been sharing confidential

---

[5] According to the Plaintiffs, in PTO 70, the Court ordered all of the State AG investigatory material produced into MDL discovery, subject only to a limited claw-back procedure.  The claw back covered documents that were trade secret; business information "unrelated to allegations in any MDL pleading"; or personal/embarrassing information "unrelated to any allegations in the MDL[.]" Plfs. Br. at 8.  Because of the claw back provision, which covers documents "unrelated" to the MDL, there is no way that Nielsen could use that information, even if he still has it in his head. *See, generally,* Pltfs. Br. at 23.

information, attorney work product, "mental roadmaps and strategic insights" since then pursuant to the CIAs to collectively develop the discovery record, Humana and Molina have "gained no special knowledge by Mr. Nielsen joining Lowey Dannenberg." Pltfs. Br. at 14.

Because the State investigatory information has been included in the MDL discovery,[6] the Plaintiffs rely on ABA Formal Opinion 509 in their argument against PRC 1.11(c)'s application.  That opinion states "[Rule 1.11] should not apply in the situation in which the lawyer's client is legally permitted to use the information in question."  Pltfs. Br. at 14.  If the client is allowed to use the confidential government information, then the reason for the Rule's disqualification provision no longer exists. "Rule 1.11(c) does not apply to all information obtained under government authority[.] . . . Whether government information is publicly available – e.g., whether it can be obtained through routine discovery – will be a question of fact." Pltfs. Br. at 15 (quoting ABA Formal Opinion 509 at 3-4).[7]

The Plaintiffs also argue that information Nielsen gained during settlement discussions is not confidential, because the information would have been based on the discovery materials or information that defense attorneys disclosed to reduce their potential liability in a settlement amount.  Pltfs. Br. at 20-21; 22-23.

Further, in his declaration, Nielsen says that he has not and will not disclose settlement discussions/positions to Lowey's MDL clients, so even if the information were confidential, it

---

[6] Plaintiffs also note that Lowey's MDL clients joined the CIAs between the private parties and the States.  In addition, Lowey attorneys attended some State proffers.  *See* Pltfs. Br. at 21.

[7] Plaintiffs also rely on case law from the Opioids litigation, where a firm was not disqualified, because the court determined that a private party's business information did not become confidential government information simply because it was produced to the government, and the information had been produced to all parties in the litigation any way.  *See* Pltfs. Br. at 16-17.

could not be used to materially disadvantage the Defendants.  Pltfs. Br. at 20 (citing Nielsen Decl. at para. 36).

Lastly, the Plaintiffs argue that even if there were a violation of Rule 1.11, the factors enumerated in *Boy Scouts* counsel against disqualification.  Those factors (discussed *supra*) are: 1) the ability of the litigants to retain loyal counsel of choice; 2) the ability of attorneys to practice without undue restriction; 3) preventing the use of disqualification as a litigation strategy; 4) preserving the integrity of legal proceedings; and 5) preventing unfair prejudice.  *See* Pltfs. Br. at 27 (citing *Boy Scouts*).  Essentially, the Plaintiffs' arguments on this fallback position boil down to the fact that Lowey Dannenberg has represented Humana for a significant period of time and has vast institutional knowledge of the client, plus the fact that the firm has been involved in the MDL litigation for a significant period of time.  In addition, the Defendants have not articulated specific information that Nielsen has in his head, only vague generalities. Lastly, the Plaintiffs argue that the Defendants want to knock out Nielsen and Lowey as a litigation tactic and knocking them out would clearly prejudice Humana and Molina.  *See* Pltfs. Br. 26-31.

### 3.    Disqualification of Lowey Dannenberg

The Plaintiffs do not appear to separately address the imputation argument.  It appears instead that they rely on their general arguments that PRC 1.11 has not been violated, and even if it has been, the *Boy Scout* factors indicate that Nielsen and Lowey Dannenberg should not be disqualified.

11

### C. The Defendants' Arguments on Reply

As to Rule 1.11(a), Defendants argue that the letter from Connecticut consenting to Nielsen's representation of Humana and Molina does not show that Connecticut gave *informed* consent. Defs. Reply at 12-13.

As to Rule 1.11(c), Defendant raise multiple counterarguments on reply. First, not "*all*" information was produced by the States in the MDL. The following information was excluded: "[D]ocuments created by a Party or Non-Party specifically for provision to the State Plaintiffs – such as transmittal letters…, presentations to the State Plaintiffs, documents created by counsel [to aid the State investigations], white papers to the State Plaintiffs, and other correspondence with the State Plaintiffs regarding the investigation[.]" Defs. Reply at 3. As a corollary argument (Defs. Reply at 10-11), the Defendants argue that not all information in Nielsen's possession could be obtained through discovery.

Second, Nielsen has withheld certain privileged information, as well as information that could not be produced in accordance with certain terms of various settlement agreements. Defs. Reply at 4-5.

Third, Nielsen must have some confidential government information,[8] because in his Declaration he promises that he will not share it with Lowey's MDL clients or use it in the MDL litigation. Defs. Reply at 5.

---

[8] The Defendants disagree with the Plaintiffs' contention that confidential government information is limited to information that the government obtained via compulsory process. According to the Defendants, information that was volunteered to the government is also included. Defs. Reply at 7. Connecticut state law states that information furnished voluntarily to the Attorney General "shall not be available to the public." Defs. Reply at 8. The Defendants then argue that the information that was confidential under Connecticut law is still confidential – *even though the Court ordered it disclosed as MDL discovery* – because the information at its core was confidential and maintains that essential character for purposes of Rule 1.11, even if it

Fourth, it is unfair to expect the Defendants to have specific details about precisely what confidential government information Nielsen may have that he could use against them, because he could have gathered that information from anywhere.  The Defendants are not omniscient, and they cannot know what information Nielsen gathered from sources other than them. Defs. Reply at 5-6.

Defendants also argue that Nielsen cannot escape Rule 1.11(c) by disclosing confidential government information, because allowing him to do so would create a situation where any government attorney could avoid the Rule simply by disclosing the information that he was not supposed to disclose.  Defs. Reply at 11-12.  This argument appears to ignore the fact that Judge Rufe ordered the disclosure, and that Nielsen did not disclose the information on his own (i.e., violate Rule 1.11 in order to avoid having to comply with Rule 1.11).

Lastly, the Defendants provide their own view of how the *Boy Scout* factors affect the disqualification analysis.  Defendants argue that allowing Nielsen to use what he learned as a government investigator would "erode[] the public trust in government and taint[] these judicial proceedings." *Id.* Next, the right to counsel is "not sacrosanct" and counsel "are routinely disqualified for rules violations." *Id.* Also, the Defendants' motion is not a litigation tactic; the Plaintiffs created this problem for themselves by retaining Nielsen and "throw[ing] a monkey

---

was ordered disclosed. Defs. Reply at 8-10.  The Defendants also distinguish the case law from the Opioid litigation, because that case law looked at whether information was readily discoverable, not whether it has already been shared. Defs. Reply at 10.  Even if this argument might somehow be philosophically or technically true, it would seem very odd to conclude that information that was disclosed in the MDL – *and that everyone has* – is still "confidential" information that cannot be used under Rule 1.11.  At the very least, the fact that other plaintiffs in the MDL have the information strongly suggests that the information cannot be used to the Defendants' material disadvantage by Attorney Nielsen.

wrench into the proceedings." *Id.* at 15.  Lastly, disqualification would not impose an undue burden on Nielsen, because there are "myriad opportunities" that he could pursue elsewhere. *Id.*

## IV. ANALYSIS

### A. Informed Consent and Rule 1.11(a)

In their briefing and during argument, the Defendants pressed the point that Attorney Nielsen and Lowey Dannenberg violated PRC 1.11(a), even though the Plaintiffs (through Attorney Nielsen's declaration) provided a letter in which the State of Connecticut indicated that it has no objection to Mr. Nielsen's representation of Molina and Humana. *See* Nielsen Decl. in support of Pltf. Opp., Exh. B.  In support of this position, the Defendants argue that the letter shows that Connecticut had no objection, but the letter did not say that Connecticut consents.  If there is a meaningful distinction between having no objection and providing consent, it has not been adequately explained.

Moreover, even if daylight existed between giving consent and not objecting, the facts here show that the Connecticut Office of the Attorney General was well informed about Attorney Nielsen's move to Lowey Dannenberg and that he would be representing private plaintiffs once he was there.  The letter from the Connecticut Office of the Attorney General states that "prior to [Nielsen's] departure from the Connecticut Office of the Attorney General, [he] disclosed [his] intention to join the law firm of Lowey Dannenberg, P.C. ("Lowey").  At that time, [Nielsen] further specified that [his] responsibilities at Lowey would include representing Humana, Inc and other insurance companies in their private litigations (currently pending in MDL 2724…) concerning allegations of price fixing and market allocation within the generic pharmaceutical industry." Nielsen Decl. in support of Pltfs. Opp., Exh. B.  The letter is signed by Jeremy Pearlman, Associate Attorney General/Chief of the Division of Enforcement and Public Protection.  It strains

credulity to believe that Mr. Pearlman would have been unaware of the multistate investigation, Attorney Nielsen's role therein, the coordination between the multistate investigation and the MDL litigation, such that he could not provide informed consent under Rule 1.11.

Further, unlike the ABA Model Rule 1.11, which requires that informed consent be confirmed in writing, PRC 1.11 has no such requirement. Accordingly, the Plaintiffs, Mr. Nielsen, and Lowey Dannenberg had no obligation to produce a signed writing from the State of Connecticut any sooner than they ultimately did.[9]

Thus, I find that the Connecticut Office of the Attorney General provided informed consent to Attorney Nielsen's representation of private clients in connection with a matter in which he participated personally and substantially as a public officer. There is no violation of Rule 1.11(a) and, therefore, no basis for disqualification on those grounds.

## B. Confidential Government Information and Rule 1.11(c)

Attorney Nielsen was of course exposed to a deep wealth of information regarding the generics antitrust investigation/litigation when he worked at the Connecticut Office of the Attorney General for multiple years. On the surface, it is tempting to suspect that after being steeped in the States' antitrust investigation for many years, Attorney Nielsen must somehow have something in his head that no one else knows and that was not shared. However, the Defendants face a demanding burden beyond presenting alluring supposition. The key issue for purposes of Rule 1.11(c) is whether he still possesses "confidential government information" that could be used to materially disadvantage the Defendants. For the reasons explained below, I find he does not.

---

[9] It is also worth noting that Rule 1.11(a) appears to be a side-switching rule, and no side-switching is involved here. The Comments to PRC 1.11 discuss conflicts of interest in association with 1.11(a). *See* Comment [2]. Further, in contrasting Rule 1.11(a) and Rule 1.11(c), the Comments explain that "Paragraphs (c) and (d)(2) apply regardless of whether a lawyer is adverse to a former client" (i.e., in contrast to Rule 1.11(a). *See* Comment [3].

Confidential government information is "information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." PRC 1.11(c).  Both the Defendants and the Plaintiffs submitted expert reports in support of their arguments regarding Rule 1.11(c) and the concept of "confidential government information."  In support of their motion, the Defendants provided the Expert Report of W. Bradley Wendel. Professor Wendel's initial report contains a robust academic analysis of Rule 1.11.  *See* Defs. Mot. at Exh. 1.  Missing from his initial report, however, is any discussion of the procedural history in the MDL, the general discoverability of information obtained through Civil Investigative Demands, and/or the cooperation agreements between the States and private plaintiffs.  Professor Wendel addresses this deficiency in his rebuttal report, which was submitted with the Defendants' reply. *See* Defs. Reply at Exh. 1, ¶¶ 5-8.  Despite the sharing of information through document production in the MDL and through years of ongoing cooperation between the States and private plaintiffs, Professor Wendel points to the ongoing risk that some confidential government information may yet be used against the Defendants.  *Id.* at ¶¶ 7-8.  Even if some unidentified, inchoate risk exists regarding information in Attorney Nielsen's possession that was not shared through document production or years of ongoing coordinated litigation efforts, the standard for disqualification of counsel is a high burden.[10]  Given the events in the MDL, which

---

[10] To the extent that Attorney Nielsen has confidential information gleaned through settlement discussions – and that information has not already been shared through years of strategic discussions between the States and private plaintiffs as they coordinate their approach and tactics, Mr. Nielsen has already affirmed that he would not use such information against the Defendants.  *See* Nielsen Decl. in Support of Plaintiffs' Opp. at ¶ 36.  Given the extreme relief that the Defendants seek through disqualification, I find Mr. Nielsen's representation to be a compelling fact to consider when evaluating the Defendants' motion.  Similarly, I find the opinions of the Plaintiffs' experts, Professor Rebecca Roiphe and Attorney Stewart Cohen to be

included sharing documents and legal strategies, Mr. Nielsen no longer has confidential government information that other plaintiffs in the MDL do not also have.

Here, the investigatory materials gathered by the Connecticut Office of the Attorney General were available through routine discovery tools. The Connecticut Office of the Attorney General has *civil* antitrust enforcement powers, not *criminal*. Thus, the Connecticut AG's investigation did not include the use of criminal investigative tools, such as grand jury subpoenas or search warrants. As a civil enforcer, the Connecticut AG's office had the power to issue Civil Investigative Demands, but those tools essentially function as pre-complaint civil discovery. *See* Nielsen Decl. in support of Pltf. Opp., ¶ 4. Similarly, the Connecticut AG (and Attorney Nielsen by proxy) was not privy to the fruits of the DOJ's criminal investigation, because Federal Rule of Criminal Procedure 6(e) would have barred sharing such investigatory information. *Id.* at ¶ 7. As a result, the information and materials that the State of Connecticut gathered during the course of its investigation would have been available to others through the use of routine discovery tools in the MDL. *See In re National Prescription Opiate Litigation*, 2024 WL 3387288, at *10 (N.D. Ohio, Mar. 18, 2024) (observing that responses to a Civil Investigative Demand are subject to compulsory discovery) (citation omitted); *See also* American Bar Association Formal Opinion 509, "Disqualification to Prevent the Misuse of "Confidential Government Information" (February 28, 2024) at 4 (observing that "Whether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact.")

---

persuasive. *See* Pltfs. Opp. at Ex. 1, 2. Primarily, I find these two expert reports to be compelling because of their detailed analyses of the underlying procedural history in the MDL, i.e., the Pre-Trial Order that directed the sharing of information between the States and the private plaintiffs, plus the agreements between the States and private plaintiffs that led to years of coordinated litigation efforts, sharing of information, and strategic ideas.

17

Further, the use of routine discovery tools was arguably not even needed here, because the Court directed the sharing of the States' materials with the MDL plaintiffs. In PTO 70, the Court ordered all of the State AG investigatory material produced into MDL discovery, subject only to a limited claw-back procedure. The claw back covered documents that were trade secret; business information "unrelated to allegations in any MDL pleading"; or personal/embarrassing information "unrelated to any allegations in the MDL[.]" Plfs. Br. at 8. Because of the claw back provision, which covers documents "unrelated" to the MDL, there is no way that Nielsen could use that information, even if he still has it in his head. *See, generally,* Pltfs. Br. at 23.

Moreover, Humana and Molina joined the Common Interest Agreements between the private parties and the States. *See* Nielsen Decl. in support of Pltf. Opp., at ¶ 15. These Common Interest Agreements called for broad sharing of information, including confidential material, attorney work product, mental impressions, strategies, and opinions, subject to a common interest among the plaintiffs in jointly prosecuting their respective cases without waiving any privileges. *Id.* The States also allowed the private plaintiffs to share their document review platform, which contains all the States' investigatory material as well as all discovery produced in MDL 2724, and shared their document coding and other work product with private plaintiffs. *Id.* Because of these Common Interest Agreements, the States (i.e., Attorney Nielsen) and the MDL plaintiffs (e.g., Humana and Molina) conferred and coordinated on litigation strategy *for years*.

Given the production of State materials in the MDL and the years of cooperation between the States and private plaintiffs occasioned by the Common Interest Agreements, I find that Attorney Nielsen and Lowey Dannenberg cannot use any confidential government information to the material disadvantage of the Defendants, as that material is known by other plaintiffs. *See, e.g., National Prescription Opiate Litigation,* 2024 WL 3387288, at *11.

Lastly, even if Attorney Nielsen's conduct constituted a violation of Rule 1.11(c), I find that the *Boy Scout* factors and the Third Circuit's general admonition regarding whether disqualification is "disruptive" versus "helpful" counsel against recommending disqualification here. The *Boy Scout* factors (discussed *supra*) are: 1) the ability of the litigants to retain loyal counsel of choice; 2) the ability of attorneys to practice without undue restriction; 3) preventing the use of disqualification as a litigation strategy; 4) preserving the integrity of legal proceedings; and 5) preventing unfair prejudice. *Boy Scouts*, 35 F.4th at 160.

Lowey has represented Humana and Molina in the MDL for years. Attorney Nielsen has been involved in the multistate generics-antitrust investigation for years, cooperated and coordinated with MDL plaintiffs, and complied with MDL orders regarding shared discovery. He also consulted with the Connecticut AG's office regarding the current representation of Molina and Humana. Defendants' motion is not beyond strategic question, given that the disqualifications that they seek would most certainly adversely affect the *Humana I* bellwether case, if not others as well. Further, the course of the MDL resulted in significant sharing of documents, attorney work product, and litigation strategy. Removing Attorney Nielsen and Lowey Dannenberg would run counter to the coordinated efforts that the MDL Court has sought to foster, in order to advance these legal proceedings with fairness and dispatch. Lastly, it is beyond question that disqualifying Attorney Nielsen and the Lowey firm would significantly prejudice Molina and Humana, while the existence of shared discovery and cooperation among the private plaintiffs and States suggests that any prejudice to the Defendants here would be minimal.

19

## V. CONCLUSION

Therefore, for the reasons outlined above, I recommend that the Court deny the Defendants' motion.

Respectfully submitted,

Date: January 8, 2026

/s/ Lawrence F. Stengel
Hon. Lawrence F. Stengel (Ret.)
*Court Appointed Special Master*
SAXTON & STUMP, LLC
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1080
lfs@saxtonstump.com