**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724 <br> 16-MD-2724 |
|  | HON. CYNTHIA M. RUFE |
| This Document Relates to: <br><br> *Humana Inc. v. Actavis Elizabeth LLC, et al.* | 18-CV-03299 |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON DAMAGES</u>**

**FILED WITH REDACTIONS – PUBLIC VERSION**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................. 3

    A.    Risk Allocation for Payment of Prescription Drug Costs Under Medicare Part D. ........................................................................................... 3

        1.    Direct Subsidies ..................................................................... 3

        2.    Reinsurance Subsidies ........................................................... 4

        3.    Low-Income Subsidies ........................................................... 4

        4.    Retrospective Payment Reconciliation Process ..................... 5

    B.    It is Undisputed that Humana's Damages Expert Failed to Consider the Effect of The Government's Medicare Part D Payments on Humana's Indirect VOC. .............................................................................................. 6

    C.    Dr. Chandra Calculated the Government's Medicare Part D Payments Based on the PRS Datasets Produced by Humana. ................................... 7

    D.    Humana Has Not Rebutted Dr. Chandra's Calculation of the Government's Medicare Part D Payments Based on the PRS Datasets. ............. 10

    E.    Humana Has Failed to Identify and Net Out Amounts Humana Already Recovered from Walgreens in Earlier Litigation Concerning the Drugs at Issue. ....................................................................................................... 11

III.    ARGUMENT ................................................................................................... 12

    A.    Humana Has Failed to Meet Its Burden of Providing Evidence from Which a Jury Could Determine Humana's Actual Damages Caused by the Alleged Conduct. ............................................................................... 12

    B.    Amounts Paid by the Federal Government under Medicare Part D for the Drugs at Issue Must Be Excluded from Any Damages Award Because They Reflect Risk Allocated to the Government by Statute and Not Harm to Humana. ....................................................................................... 16

    C.    The Government's Medicare Part D Payments Are Not Subject to the Collateral Source Rule. ......................................................................... 19

    D.    Humana Also Failed to Provide Any Basis for The Jury to Determine and Exclude from Any Damages Award Amounts Humana Has Already Recovered from Walgreens on Unrelated Overpayment Claims Concerning Drugs at Issue. ...................................................................... 22

    E.    Humana Failed to Provide Any Basis for The Jury to Determine and Exclude From Any Damages Award Amounts Derived from Transactions on Which No Overcharge Was Suffered. ............................................... 23

    F.    Humana Seeks Duplicative Recovery by Failing to Remove Its Direct Commerce From Its Indirect Commerce for Purposes of Its Damages Calculations. ........................................................................................... 25

-ii-

IV.    CONCLUSION ................................................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amerinet, Inc. v. Xerox Corp.*,
    972 F.2d 1483 (8th Cir. 1992) ...........................................................................................14

*Bonjourno v. Kaiser Aluminum & Chem. Corp.*,
    518 F. Supp. 102 (E.D. Pa. 1981) ....................................................................................14

*Bozeman v. State*,
    879 So. 2d 692 (La. 2004) ................................................................................................20

*Burns v. Anderson, Crenshaw & Associates, L.L.C.*,
    2008 WL 8834614 (D. Colo. Aug. 15, 2008) ..................................................................15

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) .........................................................................................24

*Centerpoint Mechanic Lien Claims, LLC v. Commonwealth Land Title Ins. Co.*,
    569 P.3d 796 (Ariz. 2025).................................................................................................19

*City of Vernon v. S. Cal. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) .........................................................................................12

*Coleman Motor Co. v. Chrysler Corp.*,
    525 F.2d 1338 (3d Cir. 1975)...........................................................................................13

*E. Shore Title Co. v. Ochse*,
    160 A.3d 1238 (Md. 2017) ...............................................................................................20

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
    131 Fed. Appx. 450 (5th Cir. 2005)..................................................................................14

*Farmers State Bank v. United Cent. Bank of Des Moines, Iowa*,
    463 N.W.2d 69 (Iowa 1990) .............................................................................................20

*GCCFC 2006-GG7 Westheimer Mall, LLC v. Okun*,
    2008 WL 3891257 (S.D.N.Y. 2008)..................................................................................15

*Helfend v. S. Cal. Rapid Transit Dist.*,
    465 P.2d 61 (Cal. 1970) ...................................................................................................20

*Home Placement Serv., Inc. v. Providence J. Co.*,
    739 F.2d 671 (1st Cir. 1984).............................................................................................14

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994)............................................................................................................25

*Humana Inc. v. Actavis Elizabeth, LLC, et al.*,
    No. 2:18-cv-03299 (E.D. Pa. March 25, 2026)....................................................................2

*In re Avandia Marketing, Sales Practices and Prods. Liability Litig.*,
    685 F.3d 353 (3d Cir. 2012)..............................................................................................18

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
    679 F. App'x 135 (3d Cir. 2017) .......................................................................................24

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
    2024 WL 4980784 (E.D. Pa. Dec. 3, 2024).......................................................................14

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation, In re Clomipramine Cases*,
    2025 WL 2483981, at \*19-20 (E.D. Pa. Aug. 27, 2025) .......................................................24

*In re Lidoderm Antitrust Litig.*,
    2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .....................................................................16

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    2022 WL 3362429 (S.D.N.Y. Aug. 15, 2022)............................................................13, 16, 22

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015).........................................................................................24

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020)...........................................................................................17

*In re Valsartan, Losartan, and Irbesartan Prods. Liability Litig.*,
    2023 WL 8071595 (D.N.J. Jan. 24, 2023) ........................................................................16

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990)..........................................................................................................25

*Koehler v. Packer Grp., Inc.*,
    53 N.E.3d 218 (Ill. App. Ct. 2016) ....................................................................................19

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .....................................................................................12, 13

*Nw. Human Servs., Inc. v. Panaccio*,
    2004 WL 2166293 (E.D. Pa. Sep. 24, 2004) .....................................................................18

*R.S.E., Inc. v. Pennsy Supply Inc.*,
    523 F. Supp. 954 (M.D. Pa. 1981).....................................................................................14

*Russo v. Walgreens*,
No. 1:17-cv-02246 (N.D. Ill. June 30, 2025)........................................................................22

*Sheet Metal Workers Local 441 v. GlaxoSmithKline, PLC*,
2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ........................................................................24

*U.S. Football League v. NFL*,
842 F.2d 1335 (2d Cir. 1988)................................................................................................13

*Universal Amusements Co., Inc. v. Gen. Cinema Corp. of Tex., Inc.*,
635 F. Supp. 1505 (S.D. Tex. 1985) ......................................................................................14

*Wong v. Ass'n of Apartment Owners of Harbor Square*,
545 P.3d 547 (Haw. 2024) ....................................................................................................20

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)....................................................................................................2

**STATUTES**

42 U.S.C.
§ 1395w-114 ............................................................................................................................4
§ 1395w-115(a).......................................................................................................................3
§ 1395w-115(b).......................................................................................................................4
§ 1395w-115(e).......................................................................................................................4
§ 1395y(b)(3)(A)...................................................................................................................18

False Claims Act .........................................................................................................................18

Medicare Secondary Payer Act..............................................................................................17, 18

Mich. Comp. Laws § 600.6303(1) ..............................................................................................20

**OTHER AUTHORITIES**

42 C.F.R.
§ 423.336................................................................................................................................4
§ 423.336(c)(2) ......................................................................................................................8
§ 423.343(c) ...........................................................................................................................4
§ 423.343(d)...........................................................................................................................4
§ 423.360(f)...........................................................................................................................23

Federal Rule of Evidence 702........................................................................................................2

N.D. Cent. Code §32-03.2-06 .....................................................................................................20

Restatement (Second) of Torts.....................................................................................................20

**INDEX TO DEFENDANTS' EXHIBITS**

| Exhibit | Description of Exhibits |
|---|---|
| 1 | Rebuttal Expert Report of Dr. William B. Vogt, dated February 27, 2026 |
| 2 | Excerpts from the Transcript of the deposition of Dr. William B. Vogt, taken in this action, dated December 11, 2025 |
| 3 | Expert Report of Dr. Amitabh Chandra, dated January 9, 2026 |
| 4 | Excerpts from the Transcript of Humana Inc.'s 30(b)(6) Deposition through Bethanie Stein, dated September 24, 2025 |
| 5 | Excerpts from the Transcript of the Deposition of William Fleming taken in this action, dated October 30, 2025 |
| 6 | Supplemental Expert Report of Dr. Amitabh Chandra, dated March 26, 2026 |
| 7 | Defendants' Mylan Inc., Mylan Pharmaceuticals, Inc., Mylan N.V., and UDL Laboratories, Inc.'s (collectively "Mylan") Second Set of Requests for Production of Documents to Plaintiff Humana Inc. in this action, dated September 1, 2025 |
| 8 | Plaintiff Humana Inc.'s Responses and Objections to Mylan's Second Set of Requests for Production, dated October 1, 2025 |
| 9 | Email from Deborah Rogozinski, Counsel for Plaintiff Humana Inc., to All Defendants Counsel, dated February 26, 2026 at 11:52 A.M. ET |
| 10 | White Paper drafted by Humana Supply Chain Management, a division of Plaintiff Humana Inc., entitled "Generic Deflation Outlook 2017-2019", dated September 1, 2017 and introduced as Exhibit 22 during the deposition of Keith Dostal, dated September 30, 2025 |
| 11 | Expert Report of Dr. Richard G. Frank, dated February 27, 2026 |
| 12 | Excerpts from the Transcript of the Deposition of Dr. Richard G. Frank, dated March 20, 2026 |
| 13 | Exhibit A to Humana's Amended Motion to Confirm Final Arbitration Award, *Walgreen Co. v. Humana Health Plan Inc. et al*, No. 1:22-cv-00307-ACR, (D.D.C. May 19, 2023), Dkt No. 29-1, introduced as Exhibit 12 at Deposition of Keith Dostal, dated September 30, 2025 |

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 14 | Mike Scarcella, Walgreens to pay $360 million to Humana in drug pricing settlement, Reuters (Jan. 8, 2024), available at: https://www.reuters.com/legal/litigation/walgreens-pay-360-million-humana-drug-pricing-settlement-2024-01-08/ |
| 15 | Exhibit Intentionally Omitted |
| 16 | Appendix A to Defendants' Joint Motion for Summary Judgment on Damages |
| 17 | Appendix B to Defendants' Joint Motion for Summary Judgment on Damages |
| 18 | Press Release, U.S. Department of Justice, False Claims Act Settlements and Judgments Exceed $6.8B in Fiscal Year 2025 (Jan. 16, 2026), available at: https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-68b-fiscal-year-2025 |
| 19 | Daniel Seiden, Humana Will Pay $90 Million in Medicare Drug Fraud Settlement, Bloomberg Law (Aug. 16, 2024), available at: https://news.bloomberglaw.com/federal-contracting/humana-will-pay-90-million-in-medicare-drug-fraud-settlement |
| 20 | Brendan Pierson, Humana to pay $90 mln to settle claim that it overcharged Medicare for drugs, Reuters (Aug. 16, 2024), available at: https://www.reuters.com/legal/government/humana-pay-90-mln-settle-claim-that-it-overcharged-medicare-drugs-2024-08-16/ |
| 21 | Letter from Laura Mummert, Counsel for Plaintiff Humana Inc., to All Defendants Counsel (Sep. 28, 2020) introduced as Exhibit 7 at the Deposition of Bethanie Stein, dated September 24, 2025 |
| 22 | HUM-GEN-MDL-000018854 |
| 23 | HUM-GEN-MDL-000000174 |
| 24 | HUM-GEN-MDL-000000555 |
| 25 | Expert Report of Dr. William B. Vogt, dated November 7, 2025 |
| 26 | Expert Report of Dr. Lauren J. Stiroh, dated January 9, 2026 |
| 27 | Correspondence from J. Bank (Wilson Sonsini) to R. Girnys (Lowey Dannenberg, P.C.), July 31, 2025 (memorializing the parties' meet and confer on July 25, 2025) |

## I.    INTRODUCTION

Any recovery by Humana must be based on its "actual damages." It is undisputed, however, that Humana's damages expert, Dr. William Vogt, calculated the Volume of Commerce (VOC) for Humana's indirect purchaser claims[1] without making any attempt to exclude or net out any of the amounts paid by the federal government on Medicare Part D claims for Drugs at Issue.[2]

Because any overcharges on amounts paid by the government do not constitute "actual damages" sustained by Humana, it was Humana's burden to exclude the government's Medicare Part D payments for the Drugs at Issue from its calculation of indirect VOC. Indeed, Dr. Vogt acknowledged the need to exclude such third-party payments when he explained that he deducted co-payments and deductibles paid by Medicare Part D enrollees from his indirect VOC calculation because his "objective [wa]s to calculate . . . damages to Humana and not damages to consumers."[3] Humana was required to calculate and exclude the government's Medicare Part D payments for precisely the same reason, but it failed to do so.

Defendants' damages expert, Dr. Amitabh Chandra, however, did calculate the government's actual Medicare Part D payments for the Drugs at Issue based on Humana's claims data and on Payment Reconciliation Summary (PRS) datasets exchanged between Humana and the Centers for Medicare and Medicaid Services (CMS) during the Relevant Time Period. Despite this data having always been available to Humana, neither Dr. Vogt nor any of

---

[1] Humana's indirect purchaser claims account for the overwhelming majority (REDACTED) of the VOC underlying Humana's damages claim. Specifically, Humana's damages expert calculated Humana's total direct VOC for the Drugs at Issue at REDACTED whereas he calculated Humana's total indirect VOC for the Drugs at Issue at REDACTED (Ex. 1, Rebuttal Expert Report of Dr. William Vogt (hereinafter "Vogt Rebuttal"), Tables 34, 35).

[2] The Drugs at Issue in this action are listed in Humana's amended complaint. (Docket Item No. 109, Pl. Humana's Second Am. Compl. ¶¶ 19-39).

[3] Ex. 2, Vogt Dep. at 73:6-13, 75:24-76:6.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Humana's other experts performed any analysis of the PRS datasets or provided any economic basis to rebut Dr. Chandra's calculations.[4] As a result, Dr. Chandra's calculations are unrebutted and undisputed, and the full amount of the government's Medicare Part D payments calculated by Dr. Chandra must be excluded from Humana's indirect VOC calculation as a matter of law to prevent a windfall recovery by Humana on those claims.

In addition to this critical error regarding Medicare Part D payments, Humana failed to disaggregate or net out three other significant amounts that are reductions to indirect VOC or set offs of any damages claims: *first,* amounts Humana recovered from Walgreens in a separate litigation concerning the Drugs at Issue are a set off to any damages; *second,* transactions on which no overcharge was incurred at the pharmacy level and accordingly no overcharge was passed on to Humana must be deducted from indirect VOC; and *third,* amounts Humana has double-counted in its direct and indirect VOC must be deducted from indirect VOC. Because Humana has failed to meet its burden of putting forth evidence that will permit a jury to make a reasonable determination of Humana's damages on these issues as well, Defendants are entitled to conclusive determinations of set offs or reductions in indirect VOC in the full amounts set forth in Dr. Chandra's unrebutted calculations as to each category.

---

[4] Humana's damages case relies on the testimony of Dr. Vogt, whom Defendants have moved to exclude as an expert under Federal Rule of Evidence 702. (Defs. Mot. to Exclude Certain Opinions and Testimony of Dr. William B. Vogt, *Humana Inc. v. Actavis Elizabeth, LLC, et al.*, No. 2:18-cv-03299, (E.D. Pa. March 25, 2026)). The exclusion of Dr. Vogt would leave Humana without any evidence of damages, thus entitling Defendants to summary judgment on all Humana's damages claims. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012) ("Expert testimony is necessary to establish damages in an antitrust case."). Even if Dr. Vogt is not excluded, however, Defendants are entitled to the relief sought in this motion because Humana has failed to rebut the set offs and reductions in indirect VOC calculated by Dr. Chandra.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## II.    STATEMENT OF FACTS

### A.    Risk Allocation for Payment of Prescription Drug Costs Under Medicare Part D.

Based on the calculations by Humana's damages expert, Dr. William Vogt, Medicare Part D claims constitute REDACTED of Humana's indirect VOC for the Drugs at Issue. (Ex. 3, Expert Report of Dr. Amitabh Chandra (hereinafter "Chandra Report") ¶ 26). It is undisputed, however, that Humana was responsible for only a fraction of the payments and risk represented by those Medicare Part D claims. As explained by Humana's corporate representative, Bethanie Stein, Humana shares the financial risk on Medicare Part D claims with: (1) the federal government, and specifically CMS; and (2) plan enrollees/beneficiaries. (Ex. 4, Humana Inc. 30(b)(6) Dep. through Bethanie Stein (hereinafter "Stein Dep.") at 292:2-8). Ms. Stein further admitted that Humana's damages are specific to the portion of <u>risk allocated to Humana</u>. (*Id.*).

There is no dispute that private insurers such as Humana bear little of the risk allocation for Medicare Part D claims. That is by design and set forth in the applicable statute. The government's share of the risk for Medicare Part D costs is paid through three types of subsidies.

### 1.    Direct Subsidies

Humana and other insurers submit a "bid" to CMS, informed by their historical pricing experience, estimating the costs of delivering a basic drug benefit to a Medicare enrollee of average health during the plan year, including both expected drug costs and allowances for administrative costs and profitability. (Ex. 3, Chandra Report ¶ 80; Ex. 4, Stein Dep. at 292:2-8; Ex. 5, Fleming Dep. at 76:7-19). Based on an average of all bids submitted, the government pays a monthly "direct subsidy" to plan sponsors for each beneficiary enrolled in a Part D plan at "an overall subsidy level of 74.5 percent" of the average bid amount.[5] A percentage of the direct

---

[5] 42 U.S.C. § 1395w-115(a).

**FILED WITH REDACTIONS – PUBLIC VERSION**

subsidy payments is allocated to the plan sponsor's administrative costs and profitability, and the remainder is allocated to the plan's prescription drug costs. That allocation is reflected in the PRS datasets for each plan. At the end of the plan year, CMS and plan sponsors reconcile the direct subsidy payments identified above with the actual prescription drug costs incurred.[6] Any excess actual drug costs (or savings) relative to expected costs reflected in the direct subsidy payments are then allocated between the government and the plan sponsor in accordance with the Medicare Part D "risk corridors" to achieve the statutory risk allocation.[7]

### 2.    Reinsurance Subsidies

The government also pays reinsurance subsidies to cover costs associated with beneficiaries who have exceeded the out-of-pocket threshold for their prescription drug purchases.[8] The government makes interim monthly reinsurance subsidy payments to plan sponsors based on enrollee case mix and the plan's bid estimates, and those payments are adjusted on an ongoing basis during the plan year to ensure that the federal government pays 80% of the prescription drug costs above the catastrophic level, which is the risk allocated to the government for those costs by statute.[9]

### 3.    Low-Income Subsidies

The government also pays a monthly estimated amount to plan sponsors to fully or partially cover certain out-of-pocket costs for low-income enrollees.[10] Like the reinsurance subsidies, low-income subsidies are adjusted during the plan year to ensure that the government's payments are aligned with the risk allocated to the government by statute.[11]

---

[6] 42 U.S.C. § 1395w-115(e); 42 C.F.R. § 423.336 (2025).
[7] 42 U.S.C. § 1395w-115(e).
[8] 42 U.S.C. § 1395w-115(b); *see also* 42 C.F.R. § 423.343(c) (2025).
[9] 42 U.S.C. § 1395w-115(b); *see also* 42 C.F.R. § 423.343(c) (2025).
[10] 42 U.S.C. § 1395w-114; *see also* 42 C.F.R. § 423.343(d) (2025).
[11] 42 U.S.C. § 1395w-114; *see also* 42 C.F.R. § 423.343(d) (2025).

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 4.    Retrospective Payment Reconciliation Process

At the end of the plan year, CMS and plan sponsors reconcile the subsidy payments identified above with the actual costs incurred, including the actual reimbursement costs for prescription drugs dispensed to enrollees and reflected in Prescription Drug Event (PDE) reports submitted to CMS for each drug transaction. The final allocation of payments between the government and each plan sponsor following this reconciliation process is summarized at the end of each plan year in a PRS dataset. (Ex. 6, Suppl. Expert Report of Dr. Amitabh Chandra (hereinafter "Chandra Suppl. Report") at ¶ 16). These PRS datasets evidence the final, reconciled amounts paid by the government for each plan during the plan year in accordance with the statutory risk allocation, including all subsidy payments CMS has made to the plan sponsor over the course of the plan year (net of all adjustments made to low-income and reinsurance subsidies during the course of the year), and any "risk corridor" payments to reconcile the direct subsidy payments with the plan's actual drug costs for that year. (*Id.*).

During fact discovery, Defendants sought production of the PRS datasets and other reports and datasets exchanged between Humana and CMS during the Relevant Time Period for each of Humana's Medicare Part D plans in order to calculate the amount of the government's Medicare Part D payments. (Ex. 7, Def. Mylan's Second Set of RFPs, Nos. 68, 70, Sept. 1, 2025). Humana refused to produce the requested documents during fact discovery (Ex. 8, Pl. Humana's R&Os to Def. Mylan's Second Set of RFPs, R&O Nos. 68, 70, Oct. 1, 2025), but ultimately produced the PRS datasets on February 26, 2026, five months after the close of fact discovery.

FILED WITH REDACTIONS – PUBLIC VERSION

**B.    It is Undisputed that Humana's Damages Expert Failed to Consider the Effect of The Government's Medicare Part D Payments on Humana's Indirect VOC.**

Humana's damages expert, Dr. Vogt, did not even consider the government's Medicare Part D payments in his damages model. Dr. Vogt conceded that his indirect VOC calculations for the Drugs at Issue were based solely on the transactional claims data (Ex. 2, Vogt Dep. at 76:9-24), and that he made no effort to net out the amounts paid by the government under the undisputed risk allocation discussed above, including as reflected in the PRS datasets:



(*Id.* at 74:3-75:1) (objections omitted).

The only amounts Dr. Vogt subtracted from the total paid to the dispensing pharmacy for each claim were the enrollees' copayments, which he netted out because his REDACTED (*Id.* at 73:6-13, 75:24-76:6). Dr. Vogt testified that he did not believe it was "necessary" to net out the amounts paid by the government (*Id.* at 81:7-14), but he also testified that he had no opinion whether Humana's damages should exclude amounts paid by the government because he viewed that as a "legal question that [he doesn't] offer an opinion on." (*Id.* at 88:14-21).

Dr. Vogt also could not say what he would have done, or what data he would have required, to net out amounts paid by the government:



6



REDACTED

(*Id.* at 90:17-91:12) (objections omitted).

Although Dr. Vogt was unable to say how he would go about netting out the government's Medicare Part D payments, Humana's corporate representative confirmed that Humana's in-house actuarial team makes these calculations in the ordinary course of its business to determine the net amount of Humana's "savings" in Direct and Indirect Remuneration (DIR) fees Humana collects from dispensing pharmacies:



(Ex. 4, Stein Dep. at 161:25-162:15) (emphasis added).

**C.     Dr. Chandra Calculated the Government's Medicare Part D Payments Based on the PRS Datasets Produced by Humana.**

On February 26, 2026, five months after the close of fact discovery, and after Dr. Vogt and Dr. Chandra had already been deposed, Humana produced PRS datasets for each of Humana's Medicare Part D Plans for each plan year during the Relevant Time Period. (Ex. 9, E-mail from Deborah Rogozinski, Pl. Counsel, to All Defs. Counsel (Feb. 26, 2026, at 11:52 ET)).

The PRS reconciliation process is necessarily retrospective. Each PRS dataset shows actual payments by and to the plan sponsor, including but not limited to: 1) reimbursement amounts paid to dispensing pharmacies for each prescription drug transaction during the plan

**FILED WITH REDACTIONS – PUBLIC VERSION**

year and reflected in PDE reports submitted to CMS by the plan sponsor; 2) all subsidy payments CMS has made to the plan sponsor over the course of the plan year (net of all adjustments made during the course of the year); and 3) information submitted by the plan sponsor concerning DIR[12] fees paid to the plan sponsor by dispensing pharmacies and other third parties. In order to reconcile the government's direct subsidy payments with its allocated risk for the plan's actual prescription drug costs, "CMS at its discretion makes either lump-sum payments or adjusts monthly payments in the following payment year[.]" 42 C.F.R. § 423.336(c)(2) (2025).

Based on an unrebutted analysis of the PRS datasets and claims data produced by Humana for each of its Medicare Part D plans for the relevant time period, Dr. Chandra calculated the low-income subsidies,[13] reinsurance subsidies,[14] direct subsidies,[15] and risk corridor payments,[16] and determined that the government paid REDACTED of the revised total indirect VOC for the Drugs at Issue reflected in Dr. Vogt's Rebuttal Report, with specific percentage payments for each Drug at Issue as shown in the table below.

---

[12] One of the biggest sources of DIR fees for PBMs are so-called "pharmacy incentive" programs in which PBMs withhold a portion of the "reimbursement" amount reflected in the transactional data at the point of sale and subsequently pay out a portion of that withheld amount if the pharmacy meets certain "performance" metrics established by the PBM. Humana projected it would "extract" REDACTED in "net Direct/Indirect Re-numeration [sic] 'DIR'" fees from dispensing pharmacies in 2017-2018 through its pharmacy incentive program. (Ex. 10, Dostal Dep. Ex. 22 at 2) (emphasis added). Humana's corporate representative also confirmed that DIR fees paid to Humana were used to "lower drug spend on behalf of Humana insurance." (Ex. 4, Stein Dep. at 162:16-163:1).

[13] Dr. Chandra calculated low-income subsidies based on Humana claims data showing low-income subsidies (including adjustments) actually paid by the government during the plan year in connection with specific purchases of Drugs at Issue. (Ex. 3, Chandra Report ¶ 85).

[14] Reinsurance subsidies were calculated based on Humana claims data showing reinsurance subsidies actually paid by the government during the plan year (including adjustments necessary to ensure that the federal government paid 80% of costs above the catastrophic level) in connection with specific purchases of Drugs at Issue. (Ex. 6, Chandra Suppl. Report, Table 2, Table 2 n.3(b)).

[15] Dr. Chandra calculated direct subsidies by taking the total direct subsidy payments allocated to the plan's drug costs as shown in the PRS datasets, and applying those payments proportionally to the plan's costs for the Drugs at Issue. (*Id.* Table 2, Table 2 n.3(c)).

[16] "Risk corridor" payments were calculated by taking any "risk corridor" payment owed by the government for its share of any actual drug costs in excess of expected costs, as reflected in the PRS datasets, and applying that payment proportionally to the plan's costs for the Drugs at Issue. (*Id.* ¶ 20).

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Subject Drug | Formulation | Vogt Rebuttal Report Indirect VOC | Corrected VOC | % Change in VOC |
|---|---|---|---|---|
| Acetazolamide | Capsule (ER) | REDACTED | REDACTED | REDACTED |
| Acetazolamide | Tablet | REDACTED | REDACTED | REDACTED |
| Amitriptyline | Tablet | REDACTED | REDACTED | REDACTED |
| Baclofen | Tablet | REDACTED | REDACTED | REDACTED |
| Benazepril/ Hydrochlorothiazide | Tablet | REDACTED | REDACTED | REDACTED |
| Clobetasol | Cream | REDACTED | REDACTED | REDACTED |
| Clobetasol | Emollient Cream | REDACTED | REDACTED | REDACTED |
| Clobetasol | Gel | REDACTED | REDACTED | REDACTED |
| Clobetasol | Ointment | REDACTED | REDACTED | REDACTED |
| Clobetasol | Solution | REDACTED | REDACTED | REDACTED |
| Clomipramine | Capsule | REDACTED | REDACTED | REDACTED |
| Desonide | Cream | REDACTED | REDACTED | REDACTED |
| Desonide | Ointment | REDACTED | REDACTED | REDACTED |
| Digoxin | Tablet | REDACTED | REDACTED | REDACTED |
| Divalproex Sodium | Tablet (ER) | REDACTED | REDACTED | REDACTED |
| Doxycycline | Hyclate Capsule | REDACTED | REDACTED | REDACTED |
| Doxycycline | Hyclate Tablet | REDACTED | REDACTED | REDACTED |
| Doxycycline | Hyclate Tablet (DR) | REDACTED | REDACTED | REDACTED |
| Doxycycline | Monohydrate Capsule | REDACTED | - | - |
| Doxycycline | Monohydrate Tablet | REDACTED | REDACTED | REDACTED |
| Econazole Nitrate | Cream | REDACTED | REDACTED | REDACTED |
| Fluocinonide | Cream | REDACTED | REDACTED | REDACTED |
| Fluocinonide | Emollient/Emulsified Base Cream | REDACTED | REDACTED | REDACTED |
| Fluocinonide | Gel | REDACTED | REDACTED | REDACTED |
| Fluocinonide | Ointment | REDACTED | REDACTED | REDACTED |
| Leflunomide | Tablet | REDACTED | REDACTED | REDACTED |
| Levothyroxine | Tablet | REDACTED | REDACTED | REDACTED |
| Lidocaine | Ointment | REDACTED | REDACTED | REDACTED |
| Lidocaine/Prilocaine | Cream | REDACTED | REDACTED | REDACTED |
| Nystatin | Cream | REDACTED | REDACTED | REDACTED |
| Nystatin | Ointment | REDACTED | REDACTED | REDACTED |
| Nystatin | Tablet | REDACTED | REDACTED | REDACTED |
| Pravastatin | Tablet | REDACTED | REDACTED | REDACTED |
| Propranolol | Capsule (ER) | REDACTED | REDACTED | REDACTED |
| Propranolol | Tablet | REDACTED | REDACTED | REDACTED |
| Theophylline | Tablet (ER) | REDACTED | REDACTED | REDACTED |
| Ursodiol | Capsule | REDACTED | REDACTED | REDACTED |
| Verapamil | Capsule (ER) | REDACTED | REDACTED | REDACTED |
| Verapamil | Tablet | REDACTED | REDACTED | REDACTED |
| Verapamil | Tablet (ER) | REDACTED | - | - |
| **All Subject Drugs** | | REDACTED | REDACTED | REDACTED |

(Ex. 6, Chandra Suppl. Report, Table 2).

9

**D.      Humana Has Not Rebutted Dr. Chandra's Calculation of the Government's Medicare Part D Payments Based on the PRS Datasets.**

In his rebuttal report, Dr. Vogt provided "adjusted" calculations of Humana's indirect VOC for the Drugs at Issue to reflect DIR data that Humana also produced after the close of fact discovery, and to address certain other methodological flaws noted by Dr. Chandra. (Ex. 1, Vogt Rebuttal ¶¶ 164-66).[17] But Dr. Vogt again failed to consider the government's Medicare Part D payments in his revised calculation of Humana's indirect VOC for the Drugs at Issue. (*Id.* at ¶¶ 139, 163). Rather than defending his decision to ignore the government's payments based on any economic principles, Dr. Vogt relied entirely on the opinion of Humana's rebuttal expert, Dr. Richard Frank, "in [that] regard." (*Id.* ¶ 139).

Dr. Frank also made no attempt to calculate the government's Medicare Part D payments, or to provide the jury with information that would allow it to make that calculation based on the PRS datasets. *(Id.* at ¶ 163) ("It is also my understanding that Dr. Frank does not provide alternative calculations of damages based on Defendants' critiques"); Ex. 11, Expert Report of Dr. Richard G. Frank (hereinafter "Frank Report") ¶ 3; Ex. 12, Frank Dep. at 88:23-89:22). Dr. Frank (erroneously) criticized the <u>legal</u> basis for Dr. Chandra's decision to calculate and exclude the government's payments (Ex. 11, Frank Report ¶¶ 22-63),[18] but he offered no economic basis to question either the estimates Dr. Chandra provided in his initial report or Dr. Chandra's calculations based on the PRS datasets. (Ex. 12, Frank Dep. at 143:2-151:6).

---

[17] This "adjustment" was necessary in part because Dr. Vogt failed to consider DIR fees paid to Humana in his original calculations. The combined effect of Dr. Vogt's "adjustments" reduced his indirect VOC calculation from REDACTED . (Ex. 1, Vogt Rebuttal, Table 35). Defendants reserve all rights regarding arguments that Dr. Vogt's adjustments were incorrect, and that the reduction should have been greater.

[18] As Dr. Frank acknowledged, this and Frank's other purported bases for disregarding the federal government payments are legal opinions, and fall outside the scope of Dr. Frank's expertise as an economist. (Ex. 12, Frank Dep. at 149:19-150:1).

**FILED WITH REDACTIONS – PUBLIC VERSION**

Dr. Frank had and was able to review the PRS datasets when forming his opinions. He acknowledged, for example, that the REDACTED

███████████████████████████████████████████████

███████████████████████████ (Ex. 11, Frank Report ¶ 40). But he also testified that he did not have a deep understanding of the PRS datasets themselves. (Ex. 12, Frank Dep. at 26:3-5). And it is undisputed that Dr. Frank made no attempt to use the PRS datasets to calculate the government's Medicare Part D payments for the Drugs at Issue. (Ex. 11, Frank Report ¶ 3; Ex. 12, Frank Dep. at 88:23-89:22).

**E.       Humana Has Failed to Identify and Net Out Amounts Humana Already Recovered from Walgreens in Earlier Litigation Concerning the Drugs at Issue.**

Humana filed a demand for arbitration against Walgreens in 2019, alleging that Walgreens' misconduct caused Humana to make significant overpayments on pharmacy claims for generic drugs. (Ex. 13, Dostal Dep. Ex. 12 at 3). Specifically, Humana alleged that Walgreens breached the terms of its National Chain Pharmacy Provider Agreement with Humana during the Relevant Time Period by failing to report its discounted Prescription Savings Club (PSC) prices as its usual and customary (U&C) charges for purposes of calculating reimbursement amounts that Humana paid to Walgreens for pharmacy claims submitted on behalf of Humana members. (*Id.*). Humana sought compensatory damages in excess of $1.5 billion, and the parties conducted extensive damages discovery. (*Id.* at 62). Humana was awarded more than $572 million in compensatory damages (*Id.* at 58, 72), and subsequently accepted $360 million to settle those claims in January 2024.[19]

---

[19] Ex. 14, Mike Scarcella, *Walgreens to pay $360 million to Humana in drug pricing settlement*, REUTERS (Jan. 8, 2024), https://www.reuters.com/legal/litigation/walgreens-pay-360-million-humana-drug-pricing-settlement-2024-01-08/.

**FILED WITH REDACTIONS – PUBLIC VERSION**

After learning of the recovery from Walgreens, Defendants sought discovery from Humana concerning its claim against Walgreens and any similar overpayment claims against other dispensing pharmacies and industry participants so that any recoveries on such claims relating to the Drugs at Issue could be set off against any damages award. (Ex. 7, Def. Mylan's Second Set of RFPs, Nos. 62-65, Sep. 1, 2025).[20] Again, however, Humana refused to produce any documents responsive to these requests during fact discovery. (Ex. 8, Pl. Humana's R&Os to Def. Mylan's Second Set of RFPs, R&O Nos. 62-65, Oct. 1, 2025). As a result, information concerning those recoveries—which are directly relevant to the determination of any "actual damages" claimed by Humana in this litigation—were not considered by Humana's damages expert, and were not available to Defendants' damages expert during expert discovery.

### III.    ARGUMENT

**A.    Humana Has Failed to Meet Its Burden of Providing Evidence from Which a Jury Could Determine Humana's Actual Damages Caused by the Alleged Conduct.**

Humana has the burden of providing evidence that will permit a jury to make a reasonable and principled determination of Humana's damages caused by any alleged anticompetitive conduct. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162-63 (7th Cir. 1983) (setting aside damages award on antitrust claim where plaintiff failed to disaggregate damages and did not provide evidence at trial that permitted the jury to make a "reasonable and principled estimate" of the plaintiffs' actual damages caused by alleged anticompetitive conduct); *see also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372-73 (9th Cir. 1992) (affirming summary judgment for defendants on damages because plaintiff's damages study "failed to segregate the losses, if any, caused by acts which were not antitrust

---

[20] Defendants only learned of the recovery because a copy of the arbitral award was filed on the public docket in subsequent litigation between Walgreens and Humana, and because the settlement amount was reported in the press and to the SEC.

**FILED WITH REDACTIONS – PUBLIC VERSION**

violations from those that were."). Here, that burden requires Humana to provide the jury with a reasonable basis to determine Humana's actual damages. *MCI*, 708 F.2d at 1162.[21]

Payments by the government of any alleged overcharges for the Drugs at Issue do not constitute "actual damages" to Humana as a matter of law.[22] It is therefore part of Humana's burden to provide sufficient information to exclude such payments from any damages calculation:

> Any benefits, including discounts or subsidies, that flowed to a plaintiff must be used to reduce the amount of damages suffered by that plaintiff. Therefore, as a matter of law, to the extent [Plaintiffs] receive any form of payment that covers all [or] part of [their] . . . prescription costs, those payments must be deducted from damages. **This is not even a close question** – **subsidies, of all forms, are a damages set off and the jury . . . will be so instructed.**

*In re Namenda,* 2022 WL 3362429, at *11 (emphasis added).

Whether Humana has met this burden is a question of law for the court to decide. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351-53 (3d Cir. 1975) (ordering new trial because plaintiff's evidence on the amount of damages was insufficient as a matter of law; based on plaintiff's damages report, "the jury rationally could not have reduced these figures to

---

[21] *See also U.S. Football League v. NFL*, 842 F.2d 1335, 1377-79 (2d Cir. 1988) (affirming award of $1 in damages where plaintiff failed to provide basis for jury to distinguish between damages caused by unlawful conduct and effects of lawful competition and holding trial court did not err in placing burden on plaintiff to provide "the jury with a reasonable basis upon which to estimate the amount of its losses" caused by unlawful conduct). Humana's "actual damages" are the necessary starting point for any damages calculation under the state antitrust and consumer protection statutes under which Humana brings its indirect purchaser claims. (*See* Ex. 16, Appendix A; Ex. 17, Appendix B) The same is true of Humana's unjust enrichment claims—the jury must have a basis to determine the amounts that Humana ultimately paid for the drugs at issue, because that is the necessary first step in showing any benefit Humana allegedly conferred on Defendants. Humana's failure to provide evidence to support this element of its unjust enrichment claims is addressed separately in the Defendants' Joint Motion for Summary Judgment on State Law Issues.

[22] *In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 WL 3362429, at *11 (S.D.N.Y. Aug. 15, 2022). Like Humana, the plaintiffs in *In Re Namenda* used Dr. Vogt as their damages expert, but in that case, there was conflicting expert testimony concerning the impact of Medicare subsidies and reconciliation payments for the jury to weigh. *Id.* In particular, Dr. Vogt in that case deducted (at least) a "catastrophic subsidy" from his overcharge analysis, which appears to correspond to the low-income subsidy described in this motion. *See* 15-cv-06549-CM-RWL, ECF No. 910 at 4-5. Here, it is undisputed that Dr. Vogt did not even consider the government's Medicare Part D payments at all. (Ex. 2, Vogt Dep. at 74:3-21, 83:22-84:9, 89:9-90:4, 290:1-291:10). Humana has thus produced no evidence from any lay or expert witness to meet its burden on this issue, and Dr. Chandra's calculations of the government's payments are unrebutted.

13

**FILED WITH REDACTIONS – PUBLIC VERSION**

reflect only losses due to unlawful competition."); *R.S.E., Inc. v. Pennsy Supply Inc.*, 523 F. Supp. 954, 971 (M.D. Pa. 1981) (entering judgment notwithstanding the verdict for the defendants because plaintiff's evidence of damages was insufficient as a matter of law where "there was no reasonable damage estimate submitted to the jury, nor was there evidence upon which the jury could have calculated, without speculation, the amount of damages suffered due to alleged . . . overcharges.").[23]

Humana has not met that burden in this case. It is undisputed that Humana's damages calculations do not distinguish between the amounts that were paid by Humana on which it bore the risk of loss and the amounts that were paid by the U.S. government on behalf of Medicare Part D enrollees on which the government bore the risk. The damages calculations also do not account for: (1) Humana's separate litigation-related recovery from Walgreens; (2) transactions on which no overcharge was incurred at the pharmacy level and passed on to Humana; or (3) Humana's double counting error. Although injury is determined at the point of sale, damages must be determined based on the loss actually suffered by the plaintiff.[24] Humana has thus failed

---

[23] *See also Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1497-98 (8th Cir. 1992) (affirming summary judgment for defendants on antitrust and business disparagement claims where plaintiff's damages expert failed to provide a basis for a just and reasonable damages award by the jury); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 Fed. Appx. 450, 454 (5th Cir. 2005) ("Because plaintiffs failed to offer substantial evidence on which a principled award of money damages could be based, the district court did not err in granting judgment in favor of [defendant] on the claims for money damages."); *Bonjourno v. Kaiser Aluminum & Chem. Corp.*, 518 F. Supp. 102, 114-19 (E.D. Pa. 1981) (granting a new trial on damages due to the insufficiency of plaintiff's evidence on amount of damages where "the record [was] insufficient in establishing the requisite factual basis for [plaintiff's] estimates so that the jury could make a rational determination as to their accuracy."); *Universal Amusements Co., Inc. v. Gen. Cinema Corp. of Tex., Inc.*, 635 F. Supp. 1505, 1525-26 (S.D. Tex. 1985) (directing verdict for the defendants because the plaintiff's expert's damages model was insufficient to "provide the jury a rational basis to assess the damage amount."); *Home Placement Serv., Inc. v. Providence J. Co.*, 739 F.2d 671, 678-79 (1st Cir. 1984) (remanding the question of the sufficiency of plaintiff's yardstick evidence to the district court for determination as a matter of law, stating "whether such evidence was sufficient as a matter of law should … be decided by the district court.").

[24] As this Court has recognized, it is important to distinguish between evidence relevant to antitrust injury and evidence relevant to antitrust damages. *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 2024 WL 4980784, at \*12 (E.D. Pa. Dec. 3, 2024). Evidence of government payments under Medicare Part D, or evidence that plaintiff increased "prices to recoup losses" may not be relevant to the question of whether the plaintiff suffered an antitrust injury. *Id.* But on the question of antitrust damages, "[a plaintiff's] experts should offset their damages where pass-through occurs." *Id.* This is especially true here, where Humana never assumed the risk allocated to the government by statute in the first place, and the government was required by statute to pay its allocated share of the costs for the

**FILED WITH REDACTIONS – PUBLIC VERSION**

to provide any basis to determine the amounts of those government and other payments, or to disaggregate those amounts from any "actual damages" caused by the conduct alleged in the complaint.

Because Humana has failed to meet this burden, Dr. Chandra's calculation of the government's actual Medicare Part D payments for the Drugs at Issue based on the PRS datasets is unrebutted and should be determined by the Court as a matter of law. Despite having access to Humana's data, neither Dr. Vogt nor Dr. Frank performed any analysis of the government's payments reflected in the PRS datasets or provided any economic basis to dispute Dr. Chandra's analysis of those datasets. Because Humana has failed to provide evidence to dispute the amount of the government's Medicare Part D payments for the Drugs at Issue, that amount should be conclusively applied by the Court as a REDACTED[25] reduction to Humana's indirect VOC for the Drugs at Issue.[26]

The same is true regarding three additional categories Humana fails to account for in its indirect VOC and damages calculations for the Drugs at Issue. Humana makes no attempt to account for the $360 million recovery from Walgreens for overcharges allegedly caused by Walgreens' conduct with respect to its PSC program, instead refusing to produce any information that would allow the jury to determine what portion of that recovery related to Humana's purchases of Drugs at Issue. As a result, Defendants are entitled as a matter of law to a set off for the full amount of that $360 million recovery. Nor has Humana accounted for the

Drugs at Issue on an ongoing basis subject to final reconciliation, not as a discretionary "pass through" from Humana.

[25] The same arguments also apply to Dr. Chandra's alternative estimate of government payments in his initial report, which are also unrebutted.

[26] *See GCCFC 2006-GG7 Westheimer Mall, LLC v. Okun*, 2008 WL 3891257, at *3 (S.D.N.Y. Aug. 21, 2008) ("Summary judgment may be granted on damages where there is no fact dispute as to the amount of damages."); *Burns v. Anderson, Crenshaw & Associates, L.L.C.*, 2008 WL 8834614, at *7 (D. Colo. Aug. 15, 2008) (granting defendant's motion for summary judgment on damages because the defendant showed the amount of the appropriate offset exceeded any damages available to plaintiff, and plaintiff failed to respond to this argument).

**FILED WITH REDACTIONS – PUBLIC VERSION**

significant number of transactions identified by Dr. Chandra where there was no overcharge, or where Humana has double counted transactions in both direct and indirect VOC. As a result, Defendants are entitled to reductions in indirect VOC as a matter of law based on Dr. Chandra's unrebutted calculations of the transactions in those two categories.

**B.      Amounts Paid by the Federal Government under Medicare Part D for the Drugs at Issue Must Be Excluded from Any Damages Award Because They Reflect Risk Allocated to the Government by Statute and Not Harm to Humana.**

As a matter of law, Medicare Part D subsidies and reconciliation payments by the government must be excluded from any calculation of Humana's damages because they reflect risk allocated to the government under the Medicare statute, rather than harm that ever could have been incurred by Humana.[27] As Humana has acknowledged, risk for prescription drug expenditures under Medicare Part D is allocated by statute to three parties: enrollees, the government, and plan sponsors like Humana. (Ex. 4, Stein Dep. at 292:2-8). The government is responsible for approximately 74.5% of the average bid amount, which the government pays through monthly direct subsidies, but these direct subsidy payments are reconciled at the end of the plan year to account for differences between actual and expected drug costs in accordance with the Medicare Part D "risk corridors." *Supra,* Part II.A. The government also pays additional reinsurance and low-income subsidies, which are determined and adjusted on an ongoing basis during the plan year based on specific prescription drug transactions. *Id.* Those payments are also

---

[27] *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017) ("If, on summary judgment…facts are shown that [plaintiffs] were reimbursed for these overcharges by the federal government [through Medicare Part D subsidies]…these [subsidies] can be excluded from the aggregate damages."); *In re Namenda*, 2022 WL 3362429, at *11 ("Any benefits, including discounts or subsidies, that flowed to a plaintiff must be used to reduce the amount of damages suffered by that plaintiff."); *In re Valsartan, Losartan, and Irbesartan Prods. Liability Litig.*, 2023 WL 8071595, at *2 (D.N.J. Jan. 24, 2023) (holding that Medicare Part D subsidies are "clearly relevant to the determination of actual damages sustained.").

**FILED WITH REDACTIONS – PUBLIC VERSION**

reconciled at the end of the year in accordance with the applicable, statutory risk allocation. *Id.* The government's payments are funded by U.S. taxpayers, not by Humana.

This ongoing transfer of risk to the government distinguishes the government's Medicare Part D payments from an insured's prospective payment of a fixed premium to an insurer. Insurance premiums are based on expected future costs, but the insured does not assume the risk that actual costs may exceed those expectations (including due to alleged overcharges)—that risk is transferred to the insurer. By contrast, the Medicare statute never transfers any of the government's allocated risk to plan sponsors. The government makes prospective "direct subsidy" payments to plan sponsors to cover a portion of expected prescription drug costs, but also <u>retains</u> an allocated portion of the risk that those costs will exceed expected amounts.[28] To allow Humana to recover payments made by the government, based on risk allocated to the government and never assumed by Humana, would give Humana a windfall that Congress did not contemplate or provide for in the statute.

If Congress had intended for plan sponsors to recover amounts paid by the <u>government</u> on Medicare Part D claims, it would have provided a private cause of action allowing plan sponsors—like Humana—to assert such claims. For example, Congress created a "private cause of action for damages" under the Medicare Secondary Payer Act that allows a private party to recover amounts owed to the government from a primary insurer that fails "to provide for

---

[28] Dr. Frank implicitly acknowledged the significance of this allocation of risk to the government when he argued that REDACTED

(Ex. 11, Frank Report ¶ 42). In the reinsurance context, a primary insurer cannot recover as damages amounts that it has been paid under a reinsurance policy because the risk represented by those payments was allocated to the reinsurance company under the reinsurance policy. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 29 (E.D.N.Y. 2020) ("[R]eimbursements from stop-loss insurance are post-injury offsets[.]"). The same is true of all the government's Medicare Part D payments to Humana—each payment represents risk allocated to the government by statute (rather than pursuant to an insurance policy), and Humana never assumed any portion of the government's allocated risk.

**FILED WITH REDACTIONS – PUBLIC VERSION**

primary payment (or appropriate reimbursement)." 42 U.S.C. § 1395y(b)(3)(A).[29] No such

private cause of action exists, however, that would permit Humana to recover amounts paid by

the government on Medicare Part D claims. Those amounts may be potentially recoverable by

the <u>government</u>, but they are not recoverable by Humana as damages here.[30] Indeed, the

government has already recovered settlement amounts from certain of the Defendants based on

the same Medicare Part D payments at issue here.[31] Failure to exclude the government's

payments from Humana's indirect VOC for the Drugs at Issue would therefore not only provide

---

[29] *See In re Avandia Marketing, Sales Practices and Prods. Liability Litig.*, 685 F.3d 353, 367 (3d Cir. 2012) (holding that Humana had a private cause of action under the Medicare Secondary Payer Act to recover for services covered by Medicare that were required to be reimbursed by a primary payer).

[30] The government uses the False Claims Act to recover fraudulent overcharges in Medicare Part D prescription drug costs <u>paid by the government</u> to drug manufacturers, pharmacies, and to PBMs. *See* Ex. 18, Press Release, U.S. Dep't of Just., *False Claims Act Settlements and Judgments Exceed $6.8B in Fiscal Year 2025* (January 16, 2026), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-68b-fiscal-year-2025. Humana has itself been a defendant in such FCA claims. A whistleblower brought a FCA claim against Humana in 2018, alleging that Humana submitted fraudulent bids to CMS for Part D prescription drug contracts from 2011-2017, <u>benefitting Humana by tens of millions of dollars</u> at the expense of the government and beneficiaries. Humana agreed to pay in excess of $90 million to settle that case in 2024. *See* Ex. 19, Daniel Seiden, *Humana Will Pay $90 Million in Medicare Drug Fraud Settlement*, BLOOMBERG LAW (Aug. 16, 2024), https://news.bloomberglaw.com/federal-contracting/humana-will-pay-90-million-in-medicare-drug-fraud-settlement; Ex. 20, Brendan Pierson, *Humana to pay $90 mln to settle claim that it overcharged Medicare for drugs*, REUTERS (Aug. 16, 2024), https://www.reuters.com/legal/government/humana-pay-90-mln-settle-claim-that-it-overcharged-medicare-drugs-2024-08-16/. If Humana falsified bids and overcharged the government in relation to generic drug coverage, as alleged in that FCA claim, that could serve as an intervening cause of the injury Humana claims in this litigation, and potentially offset damages further. But Humana also refused to produce materials concerning this or other overpayment claims <u>against</u> Humana, and Dr. Vogt did not consider the potential impact of such conduct in his damages model. (Ex. 7, Def. Mylan's Second Set of RFPs, No. 66, Sep. 1, 2025; Ex. 8, Pl. Humana's R&Os to Def. Mylan's Second Set of RFPs, R&O No. 66, Oct. 1, 2025). In all events, those government payments are not Humana's to recover, particularly if Humana itself may have caused some portion for the overcharges it now seeks to recover from Defendants. *See Nw. Human Servs., Inc. v. Panaccio*, 2004 WL 2166293 (E.D. Pa. Sep. 24, 2004) (social service organization could not recover damages sustained by Medicare and caused by the plaintiff's former executive's fraud because the victim of the fraud was the government, and plaintiff in fact benefitted from fraudulent overcharges).

[31] *See, e.g.,* Settlement Agreement, United States and Sandoz Inc. (Sep. 28, 2021), available at https://www.justice.gov/d9/press-releases/attachments/2021/10/01/sandoz_executed_settlement_agmt._9-30-21_0.pdf ($185,000,000 settlement based on government purchases of generic Drugs at Issue during the Relevant Time Period); Settlement Agreement, United States and Taro Pharmaceuticals U.S.A., Inc. (Sep. 30, 2021), available at https://www.justice.gov/d9/press-releases/attachments/2021/10/01/taro_executed_settlement_agmt._9-30-21_0.pdf ($213,271,037 settlement based on government purchases of generic Drugs at Issue during the Relevant Time Period); Settlement Agreement, United States and Teva Pharmaceuticals USA Inc. (Oct. 10, 2024), available at https://www.justice.gov/archives/opa/media/1373086/dl ($25,000,000 settlement based on government purchases of generic Drugs at Issue during the Relevant Time Period); Settlement Agreement, United States and Glenmark Pharmaceuticals Inc., USA (Aug. 30, 2024), available at https://www.justice.gov/archives/opa/media/1366326/dl?inline ($25,000,000 settlement based on government purchases of generic Drugs at Issue during the Relevant Time Period).

**FILED WITH REDACTIONS – PUBLIC VERSION**

Humana with a windfall, it would subject certain Defendants to duplicative claims for amounts they have already paid to resolve the government's claims.

As Dr. Vogt acknowledged, he excluded co-payments from his indirect VOC calculation because they represent damages to those consumers, not "damages to Humana." *Supra* Part II.A. The government's payments must be excluded for the same reason.

**C.    The Government's Medicare Part D Payments Are Not Subject to the Collateral Source Rule.**

Dr. Frank's conclusion that the government's Medicare Part D payments should not be subtracted from Humana's "actual damages" is not based on any economic analysis or expertise. (Ex. 12, Frank Dep. at 143:2-151:6). His conclusion is instead based on Humana's counsel's instruction that any payment REDACTED

(Ex. 11, Frank Report ¶ 26) (footnote omitted). Dr. Frank is not qualified to provide a legal opinion concerning the applicability of the collateral source rule (Ex. 12, Frank Dep. at 149:19-150:1), but his attempt to apply that rule to the government's Medicare Part D payments is also fundamentally flawed.

*First,* the collateral source rule was developed to prevent tortfeasors from avoiding damages claims where an injured party had the foresight to purchase insurance coverage for the injuries the tortfeasor caused.[32] Nothing like that happened here. Humana could not purchase insurance coverage from CMS, and the government's payments therefore do not and could not represent risk transferred from Humana to the government pursuant to any insurance policy. As

---

[32] *See, e.g.*, *Centerpoint Mechanic Lien Claims, LLC v. Commonwealth Land Title Ins. Co.*, 569 P.3d 796, 806 (Ariz. 2025) ("The collateral source rule is usually applied in personal injury cases[.]"); *Koehler v. Packer Grp., Inc.*, 53 N.E.3d 218, 257 (Ill. App. Ct. 2016) ("The collateral source rule is typically asserted by personal injury plaintiffs.").

**FILED WITH REDACTIONS – PUBLIC VERSION**

discussed in Part III.B above, the government's payments represent risk transferred from the Medicare <u>enrollees</u> to the <u>government</u> by statute, and that risk is underwritten by U.S. taxpayers, not by Humana. The policy concerns that underlie the collateral source rule simply do not apply here.[33]

This is confirmed by the Restatement (Second) of Torts—cited by Dr. Frank—which limits application of the collateral source rule to benefits received from insurance policies, employment benefits, gratuities, and social legislation benefits to the extent those benefits are enjoyed by a plaintiff beneficiary. *See* Restatement (Second) of Torts § 920A, comment (c) (A.L.I. 1979). The government's Medicare Part D payments are made for the benefit of Medicare <u>enrollees/beneficiaries</u>, they are not made for the benefit of Humana.[34]

*Second*, Dr. Frank argues that any payment REDACTED

(Ex. 11, Frank Report ¶ 26; Ex. 12, Frank Dep. at 148:9-149:9). This argument makes no sense because those same characteristics apply to Humana's own payments to its PBM. (Ex. 11, Frank

---

[33] *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 66-67 (Cal. 1970) ("The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance."); *Bozeman v. State*, 879 So. 2d 692, 704 (La. 2004) (same).

[34] *See e.g.*, *Wong v. Ass'n of Apartment Owners of Harbor Square*, 545 P.3d 547, 557 (Haw. 2024) (holding that the collateral source rule is inapplicable to payments not derived from an insurance policy, employment benefit, or other category of payment outlined in the Restatement (Second) of Torts § 920A); *E. Shore Title Co. v. Ochse*, 160 A.3d 1238, 1261 (Md. 2017) (same); *Farmers State Bank v. United Cent. Bank of Des Moines, Iowa*, 463 N.W.2d 69, 72 (Iowa 1990) (same). Moreover, Humana asserts claims under the laws of certain states that expressly <u>permit</u> set-offs for collateral payments. *E.g.*, N.D. Cent. Code. § 32-03.2-06 (allowing reduction for collateral payments); Mich. Comp. Laws § 600.6303(1) (same).

**FILED WITH REDACTIONS – PUBLIC VERSION**

Report ¶ 26). Specifically, Dr. Frank argues that the government's subsidy and reconciliation payments cannot be considered "payment" for the Drugs at Issue because:

- REDACTED (Ex. 11, Frank Report ¶¶ 23, 26; Ex. 12, Frank Dep. at 153:23-154:11).

- REDACTED (Ex. 11, Frank Report ¶¶ 24, 25; Ex. 12, Frank Dep. at 171:19-173:24).

These same characteristics apply equally to Humana's <u>own</u> payments to the non-party Humana PBM, Humana Pharmacy Solutions (HPS):

- Like the government, Humana does not pay the dispensing pharmacy directly—HPS does. (Ex. 21, Stein Dep. Ex. 7 at 1 (REDACTED); *see also* Ex. 22, HUM-GEN-MDL-000018854, p. 1).

- Like the government's subsidies, Humana plans pay HPS <u>prospectively</u> based on an estimate that is REDACTED (Ex. 22, HUM-GEN-MDL-000018854, Schedule B, Section 4) (emphasis added).

- And, neither HPS nor Humana plans pay pharmacies at the point of sale, but rather retrospectively after the prescription has been filled, and the claim has been submitted by the pharmacy and processed by HPS. (Ex. 23, HUM-GEN-MDL-000000174; Ex. 24, HUM-GEN-MDL-000000555).

Notwithstanding these shared characteristics, Dr. Frank treats Humana's payments to HPS as "payments" for the "Drugs at Issue." (Ex. 12, Frank Dep. at 182:23-186:7). The government's Medicare Part D payments to Humana are no different.

*     *     *

In sum, there is no legal basis for Humana to recover as "actual damages" amounts paid by the government on Medicare Part D claims. As a result, a REDACTED reduction in Humana's indirect VOC to exclude the government's statutory payments for the Drugs at Issue should be deemed conclusively established based on Dr. Chandra's unrebutted calculations.

21

**FILED WITH REDACTIONS – PUBLIC VERSION**

**D.      Humana Also Failed to Provide Any Basis for The Jury to Determine and Exclude from Any Damages Award Amounts Humana Has Already Recovered from Walgreens on Unrelated Overpayment Claims Concerning Drugs at Issue.**

As a matter of law, Humana cannot recover from Defendants amounts that it has already recovered from third parties based on claims that those third parties overcharged Humana on the same generic drug purchases that are at issue here. *In re Namenda*, 2022 WL 3362429, at *11. Based on publicly available documents, it is undisputed that Humana recovered $360 million from Walgreens in January 2024 based on claims that Walgreens overcharged Humana and its members by in excess of $1.5 billion for prescription drugs dispensed during the Relevant Time Period. *See supra* Part II.E. Humana's damages calculation in that case was based on Humana's reimbursements to Walgreens for generic drugs that were subject to Walgreens' discounted Prescription Savings Club pricing, including Drugs at Issue here.[35] But Humana refused to produce any documents concerning that overpayment claim during fact discovery, including the expert evidence that supported Humana's $1.5 billion damages claim against Walgreens. *Id.*

Dr. Frank suggests this amount should not be deducted because Humana may have been required to report the $360 million recovery from Walgreens to CMS as a form of DIR, and that the REDACTED

REDACTED (Ex. 11, Frank Report ¶ 62).[36] This speculation does nothing to meet Humana's burden of providing a basis for

---

[35] Based on materials filed publicly, it is clear that at least 11 Drugs at Issue were part of the Walgreens' PSC program. *Russo v. Walgreens,* No. 1:17-cv-02246 (N.D. Ill. June 30, 2025), ECF 729-1 (Exhibit 1 to complaint listing drugs that were part of PSC, including Amitriptyline, Baclofen, Benazepril, Clomipramine, Digoxin, Doxycycline Hyclate, Levothyroxine, Nystatin, Pravastatin, Propranolol, Verapamil).

[36] Dr. Frank also asserts that this provision reflects REDACTED
REDACTED (Ex. 11, Frank Report ¶ 63) (emphasis in original). But the cited provision simply provides a mechanism for the government to claw back any windfall that a plan sponsor obtains based on payments made by the government, which is precisely the sort of windfall that Humana would obtain here if the jury is unable to net out government Medicare Part D payments and third-party recoveries from Humana's damages.

**FILED WITH REDACTIONS – PUBLIC VERSION**

calculating the set off that is required by the recovery from Walgreens. First, Humana did not produce any information suggesting that Humana reported its recovery from Walgreens to CMS, let alone that Humana provided information sufficient to "link" that recovery by Humana REDACTED

█████████████████████████████████████ (*Id.* ¶ 60). Second, Humana was <u>not</u> required to report its 2024 recovery from Walgreens to CMS to the extent it related to plan years during the Relevant Time Period due to the six-year look back provision in the statute. 42 C.F.R. § 423.360(f).

Dr. Vogt's report does not even reference the $360 million recovery from Walgreens, and he made no attempt to exclude it from his damages calculation. (Ex. 25, Expert Report of Dr. William B. Vogt ¶ 59-61). As a result, Dr. Vogt's calculation of Humana's indirect purchaser damages includes both damages allegedly caused by the Defendants' conduct at issue in this litigation and damages that Humana has already recovered from Walgreens based on Walgreens' conduct. (Ex. 3, Chandra Report ¶¶ 215-217). And Humana refused to produce any information that would allow the jury to determine what portion of that recovery related to Humana's purchases of Drugs at Issue. As a result, the entire amount of the $360 million recovery from Walgreens should be conclusively determined by the Court as a set off to any damages awarded by the jury.

E.    **Humana Failed to Provide Any Basis for The Jury to Determine and Exclude From Any Damages Award Amounts Derived from Transactions on Which No Overcharge Was Suffered.**

Humana also failed to net out from its indirect VOC calculation amounts derived from transactions on which no overcharge was incurred at the pharmacy level and accordingly no overcharge was passed onto Humana. (Ex. 3, Chandra Report ¶¶ 190-195, 228). This Court has already held in the Clomipramine bellwether that on transactions where a Defendant did not actually increase its price to a particular pharmacy, no overcharge occurred on those transactions,

23

and summary judgment is proper. *See e.g.*, *In re: Generic Pharmaceuticals Pricing Antitrust Litigation, In re Clomipramine Cases*, 2025 WL 2483981, at *19-20 (E.D. Pa. Aug. 27, 2025).[37]

Dr. Chandra identified such transactions in Dr. Vogt's damages model where, despite an alleged WAC increase, the pharmacy did not experience a price increase. For example, Mylan did not raise the price of clomipramine to REDACTED However, Mylan's sales of clomipramine to REDACTED are still included in Vogt's damages model and Humana's data shows that REDACTED of Humana's clomipramine claims during the relevant time period were for Mylan's clomipramine and filled at a REDACTED (Ex. 3, Chandra Report ¶ 191.)[38] If the price for these transactions did not increase because of the alleged conduct, then the pharmacies, such as REDACTED could not have passed on any overcharge to Humana.

Dr. Chandra estimates that this error impacts at least REDACTED of Humana's claims which were filled at REDACTED (Ex. 3, Chandra Report ¶ 228). In rebuttal, Dr. Vogt claims that because his analysis was "at the 'market level'" it necessarily accounted for pharmacies that did not see a price increase, but he does not provide any analysis to support this assertion and does not appear to have tested the assumption. (Ex. 1, Vogt Rebuttal ¶ 154). Nor does he provide any alternative calculation to account for this problem, leaving Dr. Chandra's REDACTED estimate unrebutted.

---

[37] In order to prove damages caused by the Defendants' conduct, Humana must show that direct purchasers were "overcharged" and that "direct purchasers passed on the overcharge." *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 679 F. App'x 135, 139-40 (3d Cir. 2017); *accord Sheet Metal Workers Local 441 v. GlaxoSmithKline, PLC,* 2010 WL 3855552, *19 (E.D. Pa. Sept. 30, 2010); *In re Processed Egg Prods. Antitrust Litig.,* 312 F.R.D. 124, 149-50 (E.D. Pa. 2015). As an indirect purchaser, Humana pays an "overcharge only [if] the previous purchaser was unable to avoid [it]." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1170 (8th Cir. 1998).

[38] REDACTE also did not pay higher prices for several other drugs included in Vogt's damages model, including but not limited to Mylan's levothyroxine (Ex. 3, Chandra Report ¶ 192), Amitriptyline Tablets, three Benazepril tablet strengths, and Divalproex ER (Ex. 26, Expert Report of Dr. Lauren J. Stiroh ¶¶ 101, 118, 159, 164), Impax's lidocaine/prilocaine, and Glenmark's pravastatin (Ex. 3, Chandra Report ¶ 193).

**FILED WITH REDACTIONS – PUBLIC VERSION**

**F. Humana Seeks Duplicative Recovery by Failing to Remove Its Direct Commerce From Its Indirect Commerce for Purposes of Its Damages Calculations.**

Humana presents a textbook case of improperly seeking duplicative recovery. Humana is seeking damages on both its direct commerce (*i.e.*, purchases by its pharmacy) and its indirect commerce (*i.e.*, claims paid on behalf of insured customers). But where the two overlap, Humana refuses to remove its direct commerce *from* its indirect commerce for purposes of its damages calculations—counting the same transactions twice. As a result, Humana as a Plaintiff seeks to recover the same alleged overcharge twice—first through its pharmacy's purchase and <u>again</u> through its own insurance reimbursement.

It cannot do so. The Supreme Court has made clear that a party cannot obtain a double recovery for the same overcharge as both a direct and an indirect purchaser. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 212–13 (1990) (plaintiffs cannot circumvent prohibition on duplicative recovery by consolidating "direct and indirect purchasers together in a single lawsuit" because any reduction in the risk of duplicative recovery "comes at too great a cost"). And such a double recovery would constitute excessive and arbitrary relief. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 420 (1994). Moreover, Humana's counsel specifically represented during discovery that Humana would <u>not</u> attempt to double count like this. (Ex. 27, correspondence from J. Bank (Wilson Sonsini) to R. Girnys (Lowey Dannenberg, P.C.), July 31, 2025). Humana's 30(b)(6) designee also testified that Humana, as an insurer, was not asserting indirect claims on its pharmacy's direct commerce. (Ex. 4, Stein Dep. at 87:24-88:4 REDACTED

██████████████████████████████████████████████

████████████████████████████████████████████████.

Now, going back on its representation and its representative's testimony, Humana and its expert concede that it is, in fact, double counting. (Ex. 1, Vogt Rebuttal ¶ 167 REDACTED

**FILED WITH REDACTIONS – PUBLIC VERSION**

REDACTED

. Dr. Vogt offered no economic basis for doing so. Instead, he said this is a legal issue outside the scope of his assignment. (*Id.*). Dr. Vogt does not dispute that there are overlaps. In fact, he states that if necessary in further proceedings, he could "utilize[e] Humana's data" to REDACTED

(*Id.* ¶ 168). However, Dr. Vogt does not do so. He does not provide any alternative calculations that account for this double-counting problem. (*Id.* ¶ 167). As such, Dr. Chandra's calculations reducing Humana's indirect commerce by at least REDACTED the amount of its double-counted direct commerce—are unrebutted (Ex. 3, Chandra Report ¶ 228), and that reduction should be conclusively determined by the Court as a matter of law.

## IV.   CONCLUSION

For the reasons set forth above, Defendants are entitled to partial summary judgment as to Humana's indirect purchaser claims to reflect: 1) a REDACTED reduction in Humana's indirect VOC for the Drugs at Issue to exclude the full and unrebutted amount of the government's Medicare Part D payments calculated by Dr. Chandra; 2) a $360 million set off of any damages award to reflect the full amount of Humana's 2024 recovery from Walgreens; 3) at least an REDACTED reduction in Humana's indirect VOC to exclude transactions on which no overcharge was suffered; and 4) at least a REDACTED reduction in Humana's indirect VOC to remove the amount of its double-counted direct commerce.

FILED WITH REDACTIONS – PUBLIC VERSION

Dated March 26, 2026

Respectfully Submitted,

*/s/ J. Clayton Everett, Jr.*
J. Clayton Everett, Jr.
William S.D. Cravens
Y. Frank Ren
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
frank.ren@morganlewis.com

Stephen D. LaBrecque
**MORGAN, LEWIS & BOCKIUS LLP**
1 Federal Street
Boston, MA 02110
Telephone: +1.617.341.7700
Facsimile: +1.617.341.7701
stephen.labrecque@morganlewis.com

Harvey Bartle IV
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
harvey.bartle@morganlewis.com

*Counsel for Defendants Perrigo Company plc and Perrigo New York, Inc.*

27
**FILED WITH REDACTIONS – PUBLIC VERSION**

/s/ Seth Davis
Seth Davis
Sheron Korpus
Seth A. Moskowitz
David M. Max
KASOWITZ LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com
dmax@kasowitz.com


*Counsel for Defendants Actavis Elizabeth LLC, Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Teva Pharmaceuticals USA, Inc*

*Counsel for Defendants Actavis Elizabeth LLC, Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Teva Pharmaceuticals USA, Inc.*

/s/ Donald W. Hawthorne
Donald W. Hawthorne
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue
New York, NY 10178
Telephone: 212-696-6949
dhawthorne@curtis.com

*Counsel for Defendant Breckenridge Pharmaceutical, Inc.*

/s/ David Fioccola
Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

/s/ Jeffrey C. Bank
Jeffrey C. Bank
Seth C. Silber
WILSON SONSINI GOODRICH &
ROSATI
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
jbank@wsgr.com
ssilber@wsgr.com

Chul Pak
Michael Sommer
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
cpak@wsgr.com
msommer@wsgr.com

*Counsel for Mylan Inc., Mylan Pharmaceuticals, Inc., Mylan N.V., and UDL Laboratories Inc.*
/s/ Mary Pat Brogan
Mary Pat Brogan
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: 216.621.0200
mbrogan@bakerlaw.com

Carlos F. Ortiz
Kayley B. Sullivan
BAKER & HOSTETLER LLP
45 Rockefeller Center
New York, NY 10111-0100
Telephone: 212.589.4200
cortiz@bakerlaw.com
kbsullivan@bakerlaw.com
*Counsel for Defendant Heritage Pharmaceuticals, Inc.*

/s/ Brian T. Feeney
Brian T. Feeney

28

**FILED WITH REDACTIONS – PUBLIC VERSION**

Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-5865
Facsimile: (202) 416-6899
ondeck@proskauer.com

*Counsel for Defendants Sandoz Inc. and Fougera Pharmaceuticals Inc.*

*/s/ John M. Taladay*
John M. Taladay
Christopher P. Wilson
Edward W. Duffy
JoAnna B. Adkisson
Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20001
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
ed.duffy@bakerbotts.com
joanna.adkisson@bakerbotts.com
michael.munoz@bakerbotts.com

Lauri A. Kavulich
CLARK HILL PLC
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
Facsimile: (215) 640-8501
lkavulich@clarkhill.com

Lindsay S. Fouse
CLARK HILL PLC
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
Facsimile: (412) 394-2555
lfouse@clarkhill.com

GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
Telephone: (215) 988-7812
Facsimile: (215) 717-5265
Brian.feeney@gtlaw.com

*Counsel for Defendant Dr. Reddys' Laboratories, Inc.*

*/s/ Robert W. Manoso*
Robert W. Manoso
Dimitra Doufekias
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Telephone: (202) 887-1500
Facsimile: (202) 887-0763
rmanoso@mofo.com
ddoufekias@mofo.com

Michael B. Miller
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
mbmiller@mofo.com

*Counsel for Defendant Glenmark Pharmaceuticals Inc., USA*

*/s/ George G. Gordon*
George G. Gordon
Julia Chapman
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-2382
Fax: (215) 944-2222
george.gordon@dechert.com
julia.chapman@dechert.com

29
**FILED WITH REDACTIONS – PUBLIC VERSION**

*Counsel for Defendants Taro Pharmaceuticals U.S.A., Inc., Taro Pharmaceutical Industries Ltd., and Sun Pharmaceutical Industries Inc.*

/s/ Devora W. Allon
Devora W. Allon, P.C.
Gilad Bendheim
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460
devora.allon@kirkland.com
alexia.brancato@kirkland.com
gilad.bendheim@kirkland.com

*Counsel for Defendant Upsher-Smith Laboratories, LLC*

/s/Jason R. Parish
Jason R. Parish
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 452-7900
Facsimile: (202) 452-7989
jason.parish@bipc.com

Bradley J. Kitlowski
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501Grant Street
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562-1041
bradley.kitlowski@bipc.com

Caroline B. Warren
BUCHANAN INGERSOLL & ROONEY PC
Carillon Tower
227 West Trade Street, Suite 600
Charlotte, NC 28202
Telephone: (704) 444-3371
Facsimile: (704) 444-3490
caroline.warren@bipc.com

D. Brett Kohlhofer
DECHERT LLP
1900 K Street NW
Washington, D.C.
Tel: (202) 261-3349
Fax: (202) 261-3333
d.brett.kohlhofer@dechert.com

*Attorneys for Defendant Lannett Company, Inc.*

/s/ Brian J. Smith
Brian J. Smith
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (302)502-8417
brian.smith@wsgr.com

*Counsel for Defendant Mayne Pharma Inc.*

/s/ Michael J. Hartman
Robin P. Sumner
Michael J. Hartman
Melissa Hatch O'Donnell
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000
Facsimile: (215) 981-4750
robin.sumner@troutman.com
michael.hartman@troutman.com
melissa.odonnell@troutman.com

*Attorneys for Defendants Impax Laboratories, LLC, Impax Pharmaceuticals, Inc., and West-Ward Pharmaceuticals Corp.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

*Counsel for Defendant Zydus Pharmaceuticals
(USA) Inc.*

*/s/ Peter G. Siachos*
Peter G. Siachos
Matthew G. Gallo
Nicholas R. Gex
GORDON REES SCULLY MANSUKHANI
LLP
677 King Street, Suite 450
Charleston, SC 29403
Telephone: (843) 714-25
psiachos@grsm.com
mgallo@grsm.com
ngex@grsm.com

Clair E. Wischusen
GORDON REES SCULLY MANSUKHANI
LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Telephone: (703) 650-7030
cwischusen@grsm.com

Hazel Mae Pang an
GORDON REES SCULLY MANSUKHANI
LLP
101 W. Broadway Suite 2000
San Diego, CA 92101
Telephone: (619) 230-7479
hpangan@grsm.com

*Attorneys for Defendant, Epic Pharma, LLC*

31
**FILED WITH REDACTIONS – PUBLIC VERSION**