# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724-CMR |
| This Document Relates to:<br><br>*American Airlines, Inc. et al. v. Actavis Holdco U.S., Inc., et al.* | Individual Case No.<br>24-1430 |

## MEMORANDUM OPINION

On March 4, 2024, Plaintiffs American Airlines, Inc., Aramark Services, Inc., General Motors LLC, Lowe's Companies, Inc., Lumen Technologies, Inc., Lumen Technologies Service Group, LLC, RTX Corporation, Target Corporation, and US Foods, Inc. brought this action against fifty-five Defendants, accusing them of engaging in a multi-year antitrust conspiracy to allocate the market for and fix the prices of certain generic pharmaceutical products. The genesis of this litigation and the broad outline of the complaints that are now at issue are similar to those that prior opinions in this MDL recounted.[1] Those opinions generally found that complaints filed by states, individual and class plaintiffs sufficiently alleged that the defendant generic pharmaceutical companies engaged in an overarching multi-drug conspiracy to fix prices and allocate market portions of many generic drugs to themselves in violation of several federal and state laws. The

---

[1] *See e.g., In re State Attorneys General Litigation State AG Litig. v. Actavis Holdco U.S. (In re Generic Pharms. Pricing Antitrust Litig.)*, 394 F. Supp. 3d 509, 514-23 (E.D.Pa. 2019); *In re Generic Pharms, Pricing Litigation* 338 F.Supp. 3d 404 (E.D.Pa., 2018).

Plaintiffs in this case, similar to those in others in the MDL, allege that from 2009, Defendants engaged in illegal "fair share" agreements to allocate customers and markets, bid rigging, and price fixing, acts illegal under federal and state antitrust laws. This lawsuit was filed eight years after lawsuits raising similar claims were consolidated into multi-district litigation before the Honorable Cynthia M. Rufe, styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-MD-2724 (E.D. Pa.), for the purpose of ensuring uniformity in rulings and efficiency in their litigation. Since that consolidation, many others have been filed. Plaintiffs herein chose to bypass, or opt out, of the class action filed on behalf of end-payer plaintiffs ("EPPs") and file this matter as self-funded direct action Plaintiffs ("DAPs"). Following the filing of motions to dismiss, the DAPs filed an amended complaint on October 1, 2024.  Thereafter, several Defendants, four individually and several others collectively, filed seven motions to dismiss[2] this complaint for

---

[2] Sandoz AG, 24-cv-1430, Doc No. 46, Novartis AG ("Novartis"), 24-cv-1430, Doc No. 49, Actavis Elizabeth, LLC, Actavis Holdco U.S., Actavis Pharma, Inc. Mylan, Inc, Mylan Pharmaceuticals, Inc., Breckenridge Pharmaceutical, Inc., Aurobindo Pharmaceutical, Dr. Reddy's Laboratories, Teva Pharmaceuticals USA ("Teva"), G&W Laboratories, Mayne Pharma, Citron Pharma, Wockhardt USA LLC,  Morton Grove Pharmaceuticals, Inc., Lupin Pharmaceuticals, Inc., Epic Pharma, Torrent Pharma, Strides Pharma, Alvogen, Apotex Corp., Upsher-Smith Laboratories, LLC, Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals U.S.A., Inc., Pfizer Inc. and Greenstone LLC, Perrigo New York, Inc., Glenmark Pharmaceuticals Inc., USA, Sandoz Inc., Fougera Pharmaceuticals Inc., Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals LLC, Hikma Pharmaceuticals USA, Inc., Impax Laboratories, LLC, West-Ward Pharmaceuticals Corp., Zydus Pharmaceuticals (USA) Inc., Lannett Company, Inc., Bausch Health Americas, Inc., Bausch Health US LLC, and Oceanside Pharmaceuticals, Inc., Heritage Pharmaceuticals Inc., and Emcure Pharmaceuticals Ltd.,Doc., West-Ward Pharmaceuticals Corp. (n/k/a Hikma Pharmaceuticals USA, Inc.), Hikma Labs,

various reasons discussed below.

Many of the motions to dismiss the amended complaint, as well as the amended complaint itself, are sealed; the public versions numerous redactions of important information about the allegations in the amended complaint. The documents that necessitated the sealing of those motions were designated confidential pursuant to prior pre-trial orders in this MDL[3]. This litigation concerns a matter of great public interest, and with the publication of this memorandum opinion, it is time to re-examine whether continuing to designate the sealed documents or mentions of their contents in filings in this case from the public is still appropriate[4]. This court will therefore order that parties who moved to seal the amended complaint and the motions to dismiss adjudicated in this memorandum opinion show good cause for keeping them from public view. "[T]he very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness."[5]

---

Inc.(f/k/a Roxane Laboratories, Inc. ), and West-Ward Columbus Inc (f/k/a Boehringer Ingelheim Roxane Inc.), 24-cv-1430, Doc. Nos. 65 and 66; Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals LLC, 24-cv-1430, Doc. No. 76; 24-cv-1430; West-Ward & Roxane Pharmaceuticals, 24-cv-1430, Doc. No. No. 81; Ascend Laboratories, LLC, 24-cv-1430, Doc. No 83.

[3] *See e.g.*, PTO No. 7 §§ 9.2, 9.3, MDL Doc. No. 121; PTO 40 § 2, MDL Doc. No. 533; and PTO No. 195 § 9.2, MDL Doc. No. 1976.

[4] *See In re Avandia Marketing., Sales Practices & Prod. Liab. Litig.*, 924 F.3d 662, 671-72 (3d Cir. 2019) (setting forth factors courts must consider to determine whether a court should seal or continue to seal documents filed of record).

[5] *Id.*, at 672 (quoting *Littlejohn v. BIC Corp.,*, 851 F.2d 673, 678 (3d Cir.1988).

As the parties are familiar with the broader MDL and the allegations in this case, the Court, immediately below and throughout this memorandum opinion, will set forth only those facts and procedural history necessary to resolve the motions to dismiss.

## I. LEGAL STANDARD

Most of the motions move to dismiss all or parts of the amended complaint for failure to state a claim for which relief can be granted. To survive such a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff's complaint must set forth "[f]actual allegations . . . enough to raise a right to relief above the speculative level.[6]" "In analyzing whether the complaint sets forth sufficient factual allegations, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.[7]" The court must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.[8]"

## II. SUFFICIENCY OF ALLEGATIONS OF AN OVERARCHING ANTITRUST CONSPIRACY

Several defendants moved to dismiss the amended complaint for failure to adequately allege an overarching antitrust conspiracy. The amended complaint's

---

[6] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).
[7] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)).
[8] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

allegations of an overarching conspiracy are the same as those alleged in other complaints in this MDL that have been deemed sufficient make that claim.[9] To state a claim of an antitrust conspiracy, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made.[10]" In the absence of allegations of direct evidence of such an agreement, Plaintiffs may allege parallel conduct plus "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.[11]" The necessary context may be shown through allegations of "plus factors" that "serve as proxies for direct evidence of an agreement."[12] "Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.[13]" At least three "plus factors" support a finding that there is a suggestion of a preceding agreement: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."[14] "[T]he conspiracy must not be compartmentalized. The character and effect of [the] conspiracy are not to be judged by dismembering it and viewing

---

[9] *See generally, In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2023 U.S. Dist. LEXIS 31649, *30 (E.D.Pa. Feb. 27, 2023) (ruling on motions to dismiss claims of overarching conspiracy by state plaintiffs).

[10] *Id.*

[11] *Id.* at 557.

[12] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

[13] *In re Blood Reagents Antitrust Litig.,* 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)).

[14] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010) (internal quotation marks and citations omitted).

its separate parts, but only by looking at it as a whole."[15]

Plaintiffs allege that the basis for the overarching conspiracy is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. Plaintiffs have alleged parallel conduct in the form of price increases across the market for generic drugs that are "reasonably proximate in time and value.[16]" Plaintiffs also have alleged that the structure of the market for generic drugs motivated Defendants to enter into an antitrust conspiracy and undertake actions against self-interest in the form of pricing and bidding decisions that would be irrational in a competitive market for generic drugs. Further, the Amended Complaint alleges facts implying the existence of a traditional conspiracy: inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing. These allegations are not mere "labels and conclusions," "allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy.[17]" Plaintiffs allege that a competitor that does not maintain the "fair share" agreement is viewed as irresponsible, and as this Court previously held, allegations that Defendants "risked retribution not just for the individual drugs implicated, but also for other

---

[15] *In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011) (second alteration in original) (internal quotation marks and citations omitted).
[16] *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383 (3d Cir. 2015).
[17] *Twombly,* 550 U.S. at 556.

generic drugs in their portfolios ... create a plausible inference that Defendants

knew that they would need to enter into future agreements with other

combinations of would-be competitors . . . and therefore had a vested interest in

playing fair according to their shared code of conduct.[18]" Therefore, the Court will

deny the motions to dismiss as to the allegations of an overarching conspiracy.

## III. TOLLING OF STATUTES OF LIMITATION

Several Defendants assert Plaintiffs' complaint was filed beyond the statute

of limitations. The Court has dismissed similar motions in other matters in this

MDL because they are more appropriately resolved following discovery.[19] For that

reason, the Court will not now determine when the statute of limitations for the

various claims began to run. However, several Defendants in this matter challenge

the Plaintiffs' claim that the pendency of the EPPs class action tolled their federal

and state claims. This is an appropriate opportunity to address this issue.

The Defendants assert the federal and state law-based claims are not

covered by the tolling rule of *American Pipe v. Utah*, which holds "the

commencement of a class action suspends the applicable statute of limitations as

to all asserted members of the class. . . ." [20] *American Pipe* concerned the filing of a

lawsuit by putative members of a class of municipalities alleging bid-rigging in

---

[18] *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 530-31 (internal quotation marks and citation omitted).
[19] *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2023 U.S. Dist. LEXIS 31649, *30 (E.D.Pa. Feb. 27, 2023); *In re Generic Pharms. Pricing Antitrust Litig.,* 368 F.Supp. 3d 814, 852 (E.D.Pa. 2019).
[20] 414 U.S. 538, 554 (1974).

violation of the Clayton Act. Eight days after the  plaintiffs' motion for class certification was denied, several Utah municipalities that would have been members of the class filed motions to intervene in a similar lawsuit maintained by the state of Utah, despite the expiration of the statute of limitations for the alleged Clayton Act violations. The District Court dismissed the motions to intervene as untimely, a decision partially reversed by the Court of Appeals.  The Supreme Court found that the pendency of a motion for class certification in a timely-filed complaint tolled the statute of limitations for the putative members of the class.[21] "Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs."

More than a decade after *American Pipe*'s publication, Congress enacted 28 U.S.C. 1367, governing federal courts' exercise of supplemental jurisdiction. While *American Pipe* does not explicitly address tolling of claims based on state law, § 1367(d) does provides that the statute of limitations for any claims part of a civil action by virtue of supplemental jurisdiction "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." The amended complaint's claims against multiple defendants, when based on the same facts underlying the federal antitrust claims against parties who are already defendants in this MDL's class actions,[22]  are within

---

[21]  *Id.* at 550-551.
[22] Doc. No. No. 41, ¶¶ 3300-3336.

this Court's supplemental jurisdiction and, as several courts have held, are tolled just as are the federal claims, whose timeliness the defendants do not challenge.

The Sixth Circuit Court of Appeals applied § 1367(d) in *Vertrue v. Vertrue, Inc. (In re Vertrue Inc.)*, holding that the statute of limitations for state law claims was tolled when, after extensive litigation, a plaintiff class's federal claims were dismissed and the District Court declined to exercise supplemental jurisdiction over the remaining Ohio state claims.[23] Following the dismissal, several class members filed thirteen complaints, including the dismissed federal and state claims, in federal court. By the time the second lawsuit was filed, the statute of limitations for the state claims had expired. After the district court granted in part a motion to dismiss the complaint as untimely, finding that federal and state claims previously rasied in the class action lawsuit were tolled, the defendants appealed the decision not to dismiss the entire complaint. The Sixth Circuit found that the federal claims were tolled under *American Pipe*, and the state-law claims were tolled under § 1367(d), affirming the District Court's decision. The United States Supreme Court approved of *Vertrue*, when, in *Artis v. District of Columbia,* it reversed the dismissal of a plaintiff's state-law (District of Columbia law) claims that were refiled in state court (the District of Columbia Superior Court) following their dismissal, along with federal claims, in a federal District Court.[24] The statute of limitations on the *Artis* plaintiff's state law claims expired while her federal

---

[23] 719 F.3d 474, 481-82 (6th Cir., 2013).
[24] 583 U.S. 71, 78-79, n.3 (2018).

lawsuit was pending,  but due to § 1367(d), the pendency of that lawsuit tolled the statute on the state (i.e. the District of Columbia) claims— § 1367(d) tolled them from the moment her federal court lawsuit was filed until thirty days past their expiration. The Third Circuit, in *Aly v. Valeant Pharms, Int'l Inc.*, relying on *American Pipe,* has since held that neither class certification nor dismissal of the class claims need occur before class members, like the Plaintiffs herein, can file individual lawsuits and take advantage of *American Pipe*'s tolling provisions.[25]  *Aly* observed that individual class members dissatisfied with the pace of the class action certification process should not be forced to wait for a denial of certification to advance their claims.[26]

A court in this District also held, in *Romero v. Allstate Ins. Co.*[27], *American Pipe* applies with equal force to state claims brought under supplemental jurisdiction.[28] Plaintiffs in that matter were members of a plaintiff class in a 2001 lawsuit alleging federal statutory claims and various state claims under the court's supplemental jurisdiction. After class certification was denied in 2014, twelve of the class members were part of a group who either took advantage of the grant of leave to file an amended complaint or filed their own lawsuits in 2015. The defendant moved for partial summary judgment against the twelve plaintiffs because they did

---

[25] *Aly v. Valeant Pharms, Int'l Inc.*, 1 F.4th 168, 177 (2021). The *Aly* decision did not need to rely on § 1367(d) as all the claims were federal, and the individual lawsuits did not concern claims originally brought under supplemental jurisdiction.
[26] *Id.*, 1 F.4th at 179-80.
[27] 2018 U.S. Dist. LEXIS 85374 *; 2018 WL 2325405 (E.D.Pa. 2018).
[28] *Id.*, 2018 U.S. Dist. LEXIS 85374, at *48.

not file their lawsuits until after the state statute of limitations expired. The court found that that § 1367(d) tolls state claims that are subject to supplemental jurisdiction just as *American Pipe* tolls federal claims. It noted that Congress, when enacting § 1367, did not choose to differentiate or exclude state claims from its mandate.[29] When the direct action plaintiffs filed their 2024 action, the class, including them— the end-payer Plaintiffs ("EPPs") — had yet to be certified. Observing *Aly*, the court found that neither class certification nor dismissal of the class claims is required before class members can file individual lawsuits.

Plaintiffs' amended complaint does include two defendants who were not sued in the EPPs' class action— Emcure and Strides. The Plaintiffs admit as much.[30] *American Pipe* and § 1367(d) tolling only applies to parties that the Plaintiffs' class sued. Plaintiffs cite no authority to the contrary, and this Court found none. Therefore, the amended complaint will be dismissed as to Emcure Pharmaceuticals Ltd. and Strides Pharma.[31] As this matter progresses, the

---

[29] *Id.*, 2018 U.S. Dist. LEXIS 85374, at *45, *47-48. Several Defendants, relying on *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008). argue that pursuant to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) state statutes of limitation apply to all state claims, whether under diversity or supplemental jurisdiction. Doc. No. 121, pp. 5-7. *Romero* discussed similar holdings in other cases, but noted that they did not discuss § 1367(d). *Romero*, 2018 U.S. Dist. LEXIS 85374, at *53. *Chin* does not either.

[30] Doc. No. 108, p. 12 fn.14.

[31] Plaintiffs argue, in a footnote, that because Strides and Emcure have been named in other MDL complaints they had notice of the claims against them, but cite no caselaw to support the notion that the statute of limitations for any claims can be tolled against defendants who were not sued in any lawsuits the Plaintiffs were not class members. Doc. No. 108, p. 12, fn.14. Novartis AG and Sandoz AG also moved to dismiss the amended complaint because they were not named in the

remaining parties can use the discovery process to ascertain the dates statutes of limitations began to run for specific claims, including those involving the specific dosage and formulations of generic drugs described in the complaint, where that information is not apparent. However, only claims raised in the EPP actions will be tolled.

## IV. NOVARTIS AG'S AND SANDOZ AG'S MOTIONS TO DISMISS

Novartis AG (hereinafter "Novartis") and Sandoz AG filed motions to dismiss, asserting many claims common between them but not shared with the other Defendants. The grounds for those motions are discussed below.

A.     The Amended Complaint's Allegations against Novartis And Sandoz AG

Novartis and Sandoz AG moved to dismiss the amended complaint against them under Rules 12(b)(1), (2), and (6). A review of several dozen allegations[32] in the complaint explains the strength of the Plaintiffs' claims.

The amended complaint alleges that Novartis decided to (re)launch the Sandoz brand in 2003 and operate it through three wholly owned companies— Defendants Sandoz Inc. (hereinafter "Sandoz"),  Sandoz AG, and Sandoz International GmbH— that Plaintiffs allege behaved as if they were a single company.[33] Although Sandoz AG and Sandoz International, and their affiliates,

---

EPP's complaint.  Their situation is different as Plaintiffs allege their involvement in the conspiracy was concealed until 2022. Their status is discussed below.
[32] Doc. No. 41, ¶¶ 284-298.
[33] *Id.*, ¶¶ 240-41.

nominally ran the generic drugs operation, from 2003 Novartis exercised corporate oversight and determined strategic direction, including making decisions on the manufacture and marketing of drugs at issue in this matter. Sandoz's board of directors was a fig-leaf for Novartis's direction of Sandoz's operation.[34] The amended complaint asserts Novartis exercised *de facto* oversight, and its Board of Directors and the "Executive Committee of Novartis" (a corporate governance entity) exercised operational oversight and strategic direction[35]. The amended complaint cites specific events and circumstances to support that assertion.

Prior to the 2023 spin-off of the U.S. component of Sandoz, Novartis and Sandoz AG had officers and directors in common. Senior management moved between the entities, and the companies shared corporate information, files, calendars and email on a single collaborative messaging and collaborative document suite.[36] Novartis, by itself and through subsidiaries, including Sandoz AG, controlled Sandoz's generics business and Sandoz employees' internal and external communications, as well as the information stored on their computers.[37] Novartis directed Sandoz and other related entities to identify themselves as "A Novartis Company," or a "Novartis Division."[38] In 2023, Tony Fang, Sandoz's Rule 30(b) representative, testified that he did not know for the last five years

---

[34] *Id.*, ¶ 242.
[35] *Id.*, ¶ 243.
[36] *Id.*, ¶¶ 247, 267, 268.
[37] *Id.*
[38] *Id.*, ¶¶ 247, 251, 254.

13

whether he and his supervisor had been Sandoz or Novartis employees, or employees of both.[39] When, in 2015, an employee of McKesson (one of Sandoz's customers) asked some Sandoz employees basic questions about the relationships among the different Sandoz entities, all he was told in response was that all Sandoz affiliates were owned by Novartis AG.[40] When the same McKesson employee followed up with additional questions, another Sandoz employee, acting at the direction of the Sandoz legal department, responded that the McKesson employee "to focus on the fact that all of the Sandoz companies come under the Novartis umbrella.[41]" Novartis performed accounting, finance, pharmacovigilance, human resources, pension administration, legal, real estate and facility services for Sandoz.[42] In 2023, Novartis revealed that it regularly swept Sandoz's cash balances into the Novartis organization, and Plaintiffs allege this was done with the intention of transferring Sandoz's value and profits, including those produced by the alleged conspiracy, to Novartis.[43] Plaintiffs allege that Novartis controlled the conspiratorial conduct alleged in the complaint.[44] Product pricing decisions, after approval by the Sandoz pricing committee, required Novartis's approval.[45] The complaint identifies a Novartis executive, T.O., as dictating the agreements with

---

[39] *Id.*, ¶ 251.
[40] *Id.,* ¶¶ 255-56,
[41] *Id.*, ¶¶ 257.
[42] *Id.*, ¶ 258.
[43] *Id.*, ¶ 258
[44] *Id.*, ¶¶ 258-60
[45] *Id.*, ¶ 265.

14

other companies to ensure all had a "fair share" of particular drugs' markets, and who was also receiving "pricing intelligence a Sandoz employee received from competitors.[46]

Novartis, working with its subsidiaries, including Sandoz AG, was involved in and coordinated Sandoz's response to the criminal investigation of Sandoz that resulted in a March 2016 U.S. Department of Justice subpoena for information about price fixing.[47] Novartis hired legal teams to conduct an internal investigation, and Sandoz, foregoing investigating the alleged activity on its own, relied on Novartis's lawyers, considering the Novartis legal department as part of Sandoz's own "legal function."[48] Novartis authorized Sandoz's 2020 signing of a Deferred Prosecution Agreement with, and the payment of a $195,000,000 fine to, the Department of Justice.[49] Sandoz marked as "confidential" exhibits and testimony produced during MDL discovery revealing the extent of the relationship between of Sandoz, Sandoz AG and Novartis, resulting in their being sealed and unavailable to Plaintiffs.[50] Novartis and Sandoz AG directly benefited from some MDL class settlements. Sandoz's 2024 settlement with the Direct Purchaser

---

[46] *Id.*, ¶¶ 268, 269.
[47] *Id.,* ¶ 275.
[48] *Id.*
[49] *Id.,* ¶¶ 276-77.
[50] *Id.*, ¶¶ 280.

Plaintiffs[51], authorized by Novartis[52], releases not only Sandoz, but Sandoz AG and Novartis AG.[53]

The complaint details Novartis's 2012 direction of Sandoz's and Sandoz AG's coordination with another company, Mylan, to allocate market share and coordinate pricing for a generic version of the drug Diovan.[54] Novartis was interested in this drug because the patented version had been a top-selling drug, and losing the patent in 2011 would pose a formidable financial challenge for the company— it earned Novartis $5,000,000,000 in 2007, or 21% of its pharmaceutical division's revenue.[55] Novartis placed extreme pressure on a Sandoz executive to obtain "competitive intelligence" on Mylan's launch.[56] Novartis's pressure led the two companies to divide the generic Diovan market, exactly as Novartis instructed.[57]

August 2023 regulatory filings by Sandoz and Novartis contained the admission that in all prior years, the Sandoz business was not a separate legal group.[58] They also disclosed that in the past, Novartis had prevented Sandoz from pursuing certain business opportunities, putting it at a disadvantage to other

---

[51] This Court takes judicial notice that the settlement referenced in the Amended Complaint was filed as an ECF document in the Eastern District of Pennsylvania at 2014-md-2724-CMR.
[52] Doc. No. 41, ¶¶ 276-78.
[53] *Id.*, ¶ 283.
[54] *Id.*, ¶¶ 1504-1508.
[55] *Id.*, ¶¶ 1505-1507
[56] *Id.*, ¶¶ 1510-11.
[57] *Id.*, ¶¶ 1513-15.
[58] *Id.*, ¶ 271.

generic manufacturers.[59]

By 2022, Sandoz was facing dozens of lawsuits seeking damages for its conspiratorial activities and had paid fines totaling at least $380,000,000 to the DOJ.[60] In August of that year, to protect and cling to ill-gotten gains, Novartis and its Sandoz affiliates announced the spinoff of Sandoz.[61] The details, many of which were kept secret until the following year, resulted in Sandoz and Sandoz AG paying $3,300,000,000—financed by debt—to Novartis and requiring Sandoz to make future payments totaling $600 million to Novartis for unspecified technology transfers.[62] Completed on October 4, 2023, the spin-off, full details of which were first disclosed only 47 days earlier,  required Sandoz to assume all liability for the price-fixing activities described in Plaintiffs' and other MDL complaints, and liabilities related to opium litigation and hundreds of other lawsuits in the United States and Canada, and to release and indemnify Novartis as well as its directors, officers, managers, members, agents and employees from those liabilities.[63] Sandoz would also have to indemnify Novartis against any tax liabilities arising from the spin-off.[64] As a result of the spin-off, Novartis transferred $14,000,000,000 in liabilities to Sandoz entities, leaving those entities, including Sandoz, with a net

---

[59] *Id.*
[60] *Id.*, ¶ 284.
[61] *Id.*, ¶¶ 285-87
[62] *Id.*, ¶¶ 290-91.
[63] *Id.*, ¶ 292-93.
[64] *Id.*, ¶ 294.

asset value of $8,600,000,000.[65]  The spin-off left Sandoz a wholly owned subsidiary of Sandoz AG, and an indirect but wholly owned subsidiary of Sandoz Group AG.[66] Shares of the newly formed Sandoz Group AG were distributed to existing Novartis AG shareholders.[67] Though documents filed pursuant to regulations governing the spin-off did not specifically state figures for Sandoz, from 2020 to 2022, the global Sandoz organization reported its net sales had fallen by $400,000,000, a figure that roughly corresponds to the organization's sales drop in the United States over the same period.[68] At the time of the amended complaint's filing, Europe-based entities Sandoz AG and Sandoz Group AG were transferring Sandoz's profits to their balance sheets while withholding from public view the state of Sandoz's financial health.[69] Sandoz has since admitted that its assets and insurance policies might not cover its remaining and potential liabilities, though it continues to transfer profits to Sandoz AG and Sandoz Group AG.[70]

The foregoing summary provides the basis for this Court's rulings on Novartis and Sandoz AG's motions to dismiss pursuant to Rule 12(b)(1), (2) and (6).

**B.      Novartis's And Sandoz AG's Motions to Dismiss For Lack of Jurisdiction**

---

[65] *Id.*, ¶¶2 96-297.
[66] *Id.*, ¶ 295-96.
[67] *Id.*, ¶ 295.
[68] *Id.*, ¶ 289.
[69] *Id.*, ¶ 297.
[70] *Id.*, ¶¶ 291-93, 297.

**(1)    Novartis's Motion to dismiss pursuant to Rule 12(b)(1)**

Novartis alleges that the amended complaint fails to satisfy Rule 12(b)(1)'s subject matter jurisdiction requirement.[71]  That argument only succeeds if the amended complaint's claims Novartis and Sandoz AG are read selectively, ignoring those that describe Novartis's control of Sandoz during the alleged anticompetitive conspiracy and the Defendants' alleged acts to place wrongful gains from the conspiracy beyond the Plaintiffs' reach. Novartis does not refer to any extrinsic evidence in its argument regarding Rule 12(b)(1).  Therefore, the amended complaint's allegations are considered as true for the purposes of evaluating Novartis's jurisdictional challenge.[72] "[W]hen considering a Rule 12(b)(1) motion, the Court "review[s] only whether the allegations on the complaint, taken as true, allege sufficient facts to invoke the jurisdiction of the district court."[73]

When read as whole, the amended complaint alleges and details how Novartis has been and continues to siphon funds Sandoz received from its price-fixing and market-rigging activities since 2011.  The agreements underlying the 2023 spin-off of Sandoz and Sandoz AG require Sandoz to indemnify Novartis for, among other things, the anti-competitive activities described in the complaint. Sandoz has claimed that after the spin-off it does not have the assets necessary to meet its likely liabilities.  Plaintiffs seek to enjoin the further transfer of these assets

---

[71] Plaintiffs do not assert general jurisdiction over Novartis or Sandoz AG. Doc. No. 60, p. 13.

[72] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

[73]  *In re Generic Pharms. Pricing Antitrust Litg.*, 368 F.Supp. 3d at 828.

in what it credibly alleges is a scheme by Novartis to obtain and consume Sandoz's ill-gotten gains.

Article III standing requires that a plaintiff allege (1) a concrete and particularized injury that is actual and imminent, (2) a causal link between the conduct charged against the defendant and the injury, and (3) that the injury will be redressed by a favorable decision.[74] Plaintiffs' complaint alleges that Novartis, operating in the United States, controlled and concealed the full extent of its control over Sandoz for several years before the filing of the amended complaint[75] and that Novartis is now shuffling the money obtained through the anti-trust conspiracy described in the complaint (and past MDL opinions and rulings) to a foreign country. Novartis's motion to dismiss ignores these allegations and the terms of the prayer for injunctive relief raised to redress them.[76] Plaintiffs have identified the injury (the overcharging for generic drugs that was the object of the overarching conspiracy), the link between the conduct and the injury (Novartis's direction of Sandoz's operations, including participation in the conspiracy), and how the injury will be redressed by a favorable decision  (injunctive relief seeking, *inter alia,*  the cessation of transfer from Sandoz of ill-gotten gains to Novartis and Sandoz AG). Plaintiff's allegations meet the test for Article III standing.

---

[74] *Lujan v. Defenders of Wildlife*, 504 U.S. 560-61 (1992).  *See also In re Generic Pharms. Pricing Antitrust Litg.*, 368 F.Supp. 3d at 828, 831 (EPPs complaints not dismissed for lack of standing).
[75] Doc. No. 41, ¶¶ 248-249.
[76] Doc. No. 41, ¶ 3298. This averment incorporates other averments in the complaint cited above.

**(2)    Motions to dismiss pursuant to Rule 12(b)(2)**

Both Novartis and Sandoz AG move to dismiss the complaint pursuant to Rule 12(b)(2). The Plaintiffs bear the burden of pleading facts that establish personal jurisdiction under Rule 12(b)(2).[77] If defendants allege the complaint's factual allegations do not establish personal jurisdiction, the Plaintiff must prove by affidavits or other competent evidence that jurisdiction exists.[78] When the Court does not hold an evidentiary hearing, plaintiffs are entitled to have their allegations accepted as true and all factual disputes resolved in their favor.[79] The complaint needs only to make a prima facie showing of specific personal jurisdiction.[80]

Exhibits are attached to Novartis's and Sandoz AG's motions to dismiss as well as the Plaintiffs' response. Sandoz AG attached the two-page affidavit of Andrea Ferrari, who since 2024, served as the Chief Integrity Officer and Global Head of Corporate Legal since 2024, attested to its lack of contacts with Pennsylvania.[81]  The affidavit admits that prior to 2023, Sandoz AG and Sandoz were affiliated entities owned by Novartis, but that neither Novartis nor Sandoz AG directed Sandoz. In October 2023, Mr. Ferrari's declaration continues,

---

[77] *O'Connor v. Sandy Lane Hotel., Co.*, 496 F.3d 312, 316 (3d Cir. 2007).
[78] *Metcalf v. Rennaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).
[79] *O'Connor, supra.* at 316; *see also Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 984 F.3d 124, 129 (3d Cir. 2020); *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004);  *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 557 (M.D.Pa. 2009).
[80] *Miller Yacht Sales, supra.*, 384 F.3d at 97.
[81] Doc. No. 46, Ex. A, pp 1-2.

Novartis spun off entities he named "Sandoz Group AG." Sandoz AG, he relates, now wholly owns Sandoz, but it never has and does not direct its day-to-day activities.[82] They are, he says, "separate and independent corporate entities." Sandoz AG submitted no other exhibits in support of its Rule 12(b)(2) arguments.

Novartis submitted three exhibits in support of its arguments. The first is a five-page affidavit from Bertrand Richard René Bugnon.[83] Mr. Bugnon states he has worked for several Novartis entities in different countries. He avers that Novartis AG has not been incorporated in the United States and has never registered to do, or ever done, any business in Pennsylvania—Novartis is solely a holding company and has no employees or products of its own. Any products sold in the United States by U.S.-based entities bearing the Novartis name are not generic drugs, and those entities do not have a direct or indirect parent-subsidiary relationship with Sandoz. He then describes (in greater detail than Mr. Ferrari) the 2023 spinoff from Novartis of Sandoz and Sandoz AG, emphasizing that they are no longer related to Novartis. The second is five pages of a Rule 30(b)(6) deposition that is at least 279 pages in length.[84] The witness, answering leading questions, changes his testimony regarding two employees he described at another point in the deposition.[85] The third exhibit[86] is an eleven-page document that

---

[82] *Id.*, p. 2.
[83] Doc. No. 49, Ex. 1.
[84] Doc. No. 49-1.
[85] *Id.*, pp. 267-68. Plaintiffs attached longer excerpts from the same deposition, which are discussed below. Doc. No. 60, Exhibit 3.
[86] Doc. No. 49-2.

purports to describe Sandoz's management structure as of 2015. A portion of Novartis's motion to dismiss cites it to prove that Sandoz's managers could enter into contracts at or below $20,000,000. This, Novartis AG says, proves that it did not exercise "invasive" control over Sandoz.[87] Without further context or explanation, e.g., how many times every year Sandoz sought approval for expenditures, there is no telling if this limited authority was or was not significant.

Plaintiffs' response to Novartis's and Sandoz's Rule 12(b)(2) motions to dismiss includes 46 exhibits totaling 366 pages. These exhibits support and detail many of the amended complaint's allegations that Novartis controlled Sandoz, and unlike those submitted by Novartis and Sandoz AG, are detailed and show a functioning relationship between the parties that supports the Plaintiffs' allegations. Some examples suffice to demonstrate that Plaintiffs sufficiently allege Novartis and Sandoz AG controlled or were enmeshed in Sandoz from 2003 until the filing of their complaint.

Deposition testimony provided by a Sandoz employee shows that between 2010 and 2022 some price increases required Novartis approval, though the same witness, questioned by a different lawyer, testified the next day that that authority was not exercised from 2010 to 2016.[88] Deposition testimony from another Rule 30(b)(6) witness describes further enmeshment between Sandoz, Sandoz AG and

---

[87] Doc. No. 49, p.17.
[88] Doc. No. 60, Ex. 3, pp. 144-47, 265. The authenticity and provenance of all exhibits attached to Plaintiffs response to the motion to dismiss are attested to in an affidavit of Byron Gray, preceding the Exhibits in Doc. No. 60.

23

Novartis:

> Between 2018 and 2022, Novartis as a company, as a group, consolidated the manufacturing and supply chain functions from the divisions and combined them into Novartis technical operations. This division supplies to Novartis Pharma, Novartis oncology [*sic*] and Sandoz, for example. So in a sense, yes, Novartis, but Novartis technical operations are involved in supply.[89]

The amended complaint alleges that a Novartis executive was involved in Sandoz's pricing decisions.[90] Terence O'Sullivan, a Novartis employee who bore the title "Franchise Head North America" or "Director of Marketing" for Sandoz from May 2014 to May 2017[91] was also involved in pricing decisions.[92] A May 19, 2014, email to him from Christopher Bihari, a Sandoz employee with a supervisory role in generic drug sales, describes Sandoz' cooperation on pricing with a competitor.[93]

In at least 2011 and 2012, Jon Symonds, the CFO of Novartis AG[94], Jeff George, who served on the Executive Committee of Novartis[95], and Robert Pelzer, the President of Novartis Corporation[96] were the only members of

---

[89] *Id.*, Ex 15, p. 22.

[90] Doc. No. 41, ¶¶ 265-66.

[91] Ex. 44 (Terence O'Sullivan's resumé).

[92] *Id.*, Ex. 3, pp. 154; Ex. 32. This is from the same deposition attached to Novartis's motion to dismiss, referred to above.

[93] *Id.*, Ex, 22, pp. 1079-80; Ex. 32, 5th page. Exhibit 32 is a ten-page organizational chart of Sandoz that is entirely on Novartis, not Sandoz, stationary.

[94] Doc. No. 60, Ex. 36, p. 2 (Symonds biography).

[95] Doc. No. 60, Ex. 39, p. 1 (George biography).

[96] Doc. No. 60, Ex. 43, p. 1 (Pelzer biography).

Sandoz's Board of Directors.[97] Their names appear on "Action[s] by Written Consent of the Board of Directors" of Sandoz's Board to adopt the "Novartis Code of Conduct"[98] and directing certain personnel matters.[99] In 2011,  Jon Symonds, sent an email to several persons, including Jeff George, directing Sandoz to take pricing actions that would raise an additional $100,000,000.[100] The next day, George forwarded the email to Don DeGolyer.[101] A resumé for Don DeGolyer states:

> Between 2009 and 2013, he served on the Executive Committee of Sandoz AG (a Novartis company), one of the largest global generic companies, as CEO, Sandoz Inc., a $3.5bn generic pharmaceuticals and biosimilars company where he was responsible for leading over 3,000 associates in North America.[102]

A February 2015 email chain initiated by a  Novartis executive at a Novartis office in New Jersey includes a Sandoz executive's observation, "So we should do what best [*sic*]  for Novartis group and not only what is good for Sandoz."[103]  An email from Novartis demonstrates that at least some Sandoz employees were entitled to have a Novartis email account and access to Novartis calendars and contacts.[104] Novartis controlled, audited and directed the rules for use of Sandoz's

---

[97] Doc. No. 60, Ex. 10; Ex.12, pp. 009356058, 009356060 and 009356065. These exhibits bear signature lines but are unsigned.
[98] *Id.*, Ex. 10; Ex.12, pp. 009356058, 009356060 and 009356065
[99] *Id.*,  Ex.12, pp. 009356058, 009356060 and 009356065
[100] *Id.*, Ex. 1, p. 2; 36, p.2; Ex. 37, p.4; Ex. 38, pp 1, 4.
[101] *Id.*, Ex. 2
[102] *Id.*, Ex. 40.
[103] *Id.*, Ex. 27.
[104] *Id.*, Ex. 24.

electronic information systems, including confidential data.[105]  A June 2016

Novartis document entitled "Novartis Brand Refresh— Frequently Asked

Questions" tells Sandoz Employees, "The behaviors and expectations of our

customers are changing and Novartis can't just rely on its product brands. We

must speak with one voice to key stakeholders (patients, healthcare professionals,

healthcare systems, payers, politicians, and investors) to be seen as a credible and

trusted partner and as an attractive choice to potential future talent."[106]

Other exhibits attached to Plaintiffs response to Novartis and Sandoz's

motions to dismiss show Sandoz AG publicizing and describing the pending

disengagement from all Sandoz divisions and entities. An August 18, 2023,

prospectus for Sandoz AG that describes the spin-off from Novartis admits that

prior to the spin-off, "The business of Sandoz did not form a separate legal group

of companies in all years presented," referring to Sandoz's relationship to

Novartis.[107] Additionally, it notes that prior to the spin-off, "cash balances were

swept by Novartis regularly from the Sandoz's bank accounts."[108] The prospectus

states, "Novartis's technical operations unit managed the production, supply chain

and quality of the innovative medicines and the Sandoz division of the Novartis

Group. . . . [109]"

**(3)    Plaintiffs Have Alleged Sufficient Contacts To Support Personal**

---

[105] *Id.*, Ex. 13.

[106] *Id.* p. ix; Ex. 26, p. 2.

[107] *Id.*, Ex 41, p. 59, F-8.

[108] *Id.* at F-9.

[109] *Id.*, Ex. 41, p. 58.

**Jurisdiction over Novartis AG and Sandoz AG**

Plaintiffs seek relief against Novartis and Sandoz AG pursuant to the Clayton Act[110], which authorizes nationwide jurisdiction.[111] Those defendants, for different reasons, argue that the amended complaint fails to allege the minimum contacts necessary to demonstrate jurisdiction over them in the United States or Pennsylvania. However, as described above, both entities, from Switzerland or in the United States, continually inserted themselves into Sandoz's business. Plaintiff's complaint, standing alone, and in consideration with the exhibits attached to their response, establish both that Novartis and Sandoz AG purposefully directed their activities at Sandoz in the United States, and injuries alleged in the amended complaint resulted from those activities. The amended complaint sufficiently asserts the minimum contacts necessary for the exercise of personal jurisdiction over them.[112] The exhibits attached to Plaintiffs' response sufficiently demonstrate, for the purpose of Novartis AG's and Sandoz AG's Rule 12(b)(2) motions, that during the period covered by the amended complaint's allegations concerning Sandoz's alleged anti-competitive activities, Novartis and Sandoz AG were intimately and intricately involved with Sandoz. When Novartis chose to, it controlled Sandoz's actions. Not only the quantum, but the quality of evidence Plaintiffs append to their response to Novartis's and Sandoz AG's

---

[110] 15 U.S.C. §26.

[111] *In re Auto Refinishing Paint*, 358 F.3d 288, 297 (3d Cir. 2004).

[112] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-473 (1985).

27

motions to dismiss establishes a prima facie showing that both Novartis and Sandoz AG were involved in the alleged antitrust conspiracy and deeply involved in using the spin-off to remove assets that were fruits of that conspiracy from Sandoz. Neither Novartis's nor Sandoz AG's motions seriously engage with the bulk and cumulative effect of the complaint's substantive allegations against them and the exhibits appended to Plaintiffs' response. As noted above, the Plaintiffs are entitled to have their allegations accepted as true and all factual disputes resolved in their favor when the Court does not hold an evidentiary hearing.[113] The cases Novartis and Sandoz AG cite in support of their arguments that Plaintiffs fail to allege personal jurisdiction over them do not concern a combination of allegations as sweeping as those asserted in the complaint and described in the Plaintiffs' responses' exhibits.

**(4)    Alter Ego and Agency Jurisdiction**

The complaint's averments as well as the evidence contained in the exhibits attached to Plaintiffs' response, support their claim that they established a prima facie claim for alter ego jurisdiction. The alter-ego theory of jurisdiction imputes a corporation's contacts with a forum to a related corporation to determine the existence of personal jurisdiction.[114] "[T]he alter ego test looks to whether the degree of control exercised by the parent is greater than normally associated with

---

[113] *O'Connor, supra.* at 316; *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 557.
[114] *Bassil v. Starwoods Hotels & Resorts Worldwide, Inc.*, 2014 U.S. Dist. LEXIS 135927, **4-*5 (E.D.Pa. 2014).

28

common ownership and directorship and whether the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent."[115] Courts considering whether alter-ego jurisdiction is established look for the following factors:

> (1) the parent owns all or a significant majority of the subsidiary's stock,
> (2) commonality of officers or directors exists between the two corporations,
> (3) the group possesses a unified marketing image, including common branding of products,
> (4) corporate insignias, trademarks, and logos are uniform across corporate boundaries,
> (5) group members share employees,
> (6) the parent has integrated its sales and distribution systems with those of its subsidiaries,
> (7) the corporations exchange or share managerial or supervisory personnel,
> (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation,
> (9) the parent uses the subsidiary as a marketing division or as an exclusive distributor, and
> (10) the parent exercises control or provides instruction to the subsidiary's officers and directors.[116]

The Court may consider all relevant evidence to assess whether Novartis exercised control over Sandoz that is typical of a parent-subsidiary relationship—no single

---

[115] *Id.* at *5, quoting *In re Enterprise Rent-A-Car Wage & Hour Employment Pracs. Litigation*, 735 F.Supp.2d 277, 319 (W.D. Pa. 2010).

[116] *Bassil v. Starwoods Hotels & Resorts Worldwide, Inc.*, 2014 U.S. Dist. LEXIS 135927, at *5-*6; *In re Latex Gloves Prod. Liab.Litig.*, 2001 U.S. Dist. LEXIS 12757, *13 (E.D. Pa. 2001); *Superior Coal Co. v. Ruhrkohle, A.G.*, 83 F.R.D. 414, 421 (E.D. Pa. 1979) (ciations omitted).

factor is determinative.[117] "A corporation may in fact transact business in a district through related corporations. To determine whether the affiliation is sufficiently substantial to subject the principal corporation to the exercise of the court's jurisdiction through the operations of the related corporation requires unremitting scrutiny into the relationship between the two entities.[118] The substance, not form, of the inter-corporate nexus will be dispositive."[119] The Plaintiffs' exhibits show the presence of the following factors:

First factor— Novartis owned Sandoz and Sandoz AG. Bertrand Bugnon's affidavit, attached to Novartis's motion to dismiss, states Sandoz was "indirectly held" by Sandoz AG, which  and separated from Novartis by several layers of corporate organization. Mr. Bugnon though, does not assert that any other person or entity held, indirectly or not, owned any fraction of Sandoz prior to the spin-off.

Second, fifth, seventh and eighth factors— senior officers of Novartis and Sandoz AG also had senior roles at Sandoz, including Novartis's CFO serving as one of Sandoz's three directors. A member of Sandoz AG's Executive Committee was also the CEO of Sandoz. Communications between all three companies were sent on shared email chains and through electronic information systems controlled and managed by Novartis. Employees did not know if they worked for Sandoz or Novartis. Novartis consolidated the manufacturing and supply chain from its divisions, including Sandoz. Novartis instructed all its divisions, "We must speak with one voice . . . ." Nothing in the Bugnon or Ferrari affidavits directly confronts this evidence.

Tenth factor— Plaintiffs' exhibits show that Novartis provided

---

[117] *In re Chocolate Confectionary Antitrust Litig.*,  602 F.Supp. 2d at 570.
[118] *Bassil v. Starwoods Hotels & Resorts Worldwide, Inc.*, 2014 U.S. Dist. LEXIS 135927, *at 6, n.2, quoting *Gregoire v. Schleicher & Co. Int'l., A.G.*, No. 904720, 1991 U.S. Dist. LEXIS 11820, *11(E.D. Pa. Aug. 22, 1991).
[119] *Id.*

direction to Sandoz on pricing, information technology, personnel decisions, and how to preserve and enhance Novartis's reputation.

The averments in the amended complaint as well as the exhibits Plaintiff submitted, described and cited above, show Novartis was capable, willing, and did direct Sandoz. Plaintiffs established alter ego jurisdiction of both Novartis and Sandoz AG.

The amended complaint also sufficiently alleges personal jurisdiction over Novartis under the agency theory. A determination of jurisdiction under agency theory depends on the degree of control the parent corporation exercises over the subsidiary's actions.[120] The amended complaint's averments and the exhibits attached to their response to the motions to dismiss establish that Novartis continually interfered with Sandoz's operations. Control over price increases and the strategy regarding those increases establishes the requisite level of control to support agency jurisdiction at this stage of the proceedings.[121] Though the affidavits Novartis and Sandoz AG attached to their motions to dismiss generally denied participation in Sandoz's activities, Plaintiffs' exhibits, as well as the amended complaints' allegations, present a fuller picture than statements contained in the affidavits as well as the other information provided by Novartis AG's two

---

[120] *Intellectual Ventures I LLC v. Toshiba Corp.*, 66 F. Supp. 3d 495, 498 (D. Del. 2014).

[121] *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-27242023 U.S. Dist. LEXIS 31649, *41 (allegation that corporation had to approve and direct price increase strategy established jurisdiction under the agency theory.)

31

additional exhibits.

The amended complaint and the exhibits attached to Plaintiffs' response to the motion to dismiss establish, at this stage, personal jurisdiction. When and if properly raised by Novartis and Sandoz AG, this Court can revisit the issue,[122] but their motions to dismiss pursuant to Rule 12(b)(2) are denied.

**(5)      Supplemental Jurisdiction Over State Claims Against Novartis AG and Sandoz AG**

Novartis urges this Court to not exercise supplemental jurisdiction of Plaintiffs' state claims.[123] 28 U.S.C. § 1367(a) gives federal courts supplemental jurisdiction over all other claims in the action so related to the federal claims that give the court jurisdiction that they form part of the same case or controversy. 28 U.S.C. §1637(c)(2) and (3) allow dismissal of claims over which federal courts otherwise lack jurisdiction, respectively, that predominate over the claims that fall under the court's original jurisdiction and where the claims establishing original jurisdiction were dismissed. Novartis's and Sandoz AG's claims hinge, though, on this Court finding that it does not have jurisdiction over the amended complaints' federal claims.  Neither is the case here.

This Court has allowed other MDL plaintiffs to maintain similar state law claims related to their federal antitrust claims throughout this litigation.[124] Novartis and Sandoz AG offer no compelling reason to dismiss similar state law claims, all

---

[122] *Metcalfe, supra*, 566 F.3d at 331.
[123] Doc. No. 49, pp. 8-10.
[124] *See, e.g.* MDL Doc. No. 857, at 26-27.

based on the conduct underlying the federal claims, from this action.

**(6)    Motion to dismiss New Jersey's Uniform Voidable Transfer Act claims pursuant to Fed.R.Civ.Pro.9(b)**

Novartis and Sandoz AG allege that Plaintiffs failed to plead with the particularity required by Fed.R.Civ.Pro. 9(b) claims involving fraudulent intent raised pursuant to two sections of New Jersey's Uniform Voidable Transfer Act.[125] The purpose of the NJUVTA is to prevent a debtor from placing property beyond a creditor's reach.[126] As recounted above, in 2022, Sandoz faced a multitude of lawsuits for activities alleged in this MDL and had paid hundreds of millions of dollars in fines to the Department of Justice. The amended complaint further alleges that in August of that year, Novartis and its Sandoz affiliates announced

---

[125] Doc. No. 41, ¶¶ 3342 (N.J. Stat. § 25:2-25(a)(1), 3342 ((N.J. Stat. § 25:2-25(a)(2); and 3350 (N.J. Stat. § 25:2-27). Those provide in relevant part:

> **§ 25:2-25. Transfer or obligation voidable as to present or future creditor**
> a. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>> (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

[126] *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 488 (N.J. 1999).

33

that Sandoz would be spun off, but details were not revealed until one year later. When revealed, the public Sandoz AG and Sandoz, financed by debt, paid $3,300,000,000 to Novartis, and Sandoz was required to pay a further $600,000,000 to Novartis for unspecified technology transfers. Sandoz assumed all liability for liabilities arising from pending price-fixing and opioid litigation, hundreds of other lawsuits, and any tax liabilities arising from the spin-off. Sandoz has admitted its liabilities exceed its assets and insurance coverage.

Rule 9(b) requires that allegations fraud be pled with particularity. In the Third Circuit's commonsense formulation of this standard, "This means the who, what, when, where, and how: the first paragraph of any newspaper story."[127] The complaint gives that and more, detailing a series of events in which Novartis and Sandoz AG, doing if not everything possible, a great deal to conceal their taking from Sandoz the ability to pay possible future judgments in this MDL.[128] The complaint states five reasons that the spinoff was a voidable transfer: (1) at the time of the 2023 transfer Sandoz was a defendant in dozens of MDL lawsuits; (2) the transfers involved Novartis and one or more of Sandoz AG, Novartis AG, Sandoz and their affiliates; (3) key details of the transfers of assets and liabilities remained undisclosed until a few weeks before the spinoff agreement's consummation; (4) the spinoff left Sandoz with underfunded litigation reserves

---

[127] *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (1990); I*n re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1977).
[128] Doc. No. 41, ¶¶ 278-305.

34

and without resources to pay debt and tax obligations[129]; and (5) Novartis for years had transferred to itself Sandoz's value and profits, including ill-gotten gains from its conspiratorial activities.[130] These five reasons also satisfy five of eleven "badges of fraud" the NJUVTA says are considerations in assessing fraudulent intent.[131] Plaintiffs do not have to allege all eleven badges of fraud for their complaint to survive, but only enough to make their claim credible.[132] The amended complaint sufficiently alleges that Novartis and Sandoz AG, concealing their plans from the public, worked together to transfer assets held by Sandoz to deplete its ability to pay all liabilities it may incur as a result of the MDL. Plaintiff's claims therefore satisfy both Rule 9(b)'s particularity requirement and describe the requisite number of acts to allege a NJUVTA claim.

**(7)    Novartis and Sandoz AG's motions to dismiss antitrust claims**

---

[129] Novartis's motion to dismiss disputes this allegation not because it is insufficiently pled, but because it asserts the allegation is untrue. It directs the Court to a Novartis website to support its claim, stating that *In re Burlington Coat Factory*, 114 F.3d at 1426, allows references to documents not yet in the record in a Rule 12 challenge to a complaint. Doc. No. 49, pp. 23-24. The website opens to a document with 62 pages of small print, including the cited section. The cited section has a footnote referring to elsewhere in the report. Its relevance is obscure as ¶ 296 of the Plaintiffs' complaint does not refer to a specific document, and the cited section of the report does not definitively rule out Plaintiffs' description of Sandoz's financial health at the time in question.

[130] Doc. No. 41, ¶¶ 299-304.

[131] N.J. Stat. § 25:2-26 (a), (d), (g), (h), and (i).

[132] *Glichinsky*, 732 A.2d at 489-90 ("Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."); *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 747 (D.N.J. 2013)("[A] finding of several badges in one transaction generally provides conclusive evidence of an actual intent to defraud.").

Novartis and Sandoz AG assert the amended complaint should be dismissed pursuant to Rule 12(b)(6) because it does not sufficiently allege their participation in antitrust conduct. As recounted in this memorandum's discussion of the allegations against them in the amended complaint, Plaintiffs cite several examples of both Defendants' participation in and direction of Sandoz's efforts to manipulate portions of the American generic drug market. These allegations are sufficient to demonstrate that both Defendants participated in the overarching conspiracy, alleged throughout the amended complaint.

## V.      MAYNE PHARMA'S MOTION TO DISMISS

Mayne moves to dismiss the amended complaint's claims against it, arguing it fails to allege an agreement between Heritage and Mayne to rig drug prices and allocate market share.[133] The amended complaint alleges that one month prior to Mayne's February 2014 entry into the market for an acne treatment, Doxycycline Hyclate Delayed Release ("Doxy DR"), G.S.2 , an accounts director at Mayne, spoke with a counterpart, A.S.,  at Heritage.[134] As a result, Mayne and Heritage agreed to target Mylan, which had 60% of the Doxy DR market.[135] G.S.2  and AS continued to communicate about cooperating to get Mayne more market share but not at the expense of or without the agreement of other co-conspirators, as G.S.2 detailed in a March 17, 2014,  email to Jason Malek, a vice-president of Heritage

---

[133] Doc. No. 83, p. 9.
[134] Doc. No. 41, ¶455.
[135] *Id.*, ¶ 456.

Pharmaceuticals, Inc.[136] Mayne nevertheless went after Heritage customers.[137] The amended complaint then details several phone calls and emails between G.S.2 , AS, Malek and others,[138] culminating in an agreement between Heritage and Mayne for Mayne to overbid Heritage's price for Doxy DR to a customer in December 2014. The amended complaint also details a continuing conspiracy through December 2015 between Mayne and Heritage to divvy up the Doxy DR market. Malek later pleaded guilty to conspiring to bid rigging, customer allocation, and price fixing with regard to the generic drugs listed in the amended complaint[139] Moreover, as Plaintiffs, note, this Court found similar allegations against Mayne regarding Doxy DR sufficient to survive dismissal in another complaint.[140]

The complaint also alleges Mayne participated in a conspiracy regarding the painkiller Oxycodone/Acetaminophen. In 2011 and 2012, other vendors and manufacturers sold the drug at a cost of "roughly" $18 for a bottle of 100 10/325 (oxycodone/acetaminophen) mg pills.[141] By December 2013, the price those vendors charged had increased to $80 for the same bottle, with no supply shortage, demand spike or other market conditions to explain the price rise.[142] The complaint lists the vendors' communications wherein they allegedly conspired to

---

[136] *Id.*, ¶¶ 357, 457-58.
[137] *Id.*, ¶ 459.
[138] *Id.*, ¶¶ 459-74.
[139] *Id.*, ¶ 18.
[140] *In re Generic Pharms. Pricing Lit.*, 338 F.Supp. 3d at 339-40.
[141]  Doc. No. 41, ¶¶ 3184-85.
[142] *Id.*, ¶ 3185.

both raise the drug's price and allocate market share between them.[143] Mayne's President encouraged his sales team to work with competitors to coordinate the customers it should target when it entered the oxycodone/acetaminophen market in 2014.[144] Mayne charged the same price as its competitors conspired to charge in December 2013.[145]

Mayne's motion to dismiss misleadingly states that the amended complaint fails to allege specific facts showing a conspiracy between it and its competitors regarding both drugs.[146] The motion to dismiss mischaracterizes the amended complaint's direct and unambiguous allegations of communications followed by actions that, if true, demonstrate Mayne's communications and coordinated actions with its competitors in the pricing and market allocation of Doxy DR[147] and oxycodone/acetaminophen.[148] The allegations are sufficient to allege a conspiracy. Mayne may well be able to rebut them with a summary judgment motion or at trial, but they are sufficient to survive a motion to dismiss. Moreover, this Court has already rejected Mayne's similar claims that the Doxy/DR claims should be dismissed.[149]  Therefore, Mayne's motion to dismiss will be denied.

## VI.    WEST-WARD PHARMACEUTICALS AND ROXANE'S MOTION TO DISMISS

---

[143] *Id.*, ¶¶ 3186-87
[144] *Id.*, ¶ 3188.
[145] *Id.*, ¶¶ 3188-89.
[146] Doc. No. 83, pp. 11-12.
[147] Doc. No. 41, ¶¶ 475, 477, 3188.
[148] *Id.*, ¶¶ 3188-89.
[149] *In re Generic Pharms.*, 338 F.Supp. 3d at 441.

West-Ward Pharmaceutical's/Roxane's motion to dismiss[150] cites the amended complaint's failure to clearly connect its accusations to West-Ward or Roxane. Plaintiffs use "West-Ward" to refer to six different companies— Hikma USA, Hikma Pharm, West-Ward Columbus, West-Ward Pharm, and Hikma Labs— as "West-Ward"[151] and Plaintiffs provide an abbreviated history of how all these entities came to be acquired by Hikma Pharmaceuticals PLC.[152] Plaintiffs, though, create confusion later in the complaint by referring to the entity by different names, e.g., "Hikma/West-Ward,[153] Hikma/Roxane,[154] and Hikma.[155] Plaintiffs further burden this Court by asking it to refer or incorporate pleadings filed in other MDL cases rather than setting forth those arguments in its response to the motion to dismiss,[156] and with no indication that those arguments were ever approved by the Court. Such confusion justifies dismissing those claims.[157] Other Plaintiffs' arguments in other cases are not authoritative. Plaintiffs chose to file their own complaint, and that complaint will be measured by what it contains, and not what other complaints plead. The complaint, the seven motions to dismiss,

---

[150] Doc. No. 81.
[151] *Id.*, ¶ 114.
[152] *Id.*, ¶ 109-13.
[153] *Id.*, ¶ 3147.
[154] *Id.*, ¶ 3225.
[155] *Id.*, ¶ 3279.
[156] Doc. No. 104, pp. 9, 11
[157] *See In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709, 746 (E.D. Pa. 2011) (conflating antitrust allegations against three companies without distinguishing what each one did required their dismissal, even though the companies had common owners).

and the responses and replies in this matter total over 1800 pages. This Court will not go on a scavenger hunt for pleadings in other cases to supplement the amended complaint.

For those reasons, Plaintiffs' claims against West-Ward Pharmaceuticals and Roxane, including allegations against alleged subsidiaries, predecessors, and successors, will be dismissed with leave to amend.

## VII. ASCEND'S MOTION TO DISMISS ALL CLAIMS AGAINST IT REGARDING NIMOPIDINE AND SILVER SULFADIAZINE

Ascend moved to dismiss claims that it conspired with other defendants to raise the prices of Nimopridine and Silver Sulfadiazine. Nimopidine is used to reduce complications arising from bleeding in a blood vessel in the brain.[158] Jason Malek, a vice-president of Heritage Pharmaceuticals, Inc., had been conspiring with other companies to control the price and distribution of the drug.[159] Ascend received federal approval to manufacture Nimopidine in April 2014.[160] This prompted Malek, on April 8, to warn other Heritage executives that Ascend was now a competitor for Nimopridine and to contact J.D., an Ascend vice-president, to set up a meeting, to which J.D. agreed, though none is alleged to have occurred immediately.[161] On April 22, 2014, following a meeting between Malek and other Heritage sales personnel, it was agreed that Malek, who had a relationship with

---

[158] Doc. 41, ¶ 355.

[159] *Id.*, ¶¶ 357, 359-74.

[160] *Id.*, ¶ 375.

[161] *Id.*

J.D., would offer Ascend a one-third share of the market for Nimopidine.[162] That same day, Malek and J.D. agreed that (1) Heritage would raise its prices, (2) Ascend would charge a high price for its Nimodipine too, so it would not capture any Heritage customers, and (3) Heritage would stop selling to some of its customers so Ascend could get a market share at a favorable pricing.[163] At the end of June 2014, Heritage raised its Nimopidine price to twelve customers.[164] Malek unsuccessfully tried to contact J.D. for several months, and in January 2015, he asked another Heritage employee to "confidentially" discover whether Ascend had Nimopidine in its warehouse, and by January 24, Malek learned that it did.[165] By May 1, 2015, Ascend was selling Nimopidine at a higher price than Heritage, but managed to gain market share throughout the rest of 2025.[166]

The complaint contains further allegations that allege a conspiracy to control Nimopidine's and other drugs' prices and allocate customers between Ascend, Heritage and their co-defendants. Malek communicated with several competitors about carving up the market for several drugs, culminating in an April 22, 2014, teleconference with the Heritage sales team.[167] At that meeting, Malek circulated a document informing them how the scheme would work for

---

[162] *Id.*, ¶¶ 376-77, 511.
[163] *Id.*, ¶ 376.
[164] *Id.*, ¶ 381.
[165] *Id.*, ¶¶ 382-85.
[166] *Id.*, ¶ 387.
[167] *Id.*, ¶ 511,

Nimodipine and fifteen other drugs.[168] The complaint then details communications between Heritage and other defendants about the scheme's implementation to increase the price of the drugs, including Nimopidine.[169]

The complaint contains detailed allegations of Ascend's participation in a scheme to manipulate the price of Silver Sulfadiazine, a topical medication used in the treatment of second- and third-degree burns.[170] In May 2012, Ascend, a  Silver Sulfadiazine vendor, coordinated with co-defendant Actavis to raise the drug's price to supra-competitive levels in the absence of any supply shortages, demand spikes or other market conditions.[171] The price increases occurred after Ascend and Actavis executives communicated at trade meetings such as the Generic Pharmaceutical Association 2012 Annual Meeting from February 22-24, 2012, and the National Association of Chain Drug Stores 2012 Pharmacy and Technology Conference in Denver, CO, from August 25-28, 2012.[172]

Allegations that competitors acted in parallel to significantly increase the price of a product following communications with one another support claims of concerted anticompetitive conduct. As described above, Plaintiffs allege that Ascend and its competitors communicated with one another concerning the prices of Nimopidine and Silver Sulfadiazine, and soon thereafter raised the prices of the

---

[168] *Id.*

[169] *Id.*, ¶¶ 511-530.

[170] *Id.*, ¶ 3231.

[171] *Id.*, ¶ 3231-32.

[172] *Id.*, ¶ 3232.

drugs. The motion to dismiss will be denied.

## VIII. MOTIONS OF SEVERAL DEFENDANTS TO DISMISS THE COMPLAINT FOR FAILURE TO MAKE SPECIFIC ALLEGATIONS OF ANTICOMPETITIVE ACTS REGARDING SPECIFIC DRUGS OR DRUG DOSAGES AND FORMULATIONS

Several Defendants moved to dismiss the entire amended complaint because it fails to provide dosages and formulations for many the drugs alleged to have been subject to the overarching conspiracy, and thus is not the "short and plain statement" required by Fed.R.Civ.Pro. 8(a).[173] They refer this Court to the EPP's second amended complaint[174], asserting it does provide specific dosages and formulations for the drugs they claim were subject to antitrust violations. That document, though, sometimes provides specific dosages and sometimes does not. Aside from a few examples, these Defendants did not specify which allegations were insufficient.[175]

Other Defendants, in another motion to dismiss, allege the complaint fails to allege sufficient facts to underlie claims that (1)  certain drugs were subject to (1) an illegal antitrust conspiracy[176], and (2) that specific companies were among those that manipulated prices and market share for certain drugs.[177] They cite several examples of allegations against companies that involve specific drugs whose dosages or formulations are not detailed, or lack details of what specific companies

---

[173] Doc. No. 65, pp. 14-15; Doc 66, pp. 7-9.
[174] 16-cv-6011, Doc. No. 85, ¶3.
[175] Doc. 65, p. 16.
[176] Doc. No. 66, pp. 6-7; Doc 66-2.
[177] Doc. No. 66, pp. 10-13.

did regarding specific drugs.[178]

Defendant Amneal, in its own motion to dismiss, seeks to dismiss claims against it regarding only one drug, Bethanecol Chloride. While the complaint raises sufficiently detailed allegations that Amneal conspired with others to allocate market share and manipulate prices of other, clearly identified drugs, what, when and with whom Amneal did anything regarding Bethanecol Chloride and its market is not described. However, the complaint contains additional allegations that Amneal was part of the overarching conspiracy.

As noted above, this Court, in other opinions in this MDL, found there was an overarching conspiracy to fix prices and allocate market shares of many generic drugs in violation of several federal and state laws.[179] The amended complaint contains multiple specific allegations of communications, meetings, membership in trade groups that along with parallel pricing of drugs at some point states a claim for violating antitrust laws with respect to specific drugs. For all of the movants, the complaint sufficiently alleges "three 'plus factors' supporting a finding that there is a suggestion of a preceding agreement: '(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.' 'The character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a

---

[178] Doc. No. 66, Appendices A and B.

[179] *See* fn.1, *supra.*

44

whole.'"[180] Therefore, the motions to dismiss will all be denied.

## IX.  CONCLUSION

For all of the foregoing reasons, an **ORDER will issue as follows:**

- Sandoz AG's Motion to Dismiss, Doc. No. 46 is DENIED.

- Novartis AG's Motion to Dismiss, Doc. No. 48 is DENIED.

- Defendants' Joint Motion to Dismiss, Doc. No. 65 is DENIED in part. The motions of Emcure Pharmaceuticals and Strides Pharma, Inc. to dismiss the complaint are GRANTED. Plaintiffs are granted leave to file an amended complaint within the terms of the Court's memorandum.

- Defendants' Joint Motion to Dismiss, Doc. No. 66 is DENIED.

- The Motion to Dismiss of Amneal Pharmaceutical Inc. and Amneal Pharmaceutical Plaintiffs' Bethanechol Chloride Claims, Doc. No. 76, is DENIED.

- The Motion of West-Ward Pharmaceuticals and Roxane to Dismiss, Doc. No. 81, is GRANTED without prejudice. Plaintiffs are granted leave to file an amended complaint within the terms of the Court's memorandum.

- Mayne Pharma Inc.'s Motion to Dismiss, Doc No. 83 is DENIED.

---

[180] *In re Generic Pharms, Pricing Litigation*, s*upra.*, 338 F.Supp. 3d at 525, quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d at 718; *In re Foreign Exchange Rates Antitrust Litig.*, 2016 U.S. Dist. LEXIS 12837 *25 (S.D.N.Y., 2015)

- All parties who moved to seal the amended complaint and the motions to dismiss adjudicated in this memorandum opinion must show good cause for keeping them from public view within fourteen (14) days of the date of this order.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

**CYNTHIA M. RUFE, J.**