IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO: | HON. CYNTHIA M. RUFE |
| Molina Healthcare, Inc. v. Actavis Elizabeth, LLC | No. 20-695 |
| Humana Inc. v. Actavis Elizabeth LLC | No. 18-3299 |
| Humana Inc. v. Actavis Elizabeth LLC | No. 19-4862 |
| Humana Inc. v. Actavis Elizabeth LLC | No. 20-6303 |

## MEMORANDUM

This matter arises in actions that are part of multi-district litigation alleging that several generic drug manufacturers engaged in antitrust activity starting in 2009. Numerous lawsuits, including class actions, were brought by health insurance companies, hospitals, individual and chain pharmacies, and dozens of other plaintiffs. The defendants are generic drug manufacturers. Several states filed their own lawsuits against the drug manufacturers. All of the lawsuits in the MDL brought by the states are now pending in the District of Connecticut, while the rest are pending in the Eastern District of Pennsylvania. This matter concerns four lawsuits, three brought by Humana Inc. and the fourth by Molina Healthcare Inc. One of these matters (18-3299) is scheduled for September 8, 2026, as the first bellwether trial in this MDL.

On September 4, 2025, several defendants moved this Court to disqualify Plaintiffs' lead counsel, W. Joseph Nielsen ("Nielsen"), and his law firm, Lowey

Dannenberg, P.C. ("Lowey") alleging Mr. Nielsen, due to his prior participation in the MDL and matters preceding it owing to his previous position as Assistant Attorney General of Connecticut, was in violation of Pennsylvania Rules of Professional Conduct 1.11(a) and (c).[1] Following the Plaintiffs' October 1, 2025, response, this Court referred the matter to Special Master Lawrence Stengel for a report and recommendation. Special Master Stengel, after hearing argument and receiving and reviewing briefs and exhibits from the parties, issued his Report and Recommendation ("R&R") on January 8, 2026,[2] recommending that Defendants'

---

[1] Rule 1.11(a) provides, in pertinent part:
(a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
. . . .
> (2) shall not otherwise represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent to the representation.

Rule 1.11(c) provides:
> (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.

[2] MDL Doc. 3932, published at *In re Generic Pharms. Pricing Antitrust Litig.,* 2026 U.S. Dist. LEXIS 49169 (E.D.Pa. 2026).

2

motion be denied. Defendants objected to the R&R, and after reviewing the objections, Plaintiffs' response, and other related filings, this Court, on March 9, 2026,[3] adopted the R&R. Some of the Defendants[4] now move this Court to certify this matter for interlocutory appeal under 28 U.S.C. § 1292(b). Although their motion to disqualify Plaintiffs' counsel stated as grounds violations of both Rules 1.11(a) and (c), their objections to the Report and Recommendation and their motion to certify this matter for appeal discuss only Rule 11.1(c).

**1.      The Order Denying the Motion for Disqualification of Plaintiffs' Counsel**

This Court adopted Special Master Stengel's R&R, and the bases for its order are stated therein and in this Court's order approving and adopting it. For several years, Nielsen served as an Assistant Attorney General for the state of Connecticut and then left that employment to work in private practice for Lowey. Nielsen is now lead counsel for Plaintiffs Humana Inc. and Molina Healthcare in this matter. While working for Connecticut, Nielsen investigated the Defendants' alleged antitrust activities that underlie Plaintiffs' complaints. Connecticut knew of and did not object to Lowey employing Nielsen and Nielsen's representation of Plaintiffs and similarly

---

[3] MDL Doc. 4108, published at *In re Generic Pharms. Pricing Antitrust Litig.*, 2026 U.S. Dist. LEXIS 47725, 2026 WL 661653 (E.D.Pa. 2026).

[4] Not all Defendants in these matters seek leave to appeal. The movants herein are Actavis Elizabeth LLC, Actavis Phama, Inc., and Teva Pharmaceuticals; Mylan; Sandoz Inc. and Fougera Pharmaceuticals Inc.; Dr Reddy's Laboratories, Mayne Pharma; Taro Pharmaceuticals U.S.A., Inc., Taro Pharmaceuticals Ltd., and Sun Pharmaceuticals, Strides Pharma, Inc.; Pfizer and Greenstone LLC, Perrigo Company plc and Perrigo New York, Inc.; and Lannett Company, Inc.

situated parties in this matter. For these reasons, there was no violation of Rule 11.1(a).[5]  Defendants do not seek to appeal this ruling.

The R&R also found that Nielsen did not violate Rule 1.11(c) because he was not in possession of "confidential government information [that] could be used to the material disadvantage of" the Defendants, that would otherwise require disqualification. In the motion for disqualification,[6] the response,[7] and the reply,[8] both sides offered expert reports, supporting their positions. Unlike the Defendants' sole expert's report,[9] mostly an academic discussion of Rule 1.11(c), the Plaintiffs' two experts discussed[10] the history of the MDL, and in particular, the MDL's court orders giving all Plaintiffs access to information Nielsen and Connecticut obtained through Connecticut's Civil Investigative Demands and cooperation agreements between the States and private plaintiffs.[11] Information the Connecticut Attorney General's Office now shares with the Plaintiffs, obtained prior to the initiation of the lawsuits now in the MDL, resulted from Civil Investigative Demands and other investigative methods,

---

[5] MDL Doc. No. 3932, pp. 14-15.
[6] MDL Doc. No. 3662
[7] MDL Doc. No. 3715.
[8] 20-cv-695, Doc. No. 300.
[9] MDL Doc. No. 3662-1. Defendant's expert offered a second report discussing the history of MDL, appended to Defendant's reply to Plaintiff's response with their two reports. 20-cv-695, Doc. 300-1.
[10] 20-cv-695, Doc. Nos. 293-2, 293-3.
[11] MDL Doc. No. 3932, p. 16-17, n.10.

and not from criminal investigative tools, including grand jury subpoenas, search warrants, or even federal criminal investigations. Those were not and are not shared.[12]

Common Interest Agreements between the States and several plaintiffs, including Humana and Molina, resulted in widespread sharing of information, including confidential material, attorney work product, mental impressions, strategies, and opinions, reflecting a common interest among the plaintiffs in jointly prosecuting their respective cases without waiving any privileges."[13] "Because of the Common Interest Agreements, the States and the MDL plaintiffs conferred and coordinated on litigation strategies *for years*."[14] (Emphasis in original.) In his sworn declaration response to the motion to disqualify him, Nieslen stated that while representing Connecticut in the MDL, he shared all material information, and his strategic roadmaps and insights, with private plaintiffs before these depositions helped ensure that we could create the best evidentiary record possible, which was ultimately in the best interests of all plaintiffs, including the States."[15]

The R&R noted that one month after Special Master Stengel heard the parties' oral argument, Defendants asked to supplement the record ex parte and in camera, to show that confidential information, not revealed to the Plaintiffs, was shared with

---

[12] MDL Doc. No. 3932, pp. 16-17.
[13] *Id.*, p. 18. *See also* MDL Doc. No. 3717, ¶15 (Declaration of W. Joseph Nielsen in Support of Plaintiffs' Memorandum of Law in Opposition to Certain Defendants' Motion to Disqualify Plaintiffs' Counsel and Law Firm).
[14] MDL Doc. No. 3932, p. 18.
[15] MDL Doc. No. 3717, ¶21.

Nielsen while he worked for Connecticut. Special Master Stengel asked the parties to submit additional letters on the propriety of such an *ex parte* and *in camera* request, and after receiving responses, he determined due process required that any evidence he received would be shared with all parties. No Defendant responded to this offer.[16] Nielsen acknowledged that he obtained information from the Defendants during settlement discussions when representing Connecticut, but he never did and will not share that information with his new firm or the Plaintiffs, and he has not and will not participate in their settlement discussions.[17]

Finally, Special Master Stengel considered factors the Third Circuit directs District Courts consider when ruling whether to disqualify an attorney: "the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the integrity of legal proceedings, and preventing unfair prejudice."[18] A court may consider other factors. "Sometimes disqualification is more disruptive than helpful even though an attorney may not have satisfied his or her professional obligations."[19]  As both Lowey and Nielsen were involved in the MDL for years, cooperating and coordinating with each other and other plaintiffs, Connecticut

---

[16] *Id.*, p. 7 n.4. *See also* MDL Doc. Nos. 4042-3, 4042-4, 2042-5 and 4042-6 (correspondence between the parties and Special Master Stengel regarding post-argument submission of additional evidence).

[17] *Id.*, p16, n.10; MDL: Doc. No. 3717, ¶36.

[18] *In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir., 2022).

[19] *Id.*

consented to Nielsen's employment with Lowey and his representation of Plaintiffs, and granting the motion to disqualify both Nielsen and Lowey would adversely affect the upcoming bellwether trial in this MDL, the R&R recommended, and the Court agreed, the motion to disqualify should be denied.[20]

## II.   Certification under 28 U.S.C. §1292(b)

28 U.S.C. 1292(b) allows a district court to grant a request to certify a matter for interlocutory appeal if it concerns (1) "a controlling question of law,"(2) "as to which there is a substantial ground for difference of opinion" and (3) when "an immediate appeal from the order may materially advance the ultimate termination of the litigation."   Even when the statutory criteria of §1292(b) are satisfied, a court possesses discretion to deny certification of an appeal.[21]

## (a)   Controlling Question of Law

A question that encompasses factual, as well as legal, matters is not a controlling issue of law.[22]   Disagreement with the district judge's ruling is not grounds for certification of a question for appeal.[23] Even if a question appears to be a controlling question of law, questions that involve the district court's application of the facts

---

[20] MDL Doc. No. 3932, p. 19; *In re Generic Pharms. Pricing Antitrust Litig.*, 2026 U.S. Dist. LEXIS 47725, *49.

[21] *Bachowski v. Usery*, 545 F.2d 363, 368 (3d Cir. 1976); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974); *In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 708 (M.D.Pa. 2009).

[22]  *Link v. Mercedes-Benz of N. Am., Inc.*, 550 F.2d 860, 862 (3d Cir. 1977); *Katz v. Carte Blanche Corp.*, 496 F.2d at 764; *Johnson v. Alldredge*, 488 F.2d 820, 822 (3d Cir. 1973).

[23] *Max Daetwyler Corp. v. Meyer*, 575 F. Supp. 280, 282 (E.D. Pa. 1983).

presented to legal standards are not controlling questions of law requiring the question's certification.[24] This is such a case.

Disqualification of counsel pursuant to Rule 1.11(c) turns not only on whether an attorney moving from public to private practice possessed confidential government information, but also on whether that information could be used to the material disadvantage of the opposing side. Because Nielsen and Lowey worked together opposing Defendants for several years in the same litigation, sharing discovery, work product and litigation strategy, the Court found no material disadvantage to the Defendants. This finding turned not on the undisputed fact that Nielsen changed his employment from public to private after representing Connecticut against the Defendants for years, but rather on an examination the degree of access Plaintiffs had to the same information Nielsen saw and possessed when representing Connecticut. The Defendants implicitly acknowledged this examination's importance when, following the Plaintiffs' submission of two expert reports that dove deeply into the relationship fostered between the Plaintiffs and Connecticut and the MDL's 2019 discovery sharing order[25] the Defendants replied with another report by their same expert exploring the information sharing rules and practices of the MDL, but reaching a different conclusion.  Relying on the R&R, its knowledge of this MDL it has

---

[24] *Howmedica Osteonics Corp. v. Howard*, 2024 U.S. Dist. LEXIS 40518, *4-*5 (D.N.J. 2024).
[25] MDL Doc. 841, Pre-trial Order 70.

presided over since 2016, and its review of the submissions of the parties before and

after the R&R's issuance, this Court determined that Nielsen's representation of the

Plaintiffs would not materially harm the Defendants, and thus there was no violation

of Rule 1.11(c).

> Another court succinctly described "a controlling issue of law":

> The antithesis of a proper § 1292(b) appeal is one that turns on whether there is a genuine issue of fact or whether the district court properly applied settled law to the facts or evidence of a particular case. In determining whether to grant review, we should ask if there is substantial dispute about the correctness of any of the pure law premises the district court actually applied in its reasoning leading to the order sought to be appealed. The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law.[26]

As the determination of this matter turns on competing factual contentions

concerning what Nielsen knew and thought when he represented Connecticut, how

much of that he was permitted to, and could, share with the plaintiffs, and whether

what he knows will materially harm the Defendants, the question Defendants seek to

certify is not a controlling issue of law.

**(b)    Substantial ground for difference of opinion**

The Defendants submit that this Court's decision departed from every other

reported or published decision confronting an alleged violation of Rule 1.11(c) or

similar strictures. It did not. First, the circumstances of this case — an MDL where

---

[26] *McFarlin v. Conseco Servs.,* 381 F.3d 1251, 1259 (11th Cir. 2004).

counsel for the states and private parties shared all the documents they collected —

are not unprecedented but rare. With one exception, none of the opinions the

Defendants cite to show this Court diverged from the norm involves a similar

situation.  In *American Roller v. Budinger*, the court remanded a matter for further

proceedings and fact-finding when an attorney who had previously been counsel for a

company later represented a party suing that company for patent infringement, over

the objection of his former client.[27] *General Motors Corp. v. New York* disqualified an

attorney representing New York City in an antitrust matter similar to one he had

pursued for the federal government against the same defendant, which had settled

sixteen years earlier.[28] In *United States v. Villasprings Health Care Center*, a district court

disqualified an attorney representing a client who, when previously representing the

state of Kentucky in an investigation of charges of abuse and neglect by his current

client, gave that office "non-privileged" documentary material collected during

Kentucky's criminal investigation.[29] The attorney's former client, the United States,

objected to the attorney's representation of their former mutual adversary because the

investigation gave him insights into the strengths and weaknesses of the United States'

case.[30] In *Kronberg v. LaRouche*, a plaintiff's attorney who, as an Assistant United States

attorney, participated in several prosecutions of the defendant, later represented one

---

[27] 513 F.2d 982.

[28] 501 F.2d. 639, 642, 650-52 (2d Cir. 1974).

[29] 2011 WL 5330790, *1 (E.D. Ky. 2011).

[30] *Id.*,  at*6.

of the government witnesses.[31] With the litigation at an early stage (no discovery had been exchanged and nothing was scheduled), removal of her counsel, due to the knowledge and insights he gained while prosecuting the plaintiff, was proper.[32]

Years-long MDL litigation involving government and private parties presents special considerations that guide whether the application of Rule 1.11(c) should disqualify counsel. In 2019, Judge Dan Aaron Polster, supervising multidistrict litigation by over 1600 cities and counties against manufacturers, distributors and vendors of opioid products brought by, among others, several municipalities, considered whether an attorney who participated in pre-litigation government investigations of the opioid industry was disqualified from representing a defendant in the litigation.[33] In 2013, the attorney, while working for the Department of Justice, began work with a task force — assembled from interested municipal and state offices, medical and opioid treatment providers — that explored solutions to widespread problems caused by opioid consumption. She continued to work with the task force as she advanced in her office to become the United States Attorney for Northern District of Ohio. After a new administration forced her to resign in 2017, she was employed by a law firm that represented a company being sued in that MDL, becoming Defendants' Co-Liaison counsel shortly after the MDL's creation. At least

---

[31] 2010 WL 1443934, *1 (E.D.Va. 2010).
[32] *Id.*, at *4-5.
[33] *In re Nat'l Prescription Opiate Litig.*, 2019 U.S. LEXIS 46065 (N.D. Ohio, 2019), *66-*67, *79.

two of the government units moved to disqualify her and her firm from the MDL for violating Rules 1.11(a) and (c).[34] Because the attorney had not worked on the MDL litigation while working for the DOJ, Rule 1.11(a) was not implicated.[35] However, the DOJ informed the court that the attorney had received confidential information about different government units' struggles with the opioid problems that could impact the plaintiffs' damage claims and materially prejudice them.[36] For that reason, Rule 1.11(c) required both the attorney and her law firm be disqualified from participating in the litigation involving the two municipalities objecting to her participation, though she and her firm could continue to participate in MDL cases involving other plaintiffs.[37]

Judge Polster, in the same MDL, reached a different result in 2024 when considering a motion to disqualify a law firm pursuant to Rule 1.11(c) that worked for two cities and a state to investigate the opioid problem and that later represented plaintiffs in the MDL. Four years before opium litigation began, the City of Chicago hired an outside lawyer and her firm to represent it in its investigation of potential claims regarding fraudulent marketing of opioid drugs. After the MDL was formed, an attorney from the firm of Motley Rice was appointed co-lead counsel for the MDL's Plaintiffs' Executive Committee.  Nine months after that, the attorney previously hired by Chicago to investigate and litigate potential claims regarding

---

[34] *Id.*, at *66-69.
[35] *Id.*, at *72.
[36] *Id.*, at *74-75
[37] *Id.*, at *75-77.

opioid drugs moved from her prior firm to Motley Rice and continued her representation of Chicago. Around the same time, Motley Rice was retained by Chicago to conduct a separate investigation into seeking pharmaceutical copay clawbacks. By 2020, Motley Rice was also retained to represent both Washington, D.C., and the state of Hawaii in the investigation and possible litigation regarding claims against the pharmaceutical industry. Motley Rice's agreements with the three clients prohibited disclosure of confidential information obtained without court orders or prescribed consents.[38] Judge Polster determined that the three agreements gave Motley Rice government authority.[39] This case differed from the prior situation because, unlike the former United States Attorney, Motley Rice had not switched sides. Also, as in this matter, the documents the moving defendant produced for Motley Rice's investigation were now available in a repository available to the MDL's parties; as a result, Motley Rice did not obtain or possess confidential government information.[40] Judge Polster, therefore, did not disqualify Motley Rice.[41]

Another federal district court also refused to disqualify Motley Rice in similar litigation. The same defendant from Judge Polster's decision moved to disqualify Motley Rice from representing Anne Arundel County in a Maryland opioid litigation matter, alleging that the government authority it exercised on behalf of Chicago,

---

[38] *In re Nat'l Opium Litig.*, 2024 U.S. Dist. LEXIS 12470 (N.D. Ohio, 2024), *112-117.
[39] *Id.*, at 118.
[40] *Id.*, at 151-152.
[41] *Id.*, at 154

Washington, D.C., and Hawaii constituted a conflict of interest. Because both Motley Rice and Anne Arundel County had equal access to the documents in the MDL repository, Motley Rice did not possess confidential government information.[42] The defendant failed to show that it faced any greater disadvantage from Motley Rice's attorneys than from the county's other attorneys.[43]

The Defendants' statement that every other court facing a situation similar to Nielsen's and Lowey's required disqualification[44] is inaccurate. Decisions to disqualify attorneys due to prior government employment are fact-sensitive, considering both the circumstances and the stage of the litigation. Unlike in *Kronberg*, this matter is at an advanced stage of litigation: discovery closed seventeen months ago, and in four months, one of these cases, after years of discovery and litigation, will be the first bellwether trial in the decade-old MDL. As in the opioid litigation, all of the attorneys have access to the same documents. While the Defendants claim information Nielsen obtained during settlement discussions is confidential government information that Nielsen and Lowey can use to the Defendants' detriment, they forewent an opportunity to describe to Special Master Stengel what information Nielsen possesses from settlement discussions that would not have been shared or available to other MDL plaintiffs. Nielsen's declaration supporting Plaintiffs' opposition to the motion

---

[42] *Anne Arundel Cnty. v. Express Scripts, Inc., et al.*, 2025 U.S.Dist. LEXIS 9840 (D. Md. 2025), *18-*28.

[43] *Id.*, at *28

[44] 20-cv-695, Doc. No. 325-1, p. 9.

to disqualify states that starting in 2018, while working for Connecticut, he shared confidential information, work product, mental impressions, opinions and strategies with MDL private plaintiffs, including Humana and Molina pursuant to common interest agreements.[45]  At the same time, he complied with the MDL Court's order that Connecticut share all of its investigatory materials with the MDL's plaintiffs.[46] Other Courts facing the situation presented here have allowed the former government counsel to continue representing their clients. Grounds for disagreeing with the Court's decision are therefore not substantial.

**(c)      Advancement of the Termination of the Litigation**

An interlocutory appeal will materially delay, not advance, the termination of this litigation. In one of these cases, the summary judgment argument is scheduled for next month, and the trial is three months later. This schedule was set almost nine months ago.[47]  The litigation will not end if Defendants prevail following an interlocutory appeal; it will only be delayed.

To determine whether an immediate appeal will materially advance the termination of the litigation, "[t]he court must evaluate whether an appeal could eliminate the need for a trial, simplify a case by foreclosing complex issues, or enable the parties to complete discovery more quickly or at less expense. Cases in which

---

[45] MDL Doc. No. 3717, ¶¶ 15-18.
[46] *Id.*, ¶ 16.
[47] ECF Doc. No. 3618, PTO 306, pp; 2, 4.

discovery has closed are generally inappropriate for interlocutory appeal because they are rapidly approaching conclusion under their own momentum."[48] Courts generally do not certify a question for interlocutory appeal when a successful appeal will not terminate the litigation.[49]

**(4)    Exercise of Discretion Whether to Grant an Interlocutory Appeal**

A question cannot be certified for interlocutory appeal pursuant to §1292(b) unless all of its requirements are met.[50] Because the defendants cannot satisfy all three requirements for certification of a question for interlocutory appeal, this Court is without discretion to grant their motion. The Defendants' motion to disqualify Nielsen and Lowey was not frivolous. This Court, however, agreed with Special Master Stengel that the evidence and arguments Defendants advanced in support of their motion to disqualify did not prove that information Nielsen acquired during his tenure as a Connecticut Assistant Attorney General before and during this litigation "could be used to the material disadvantage of" the Defendants in violation of Rule 1.11(c). While he was an Assistant Attorney General, private plaintiffs, including Humana and Molina, gained access to all of the "States' Investigatory Materials." Nielsen and other MDL plaintiffs shared a 71.5 million document discovery record that included 3.5 million investigatory documents collected by Connecticut and other

---

[48] *In re Chocolate Confectionary Antitrust Litig.* 607 F.Supp. 2d at 707. (Citations omitted).
[49] *L.R. v. Manheim Twp. Sch. Dist.,* 540 F. Supp. 2d 603, 613 (E.D. Pa. 2008).
[50] *Katz v. Carte Blanche Corp.,* 496 F.2d at 754.

states, as well as almost 400 depositions.[51] The states and the private plaintiffs shared all confidential material, work product, strategic roadmaps, and insights.[52] Connecticut did not oppose Nielsen's lateral move in the MDL to representation of private plaintiffs. The rapidly approaching bellwether trial will inform other MDL parties' assessments of likely outcomes regarding liability, and, if Plaintiffs have any success, damages, and the utility of different strategies and evidence.  All of this information will aid the MDL parties in reaching settlements or preparing for trial. After 10 years, it is time for this MDL's first trial. The need for the MDL to progress weighs heavily on this decision.

WHEREFORE, for all of the foregoing reasons, Defendants' motion to certify the Court's March 9, 2026, order denying disqualification of Plaintiffs' counsel W. Joseph Nielsen and the law firm of Lowey Dannenberg P.C. for interlocutory appeal pursuant to 28 U.S.C. 1292(b) will be DENIED.

BY THE COURT:

/s/ Cynthia M. Rufe

_____

CYNTHIA M. RUFE, J.

May 13, 2026

---

[51] MDL Doc. No. 3717, ¶29.

[52] *Id.*