**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*Humana Inc. v. Actavis Elizabeth, LLC, et al.* | HON. CYNTHIA M. RUFE<br><br>2:18-cv-03299 |

**PLAINTIFF HUMANA INC.'S OPPOSITION TO
<u>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON DAMAGES</u>**

FILED WITH REDACTIONS - PUBLIC VERSION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ii

I.      INTRODUCTION.........................................................................................................1

II.     COUNTER-STATEMENT OF FACTS........................................................................3

    A.  Medicare Part D Program.........................................................................................3

    B.  Federal regulations allocate the job of pursuing fraud, waste, and abuse to Part D Sponsors like Humana .........................................................................................................................4

    C.  Humana's Experts' Dr. Vogt's and Dr. Frank's Opinions...........................................6

III.    ARGUMENT................................................................................................................8

    A.  Humana has introduced evidence that a reasonable jury could find satisfies its burden of proof on damages..........................................................................................................8

    B.  The subsidies that Humana prospectively received from CMS as a Medicare Part D Sponsor are legally indistinguishable from premiums paid by commercial plans and are not relevant to damages...............................................................................................................12

    C.  The Walgreens settlement is not a proper offset..........................................................14

    D.  Humana has not calculated any damages that were not "baked into" the transactional prices, so any lack of damage due to CVS pricing was captured in Dr. Vogt's damages analysis...16

    E.  Humana's health plans may seek damages for their indirect purchases, and Humana's pharmacy can seek damages for its direct purchases. ....................................................17

IV.     CONCLUSION ...........................................................................................................19

i

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Mills,*
286 U.S. 397 (1932) ............................................................................................................... 9, 15

*Bonjorno v. Kaiser Aluminum & Chem. Corp.,*
752 F.2d 802 (3d Cir. 1984) ...................................................................................................11

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) ............................................................................................................. 17, 18

*Danny Kresky Enters. Corp. v. Magid,*
716 F.2d 206 (3d Cir. 1983) ..................................................................................................16

*Delta/AirTran Baggage Fee Antitrust Litig.,*
317 F.R.D. 675 (N.D. Ga., 2016) ........................................................................................15

*Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.,*
604 U.S. 321 (2025) ...............................................................................................................18

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,*
995 F.2d 425 (3d Cir. 1993) ............................................................................................ 14, 15

*Honda Motor Co. v. Oberg,*
512 U.S. 415 (1994) ...............................................................................................................18

*In re Airline Ticket Comm'n Antitrust Litig.,*
918 F. Supp. 283 (D. Minn. 1996) ......................................................................................15

*In re Asacol Antitrust Litig.,*
No. 15-12730, 2017 WL 53695 (D. Mass. Jan. 4, 2017) ....................................................12

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.,*
804 F.3d 633 (3d Cir. 2015) ..................................................................................................12

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.,*
685 F.3d 353 (3d Cir. 2012) ............................................................................................... 4, 5

*In re Cardizem CD Antitrust Litig.,*
200 F.R.D. 297 (E.D. Mich. 2001).......................................................................................10

*In re Chocolate Confectionary Antitrust Litig.,*
289 F.R.D. 200 (M.D. Pa. 2012)..........................................................................................16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
516 F. Supp. 2d 1072 (N.D. Cal. 2007)...............................................................................17

FILED WITH REDACTIONS - PUBLIC VERSION

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................................................17

*In re HIV Antitrust Litig.*,
No. 19-CV-02573-EMC, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ................................... 9, 10

*In re HIV Antitrust Litig.*,
No, 19-2573, 2023 WL 3011624 (N.D. Cal. Apr. 18, 2023) ...................................................12

*In re K-Dur Antitrust Litig.*,
2008 WL 2699390 (D.N.J. Apr. 14, 2008) ...........................................................................10

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ........................................ 12, 13

*In re Lipitor Antitrust Litig.*,
No. 12-2389, 2020 WL 5642175 (D.N.J. Sept. 22, 2020) ......................................................12

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ....................................................................................... 8, 11

*In re Namenda Indirect Purchaser Antitrust Litig.*,
No. 1:15cv6549, 2022 WL 3362429 (S.D.N.Y. Aug. 15, 2022) ...............................................8

*In re Niaspan Antitrust Litig.*,
464 F. Supp. 3d 678 (E.D. Pa. 2020) .................................................................................9

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017) ...............................................................................17

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-2503, 2016 WL 6897809 (D. Mass. Sept. 19, 2016) ..................................................12

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
421 F. Supp. 3d 12 (E.D. Pa. 2019) .................................................................................16

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ............................................................................................9

*In re Terazosin Hydrochloride*,
220 F.R.D. 672 (S.D. Fla. 2004) ......................................................................................12

*In re Valsartan, Losartan, and Irbesartan Prods. Liability Litig.*,
2023 WL 8071595 (D.N.J. Jan. 24, 2023) ..........................................................................13

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ............................................................................................9

iii

FILED WITH REDACTIONS - PUBLIC VERSION

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   No. 18-MD-2836, 2020 WL 5778756 (E.D. Va. Aug. 14, 2020) ........................................12

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   No. 18-MD-2836, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021) ........................................12

*Kansas v. UtiliCorp United, Inc.*,
   497 U.S. 199 (1990) ..............................................................................................................18

*Rossi v. Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998) ....................................................................................................8

*RSE, Inc. v. Pennsy Supply Inc.*,
   523 F. Supp. 954 (M.D. Pa. 1981) .........................................................................................11

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.*,
   245 U.S. 531 (1918) ..............................................................................................................10

*Staley v. Gilead Scis., Inc.*,
   589 F. Supp. 3d 1132 (N.D. Cal. 2022) .................................................................................17

*United States ex rel. Behnke v. CVS Caremark Corp.*, No. CV,
   14-824, 2020 WL 1953626 (E.D. Pa. Apr. 23, 2020) ........................................................ 4, 13

*Van Dyk Rsch. Corp. v. Xerox Corp.*,
   631 F.2d 251 (3d Cir. 1980) ....................................................................................................8

*Williams Inglis & Sons Baking Co. V v. Continental Baking Co., Inc.*,
   981 F.2d 1023 (9th Cir. 1992) ................................................................................................11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ................................................................................................................8

**Statutes**

31 U.S.C. §§ 3729-3733 ................................................................................................................14

31 U.S.C. §§ 3801-3812 ................................................................................................................14

42 U.S.C. § 1320a-7a......................................................................................................................14

42 U.S.C. § 1395y(b)(3)(A) .............................................................................................................4

**Regulations**

42 C.F.R. §§ 423.265(c)-(d)............................................................................................................3

42 C.F.R. §§ 423.272, 423.279........................................................................................................3

iv

42 C.F.R. §§ 423.293, 423.315........................................................................................3

42 C.F.R. §§ 423.315 (c)-(d), 423.329(c)-(d)..................................................................3

42 C.F.R § 422.504............................................................................................................5

42 CFR § 422.503(b)(4)(vi)(G)(1) ....................................................................................5

42 CFR § 422.503(b)(4)(vi)(G)(2) ....................................................................................5

42 CFR §§ 422.503(b)(4)(vi) & 423.504(h)(1) ............................................................ 5, 13

42 CFR §§ 423.504(h)(1) and 423.504(i)..........................................................................5

Medicare Prescription Drug Benefit Programs,
   75 Fed. Reg. 9678.......................................................................................................5

FILED WITH REDACTIONS - PUBLIC VERSION

Humana Inc. ("Humana") submits this Opposition to Defendants' Joint Motion for Summary Judgment on Damages ("Jt Damages Br.").

## I.    INTRODUCTION

The amount of antitrust damages to be awarded to a purchaser of a product carrying an illicit overcharge has long been held to be a jury issue.  One of the abiding rules of damages—that courts are unconcerned about collateral effects of the tortfeasor's harm—rejects defendants' effort to trace injury past the entity who paid for the drugs at the pharmacy in favor of entities that transfer risk to those payers.  If there is to be any cognizable offset of damages (and there should not be), the law in this Circuit requires that it be determined by the court following the verdict after exemplary damages are applied, as courts have recently held.

Third party payors ("TPPs") such as Humana indisputably suffer injury from defendants' anticompetitive conduct because they remit payment through their PBM payment agents at the pharmacy point of sale.  The same is true of the economic reality that, consistent with the Medicare Part D structure, the burden of paying inflated prices rests solely with plan sponsors like Humana. The government does not buy drugs; indeed, the entire reason for the public/private partnership of Part D (like Part C) is to transfer the risk of medical expenses from the government to the plan sponsor and let the private market work to reduce the costs of healthcare. Humana's benefit in the transaction is to profit from its expertise in managing costs while its obligation is to pay for legally incurred costs of care.  Humana did not sign up to pay for price-fixed goods and services.

Allowing the pharmaceutical manufacturers an offset for Medicare Part D payments that CMS pays Humana fundamentally violates the bargain between the Government and Humana.  If, as the defendants argue, the subsidies paid to Humana reduce the antitrust overcharges borne by Humana, then the harm to Humana is irremediable, and the full deterrent effect of private

enforcement of the antitrust laws is undermined.  And if the Court were to eliminate over 95% of the overcharges that Humana suffered at the point of sale as defendants urge, then the retrospective post-settlement or post-verdict sharing between Humana and CMS dictated by federal regulations would be eviscerated.  Defendants cannot make their overcharges disappear by having the Court improperly assign them to a third party that transferred the risk of loss to the victim TPP that paid the overcharge.

Over the past 20+ years, nearly all courts have rejected pharmaceutical companies' efforts to defend cost-recovery cases brought by TPPs, on the ground that premium payments mitigate the TPPs' losses.  This Court agreed by refusing to allow discovery on this point.  To win their argument, therefore, defendants must convince this Court that Medicare Part D payments are legally and/or factually different from premium payments by private employers.  But they must lose, as there is no meaningful distinction between the Government paying Humana to bear the risk of pharmaceutical charges and a premium payer paying Humana to achieve the same goal.  Both arguments rely on shifting the antitrust loss to someone that doesn't buy drugs—in the case of Part D—Medicare— and in the case of premiums—employers, individuals, and unions.  The prospective payments made to Humana by both entities are not specific to the particular drugs at issue in this case, rather they cover all drugs writ large in the case of Part D and all medical treatments and therapies in the case of commercial premiums.

Defendants pose three other offsets.  The first is a reduction of the amounts that Humana received from the settlement of its separate fraud and breach of contract case against Walgreens. This offset has no legal basis because the resolution of a prior, separate cause of action against a non-defendant pharmacy cannot offset these defendants' antitrust liability. Second, defendants claim that offsets should apply to "transactions on which no overcharge was incurred at the pharmacy level" but those transactions already did not contribute to Dr. Vogt's damages analysis because his

economic analysis of no overcharges results in no damages.  Third, defendants' suggestion that Dr. Vogt "double-counted" its direct and indirect damages is incorrect—his analysis properly applied the indirect damages to the Humana health plans and the direct damages to the Humana pharmacy that separately purchased the pertinent drugs directly from certain defendants.

## II.    COUNTER-STATEMENT OF FACTS

### A.  Medicare Part D Program

As a Medicare Part D sponsor, Humana contracts with the Centers for Medicare and Medicaid Services ("CMS") to provide prescription drug benefits to Medicare beneficiaries. Humana receives compensation for this service from (1) beneficiaries, who pay premiums, and (2) CMS itself. 42 C.F.R. §§ 423.293, 423.315.  CMS's payments to Part D sponsors take place in two main stages.

*First*, CMS makes monthly prospective payments to sponsors.  The process of calculating the size of these payments is extremely complex.  Each sponsor submits an annual bid to CMS that estimates the cost of its participation in the Medicare program for the following year—an estimate that takes into account, among other things, the amounts it will have to pay for the entire universe of prescription drugs for all of its beneficiaries (*i.e.*, tens of thousands of drugs).  *See* 42 C.F.R. §§ 423.265(c)-(d).  An individual sponsor's bid is not the only factor in determining the actual amount of the monthly payments; CMS negotiates with individual sponsors before approving (or rejecting) a bid, calculates a nationwide average based on bids from different sponsors, and then weighs that average by the plans' share of total enrollment. 42 C.F.R. §§ 423.272, 423.279.  CMS also makes other monthly subsidies to Part D sponsors.  These subsidies include reinsurance payments to cover costs of catastrophic coverage, as well as subsidies for low-income beneficiaries.  42 C.F.R. §§ 423.315 (c)-(d), 423.329(c)-(d).

*Second*, CMS engages in an annual reconciliation process.  Because the monthly prospective payments are based upon estimates, they do not reflect the Part D sponsors' actual expenditures.

The reconciliation process accounts for the difference between the estimates and the expenditures, and can result in additional payments from CMS to the sponsor (if the estimates were too low) or in the sponsor returning some funds to CMS (if the estimates were too high). The reconciliation relies on two main components: Prescription Drug Event ("PDE") records, which reflect the price paid at the point of sale (*i.e.*, the pharmacy), and (2) the Direct and Indirect Remuneration Report ("DIR Report"), which reflects changes or adjustments that occur after the sale.[1] While reconciliation occurs on an annual basis, sponsors may resubmit information related to prior years—much like individuals who must file annual tax returns, but can amend prior years' returns.[2] These resubmissions account for a number of factors, including legal recoveries that may be obtained at one point but compensate the sponsor for injuries spanning several years prior. *Id.* at 9-10, 19-20. For that reason, the final payments may not be reflected for up to ten years. *See United States ex rel. Behnke v. CVS Caremark Corp.*, No. CV 14-824, 2020 WL 1953626, at *2, *3 (E.D. Pa. Apr. 23, 2020).

## B. Federal regulations allocate the job of pursuing fraud, waste, and abuse to Part D Sponsors like Humana

The Medicare Secondary Payor ("MSP") statutes and regulations provide a useful framework for analyzing the rights and obligations of a Part D Sponsor *vis-a-vis* CMS with respect to collecting overpayments from third parties. As the Third Circuit held in *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 685 F.3d 353 (3d Cir. 2012), Medicare Advantage and Part D plan sponsors have a private right of action under the MSP Act, 42 U.S.C. § 1395y(b)(3)(A), to recover amounts paid by the plan sponsor that should have been borne by a third party. The *Avandia* court reasoned:

> [A]s CMS has noted, MAOs [Medicare Advantage Organizations]
> compete best when they recover consistently from primary payers.

---

[1] *See* CMS Fact Sheet, Medicare Part D—Direct and Indirect Remuneration (DIR), (Jan. 19, 2017), ("CMS Fact Sheet"), https://www.cms.gov/newsroom/fact-sheets/medicare-part-d-direct-indirect-remuneration-dir.

[2] *See* CMS Final Medicare Part D DIR Reporting Guidance for 2020 (Correction to Navigation Paths) (May 20, 2021), https://www.cms.gov/files/document/2020dirreportingguidancememocorrection.pdf at 31-34.

> Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 9678, 19797 (Apr. 15, 2010). When they "faithfully pursue and recover from liable third parties," MAOs will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees.

*Avandia*, 685 F.3d at 363. The *Avandia* court further recognized that CMS also allocated the "right (and responsibility) to collect" recovery monies spent by Part D plans from third parties to MAOs. 685 F.3d at 366 (citing Ctrs. For Medicare & Medicaid Svcs., Dep't of Health and Humana Svcs. Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011)).

Part D plan sponsors similarly are required to implement a compliance program that includes "measures that prevent, detect, and correct fraud, waste, and abuse." *See* 42 CFR §§ 422.503(b)(4)(vi) & 423.504(h)(1). Examples of fraud, waste, and abuse by pharmaceutical manufacturers include payments for overcharges stemming from anticompetitive conduct. *See* 42 CFR § 422.503(b)(4)(vi). Under the compliance program, if a Part D sponsor "discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct." *See* 42 CFR § 422.503(b)(4)(vi)(G)(1). There are similar requirements in 42 C.F.R § 422.504, which govern the contract provisions between a Part D sponsor and CMS. *See* 42 CFR §§ 423.504(h)(1) and 423.504(i). Part D sponsors then "must conduct appropriate corrective actions" to address the potential fraud and abuse. *See* 42 CFR § 422.503(b)(4)(vi)(G)(2). The process of addressing drug claims tainted by fraud is "to remove the record of the transaction from CMS databases[,] because coverage and payment are prohibited under federal law."[3]

---

[3] CMS ANNOUNCEMENT OF CALENDAR YEAR (CY) 2014 MEDICARE ADVANTAGE CAPITATION RATES AND MEDICARE ADVANTAGE AND PART D PAYMENT POLICIES AND FINAL CALL LETTER, at 159 (under heading "PDE Guidance on Post-Point-of-Sale Claim Adjustments") (emphasis added) (Apr. 1, 2013), www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2014.pdf.

As part of the Medicare Part D reconciliation process, Medicare Part D sponsors are required to report legal recoveries to CMS and account for those recoveries. *See* PX 1276 Nguyen Tr. Ex. 12756, Dep't of Health & Human Services, "Final Medicare Part D DIR Reporting Guidance for 2020 (Correction to Navigation Paths)" (May 20, 2021), at 10-11, 19-20 (Medicare Part D sponsors must report, as part of its annual DIR Report, any legal judgment or settlement amount received from pharmaceutical manufacturers for covered Part D drugs).[4]

### C. Humana's Experts' Dr. Vogt's and Dr. Frank's Opinions

Humana's damages expert, Dr. Vogt, was retained to opine on whether Humana was overcharged for its purchases of the drugs at issue. As defendants note, Dr. Vogt testified that



. Jt. Damages Br. at 6. In his Rebuttal Report, Dr. Vogt makes clear that

. PX 146(Vogt Reply Rpt.) ¶¶ 2, 3. Dr. Vogt analyzed the

. PX 146 (Vogt Reply Rpt.) ¶ 170.

In the event the Court concludes that the jury should decide any Medicare Part D offset, Humana retained Dr. Richard Frank to provide context and analyze key points in the defendants' joint report of Dr. Chandra, namely, Dr. Chandra's representation of Medicare Part D coverage and policies, and his conclusion that Dr. Vogt's damages methodology for Part D sponsors should be changed. PX 150 (Frank Reply Rpt.) ¶¶ 1, 2. Dr. Frank

---

[4] *See also* Dep't of Health & Human Services, "Final Medicare Part D DIR Reporting Guidance for 2023" (March 14, 2024) at 10-11, 19-20, available at https://www.cms.gov/files/document/2023dirguidance3142024508g.pdf (same).

██████████████████████████████████████████, PX 150 (Frank Reply Rpt.) ¶ 3, and (ii) ████████

████████████████████████████████████ PX 150Frank Reply Rpt.) Section VI.

Dr. Frank drew several conclusions regarding Part D payments, all of which are grounded in economics rather than law. Jt. Damages Br. at 10-11. Dr. Frank offers an economic opinion regarding Medicare Part D rules for reporting DIR, describing CMS's reporting rules and regulations and concluding that: "████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████" PX 150 (Frank Reply Rpt.) ¶¶ 56-60. Dr. Frank further opines that "████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████" *Id.* ¶ 61. He also opines that these regulations "████████████

████████████████████████████████████████████████████████

████████████████████████████████" which is the ████████████████████████████

████████████████████████████████████████ *Id.* ¶ 63.

Based on his understanding of the Medicare Part D payment system, Dr. Frank concludes that, from an economic perspective, ████████████████████████████████████████████████

████████████████████████. *See id.* ¶ 23 ████████████████████████████████████

████████████████████████████████").

Dr. Frank also opines on Medicare payments as estimates of future sales: "████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████" *Id.* ¶ 24 (emphasis in the original). Dr. Frank concluded that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. In sum, Dr.

Frank renders the economic view that ████████████████████████████████████

████████ .

Dr. Frank further opines that █████████████████████████████████████████

████████████████████████████████████████ . *See, id.* at 25 ("█████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████ ").

## III.    ARGUMENT

### A. Humana has introduced evidence that a reasonable jury could find satisfies its burden of proof on damages.

The burden of proof on damages in an action alleging antitrust violations differs from the fact of the injury itself. *See Van Dyk Rsch. Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir. 1980) ("the evidence linking illegality and injury must be more precise than that needed to establish the amount of damages"); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998) ("To recover damages, an antitrust plaintiff must prove causation ...."). The actual amount of damages may result from a "reasonable estimate, as long as the jury verdict is not the product of speculation or guess work." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) (citing, *inter alia*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24 (1969). "The relaxed measure of proof is afforded to the amount, not the causation of loss—the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven." *In re Lower Lake Erie*, 998 F.2d at 1176 (citation omitted).[5]

---

[5] Defendants attempt to impose an additional burden on Humana, arguing that it is "part of Humana's burden to provide sufficient information to exclude [payments by the government of any alleged overcharges for the Drugs at Issue] from any damages calculation." Jt. Damages Br. at 13. This is improper at this stage because, as the *Namenda* Court held, whether the actual damage suffered by TPPs was calculated correctly, as determined by Dr. Vogt in both *Namenda* and in this case, is an issue for the trier of fact. *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15cv6549, 2022 WL 3362429, at *12 (S.D.N.Y. Aug. 15, 2022). Indeed, that defendants criticize Dr. Vogt's analysis and what he did and did not factor into his damages model does not mean that Humana has failed to meet its burden of providing evidence of its damages calculations or that Dr. Chandra's calculations are unrebutted. Jt. Damage Br. at 15. Again,

Defendants do not—and cannot—contest that Humana has suffered an injury which results in damages. Nor can they. TPPs such as Humana, pay for prescription drugs, less member cost share, and bear the impact of any overcharge. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) ("TPPs, like individual consumers, suffered direct economic harm when, as a result of DuPont's alleged misrepresentations, they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 717 (7th Cir. 2001) ("Unlike members of the consumer class, TPPs are sophisticated purchasers of pharmaceuticals.").

Injury to TPPs occurs at the point of sale, *i.e.*, when their members' prescriptions are filled at the pharmacy. *See, e.g.*, *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 723 n.12 (E.D. Pa. 2020) (collecting cases); Order at 25, *In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-md-2878 (D. Mass. May 14, 2021), ECF No. 389 (TPPs bear the impact of an overcharge when a drug is purchased). "In the antitrust context, injury occurs when a purchaser incurs a single overcharge." Jan. 7, 2025 Order (ECF No. 3226) at 4, n.10 (citing *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 709 (E.D. Pa. 2020) (quoting *Adams v. Mills*, 286 U.S. 397, 407 (1932) ("[i]n contemplation of law the claim for damages arose at the time the extra charge was paid.")). Humana's prescription drug plans absorb all indirect purchaser damages at the pharmacy counter. By definition, end-payers sit at the end of the distribution chain; there are no subsequent purchasers to whom the overcharge can be passed.

Adjacent to the well-established principle that injury to TPPs occurs when a member makes a purchase at a pharmacy is the fact that government Part D payments do not relate to pharmacy transactions at the point of sale. *See In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2022 WL

these are issues for the trier of fact, not a ruling of law for the Court to make at summary judgment. *In re Namenda*, 2022 3362429, at *12.

22609107, at *27 (N.D. Cal. Sept. 27, 2022) ("As the EPPs note, the prospective government payments [from the federal government/plan member] are not made at the point of purchase for a prescription drug, and thus, they are not part of the drug purchase transaction.") (internal quotations and citation omitted), *Id.* at *28 (rejecting as "unlikely" the possibility that pharmacy benefit managers would independently bear any of the overcharge paid by end-payors). Defendants' efforts to minimize the full amount of overcharges to which Humana is entitled are underscored by this uncontroverted fact.[6]

Humana is entitled to recover the full measure of overcharges incurred as a result of Defendants' unlawful conduct, regardless of any purported benefit it received from the antitrust violations. *See In re K-Dur Antitrust Litig.*, 2008 WL 2699390, at *8 (D.N.J. Apr. 14, 2008) ("[I]f the [plaintiffs] incurred an overcharge based upon the Defendants' alleged actions, they would be deemed to have suffered an antitrust injury and would be entitled to recover the full amount of the overcharge, regardless of whether they may have benefited in other ways from the Defendants' alleged actions." (quoting Special Master's report)); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317 (E.D. Mich. 2001) ("Defendants' core concern here is that, without inclusion of its offsetting benefits arguments, the overcharge damage theory may result in a windfall to Plaintiffs. The courts have rejected similar concerns, recognizing that the risk 'inheres in *Hanover Shoe*.'") (quotation omitted). As Justice Holmes observed: "The general tendency of the law, in regard to damages at least, is not to go beyond the first step … The plaintiffs suffered losses to the amount of the verdict

---

[6] That Dr. Vogt ███████████████████████████████████████████████ —is irrelevant. Jt. Damages Br. at 6. The same is true of the argument that Dr. Vogt ████████████████████████████████████████████████ *Id.* at 6-7. Humana's corporate representative concerning '█████████████████ ██' PX 1639 (Stein) at 161:25-162:15, does not invalidate the reality that CMS pays for Humana's services in managing the prescription drug plans, and does not make payments to pharmacies for drugs.

when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events."  *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533–34 (1918).

The calculation of damages is fundamentally an issue the jury decides.  *See e.g.*, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993) ("Once causation is determined, however, the actual amount of damages may result from a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.") (internal quotations and citation omitted); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 813 (3d Cir. 1984) ("Once a jury has properly found causation of antitrust injury from unlawful activity . . . the damages in this case may be determined without strict proof of what act caused which injury as long as the damages are not based upon speculation or guesswork").[7]

Once an award has been determined, however, any offsets should be determined by the Court.  *See, e.g.*, *Williams Inglis & Sons Baking Co. Vv. Continental Baking Co., Inc.*, 981 F.2d 1023, 1024 (9th Cir. 1992) (offsetting a settlement against a trebled antitrust verdict post-trial: "under our existing law settlement payments should be deducted from the damages after they have been trebled."); PX 72, *In re Amitiza Antitrust Litig.*, March 30, 2026 Pre-Trial Transcript at 94:19-25 ("the jury gets to decide what the damages are, but that's the whole universe of what the damages are . . . the overages in Medicare, I mean, those are things that I don't think it offends the constitution to consider the offset after trial"); PX 71, *Humana v. Celgene*, December 20, 2022 Transcript at 56:19-

---

[7] Defendants cite *RSE, Inc. v. Pennsy Supply Inc.*, 523 F. Supp. 954 (M.D. Pa. 1981) for the proposition that plaintiff's evidence of damages was insufficient as a matter of law where a plaintiff fails to provide a damage calculation that would enable to the jury to provide an award "without resorting to guesswork or speculation."  Jt. Damages Br. at 14.  But Defendants' reliance upon *RSE* is entirely misplaced.  In that case, plaintiff did not provide either a reasonable damage model *or* sufficient raw data such that damages could be calculated.  *RSE*, 523 F. Supp. at 971.  That is simply not the case here.  It is clear from Defendants' brief that their issues with Humana's damage calculations pertain to its calculation of offsets, *see* Jt Damages Br. at 9 (calculating Humana's purported "Corrected VOC"), not that Humana's damages calculations are wholly speculative such that a damages award would be crafted from whole cloth.  As such, *RSE* and the cases cited at page 14 n.23 are inapposite.

57:11 ("Let [Humana] recover whatever the jury says, and if it needs to be reduced… we can reduce it.").

### B. The subsidies that Humana prospectively received from CMS as a Medicare Part D Sponsor are legally indistinguishable from premiums paid by commercial plans and are not relevant to damages.

Defendants contend that, because the government is "responsible for approximately 74.5% of the average bid amount," it is the government that bears risk for prescription drug expenditures, not Humana.  Jt. Damages Br. at 16-17.  Defendants are mistaken.

A virtually unbroken line of caselaw holds that end payers like Humana that sit at the end of the pharmaceutical distribution chain do not pass on overcharges, as insurance premiums are calculated on a forward-looking basis without reference to any specific drug or purchase.  *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 641 (3d Cir. 2015) (courts are not entitled to presume that end payors can adjust their premiums to recoup fraudulently induced payments for prescription drugs).[8]  Indeed, this Court has already concluded that discovery of insurance premiums is impermissible on this basis.  *See In re Generic Pricing Antitrust Litig.*, 16-md-2724, ECF No. 3226 (Jan. 7, 2025 Order Adopting Special Master Marion's 16th R&R) (concluding

---

[8] *See also In re Zetia (Ezetimibe) Antitrust Litig.*, No. 18-MD-2836, 2020 WL 5778756, at *20 (E.D. Va. Aug. 14, 2020), *adopted and approved in full*, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021) ("premiums are set in advance based on aggregate expected increases, there is no way to trace any premium increase to the alleged overcharge paid for brand or generic Zetia during the class period."); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2017 WL 679367, at *23 (N.D. Cal. Feb. 21, 2017) ("Even if the pass-on defense could apply to these end-payor health insurance and welfare plan TPPs, there is no evidence that premiums are calculated either to account for antitrust overcharges or prices of specific drugs.  Instead, the evidence is that the premiums are set to cover future (not past) costs based on what actuaries determine those future costs will be and known market dynamics."); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 690 (S.D. Fla. 2004) ("[T]he third-party payers take no account of the expected impact of individual drugs [] on claims when determining premiums to be charged…. Further, to the extent that any third-party payer did charge its insureds a higher premium because of a drug company's monopolistic activities, the charging of a higher premium in the future cannot be accurately described as a "pass on" of those charges.  The record is clear that the purpose of a future projection is, as the name implies, to estimate anticipated future costs."); *In re Asacol Antitrust Litig.*, No. 15-12730, 2017 WL 53695, at * 4 (D. Mass. Jan. 4, 2017) (quoting *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-2503, 2016 WL 6897809, at *2 (D. Mass. Sept. 19, 2016)); *In re HIV Antitrust Litig.*, No, 19-2573, 2023 WL 3011624, at *1 (N.D. Cal. Apr. 18, 2023); *In re Lipitor Antitrust Litig.*, No. 12-2389, 2020 WL 5642175, at *3 (D.N.J. Sept. 22, 2020) (holding that "consumers and third-party payors are injured by different portions of the same Lipitor purchase and related overcharge.  The consumer's portion of the Lipitor purchase (and overcharge) is their copayment and the third-party payor's portion of the Lipitor purchase (and overcharge) is the remainder.") (citations omitted).

that the Third Circuit has noted that this concept "lacks a limiting principle"); *FWK Holdings LLC et al. v. Takeda Pharma. Co.*, 1:21-cv-11057, ECF No. 763 (Order on Motions in Limine) (granting motion *in limine* precluding argument or evidence that EPPs 'passed on' overcharges and addressing the issue post-trial).

As a Part D plan sponsor, Humana is contractually and statutorily obligated to implement and pursue a compliance program that includes "measures that prevent, detect, and correct fraud, waste, and abuse." *See* 42 CFR §§ 422.503(b)(4)(vi) and 423.504(h)(1).  It is Humana that bears the risk in its efforts to apply those measures, *not* the government.  The payments Humana receives from the government as a Part D sponsor are determined holistically—across thousands of drugs, not individual drugs—and on a prospective basis.

Defendants operate under the fundamental misunderstanding that the government "makes prospective direct subsidy payments to plan sponsors to cover a portion of expected prescription drug costs." Jt. Damages Br. at 17.  But CMS makes payments "*for delivering* prescription drug benefits to Medicare beneficiaries."[9]  It is for this purpose that Medicare relies upon transaction data—PDE—reported by Part D sponsors.  *Id.*  Part D sponsors like Humana report PDE to Medicare once a month.  *See, e.g.*, *Behnke*, 2020 WL 1953626, at *2.  Payments under Part D are not made to cover the cost of the drugs themselves; the drugs are paid for by Part D sponsors such as Humana that bear the risks associated with paying inflated prices.[10]

---

[9] Centers for Medicare & Medicaid Services, Medicare Part D Direct and Indirect Remuneration (DIR) (Jan. 19, 2017), U.S. Dep't of Health & Hum Serv., https://www.cms.gov/newsroom/fact-sheets/medicare-part-d-direct-indirect-remuneration-dir/ (emphasis added).

[10] Defendants rely upon *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *25 (N.D. Cal. Feb. 21, 2017), *In re Namenda*, and *In re Valsartan, Losartan, and Irbesartan Prods. Liability Litig.*, 2023 WL 8071595, at *2 (D.N.J. Jan. 24, 2023) for the proposition that the calculation of Medicare Part D subsidies and other discounts may be used to reduce the amount of antitrust damages a plaintiff has suffered.  Jt. Damages Br. at 16 n.27.  Humana respectfully submits that these decisions did not correctly analyze the structure of Part D and the antitrust jurisprudence that demands that no offsets are applied to overcharges caused by antitrust violations except settlement payments by settling defendants.

To this end, payments received from CMS—which are determined on a prospective basis—are analogous to the insurance premiums that Humana sets for its members.  *See* PX 150 (Frank Reply Rpt.) ¶ 30.  This Court rejected discovery requests related to insurance premiums on the ground that premium payments are irrelevant to EPPs' claims.  Defendants' efforts to offset the payments Humana receives from CMS related to Medicare Part D are nothing more than an inartful attempt to relitigate the premium pass-on argument as Part D subsidies are factually and legally indistinguishable from the litany of cases rejecting the notion that insurers "pass on" costs related to insurance premiums.[11]

### C.  The Walgreens settlement is not a proper offset.

Defendants contend that, with respect to its recovery of $360 million from Walgreens in 2024, Humana "cannot recover from Defendants amounts that it has already recovered from third parties."  Jt. Damages Br. at 22.  This argument is erroneous as a matter of law.

The Walgreens recovery is based upon an injury—allegations of civil fraud and breach of contract from overcharges due to Walgreens' inaccurate reporting of drugs in its prescription discount program—that is distinct from the antitrust claims Humana alleges here.  In this circumstance, Third Circuit precedent does not permit an antitrust offset based on a prior settlement with a non-party that was not also responsible for the antitrust violation at hand.  *See Gulfstream III*

---

[11] Defendants claim that because "the government has already recovered settlement amounts" from Sandoz Inc., Taro Pharmaceuticals USA, Teva Pharmaceuticals USA Inc. and Glenmark Pharmaceuticals, USA, *see* Jt. Damages Br. at 18 n.31, "it would subject certain Defendants to duplicative claims for amounts; they have already paid to resolve the government's claims," Jt. Damages Br. at 19.  But this is not accurate. The payments under the settlement agreements did not release claims under any of the antitrust or consumer protection laws Humana invokes in its Second Amended Complaint, rather, the DOJ explains that the releases are only for claims under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.  *See* Taro, Glenmark & Sandoz DOJ Settlements at ¶ 2.  And while part of the releases covered unjust enrichment, neither these defendants nor their experts have made a showing of the amounts of any offset attributable to the unjust enrichment portion of their payments, nor whether they made Humana whole.

*Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 436 (3d Cir. 1993) (holding that "where a plaintiff executes a general settlement instrument which settles multiple claims with a defendant, but a non-settling defendant is not a party to that agreement, the non-settling defendant need show only that the plaintiff settled a claim on which the non-settling defendant was found liable at trial."). The Defendants in this MDL were not sued for the fraud and breach of contract claims Humana alleged against Walgreens in its separate arbitration. As a result, the fact that Humana received a recovery from its settlement with Walgreens on separate claims is not a proper offset here. *See id.* (the stated rule requires that "a settling plaintiff is entitled to only one full recovery while at the same time . . . **protects the plaintiff from the application of amounts received in settlement of unrelated claims.**")(emphasis added).

To this end, the argument that Humana's entire $360 million recovery should be offset against any award of damages to Humana should be disregarded entirely. *See Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 684 (N.D. Ga., 2016) (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D. Minn. 1996) ("mitigation and offset generally do not affect the ultimate measure of damages' in horizontal price-fixing cases")); *Adams v. Mills*, 286 U.S. 397, 407 (1932) ("Neither the fact of subsequent reimbursement by the plaintiffs from funds of the [third parties] nor the disposition which may hereafter be made of the damages recovered is of any concern to the wrongdoers."). Even if this offset were available to the defendants, it would have to await post-judgment proceedings to determine whether and by how much the offset would reduce the verdict (after available trebling is applied). *See Gulfstream III Assocs.*, 995 F.2d at 431–32 (3d Cir. 1993) (affirming the pretrial denial of summary judgment on offsets because "further evidentiary proceedings would have been necessary . . . before the court could possibly have determined that the settlement proceeds exceeded any potential verdict.[]"); *accord, In re Amitiza Antitrust Litig.*, March 30,

2026 Pre-Trial Transcript at 94:19-25; *Humana v. Celgene*, December 20, 2022 Transcript at 56:19-57:11.

**D. Humana has not calculated any damages that were not "baked into" the transactional prices, so any lack of damage due to CVS pricing was captured in Dr. Vogt's damages analysis.**

Defendants argue that Dr. Vogt failed to calculate Humana's indirect VOC calculation amounts on purchases where no overcharge was incurred at the pharmacy level.  Dr. Vogt's purported failure to do so, Defendants contend, ███████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████.  Jt. Damages Br. at 23-24.  Defendants' arguments are entirely misplaced.

Humana takes no position on whether certain prescriptions sourced from CVS carry with them positive damages.  However, as Dr. Vogt opined in his rebuttal report, █████████████ ████████████████████████████████████████████████████  *See* PX 146 (Vogt Reply Rpt.) ¶ 154.  Dr. Vogt does not separately evaluate these transactions because ████████ ██████████████████████████████████████████████.  As a result, Dr. Vogt does not leave Dr. Chandra's estimations unrebutted or suggest that his analyses were improper.  *See Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 213 (3d Cir. 1983) ("plaintiffs must be free to select their own damages theories as long as they are supported by a reasonable foundation").  The determination of how these transactions should be analyzed is for the jury.  *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 40 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) (courts "may not" evaluate the "persuasiveness" of an expert's conclusions); *see also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 210 (M.D. Pa. 2012) (disputes regarding expert conclusions "go to the weight, and not the admissibility" of expert testimony).

### E.  Humana's health plans may seek damages for their indirect purchases, and Humana's pharmacy can seek damages for its direct purchases.

Defendants finally contend that Humana improperly seeks "duplicative recovery," because it does not subtract its direct pharmacy purchases from its indirect insurance payments.  Jt. Damages Br. at 25.  This argument ignores the complementary nature of federal and state antitrust remedies.

In *ARC America*, the Supreme Court held that the federal antitrust laws—which only allow direct purchasers to recover damages—do not preempt state laws allowing indirect purchasers to recover damages for their overcharges.  *See California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989).  In so holding, the Court explained that the federal antitrust laws were designed "*to supplement, not displace, state antitrust remedies.*" *Id.* at 102 (emphasis added).  And the Court rejected the idea that there was a federal policy against "multiple liability," explaining that it had never identified any policy "against States imposing liability in addition to that imposed by federal law." *Id.* at 105.

Given that federal and state antitrust remedies supplement one another, Defendants' "concern" about "duplicative recovery" is misplaced. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009) (antitrust standing context); *see id.* (reasoning that states allowing indirect-purchaser recovery "have necessarily made the policy decision that duplicative recovery may permissibly occur") (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1093 (N.D. Cal. 2007)); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 726 & n.19 (S.D.N.Y. 2017) (same) (collecting cases).  Accordingly, Humana may seek direct damages under federal law *and* indirect damages under state law. *See ARC*, 490 U.S. at 101-102, 104-105.

Defendants concede that Humana comprises entities that purchase drugs from generic manufacturers and other entities that purchase generic drugs from pharmacies.  Humana, as assignee over the claims of its subsidiaries, *see* PX 1277, PX 1278, PX 1279 (HUM-GEN-MDL-000000057; 000000053; 000000045), can seek both types of recoveries in this action.  *See Staley v. Gilead Scis., Inc.*, 589 F. Supp. 3d 1132, 1134 (N.D. Cal. 2022) (insurer suing under federal and state antitrust claims).

Separate corporate entities under Humana's corporate umbrella bought directly and indirectly and each of these entities is entitled to recover under these separate statutes. *See Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 327 (2025) ("It is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations.") (citation and quotations omitted).

Contrary to Defendants' assertion, the Supreme Court has never "made clear" that a party is prohibited from recovering as "both a direct and an indirect purchaser." Jt. Damages Br. at 25. In *UtiliCorp*, the Court reiterated that indirect purchasers cannot recover under the *federal* antitrust laws, and its discussion of "multiple recoveries" concerned this *federal* rule. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 204, 207–08, 212–13 (1990). The Court did not disturb its decision—from just the year before—that *state* antitrust laws may impose supplemental liability. *See ARC*, 490 U.S. at 102, 105. Defendants also point to *Oberg*, but that case involved the constitutional limits on the "size of punitive damages awards," not antitrust damages. *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420 (1994).

Defendants' factual citations do not help them. To begin with, Defendants mischaracterize Bethanie Stein's testimony. Jt. Damages Br. at 25. In her testimony, Ms. Stein ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. The key portion of that testimony is "███████████████████████████████████████████████████ ████████████████████████████" PX 1639 (Stein) at 87:25-88:4 (emphasis added.) This statement is true and consistent with the way Humana has calculated its direct purchaser damages. But this has nothing to do with purported duplicative damages. Indeed, the purported duplicative damages relate to HPI's purchases from *Defendants* and not through wholesalers. Defendants also rely on a letter from Mylan's counsel to Humana's counsel purporting to memorialize a meet and confer on certain discovery issues. Ex. 27 to Jt. Damages Br. But defendants cannot meet their

burden to establish a waiver of Humana's health plans' right to seek recovery for the full amount of its indirect purchaser damages based upon Mylan's one-sided characterization of a statement purportedly made during a meet-and-confer.

## IV.    CONCLUSION

For the foregoing reasons, Humana respectfully requests that the Court deny Defendants' Joint Motion for Summary Judgment on Damages in its entirety.

Dated: May 1, 2026                              Respectfully submitted,

                                                */s/ Peter D. St. Phillip, Jr.*
                                                Peter D. St. Phillip, Jr.
                                                W. Joseph Nielsen
                                                Raymond P. Girnys
                                                Noelle Ruggiero
                                                Uriel Rabinovitz
                                                Deborah Rogozinski
                                                Alexis H. Castillo
                                                Thomas Griffith
                                                LOWEY DANNENBERG, P.C.
                                                44 South Broadway, Suite 1100
                                                White Plains, NY 10601
                                                Tel. (914) 997-0500
                                                pstphillip@lowey.com
                                                jnielsen@lowey.com
                                                rgirnys@lowey.com
                                                nruggiero@lowey.com
                                                urabinovitz@lowey.com
                                                drogozinski@lowey.com
                                                acastillo@lowey.com
                                                tgriffith@lowey.com


                                                Matthew A. Cartwright
                                                LOWEY DANNENBERG, P.C.
                                                100 Front Street, Suite 520
                                                West Conshohocken, PA 19428
                                                mcartwright@lowey.com

                                                Todd Schneider
                                                J. Caleigh Macdonald

FILED WITH REDACTIONS - PUBLIC VERSION

David D. Burnett
SCHNEIDER² WALLACE COTTRELL KIM LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel. 415-421-7100
tschneider@schneiderwallace.com
jmacdonald@schneiderwallace.com
dburnett@schneiderwallace.com

Jason H. Kim
SCHNEIDER² WALLACE COTTRELL KIM LLP
300 S. Grand Ave., Suite 2700
Los Angeles, CA 90071
Tel. 415-421-7100
jkim@schneiderwallace.com

*Counsel for Plaintiff Humana Inc.*

20

FILED WITH REDACTIONS - PUBLIC VERSION

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2026 a copy of the foregoing document was served electronically upon Counsel of Record via electronic mail to:

MDL2724plaintiffsleadsetc@ag.ny.gov; MDL2724AllDeftsService@groups.troutman.com; and GxStateCasesAllDeftsService@groups.troutman.com.


*/s/Peter D. St. Phillip, Jr.*

21

FILED WITH REDACTIONS - PUBLIC VERSION