## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:**<br><br>*Humana Inc. v. Actavis Elizabeth, LLC, et al.* | **No. 18-cv-3299** |

<u>**MEMORANDUM OPINION**</u>

**Rufe, J.**                                                                              **August 11, 2026**

In this multidistrict litigation concerning alleged price-fixing of generic drugs, the Court

selected Plaintiff Humana Inc.'s 2018 action ("*Humana I*") as the first bellwether case to involve

a Direct-Action Plaintiff ("DAP"). This *Humana I* Opinion resolves Defendants' joint motion to

exclude the opinions and testimony of Dr. William B. Vogt. In total, Defendants have jointly

moved to exclude the opinions and testimony of five of Humana's experts: Dr. W. David

Bradford, Dr. William B. Vogt, Dr. Richard G. Frank, Dr. Aaron S. Kesselheim, and Ms. Stacy

Arruda. Humana in turn seeks to exclude the opinions and testimony of two defense experts: Mr.

Khody R. Detwiler and Dr. Bonny Levin. On June 4, 2026, the Court heard argument on the

motions to exclude Dr. Bradford, Dr. Vogt, and Dr. Frank. Having carefully studied the expert

reports of Dr. Vogt, the relevant rebuttal reports of Defendants' experts, the parties' briefs, and

the evidence and argument presented, the Court now addresses Defendants' joint motion to

exclude Dr. Vogt.

## I.     BACKGROUND

The following Background is drawn from the Court's Memorandum Opinion addressing

Defendants' joint motion to exclude Humana's merits expert, Dr. W. David Bradford, and is

supplemented where relevant.[1] Humana is a health insurer headquartered in Kentucky that

"either directly or through its health plan subsidiaries, [insures] and administers health plan

benefits for its members and group customers, including self-funded group customers that

contract with Humana to administer claims on their behalf and pursue recoveries related to those

claims."[2] Defendants are manufacturers of generic pharmaceutical products. Humana claims that

it purchased generic drugs manufactured by Defendants that were subject to the unlawful

anticompetitive conduct broadly complained of in this MDL. That is, Humana alleges that

certain Defendants conspired to unlawfully fix prices and allocate market share for 21 or 22

generic drugs (the "Subject Drugs").[3] Humana also avers that, through the price-fixing on

individual drugs and maintenance of "fair share" commitments in the industry, Defendants

entered into an overarching conspiracy to restrain trade in the generic drug market.[4]

Humana's claims involve two distinct streams of commerce. First, it brings claims as an

indirect purchaser based on insurance payments made on behalf of members who submitted

---

[1] A fuller discussion of the allegations in the MDL may be found in the Court's Opinions of October 16, 2018, and February 15, 2019. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411–34 (E.D. Pa. 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 820–27 (E.D. Pa. 2019).

[2] 18-cv-3299, Doc. No. 110 ¶ 48. Unless otherwise noted, document numbers henceforth correspond to filings in the *Humana I* docket.

[3] As pled in its Second Amended Complaint, Humana alleged individual conspiracies as to 21 drugs: acetazolamide, amitriptyline, baclofen, benazepril, clobetasol, clomipramine, desonide, digoxin, divalproex, doxycycline, econazole, fluocinonide, leflunomide, levothyroxine, lidocaine, nystatin, pravastatin, propranolol, theophylline, ursodiol, and verapamil. *See id.* ¶¶ 19–39. At the parties' July 27, 2026 pre-trial conference, Humana represented that it has dismissed with prejudice its claims as to certain drugs to achieve a narrower presentation for trial. The 13 remaining drugs as of this writing are baclofen, benazepril, clobetasol, clomipramine, digoxin, divalproex, doxycycline (delayed release form only), fluocinonide, levothyroxine, lidocaine, pravastatin, propranolol, and theophylline. The expert reports relevant to the pending *Daubert* motions were produced before the July 27, 2026 conference. Those reports refer to 22 drugs, including the drug "Lidocaine/Prilocaine." *See, e.g.*, Expert Report of Amitabh Chandra, Ph.D. ¶ 13 [Doc. No. 475] (hereinafter "*Chandra* 1") (identified as Exhibit 4 to the Declaration at Doc. No. 446-1). When used in the context of the expert reports, the term "Subject Drugs" refers to all 22 drugs.

[4] *See id.* ¶¶ 261–62, 1686–1729 (Counts CVI through CX address the alleged overarching conspiracy among Defendants).

claims under their prescription drug coverage.[5] In pursuing a remedy for the alleged injuries it sustained as an indirect purchaser, Humana seeks to show that price increases taken by Defendant-Manufacturers were passed-through to Humana in the generic drug supply chain. In some cases, Defendants and Humana were separated by only one intermediary (e.g., a wholesaler), whereas in others there were multiple supply-chain intermediaries (e.g., a wholesaler and a pharmacy) interposed between them.[6] Second, Humana presses claims as a direct purchaser based on the transactions of its subsidiary, Humana Pharmacy, Inc, which purportedly purchased generic drugs directly from Defendants for distribution to plan members on a mail-order and retail pharmacy basis.[7]

The parties offer expert opinions on a range of issues, including collusion, damages, and the functioning of the generic drug market. They have in turn filed motions to exclude expert testimony under Federal Rule of Evidence 702.[8] On June 4, 2026, the Court held hearings on the subset of motions deemed essential to summary judgment issues, namely, Defendants' motions to exclude the testimony of Dr. W. David Bradford, Dr. William B. Vogt, and Dr. Richard G.

---

[5] *See Chandra* 1 ¶ 14 (distinguishing between Humana's indirect and direct purchases); *see also* Expert Report of Professor William B. Vogt, Ph.D ¶ 66 [Doc. No. 475] (hereinafter "*Vogt* 1"). Dr. Vogt's opening report is identified as Exhibit 1 to the Declaration at Doc. No. 446-1.

[6] The definitive number of intermediaries operating between Humana and Defendants is made complex by the fact that Humana relies on its subsidiary, Humana Pharmacy, Inc. ("HPI"), for significant portions of its commerce. As Dr. Chandra explains, "HPI regularly purchases drugs, including generic medications from manufacturers and wholesalers." *Chandra* 1 ¶ 61. Humana also operates its own PBM, "Humana Pharmacy Solutions," *Id.* at ¶ 12, but it continues to "negotiate[] with non-Humana retail pharmacies for inclusion in its pharmacy network." *Id.* ¶ 61. Dr. Vogt, by contrast, does not address all of these specifics. He notes, more simply, that "Manufacturers produce the drugs and sell them to (a) wholesalers, (b) large retailers, such as big pharmacy chains, or (c) healthcare organizations." *Vogt* 1 ¶ 12. In discussing pass-through, Dr. Vogt appears to imply that there are two layers of separation between Humana and Defendants based on his explanation of incentive structures affecting wholesalers and pharmacies. For instance, he notes, "I have examined the extent to which wholesalers and pharmacies have the incentives to pass on any price[] increases from manufacturers to their customers, that is pharmacies and end payors, respectively." *Id.* ¶ 68. Humana's Second Amended Complaint also recites, "Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributers." Doc. No. 110 ¶ 134.

[7] *E.g.*, Doc. No. 110 ¶¶ 761–71, 805–15, 849–59.

[8] Doc. Nos. 439, 445, 446, 449, 450, 459, 464.

Frank.[9] At the hearings, the parties reserved all of their time for argument and declined to present live testimony. The arguments referred to the experts' deposition transcripts and, where relevant, the video-recorded depositions themselves.

## II.    LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[10] and its progeny. Rule 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[11]

In applying Rule 702, district courts exercise a "rigorous gatekeeping function"[12] to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[13] The Third Circuit requires the proponent of expert testimony under Rule 702 to prove by a preponderance of the evidence that (1) the expert is qualified; (2) the expert's testimony is

---

[9] Doc. Nos. 439, 445, 446.

[10] 509 U.S. 579 (1993).

[11] Fed. R. Evid. 702.

[12] *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000).

[13] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (quoting *Daubert*, 509 U.S. at 589).

4

reliable and about matters requiring scientific, technical, or specialized knowledge; and (3) the

expert's testimony will assist the trier of fact.[14]

In simple terms, there are three restrictions: qualifications, reliability, and fit.[15] To satisfy

the qualification prong, the proffered expert must possess specialized expertise.[16] This criterion

is nebulous, as "a broad range of knowledge, skills, and training qualify an expert."[17] Next, to be

reliable, expert testimony "must be based on the 'methods and procedures of science' rather than

on 'subjective belief or unsupported speculation.' "[18] An expert must rely upon good grounds for

his or her opinions, but not necessarily the best grounds or unflawed methods.[19] In evaluating

reliability, courts in the Third Circuit consider the following non-exhaustive factors enunciated

in *Daubert* and *United States v. Downing*[20]:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has
> been subject to peer review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's operation; (5)
> whether the method is generally accepted; (6) the relationship of the technique to
> methods which have been established to be reliable; (7) the qualifications of the
> expert witness testifying based on the methodology; and (8) the non-judicial uses
> to which the method has been put.[21]

The "test of reliability is 'flexible,' " with the factors' relevance depending "on the nature of the

issue, the expert's particular expertise, and the subject of his testimony."[22] Finally, to establish

---

[14] *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2024 WL 4980784, at *3 (E.D. Pa. Dec. 3, 2024) (citing *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir. 2008); *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025)).

[15] *Cohen*, 125 F.4th at 460.

[16] *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

[17] *Id.* (quoting *In re Paoli R.R. Yard PCB Litig. (Paoli II)*, 35 F.3d 717, 741 (3d Cir. 1994)).

[18] *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590).

[19] *See In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784, at *4 (E.D. Pa. Dec. 3, 2024) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 784 (3d Cir. 1996); *Paoli II*, 35 F.3d at 744–45).

[20] 753 F.2d 1224 (3d Cir. 1985).

[21] *Pineda*, 520 F.3d at 247–48 (citing *Paoli II*, 35 F.3d at 742 n.8).

[22] *Kumho Tire Co.*, *Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999).

"fit," the expert testimony must assist the trier of fact by supplying a "scientific connection to the pertinent inquiry."[23] The "fit" standard "goes primarily to relevance"[24] and demonstrates that "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*."[25]

Aside from these criteria, Defendants note that the 2023 amendment to Rule 702 resulted in two modifications. First, the amendment clarified that courts apply a preponderance of the evidence standard when assessing questions of admissibility under Rule 702.[26] Second, the amendment emphasized that an expert opinion must "reflect a reliable application of the principles and methods to the facts of the case."[27]

## III.    DISCUSSION

Humana offers Dr. William B. Vogt, Ph.D., as its damages expert. Dr. Vogt, a former university professor, is a research director at a healthcare consulting firm specializing in industrial organization, health economics, and applied econometrics.[28] His research focuses on topics such as pharmaceuticals, pharmacy benefit design, and Medicare Part D.[29]

To quantify damages, Dr. Vogt employed a "difference-in-differences" ("DID") regression model. Using this approach, he calculated the "estimated overcharge" on the Subject Drugs from Defendants' purported illegal conduct and applied the overcharge to the total of what

---

[23] *Schneider*, 320 F.3d at 404 (quoting *Daubert*, 509 U.S. at 591–92).

[24] *Daubert*, 509 U.S. at 591.

[25] *Paoli II*, 35 F.3d at 743.

[26] Fed. R. Evid. 702 advisory committee's notes to 2023 amendment.

[27] *Id.*

[28] *Vogt* ¶ 1.

[29] *Id.* ¶ 2. Defendants do not challenge Dr. Vogt's qualifications.

Humana spent on the Subject Drugs (the "Volume of Commerce") during the collusion period.[30]

Dr. Vogt began by choosing "Control Drugs" that shared characteristics with the Subject Drugs

but that were not subject to price-fixing allegations.[31] Using manufacturer-level IQVIA

MIDAS[32] data, and applying Dr. Bradford's start and end dates, he then assessed how the price

difference between the Subject Drugs and Control Drugs evolved during the alleged collusion

period and performed regressions to quantify the total overcharge.[33] Then, in a final step, he

applied the manufacturer-level overcharge to (1) Humana's Volume of Commerce for

direct-purchases made by its pharmacies; and (2) Humana's Volume of Commerce for indirect

purchases, that is, claims paid by Humana on behalf of its insureds.[34] To convert the overcharge

at the manufacturer-level to the overcharge for Humana, Dr. Vogt assumed a 100% rate of

pass-through within the supply chain.[35]

Defendants offer various reasons why the Court should exclude Dr. Vogt's testimony.

They argue that his DID model was flawed and unreliable,[36] that he wrongly assumed a 100%

pass-through of overcharges to Humana,[37] and that he improperly failed to net out Medicare Part

D subsidies and amounts related to unpled claims.[38] The Court addresses each in turn.

---

[30] *Id.* §§ 2.3, 3.4.

[31] *Id.* § 3.1.

[32] The IQVIA MIDAS data set "contains unit and dollar sales for all drug products, broken down by manufacturer and drug for all drug products." *Vogt 1* Appendix 2 ¶¶ 56–57. The sales data that Dr. Vogt retrieved through this source enabled him to aggregate data at the "manufacturer level," as opposed to the pharmacy level or consumer level.

[33] *Id.* §§ 3.1–3.3; Rebuttal Report of Professor William B. Vogt, Ph.D. ¶ 4(c) [Doc. No. 475] (hereinafter "*Vogt 2*"). Dr. Vogt's rebuttal report is identified as Exhibit 3 to the Declaration at Doc. No. 446-1.

[34] *Vogt 1* ¶¶ 59, 65–76.

[35] *Id.* ¶ 68; *Vogt 2* ¶ 157.

[36] Doc. No. 475 at 9–18.

[37] *Id.* at 19–22.

[38] *Id.* at 22–25.

### A.     Validity of Dr. Vogt's DID Model

With respect to Dr. Vogt's model, the Defendants fault his Control Drug selections, use of molecule-level IQVIA pricing data,[39] and reliance on purportedly arbitrary start dates and end dates.[40] They also argue that Dr. Vogt's DID model does not fit the facts of the case because he did not supplement it with causal analysis of why the price increases occurred.[41]

The last three arguments are amenable to swift resolution, as they raise issues that were explored in the Court's opinions addressing Dr. Bradford and the class *Daubert* decisions. First, though Defendants protest that IQVIA data does not capture what Humana paid,[42] Dr. Vogt rebuts this by noting that IQVIA data is "widely-accepted" for analyzing "market-wide prices as opposed to 'off-invoice prices,' " which matters insofar as "inflation of market prices was the object of the alleged conspiracy in this matter."[43] In any event, courts frequently cite IQVIA as a reliable data source to use when measuring damages to third-party payors.[44] Having employed a method that is "subject to peer review,"[45] "generally accepted,"[46] and "established to be reliable,"[47] Dr. Vogt had good grounds to use IQVIA data as an analytical starting point. The

---

[39] IQVIA (formerly "IMS Health") is a private healthcare data analytics vendor that "distributes a series of generic drug market measurement and research datasets sold under the brand name 'IQVIA MIDAS.' " *Vogt* 2 ¶ 114.

[40] Doc. No. 475 at 17–18.

[41] *Id.* 12–14.

[42] Doc. No. 475 at 4.

[43] *Vogt* 2 ¶ 115.

[44] *See In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070, at *17 & n.132 (E.D. Pa. Dec. 5, 2024); *In re Amitza Antitrust Litig.*, No. 21-11057-MJJ, 2025 WL 4036635, at *20 (D. Mass. Oct. 29, 2025).

[45] *Schneider*, 320 F.3d at 405.

[46] *Id.*

[47] *Id.*

Court reviews the rest of Defendants' contentions on price pass-through in the following section.[48]

Second, for the collusion periods start and end dates, Dr. Vogt relied on Dr. Bradford's report, so the dates are not grounds for exclusion.[49] Dr. Bradford's start dates stem from a permissible documentary review, and his selection of end dates followed from defense counsel's requested stipulation, which assures the Court of its reasonableness.

Third, though Dr. Bradford's opinions are admissible, Dr. Bradford himself admitted that he did not assess causality.[50] The Court will therefore exclude from Dr. Vogt's report the excerpts that assume, without requisite support, that a causal relationship exists between the alleged anticompetitive conduct and the price increases. To be clear, though, the absence of expert testimony drawing a causal link between alleged price-fixing (or other illicit conduct) and price increases does not bar all of Dr. Vogt's testimony by analogy to *PBM Antitrust*. Dr. Bradford addressed all three salient criteria that the court found lacking there: (1) whether there is an "antitrust explanation" for the price difference; (2) whether an expert can "rule out other factors as being responsible for the [price difference]" or whether an expert "consider[ed] any other factors" at all; and (3) whether expert analysis "distinguish[es] between unlawful and lawful explanations for the observed differential."[51] It was appropriate for Dr. Vogt to rely on

---

[48] In parallel with its reasoning for Dr. Bradford, the Court disagrees that Dr. Vogt's molecule-level analysis was scientifically invalid. Literature is divided on the appropriate level of granularity to use when studying generic drug pricing. *Vogt* 2 ¶¶ 66–67 (citing Robert Clark et al., *Collusion in the US Generic Drug Industry*, Int'l J. Indus. Org., Dec. 2022 (2022)). But regardless, Dr. Vogt recalculated Humana's overcharge at the molecule-form level, demonstrating that "the results in Vogt 1 are not substantively sensitive to decisions about the granularity of the analysis." *Id.* ¶ 72. Defendants' concerns about the outlier formulations that experienced price decreases, such as acetazolamide capsules and verapamil tablets, are properly articulated to a jury.

[49] *Nichols v. Morrisey*, No. 23-cv-0637, 2024 WL 871322, at *6 (E.D. Pa. Feb. 29, 2024) ("An expert is permitted to rely on the opinion of another expert in drawing his conclusions." (citing *Joiner*, 522 U.S. at 146)).

[50] *See, e.g.*, Bank Decl. Ex. 4, Bradford Depo. Tr. 366:2–367:17 [Doc. No. 471].

[51] *PBM Antitrust*, 2017 WL 275398, at *18.

Dr. Bradford's analyses and his conclusion that Defendants' conduct is "indicative of collusion and/or agreement, as opposed to independent decisions, oligopolistic pricing or other market factors that would not be indicative of collusion or agreement."[52] Consequently, Dr. Vogt does not "fail to correct for salient factors . . . that may have caused the harm of which the plaintiff is complaining,"[53] and his testimony does not lack "fit." The Court will exclude only those portions of his report that expressly note a causal relationship between price increases and collusion.[54]

Whether Dr. Vogt applied a reliable methodology for selecting control drugs asks a more difficult question. Defendants challenge Dr. Vogt's control-drug methodology on several fronts, with their primary criticism being that his model did not meet the "parallel pre-trends" assumption.[55] As defense expert Dr. Amitabh Chandra explains, the parallel pre-trends assumption is meant to check that the control groups and test groups evolve similarly in the "benchmark period" before the alleged collusion began.[56] If the curves deviate in the benchmark period, that undermines the DID model's efficacy.[57]

Although Dr. Vogt understood the importance of the parallel pre-trends assumption,[58] Defendants argue his model did not abide by it because he tested the assumption visually, rather than with statistical techniques that Defendants say are standard practice. In particular,

---

[52] *Bradford* 1 ¶ 13.

[53] *PBM Antitrust*, 2017 WL 275398, at *18 (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998)).

[54] Specifically, the following text referenced by Defendants shall be excluded: *Vogt* 1 ¶ 6 ("as a result of Defendants' alleged misconduct concerning the pricing, marketing, and sale of those drugs"); *id.* ¶ 9 ("for 1) the conclusion that the alleged collusive behavior had the effect of harming competition and raising prices"); *id.* ¶ 64 ("show a significant and sizeable cartel effect").

[55] Doc. No. 475 at 9–11.

[56] *Chandra* 1 ¶¶ 127, 143, 152.

[57] *Id.* ¶ 152.

[58] *Vogt* 2 ¶ 104–05.

Defendants take issue with the benchmark-period deviations between test and control curves for propranolol, acetazolamide, baclofen, digoxin, and pravastatin.[59]

The Court shares these concerns, but only to an extent. To be certain, plenty of studies use statistical tests to evaluate whether the parallel pre-trends assumption is satisfied.[60] That rigorous testing would have been helpful here. But even without it, the Court does not find Dr. Vogt's methodology so flawed as to be unreliable. For one thing, the court that most closely considered this issue held that a visual check of the parallel pre-trends assumption was supported by literature as an adequate means of verifying a DID control group.[61] Another court went further, declining to exclude an expert that omitted a pre-trends analysis altogether based on examples of academic work that did the same.[62] And while Humana should have provided some analysis of the articles cited by Dr. Chandra, it is evident that Dr. Vogt, like the expert in *Dealer Management Systems*, cited sources indicating that a visual test of the pre-trends assumption is accepted in the econometrics community.[63]

---

[59] Doc. No. 475 at 11 & n.19.

[60] *Chandra* 1 ¶¶ 154–57 (citing Ariella Kahn-Lang & Kevin Lang, *The Promise and Pitfalls of Differences-in-Differences: Reflections on* 16 and Pregnant *and Other Applications*, 38 J. of Bus. & Econ. Stats. 613, 615 (2020); Jonathan Roth et al., *What's Trending in Difference-in-Differences? A Synthesis of The Recent Econometrics Literature*, 235 J. Econometrics 2218, 2232–33 (2023)).

[61] *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1066–67 (N.D. Ill. 2022).

[62] *FTC v. Amazon.com, Inc*, No. 2:23-cv-00932, 2025 WL 2433786, at *7 n.8 (W.D. Wash. Aug. 22, 2025).

[63] The first source Dr. Vogt cites is a webpage published by the Columbia University Mailman School of Public Health under the "Population Health Methods" tab. That webpage is titled "Difference-in-Difference Estimation," and cites various "application articles," where DID models were employed. *Difference-in-Difference Estimation*, Columbia Univ. Mailman Sch. of Pub. Health, https://www.publichealth.columbia.edu/research/population-health-methods/difference-difference-estimation (last visited July 23, 2026). The webpage states, "The parallel trend assumption is the most critical of the above four assumptions to ensure internal validity of DID models and is the hardest to fulfill . . . . Although there is no statistical test for this assumption, visual inspection is useful when you have observations over many time points." *Id.*

The second source Dr. Vogt refers to is an *American Economic Review* journal article studying the effect of market entrants on a generic drug cartel. Amanda Starc & Thomas G. Wollman, *Does Entry Remedy Collusion? Evidence from the Generic Prescription Drug Cartel*, 115 Am. Econ. Rev. 1400 (2025). The article includes figures showing pre-trends that are closely aligned before the substantial price increases. It also discusses that "the prices of cartelized and uncartelized drugs exhibit very similar trends in the periods leading up to Teva hiring NP" and that "within the pre-event trends, quarter-to-quarter innovations in the price series are correlated." *Id.* at 1410.

Moreover, Dr. Vogt tested the efficacy of his controls and his model with sensitivity checks. He did so by "(i) using all non-Subject Drugs as Control Drugs; (ii) selecting controls based on therapeutic classification; (iii) using the prices of all Control Drugs in a given Control Group instead of the median price; (iv) adding a linear time trend; and (v) running [his] regressions at the molecule-form level in a number of ways."[64] In doing so, he found that, "[o]verall, . . . these sets of estimates are closely clustered around the headline damages number" shown in his opening report.[65] Those checks, coupled with a visual inspection supported by literature and precedent, assure the Court that Dr. Vogt's methodology complied with *Daubert*, especially given "the difficulty of establishing a suitable control group when collusion is pervasive," as it is alleged to be here.[66] While Dr. Vogt's verification method was not superlative, it was adequately supported, adequately tested, and reliable. Defendants' contentions, including their disagreement with Dr. Vogt's use of a linear variable to test whether his controls met the parallel pre-trends assumption, are apt for cross-examination.

As for the parameters of Dr. Vogt's control-drug selections, Defendants maintain that he failed to account for factors like the number of manufacturers and API disruptions.[67] Questions of which factors to consider in selecting a control group often arise in the context of surveys, where controls should "share as many characteristics with the experimental stimulus as

---

Admittedly, unlike the articles discussed in *Dealer Management Systems*, this reliance on a visual comparison in the pre-event curves was not associated with a discussion of DID regression models.

[64] *Vogt* 2 ¶ 171.

[65] *Id.*

[66] Robert Clark et al., *Collusion in the US Generic Drug Industry*, Int'l J. Indus. Org., Dec. 2022, at 20 (2022).

[67] Doc. No. 475 at 11–12.

possible."[68] In a survey, though, an expert can style her control group to fit a situation,[69] whereas Dr. Vogt was inherently limited by the drugs in the marketplace. Even so, he aligned the control and test drugs based on (1) availability from 2008 to 2020, (2) the route of administration (e.g., oral, topical), and (3) the Herfindahl-Hirschman Index ("HHI"), while controlling for generic drugs that are not subject to price-fixing allegations.[70] After naming a set of control drugs for each subject drug, he then plotted their median prices to reduce outlier effects.[71] Although Dr. Vogt could have done more, neither side pointed to scholarship specifying the exact number of criteria that is appropriate. At any rate, HHI is an accepted predictor of market competitiveness (and thus price),[72] and Dr. Vogt's other criteria are contextually sensible, so the Court finds that Defendants' objections are best reserved for the jury.[73]

### B.      Pass-Through

As previewed in their IQVIA data argument, Defendants consider Dr. Vogt's analysis unreliable because he assumed that all of the overcharge at the manufacturer-level was "passed through" to Humana.[74] The overcharge that was passed through, Defendants argue, depends on economic variables and is frequently less than the overcharge at the manufacturer level, as

---

[68] *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) (alteration and internal quotations omitted); *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d. Cir. 2013) (internal quotations omitted).

[69] *See THOIP*, 690 F. Supp. 2d at 223 (expert designed a "control" product to mirror a test product but with one minor difference); *Pa. State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602, 617 (M.D. Pa. 2024) (similar).

[70] *Vogt* 1 ¶ 28.

[71] *See* Davis Decl. Ex. 2, Vogt Depo. Tr. 216:22–217:2 [Doc. No. 475].

[72] *See* Manoso Decl. Ex. C, Kesselheim Depo. Tr. at 29:24–30:9, 101:16–102:2 [Doc. No. 485].

[73] *See In re Prograf Antitrust Litig.*, No., 11-md-2242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) (noting many courts consider comparability to be a jury question because it involves "weighing facts" (citing 1 Am. Bar Ass'n, Antitrust Law Developments 786 (7th ed. 2012)).

[74] Doc. No. 475 at 19.

evidenced by certain drugs at issue here.[75] Dr. Vogt defends his assumption of a "complete pass-through" based on qualitative market features and, in his rebuttal report, through a quantitative comparison with Humana's price increases.[76]  However, Defendants say his quantitative testing is deficient because it looked at *dollar-for-dollar* pass-through, not the *percentage* pass-through that they say his model had assumed.[77]

In an antitrust case, an expert's damages model "need not be exact."[78] Plaintiffs are required to present a "reasonable estimate" of damages.[79] "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."[80] Even so, to survive a *Daubert* challenge, an expert's model must rest upon "good grounds" not just in the broad sense but also "for each step in the analysis."[81] Because Dr. Vogt's method for estimating Humana's indirect-purchase damages involves determining overcharge at the manufacturer-level as a first step and applying that overcharge to Humana's indirect Volume of Commerce based on a 100% pass-through assumption, his methodology is only as reliable as that assumption.

Expert testimony on pass-through is most often considered by courts at class certification. Class certification case law can therefore supply several important principles for the Court's consideration here. Pass-through poses an "empirical question."[82] Courts will exclude or cast

---

[75] *Id.* at 19–20.

[76] *Vogt 1* ¶¶ 68–73; *Vogt 2* ¶¶ 155–62.

[77] Doc. No. 475 at 20–21.

[78] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

[79] *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 484 (3d Cir. 1998).

[80] *Zenith Radio Corp. v. Hazeltine Rsch. Inc*, 395 U.S. 100, 124 (1969) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946)).

[81] *Paoli II*, 35 F.3d at 745.

[82] *In re Fresh Del Monte Pineapples Antitrust Litig.*, No, 04-md-1628, 2008 WL 5661873, at *5 (S.D.N.Y. Feb. 20, 2008).

doubt on pass-through models that are based on assumptions that lack data-driven support.[83] But pass-through models are also readily found reliable when backed by statistical analysis, often involving some form of regression.[84] A review of "qualitative, quantitative and anecdotal evidence" together likewise provides foundation for an expert to reliably opine on how an overcharge on direct purchasers passes down the supply chain.[85]

The imperfections in Dr. Vogt's consideration of pass-through are not severe enough to require exclusion here. Consider first his qualitative discussion of market features. Dr. Vogt describes that wholesalers generally operate at low margins, which to him suggests that they are ill-fitted to absorb price increases. Citing a university web article published by the authors of a study, he opines that for a $100 expenditure on pharmaceuticals by consumers, wholesalers retain only $2, with a small fraction of it captured as profit.[86] He then argues that pharmacies, like wholesalers, are also incentivized to pass on price increases down the supply chain because of a reimbursement structure that exists between (1) the pharmacy and PBMs or (2) the pharmacy and Centers for Medicare and Medicaid Services ("CMS"). He explains,

> [P]harmacies often contract with PBMs for inclusion in their pharmacy network and submit claims for reimbursement at a negotiated rate. This reimbursement rate is typically based on a discount percentage from the AWP plus a dispensing fee, minus any patient cost sharing (e.g., copays) collected. Similar incentives for pharmacies are also present in the CMS (Medicaid) reimbursement methodology,

---

[83] *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685 (S.D. Fl. 2012) ("[The] expert offers no methodology . . . [and] bases his assumption on the fact that if all terms of a cost plus contract are carried out, then pass through *should* occur."); *In re Domestic Drywall Antitrust Litig.*, No. 2017 WL 3700999, at *14 (E.D. Pa. Aug. 24, 2017) ("IPPs' damages model assumes a 100% pass-through rate, which is something that they must prove.").

[84] *See, e.g.*, *In re Turkey Antitrust Litig.*, No. 19-C-8318, 2025 WL 264021, at *19, 23 (N.D. Ill. Jan. 22, 2025) (weighted average pass-through rate based on individual regressions found reliable); *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-2196, 2014 WL 6461355, at *59, 64 (average pass-through rates calculated based on multi-step regressions were a "proper offer of generalized evidence of overcharge passthrough") (N.D. Oh. Nov. 17, 2014).

[85] *See Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 684 (9th Cir. 2022).

[86] *Vogt* 1 ¶ 70 (citing Neeraj Sood et. Al, *Follow the Money: The Flow of Funds in the Pharmaceutical Distribution System*, U.S.C. Schaeffer Inst. for Pub. Pol'y & Gov't Serv., https://schaeffer.usc.edu/research/follow-the-money-the-flow-of-funds-in-the-pharmaceutical-distribution-system/ (last accessed July 24, 2026)).

whereby states reimburse pharmacies the cost of acquiring the drug (average acquisition cost, or AAC) plus a dispensing fee. That explicitly ties payment to what pharmacies actually paid, and files are updated weekly — so acquisition cost increases are likely to be passed through almost fully in reimbursement.[87]

Without further citation, Dr. Vogt finally remarks that IQVIA's MIDAS data set, which he used to estimate the total overcharge at the manufacturer level, also includes data on prices charged by wholesalers and pharmacies. He notes that the price trends across each set of data "followed a similar path historically."[88]

While allusions to market dynamics, alone, may not have been a sound basis to assume complete pass-through,[89] Dr. Vogt strengthened his account of pass-through by statistically comparing increases in Humana's indirect-purchase data to the manufacturer-level IQVIA data for all 22 Subject Drugs, so the Court finds that his 100% pass-through model was not so problematic as to require exclusion. In his statistical analysis, Dr. Vogt found that "in many instances, the Humana Indirect series shows a larger price spike; in others it is the opposite. In any case, this evident co-movement already suggests that for most drugs the 100% assumption is reasonable."[90] He also estimated regression equations to quantify the relationship between upstream and downstream price increases, obtaining a coefficient of 1.68 significant at the 99th percentile.[91] Finding a coefficient statistically greater than 1, he concluded that a 100% pass-through assumption was, if anything, underestimated.[92]

---

[87] *Id.* ¶ 71.

[88] *Id.* ¶ 74.

[89] *See Fla. Cement & Concrete.*, 278 F.R.D. at 685.

[90] *Vogt 2* ¶ 158.

[91] *Id.* ¶¶ 161–62.

[92] *Id.*

Dr. Chandra's critiques do not demonstrate that Dr. Vogt's methods were scientifically invalid and thus go to weight. While Dr. Chandra notes that pass-through is often "incomplete," depending on factors like price rigidities, bargaining power, long-term contracts, and geography,[93] much of the literature he cited for authority is gathered from other industries.[94] And although one literature survey suggested that pass-through is below 100% in the overwhelming number of instances (28 of 29 peer-reviewed estimates), that survey does not categorically rule out that it can be close to or above 100% based on the twenty-ninth example.[95] Similarly, while Dr. Chandra and another defense expert point to record evidence of incomplete pass-on of costs by pharmacies for levothyroxine and pravastatin,[96] those drugs were among the exceptions in Dr. Vogt's 22-drug statistical comparison where the overcharge was greater at the manufacturer level. Humana's price differential for clobetasol, on the other hand, significantly outpaced what was observed upstream.[97] In sum, the Court notes that Dr. Chandra's analysis is more comprehensive overall, but it is not the Court's function to weigh competing statistical accounts.

Finally, while Defendants complain that Dr. Vogt's statistical comparisons evaluated *dollar-for-dollar* as opposed to *percentage* pass-through, that argument is not a criticism of the

---

[93] *Chandra* 1 ¶ 176 & n.241.

[94] *Id.* ¶ 175 (citing the following articles); Nakamura, E., and D. Zerom, "Accounting for Incomplete Pass-Through," The Review of Economic Studies, Vol. 77, No. 3, July 2010, pp. 1192-1230; Hong, G. H., and N. Li, "Market Structure and Cost Pass-Through in Retail," The Review of Economics and Statistics, Vol. 99, No. 1, March 2017, pp. 156-166; Nelson, J. P., and J. R. Moran, "Effects of Alcohol Taxation on Prices: A Systematic Review and Meta-Analysis of Pass-Through Rates," The B.E. Journal of Economic Analysis & Policy, Vol. 20, No. 1, 2019, pp. 1-21; Bonnet, C., et al., "Empirical Evidence on the Role of Nonlinear Wholesale Pricing and Vertical Restraints on Cost Pass-Through," The Review of Economics and Statistics, Vol. 95, No. 2, May 2013, pp. 500-515.)

[95] *Chandra* 1 ¶ 175; *see* "Cost pass-through: theory, measurement, and potential policy implications. A Report prepared for the Office of Fair Trading," Economics, February 2014, https://assets.publishing.service.gov.uk/media/5a74a3a940f0b619c86593b8/Cost_Pass-Through_Report.pdf, Table 9 (reporting that a multinational simulation covering cost pass-through in the US automotive market yielded a median wholesale-to-retail pass-through rate of 0.54 and individual pass-through rates between 0.3 and 1.20)).

[96] *Chandra* 1 Figs. 12-13; Expert Report of Mathis Wagner, Ph.D. ¶ 192. [Doc. No. 475] (hereinafter "*Wagner*"). Dr. Wagner's report is identified as Exhibit 6 to the Declaration at Doc. No. 446-1.

[97] *Vogt* 2 Fig. 6.

17

statistical comparisons themselves or of regressions that Dr. Vogt used to model that comparison. This argument is thus better poised to be raised on cross-examination, as opposed to a Rule 702 motion. Since Dr. Vogt used Humana's own pricing data and verifiable techniques to confirm his assumption, nothing more was required by *Daubert* and Rule 702.[98]

### C.    Medicare Part D and Unpled Claims

Defendants offer two final reasons why Dr. Vogt's damages estimate is inflated. First, Defendants complain that he failed to deduct Medicare Part D subsidies paid to Humana by the federal government.[99] "Medicare Part D plans are privately-administered, government-subsidized plans that generally cover outpatient prescription medicines."[100] Defendants argue that the federal government pays for a significant amount of the cost of prescription drugs, so Dr. Vogt's analysis that does not account for such reimbursements overinflates Humana's damages.

That argument is premature and inappropriate at the *Daubert* stage.[101] Courts that have evaluated whether, and how, to reduce damages on account of Part D subsidies have not

---

[98] *Simon & Simon, PC v. Align Tech., Inc.*, 350 F.R.D. 565, 574 (N.D. Cal. 2023) (deeming reliable Dr. Vogt's "opinion that there was a consistent passthrough of prices from direct to indirect purchasers" as it was "consistent with qualitative evidence, is founded on substantial data, and was formed using reliable methods"). Aside from rejecting pass-through models that are not sufficiently data-driven, *Fla. Cement & Concrete*, 278 F.R.D. at 685; *Domestic Drywall*, 2017 WL 3700999, at *14, courts have excluded pass-through opinions that are too sweeping to capture antitrust injury and damages on a class-wide level. *See, e.g.*, *Sibide v. Sutter Health*, 333 F.R.D. 463, 484 (N.D. Cal. 2019) (expert's opinion that pass-through was "near" or "close to" 100 percent did "not explain how these results or her analyses support her decision to assume a uniform 100-percent-passthrough rate across all health plans, all business lines, all health-insurance products, in all competitive situations."). In this case, however, Dr. Vogt's comparative qualitative and quantitative explanations for his 100% pass-through assumption is not susceptible to criticisms particular to class-wide damages estimates. To that point, the pass-through case cited by Defendants, *In re Processed Egg Prods.*, 312 F.R.D. 124 (E.D. Pa. 2015), is inapplicable because the expert's pass-through analysis there was deficient insofar as it used a single retailer's data to model damages to a nationwide class of indirect resellers.

[99] Doc. No. 475 at 23–24.

[100] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784, at *8 (E.D. Pa. Dec. 3, 2024).

[101] *In re HIV Antitrust Litig.*, No. 19-cv-2573, 2023 WL 3090619, at *10 (N.D. Cal. Mar. 13, 2023) (declining to exclude expert testimony that did not account for Medicare subsidies because "that does not render [the testimony] entirely unreliable"); *see also In re Zetia (Exetimibe) Antitrust Litig.*, No. 18-md-2836, 2023 WL 3064462, at *5 (E.D. Va. Apr. 18, 2023) (excluding evidence of Part D payments because such payments were not "directly traceable to the EPPs' expenditures" for the relevant drugs); *In re Namenda Indirect Purchaser Antitrust Litig.* No.

18

excluded an expert who did not compute the Part D offset. Even if this omission weakens Dr. Vogt's analysis, it does not undermine the validity of his model or that model's capacity to provide a baseline from which to apply an offset.

Second, Defendants fault Dr. Vogt for calculating damages relating to statutes Humana did not plead.[102] The Court agrees with this in part. A proponent of expert testimony under Rule 702 must show by a preponderance of the evidence that the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."[103] This criterion embodies the "fit" prong of Rule 702.[104] Humana has pled state antitrust and consumer protection claims under the laws of thirty-six jurisdictions,[105] and unjust enrichment claims under the laws of the District of Columbia and all United States territories and states except Ohio and Indiana.[106] Dr. Vogt then computed Humana's indirect damages accounting for purchases in all fifty states, the District of Columbia, and Puerto Rico.[107] Dr. Vogt's state-by-state projections fit the case for the thirty-six jurisdictions under whose laws Humana has brought state antitrust and consumer protection claims. Less clear is whether his damages estimates for the other jurisdictions are relevant to an estimate of what Humana would recover if it prevailed on its unjust enrichment claims.[108] As of

---

1:15-cv-6549, 2022 WL 3362429, at *11–12 (S.D.N.Y. Aug. 15, 2022) (determining an offset was required but leaving the question to the jury to resolve disputed expert calculations of the offset).

[102] Doc. No. 745 at 24–25.

[103] *In re TMI Litig.*, 193 F.3d at 663 (quoting Fed. R. Evid. 702).

[104] *Id.*

[105] *E.g.*, Doc. No. 110 ¶¶ 772–85.

[106] *E.g., id.* ¶¶ 786–97. Ohio and Indiana are also not among the other thirty-six states.

[107] *Vogt 1* Table 4.

[108] The quantum of relief for unjust enrichment is generally the *benefit retained by the defendant. See, e.g., Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988) ("Our cases hold that the measure of damages for unjust enrichment is the reasonable value of the goods and services to the defendant."); *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649 A.2d 518 (Conn. 1994) ("[T]he measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant."); *see also* 3 D. Dobbs, Law of Remedies § 12.1(1), at 9 ("Restitutionary recoveries are based on the defendant's gain, not on the plaintiff's loss."). The First Restatement of Restitution, however, distinguishes between scenarios "[w]here benefit and loss coincide" and those where they

this writing, the only state projections that would require exclusion are for Ohio and Indiana, whose damages calculations are not connected to any pending claim brought by Humana.

## IV.    CONCLUSION

For the reasons outlined in this Opinion, Defendants' Motion to Exclude the Opinions and Testimony of Dr. William B. Vogt will be granted in part to exclude references to causation in paragraphs 6, 24, and 64 of his opening report and to exclude damages estimates pertaining to Ohio and Indiana. In all other respects, Defendants' Motion will be denied.

---

do not, adding, "[o]rdinarily the benefit to the one and the loss to the other are co-extensive." Restatement (First) of Restitution § 1(d)–(e) (1937). This language is absent from the corresponding section of the Third Restatement.