IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-MD-2724**<br>**HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:**<br>***Humana Inc. v. Actavis Elizabeth, LLC, et al.*** | **No. 18-cv-3299** |

**MEMORANDUM OPINION**

**Rufe, J.** **August 13, 2026**

In this multidistrict litigation concerning alleged price-fixing of generic drugs, the Court selected Plaintiff Humana Inc.'s 2018 action ("*Humana I*") as the first bellwether case to involve a Direct-Action Plaintiff ("DAP"). This *Humana I* Opinion resolves Defendants' joint motion to exclude the opinions and testimony of Dr. Richard G. Frank and the parties' related Motions in Limine regarding the introduction of evidence regarding Medicare Part D repayments.

Defendants move to exclude the expert opinions and testimony of Dr. Richard G. Frank, who was engaged to respond to Defendants' rebuttal damages expert regarding the impact of Medicare Part D reimbursements on the total damages calculations. On June 4, 2026, the Court heard argument on the motion to exclude Dr. Frank.

Within its Omnibus Motion in Limine, Plaintiff Humana's Motion in Limine No. 20 seeks to preclude evidence and argument that the federal government paid for or funded Humana's Medicare Part D prescription drug purchases. Humana requests that the issue of Medicare Part D reimbursements be reserved and decided by the Court in a post-trial hearing.

Similarly, within their Omnibus Motion in Limine, Defendants' Motion in Limine G seeks to preclude Humana from presenting incorrect, misleading, or inflammatory information

about damages, including that Humana should not be permitted to suggest that it would be required to report any litigation recoveries to regulatory agencies or the federal government, that federal law or regulations provide Humana the right or obligation to recover damages on behalf of the federal government, or that Defendants would obtain a "windfall" if Medicare payments are deducted from the damages calculations.

Having carefully studied the expert reports of Dr. Vogt, the relevant rebuttal reports of Defendants' experts, the parties' briefs, and the evidence and argument presented, and the Motions in Limine and responses thereto, the Court now addresses Defendants' joint motion to exclude Dr. Frank, Humana's Omnibus Motion in Limine No. 20, and Defendants Joint Omnibus Motion in Limine G.

## I. BACKGROUND

The following Background is drawn from the Court's Memorandum Opinion addressing Defendants' joint motion to exclude Humana's merits expert, Dr. W. David Bradford, and is supplemented where relevant.[1] Humana is a health insurer headquartered in Kentucky that "either directly or through its health plan subsidiaries, [insures] and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims."[2] Defendants are manufacturers of generic pharmaceutical products. Humana claims that it purchased generic drugs manufactured by Defendants that were subject to the unlawful anticompetitive conduct broadly complained of in this MDL. That is, Humana alleges that

[1] A fuller discussion of the allegations in the MDL may be found in the Court's Opinions of October 16, 2018, and February 15, 2019. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411–34 (E.D. Pa. 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 820–27 (E.D. Pa. 2019).

[2] 18-cv-3299, Doc. No. 110 ¶ 48. Unless otherwise noted, document numbers henceforth correspond to filings in the *Humana I* docket.

certain Defendants conspired to unlawfully fix prices and allocate market share for 21 or 22 generic drugs (the "Subject Drugs").[3] Humana also avers that, through the price-fixing on individual drugs and maintenance of "fair share" commitments in the industry, Defendants entered into an overarching conspiracy to restrain trade in the generic drug market.[4]

Humana's claims involve two distinct streams of commerce. First, it brings claims as an indirect purchaser based on insurance payments made on behalf of members who submitted claims under their prescription drug coverage.[5] In pursuing a remedy for the alleged injuries it sustained as an indirect purchaser, Humana seeks to show that price increases taken by Defendant-Manufacturers were passed-through to Humana in the generic drug supply chain. In some cases, Defendants and Humana were separated by only one intermediary (e.g., a wholesaler), whereas in others there were multiple supply-chain intermediaries (e.g., a wholesaler and a pharmacy) interposed between them.[6] Second, Humana presses claims as a

[3] As pled in its Second Amended Complaint, Humana alleged individual conspiracies as to 21 drugs: acetazolamide, amitriptyline, baclofen, benazepril, clobetasol, clomipramine, desonide, digoxin, divalproex, doxycycline, econazole, fluocinonide, leflunomide, levothyroxine, lidocaine, nystatin, pravastatin, propranolol, theophylline, ursodiol, and verapamil. *See id.* ¶¶ 19–39. At the parties' July 27, 2026 and August 10, 2026 pre-trial conferences, Humana represented that it has dismissed with prejudice its claims as to certain drugs to achieve a narrower presentation for trial. The 11 remaining drugs as of this writing are baclofen, benazepril, clobetasol, clomipramine, digoxin, divalproex, fluocinonide, levothyroxine, lidocaine, pravastatin, and theophylline. The expert reports relevant to the pending *Daubert* motions were produced before the July 27, 2026 conference. Those reports refer to 22 drugs, including the drug "Lidocaine/Prilocaine." *See, e.g.*, Expert Report of Amitabh Chandra, Ph.D. ¶ 13 [Doc. No. 475] (hereinafter "*Chandra* 1") (identified as Exhibit 4 to the Declaration at Doc. No. 446-1). When used in the context of the expert reports, the term "Subject Drugs" refers to all 22 drugs.

[4] *See id.* ¶¶ 261–62, 1686–1729 (Counts CVI through CX address the alleged overarching conspiracy among Defendants).

[5] *See Chandra* 1 ¶ 14 (distinguishing between Humana's indirect and direct purchases); *see also* Expert Report of Professor William B. Vogt, Ph.D ¶ 66 [Doc. No. 475] (hereinafter "*Vogt* 1"). Dr. Vogt's opening report is identified as Exhibit 1 to the Declaration at Doc. No. 446-1.

[6] The definitive number of intermediaries operating between Humana and Defendants is made complex by the fact that Humana relies on its subsidiary, Humana Pharmacy, Inc. ("HPI"), for significant portions of its commerce. As Dr. Chandra explains, "HPI regularly purchases drugs, including generic medications from manufacturers and wholesalers." *Chandra* 1 ¶ 61. Humana also operates its own PBM, "Humana Pharmacy Solutions," *Id.* at ¶ 12, but it continues to "negotiate[] with non-Humana retail pharmacies for inclusion in its pharmacy network." *Id.* ¶ 61. Dr. Vogt, by contrast, does not address all of these specifics. He notes, more simply, that "Manufacturers produce the drugs and sell them to (a) wholesalers, (b) large retailers, such as big pharmacy chains, or (c) healthcare organizations." *Vogt* 1 ¶ 12. In discussing pass-through, Dr. Vogt appears to imply that there are two layers of

direct purchaser based on the transactions of its subsidiary, Humana Pharmacy, Inc, which purportedly purchased generic drugs directly from Defendants for distribution to plan members on a mail-order and retail pharmacy basis.[7]

The parties offer expert opinions on a range of issues, including collusion, damages, and the functioning of the generic drug market. They have in turn filed motions to exclude expert testimony under Federal Rule of Evidence 702.[8] On June 4, 2026, the Court held hearings on the subset of motions deemed essential to summary judgment issues, namely, Defendants' motions to exclude the testimony of Dr. W. David Bradford, Dr. William B. Vogt, and Dr. Richard G. Frank.[9] At the hearings, the parties reserved all of their time for argument and declined to present live testimony. The arguments referred to the experts' deposition transcripts and, where relevant, the video-recorded depositions themselves.

## II. LEGAL STANDARD

Admission of evidence at trial is governed by the Federal Rules of Evidence. All evidence is subject to Federal Rules of Evidence 401 & 402, which states that "[i]rrelevant evidence is not admissible."[10] Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[11]

---

separation between Humana and Defendants based on his explanation of incentive structures affecting wholesalers and pharmacies. For instance, he notes, "I have examined the extent to which wholesalers and pharmacies have the incentives to pass on any price[] increases from manufacturers to their customers, that is pharmacies and end payors, respectively." *Id.* ¶ 68. Humana's Second Amended Complaint also recites, "Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributers." Doc. No. 110 ¶ 134.

[7] *E.g.*, Doc. No. 110 ¶¶ 761–71, 805–15, 849–59.

[8] Doc. Nos. 439, 445, 446, 449, 450, 459, 464.

[9] Doc. Nos. 439, 445, 446.

[10] Fed. R. Evid. 402.

[11] Fed. R. Evid. 401.

All otherwise admissible evidence is also subject to Rule 403, which permits the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[12]

"A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules."[13] "A trial court has a duty to limit the jury's exposure to only that which is probative and relevant and must attempt to screen from the jury any proffer that it deems relevant."[14] "[A] court would be remiss if it failed to screen what the jury is exposed to because of the potential for jury confusion or prejudice."[15]

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[16] and its progeny. Rule 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[17]

---

[12] Fed. R. Evid. 403.

[13] *United States v. Abel*, 469 U.S. 45, 54 (1984).

[14] *United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988).

[15] *Id*.

[16] 509 U.S. 579 (1993).

[17] Fed. R. Evid. 702.

In applying Rule 702, district courts exercise a "rigorous gatekeeping function"[18] to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[19] The Third Circuit requires the proponent of expert testimony under Rule 702 to prove by a preponderance of the evidence that (1) the expert is qualified; (2) the expert's testimony is reliable and about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony will assist the trier of fact.[20]

In simple terms, there are three restrictions: qualifications, reliability, and fit.[21] To satisfy the qualification prong, the proffered expert must possess specialized expertise.[22] This criterion is nebulous, as "a broad range of knowledge, skills, and training qualify an expert."[23] Next, to be reliable, expert testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' "[24] An expert must rely upon good grounds for his or her opinions, but not necessarily the best grounds or unflawed methods.[25] In evaluating reliability, courts in the Third Circuit consider the following non-exhaustive factors enunciated in *Daubert* and *United States v. Downing*[26]:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to

[18] *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000).

[19] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (quoting *Daubert*, 509 U.S. at 589).

[20] *See In re Generic Pharms. Pricing Antitrust Litig*., No. 16-md-2724, 2024 WL 4980784, at *3 (E.D. Pa. Dec. 3, 2024) (citing *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir. 2008); *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025)).

[21] *Cohen*, 125 F.4th at 460.

[22] *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

[23] *Id.* (quoting *In re Paoli R.R. Yard PCB Litig. (Paoli II)*, 35 F.3d 717, 741 (3d Cir. 1994)).

[24] *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590).

[25] *See In re Generic Pharms. Pricing Antitrust Litig*., 2024 WL 4980784, at *4 (E.D. Pa. Dec. 3, 2024) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 784 (3d Cir. 1996); *Paoli II*, 35 F.3d at 744–45).

[26] 753 F.2d 1224 (3d Cir. 1985).

> methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[27]

The "test of reliability is 'flexible,' " with the factors' relevance depending "on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[28] Finally, to establish "fit," the expert testimony must assist the trier of fact by supplying a "scientific connection to the pertinent inquiry."[29] The "fit" standard "goes primarily to relevance"[30] and demonstrates that "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*."[31]

Aside from these criteria, Defendants note that the 2023 amendment to Rule 702 resulted in two modifications. First, the amendment clarified that courts apply a preponderance of the evidence standard when assessing questions of admissibility under Rule 702.[32] Second, the amendment emphasized that an expert opinion must "reflect a reliable application of the principles and methods to the facts of the case."[33]

## III. DISCUSSION

### A. Motion to Exclude Dr. Frank

Humana engaged Richard G. Frank, Ph.D., to rebut Defendants' expert Dr. Amitabh Chandra's opinions on Medicare Part D reimbursements. Dr. Frank was formerly a professor of Health Economics at Harvard University Medical School and is currently the Chair of Economic

[27] *Pineda*, 520 F.3d at 247–48 (citing *Paoli II*, 35 F.3d at 742 n.8).

[28] *Kumho Tire Co.*, *Ltd. v. Carmichael*, 526 U.S. 137, 141, 150 (1999).

[29] *Schneider*, 320 F.3d at 404 (quoting *Daubert*, 509 U.S. at 591–92).

[30] *Daubert*, 509 U.S. at 591.

[31] *Paoli II*, 35 F.3d at 743.

[32] Fed. R. Evid. 702 advisory committee's notes to 2023 amendment.

[33] *Id.*

Studies at the Brookings Institution.[34] His research on economics and the pharmaceutical industry has been widely published, and he has served on the boards of multiple health economics journals.[35]

As background, Dr. Chandra opined that Humana's damages expert Dr. William B. Vogt's estimate of damages is misleading because Dr. Vogt failed to reduce his Volume of Commerce and overcharge estimates based on Medicare Part D reimbursements paid to Humana by the Centers for Medicare and Medicaid Services ("CMS"). Dr. Chandra observes that 95.1% of Humana's indirect-purchase Volume of Commerce calculated by Dr. Vogt originates from Medicare Part D plans operated in coordination with CMS.[36] These Medicare Part D plans provide for cost-sharing between the enrollee, Humana, and CMS. While the breakdown is variable, there are several scenarios where CMS bears substantial portions of the total cost. For instance, according to Dr. Chandra, CMS pays large reinsurance subsidies when a beneficiary exceeds an out-of-pocket threshold and Low-Income Subsidies ("LIS") for beneficiaries within a certain income range.[37] Dr. Chandra further describes that CMS pays "direct subsidies" to Humana to assist with bidding and that Humana receives compensation from CMS—termed Direct and Indirect Remuneration ("DIR")—in an end-of-year reconciliation process.[38] He adds that, aside from the DIR payments and certain other discounts, Humana receives the subsidies in

[34] *See* Expert Report of Richard G. Frank, Ph.D. ¶ 5 (hereinafter "*Frank*"). Dr. Frank's report is identified as Exhibit A of the Declaration at Doc. No. 439-1.

[35] *Id.* ¶¶ 5, 7. Defendants do not challenge Dr. Frank's qualifications.

[36] *Chandra* 1 ¶ 77.

[37] *Id.* ¶¶ 81–83.

[38] *Id.* ¶ 84.

the form of advanced, capitated payments.[39] All of these subsidies, Dr. Chandra maintains, should have been deducted from Dr. Vogt's damages estimates.[40]

In response, Dr. Frank offers explanations for why the Medicare Part D subsidies paid by CMS should not offset Humana's damages. Generally speaking, he distills those explanations into five points: (1) CMS subsidies under Medicare Part D do not issue at the point of sale; (2) prospective CMS subsidies were based on future projections; (3) CMS subsidies are meant to cover aggregated sales and costs, not claims or purchases for individual drugs; (4) the entity making the payments is a "third party not involved in the purchase transaction"; and (5) the law regulating DIR requires Part D sponsors to report litigation recoveries to CMS and provides mechanisms for the distribution of portions of those recoveries.[41] In addition, Dr. Frank supplies background on the pharmaceutical industry as it relates to Medicare Part D.[42] Defendants complain that certain of Dr. Frank's opinions are legalistic, not scientific, and beyond what Rule 702 allows. Specifically, Defendants seek to exclude only paragraphs 22–43, 50–51, and 53–63 of Dr. Frank's report as beyond the scope of expert testimony.

There is a difference between an expert who explains the operation of a complex industry based on expertise and one who uses expertise to say what the law is. "While it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and

---

[39] *Id.*

[40] *See id.* ¶¶ 85–95.

[41] *Frank* ¶¶ 23–28.

[42] *See, e.g.*, *id.* ¶¶ 11–14.

practices."[43] As relevant to Medicare Part D subsidies, an expert's testimony will also be admissible if it employs a reliable methodology to calculate the subsidies at issue.[44] Above all, though, it is incumbent on the district court to limit testimony so that the expert does not opine on what the law requires.[45]

Applied here, these principles require that most of the challenged testimony be excluded, specifically paragraphs 22–28, 30–31, 33, 37–39, 41–43, 50–51, and 53–63 and related testimony. Starting with his first three points, Dr. Frank relies on his experience with Medicare Part D to explain that Part D subsidies are not applied at the point-of-sale and that they are paid as aggregate estimates, not purchase-by-purchase reimbursements. But he makes these otherwise acceptable inferences in service of the conclusion that Part D subsidies "should not be deducted when calculating damages."[46] That is impermissible because, as Defendants' point out, "[t]he determination of what legal standard to apply when calculating damages, and whether that standard was properly applied, are questions of law."[47] The fourth and fifth points stray even further into legal advocacy. In his fourth point, Dr. Frank offers no specialized industry insight and, citing the collateral source rule, says that CMS's payments should not count as an offset to damages because CMS is a third party. And in his fifth, Dr. Frank purports to interpret the legal effect of Medicare regulations.

---

[43] *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217–18 (3d Cir. 2006) (admitting expert testimony on business practices in the securities industry but not on whether certain registration requirements applied).

[44] *See Namenda*, 2022 WL 3362429, at *12.

[45] *Leo*, 941 F.2d at 197 ("The district court took care to limit Moran's testimony so that he was not giving his opinion as to what the law required."); *see also Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) ("Experts cannot render conclusions of law or provide opinions on legal issues." (internal quotations omitted)).

[46] *Frank* ¶ 22.

[47] *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 293 (3d Cir. 2014).

To salvage his testimony, Humana repeats Dr. Frank's qualifications as a health economist and argues, among other things, that Dr. Frank's opinions survived *Daubert* challenges in the past and that his opinions serve the permissible function of explaining the economic and regulatory complexities of Medicare Part D.[48] These arguments do not significantly affect the outcome. Although Dr. Frank is well qualified, that does not permit him to deploy his knowledge of the pharmaceutical industry to opine whether an offset should, or should not, be applied in calculating damages—this is a legal question.[49] Not surprisingly, the cases in which Dr. Frank's testimony was admissible were markedly different. In each instance, the courts were considering the reliability of Dr. Frank's damages calculations or his yardstick method for modeling the "but-for" world, which are analyses that he did not undertake here.[50]

This is not to suggest that Dr. Frank's testimony is entirely inadmissible. Defendants recognize as much in seeking to exclude only portions of his report. Even within those challenged excerpts,[51] Dr. Frank at times properly limits his opinions to the business practices relating to Medicare Part D. With respect to LIS cost-sharing payments in paragraphs 29, 32, and 34, for example, he explains that these payments consist of recurring prospective subsidies and retrospective subsidies, that the retroactive subsidies may effectively "be positive or 'negative,' " and that the "great majority" of LIS payments would have been the same in the "but-for"

[48] Doc. No. 591 at 54–65.

[49] *See, e.g.*, *HIV*, 2023 WL 3603732, at *2–3 (N.D. Cal. May 23, 2023) (whether Medicare Part D subsidies offset Plaintiffs' recovery was a legal issue for the court); *Namenda*, 2022 WL 3362429, at *11 (noting Medicare Part D subsidies must be deducted from damages "as a matter of law"). *But see id.* at *12 (competing accounts of what the calculated offset would be raise an issue of fact).

[50] *HIV*, 2023 WL 3090619, at *16; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2018 WL 734655, at *1–2 (D. Mass. Feb. 6, 2018); *In re Restasis (Cyclonsporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 23 (E.D.N.Y. 2020).

[51] *I.e.*, paragraphs 22–43, 50–51, and 53–63.

world.[52] He also provides useful background on reinsurance subsidies in paragraphs 35, 36, and 40.[53] In offering foundational background, Dr. Frank does not apply law to fact or purport to say what the law is, so the motion to exclude will be denied as to paragraphs 29, 32, 34–36, and 40.

For the foregoing reasons, Defendants' Motion to Exclude Certain Opinions and Testimony of Richard G. Frank, Ph.D., will be granted in part. By separate Order, the following paragraphs will be excluded: 22–28, 30–31, 33, 37–39, 41–43, 50–51, and 53–63.

### B. Motions in Limine

Both Humana's Motion in Limine No. 20 and Defendants' Motion in Limine G seek to preclude the presentation to the jury of certain evidence regarding Medicare Part D. The crux of the dispute over Medicare Part D reimbursements is that Humana is seeking damages for the full amount of overcharged payments it made as a result of Defendants alleged antitrust activity. Defendants argue that calculation of damages must take into account Medicare Part D reimbursements that Humana received from the federal government on its purchases of Medicare Part D drugs, and Humana argues such an offset is not necessary.

Humana's Motion in Limine No. 20 seeks to preclude all evidence that the federal government paid for or funded Humana's Medicare Part D prescription drug purchases and specifically moves to preclude evidence or argument that "(a) payments from [Centers for Medicare and Medicaid Services ("CMS")] to Humana as a Medicare Part D plan sponsor reduce or offset Humana's antitrust damages; (b) the federal government 'pays for' prescription drugs under Part D; or (c) Humana's damages are limited to the 'risk' Humana bears after accounting for government subsidies."[54]

---

[52] *Frank* ¶¶ 29, 32, 34.

[53] *Id.* ¶¶ 35, 36, 40.

[54] Pl.'s Mem. L. Supp. Omnibus Mot. in Limine at 38 [Doc. No. 802].

Defendants' Joint Motion in Limine G seeks to preclude "Humana from arguing, stating, implying, or in any way presenting incorrect, misleading, or inflammatory information regarding Humana's alleged damages."[55] Specifically, Defendants ask the Court to preclude Humana from presenting evidence or argument that "(1) Humana is required to report litigation recoveries to [CMS] or that the federal government may receive a portion of litigation recoveries; (2) the United States government . . . bestowed upon Humana the right or obligation to recover damages in cases like this one; and (3) Trial Defendants would obtain a windfall if Medicare payments are deducted from Humana's indirect volume of commerce."[56]

As the Fourth Circuit has noted, "the statutes and provisions . . . involving the financing of Medicare . . . are among the completely impenetrable texts within the human experience," which are "dense reading of the most tortuous kind."[57] As discussed above, the issue of whether an offset should or should not be applied to a damages calculation is a *legal question*. Legal questions are properly for the Court, not the jury, to decide.

Moreover, given the complexity of the Medicare framework and related regulations, presenting the relevant factual information to the jury poses an undue risk of confusion. The jury is likely to become confused by the distinctions between the relevant legal and factual questions at issue in the Medicare offsets and by the factual information relevant to calculating any potential offset. Pursuant to Rule 403, such information will be precluded from presentation to the jury. Rather, this information is best reviewed by the Court in order to make a post-verdict determination, if appropriate.[58]

---

[55] Defs.' Mem. L. Supp. Mot. in Limine at 59 [Doc. No. 803].

[56] *Id*.

[57] *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).

[58] *See In re HIV Antitrust Litig*., Case No. 19-cv-02573-EMC, 2023 WL 3603732, at *3 (N.D. Cal. May 23, 2024) ("Should Plaintiffs prevail at trial, then there may need to be a limited bench trial on the issue of Medicare payments

Because both Humana's Motion in Limine No. 20 and Defendants' Motion in Limine G seek to preclude evidence of Medicare Part D payments, both Motions will be granted. Indeed, all evidence regarding Medicare Part D payments relating to Humana's damages will be precluded from presentation to the jury.

Thus, the Court must determine whether, and how, to reduce damages on account of Part D subsidies. If Humana receives a verdict in its favor, the Court will hold a post-verdict hearing to hear evidence on Medicare Part D reimbursements to make such a determination. The Court's ruling on Defendants' Motion to Exclude Dr. Frank's opinions and testimony applies with equal force to any such post-verdict hearing. The Court will entertain only admissible and appropriate information to make a determination on Medicare Part D reimbursements, as may or may not affect the calculation of damages.

## IV. CONCLUSION

For the reasons outlined in this Opinion, Defendants' Motion to Exclude Certain Opinions and Testimony of Dr. Richard G. Frank will be granted as to paragraphs 22–28, 30–31, 33, 37–39, 41–43, 50–51, and 53–63. In all other aspects, Defendants' Motion to Exclude will be denied. Humana's Omnibus Motion in Limine No. 20 and Defendants' Joint Omnibus Motion in Limine G will be granted. An order will be entered.

---

and set-off."); *In re Zetia (Ezetimibe) Antitrust Litig*., 2023 WL 3064462, at *5 (E.D. Va. April 18, 2023) (noting that "government payments under Medicare Part D are set in advance and are not calculated based on purchases of specific drugs," and pass-on arguments based on those payments "would only mislead and confuse the jury"); *In re Amitiza Antitrust Litig*., 21-cv-11057 (D. Mass. April 11, 2026) ECF 763 (Order deferring a motion in limine to preclude argument based on passed on overcharges related to Medicare Part D because :the Court will address this issue post-trial").