# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

--------------------------------:

IN RE: GENERIC PHARMACEUTICALS : MDL 2724
PRICING ANTITRUST LITIGATION : 16-MD-2724

--------------------------------:

IN RE: CLOMIPRAMINE CASES :

--------------------------------:

THIS DOCUMENT RELATES TO: :
CLOMIPRAMINE BELLWETHER ACTIONS:

--------------------------------:

HIGHLY CONFIDENTIAL

Videotaped Deposition of JAMES NESTA
Washington, D.C.
Tuesday, November 19, 2025
8:46 a.m.

Job No. PA-7634479
Pages 1 - 208
Reported by: Robert M. Jakupciak, RPR

A. I am.
Q. Have there been any communications regarding potential immunity for you with the Department of Justice?
A. No.
Q. Have there been any communications with any State prosecutorial agencies regarding any potential immunity?
A. No.
Q. Had there been any before your September 2022 deposition?
A. No, sir.
Q. You have been -- you have indicated already that you have counsel, Cozen O'Connor, in this case; correct?
A. Correct.
Q. When did you hire them?
A. I don't remember the specific date. I'm not sure.
Q. How did you choose Cozen O'Connor?
A. They were referred to me by

Mylan.
Q. So who at Mylan referred you to Cozen O'Connor?
A. I don't remember.
Q. Your best recollection is that was years before the September 2022 deposition?
A. I don't remember.
Q. What's your best recollection regarding how much before the September 2022 deposition that Mylan selected Cozen O'Connor as your counsel for this case?
MR. SOMMER: Objection to the form.
A. I don't remember.
Q. Has -- is Cozen O'Connor the only lawyers that have been representing you in connection with allegations regarding generic drug pricing?
A. I believe Mylan has also represented me working with Cozen.
Q. And in what way?

MR. RYAN: I'm going to instruct you not to disclose any communications with counsel in your answer. Could you reask the question, please?

BY MR. SOBOL:

Q. When you say, "I believe Mylan has represented me working with Cozen", what did you mean?

A. I mean Mylan referred Cozen. That's what I meant.

Q. Now, do you have any agreements with Mylan regarding cooperation in its legal defense?

A. No.

Q. Do you have any agreements with Mylan regarding payment of your attorneys fees?

A. Yes.

Q. What's your understanding as to what that arrangement is?

A. They will pay for my attorney fees.

Q. And under what circumstances, if
any, might you need to repay them?
A. Don't remember.
MR. SOBOL: Let's have marked as
DR, the next Exhibit Number. 12622.
(Nesta Exhibit Number 12622
was marked for identification.)
BY MR. SOBOL:
Q. I've had the exhibit placed
before the witness. This is a photocopy of
an Affirmation and Undertaking to Repay
Expenses Advanced, dated May 22, 2019,
signed by you; correct?
A. Give me a second, please.
Q. Yep.
THE WITNESS: Okay.
BY MR. SOBOL:
Q. So is this an agreement
between -- well, is this an Affirmation and
Undertaking to Repay Expenses Advanced
signed by you on or about May 22, 2019?
A. This is a document that my

lawyers explained to me that I signed.
Q. And what do you understand this document to be?
A. Again, it's a document my lawyers explained to me and I signed it based on their advice.
Q. And what do you understand it to be?
A. A document that I signed based on their advice.
Q. That's all you understand it to be?
A. That's correct.
Q. Did you read it before you signed it?
A. I did.
Q. And when you read it, what did you understand it to be?
A. Meaning that I have to represent my company in ways that, that are -- rephrase your question. I'm not sure of your question, what you are asking me.

Q. When you read it, what did you understand it to be?

MR. RYAN: Objection. Form. You can answer.

A. I understand it to be me signing off that if I, that they would pay for my lawyers expenses, and if it doesn't cooperate or do the right thing or lie in any way, that I would have to pay for legal fees.

Q. Okay. So there are circumstances then you understand where you might need to repay the legal fees that Mylan has paid to Cozen O'Connor; correct?

A. Correct.

Q. How much has Cozen O'Connor incurred to date in representing you?

A. I have no idea.

Q. Is it more or less than a million dollars?

A. I have no clue.

Q. Here in the document it says in

don't even know how much your attorneys fees have been, but there might be a circumstance under which that amount of money might need to be repaid to Mylan?

A. I don't remember.

Q. Well, showing you this document, do you remember now?

A. No. I have no idea what kind of money I would have to pay Mylan. No idea.

MR. SOBOL: Let's have DQ marked as Exhibit 12623.

(Nesta Exhibit Number 12623 was marked for identification.)

BY MR. SOBOL:

Q. I've had a document entitled Transition and Separation Agreement and Release, dated May 22 -- excuse me -- dated October 6, 2024, signed by you and by Mylan. Do you see this document?

A. Yes.

Q. What is it?

A. Transition -- it says it's a

any communications with client -- with your attorneys about this document.

A. I'll go with my attorney's advice.

Q. You have no understanding whatsoever about what this document means other than what your lawyers have told you?

MR. RYAN: Objection. Asked and answered.

A. I don't remember.

Q. Did you read it before you signed it?

A. Honestly I don't remember, no.

Q. When did you stop working at Mylan?

A. I haven't.

Q. You still work there?

A. Uh-huh.

Q. The recitals to this document on the first page says, the second recital says:

"Whereas, the company is

restructuring roles and responsibilities within employee's business unit, including eliminating employee's role, but wishes to retain employee's services through a 15-month transition period, culminating in the separation of the employee from the employment of the company effective December 31, 2025."

That's what this document says; correct?

A. That's what it says, yes.

Q. Was your role eliminated back in October of 2024?

A. Yes.

Q. Why?

A. They were down-sizing and the role was eliminating, and so I was -- the role was put aside to do other opportunities within the organization.

Q. And have you been working full-time at Mylan since the time you signed this document?

A. I have.
Q. And do you have any plans to leave Mylan?
A. At this point I do not.
Q. What about at the end of December of 2025?
A. At this time I do not.
Q. At this time you do not what?
A. Have any plans to leave Mylan.
Q. So you signed a separation agreement a year ago saying that you were going to be leaving the end of this year. Did anything change since this agreement was signed?
MR. RYAN: Objection. I instruct you not to answer to the extent it would disclose any communications with counsel.
A. I'll go with my attorney's advice.
Q. Have you spoken to anybody at Mylan, not your lawyers, but anybody at

the company effective as of December 31, 2025"; correct?

A. That's what the document says, yes, sir.

Q. And how much did the company agree to pay you during this transition period?

A. I don't remember.

Q. Look down on this page under Covenants, 1-A, Severance Payments, second line. Here it indicates that Mylan will pay you, Mr. Nesta, $347,066; correct?

A. That's what the document says, yes, sir.

Q. And that's what Mylan agreed to pay you?

A. That's what they agreed to pay me.

Q. $347,000 for a 15-month period; correct?

A. That's what it says in the document, yes, sir.

Q. Now, during the break were you able to think of any example of anything over the past 15 months that you did in response to requests by your boss for Mylan?

MR. SOMMER: Object to the form.

A. Again, I don't remember, no.

Q. What have you done in order to earn the $347,000 from Mylan over the past months since October of 2024?

MR. SOMMER: Objection to the form.

MR. RYAN: Objection.

A. Again, don't remember.

Q. Turn to page 8 of this document, please.

A. Sure.

Q. On page 8 of this document, which you signed -- you signed this document; correct?

MR. RYAN: Objection. Asked and answered.

A. Yes. I signed the document.

Q. And you are the employee in this agreement; correct?
A. That's correct.
Q. Paragraph 12 of the agreement is entitled Limits on Cooperation; Compliance. And the first sentence says:
Employee, that meaning you, Mr. Nesta, agrees that you will not knowingly encourage, counsel, or assist any lawyers in their client's -- or their clients in the preparation or prosecution of any disputes, differences, grievances, claims, charges or complaints by any third party, other than government agencies, as related directly to the ADEA waiver in this agreement or otherwise required by law against any of the releasees.
That's what this says; correct?
MR. SOMMER: Objection to the form.
MR. RYAN: Objection.
A. That's what the document says.

Q. And then it goes on on the next page where it says that you shall use your best efforts to cooperate with and respond to reasonable requests for information or follow-up assistance pertaining to work you performed on behalf of the company.
That's what it says in part; correct?
A. Yes, sir.
Q. And then it references various matters involving allegations regarding generic drug price-fixing, correct, including this litigation?
MR. SOMMER: Object to the form. But you can answer.
A. That's what the document says.
Q. Okay. So you have been working with Mylan in defense of litigation involving allegations of generic drug pricing this past year; correct?
MR. RYAN: Objection.
A. Can you rephrase the question?

Q. Sure. This past year, 2025, since the time that you signed this agreement, you have been working with Mylan in order to assist Mylan in defending allegations regarding generic drug pricing?

MR. RYAN: Same objection. You can answer.

A. Yes.

Q. And in exchange, you've been paid the sum of $347,000 for that period; correct?

MR. SOMMER: Objection to the form.

A. No.

Q. So how is that incorrect?

A. I don't understand your question, how it's incorrect.

Q. Well, I asked the question: In exchange for your doing that, assistance in connection with defense of drug pricing allegations, you have been paid -- you are being paid at the rate of $347,000; correct?

UNITED STATES OF AMERICA )
ss:
DISTRICT OF COLUMBIA )

I, ROBERT M. JAKUPCIAK, an RPR and Notary Public within and for the District of Columbia do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of these parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of December, 2025.



My Commission Expires:
February 28, 2029