# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CA NO. 16-MD-2724

---------------------------------
IN RE: GENERIC PHARMACEUTICALS
PRICING ANTITRUST LITIGATION MDL NO. 2724
THIS DOCUMENT RELATES TO:
ALL ACTIONS
---------------------------------

HIGHLY CONFIDENTIAL
DAY 1 OF 2
ZOOM VIDEO DEPOSITION
Taken on behalf of the Plaintiffs of
JAMES NESTA
Washington, D.C.
July 21, 2026
9:05 a.m.

Reported by: Audra M. Smith, RPR, CRR, FCRR
Video by: Orson Braithwaite

BY MR. NIELSEN:
Q You can answer the question, sir.
MR. SOMMER: Objection to the form.
A I'm not answering the question.
BY MR. NIELSEN:
Q I mentioned the upcoming trial in September that you're aware of, right?
A Yes.
Q Are you intending to -- are you planning to attend that trial in person?
A No.
Q Have you discussed your potential attendance at that trial with anyone from Mylan?
MR. SOMMER: Objection to the extent it calls for any attorney-client communications, but you can certainly answer the question "yes" or "no."
A No.
BY MR. NIELSEN:
Q Would you be willing to attend the trial in person if asked by the plaintiff in that case?
A Can you repeat the question?
Q Yeah. Would you be willing to attend that trial in person if you were asked by the

plaintiff in that case to attend and testify?
A If I was available.
Q Okay. Are you currently employed?
A I am employed, on severance, yes.
Q Okay. We'll come back to that.
So you've been deposed in this case now several times, correct?
A Yes.
Q And in the first deposition, which happened in 2022, you asserted the Fifth Amendment in response to all substantive questions, correct?
A Correct.
Q And in November of this past year, 2025, you testified only about the drug clomipramine, right?
A Correct.
Q Has anyone from the Department of Justice confirmed that you are not a target of any antitrust investigation?
A Yes.
Q Do you know when that happened?
A I don't know specific dates, but it was a press release.
Q There's a press release that Jim Nesta is no longer the target of any antitrust

question to address the objection.
Understood?
A Yes.
Q If you need a break at any time, just let me know. If there's a question pending, I'll ask you to answer that question, but otherwise we can take breaks any time you need to, okay?
A Thank you.
Q All right. How did you prepare for this deposition?
MR. SOMMER: Objection to the extent that calls for any discussions with counsel. I'm going to advise you that that is protected by the attorney-client privilege, and you should not disclose that. Otherwise, you can answer the question.
BY MR. NIELSEN:
Q I'll restate the question. Generally, without divulging any specific communications that you had with counsel seeking legal advice, how did you prepare for this deposition?
A Prepared for this deposition by getting together with my counsel and go over certain things to prepare, correct.
Q How many times did you get together

with counsel?
A I can't remember. A number of times.
Q More than 10?
A Maybe more than 10, yes.
Q Do you have a general sense of how long each of those meetings with counsel lasted?
A I do not.
Q Were they more than an hour each?
A Yeah. More than an hour.
Q More than two hours?
A I can't put a specific number on it.
Q Would you say you met with counsel to prepare for this deposition for more than 20 hours total you think?
A I'm not sure of the number. To be honest, I have no idea the amount of hours.
Q Who was present for these meetings?
MR. SOMMER: Objection to the form.
You can answer.
A My counsel and Mylan's counsel.
BY MR. NIELSEN:
Q Can you just identify your counsel for the record?
A Sure. Barry and Rebecca, right here, and then Peter and Mike. Peter, sorry.

Q Can you identify Mylan's counsel?
A Michael.
Q Were there any other lawyers representing Mylan present during any of your prep sessions?
A I just generally worked with Michael.
Q During any of your prep sessions, did any attorneys from the Markus/Moss law firm attend?
A I have no idea. Not sure.
Q So it's possible?
A Again, I don't know. I'm not sure.
Q Were there a lot of people attending each of these prep sessions?
MR. SOMMER: Objection to the form.
A What do you describe as a lot of people?
BY MR. NIELSEN:
Q Were there more than five?
A I don't know. I mean, numbers could vary. I'm not sure. Different meetings. Different number of people.
Q For some of them, were there more than five?
A Some, yeah.

individuals that you have kept in touch with in the generic pharmaceutical industry?
A Yes. John Kerr, my old boss at Mylan. Who else? And then Mark Dudick was another one who I keep in touch with, looking for a job as of recent.
Q Other than looking for employment, have you kept in touch with Mark Dudick?
A Yeah. Mark's a good friend of mine, yes.
Q Okay. How about Tim Gustafson? Other than looking for employment, have you kept in touch with Tim Gustafson?
A No.
Q And how about Ms. Strzeminski?
A Employment.
Q You haven't kept in touch with Ms. Strzeminski other than to reach out and look for employment?
A Correct.
Q Okay. Who's paying for your legal representation in this case?
A Mylan.
Q Do you have any agreement or understanding with Mylan that the company will pay

for a judgment, including damages or civil penalties, if one is awarded against you personally?

A I don't understand the question. Can you explain it, please?

Q Sure. You understand that certain plaintiffs in the generics price fixing MDL have named you personally as a defendant in certain cases, right?

A Yes.

Q And in those cases if you are found liable, you will be responsible for paying damages or potentially civil penalties. Do you understand that?

A Yes.

Q Okay. Do you have any agreement or understanding with Mylan that the company will pay a judgment against you if one is awarded?

A I don't know if I have an agreement, but that's my understanding.

Q So your understanding is that Mylan would pay a judgment against you if it is awarded?

A That's my understanding, yes.

Q All right. I want to pull up Tab 1 in the binder. And for the record, Tab 1 --

Q Do you have an understanding how long that severance will last?
A Yes. Until the end of this year.
Q So you'll still be receiving compensation from Mylan until December 31, 2026?
A Yes.
Q How much in severance are you currently receiving from Mylan?
MR. RYAN: Objection to form.
A I'm receiving what my base pay was prior to separation.
BY MR. NIELSEN:
Q Do you have any sense of how much that is?
A I do not.
Q Aside from the severance, are you receiving any other compensation from Mylan currently?
A No.
Q Did Mylan pay you a bonus in 2026 for -- for the year 2025?
A Do you mean this year, of 2026?
Q Correct.
A No.
Q How about in the prior year? Did you

receive a bonus in 2025?
A Yes.
Q Okay. And that would have been for your 2024 employment?
A That's correct.
Q Do you recall how much that bonus was?
A I don't remember exactly how much.
Q Do you recall how much you earned in the calendar year 2025?
A I do not.
Q Do you have a ballpark figure?
A 300-some-thousand maybe.
Q Okay. What kind of cars do you currently drive?
MR. RYAN: Objection to form.
A I had a company car, it was a Nissan Armada, up until severance.
BY MR. NIELSEN:
Q So you no longer drive a Nissan Armada?
A Nope.
Q And when did you stop driving that vehicle?
A Upon my severance.
Q When did your severance start?
A January.

A I don't understand your question.
BY MR. NIELSEN:
Q Do you understand what an obligation is?
A I do.
Q Do you understand what cooperation is?
A Yes.
Q Okay. Are you still under an obligation to cooperate with Mylan?
MR. SOMMER: Objection to the form.
A No. I don't think I am.
BY MR. NIELSEN:
Q You're here voluntarily?
A Yes, sir.
Q So you made your own decision to be here to testify today?
A I did.
Q What's the reason that you decided independently to come here and testify?
MR. SOMMER: Objection to the form.
A I have nothing to hide.
BY MR. NIELSEN:
Q If you look at page 9 of tab 1 -- actually, paragraph 12 starts on page 8 and goes over onto page 9. Tell me when you're there.

A Tab 9, you said, Joe?
Q Tab 1. It's the document we've been looking at, tab 1, page 9. It's page 8 going over onto page 9.
A Okay.
Okay.
Q Okay. I want to point you to the sentence at the top of page 9. It says "employee" -- and that's you, right? You're the employee in this agreement?
A Yes.
Q "Employee shall use employee's best efforts to cooperate with and respond to reasonable requests for information or follow-up assistance pertaining to work employee performed on behalf of the company and/or any parent subsidiary or affiliation within the Viatris network, or other matters in which employee was involved or of which employee was otherwise aware relating to such employment.
"Employee's obligations hereunder shall include without limitation employee's response to requests of the Viatris, Inc. general counsel or deputy general counsel or their designees regarding any business development or legal

matters of any kind currently pending or which may arise after the separation date, including without limitation, In Re: Generic Pharmaceuticals Pricing Antitrust Litigation (MDL2724) pending in the U.S. District Court for the Eastern District of Pennsylvania."

Do you see that?

A I know you read it, but I wasn't sure which paragraph you said. It was number 12, right?

Q Yeah. It starts at the top of page 9, beginning with "Employee." Top of page 9.

A Right here.

Q The top. Yeah.

A Okay. That's the one you just read, right?

Q Yes.

Do you understand that?

A Yes.

Q You're under an obligation, a contractual obligation to cooperate with Mylan in this litigation, correct?

MR. SOMMER: Objection to the form.

MR. RYAN: Objection to form.

A If it says -- this is what the document

says, as far as being under an obligation, but at this point, you know, I think -- I'm not under an obligation. I'm here on my own recognizance.

BY MR. NIELSEN:

Q All right. Let's pull up tab 2 in the binder, okay?

For the record, tab 2 is the transcript from Mr. Nesta's deposition on November 19, 2025.

We're going to mark that as Exhibit 13492.

(Exhibit Number 13492 was identified as of this date.)

BY MR. NIELSEN:

Q So, Mr. Nesta, this is the transcript in your last deposition in the case where you gave testimony about the drug clomipramine.

Do you understand that?

A Can I have a second to review it and take a look at it? So all this is my deposition, all these pages, correct?

Q Correct.

A How many pages are there?

Q How many pages total in this document? 253 pages.

A Okay.

December 2012 to present, correct?
A Yes.
Q And the description there says: Led North American sales and commercial strategy for Mylan Pharmaceuticals, overseeing market positioning across therapeutic categories and managing integrated sales, marketing, and business development functions. Built and strengthened C-level relationships with major healthcare customers and partners, developed high-performing sales teams, and helped transform market opportunities into 1 billion-plus growth initiatives.
Do you see that?
A I see it.
Q Okay. Is that an accurate description of your role and responsibilities at Mylan starting in at least December of 2012?
A Yes.
Q During the time when you were employed by Mylan, did you work anywhere else?
A No, not that I recall.
Q Are you currently employed anywhere?
A No.
Q What is Trifluent Pharma?

working at Mylan?
A No.
Q Did you ever share Mylan's proprietary information with a competitor?
A No.
Q Did you ever engage in price fixing with a competitor?
A Never engaged in price fixing or made any agreements in terms of prices or agreements, never.
Q Did you ever talk to a competitor about a price increase?
A Ever -- I don't understand your question.
Q What don't you understand about it?
MR. SOMMER: Objection to the form.
A I don't understand your question.
BY MR. NIELSEN:
Q Did you ever -- while you were employed by Mylan, did you ever speak to a competitor about a price increase?
A No.
Q While you were at Mylan, did you ever speak to a competitor about a generic drug product that you competed with that competitor on?

A I don't remember, but I know I didn't speak to anything -- a competitor about an agreement in terms of price increases or terms of sharing our markets.

Q That wasn't my question.

Did you ever speak to a competitor about a generic drug product that you competed with that competitor on?

MR. RYAN: Objection.

MR. SOMMER: Objection to form.

MR. RYAN: Asked and answered.

MR. NIELSEN: No, it wasn't.

A I don't remember. Again, what I know I didn't do is speak to any competitor about price fixing or agreements in terms of sharing the markets.

Q Did you ever speak to a competitor about a price increase?

A Again, I don't remember. What I do know is I did not speak to a competitor about price fixing or agreements of increasing prices or sharing of markets.

Q So you think you might have spoken to competitors about price increases, just not price fixing. Is that your testimony?

Q Okay?
A Sure.
Q During these calls on November 29th, you talked about Mylan's price increases on estradiol and nadolol, right?
MR. RYAN: Objection to form.
A I'm going to answer the question again. I don't remember what I talked about, but I know for a fact I didn't talk about price increases, allocation of markets, or any anticompetitive information.
BY MR. NIELSEN:
Q Okay. So it's just a coincidence that you happened to be calling him the day after that pricing committee meeting then? Is that your testimony?
MR. RYAN: Objection to form.
(Overlapping speakers.)
MR. SOMMER: Objection to the form. Asked and answered.
A My testimony is I don't remember the call. That was a long time ago. My testimony is I did not talk to Kevin Green about price increases, allocation of markets, or any agreements. That's my testimony.

she was in the industry. We were all in the industry together. Again, she was going through a divorce. I was going through a divorce. We talked, flirted. That's what we did. That was our relationship.

Q Did you ever have any kind of intimate relationship with Ms. Strzeminski?

A No.

MR. RYAN: Objection to form.

A No.

BY MR. NIELSEN:

Q No.

Did you ever get together with Ms. Strzeminski outside of any kind of work context?

A No.

Q In 2013 Ms. Strzeminski worked at Greenstone, correct?

A I don't remember the dates she worked there.

Q Okay. And you talked to Robin Strzeminski about business matters during this time period, right?

MR. RYAN: Objection to form.

A I have no idea what me and her talked

about at that time. It was a long time.
BY MR. NIELSEN:
Q Okay.
A 2013 is a long time.
Q Well, you were talking about the other competitor in this market right around this time period, weren't you?
A No.
MR. RYAN: Objection to the form.
A No. I would never talk about --
MR. RYAN: Let me object before you answer.
A No. I would never talk about a competitor about anything in terms of price increases, in terms of market allocation, or agreements.
BY MR. NIELSEN:
Q That wasn't my question. You were talking to Ms. Strzeminski about the other competitor in this market around this time period, weren't you?
MR. RYAN: Objection to the form.
A I don't remember, but I do know I didn't talk to her about market allocation, agreements, or price fixing.

minutes, right?
A That's what it says, yes, sir.
Q Were you speaking to them about the same topic?
A I don't remember.
Q Do you have any reason to doubt you had these calls with Ms. Strzeminski at Greenstone and Mr. Greene at Mutual on February 5 and 6, 2013?
A I'm not doubting it. I just don't remember the calls.
Q Is it just a coincidence that the day after you approved the price increase on the spironolactone product you called both of Mylan's competitors?
MR. SOMMER: Object to the form.
A Can you repeat your question?
BY MR. NIELSEN:
Q Is it just a coincidence that the day after you approved a price increase on spironolactone you called both of Mylan's competitors?
MR. SOMMER: Objection to the form.
A I don't remember why I called.
BY MR. NIELSEN:
Q That was -- that was the same thing we

who I mentioned earlier is a good friend of mine. Started in Little League together in Charlotte. He was also in the industry. He called me and said that he would give my phone number to Della to talk about possible job opportunities.

Q And Della Lubke testified that every call she had with you was about business, not a social call. Do you deny that?

MR. RYAN: Objection to the form.

A I think Della Lubke is mistaken.

BY MR. NIELSEN:

Q In what way was she mistaken?

A I talked to Della Lubke about job opportunities of my own. That's what we talked about.

Q That's the only thing you ever talked about?

A That's the only thing we talked about with Della Lubke, jobs, that's about it.

Q Okay. But you called her on the same day that you approved this massive price increase by Mylan and clomipramine, didn't you?

MR. RYAN: Objection to the form.

MR. SOMMER: Objection to the form.

A I don't remember the day when I called

her or when we had the increase. I'm not following you.

BY MR. NIELSEN:

Q Go to tab 25. For the record, tab 25 is a one-page document, which was previously marked as Exhibit 3521, and it lists phone calls between various individuals. I want to focus on the calls on May 13. It's the same day you sent that email saying I approve the price increase for clomipramine, right?

MR. RYAN: Objection to the form.

A I don't remember. What's your question? Start over. Sorry.

BY MR. NIELSEN:

Q So May 13 you sent an email saying "I approve," right?

A Yes.

Q And you were approving the price increase on clomipramine, right?

A Yes.

Q Okay. And that same day you called Della Lubke at Sandoz, correct?

A I don't remember if I called but according to your document, yes.

Q And Sandoz sold clomipramine, right?

A I don't remember if they did or not. It was theirs --
Q We looked at the IMS and Sandoz was listed as a seller of clomipramine, you don't remember that?
MR. SOMMER: I'm sorry. Objection. Are you asking whether he looked -- remembers looking at the document a few minutes ago --
MR. NIELSEN: Two minutes ago.
MR. SOMMER: -- or the event from 13 years ago?
MR. NIELSEN: I'm asking if he remembers looking at the document from two minutes ago.
A I remember.
BY MR. NIELSEN:
Q Okay. And it listed Sandoz as a supplier of clomipramine, right?
A It also mentioned other people. Was there another competitor in there, too?
Q Yes. Taro was a competitor, right?
A Was there any more?
Q Mallinckrodt was listed on the list as well.
A So now I remember. Thanks for

refreshing my memory.
Q Okay. And you called Sandoz the day you approved the price increase, right?
A I don't remember.
Q Do you have any reason to doubt at 8:40 a.m., on May 13, 2013, you called Della Lubke, and the duration of that call was 4 minutes and 7 seconds?
A I have no reason to doubt but I know I didn't call -- I mean, no reason to doubt what you're saying, but these aren't my phone records and I don't remember the phone conversations.
Q Well, you called her to tell her about the price increase, right?
MR. RYAN: Objection to the form.
A Absolutely not.
BY MR. NIELSEN:
Q This was the pattern that you engaged in while you were at Mylan, isn't it?
MR. RYAN: Objection to the form.
MR. SOMMER: Objection to the form.
A There was no pattern again. Again, didn't talk to competitors around agreements, price fixing, or raising prices. I didn't have the authority to do any of that.

BY MR. NIELSEN:
Q I'm going to move to strike the answer everything after I don't recall as nonresponsive.
We can do this all day, Mr. Nesta.
A Sure.
Q Do you have any explanation --
MR. SOMMER: Hold on a second. Oppose.
Go ahead.
BY MR. NIELSEN:
Q Do you have any explanation for why you called Della Lubke on May 13, 2013?
A It's a long time ago. I don't remember.
Q Back in 2022, do you remember me taking your deposition?
A No.
Q Well, I did.
A Oh, you taking -- yeah, you did. I remember, yeah.
Q And when I asked you questions about this phone call you asserted the Fifth Amendment, right?
A I think I did on -- yeah, that was the day of the Fifth Amendment, yes, sir.
Q And then in 2025 you were asked about

this call again, and you testified "I don't remember again what I talked about on that day, but I know I didn't talk about clomipramine."
Do you remember that?
A I don't.
Q Well, sitting here today, can you think of any possible reason for calling Della Lubke on the day you approved a price increase on clomipramine, other than you wanted to talk to her about the price increase?
MR. RYAN: Objection to the form.
MR. SOMMER: Objection to the form.
MR. RYAN: Asked and answered.
A Again, don't remember the conversation but I can tell you for a fact didn't talk to Della Lubke or any competitor in terms of price increases, allocation of market, or agreements.
BY MR. NIELSEN:
Q So the answer is, no, you cannot think of a single possible reason why you would have called her that day?
MR. RYAN: Objection to the form.
MR. SOMMER: Objection to the form.
A I don't remember the conversation.
BY MR. NIELSEN:

Q Did you ever get together with Tim Gustafson outside of a work context?
A Can't remember.
Q Okay. So you were business friends, right?
A Yes.
Q Okay. And Tim Gustafson testified under oath in his deposition in this case that he colluded with you while at a trade show. Did you know that?
MR. RYAN: Objection to the form.
MR. SOMMER: Objection.
A I don't know what Tim said, but I know that we never colluded, nor did we set -- price fix or allocate or market share or have any agreements.
BY MR. NIELSEN:
Q Tim Gustafson testified that he passed you a napkin with a list of customer names on it that you were going to concede to his company. Do you recall that happening while at a trade show?
MR. RYAN: Objection to the form.
A No.
BY MR. NIELSEN:
Q Do you have any reason to dispute

MR. SOMMER: Objection to the form.
MR. RYAN: Asked and answered.
A Don't remember.
BY MR. NIELSEN:
Q Is that just a coincidence, you think, that that's what the phone records represent?
MR. RYAN: Objection to form.
MR. SOMMER: Objection.
A I don't know what the coincidence is, but I know I didn't speak to her about market allocation, price fixing, or antitrust, anything to do with it. Or, I'm sorry, or allocating to customers.
BY MR. NIELSEN:
Q Pull up tab 52, please.
For the record, tab 52 is a three-page document that was previously marked as Exhibit 3487. I'll start with the email at the top.
(Previously marked Exhibit Number 03487 was identified.)
A Can you give me a second here, Joe?
Q Uh-huh.
A Thank you.
Tab 52, right? Yeah.

Robert O'Neill at Mylan on September 6?

MR. RYAN: Objection to the form.

A No.

BY MR. NIELSEN:

Q So you called Della Lubke at 1:02 p.m. Eastern time, and then you connected with her seven times over September 6 and September 7, 2012. Is that just a coincidence?

MR. RYAN: Objection to form.

A I don't remember if it's coincidence, but I do know I wasn't talking to Della Lubke about market allocation, price fixing, or any type of agreement.

BY MR. NIELSEN:

Q You were talking to her about valsartan/HCTZ, right?

MR. RYAN: Objection to form.

A I don't remember what I was talking to Della about, but I know I wasn't talking to her about fixing the pricings, market allocation, or any type of agreement. That's what I do know.

BY MR. NIELSEN:

Q Do you know whether you were talking to her about valsartan/HCTZ or not?

MR. SOMMER: Objection. Asked and

answered.

MR. NIELSEN: No, it has not.

A I don't remember what I was talking to Della about, but I know that I was not talking to her about market allocation, agreements, or price fixing.

BY MR. NIELSEN:

Q Were you talking to her about specific customers for valsartan?

MR. RYAN: Objection to form.

A No. I know for a fact I was not talking to her about anything to do with customers, market allocation, agreements, or price fixing.

BY MR. NIELSEN:

Q You were talking to her about whether Mylan would approach Walgreens for valsartan, weren't you?

MR. RYAN: Objection.

MR. SOMMER: Objection.

A I don't remember what I was talking to Della Lubke about, but I know I wasn't talking to her about market allocation, fixing prices, or any type of agreement with Della.

BY MR. NIELSEN:

Q And the anticipated launch date was supposed to be September 12 according to this document, right?
A According to the document, yes.
Q Okay. Going back to tab 52, this is the email string between you and Robert O'Neill where you say: I suggest you call me to talk.
Right?
Was Robert O'Neill aware that you were coordinating with Sandoz about which customers to target for the valsartan/HCTZ launch?
MR. RYAN: Objection to form.
MR. SOMMER: Objection to the form.
A I don't know what Robert O'Neill was, but we'd never be coordinating with any competitors in terms of agreements or in terms of price fixing or market allocation.
BY MR. NIELSEN:
Q Were other senior executives at Mylan aware you were colluding with competitors?
MR. RYAN: Objection to form.
MR. SOMMER: Objection to the form.
A I don't know exactly what they were aware of, but I know that I didn't collude with competitors or have any agreements or fixed prices

or any of your allegations.

BY MR. NIELSEN:

Q Are you lying now like you lied in your prior deposition about whether you had your phone or not?

MR. SOMMER: Objection to the form.

MR. RYAN: Objection to form. Please stop harassing the witness and just ask discovery questions.

A No.

MR. NIELSEN: If Mr. Nesta will commit to attend the September trial in person, I can conduct this like a discovery deposition. But for now he hasn't committed to that, so I'm going to take it as if we might need to use it at trial.

MR. SOMMER: Every deposition is taken as if you might need it at trial. That's a silly statement. Let's keep going.

BY MR. NIELSEN:

Q You had another flurry of phone calls with Della Lubke from September 12 through September 14, 2012, which was when Mylan was expecting it was going to launch valsartan/HCTZ, right?

MR. SOMMER: Oppose.
BY MR. NIELSEN:
Q So how else could you possibly be so confident that Harvard would have no choice and would have to go with Mylan --
A Well --
Q Other than speaking to Sandoz about it?
MR. RYAN: Objection to form.
MR. SOMMER: Objection to the form.
A I don't remember how I could be so confident. But I know for a fact that I wasn't speaking to Della about market allocation with customers, price fixing, or any type of agreement with Della, who to go to and who not to.
BY MR. NIELSEN:
Q Well, your email says: Harvard will have no choice. They will have to go with us.
A True.
Q Why did you think that?
MR. RYAN: Objection to form. Asked and answered.
A I will answer it again. I don't remember. But I'll tell you, I wasn't speaking to Della about market allocation to customers, price increases, or any conspiracy or overarching

recall that?
A Yes.
Q Why did you think it was a good idea to vote to approve a price increase on bromocriptine mesylate in May of 2013?
MR. RYAN: Objection to the form.
A I don't remember.
BY MR. NIELSEN:
Q On May 23, 2013, Mylan was about to reenter the market, right?
A I don't remember a specific date when we were entering the market or when we did. I don't remember.
Q You've looked at some emails showing Mylan was planning to reenter the market as of May 1, right?
A I saw --
MR. RYAN: Objection to form.
A Sorry.
I saw emails, but I don't remember.
BY MR. NIELSEN:
Q Okay. And if Mylan was going to reenter the market, wouldn't raising prices to match Sandoz make it harder to obtain customers?
MR. RYAN: Objection to the form.

A Again, I don't know what would make things right, but I know that I never spoke to anyone in terms of price increases, allocation of market, reentry of products, none of that.
MR. NIELSEN: Move to strike everything after "I don't recall."
MR. SOMMER: Oppose.
BY MR. NIELSEN:
Q You know what AnalySource is, right?
A I'm sorry?
Q Have you heard of AnalySource?
A I have not.
Q Do you know what IQVIA is?
A Heard of it, but I'm not sure exactly what it is.
Q IMS?
A Yes.
Q Okay. If those databases of pricing. You understand those are pricing databases, right?
A No. IMS -- I don't think it's pricing, is it?
Q Compendia?
A Compendia, yes. Gotcha now.
Q Okay. Do you understand what pricing compendia are in the generic industry?

Q So just to recap. We just saw that you were talking to Della Lubke right around the time when Mylan temporarily discontinued its sales for bromocriptine in March 2013, right?

MR. RYAN: Objection to form.

A What's your question? I'm sorry.

BY MR. NIELSEN:

Q You were talking to Della Lubke right around the time that Mylan temporarily discontinued its sales for bromocriptine in March of 2013, right?

MR. RYAN: Objection to form.

A I don't remember.

BY MR. NIELSEN:

Q You had -- we looked at calls that you had with her on March 4 and March 11, 2013, just about five minutes ago, right?

MR. RYAN: Objection to form.

A Don't remember the calls.

BY MR. NIELSEN:

Q And then you were talking to Della Lubke in May of 2013 when Mylan was planning to relaunch at higher prices, right?

MR. RYAN: Objection to form.

A I don't remember the calls with Della

Lubke.

BY MR. NIELSEN:

Q But we just looked at exhibits that showed that you talked to her on May 8, right?

MR. RYAN: Objection to form.

A Don't remember the calls with Della Lubke, but I do know we weren't speaking anything in terms of price fixing, allocation of market, or any type of agreement.

BY MR. NIELSEN:

Q Well, you also weren't talking to her about getting a job, right?

MR. RYAN: Objection. Asked and answered.

A Again, I remember I was talking to her, but I know I wasn't talking to her about price fixing, raising the prices, or allocation of any market.

BY MR. NIELSEN:

Q This is eight months after you first started talking to Ms. Lubke according to the phone records, right?

A Correct.

Q And you never offered Della Lubke a job?

MR. RYAN: Objection to form and asked and answered.
A Again, I don't remember I talked to Della Lubke, but I do know I didn't talk to her about market allocation, price fixing, or any type of agreement.
BY MR. NIELSEN:
Q Well, you did speak to Della Lubke on May 23, 2013, which is the day you voted to approve the price increase on bromocriptine mesylate, right?
MR. RYAN: Objection. Form.
MR. SOMMER: Objection. Asked and answered.
A Again, I don't remember the context of the call with Della Lubke, but I know I didn't speak to her anything about in terms of price fixing, raising of prices, allocation of markets, or any type of agreement.
BY MR. NIELSEN:
Q Well, you also spoke to her multiple times on May 31, 2013, which is the day that Mylan reentered the market and the day that Mylan's new pricing for bromocriptine mesylate became effective, right?

MR. RYAN: Objection to form.
MR. SOMMER: Objection. Just ask --
A Again, same answer as before, but I'll repeat it. Don't remember a conversation with Della Lubke. Didn't speak to her about price fixing, market allocation, or any type of agreement.
BY MR. NIELSEN:
Q Did you speak to her about bromocriptine mesylate at all?
MR. SOMMER: Objection. Asked and answered.
BY MR. NIELSEN:
Q I'm not asking generally about price fixing. I'm not asking generally about agreements. I'm asking about this specific product. Did you speak to Della Lubke about bromocriptine mesylate in May of 2013?
MR. RYAN: Objection to form.
MR. SOMMER: Asked and answered.
A Again, don't remember what I spoke to Della Lubke about. These calls were a long time. But I know I didn't speak to Della Lubke about price fixing, allocation of markets, or any type of agreement.

that list as of July 16, 2013?
MR. RYAN: Same objection.
BY MR. NIELSEN:
Q Right?
MR. SOMMER: I'm going to object. I don't think that's accurate.
But you can answer if you understand the question.
MR. NIELSEN: It's 100 percent accurate.
A Sure, I don't remember.
BY MR. NIELSEN:
Q We're going to go through them all.
A Sure.
Q How would Della Lubke know that Mylan, for example, was going to take a price increase on haloperidol?
A Maybe we sent our price information out to customers. Maybe she got it from a customer like she said that in the email.
Q We already looked at --
A Did she say that, Joe? Did she say that there? No?
Q On August 6, 2013, you approved the price increase on haloperidol, right? Do you

remember that?
A I don't remember that.
Q And it included trifluoperazine as well, right?
A I don't remember.
Q And levothyroxine, right?
A This is her email, once again. How she got information, no idea. Most likely it was probably from a customer. We probably sent out a price increase notice. I don't know if we did or not. But I know for a fact I didn't give her anything in terms of price increases, you know, market allocation, any type of agreement, so on and so forth.
Q Well, you said we probably sent out a price increase, but I don't know. Which one is it?
A I don't know.
Q You don't know.
A I have no idea.
Q Okay. You would not have given Ms. Lubke information about all these price increases if you thought she would turn around and use that information against you, right?
MR. SOMMER: Objection to the form.

MR. RYAN: Objection to form.
A Again, I don't know what Ms. Lubke would do. But I know I didn't give her anything in terms of price information, anything in terms of market allocation, sharing of customers, or fixing the markets. I have no idea where Ms. Della Lubke got her information that you're referring to, but it wasn't from me.
BY MR. NIELSEN:
Q She says it was from you.
A Okay.
Q How are you going to dispute that?
MR. RYAN: Objection to form.
MR. SOMMER: Objection to the form.
A I'm going to dispute it because I know I didn't.
BY MR. NIELSEN:
Q Why did you call Ms. Lubke on August 6 when you were approving the price increase on haloperidol and levothyroxine?
MR. RYAN: Objection to the form. Asked and answered.
A I don't remember why I called her on August 6.
MR. NIELSEN: So I want to -- how much

(Previously marked Exhibit Number 03498 was identified.)

BY MR. NIELSEN:

Q So, Mr. Nesta, at 2:32 p.m. on July 18, Ms. Lubke calls you, and the duration of that call is 31 seconds. Do you see that?

A I do.

Q And then at 2:41 you call Ms. Lubke back, and the duration of that call is 1 minute and 21 seconds. Do you see that?

A Yes.

Q Do you have any reason to doubt you had these calls with Della Lubke on July 18th?

A I have no reason to doubt. I don't remember the calls.

Q And so just so the jury is clear --

A Uh-huh.

Q -- you don't remember what you discussed with Ms. Lubke on July 18, right?

A That's correct.

Q And you weren't giving her a job offer when you talked to her on July 18, right?

MR. RYAN: Objection to form.

MR. SOMMER: Objection to the form.

MR. RYAN: Asked and answered.

A Again, I don't remember what we talked about at all on July 18, but I know I didn't talk about price fixing, raising of markets, allocation of customers, or documents.

BY MR. NIELSEN:

Q Prior to these phone calls with Ms. Lubke on July 18, 2013, had Mylan been planning to raise prices on benazepril/HCTZ?

A I don't remember.

Q Pull up tab 70, please.

And for the record, tab 70 is a one-page document with a Bates number MYLGP0006173298. We're going to mark that as Exhibit 13516.

(Exhibit Number 13516 was identified as of this date.)

BY MR. NIELSEN:

Q Mr. Nesta, you were not copied on this email. But if Mylan had started planning to take a price increase on benazepril/HCTZ on July 29, you would have known about that, right?

A It's not my email. So wasn't copied on it, so I don't remember.

Q This is an email from Allene Walker on July 29, right?

A Don't remember.
Q We discussed this earlier today, but Mylan did raise its pricing for benazepril/HCTZ just about ten days after this. Do you remember that?
A I don't.
Q We went through the August 6, 2013, pricing committee meeting where you approved -- voted to approve the price increases on products, right?
A I don't remember.
Q And benazepril/HCTZ was one of them. Do you remember that?
A We went through a lot of products. No, I don't.
Q It was the second drug in the PowerPoint presentation, right?
A Sure.
Q And you called Della Lubke second of all the competitors you were calling that day, right?
MR. RYAN: Objection to the form. Argumentative.
A Again, didn't call Della Lubke. Don't remember the conversation. But I know this.

Didn't call Della in terms of anything in terms of price fixing, market allocation, or agreements.

BY MR. NIELSEN:

Q Well, you called her two different phone numbers that morning. We looked at that. Do you remember that?

A I don't remember.

Q You were trying to get a hold of her, right?

A Again, I don't remember.

Q And if we could go back to tab 38 again, which is the August 6, 2013, pricing committee meeting minutes in the presentation.

A Uh-huh.

Q And then look at page 13 of the presentation, which relates to benazepril/HCTZ.

A Oh, presentation.

Q Yep.

A Okay.

Q The presentation shows the price changes that Mylan implemented to certain customers, right?

A This isn't my email. It's a presentation. I don't understand your question.

Q Well, you voted to approve these price

times between 2012 and 2014. Your testimony is, you never spoke about the concept of being a rational competitor?

MR. RYAN: Objection to form.

MR. SOMMER: Objection to the form. You want him to accept your representation that he actually spoke to him hundreds of times?

BY MR. NIELSEN:

Q In preparation for this deposition, have you gone back to look at your communications with any competitors in the industry?

A No.

Q Do you have a sense of how many times you spoke to Kevin Green from 2012 to 2014?

A You told me 700 something, right?

Q Several hundred.

A Several hundred out of how many years?

Q Two years.

A Two years, okay.

Q Yeah.

A And?

Q And you don't remember ever talking to him about the concept of being a rational competitor?

A No.

MR. SOMMER: I'm sorry, I'm going to make my same objection. Are you representing to the witness that there were several hundred conversations between him and Mr. Green?

MR. NIELSEN: Yes. Absolutely, yes.

MR. SOMMER: I want to know if that's your representation.

Go ahead.

A Yes. There were several hundred conversations. I'm not denying that.

BY MR. NIELSEN:

Q And you talked about the concept of being a rational competitor, right?

MR. RYAN: Objection to the form.

A I don't know what we talked about in terms of conversations two years ago or for two years. But I know, once again, didn't talk to Kevin about fixing markets, market allocation, or customer allocation.

BY MR. NIELSEN:

Q Yet you called him every time you were approving a price increase on a Teva product, right?

DISTRICT OF COLUMBIA)

REPORTER'S CERTIFICATE

I, Audra Marie Smith, Notary Public for the District of Columbia, Registered Professional Reporter in and for the above county and state, do hereby certify that the deposition was taken before me at the time and place hereinbefore set forth; that the witness sworn to tell the truth, the whole truth, and nothing but the truth under penalty of perjury; that the proceedings were transcribed and recorded by me by means of stenotype; which is reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the events of this case.

IN WITNESS WHEREOF, I have hereto set my hand this 27th day of July, 2026.

AUDRA MARIE SMITH



Audra Marie Smith, RPR, CRR, FCRR

NOTARY PUBLIC REGISTRATION NO:

MY COMMISSION EXPIRES: 7/30/31