IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br>**16-MD-2724**<br><br>**HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:**<br><br>***Humana Inc. v. Actavis Elizabeth, LLC, et al.*** | **No. 18-cv-3299** |

**CORRECTED MEMORANDUM OPINION**

**Rufe, J.** **August 27, 2026**

In this multidistrict litigation concerning alleged price-fixing of generic drugs, the Court selected Plaintiff Humana Inc.'s 2018 action ("*Humana I*") as the first bellwether case to involve a Direct-Action Plaintiff ("DAP"). This *Humana I* Opinion resolves the joint motion for summary judgment on the overarching conspiracy claim and the individually-filed summary judgment motions by the remaining defendants, including Lannett and Mylan.

The Defendants collectively move for summary judgment on the overarching conspiracy claim; each Defendant moves for summary judgment on the overarching conspiracy claim against it; Lannett moves for summary judgment on digoxin, baclofen, and levothyroxine; and Mylan moves for summary judgment on benazepril, clomipramine, divalproex, and levothyroxine.[1]

[1] As pled in its Second Amended Complaint, Humana alleged individual conspiracies as to 21 drugs: acetazolamide, amitriptyline, baclofen, benazepril, clobetasol, clomipramine, desonide, digoxin, divalproex, doxycycline, econazole, fluocinonide, leflunomide, levothyroxine, lidocaine, nystatin, pravastatin, propranolol, theophylline, ursodiol, and verapamil. 18-cv-3299, Doc. No. 110 ¶¶ 19-39. Unless otherwise noted, document numbers henceforth correspond to filings in the *Humana I* docket.

Defendants Mylan and Lannett also moved for summary judgment on acetazolamide, amitriptyline, doxycycline, propranolol, and verapamil, and other Named Defendants also moved for summary judgment on claims within the complaint. Humana has since either moved to dismiss, stayed, or have stipulated agreements of dismissal of its

Defendants Mylan and Lannett, at the last minute, at 10:30 p.m on August 25, 2026, filed a Notice seeking to withdraw their motions for summary judgment. Their notice also stated that the Court and its staff "need not devote any further resources to these motions, and, indeed, the Court no longer has jurisdiction to rule on these motions." Mylan and Lannett alone cannot withdraw the Joint Motions because other parties to the Motions who have not yet been dismissed did not join the withdrawal. The joint motions were signed by thirteen other defendants. Stays of deadlines have issued for many of them, not all of them have formally requested such stays, and their cases are still active. Jury selection in this matter, in which there are still many recently-filed pending motions is scheduled for September 8, 2026. While this Court acknowledges that it is unlikely trial will involve defendants other than Mylan and Lannett, given that there are still other defendants who have not been dismissed did not sign the notice, the joint motion is not moot. Accordingly, the Notice of Withdrawal is hereby stricken, and the Joint Motion for Summary Judgment on the Overarching Conspiracy claim remains live.

Regarding their intention to withdraw individual summary judgment motions, the Notice of Withdrawal relied on "Humana's repeated representations to the Court that it is now proceeding solely with respect to a single individual drug conspiracy." However, Humana has neither formally dismissed its claims on other drugs or its overarching conspiracy claim nor made any representation on the record of its intent to proceed on a single drug conspiracy. This Court notes that the Plaintiff within the last several weeks stated its intention to dismiss other claims, but within days or even hours the parties, including Mylan and Lannett, *looking the gift*

claims on other drugs and defendants. The 11 remaining drugs as of this writing are baclofen, benazepril, clobetasol, clomipramine, digoxin, divalproex, fluocinonide, levothyroxine, lidocaine, pravastatin, and theophylline. Humana has also signaled an intention to dismiss with prejudice its claims regarding digoxin as to Mylan only. Accordingly, the Court addresses only the remaining drugs and Defendants, Mylan and Lannett.

*horse in the mouth,* disputed the extent and breadth of the dismissals. Those disputes remain unresolved with jury selection thirteen days away.

Remarkably, Defendants also filed a letter requesting the Court to file a proposed order dismissing the remaining drugs and claims. As a matter of law, only a Plaintiff may elect to dismiss their claims—not Defendants. Accordingly, all remaining, non-dismissed drugs and the overarching conspiracy remain in this action. Mylan and Lannett's Notice of Withdrawal of these motions is premature. Ruling on the pending summary judgment motions also fulfills the purpose of a bellwether case in an MDL and these rulings will be instructive to other parties in this action and other cases within the MDL. Thus, as Defendants Mylan and Lannett's Notice of Withdrawal is both improper as to the joint motions and premature, the Court must preserve the rights of the parties and the structure of the MDL, and it will rule on the relevant motions.

The motions for summary judgment having been fully briefed, the joint motion for summary judgment on the overarching conspiracy will be denied, Mylan's motion for summary judgment will be denied in its entirety, and Lannett's motion for summary judgment will be denied in its entirety for the reasons stated herein.

## I. BACKGROUND

A full recounting of the history of this action is set forth in the Court's Opinions of October 16, 2018, February 15, 2019, and July 28, 2026. Humana is a health insurer headquartered in Kentucky that "either directly or through its health plan subsidiaries, [insures] and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims."[2] Defendants are manufacturers of generic pharmaceutical

[2] Doc. No. 110 ¶ 48.

products. Humana claims that it purchased generic drugs manufactured by Defendants that were subject to the unlawful anticompetitive conduct broadly complained of in this MDL. That is, Humana alleges that certain Defendants conspired to unlawfully fix prices and allocate market share for 21 or 22 generic drugs (the "Subject Drugs"). Humana also avers that, through the price-fixing on individual drugs and maintenance of "fair share" commitments in the industry, Defendants entered into an overarching conspiracy to restrain trade in the generic drug market.[3] Defendants jointly and individually move for summary judgment as to the overarching conspiracy and individually move for summary judgment as to the individual drug conspiracies.

## II. LEGAL STANDARD

A court will award summary judgment on a claim, or part of a claim, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[5] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."[7] Such a requirement does not mean that all facts must be viewed in favor of the non-moving party, but only those inferences and assumptions that are reasonable.[8] Further, a court

---

[3] *See id.* ¶¶ 261-62, 1686-1729 (Counts CVI through CX address the alleged overarching conspiracy among Defendants).

[4] Fed. R. Civ. P. 56(a).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

[7] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[8] *Pennsylvania Coal. Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

may not weigh the evidence or make credibility determinations.[9] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[10] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[11] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[12] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[13]

A summary judgment analysis in an antitrust case largely mirrors the analysis for summary judgment in all other cases.[14] The Supreme Court, however, has highlighted a particular divergence in the evaluation of summary judgment cases for claims brought under Section 1 of the Sherman Act.[15] In antitrust cases such as this one, in which the plaintiffs allege unreasonable restraint of trade through horizontal price fixing under Section 1, proof of a plaintiff's claim may come in the form of direct evidence, which is "explicit and requires no inferences to establish the proposition or conclusion being asserted," or in the form of circumstantial evidence.[16]

[9] *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[11] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[12] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[13] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[14] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).

[15] *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (discussing summary judgment under 15 U.S.C. § 1).

[16] *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 118 (3d Cir. 1999).

However, the Supreme Court has limited the range of inferences that may be made from circumstantial, or ambiguous, evidence. [17] Whether an inference from circumstantial evidence is acceptable varies with the plausibility of plaintiffs' theory of anticompetitive conduct.[18] Thus, evidence of conduct that could have resulted from antitrust behavior or permissible competition, by itself, is insufficient to demonstrate an antitrust conspiracy.[19] To survive summary judgment, a plaintiff relying on circumstantial evidence in a Section 1 case must provide evidence that "tends to exclude the possibility" that the alleged antitrust event was a result of permissible competitive behavior, rather than permissible independent action.[20] The Third Circuit has held that such evidence by the plaintiff may be provided in the form of parallel price movements.[21] However, because parallel price movements can be a "necessary fact of life"[22] in an oligopolistic market, additional "plus factors" must often be shown to substantiate the inference of a conspiracy rather than permissible behavior.[23] Such "plus factors" include (a) motive; (b) acting contrary to one's interest; and (c) evidence implying a traditional conspiracy.[24] If the plaintiff is unable to provide such evidence, then there is no genuine dispute of material fact, and summary judgment is proper at this stage.[25]

---

[17] *Matsushita*, 475 U.S. at 588; *see also InterVest Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003).

[18] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230-32 (3d Cir.1993).

[19] *Matsushita,* 475 U.S. at 588.

[20] *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 764 (1984).

[21] *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017).

[22] *In re Baby Food,* 166 F.3d at 122.

[23] *Valspar,* 873 F.3d at 193.

[24] *Id.* While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they "largely restate the phenomenon of interdependence." *In re Flat Glass,* 385 F.3d at 360.

[25] *Matsushita,* 475 U.S. at 597-98. Since those qualities are intrinsic to oligopolies, we instead focus on the third plus factor: "evidence implying a traditional conspiracy." *In re Flat Glass*, 385 F.3d at 360 (citation omitted). To meet this factor, we require "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Id.* at 361.

## III. Discussion

Given that certain defendants move for summary judgment on the same drug, the Court will review Mylan and Lannett's Motions for Summary Judgment on a drug-by-drug basis.

### A. Joint Motion for Summary Judgment on Overarching Conspiracy

The Defendants' joint motion for summary judgment is broadly based on four claims: 1) Humana has no evidence of an agreement to control the prices of and market for generic drugs; 2) Humana failed to demonstrate interdependence, overlap, and a common goal amongst the alleged conspirators; 3) Humana's claim of an overarching conspiracy fails if it cannot prove all of the individual conspiracies alleged in its complaint, i.e., prove that between all twenty-four defendants in the complaint conspiracies existed to manipulate the prices and markets for twenty-two drugs, and 4) Humana has not established Defendants' behavior caused it any harm.[26]

Humana's complaint contains a detailed description of the alleged overarching conspiracy to raise the prices of multiple generic drugs. Humana alleges the illegal agreements between Defendants described their anti-competitive behavior as "playing nice in the sandbox," a mode of behavior that guaranteed or entitled the conspirators to a "fair share" of the markets for generic drugs.[27] The first generic manufacturer in the market received the greatest share of a particular drug's market; later entrants to the market received lesser shares.[28] The ground rules for the conspiracy—which the complaint states were in effect at least since 2006—required the conspirators' employees to exchange information about bids and requests for proposals

[26] Defendants also moved for summary judgment on Humana's claims for injunctive relief. Humana has since withdrawn those claims, so Defendants' joint motion for summary judgment is moot as to injunctive relief.

[27] Second Am. Compl. ¶ 21.¶ 263.

[28] Second Am. Compl. ¶ 21.¶ 263.

("RFPs").[29] The conspirator entitled to the largest share would submit a bid slightly lower, but nevertheless higher than the prevailing price, than a competing conspirator.[30] The conspirators continued to divide the market until they reached what they considered a "stable" market. Once this artificial equilibrium was achieved, the conspirators did not compete on price, and together significantly raised prices.[31] A conspirator avoided competing in price on some drugs in return for co-conspirators not challenging it on other drugs. As a result of this behavior conspirators avoided competing with one another on price, and maintained for them a stable market, depriving their customers of a competitive market where bargaining with several vendors of the same product deprived a buyer of the opportunity to engage in good faith bargaining for the best price on every product.[32]

1. Motion for summary judgment on overarching conspiracy allegations

Humana, in response to Defendants joint motion for summary judgment the overarching conspiracy claims, provided ample, direct evidence of its existence. The evidence consists, inter alia, of deferred prosecution agreements ("DPA") and guilty pleas Defendants and their employees entered into, deposition testimony, statements to authorities, and internal company documents.

Six Defendants moving for summary judgment on the overarching conspiracy claims, when facing criminal prosecution by the United States Department of Justice, entered into deferred prosecution agreements ("DPA") in which admitted to conspiring with one other defendants and companies to allocate markets for and rig prices of drugs named in the SAC.

[29] Second Am. Compl. ¶ 21.§265.

[30] Second Am. Compl. ¶ 21.¶ 263.

[31] Doc. No. 110, ¶¶ 264-266.

[32] Doc. No. 110, ¶ 266-270.

Every deferred prosecution agreement contained an admission to violating Section 1, a brief description of the activity subject of the agreement, an agreement to pay a financial penalty and enact procedures to avoid future violations of the law, and notations that restitution was not a subject of the agreement due to pending litigation in the MDL involving the same conduct:

- Teva Pharmaceuticals entered a DPA on August 21, 2023, accepting responsibility for violating Section 1 of the Sherman Act by (1) conspiring with Glenmark Pharmaceuticals and Apotex Corp., both co-defendants in this lawsuit, from May 2013 to December 2015 by agreeing to increase and maintain the prices of pravastatin and other generic drugs sold in the United States, (2) conspiring with Taro, a co-defendant in this lawsuit, July 2013 to at least December 2015 by agreeing to allocate customers and rig bids for, stabilize, maintain and fix prices of generic drugs sold in the United States, and (3) conspiring to suppress and eliminate competition with Sandoz from July 2013 to at least December 2015 to allocate customers and rig bids for, and stabilize, maintain and fix prices of generic drugs sold in the United States. Teva additionally admitted that it was responsible for the acts of its officers, directors, employees and agents that gave rise to it admitted Sherman Act violations. Teva agreed to pay a $225,000,000 penalty, and to several other conditions including product donations to charitable organizations. Due to the pendency of this and other lawsuits against Sandoz pending in this MDL, restitution was not ordered. Breach of the agreement before the expiration of its terms would result in Teva being subject to federal prosecution for its antitrust crimes.[33]

- On. March 2, 2020, Sandoz, Inc., entered a DPA accepting responsibility for violating Section 1 of the Sherman Act for (1) conspiring with an unnamed generic drug company to allocate customers and rig bids for, and stabilize, maintain and fix prices of generic drugs sold in the United States from March 2013 to at least December 2015; (2) conspiring with generic drug company Kavod Pharmaceuticals to allocate customers for and stabilize, maintain and fix prices of generic drugs in the United States from at least April 2014 until at least September 2015; and (3) conspiring with two other unnamed generic drug companies by agreeing to allocate customers and rig bids for, and stabilize, maintain and fix prices of generic drugs sold in the United States from July 2013 until at least December 2015. The generic drugs subject of Sandoz's admissions included clobetasol, benazepril HCTZ, desonide ointment, tobramycin inhalation

[33] Teva DPA (PX 132).

solution, and nystatin triamcinolone. Sandoz agreed to pay a $195,000,000 penalty, but due to the pendency of this and other lawsuits against Sandoz pending in this MDL, restitution was not ordered. Sandoz could be criminally prosecuted for its admitted Section 1 violations if it violated the terms of the DPA.[34]

- On July 23, 2020, Taro entered a DPA accepting responsibility for violating Section 1 of the Sherman Act by (1) conspiring with Sandoz Inc., a generic drug company with its principal place of business in New Jersey, to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015; (2) conspiring with an unnamed generic drug company to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as May 2013 and continuing until at least December 2015. The generic drugs subject of Taro's conspiratorial acts included clobetasol, desonide ointment, and nystatin triamcinolone. Taro agreed to pay a fine of $205,653,218, but due to the pendency of this and other lawsuits against Taro pending in this MDL, restitution was not ordered. Taro could be criminally prosecuted for its admitted Section 1 violations if it violated the terms of the DPA.[35]

- On July 31, 2023, Glenmark entered into a DPA admitting to violating Section 1 of the Sherman Act from May 2013 to at least December 2015 by conspiring with Teva and Apotex and other individuals and entities engaged in the sale of generic drugs to suppress and eliminate competition by agreeing to increase and maintain the price of pravastatin. Glenmark agreed to pay a $30,000,000 penalty, but due to this and other lawsuits pending in this MDL, restitution was not ordered.[36]

- On May 7, 2020, Apotex entered a DPA admitting violating Section 1 of the Sherman Act from May 2013 to at least December 2015 by conspiring with others in the business of selling generic drugs to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin sold in the United States. It agreed to pay a fine of $24,100,000, but in light of the pendency of lawsuits in this MDL against Apotex, restitution was not ordered.[37]

---

[34] Sandoz DPA (PX 130).

[35] Taro DPA (PX 131).

[36] Glenmark DPA (PX 132).

[37] Apotex DPA (PX 134).

- On May 30, 2019, Heritage entered a DPA admitting violating Section 1 of the Sherman Act, participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including glyburide, a purpose of which was to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide sold in the United States. Heritage agreed to pay a $225,000 penalty, but restitution was not imposed due to the pendency of this and other lawsuits in this MDL.[38]

Some employees of Defendants pled guilty to antitrust violations overlapping with the SAC's allegations of an overarching conspiracy.

- Armando Kellum, who held the positions of Credit Manager; Finance Manager; Rebates, Trade Audit & Control Manager; National Accounts Manager; Contracts Manager; Pricing Manager; Associate Director of Contracts and Pricing; Director of Contracts and Pricing; Senior Director of Contracts and Pricing; Executive Director of Contracts and Pricing; Vice President of Contracting & Business Analytics at Sandoz,[39] pled guilty to violating Section 1 of the Sherman Act for conspiring with an unnamed manufacturer and vendor of generic drugs to rig bids and allocate customers for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States between March 2013 and June 2015. Kellum expressly agreed that he "and his co-conspirators discussed the allocation of and agreed to allocate customers in connection with launches of generic drugs; provided and received specific non-public prices paid by allocated customers to their existing suppliers; communicated regarding the timing and specific amount of prospective price increases; and submitted bids and offers to, and declined requests to submit bids and offers from, customers in accordance with the agreement reached between the co-conspirators." He agreed to a pay a fine of $20,000, but due to the pendency of the lawsuits in the MDL, restitution was not ordered. [40]

- On December 9, 2016, Jeffrey Glazer, as Chief Executive and Chairman of Heritage,[41] pled guilty to violating Section of the Sherman Act for (1) between April 2013 until at least December 2015 participating in a conspiracy with another generic drug company to allocate customers, rig bids, and fix an maintain the prices

[38] Heritage DPA (PX 135).

[39] Sandoz/Fougera answer to requests for admission 148 (PX 116).

[40] PX 136.

[41] Glazer Dep. at 24 (PX 28).

of doxycycline hyclate and glyburide in the United States, and (2) between April 2014 and at least until December 2015 participating with persons and entities to allocate customers and fix prices of glyburide sold in the United States.[42]

- Jason Malek, a vice president of commercial operations at Heritage, on December 9. 2016, pled guilty to violating Section 1 of the Sherman Act between April 2014 and at least until December 2015 by conspiring with other conspirators to allocate customers and fix the prices of doxycline hyclate and glyburide.[43]

Finally, evidence from depositions of Defendants' employees also directly show that multiple companies and the drugs they manufactured and sold were enmeshed in a conspiracy to violate the antitrust laws and benefit Defendants:

- Christopher Bihari, Sandoz's Director of National Accounts, testified that Sandoz entered into agreements regarding the pricing of and dividing the market for several drugs.[44]

- Bihari stated that in October 2012 Taro's Ara Aprahamian facilitated an agreement between Sandoz and Actavis regarding desonide lotion and other drugs whose names he could not recall.[45]

- Bihari testified that Sandoz and Taro had agreements regarding pricing and customer sharing for nystatin triamcinolone ointment, which they referred to as "NT creme," resulting in the product's market price rising and remaining high. Sandoz and Taro also had agreements regarding fluocinonide ointment, and any other product that both Sandoz and Taro manufactured and sold.[46]

- Bihari described agreements with Glenmark for desoximetasone ointment, fluticasone and other drugs. Sandoz would bid high for desoximetasone ointment to allow Glenmark to maintain its position, and Glenmark would do the same for Sandoz with fluticasone. The agreements were not restricted to these two drugs.[47]

---

[42] Glazer guilty plea agreement (PX 137).

[43] Malek guilty plea agreement (PX 138).

[44] Bihari Dep at 1638 (PX 1).

[45] Bihari Dep. at 593-595 (PX 1).

[46] Bihari Dep. at 619-633, 717, 770, 1404 (PX 1).

[47] Bihari Dep. at 710, 717, 1377 (PX 1).

- Bihari admitted that Sandoz regularly had similar agreements with other competitors too.[48]

- Michael Vezza, Sandoz's Associate Director of Pricing, Contracts and Analytics, described the "fair share" understanding between the co-conspirators as, "if there were two competitors, their share was 50-55 percent of the market, If there was three competitors, it would be in the 30 percent range. Yeah. . . .I mean, I don't know if the term fair share was used all the time, but everybody was aware of what's - -not everybody. You know, a point of interest was the share target. And if we already had so much share, why would they come after us, because we only had this share and- - or things like that. . . .[Fair share] would be a commonly known term."[49]

- Vezza described a "rational competitor" as "someone that would know all those terms, would know what fair share meant. Would, you know, give up share if they were the majority supplier. They would -- if they were entering the market, that they wouldn't go after 100 percent of the market, that they would go after a fair share. Somebody that might, you know, back off after you defended an award."[50]

- Vezza said competitors would discuss sensitive competitive information with one another because, "It would be beneficial to -- you know, if somebody were to be launching into -or wanting to gain more share in an existing market, it would -- it would be good to know how much share are they looking for. Are they going to go after everybody. Like what is -what is their overall objective. You know, is it one customer? Is it two customers? You know, are you looking for 5% share, 20% more share."[51]

- Vezza related that Sandoz had agreements with Taro to fix prices for clobetasol and nystatin triamcinolone crème and other drugs.[52]

- Vezza described an agreement with Taro to fix prices and allocate customers for several drugs, including Tobramycin inhalation solution.[53]

---

[48] Bihari Dep. at 1525-1526, 1550-1551, 1638 (PX 1).

[49] Vezza Dep. at 841-843 (PX 2).

[50] Vezza Dep. at 844 (PX 2).

[51] Vezza Dep. at 846 (PX 2).

[52] Vezza Dep., at 855-856, 860 (PX 2).

[53] Vezza Dep. at 863 (PX 2).

- Vezza stated that Chris Bihari told him he had reached agreement with Taro concerning fluocinonide. Bihari informed Vezza of this and other agreements with Taro to fix prices and allocate markets. Generally, the information generated by Bihari's communications with competitors helped Sandoz when launching products, winning contracts, and increasing prices. Vezza knew Sandoz should not have received or used that information.[54]

- Vezza reached an agreement with Nisha Patel of Teva that they, on behalf of their companies, would follow, i.e not undercut, each other's price increases and not poach each other's customers when either company increased prices.[55]

- Sandoz and Taro abided by the generic drug industry's generally understood and accepted "fair share" principles. Resultant agreements could involve as many as thirty drugs per company.[56]

- Della Lubke, Sandoz's Director of National Accounts, described a July 16, 2013, email that described Mylan's price increases on drugs also sold by Sandoz, information she received from Mylan.[57]

- Lubke related that Sandoz and Mylan implicitly understood they would follow each other's prices on benazepril HCTZ and other drugs. In August 2013, after Mylan raised its benazepril HCTZ, Sandoz, following, i.e. not undercutting, the increase, raised its price for the drug from $32.00 to $162.00.[58]

- Lubke related that, as of 2013, Sandoz and Taro shared information with one another so that they would not harm one another's business, for example, by not poaching one another's customers for specific drugs.[59]

- Lubke spoke with Nesta on July 16, 2013, discussing Mylan's pending large price increase for levothyroxine, a product sold by Sandoz, and that Lannett would follow shortly with an equivalent price.[60]

---

[54] Vezza Dep., at 569, 594-595, 809-810 (PX 2).

[55] Vezza Dep., at 831-832, 1684(PX 2).

[56] Vezza Dep., at 921-922, (PX 2).

[57] Lubke Dep., at 687-693 (PX 5); July 16, 2013, email from Lubke to Michael Vezza, Armando Kellum and Dave Picard (PX 1292).

[58] Lubke Dep., at 714-716 (PX 5).

[59] Lubke Dep. at pp. 945-947 (PX 5).

[60] Lubke Dep. at pp. 755-756 (PX 5).

- Paul Dutra, Vice President of Sales and Marketing at Glenmark, related that working with Nisha Patel, Glenmark and Teva agreed to raise prices on several products, including pravastatin, and with Erika Vogel-Baylor of G&W Laboratories to raise the price of ciclopirox creme and mometsone in the United States.[61]

These deposition excerpts from Defendants' employees contain admissions that they, on behalf of Defendants, worked with one another to share knowledge of their dealings with their customers, guarantee market shares by not underbidding one another, and deprive their customers of a market driven by free and fair competition for generic drugs. The agreements were not always bilateral and show Defendants' employees agreeing without any reservations to share and watch each other's prices to allow them to maintain agreed upon market shares. They support Humana's claims that the conspiracy, rooted in common understandings and sharing coded descriptions of its mechanics, required its participants at times to raise their prices so others could maintain market share and sales to particular customers, or refrain from selling products to allow co-conspirators to maintain their share of the market.

Internal memoranda and communications further illustrate the "fair share" creed the Defendants shared. A November 30, 2011, internal email from Lannett asks for information as to whether Lannett "has it [*sic*] 'fair share' for each product."[62] Teva's Nisha Patel described, in a statement to the U.S. Postal Service Office of the Inspector General how she ranked competitors by the quality of Teva's communication with them, and how advantageous it would be to Teva to cooperate with or undercut them.[63] Companies she communicated with included

[61] Dutra Dep. at pp. 955-959 (PX 6).

[62] Lannett internal email, 11/30/2011 (PX 1242).

[63] U.S.P.S. Off. Of Insp Gen. interview with Nisha Patel (PX 83).

Mylan, Heritage, Zydus, Lupin, Breckenridge, Par, Apotex and Actavis, mostly by phone.[64] A February 14, 2014 text message exchange between Nisha Patel and with co-workers how due to Sandoz's reasonableness with pricing on dexmethylphenidate Teva should relinquish a share.[65] In a December 14, 2014, email Teva's Director of Sales and Trade Relations told the Director of Generics and Sourcing at Walgreens Boots Alliance Development GmbH to inform Greenstone (another generics company) that Teva "is playing nice in the sandbox" and will yield to their request to walk away from a customer and leave it for Greenstone.[66] Sandoz's Lubke testified that in May 2013, Sandoz postponed a planned clomipramine price increase after several phone calls with Mylan's Nesta discussing their some of their products' prices.[67]

Humana cites many examples of activities that when viewed collectively give rise to an inference of conspiratorial activity. A few examples exhibit the gist of Humana's indirect evidence. Within a twenty minute period, James Nesta of Mylan on August 6, 2013, called Sandoz's Della Lubke twice, Alvogen's William Hill once, Lannett's Kevin Smith twice, and texted and Teva's Kevin Green and Green called back once.[68] On March 27, 2014, phone calls, Mylan's Nesta and Lannett's Smith spoke twice, and Steven Greenstein of Sandoz called Smith, all between noon and 4:00 o'clock.[69] On April 23 and 24, 2014, Nesta and Smith exchanged phone calls four times, and Greenstein and Smith spoke twice.[70] An internal Teva "profile" of

---

[64] *Id.*

[65] Patel text message exchange, 2/12/2014 (PX 1227).

[66] Email exchange between Terri Coward and Franklin Harris 12/10/103 (PX 1254).

[67] Lubke Dep. at 764-765 (PX 5).

[68] Nesta phone records (PX 807).

[69] Nesta phone records (PX 811).

[70] Nesta Phone records (PX 813).

Mylan complements it on not going after more than its "fair share."[71] A Sandoz document compiled by its Marketing Director, Terrance O'Sullivan, states that, "Wherever we have lower than fair share, the products are on the list," and Sandoz is "not targeting Perrigo or Taro."[72]

All the above, which is a fraction of direct evidence Humana cites, shows Defendants' claim that Humana has no direct evidence of a direct conspiracy[73] is wrong. The foregoing is only a portion of the direct and indirect evidence supporting the SAC's allegations that Defendants were engaged in a multi-party scheme to allocate business between and not steal customers from one another. The criminal documents, the deposition testimony and the internal company documents are direct evidence that Defendants were not simply monitoring and reacting to one another's pricing but rather were cooperating with one another so they could set the prices for their products without having to haggle with customers. The deferred prosecution agreements are also telling. Six of the defendants, in exchange for avoiding criminal prosecution, agreed they conspired with others to violate antitrust laws, bound themselves to pay fines sometimes amounting to hundreds of millions of dollars, and also agreed that this litigation could result in judgments requiring them to pay Humana and other MDL plaintiffs' restitution. Together this evidence shows Humana can present evidence that several Defendants worked together to fix prices, a *per se* violation of the Sherman Act.[74] Humana meets the requirement, as described by the Third Circuit's Judge Aldisert, that "the antitrust plaintiff should present direct

---

[71] Teva document profiling Mylan at 3 (PX 1229).

[72] Message from Terrance O'Sullivan (PX 1239).

[73] Defendants' JSJM on overarching conspiracy at 14 [Doc 493].

[74] *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 218 (1940) (price fixing agreements are *per se* violations of the Sherman Act).

or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[75]

The Third Circuit employs a three-step inquiry to determine whether a number of events constitutes a single conspiracy or separate, unrelated conspiracies. First, the Court must determine whether there was a common goal between the conspirators. Second, the Court examines the nature of the scheme to determine whether it was aimed at bringing about a continuous result that would not continue without the conspirators' continuous cooperation. Finally, the Court examines the extent to which the participants overlap in the various dealings.[76] The evidence cited above— both the direct evidence in the form of the admissions in the deferred prosecutions agreements and guilty pleas, and in the deposition testimony of Defendants' employees, and the indirect evidence that bolsters the deposition testimonies' accounts— satisfies all three requirements. The goal was to allow the conspirators to deceive their customers into thinking the conspirators were engaged in spirited competition for their business. Failing to prove that all named conspirators conspired with a particular defendant is not fatal to the overarching conspiracy charge against that defendant.[77] The mechanics of the scheme required constant communication between employees of the conspirators with responsibility for the sale of their products. This Court also previously found that Humana presented enough evidence to overcome Defendants joint motion for summary judgment to dismiss Humana's claims that Defendants' fraudulently concealed their anticompetitive activities, thus allowing the

---

[75] *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 764 (1984), *quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (1980).

[76] *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989).

[77] *Id*.

jury to determine when Humana's Sherman Act antitrust claims accrued.[78] That opinion cited evidence that Defendants understood not to have substantive communications in writing. Different combinations of conspirators meshed with one another with a common understanding and goal to conceal their actions. [79]

For all of these reasons, Humana's claim that it was the victim of an overarching conspiracy between the Defendants that violated the Sherman Act will be submitted to the jury.

2. Causation

Defendants' summary judgment motion regarding the overarching conspiracy is also based on its contention that Humana cannot prove that conspiracy caused Humana harm. When filing their joint motion, Defendants, due to this Court's scheduling order requiring filing of all summary judgment motions and motions to exclude expert testimony on the same date, did not have the benefit of this Court's rulings on their motions to exclude the testimony of Defendants' experts on causation and damages. Since then, those rulings have issued, and most of testimony Humana wants to offer from those experts can be admitted at trial. Plaintiff's causation expert, William Bradford, Ph.D., is now allowed to testify that, "Defendants had the 'ability and incentive . . . to act in concert,' that the sharp price increases 'are atypical of behavior in a competitive market,' and that 'Defendants took actions that would have been against their own self-interest unless a collusive agreement was in place.' . . . . . . 'Defendants' conduct related to the pricing, marketing, and sale of the Subject Drugs is indicative of collusion and/or agreement, as opposed to independent decisions, oligopolistic pricing or other market factors.'"[80] Dr.

---

[78] *See* Memorandum Opinion denying Defendants motions to dismiss Counts 91 and 106 of Humana's SAC [Doc. 821 at 17-18].

[79] *Id.* at 16-17

[80] Opinion on motion to exclude testimony of W. David Bradford, Ph.D. [Doc No 811 at 7] .

Bradford "found the generic drug market susceptible to collusion due to its (1) 'high concentration' of supply; (2) 'multimarket contacts'; (3) 'high barriers to entry'; (4) 'product homogeneity'; (5) 'inelastic and stable demand'; and (6) 'price transparency.' These are clearly economic inquiries, and Defendants' qualms about the accuracy of the conclusions drawn from them, as alluded to above, are appropriately saved for cross-examination."[81] William B. Vogt, Ph.D., will be allowed to offer his opinions on how the conspiracy described by Dr. Bradford affected the prices Humana and one of its subsidiaries purchased drugs whose prices were increased as a result of the Defendants' conspiracy.[82] These rulings answer Defendants' issues regarding causation, and the Court need not address them again.

**B. Clomipramine – Mylan**

As an initial matter, Mylan moves for summary judgment as to the clomipramine conspiracy, despite this Court's denial of summary judgment on clomipramine as to Mylan in the *Clomipramine* EPP and DPP bellwether actions.[83] Mylan notes this previous denial but argues that "new testimony evidencing independent action, taken with the Clomipramine MSJ record, shows that Humana lacks sufficient evidence to go to trial."[84] Specifically, Mylan points to the testimony of James Nesta and Michael Aigner, former employees of Mylan, who had previously invoked the Fifth Amendment in response to questioning. Now, both Nesta and Aigner have denied agreements by Mylan as to clomipramine in their depositions.[85]

[81] *Id.* at 21.

[82] Opinion on motion to exclude testimony of William B. Vogt, Ph.D. (Doc. 847 at 6-7, 10, 12-13, 15-18]. The Court did exclude three paragraphs of Dr. Vogt's testimony, but otherwise Huana is allowed to offer his testimony concerning the damages Humana claims the conspiracy caused.

[83] *In re Generic Pharms. Pricing Antitrust Litig*., No. 16-md-2724, 2025 WL 2483981, at *7-17 (E.D. Pa. Aug. 27, 2025) (*hereinafter* "Clomipramine Opinion").

[84] Mylan Mem. L. Supp. Mot. Summ. J. at 22 [Doc. No. 489] (*hereinafter* "Mylan MSJ").

[85] Mylan MSJ, Ex. 89, Aigner Dep. at 49, 95-96 [Doc. No. 489-2]; Ex. 90, Nesta Dep. at 147 [Doc. No. 489-2].

Mylan further argues that the Court's denial of summary judgment as to clomipramine failed to account for the testimony of Della Lubke's supervisor, Armando Kellum (Sandoz).[86] Kellum testified that Lubke's supervisors did not ask her to contact Mylan, that he was not aware Lubke (Sandoz) knew Nesta, and that he was not aware of any agreements with Mylan and Sandoz and would have been so aware given his position in the Sandoz company.

These arguments are unavailing. In ruling on summary judgment in the *Clomipramine* action, this Court determined (1) that there was no direct evidence that Mylan was a party to a clomipramine conspiracy; (2) there was parallel conduct; (3) the facts satisfy the "motive to conspire"; (4) the facts satisfy the "action contrary to interests factor"; and (5) there was traditional evidence of a conspiracy, including communications between parties, advance knowledge, and economic evidence consistent with a conspiracy.[87] While the Court noted that "the first two plus factors [parallel conduct and motive to conspire] weigh less strongly in [the plaintiffs'] favor than the third [traditional evidence of a conspiracy]," it recognized that "the Third Circuit has explained that in price fixing cases involving oligopolies, the first two factors largely restate the phenomenon of interdependence, which leaves the traditional non-economic evidence of a conspiracy as the most important plus factor in an oligopolistic market."[88] That the first two factors weighed only slightly in plaintiffs' favor does not render the ruling unstable, particularly when the purportedly new evidence Mylan relies on does not impact the first two factors.

[86] Mylan MSJ at 22 [Doc. No. 489]. For ease of reference, parentheticals denote where each individual was employed.

[87] Clomipramine Opinion, at *17-18, 20-22, 24-26.

[88] *Id*. at 36 (quoting *In re Chocolate*, 801 F.3d at 398) (internal quotations and alterations omitted).

Despite a request by plaintiffs, the Court explicitly refused to draw adverse inferences from the Fifth Amendment invocations for Nesta, Aigner, and Kellum.[89] There was no affirmative evidence taken from the invocations in deciding summary judgment. Further, the testimony on which Mylan relies rests on a credibility determination of those witnesses, which is a factual question for the jury to decide. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."[90] The mere existence of testimony, the credibility of which the Court cannot evaluate at this stage, that there was no agreement with Mylan does not establish that there is no genuine dispute of material fact. Mylan's motion for summary judgment as to clomipramine will be denied.

### C. Baclofen – Lannett

Baclofen is a muscle relaxant and anti-spastic agent used to treat muscle symptoms in people with multiple sclerosis or spinal injury or disease.[91] The primary manufacturers during the relevant period were Teva, Upsher-Smith, and Qualitest ("Par").[92] After exiting the market in 2011, Lannett re-entered the market in mid-2014.[93] Humana alleges that Lannett conspired with Upsher-Smith, Teva, and Par and specifically alleges that executives from Lannett communicated with Upsher-Smith, Teva, and Par prior to reentering the market, that the prices of baclofen rose by more than 550%, and that Lannett agreed to limit itself to a 10% market share.

---

[89] *Id*. at 33.

[90] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255.

[91] Doc. No. 110. ¶ 21.

[92] Humana Omnibus Resp. Opp'n Individual Mots. for Summ. J. at 41 [Doc. No. 598] (*hereinafter* "Humana Opp'n"); 4/10/14 Mouro-Sherman Email (PX 1487); 4/11/14 Patel Emails (PX 1191); 8/4/14 Patel Email (PX 1192). The notation "PX" refers to Humana's exhibits.

[93] Humana Opp'n at 41 [Doc. No. 598]; Lannett Q3 2014 Market Share Chart (PX 403).

1. <u>Baclofen Factual Background</u>

During the relevant period, baclofen's wholesale acquisition costs ("WAC") prices were published and rapidly disseminated to wholesalers and customers. Internal documents of the manufacturers reflect that manufacturers closely tracked their competitors' WAC and contract pricing.[94]

In January 2014, Upsher-Smith informed its customers that it planned to increase baclofen prices in February 2014, citing market and margin pressures.[95] On February 21, 2024, Upsher-Smith implemented WAC increases, which raised prices on baclofen 10-mg tablet approximately 350% and raised prices on baclofen 20-mg tablets approximately 420%.[96] Teva was aware of Upsher-Smith's February 2014 increase, monitored the post-increase market, observed the increase in customer pricing, evaluated customer requests, and assessed market disruption and supply issues that Par experienced in early 2014.[97] In April 2014, Teva placed baclofen on an internal "alert" status and directed sales teams not to pursue aggressive bids while it was monitoring the market's response to Upsher-Smith's increase.[98]

There were communications between Upsher-Smith's Brad Leonard and Teva's Nisha Patel in April and September of 2014[99] and between Patel and Lannett's Tracy Sullivan in June

---

[94] 4/11/14 Patel Emails (PX 1191); 4/10/14 Dundrud Emails (PX 392); 3/27/14 Zitnak Emails (PX 395).

[95] ECRM Brand Discussion Attended by Brad Leonard & Doug Zitnak of Upsher-Smith (PX 411); 1/24/14 Zitnak Emails (PX 399).

[96] 4/11/14 Patel Emails (PX 1191); Upsher-Smith Responses & Objections to Requests for Admission 1, 3, 5, 7 (PX No. 127).

[97] 3/26/14 Maerzke Email (PX 383); 4/11/14 Patel Emails (PX 1191); 3/19/14 Zitnak Emails (PX 397); 4/10/14 Dundrud Emails (PX 392).

[98] 4/10/14 Patel Email (PX 382); 4/16/14 Tefera Emails (PX 381).

[99] 4/10/14 Patel Phone Records (PX 378).

and July of 2014.[100] While baclofen pricing and supply conditions where changing, Teva, Upsher-Smith, and Lannett representatives attended industry meetings in August of 2014.[101]

In early April 2014, Teva circulated pricing analyses that assumed raising its baclofen WAC to match Upsher-Smith's existing pricing.[102] Viewed in the light most favorable to Humana, there is evidence that this proposed increase was not based on increases to Teva's manufacturing costs, but due to competitor pricing and Par's supply disruptions.[103] On April 15, 2014, Teva implemented WAC increases that matched Upsher-Smith's February increases.[104] Teva adopted identical dollar prices for 10 mg and 20 mg tablets across comparable package sizes, and Teva acknowledges that its baclofen WAC prices matched Upsher-Smith's as of that date.[105]

As the baclofen price increases took effect, Lannett planned a mid-2014 reentry into the market.[106] Internal documents reflect that Lannett anticipated taking a limited share and focused on monitoring prevailing market prices rather than price disruption.[107] On June 5, 2014, in an internal email, Kevin Smith, Senior Vice President of Sales & Marketing of Lannett, stated "[w]e can take only a 10% market share" of baclofen.[108] On June 12, Sullivan (Lannett) reached out to Patel (Teva) on Facebook and stated that she "was hoping to touch base with [Patel] about some industry news. What is your cell phone? Or could you give me a call when you have a

---

[100] 6/12/14-7/11/14 Sullivan Phone Records (PX 377).

[101] 8/26/14 Leonard Email (PX400); 9/5/14 Doorley Email (PX 1651).

[102] 4/11/14 Patel Emails (PX 1191); 4/10/14 Dundrud Emails (PX 392).

[103] 4/11/14 Patel Emails (PX 1191); 5/20/14 Patel Emails (PX 384); 5/9/14 Dunrud Email (PX 390).

[104] Teva Resp. & Objs. to Requests for Admission 5-9 (PX 124).

[105] *Id.*

[106] 7/14/14 McManus Email (PX 1198); 6/16/14 McManus Email (PX 408); 6/5/14 Smith Email (PX 1199).

[107] 6/5/14 Smith Email (PX 1199).

[108] *Id.*

minute."[109] Two minutes after Sullivan's initial message, Patel called Sullivan and the two had a seven-minute phone call.[110] Later that day, Sullivan messaged Patel "Definitely Mid July. I'll touch base with you in a few weeks."[111] Lannett re-entered the baclofen market in July 2014 and set its prices near the elevated Upsher-Smith/Teva prices.[112] On July 1, 2013, Tracy Sullivan (Lannett) twice called Nisha Patel (Teva), and Patel returned the call later that day and the pair had a 6 and a half minute call.[113] Sullivan (Lannett) and Patel (Teva) also exchanged texts and calls on July 11, 2014.[114]

Sullivan testified that she contacted Patel on June 12 because she knew Patel, they had recently run into each other at an industry event and wanted to reconnect with one another.[115]

The record evidence shows that there were several communications between the baclofen manufacturers during the period in which baclofen pricing and allocation decisions were made. There are additional details reflecting communications between Teva and Upsher-Smith, which are not relevant to the instant motion, so the Court does not recount them.

2. <u>Direct Evidence of a Conspiracy</u>

Lannett first argues that there is no direct evidence that it participated in a baclofen pricing conspiracy.[116] Direct evidence "is explicit and requires no inferences to establish the

---

[109] Lannett MSJ, Ex. 109, Sullivan Patel Facebook Messages [Doc. No. 478-2].

[110] 6/12/14-7/11/14 Sullivan Phone Records (PX 377).

[111] Lannett MSJ, Ex. 109, Sullivan Patel Facebook Messages [Doc. No. 478-2].

[112] 7/2/14 Lannett Pricing Offer (PX 1195) (setting price for 1000 size 10mg baclofen at $168 and 500 size 20 mg at $148); 8/5/14 Lannett Pricing Offer (PX 1484) (baclofen 10mg 100 WAC is $29.93; 10mg 1000 WAC is $299.25; 20mg 100 WAC is $49.40; 20mg 500 WAC is $247).

[113] 6/12/14-7/11/14 Sullivan Phone Records (PX 377).

[114] 6/12/14-7/11/14 Sullivan Phone Records (PX 377).

[115] Lannett MSJ, Ex. 111, Sullivan Dep. at 38-39 [Doc. No. 478-2].

[116] Lannett Mem. L. Supp. Mot. for Summ. J. at 35 [Doc. No. 478] (*hereinafter* "Lannett MSJ").

proposition or conclusion being asserted."[117] Indeed, Humana presents no direct evidence of Lannett's participation in the baclofen conspiracy. Accordingly, to avoid summary judgment, Humana must rely on circumstantial evidence and reasonable inferences of a conspiracy.

3. Circumstantial Evidence of a Conspiracy

Because Humana does not show direct evidence of Lannett's participation in a conspiracy, the Court analyzes Humana's circumstantial evidence to determine whether it gives rise to a reasonable inference of conspiracy. "[A] nonmovant plaintiff in a [S]ection 1 case does not have to submit direct evidence, i.e., the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence."[118]

The parties agree the baclofen market was an oligopoly before and during the 2014 price increases and Lannett's reentry into the market. "Oligopolies pose a special problem . . . because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing. . . [and can be the] result of 'interdependence,' which occurs because 'any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'"[119] Defendants, however, are not entitled to summary judgment just by arguing that there is a plausible explanation for their potentially anticompetitive behavior.[120] Instead, the Court analyzes the evidence to determine whether there is parallel conduct and, if parallel conduct did occur, whether the non-movant party meets certain plus factors, including: (a)

[117] *In re Baby Food,* 166 F.3d at 118; *see also InterVest, Inc.,* 340 F.3d at 149 ("cases require that direct evidence of an illegal agreement [must] be established with much greater clarity" than the ambiguous statements plaintiffs offered to show an agreement).

[118] *Petruzzi's*, 998 F.2d at 1230.

[119] *Valspar*, 873 F.3d at 191.

[120] *In re Chocolate*, 801 F.3d at 396-97.

motive; (b) acting contrary to one's interest; and (c) evidence implying a traditional conspiracy.[121]

*a. Parallel Conduct*

In order to show that they can create a material dispute of fact through inferences based on circumstantial evidence of consciously parallel behavior, the Third Circuit requires that plaintiffs must first establish that defendants' behavior was parallel in that it occurred at approximately the same time and in approximately the same scope, defendants were conscious of each other's conduct, and that awareness was an element in their decision-making process.[122]

Lannett claims that it did not participate in parallel conduct, and in fact, entered the market well after Teva and Upsher-Smith implemented their price increases. Further, after entering the market, Lannett said it "never took a price increase on baclofen, rather, [it] competed aggressively, often cutting baclofen prices during the bid process."[123] It argues that the fact of its late entry bars any finding of its participation in a baclofen conspiracy.

This Court previously decided on a motion to dismiss that plaintiffs "sufficiently pled parallel conduct at this stage of the litigation where they allege that a 'late' Defendant['s] pricing behavior essentially matched that of the other defendants."[124] The Court further found that "being a latecomer to a conspiracy furnishes no defense—joint and several liability attaches to all conspirators regardless of when they joined or participated in the common scheme."[125] Now, at this stage, Humana has presented sufficient evidence that Lannett entered the market at

---

[121] *Id.* at 398. "While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they "largely restate the phenomenon of interdependence." *In re Flat Glass,* 385 F.3d at 360.

[122] *In re Flat Glass,* 385 F.3d at 360.

[123] Lannett Mem. L. Supp. Mot. for Summ. J. at 35 [Doc. No. 478] (*hereinafter* "Lannett MSJ").

[124] *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 443 (E.D. Pa. 2018).

[125] *Id.*

"supracompetitive prices, comparable to the other" manufacturers following and around the same time as communications between Lannett and its competitor, Teva.[126] Accordingly, Humana has met its burden to establish a genuine dispute of material fact as to parallel conduct.

*b. Plus Factors*

Lannett's argument further challenges Humana's ability to provide evidence establishing the Third Circuit's "plus factors" applied to circumstantial evidence. A plus factor is an action that is inconsistent with unilateral conduct, and which then allows inference of an agreement. Courts typically look to various "plus factors" in antitrust cases to distinguish legal conscious parallelism from illegal price-fixing agreements.[127] The Third Circuit has identified three "plus" factors: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'"[128] In addition, the Third Circuit has explicitly said that "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor.'"[129]

***(1) Motive to Conspire***

Evidence that the market was conducive to price fixing is sufficient as evidence to demonstrate that parties had a motive to conspire.[130] Humana argues for all drugs at issue that the drugs "exist in a highly concentrated market with no viable substitutes and substantial barriers to entry."[131] Lannett does not meaningfully address this prong. Given market

[126] *Id.* at 444.

[127] *See In re Baby Food,* 166 F.3d at 122.

[128] *In re Chocolate*, 801 F.3d at 398 (quoting *In re Flat Glass*, 385 F.3d at 360).

[129] *In re Ins. Brokerage,* 618 F.3d at 323.

[130] *In re Chocolate*, 801 F.3d at 398 ("Evidence of a motive to conspire means the market is conducive to price fixing.").

[131] Humana Opp'n at 5 [Doc. No. 598] (quoting *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2483981, at *11).

concentration and high barriers to entry in the market, the Court concludes that there is sufficient evidence from which a reasonable factfinder could determine that Defendants did have a motive to conspire: "There is little doubt that [a] highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing."[132] Satisfaction of this plus factor, however, "does not itself create a reasonable inference of concerted action because it merely restates interdependence."[133]

#### *(2) Actions Contrary to Lannett's Interest*

"[E]vidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market."[134] Lannett argues that its actions were consistent with independent self-interest and were motivated by internal analysis that was consistent with its unilateral interests.[135] Lannett exited the baclofen market in 2011 due to low margins, but made the determination to reenter the market following a price increase that Lannett argues changed conditions sufficiently to warrant reentry.[136]

As to all drugs, Humana argues that there is "evidence of behavior inconsistent with a competitive market" because its expert opines that "cost increases could not explain price increases."[137] Indeed, Dr. Bradford opines that the price increase to the subject drugs could not be explained by alternative competitive factors.[138]

---

[132] *In re Valspar*, 873 F.3d at 197.

[133] *In re Chocolate,* 801 F.3d at 398.

[134] *Id*.

[135] Lannett MSJ at 36 [Doc. No. 478].

[136] *Id*.

[137] Humana Opp'n at 5 [Doc. No. 598] (quoting *In re Generic Pharms. Pricing Antitrust Litig*., 2025 WL 2483981, at *12).

[138] Bradford Rep. ¶¶ 154-173 (PX 143).

The exchange of pricing information itself is also conduct against self-interest, so evidence that supports a reasonable inference of shared pricing information also supports an inference of conduct contrary to one's interest.[139]

Humana further argues that despite the changed conditions, it was against Lannett's interest to reenter the market at the inflated Teva/Upsher-Smith prices and to intentionally limit itself to 10% of the market.[140] Smith (Lannett) testified that the decision to limit Lannett to a 10% market share was based on a conclusion that Lannett could "only do so many batches of this project," which totaled "roughly about a 10% share."[141] Lannett points to emails it alleges supports this claim, however the two sets of emails, one of which says to a customer "I'd hate to commit and not be able to supply your full volume" and the other discusses Lannett's capacity to meet customer supply needs, both *post-date* Smith's email about limiting Lannett to a 10% baclofen share.[142] Accordingly, Smith's testimony about the motivation for the limited share is a credibility and factual determination that must be made by the jury. The decision to reenter the market at a high price and limit itself to a small share is sufficiently probative of action contrary to Lannett's interest to establish this factor. However, like the previous plus factor, this weighs only slightly in Humana's favor.

***(3) Traditional Evidence of Conspiracy***

Finally, Lannett argues that Humana has not presented traditional evidence of conspiracy. Traditional evidence of a conspiracy is the most important factor when evaluating circumstantial

---

[139] *In re Generic Pharms. Pricing Antitrust Litig*., 2025 WL 2483981, at *12.

[140] Humana Opp'n at 50 [Doc. No. 598].

[141] Lannett MSJ, Ex. 18, Smith Dep. at 333 [Doc. No. 478-

[142] Lannett MSJ, Ex. 107, 6/25/14 Sullivan Email; Ex. 108, 9/11/14 Mathew Email [Doc. No. 478-2].

evidence of a conspiracy in an oligopolistic market.[143] This element requires plaintiffs to provide "proof that the [conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan."[144] This includes non-economic evidence that there was an "actual, manifest agreement not to compete . . . even though no meetings, conversations, or exchanged documents are shown."[145]

Lannett claims that Humana has simply identified certain communications that do not establish communication or an agreement to divide market allocation or fix prices. "[C]ommunications between competitors do not permit an inference of an agreement to fix prices" without evidence that the "communications rise to the level of an agreement, tacit or otherwise."[146]

The Third Circuit has held that the mere opportunity for improper communications is insufficient to support an inference of conspiracy, [147] and that "sporadic" communications between individuals without pricing authority cannot form the basis of a reasonable inference of a conspiracy.[148] Similarly, the "exchange of pricing information by lower level employees" is not sufficient to defeat summary judgment where the evidence consisted "of sporadic exchanges of shop talk among field sales representatives."[149]

In contrast, the evidence that higher-level defendants communicated close in time to parallel price announcements, and that exchanges of information were tightly linked with

---

[143] *In re Chocolate.,* 801 F.3d at 401.

[144] *In re Flat Glass*, 385 F.3d at 361.

[145] *In re Ins. Brokerage,* 618 F.3d at 322 (internal quotation marks omitted).

[146] *In re Baby Food*, 166 F.3d at 126 (quoting *Alvord-Polk, Inc v. F. Schumacher & Co*., 37 F.3d 996, 1013 (3d Cir. 1993)).

[147] *In re Chocolate*, 801 F.3d at 409.

[148] *Id.*; *In re Baby Food,* 166 F.3d at 125.

[149] *In re Baby Food,* 166 F.3d at 125.

allegedly concerted action, raises a reasonable inference of concerted action.[150] To determine whether Humana can correlate information exchanges with "specific collusive behavior,"[151] "[a] court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."[152]

The most substantial evidence against Lannett is the series of communications between Sullivan (Lannett) and Nisha Patel, Teva's Director of Strategic Customer Marketing. According to Sullivan's testimony, in mid-2014, she and Patel had personal contact with each other a trade show. In June 2014, Lannett was deciding whether to enter the baclofen market following Teva and Upsher-Smith implementing substantial price increases. On June 5, 2014, Smith (Lannett) sent an internal email stating that Lannett could only take 10% of the baclofen market. On June 12, Sullivan (Lannett) contacted Patel (Teva) seeking to touch base regarding some "industry news." Immediately afterwards, Patel called Sullivan. Later that day, Sullivan sent a message saying "definitely Mid-July. I will touch base with you in a couple weeks." Based on this evidence, it is a reasonable inference that Sullivan and Patel discussed Lannett's imminent entry into the baclofen market. Indeed, on July 1 and July 11, Sullivan and Patel exchanged additional texts and calls as Lannett entered the baclofen market. As Lannett launched at the Teva/Upsher-Smith price level and limiting itself to a 10% share, Sullivan was "touching base" with Patel. This evidence, the fact of communication, content of messages, and temporal proximity to Lannett's pricing and market share decisions supports a reasonable inference of Lannett's participation in a conspiracy to fix prices and assign market share of baclofen.

---

[150] *In re Flat Glass*, 385 F.3d at 369.

[151] *Id.*

[152] *Id.*

Humana has produced sufficient evidence that, if credited by the factfinder, would establish this factor. Accordingly, upon consideration of Lannett's arguments and Humana's evidence, the Court will deny Lannett's motion for summary judgment as to baclofen.

### D. Benazepril – Mylan

Benazepril is a generic drug used to treat hypertension. Humana alleges that Mylan and Sandoz entered into an agreement to raise the price of benazepril during 2013 and 2014.[153]

#### 1. Factual Background

In July 2013, Sandoz was in the process of relaunching benazepril.[154] Sandoz sought to properly time the market, so Michael Vezza (Sandoz) told his team to "hold off" launching the drug until "we can confirm" that Mylan was going to increase its price.[155]

On July 18, 2013, Della Lubke (Sandoz) learned that Mylan intended to raise the prices of several drugs, not including benazepril HCTZ.[156] Vezza (Sandoz) responded to this information that he "[w]as hoping to see that one."[157] That same day, Lubke called James Nesta of Mylan.[158] She testified that she "asked him if Benazepril HCTZ would be one that would be raising the price on."[159] Lubke and Nesta had multiple phone calls on July 18 and 19, 2023.[160] Lubke testified that on these calls, Nesta confirmed that Mylan would be increasing the price of benazepril.[161]

---

[153] Humana Opp'n at 50 [Doc. No. 598].

[154] Mylan MSJ, Ex. 69, 6/28/13 Vezza Emails [Doc. No. 489-1].

[155] 7/16/13 Vezza Email (PX 375); 7/12/13 Jorge Email (PX 374).

[156] 7/18/13 Vezza Emails (PX 1292).

[157] *Id.*

[158] 7/18/13 Nesta Phone Records (PX 371).

[159] Lubke Dep. at 708 (PX 5).

[160] 7/18/13 Nesta Phone Records (PX 371); 7/19/13 Nesta Phone Records (PX 372).

[161] Lubke Dep. at 708-709 (PX 5).

Lubke and Nesta also spoke on August 6, 2013, and on that day, the Mylan pricing committee approved the benazepril price increase.[162] On August 9, 2013, Mylan increased its benazepril WAC price by 334%.[163] Lubke testified that this increase was consistent with the information that Nesta provided her in July.[164]

On August 20, 2013, Vezza (Sandoz) recommended that Sandoz "take the price up ASAP."[165] Sandoz relaunched benazepril at a price "consistent with [Lubke's] discussions with Mr. Nesta in July."[166] Lubke testified that the price was consistent with her conversations with Mylan and explained that "[b]y confirming that Mylan was going to take a price increase on benazepril, that allowed us to hold off the relaunch until the price increase went into effect."[167]

2. Direct Evidence

Mylan first argues there is no direct evidence of a conspiracy as to benazepril. As explained above, direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted."[168] Mylan notes that Lubke (Sandoz) testified that no agreement existed between herself and Nesta or anyone else from Mylan.[169] Humana, however, argues that Lubke "explicitly confirmed Sandoz's agreement with Mylan, as she noted that

---

[162] 8/6/13 Nesta Phone Records (PX 373); 8/9/13 Mauro Email (PX 1133).

[163] Mylan Resp. & Objs. to Requests for Admission 3-5 (PX 126).

[164] Lubke Dep. at 713 (PX 5).

[165] 8/19/13 Vezza Email (PX 1294).

[166] Lubke Dep. at 715 (PX 5).

[167] Lubke Dep. at 715-718 (PX 5).

[168] *In re Baby Food,* 166 F.3d at 118; *see also InterVest, Inc.,* 340 F.3d at 149 ("cases require that direct evidence of an illegal agreement [must] be established with much greater clarity" than the ambiguous statements plaintiffs offered to show an agreement).

[169] Mylan MSJ at 18 [Doc. No. 489].

Mylan's confirmation of a price increase on [b]enazpril allowed Sandoz to hold off on a relaunch until the price increase went into effect."[170]

Specifically, Lubke (Sandoz) testified that (1) in July of 2013 she learned from Nesta (Mylan) of potential price increases on several Mylan drugs, not including benazepril,[171] after a July 16, 2013, call with Nesta, wherein Lubke "told him that [she] needed to know what price increases Mylan was taking on products so that we could follow";[172] (2) Vezza (Sandoz) and other Sandoz employees "were happy to get" this list of drugs with potential price increases;[173] (3) Vezza in particular followed up regarding benazepril HCTZ, stating that he "[w]as hoping to see that one" and Lubke believed he was asking if Mylan would increase the price of benazepril;[174] (4) Lubke told Vezza she would "check on it";[175] (5) Vezza sought information about a price increase that had not yet happened as part of Sandoz's pricing department;[176] (6) Lubke reached out to Nesta on July 18, 2013, "to find out if that was a product they planned to take a price increase on";[177] (7) Nesta confirmed in that call that Mylan was going to take a price increase on benazepril HCTA;[178] (8) she believed Nesta understood she "was asking because . . . [she] had told him that [Sandoz] was looking for products Mylan was taking price increases on so that [it] could follow";[179] (9) Mylan's August 2013 300% increase was consistent with the

[170] Humana Opp'n at 52 [Doc. No. 598].

[171] Lubke Dep. at 687-699 (PX 5).

[172] *Id*. at 699.

[173] *Id*. at 704.

[174] *Id*. at 705.

[175] *Id*. at 706.

[176] *Id*. at 706-707.

[177] *Id*. at 707-708.

[178] *Id*. at 708-709.

[179] *Id*. at 709-710.

information Nesta provided Lubke in July 2013;[180] (10) Sandoz increased its benazepril HCTZ prices in accordance with Nesta and Lubke's conversations;[181] (11) in discussing benazepril, Lubke said she "believe[d] it was understood from a previous call" that "Sandoz wanted to follow Mylan's increases"[182]; (12) she believes that "the information that [she] obtained from Mr. Nesta about Mylan's upcoming price increase on benazepril HCTA and provided to Mr. Vezza help[ed] Sandoz generate revenue";[183] and (13) she understood that "Sandoz [could] have used the information that Mr. Nesta provided to harm Mylan's benazepril HCTZ business" but Lubke did not recall Nesta expressing such a concern.[184]

To constitute direct evidence, Humana's evidence must plainly show that a conspiracy existed.[185] Direct evidence may include "an explicit admission from a participant that an antitrust conspiracy existed."[186] Mylan notes Lubke's denial of entering into an agreement with anyone at Mylan concerning any products. However, Mylan notes only a portion of Lubke's deposition wherein Lubke denied personal knowledge of an overarching conspiracy.[187] Lubke testified that she didn't have the authority to make a commitment on behalf of Sandoz, and "didn't make a commitment, other than . . . that [she] told [Nesta] that [Sandoz] . . . would follow."[188] She

---

[180] *Id*. at 713.

[181] *Id*. at 715.

[182] *Id*. at 715-716.

[183] *Id*. at 716.

[184] *Id*. at 710.

[185] *In re Baby Food*, 166 F.3d at 118.

[186] *In re Chocolate*, 801 F.3d at 396.

[187] Lubke Dep. at 527-528, Mylan MSJ, Ex. 2 [Doc. No. 489].

[188] Lubke Dep. at 476.

testified that she "wanted [Nesta] to know that the reason [she] was asking was not to hurt him but to help [Sandoz]."[189]

While the Court previously determined that Lubke's testimony regarding Mylan's involvement in the alleged clomipramine conspiracy was "not sufficiently detailed to prove the alleged conspiracy,"[190] Lubke's testimony regarding benazepril is far more detailed. Here, the testimony is sufficiently detailed to independently support the likelihood of a benazepril conspiracy at summary judgment. While "communications between competitors do not [necessarily] permit an inference of an agreement to fix prices"[191] and the exchange of price information alone is insufficient to allow an inference of a price fixing agreement,[192] here Lubke and Nesta's "communications rise to the level of an agreement, tacit or otherwise,"[193] so an inference of a price-fixing agreement is permitted. Accordingly, Humana's direct evidence of Mylan's involvement in the alleged benazepril conspiracy is sufficient to overcome summary judgment. Because Humana survives summary judgment based on its direct evidence, the Court need not also evaluate the circumstantial evidence presented.

**E. Digoxin – Lannett**

Digoxin is a generic cardiotonic glycoside used to treat heart failure and atrial fibrillation. In 2012 and 2013, Lannett and Impax were the primary competitors for digoxin. In 2014 and 2015, other manufacturers re-entered the market, including Par, West-Ward, and Mylan. Humana

---

[189] *Id*. at 477.

[190] Clomipramine Opinion at 17.

[191] *In re Baby Food*, 166 F.3d at 126.

[192] *Id*. (citing *Amey, Inc. v. Gulf Abstract & Title, Inc*., 758 F.2d 1486, 1505 (11th Cir. 1985)).

[193] *Id*. (quoting *Alvord-Polk, Inc v. F. Schumacher & Co*., 37 F.3d 996, 1013 (3d Cir. 1993)).

alleges that Lannett and Impax conspired to increase the price of digoxin in October 2013. Lannett moves for summary judgment as to digoxin.

1. Factual Background

Prior to 2013, the price of digoxin was relatively stable.[194] In July 2013, Lannett began considering a price increase to digoxin. Elliot Wilbur, who was a stock analyst with Lannett investor Needham & Co., emailed Arthur Bedrosian (Lannett) that Major Pharmaceuticals increased the WAC price of one formulation of digoxin by nearly 30%, and wrote "FYI – we like price increases. . . ."[195] Bedrosian responded, "Not as much as we do."[196] Wilbur told Bedrosian to "think big" and noted that Mylan had "just raised verapamil 550%."[197] Bedrosian forwarded these emails to Lannett's Kevin Smith.[198]

On August 26, 2013, the producer of brand name digoxin increased the brand name price by over 200%.[199]

In October 2013, Lannett was analyzing a potential digoxin price increase and observed that it could earn $50 million in revenue for six month sales.[200] Smith (Lannett) testified that the discussed price increases were not due to active pharmaceutical ingredient ("API") shortages but may have been tied to delays in API shipping.[201]

---

[194] Humana Opp'n at 111 [Doc. No. 598].

[195] 7/17/13 Bedrosian Emails (PX 598).

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] Lannett MSJ, Ex. 72, 10/2/13 Sullivan Email [Doc. No. 478-1].

[200] 10/4/13 Foley Email (PX 192); Foley Dep. at 263-265 (PX 307); Digoxin Projected Revenue Chart (PX 599).

[201] Smith Dep. at 383-385 (PX 5).

On October 15, 2013, Smith (Lannett) and Danny Darnell of Impax had an 11-minute phone call, which was the first phone communication between the two in at least three years.[202] That same day, Lannett informed its customers of digoxin price increases.[203]

Two days later, on October 17, 2013, Dan Wichman, of an investor for Lannett, emailed Bedrosian (Lannett) and asked "Am I seeing this Digoxin price increase correctly? Looks pretty large. Guess [Impax] is the main competitor there."[204] Bedrosian confirmed, and Wichman asked "You guys led and assume [Impax] will follow?" to which Bedrosian said, "That is the usual plan."[205]

Also on October 17, 2013, Impax held an internal meeting about a digoxin price increase and, the same day, began notifying customers of a price increase.[206] After issuing a price decrease on digoxin to Amerisource Bergen on October 15, 2013,[207] two days later, Impax notified Amerisource Bergen of a price increase on digoxin on October 17, 2013, which would become effective October 22, 2013[208]—just one week after the price decrease was issued and became effective.

On October 24, 2013, an Impax customer contacted Justin McManus, a national account manager at Lannett, following Impax's price increase, and McManus confirmed the Impax price increase.[209] Also on that day, Lannett executives emailed discussing "the issue of extraordinary

---

[202] Smith Dep. at 386-389 (PX 5); Smith Phone Record (PX 1665).

[203] 10/15/23 Email from Molina to Smith (PX 639).

[204] 10/17/13 Wichman Bedrosian Emails (PX 1105).

[205] *Id*.

[206] 10/17/13 Impax "Digoxin Price Increase" Meeting Invitation (PX 632); 10/17/13 Engle to Hanson Notification Letter (PX 622).

[207] 10/15/13 Trice Email (PX631).

[208] 10/17/13 Trice Email (PX633).

[209] 10/24/13 McManus Email, Lannett Ex. 77 [Doc. No. 478-1].

performance bonus years" so sufficient funds would be reserved to issue substantial year-end bonuses, and noting to "add another 4.6 million in profits by December from the Digoxin increase. Impax raised their prices."[210]

On December 4, 2013, a customer, Econdisc, asked Sullivan (Lannett) what factors contributed to the digoxin price increase, and Sullivan responded that "our cost of doing business with our contract manufacturer was increased significantly. The market price on the brand also dramatically shifted upwards. We increased our price to recoup some of our exposure."[211]

On December 5, 2013, Sullivan (Lannett) emailed Smith (Lannett), including an attachment that Humana avers lists Lannett's cost per drug, as well as the WAC price per drug. However, Humana did not provide a copy of this attachment for the record.

In late 2013, the price of digoxin spiked by over 700% while Lannett and Impax were the sole competitors. In early 2014, Par was preparing to enter the digoxin market.[212] In an internal Par email exchange on January 6, 2014, wherein Rick Guillory notified James Kellerman that Par would be launching digoxin, Jon Holden emailed Guillory and said "Just a heads up he sent your email to Lannett shortly after he received it. Can you call him and get pricing guidance?"[213]

Also on January 6, 2014, Holden (Par) and Smith (Lannett) spoke on the phone twice—once for about 14 minutes at 1:43 PM and once at 2:18 PM.[214] At 4:07 PM, Holden (Par) notified Guillory (Par) that Lannett had received Par's information about entering the market from another source.[215]

---

[210] 10/24/13 Bedrosian Email (PX1103).

[211] 12/4/13 Sullivan Email (PX 193).

[212] 1/6/14 Guillory Emails (PX 586).

[213] *Id.*

[214] 1/6/14 Smith Phone Records (PX 1730).

[215] 1/6/14 Guillory Emails (PX 586).

The same day, internal Lannett emails discussed the information that a new competitor was soon entering the market, but Smith (Lannett) did not expect it would have an impact on Q3 predictions.[216] Par ultimately entered the market in January 2014 with "WAC and AWP . . . set at parity to [Impax] and Lannett."[217]

On January 10, 2014, Smith (Lannett) called Darnell of Impax, and the call was not answered.[218] On January 15, 2014, a customer, Cardinal Health, notified Impax of a competitive bid at 3:31 PM.[219] Later that day, Darnell (Impax) returned Smith's (Lannett) call at about 5:00 PM, which lasted 9 minutes.[220] After 9:00 PM that day, Todd Engle of Impax notified other Impax employees that "Cardinal is worth about $14M in sales per year," and he provided this information for the next day's call regarding digoxin at Cardinal.[221] The next day, January 16, 2014, internal Impax emails stated that, after speaking with Cardinal, "[Impax] will relinquish the primary source position on Digoxin" for Cardinal.[222]

On January 17, 2014, Rite Aid approached Lannett with a request to bid on digoxin after receiving a competitive offer from another manufacturer.[223] In response, Smith (Lannett) asked whether it was Impax or Par and said he was "inclined to let it go or bid at slightly off our new price."[224] That day, Smith called Holden (Par) three times and called once the next day, leaving

---

[216] 1/6/26 Lannett Emails (PX602).

[217] 1/22/14 Goodman Email (PX 1490).

[218] 1/10/14 Smith Phone Records (PX 604).

[219] 1/15/14 Engle to Darnell Email (PX 634).

[220] 1/15/14 Smith Phone Records (PX 604).

[221] 1/15/14 Engle Impax Internal Emails (PX 635).

[222] 1/16/14 Grigsby Email (PX 636).

[223] 1/17/14 Smith Sullivan Emails (PX 605).

[224] *Id*.

messages between 20 and 40 seconds long on three of those calls.[225] The final call was at 10:54 AM.[226] At 11:05 AM, Smith responded to Sullivans's request for "[a]ny updates," and stated "No. He did not return my call last night and I called him 30 minutes ago and he did not pick up. . . . Rite Aid we will probably walk away from."[227]

In late January 2014, Lannett employees discussed whether to submit competing bids for other customers, specifically McKesson.[228] In this email chain, Smith states "it depends on what happened at Cardinal."[229] After some additional emails, on January 21, 2014 at 5:39 PM, Smith wrote "Just got this info. Par is out at SF. We should tweek [sic] the price."[230] At 5:22 PM, Smith (Lannett) and Holden (Par) had a 13-minute phone call, which concluded less than five minutes before Smith sent the email.[231]

When Par entered the market, West-Ward was planning to launch its reentry into the digoxin market. There are additional alleged communications between West-Ward, Par, and Mylan that are not relevant for purposes of evaluating Lannett's motion for summary judgment, so the Court will not recount them in full. Notably, however, in an internal April 11, 2014 Par email, Holden stated that he was "ok" with a "20% share for Digoxin in what's essentially a 3 player market," and stating that the "eased up" on fighting for market share was "because of the market pricing erosion concern."[232] Further, in May 2014, when West-Ward prepared to enter

[225] 1/17-18/14 Smith Phone Records (PX 606).

[226] *Id.*

[227] 1/18/14 Smith Sullivan Emails (PX 607).

[228] 1/18/14-1/21/14 Lannett Internal Emails (PX 610).

[229] *Id.*

[230] *Id.*

[231] 1/21/14 Smith Phone Records (PX 609).

[232] 4/11/14 Holden Emails (PX 585).

the market, Karen O'Connor (Par) and other Par employees sought to discuss "Lannett price reduction risk" and "West-Ward entering [the] market," among other items.[233] On May 21, 2014, O'Connor responded that she knew "Westward [sic] is coming into the market and are going after [Impax's] share."[234] The day before, O'Connor had two phone calls with Doug Statler of West-Ward.[235] In her May 21 email at 9:12 AM, O'Connor also stated that she could "check on the Lannett piece."[236] Also at 9:12 AM on May 21, O'Connor placed a call to Sullivan (Lannett), which lasted about 7 minutes.[237] At 9:21 AM, O'Connor sent another internal Par email which stated that she "just talked to Lannett and they are not having API issues and don't plan a price reduction or increase."[238]

On June 11, 2014, Justin McManus (Lannett) received an offer to bid on Walmart's digoxin business.[239] He asked Smith (Lannett) whether they should made a bid, Smith asked who the prior provider was, and when notified it was Impax, with no further information in the email, he directed McManus "Do not bid."[240] Later that day, Smith called William Ball of Impax.[241] The pair spoke for two minutes at 6:25 PM and for seven minutes at 6:42 PM.[242] At 7:05 PM, Ball emailed Mike Grisby (Impax) regarding the digoxin Walmart bid, stating that "Lannett probably will not bid."[243]

---

[233] 5/21/14 O'Connor Emails (PX 1489).

[234] *Id*.

[235] 5/20/14 O'Connor Phone Records (PX 194).

[236] 5/21/14 O'Connor Emails (PX 1489).

[237] 5/21/14 O'Connor Sullivan Phone Records (PX 588).

[238] 5/21/14 O'Connor Emails (PX 1489).

[239] 6/11/14 Smith McManus Emails (PX 611).

[240] *Id*.

[241] 6/11/14 Smith Phone Records (PX 612).

[242] *Id*.

[243] 6/11/14 Ball Email (PX 623).

On June 26, 2014, a customer, Associated Pharmacies, notified McManus (Lannett) that it had a "competitive offer on Digoxin" and offered Lannett the right to rebid.[244] McManus asked whether Lannett's existing offer was "WAY out of line" "or pretty close," and the customer responded that they could not give any guidance at 11:22 AM.[245] At 11:32 AM, Smith (Lannett) called Holden (Par) and the two spoke for nearly 13 minutes.[246] At 12:37 PM, McManus (Lannett) emailed Smith (Lannett) with a subject line "Associated" and stated "All good!! Keeping Digoxin."[247]

In early November 2013, Mylan was prepared to launch into the digoxin market.[248] On February 25, 2015, with three more manufacturers on the market than in 2013, the price of digoxin was over seven times higher than the pre-increase price.[249]

2. Circumstantial Evidence

Lannett argues that Humana has not presented sufficient evidence to overcome summary judgment as to digoxin. It is undisputed that there is no direct evidence of Lannett's participation in the allege digoxin conspiracy. Lannett claims that the record does not support an inference of conspiracy based on circumstantial evidence.

As discussed above, "a nonmovant plaintiff in a [S]ection 1 case does not have to submit direct evidence, i.e., the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence."[250] The parties agree the digoxin

---

[244] 6/26/14 McManus Emails (PX 613).

[245] *Id*.

[246] 6/26/14 Smith Phone Records (PX 614).

[247] 6/26/14 McManus Smith Email (PX 615).

[248] 11/12/14 Reilly Emails (PX 1107).

[249] Ball Dep. at 103-106 (PX 47); 2/26/14 Ball Emails (PX 629); 10/18/13 Engle Letter to Moen (PX 630).

[250] *Petruzzi's*, 998 F.2d at 1230.

market was an oligopoly before and during the 2014 price increases and Lannett's reentry into the market.[251] Thus, the Court analyzes the evidence to determine whether there is parallel conduct and, if parallel conduct did occur, whether the non-movant party meets certain plus factors.[252]

Lannett does not dispute the existence of parallel pricing. Lannett notified customers that it would be increasing digoxin prices on October 15, 2013, and Impax began notifications of its price increase just two days later, on October 17, 2013. These increases within days of one another are evidence of parallel conduct. Accordingly, the Court evaluates the plus factors.

*a. Motive*

As noted above, evidence that the market was conducive to price fixing is sufficient as evidence to demonstrate that parties had a motive to conspire.[253] Lannett argues that "the record with respect to the pricing of Digoxin reflects exactly what would be expected in an oligopoly without any conspiracy."[254] It argues that its price increase in October 2013 was "based on its own ordinary-course internal analysis" following the brand name version of digoxin increased its price.[255] Humana argues that the price of digoxin increased 800% from its mid-2013 price following the October 2013 increase.[256] It also points to the entry of new market participants in

---

[251] Lannett MSJ at 31 [Doc. No. 478].

[252] *Id.* at 398. "While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they "largely restate the phenomenon of interdependence." *In re Flat Glass,* 385 F.3d at 360.

[253] *In re Chocolate*, 801 F.3d at 398 ("Evidence of a motive to conspire means the market is conducive to price fixing.").

[254] Lannett MSJ at 31 [Doc. No. 478].

[255] *Id.*

[256] Humana Opp'n at 120 [Doc. No. 598].

2014, whose entry would contribute to a motive to conspire to keep prices high despite increased competition.[257]

Given market concentration and high barriers to entry in the market, the Court concludes that there is sufficient evidence from which a reasonable factfinder could determine that Defendants did have a motive to conspire: "There is little doubt that [a] highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing."[258] Satisfaction of this plus factor, however, "does not itself create a reasonable inference of concerted action because it merely restates interdependence."[259]

*b. Action Contrary to Interest*

"[E]vidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market."[260] Lannett argues that it "actively competed in the Digoxin market for business," and that its decision not to bid for certain customers was based on "independent strategic reasons not to bid to protect its supply and profitability."[261]

Evidence that Lannett acted contrary to its self-interest "means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."[262] Humana argues that Lannett acted against its independent self-interest by: (1) sharing pricing information

---

[257] *Id*. at 120-22.

[258] *In re Valspar*, 873 F.3d at 197.

[259] *In re Chocolate,* 801 F.3d at 398.

[260] *Id*.

[261] Lannett MSJ at 32 [Doc. No. 478].

[262] *In re Flat Glass*, 385 F.3d at 360-61.

with purported competitors,[263] (2) declining opportunities to obtain new business,[264] and (3) participating in a price increase that was not caused by change in cost or demand.

In *In re Flat Glass Antitrust Litigation*, the Third Circuit determined that evidence of actions contrary to self-interest existed where there was no proof that price increases were caused by changes in costs or demand.[265] Similarly, in *In re Chocolate Confectionary Antitrust Litigation*, the Third Circuit found that the plaintiffs had satisfied their burden to show conduct against self-interest where plaintiffs' experts opined that cost increases could not explain price increases.[266] Here, Lannett increased its digoxin prices by 700% in October 2013, which it attributed to the increase of the brand-name version of digoxin, which was increased by over 200% in August 2013. Smith's (Lannett) testimony asserts that Lannett's decision to increase the price was not based on API shortages but did consider anticipated supply disruptions. Humana's expert opined that the digoxin price increase cannot be explained by market factors alone, and Lannett's increase was substantially larger than the increase of the brand-name digoxin, and there is no evidence before the Court that the anticipated supply disruptions had yet created increased costs for Lannett.

Further, Lannett made multiple decisions to refrain from submitting bids for customers.[267] First, Lannett declined to bid for Walmart's business following notification that Impax was the incumbent manufacturer for Walmart. Lannett also decided not to submit a bid to

[263] Unilateral sharing of price information with a competitor is inconsistent with a company's self-interest. *Id.* at 361, n.12 ("[C]ertain types of 'actions against self-interest' . . . such as apparently unilateral exchanges of confidential price information, cannot simply be explained as a result of oligopolistic interdependence.").

[264] Humana Opp'n at 123-24 [Doc. No. 598].

[265] 385 F.3d at 362.

[266] 801 F.3d at 399.

[267] *Petruzzi's*, 998 F.2d at 1245 ("[A]bsent an agreement it does not make economic sense for defendants not to bid on an account, unless they have some problem like capacity or they know the existing price is too high.").

retain Rite-Aid's business, a decision which was made after Smith's comment that it was "very important" whether Impax or Par had provided the competitive bid to Rite Aid, was evidence of action against competitive interest. While there are potential non-collusive explanations for these actions, as Lannett argues,[268] the actions support a finding that Lannett acted against its interest. Humana has met its burden as to this plus factor. However, like the previous plus factor, this weighs only slightly in Humana's favor.

*c. Traditional Evidence of Conspiracy*

Traditional evidence of a conspiracy is the most important factor when evaluating circumstantial evidence of a conspiracy in an oligopolistic market.[269] This element requires plaintiffs to provide "proof that the [conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan."[270] This includes non-economic evidence that there was an "actual, manifest agreement not to compete . . . even though no meetings, conversations, or exchanged documents are shown."[271]

Lannett argues that Humana has not presented sufficient traditional evidence to demonstrate assurances of common action and that the evidence of communications between Lannett and competitors does not "allow for a reasonable inference that these calls were anything more than networking and/or personal calls between individuals in the same industry."[272] Indeed, much of Lannett's argument rests on its assertion that the record evidence regarding its pricing

---

[268] Lannett MSJ at 32 [Doc. No. 478].

[269] *In re Chocolate.,* 801 F.3d at 401.

[270] *In re Flat Glass*, 385 F.3d at 361.

[271] *In re Ins. Brokerage,* 618 F.3d at 322 (internal quotation marks omitted).

[272] Lannett MSJ at 33 [Doc. No. 478].

and bid decisions and communications with competitors does not, "individually or collectively, tend[] to exclude the possibility that Lannett acted independently."[273]

Humana points to several instances of communications that it argues support an inference of collusion. It argues there is evidence that Defendants shared competitively sensitive information, agreed not to take each other's share of the market and not poach one another's customers, and coordinated their efforts not to compete for key customers.[274]

First, the day that Lannett began notifying customers of its October 2013 price increase, Smith (Lannett) and Darnell (Impax) had an 11-minute phone call, which was their first phone communication in three years. Two days later, a Lannett investor asked Bedrosian (Lannett) about the size of the digoxin price increase and asked, "You guys led and assume [Impax] will follow?" to which Bedrosian responded, "That is the usual plan." That very same day, Impax began notifying its customers of a digoxin price increase.

Next, on January 6, 2014, internal Par emails were discussing its intention to launch digoxin and join the market. That day Holden (Par) and Smith (Lannett) had two phone calls, and after one of those calls, Holden emailed the internal Par email chain that Lannett had received information about Par's entering the market, purportedly from a different source. Also on January 6, 2014, internal Lannett emails discussed information that a new competitor would be entering the market but Smith (Lannett) did not expect the new entrant to impact Lannett's Q3 predictions.

Third, on January 15, 2014, after receiving a notification from Cardinal Health, a large customer worth $14 million in sales per year, that it received a competitive bid from another

[273] Lannett Reply Supp. MSJ at 26 [Doc. No. 657].

[274] Humana Opp'n at 124 [Doc. No. 598].

manufacturer, Darnell (Impax) returned a recent phone call from Smith (Lannett). The next day, Impax decided to "relinquish the primary source position on Digoxin" for Cardinal.

Fourth, as discussed, Lannett received an offer to bid on Rite-Aid's business. Smith (Lannett) attempted to call Holden (Par) four times in the 24 hours after he received the offer from Rite Aid, to no answer. After noting that "he did not return my call," Smith decided "Rite Aid we will probably walk away from." Lannett also decided to adjust its bid price for McKesson after Smith (Lannett) and Holden (Par) had a phone call.

Later in 2014, Lannett was in contact with competitors, including O'Connor (Par) when Par was discussing the "Lannett price reduction risk." Following a 7-minute phone call between Sullivan (Lannett) and O'Connor (Par), O'Connor sent an internal Par email stating that she "just talked to Lannett and they are not having API issues and don't plan a price reduction or increase."

When offered the opportunity to provide a bid to Walmart, Smith (Lannett) asked who the prior manufacturer was, learned it was Impax, directed McManus (Lannett) not to bid, and later called Ball (Impax). Following two calls with Smith (Lannett), Ball sent an email to another Impax employee stating that "Lannett probably will not bid."

Finally, after a customer notified McManus (Lannett) that it received a competitive offer and declined to provide any guidance on whether Lannett's offer was in line with the competitor, Smith (Lannett) called Holden (Par). Approximately an hour later, McManus (Lannett) emailed Smith (Lannett) about the customer and said "All good!! Keeping Digoxin."

Lannett argues that the fact of these communications does not exclude the possibility of independent action. However, Lannett relies on the testimony of Smith (Lannett) and

Sullivan (Lannett) that they did not recall discussing digoxin or digoxin pricing, respectively, on these phone calls.[275] The accuracy of such testimony poses a credibility issue for the jury to decide. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[276] The mere existence of testimony that the individuals involved do not remember the phone calls is not sufficient to warrant summary judgment, nor does it rebut the evidence presented that tends to exclude the existence of independent decision making. While Lannett argues that Holden (Par) sent an email requesting that a colleague "collect competitive intelligence" on Lannett following a phone call between Smith (Lannett) and Holden (Par), the email itself asks the colleague to "call him and get pricing guidance."[277] It is not clear that this request seeks "competitive intelligence" in general or on Lannett specifically. Further, the timing of the call supports a reasonable inference that the two exchanged the information that Par was entering the digoxin market and that Par would not intend to substantially disrupt the existing market.

Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions, particularly where those conversations occur between company representatives with pricing authority.[278] Humana has produced evidence that representatives of Lannett and Impax communicated about digoxin during the period when both companies implemented substantial price increases, and that Lannett communicated with other

---

[275] Lannett MSJ at 33-34 [Doc. No. 478].

[276] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249.

[277] Lannett MSJ, Ex. 96 [Doc. No. 478-1].

[278] *In re Flat Glass*, 385 F.3d at 368-69.

competitors during periods when the manufacturers were making decisions about entering the digoxin market or making bids to certain customers. To determine whether the evidence of communications can be correlated with "specific collusive behavior,"[279] "[A] court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence."[280] Here, the communications are all correlated closely in time with decisions to increase prices and refrain from bidding on customers. This information raises a reasonable inference of concerted action. Humana has produced sufficient evidence that, if credited by the factfinder, would establish this factor.

Viewing the evidence as a whole, Humana has produced sufficient evidence from which a reasonable factfinder could conclude that it is more likely than not that Defendants conspired to fix prices. Lannett's parallel price increase in 2013 does not in itself raise an inference of conspiracy.[281] Further, the first two plus factors weigh less strongly in Humana's favor than the third because the Third Circuit has explained that in price fixing cases involving oligopolies, "the first two factors largely restate the phenomenon of interdependence,' . . . [which] leaves traditional non-economic evidence of a conspiracy as the most important plus factor" in an oligopolistic market.[282]

However, Humana has produced sufficient traditional evidence of a conspiracy to survive summary judgment. Humana's evidence that Lannett engaged in specific communication with other competitors, in tandem with other evidence suggesting that they made certain pricing decisions in temporal proximity of those communications, sufficiently shows that circumstantial

[279] *Id.*

[280] *Id.*

[281] *See Valspar,* 873 F.3d at 196.

[282] *In re Chocolate*, 801 F.3d at 398.

evidence can establish a reasonable inference that Lannett participated in a conspiracy to raise the prices of digoxin. Lannett's motion for summary judgment as to digoxin will be denied.

### F. Divalproex – Mylan

In early 2013, Mylan, Par, and Wockhardt were the three generic manufacturers of divalproex.[283] In May 2013, Wockhardt exited the market, and Humana alleges that Mylan and Par conspired to use its exit as a pretext for unwarranted large price increases.[284]

#### 1. Factual Background

On May 23, 2013, news broke that Wockhardt was facing an import ban that would prevent it from importing an additional supply of divalproex.[285] Wockhardt exited the market. Following the exit, certain customers reached out to Mylan and Par to obtain a new supplier.[286] Mylan provides copies of emails showing that three customers contacted Par to be a supplier and one customer contacted Mylan.[287]

On May 31, 2013, Mylan internally proposed and approved price increases for divalproex.[288] On June 5, 2013, Par began notifying customers that it was "at max capacity for divalproex and cannot take on any additional business."[289]

On June 13, 2013, Mylan began notifying its customers of the price increase.[290] Mylan's WAC price increases included a 230% increase on "100's" of 250mg, 247% for 100's on 500mg,

---

[283] Mylan MSJ at 30 [Doc. No. 489].

[284] Humana Opp'n at 127 [Doc. No. 598].

[285] Mylan MSJ at 30 [Doc. No. 489]; https://www.reuters.com/article/world/wockhardt-hit-by-fda-import-alert-on-drug-plant-idUSDEE94M095/.

[286] Mylan MSJ, Ex. 121, Ex. 122, Ex. 123, Ex. 124 [Doc. No. 489-2].

[287] *Id*.

[288] Mylan MSJ, Ex. 125, 5/31/13 Mylan Emails [Doc. No. 489-2].

[289] Mylan MSJ, Ex. 127, 6/5/13 Guillory Emails [Doc. No. 489-2].

[290] 6/13/13 Guillory Email (PX 655), Mylan MSJ, Ex. 126 [Doc. No. 489-2].

60% for 500's on 500mg, and 338% for 500's on 250mg.[291] Par further identified that it was selling at its limits on June 13, 2013.[292] Also on June 13, 2013, Lance Wyatt of Mylan had a phone call with Amanda Rebnicky of Dr. Reddy's.[293] Dr. Reddy's was not part of the divalproex market, but it received FDA approval to sell divalproex in March 2012.[294]

The next day, on June 14, 2013, Michael Aigner of Mylan called Karen O'Connor of Par.[295] The pair spoke for nearly 16 minutes.[296] That day, Jon Holden (Par) sent an internal email asking for more information about Mylan's price increase.[297] O'Connor (Par) responded with detailed information regarding Mylan's increases for various concentrations and amounts.[298] On June 19, 2013, Par sent internal emails expressing an intention to match Mylan's new AWP and WAC prices.[299] On June 25, 2013, twelve days after Mylan's increase, Par increased its divalproex prices.[300] The next day, on June 26, 2013, Aigner (Mylan) and O'Connor (Par) spoke on the phone for approximately 3 minutes.[301]

In August 2013, Zydus was planning to enter the divalproex market, and O'Connor (Par) "tried to find out" the market share Zydus was seeking.[302] O'Connor (Par) spoke with Laura Short of Zydus on August 6, 2013, for over 20 minutes and August 16, 2013, for approximately

---

[291] 6/14/13 O'Connor Email (PX 656).

[292] Mylan MSJ, Ex. 128 6/13/13 Guillory Email [Doc. No. 489-2].

[293] 6/13/13 Wyatt Phone Records (PX 201).

[294] Humana Opp'n at 127 [Doc. No. 598].

[295] 6/14/13 O'Connor Phone Records (PX 196).

[296] *Id.*

[297] 6/14/13 O'Connor Email (PX 656).

[298] 6/14/13 O'Connor Email (PX 656).

[299] 6/19/13 Altamuro Email (PX 661).

[300] 6/24/13 Minchin Email (PX 657).

[301] 6/26/13 Aigner Phone Records (PX 197).

[302] O'Connor Dep. at 131-132 (PX 46).

12 minutes.[303] Zydus ultimately launched divalproex at the prevailing Mylan/Par WAC on August 14, 2013.[304]

On August 13, 2013, a customer, McKesson, asked Wyatt (Mylan) whether Mylan would bid to retain McKesson's divalproex business.[305] Wyatt responded that Mylan was "going to let Zydus have a little share here folks."[306] On Augst 15 and 16, 2013, James Nesta (Mylan) and Kristy Ronco (Zydus) exchanged several texts and had at least one phone call.[307] McKesson ultimately accepted a bid from Dr. Reddy's and put Mylan in a secondary position.[308]

Dr. Reddy's launched in the divalproex market on August 22, 2013.[309] On August 28, 2013, Nesta (Mylan) and Jake Austin of Dr. Reddy's spoke on the phone several times.[310] Within a week, Mylan elected to "give up [its] share" of divalproex to Dr. Reddy's.[311]

In early September 2012, Mylan and Par were both submitting divalproex bids to Cardinal.[312] On September 6, 2013, Aigner (Mylan) and O'Connor (Par) had a 22-minute phone call.[313] The next day, Paul Campanelli, the president of Par, emailed O'Connor (Par) to thank her "for resolving the Cardinal situation with Mylan."[314]

---

[303] 8/6/13 O'Connor Phone Records (PX 198); 8/16/13 O'Connor Phone Records (PX 199).

[304] Mylan MSJ, Ex. 138, 8/14/13 Bover Email [Doc. No. 489-3]; Mylan MSJ at 31 [Doc. No. 489].

[305] 8/13/13 Wyatt Emails (PX 660).

[306] *Id*.

[307] 8/15-16/13 Nesta Phone Records (PX200).

[308] Mylan MSJ at 31 [Doc. No. 489]; Ex. 147, 8/30/13 Nuzum Emails; Ex. 148, 10/2/13 Campbell Emails; Ex. 149, 9/25/13 Wyatt Emails [Doc. No. 489-3].

[309] 8/22/13 Kenney Email (PX 662).

[310] 8/28/13 Nesta Phone Records (PX 204).

[311] 9/5/13 Wyatt Email (PX 1504).

[312] 9/3/13 O'Connor Emails (PX 658).

[313] 9/6/13 O'Connor Phone Records (PX 195).

[314] 9/7/13 Campanelli Email (PX 659).

In February 2014, Mylan and Dr. Reddy's both presented offers to a customer, Omnicare.[315] The same day that Nesta (Mylan) approved a price decrease in Mylan's offer to Omnicare, Nesta and Austin (Dr. Reddy's) spoke on the phone twice.[316] Two days later, the pair had three phone calls.[317]

2. <u>Circumstantial Evidence</u>

The evidence presented by Humana does not rise to the level of direct evidence of Mylan's participation in a conspiracy to fix the price of divalproex. Accordingly, the Court reviews the evidence to determine whether Humana has presented circumstantial evidence of parallel conduct and any plus factors sufficient to support a reasonable inference that Mylan participated in a divalproex conspiracy such that a reasonable jury could find that Mylan's participation was more likely than not.

*a. Parallel Conduct*

Mylan first argues that there is no evidence of parallel conduct, pointing to Wockhardt's exit from the market prior to Mylan's price increase. Yet, this factor looks specifically at the conduct of the alleged conspirators, not their reasoning for acting. On May 31, 2013, Mylan internally approved price increases. On June 13, 2013, Mylan notified its customers of the increase. On June 25, 2013, twelve days later, Par also increased its divalproex prices.

These actions, raising divalproex prices, within two weeks of one another meets the standard for parallel conduct. This Court previously held at the motion to dismiss stage that "[p]laintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct…'Rather, they must allege price

[315] 2/25/14 Nesta Email (PX 667).

[316] 2/25/14 Austin Phone Records (PX 207).

[317] 2/27/14 Austin Phone Records (PX 207).

increases that are 'reasonably proximate in time and value.'"[318] At summary judgment, this does *not* require that the entities acted identically or that they engaged in identical conduct.[319] This Court previously held that price increases over two weeks apart satisfied the parallel conduct prong.[320] Humana has met its burden of showing parallel conduct.

*b. Motive to Conspire*

Next, Mylan argues that no plus factors have been established, including that there was no motive to conspire. It claims that Mylan "made the independent, profit-maximizing decision to increase WAC after Wockhardt exited the market."[321] This argument, however, rests on Mylan's motivations, not the market conditions that would create a motive to conspire. Here, Humana has presented evidence that Wockhardt exited the market, leaving a two-player market absorbing new customers from Wockhardt.

Given market concentration and high barriers to entry in the market, the Court concludes that there is sufficient evidence from which a reasonable factfinder could determine that Defendants did have a motive to conspire: "There is little doubt that [a] highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing."[322] However, this plus factor, standing alone, does not support a reasonable inference of conspiracy "because it merely restates interdependence."[323]

---

[318] *In re Generic Pharms. Pricing,* 338 F. Supp. 3d at 441 (quoting *In re Blood Reagents*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010)).

[319] *Id.* at 442.

[320] Clomipramine Op. at 21.

[321] Mylan MSJ at 32-33 [Doc. No. 489].

[322] *In re Valspar*, 873 F.3d at 197.

[323] *In re Chocolate,* 801 F.3d at 398.

*c. Conduct Against Interest*

Mylan next argues that there is no evidence of conduct contrary to its self-interest. In addition to arguing the price increase was inconsistent with a competitive market and could not have been explained by changes in cost or demand,[324] Humana points to several instances where Mylan declined to try to defend a customer from a new entrant competitor, including McKesson, Rite Aid, and Walgreens. Further, Humana presented evidence that Mylan gave up its market share to Dr. Reddy's following its entry into the market.

Mylan's expert, Richard J. Gilbert, opined that "[i]t can be consistent with the unilateral self-interest of an incumbent to accommodate an entrant by declining to defend a position at one or more customers."[325] In his analysis, he explains that electing to cede a customer can keep prices high and bring market share to equilibrium. However, the testimony he cites notes there are competing factors at play between retaining a customer and aiming to keep prices high.[326]

Further, there is no evidence before the Court that in these instances, Mylan considered this motivation in declining to retain Rite Aid, Walgreens, or McKesson. Gilbert's report also does not comment on a decision to cede market share to a competitor without discussion of a particular customer. Humana presented evidence that Mylan "gave up" a market share, without reference to declining to bid on a particular customer. Given the competing evidence on this issue, the Court finds that Humana has met its burden to show that Mylan acted contrary to its self-interest, but this factor weighs only slightly in Humana's favor.

---

[324] Bradford Rep. ¶¶ 154-173 (PX 143).

[325] Mylan MSJ, Ex. 28, Gilbert Rep. ¶ 283 [Doc. No. 489].

[326] *Id*. ¶¶ 281-300.

*d. Traditional Evidence of Conspiracy*

Finally, Mylan argues that Humana has not presented any traditional evidence of a conspiracy. Specifically, Mylan argues that the "mere fact of telephone connections" is not sufficient to conclude that any communication occurred or that the content of any of the calls involved agreement regarding divalproex.[327] Indeed, "[m]ere communication between alleged co-conspirators, without more, is not sufficient to defeat the presumption of independent action."[328] Yet, Humana presents well more than the mere fact of communication.

Not only are there several instances of communication between Mylan and its competitors, but these phone calls are in close temporal proximity to pricing decisions by Mylan or its competitors. Most clearly, Mylan and Par were purportedly competing for Cardinal's business, for which Par was the incumbent. In the midst of the purported competition, Aigner (Mylan) had a 22 minute call with O'Connor (Par). The very next day, the President of Par thanked O'Connor "for resolving the Cardinal situation with Mylan." This evidence tends to exclude the possibility of independent action, and provides a reasonable inference that Mylan participated in a conspiracy.

The fact of Wockhardt's exiting the market prior to the price increase does not overcome the evidence presented by Humana. It is a question of fact whether Mylan and Par's initial increase amount was correlated to the Wockhardt's export ban, and Humana's expert Dr. Bradford opines that the exit of a competitor from the market cannot explain price increases of divalproex. Further, Wockhardt's exit does not explain the alleged cooperation and collusion between Mylan and new market entrants of Dr. Reddy's and Zydus.

---

[327] Mylan MSJ at 33-34 [Doc. No. 489].

[328] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 153 (3d Cir. 2017).

Thus, Humana has met its burden to produce sufficient traditional evidence of a conspiracy to survive summary judgment. Humana's evidence that Mylan engaged in specific communication with other competitors, in tandem with other evidence suggesting that they made certain pricing and bidding decisions in temporal proximity of those communications, sufficiently shows that circumstantial evidence can establish a reasonable inference that Mylan participated in a conspiracy to raise the prices of divalproex.

**G. Levothyroxine – Mylan, Lannett**

Levothyroxine is a synthetic thyroid hormone used to treat hypothyroidism.[329] Humana alleges that Mylan and Lannett participated in a conspiracy with Sandoz to raise prices of levothyroxine in January 2013, August/September 2013, and April/May 2014. Both Mylan and Lannett move for summary judgment as to levothyroxine.

1. Levothyroxine Factual Background

Mylan began considering a levothyroxine price increase in mid-2012.[330] In late 2012, the brand-name version of levothyroxine increased prices.[331] In December 2012, Mylan approved a price increase.[332] On January 3, 2013, Mylan sent notices of price increases to customers, with the 20% increases to become effective the following day.[333]

Also on January 3, 2013, Nesta (Mylan) had multiple phone calls with Kevin Green of Teva, who was not a levothyroxine manufacturer.[334] The next day, Green (Teva) had multiple phone calls with counterparts at Sandoz—a levothyroxine manufacturer, Paul Krauthauser and

---

[329] Mylan MSJ, Ex. 23, ¶ 22 [Doc. No. 489-1].

[330] Mylan MSJ, Ex. 232, July 2012 Scorecard [Doc. No. 489-3].

[331] Mylan MSJ, Ex. 234 [Doc. No. 489-3].

[332] *Id.*

[333] 1/3/13 Kelley Email (PX 808);

[334] 1/3/13 Nesta Phone Records (PX 809).

Armando Kellum.[335] Later that day, Kellum (Sandoz) sent an internal email stating that he "[j]ust heard from a customer that . . . Mylan took a significant price increase on levothyroxine."[336] Kellum's phone records do not reflect any calls with customers on January 4, 2013.[337]

On January 3, 2013, Nesta (Mylan) also called Bill Hill, the vice president of sales at Alvogen, which did not sell levothyroxine.[338] The next morning, January 4, Hill called Kevin Smith (Lannett), and the two had a six minute phone call.[339] Immediately following that call, Smith (Lannett) and Hill (Alvogen) both called Nesta (Teva) at 8:51 AM.[340] Neither call appears to have been answered as both lasted approximately 40 seconds. Smith's call to Nesta was the first call between the two, according to the phone records. Two minutes later, Nesta returned Hill's call and the pair spoke for over 4 minutes.[341]

The same day as the Mylan price increase, effective January 4, 2013, customers reached out to Lannett, but Lannett declined to take on additional business.[342] On January 10, 2013, Nesta (Mylan) and Smith (Lannett) spoke on the phone for approximately 5 minutes.[343] Nesta later called Smith back to no answer.[344] Smith testified that, at this time, Lannett was "in the process of evaluating what we should do with levothyroxine."[345]

---

[335] 1/4/13 Green Phone Records (PX 809).

[336] 1/4/13 Kellum Emails (PX 827).

[337] Humana Opp'n at 173 n.1108 [Doc. No. 598].

[338] 1/3/13 Hill Phone Records (PX 1725).

[339] 1/4/13 Smith Phone Records (PX 829).

[340] 1/4/13 Smith Phone Records (PX 829); 1/4/13 Hill Phone Records (PX 1725).

[341] 1/4/13 Hill Phone Records (PX 1725).

[342] 1/4/13 McManus Email (PX 1388); 1/4/13 Sullivan Email (PX 834).

[343] 1/10/13 Smith Phone Records (PX 810).

[344] *Id.*

[345] Smith Dep. at 614 (PX 33).

On January 14, 2013, Lannett implemented a pricing change. The parties dispute whether this change was a WAC increase or decrease.[346] Mylan argues it was a decrease of WAC; however, the only evidence Mylan provides is an email regarding a particular consumer who received a price decrease.[347] Nor does Humana provide evidence of a comparison between the WAC prices before and after the adjustment. Accordingly, it is a disputed question of fact whether Lannett increased its WAC price in January 2013.

Following this adjustment, Lannett told interested customers that it was "not currently accepting new business" for levothyroxine and certain other drugs prior to providing a pricing bid.[348]

In July 2013, Sandoz learned that Mylan and Teva both increased the prices on several drugs.[349] Vezza, of Sandoz, testified that Sandoz wanted to get a comprehensive list of Teva and Mylan increases "so A, we wouldn't poach customers on those products; and B, that we could . . . allocate our inventory; and then C, do the math, try to follow the increase."[350] Della Lubke (Sandoz) testified that she was asked to ascertain pricing information on Mylan by her supervisors and colleagues, including in one July 15, 2013 meeting and follow up email at 12:11 PM on July 16, 2013.[351]

On July 16, 2013, Lubke (Sandoz) called Nesta (Mylan) at 4:50 PM and the two spoke again at 5:24 PM for approximately 20 minutes.[352] Lubke testified that she called Nesta because

---

[346] 1/14/13 Sullivan Letter to Cadigan (PX 835).

[347] Mylan MSJ, Ex. 241, 1/16/13 Molina Email [Doc. No. 489-3].

[348] 3/4/13 Carotenuto Emails (PX 800).

[349] 7/15/13 Kellum Emails (PX 822); 7/16/13 Vezza Email (PX 375).

[350] Vezza Dep. at 1661 (PX 2).

[351] Lubke Dep. at 687-688, 692-694 (PX 5); 7/16/13 Vezza Email (PX 375).

[352] 7/16/13 Lubke Phone Records (PX 804).

she "needed to know what price increases Mylan was taking on products so that [Sandoz] could follow."[353] Nesta provided a list of drugs on which Mylan planned "BIG" increases, including levothyroxine.[354] Lubke testified that she believed Nesta shared that information with her "because of what I had said, that we were looking for a list of price increases so that we could follow."[355] As discussed above, Lubke was praised for obtaining this information.

On August 6, 2013, Mylan's pricing committee, including Nesta, approved a significant increase on levothyroxine, which was estimated to increase Mylan's gross margin by $173.2 million.[356] That morning, Nesta (Mylan) called Lubke (Sandoz) and Smith (Lannett), from Mylan's two levothyroxine competitors, to no answer.[357] Nesta followed up by calling Hill (Alvogen) and Green (Teva), who he has also spoken with during the January 2013 levothyroxine increases.[358] On August 8, 2013, Mylan notified its customers of the increase, which became effective August 9, 2013.[359]

From August 10 to August 13, 2013, representatives from Mylan, Sandoz, and Lannett attended the NACDS Total Store Expo in Las Vegas, Nevada, including Nesta (Mylan), Smith (Lannett), and Lubke (Sandoz).[360] While at the trade show, Lannett was working on a price increase to follow Mylan's.[361]

---

[353] Lubke Dep. at 699 (PX 5); *see also id*. at 710, 715.

[354] 7/16/13 Lubke Email (PX 535).

[355] Lubke Dep. at 701-702 (PX 5).

[356] 8/9/13 Mauro Email (PX 806); 8/6/13 Mylan Pricing Committee Meeting Minutes (PX 794); .

[357] 8/6/13 Nesta Phone Records (PX 807).

[358] *Id*.

[359] 8/8/13 Kelley Email (PX 797).

[360] 8/11/13 NACDS Email (PX 1401); 8/8/13 Nesta Email (PX 1402); 6/10/13 Lubke Email (PX 1422); Smith Dep. at 621-622 (PX 33).

[361] Smith Dep. at 622-623 (PX 33); 8/12/13 McManus Emails (PX 836); Sullivan Dep. at 454-455 (PX 34).

On Saturday, August 10, 2013, during the trade show, Steven Greenstein of Sandoz sent an internal email saying, "I am hearing that late Thursday evening Mylan took a 300% price increase on Levothyroxine!!!," Lubke (Sandoz) responded "This is correct based on my info as well."[362] Lubke testified that she got this information directly from Nesta (Mylan).[363]

On the last day of the trade show, August 13, 2013, Lannett increased its levothyroxine prices to match Mylan's WAC prices.[364] When a customer told Lannett that it could obtain Mylan's Levothyroxine for a lower price than Lannett, McManus (Lannett) told the customer: "[Mylan's prices] are way higher than that…price increase went out Friday. WAC, AWP and contract. *We confirmed here at the show [NACDS] before we followed*."[365] Following the increase, Lannett told prospective customers that it was not in a position to take on additional business,[366] yet within days of conveying this information, McManus (Lannett) sent an internal email stating that "[w]e are still in full supply of Levothyroxine."[367] In the days following Lannett's increase, Greenstein (Sandoz) sent an internal email stating that "Lannett rationalized the market earlier this week" regarding levothyroxine pricing.[368] Kellum (Sandoz) then requested levothyroxine be put on an inventory hold.[369]

Sandoz increased levothyroxine prices on September 12, 2013.[370] Lubke testified that Sandoz's Levothyroxine increase in September 2013 was consistent with the representations she

---

[362] 8/10/13 Greenstein Email (PX 825).

[363] Lubke Dep. at 758-759 (PX 5).

[364] 8/3/13 Molina Email (PX 837, PX 815); 8/13/13 Sullivan Letter (PX 838); 8/13/13 McManus Emails (PX 814).

[365] 8/13/13 McManus Emails (PX 814) (emphasis added).

[366] 9/12/13 McManus Emails (PX 817); 9/5/13 Smith Email (PX 818).

[367] 9/12/13 McManus Emails (PX 819).

[368] 8/14/13 Greenstein Emails (PX 1418).

[369] 8/20/13 Kellum Emails (PX 1414).

[370] 9/12/13 Rosado Email (PX 826).

had made to Jim Nesta at Mylan, that Sandoz would follow Mylan's price increases.[371] The day following Sandoz's increase, Smith (Lannett) declined to take on levothyroxine business for a prospective customer.[372] Sandoz, too, declined to bid on additional business after the increase.[373]

On March 27, 2014, Nesta (Mylan) called Smith (Lannett) at 12:01 PM, and the two spoke for over four minutes.[374] Smith later called Greenstein (Sandoz) and they had two phone calls totaling 9 minutes.[375] According to the records, this was the first phone contact between Smith and Greenstein.

On April 11, 2014, the Mylan pricing committee, without Nesta present but with a proxy voting in his place, approved an increase on levothyroxine.[376] The increase required and obtained approval from the Executive Committee on April 22, 2014.[377] On April 23, 2014, Nesta (Mylan) called Smith (Lannett) multiple times.[378] The two spoke for about 50 seconds at 7:57 PM.[379] At 8:10 PM, Smith (Lannett) sent an internal email to colleagues that "It will happen tomorrow," and McManus responded with "Levo?"[380]

The next day, Mylan implemented its levothyroxine price increase and notified its customers.[381] The day of Mylan's increase, Lannett held a conference call.[382] At 9:05 AM,

[371] Lubke Dep. at 760 (PX 5).

[372] 9/13/13 Smith Emal (PX 801).

[373] 11/13/13 Kellum Email (PX 1419).

[374] 3/27/13 Smith Phone Records (PX 811).

[375] *Id*.

[376] 4/24/14 Singletary Email (PX 1403); 4/11/14 Singletary Email (PX 1409); 4/11/14 Nesta Email (PX 1412).

[377] 4/24/14 Singletary Email (PX 1403).

[378] 4/23/13 Smith Phone Records (PX 813).

[379] *Id*.

[380] 4/23/14 Smith Email (PX 832).

[381] 4/24/14 Singletary Email (PX 812).

[382] 4/23/14 Smith Email (PX 832).

McManus (Lannett) emailed Smith (Lannett) contact information for Greenstein (Sandoz).[383] Smith testified that the conference call probably occurred before McManus sent the email.[384] Later that day, Smith called Greenstein, and they spoke at least twice, including for four minutes at 4:37 PM.[385] At 4:51 PM, Greenstein (Sandoz) sent an internal email stating "I am hearing that Mylan just took a price increase on Levothyroxine. We will need to confirm but I was told their WACs are going up 55%."[386] He also stated that he "heard that Lannett is taking the price up [too]."[387] William Giannone, a pricing analyst, responded "Good work Steve. ChaChing."[388] Sandoz immediately put the product on strict allocation,[389] and Armando Kellum instructed his colleagues not to accept new offers from any customers for levothyroxine.[390]

Four days after Mylan's increase, Lannett sent notices of its own price increase on April 28, 2014.[391] On May 22, 2014, Sandoz increased its levothyroxine prices to match Mylan and Lannett.[392]

In early May 2014, after a customer inquired about the price increase, Lannett blamed the increase on an increase in the API price.[393] When the customer asked for documentation that the

---

[383] 4/24/14 McManus Emali (PX 833).

[384] Smith Dep. at 647 (PX 33).

[385] 4/24/14 Smith Phone Records (PX 813).

[386] 4/24/14 Giannone Email (PX 1425).

[387] *Id.*

[388] *Id.*

[389] 4/24/14 Vezza Email (PX 1427).

[390] 4/26/14 Kellum Email (PX 1424).

[391] 4/24/14 Sullivan Letter (PX 1374).

[392] 5/22/14 Christides Email (PX 1426).

[393] 5/1/14 Sullivan Email (PX 1391); 5/2/14 Sullivan Email (PX 1375).

API price increased, Lannett did not do so and then rescinded to price increase as to that customer on July 23, 2014.[394]

Humana alleges that, prior to rescinding the increase, on July 15, 2014, Smith (Lannett) called Greenstein (Sandoz) and on July 21, 2014, Sullivan (Lannett) called Nesta (Mylan).[395] However, Humana does not correctly identify these phone records for the Court. Accordingly, the Court cannot consider these communications.

2. Mylan's Motion for Summary Judgment

*a. Parallel Conduct*

The parties do not dispute that there is no direct evidence, so the court evaluates the circumstantial evidence. Mylan first argues that there is no parallel conduct alleged. First, it points to the January 2013 increase where it argues that following Mylan's price increase, Lannett decreased its prices to mirror Mylan's new price.[396] Because the record has not established that Lannett increased its prices following Mylan's increase, there is no evidence of parallel conduct related to the January increase. However, the record is undisputed that both the August 2013 and April 2014 cases involve Mylan increasing its prices, with Lannett increasing its prices within days. This evidence is sufficient to establish parallel conduct, such that the Court will evaluate the plus factors.

*b. Plus Factors*

***(1) Motive to Conspire***

Mylan next argues that there is no motive to conspire because Mylan's version of levothyroxine was interchangeable with 4 branded products, while its competitors' versions were

---

394 5/2/14 Sullivan Emails (PX 1384); 7/23/14 Sullivan Email (PX 1218).

395 Humana Opp'n at 183 [Doc. No. 598].

396 Mylan MSJ at 47 [Doc.  No. 489].

interchangeable with only 3 branded products. Humana has presented evidence that the interchangeability of the generic drug with the various branded versions that, if credited, would not have an impact on the consumer.[397] Accordingly, given the highly concentrated nature of the market and the high barriers to entry, the Court finds that the market is conducive to price fixing, which is sufficient to demonstrate motive to conspire.

#### *(2) Action Contrary to Interest*

Mylan next argues that there was no conduct against its interest because the decisions it made were economically rational. However, Humana has presented evidence that, if credited, would establish Mylan acted against its interests in sharing information with competitors prior to its price increases, engaging in communications with competitors surrounding the increases, and by increasing prices such that the increase cannot be explained by a competitive market.

#### *(3) Traditional Evidence of Conspiracy*

Finally, Mylan argues there is no traditional evidence of conspiracy because Humana does not provide evidence of the content of the April 2014 call between Nesta (Mylan) and Smith (Lannett).

However, Humana does not identify just one phone call to support evidence of conspiracy. First, in January 2013, Nesta (Mylan) called counterparts at Teva and Alvogen, both of which do not sell levothyroxine, who subsequently called Kellum (Sandoz) and Smith (Lannett), respectively. Following those calls, Kellum reported hearing information about Mylan's increase and Smith sought to contact Nesta. This evidence supports a reasonable inference that individuals from Teva and Alvogen shared information from Nesta regarding levothyroxine with competitors at Sandoz and Lannett.

---

[397] Smith Dep. at 627 (PX 33); Kesselheim Rep. ¶ 25 (PX 151).

On the day of the January 2013 increase, Nesta (Mylan) and Smith (Lannett) had a phone call while Lannett was evaluating what to do with levothyroxine. Following that call, Lannett implemented its disputed price adjustment. After the increase, Lannett was not accepting new business on levothyroxine. While the record evidence is disputed as to Lannett's parallel price matching, there is sufficient evidence to support a reasonable inference that Nesta and Smith discussed the levothyroxine market that may have affected Lannett's decisions to take on new customers.

In July 2013, Nesta (Mylan) spoke with Lubke (Sandoz), allegedly with the knowledge that Sandoz wanted advance knowledge of Mylan's price increases so that it could follow. The evidence supports the inference that Nesta provided Lubke a list of such drugs, including levothyroxine. Indeed, the following month, Mylan did implement such an increase on levothyroxine. Given the notice given over a month before Mylan's increase and Lubke's testimony that sharing such knowledge could make Mylan vulnerable, Humana produced sufficient evidence to establish that Nesta shared this information and that there was a tacit agreement between Mylan and Sandoz not to sabotage one another with the pricing information.

Further, Mylan approved a levothyroxine price increase on August 6, 2013, and Nesta (Mylan) called both Lubke (Sandoz) and Smith (Lannett), to no avail. He then attempted to call counterparts at Teva and Alvogen. On August 8, Mylan notified customers of the price increase, and on August 10, representatives from Mylan, Sandoz, and Lannett attended a trade show together. During the trade show, Lannett decided to increase its prices and Sandoz confirmed Mylan's increase. Humana presents additional evidence that the representatives discussed levothyroxine at the conference in the form of an email from Lannett to a customer that confirmed Mylan's prices were "way higher" than what the customer represented and that

Lannett confirmed the information at the trade show. This evidence supports a reasonable inference that the competitors discussed levothyroxine pricing and customer supply.

Finally, on March 27, 2014, Nesta (Mylan) called Smith (Lannett), who then called Greenstein (Sandoz) after speaking with Nesta. On April 11, 2014, Mylan initially approved a levothyroxine price increase, which was given final approval on April 22. On April 23, 2014, Nesta (Mylan) called Smith (Lannett) multiple times, and following one call, Smith sent an email saying, "It will happen tomorrow." This evidence of phone contact in late March and the day after approval was given does not definitively prove the content of the calls. However, the evidence is sufficient to support a reasonable inference that Nesta warned Smith and Greenstein that a Mylan price increase was coming, obtained agreement that Lannett and Sandoz would follow, and that on April 23, Nesta confirmed the timing of the information he had previously provided to Smith. Indeed, Lannett increased its prices shortly after Mylan's increase.

Mylan presumes that it cannot be a participant in a conspiracy if it acts first. Yet, Humana presents record evidence that supports reasonable inferences that Mylan intentionally notified competitors of its anticipated price increases and of the size of those increases and that it communicated with competitors to ensure that they would follow the increases, not seek to undercut the market, and not poach customers from one another.

Mylan further argues that "there is no information that could have been disclosed on [the April 2014] call other than a decision to increase Mylan's WAC price—which was publicly announced to customers the following day."[398] This too is false. On the calls, Nesta could have exchanged timing and exact pricing information, obtained agreements—tacit or otherwise—from

[398] Mylan MSJ at 48 [Doc. No. 489].

competitors that they would seek to keep the high prices, and enter into agreements that they would not seek to take clients from one another while the price increases occurred.

Mylan also argues that attending a conference or trade show is not evidence of a conspiracy. As this court previously held: "Participation in trade organizations and their meetings demonstrates how and when Defendants had opportunities to exchange information or make agreements. While this information exchange, standing alone, does not create an inference of an illegal agreement . . . , the fact of its existence indisputably facilitates and supports an inference of an agreement."[399] While lawful behavior, on its own, would not establish participation in an unlawful conspiracy, the evidence of trade show attendance, information shared after the show, the timing of Lannett's increase, and the opportunity to conspire are probative information which the jury may consider.

The Court finds that Humana has presented sufficient evidence such that a reasonable jury could infer that it is more likely than not that Mylan participated in a conspiracy regarding levothyroxine. Mylan's motion for summary judgment on levothyroxine will be denied.

3. Lannett's Motion for Summary Judgment

Lannett also moves for summary judgment on levothyroxine. The Court's analysis of parallel conduct and motive to conspire are identical for Lannett, so Humana has established these factors as to Lannett as well.

*a. Action Contrary to Interest*

Humana produced evidence sufficient to support a reasonable inference that Lannett acted contrary to its interest. There is evidence to support an inference that Lannett shared its plans to increase its prices and follow Mylan's increases with competitors, including Sandoz,

[399] *In re Generic Pharms. Pricing*., 338 F. Supp. 3d 404 at 449-450 (internal quotations omitted).

based on communications in: January 2013, when Smith spoke with Nesta between the Mylan and Lannett increases; August 2013, when Lannett confirmed the Mylan increase and relayed that information to customers; and April 2014, when Sandoz said it "heard that Lannett was taking the price up to[o]" following calls between Smith (Lannett) and Greenstein (Sandoz).

There is also evidence that Lannett acted against its interest by declining to take on new customers when it had a full supply of levothyroxine. Thus, Humana has presented evidence to establish this factor, if credited.

*b. Traditional Evidence of Conspiracy*

Lannett argues that Humana has failed to establish traditional evidence of conspiracy by relying on witness and expert testimony. First, Lannett argues that Smith and Greenstein deny a levothyroxine conspiracy and testified that they did not remember the content of the communications that Humana identified. Second, Lannett relies on an expert opinion that certain of the calls Humana identifies in the record are attenuated to such an extent that "the records do not support that anyone spoke, nor contain any content, and therefore, they do not provide enough information to determine if there was a conversation or, if there was, who the participants were."[400] Such testimony establishes that there is a genuine dispute of material fact regarding the traditional evidence of conspiracy that must be decided by a jury. The Court may not weigh evidence or make credibility determinations at this juncture. Accordingly, the evidence to which Lannett points does not rebut the evidence this Court has recounted that supports a reasonable inference of Lannett's participation in a levothyroxine conspiracy. Lannett has not established it is entitled to summary judgment on this claim.

[400] Lannett MSJ, Ex. 56, Jensen Rep. ¶ 44 [Doc. No. 478-1].

### H. Overarching Conspiracy Claims

In addition to moving for summary judgment on the individual drug claims, Mylan and Lannett each also move for summary judgment on the overarching conspiracy claims. Having determined that there is a triable issue of fact about whether an overarching conspiracy existed, the Court will now decide whether Mylan and Lannett were each knowing participants in that conspiracy.

#### 1. Mylan

Mylan argues that Humana has not produced sufficient evidence to establish its participation in the overarching conspiracy because it alleges: (1) there is no evidence Mylan joined the overarching conspiracy, (2) any deferred prosecution agreements ("DPAs") or plea agreements do not mention Mylan, (3) Mylan was a victim of the proposed pravastatin conspiracy, (4) there is no evidence of the three *Kelly* factors, and (5) that Humana seeks to add claims through its expert witness.

Several of these arguments are easily dispensed with. First, as to the last argument, an expert cannot add a party as a defendant on certain claims, and Humana does not bring the identified individual conspiracy claims against Mylan and it cannot seek damages based on individual conspiracies as to baclofen, clobetasol, econazole, and pravastatin.

Second, this Court addressed the *Kelly* factors above in its decision on the overarching conspiracy. The Court determined that it is a triable issue whether an overarching conspiracy existed, and thus the *Kelly* factors are established for purposes of summary judgment. The remaining issue is whether Mylan itself was aware of and committed to the common goal.

Third, to the extent that Mylan argues that the DPAs and plea agreements do not make Humana's case against it, it is correct. However, Humana need not prove Mylan's involvement in the overarching conspiracy through a DPA or plea agreement.

Mylan's remaining arguments warrant more fulsome analysis.

Mylan's claim that it cannot be a participant in the overarching conspiracy because it claims to be a victim of the alleged pravastatin conspiracy fails. Humana stipulated to the dismissal of pravastatin claims against Mylan, so it is not facing liability for involvement in a pravastatin conspiracy. Even if an individual sub-agreement within the overarching conspiracy could have harmed Mylan, which Mylan has not established,[401] Humana is not required to prove that each individual member of the overarching conspiracy was aware of and benefitted from each individual action in furtherance of the conspiracy. As this Court has previously held, "a single conspiracy may attract different members at different times or involve sub-groups committing acts in furtherance of the overall plan. A defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy."[402] An individual participant need not be accused of having knowledge of and benefited from all activities to have advanced the conspiracy. Accordingly, Mylan's potential harm from a pravastatin-specific sub-agreement does not obviate the possibility of its involvement in the overarching conspiracy. If Humana proffers sufficient evidence from which a reasonable jury could infer that it is more likely than not that Mylan was a participant, then Mylan's claimed harm from pravastatin, for which it did not provide evidence, will not otherwise warrant summary judgment on the overarching conspiracy claim against it.

As recounted above, Humana presented evidence that Nesta (Mylan) shared information on a host of drugs with Lubke (Sandoz), including levothyroxine, clomipramine, and, later,

---

[401] Mylan MSJ at 63 [Doc. No. 489] (citing Mylan's position as a downstream purchaser, noting that Mylan purchased pravastatin from Teva, and noting that the United States Department of Justice identified Mylan Institutional as a "potential victim" of the alleged pravastatin conspiracy).

[402] *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 529 (E.D. Pa. 2019) (internal citations and quotations omitted).

benazepril. However, Nesta did not limit the information sharing to these three drugs. Rather, there is evidence sufficient to infer that Nesta provided advance pricing information on nine drugs simultaneously, and that there were other drugs to be increased in addition to the nine listed drugs.[403]

Lubke (Sandoz) testified that she and Nesta (Mylan) shared competitively sensitive pricing information and that the two had an understanding that Nesta was sharing this information so that Sandoz could follow Mylan's increases.[404]

She also testified that she and Nesta "discussed multiple generic drugs. . . during a single phone call" and that prior to the call, she believed that Nesta "was finding the products that overlapped with Sandoz that he gave [her] in the list of products."[405] Lubke explained that the list Nesta provided was not inclusive of all upcoming price increases and "there were others."[406]

Lubke also testified that Sandoz and Mylan had an understanding that they would not "come after" each other's customers. "Mylan didn't like having their prices challenged," and "if you come after our customers, we will come after yours."[407] She also testified that in one instance, Sandoz went after a Mylan customer, ABC, but only with Nesta's consent.[408] Lubke's testimony made clear that the exchange of information placed Mylan in a vulnerable position, but Nesta did not express concern given a tacit understanding that Sandoz would follow the price increases and not hurt Mylan.

---

[403] 7/16/13 Lubke Email (PX 1292).

[404] Lubke Dep. at 710 (PX 5).

[405] Lubke Dep. at 700 (PX 5).

[406] 7/16/13 Lubke Email (PX 1292).

[407] Lubke Dep. at 702-703 (PX 5).

[408] *Id.*at 703.

Lubke's testimony regarding her interactions with Nesta is consistent with the industry "rules of engagement," which included following competitors' price increases and avoiding "poaching" each other's customers.[409]

Humana also seeks an adverse inference based on Nesta (Mylan) and Aigner's (Mylan) invocations of the Fifth Amendment. In its opinion on the *Clomipramine* bellwether, the Court declined to draw adverse inferences from these invocations, finding that it was premature. At the time of that ruling, Nesta and Aigner had agreed to withdraw their invocations of the Fifth Amendment but had not yet sat for a second deposition. Now, both have sat for secondary depositions, which were limited to the clomipramine allegations. Thus, the issue of whether to draw adverse inferences as to their answers regarding the overarching conspiracy is now ripe for the Court's consideration.

When considered alongside other evidence, a witness's invocation of the Fifth Amendment in a civil case can support an adverse inference that the testimony would have been unfavorable.[410] Such evidence can sometimes be used to draw an adverse inference in civil cases, when the silence of a corporation's personnel can be attributed to the corporation.[411] Mylan argues that the invocation of the Fifth Amendment alone cannot establish evidence sufficient to meet Humana's burden of production at summary judgment and that there is not "sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference."[412] Yet, the invocations here did not occur on blank slate. The invocations are evaluated alongside Lubke's testimony and the record evidence of contemporaneous

---

[409] *See Connecticut v. Sandoz, Inc.*, 3:20-CV-00802-MPS, 2026 WL 75851, at *11 (D. Conn. Jan. 9, 2026).

[410] *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

[411] *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986).

[412] Mylan MSJ at 10 (quoting *United States v. Local 560 Int'l Bhd. of Teamsters*, 780 F.2d 267, 292 n.32 (3d Cir. 1985)).

communications with competitors. As discussed, the topics of these conversations and communications may be reasonably inferred from evidence without considering the invocations. Thus, considered alongside the other evidence before it, the Court may draw adverse inferences from their invocations when asked whether Mylan and Sandoz colluded to exchange information, allocate customers, and fix prices.

An adverse inference may be drawn from the invocation of the Fifth Amendment as to a particular question, and the Court can draw an inference that the answer to that question would have been adverse to the claimant.[413] The invocations here are just one piece of evidence to be considered holistically in evaluating Humana's claims against Mylan.[414]

Questions to which Nesta invoked the Fifth Amendment included:

- "Did you also make it clear to Ms. Lubke during those phone calls that prices on all of the products that you discussed with her should be kept high?"
- "Did you understand from your conversations with Ms. Lubke that Sandoz would follow Mylan's price increases on the drugs that you had identified?"
- "[T]he reason you would have given this information to Della Lubke was because you knew from your conversations with her that Sandoz was going to follow those price increases by Mylan?"
- "Did you have an understanding with Della Lubke that Sandoz was not going to compete for Mylan's customers after the price increases identified in that email?";
- "Did that understanding include that in situations where Sandoz needed more market share to gain its fair share, that there would be instances where Sandoz

[413] *See Rad Servs.*, 808 F.2d at 277.

[414] *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002).

would be able to reach out to you to negotiate to get that additional market share?"

- "Did you have an understanding with Della Lubke that Sandoz was not going to compete for Mylan's customers after the price increases identified in that email?"[415]

Aigner invoked the Fifth Amendment in response to questions about Mylan and Heritage agreeing not to bid on one another's customers surrounding three drug price increases about which information was allegedly shared between the two companies.[416] When considered alongside the other evidence before the Court, a reasonable juror could infer that the answers to these questions would have been unfavorable to Mylan.

This evidence is enough to permit a reasonable juror, drawing all inferences in favor of Humana, to find that Mylan joined the overarching conspiracy by committing to the "rules of engagement." Mylan's motion for summary judgment on the overarching conspiracy claim will thus be denied.

2. Lannett

Lannett argues that Humana has failed to provide either direct or circumstantial evidence that tends to exclude the possibility of independent action relating to its overarching conspiracy claim. As there is no direct evidence in the form of testimony or documentation of Lannett's involvement in the overarching conspiracy, Humana must provide circumstantial evidence to survive summary judgment on its overarching claim against Lannett.

---

[415] Nesta Dep. at 132-142, (PX 25).

[416] Aigner Dep. (PX 24).

Humana identifies certain actions by Lannett that it argues are consistent with the industry "rules of engagement." First, with regard to baclofen, there is evidence that Lannett communicated with Teva prior to entering the market, and Teva conceded its market share to Lannett. As for levothyroxine, there is evidence that Lannett refused to seek Mylan's customers when Mylan instituted price increases.

Humana's liability expert also identifies certain instances that Humana argues establish that Lannett cooperated with and shared an understanding of the term "fair share" with its competitors.[417] Lannett argues that Humana does not identify that any use of the term "fair share" by Lannett employees correlates with a shared understanding of the term. However, Lannett points to testimony from Lannett employees as well as competitors' employees regarding their understanding of the term fair share.[418] This Court has determined that the use of the term fair share is relevant circumstantial evidence from which a jury may infer the existence of an overarching conspiracy. Given Lannett's reliance on individual testimony regarding the term fair share, there is a genuine dispute of material fact regarding its relevance to Lannett for the jury to evaluate.

Further, as recounted above, Bedrosian (Lannett) referred to Impax's following its digoxin price increase as "the usual plan"; Lannett intentionally limited itself to a set market share of baclofen prior to identifying any justification for doing so; Lannett's activity regarding digoxin overlapped with its employees participation in a trade show and timing of baclofen pricing and market decisions, which is consistent with participation in the overarching conspiracy; and Sullivan (Lannett) specifically contacted Patel (Teva), who was deeply involved

[417] Bradford Rep. ¶¶ 320, 399

[418] Lannett MSJ at 13-14 (citing testimony from Smith, Foley, McGalliard, and Lauren Carotenuto from Lannett and from Taro and Amneal regarding differing understandings of the term fair share).

in other aspects of the overarching conspiracy, following their interactions at the trade show. There is also evidence that Lannett was aware of other drug pricing factors and was influenced by price increases on other drugs, as identified by a Lannett investor telling Bedrosian (Lannett) to "think big" and identifying a 550% increase on a non-Lannett Mylan drug. This awareness of other drug pricing undercuts Lannett's argument that it would not have a motivation to engage in an overarching conspiracy including drugs it did not sell.

The Court recognizes that Lannett did not enter into any deferred prosecution agreements and none of its current or former employees pled guilty or invoked the Fifth Amendment. However, Humana has proffered sufficient evidence to reasonably infer that a jury could find Lannett's participation in the overarching conspiracy more likely than not. Lannett's motion for summary judgment on the overarching conspiracy claim will be denied.

Lannett also filed a Motion to Dismiss the overarching conspiracy claims against it, which will also be dismissed given the adequacy of the complaint and the evidence presented against Lannett at this stage.

**I. Mylan's Remaining Arguments**

Mylan raises several additional arguments in support of its motion for summary judgment that the Court will address in brief.

First, Mylan argues that Humana has not established causation as to Humana. This argument is a damages dispute that has been addressed by the Court in ruling on Defendants' Joint Motion for Summary Judgment on Damages and their Motion to Exclude Dr. Vogt. It need not address this argument once again.

Second, Mylan argues Humana fails to plead the rule of reason and thus is barred from pursuing a claim under the theory. Humana solely alleges per se violations based on a horizontal

price-fixing agreement, so Mylan is not entitled to summary judgment on any claim based on the rule of reason.

Third, Mylan argues that it cannot be held liable for activity that occurred before it joined any purported conspiracy. It does not, however, identify which conduct or damages on remaining drugs would be impacted. Accordingly, its motion for summary judgment on these grounds will be dismissed.

Fourth, Mylan argues that Humana cannot recover against Mylan based on conduct that occurred after 2015. Mylan argues that Humana does not provide evidence that the conspiracy extended beyond 2015 and does not provide evidence of Mylan conduct after 2015. To the extent the argument is based on the end date of the alleged conspiracies in general, this is a joint damages issue that will not be addressed here.

However, as to Mylan in particular and it's potential withdrawal from the conspiracies, Mylan does not report the elements of withdrawal. Thus, the Court discusses them.

"[I]n a lawsuit for federal antitrust violations, 'each member of a conspiracy is liable for all damages caused by the conspiracy's entire output.' "[419] "Mere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal."[420] Rather, the defendant must present evidence of an affirmative act demonstrating withdrawal, "typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals."[421] "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have

---

[419] *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, CV 15-6480, 2021 WL 409982 (E.D. Pa. Feb. 5, 2021) (quoting *Paper Sys. Inc. v. Nippon Paper Indus. Co., 281 F.3d 629*, 632 (7th Cir. 2002)).

[420] *United States v. Steele*, 685 F.2d 793, 803 (3d Cir. 1982).

[421] *Id*. at 803-04.

generally been regarded as sufficient to establish withdrawal or abandonment."[422] "Simply ending participation in price-fixing activity is not necessarily sufficient to show withdrawal."[423]

Mylan has presented no evidence that it withdrew from any conspiracy, so its motion for summary judgment on conduct after 2015 will be denied.

Finally, Mylan argues that there is no evidence as to a finding of liability against Mylan N.V., Mylan, Inc., or UDL Laboratories because Mylan Pharmaceuticals Inc. was the only one of its entities that had an agreement with Humana. Mylan claims that only Mylan Pharmaceuticals Inc. not Mylan N.V. or Mylan Inc., sold and distributed pharmaceuticals in the United States and that UDL Laboratories sold only to large institutional customers.

Neither Humana nor Mylan extensively discuss the issue of Mylan entities' liability, so neither will the Court. Under Federal Rule of Civil Procedure 56(c), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[424] Mylan cites only to an agreement between Mylan Pharmaceuticals and Humana and Committee Pricing Procedures of UDL Laboratories.[425] Mylan does not deny a relationship between the entities and does not establish the limiting factors on the relationships.

---

[422] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978).

[423] Winn-Dixie Stores, 2021 WL 409982, at *4.

[424] Fed. R. Civ. P. 56(c).

[425] Mylan MSJ at 69-70 [Doc. No. 489].

Humana identifies certain conversations between the president of Mylan Inc. and Jeffrey Glazer of Heritage, following which Heritage secured a customer that previously was a Mylan customer. This evidence supports a reasonable inference that Mylan Inc.'s president was aware of Mylan Pharmaceutical's participation in a conspiracy.[426]

As Humana recognizes, "corporate interrelationships . . . are not determinative of the applicability of the Sherman Act" because the Act "is aimed at substance rather than form."[427] The evidence Mylan identifies does not establish that there is no genuine dispute of material fact as to the substance of its entities' actions. Accordingly, it is a question for the jury whether each Mylan entity may be liable.

## IV. CONCLUSION

For the reasons stated herein, the Joint Motion for Summary Judgment on the overarching conspiracy will be denied; Mylan's individual motion for summary judgment will be denied in its entirety; Lannett's motion for summary judgment will be denied in its entirety; and Lannett's Motion to Dismiss will be denied. An order will be entered.

[426] Humana Opp'n at 277 [Doc. No. 598].

[427] Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 192-93 (2010).